```
IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - x
THE UNITED STATES OF AMERICA,

                              Criminal Action No.
             Plaintiff,       1:19-cr-00148-CKK-1
                              Monday, March 27, 2023
vs.                           8:54 a.m.
                              *MORNING SESSION*
PRAKAZREL MICHEL,

             Defendant.
- - - - - - - - - - - - - - - x
_____

                TRANSCRIPT OF JURY TRIAL
     HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                UNITED STATES DISTRICT JUDGE
_____
```

APPEARANCES:

For the United States:        **JOHN DIXON KELLER, ESQ.**
                              **U.S. DEPARTMENT OF JUSTICE**
                              1301 New York Avenue NW
                              Suite 1016
                              Washington, DC 20530
                              (202) 598-2231
                              john.keller2@usdoj.gov

                              **SEAN F. MULRYNE, ESQ.**
                              **NICOLE RAE LOCKHART, ESQ.**
                              **U.S. DEPARTMENT OF JUSTICE**
                              Public Integrity Section
                              1400 New York Avenue, NW
                              Washington, DC 20005
                              (202) 598-2816
                              sean.mulryne@usdoj.gov
                              nicole.lockhart@usdoj.gov

For the Defendant:            **DAVID ELLIOTT KENNER, ESQ.**
                              **ALON ISRAELY, ESQ.**
                              **KENNER LAW FIRM**
                              16633 Ventura Boulevard
                              Encino, CA 91436
                              (818) 995-1195
                              david@kennerlaw.com
                              aicb@biaprotect.com

(Continued on Next Page)

```
 1      APPEARANCES (CONTINUED):

 2      For the Defendant:          CHARLES R. HASKELL, ESQ.
                                    LAW OFFICES OF CHARLES R.
 3                                  HASKELL, P.A.
                                    641 Indiana Avenue, NW
 4                                  Washington, DC 20004
                                    (202) 888-2728
 5                                  charles@charleshaskell.com

 6
        Court Reporter:             Lisa A. Moreira, RDR, CRR
 7                                  Official Court Reporter
                                    U.S. Courthouse, Room 6718
 8                                  333 Constitution Avenue, NW
                                    Washington, DC  20001
 9                                  (202) 354-3187

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Criminal Case 19-148-1, the

3    United States vs. Prakazrel Michel.

4              Counsel, please identify yourself for the record,

5    starting with the government.

6              MR. KELLER:  John Keller on behalf of the

7    government, Your Honor, along with my colleagues, Nicole

8    Lockhart and Sean Mulryne.

9              THE COURT:  All right.  Good morning, everyone.

10             MR. KENNER:  Good morning, Your Honor; David

11   Kenner, along with Charles Haskell and Alon Israely with the

12   defense currently in the courtroom.

13             THE COURT:  Okay.

14             All right.  There was one preliminary issue

15   relating to the voir dire where you requested as part of the

16   description that for the paragraphs "The Statement of Case,"

17   that we add to the second, third, and fourth, which talks

18   about the different aspects of the indictment, the language

19   "not to register as a foreign agent under Foreign Agents

20   Registration Act when they allegedly attempted to," and then

21   the rest of the language.  I'm not going to add the

22   language.  I agree with the government.

23             One, I think it's confusing.  These are supposed

24   to be -- these are not final instructions to them.  We have

25   something that relates to FARA -- F-A-R-A the acronym --
```

1    that is when we ask questions in terms of what their

2    knowledge or whatever would be.

3            The other thing is that I believe that at least in

4    terms of the description, I think Paragraphs 3 and 4, it

5    wouldn't be accurate because I don't think FARA applies.  So

6    I'm not going to be giving that language.

7            Are there other things that need to be said?  The

8    one thing I would remind everybody, please read my orders,

9    okay?  Because I do get them out, and they do have

10    information in terms -- so you know what I've ruled on.

11            Also, make sure you look at my trial procedure

12    orders, which sets out very specifically in terms of when

13    you should file things so that we can do this efficiently

14    and without burden on everybody if you're bringing issues

15    up.

16            So obviously in trials we try to do things in

17    advance.  That never totally works.  So there are going to

18    be things that come up in the evening that you're going to

19    need to bring to my attention.

20            But I'd appreciate it if you'd follow what I've

21    set out as a specific procedure, which should work for

22    everybody, but it also gives the other side opportunities to

23    respond and me to get enough time to get a ruling out so you

24    know what I'm going to rule on.  If you do this at the last

25    minute, you're going to get rulings at the last minute,

 1    which is not useful.

 2            I think the boxes may be a little -- is that going

 3    to be our problem, having them that high eventually over

 4    there with the jury?

 5            THE COURTROOM DEPUTY:  Yes.

 6            THE COURT:  Okay.  You may need to spread them out

 7    a little bit because when we -- nobody's going to be able to

 8    see over it, for one thing, in terms of whoever is behind

 9    it.

10            We don't need to do it this instant.

11            We are going to start in the ceremonial courtroom.

12    They'll let us know when they're going to be sending them

13    down; so you can go down there, get yourself set up, and

14    then they'll bring the jury in.

15            They will stay there.  They'll bring them in one

16    by one.  We'll do the inquiry in here.

17            What are all of those things?

18            MR. KELLER:  Your Honor, those are copies of the

19    government exhibits for the Court and for the jurors.

20            THE COURT:  Okay.  That's not going to work there.

21            Okay.  We'll wheel them in the back for now

22    because we'll have the juror -- can we do it in the jury

23    box, or you want to do it in the witness?

24            THE COURTROOM DEPUTY:  The witness box.

25            THE COURT:  The witness box.  Okay.

```
 1              But I think if we -- we'll wheel those out.  We
 2      have a little bit of time.
 3              They're still doing attendance, right, Dorothy?
 4              THE COURTROOM DEPUTY:  Yes.
 5              THE COURT:  All right.  We'll move those over.
 6              They're going to stay in there.  The jurors, if
 7      they're excused for cause, they can go home.  Since they're
 8      a special panel, they don't have to go to the jury office.
 9              If they're not excused, we'll be sending them to
10      the courtroom next door so that they can wait there as
11      opposed to having them go back to the ceremonial courtroom
12      where they start talking to each other about what they were
13      asked or whatever.  They're told not to do that.
14              All right.  Are there any other issues that we
15      need to talk about now?
16              Did you reach some stipulations, I hope, about
17      exhibits, et cetera?
18              MR. KELLER:  We did, Your Honor, and we filed
19      those on the docket.
20              THE COURT:  Okay.  Are they related to the
21      documents themselves?
22              MR. KELLER:  Yes, they're related to business
23      records and public records, and there's one stipulation as
24      to a fact.
25              THE COURT:  Okay.  So in terms of that, if you
```

1  want me to read it to the jury, let me know at what point

2  you want it done.  And I need to have a copy of it.

3  Do you have the exhibit list and witness list in

4  the boxes, or separate?

5  MR. KELLER:  We have them available here for the

6  Court, Your Honor.  We have the updated notional witness

7  list kind of trimmed down from the original witness list.

8  And then we have the list with all of the cities and states

9  and the places of employment for the witnesses.  And then I

10  don't know if the Court --

11  THE COURT:  I don't need all of that.  You're

12  going to be doing all of that because you're introducing the

13  witnesses.

14  I need the witness list and the -- Ms. Patterson

15  and the court reporter need that, and we need the exhibit

16  list.

17  You know, the rest of the information is something

18  that you would be presenting.  I don't necessarily have to

19  have that, but I do need -- we do need the witness list and

20  the exhibit list at some point before we start.

21  MR. KELLER:  Did the Court want four copies in

22  total?

23  THE COURT:  Yes, that would be helpful.

24  MR. KELLER:  Okay.

25  THE COURT:  That way I can have one out here and

```
 1    one in chambers.  Okay?

 2                Anything -- Mr. Kenner, anything else from you?

 3                MR. KENNER:  No, Your Honor.  We're good.

 4                THE COURT:  All right.  Then I think what I'm

 5    going to do is I'm going to get off the bench.

 6                And as soon as we get notice, Dorothy -- do you

 7    need Sam to help you?

 8                THE COURTROOM DEPUTY:  Yes.  He can come up now,

 9    yes.

10                THE COURT:  Did you get anybody else to help you?

11                THE COURTROOM DEPUTY:  No, just Sam.

12                (Discussion off the record)

13                THE COURT:  Okay.  I think what we'll do is,

14    unless you have to talk about something, I'm going to ask

15    you to go down to the ceremonial courtroom yourself.  Set

16    yourself up.  You don't have to take anything because all

17    we're going to do in there is read the voir dire questions,

18    period, and then we'll be back here.  So that's why I had

19    you come here so you can set up.

20                So why don't you go down there.  They're not

21    immediately ready.  I mean, it's 80 people we're getting, or

22    90, so it takes time to, you know, have them go through.

23    They have to do the list, et cetera.  But you might as well

24    wait down there as opposed to waiting in here.  Okay?

25                So you can make your way down there, if you would,
```

1    and so you'll be there when they start bringing the jury in,

2    and then I'll come down and read the questions.  Okay?

3              Any questions at this point?

4              MR. KENNER:  Your Honor --

5              THE COURT:  Do you have your chair?

6              MR. KENNER:  I'm sorry, I omitted something.  Does

7    the Court want us to include with the witness list a list of

8    all of the names of people who will be referenced during the

9    testimony?

10             THE COURT:  It would be helpful to have a

11   reference, you know, to them.  Obviously some people you're

12   going to recognize.  If you're going to be talking about the

13   president's names, I'm not sure you need to do that, but if

14   there are other names -- in other words, I would leave out

15   the ones that most people are going to know, which are the

16   presidents.  You don't need to mention those.

17             But I would -- other people you should bring up,

18   just in case they know them from some other aspect.  Even if

19   there's testimony about it, and it turns out they know them,

20   we need to know that in advance.

21             MR. KENNER:  Yes.  I have prepared that.  I just

22   wanted to make sure Your Honor wanted it.

23             THE COURT:  Yes, but I'd leave out the presidents.

24   Everybody is going to know who was president, at least I

25   hope so.

```
 1                    MR. KENNER:  Thank you, Your Honor.

 2                    THE COURT:  All right.  Okay.

 3                    (Recess taken)

 4                    THE COURT:  Good morning, everyone.

 5                    PROSPECTIVE JURORS IN UNISON:  Good morning.

 6                    THE COURT:  I'll be the presiding judge.  I'm

 7      Judge Colleen Kollar-Kotelly, and you've been called to this

 8      courtroom for possible selection as jurors in a case

 9      entitled United States against Prakazrel Michel.

10                    The defendant, Mr. Michel, is charged with

11      conspiracy -- these are general terms to just give you a

12      sense of what the case is about -- is charged with

13      conspiracy to defraud the United States and to make illegal

14      foreign and conduit contributions to political campaign

15      committees; concealing material facts and making false

16      entries regarding those allegedly unlawful contributions to

17      the political campaign committees; witness tampering;

18      conspiracy to serve as an unregistered agent of a foreign

19      principal in a foreign government; and to commit money

20      laundering; acting as an unregistered agent of a foreign

21      principal; acting as an agent of a foreign government; and

22      conspiracy to make false statements to banks.

23                    So that just gives you a very broad background.

24                    So the process of jury selection is called the

25      voir dire process, and its object is to select 12 jurors --
```

1    in this case we'll have three alternates -- who have no

2    prior knowledge concerning this case and no bias toward

3    either side in this case.

4          In short, it is our aim to select a jury that will

5    reach a verdict based solely on the evidence presented in

6    the courtroom and the law as I instruct you.

7          So at this point, what I'm going to ask is if all

8    of you could stand.  We need to swear you in.

9          (Venire sworn)

10          THE COURT:  Now we're about to begin the procedure

11    that we call voir dire.  And just historically, the word

12    "voir dire" is a legal term which comes from the French

13    language and means to speak truthfully.  The origin of voir

14    dire helps explain the purpose of the questions that we're

15    going to be going through.  It's the time at the beginning

16    of a trial when a jury of 12 jurors and three alternates are

17    selected, and I'll be asking you some questions that the

18    lawyers and I think will be helpful to us in selecting a

19    fair and impartial jury.  And you, of course, are bound by

20    the oath that you've just taken to speak truthfully in

21    response to these questions.

22          Now, the purpose of the questions is to find out

23    if you know anything about the facts of the particular case,

24    if you know the attorneys -- and they'll be introduced to

25    you -- Prakazrel Michel, the defendant, any of the witnesses

1    or anyone else connected with the case.  It's also to help

2    the parties choose a jury that's going to be fair and

3    impartial, that will make a decision based only on the

4    evidence presented in the courtroom, and will follow my

5    instructions and be fair with both sides.

6           Now, you've been given hopefully a note card.

7    Does everybody have a note card?  Okay.  And either a pen or

8    a pencil.  And I'll ask you, if you have not done so

9    already, if you would write your juror number on one side.

10          All right.  I see heads up.

11          If for some reason you can't hear me or didn't

12   understand something, please don't hesitate to put your hand

13   up.  Okay.

14          PROSPECTIVE JUROR:  My pen doesn't work.

15          THE COURT:  Oh, okay.  We'll definitely get you a

16   better one.

17          Now, what I'm going to be doing during this

18   process is I'm going to introduce you to all of the

19   participants.  I'll also be asking a series of questions.

20   Now, if your answer to any of these questions is yes, or you

21   have information to provide in response to the question,

22   then please put the number of the question on your card.

23          You don't need to put anything else unless you

24   need to put something there to remind you of what it is that

25   you want to bring to my attention.  Only put the number of

1    the question that you have information to provide me and

2    counsel.  Don't write down all the questions -- the numbers.

3            At the end, after I've gone through all of the

4    questions, we'll be bringing you to another courtroom one by

5    one and going over the answers to those questions.  So I'd

6    ask that you not write all the questions down.  Only write

7    the ones where you have information to provide the Court and

8    counsel.

9            If you need to have a question repeated for

10   whatever reason or you can't hear it or you just need to

11   hear it again because you're not sure you understood it,

12   please put your hand up -- put it up really high so I won't

13   miss you -- get my attention, and I'll go over the question

14   again.

15           If you're not sure exactly whether the information

16   you have fits the question, just put the number down.  We'll

17   talk about it later and see if it does actually answer that

18   question.

19           I have a catch-all question at the end.  That's

20   going to be Question 42.  So if we go through this process

21   and you think of some information in response to an earlier

22   question and you can't remember the number to that, just put

23   this catch-all question number down.  I'll identify it for

24   you when we get there, and you can bring up the information

25   in that context.

1           Now, we'll be exploring in these questions not

2    only trying to find out what you know and who you recognize

3    in terms of people involved in the case, but to explore, to

4    some degree, your opinions or your views on issues that we

5    think are related to the case.  And we'll have some requests

6    about some limited personal information.

7           All of this is being requested to aid the Court

8    and the parties in selecting an impartial jury.

9           Now, also, now that you're a prospective juror,

10   you must follow the following instructions until you've been

11   excused from further service in this case.

12          Do not communicate with anyone about the case on

13   your cell phone, tablet, email, iPhone, text messaging,

14   Twitter, blogs, websites -- you fill in the blanks if I

15   don't do it -- TikTok, Twitter, whatever, LinkedIn.  There

16   are so many of them, I keep adding to the list.  But at any

17   rate, I don't want you communicating in any way on them.

18          If you communicate, you're going to get an answer,

19   and the problem with that is in them providing you

20   information, which I don't want to have happen.  All of the

21   information you need you'll be hearing as part of this case.

22          Do not read anything about this case.  I don't

23   know whether there's going to be publicity, but if there is,

24   then I would ask that you avoid newspaper accounts or

25   anything on your iPhones that may relate to this case, TV,

1    whatever.

2              Also, I'd ask that you not watch TV shows or

3    listen to radio shows that could influence your decision in

4    this case; and that I'll leave to your own judgment.  You'll

5    get a sense of what the case is about shortly.

6              Do not read or listen to any news accounts.

7    Again, it can be whether you're looking at the short news

8    accounts on your phones or any other way.  Please don't do

9    that.

10             Do not at any time discuss the case with anyone,

11   including members of your family, which I know is sometimes

12   difficult, close friends, colleagues, acquaintances, or

13   other members of the jury panel.  Again, you start to talk

14   to them, they'll start giving you information or questions,

15   and that creates a problem.

16             If you are selected here's what you say.  You're

17   selected in a criminal case, period.  You don't need to say

18   anything else, at least until after the trial is completed.

19             Now, do not let anyone, including your family

20   members, close friends, colleagues, acquaintances, court

21   personnel, parties or persons involved in the case, talk to

22   you about your views or any aspect of this case except

23   officially in the courtroom.

24             Now, as I've indicated, this is a criminal case,

25   and I want to go through a couple of legal principles that I

1    want to make sure that you are willing to follow.

2         First, this is Question No. 1, the defendant,

3    Mr. Michel, has been charged in what we call an indictment.

4    An indictment is just the formal way of informing a

5    defendant of the nature of the charges against him.  You're

6    not to consider the indictment as any indication of guilt.

7         In a criminal trial every defendant is presumed to

8    be innocent.  This presumption remains with him throughout

9    the trial unless and until he's had every element of every

10   charge against him proven beyond a reasonable doubt.

11        The burden of proving him guilty beyond a

12   reasonable doubt rests with the government, and the burden

13   never shifts during the course of the trial.  A defendant

14   doesn't have to prove his innocence, produce any evidence,

15   or testify.

16        So the fact that he's been indicted is simply to

17   inform him of the charges.  There should be no inference of

18   guilt based on that.

19        Now, those principles of law will underlie the

20   trial in this case.

21        If there's anyone who believes that they would be

22   unable -- in other words, not able -- to follow those

23   principles of law if selected as a juror in this trial, put

24   number 1 on your card.  And this is the fact that an

25   indictment, you're not to infer guilt; that it has to

1    be proved on every element of each charge beyond a

2    reasonable doubt; and that it's the government's burden and

3    not Mr. Michel's.

4            Moving on to Question 2.  As I've explained, every

5    defendant is entitled to a presumption of innocence.

6    Nevertheless, do you think a defendant should have to prove

7    their innocence merely because they have been charged with a

8    crime?

9            Now, you shouldn't have that view, but if you do,

10   please put number 2 on the card.

11           No. 3:  If it should come to pass, after you've

12   heard all the evidence, the arguments of the lawyers, and my

13   instructions in the law, that you are then persuaded by the

14   trial itself that the defendant is guilty of the charge

15   beyond a reasonable doubt, then it would be your duty to

16   vote guilty.

17           Is there anyone who believes that they would be

18   unable to carry out that duty?  If you think so, please put

19   No. 3 on your card.

20           Now, No. 4:  On the other hand, after you've heard

21   all the evidence, the arguments of the lawyers, and my

22   instructions in the law, if you then have a reasonable doubt

23   as to the defendant's guilt of the charge, then it would be

24   your duty to vote not guilty.

25           If there's anyone who believes that they would not

1    be able to carry out that responsibility, please put No. 4

2    on your card.

3         Now, I'm going to briefly state some background

4    information relating to the criminal charges that are at

5    issue.  This is what the government has indicated the

6    charges are about and what the defendant has indicated is

7    his defense.  I'm providing this information in order to

8    inform you of why we're going to be asking some of the

9    questions that will follow.

10        So the indictment in this case charges what I will

11   characterize as four categories of unlawful conspiracies and

12   violations of criminal law associated with those

13   conspiracies.  So, again, this is to give you background

14   information.

15        First, the indictment claims that Mr. Michel

16   unlawfully conspired with a foreign national, Low Taek

17   Jho -- this is spelled L-O-W, T-A-E-K is the second, and

18   J-H-O; I'll be calling him Mr. Low -- to violate federal

19   election law prohibitions against making political

20   contributions using the name of another person and using

21   foreign funds.  The indictment claims that Mr. Michel did so

22   in order to contribute money to two campaign committees

23   associated with former President Barack Obama's 2012 re-

24   election for president of the United States.  It further

25   claims that Mr. Michel used what the law terms as "straw

1    donors," individuals to whom Mr. Michel allegedly gave

2    money who would then make contributions in their name, when

3    Mr. Michel or another person was the true contributor.

4          Mr. Michel denies these allegations.

5          Second, the indictment claims that Mr. Michel

6    conspired with Mr. Low and others, including, but not

7    limited to, Elliott Broidy, B-R-O-I-D-Y, George

8    Higginbotham, and Nickie Lum, L-U-M, Davis, to lobby the

9    administration of former President Donald Trump to close an

10   investigation into Mr. Low and others for the alleged theft

11   of assets owned by a Malaysian sovereign wealth fund named

12   IMDB, and those are capital letters.  The indictment claims

13   that Mr. Michel aided and abetted others in lobbying the

14   Trump Administration to do so and did not register with the

15   Department of Justice before engaging in such activities

16   knowing that he was required to do so by law.

17         It further claims that Mr. Michel conspired with

18   Mr. Low and others to launder money from foreign sources

19   into the United States to support these alleged lobbying

20   efforts, and then conspired with others to launder the money

21   within the United States in an alleged effort to conceal the

22   true source and purpose of the funds.

23         As to these alleged activities, Mr. Michel

24   maintains his innocence and argues that he never intended to

25   influence then-President Trump's administration with respect

to Mr. Low, had no power to do so, and never attempted to do

so.  Rather, he claims that throughout the time of this

alleged conspiracy he attempted to raise funds for certain

entertainment projects and to appease foreign investors in

those entertainment projects.

Third, the indictment claims that Mr. Michel

conspired with Mr. Low and others -- again including, but

not limited to, Elliott Broidy, George Higginbotham, Nickie

Lum Davis, and an official of the government of the People's

Republic of China -- to lobby the administration of Former

President Trump to return a Chinese national residing in the

United States, Guo Wengui -- G-U-O, and his last name is

W-E-N-G-U-I, who I will call "Mr. Guo" -- back to the

People's Republic of China.

The indictment further alleges that Mr. Michel in

fact agreed to assist the People's Republic of China as its

agent and aided and abetted others in lobbying the

administration of former President Trump to return Mr. Guo

to China.

As to these alleged activities, Mr. Michel

maintains his innocence and argues that he never intended to

influence the Trump Administration with respect to Mr. Low,

had no power to do so, and never attempted to do so.

Rather, he claims that throughout the time of this alleged

conspiracy he attempted to raise funds for certain

1    entertainment projects and to appease foreign investors in

2    those entertainment projects.  Mr. Michel maintains that he

3    was acting in his artistic persona throughout the time of

4    this alleged conspiracy, and that he attempted to assist

5    federal law enforcement during this time.

6          Fourth and last, the indictment claims that

7    Mr. Michel conspired with Mr. Higginbotham to make false

8    statements to domestic financial institutions in furtherance

9    of the alleged offenses.  As to these alleged activities,

10   Mr. Michel maintains his innocence.

11         So that gives you a background idea of what's

12   involved and why we're going to be asking some of these

13   questions.

14         So Question No. 5:  Are you familiar with the

15   facts of this case from any source?  In other words, have

16   you heard about it in some way either from friends,

17   newspapers, radio, TV, whatever?  It doesn't matter what the

18   source is, but if you have in some way and are familiar with

19   it, please put No. 5 down.

20         Now, I'm going to be introducing you to counsel --

21   and this is Question No. 6 -- in order to find out whether

22   you know any of these individuals.

23         The government is represented by trial attorneys

24   John Keller -- if you would stand, please; this is Mr.

25   Keller -- Sean Mulryne -- this is Mr. Mulryne -- Nicole

1    Lockhart.  They will be assisted at one point by Dinora

2    Orozco and Martese Johnson.  These are paralegals.  All of

3    them work for the Public Integrity Section of the Department

4    of Justice.  Their offices are located at 1301 New York

5    Avenue, Northwest.

6              Now, do you know any of the government attorneys

7    in any capacity?

8              And the two paralegals are over here on my right.

9    They're standing.

10             So if you know either the attorneys or either of

11   the paralegals, please put No. 6 down.  And you might just

12   put who it is so you know who we're talking about.

13             Thank you.  You can go ahead and sit down.

14             Now 7 is additionally the Department of Justice

15   Office of the Inspector General has an agent in charge, and

16   that's Harry Lidsky -- he's over here to my right -- and FBI

17   Special Agent Robert...

18             MR. HEUCHLING:  Heuchling, Your Honor.

19             THE COURT:  Heuchling.  H-E-U-C-H-L-I-N-G.

20             So if you know either of them, please put No. 7 on

21   your card and put down either the inspector general or the

22   FBI.  If you know any of them in any capacity, please put 7.

23   Thank you.

24             No. 8 is -- let me introduce you to the defendant

25   in this case, Prakazrel Michel.  Mr. Michel, if you would

1      please stand.

2              Do any of you know Mr. Michel personally?  If you

3      do, please put No. 8 down.

4              All right.  Thank you, Mr. Michel.

5              No. 9 is do any of you otherwise know Mr. Michel

6      in such a way as to affect your fair and impartial service

7      as a juror in this case?

8              So No. 8 is whether you know him personally.

9              No. 9 is whether you know him or know something

10     about him that would affect your fairness and impartiality

11     as a juror in this case.  If you know him in that capacity

12     and feel that you could not be fair and impartial if you

13     were selected as a juror, please put No. 9 on your card.

14             Now, 10 are the attorneys representing Mr. Michel.

15     He's represented by David Kenner over here to my left,

16     Charles Haskell, Kriss Anne Carlstrom.  Is she here?  No,

17     she's not.

18             MR. HASKELL:  She's not present.

19             THE COURT:  Okay.  That's C-A-R-L-S-T-R-O-M, if

20     anyone knows her.

21             And Mr. Kenner's office and Mr. Israely's office

22     are located at 16633 Ventura Boulevard, Encino, California.

23     Mr. Haskell's office is located at 641 Indiana Avenue, N.W.,

24     in D.C.  And Ms. Carlstrom's office is located in Charlotte,

25     North Carolina.

1          So of those that are here or in terms of the

2    names, do any of you know any of the defense counsel in this

3    case?  If you do, please put No. 10 on your card.

4          Now, No. 11, also sitting at defense counsel table

5    will be Kathryn Lestelle, L-E-S-T-E-L-L-E; Lois Heaney, H-E-

6    A-N-E-Y; and Liquori Campbell, L-I-Q-U-O-R-I.  So if you

7    know any of the ones either by name or that you see here,

8    please put No. 11 on your card.

9          Now, let me move to Question No. 12.  Does any

10   member of the jury panel know any other member of the panel;

11   for example, from work, school, socially, prior jury

12   service, or from the neighborhood?  And what I want you to

13   do is to look around at your fellow jurors.

14         Take a good look.  I know there's a lot of you

15   here.  Look around.  Don't be shy.  If you need to stand up

16   or whatever, I don't have a problem.  We're going to take a

17   little bit of time here.

18         What I want you to do is see whether you know, you

19   know, somebody else.  And, again, it can be from some time

20   ago or recently.  And this may be the opportunity to hook up

21   with old friends.

22         But anyway, look around and see whether you know

23   anybody.  If you do, please put No. 12 on your card.

24         I would also ask if you could figure out roughly

25   where you think that person is seated -- you know, the

1     center or the back, whatever -- so when you come up to the

2     bench and we ask you about that, you can tell us where that

3     person is.

4              So, again, if you recognize somebody from the jury

5     panel in the courtroom from some other aspect of your life,

6     please put No. 12 on the card.

7              Now No. 13.  At this point, for the next two

8     questions, I'm going to be asking counsel to introduce

9     witnesses.  We don't have them here.  There is a fair number

10    of them.

11             These people that they're going to introduce may

12    or may not be the subject of testimony of witnesses.  In

13    other words, some of these may be witnesses.  Some of them,

14    names may come up about them.

15             I've asked them to introduce everybody they could

16    possibly call.  That doesn't mean they're going to call all

17    of them, but I want to make sure that if you know them, that

18    you tell us so we don't proceed and then find out that you

19    know somebody very well that, you know, winds up being

20    called.  So I've asked them to be as inclusive as possible.

21             And the question I'm going to ask is whether you

22    know any of the witnesses personally that have been

23    introduced to you or know any of the witnesses by reputation

24    in such a way that it would affect your fairness and

25    impartiality in this case.  Part of it is personally,

1    doesn't matter how, and also you may recognize some of these

2    people and know them by reputation.

3              But if their reputation is such that you think it

4    would affect your fairness and impartiality, then you need

5    to put the number down.  All right?  And you'll see when

6    they give the list of witnesses why I've asked the second

7    question.

8              So 13 is going to be the government witnesses.

9    They'll go through them slowly and carefully.  They're going

10   to give you a little bit of background information relating

11   to these witnesses to hopefully identify them for you.  And

12   the question is whether you know them personally, you know,

13   in terms of -- and the other, if you don't know them

14   personally, but these are people that you know by

15   reputation.  And if that reputation, from your perspective,

16   would affect your fairness and impartiality, then you need

17   to put 13 down.

18             So if you can proceed.

19             And if you could spell some of the names.  They're

20   not that typical.

21             MR. HASKELL:  Thank you, Your Honor.

22             Good morning.  This will include witness names,

23   city of residence, and place of employment.

24             Frank White, Washington, D.C., business owner.

25             Tysa Wright; Los Angeles, California; Gypsy

```
 1   Paradise --
 2              THE COURT:  Slow down, slow down, so that these
 3   names -- start again.  These names have to sink in for them
 4   to think:  Do I know this person?
 5              MR. HASKELL:  Yes, Your Honor.
 6              THE COURT:  Okay.
 7              MR. HASKELL:  Frank White in Washington, D.C.,
 8   business owner.
 9              Tysa Wright; Los Angeles, California; Gypsy
10   Paradise.
11              Jack Brewer; Fort Lauderdale, Florida; The Brewer
12   Group.
13              William Kirk; Washington, D.C.; K&L Gates.
14              John Kelly; Manassas, Virginia; retired.
15              Allan Maragh -- spelled M-A-R-A-G-H -- Los
16   Angeles, California; City National Bank.
17              Marc Moscowitz -- M-O-S-C-O-W-I-T-Z -- New York,
18   New York; self-employed.
19              Eric Feigenbaum -- F-E-I-G-E-N-B-A-U-M -- New
20   York, New York; Versant.
21              Steve Wynn; Las Vegas, Nevada; self-employed.
22              Ashley Carranza; San Antonio, Texas; formerly
23   Citibank.
24              Ron Vinder; New York, New York; Morgan Stanley.
25              Neville Richardson; San Francisco, California;
```

1    investment advisor.

2             Richard Kromka; Los Angeles, California; EC M&N --

3    I'm sorry, M&A.

4             Claudine Oriol; New York, New York; filmmaker.

5             Edgar Mejia; Monrovia, California; Conexion.

6             Jason McCall; Grapevine, Texas; investor.

7             Ferrydoon Ardehali -- last name A-R-D-E-H-A-L-I --

8    Staten Island, New York; Integrity First Group.

9             Joseph Ronquillo; Los Angeles, California;

10   entertainment agent.

11            Randall Toussaint; Port Au Prince, Haiti; Panexus

12   Haiti.

13            Naomi Firestone; Capetown, South Africa;

14   unemployed.

15            Mark Richard Hilaire; New York, New York; doctor.

16            Neda Shojai -- S-H-O-J-A-I -- Staten Island, New

17   York; Integrity First Group.

18            William Rutherford; West Orange, New Jersey;

19   Ebenezer Church.

20            Leonardo DiCaprio; Los Angeles, California; actor.

21            Matt Pottinger; Salt Lake City, Utah; consultant.

22            David Sugarman; Miami Florida; Private Equity.

23            Loic Gouzer; New York, New York; art dealer.

24            Paige Rolfe; Los Angeles, California; unknown.

25            Jana Aristizabal -- last name A-R-I-S-T-I-Z-A-B-

1    A-L -- Fort Lauderdale, Florida; Marcum.

2              George Higginbotham; Washington, D.C.; Citadel

3    Firm, LLC.

4              Michael Hartsock; Washington, D.C.; Federal

5    Election Commission.

6              Elliott Broidy; West Palm Beach, Florida; self-

7    employed.

8              Rudolph Moise; Fort Lauderdale, Florida;

9    physician.

10              Nickie Lum Davis; Los Angeles, California; self-

11    employed.

12              Heather Hunt, Department of Justice.

13              H.R. McMaster; Palo Alto, California; Stanford.

14              Ricky Waddell; Orlando, Florida; contractor.

15              Barry Bekkedam; Hobe Sound, Florida; self-

16    employed.

17              Rob Willis; Los Angeles, California; food service.

18              Joel Rousseau; New York, New York; self-employed.

19              Steven Plotnick; New York, New York; attorney.

20              April McDaniel; Los Angeles, California; Crown +

21    Conquer.

22              FBI Special Agent Robert Heuchling.

23              FBI Supervisory Special Agent Andrew Zitman.

24              FBI Special Agent Justin Gray.

25              FBI's analyst, Eric Van Dorn.

 1              DOJ OIG Assistant Special Agent in Charge, Harry

 2     Lidsky.

 3              FBI Staff Operations Specialist, Evie Henry.

 4              Tom Reynolds, formerly CitiBank N.A.

 5              Michael Sun; New York, New York; Citibank.

 6              Michelle Lipson; Fort Lauderdale, Florida; Marcum.

 7              DOJ OIG Senior Digital Investigator Analyst,

 8     Shervin Jalali, J-A-L-A-L-I.

 9              And lastly, Leticia Santos; Los Angeles,

10     California; City National Bank.

11              THE COURT:  All right.  So if you know any of

12     these people or you think you know any of these people,

13     please put No. 13 down.

14              Now, No. 14 are the defendant's witnesses.

15     Mr. Michel, of course, has no obligation to present any

16     evidence or any witnesses.  However, if Mr. Michel and his

17     attorney choose to call a witness or witnesses, then you may

18     hear testimony from or about the following persons.  So he's

19     not obliged to put on any defense or put on any witnesses,

20     but we want to make sure that if he decides to do so, that

21     we know whether you know them.

22              So, again, do you know any of these additional

23     witnesses personally -- they will be introduced to you

24     shortly -- or know any of these witnesses in such a way that

25     it would affect your fairness and impartiality as a juror in

1    this case, and that's reputation or otherwise?

2             So 14 is whether you know them or whether you know

3    of them in such a way that you think it would affect your

4    fairness and impartiality.

5             So if you recognize anybody, it's 14.

6             So defense counsel.

7             MR. KENNER:  Steven Bannon, Eric --

8             THE COURT:  I think you're going to need to -- if

9    you wish to remain seated, I don't have a problem, but you

10   need to speak more clearly into the microphone.

11            MR. KENNER:  Thank you.

12            Steven Bannon.

13            THE COURT:  Can you start from the beginning.  I'm

14   sorry, sir.

15            MR. KENNER:  Yes.

16            THE COURT:  And speak in a really loud voice so

17   that the people in the back can hear you.

18            MR. KENNER:  Steven Bannon, Barry Bekkedam,

19   Elliott Broidy --

20            THE COURT:  Were you going to provide some

21   information about who they are?

22            MR. KENNER:  Yes.  I can do that, Your Honor.

23            THE COURT:  I would do it as you go along.

24            MR. KENNER:  Okay.  Steven Bannon is an associate

25   of President Trump.

```
1                  Barry Bekkedam is a financial advisor.

2                  Elliott Broidy is another Trump associate.

3                  Jack Devlin is an accountant.

4                  THE COURT:  Okay.  Slow down.  Slow down.

5                  Can people hear him in the back?  You're nodding,

6       okay.  Go ahead, sir.

7                  MR. KENNER:  Shomik Dutta, involved in a company

8       called DuSable.

9                  THE COURT:  Can you spell the last name, please.

10                 MR. KENNER:  Yes, Dutta, D-U-T-T-A.  And the

11      company is DuSable is D-U-S-A-B-L-E.

12                 Some of them the witness list is inclusive of some

13      government witnesses.

14                 The next one is Leonardo DiCaprio.

15                 THE COURT:  You don't need -- sir, you don't need

16      to do them again.

17                 Witnesses don't belong to each other, so if

18      they've already indicated it, there's no reason to do it

19      again.  It should be any additional witnesses.  That would

20      make it easier, Mr. Kenner.

21                 MR. KENNER:  Shomik Dutta.

22                 Richard Gates, a Trump associate.

23                 Rudolph Gifford from the Obama campaign in 2012.

24      Rudolph Giuliani at one time retained by Mr. Low, former

25      mayor of New York and, I'm not sure, but I think he's still
```

1    a practicing lawyer.

2            Loic Gouzer, G-O-U-Z-E-R, from Christie's Auction

3    House.

4            Michael Hartsock.

5            Erica Hilliard, who is an assistant of Mr. Broidy.

6            Heather Hunt, who is with the FARA commission.

7            Jeff -- I'm sorry, William Kirk.

8            Kathryn Lestelle; Riverside, California; L-E-S-T-

9    E-L-L-E, Kathryn with a K.  And she is the investigator for

10   the defense lawyers.

11           Tricia Lum, who is the sister of Nickie Lum Davis.

12           Rich Malone, who is an accountant and formerly

13   worked for the United States government, both the DEA and

14   the FBI -- I'm sorry, and the tax people, the IRS.

15           Jason McCall, who was an associate of Frank

16   White's.

17           H.R. McMaster, who is a Trump associate.

18           Marc Moscowitz, who is an accountant.

19           Matthew Pottinger, who is former President Trump's

20   White House counsel.

21           Thomas Reynolds from City National Bank.

22           Richard Neville -- I'm sorry, Neville Richardson,

23   who is a contributor at the Obama campaign.

24           Robin Rosenzweig, who is Elliott Broidy's wife and

25   owned during the time in question a law firm called Colfax

1    Law.

2              Helene Ross, who is Barry Bekkedam's office

3    manager.

4              Jeff Sessions, the former Attorney General of the

5    United States.

6              Guo Wengui, spelled W-E-N-G-U-I.

7              That concludes the witness list.

8              I'm now going to go through a list of names and

9    companies that will possibly be made reference to by

10   witnesses and part of the case, and those subjects that may

11   be named or referred to are:  Gina Adams; Mohamed Al-

12   Husseiny, Jerome Adler, Ferrydoon Ardehali, Jana

13   Aristizabal.

14             I will spell these for you.  Ardehali is A-R-D-E-

15   H-A-L-I.  His first name is spelled F-E-R-R-Y-D-O-O-N.

16             Jana Aristizabal is a senior account manager at

17   Marcum LLP.

18             Riza Aziz is a Malaysian film producer.

19             Swiss Beatz is a record producer and performer.

20             Marjorie Bonzil, B-O-N-Z-I-L.

21             Jack Brewer, B-R-E-W-E-R.

22             Jim Carrey, an actor.

23             Ben Parson, a politician.

24             Chris Christie, who is a politician and a lawyer,

25   former governor of New Jersey.

1              Jeff Daniels, who is an actor.

2              Joyms, J-O-Y-M-S, last name Fahy, F-A-H-Y; she was

3     Mr. Low's nanny.

4              Sean Fern, F-E-R-N.

5              William Ferrell, an actor.

6              Naomi Firestone.

7              Gouzer Goic, G-O-I-C [sic].

8              Marquosa, M-A-R-Q-U-O-S-A, Haley, H-A-L-E-Y.

9              Alan Hanson, H-A-N-S-O-N.

10             Farooq Hassan, H-A-S-S-A-N.

11             Bradley Hope.

12             Henry Evey, E-V-E-Y, who is an agent.

13             Jamie Foxx, an actor.

14             Michel Gaspard; Patrick Gaspard; Charles Grassley,

15    who is a senator; Justin Gray; Damjan Hezir, H-E-Z-I-R; Marc

16    Hilaire, H-i-l-a-i-r-e.

17             Paris Hilton, the celebrity.

18             Raymond Hopkins.

19             Elva Hsiao, H-S-I-A-O, who is a Taiwanese singer.

20             Emily Huang, who is a -- at one time a Chinese

21    hostage, a hostage held by the People's Republic of China.

22             Jesse Jackson.

23             Debra Jacobson.

24             Charlie Johnson.

25             Darryl Johnson.

 1                Andy Kang, K-A-N-G.

 2                Kim Kardashian, public figure.

 3                Bo Kelleher.

 4                Miranda Kerr, an actress.

 5                Alicia Keys, a singer.

 6                Ron Kirk.

 7                Lisa Korbatov, K-O-R-B-A-T-O-V.

 8                Jonathan Krass, K-R-A-S-S.

 9                Richard Krass, K-R-A-S-S.

10                Richard Kromka, K-R-O-M-K-A.

11                The next one I'm going to spell for you.  First

12       name is P, like Paul, H-E-N-G-P, like Paul, H-I-A-N.  Last

13       name is L-A-O-G-U-M-N-E-R-D.

14                Danny Lauture, L-A-U-T-U-R-E.

15                Natalie Lawson.

16                Costas Liappas, L-I-A-P-P-A-S.

17                Tom Leissner.

18                Sun Lijun.

19                Sun Linn.

20                Michele Lipson.

21                Steve Loglisci, L-O-G-L-I-S-C-I.

22                Lindsey Lohan, an entertainer.

23                Low Taek Jho.

24                Lowell, Abbe; an attorney in Washington, D.C.

25                Gene Lum and Nora Lum.  They're related to Nickie

```
 1      Lum Davis and Trish Davis.

 2              The Malaysian prime minister's wife, first name

 3      R-O-S-M-A-H, last name M-A-N-S-O-R.

 4              Allan Maragh, M-A-R-A-G-H.

 5              Jason McCall, M-c-C-A-L-L.

 6              Joey McDaniel.

 7              Joey McFarland.

 8              Edgar Mejia, M-E-J-I-A.

 9              Rudolph Moise, M-O-I-S-E.

10              Marc Moscowitz.

11              Joel Mowbray, M-O-W-B-R-A-Y.

12              George Nadar.

13              The former prime minister of Malaysia, PM Najib,

14      N-A-J-I-B.

15              Kathy Nojimi, N-O-J-I-M-A -- Nojima, I'm sorry.

16              Michael O'Neil, Claudine Oriol, Yousef Al -- I'll

17      spell the last name -- O-T-A-B-I-A, who is a United Arab

18      Emirates ambassador.

19              Thomas Perrelli.

20              Chuck Plotnick.

21              John Plotnick.

22              Steven Plotnick.

23              Stanley Pottinger.

24              Rence Priebus, formerly with the Republican

25      National Committee.
```

```
 1                    The name is P-S-Y, is a Korean singer.
 2                    Ian Rakow, R-A-K-O-W.
 3                    Emily Ratajkowski, R-A-T-A-J-K-O-W-S-K-I, who is
 4       an actress.
 5                    Najib Razak, who is the former prime minister.
 6                    Busta Rhymes, an entertainer.
 7                    Paige Rolfe, R-O-L-F-E.
 8                    Joseph Ronquillo, R-O-N-Q-U-I-L-L-O.
 9                    Helen Ross.
10                    Michele Ross.
11                    William Rutherford.
12                    Nicole Scherzinger, who is a singer, songwriter,
13       actress.
14                    Sabah Sheikh is a businessman with the Kuwaiti
15       prime minister's family.  That's spelled, first name,
16       S-A-B-A-H; last name S-H-E-I-K-H.
17                    Leticia Santos.  That's L-E-T-I-C-I-A; last name
18       Santos, S-A-N-T-O-S.
19                    Martin Scoresese, the director, screenwriter, and
20       actor.
21                    Neda Shojai, S-H-O-J-A-I.
22                    Lorraine Schwartz.
23                    Andrew Smith.
24                    Eric Smith.
25                    Michael Son, last name spelled S-O-N.
```

1          Brittany Spears, an entertainer.

2          Alan Stone.

3          Stone, Blaine, CEO of Military Capabilities &

4      Review.

5          David Sugarman, who is an entertainer.

6          Eric Tan.

7          Randall Toussaint, spelled T-O-U-S-S-A-I-N-T.

8          Eric Trump.

9          Ivanka Trump.

10          Kate Upton.

11          Usher.

12          Yuri Vanatek, V-A-N-A-T-E-K.

13          Taryn, T-A-R-Y-N, last name V-O-G-E-L.

14          Ricky Waddell, W-A-D-D-E-L-L.

15          Mark Wahlberg, who is an actor.

16          Richard Walters.

17          Kanye West, who is an entertainer.

18          Rob Willis, an entertainer known as Wisdom.

19          Tysa Wright, T-Y-S-A, W-R-I-G-H-T.

20          Xi Jinping, the prime minister from China.

21          And the following law firms:

22          David Boise.

23          Rudy Giuliani.

24          Kobre & Kim; specifically there Allan Dunlavy,

25      Brian Murphy, and Daniel Landman.

```
1                    The firm Shillings International.
2                    Lawyer Marc Kasowitz, and Lawyer Bobby Burchfield.
3        That's B-U-R-C-H-F-I-E-L-D.
4                    And I'll mention some company names that we will
5        be referencing.
6                    Aabar, A-A-B-A-R.
7                    Alsen Chance Holdings, A-L-S-E-N Chance Holdings
8        Limited.
9                    Anicorn.
10                   Ankura, A-N-K-U-R-A.
11                   Artemus, A-R-T-E-M-U-S.
12                   A PAC for president -- former President Obama
13       called Black Men Vote.
14                   And Blackstone Asia Real Estate Partners.
15                   Broidy Capital Management.
16                   A company called Circinus, C-I-R-C-I-N-U-S, which
17       is a company owned by Elliott Broidy.
18                   Colfax Law, which is a law firm of Broidy's wife.
19                   DuSable, D-U-S-A-B-L-E, which was a solar energy
20       company.
21                   Farmers Merchant Trust.
22                   Flatbridge.
23                   Adam Flak.  That's F-L-A-K.
24                   Good Star, G-O-O-D, S-T-A-R.
25                   Intelligent Resources.
```

```
 1              JR Enterprises.

 2              MCKM.

 3              LNS Capitol.

 4              Lucky Mark.

 5              P-E-T-R-O-S-A-U-D-I, Petrosaudi.

 6              PJ Holdings, LLC, 2012.

 7              PJ Holdings, LLC, also 2012.

 8              Prasperity, P-R-A-S-P-E-R-I-T-Y, which is a

 9      company of Mr. Michel's.

10              A company called Red Rock.

11              Sotheby's, S-O-T-H-E-B-Y-'-S.

12              And a movie called "The Wolf of Wall Street."

13              THE COURT:  So for 14, either you know of the

14      witnesses personally or you know something about them,

15      reputation or otherwise, and the witnesses or the entities

16      that he's identified in terms of either law firms or other

17      kinds of companies.

18              If you think you know them, as I said, either

19      personally or have contact with them, or the familiarity you

20      have with them is such that you feel that you would not be

21      fair and impartial in this particular case, in that case

22      then put No. 14 down.

23              No. 15:  You're going to hear testimony from

24      federal law enforcement officers.  Would any of you be

25      inclined to give greater or lesser weight to a law
```

1    enforcement officer's testimony than that of other witnesses

2    simply because of their status as a law enforcement officer?

3         In other words, we want you to treat them like

4    anybody else.  When they get up on the stand and testify,

5    you would make decisions about their credibility.

6         What we don't want you to do is before they say

7    anything to have decided they have greater or lesser

8    credibility just because they're law enforcement.  We want

9    you to treat them like everybody else and make individual

10   decisions about their credibility based on what they have to

11   say as witnesses.

12        But if you think that you would either give

13   greater weight or lesser weight just on their status, then

14   put No. 15 on your card.

15        Now, the following questions that I'm going to get

16   into apply to each of you, members of your immediate family,

17   and close friends.

18        Now, let me try and define that.  What that means,

19   really, is people that you're close to, that you see

20   frequently, that you talk to.  It may be that they've had

21   experiences that might influence you that you know about.

22   So you need to decide who is close to you, your relatives,

23   and who would be close to you as a friend.

24        So this is a very individual decision.  Family

25   relations and what you view as your family may differ from

1    individuals.  So I'm not going to be specific.  Obviously

2    spouses, partners, children, siblings, those kinds of

3    relatives would be included, but you may have a different

4    view of what your family is.

5            Now, obviously in terms of relatives, people

6    you've lived with or people you are living with now or

7    friends in that category clearly fall into that category.

8    But as I said, everybody's family and friendships both

9    change and differ, so you need to decide that.

10           But the point of asking you beyond just you is

11   because if you're close to these people, you may know

12   something about their life, you might be influenced by

13   what's happened to them or conversations that you might have

14   had with them.  So that's why we're expanding it to include

15   not only you, but family and close friends.

16           So No. 16:  Have you -- that's you -- any members

17   of your family, or close friends ever been employed by any

18   law enforcement agency?

19           I'm going to give you some examples.  "Law

20   enforcement agency" includes any police department in or

21   outside of the District of Columbia, special police

22   officers, the Federal Bureau of Investigation, prosecutors'

23   offices, the U.S. Attorney's Office, the D.C. Attorney

24   General's Office, correctional officers, the Department of

25   Justice, the U.S. Marshals Service, sheriffs' departments,

1    the Internal Revenue Service, the U.S. Secret Service,

2    probation officers, parole officers, and the Public Defender

3    Service.

4        Now, you may also have a view that there may be

5    other agencies or entities that you consider law

6    enforcement.  You fill that in.  I've just given you

7    examples.

8        Certainly if you or somebody close to you or

9    whether family or friends falls into the categories I've

10   given you, you need to put 16 down.  But if there's some

11   other law enforcement agency that I have not put down, then

12   please put No. 16 down.

13       All right.  No. 17 again applies to each of you,

14   members of your family and close friends, ever been employed

15   by the Court system.  That includes D.C. Superior Court or

16   the U.S. District Court, which is this court, whether it's

17   in D.C. or someplace else.  If you have, then please put --

18   this is employment -- put No. 17 on your card.

19       No. 18:  Have you, members of your family, close

20   friends had an experience with law enforcement as you define

21   it or with any person associated with or employed by the

22   U.S. Attorney's Office or the Court which would make it

23   difficult for you to be fair and impartial as a juror in

24   this case?  So that's you, members of your family, close

25   friends, you've had an experience, and it would be with law

1    enforcement as you define it, any person associated with or

2    employed by the U.S. Attorney's Office, or the Court, which

3    would make it difficult to be fair and impartial in this

4    case.  If that's -- if you have those feelings or beliefs,

5    then please put 18 on your card.

6            No. 19:  Have you or members of your family or

7    close friends ever been employed by a criminal defense

8    attorney or been involved in any way in the defense of a

9    criminal case?

10            So, again, this is you, family, close friends,

11    employed by a criminal defense attorney in any capacity or

12    been involved in any way in the defense of a criminal case.

13    If the answer is yes, put 19.

14            No. 20:  This, again, applies to you, members of

15    your family, close friends, been a lawyer, ever worked for a

16    lawyer, or have you ever studied law?  So either you're a

17    lawyer, you've worked for a lawyer in any capacity, or

18    you've studied the law, put No. 20 down.

19            No. 21 again applies to you, family, friends, ever

20    worked in the following fields:  accounting, forensic

21    accounting, banking or banking regulations.  So accounting,

22    forensic accounting, banking or banking regulations, please

23    put 21 on your card.

24            22:  Have you, members of your family and close

25    friends ever worked in campaign fundraising or campaign

1    finance?  So you or somebody close to you ever worked in

2    campaign fundraising or campaign finance, put No. 22 on your

3    card.

4            No. 23:  You or somebody close to you ever run for

5    elected office?  If the answer is yes, put 23 on your card.

6            24:  Have you, family, close friends, ever worked

7    in any state or federal regulatory agency or commission

8    governing law enforcement, national security, banking,

9    foreign affairs, or campaign finance?

10            So if you worked for a state or federal regulatory

11    agency or commission governing and it would be related to

12    law enforcement, national security, banking, foreign

13    affairs, or campaign finance, put No. 24 on your card.

14            No. 25:  This again applies to you, family, close

15    friends, ever been a victim or a witness to a similar crime

16    as the crime charged in this case, including but not limited

17    to financial crimes, investment fraud, identity theft, or

18    campaign finance violations?

19            So if you've been a victim or a witness, and the

20    crimes -- I'll give you some examples -- are financial

21    crimes, investment fraud, identity theft, campaign finance

22    violations, put No. 25 on your card.

23            26:  Have you, members of family, close friends

24    ever been arrested or charged with a crime or found guilty

25    or gone to jail for a similar crime as the crimes charged in

1    this case, including, but not limited to, financial crimes,

2    investment fraud, identity theft, or campaign finance

3    violations?

4         If you or anybody close to you has been arrested

5    or charged with a crime or found guilty or gone to jail for

6    a crime as the ones in here, but certainly it would cover

7    financial crimes, investment fraud, identity theft, or

8    campaign finance violations, put No. 26 down.

9         27:  Have you, members of your family and close

10   friends ever been a victim, a witness, or arrested or

11   convicted of any crime -- it doesn't matter what the crime

12   was -- which has so affected you that it would interfere

13   with your ability to be fair and impartial in this case?

14        So, in other words, this is broadly stated in

15   terms of any crime that has involved your family or yourself

16   that is such -- that has affected you that you don't think

17   you'd be fair and impartial in this case.  If that is the

18   case, then please put 27 on your card.

19        Now, the next questions apply only to you, so

20   we're leaving the family and close friends out of the

21   picture.

22        28:  One of the offenses charged in this case is a

23   conspiracy to violate and actual violations of a law called

24   the Foreign Agents Registration Act.  Have you or any person

25   or entity with which or whom you have frequently interacted

1     ever been subject to this law or considered this law at

2     length?  We're talking about the Foreign Agents Registration

3     Act.  So any contact with that.  Have you personally or any

4     person or entity with which or whom you have frequently

5     interacted ever been subject -- in other words, they were

6     required to register under that or consider this law at

7     length, put No. 28 down.

8             29:  Do you have strong opinions about money from

9     foreign countries being used to influence the outcome of

10    elections or to seek political favors from elected officials

11    in such a way as to affect your fairness and impartiality as

12    a juror in this case?

13            Everybody has opinions, so I'm not expecting

14    people to be without opinions.  The question is whether your

15    opinions are such that they're going to affect your fairness

16    and impartiality as a juror in this case.  If you think your

17    views would, then you need to put 29 on your card.

18            30:  Do you have any positive or negative feelings

19    towards foreign nationals who are lawful permanent residents

20    but not citizens of the United States?

21            Okay.  So if you've got, again, strong views that

22    you would claim as negative or positive about foreign

23    nationals who are lawful permanent residents but not

24    citizens, then put No. 30 on your card.

25            31:  During this trial, you may learn that the

1    government has entered into a cooperation agreement or

2    court-approved plea agreement with a witness.  You may hear

3    that as part of an agreement the witness has agreed to

4    testify in the hopes of receiving more lenient treatment by

5    law enforcement in return for truthful cooperation with the

6    government.  Agreements such as these are lawful, and the

7    government is permitted to enter into them.

8            But do you have an opinion -- whether positive or

9    negative -- about witnesses who testify for the prosecution

10   under such agreements?  If you have opinions -- and, again,

11   they need to be strong enough either positive or negative.

12   If you have those opinions, please put 31 on your card.

13           Now, No. 32 is whether you have ever served on a

14   grand jury?

15           A grand jury is not a jury as you will be

16   listening to what we call a petit jury, where you will be

17   listening to a trial and will be determining the guilt or

18   innocence of a defendant.  In the grand jury, the government

19   presents evidence to the grand jury, and the grand jury

20   makes a decision as to whether or not to indict someone; in

21   other words, whether there's exhibition evidence and whether

22   they -- the evidence points to a particular person.

23           So if you've ever served on a grand jury, please

24   put No. 32 on your card.

25           Now, 33:  Have you ever served as a juror?  In

1    other words, you've been selected, as you would do today, in

2    a criminal case.  It can either be in federal court or the

3    D.C. court, Superior Court, or some other court someplace

4    else.  So if you've ever served as a trial juror in a

5    criminal case -- as I said, either in federal court, D.C.

6    Superior Court, or some other court -- please put No. 33 on

7    your card.

8            Now, 34:  Do any of you now or have you within the

9    past five years belonged to or participate in a crime

10   prevention group?  And these can be neighborhood watch

11   organizations, what used to be the Orange Hat groups, or any

12   other crime prevention group.

13           If you have within the past five years been a

14   member of one of these groups, an active member of one of

15   these groups, please put No. 34 on your card.

16           Now, 35:  To reach a verdict, every juror must

17   agree on the verdict.  That is, any verdict must be

18   unanimous.  In deliberations, you must consider the opinions

19   and points of view of your fellow jurors.  In the final

20   analysis, however, you must follow your own conscience and

21   be personally satisfied with any verdict.

22           Would you have any difficulty expressing your own

23   opinions and thoughts about this case to fellow jurors?

24           What we want is to make sure that we choose jurors

25   that will listen to the evidence, that during deliberations

1    will be willing to express their views and to listen to

2    other people's views and to discuss them.  So if you don't

3    think that you are willing or able to engage in that

4    process, please put No. 35 on your card.

5          Now, 36 is the length of the trial, which is

6    always somewhat of a guess.  So I'm going to expect this

7    case to take approximately four weeks to try, and there are

8    certain days that we will not be sitting, so some of them

9    are in terms of -- we'll be stopping at noon, others we

10   actually will not be sitting for the whole day.

11         So let me indicate.  We will not hold trial after

12   12:00 on Wednesday, April 5th, in order to observe the

13   Jewish holiday.  Nor will we hold trial on Friday, April

14   7th; the Court is in recess.  Nor Monday, April 10th; that's

15   also around the Easter holiday.  And also on April 12th we

16   will have only a half a day as well.

17         So the half days are April 5th and the 12th.  So

18   we'll sit in the morning, but not in the afternoons.  And

19   then April 7th and April 10th we will not be sitting the

20   whole day.  So those are days that you don't need to come to

21   court.

22         Now, figuring out how long the case is going to

23   be, we figure roughly approximately four weeks.  It's going

24   to depend on how long it takes us to choose a jury.

25   Sometimes it's short, sometimes it's not.  So it's hard to

1    tell how much more we'll be able to do today in terms of

2    actually getting into the case.

3           If we can choose the jury fairly quickly, then

4    obviously we'll proceed, you know, as soon as possible in

5    choosing it.  As I said, it's difficult to figure out

6    exactly how long it's going to be, but I do think that it

7    will take at least four weeks.  It may actually go into the

8    last week in April.

9           Now, how long you deliberate, obviously, is an

10   open question.  So we can never tell you how long that will

11   be, which is why I think the trial itself will take four

12   weeks.  If it's less, that will be great for all of us.  But

13   it may go into that last week of April based just on

14   deliberations.

15          Now, I know that participating as a juror isn't

16   easy, and I know certainly in D.C. that you receive jury

17   notices from two courts.  You get a notice from D.C.

18   Superior Court, and you get a notice from the federal court,

19   this court, probably for most of you.  I live in D.C., so I

20   get those notices as well for both courts.

21          You should be aware that I'm not automatically

22   excused in each of these courts, so if it's D.C. Superior

23   Court, like you, I have to clear my calendar.  I can't go to

24   the judge and say, you know, "I'm sorry.  I'm too important.

25   I can't sit."  So I clear my calendar.

1          So when I get a jury notice, I figure out -- I

2     don't put any trials or other matters during that period of

3     time because I know it's important to be able to

4     participate.  Nobody does my work during this period so,

5     like you, I know what that means.  It means I have to make

6     up that work at some other time.

7          So I understand very clearly how that works for

8     you as well.  This does take you from -- away from other

9     responsibilities.

10          Now, let me tell you in terms of the schedule.

11     I've indicated to you the days that we would have half days

12     or full days.  Otherwise we will be sitting.  What I try is

13     not have other matters during this period of time.  I either

14     will do them before you would be coming in or after you

15     leave.  I usually do them sometime between 9:00 and 9:15.

16          We'll probably start around 9:15 or 9:30.  We may

17     go -- we won't go later than 5:00.  Some days we may stop at

18     4:00, particularly if there's something that has come up.

19          During the trial, when you're hearing evidence, we

20     will be taking a morning break, an afternoon break, and

21     obviously lunch.  If you need other breaks, we'll, of

22     course, take them.  We do take an hour for lunch.

23          Let me let you know at the beginning that if

24     you're part of the jury that deliberates, then you don't get

25     excused at lunchtime.

1          I'm telling you all of this so if you need to do

2     banking or other kinds of things.

3          You don't deliberate during that period of time,

4     but you do stay in the courthouse.  I will repeat this, but

5     I'm just letting you know in terms of your own planning.

6          Now, having said all that, I want to mention one

7     other thing.  One of the nice things we do as judges is that

8     we participate in the naturalization ceremony for

9     immigrants, and that has actually started again -- it was

10    discontinued to some degree during COVID -- immigrants who

11    are now becoming citizens, and we usually have about 100

12    people a month.

13         The judges take turns for the ceremony.  Different

14    jurisdictions do it differently, but we have a very nice

15    ceremony.  We usually have a speaker, and there's a

16    reception.

17         One of the things that I find so nice is that the

18    immigrants -- there are two things that they are very

19    excited about:  that's being able to vote and, believe it or

20    not, being able to be on a jury.  And I think that we who

21    were born here and don't have this issue sometimes take

22    participation as a juror for granted and don't understand

23    the fact that many people come from countries who just never

24    get a jury trial and where their criminal justice system is

25    completely different and, perhaps, not as fair as ours.  So

1      it's something that you should think about in terms of your

2      participation as a member of this community.

3              I say all this because I realize in recent years,

4      if you're like me, you're getting called more and more

5      often.  I now get called every year.  It used to be every

6      two years.  And as I said, I've never been chosen or wound

7      up in the jury box, but judges have been chosen as jurors,

8      so we can't count on not being chosen.

9              So I say all of this because I want you to

10     understand that I appreciate the fact that this takes you

11     away from other responsibilities.  And I've also discussed

12     the immigration ceremony because I want you to think

13     carefully what it means to, from time to time, contribute to

14     this community, and being a juror is that contribution.

15             Now, we're all ready to go.  We have witnesses.

16     Everybody's prepared to go.  So it's very important that we

17     be able to choose the jury and move forward.

18             Now, having given you this introduction, my

19     question on 36 is:  Does anyone have any pressing commitment

20     that would make sitting on this jury a hardship?  If you

21     think that there is one, then put No. 36 on your card.  But

22     as I said, I would ask you to think carefully as to whether

23     that is the case.

24             Now, No. 37 is:  Does anyone, due to health

25     problems or medication or the like, feel that they cannot

1    sit on this jury?  If there is a problem, please let me

2    know, and put down No. 37.

3         38:  If you have difficulty seeing or hearing that

4    would make it difficult for you to follow or receive the

5    evidence presented or for which you need an accommodation,

6    please let me know.  We have earphones for those hard of

7    hearing, or we can make some accommodation for you.

8         So if you have some difficulties and need an

9    accommodation, please put 38 down, and we will work with

10   you.

11        39 is:  Do you have religious or moral beliefs,

12   social, political, philosophical, or any other beliefs that

13   would interfere with being a member of this jury and

14   returning a fair and impartial verdict solely on the

15   evidence?

16        Now, everybody has opinions, beliefs.  We're not

17   people who do not have those.  The question really is

18   whether these are so strong that they're going to interfere

19   with your being able to be fair and impartial.  We want you

20   to be able to put them aside and make a decision based only

21   on the evidence presented in the courtroom.  But if you

22   think you have some problem based on religious, moral,

23   social, political, philosophical or other beliefs that would

24   interfere, then please put 39 down.

25        Now, No. 40:  Would you, for any reason, hesitate

1    to enforce the laws involved in this case?  All this is

2    based on laws, statutes, and we want to make sure that

3    there's no one who would be hesitant about enforcing the

4    laws; and those laws will be explained to you.

5           So if you think -- it doesn't matter what the

6    reason is -- that you would be hesitant to enforce the laws

7    that are involved in this case, please put No. 40 on your

8    card.

9           Now, 41 -- and we want to make sure that you

10   follow the instructions of the law that I'm going to give

11   you regardless of whether or not you agree with these

12   instructions.  And I'm sure that there are some lawyers

13   here, so one of the things is to make sure that as lawyers

14   you will not make your own decisions, if you were chosen,

15   about what the law is, but that you would follow what the

16   Court states.

17          So if, for some reason, you think you cannot

18   follow my instructions, please put No. 41 on the card.

19          And the last question is what I said was my catch-

20   all question.  So is there any reason that you can think of,

21   whether or not it's been covered by a previous question, why

22   you couldn't sit fairly, attentively, and impartially in

23   this case?

24          So what this does is it covers if you couldn't

25   remember, you thought of something afterwards, you don't

1    remember the number of the question, put down No. 42 and

2    bring up the information. Or if there's something you need

3    to bring to our attention that I haven't asked about but

4    that you think would interfere with your being fair,

5    attentive, and impartial in this case, then please put No.

6    42 on your card.

7         Now, we finished the end of the questions.

8    There's a little dance in here in terms of moving you around

9    in terms of going through this process. So counsel and I

10   and the parties will be going to another courtroom, which

11   will actually be the courtroom where the trial will take

12   place. You're going to remain here, and you'll be brought

13   one by one individually to my courtroom, which is just down

14   the hall, for voir dire. Bring your cards. Take good care

15   of them because what we're going to do is go over the

16   answers to the questions that you have written down.

17        If excused after the individual voir dire, after

18   we go through your questions that you put on the card, you

19   can go home. You don't have to go back to the jury office,

20   as you would ordinarily. This is a special panel, and so if

21   I tell you you're -- you're told you're excused, then you

22   can leave.

23        If you're not excused, then we're going to be

24   sending you to another courtroom. Not this one, nor the one

25   where the trial will take place, but another courtroom next

1    door, and we ask that you would be waiting there.

2              We will try not to have all of you hang around all

3    day.  Part of it is to see how it moves along, but you do

4    need to take very good care of your cards.

5              So those of you that are staying in here, if you

6    need to use the restrooms, you can.  Please go out and come

7    back.  Don't hang out in the hall.  Don't make me send the

8    marshals to go get you.  Okay?  So come back.

9              If you could, stay where you're seated.  We have

10   quite a number of jurors, and we have to have you sort of in

11   the list so people can look at Juror No. 1, look at the

12   list, see who it is, and your juror number.  So if you start

13   mixing up where you're sitting, this may be a problem.

14             You can stand, even walk around, as long as you

15   know where you are in terms of coming back.

16             Please do not discuss what you're going to bring

17   to my attention with your other jurors.  Don't tell them

18   things that create a problem for them.  Okay?

19             You can talk about weather, sports, doesn't matter

20   what you want to talk about, or sit there quietly.  This may

21   be a peaceful time for you, whatever.  But what I want you

22   to do is make sure -- and please don't look at any devices

23   or anything else during this time.  Remember what I said.

24   You have to put all the electronics, go back 50 years or

25   whatever it is, and just think of yourself as not having any

```
1    electronics.
2              We will come and get you.  We'll give you
3    instructions.  I will let you go to lunch.  So we'll come
4    back and excuse you for lunch.
5              And Ms. Patterson is the deputy courtroom clerk.
6    She will be your guide.  And we do have some other
7    individuals, law clerks, who are going to move you around so
8    we lose as little time as possible.
9              I will come back in here and tell you about lunch
10   and how you're supposed to -- where you're supposed to go
11   and how you're supposed to come back.
12             I think that's it.
13             So if you can -- we will decamp and go to the
14   other courtroom, if you all could just sit here.  And as I
15   said, please stay in the courtroom.  Don't go off someplace
16   else.  That creates us having to go and find you.
17             And when you're excused, always come back.  Once
18   in a while I lose somebody, but I want to make sure that
19   doesn't happen because I will tell you, I'll send out the
20   marshals to get you.  So you don't want to have that happen.
21             But I know you're all responsible people so I know
22   I won't need to do that.
23             All right.  I will meet you in the other
24   courtroom.
25             (Recess taken)
```

```
1                THE COURT:  If you would step up over here.  Come

2       up to the witness stand over here.

3                This is Juror No. 0531, and No. 33.

4                All right.  No. 33 asks -- you can take your mask

5       off to talk, otherwise we can't really hear you.

6                33 is whether you've served as a juror in a

7       criminal trial.  Which court did you serve as a juror?

8                PROSPECTIVE JUROR 0531:  It was children and

9       family --

10               THE COURT:  Can you speak up.

11               PROSPECTIVE JUROR 0531:  Children and family in

12      Duvall County, Florida.

13               THE COURT:  Okay.  And how long ago was that?

14               PROSPECTIVE JUROR 0531:  That was back in 1996/97,

15      sometime around there.

16               THE COURT:  Can you move the microphone up just a

17      tad?  There you go.  The chair moves around, too.  It just

18      makes it easier.

19               And was it a criminal case?

20               PROSPECTIVE JUROR 0531:  It was.  It ended in a

21      mistrial.

22               THE COURT:  All right.  Do you remember what the

23      charge was?  If you don't, that's okay.

24               PROSPECTIVE JUROR 0531:  It was a molestation

25      case.
```

1           THE COURT:  I'm sorry?

2           PROSPECTIVE JUROR 0531:  It was a molestation

3     case.

4           THE COURT:  Okay.  So it was a family case?

5           PROSPECTIVE JUROR 0531:  Yes.

6           THE COURT:  All right.  The reason we ask this is

7     to see whether there's anything about that experience as a

8     former juror in that trial that you think would affect your

9     fairness and impartiality in this case.  We want to make

10    sure you can separate the two things out.

11          PROSPECTIVE JUROR 0531:  No.  It was so long ago.

12          THE COURT:  So you feel you could be fair and

13    impartial in this case?

14          PROSPECTIVE JUROR 0531:  Absolutely.

15          THE COURT:  All right.  Any questions, Government?

16          MR. KELLER:  I know it was a long time ago.  Do

17    you recall about how long deliberations lasted before the

18    mistrial?

19          PROSPECTIVE JUROR 0531:  Probably about eight

20    hours.  It didn't go past the first day.

21          MR. KELLER:  Okay.  Thank you.

22          THE COURT:  Mr. Kenner or whomever on the defense

23    side?

24          MR. KENNER:  Good morning.  How are you?

25          PROSPECTIVE JUROR 0531:  I'm great.  How are you?

1          MR. KENNER:  Good.  Do you recall being instructed

2     in that previous case about the definition or what

3     "reasonable doubt" means?

4          PROSPECTIVE JUROR 0531:  Yes.

5          MR. KENNER:  And in that prior deliberation --

6          THE COURT:  We should not get into what happened

7     in the deliberation.

8          MR. KENNER:  I'm not going to ask specifically

9     about that.  I want to know, was the issue that caused the

10    jury to not come to a verdict --

11         THE COURT:  That's not appropriate.  She

12    volunteered the information, and ordinarily I don't ask what

13    the verdict is.

14         MR. KENNER:  Okay.  All right.  Nothing further.

15         THE COURT:  All right.  You can step down.  Thank

16    you.

17         She volunteered the information, but as a

18    practical matter, we generally -- you can ask whether

19    they've reached a verdict, but generally after that, we

20    don't get into what the verdict was or what happened in the

21    deliberations as long as it doesn't appear to affect, you

22    know, her case.  And it's a completely different case and a

23    long time ago.

24         So is this person -- are we keeping this person?

25    Any issue?

```
 1              If I don't see -- you don't have to pop up each

 2      time.  Let me put it this way, if nobody says anything, I'll

 3      assume that this person is being accepted, in which case go

 4      ahead and send her to the next room, and let's get the next

 5      juror in.

 6              All right.  If you would step up over here,

 7      please.

 8              Go ahead and sit down.  Make yourself comfortable.

 9              All right.  This is Juror No. 0567, and the

10      questions are 16 and 32.

11              You can take your mask off to answer, otherwise we

12      can't hear what you're saying.

13              PROSPECTIVE JUROR 0567:  Okay.

14              THE COURT:  All right.  16 is whether you or

15      somebody close to you is employed by law enforcement.  Is

16      that you or somebody else?

17              PROSPECTIVE JUROR 0567:  Oh, someone else in my

18      family.

19              THE COURT:  Can you just give the relationship?

20              PROSPECTIVE JUROR 0567:  My uncle.

21              THE COURT:  Your uncle?

22              PROSPECTIVE JUROR 0567:  Yes.

23              THE COURT:  Okay.  And what law enforcement agency

24      is it?

25              PROSPECTIVE JUROR 0567:  He's a police officer.
```

```
 1                    THE COURT:  Okay.  And where?
 2                    PROSPECTIVE JUROR 0567:  I'm not sure where he is
 3          now.  He was at 2D with the SWAT team, but I'm not sure.  I
 4          don't want to --
 5                    THE COURT 0567:  So he's a D.C. police officer?
 6                    PROSPECTIVE JUROR 0567:  Oh, he's a D.C. police
 7          officer.  I'm not sure where he works.
 8                    THE COURT:  And is he actively a police officer
 9          now?
10                    PROSPECTIVE JUROR 0567:  Yes, ma'am.
11                    THE COURT:  Okay.  And do you know how long he's
12          been a police officer approximately?
13                    PROSPECTIVE JUROR 0567:  Maybe like 30-some-odd
14          years.
15                    THE COURT:  It's been some time, I take it?
16                    PROSPECTIVE JUROR 0567:  Yes, it's been some time,
17          absolutely.
18                    THE COURT:  Okay.  Has your uncle lived in your
19          family home when you've lived there at any time?
20                    PROSPECTIVE JUROR 0567:  No.
21                    THE COURT:  Okay.  Has he discussed with you his
22          cases?  You know, what he does, what things he's been
23          involved with as a police officer?
24                    PROSPECTIVE JUROR 0567:  No.
25                    THE COURT:  Is there anything about his being a
```

1    law enforcement officer that you think would affect your

2    fairness and impartiality in this case?

3             PROSPECTIVE JUROR 0567:  Absolutely not.

4             THE COURT:  Okay.  Because you do know that we

5    will have law enforcement officers testifying.  Can you

6    treat them like you would everybody else?

7             PROSPECTIVE JUROR 0567:  Absolutely.

8             THE COURT:  All right.  Question No. 32 is whether

9    you've ever served on a grand jury.

10           PROSPECTIVE JUROR 0567:  Yes, I have.

11           THE COURT:  How long ago?

12           PROSPECTIVE JUROR 0567:  Oh, I was like 26.

13           THE COURT:  I'm sorry?

14           PROSPECTIVE JUROR 0567:  I was like 26.  I was

15    born in '63.  I just had a birthday Feb 11th.  Believe it or

16    not, I'm 60 years old.

17           THE COURT:  So it's been a while.

18           In D.C. or someplace else?

19           PROSPECTIVE JUROR 0567:  In D.C.

20           THE COURT:  Okay.  And was it associated with this

21    court or with the local courts?

22           PROSPECTIVE JUROR 0567:  Local courts.

23           THE COURT:  And was it a grand jury that handled a

24    lot of cases or a special grand jury about a particular

25    case?

```
 1                PROSPECTIVE JUROR 0567:  I'm not really sure.  I
 2      can just tell you that I served on a criminal trial.
 3                THE COURT:  I'm sorry?
 4                PROSPECTIVE JUROR 0567:  I said I'm not really
 5      sure.  I can tell you that I served on a criminal trial.
 6                THE COURT:  Okay.  So you served as a juror.  You
 7      were selected, and you made a decision?
 8                PROSPECTIVE JUROR 0567:  Absolutely.
 9                THE COURT:  So it wasn't the grand jury where the
10      government presents its evidence and you decide whether to
11      indict them or not; that's not what you're talking about?
12                PROSPECTIVE JUROR 0567:  Yes, it is.
13                THE COURT:  It is?
14                PROSPECTIVE JUROR 0567:  It is.
15                THE COURT:  Okay.  So have you done both?  Have
16      you served as a grand juror where they present evidence, and
17      you don't hear from the defense; you basically decide
18      whether or not the person should be charged?
19                PROSPECTIVE JUROR 0567:  That's what we did.
20                THE COURT:  That's what you did?
21                PROSPECTIVE JUROR 0567:  That's exactly it.
22                THE COURT:  Okay.  And in terms of -- is there
23      anything about that particular experience that you think
24      would affect you in this one?
25                PROSPECTIVE JUROR 0567:  Absolutely not.
```

1           THE COURT:  Okay.  And you understand that there's

2    a totally different standard in a trial, such as if you were

3    selected here, it's beyond a reasonable doubt.  And in that

4    it's a much lower standard and burden in terms of your

5    deciding whether there's probable cause to believe a crime

6    has been committed and whether that's the person who

7    committed it.

8           Here there's a much higher standard and burden.

9    Do you understand that?

10           PROSPECTIVE JUROR 0567:  Yes, Your Honor.

11           THE COURT:  All right.  And you would apply the

12    higher standard and burden in this case.  Can you do that?

13           PROSPECTIVE JUROR 0567:  Yes, Your Honor.

14           THE COURT:  All right.  And have you done it just

15    once, or more than once?

16           PROSPECTIVE JUROR 0567:  Just once.

17           THE COURT:  All right.  Any questions.

18           MR. KELLER:  Ms. Evans, on the first question,

19    your uncle who is a D.C. police officer, how often would you

20    say you see him?

21           PROSPECTIVE JUROR 0567:  Oh, I see him quite often

22    actually.  Well, family members you kind of see, you know.

23    I want to say maybe at least twice a month.

24           MR. KELLER:  And do you socialize with any of his

25    co-workers, anybody else that he works with?

1      PROSPECTIVE JUROR 0567:  I do know a friend of

2   his, absolutely.  He's come by in a patrol car.  He's come

3   by grandma's house and still comes to visit.  Yes, I do know

4   one of his other co-workers.

5      MR. KELLER:  And then on the second question

6   regarding your grand jury service, do you recall how long

7   you sat?  I know it was a long time ago.  Do you recall how

8   many months you sat with that grand jury?

9      PROSPECTIVE JUROR 0567:  Yes, I do.  It was a

10  couple of months because we had -- is it okay for me to

11  answer why?

12     MR. KELLER:  Yes.

13     THE COURT:  You should not get into what you

14  considered was your --

15     (Indecipherable cross-talk)

16     PROSPECTIVE JUROR 0567:  Yes, yes.  It was over a

17  month.

18     MR. KELLER:  And was that -- I believe the judge

19  asked you something related to this, but was that time

20  period all focused on one case primarily or --

21     PROSPECTIVE JUROR 0567:  Yes, sir.

22     MR. KELLER:  And do you recall whether the grand

23  jury voted to indict or not indict?

24     PROSPECTIVE JUROR 0567:  Yes, I do.  I recall.

25     MR. KELLER:  What was the grand jury's ultimate --

```
 1                    PROSPECTIVE JUROR 0567:  It was an indictment.  I
 2      shouldn't answer?
 3                    THE COURT:  Go ahead.
 4                    MR. KELLER:  What was the grand jury's ultimate
 5      determination?
 6                    PROSPECTIVE JUROR:  He was found guilty.
 7                    MR. KELLER:  That's all I've got, Your Honor.
 8                    THE COURT:  Okay.  Any questions, Mr. Kenner?
 9                    MR. KENNER:  Yes, thank you.
10                    Good morning.  How are you?
11                    PROSPECTIVE JUROR 0567:  How are you?
12                    MR. KENNER:  Good.  Thank you.
13                    I just want to understand.  The case that you
14      considered when you were a grand juror, did I understand
15      correctly you said he was found guilty?
16                    PROSPECTIVE JUROR 0567:  The individual was
17      indicted, yes.
18                    MR. KENNER:  Oh, okay, yes.  So you didn't mean to
19      say found guilty; you mean to say he was indicted?
20                    PROSPECTIVE JUROR 0567:  I meant to say indicted.
21                    MR. KENNER:  Okay.  And you understand the
22      difference between the level of proof necessary in a grand
23      jury versus the level of proof in a trial?
24                    PROSPECTIVE JUROR 0567:  Yes, sir.
25                    MR. KENNER:  And have you ever discussed criminal
```

1    justice issues with your uncle or his friend?

2              PROSPECTIVE JUROR 0567:  No.

3              MR. KENNER:  Okay.  Have you formed -- based on

4    all of your experiences on a regular jury, a grand jury,

5    having an uncle in law enforcement, do you have any views

6    about how to measure proof beyond a reasonable doubt?

7              PROSPECTIVE JUROR 0567:  No.

8              MR. KENNER:  You would listen to what the judge

9    told you about that and follow her instructions; is that

10    correct?

11              PROSPECTIVE JUROR 0567:  Absolutely.

12              MR. KENNER:  What were the charges in the grand

13    jury case?

14              PROSPECTIVE JUROR 0567:  It was a murder charge.

15              MR. KENNER:  A murder charge?

16              PROSPECTIVE JUROR 0567:  Yes.  The case I was on,

17    absolutely.  It was murder, a murder charge.

18              MR. KENNER:  Did you ever have occasion to follow

19    that case?  Did that case go to trial, do you know?

20              PROSPECTIVE JUROR 0567:  Yes.

21              MR. KENNER:  And did you follow the result of that

22    trial?

23              PROSPECTIVE JUROR 0567:  That's what made me say

24    that the person was found guilty.

25              MR. KENNER:  So you sat as a grand juror and a

1    trial juror in the same case?

2         PROSPECTIVE JUROR 0567:  Absolutely.  That's why I

3    say it took over -- we were in there over months.  It took

4    over a month.

5         THE COURT:  Let me clarify this.

6         In terms of the grand jury, you make a decision

7    whether it's to charge the person.  Were you then selected

8    in the trial itself?

9         PROSPECTIVE JUROR 0567:  That's what I was trying

10   to say.

11        THE COURT:  In the same one?

12        PROSPECTIVE JUROR 0567:  Absolutely, Judge.

13   That's what I was trying to explain when I told him that it

14   took over a month.

15        THE COURT:  Okay.  But what I'm trying to do is

16   there's two roles, and I'm trying to figure it out.

17        The first role would be as the grand juror.  The

18   government would present the evidence, and then you would

19   make a decision as to whether or not to indict, in other

20   words, to charge the person.

21        PROSPECTIVE JUROR 0567:  Okay.

22        THE COURT:  The second is you would have a trial

23   such as this where you would be a juror, and you would

24   listen to the government's evidence, the defense evidence,

25   if they presented a defense, and then make a decision beyond

1    a reasonable doubt, which is different than the other.

2            You were in the same exact same homicide case, or

3    a different case?

4            PROSPECTIVE JUROR 0567:  No, this was the same

5    homicide case.

6            THE COURT:  So you served both as the trial juror

7    and as the grand juror?

8            PROSPECTIVE JUROR 0567:  Absolutely.

9            THE COURT:  And how long ago was this?

10           PROSPECTIVE JUROR 0567:  I was 25, so that was a

11   long time ago.

12           THE COURT:  Well, I won't ask how old you are.  So

13   roughly how long ago are we talking about?

14           PROSPECTIVE JUROR 0567:  I'm 60 years old now.  I

15   don't have a problem saying my age.  I feel good about it.

16   I really do.

17           THE COURT:  All right.

18           PROSPECTIVE JUROR 0567:  Okay.

19           THE COURT:  So it was 45 years ago.

20           PROSPECTIVE JUROR 0567:  I was 25 then.

21           THE COURT:  Anything else?

22           MR. KENNER:  I'm sorry.

23           Could you tell me what your occupation is, please?

24           PROSPECTIVE JUROR 0567:  I'm a nurse.

25           MR. KENNER:  Where?

1          PROSPECTIVE JUROR 0567:  I do private duty nursing

2     through an agency.

3          MR. KENNER:  I have nothing further.

4          THE COURT:  All right.  You can step down.  Thank

5     you.

6          PROSPECTIVE JUROR 0567:  Okay.

7          MR. KENNER:  Your Honor, I would like to challenge

8     that juror.

9          THE COURT:  Any questions?  I mean, she must be

10    mistaken.  I can't believe somebody would have -- everybody

11    always asks if you've been on a grand jury; that she would

12    be a grand juror and a trial juror in the same case.

13          Do you have any problem?  I think she's confused.

14          MR. KELLER:  Your Honor, it sounds like it was 35

15    years ago.  It doesn't sound like it would impact her

16    ability to be fair and impartial in this case.

17          MR. KENNER:  Well, Your Honor, may I respond?

18          THE COURT:  Yes.

19          MR. KENNER:  It would concern me with regard to

20    her understanding the difference between the burden of proof

21    in the actual trial versus a grand jury proceeding.

22          And I totally agree with Your Honor; I've never

23    ever heard of the same person sitting on a grand jury

24    sitting in a jury trial of the same charge.  I think she

25    should be excused.

```
 1              THE COURT:  I'm going to excuse her.  The years
 2      that she would have been doing this, the two -- I was a
 3      judge in Superior Court.  We would never have had somebody
 4      do both.  So I think she's confused for whatever reason, so
 5      I'll excuse her based on that.
 6              If you would step up over here, please.
 7              We appear to be missing the next one, which would
 8      be 0272.  You're 0011; is that correct?
 9              PROSPECTIVE JUROR 0011:  Correct, Your Honor.
10              THE COURT:  Okay.  So we'll find what happened to
11      the other one.
12              This is Juror, then, 0011, who is No. 3 on the
13      list, and it's 14, 16, 19, 24, and 36.
14              Okay.  So let me go through these.
15              All right.  14 is the defense witness.  Is there
16      somebody that you recognize or that you heard?
17              PROSPECTIVE JUROR 0011:  Several folks, Your
18      Honor.  No individuals that I know personally, but from
19      exposure broadly in the media and for whom I would find a
20      hard time removing my bias if they were to provide evidence
21      or testimony.
22              THE COURT:  Okay.  So which people are you talking
23      about?
24              PROSPECTIVE JUROR 0011:  In this case it would be
25      Rudy Giuliani, Rence Priebus, several others who, in my
```

1    opinion, have shown themselves to act in bad faith over time

2    in the media again and in their dealings in political life.

3              THE COURT:  So you're indicating that for them,

4    that there would be -- your bias is strong enough that you

5    feel that you would not be able to be fair and impartial.

6    Is that what you're indicating?

7              PROSPECTIVE JUROR 0011:  I am, Your Honor.

8              THE COURT:  Okay.  Even though -- let's assume

9    that -- if you could give me some of the other names.  Even

10   if they don't testify, but they're just mentioned, would it

11   make a difference to you or does it not make a difference to

12   me?

13             PROSPECTIVE JUROR 0011:  It does not make a

14   difference to me.

15             THE COURT:  And who besides Giuliani?

16             PROSPECTIVE JUROR 0011:  I had written six or so

17   names on the note card.

18             THE COURT:  Let me --

19             PROSPECTIVE JUROR 0011:  My handwriting is

20   terrible.  I apologize.

21             THE COURT:  Bannon.

22             PROSPECTIVE JUROR 0011:  Steven Bannon.

23             THE COURT:  Chris Christie?

24             PROSPECTIVE JUROR 0011:  Chris Christie.

25             THE COURT:  Priebus.

```
 1                    PROSPECTIVE JUROR 0011:  Rence Priebus.

 2                    THE COURT:  And --

 3                    PROSPECTIVE JUROR 0011:  Rudy Giuliani.  That is a

 4      sufficient enough, I believe, list.

 5                    THE COURT:  All right.  You also have Blackstone.

 6                    PROSPECTIVE JUROR 0011:  Yes.  As I separate the

 7      group, I believe that they were given a number of names or

 8      organizations.

 9                    I am a partner in a consulting firm globally that

10      has several of them as clients; Blackstone being the one

11      that I have had proximate work for in the past, but a couple

12      of others rang bells.  And I am not sure but could suspect

13      that others might also be on my broader-speaking client

14      roster for other partners at my firm.

15                    THE COURT:  Okay.  Do you have particular views

16      about them as well, or not?

17                    PROSPECTIVE JUROR 0011:  Not personal views, no,

18      just business dealings in the past.

19                    THE COURT:  All right.  Let me ask you to step out

20      for a second, and we'll bring you right back.  If you can go

21      out this way, and you'll wait for a second.

22                    PROSPECTIVE JUROR 0011:  Certainly.

23                    THE COURT:  Mr. Kenner, you did a cast of

24      thousands in terms of mentioning all the different people

25      that would come up.  Obviously he's indicated a bias in
```

1    terms of particular individuals.

2         Are these names actually going to come up?

3    Because a lot of these people people would have heard of in

4    some way.  So I want to make sure we're not eliminating a

5    lot of people when their names are never going to make an

6    appearance.  So the fact that they have a bias against them,

7    if they're not going to come up, eliminates them when that's

8    not necessary.

9         MR. KENNER:  Your Honor, all of those names and

10   companies were culled from discovery.

11        THE COURT:  Okay.  You have to speak up, sir.

12        MR. KENNER:  I'm sorry.  All of those names were

13   culled from the discovery that we've received from the

14   government, and yes, I believe they are likely to come up.

15        THE COURT:  Okay.

16        MR. KENNER:  And I would also indicate, Your

17   Honor, this is a gentleman that is a strategist at the Bane

18   Capital, which is a very conservative --

19        THE COURT:  That's a different issue than what I'm

20   bringing up.

21        MR. KENNER:  All right.  I'm sorry.

22        THE COURT:  Mr. Keller, I mean, the fact that

23   something's in discovery doesn't necessarily mean

24   everybody's going to come up.  So my question is whether

25   some of these names are actually likely to come up.

1          You've indicated quite a large group, Mr. Kenner,

2    who I'm assuming are not -- I know are not going to testify.

3    So the question is, you know, are their names likely to come

4    up or not?

5          MR. KELLER:  Rence Priebus's name certainly is

6    going to come up.  There are messages, communications with

7    Mr. Priebus that we intend to offer into evidence.

8          The other names, Mr. Bannon, Mr. Giuliani, could

9    come up in passing.  But Rence Priebus for sure, Your Honor.

10         THE COURT:  Okay.  So one way of also doing this

11   is if it looks like this person's -- a juror would be

12   excused without going through all of the questions, I may

13   ask whether we need to go further, which is a signal to you

14   that it sounds like the person has said something and it's

15   going to get them excused.

16         If you agree, that's fine.  If you want me to go

17   on to the other questions, just simply say, "can we address

18   the other questions," and that's fine.  I don't have any

19   problem with that.

20         So it just may be my -- you know, on some of

21   these, I'm assuming with this one, that there would be a

22   request for him to be excused.  Am I correct?

23         MR. KENNER:  Yes.

24         THE COURT:  All right.  Government?

25         MR. KELLER:  No objection, Your Honor.

1          THE COURT:  All right.  So then we won't go on to

2    the rest of the questions.  All right.  Otherwise we're just

3    wasting time if the person's going to wind up getting

4    excused.

5          So at this point I'll excuse No. 0011.  And did we

6    get --

7          THE COURTROOM DEPUTY:  He left his stuff here.

8          THE COURT:  Okay.  Can we take it out?

9          THE COURTROOM DEPUTY:  Can I just take it?

10          THE COURT:  Yeah.

11          My question is whether we're getting 0272.  Have

12    we found 0272?

13          Sir, if you'd step up over here.

14          PROSPECTIVE JUROR NO. 0264:  Good morning, Your

15    Honor.

16          THE COURT:  I'm fine.  Thank you.

17          Okay.  So what's happened to the second juror?

18          PROSPECTIVE JUROR NO. 0264:  The third one didn't

19    walk over with us.

20          THE COURTROOM DEPUTY:  He didn't walk over?

21          PROSPECTIVE JUROR NO. 0264:  The guy said

22    something to you, but I don't think you heard him.

23          THE COURT:  Did he stay in the ceremonial

24    courtroom, do you know?

25          PROSPECTIVE JUROR NO. 0264:  Yes.  So the guy next

1    to me, the guy who just came in, he said, like when we were

2    walking down the hall, the guy isn't here, so...

3                    (Court confers with law clerk)

4              THE COURT:  All right.  So this is Juror No. 0264,

5    which is No. 5 on your list.  And questions are 13, 14, 20,

6    36, and 42.

7              So let me start with 13, which is the government's

8    witnesses, and this would be a combination whether you know

9    the witnesses personally or you know them by reputation or

10   some other way, and you think it would affect your fairness

11   and impartiality.

12             So is there a particular witness?

13             PROSPECTIVE JUROR 0264:  Yes, I saw two.  I wrote

14   their names next to their thing so I can remember.

15             If I'm not mistaken 13 goes to Elliott Broidy.

16             THE COURT:  Okay.

17             PROSPECTIVE JUROR 0264:  Who, if it's the same

18   guy, was the guy with the Russian spy mistress.  I could be

19   wrong.

20             THE COURT:  Okay.

21             PROSPECTIVE JUROR 0264:  And, yeah, I think he was

22   convicted and pardoned.

23             THE COURT:  Okay.  So from your perspective,

24   that's what you associate him with.  So I take it you don't

25   know him personally?

```
 1                    PROSPECTIVE JUROR 0264:  Correct.

 2                    THE COURT:  But you know him by this information

 3       you've provided.  Would that affect your fairness and

 4       impartiality?

 5                    PROSPECTIVE JUROR 0264:  I think so, yeah.

 6                    THE COURT:  And let me just do the next one, which

 7       is 14, which would be the defense witnesses.  And you have

 8       also Mr. Broidy.  You've got Steven Bannon, Rudy Giuliani,

 9       Jeff Sessions, and several others.

10                    Are these people you know personally?

11                    PROSPECTIVE JUROR 0264:  I do not.

12                    THE COURT:  Okay.  So are they all knowing them by

13       reputation?

14                    PROSPECTIVE JUROR 0264:  Correct.

15                    THE COURT:  And would your knowledge of them by

16       reputation affect your fairness and impartiality?

17                    PROSPECTIVE JUROR 0264:  Absolutely.

18                    THE COURT:  Okay.  And what would be the basis for

19       it in general terms?

20                    PROSPECTIVE JUROR 0264:  Well, some of them are

21       convicted criminals, and others are just -- I've lived in

22       the District for over 40 years, and I -- you know, a

23       disbarred lawyer.  I mean, it's ridiculous.  I don't even

24       know why they would even call on these witnesses.

25                    (There is laughter in the courtroom)
```

```
 1              THE COURT:  Do we need to go on to any of the
 2      other questions, Mr. Keller?
 3              MR. KELLER:  I don't believe so, Your Honor.
 4              THE COURT:  Mr. Kenner?
 5              MR. KENNER:  Your Honor, yes, I would ask that the
 6      Court go on.
 7              THE COURT:  Okay.
 8              MR. KENNER:  Or perhaps --
 9              THE COURT:  So let me get a little more
10      information, then, on Question 14.
11              Let me -- Dorothy, if you could hand this back.
12      He has names.
13              And let's go through the names so that you
14      remember who they are.  Okay?  So 13 was Elliott Broidy.
15              And let's do 14, which is the defense would either
16      be calling these witnesses or be -- the names would come up
17      in the testimony should they call them.  So if you could
18      give us the names for the answer to 14, I'd appreciate it.
19              PROSPECTIVE JUROR 0264:  No problem.  And perhaps
20      it bears noting, I'm a trial lawyer for over 40 years so.
21      You know, I take this seriously.
22              Steven Bannon is convicted of a crime and was
23      pardoned.
24              Rudy Giuliani's a disbarred lawyer.
25              Chris Christie is a political hack.
```

1          Charles Grassley -- well, he is --

2          THE COURT:  Counsel, audience, please.

3          PROSPECTIVE JUROR 0264:  Charles Grassley is --

4   I've seen him lie.

5          Jessie Jackson, same thing.

6          Rence Priebus is, like I said before, you know,

7   that elicited the laughter.

8          Eric and Ivanka, no credibility.

9          Xi Jinping, I mean --

10         THE COURT:  Okay.

11         PROSPECTIVE JUROR 0264:  It's beyond

12  comprehension.

13         THE COURT:  So your perspective in regard to these

14  individuals, whether they testify or whether their names

15  came up in the testimony, are you indicating that you

16  couldn't be fair and impartial in the sense of considering

17  their testimony without having a bias?  Is that what you're

18  telling me?

19         PROSPECTIVE JUROR 0264:  Yes, ma'am.

20         MR. KENNER:  Your Honor, I withdraw my request.

21         THE COURT:  Okay.  So let me -- if you could give

22  back the card, though, to Ms. Patterson.

23         PROSPECTIVE JUROR 0264:  Oh, okay.

24         THE COURT:  Now, let me ask you to step down, if

25  you would.  You can follow her out.

```
 1                    PROSPECTIVE JUROR 0264:  Thank you.

 2                    THE COURT:  All right.  Any comments?

 3                    Speak up.  Come on.  We need to move this.  Either

 4      one of you or neither one of you.

 5                    MR. KENNER:  I move to excuse.

 6                    MR. KELLER:  No objection, Your Honor.

 7                    THE COURT:  All right.  Then 0264 is excused for

 8      cause.

 9                    Bring in the next one.

10                    I would just ask those in the courtroom, please

11      don't laugh.  This is a courtroom.

12                    Have we found our missing person?

13                    THE LAW CLERK:  We did.  The next prospective

14      juror will be 0272.

15                    THE COURT:  Okay.  Terrific.

16                    If you could step up over here, sir.

17                    So this is Juror No. 0272, and he has not marked

18      any questions on the card; is that correct?

19                    PROSPECTIVE JUROR 0272:  That's correct.

20                    THE COURT:  Okay.  Any questions?

21                    MR. KELLER:  Sir, could you just tell us where you

22      work or where you previously worked?

23                    PROSPECTIVE JUROR 0272:  Previously worked?

24      That's several places.  Where I worked the past three years?

25                    THE COURT:  You need to move it up.
```

```
1              PROSPECTIVE JUROR 0272:  I'm sorry?

2              THE COURT:  You need to move it up a little bit so

3     we can hear you.  Perfect.

4              PROSPECTIVE JUROR 0272:  I work on Fort George

5     Meade, the Army base, which is in -- that's Fort Meade,

6     Maryland.

7              I'm a cable technician, and I've been there the

8     past three years.  The company I work for is CyberCore Tech.

9              MR. KELLER:  That's all I have, Your Honor.

10             THE COURT:  Mr. Kenner?

11             MR. KENNER:  How long have you been in the D.C.

12    area?

13             PROSPECTIVE JUROR 0272:  Practically most of my

14    life, with the exception of about three years I lived in

15    Atlanta, Georgia.

16             MR. KENNER:  Okay.  Have you ever consulted with

17    an attorney?

18             PROSPECTIVE JUROR 0272:  No, I have not.

19             MR. KENNER:  I have nothing further.

20             THE COURT:  All right.  You can step down, sir.

21    Thank you.

22             All right.  Well, he didn't say anything that was

23    a problem, so moving on.

24             If you'd step up over here, sir.  All right.  You

25    can make yourself comfortable, and you can take your mask
```

1    off so we can actually hear what you're saying.

2           So this is Juror No. 0175, and it's 20, 21, 24,

3    26, and 32.

4           So 20 is whether you have strong opinions about

5    money from foreign countries being used to influence the

6    outcome of elections or to seek political favors from

7    elected officials in such a way as to affect your fairness

8    and impartiality.

9           PROSPECTIVE JUROR 0175:  I'm sorry, Judge, I think

10   I had the wrong number on that one.

11          Sorry, I think I had the wrong number on that one.

12   I was trying to respond to the one about a spouse being an

13   attorney.

14          THE COURT:  I'm sorry, that's my fault.  I read

15   the wrong one.  Hold on.  I take it back.  I read the wrong

16   one here.

17          20 is are you or members of your close family a

18   lawyer, studied law, or -- that sounds better, sorry.

19          So it's you or somebody close to you work for a

20   lawyer or you are a lawyer or studied law.  So is this you

21   or somebody else?

22          PROSPECTIVE JUROR 0175:  It's my husband.

23          THE COURT:  Okay.  And has the person studied law

24   or is a lawyer?

25          PROSPECTIVE JUROR 0175:  He's a lawyer, yes.

```
 1                  THE COURT:  He's practicing?  Okay.

 2                  Does he work for the government or private law

 3       firm?

 4                  PROSPECTIVE JUROR 0175:  He just finished a five-

 5       year stint with the government and just returned to a large

 6       firm.

 7                  THE COURT:  Okay.  In terms of the -- which

 8       government agency was he working for?

 9                  PROSPECTIVE JUROR 0175:  He was the National Labor

10       Relations Board.

11                  THE COURT:  Okay.  And is he still practicing in

12       the labor area at the firm?

13                  PROSPECTIVE JUROR 0175:  Yes.

14                  THE COURT:  Does he do litigation, to your

15       knowledge?

16                  PROSPECTIVE JUROR 0175:  He does not.

17                  THE COURT:  And have you discussed, you know,

18       legal issues or things that he's worked on?

19                  PROSPECTIVE JUROR 0175:  Of course.

20                  THE COURT:  Okay.  Anything about those

21       discussions -- since he doesn't litigate, he wouldn't have

22       discussed trials or anything, but anything about those

23       discussions about the law or what his work is or was in the

24       labor field that you think would affect your fairness and

25       impartiality in this case?
```

1              PROSPECTIVE JUROR 0175:  No.

2              THE COURT:  Okay.  Anybody else, or is that --

3              PROSPECTIVE JUROR 0175:  His brother is an

4    attorney as well.  He's not practicing.  So that would be my

5    brother-in-law.

6              THE COURT:  Did his brother practice in terms of

7    litigation in any way?

8              PROSPECTIVE JUROR 0175:  No.

9              THE COURT:  Do you know what his specialty would

10   have been?

11             PROSPECTIVE JUROR 0175:  I don't.

12             THE COURT:  Okay.  So did he ever practice?

13             PROSPECTIVE JUROR 0175:  I believe he did.

14             THE COURT:  But you're not sure what --

15             PROSPECTIVE JUROR 0175:  Correct.  That was prior

16   to me meeting him.

17             THE COURT:  Okay.  And 21 is whether you or

18   somebody close to you worked in accounting, forensic

19   accounting, banking or banking regulations.  Is that you or

20   somebody else?

21             PROSPECTIVE JUROR 0175:  That's me.

22             THE COURT:  Okay.  And which of those fields have

23   you worked in?

24             PROSPECTIVE JUROR 0175:  I have my degree in

25   finance, and I started as a bank examiner for the Federal

1    Deposit Insurance Corporation, so that is very much

2    accounting related.

3            THE COURT:  So you worked for FDIC?

4            PROSPECTIVE JUROR 0175:  I did for 15 years, and

5    I've moved to a different government agency now.

6            THE COURT:  Okay.  And you need to speak up to

7    make sure that they all can hear you.

8            PROSPECTIVE JUROR 0175:  I'm sorry.

9            THE COURT:  What did you do at FDIC?

10           PROSPECTIVE JUROR 0175:  I was a bank examiner.

11           THE COURT:   And where are you working now?

12           PROSPECTIVE JUROR 0175:  Now I'm with the Office

13   of the Comptroller of the Currency, which is a division of

14   the Treasury Department.

15           THE COURT:  Okay.  In terms of bank examiner, what

16   exactly did you do as a bank examiner?

17           PROSPECTIVE JUROR 0175:  So as an examiner, I went

18   into banks to conduct routine examinations of the bank's

19   risk, risk presence, and evaluated their compliance with

20   laws and identified risks; determined if the bank had proper

21   measures in place to mitigate those risks; and assigned

22   ratings to the banks, and enforced laws.

23           THE COURT:  Okay.  And how long have you been with

24   the Comptroller of the Currency?

25           PROSPECTIVE JUROR 0175:  I've been there 14 years.

1          THE COURT:  And if you could tell me again what

2     you do there?

3          PROSPECTIVE JUROR 0175:  I just accepted a new

4     position two weeks ago as the chief learning officer with

5     the OCC.  So now I'm responsible for the training of our

6     examiners.

7          THE COURT:  All right.  So if we had testimony

8     relating to banks, banking, and various other aspects of a

9     bank and how people use the banks, would you be able to --

10    putting it in very general terms, would you be able to

11    listen to the testimony and make a decision based on what's

12    presented in the courtroom and not being an expert in terms

13    of deciding based on your training and your job what should

14    or should not have happened or what -- in other words,

15    putting something in that's not part of the case?

16         PROSPECTIVE JUROR 0175:  Yes.

17         THE COURT:  Can you separate it out?

18         PROSPECTIVE JUROR 0175:  Yes.

19         THE COURT:  Now, 24 is the -- whether you or

20    somebody close to you had worked for a state federal

21    regulatory agency and banking, et cetera, campaign -- how

22    about campaign finance, anything in that?

23         PROSPECTIVE JUROR 0175:  No.

24         THE COURT:  So this is the same --

25         PROSPECTIVE JUROR 0175:  It was the same, me.

```
 1              THE COURT:  Is there anybody else, or is this just
 2      you that --
 3              PROSPECTIVE JUROR 0175:  That was just me that I
 4      was thinking of, yes.
 5              THE COURT:  Just you?  Okay.
 6              And 26 is whether you or somebody close to you had
 7      been arrested, charged, found guilty, gone to jail for a
 8      similar crime, and we put in here financial crimes,
 9      investment, identity theft, or campaign finance.  So could
10      you identify who that person would be?
11              PROSPECTIVE JUROR 0175:  Yes.  And I may have been
12      overthinking this, but the same brother-in-law that I
13      mentioned earlier who is an attorney or was an attorney was
14      convicted of honest services fraud.
15              THE COURT:  Okay.  And do you know what that
16      actually entailed?
17              PROSPECTIVE JUROR 0175:  I know enough to be
18      dangerous, but not any specifics.  It was right around the
19      time I met him that all of this was happening.
20              THE COURT:  Okay.  So this is your brother-in-law,
21      but presumably he's not practicing now?
22              PROSPECTIVE JUROR 0175:  That's right.
23              THE COURT:  And did he go to trial?  Did he plead?
24              PROSPECTIVE JUROR 0175:  He went to trial.  He was
25      convicted I believe in this very -- maybe not this room, but
```

1    certainly in this hallway.  But he served time in prison.

2              THE COURT:  And where would that occur?  D.C. or

3    someplace else?

4              PROSPECTIVE JUROR 0175:  D.C.

5              THE COURT:  In this court or the local court?

6              PROSPECTIVE JUROR 0175:  It was this one.

7              THE COURT:  Were you a witness, or did you come

8    and watch?

9              PROSPECTIVE JUROR 0175:  I came to the sentencing.

10             THE COURT:  Okay.  But you didn't come to the

11   trial itself?

12             PROSPECTIVE JUROR 0175:  No.

13             THE COURT:  Did you speak at the sentencing?

14             PROSPECTIVE JUROR 0175:  No.

15             THE COURT:  Did you have discussions with your

16   husband or your brother-in-law relating to the trial itself?

17             PROSPECTIVE JUROR 0175:  Yes.

18             THE COURT:  And did you come to some conclusions

19   based on those discussions that he was treated fairly or not

20   treated fairly by the judicial system?

21             PROSPECTIVE JUROR 0175:  Yes.

22             THE COURT:  And what were those conclusions?

23             PROSPECTIVE JUROR 0175:  I believe that he was not

24   treated fairly.

25             THE COURT:  Okay.  In what way?

1          PROSPECTIVE JUROR 0175:  The facts of the case or

2     the version that I heard of the facts led me to believe that

3     he was strong-armed.  And, you know, I'll leave it at that.

4          THE COURT:  He was forced into doing this; is that

5     what you're saying?

6          PROSPECTIVE JUROR 0175:  No, no.  He was perhaps

7     not treated fairly by prosecutors.  He did not accept a plea

8     deal, and, you know, I don't know enough about the facts,

9     but...

10          THE COURT:  Okay.  So this is based on -- since

11     you didn't go to the trial, this would have been based on

12     discussions with your brother-in-law?

13          PROSPECTIVE JUROR 0175:  And my husband.

14          THE COURT:  And your husband.  So I take it that's

15     their view?

16          PROSPECTIVE JUROR 0175:  Yes.

17          THE COURT:  Okay.  So in this case obviously we

18     have prosecutors as well.  Does that -- does your feelings

19     about that spill over such that you would be more biased or

20     not or not be as impartial in terms of the government's case

21     and the defense case?

22          PROSPECTIVE JUROR 0175:  It does not.

23          THE COURT:  Anything else -- how long ago was

24     that?

25          PROSPECTIVE JUROR 0175:  Two -- I think he was --

1      that was late 2011, maybe October of 2011.

2              THE COURT:  Okay.  And I take it the facts in the

3      particular case that you know of are based on what you have

4      been told by --

5              PROSPECTIVE JUROR 0175:  Correct.

6              THE COURT:  Okay.  32 is whether you've ever

7      served on a grand jury.  Have you?

8              PROSPECTIVE JUROR 0175:  I did.

9              THE COURT:  And you know the distinction between a

10     trial jury and a grand jury?

11             PROSPECTIVE JUROR 0175:  Correct.  It was grand

12     jury with Superior Court.

13             THE COURT:  Where -- okay.  The grand jury for

14     Superior Court?

15             PROSPECTIVE JUROR 0175:  Correct.

16             THE COURT:  How long ago was that?

17             PROSPECTIVE JUROR 0175:  That was last August and

18     September.  It was five weeks.

19             THE COURT:  Okay.  And did -- was that with a

20     bunch of different cases or one investigation?

21             PROSPECTIVE JUROR 0175:  Correct, 47 cases, pieces

22     of 47 cases.

23             THE COURT:  Okay.  Anything about that experience

24     that you think would affect your consideration of the

25     evidence in this case?

1          PROSPECTIVE JUROR 0175:  No.

2          THE COURT:  And you know the distinction between

3    the standard and the burden in a grand jury is much lower?

4          PROSPECTIVE JUROR 0175:  I do.

5          THE COURT:  And not beyond a reasonable doubt as

6    it would be here.  Do you understand that?

7          PROSPECTIVE JUROR 0175:  I do.

8          THE COURT:  And would you commit to applying the

9    burden and standard of beyond a reasonable doubt in this

10   case?

11         PROSPECTIVE JUROR 0175:  Yes.

12         THE COURT:  All right.  Government, any questions?

13         MR. KELLER:  Your Honor, I might be mistaken.  Was

14   there another positive answer to Question 42?  I thought I

15   heard that on the list.

16         THE COURT:  It's 20, 21, 24, 26, and 32.

17         MR. KELLER:  Okay.  I misheard.

18         With respect to the criminal case involving your

19   brother-in-law, what were your impressions of the sentencing

20   that you attended?  Did you feel like he was treated fairly

21   at sentencing?

22         PROSPECTIVE JUROR 0175:  At sentencing, yes.

23         MR. KELLER:  And with respect to your reference to

24   feeling like he was strong-armed because he didn't take a

25   plea, can you elaborate on that?  What led to that

1    impression?  What about the trial or the charges gave you

2    that impression?

3              PROSPECTIVE JUROR 0175:  So, again, most of this

4    will be -- I'm not sure that hearsay's even the right word,

5    but family discussions about the event, because I didn't

6    meet him or my husband until this was long underway.

7              There was -- there were things such as the FBI

8    raiding his house with his daughter at home.  There was

9    pressure for him to go with a plea that he didn't go with,

10   and so there was full-force prosecution with him with a very

11   severe sentence recommended.

12             So it was stuff like that.  And it was just very

13   tough for the family, as you would understand.

14             MR. KELLER:  If the judge were to instruct you

15   that considerations about sentencing should play no role in

16   your consideration of the evidence in this case, do you

17   think you'd actually be able to follow that, or do you think

18   based on this personal experience sentencing would be

19   something that would be in the back of your mind as you

20   considered the evidence in this case?

21             PROSPECTIVE JUROR 0175:  Well, I can't say that it

22   wouldn't be in the back of my mind.

23             THE COURT:  You understand you have nothing to do

24   with the sentence?

25             PROSPECTIVE JUROR 0175:  Understood, correct.

1          THE COURT:  So it's something that the Court

2     decides totally separately.  But we would not want you

3     thinking, well, if I don't convict or if I convict in terms

4     of what's going to happen in terms of sentencing.  If that

5     would influence you, you need to let us know.

6          PROSPECTIVE JUROR 0175:  That would not.

7          MR. KELLER:  So it would not influence you, but it

8     would be in the back of your mind?

9          PROSPECTIVE JUROR 0175:  I don't mean to be flip,

10    but I really think about things.  So certainly I can't say

11    that I wouldn't think about it.  It wouldn't influence

12    anything.

13         MR. KELLER:  With respect to the grand jury

14    service, was there anything about that experience that made

15    you feel like dealing with other jurors or dealing with

16    deliberations was difficult or unpleasant?

17         PROSPECTIVE JUROR 0175:  Yes.

18         MR. KELLER:  How so?

19         PROSPECTIVE JUROR 0175:  It was -- we had 23

20    people in the grand jury and a very interesting mix of

21    personalities, and it was a very difficult five weeks

22    personality-wise.

23         MR. KELLER:  If some of those same -- if there

24    were personality conflicts among the jurors on this case,

25    that might make it difficult for you to fully express your

1    views or fully participate in deliberations?

2              PROSPECTIVE JUROR 0175:  No.

3              MR. KELLER:  Would it make it difficult for you to

4    be open to the views of your fellow jurors and fully

5    consider their views as part of deliberations?

6              PROSPECTIVE JUROR 0175:  No.

7              MR. KELLER:  Nothing further, Your Honor.

8              THE COURT:  Mr. Kenner.

9              MR. KENNER:  Thank you, Your Honor.

10             How many cases during your grand jury experience

11   did you vote on whether to indict or not to indict?

12             PROSPECTIVE JUROR 0175:  I believe we had -- of

13   the 47, there were seven that we ultimately voted on.

14             MR. KENNER:  Okay.  Of those seven, were any of

15   the votes to not issue an indictment?

16             PROSPECTIVE JUROR 0175:  No.

17             MR. KENNER:  Okay.  So every case you heard was

18   indicted?

19             PROSPECTIVE JUROR 0175:  Correct, yes.

20             MR. KENNER:  Did you ever do --

21             THE COURT:  Well, it's not every case that you

22   heard, because you said there were 47 cases you heard.

23             PROSPECTIVE JUROR 0175:  Right.  We heard pieces

24   of 47 cases throughout the five weeks.  We were asked to

25   vote on I believe it was seven.  I might be off one or two.

1    But for all of those, we voted for indictment.

2            MR. KENNER:  Okay.  In connection with the work

3    that you do -- let's go back first to the work you did as a

4    bank examiner.  Can you describe to me the kinds of things

5    that you looked for or evaluated when you did a bank

6    examination?

7            PROSPECTIVE JUROR 0175:  Sure.  And please, if you

8    will, cut me off if this is going too deep.  But we're

9    required to evaluate a bank on various components, and they

10   include capital, asset quality, management, earnings,

11   liquidity, and sensitivity to market risk.  So that's the

12   focus of any bank exam.

13           We're evaluating all of those components during

14   the exam, while looking at underlying laws, the regulations,

15   ensuring that the bank is adhering to those; while also

16   identifying risk, the bank's risk profile; and if, for

17   example, they're taking on a new type of a lending, have

18   they done their due diligence?  Have they put the right

19   protocols in place?  Have they hired the right people?

20   Ensuring that the accounting looks good.  Again, ensuring

21   that they're adhering to and complying with laws and

22   regulations.

23           So that's the high-level focus of any bank exam.

24   And the scope varies depending on the size of the exam, the

25   quality of the bank, et cetera.

1          MR. KENNER:  Thank you.

2          In the course of these kinds of investigations,

3     one of the things you said that you would evaluate is the

4     way in which they followed laws and rules?

5          PROSPECTIVE JUROR 0175:  Correct, yes.

6          MR. KENNER:  Would some of those laws involve

7     money laundering?

8          PROSPECTIVE JUROR 0175:  Yes, of course.

9          MR. KENNER:  Do you have a familiarity with 18 USC

10    1956?

11         PROSPECTIVE JUROR 0175:  That number does not ring

12    a bell.

13         MR. KENNER:  Okay.  Do you have familiarity with

14    18 USC 1957(f) -- subsection (f), subsection (b).

15         PROSPECTIVE JUROR 0175:  So I may or may not, but

16    I've not been an examiner for 20 years now --

17         MR. KENNER:  Okay.

18         PROSPECTIVE JUROR 0175:  -- an actual examiner.

19    So I'm on the training side, and we train on the -- I know

20    of the terms anti-money laundering, I know suspicious

21    activity reports, BSA, things like that, but I don't know

22    the specific cites.

23         MR. KENNER:  Okay.  But, for example, now that

24    you're teaching, you teach how to look for specified

25    unlawful activity reports?

1          PROSPECTIVE JUROR 0175:  Correct.  I don't teach.

2     I oversee a team that designs and delivers training, but I

3     don't -- I'm not in there in the weeds and in the content.

4          MR. KENNER:  Okay.  And does what your department

5     do in part is train these people to look for money

6     laundering?

7          PROSPECTIVE JUROR 0175:  Correct.

8          MR. KENNER:  And is part of what you train them to

9     do to look for specified unlawful activity reports?

10         PROSPECTIVE JUROR 0175:  Correct.

11         MR. KENNER:  When you were -- have you yourself

12    ever examined any suspicious activity reports?

13         PROSPECTIVE JUROR 0175:  I have.

14         MR. KENNER:  About approximately how many?

15         PROSPECTIVE JUROR 0175:  Sorry.  Are you asking

16    about individual SARs that I would have looked at?

17         MR. KENNER:  Yes.

18         PROSPECTIVE JUROR 0175:  Over the years, probably

19    50.  And that's just a guess.  And that would have been in

20    my 20s, which was a very long time ago.

21         MR. KENNER:  But you're still the director of a

22    department that teaches --

23         PROSPECTIVE JUROR 0175:  Correct, yes.

24         MR. KENNER:  -- people how to do that?

25         PROSPECTIVE JUROR 0175:  Yes.

1            MR. KENNER:  And have you ever had occasion, as a

2    bank examiner or in your current work, to trace large sums

3    of money deposited from foreign sources?

4            PROSPECTIVE JUROR 0175:  Yes.

5            MR. KENNER:  And on approximately how many

6    occasions have you done that?

7            PROSPECTIVE JUROR 0175:  I can think of two that

8    stick out in my mind.

9            MR. KENNER:  Okay.  And when I asked you about

10   large sums of money, what do you -- what did you take "large

11   sums of money" to mean?

12           PROSPECTIVE JUROR 0175:  I wouldn't even remember.

13   You know, I wouldn't even put a dollar on it, but large.

14   Hundreds of thousands -- the one incident that I -- the one

15   bank that I examined, we were looking at -- it was wires of

16   over hundreds of thousands of dollars.  These were large.

17           MR. KENNER:  Okay.  Have you ever investigated or

18   traced money, large sums of money, from foreign sources

19   where the amounts were in the hundreds of millions?

20           PROSPECTIVE JUROR 0175:  Not that I remember.

21           MR. KENNER:  Do you -- would you agree that you

22   would take some special expertise into your consideration of

23   the evidence?  I mean, you wouldn't ignore what you know,

24   would you?

25           PROSPECTIVE JUROR 0175:  No, I wouldn't -- I don't

1    think that I would.

2              THE COURT:  Well, what you know about -- I think

3    what he's asking is you have an expertise, as you explained.

4    Would you use that expertise in considering the evidence or

5    would you be able to separate it out and make decisions

6    based on what gets presented in the court and not bring in?

7    What we don't want is an expert on the jury panel.

8              PROSPECTIVE JUROR 0175:  Correct.  I would argue

9    that I'm not an expert in this area.  I have perhaps an

10   awareness of it at this point.  I am so far removed from

11   those specifics and that work that it's -- I would not

12   consider myself an expert.

13             MR. KENNER:  Well, if you were to hear testimony

14   from a person acting as a bank examiner or acting in a

15   capacity of evaluating the due diligence of a bank, would

16   you not have in your mind in doing that what you know about

17   what should be happening?

18             PROSPECTIVE JUROR 0175:  Yes, I would.

19             MR. KENNER:  I'm sorry, you would?

20             PROSPECTIVE JUROR 0175:  I would have that in my

21   mind about what should be happening.

22             MR. KENNER:  Okay.  So if subject matters in this

23   case had to do with the propriety with which various

24   financial institutions, including banks, exercise due

25   diligence or fail to exercise due diligence, you have a set

1    of criteria in your mind that you would use to evaluate that

2    question, right?

3              PROSPECTIVE JUROR 0175:  I think so, yes.

4              MR. KENNER:  And that's based on your previous

5    employment?

6              PROSPECTIVE JUROR 0175:  My experience.

7              MR. KENNER:  And your current employment?

8              PROSPECTIVE JUROR 0175:  Yes.

9              MR. KENNER:  Have you ever looked at foreign wire

10   transfers?

11             PROSPECTIVE JUROR 0175:  I believe I have.

12             MR. KENNER:  And you're familiar with what you

13   were looking for when you looked at them, right?

14             PROSPECTIVE JUROR 0175:  Yes.

15             MR. KENNER:  And what kinds of things were you

16   looking for?

17             PROSPECTIVE JUROR 0175:  At the time -- and this

18   is -- you're drawing on a very old memory.  We were looking

19   to see if we could discern or assess the source of those

20   transfers into the bank.  If we could determine who --

21   really who the person was behind the funds.  And really what

22   we were trying to focus on in this one instance was if the

23   bank knew the answers to those questions and why the bank

24   wasn't getting these large volume of incoming funds.

25             MR. KENNER:  Okay.  So you would essentially

1    evaluate the due diligence of a bank in connection with wire

2    transfers from out of the country?

3                PROSPECTIVE JUROR 0175:  Correct, yes.

4                MR. KENNER:  And, again, you wouldn't leave

5    that -- those experiences that you've had or the knowledge

6    you have when you went into the jury room, right?

7                PROSPECTIVE JUROR 0175:  I wouldn't.  But I

8    also -- as I'm saying, I haven't done that in over 20 years

9    so, you know --

10               MR. KENNER:  Okay.

11               PROSPECTIVE JUROR 0175:  -- I have familiarity

12   with what's happening there, but not immediate expertise

13   with it.

14               MR. KENNER:  Okay.  But you are the director of a

15   department that trains people in how to be an effective bank

16   examiner?

17               PROSPECTIVE JUROR 0175:  Yes.

18               MR. KENNER:  And that would touch on all the

19   things I've talked to you about?

20               PROSPECTIVE JUROR 0175:  Yes.

21               MR. KENNER:  So the work experiences that you've

22   had will remain in the back of your mind when you go into

23   the jury room.  Would that be a fair statement?

24               PROSPECTIVE JUROR 0175:  I would think so, yes.

25               MR. KENNER:  And you would kind of filter the

1    evidence through that kind of lens?

2              PROSPECTIVE JUROR 0175:  Yes.

3              MR. KENNER:  I have nothing further.

4              THE COURT:  All right.  You can step down, sir.

5              MR. KENNER:  Your Honor, there would be a motion

6    to excuse the juror for cause.

7              THE COURT:  Any objection?

8              MR. KELLER:  No, Your Honor.

9              THE COURT:  All right.  I'll excuse Juror No.

10   0175.

11             If you could step up over here, please.  Please go

12   ahead and sit down.  And you can take your mask down because

13   it's hard to hear you.

14             All right.  This is Juror No. 0965, and her

15   question is 33.

16             So as I understand it, then, you've been a juror

17   in a trial in a criminal case; is that correct?

18             PROSPECTIVE JUROR 0965:  Yes.

19             THE COURT:  Okay.  And which court was it?  Was it

20   this court or Superior Court?

21             PROSPECTIVE JUROR 0965:  Superior Court last week.

22             THE COURT:  Okay.  And how long ago was that?

23             PROSPECTIVE JUROR 0965:  The trial ended last

24   Thursday.  It was for three and a half weeks.

25             THE COURT:  Oh, so just last week?

```
 1              PROSPECTIVE JUROR 0965:  Yes.

 2              THE COURT:  All right.  As I mentioned, you get

 3     called in each court.

 4              PROSPECTIVE JUROR 0965:  Yes, I received two

 5     summons.

 6              THE COURT:  Okay.  How long did the trial last?

 7              PROSPECTIVE JUROR 0965:  That was for three and a

 8     half weeks.

 9              THE COURT:  And is that the only time you've been

10     a trial juror, or you've been one before?

11              PROSPECTIVE JUROR 0965:  I've been to one before.

12     It's been a few years.  It was only a one-day trial.

13              THE COURT:  Okay.  And was that in Superior Court,

14     too?

15              PROSPECTIVE JUROR 0965:  Yes.

16              THE COURT:  Okay.  And do you remember the nature

17     of the charges in each of these cases?

18              PROSPECTIVE JUROR 0965:  I know the last one.  It

19     was a murder case.

20              THE COURT:  Do you remember the one before that,

21     the one-day one?

22              PROSPECTIVE JUROR 0965:  It was a drug case.

23              THE COURT:  Anything about that experience, either

24     as a juror in terms of dealing with other jurors or what

25     happened in the court, that you think would affect your
```

1   fairness and impartiality in this case?

2          PROSPECTIVE JUROR 0965:  No.

3          THE COURT:  Were you the foreperson in either of

4   these cases?

5          PROSPECTIVE JUROR 0965:  No.

6          THE COURT:  Without indicating what the verdict

7   might have been, did the jury actually reach a verdict?

8          PROSPECTIVE JUROR 0965:  Yes, we did.  Yes.

9          THE COURT:  All right.  Mr. Keller?

10         MR. KELLER:  Do you remember about how long the

11  deliberations lasted for the one-day trial?

12         PROSPECTIVE JUROR 0965:  I would probably say

13  maybe like three to four hours for the one-day.

14         MR. KELLER:  And then in the recent, the longer

15  trial, the three-and-a-half-week one?

16         PROSPECTIVE JUROR:  It was two days.

17         MR. KELLER:  Your Honor, it's the Court's

18  preference that we don't ask what the verdict was?

19         THE COURT:  Don't ask for the verdicts.

20         MR. KELLER:  Was there anything about the more

21  recent case, the longer -- involving the longer

22  deliberations, that gave you a sense that being a juror was

23  unpleasant or difficult or having to go through that process

24  of working with your fellow jurors to reach a verdict, what

25  was your impression after that?

1          PROSPECTIVE JUROR 0965:  I think working with

2     the -- some of the jurors was hard for some people to make a

3     decision, so that's why we went into two days.  So I think

4     some people felt pressured to make a decision.

5          It was an experience.  It was an experience.

6          MR. KELLER:  Do you think that experience would

7     impact how you would work with your fellow jurors if you

8     were selected as a juror in this case during deliberations?

9     Do you think you'd be more likely to voice your opinion or

10    less likely to voice your opinions --

11         THE COURT:  That's two questions.

12         MR. KELLER:  -- based on the type of pressure that

13    you're describing in this most recent case?

14         PROSPECTIVE JUROR 0965:  No, I think based on the

15    evidence that's provided in this case, which is probably --

16    different from the previous case that I served on, so, you

17    know, the decision has to be on the evidence to make the

18    final decision.

19         MR. KELLER:  And, again, just focusing on the

20    pressure that you described, would you be comfortable and

21    willing to voice your opinion in this case even if it was

22    different from the opinions of your fellow jurors?

23         PROSPECTIVE JUROR 0965:  Absolutely.  Absolutely,

24    yes.

25         MR. KELLER:  Are you currently working?

1          PROSPECTIVE JUROR 0965:  Yes.

2          MR. KELLER:  Where do you work?

3          PROSPECTIVE JUROR 0965:  I'm a contractor with the

4     United States Coast Guard.  I work for a company called

5     First Information Technology Services.

6          MR. KELLER:  What kind of services does your

7     company provide?

8          PROSPECTIVE JUROR 0965:  We provide IT service --

9     I'm a cyber security engineer for that company.

10          MR. KELLER:  Can you just give me kind of a high-

11     level description of what kinds of work that you do

12     personally for the company?

13          PROSPECTIVE JUROR 0965:  We provide -- we monitor

14     the network for the Coast Guard.  We also scan their -- when

15     I say "scan," scan their devices, like their laptops, their

16     servers.  We provide reports.  Just, oh, my goodness, it's

17     so much.

18          What else do we do?  Just provide daily mostly

19     monitoring.  You know, make sure the network is secure.

20          MR. KELLER:  So it doesn't have anything to do

21     with any type of investigations that the Coast Guard might

22     be working on or enforcement activities of the Coast Guard?

23          PROSPECTIVE JUROR 0965:  No, no.  They have a

24     separate group that does that.  I'm not involved in that

25     process.

1    MR. KELLER:  And so your work is mainly just

2    focused on protecting the Coast Guard's systems?

3    PROSPECTIVE JUROR 0965:  Exactly.

4    MR. KELLER:  That's all I have, Your Honor.

5    THE COURT:  You mentioned that some jurors felt

6    pressured.  Did you feel pressured as part of the discussion

7    with your fellow jurors, or no?

8    PROSPECTIVE JUROR 0965:  Me myself?  No, I was

9    not.  I didn't.  No, I was not.  I didn't feel any type of

10   pressure from the other judges -- from the other jurors to

11   make a decision.

12   THE COURT:  All right.  Mr. Kenner.

13   MR. KENNER:  I'm sorry, I didn't hear that last

14   answer.

15   PROSPECTIVE JUROR 0965:  I felt no pressure from

16   the other jurors to make a decision in the case that I

17   recently served on.

18   MR. KENNER:  Okay.

19   THE COURT:  Mr. Kenner.

20   MR. KENNER:  Thank you, Your Honor.

21   Ma'am, this prior trial that you had that just

22   ended you said just a short time ago.

23   PROSPECTIVE JUROR 0965:  Yes, that's last

24   Thursday.

25   MR. KENNER:  Do you feel any kind of juror

1    fatigue?

2              PROSPECTIVE JUROR 0965:  Yes.  I'm still

3    recovering.

4              MR. KENNER:  You're still recovering from that

5    one?

6              PROSPECTIVE JUROR 0965:  I'm still recovering,

7    yes.  And to be honest, my employer is not too happy.

8              MR. KENNER:  How do you feel about sitting on a

9    case right now that's estimated to be four weeks plus

10   deliberation time?

11             PROSPECTIVE JUROR 0965:  I mean, if it was up to

12   me, I could do it.  But I don't -- I'm not sure if I'll have

13   a job after another four weeks.

14             MR. KENNER:  Well, let's talk about that for a

15   second.  You're saying it and laughing, but is there some

16   concern that you will suffer in some way with your job as a

17   result of three and a half weeks and then another four-plus

18   weeks, seven and a half weeks?

19             THE COURT:  Legally they can't fire you.

20             PROSPECTIVE JUROR 0965:  I don't think so.

21   They're still paying me.  So as long as I show proof that I

22   attend and provide service that day, then yeah.

23             MR. KENNER:  Okay.  Let's talk about this last

24   trial that you sat on.  Do you recall how many votes -- how

25   many different votes that --

1        THE COURT:  No, this is not appropriate, to get

2   into the deliberations.  I'm sorry.  I've asked the

3   questions that you can ask.  Did they reach a verdict?  Was

4   she the foreperson?  Did they have -- did that experience

5   affect her consideration of the evidence in this case?

6        MR. KENNER:  Okay.  In that prior trial, were you

7   instructed by the judge in that trial about the presumption

8   of innocence?

9        PROSPECTIVE JUROR 0965:  Instructed by the judge?

10       MR. KENNER:  Yes.

11       PROSPECTIVE JUROR 0965:  No.  In what terms?  He

12   provided instructions at the end before deliberation on what

13   we should base our vote on, yes, if that's what you're

14   referring to.

15       MR. KENNER:  Do you recall whether or not one of

16   those instructions that he gave to that jury was about the

17   burden -- the presumption of innocence?

18       PROSPECTIVE JUROR 0965:  Yes, I remember that.

19   Yeah.

20       MR. KENNER:  And do you -- what is your

21   recollection -- what is your understanding, after having

22   been given a direction by the judge, as to presumption of

23   innocence?  What do you understand that to mean?

24       PROSPECTIVE JUROR 0965:  Well, from what I

25   remember is that everyone is innocent until proven guilty.

1    You have to listen to all the evidence.

2                MR. KENNER:  Okay.

3                PROSPECTIVE JUROR 0965:  You can't, you know, make

4    anything up basically.  You can't presume anything or -- you

5    know, you have to base your decisions based on the evidence

6    that was provided by both parties.

7                MR. KENNER:  Okay.  And you're comfortable with

8    the fact that Mr. Michel, in this case, is entitled to that

9    same presumption of innocence?

10               PROSPECTIVE JUROR 0965:  Absolutely.  Everyone is

11   entitled to -- yeah, everyone is innocent until proven

12   guilty, yeah.

13               MR. KENNER:  Okay.  And did the judge in that

14   prior trial instruct you about what the burden of proof was

15   to take away that presumption of innocence?

16               PROSPECTIVE JUROR 0965:  He may have.  It was a

17   thick folder that we read and went over, but he may have.

18               MR. KENNER:  What is your understanding of proof

19   beyond a reasonable doubt after -- given -- were you

20   instructed in that as well?

21               THE COURT:  Mr. Kenner, that's not appropriate to

22   ask her to try and describe it.  We have an instruction that

23   she'll be provided in terms of applying it.

24               MR. KENNER:  Okay.

25               THE COURT:  Move on to another question.

```
 1              MR. KENNER:  Have you ever retained or hired a
 2   lawyer?
 3              PROSPECTIVE JUROR 0965:  Not for myself
 4   personally, but for a family member.
 5              MR. KENNER:  Okay.  Did you or your family members
 6   have any -- why don't I withdraw that.
 7              Did that lawyer give advice?
 8              PROSPECTIVE JUROR 0965:  I think, yes.
 9              MR. KENNER:  And did you or anybody that was
10   getting that advice hesitate to rely on the advice you got
11   from the attorney?
12              PROSPECTIVE JUROR 0965:  No.
13              MR. KENNER:  How long have you lived in D.C.?
14              PROSPECTIVE JUROR 0965:  I've lived in D.C. since
15   1988.
16              MR. KENNER:  I don't have any other questions,
17   Your Honor.  Thank you.
18              THE COURT:  All right.  You can step down.  Thank
19   you.
20              PROSPECTIVE JUROR:  Thank you.
21              THE COURT:  Obviously this is not going to be
22   quick, but I think it's time to take a lunch break, so let
23   me wait until Dorothy comes back.
24              We're going to take a lunch break.
25              (Discussion off the record)
```

1              THE COURT:  There's no issue with this juror; is

2      that correct?

3              MR. KENNER:  Your Honor, I would make a challenge

4      for cause.

5              THE COURT:  Based on what?

6              MR. KENNER:  Based on the closeness of the

7      previous trial to this trial, and I really do have some

8      concern that it was recently that she was instructed about a

9      state case.  Now she's going to be --

10             THE COURT:  I can't hear you, sir.

11             MR. KENNER:  I'm sorry.  Now she's going to be --

12     I'm just concerned about the jury fatigue, Your Honor.

13             THE COURT:  Well, she sounded like she was willing

14     to do it.

15             What's your position?

16             MR. KELLER:  We would oppose the motion to strike.

17             THE COURT:  She certainly -- you asked her the

18     questions.  She was willing to, you know, be a juror.  She

19     knew the presumption of innocence.

20             Reasonable doubt is not an easy instruction.

21     so, frankly, trying to get a layperson to discuss it I think

22     is -- that's why I stopped you -- is not appropriate.

23             So I'm not excusing her.

24             MR. KENNER:  Thank you, Your Honor.

25             THE COURT:  So what I'm going to ask is that we

1    come back at 2:00.  They're going to come back a little

2    later.  I want to talk to you about perhaps excusing the

3    people at the end -- because at the rate we're going we're

4    not going to reach them -- so that they're not waiting

5    around all day when we're never going to talk to them.  So

6    I'd ask that you come back at 2:00.

7         All right.  We're on a break.  So I'll see you all

8    back.

9         Please be careful.  You know, jurors, until

10   they're chosen, do not wear badges, so do not talk about the

11   case -- are you all listening?  You're not.

12        MR. KENNER:  Yes.

13        THE COURT:  Okay.  Do not talk about this case in

14   the restrooms, out in the halls, or anything else.  You've

15   got separate rooms.  You can go and discuss there.

16        They're not -- they don't have badges now so

17   you're not going to know.  We have a bunch of trials.

18   You're not going to know when they're jurors or not, so I

19   want to make sure nobody hears something from you all.  So

20   nothing out in the public areas.  Okay?

21        MR. KENNER:  Thank you, Your Honor.

22        THE COURT:  All right.

23        (Lunch recess taken)

24

25

1                **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 10th day of October, 2023.

9

10                                    /s/Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
                                     Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25