```
1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
     * * * * * * * * * * * * * * *    )
3    UNITED STATES OF AMERICA,        )     Criminal Action
                                      )     No. 19-00148-1
4                    Plaintiff,       )
                                      )
5       vs.                           )
                                      )
6    PRAKAZREL MICHEL,                )     Washington, D.C.
                                      )     April 11, 2023
7                    Defendant.       )     9:17 a.m.
                                      )     MORNING SESSION
8    * * * * * * * * * * * * * * *    )

9

10                   TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
11                   UNITED STATES DISTRICT JUDGE

12

13
     APPEARANCES:
14
     FOR THE GOVERNMENT:       JOHN D. KELLER, ESQ.
15                             U.S. DEPARTMENT OF JUSTICE
                               1301 New York Avenue, Northwest
16                             Suite 1016
                               Washington, D.C. 20530
17
                               SEAN F. MULRYNE, ESQ.
18                             NICOLE RAE LOCKHART, ESQ.
                               U.S. DEPARTMENT OF JUSTICE
19                             Public Integrity Section
                               1400 New York Avenue, Northwest
20                             Washington, D.C. 20005

21
     FOR THE DEFENDANT:        DAVID E. KENNER, ESQ.
22                             ALON ISRAELY, ESQ.
                               KENNER LAW FIRM
23                             16633 Ventura Boulevard
                               Encino, California 91436
24

25
```

1    APPEARANCES, CONT'D:

2    FOR THE DEFENDANT:        CHARLES R. HASKELL, ESQ.
                               LAW OFFICES OF CHARLES R.
3                                HASKELL, P.A.
                               641 Indiana Avenue, Northwest
4                              Washington, D.C. 20004

5
     REPORTED BY:              LISA EDWARDS, RDR, CRR
6                              Official Court Reporter
                               United States District Court for the
7                                District of Columbia
                               333 Constitution Avenue, Northwest
8                              Room 6706
                               Washington, D.C. 20001
9                              (202) 354-3269

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                               Direct      Cross        Red.

4

   WITNESSES FOR THE GOVERNMENT:
5
   George Higginbotham                        15
6

7

8  EXHIBITS RECEIVED IN EVIDENCE                            PAGE

9
   Government's Exhibit No. 379                              78
10 Government's Exhibit No. 377                              79
   Government's Exhibit No. 378                              80
11 Government's Exhibit No. 456                              94
   Government's Exhibit No. 104                             114
12

13 Defendant's Exhibit No. 222                              40

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning, everyone.
 2              MR. KELLER:  Good morning, your Honor.
 3              MR. KENNER:  Good morning, your Honor.
 4              THE COURT: I hope everybody had a good four-day
 5     weekend.
 6              You have peppered me with various emails, so let
 7     me go through what rulings I can make at this point.
 8              So let me start with the Government's request for
 9     admission of foreign bank account records.  I'm going to do
10     these in summary form without a lot of detail.  And in
11     response, the Defendant requested a stipulation relating to
12     the -- basically, summaries of financial records of two
13     accounts, Blackstone and Alsen Chance, as to whether each
14     would stipulate to the other records.
15              My understanding is the Government's looking into
16     it.
17              MR. MULRYNE:  We've confirmed that those summaries
18     are accurate, your Honor.  So the Government has no
19     objection to those exhibits coming in.
20              THE COURT:  Okay.  So both of will you have
21     stipulations, presumably.  We don't need to read them to the
22     jury.  It's really more if you'd write them out.  Just have
23     them in the record that you're each agreeing to whatever it
24     is, the foreign bank records for the Government and the
25     summaries for the defense.  Okay.  That's good.
```

1          Moving to Mr. Higginbotham -- he's not here.

2     Right?  Getting to the notebook, which is Government's

3     Exhibit 371, the defense had raised issues relating to the

4     803 -- Rule 803 Subsection (6) and 807, totally apart from

5     issues relating to impeachment or inconsistent statements.

6          So I've reviewed the latest submission this

7     morning.  I've looked at what the Government had provided

8     and the defense on the admissibility of certain portions of

9     Mr. Higginbotham's notebook.  As I've said, it's

10    Government's Exhibit 371.

11         I want to thank you, Mr. Haskell, for a

12    particularly thorough and well-researched submission.  It's

13    one of the ones that provided a lot of additional

14    information, which was very helpful, and the kind of thing

15    that I like getting so that I can actually come out and make

16    some rulings on it.  So I appreciate that, not that I didn't

17    appreciate what the Government gave me, but you were very

18    thorough in what you were requesting.

19         So on the whole, I agree with the defense that the

20    record as it stands establishes that Mr. Higginbotham

21    regularly recorded notes regarding work with Mr. Michel and

22    his impressions.

23         The notes that the defense has identified, I

24    think, satisfy Federal Rule of Evidence 803 Subsection (6)

25    insofar as there doesn't appear to be another exhibit

1    bearing Mr. Higginbotham's impressions of the work he

2    performed for Mr. Michel.

3         I also find that the notes the defense has

4    identified satisfy Rule 807's residual exception based on

5    the totality of the circumstances of the notebook,

6    Mr. Higginbotham's testimony so far.

7         I'm going to reserve ruling on whether particular

8    notes are collateral and therefore admissible until the

9    defense moves the particular notes into evidence.  I can

10   indicate a couple of things, however:

11        In terms of collateral, they would be

12   nonadmissible as extrinsic evidence if it doesn't go to an

13   element of the offense or to an affirmative defense that's

14   being raised.

15        So you can ask the questions, but if it's

16   collateral or that's what I conclude, then I'm not going to

17   admit the portions of the notebook that you're asking for.

18   So I'm going to do these by -- you ask your questions and

19   then you ask to admit particular things and I'll make a

20   ruling in context.

21        I would say that in terms of categories that

22   Mr. Haskell has identified that I think it's material

23   whether and when Mr. Higginbotham told Mr. Michel about

24   FARA.  I think it goes to the issue of willfulness.  That

25   was Category I that Mr. Haskell set out.

1          Category II is what advice was provided.  It goes

2     to the advice of counsel and the advice was -- would have

3     been related to FARA.

4          III, it's a little more attenuated.  But whether

5     Mr. Higginbotham negotiated other contracts with other

6     entities related to entertainment projects, which is Anicorn

7     and Artemus, which were companies or entities that were set

8     up by Mr. Michel.  And the defense indicates that the

9     purpose of those was that the proceeds through these various

10    entertainment projects in Asia -- the proceeds went into

11    these two companies.  The funding was from Asian investors

12    for legitimate business opportunities, if I understood what

13    you set out.

14         The Government has indicated that the two

15    companies or entities were set up to funnel foreign funds

16    from Low, China, to unlawfully lobby the American government

17    on behalf of Mr. Low and the Chinese.

18         So I think at least -- I think that there's enough

19    there.

20         The fourth one, really, about his financial

21    problems, I have a little bit more of a question, so I'll

22    wait until you come up with that.

23         In terms of jury instructions, I will resolve

24    those and get them back to you --

25              MR. MULRYNE:  Your Honor --

1          THE COURT:  -- later in the week.

2          MR. MULRYNE:  Sorry to interrupt.

3          Since the Government hasn't had a chance to

4    respond to the 7:30 a.m. email this morning, for the sake of

5    the record, on Mr. Higginbotham's notebook, I just want to

6    make sure the record is clear that the Government's

7    objecting to that coming in as a business record under

8    803(6).

9          It's distinguishable from the *Skeddle* case that

10   the defense cited where there was a legitimate accounting

11   firm that was an ongoing concern and there were multiple

12   employees and there was testimony that it was the employees'

13   regular practice to take notes at meetings and the notes

14   there reflected what had happened in meetings of clients of

15   the accounting firm.

16         Here, Mr. Higginbotham has testified that he knew

17   he was not permitted to practice law outside of the

18   Department of Justice at the time that these notes were

19   created, that Mr. Michel was his only client and that he

20   made notes on an ad hoc basis.  And if you look at the

21   notes, they include things like --

22         THE COURT:  Oh, I agree on the ad hoc basis.  I'm

23   talking about strictly what he wrote down relating to

24   Mr. Michel.  And most of the things, the two first

25   categories they talked about, would go to the willlfulness;

1    and the rest of it potentially -- I'm not making any rulings

2    that he has an advice of counsel, that he's made that out.

3    But it does seem to me that you can certainly ask the

4    questions.  Whether they get admitted is a different issue.

5    But I do think that he's at least made a colorable claim to

6    be able to get them in.  We'll see what comes out.  I'm not

7    making a ruling about which sections -- it's not the whole

8    notebook, but they'd have to be particular excerpts.  And it

9    has to fit into what they've described.

10            So that's why I'm indicating broad categories, and

11    it'll come as to each one.  But I think that in terms of

12    what -- if you look through the notebook, which I have, and

13    I've looked through it, the notebook itself includes a whole

14    series of different other things, including his own

15    finances, et cetera.

16            So the question as related to Mr. Michel is more

17    distinct and it depends on how he describes these things in

18    terms of coming through.  But I'm not precluding it, is my

19    point.

20            MR. MULRYNE:  And I guess --

21            THE COURT:  I'm not precluding the questions.  Let

22    me put it that way.

23            MR. MULRYNE:  Understood, your Honor.

24            Maybe the Government was unclear on the basis for

25    the ruling.  If there are -- if counsel is able to establish

1    an inconsistency, then --

2            THE COURT:  That's -- but that's a different --

3    inconsistency -- the inconsistency would obviously be

4    impeachment.  There's several ways.  One is obviously

5    refreshing recollection, which we've had issues with.

6    Inconsistency, they would come in -- they wouldn't come in

7    because it would be impeachment and these are not under

8    oath.  So the notebooks would not come in.  The testimony

9    would.

10           This is totally separate in terms of considering

11   it.  So it's not an inconsistency.  I mean, that's a

12   separate category.  These are categories under, as I said,

13   Rule 803(6) and 807.

14           I think there's enough to be able to ask the

15   questions.  Whether all this goes in is a different issue,

16   depending on what he says and what's in the notebook related

17   to it.  But certainly if you look through the notebook in

18   terms of what he has set out relating to Mr. Michel -- and

19   the case that you cited does have other citations for other

20   cases.  So this is not only that, just that one.

21           MR. MULRYNE:  Understood, your Honor.

22           The Court obviously has great discretion in terms

23   of the residual exception.

24           But as to business records specifically, the

25   Government just wants the record to be clear:  We do not

1    believe that defense or the testimony has laid a sufficient

2    foundation to admit any pages of this notebook as business

3    records.

4             THE COURT:  Well, as I said, we'll see what --

5    part of this is so that they get to ask the questions

6    instead of my cutting them off and saying, No, you can't.

7    All right?

8             In terms of -- as I said, some of the rest of this

9    I think is more difficult.

10            Jury instructions:  With Mr. White -- what I'm

11   going to do is do a longer lunch hour and add a discussion.

12   We'll go to lunch and then I'd add in a 15-, 20-minute

13   discussion about Mr. White.  I don't want to take it now

14   since we have the jury and not hold it up.  It's a

15   defense -- potential defense witness.  We can have a

16   discussion of how that's going to be handled.

17            The last thing I think was defense had some issues

18   with my handling of objections.  So I'm pleased that we

19   agree on the procedures to refresh recollection and to

20   impeach with inconsistent statements.  The notebook is not

21   under oath.  So if it's impeachment, the notes in the

22   notebook don't get admitted, but you do have of course the

23   testimony.

24            I would say generally I don't consider objections

25   unless the Government says "Objection," starts to stand or

 1    stands and I hear what they are.  I don't do -- I generally

 2    don't hop in and do their objections for them.

 3          There are instances where I have added material,

 4    particularly if I've based the objection on -- that it's not

 5    probative, not relevant; and in general in those instances I

 6    have added 403, which is appropriate in considering whether

 7    material is probative or relevant.  And obviously, you're

 8    looking at the prejudice, whether the probative value

 9    substantially is outweighed by undue prejudice.  And you

10    look at confusion of issues for the jury, distraction of the

11    jury, needlessly cumulative, those kind of things.  So I

12    have added 403 on some of the rulings where they may not

13    have said 403; but in deciding whether something is

14    probative or relevant, I have.

15          I have weighed in on a couple of things.  One, I

16    think perhaps Mr. Kenner didn't hear my answer, but when we

17    had the conference he asked a question and I said you

18    couldn't ask it.  And then that's the first thing you asked.

19    So I did jump in there, I must admit.

20          Also, "asked and answered," we've had a couple of

21    instances where three or four times we've had the same

22    question asked, even though you got the answer.  And

23    certainly in those instances, you know, counsel has stood up

24    to object to that; and I have gone ahead and indicated it.

25    Or I have interrupted you if it's exactly the same question

1    we've already heard.

2            The other area that I have some concern is, there

3    were some questions last week where there was information in

4    the question that we don't have on the record at this point.

5    And the answer -- there would be a question about whether

6    the answer -- whether the information that you're asking for

7    is admissible.  And I've ruled that it was not for various

8    reasons, that those have been asked in different ways, but

9    it's the same objection that I've sustained.

10           My concern, frankly, is although you tell the jury

11   that questions are not evidence, only the answers, unless

12   for some reason the question contains information we already

13   have, but these were questions where we don't have the

14   evidence contained in it at this point.  And frankly, asking

15   them in different ways with the same thing, there's the same

16   objection.  I'm concerned that the jury is going to not be

17   as careful about what was asked that is not evidence and

18   what they think is evidence.

19           So I have on those instances expanded my ruling

20   with more details, frankly, for the parties and the record.

21           I would note that 103(d), that one of my jobs *sua*

22   *sponte* is to keep out inadmissible evidence, particularly if

23   it's unduly prejudicial.  And so for the record, I can add

24   additional grounds.

25           And 611:  I can also control cross-examination.

1    But I make an effort to let counsel present their own case.

2              But I am trying to be vigilant about making sure

3    inadmissible evidence does not get presented to the jury.

4    You've made your records in various ways and so my rulings

5    stand.

6              I think we're ready to go with Mr. Higginbotham at

7    this point.

8              Are we getting him?

9              MR. MULRYNE:  Yes, your Honor.

10             (Thereupon, Mr. Higginbotham entered the courtroom

11   and the following proceedings were had:)

12             THE COURT:  Please come back up, Mr. Higginbotham.

13   We actually didn't call the case.

14             MR. HIGGINBOTHAM:  Good morning.

15             THE COURT:  Good morning.

16             Let me quickly call the case since we have a

17   different court reporter.

18             19-CR-148, United States Code versus Prakazrel

19   Michel.

20             Government, can you identify yourself, please.

21             MR. MULRYNE:  Yes, your Honor.  John Keller, Sean

22   Mulryne and Nicole Lockhart on behalf of the Government.

23             THE COURT:  Defense?

24             MR. KENNER:  Good morning, your Honor.  David

25   Kenner, Alon Israely, Charles Haskell and Kriss Carlstrom

1    are for the defense.

2                THE COURT:  I didn't call the case earlier.  We're

3    all set.

4                (Whereupon, the jury entered the courtroom at 9:34

5    a.m. and the following proceedings were had:)

6                THE COURT:  Everybody sit down, please.

7                Good morning, members of the jury.

8                THE JURY:   Good morning.

9                THE COURT:  I'll let you settle in.

10                Mr. Higginbotham is our witness.  And we were --

11    we stopped last Thursday with -- in the middle of the

12    cross-examination.

13                MR. MULRYNE:  Your Honor, are we missing a juror?

14                THE COURT:  Oh, we are.  Thank you for noticing

15    that.  I just assumed everybody was there.

16                (Thereupon, an unidentified juror entered the

17    courtroom and the following proceedings were had:)

18                THE COURT:  We're now ready to proceed.  We have

19    Mr. Higginbotham, and we stopped in the middle of the

20    cross-examination by Mr. Kenner.

21                Mr. Kenner?

22                MR. KENNER:  Thank you, your Honor.

23    (GEORGE HIGGINBOTHAM, GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

24                        CONTINUED CROSS-EXAMINATION

25

 1    BY MR. KENNER:

 2    Q.  Good morning, Mr. Higginbotham.

 3    A.  Good morning, Mr. Kenner.

 4            MR. KENNER:  May I ask the court reporter to move

 5    so I can see the witness?

 6            THE COURT REPORTER:  Oh, of course.

 7    BY MR. KENNER:

 8    Q.  On Thursday of last week, Mr. Keller asked you questions

 9    about the Foreign Agent Registration Act.

10            Do you recall that?

11    A.  Yes, sir.

12    Q.  And the statute is abbreviated to be FARA, F-A-R-A.  You

13    understand that?

14    A.  Yes, sir.

15    Q.  You told the jury last week that you have concerns about

16    FARA.  Correct?

17    A.  Yes, sir.

18    Q.  In connection with this matter?

19    A.  Yes, sir.  And I communicated those concerns to

20    Mr. Michel.

21    Q.  And I believe you testified that you told Mr. Michel on

22    a couple of occasions about your concerns about FARA.  Did

23    you say that?

24    A.  Yes, sir, I did.

25    Q.  And I believe you also told the jury that Mr. Michel

 1    told you that he did not want to register because he

 2    traveled a lot, he was already getting stopped coming in and

 3    out of airports.  And I believe your words were "It just all

 4    seemed like a very much inconvenience."  Is that correct?

 5    A.  Not quite, sir.  What Mr. Michel communicated to me, not

 6    that he was being stopped coming in and out of airports, but

 7    registration with FARA could cause him to be stopped.

 8    Q.  Okay.

 9          MR. KENNER:  Can I have Mr. Higginbotham's

10    transcript, Page 20, Lines -- Page 20, Line 20, through

11    Page 21, Line 2, just for the witness and counsel, please.

12          MR. MULRYNE:  Your Honor, the juror --

13          THE COURT:  Is the headset not working?

14          UNIDENTIFIED JUROR:  No.

15          THE COURT:  Let me get a new one.  The battery

16    obviously dies at some point.

17    BY MR. KENNER:

18    Q.  Sir, I'm going to ask you to look at Page 20, starting

19    with Line 20.  And then when you're done with that, tell me

20    and I'll --

21          THE COURT:  And this is Defense Exhibit -- we'll

22    make it 220.  And this is to refresh his recollection?

23          MR. KENNER:  I'm sorry.  This is a transcript from

24    last Thursday.

25          THE COURT:  Right.  But I'm assuming there's a

```
 1    purpose to it.
 2              MR. KENNER:  Yes.
 3              THE COURT:  The purpose is to refresh his
 4    recollection or what?
 5              MR. KENNER:  Initially to refresh his
 6    recollection.  I believe the testimony he gave is
 7    inconsistent also with the answer he gave today.
 8              THE COURT:  So this is Defense Exhibit 220.
 9              THE WITNESS:  There is nothing on my screen.
10    BY MR. KENNER:
11    Q.  Do you see that there?
12              THE COURT:  We're showing it to the Government
13    first.
14              THE WITNESS:  Oh, sorry.
15    BY MR. KENNER:
16    Q.  Did you read --
17              THE COURT:  Let me see the rest of it.  Okay.
18              MR. MULRYNE:  No objection, your Honor.
19              THE COURT:  You show it to -- Dorothy, if you can
20    just show it to the witness only.
21    BY MR. KENNER:
22    Q.  So did in fact --
23              THE COURT:  Sir, he doesn't have it up there.
24              MR. KENNER:  Oh, I'm sorry.
25              THE COURT:  It shouldn't be shown to the jury; it
```

 1   should only be shown to him.  It's not showing up on his

 2   screen.

 3   BY MR. KENNER:

 4   Q.  Do you see it on your screen?

 5   A.  No.

 6           THE COURT:  No.  He doesn't have it on his screen.

 7   You need to wait a second.  It's on ours, so it's a matter

 8   of a problem with the screen.

 9           MR. KENNER:  Fine.

10   BY MR. KENNER:

11   Q.  Did you read to yourself the --

12           THE COURT:  Mr. Kenner, it's not up there yet.

13           MR. KENNER:  I apologize.  I didn't realize that

14   was not working there.

15           THE COURTROOM DEPUTY:  (Assists the witness with

16   the audiovisual equipment.)

17           THE WITNESS:  Thank you.

18           THE COURT:  So do you have it --

19           MR. KENNER:  Yes.  It starts on Page 20.

20           THE COURT:  You need to go from one page to the

21   next.

22           MR. KENNER:  Yes.

23           THE COURT:  What I would ask you to do,

24   Mr. Higginbotham, is to read it to yourself and then look up

25   and then he'll ask some questions as to whether that

1    refreshes your recollection.  Okay?

2            THE WITNESS:  Sure.

3            THE COURT:  Have you had an opportunity to read

4    it?  You have to say something orally.

5            THE WITNESS:  Oh.  Yes, I've read it.

6            THE COURT:  Thank you.

7    BY MR. KENNER:

8    Q.  Does that refresh your recollection that you did testify

9    that he told you -- Mr. Michel told you it was inconvenient

10    coming and going from airports?

11    A.  Yes.  I was paraphrasing what Mr. Michel had said to me

12    with regard to the registration of -- with FARA and one of

13    the reasons why he didn't want to register with FARA.  It

14    was my understanding -- and I can set the record straight

15    now -- that it was not that he -- the only distinction that

16    I was making in this particular circumstance was that he was

17    not currently being stopped; it was if he had registered for

18    FARA that he would be stopped at airports.  And this was

19    something that Mr. Michel said to me in casual conversation

20    as we were discussing it.

21    Q.  Okay.  You've testified that you told Mr. Michel about

22    FARA.  When did you first tell Mr. Michel -- well, when was

23    the first conversation that you had with Mr. Michel about

24    the question of FARA registration?

25    A.  I believe that that question -- the recommendation came

1    up in regards to the Guo Wengui matter.  I understand that

2    there was two matters.

3         THE COURT REPORTER:  I'm sorry, sir.  Could you

4    spell the name you just referenced?

5         THE WITNESS:  I think it's G-U-O W-E-N-G-U-I.  I

6    don't know the proper spelling of his name.

7    BY MR. KENNER:

8    Q.  So your testimony is that you did not mention FARA to

9    Mr. Michel until the Guo matter came up?

10   A.  I believe that that is the case.  Yes.

11   Q.  And was that Guo matter brought up in the meeting that

12   you had in China to which you went with Mr. Michel?

13   A.  No, sir.  The Guo Wengui matter was brought up early

14   summer of 2017 when I was at Mr. Michel's apartment in New

15   York City.

16   Q.  Oh, that was the second visit?

17   A.  The second room.  Yes, sir.

18   Q.  The second room.

19        So what did you tell Mr. Michel about FARA at that

20   first time you raised it?

21   A.  I don't think that it was actually in the second room

22   that I raised it.  I think that I went back.  I processed

23   some of the things that he had told me in the room.  And I

24   did some research, and it looked as though that the

25   activities that we were engaged with had to do with -- that

1    should be -- appropriately, we should register with FARA.

2    Q.  Did you believe that that same advice applied to you?

3    A.  Not necessarily, because I didn't believe that I was the

4    one that was actually performing the services that would

5    fall under -- that would fall under FARA.

6    Q.  Okay.  That's conversation number one.

7           What is the second time that you had a

8    conversation -- oh, by the way, in that conversation, did

9    you tell Mr. Michel -- did you advise him, You must

10   register?

11   A.  I didn't say, You must register.  I suggested to him

12   that it looked like FARA becomes very, very important as we

13   were doing the activities with regard to 1MDB and with Guo

14   Wengui.

15   Q.  And did you study the Foreign Agent Registration Act

16   before you had conversations with Mr. Michel about it?

17   A.  I think "study" would be an exaggeration.  I looked at

18   the regulation and thought that the activities that were

19   being performed would fall under -- would call for

20   registration with FARA.

21   Q.  Prior to this, have you ever practiced in the area of

22   advising people about the Foreign Agent Registration Act?

23   A.  No, sir, I have not.

24   Q.  How much time did you spend doing whatever it is you did

25   to cause you to believe that what was going on for

1    Mr. Michel, but not you, was a violation of FARA?

2    A.  I wouldn't be able to tell you with an hour amount.  I

3    didn't keep time in that way.  I think we've addressed that

4    previously.

5    Q.  I'm not asking for an hourly count.  What I want to know

6    is, how did you familiarize yourself as a lawyer with the

7    FARA statute so that you could advise Mr. Michel about it?

8    A.  I went and read a few documents -- I actually went and

9    read FARA and -- or parts of it and a few documents where

10   FARA was implicated for agents.

11   Q.  FARA is quite a lengthy set of regulations.  Correct?

12   A.  I assume so, yes.

13   Q.  I'm sorry?

14   A.  I assume so, yes.  Yes.

15   Q.  Well, you assume so or you read it and so you know so?

16   Which is it?

17   A.  I read portions of it, sir.  I did not read every single

18   line of FARA.

19            MR. KENNER:  Your Honor, I have the Foreign

20   Registration Executive Order No. 9176 *et seq.* which

21   describes FARA.  I would like to present this to the witness

22   to look at to tell me which portions of this document he

23   read.

24            MR. MULRYNE:  Objection, your Honor.  Calls for a

25   legal conclusion and it's not relevant.

```
 1                    MR. KENNER:  He's a lawyer.  He was giving

 2      Mr. Michel advice about his legal conclusion with regard to

 3      FARA.

 4                    THE COURT:  Well, that's your conclusion,

 5      Mr. Kenner.  But I do think if he's indicated -- the witness

 6      has indicated he looked at portions of it.  I don't have a

 7      problem if you want to give him a copy.  Show it to

 8      Mr. Keller.  And if Mr. Higginbotham can indicate what he

 9      looked at, he can tell us.  If he can't recall, he can tell

10      us that.

11                    So this is an additional exhibit on your part.  So

12      we're now at 221, which is the FARA.

13                    MR. KENNER:  Your Honor --

14                    THE COURT:  Can you show it to the Government?  If

15      they have --

16                    MR. KENNER:  Yes.  Of course.

17                    THE COURT:  So let them see it.  I know you're not

18      asking to have it admitted, but everything that's shown has

19      to have an exhibit number so we can tell at a later date

20      what it is that we're talking about.

21                    MR. KENNER:  Yes.

22                    May this document be marked Exhibit 221, please,

23      your Honor, for identification?

24                    THE COURT:  That's fine.

25                    MR. KENNER:  May Ms. Carlstrom approach the
```

Higginbotham - CROSS - By Mr. Kenner

1    witness with the document?

2              THE COURT:  Yes.

3              MR. CARLSTROM:  (Tenders document to the witness.)

4              MR. MULRYNE:  Your Honor, just so I'm clear, this

5    is being used to refresh his recollection as to what,

6    exactly?

7              THE COURT:  In terms of -- I understand the

8    question that Mr. Kenner asked is if he can identify what he

9    looked at in the FARA regulation in order to have a

10   discussion with Mr. Michel.

11             MR. MULRYNE:  The specific lines or --

12             THE COURT:  Specific portions -- assuming he can

13   do so.  I don't know whether he remembers it or doesn't.  If

14   he can look through it and indicate what it is that he

15   looked at or didn't look at.

16   BY MR. KENNER:

17   Q.  Do you have a pen, a red pen up there or any pen?

18             THE COURT:  I think you need to figure out whether

19   he has material -- whether he can recollect what he looked

20   at in there.

21             MR. KENNER:  Okay.

22   BY MR. KENNER:

23   Q.  I've shown you the FARA statute.  Is that the statute

24   that you looked at?

25   A.  Yes, sir, it is.

1    Q.  And can you scroll through the pages and tell me which

2    portions of it that you read before giving Mr. Michel

3    advice?

4    A.  Sir, this looks to be about a 60-or-so-page,

5    70-or-so-page document.

6    Q.  That's the statute.  Yes, sir.

7    A.  Yes, sir, it is.

8           I reviewed enough of the document.  I cannot

9    identify what specific passages of the document that I

10   reviewed.  But I reviewed enough and looked at other

11   scholarly articles having to do with FARA that suggested

12   that the activities that Mr. Michel and others were engaged

13   in could possibly need to be -- they could possibly need to

14   register for FARA.  And I communicated that information to

15   Mr. Michel on numerous occasions.

16   Q.  Okay.  Sir, you have a notebook of notes that you kept.

17   It's been marked as Government's Exhibit 371.

18              MR. KENNER:  Can you pull 371 up?

19              THE COURT:  What part do you want of 371?

20              MR. KENNER:  Right now, I want Page 51 of Exhibit

21   371.

22              THE COURT:  Is there a page number?  I don't see

23   one on my --

24              MR. KENNER:  I added them, your Honor.  They did

25   not come with them.  I just paginated them.  I'm sorry.

1     I'll tell you.

2                THE COURT:  How about at the bottom?  Give me the

3     Bates number --

4                MR. KENNER:  The Bates number --

5                THE COURT:  -- that's at the bottom of the

6     document.  If you could bring it up more clearly.  It's too

7     small for me to read.  If you can enlarge it.

8                MR. KENNER:  Yes.  Absolutely.

9                THE COURT:  Hang on one second.  There we go.

10    It's near the end, I take it.  Okay.

11               Government, do you have it as well?

12               MR. KENNER:  Thank you.

13    BY MR. KENNER:

14    Q.  Did you make a note about a conversation with Mr. Michel

15    regarding FARA in this notebook?

16    A.  Yes, I did, sir.

17    Q.  And can you tell me the date that you did that?

18    A.  I can't tell you the exact date that I did it, because

19    it doesn't look like there's a date on that particular page.

20    But that took place -- that note was in reference to items

21    that I was bringing up or wanted to bring up towards the

22    beginning of 2018.  So I would say that this note would have

23    been in the fall of 2017.

24    Q.  I'm sorry.  It would have been involved in --

25    A.  It would have been the fall, the fall of 2017.

1    Q.  I'm sorry.  I didn't understand that.  A vault?

2    A.  Fall.  Autumn.

3            THE COURT:  Autumn.

4    BY MR. KENNER:

5    Q.  Sometime in the fall.  Okay.

6            And can you go backwards and find -- well, this

7    notebook, by the way, is in chronological order.  Correct?

8    A.  More or less, yes, sir.

9    Q.  And what is the last date that you find before the

10   comment on Page 51?  What's the last date prior to that

11   that's recorded in the notebook?

12   A.  I'm only looking at one page at a time, sir.

13   Q.  I'm sorry.

14   A.  I don't know.

15           THE COURT:  Can I make a suggestion, Mr. Kenner?

16           MR. KENNER:  Sure.

17           THE COURT:  Perhaps if you have a paper copy, if

18   you want him to look at different things, it might be

19   easier.

20           MR. KENNER:  Sure.

21           THE COURT:  Instead of totally scrolling through.

22           MR. KENNER:  Yes.  We'll grab Government's Exhibit

23   371.  Just give me a moment, please, your Honor.

24           THE COURT:  Certainly.  I just think it might be

25   easier if you're asking him questions.

```
 1              MR. KENNER:  I appreciate it.  Thank you, your
 2   Honor.
 3              THE COURT:  I assume the Government has their
 4   paper copy as well?
 5              MR. MULRYNE:  Yes, your Honor.
 6              THE COURT:  Okay.
 7              MR. KENNER:  May Ms. Carlstrom approach the
 8   witness with the document?
 9              THE COURT:  Yes.
10              MR. KENNER:  Thank you, your Honor.
11              MS. CARLSTROM:   (Tenders document to the witness.)
12              THE COURT:  The Bates number on is -- the last
13   numbers are 6637.  So it's near the back, what's on the
14   screen.
15              THE WITNESS:  It looks like the last date is 11-8,
16   I believe.
17   BY MR. KENNER:
18   Q.  November 8th of 2017?
19   A.  Yes, sir.  That's what it looks like.
20   Q.  So if these are in chronological order, that note would
21   have been written after November 8th of 2017.  Correct?
22   A.  That is consistent with my testimony.
23   Q.  I'm sorry.  I didn't hear you.
24   A.  That is consistent with my testimony.  I said that it
25   was written --
```

1    Q.  I'm not suggesting --

2            THE COURT:  Can we all not be speaking at the same

3    time?

4            MR. KENNER:  Yes.  Okay.

5    BY MR. KENNER:

6    Q.  Now, can you look through your notebook, Exhibit 371,

7    and tell me any other point prior to November 8th of 2017

8    where you reflected in a note in your notebook that you had

9    a conversation with Mr. Michel prior to November 8th of 2017

10    about FARA?

11    A.  I don't think that you'll find that, sir.

12    Q.  When you say you don't think I'll find it, is that

13    because there is no such notation prior to November 8th of

14    2017?

15    A.  I don't believe that there is, sir.

16    Q.  Well, if you do not -- if you're not sure, turn the

17    pages of the document and let's get the record clear.

18    A.  No, sir.  I don't believe that there is.

19    Q.  Well, you don't think it's there?

20    A.  No.  I do not see any other references to FARA prior --

21    in the document.

22    Q.  And the reference to FARA after November 8th of 2017,

23    can you read that, please?

24    A.  It says, "Licenses, memberships, trips."  The first

25    thing that I have is "FARA:  Need to consider this

1    strongly," followed by an exclamation point.

2    Q.  Okay.  So as of November 8th of 2017, you hadn't yet

3    decided whether or not registration was required under FARA,

4    just that you needed to consider it.  Is that correct?

5    A.  I hadn't made a decision as to whether or not it was

6    required.  But I brought up the FARA earlier on -- in the

7    summertime.  And in the time that had passed, I had traveled

8    to the Chinese embassy on behalf of Mr. Michel.  Mr. Michel

9    and I had traveled together to Hong Kong and Macau.

10    Mr. Michel had traveled to meet with Mr. Jho Low a number of

11    times.

12             And these recommendations that you find here, as I

13    stated previously, were recommendations that I was making

14    for the new year.  And given all of the work that had been

15    done having to do with foreign agents, both Jho Low and Guo

16    Wengui, it seemed appropriate that moving into the new year

17    it would be necessary to register for FARA.

18    Q.  Okay.  Do I understand correctly that you were making

19    this note in anticipation of -- in 2019 registering for

20    FARA?  Is that --

21    A.  2018, sir.

22    Q.  Well, this is November -- after November of 2018.  You

23    just said you wrote it --

24             THE COURT:  No.  '17.

25             MR. KENNER:  I'm sorry.  '17.  I apologize.

Higginbotham - CROSS - By Mr. Kenner

1    BY MR. KENNER:

2    Q.  So it was January of 2018 that you were starting to

3    think about strongly considering registering for FARA.

4    Correct?

5    A.  This was, as I stated previously, as we were moving out

6    of 2017.  And all the work that had been done with regard to

7    the conspiracy during 2017, I was looking at 2018 and the

8    registrations and the other activities that would be

9    necessary to further legitimize what we were doing.

10            I thought that FARA was at the top of that list.

11   As you can see, you asked me to read it to you.  It says,

12   "Licenses, memberships, trips."  Those are the things that I

13   thought were necessary for Mr. Michel to do to legitimize

14   what he was doing.  FARA is number one.

15            So yes.  When I said "Need to consider strongly"

16   followed by an exclamation point, it was in addition to

17   recommendations that I had made previously to him he so --

18   Q.  I'm sorry.  When did -- are you finished?

19   A.  Yes, sir.

20   Q.  When is the first time you recall, if ever, telling

21   Mr. Michel, You must register under FARA.  As your lawyer, I

22   want you to know that?

23   A.  I don't think that I ever said, You must register for

24   FARA.  I recommended to him on more than one occasion during

25   the, I would say, late spring, early summer when I was aware

Higginbotham - CROSS - By Mr. Kenner

```
 1    of the -- not only the Jho Low matter, but also the Guo

 2    Wengui matter, that it was necessary to register.

 3    Q.   Okay.  Did you ever write Mr. Michel an email or a text

 4    message or anything other than conversations you are

 5    recalling -- did you ever advise him in writing that he must

 6    register for FARA?

 7    A.   No, sir, I did not.

 8    Q.   Is there a reason you didn't if you thought this was so

 9    important?

10    A.   This was one of many things that I brought up to

11    Mr. Michel, sir.  No.  There was no particular reason why I

12    did not put it in writing.

13    Q.   And you don't ever recall telling Mr. Michel, As your

14    lawyer, I am advising you that you must register under FARA?

15              MR. MULRYNE:  Asked and answered a couple of times

16    already, your Honor.

17              THE COURT:  I think we should move on, Mr. Kenner.

18    He's indicated what his position is.

19              MR. KENNER:  Certainly.

20              Your Honor, I --

21    BY MR. KENNER:

22    Q.   Did you ever tell Mr. Michel that he was doing something

23    unlawful if he didn't register under FARA?

24    A.   No, I did not.

25    Q.   You have testified previously -- and I think we looked
```

1    at some emails about your job being to make sure everything

2    was done legally and correctly.

3              Do you recall that?

4    A.  Yes, sir, I do.

5    Q.  And I think you also indicated that your job was to make

6    sure everything was kosher in all of the things that were

7    being done.

8              Do you recall that?

9    A.  Yes, sir, I do, with the caveat that that email, I

10    believe, was in -- and the Government can bring this

11    document up -- I believe that email was very, very early on.

12    That was before I was invited to go to the Chinese embassy.

13    This was before we took trips to Macau.  This is before tens

14    of millions of dollars came in.

15             The scope of the work that I was doing at the time

16    and the scope that I -- of the work that I could even

17    anticipate at that time was significantly different than

18    what it ended up being by the time we get to this -- by the

19    time you get to the end of 2017.

20    Q.  And your looking into FARA occurred before you went to

21    Hong Kong with Mr. Michel.  Correct?

22    A.  Yes, sir, it did.

23    Q.  And notwithstanding your position on FARA, for lack of a

24    better phrase, you went ahead and went to China to talk

25    about doing things that you've indicated you think would

1    violate FARA?

2    A.  Yes, sir.  That is true.

3    Q.  Why did you do that?

4    A.  Why did I do what?

5    Q.  Go to Hong Kong after telling us that you had already

6    known that it would be a violation of FARA to do the things

7    that you were doing and you said -- and the things

8    Mr. Michel was doing.  Why would you hop on a plane and go

9    over to Hong Kong to continue to violate your perception of

10   what FARA required?

11   A.  I had a tremendous amount of dedication and loyalty to

12   Mr. Michel.  There was -- I had been his stenographer on

13   writing the contracts that were, you know, hiding the true

14   purpose of the money.  I had been his messenger thus far at

15   the embassy.  You know, I played the role of an actor when I

16   was in Macau.  I was not behaving in what I would say a

17   rational manner.

18   Q.  Why?

19   A.  Mr. Michel was a very, very good friend of mine.  He was

20   my client.  He was someone that I trusted.  And I wanted to

21   do what I possibly could to facilitate what he was -- what

22   we were doing at the time.

23   Q.  So your testimony now is that because you perceived

24   yourself to be good friends with Mr. Michel, instead of

25   keeping him properly advised of the law and what he could

 1    and couldn't do, you just said:  He's my friend.  I'll just

 2    go along with it?

 3    A.  Well, sir, yes, to a certain extent.  Yes.

 4    Q.  Did you have any sense that you were violating your

 5    ethical obligation as a lawyer in an attorney-client

 6    privilege to -- when you were being relied on for legal

 7    advice?  Did you feel that what --

 8              THE COURT:  You're asking too many questions.

 9              MR. KENNER:  I'm sorry, your Honor.  I apologize.

10              THE COURT:  You need to break it down.

11              MR. KENNER:  Okay.

12    BY MR. KENNER:

13    Q.  Sir, did you believe you were fulfilling your ethical

14    responsibility as Mr. Michel's lawyer by not telling him --

15    by not giving him proper legal advice because he was a

16    friend?

17    A.  I think that there's two different issues that are at

18    hand here, sir.  I represented Mr. Michel on and off for

19    over 15 years in other discrete legal matters.  In that

20    capacity, particularly in the entertainment world, I was

21    very much his lawyer.

22              In this particular circumstance having to do with

23    the matters with 1MDB and the matters having to do with Guo

24    Wengui, I considered myself more of a fixer, someone who was

25    doing whatever he possibly could to make sure that we could

1    continue doing what Mr. Michel wanted to achieve and what

2    Mr. Broidy and Nickie Lum Davis wanted to achieve.  And so I

3    have admitted and I still continue to admit that I betrayed

4    my legal responsibility.  I betrayed my ethical

5    responsibility.  When I was engaging in these activities, I

6    considered myself doing good work, but in all truth and

7    honesty, I was merely an accomplice to continuing this

8    conspiracy.

9    Q.  But this is at the very same time that you were acting

10   as Mr. Michel's lawyer, as you told us last Thursday?

11   A.  Mr. Keller, I've said that I have acted in a number of

12   different capacities.  I just went through stenographer,

13   actor, messenger, accomplice when it came to writing the

14   letters to the -- to the banks and hiding the true purpose

15   and meaning of the funds that were coming in.  I was acting

16   in a number of different capacities, sir.  And to limit it

17   to my legal representation would not be an accurate

18   representation of the truth.

19   Q.  So your testimony now is that you were not acting as

20   Mr. Michel's lawyer during the time period in question?

21   A.  I was -- I will always be a lawyer.  I graduated from

22   law school.  But in this particular capacity, I was doing

23   legal as well as extralegal things.

24   Q.  And the extralegal things were in violation of law?

25   A.  Yes, sir, they were.

1    Q.  And in violation of your ethical responsibility to your

2    client?

3    A.  Yes, sir, they were.  And I took responsibility.  I take

4    responsibility for that.

5    Q.  All right.  When you indicate you were a stenographer

6    for Mr. Michel, that's an interesting word.  What do you

7    mean you were a stenographer for him?

8    A.  Well, I was given very specific instructions as to what

9    was to go in and what was not to be included in the

10   contracts that the Government presented very meticulously on

11   Thursday.

12   Q.  Well, we'll go over those contracts in a little bit

13   again.

14          But you're telling me that the language that we

15   see in the contracts and agreements that you did came from

16   Mr. Michel?  You were a stenographer just writing down what

17   he said?

18   A.  Well, as you know, Mr. Keller --

19   Q.  I'm not Mr. Keller.

20   A.  I'm sorry.  Mr. --

21          THE COURT:  Kenner.

22          THE WITNESS:  Kenner.  Sorry.  My apologies.

23   BY MR. KENNER:

24   Q.  Thank you.

25   A.  As you know, in contracts, there's a lot of boilerplate.

Higginbotham - CROSS - By Mr. Kenner

1    There's a lot of language that is consistent through all

2    contracts.  The material points, though, in terms of the

3    material deal points were ones that were provided by

4    Mr. Michel.

5              MR. KENNER:  Your Honor, at this point I would

6    move to introduce Government's Exhibit 371.

7              THE COURT:  You can't introduce the whole

8    document, as I've indicated.  Is there something in

9    particular you're asking for?

10              MR. KENNER:   Yes.  Let's start with Page 51.

11              THE COURT:  So this is Bates stamped -- hold on --

12    DOJ 0000106637.  And it's being admitted for what purpose?

13              MR. KENNER:  Thank you, your Honor.

14              THE COURT:  I said, what is it being admitted for?

15    I have to hear that.

16              MR. KENNER:  Oh, it's being admitted for the

17    purpose of establishing when -- the first time in his

18    writings he makes reference to FARA.

19              THE COURT:  All right.  Mr. Keller?  According to

20    the testimony, it is the first time that he's put in

21    writing -- in writing the important portion in terms of a

22    date.

23              MR. MULRYNE:  Yes, your Honor.  I believe he's

24    testified to that on the stand.  This would be a hearsay

25    statement in the notebook, your Honor.

1              THE COURT:  Well, as I've ruled already in terms

2     of the Federal Rules of Evidence in terms of both

3     Rule 803(6) and 807, I will allow this one page with the

4     understanding that it's being admitted to show the first

5     time in writing that he put anything in relating to FARA and

6     the Defendant, which would go to one of the elements.

7              MR. MULRYNE:  Thank you, your Honor.

8              THE COURT:  You're going to have to label it as

9     a -- hold on.  It's going to be Exhibit 222, and it's this

10    Bates-stamped page that I've just indicated.

11             THE COURT REPORTER:  Sorry, Judge.  It's a defense

12    exhibit?

13             THE COURT:  Yes.  Defense Exhibit 222.

14             (Whereupon, Defendant's Exhibit No. 222 was

15    entered into evidence.)

16             THE COURT:  Mr. Kenner?

17             MR. KENNER:  Yes.  Thank you, your Honor.

18             THE COURTROOM DEPUTY:  Do you want this published?

19             MR. KENNER:  I'm sorry?

20             THE COURT:  Do you want this published?

21             MR. KENNER:  Yes.

22             THE COURT:  This is being admitted as the first

23    time that it's in writing that indicates Mr. Michel and

24    FARA.

25             Mr. Kenner, let's go forward.

```
 1                    MR. KENNER:  I thought --

 2                    THE COURT:  They're looking at it.  It's been

 3         highlighted.  It's one line.

 4                    MR. KENNER:  Okay.

 5         BY MR. KENNER:

 6         Q.  So, Mr. Higginbotham --

 7                    THE COURT:  Unless you're planning on using it

 8         again, we should take it down.

 9                    MR. KENNER:  Yes.

10                    We can take it down, please, Mr. Campbell.

11         BY MR. KENNER:

12         Q.  Now, with regard to FARA, when Mr. Michel went in early

13         May of 2017 to Bangkok to meet with Jho Low and Mr. Broidy

14         and Ms. Lum Davis, you knew about it at the time.  Correct?

15         A.  I knew --

16         Q.  You knew he was going?

17         A.  At that time, Mr. Michel was traveling a lot.  So yes.

18         I knew that he was going.  I did not know who necessarily

19         was -- who he was traveling with.

20         Q.  When you say you didn't necessarily know, does that mean

21         you probably -- may or may not have known?  You just don't

22         remember now?

23         A.  I don't recall.

24         Q.  And later in the same month, when Mr. Michel went to

25         Hong Kong with Mr. Broidy and Ms. Lum Davis to meet with Jho
```

1   Low, where he met Minister Sun Lijun, you knew about that.

2   Correct?

3   A.  I knew about his trips.  I did not know who he traveled

4   with, nor who he met other than with Jho Low.

5   Q.  And when Mr. Michel came back, he didn't -- or before he

6   went, he didn't tell you, Hey, there's some good news.  I'm

7   going to meet with them now?

8   A.  Meet with...?

9   Q.  Jho Low, meet with Nickie Lum Davis and Broidy.

10  A.  No.  I did not receive tremendous amount of information

11  about their travels as a group.

12  Q.  What information did you receive?

13  A.  That he was traveling to meet with Jho Low.  I did

14  not -- I don't know -- I can't testify to who he traveled

15  with, when and who he met there other than Jho Low.

16  Q.  And at that time, the timeframe of these meetings, you

17  already knew that Jho Low was trying to get help with regard

18  to his forfeiture complaint?

19  A.  Yes, sir.

20  Q.  And you knew that he was trying to arrange something to

21  get Guo Wengui back from the United States to China.

22  Correct?

23  A.  I did not know about the Guo Wengui matter until after

24  the meeting in the second room.

25  Q.  Okay.  Well, after the meeting, how did you find out?

1          THE COURT:  After which meeting?  There's two

2     meetings.

3     BY MR. KENNER:

4     Q.  The meeting where Mr. Michel went to Hong Kong with

5     Mr. Broidy and Ms. Lum Davis and met with Jho Low and got

6     introduced to Vice Minister Sun Lijun.

7     A.  As I just stated, sir, I did not know about the Guo

8     Wengui matter the -- the first I heard of it was in the

9     meeting with Mr. Michel in the, quote-unquote, "second

10    room."

11    Q.  Quote-unquote...?

12    A.  The second room, which was the email that the Government

13    presented on Thursday.

14    Q.  Okay.  Did you tell -- give me a timeframe.  When did

15    Mr. Michel tell you or when did you become aware of the

16    second trip to China with Nickie Lum Davis, Elliott Broidy,

17    where they met with Jho Low and the vice minister?  When did

18    you hear about that?

19    A.  I did not hear about that, sir.  What I'm saying is,

20    Mr. Michel would tell me that he is traveling to Asia to

21    meet with Jho Low.  I cannot tell you who accompanied him,

22    nor who he met with, other than Jho Low.  That was not

23    information that I was privy to.

24    Q.  And did that ever change or is it your testimony that

25    only when the Government came to talk to you about your

1    conduct that you heard it from the Government?

2            THE COURT:  Heard what from the Government?

3            MR. KENNER:  About this trip to Hong Kong, the

4    second trip.

5    BY MR. KENNER:

6    Q.  I want to know, when did you find out about it?

7            THE COURT:  Hold on.  You're asking a lot of

8    different questions.  And I'll I'd ask, Mr. Kenner, is that

9    you be specific.  He indicated he knew something about Jho

10   Low.  He doesn't -- he didn't know about the rest.  So if

11   you could make a distinction when you're asking him these

12   questions.

13           MR. KENNER:  Thank you.

14   BY MR. KENNER:

15   Q.  When did you find out or -- let me withdraw that.

16           Is it your testimony that you never found out that

17   Jho Low was present at a meeting with Mr. Sun in Hong Kong

18   when Mr. Michel went to meet with him?

19   A.  No.  That is my testimony.  I did not know that Jho Low

20   was meeting with Mr. Sun or with Mr. Michel.  I knew that

21   Mr. Michel was traveling to Asia.  As I stated previously

22   for the third time now, I have not -- I did not know who

23   specifically accompanied him on those trips or who else he

24   met other than Jho Low.

25   Q.  So did you ever find out about it or, as you sit there

1    today, you still don't know that that happened?

2    A.  I didn't find out about that until there was a

3    Government exhibit presented that had this supposed meeting

4    on it.  It was just not something I was privy to.

5    Q.  Okay.  So it was after you were indicted that for the

6    first time you became aware of this particular meeting that

7    we've been talking about?

8    A.  Yes, sir.

9    Q.  And six months after that meeting, as I gather from the

10   November 18th chronological entry in your notebook, you were

11   still on the fence about whether FARA needed to -- whether

12   Mr. Michel and you or others needed to register?

13   A.  I don't think "on the fence" would be a fair

14   characterization, sir.  I understand that the plain language

15   said "consider strongly."  But I know what I meant by that,

16   and that as we were moving into 2018 and as I anticipated to

17   be continuing these kinds of activities, that registration

18   for FARA would become necessary, consistent with what I had

19   said previously earlier in the summer.

20   Q.  Did you ever reduce to writing what you gathered when

21   you read the FARA statute?

22   A.  No, sir, I did not.

23   Q.  Did you ever reduce to writing -- I think you mentioned

24   you read some scholarly *Law Review* articles?

25   A.  No, sir.  I did not reduce those to writing.

```
 1    Q.  You what?

 2    A.  No, sir.  I did not reduce those to writing.

 3    Q.  Okay.  Did you discuss those with Mr. Michel?

 4    A.  As I've stated previously, sir, yes.  I did discuss

 5    those things with Mr. Michel.

 6    Q.  Well, when you gave this advice about FARA to Mr. Michel

 7    regarding registration requirements, would it be a fair

 8    statement to say that you were providing legal advice to him

 9    for which you were being paid?

10    A.  Yes, sir, it would be.

11    Q.  So I think in the chronology there was the second room

12    or shortly after that conversation about FARA with

13    Mr. Michel.  When after that was the next time that you

14    mentioned FARA to Mr. Michel?

15    A.  I believe it was in association with a *Wall Street*

16    *Journal* article that I had read involving him and Jho Low

17    previously.  But I do not remember the specific date that I

18    provided that advice.

19    Q.  Okay.  After you read that article -- it was in mid-2015

20    when the *Wall Street Journal* published that article.  Did

21    you have another conversation with Mr. Michel about

22    registering?

23              MR. MULRYNE:  Objection, your Honor.  Assuming

24    facts not in evidence.

25              THE COURT:  Yes.  It's not clear to me.  He didn't
```

Higginbotham - CROSS - By Mr. Kenner

1    indicate he doesn't remember the date.  You put a date in.

2    I don't know whether that's the article or not.

3              MR. KENNER:  All right.

4              THE COURT:  We don't have any evidence as to when

5    it was done and he indicated he didn't remember.

6              MR. KENNER:  I will do that.  Thank you very much,

7    your Honor.

8    BY MR. KENNER:

9    Q.  I want to know the next time you recall talking to

10   Mr. Michel about FARA after the second room occasion.

11   A.  I believe that it was after my trip to the embassy, sir.

12   Q.  After...?

13   A.  My trip to the embassy, sir.

14   Q.  Okay.  And did you talk about FARA with him before you

15   went to the embassy?

16   A.  Yes, sir, I did.

17   Q.  Other than in the second room?

18   A.  No.  I did not speak to him about FARA in the second

19   room, sir.  After I digested the things that he had said to

20   me, I suggested to him that FARA registration would be a

21   good idea.  After traveling to the embassy at his request, I

22   brought up FARA again.

23              Understand, sir, that this is someone who I'm

24   speaking with five, six, seven, eight times a day.  And that

25   it's difficult to -- for me to recall the exact time that I

1    told him when -- or I recommended to him to register for

2    FARA.

3              But it is something that I did do.  I do remember

4    him specifically referencing the airport incident, and I

5    don't want to go through that again.  And it was something

6    that was important enough for it to be the first entry in my

7    recommendations moving into 2018 as we were continuing with

8    this -- with these activities.

9    Q.  But your entry says you were getting close to needing to

10   register.  Is that what you told Mr. Michel in November of

11   2017?

12   A.  I don't believe that that's what the entry says.  It

13   says we need to register or I strongly recommend registering

14   for FARA.

15   Q.  It's already been published.  But just to refresh your

16   recollection, the entry in your notebook reads:  "FARA,"

17   F-A-R-A, in capital letters, then it says "Need to be

18   considered -- need to consider this strongly."

19              Are you saying that's -- those notes are

20   inaccurate?

21   A.  No.  I'm not saying that's inaccurate.  What I'm saying

22   by that is that I had brought it up previously.  Mr. Michel

23   had taken a very cavalier attitude towards it, and that it

24   wasn't important to him.

25              And I'm putting a note to myself in there, "Need

Higginbotham - CROSS - By Mr. Kenner

1    to consider this strongly" from the perspective of, although

2    he doesn't think that it's necessary, the activities that we

3    had engaged in during that time definitely warrant

4    registration with FARA.

5    Q.  When you say "The activities we engaged with warranted a

6    registration under FARA," that was for you and Mr. Michel.

7    That's what you meant by "we."  Correct?

8    A.  Not necessarily.  We --

9    Q.  Well, not necessarily.  What does that mean?

10    A.  We engaged in a number of activities.  It was to travel

11    to Macao; it was providing lies to banks; it was numerous

12    conversations.  When I say "we," generally, the work that we

13    were doing, sir.

14    Q.  Can you tell us the next conversation that happened with

15    Mr. Michel about FARA?

16    A.  I don't think that there was any more, sir.

17    Q.  After November 18th?

18    A.  No.

19            THE COURT:  No.  It's November 8th --

20            MR. KENNER:  I'm sorry.  November 8th of 2017.

21            THE WITNESS:  No, sir.

22    BY MR. KENNER:

23    Q.  Before I move on, I want to be very specific.  Is it

24    true that you never advised Mr. Michel that he must register

25    under FARA to comply with the law?

1        MR. MULRYNE:  Asked and answered, your Honor.

2        THE COURT:  It has been.  He's given his answer.

3        MR. KENNER:  Excuse me one moment, your Honor.

4        THE COURT:  Sure.

5    BY MR. KENNER:

6    Q.  By the way, when you were checking on the requirements

7    of FARA, did you ever come to learn that FARA has a hotline

8    to answer questions for people who needed clarification

9    about how to go about compliance and under what

10   circumstances?

11   A.  No.  I was not familiar with that hotline.

12   Q.  Then I assume you never called it?

13   A.  That would be a correct assumption.

14        MR. KENNER:  May I just have a moment, your Honor?

15   May I just have a moment to get an exhibit?

16        THE COURT:  Why don't you go ahead and stand and

17   stretch while they're looking for the document, if you'd

18   like.  It's a little early for a break, but I think you

19   could stand.

20   BY MR. KENNER:

21   Q.  Sir, during the period of October 1st, 2016, to January

22   2nd, 2018, were you working on matters unrelated to Jho Low

23   or Mr. Guo as Mr. Michel's lawyer?

24   A.  Yes, I was.

25   Q.  And did you do work for him in connection with albums

1    that he was doing?

2    A.  Yes, I did.

3    Q.  And did you draft and negotiate agreements with, first,

4    a Mr. Bink on January 12th, 2017?

5            MR. MULRYNE:  Objection, your Honor.  Relevance.

6            MR. KENNER:  I want to show, your Honor, the

7    number of matters that he was also working on for Mr. Michel

8    to --

9            THE COURT:  I think as I indicated earlier in my

10   initial findings that this falls into Group No. 3, if that's

11   what he's developing.  I'll see where it goes.  So I'll

12   allow it at this point.

13   BY MR. KENNER:

14   Q.  On or about January 12th of 2017?

15   A.  Yes, sir.  I was working on a number of different

16   matters with him, including that one.

17   Q.  Were you also working on October 25th of 2017 on RU the

18   Streets?

19   A.  I believe that would have been 2016.  Yes.

20   Q.  How about in connection with Chucky Thompson on July 5th

21   of 2017?

22   A.  Yes, sir.  There were a number of entertainment-related

23   matters I was handling for Mr. Michel at the time.

24   Q.  About 71 of them?

25   A.  That I -- I guess.  I don't know exactly how you would

1    define discrete matters.  71 seems somewhat high.

2    Q.  That's fine.

3         Did you work on albums with Carty Cleans on or

4    about December 28th, 2017?

5    A.  Yes, sir.

6    Q.  And did you work on -- with Damion Scott on or about May

7    27, '17, to draft and review a producer agreement with him?

8    A.  Sir, as I've stated, I was working on a number of

9    various matters.  I don't recall these individual names

10   specifically.  But they --

11   Q.  Did -- I'm sorry.

12   A.  I definitely could have been.  Yes.

13   Q.  Okay.  Did you work on an agreement and negotiate an

14   agreement with Twenty Four Seven on or around December 7th

15   of 2017?

16   A.  I do not recall the specific name, sir.  As you said,

17   there were -- you know, you're suggesting 70.  I think that

18   number is somewhat high.  There were a number of

19   music-related items that I was working with Mr. Michel on.

20   And a lot -- when you are working on an album, there are a

21   number of different individuals that contribute to the

22   album, whether it be producers, songwriters, side artists

23   and others.  So if this is all within that category, then

24   these are items that I did work on.

25   Q.  Okay.  What about Pras Presents?  Did you work on

Higginbotham - CROSS - By Mr. Kenner

1    something called Pras Presents, a music production platform?

2    A.   Yes, I did.

3    Q.   That was on or around May 10th of 2017?

4    A.   Yes, I did.

5    Q.   And tell me what Pras Presents was.

6    A.   If I remember correctly, it was a collection of artists

7    that Mr. Michel was working with at the time.  And we were

8    putting out -- or Mr. Michel was putting out an album with a

9    number of different artists, including himself.

10   Q.   Called the Compilation Album.  Correct?

11   A.   That's -- yes.

12   Q.   And did you negotiate with Aaron Management on or around

13   May 28th of '17 through July 19th of 2017?

14   A.   That's very possible, sir.

15   Q.   Well, do you remember doing it or is it just possible?

16        MR. MULRYNE:  Your Honor, objection to this whole

17   line of questioning on relevance.

18        THE COURT:  I'm assuming he's going to tie it up.

19        MR. KENNER:  Yes, I am.

20        THE COURT:  I agree with you.  It is irrelevant.

21   But I'm assuming that it'll be tied up as I discussed as

22   they were presented to me.

23        THE WITNESS:  I remember Aaron Management as one

24   of the other parties that I negotiated with.

25

Higginbotham - CROSS - By Mr. Kenner

1    BY MR. KENNER:

2    Q.  Okay.  And with regard to personal matters for

3    Mr. Michel, did you work on something with Lauren Kulak on

4    or around September 24th, 2017?

5    A.  I believe that Mr. Kulak was being hired by Mr. Michel

6    to perform some particular function.  I don't remember

7    exactly what it is at this time.

8    Q.  And you worked on the Barry Bekkedam matter.  Correct?

9    A.  I did a little bit of work on the Barry Bekkedam matter

10   as well.  Yes.

11   Q.  And you negotiated with Mr. Marc Moskowitz?

12   A.  I negotiated with Mr. Marc Moskowitz?

13   Q.  Yeah.

14   A.  I suggested Mr. Marc Moskowitz as his money manager as a

15   replacement for Mr. Bekkedam.

16   Q.  Okay.  And did you negotiate with him over what his fee

17   would be?

18   A.  There was some negotiation over that, yes.

19   Q.  That you took part in?

20   A.  Yes, sir.

21   Q.  And did you discuss with Mr. Michel the matter of taxes?

22   A.  In what regard, sir?

23   Q.  Didn't there come a time when for one year when

24   Mr. Bekkedam was still his business manager there was no tax

25   return filed, that it was later filed, but at that time it

1    was not?

2    A.  It was my understanding from Mr. Michel that he was

3    alerted of the issue with Mr. Bekkedam because the Internal

4    Revenue Service visited Mr. Michel's home in Florida and

5    that set off his awareness that there could be something

6    wrong with the representation that Mr. Bekkedam was

7    providing him.

8    Q.  And did you work with him in evaluating a whole range of

9    business deals?

10   A.  Yes, sir.

11   Q.  And did you work with him on a black film company called

12   Blacture?

13   A.  Yes, I did.

14   Q.  And what did you do in connection with Blacture?

15   A.  Any number of different things.  There was reviewing

16   contracts; there was meeting with various people that we

17   were hiring to assist with the development of the platform.

18   I can't remember those other things.  It was quite an

19   effort.

20   Q.  What is your understanding of what the -- what Blacture

21   as a company was doing?

22   A.  In broad strokes, it was an effort to elevate and

23   highlight the achievements, the theatrical achievements, of

24   predominantly black actors, movie directors, producers and

25   provide a platform where that could be easily accessed for

1    the public.

2    Q.  Did you work on something called Alpha Private Equity

3    Advisors in or around October 1st of 2016?

4    A.  That I don't recall.

5    Q.  You don't recall negotiating and drafting a draft loan

6    agreement with them?

7    A.  You'd have to refresh my memory on that.

8    Q.  Well, did you -- do you know what Alpha Private Equity

9    Advisors is?

10   A.  I do not recall at this time.  I'm not saying that I

11   didn't work on it.  I just don't recall at this time.

12   Q.  Okay.  And you worked on the initial introductions and

13   communications with Marc Moskowitz.  Correct?

14   A.  Yes, I did.  I introduced Mr. Michel to Mr. Moskowitz.

15   Q.  Okay.  I think I asked you the other day if you had any

16   knowledge about working on a deal in Sudan in connection

17   with commodities, in that case gold?

18   A.  Yes.  I do recall that.

19   Q.  And did you put together loan agreements with other

20   partners that were involved in that activity?

21   A.  Yes.  I do recall that.

22   Q.  And did you do a Dubai corporate structure agreement

23   with Panis Shah and a board of directors in or around

24   January 15th of 2017?

25   A.  Yes.  I recall working on that.

1    Q.  Are you familiar with a company called Impact Film Fund?

2    A.  Not off -- no.  I don't recall that.

3    Q.  You don't recall talking to representatives of that

4    company and reviewing the agreement that was proposed to

5    fund these other projects?

6    A.  I'm not saying that I didn't do it.  I just don't recall

7    the name Impact.  We were speaking with a number of

8    different entities at that time.

9    Q.  And did you work with Mr. Michel in negotiating with NBC

10   for a Super Bowl ad?

11   A.  Yes, sir.  I do recall that.

12   Q.  And did you review the documents?

13   A.  Yes, I did.

14   Q.  Did you make changes and edits and send drafts back and

15   forth?

16   A.  Yes.  There was not a lot to be done with that.  NBC was

17   pretty firm on their -- on their agreement.

18   Q.  And Mr. Michel -- that agreement was to introduce

19   prosperity to the world.  Correct?

20   A.  Prosperity and the black film project that we discussed

21   previously.

22   Q.  And did Mr. Michel pay somewhere in the neighborhood of

23   $4 million for that Super Bowl ad?

24   A.  Yes.  I think it was a little bit more than that.

25   But --

Higginbotham - CROSS - By Mr. Kenner

```
 1    Q.  Four and a half million?

 2    A.  Yes.  It was in that area.  Yes, sir.

 3    Q.  And can you tell me, what is Gorrilla Music Publishing?

 4    A.  I do not recall off the top of my head.

 5    Q.  Do you recognize Gorrilla Music Publishing?

 6    A.  Not particularly.

 7    Q.  You don't recall -- do you recall whether or not

 8    Gorrilla Music Publishing was an attempt to create a

 9    black-owned music publishing company?

10            MR. MULRYNE:  Objection, your Honor.  He's already

11    testified he doesn't remember.

12            THE COURT:  I must say, at this point he doesn't

13    seem to have a memory of it.

14            MR. KENNER:  Okay.

15    BY MR. KENNER:

16    Q.  Let me switch tracks here for a moment.

17            You've testified previously about your friendship

18    with Mr. Michel.  Correct?

19    A.  Yes, sir.

20    Q.  And that that swayed you in what you decided that you

21    should and should not advise him about?

22    A.  I do believe that unfortunately it clouded my judgment,

23    sir.  Yes.

24    Q.  Now, when you say you were friends with Mr. Michel,

25    other than having been at his house at the occasion of the
```

1    second room, did you ever go out socially with Mr. Michel?

2    Did you ever go out to dinner?

3    A.  Yes, sir, we did.

4    Q.  How often did you go to dinner with Mr. Michel?

5              THE COURT:  What time period are you talking

6    about?

7              MR. KENNER:  I'm sorry?

8              THE COURT:  Would you put a time period to this?

9              MR. KENNER:  Yes.

10   BY MR. KENNER:

11   Q.  During the time period of the alleged conspiracy here.

12   A.  I would say half a dozen times, maybe.  You have to

13   understand, sir, that Mr. Michel was traveling quite

14   frequently.  He lived on the West Coast primarily.  I was on

15   the East Coast primarily.  Notwithstanding the number of

16   times that we went to dinner and/or lunch, we did speak on

17   the phone very, very frequently.

18   Q.  Okay.  But over this whole period of time, your

19   recollection is six times you had dinner with Mr. Michel?

20   A.  In that area, sir.  Yes.

21   Q.  Well, let's start with the first one and go through what

22   you remember.

23              Where did you go to dinner --

24              MR MULRYNE:  Objection.

25   BY MR. KENNER:

```
1    Q.  -- the first time with Mr. Michel?

2              THE COURT:  Let him finish his question.  I'm

3    sorry.  I didn't hear the rest of it.

4              If you could just ask what you were asking.  I

5    didn't hear.

6              MR. KENNER:  Yes.

7    BY MR. KENNER:

8    Q.  When is the first time you went out to dinner with

9    Mr. Michel?

10             THE COURT:  I assume he's trying to -- the

11   objection is --

12             MR. MULRYNE:  The objection is relevance, your

13   Honor.  There was no tie-up to that litany of questions

14   about prior contracts and other legal work; and now we're

15   talking about specific dinners that he had with the

16   Defendant.  Relevance.

17             THE COURT:  This is a different area, I would

18   agree, than what he was asking prior, since he's exploring

19   as I understand it the nature of the friendship.

20             Is that correct?

21             MR. KENNER:  Yes.

22             THE COURT:  I'll allow a few questions.

23             MR. KENNER:  Thank you.

24   BY MR. KENNER:

25   Q.  Do you recall where you went to dinner and approximately
```

Higginbotham - CROSS - By Mr. Kenner

1    when it was the first time you had dinner with Mr. Michel?

2              THE COURT:  What year are you talking about?

3              MR. KENNER:  During the term of this conspiracy.

4              THE COURT:  Give us a year.

5              MR. KENNER:  2012 to 2018, '19.

6              THE WITNESS:  I'm genuinely trying to answer your

7    question, sir.  I believe Mr. Michel may have traveled to

8    D.C., and I think our first encounter may have been at one

9    of the hotels in Georgetown.  I remember another lunch that

10   we had in New York City.  I remember a dinner that we had in

11   New York City.  I remember another occasion where we met

12   with one of the individuals that was involved with the Sudan

13   matter that you just brought up.  Like I said, I don't

14   remember every single dinner that we had or lunch that we

15   had.

16   BY MR. KENNER:

17   Q.  Would it be fair to say that the times that you're

18   making reference to were primarily to discuss business or

19   legal matters with Mr. Michel?

20   A.  I'm not sure that that would be fair to say if you want

21   to use the word "primarily."  At that time, we shifted very

22   comfortably between things that were legal, things that had

23   to do with business and things that had to do with purely

24   social matters.

25   Q.  All right.  How many times has Mr. Michel, if at all,

1    been to your home?

2    A.  I believe once, maybe twice.

3    Q.  And on the occasion that he came to your home, was this

4    in a time period relative to when you were expecting your

5    child?

6    A.  Yes, sir.

7    Q.  And did you have some kind of a celebration of --

8    religious or otherwise after your first child was born?

9    A.  No, sir.

10   Q.  Did you ever go to a ball game with Mr. Michel?

11   A.  No, sir.

12   Q.  Did you ever go out and do anything other than what

13   you're recalling these six times of eating?

14   A.  Meaning what?

15   Q.  Did you ever do anything social with him?  Did you go to

16   a football game or a basketball game or baseball game?

17   A.  No, sir.

18   Q.  So your description of this friendship relationship that

19   you had with Mr. Michel, essentially you can recall you're

20   saying six times when you had a meal with him and nothing

21   else?

22   A.  Sir, we specifically I believe at the request of the

23   judge delineated the time period having to do with, as you

24   say, the alleged conspiracy.

25   Q.  Yes.  That's the time period I'm talking about.

1    A.  Yes, sir.  But I met Mr. Michel in 2002, 2003.  And

2    so --

3    Q.  I'm not talking about that.

4             THE COURT:  Just a second.  You asked him.  Let

5    him finish.

6             THE WITNESS:  If you're talking about the time

7    period of, let's say, October 2016 to the end of 2017,

8    everything that I've said is accurate.

9             But you can't negate the fact that I had known

10   him, shared an office with him, from the 2002-2003

11   timeframe.  And in that period, those 15 years previous,

12   there were any number of different conversations that were

13   purely social.  I don't think that there were any sporting

14   events.  But if you limit it to that time period, I think

15   that that is -- that it would be an inaccurate

16   representation.

17   BY MR. KENNER:

18   Q.  Sir, there came a time when, after not seeing Mr. Michel

19   for a lengthy period, you and he ran across each other.

20   Correct?

21             THE COURT:  You're going to have to -- that's very

22   generalized.  You need to make it more specific in timing

23   since he's talked about knowing him since 2002 on.

24             MR. KENNER:  Okay.

25

```
 1    BY MR. KENNER:

 2    Q.  After the 2002-2003 time period that you made reference

 3    to, when after that did you next see Mr. Michel?

 4    A.  I saw Mr. Michel and spoke with Mr. Michel on a number

 5    of occasions in that 15-year period.

 6    Q.  So you were still his legal advisor?

 7    A.  Off and on.  I'm sure Mr. Michel had other attorneys

 8    during that time period.  And when he needed my assistance

 9    with things, I was there.

10    Q.  On how many occasions in those 15 years did Mr. Michel

11    ask you to get involved as his lawyer?

12    A.  A number, sir.  It would have been many.  There were

13    many, many, many projects that I worked on with Mr. Michel,

14    sometimes --

15    Q.  Are there -- I apologize.  Go ahead.

16    A.  -- sometimes with a greater level of intensity,

17    depending on the project we were working on.  But it ebbed

18    and flowed.

19    Q.  So you were continuing to work with him and at some

20    point you ran into him in D.C. or in New York?

21    A.  What is the timeframe, sir?

22    Q.  The timeline, sir, is when you again started to

23    represent Mr. Michel.

24    A.  Yes.

25    Q.  During the time period of this conspiracy.  Do you have
```

1    that in mind?

2    A.  Yes, sir.

3    Q.  Okay.

4    A.  He contacted me in the fall of 2016 and asked me to get

5    involved on a couple matters that he was dealing with, sir.

6    Q.  How did -- were you working for the Department of

7    Justice at that time?

8    A.  Yes, I was, sir.

9    Q.  And did he contact you by calling the Department of

10   Justice?

11   A.  No, sir.

12   Q.  To your understanding, how did you guys run into -- how

13   did -- what precipitated Mr. Michel reaching out to you for

14   legal advice between 2012 and 2019?

15              THE COURT:  '19?

16              MR. KENNER:   I'm sorry.  '18.

17              THE WITNESS:  Sir, I've had the same cell phone

18   number for the last 25-plus years.  It hasn't changed.  If

19   he wanted to get in contact with me, all he'd have to do is

20   give me a call.

21   BY MR. KENNER:

22   Q.  Okay.  So one day you get up and you're doing what

23   you're doing and a phone call appears on your phone from

24   Mr. Michel?

25   A.  That is exactly what happened.  Yes.

1    Q.  And did Mr. Michel know -- what was your understanding

2    of whether Mr. Michel knew when he called you about your

3    work being employed by the Justice Department?

4    A.  At that time, I don't think that he knew.

5    Q.  Okay.  And after he talked to you on the phone, was that

6    about retaining your services on new projects?

7    A.  Yes, it was.

8    Q.  And what projects did he tell you he wanted to retain

9    you on?

10   A.  I believe it was on some of the music-related,

11   entertainment-related projects that you went through

12   earlier.

13   Q.  And at what point did the first conversation you had

14   with Mr. Michel about a fellow named Joel take place?

15   A.  Not until, I believe, February or March of 2017.

16   Q.  February or March of 2013?

17   A.  '17.

18   Q.  '17.

19          And did he tell you about that over the telephone

20   or in person?

21   A.  Over the phone.

22   Q.  Okay.  By the way, did you ever have meetings with

23   Mr. Michel in your office at the Department of Justice?

24   A.  I did.

25   Q.  Didn't you even on occasions use the Department of

 1    Justice copy machine to make copies for your side gig

 2    representing Mr. Michel?

 3    A.  Yes, I did.

 4    Q.  Did it occur to you that that wasn't legal or allowed by

 5    regulations?

 6    A.  Yes.  I wasn't supposed to be representing Mr. Michel at

 7    all.

 8    Q.  And you knew that when you started to represent him?

 9    A.  Yes, I did.

10    Q.  So at this point, if I've got it correctly, you're

11    expecting a baby.  Isn't it true at that time because you

12    were expecting a baby you were looking for a home to buy?

13    A.  No, sir.  My wife and I had a home.  We were remodeling

14    it at the time.

15    Q.  Okay.  Did there come a time when you had to take steps

16    to clean up your credit so you could get a loan in

17    connection with your house?

18              MR. MULRYNE:  Objection, your Honor.  Relevance.

19              THE COURT:  Let's have a conversation about this

20    for a second.

21              (Whereupon, the following proceedings were had at

22    sidebar outside the presence of the jury:)

23              THE COURT:  Mr. Kenner?

24              MR. KENNER:  Yes.

25              THE COURT:  So it's not clear to me at this point,

 1    are you trying to get into his financial difficulties?

 2            MR. KENNER:  Yes.  I'm trying to connect

 3    ultimately his chasing the bag to his expanding family, his

 4    lack of credit, his litany of money that he owed, which is

 5    also reflected in the notebooks.  And that was a significant

 6    reason that he was willing to mislead Mr. Michel and not

 7    give him correct or proper legal advice, because it was him

 8    who needed the money.

 9            THE COURT:  And this goes to what, exactly?

10    What's the --

11            MR. KENNER:  This goes to the failure to provide

12    proper legal advice.

13            THE COURT:  I know.  But what does that hook up

14    into?

15            MR. KENNER:  It hooks up into -- you know, I'm not

16    arguing entrapment here.  But essentially, it's entrapping

17    Mr. Michel, who through Mr. Rousseau, Mr. Higginbotham knew

18    that Jho Low was literally a target for money.  He'd been

19    giving it around freely and voluntarily and excessively.

20    And Mr. Michel was aware of that.

21            I think it's highly relevant to establish --

22            THE COURT:  What?  In terms of -- this clearly

23    doesn't go -- it's not material to any of the elements in

24    terms of -- as far as I can see.  So if it is a defense,

25    what's the defense?  This is the first time I've heard

Higginbotham - CROSS - By Mr. Kenner

1    entrapment, and there's issues with that.

2            MR. KENNER:  Yes.  As I said, I'm not --

3            THE COURT:  You're not arguing entrapment.

4            MR. KENNER:  No.

5            THE COURT:  So what are you getting at?

6            MR. KENNER:  What I'm trying to do is these

7    questions go to the legal accuracy of the legal advice that

8    Mr. Michel was paying him to receive and relying on it.

9            THE COURT:  And so it's your view this goes to the

10   issue of advice-of-legal-counsel defense?

11           MR. KENNER:  Yes.

12           THE COURT:  Okay.  Mr. Keller?

13           MR. MULRYNE:  Your Honor, he's --

14           THE COURT:  Go ahead.

15           MR. MULRYNE:  The witness has testified that he

16   was hoping to make money from this relationship and from

17   future work from Mr. Michel.

18           He's testified now extensively about unrelated

19   work to this conspiracy in this case; for what relevance, I

20   don't -- I still don't understand.

21           THE COURT:  We'll wait to see if he hooks it up or

22   not.  He hasn't so far.

23           MR. MULRYNE:  He's testified about the fact that,

24   yes, he has agreed on the stand that he did not use his

25   better judgment because of his friendship with Mr. Michel

1    and perhaps because he was financially motivated.

2         The further we go down these rabbit holes, the

3    more we get into real relevance problems and potential 403,

4    confusing the jury.

5         THE COURT:  I think the difficulties in what

6    Mr. Haskell had provided in terms of the last one, I have

7    some questions about.  I mean, he's testified if you want to

8    argue -- we won't get into it at this point because the

9    advice of counsel is going to be decided at a later point.

10   But it does seem to me if indicated that he was -- he did

11   this for the money.  So you already have that.

12        So I'm not sure what adding -- you know, whether

13   he had financial difficulties or not.  He already said that

14   instead of getting into sort of his personal finances as

15   opposed to -- you already have on the record that he was

16   interested in the money.  He was interested in "the bag," I

17   believe, is the way he phrased it.

18        MR. MULRYNE:  Yes.

19        THE COURT:  So I'm not sure going down into this

20   additional information, frankly, is particularly probative.

21   And it's starting to get into 403-land, where you've already

22   got information about his financial difficulties and his

23   motivation in terms of what he did and what he didn't do.

24        But my suggestion is we take the morning break at

25   this point and I'll give you an opportunity to think about

 1     it.

 2                    MR. KENNER:  Thank you.

 3                    THE COURT:  But I would have a question about

 4     whether it's necessary at this point if the whole purpose of

 5     this is to say that his interest in money somehow tainted

 6     his advice, as to whether you need anything further.

 7                    MR. KENNER:  Thank you, your Honor.

 8                    THE COURT:

 9                    (Whereupon, the following proceedings were had in

10     open court:)

11                    THE COURT:  What we'll do is take our morning

12     break at this point.  Let's see.  It's -- the clocks are all

13     different.  Mine has roughly about seven minutes after

14     11:00.  So I'll say 11:25, so it's 20 minutes, to make sure

15     you all get enough time and everybody else does as well.

16                    So again, don't talk about the case.  And we'll

17     come and get you.

18                    (Whereupon, the jury exited the courtroom at 11:08

19     a.m. and the following proceedings were had:)

20                    THE COURT:  We're on a break.  So you know not to

21     talk about your case.  Just come on back at 25 after.

22                    (Thereupon, the witness retired from the courtroom

23     and the following proceedings were had:)

24                    THE COURT:  As I said, I think there's a question

25     as to whether we need to go down this path if the purpose

Higginbotham - CROSS - By Mr. Kenner

```
 1      is -- you've explained, is what you said.
 2                  MR. KENNER:  Thank you, your Honor.
 3                  What time do we come back?
 4                  THE COURT:  25 after.
 5                  (Thereupon a recess was taken, after which the
 6      following proceedings were had:)
 7                  THE COURTROOM DEPUTY:  Did you want the jury here?
 8                  THE COURT:  One second.
 9                  Mr. Kenner, what's your decision in terms of
10      pursuing anything further?
11                  MR. KENNER:  I'll move on, your Honor.
12                  THE COURT:  So you're not going to pursue anything
13      further on the financial difficulties?
14                  MR. KENNER:  I mean --
15                  THE COURT:  You need to speak into the microphone,
16      please.
17                  MR. KENNER:  As long as the record is clear that
18      my -- as to what it is that I intend that that would -- the
19      relevance of it to be, which I said when we were on the
20      telephone.  So having said that, I don't know that I need to
21      add any more.
22                  THE COURT:  All right.  Then we'll move on.
23                  (Whereupon, the jury entered the courtroom at
24      11:30 a.m. and the following proceedings were had:)
25                  THE COURT:  Let's proceed with your examination,
```

 1    cross-examination, of Mr. Higginbotham.

 2            MR. KENNER:  Your Honor, I would like to display

 3    to the witness a page from the notebook.  The DOJ number is

 4    0000106618.

 5            THE COURT:  I must admit, once you display it --

 6    are you showing it to the witness?  Is that what you want?

 7            MR. KENNER:  Yes, your Honor.

 8            THE COURT:  Okay.

 9            MR. KENNER:  May I proceed, your Honor?

10            THE COURT:  Yes.  Go ahead.

11    BY MR. KENNER:

12    Q.  Mr. Higginbotham, on your screen, you will see a

13    reference or a document that bears the Department of Justice

14    No. 0000106618.

15            Do you see that to be there?

16    A.  Yes, sir, I do.

17    Q.  And on that document, do you see a little diagram after

18    the number 14 above it?

19    A.  Yes, sir, I do.

20    Q.  Do you see that diagram?

21    A.  Yes, I do.

22    Q.  That's your handwriting.  Correct?

23    A.  Yes, sir, it is.

24    Q.  Was this an analysis of how to move money around that

25    came from Jho Low or others?

1    A.  It was on the analysis.  I think that as I've stated

2    before, this notebook contained just some of my own thoughts

3    and it was, I think, a proposed way of money to move around.

4    But like I said, this was never shared with Mr. Michel.

5    Q.  Okay.

6    A.  Or I didn't say that before, but it was never shared

7    with Mr. Michel.

8    Q.  But what I'm looking at here with the boxes around them

9    is your perception of a way to move money around and hide it

10   from the government.  Is that correct?

11   A.  No, sir.  It was not with the intent to hide it from the

12   government.  I believe at that time Mr. Michel was

13   investigating putting some of the monies that he had earned

14   into an offshore account in Caymans.  I don't know if it

15   could be appropriately described as hiding.

16   Q.  Okay.

17            MR. KENNER:  May I publish this portion of the

18   page, your Honor?

19            MR. MULRYNE:  Objection, your Honor.  Relevance.

20   This clearly doesn't fall within the business records

21   exception, and I'm not sure what the relevance of it is.

22            THE COURT:  Let's discuss it.  I don't see it

23   either at this point.

24            (Whereupon, the following proceedings were had at

25   sidebar outside the presence of the jury:)

Higginbotham - CROSS - By Mr. Kenner

```
 1                 THE COURT:  What does this go to?

 2                 MR. KENNER:  It goes to his charting of how money

 3       should be moved.  It starts with an "account in

 4       Higginbotham," George Higginbotham; there's an arrow to the

 5       right; "U.S. accounts"; and then there's another arrow to

 6       "Others."

 7                 Flowing down from George Higginbotham is a Cayman

 8       account.  Flowing down from that is "Money to George

 9       Higginbotham."  Flowing to the right would be "Money to Pras

10       Michel."  And below that is "Others."

11                 THE COURT:  Okay.  What does this go to?  He never

12       shared it with Mr. Michel.  So Mr. Higginbotham's state of

13       mind isn't at issue; it's Mr. Michel's.

14                 MR. KENNER:  I think this is part of the advice of

15       counsel.  I think this is --

16                 THE COURT:  Hold on one second.

17                 This is to support your advice-of-counsel defense?

18                 MR. KENNER:  This is to support the fact that

19       Mr. Higginbotham was the one who was coming up with the

20       advice about how to do things.  And part of his legal

21       advice, whether he said it to Mr. Michel or not, is

22       reflected in this exhibit.

23                 THE COURT:  I'm not sure -- Mr. Kenner, hold on.

24                 Mr. Kenner, if he never -- this is his own

25       thinking.  And he's indicated he never showed it to -- never
```

1    discussed it with Mr. Michel.  So I don't see how it goes to

2    giving any advice to Mr. Michel if he never actually told

3    him.  And it doesn't sound like he actually did this, or at

4    least you don't have that on the record.

5            So unless you either -- you don't have that he

6    told Mr. Michel what he was thinking here, where it would be

7    legal advice to him based on this, because he never imparted

8    that.  And so I'm not sure -- there has to be something that

9    gets imparted to Mr. Michel to reflect this.

10           MR. KENNER:  Yes.  I believe that's what the

11   evidence will show.  But if --

12           THE COURT:  Well, based on what, though?

13           MR. KENNER:  I don't want to be more specific than

14   that at this moment.

15           THE COURT:  Well, you can't get it in without it.

16           MR. KENNER:  Okay.

17           THE COURT:  You can't get it in based on what

18   you've told me.

19           MR. KENNER:  Okay.

20           (Whereupon, the following proceedings were had in

21   open court:)

22           THE COURT:  I'll sustain the objection at this

23   point.

24           You can take it down, Dorothy.

25

 1    BY MR. KENNER:

 2    Q.  Mr. Higginbotham, are you aware of a document dated July

 3    22nd, 2016, and reflecting that Lucky Mark was being formed?

 4    You saw that, correct?

 5    A.  There were registration documents for Lucky Mark that

 6    I've seen.  Yes.

 7    Q.  And that was something that you needed to acquire in

 8    order to open bank accounts.  Is that correct?  Didn't the

 9    bank want to know who was Lucky Mark?  Who are they?  What

10    are they?

11            THE COURT:  You asked a series of questions.

12    Which question do you wish him to answer?

13            MR. KENNER:  I just want to --

14    BY MR. KENNER:

15    Q.  My question is:  Did you review documents July 22nd,

16    2016, or thereabouts regarding the formation of Lucky Mark

17    Trading?

18    A.  There were documents that were provided to me for the

19    incorporation of Lucky Mark.  Yes.

20            MR. KENNER:  Your Honor, I would like to show the

21    witness and the Court and counsel only Government's Exhibit

22    No. 379.

23    BY MR. KENNER:

24    Q.  You've seen this before, haven't you?

25    A.  Yes, sir, I have.

1    Q.  And this represents date-wise the incorporation on the

2    22nd day of July, 2016, of a company called Lucky Mark (HK)

3    Trading, Limited?

4    A.  Yes, sir.

5    Q.  And was this amongst the documents that you sent to the

6    bank later in trying to open the account?

7    A.  I did send -- I believe that this is the document that

8    was attached to an email.  But it was not for the opening of

9    an account; it was for answering inquiries related to an

10   existing account at City National.

11   Q.  Okay.  Going to March 20th of 2017 --

12              THE COURT:  I don't think this document has been

13   admitted, has it?  I don't believe so.

14              MR. KENNER:  I'm going to move to publish

15   Government's Exhibit 379.

16              THE COURT:  Well, forget publishing.  We need to

17   get it admitted first.  It hasn't been -- at least I don't

18   have it listed as admitted, sir.

19              MR. KENNER:  Yes.  I'd ask to admit Government's

20   Exhibit 379.

21              MR. MULRYNE:  No objection, your Honor.

22              THE COURT:  Then I'll admit Government's Exhibit

23   379 without objection.

24              (Whereupon, Government's Exhibit No. 379 was

25   entered into evidence.)

```
 1              MR. KENNER:  Thank you, your Honor.
 2              THE COURT:  You may publish it.
 3    BY MR. KENNER:
 4    Q.  Do you recall when Mr. Moskowitz formed Anicorn?
 5    A.  Yes, sir, I do.
 6    Q.  And when was that?
 7    A.  I believe it was March -- in the March timeframe of
 8    2017.
 9    Q.  Showing you Government's Exhibit 377, does that refresh
10    your recollection of the date on which Anicorn was formed by
11    Mr. Moskowitz?
12    A.  Yes, sir.  I answered in the March timeframe.  It looks
13    like this is on the 20th day of March.
14              THE COURT:  Of what year?
15              THE WITNESS:  2017.
16              MR. KENNER:  May this -- I'd move to admit
17    Government's Exhibit 377.
18              MR. MULRYNE:  No objection, your Honor.
19              THE COURT:  I'll admit Government's Exhibit 377
20    without objection.
21              (Whereupon, Government's Exhibit No. 377 was
22    entered into evidence.)
23              MR. KENNER:  Thank you.
24              May it just be briefly published?
25
```

Higginbotham - CROSS - By Mr. Kenner

1    BY MR. KENNER:

2    Q.  Do you see the date there, the 20th day of March, 2017,

3    at 6:12 p.m.?

4    A.  Yes, sir.

5    Q.  And that's the date Anicorn was formed.  Correct?

6    A.  Yes, sir.

7    Q.  I would ask, do you know when Artemus was formed by

8    Mr. Markowitz?

9    A.  I believe Mr. Moskowitz formed both of the companies, if

10   not on the same day, very close in proximity to each other.

11   Q.  Okay.

12          MR. KENNER:  Your Honor, I'd ask that we display

13   to the Court, witness and counsel only Government's Exhibit

14   378.

15          MR. MULRYNE:  No objection to admission, your

16   Honor.

17          THE COURT:  You're asking to have it admitted?

18   I'll admit Government's Exhibit 378 without objection.

19          (Whereupon, Government's Exhibit No. 378 was

20   entered into evidence.)

21          MR. KENNER:  Thank you.

22   BY MR. KENNER:

23   Q.  Sir, do you see the date on this document to be the

24   same, the 20th day of March of 2017?

25   A.  Yes, sir, I do.

1    Q.  And did you participate in forming those two companies?

2    I know it was physically done by Mr. Markowitz [sic].  But

3    were you involved in discussions about whether or not these

4    companies should be formed?

5    A.  Those are two different questions, sir.  I did not

6    actually perform the filing.  That was done by

7    Mr. Moskowitz.

8            And I do believe that I did participate in

9    conversations about the formation of new entities.

10   Q.  Were those conversations with Mr. Moskowitz?

11   A.  I believe they were with Mr. Michel and Mr. Moskowitz.

12   Q.  And what did Mr. Moskowitz -- I'm sorry -- what did you

13   tell Mr. Moskowitz about Anicorn and Artemus being formed?

14           MR. MULRYNE:  Objection, your Honor.  Hearsay,

15   relevance.

16           THE COURT:  Let me hear what you have to say for a

17   moment.

18           (Whereupon, the following proceedings were had at

19   sidebar outside the presence of the jury:)

20           THE COURT:  What are you getting at, Mr. Kenner?

21           MR. KENNER:  Yes.

22           THE COURT:  I mean, in terms of -- what do you

23   have to say about it or what the purpose of these companies

24   was?

25           MR. KENNER:  What the purpose of the companies

1    was.  That's a better way to ask it.

2         THE COURT:  Okay.  Well, the purpose is what,

3    though?  That's what I'm trying to get at in terms of the

4    probative value.

5         MR. KENNER:  The probative value goes to the

6    advice of counsel.  Mr. Higginbotham once again was involved

7    as the lawyer.  Mr. Moskowitz was a financial advisor.  And

8    I think what -- Mr. Michel, he told us, was present.  What

9    that conversation was is --

10        THE COURT:  What do you expect the purpose to be?

11   What do you expect the answer to be, his purpose?

12        MR. KENNER:  You know what?  I'm not sure what

13   he'll say.

14        THE COURT:  What do you expect him to say?

15        MR. KENNER:  I think he'll say this was done to

16   set up shell companies to hide money.

17        THE COURT:  Mr. Keller?

18        MR. MULRYNE:  What he told Mr. Moskowitz about

19   these companies is not relevant to advice of counsel or

20   anything else.  If he wants to ask him what his

21   understanding of the purpose of the companies was --

22        THE COURT:  Right.

23        MR. MULRYNE:  -- he can ask him that.  Or if he

24   wants to ask him what he told Mr. Michel, he can ask him

25   that.  But what he told Mr. Moskowitz is not --

```
 1                    THE COURT:  Right.
 2                    MR. MULRYNE:  -- admissible.
 3                    THE COURT:  It doesn't seem to me it should be
 4       what he told Mr. Michel or something as Mr. Keller has
 5       indicated, which gets to the issue of what you wanted to ask
 6       him.  It wouldn't be hearsay.
 7                    MR. KENNER:  Thank you, your Honor.
 8                    (Whereupon, the following proceedings were had in
 9       open court:)
10       BY MR. KENNER:
11       Q.  Mr. Higginbotham, what was your understanding of the
12       purpose for which Anicorn and Artemus -- I'll break them
13       down separately, if you prefer -- but what was your
14       understanding of why those companies were being formed?
15       A.  It was my understanding that based on the difficulties
16       that Mr. Michel was having with Mr. Bekkedam that it was
17       necessary to have a fresh start, so to speak, in terms of
18       his corporate entities, so that they were not associated
19       with any of the prior transactions that were embroiled in
20       the controversy with Mr. Bekkedam.
21       Q.  Okay.  So your understanding is that these companies
22       needed to be set up to give Mr. Michel a fresh start in --
23       with a new business advisor and cut it off from any previous
24       advice he had from Mr. Bekkedam.  Correct?
25       A.  Yes, sir.  That was my understanding.
```

```
 1              MR. KENNER:  I'd like to show the witness

 2    Government's Exhibit 274, which has already been admitted.

 3              THE COURT:  That's correct.  Is it 2 or 3?

 4              MR. KENNER:  274, your Honor.

 5              THE COURT:  274.  I'm sorry.  Let me just

 6    double-check.

 7              Dorothy, have we admitted 274?

 8              THE COURTROOM DEPUTY:  Yes.

 9    BY MR. KENNER:

10    Q.  Mr. Higginbotham --

11              THE COURT:  Okay.  It has been admitted.  Go

12    ahead.  I'm sorry.

13    BY MR. KENNER:

14    Q.  Mr. Higginbotham, I just want to direct your attention

15    to the callout box.  This indicates the email was from you.

16    Correct?

17    A.  Yes, sir.

18    Q.  And the subject was "The work and the bag"?

19    A.  Yes, sir.

20    Q.  And it was sent to Mr. Pras Michel?

21    A.  Yes, sir.

22    Q.  And can you tell me, please, the date of this email?

23    A.  March 24th, 2017.

24    Q.  Thank you.

25              MR. KENNER:  I'd ask that the witness look at
```

Higginbotham - CROSS - By Mr. Kenner

1     Government's Exhibit 275, which also has been admitted.

2              THE COURT:  It has been admitted.

3     BY MR. KENNER:

4     Q.  Mr. Higginbotham, looking at Government's Exhibit 275,

5     what date does it reflect that this email was received?

6     A.  Thursday, the 6th of April, 2017.

7     Q.  April 6th, 2017.  Correct?

8     A.  Yes, sir.

9     Q.  And you were forwarding a document -- or you got

10    forwarded a document.  Correct?

11    A.  Yes, sir.

12    Q.  And that document came from Mr. Michel?

13    A.  Yes, sir.

14    Q.  And the document, without going into detail right now,

15    was Mr. Michel forwarding to you a purported contract

16    between COLFAX and Low Taek Jho, retainer agreement for

17    legal services.  Is that correct?

18    A.  Yes, sir.

19              MR. KENNER:  May I display Government's Exhibit

20    305, which has also been admitted?

21    BY MR. KENNER:

22    Q.  This is an email that's from you.  Is that correct?

23    A.  Yes, sir.

24    Q.  And it's to Pras Michel?

25    A.  Yes, sir.

1    Q.  And the subject is "ET phone home"?

2    A.  Yes, sir.

3    Q.  And the attachment is E&P agreement.  Correct?

4    A.  Yes, sir.

5    Q.  And this email was sent by you on April 10th, 2017.

6    Correct?

7    A.  Yes, sir.

8    Q.  And you worked on the document that you were asking

9    Mr. Michel to review?

10   A.  Yes, sir.

11   Q.  And giving him advice on it?

12   A.  Not giving advice.  It says in the email that we can

13   discuss it tonight.  It -- which probably means that I had

14   made some changes that he had requested and we can discuss

15   whether or not those changes were appropriate.

16   Q.  Okay.  That's in your role as Mr. Michel's attorney.

17   Correct?

18   A.  Yes, sir.  Loosely.

19          MR. KENNER:  Can I ask that Government's Exhibit

20   307, which also has been admitted, be displayed?

21          THE COURT:  All right.

22   BY MR. KENNER:

23   Q.  Sir, looking at Exhibit 307, this is an email from you.

24   Correct?

25   A.  Yes, sir.

1    Q.  And it's sent on April 27th of 2017.  Correct?

2    A.  Yes, sir.

3    Q.  It was sent to Mr. Michel?

4    A.  Yes, sir.

5    Q.  And the subject was "Anicorn with WuTang."  What did you

6    understand that to be?

7    A.  Well, we reviewed the incorporation of Anicorn

8    previously.  And WuTang, it was a moniker that we used for

9    Jho Low.

10   Q.  So you were sending to Mr. Michel for his review a

11   document or an agreement between Anicorn and Jho Low.

12   Correct?

13   A.  Yes, sir.

14   Q.  And you worked on that agreement?

15   A.  Yes, sir, I did.

16   Q.  And you gave Mr. Michel legal advice about it?

17   A.  No, sir.  As I stated previously, in this particular set

18   of documents, it was most often the case, if not always,

19   that Mr. Michel provided me with the relevant material deal

20   points.

21   Q.  Okay.  That's typical from a client.  Right?  "I want to

22   do this deal for this amount of money for that event at this

23   time," those kinds of things?

24   A.  Yes, sir.  But that's different than what you had

25   referenced, sir.  You said I gave him legal advice.

1    Q.  Did you make edits in this agreement?

2    A.  Based on the deal points that were provided to me, yes,

3    sir.

4    Q.  Okay.  So you're advising Mr. Michel and giving him your

5    legal opinion based upon what Mr. Michel was trying to

6    accomplish and correcting it to get closer to him being able

7    to do that?

8            THE COURT:  You've asked a couple of questions in

9    there.  You have to break it down.

10           MR. KENNER:  Okay.

11   BY MR. KENNER:

12   Q.  Is the purpose that you reviewed this document together

13   with the deal points that Mr. Michel gave you was to get the

14   written agreement to coincide with the deal points?

15   A.  Yes.

16   Q.  And did you make edits on the document to do that?

17   A.  In accordance with the deal points that were provided,

18   yes.

19   Q.  Yes.  And that's what you sent here to Mr. Michel?

20   A.  Yes, sir.

21   Q.  And that was based on your legal advice as his lawyer

22   with regard to this document.  Correct?

23   A.  Once again, sir, there are circumstances in normal

24   negotiations where you provide legal advice, where you make

25   a recommendation as to the, you know, positive and negative

1    aspects of any agreement.

2            In this particular case, as I have testified

3    previously, I was merely putting the deal points into a

4    standardized document.  And the only thing I take exception

5    to is you saying "providing legal advice."  In this

6    particular instance with this set of documents, I was merely

7    putting in deal points into a relatively standard

8    boilerplate agreement.

9    Q.  You were acting as a lawyer with regard to this

10   document.  Correct?

11   A.  Yes, sir.

12   Q.  And you gave those comments of yours, your legal

13   comments and advice, to Mr. Michel.  Correct?

14   A.  With regard to the deal points that he had provided.

15   Q.  There is an attachment to that email?

16           THE COURT:  Which exhibit are we talking about?

17           MR. KENNER:  307 that I just showed him.  It's

18   Government's Exhibit 308.  May that be shown at this point

19   to Mr. Higginbotham, your Honor?

20           THE COURT:  Okay.  308 has been admitted.

21           MR. KENNER:  It has been.  Then can we publish

22   Exhibit 308, please.

23   BY MR. KENNER:

24   Q.  Do you recognize Exhibit 308?

25   A.  Yes, sir, I do.

1    Q.  This Exhibit 308 was attached to the email that you just

2    looked at that you sent to Mr. Michel, which was

3    Government's Exhibit 307.  Correct?

4    A.  Yes, sir.

5    Q.  And did you review that agreement?

6    A.  Yes, sir, I did.

7    Q.  And did you make any changes in it?

8    A.  Yes, sir.  As I've stated previously, I made edits based

9    on the deal points that were provided.

10   Q.  And do you have copies of the edits someplace?

11   A.  Possibly, yes.

12   Q.  Okay.  They're not here with you today, though.

13   Correct?

14   A.  No, sir.

15   Q.  And those edits were done to provide your best legal

16   advice to Mr. Michel with regard to making sure that this

17   document accurately reflected what Mr. Michel told you the

18   deal points were.  Correct?

19   A.  Yes, sir.  Once again, the only exception that I take to

20   your statement is "advice."  With regard to all of these

21   documents, I believe I've stated now for the third time the

22   deal points were provided to me.  So it wasn't a normal

23   advisory capacity I was taking, sir.

24   Q.  Sir, isn't it the case when you represent the client the

25   deal points are given to you by your client and you're

Higginbotham - CROSS - By Mr. Kenner

1    tasked as a lawyer to make sure that a written agreement

2    that purports to memorialize what the deal points are -- to

3    make sure that they do that?

4    A.  That is different than what you just said previously,

5    sir.

6    Q.  Well, would you agree to this one that I just said?

7    A.  Yes, I would.

8    Q.  Okay.  And you gave that advice to Mr. Michel.  Correct?

9    A.  Yes.  For his review.

10   Q.  As his lawyer?

11   A.  Yes, sir.

12   Q.  And you understood that Mr. Michel would review what you

13   sent to him and that subsequently there might be another

14   conversation about it?

15   A.  Yes, sir.

16   Q.  Okay.

17              MR. KENNER:  May I show Government's Exhibit 439,

18   which has already been admitted?

19              THE COURT:  It has been admitted.

20   BY MR. KENNER:

21   Q.  Do you recognize this document?

22   A.  Yes, sir, I do.

23   Q.  And it's a document purportedly from Anicorn, LLC.

24   Correct?

25   A.  Yes, sir.

1  Q.  And it is dated May 1st, 2017.  Correct?

2  A.  Yes, sir.

3  Q.  And it is about Tycoon Talent, Limited.  Is that

4  correct?

5  A.  Yes, sir.

6  Q.  Did you review this document?

7  A.  Yes, sir.

8  Q.  Did you make edits and changes on the document?

9  A.  I believe so.  Yes, sir.

10  Q.  And that was again to as a lawyer advise Mr. Michel as

11  to whether or not the deal points that he gave you were

12  properly reflected so that he could rely on this legal work.

13  Correct?

14  A.  Yes, sir.

15  Q.  And you did that as his attorney?

16  A.  Yes, sir.

17  Q.  And he was your client?

18  A.  Yes, sir.

19  Q.  Okay.  On --

20          MR. KENNER:  May I show the witness GX 662?

21          THE COURT:  What's that?

22          MR. KENNER:  It's been admitted, your Honor.  It's

23  with reference to $2.8 million going to Anicorn seven days

24  after the agreement we just made reference to.

25          THE COURT:  What exhibit number is it?

1                  MR. KENNER:  The exhibit number is 662.

2                  THE COURT:  Okay.  That's what I was looking for.

3       BY MR. KENNER:

4       Q.  Do you see Exhibit 662 in front of you?

5       A.  Yes, sir, I do.

6       Q.  And does this document --

7                  THE COURT:  Which has been admitted.

8                  MR. KENNER:  Yes.  It has been admitted, your

9       Honor.

10      BY MR. KENNER:

11      Q.  Calling out --

12                 THE COURT:  You need to speak into the microphone.

13                 MR. KENNER:  I'm sorry.  I keep going back and

14      forth.  I apologize.

15                 THE COURT:  I understand.

16      BY MR. KENNER:

17      Q.  Does this callout reflect a receipt of money from -- a

18      wire from Lucky Mark Trading, Limited?

19      A.  Yes, it does.

20      Q.  And what is the posting date of this transfer?

21      A.  It looks like May either 8th or 6th, 2017.

22      Q.  The next column, where it says Effective Date, it says

23      May 8th, 2017, as well.  Correct?

24      A.  Yes, sir.

25                 MR. KENNER:  May I display to the Government

1    Government's Exhibit 456?

2                Don't publish it yet.

3                MR. MULRYNE:  No objection, your Honor.

4                THE COURT:  Are you asking for its admission?

5    They're not objecting if you are.

6                MR. KENNER:  Yes.  Thank you.  I move for its

7    admission.

8                THE COURT:  I'll admit 456 without objection.

9                (Whereupon, Government's Exhibit No. 456 was

10   entered into evidence.)

11               MR. KENNER:  May I now display Government's

12   Exhibit 662 --

13               THE COURT:  We haven't displayed this.  Did you

14   want it published?

15               MR. KENNER:  Yes, your Honor.  I do want it

16   published.

17               THE COURT:  Well, it didn't come up.  We don't

18   have it on the screen.

19               MR. KENNER:  I'm sorry.  That same exhibit was

20   admitted under Government's Exhibit 662, which I now have on

21   the screen.

22   BY MR. KENNER:

23   Q.  Sir, do you recognize this now, the date on it to be May

24   17th, 2017?

25   A.  Yes, sir, I do.

1   Q.  And this is referencing a deposit by way of an incoming

2   wire from Lucky Mark Trading, Limited.  Is that correct?

3   A.  Yes, sir, it is.

4   Q.  And the amount here is $2,800,000.  Is that correct?

5   A.  Yes, sir.

6   Q.  Now, we've talked --

7           MR. KENNER:  Your Honor, may I finish this now

8   seated instead of standing?

9           THE COURT:  Yes.  Go ahead.  If you can just pull

10  the microphone over.

11          MR. KENNER:  Thank you.

12          THE COURT:  You might move the screen there.  He's

13  not going to be able to see and we can't see him.  He can

14  look at the other screen that's next to Mr. Michel or in

15  front of Mr. Michel.

16          If you just look over, you can see the other

17  screen.

18          MR. KENNER:  Thank you.

19          THE COURT:  That way we can see you and you can

20  see the witness.

21  BY MR. KENNER:

22  Q.  Are you able to see me clearly?

23  A.  Yes, sir, I am.

24  Q.  Thank you.

25          You're aware that on May 19th, 2017, without

1    reference at this moment to who was on the trip, did you

2    understand that this is where Mr. Michel met with Minister

3    Sun?

4    A.  I was not aware at the time, sir.  No.

5    Q.  Okay.

6              MR. KENNER:  May I --

7              THE COURT:  If you could speak more directly into

8    the microphone so we can hear you better.

9              MR. KENNER:  May Government's Exhibit -- I'm

10    sorry.

11    BY MR. KENNER:

12    Q.  On July 15th of 2017, you called the Chinese embassy.

13    Correct?

14    A.  Yes.  Mr. Michel provided me with a contact person at

15    the embassy, and I contacted that person to work out the

16    particulars with my visit to the Chinese embassy.

17    Q.  On July 16th of 2017, you went to the embassy and

18    delivered whatever message you delivered.  Correct?

19    A.  Yes, sir, I did.

20    Q.  And did you then get a call from the Department of

21    Justice?

22    A.  Yes, sir, I did.

23    Q.  Was that the same night that you went to the embassy,

24    the Chinese embassy?

25    A.  No, sir, it was not.

1    Q.  Was it the next day?

2    A.  I believe it was the next day, sir.

3    Q.  And you went to the embassy, I think you told us, on a

4    Sunday.  Correct?

5    A.  Yes, sir.

6    Q.  So on Monday, the next day after that trip to the

7    embassy, you were contacted to have a meeting.  Correct?

8    A.  Yes.  A representative from DOJ was trying to get in

9    contact with me.  I was currently out on what could be

10   characterized as paternity leave.  And I was supposed to

11   report back to work, I believe, the following day or that

12   Wednesday.

13   Q.  Okay.  And that meeting that you had on Monday, was that

14   by telephone or in person?

15   A.  It wasn't a meeting -- well, it was a brief set of

16   questions.  "Why did you go to the embassy?  What was that

17   about?"  Et cetera.

18            And they wanted to meet with me when I got back

19   to -- when I got back to work.

20   Q.  My question is:  Did you meet in person or by telephone?

21   A.  Oh, it was over the telephone, sir.

22   Q.  And do you recall who you were talking to over the

23   telephone?

24   A.  I do not.

25   Q.  And as a result of that conversation on Monday, the day

1    after you went to the embassy, did something occur that

2    was -- was another meeting arranged or a meeting arranged?

3    A.  I do not remember the exact sequence of events.  But I

4    was scheduled to go back to the office.  At that time I was

5    detailed to Main Justice.  So that was the office that I'm

6    referring to.  I was supposed to go back to the office, I

7    believe, on that Tuesday or Wednesday of that week.

8           And then I was informed that the original person

9    that I was going to speak with that had contacted me -- I

10   was not going to meet with that woman and that I was going

11   to meet with someone else and that I would be informed who

12   that was.

13   Q.  Okay.  And was this a communication by telephone?

14   A.  No.  When I was -- I went back to the office, and I

15   believe the director of the office came in and spoke with me

16   and said that You will not be speaking with that lady.

17   You'll be speaking with someone else.

18   Q.  All right.  And that conversation was when you went back

19   to work at DOJ?

20   A.  Yes.  And that was in person, sir.

21   Q.  All right.  And were you -- did you go -- withdraw that.

22          Did you go to a room, a conference room, to talk

23   to somebody?

24   A.  Yes, I did.

25   Q.  And who was that somebody that you talked to?

1    A.  It was Mr. Lidsky.  And he had another colleague with

2    him.  I don't remember her name.

3    Q.  Okay.  Let me ask you this, Mr. Higginbotham:  Did you

4    have an understanding before talking to Mr. Lidsky with

5    regard to whether or not you were not going to be allowed to

6    come back to work for the Department of Justice?

7    A.  No.  I did not have an understanding about that.

8    Q.  Was it after your meeting with Mr. Lidsky that you came

9    to that understanding?

10   A.  It was significantly after that, sir.

11   Q.  I'm sorry?

12   A.  Significantly after that.

13   Q.  Okay.  When did you first become aware that you were

14   going to be let go by the Department of Justice?

15   A.  In the summer of 2018.

16   Q.  So between July of 2017 and the summer of 2018, you

17   continued to work for the DOJ?

18   A.  Yes, sir, I did.  I was put -- just to -- as a caveat to

19   that, I was put on -- I guess "administrative leave" would

20   be the technical term in January of 2018.

21   Q.  Up until January of 2018, were you still going to work

22   at the Department of Justice?

23   A.  Yes, sir, I was.

24   Q.  Were you still performing your job at the Department of

25   Justice?

1    A.  Yes, sir, I was.

2    Q.  Had you known by that time that the rules of the

3    Department of Justice, the rules and regulations,

4    specifically precluded an attorney from the Department of

5    Justice having a private practice on the side?

6    A.  Yes.  I did know that that was against the rules, sir.

7    Q.  And when did you become aware that that was against the

8    rules?

9    A.  I don't remember the specific date.  But it was prior to

10   that.  There was a -- I guess an ethics seminar that they

11   provided where they said that the practice of law outside --

12   as a side job was prohibited.

13   Q.  And when did that take place, approximately?

14   A.  I would say -- I sincerely don't remember exactly when

15   that took place.

16   Q.  But it would have been before January of 2018?

17   A.  I can't say that specifically.  Oh, before January of

18   2018?  Yes.  Yes.

19   Q.  Okay.  Let me go back to July 20th of 2017.  Is that

20   when an official investigation of you as a possible person

21   that was working as a government agent took place?

22   A.  I couldn't answer when an official investigation was

23   opened up against me.

24   Q.  I'm sorry.  I can't hear you, sir.

25   A.  I was approached by Mr. Lidsky.  I had a meeting with

1    Mr. Lidsky, as I've testified, in July following my trip to

2    the embassy.  If you're considering that the beginning or

3    the official beginning of an investigation of me, I would

4    have to say yes.

5    Q.  Okay.  Did you sign any documents in that first

6    interview with Mr. Lidsky on July 20th, 2017?

7    A.  I don't recall signing any documents.

8           THE COURT:  It's your best memory or you don't

9    remember whether or not you did?

10          THE WITNESS:  I don't remember whether or not I

11   did.

12   BY MR. KENNER:

13   Q.  After that interview with Mr. Lidsky, did you go back to

14   your office to go back to work?

15   A.  Yes, sir, I did.

16   Q.  And how long after you left Mr. Lidsky on July 20th did

17   you continue to work for the DOJ?

18   A.  I continued working for the DOJ until January of 2018.

19   Q.  Sir, on July 26th of 2017, six days after what we were

20   just talking about, did you have another interview with

21   Mr. Heuchling where Mr. Lidsky was also present?

22   A.  No.  Mr. Lidsky got -- it wasn't Mr. Heuchling at that

23   time.  Mr. Lidsky asked me whether or not I'd be willing to

24   speak with him at the D.C. FBI field office.

25          I told him I would be willing to have that

1    conversation.  And I went to the D.C. field office of the

2    FBI.

3    Q.  How long after your first interview of Mr. Lidsky on

4    July 20th of 2017 did you go to FBI headquarters for another

5    interview?

6    A.  I don't recall the exact date.

7    Q.  Weeks?  Months?

8    A.  Weeks.  Weeks.

9    Q.  Sir, was there an agreement in the meetings on July

10   20th, 2017, that you would going forward be working as a

11   government agent?

12              MR. MULRYNE:  Objection, your Honor.  We covered

13   this on Thursday extensively.

14              THE COURT:  We did.

15              MR. KENNER:  I have some other questions about

16   that.

17              THE COURT:  Well, then, you've asked and answered

18   this one.  So what other questions do you have that we have

19   not covered?  Because you did go through quite a bit.

20              MR. KENNER:  Thank you.

21   BY MR. KENNER:

22   Q.  Did there come a time, sir, when you expressed to agents

23   from the FBI or OIG that you felt that you couldn't continue

24   to do work for them as an agent at the same time you

25   continued to work for DOJ?  Didn't you tell them you needed

1    some protection and some kind of a written agreement

2    regarding that?

3    A.  When I received -- when I got back from Macao,

4    understand -- and I think that we went through this pretty

5    extensively on Thursday -- when I got back from Macao, my

6    understanding of OIG and FBI from the meetings that we had

7    had previously, the original meeting with Mr. Lidsky and

8    then the second meeting with the FBI at the field office,

9    were all associated with national security interests.

10          When I got back from Macao, there was some

11    information that I had heard that sounded more along the

12    lines of a national security matter; and I did get in

13    contact with Mr. Lidsky.

14          But please do understand that I did not mention

15    anything about Jho Low.  I didn't mention anything about

16    large sums of payments of money coming in.  I did not do any

17    of those kinds of things.

18          And part of my justification for reaching out to

19    Mr. Lidsky when I returned from Macao was that I was stopped

20    in Houston, which is my first port of entry.  And at that

21    point in time, I felt that -- I was trying to show -- play

22    two sides, so to speak, in terms of showing the Government

23    that I was on their side but at the same time continuing

24    with the activities with Mr. Michel.

25    Q.  Can you tell me exactly what that means, please?

1    A.  It means that I felt that the heat was on and that they

2    were now following me more closely; and the activities that

3    we were involved with in terms of being -- getting the bank

4    issues, all of those things led me to a greater sense of

5    anxiety and concern.

6    Q.  So after your first contact in July of 2017 with the

7    Government, you continued to work as Mr. Michel's attorney.

8    Correct?

9    A.  Yes.

10   Q.  And you were working as a government agent.  Correct?

11   A.  No, sir.

12         MR. KENNER:  May I ask to show the witness --

13   BY MR. KENNER:

14   Q.  Sir, let me back up a little bit.

15         In August of 2017, August 4th, 2017, you executed

16   or completed an investor loan agreement between Lucky Mark

17   and Anicorn.  Correct?

18   A.  I would have to see that.  I'm not exactly sure what

19   you're referring to, sir.

20         MR. KENNER:  May I ask to show the witness and the

21   Court Government's Exhibit 161, which has already been

22   admitted?

23         THE COURT:  It has been admitted.

24         We're supposed to be seeing this.

25

Higginbotham - CROSS - By Mr. Kenner

1    BY MR. KENNER:

2    Q.  Do you remember seeing this document?  Correct?

3    A.  Yes, sir, I do.

4    Q.  And is that the investor loan agreement that you worked

5    on between Lucky Mark and Anicorn?  I'll scroll through it

6    for you.  Tell me when to move forward.

7    A.  You can move forward.  You can continue to move forward.

8    Yes.  I recognize the document, sir.

9    Q.  And tell me what this document was meant to create.

10    A.  It was meant to create the appearance that Lucky Mark

11    was providing a loan to Anicorn in the event that any bank

12    or financial institution were to have any questions about

13    the purpose and the meaning of the money that was coming in.

14    Q.  Okay.  And who are the signatories to that agreement?

15    A.  I would have to see the last page, sir.

16            THE COURT:  Do you need it enlarged?

17            THE WITNESS:  No, ma'am.  Thank you.

18            It looks like it's Mr. Laogumnerd and a signature

19    that I've come to know as Ms. Freeman, I believe.

20    BY MR. KENNER:

21    Q.  Ms. Freeman was a longtime assistant to Mr. Michel prior

22    to this.  Correct?

23    A.  I believe so.

24    Q.  And isn't it true that because as you pointed out

25    Mr. Michel was traveling a lot, he placed Ms. Freeman on the

1    board so that she could be present to sign documents when

2    they needed to be?

3    A.  I could not verify that, sir.

4    Q.  Well, did you ask the question as Mr. Michel's lawyer,

5    Who the heck is Monica Freeman or Why is she signing on

6    behalf of Anicorn?

7    A.  No, I did not.  There was -- I distinctly remember when

8    these agreements were being done I was in the midst of a

9    vacation.  Mr. Michel would, as he often does, ask me to

10   make various changes to the agreements.  I made those

11   changes.

12         I did not do a tremendous amount of advisory on

13   why or who in the manner that you're suggesting.

14   Q.  I'm sorry.  You said you didn't use the -- you didn't do

15   a tremendous amount...?

16   A.  Of due diligence in terms of why or who or for what

17   purpose he was asking me to make those changes.

18   Q.  And Mr. Michel is the one that asked you to review this

19   document to make sure that it was legal and correct so that

20   he could rely on it.  Correct?

21   A.  No, sir.  He just said, I need you to make a few changes

22   to these documents.  Can you please make them?

23         I made them.

24         There was not a normal exchange in terms of

25   advice.  It was, I just need you to do this.

1             MR. KENNER:  Can we scroll back up to the top of

2     that document?

3     BY MR. KENNER:

4     Q.  I'm going to scroll again through this document and ask

5     you to stop when you see something that Mr. Michel told you

6     to change in this agreement.  Is it on the first page?

7     A.  I can tell you with regard to -- there were a number of

8     agreements, I believe, that were associated with this.  And

9     the only thing that was changing was the ownership -- was

10    the signatories as they were referenced at the beginning of

11    the agreement and as they were assigned at the end.

12    Q.  If I were to show you each page of this agreement, would

13    you be able to point out the things that Mr. Michel -- if I

14    understand it, he gave you this document and said, Change

15    this paragraph or Change that paragraph from this to that?

16    Is that what you're telling us?

17    A.  No.  The only material changes were the ownership and

18    signatory --

19    Q.  Sorry.  Your voice is fading.  The only change is what?

20    A.  Were the ownership, were the relevant parties and the

21    signatory to the agreement.

22            MR. KENNER:  Can I ask right now that we show

23    Exhibit 163, which has also been admitted?

24            THE COURT:  Is it 163?

25            MR. KENNER:  Yes, your Honor.

Higginbotham - CROSS - By Mr. Kenner

1          THE COURT:  That has been admitted.  Yes.  You can

2     show it.

3          MR. KENNER:  Thank you.

4          Would you put up Exhibit 163, please.

5     BY MR. KENNER:

6     Q.  Do you see Government's Exhibit 163 before you?

7     A.  Yes, sir, I do.

8     Q.  Do you recognize it?

9     A.  Yes, I do.

10    Q.  And what is it?

11    A.  It's an Investors Loan Agreement II.

12         MR. KENNER:  Can I ask Mr. Campbell to put up

13    Exhibit 161 on one-half of the screen and Exhibit 163 on the

14    other half, side by side.

15    BY MR. KENNER:

16    Q.  Do you see that at least the first page appears to me to

17    be the same?

18    A.  Yes, sir.  It does look to be the same except for the

19    addition of 1.2 on the bottom of the second page.

20    Q.  And the borrower in both of these is referred to as

21    Anicorn?

22    A.  Yes, sir, it does.

23    Q.  Okay.  Do you see any other changes between Exhibit 161

24    and 163 on this page?

25    A.  It looks like the signatories or the initials down at

1    the bottom.

2    Q.  I'm sorry.  The what?

3    A.  The initials.  If you look at the initials at the

4    bottom.

5    Q.  Oh.  And the initials on the bottom, do you recognize

6    them?

7    A.  I believe one is Mr. Michel and Ms. Freeman and the

8    other one is Mr. Michel.  I don't recognize the other one.

9            MR. KENNER:  Let me ask Mr. Campbell, can we go to

10    the last page of these documents, please?

11    BY MR. KENNER:

12    Q.  These are the signatory pages for Exhibits 161 and 163.

13    Do you see that to be the case?

14    A.  Yes, sir, I do.

15    Q.  The lender seems to be signed by Phengphian -- I'm

16    sorry; I don't know how to pronounce his name -- but Pheng?

17    A.  Yes.  Mr. Laogumnerd.  Yes.

18    Q.  Not Pras Michel?

19    A.  That's the lender.  Yes, sir.

20    Q.  Now, on the bottom, for the borrower, on the left on

21    Exhibit 161, you had Ms. Freeman.  Correct?

22    A.  Yes, sir.

23    Q.  And who is the signatory for Anicorn on Exhibit 163?

24    A.  That's my signature.

25    Q.  So the difference between Exhibit 161 and 163, it's the

1    same document except in Version II you become the signatory

2    to the document instead of Ms. Freeman.  Correct?

3    A.  Yes, sir.

4    Q.  Do you know when you signed this document?

5    A.  I do not recall.  Is there a date on the first page?

6    Q.  Version II says this 13th day of September, 2017.  And

7    let's go to Version I.  This appears to be the 4th day of

8    August, 2017.

9            There are two different dates.  Correct?

10   A.  Yes, sir.

11           MR. KENNER:  Can we display those different dates

12   side by side, please.

13   BY MR. KENNER:

14   Q.  Do you see the dates on these two documents?

15   A.  Yes, sir, I do.

16   Q.  And Document 161, that was not signed by you, but that's

17   signed by Monica, what's the date of that document?

18   A.  That would be August 4th.

19   Q.  Of 2017?

20   A.  Yes, sir.

21   Q.  And then one day short of a month later, on September

22   13th of 2017, you changed the agreement to be between

23   yourself and Mr. Pheng from Lucky Mark.  Correct?

24   A.  Yes, sir; at the instruction of Mr. Michel.

25   Q.  Please remind me, sir, of the date that you went to

1    Macao with Mr. Michel.

2    A.  I do not remember that date offhand.  I'm sure that we

3    can pull that up.

4    Q.  I'll get you the date in a moment.

5             But you recall talking to Mr. Lidsky?

6             THE COURT:  We can't hear you.

7    BY MR. KENNER:

8    Q.  Do you recall talking to Mr. Lidsky upon your return

9    from Hong Kong?

10   A.  Yes, sir, I do.

11            MR. KENNER:  May I just have a moment to find the

12   date of that?

13   BY MR. KENNER:

14   Q.  Does September 5, 2017, refresh your recollection as to

15   the date --

16   A.  Yes.

17   Q.  -- that you went to Macao?

18   A.  Yes, sir.

19   Q.  And it was on September 5th, 2017.  Is that correct?

20   A.  Yes.  I believe it was, sir.

21   Q.  And you got there with Mr. Michel.  Is that correct?

22   A.  Yes, sir, I did.

23   Q.  And you both landed on September the 3rd of 2017.

24   Correct?

25   A.  I think you just said September 5th.  So we would have

1    landed after we left.

2    Q.  I'm sorry.  I apologize.

3         You arrived with Mr. Michel on September the 3rd

4    of 2017.  Correct?

5    A.  Yes, sir.

6    Q.  And two days later, on September the 5th of 2017, do you

7    or Mr. Michel leave Hong Kong?

8    A.  I believe Mr. Michel left before I did.  I don't

9    remember exactly how many days it was.  But he did leave

10   before I did.

11   Q.  Okay.  Do you recall that you departed from Hong Kong on

12   September the 7th of 2017?

13   A.  Yes.  Yes.

14   Q.  So you were there for a couple of days with Mr. Michel.

15   He leaves.  You stay there for another couple of days doing

16   this agreement with Mr. Laogumnerd.  Correct?

17   A.  I did an agreement with Mr. Laogumnerd.  I do not

18   believe that this was the agreement that we did.

19   Q.  Okay.  Well, let me go to -- and I need to show this

20   just to Mr. Higginbotham, the Court and counsel -- and that

21   would be Government's Exhibit 104.

22        Sir, do you recognize Exhibit 104?

23   A.  Yes, I do.

24   Q.  And tell us what it is, please.

25   A.  There was a conversation or conversations, I should say,

1    that took place in Macao where Jho Low expressed concern

2    about sending additional money for two reasons:  One,

3    neither of the two --

4    Q.  Excuse me, sir.  I know I'm interrupting you.

5             I just want you to answer my question.  Then you

6    can go on and explain as long as you want.

7    A.  So which question is that, sir?

8    Q.  My question is:  What is the document, Exhibit 104?

9    A.  My apologies, sir.

10            It is an irrevocable power of attorney to operate

11    Red Rock IX, Limited.

12    Q.  And who was receiving this irrevocable power of attorney

13    to operate Red Rock?

14    A.  I was, sir.

15    Q.  And who granted that irrevocable power of attorney for

16    you to be running Red Rock?

17    A.  It looks as though it was Mr. Laogumnerd.

18    Q.  That's Pheng.  Right?

19    A.  Yes, sir.

20            MR. KENNER:  And if we can go to the last page of

21    this agreement, please, Mr. Campbell.

22    BY MR. KENNER:

23    Q.  I'm going to Page 3.

24            MR. KENNER:  First of all, may this agreement be

25    admitted into evidence, your Honor?

```
 1                    MR. MULRYNE:  No objection, your Honor.
 2                    THE COURT:  I'll admit Government's Exhibit 104
 3       without opposition.
 4                    (Whereupon, Government's Exhibit No. 104 was
 5       entered into evidence.)
 6                    MR. KENNER:  Thank you.
 7       BY MR. KENNER:
 8       Q.  And looking at Page 3 of Exhibit 104, do you see a
 9       signature -- well, let me just read it to you:  "This
10       irrevocable power of attorney shall not be affected by and
11       shall not terminate on the disability or incapacity of the
12       principal.  This is a durable power of attorney."
13                    Who is the principal that's being referred to
14       there?
15       A.  I'm not exactly sure.
16       Q.  You signed an agreement with a principal and you don't
17       know who it was?
18       A.  My apologies.  I didn't see the principal was there.
19       The principal was Mr. Laogumnerd.
20       Q.  And it reads:  "This irrevocable power of attorney shall
21       be effective from the date hereof indefinitely until such
22       time as complete and total ownership of Red Rock IX is
23       assumed by new shareholder(s) and/or owner(s).  A copy of
24       the sale of shares of Red Rock IX is attached as Exhibit C
25       hereto and incorporated by reference."
```

1          And it appears to be executed by Mr. Pheng on the

2     5th day of September, 2017?

3     A.  Yes, sir.

4     Q.  Below that paragraph, there's some handwriting.  Is that

5     your handwriting?

6     A.  Yes, sir.

7     Q.  Can you tell me what it says, your handwriting?

8     A.  I believe it says "Acknowledged by" followed by my

9     signature and then my name written out.

10    Q.  And that reads:  "The undersigned witness certifies that

11    Mr. Pheng Laogumnerd, known to me to be the same person

12    whose name is subscribed as principal to the foregoing power

13    of attorney, appeared before me and acknowledged signing and

14    delivered this irrevocable power of attorney as the free and

15    voluntarily act of the principal for the uses and purposes

16    therein set forth.  I believe him/her to be of sound mind

17    and memory."

18          Do you see that?

19    A.  Yes, sir, I do.

20    Q.  Who signed that?

21    A.  Joel Rousseau.

22    Q.  Where did he come from in these agreements?

23    A.  When Mr. Michel asked me to travel to Hong Kong and

24    Macao with him, Joel Rousseau accompanied us on that trip.

25    Q.  Okay.  And he was as a witness to your signature.

Higginbotham - CROSS - By Mr. Kenner

1    Correct?

2    A.  He's --

3    Q.  He's not a party.  It says on the bottom, "Dated:  5

4    September 2017."  Then it says "Witness," and it appears to

5    have a signature of Joel Rousseau.  And typed in under the

6    signature is the name Joel Rousseau.

7            Would it be correct to say that Mr. Rousseau was

8    not a party to this agreement; he was there to witness or

9    what he's doing here is witnessing your signature to the

10   agreement?  Correct?

11   A.  That is correct in part and incorrect in part.  He is a

12   witness to the signature of Mr. Laogumnerd.  And if you

13   look, it's clearly in black and white there.

14           But he is not -- you are accurate in that he is

15   not a party to the agreement.

16   Q.  The parties to the agreement were you and you.  Correct?

17   Anicorn, which you are taking full control over -- I'm

18   sorry.

19           So the agreement was between Pheng and you where

20   you were taking over Red Rock IX under a grant of a power of

21   attorney, a durable power of attorney, for you to continue

22   to run it until it sold or otherwise disbanded.  Correct?

23   A.  That would be incorrect.  And if I can provide you an

24   explanation of the agreement, I'd be more than happy to give

25   it to you.

Higginbotham - CROSS - By Mr. Kenner

1    Q.  Well, let me scroll back to the top.  And we'll go

2    forward again, and you tell me to stop when you see what's

3    in this document that is contradictory to what I just said.

4    Okay?

5    A.  Okay.

6    Q.  Tell us when to scroll -- when you finish the page.

7    A.  Yes.  This is an irrevocable power of attorney granting

8    me the ability to give me powers having to do with the

9    administration of the company.

10   Q.  Is this the document that needed to be signed before you

11   got control over $41 million in your client trust account?

12   A.  No, it is not.  This is a document that was ultimately

13   not acceptable to Mr. Broidy, according to what Mr. Michel

14   told me.  And the deposit of the $41 million into my account

15   was, in fact, the more comfortable way that Mr. Broidy

16   wanted to proceed.

17        This scheme, so to speak, that was established by

18   this irrevocable power of attorney was unacceptable to

19   Mr. Broidy.  And sometime after, it was found to be that

20   this had absolutely no real significant power.

21   Q.  Who determined that?

22   A.  Excuse me?

23   Q.  Who determined that this document had no real

24   significant power?  Who told you that?

25   A.  Because it was ultimately scuttled in order for the

Higginbotham - CROSS - By Mr. Kenner

1    $41 million to come in.  And at that point in time, the

2    parties were more comfortable with the -- that arrangement.

3    Q.  Okay.  So this irrevocable power of attorney between you

4    on behalf of Red Rock and you on behalf of Anicorn was

5    rejected as a way by which you could receive this

6    $41 million.  Is that correct?

7    A.  No, sir.  If you could give me just a little bit of

8    latitude, I can explain to you what transpired.

9    Q.  Please.  I don't like the insinuation I don't give you

10   latitude.  But go ahead.  Give us all the latitude you have.

11   A.  Okay.  When I traveled to Macao, there were

12   conversations that took place between Mr. Michel,

13   Mr. Rousseau, Mr. Laogumnerd and Jho Low.  Those

14   conversations involved the money that was being sent over

15   for the two matters, the 1MDB matter and the extradition.

16        Mr. Low, Jho Low, was very, very concerned that a

17   significant amount of money, tens of millions of dollars,

18   had been sent already and there had been no real action

19   taken place on either one of those two matters.

20        Mr. -- it was my understanding from Mr. Michel

21   that Mr. Broidy still wanted additional funds to be -- to

22   come in.  We at that time decided that the best thing to do

23   was to give me some sense of power or control over Red Rock

24   IX, which had sufficient assets in it so that in the event

25   that either one of those two matters were resolved or both

1    of those matters were resolved, that I would have the power

2    to control the assets, the money, that was in Red Rock IX

3    and distribute it accordingly.

4            Shortly after Mr. Michel came back and shortly

5    after I came back from Macao, that was not an acceptable

6    arrangement as far as I was told from Mr. Michel.  And it

7    was subsequent to that that the arrangement was that

8    $41 million would be put into my IOLTA escrow account and

9    then distributed in the event that either one or both of the

10   matters were resolved.

11   Q.  And, sir, you testified last week that you had total

12   control over that $41 million.  Did I understand that

13   correctly?

14   A.  I brought -- at that time, I was running a sole

15   proprietorship and I didn't have --

16   Q.  I'm sorry.  I can't hear you.

17   A.  At that time -- yes.  Yes.

18   Q.  In the course and scope of your experience as an

19   attorney, who does the money in a law firm or a lawyer's

20   IOLTA or trust or escrow account, who does that belong to?

21   The lawyer?

22   A.  No, it does not.

23   Q.  Who did it belong to?

24   A.  It belonged to -- it is controlled by an escrow

25   agreement.

1    Q.  Did you write the escrow agreement?

2    A.  I believe I did draft an escrow agreement.  Yes.

3            MR. KENNER:  May I just have a moment, your Honor?

4            THE COURT:  Certainly.

5    BY MR. KENNER:

6    Q.  Who were the signatories to this escrow agreement?

7    A.  I believe I was the only signatory to the -- oh, I'm

8    sorry.  The escrow agreement?  It was Mr. Michel and Nickie

9    Lum Davis, if I remember correctly.

10   Q.  Do you have anything with you that could refresh your

11   recollection about that?

12   A.  No, sir.  I came into the court with just my

13   identification today.

14   Q.  Was Nickie Lum Davis your client?

15   A.  No, she was not.

16   Q.  Then what was money doing in your trust account for her?

17   A.  Mr. Michel, when I asked for an escrow agreement for

18   that money, because I wanted to have a justifiable or

19   somewhat justifiable reason for having such an extraordinary

20   amount of money in the account, it was to be signed off on

21   by Ms. Nickie Lum Davis and Mr. Michel.

22   Q.  So just to try to bring this together, these September

23   5th-dated documents that you've been testifying about is

24   when you were in Macao.  Correct?

25   A.  Yes, sir.

Higginbotham - CROSS - By Mr. Kenner

1   Q.  And it's after Mr. Michel left Hong Kong.  Correct?

2   A.  Yes, sir, it is.

3   Q.  And when you came back, you told -- from Hong Kong, you

4   went and told Mr. Lidsky about this agreement?

5   A.  No, sir, I did not.

6   Q.  You never told him about this?

7   A.  No, I did not, sir.

8   Q.  Did you lie to him?

9   A.  I didn't bring it up.  As I've testified previously, I

10   thought Mr. Lidsky was interested in national security

11   matters, not having to do with this, sir.

12   Q.  Mr. Lidsky's interest, would it be a fair statement as

13   you perceived it, is to have you continue to operate

14   undercover as an agent on behalf of the Department of

15   Justice?

16        MR. MULRYNE:  Objection, your Honor.  Misstates

17   the evidence.

18        THE COURT:  At this point, it does.

19        You can reword it if you want.

20        MR. KENNER:  Thank you, your Honor.  I will come

21   back to it.

22   BY MR. KENNER:

23   Q.  So was Version II of the two documents we laid side by

24   side before -- I believe it was Government's Exhibit 163 --

25   was that after you met with Mr. Lidsky?

1    A.  I don't recall -- I guess so.  I really don't remember

2    the dates.

3    Q.  Well, didn't you meet with him initially back in July of

4    2017?

5    A.  Oh, yes.  Yes.  Yes.  I thought that you were referring

6    to the time when I came back from Macao.

7    Q.  And then did you meet with Mr. Lidsky on September 11th

8    of 2017?

9    A.  If that's following the trip to Macao, yes.

10   Q.  Okay.  And was this meeting outdoors?

11   A.  Yes, sir, it was.

12   Q.  Where was it?

13   A.  In the Courtyard of City Center, I believe.

14   Q.  I'm sorry.  In the courthouse?

15   A.  In the Courtyard of -- close to the City Center.

16   Q.  And did Mr. Lidsky tell you he was recording your

17   conversation with him?

18   A.  No, he did not.

19   Q.  Did you later come to learn that he was recording your

20   conversation?

21   A.  Yes, I did.

22   Q.  Have you listened to that recording of the conversation?

23   A.  No, sir, I have not.

24   Q.  Have you looked at a transcript based on that

25   conversation?

 1                    MR. MULRYNE:  Objection.  Relevance, your Honor.

 2                    THE COURT:  Why don't we have a conversation for a

 3       brief moment.

 4                    MR. KENNER:  Sure.

 5                    (Whereupon, the following proceedings were had at

 6       sidebar outside the presence of the jury:)

 7                    THE COURT:  What is it -- it sounds like you're

 8       moving towards like there's some inconsistency here or

 9       something?

10                    MR. KENNER:  No.  This witness has said that the

11       only thing he talked to Mr. Lidsky about was going to the

12       embassy and that he didn't say anything about Mr. Michel.

13                    I'm not going to take the Court's time to play the

14       audio, but there is a transcript of the audio.  It's

15       Defendant's Exhibit 83.  I'd like to have him review it.

16       And it will clearly show that a significant portion of that

17       conversation with Mr. Lidsky was about Mr. Michel.

18                    THE COURT:  Mr. Mulryne, is that correct?  Do you

19       know?

20                    MR. MULRYNE:  I need to look at the transcript.

21       But what he's testified is that he talked to Mr. Lidsky

22       about national security issues, including setting up

23       meetings for the prime minister of Malaysia, and that what

24       he didn't disclose was the money coming in from Jho Low or

25       the arrangement with Jho Low or the work related to Guo.  So

1    if there's a specific question and he wants to confirm it

2    with a specific portion of the transcript that he believes

3    is inconsistent and highlight that to the Government, we'll

4    review it.

5              THE COURT:  I think part of the problem is that

6    you're going to have to ask the question that you think is

7    specific to what it is that he said in the transcript.

8              Now, one thing we can do is break for lunch so you

9    can take a look at it, show it to the Government and we can

10   move this along.

11             MR. KENNER:  Yes.  Thank you.

12             THE COURT:  Why don't we do that.

13             MR. KENNER:  Okay.  Thank you.

14             (Whereupon, the following proceedings were had in

15   open court:)

16             THE COURT:  Ladies and gentlemen, I'm going to do

17   lunch now.  At this point, it's five to 1:00.  And I'm going

18   to ask you to come back at ten after 2:00.  We have one

19   quick thing to talk about before we bring you back in.  And

20   please keep in mind, we're going through to the whole day

21   today.

22             Tomorrow we are stopping at 11:00, though, as I've

23   indicated to you before.

24             (Whereupon, the jury exited the courtroom at 12:54

25   p.m. and the following proceedings were had:)

1          THE COURT:  All right, Mr. Higginbotham.  I'm

2     going to excuse you.  Just be ready to come back at ten

3     after 2:00.

4          (Thereupon, the witness retired from the courtroom

5     and the following proceedings were had:)

6          THE COURT:  If we could just have one moment.

7          I think, Mr. Kenner, I don't know what the

8     transcript says.  But I do think you need to be a little bit

9     more specific about what it is that you claim he told him

10    about Mr. Michel.  I mean, there's been a whole series of

11    different things in terms of what he would have discussed

12    about the embassy visit, the trip, et cetera, and what it is

13    that he did or did not say anything about Mr. Michel.  It

14    was in the context of a particular discussion, not just in

15    general.

16         So I think to set this up you have to ask the

17    question that you think is different than what he said in

18    the transcript, because frankly at this point it would be

19    difficult to indicate whether it actually is or is not based

20    on the context in which you asked about whether he brought

21    up Mr. Michel.

22         So if you've got -- I assume the parties have the

23    transcript.  Am I correct?  I know Mr. Kenner does.

24         Do you, Mr. Keller?

25         MR. MULRYNE:  Yes, your Honor.

1          THE COURT:  So may I suggest that you indicate,

2     Mr. Kenner, to Mr. Keller what in the transcript is -- you

3     think somehow is an inconsistent statement on your part --

4     on his part?  But it has to be more specific.  I mean,

5     they've discussed various trips and various other ways of

6     doing things.  So your general question in the context that

7     you asked at least in my looking at the realtime isn't

8     specific enough, depending on what it is that he actually

9     said in the transcript.  So you're going to have to make it

10    tighter.

11          So I'd just ask that you all take a look at that.

12    But I'll ask you to come back at 2:00 so we can discuss

13    that.  And I want to have a brief discussion about

14    Mr. White so we can move that forward.

15          MR. KENNER:  Thank you, your Honor.

16          (Thereupon, a luncheon recess was taken, after

17    which the following proceedings were had:)

18          (Morning session concluded.)

19

20

21

22

23

24

25

1                           **<u>CERTIFICATE</u>**

2

3               I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10              Dated this 11th day of April, 2023.

11

12           <u>/s/ Lisa Edwards, RDR, CRR</u>
             Official Court Reporter
13           United States District Court for the
               District of Columbia
14           333 Constitution Avenue, Northwest
             Washington, D.C. 20001
15           (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$2,800,000** [1] - 95:4
**$41** [6] - 117:11, 117:14, 118:1, 118:6, 119:8, 119:12

## '

**'17** [6] - 31:24, 31:25, 52:7, 53:13, 66:17, 66:18
**'18** [1] - 65:16
**'19** [2] - 61:5, 65:15

## /

**/s** [1] - 127:12

## 0

**0000106618** [2] - 73:4, 73:14
**0000106637** [1] - 39:12

## 1

**1.2** [1] - 108:19
**1016** [1] - 1:16
**103(d** [1] - 13:21
**104** [7] - 3:11, 112:21, 112:22, 113:8, 114:2, 114:4, 114:8
**10th** [2] - 53:3, 86:5
**11** [1] - 1:6
**11-8** [1] - 29:15
**114** [1] - 3:11
**11:00** [2] - 71:14, 124:22
**11:08** [1] - 71:18
**11:25** [1] - 71:14
**11:30** [1] - 72:24
**11th** [2] - 122:7, 127:10
**12:54** [1] - 124:24
**12th** [2] - 51:4, 51:14
**1301** [1] - 1:15
**13th** [2] - 110:6, 110:22
**14** [1] - 73:18
**1400** [1] - 1:19
**15** [5] - 3:5, 11:12, 36:19, 63:11, 64:10
**15-year** [1] - 64:5

**15th** [2] - 56:24, 96:12
**161** [7] - 104:21, 108:13, 108:23, 109:12, 109:21, 109:25, 110:16
**163** [10] - 107:23, 107:24, 108:4, 108:6, 108:13, 108:24, 109:12, 109:23, 109:25, 121:24
**16633** [1] - 1:23
**16th** [1] - 96:17
**17th** [1] - 94:24
**18th** [2] - 45:10, 49:17
**19-00148-1** [1] - 1:3
**19-CR-148** [1] - 14:18
**19th** [2] - 53:13, 95:25
**1:00** [1] - 124:17
**1MDB** [3] - 22:13, 36:23, 118:15
**1st** [3] - 50:21, 56:3, 92:1

## 2

**2** [2] - 17:11, 84:3
**2.8** [1] - 92:23
**20** [7] - 17:10, 17:18, 17:19, 19:19, 71:14
**20-minute** [1] - 11:12
**20001** [2] - 2:8, 127:14
**20004** [1] - 2:4
**20005** [1] - 1:20
**2002** [2] - 63:1, 63:23
**2002-2003** [2] - 63:10, 64:2
**2003** [1] - 63:1
**2012** [2] - 61:5, 65:14
**2013** [1] - 66:16
**2016** [8] - 50:21, 51:19, 56:3, 63:7, 65:4, 77:3, 77:16, 78:2
**2017** [68] - 21:14, 27:23, 27:25, 29:18, 29:21, 30:7, 30:9, 30:14, 30:22, 31:2, 32:6, 32:7, 34:19, 41:13, 48:11, 49:20, 51:4, 51:14, 51:17, 51:21, 52:4, 52:15, 53:3, 53:13, 54:4, 56:24, 63:7, 66:15, 78:11, 79:8, 79:15,

80:2, 80:24, 84:23, 85:6, 85:7, 86:5, 87:1, 92:1, 93:21, 93:23, 94:24, 95:25, 96:12, 96:17, 99:16, 100:19, 101:6, 101:19, 102:4, 102:10, 104:6, 104:15, 110:6, 110:8, 110:19, 110:22, 111:14, 111:19, 111:23, 112:4, 112:6, 112:12, 115:2, 116:4, 122:4, 122:8
**2018** [16] - 27:22, 31:21, 31:22, 32:2, 32:7, 45:16, 48:7, 50:22, 61:5, 99:15, 99:16, 99:20, 99:21, 100:16, 100:18, 101:18
**2019** [2] - 31:19, 65:14
**202** [2] - 2:9, 127:15
**2023** [2] - 1:6, 127:10
**20530** [1] - 1:16
**20th** [9] - 78:11, 79:13, 80:2, 80:24, 100:19, 101:6, 101:16, 102:4, 102:10
**21** [1] - 17:11
**220** [2] - 17:22, 18:8
**221** [2] - 24:12, 24:22
**222** [4] - 3:13, 40:9, 40:13, 40:14
**22nd** [2] - 77:3, 77:15, 78:2
**24th** [2] - 54:4, 84:23
**25** [2] - 71:21, 72:4
**25-plus** [1] - 65:18
**25th** [1] - 51:17
**26th** [1] - 101:19
**27** [1] - 52:7
**274** [4] - 84:2, 84:4, 84:5, 84:7
**275** [2] - 85:1, 85:4
**27th** [1] - 87:1
**28th** [2] - 52:4, 53:13
**2:00** [3] - 124:18, 125:3, 126:12
**2nd** [1] - 50:22

## 3

**3** [4] - 51:10, 84:3, 113:23, 114:8
**305** [1] - 85:20
**307** [4] - 86:20, 86:23, 89:17, 90:3
**308** [5] - 89:18,

89:20, 89:22, 89:24, 90:1
**333** [2] - 2:7, 127:14
**354-3269** [2] - 2:9, 127:15
**371** [9] - 5:3, 5:10, 26:17, 26:18, 26:19, 26:21, 28:23, 30:6, 39:6
**377** [5] - 3:10, 79:9, 79:17, 79:19, 79:21
**378** [4] - 3:10, 80:14, 80:18, 80:19
**379** [5] - 3:9, 77:22, 78:15, 78:20, 78:23, 78:24
**3rd** [2] - 111:23, 112:3

## 4

**4** [1] - 57:23
**40** [1] - 3:13
**403** [4] - 12:6, 12:12, 12:13, 70:3
**403-land** [1] - 70:21
**439** [1] - 91:17
**456** [4] - 3:11, 94:1, 94:8, 94:9
**4th** [3] - 104:15, 110:7, 110:18

## 5

**5** [2] - 111:14, 116:3
**51** [3] - 26:20, 28:10, 39:10
**5th** [6] - 51:20, 111:19, 111:25, 112:6, 115:2, 120:23
**5th-dated** [1] - 120:23

## 6

**6** [2] - 5:4, 5:24
**60-or-so-page** [1] - 26:4
**611** [1] - 13:25
**641** [1] - 2:3
**662** [5] - 92:20, 93:1, 93:4, 94:12, 94:20
**6637** [1] - 29:13
**6706** [1] - 2:8
**6:12** [1] - 80:3
**6th** [3] - 85:6, 85:7, 93:21

## 7

**70** [1] - 52:17
**70-or-so-page** [1] - 26:5
**71** [2] - 51:24, 52:1
**78** [1] - 3:9
**79** [1] - 3:10
**7:30** [1] - 8:4
**7th** [2] - 52:14, 112:12

## 8

**80** [1] - 3:10
**803** [3] - 5:4, 5:24
**803(6** [2] - 10:13, 40:3
**803(6)** [1] - 8:8
**807** [3] - 5:4, 10:13, 40:3
**807's** [1] - 6:4
**83** [1] - 123:15
**8th** [11] - 29:18, 29:21, 30:7, 30:9, 30:13, 30:22, 31:2, 49:19, 49:20, 93:21, 93:23

## 9

**91436** [1] - 1:23
**9176** [1] - 23:20
**94** [1] - 3:11
**9:17** [1] - 1:7
**9:34** [1] - 15:4

## A

**a.m** [5] - 1:7, 8:4, 15:5, 71:19, 72:24
**Aaron** [2] - 53:12, 53:23
**abbreviated** [1] - 16:12
**ability** [2] - 117:8, 127:7
**able** [8] - 9:6, 9:25, 10:14, 23:2, 88:6, 95:13, 95:22, 107:13
**absolutely** [2] - 27:8, 117:20
**acceptable** [2] - 117:13, 119:5
**accessed** [1] - 55:25
**accompanied** [3] - 43:21, 44:23, 115:24

**accomplice** [2] - 37:7, 37:13

**accomplish** [1] - 88:6

**accordance** [1] - 88:17

**according** [2] - 39:19, 117:13

**accordingly** [1] - 119:3

**account** [13] - 4:9, 74:14, 75:3, 75:8, 78:6, 78:9, 78:10, 117:11, 117:14, 119:8, 119:20, 120:16, 120:20

**accounting** [2] - 8:10, 8:15

**accounts** [3] - 4:13, 75:5, 77:8

**accuracy** [1] - 69:7

**accurate** [5] - 4:18, 37:17, 63:8, 116:14, 127:4

**accurately** [1] - 90:17

**achieve** [2] - 37:1, 37:2

**achievements** [2] - 55:23

**acknowledged** [2] - 115:8, 115:13

**acquire** [1] - 77:7

**Act** [3] - 16:9, 22:15, 22:22

**act** [1] - 115:15

**acted** [1] - 37:11

**acting** [4] - 37:9, 37:15, 37:19, 89:9

**Action** [1] - 1:3

**action** [1] - 118:18

**activities** [13] - 21:25, 22:13, 22:18, 26:12, 32:8, 37:5, 45:17, 48:8, 49:2, 49:5, 49:10, 103:24, 104:2

**activity** [1] - 56:20

**actor** [2] - 35:15, 37:13

**actors** [1] - 55:24

**ad** [4] - 8:20, 8:22, 57:10, 57:23

**add** [4] - 11:11, 11:12, 13:23, 72:21

**added** [4] - 12:3, 12:6, 12:12, 26:24

**adding** [1] - 70:12

**addition** [2] - 32:16, 108:19

**additional** [6] - 5:13, 13:24, 24:11, 70:20, 113:2, 118:21

**addressed** [1] - 23:3

**administration** [1] - 117:9

**administrative** [1] - 99:19

**admissibility** [1] - 5:8

**admissible** [3] - 6:8, 13:7, 83:2

**admission** [4] - 4:9, 80:15, 94:4, 94:7

**admit** [13] - 6:17, 6:19, 11:2, 12:19, 37:3, 73:5, 78:19, 78:22, 79:16, 79:19, 80:18, 94:8, 114:2

**admitted** [32] - 9:4, 11:22, 24:18, 37:3, 39:12, 39:14, 39:16, 40:4, 40:22, 78:13, 78:17, 78:18, 80:17, 84:2, 84:7, 84:11, 85:1, 85:2, 85:20, 86:20, 89:20, 91:18, 91:19, 92:22, 93:7, 93:8, 94:20, 104:22, 104:23, 107:23, 108:1, 113:25

**advice** [40] - 7:1, 7:2, 9:2, 22:2, 24:2, 26:3, 36:7, 36:15, 46:6, 46:8, 46:18, 65:14, 68:7, 68:12, 69:7, 69:10, 70:9, 71:6, 75:14, 75:17, 75:20, 75:21, 76:2, 76:7, 82:6, 82:19, 83:24, 86:11, 86:12, 87:16, 87:25, 88:21, 88:24, 89:5, 89:13, 90:16, 90:20, 91:8, 106:25

**advice-of-counsel** [1] - 75:17

**advice-of-legal-counsel** [1] - 69:10

**advise** [5] - 22:9, 23:7, 33:5, 58:21, 92:10

**advised** [2] - 35:25, 49:24

**advising** [3] - 22:22, 33:14, 88:4

**advisor** [3] - 64:6, 82:7, 83:23

**Advisors** [2] - 56:3, 56:9

**advisory** [2] - 90:23, 106:12

**affected** [1] - 114:10

**after..** [1] - 47:12

**Agent** [3] - 16:9, 22:15, 22:22

**agent** [5] - 100:21, 102:11, 102:24, 104:10, 121:14

**agents** [3] - 23:10, 31:15, 102:22

**agree** [6] - 5:19, 8:22, 11:19, 53:20, 60:18, 91:6

**agreed** [1] - 69:24

**agreeing** [1] - 4:23

**agreement** [48] - 52:7, 52:13, 52:14, 56:6, 56:22, 57:4, 57:17, 57:18, 85:16, 86:3, 87:11, 87:14, 88:1, 88:14, 89:1, 89:8, 90:5, 91:1, 92:24, 102:9, 103:1, 104:16, 105:4, 105:14, 107:6, 107:11, 107:12, 107:21, 110:22, 112:16, 112:17, 112:18, 113:21, 113:24, 114:16, 116:8, 116:10, 116:15, 116:16, 116:19, 116:24, 119:25, 120:1, 120:2, 120:6, 120:8, 120:17, 121:4

**Agreement** [1] - 108:11

**agreements** [7] - 38:15, 51:3, 56:19, 106:8, 106:10, 107:8, 115:22

**ahead** [9] - 12:24, 34:24, 50:16, 64:15, 69:14, 73:10, 84:12, 95:9, 118:10

**airport** [1] - 48:4

**airports** [4] - 17:3, 17:6, 20:10, 20:18

**album** [3] - 52:20, 52:22, 53:8

**Album** [1] - 53:10

**albums** [2] - 50:25, 52:3

**alerted** [1] - 55:3

**alleged** [2] - 59:11, 62:24

**allow** [3] - 40:3, 51:12, 60:22

**allowed** [2] - 67:4,

99:5

**Alon** [1] - 14:25

**ALON** [1] - 1:22

**Alpha** [2] - 56:2, 56:8

**Alsen** [1] - 4:13

**AMERICA** [1] - 1:3

**American** [1] - 7:16

**amount** [8] - 23:2, 35:11, 42:10, 87:22, 95:4, 106:12, 118:17, 120:20

**amount..** [1] - 106:15

**analysis** [2] - 73:24, 74:1

**Anicorn** [19] - 7:6, 79:4, 79:10, 80:5, 81:13, 83:12, 87:5, 87:7, 87:11, 91:23, 92:23, 104:17, 105:5, 105:11, 106:6, 108:21, 109:23, 116:17, 118:4

**answer** [12] - 12:16, 12:22, 13:5, 13:6, 18:7, 50:2, 50:8, 61:6, 77:12, 82:11, 100:22, 113:5

**answered** [5] - 12:20, 33:15, 50:1, 79:12, 102:17

**answering** [1] - 78:9

**answers** [1] - 13:11

**anticipate** [1] - 34:17

**anticipated** [1] - 45:16

**anticipation** [1] - 31:19

**anxiety** [1] - 104:5

**apart** [1] - 5:4

**apartment** [1] - 21:14

**apologies** [3] - 38:22, 113:9, 114:18

**apologize** [6] - 19:13, 31:25, 36:9, 64:15, 93:14, 112:12

**appear** [1] - 5:25

**appearance** [1] - 105:10

**aPPEARANCES** [1] - 1:13

**APPEARANCES** [1] - 2:1

**appeared** [1] - 115:13

**applied** [1] - 22:2

**appreciate** [3] - 5:16, 5:17, 29:1

**approach** [2] - 24:25, 29:7

**approached** [1] - 100:25

**appropriate** [3] - 12:6, 31:16, 86:15

**appropriately** [2] - 22:1, 74:15

**April** [6] - 1:6, 85:6, 85:7, 86:5, 87:1, 127:10

**area** [5] - 13:2, 22:21, 58:2, 59:20, 60:17

**argue** [1] - 70:8

**arguing** [2] - 68:16, 69:3

**arrange** [1] - 42:20

**arranged** [2] - 98:2

**arrangement** [4] - 118:2, 119:6, 119:7, 123:25

**arrived** [1] - 112:3

**arrow** [2] - 75:4, 75:5

**Artemus** [4] - 7:7, 80:7, 81:13, 83:12

**article** [4] - 46:16, 46:19, 46:20 - 26:11, 45:24

**articles** [2] - 26:11, 45:24

**artists** [3] - 52:22, 53:6, 53:9

**Asia** [3] - 7:10, 43:20, 44:21

**Asian** [1] - 7:11

**aspects** [1] - 89:1

**assets** [2] - 118:24, 119:2

**assigned** [1] - 107:11

**assist** [1] - 55:17

**assistance** [1] - 64:8

**assistant** [1] - 105:21

**assists** [1] - 19:15

**associated** [3] - 83:18, 103:9, 107:8

**association** [1] - 46:15

**assume** [7] - 23:12, 23:14, 23:15, 29:3, 50:12, 60:10, 125:22

**assumed** [2] - 15:15, 114:23

**assuming** [5] - 17:25, 25:12, 46:23, 53:18, 53:21

**assumption** [1] - 50:13

**attached** [3] - 78:8, 90:1, 114:24

**attachment** [2] -

86:3, 89:15
**attempt** [1] - 58:8
**attention** [1] - 84:14
**attenuated** [1] - 7:4
**attitude** [1] - 48:23
**attorney** [19] - 36:5, 86:16, 92:15, 100:4, 104:7, 113:10, 113:12, 113:15, 114:10, 114:12, 114:20, 115:13, 115:14, 116:21, 117:7, 117:18, 118:3, 119:19
**attorney-client** [1] - 36:5
**attorneys** [1] - 64:7
**audio** [2] - 123:14
**audiovisual** [1] - 19:16
**August** [4] - 104:15, 110:8, 110:18
**autumn** [2] - 28:2, 28:3
**Avenue** [5] - 1:15, 1:19, 2:3, 2:7, 127:14
**aware** [9] - 32:25, 43:15, 45:6, 68:20, 77:2, 95:25, 96:4, 99:13, 100:7
**awareness** [1] - 55:5

**B**

**baby** [2] - 67:11, 67:12
**backwards** [1] - 28:6
**bag** [3] - 68:3, 70:16, 84:18
**ball** [1] - 62:10
**Bangkok** [1] - 41:13
**bank** [7] - 4:9, 4:24, 77:8, 77:9, 78:6, 104:3, 105:11
**banks** [2] - 37:14, 49:11
**Barry** [2] - 54:8, 54:9
**baseball** [1] - 62:16
**based** [12] - 6:4, 12:4, 76:7, 76:12, 76:17, 83:15, 88:2, 88:5, 88:21, 90:8, 122:24, 125:19
**basis** [3] - 8:20, 8:22, 9:24
**basketball** [1] - 62:16
**Bates** [5] - 27:3, 27:4, 29:12, 39:11,

40:10
**Bates-stamped** [1] - 40:10
**battery** [1] - 17:15
**bearing** [1] - 6:1
**bears** [1] - 73:13
**became** [1] - 45:6
**become** [5] - 43:15, 45:18, 99:13, 100:7, 110:1
**becomes** [1] - 22:12
**BEFORE** [1] - 1:10
**beginning** [4] - 27:22, 101:2, 101:3, 107:10
**behalf** [7] - 7:17, 14:22, 31:8, 106:6, 118:4, 121:14
**behaving** [1] - 35:16
**Bekkedam** [9] - 54:8, 54:9, 54:15, 54:24, 55:3, 55:6, 83:16, 83:20, 83:24
**believes** [1] - 124:2
**belong** [2] - 119:20, 119:23
**belonged** [1] - 119:24
**below** [2] - 75:10, 115:4
**best** [4] - 90:15, 101:8, 118:22, 127:7
**betrayed** [1] - 37:3, 37:4
**better** [4] - 34:24, 69:25, 82:1, 96:8
**between** [13] - 61:22, 65:14, 85:16, 87:11, 99:16, 104:16, 105:5, 108:23, 109:25, 110:22, 116:19, 118:3, 118:12
**Bink** [1] - 51:4
**bit** [8] - 7:21, 38:12, 54:9, 57:24, 102:19, 104:14, 118:7, 125:8
**black** [5] - 55:11, 55:24, 57:20, 58:9, 116:13
**black-owned** [1] - 58:9
**Blackstone** [1] - 4:13
**Blacture** [3] - 55:12, 55:14, 55:20
**board** [2] - 56:23, 106:1
**boilerplate** [2] - 38:25, 89:8
**born** [2] - 62:8
**borrower** [2] -

108:20, 109:20
**bottom** [8] - 27:2, 27:5, 108:19, 109:1, 109:4, 109:5, 109:20, 116:3
**Boulevard** [1] - 1:23
**Bowl** [2] - 57:10, 57:23
**box** [1] - 84:15
**boxes** [1] - 74:8
**break** [8] - 36:10, 50:18, 70:24, 71:12, 71:20, 83:12, 88:9, 124:8
**brief** [3] - 97:15, 123:3, 126:13
**briefly** [1] - 79:24
**bring** [6] - 27:6, 27:21, 34:10, 120:22, 121:9, 124:19
**bringing** [1] - 27:21
**broad** [2] - 9:10, 55:22
**Broidy** [10] - 37:2, 41:13, 41:25, 42:9, 43:5, 43:16, 117:13, 117:15, 117:19, 118:21
**brought** [9] - 21:11, 21:13, 31:6, 33:10, 47:22, 48:22, 61:13, 119:14, 125:20
**business** [10] - 7:12, 8:7, 10:24, 11:2, 54:24, 55:9, 61:18, 61:23, 74:20, 83:23
**buy** [1] - 67:12
**BY** [79] - 2:5, 16:1, 16:7, 17:17, 18:10, 18:15, 18:21, 19:3, 19:10, 20:7, 21:7, 25:16, 25:22, 27:13, 29:2, 29:17, 30:5, 32:1, 33:21, 36:12, 38:23, 41:5, 41:11, 43:3, 44:5, 44:14, 47:8, 49:22, 50:5, 50:20, 51:13, 54:1, 58:15, 59:10, 59:25, 60:7, 60:24, 61:16, 63:17, 64:1, 65:21, 73:11, 77:1, 77:14, 77:23, 79:3, 80:1, 80:22, 83:10, 84:9, 84:13, 85:3, 85:21, 86:22, 88:11, 89:23, 91:20, 93:3, 93:10, 93:16, 94:22, 95:21, 96:11, 101:12, 102:21, 104:13,

105:1, 105:20, 107:3, 108:5, 108:15, 109:11, 110:13, 111:7, 111:13, 113:22, 114:7, 120:5, 121:22

**C**

**California** [1] - 1:23
**callout** [2] - 84:15, 93:17
**Campbell** [4] - 41:10, 108:12, 109:9, 113:21
**cannot** [2] - 26:8, 43:21
**capacities** [2] - 37:12, 37:16
**capacity** [3] - 36:20, 37:22, 90:23
**capital** [1] - 48:17
**careful** [1] - 13:17
**CARLSTROM** [2] - 25:3, 29:11
**Carlstrom** [3] - 14:25, 24:25, 29:7
**Carty** [1] - 52:3
**case** [15] - 8:9, 10:19, 14:1, 14:13, 14:16, 15:2, 21:10, 56:17, 69:19, 71:16, 71:21, 87:18, 89:2, 90:24, 109:13
**cases** [1] - 10:20
**casual** [1] - 20:19
**categories** [4] - 6:21, 8:25, 9:10, 10:12
**category** [2] - 10:12, 52:23
**Category** [2] - 6:25, 7:1
**cavalier** [1] - 48:23
**caveat** [2] - 34:9, 99:18
**Cayman** [1] - 75:7
**Caymans** [1] - 74:14
**celebration** [1] - 62:7
**cell** [1] - 65:17
**Center** [2] - 122:13, 122:15
**certain** [2] - 5:8, 36:3
**certainly** [6] - 9:3, 10:17, 12:23, 28:24, 33:19, 120:4
**CERTIFICATE** [1] - 127:1
**certifies** [1] - 115:10
**certify** [1] - 127:4
**cetera** [3] - 9:15,

97:17, 125:12
**chance** [1] - 8:3
**Chance** [1] - 4:13
**Change** [2] - 107:14, 107:15
**change** [3] - 43:24, 107:6, 107:19
**changed** [2] - 65:18, 110:22
**changes** [11] - 57:14, 86:14, 86:15, 90:7, 92:8, 106:10, 106:11, 106:17, 106:21, 107:17, 108:23
**changing** [1] - 107:9
**characterization** [1] - 45:14
**characterized** [1] - 97:10
**CHARLES** [2] - 2:2, 2:2
**Charles** [1] - 14:25
**charting** [1] - 75:2
**chasing** [1] - 68:3
**check** [1] - 84:6
**checking** [1] - 50:6
**child** [2] - 62:5, 62:8
**China** [5] - 7:16, 21:12, 34:24, 42:21, 43:16
**Chinese** [6] - 7:17, 31:8, 34:12, 96:12, 96:16, 96:24
**chronological** [3] - 28:7, 29:20, 45:10
**chronology** [1] - 46:11
**Chucky** [1] - 51:20
**circumstance** [2] - 20:16, 36:22
**circumstances** [3] - 6:5, 50:10, 88:23
**citations** [1] - 10:19
**cited** [2] - 8:10, 10:19
**City** [6] - 21:15, 61:10, 61:11, 78:10, 122:13, 122:15
**claim** [2] - 9:5, 125:9
**clarification** [1] - 50:8
**clean** [1] - 67:16
**Cleans** [1] - 52:3
**clear** [7] - 8:6, 10:25, 25:4, 30:17, 46:25, 67:25, 72:17
**clearly** [6] - 27:6, 68:22, 74:20, 95:22, 116:13, 123:16
**client** [10] - 8:19,

35:20, 36:5, 38:2, 87:21, 90:24, 90:25, 92:17, 117:11, 120:14
**clients** [1] - 8:14
**clocks** [1] - 71:12
**close** [3] - 48:9, 80:10, 122:15
**closely** [1] - 104:2
**closer** [1] - 88:6
**clouded** [1] - 58:22
**Coast** [2] - 59:14, 59:15
**Code** [1] - 14:18
**coincide** [1] - 88:14
**COLFAX** [1] - 85:16
**collateral** [3] - 6:8, 6:11, 6:16
**colleague** [1] - 99:1
**collection** [1] - 53:6
**COLLEEN** [1] - 1:10
**colorable** [1] - 9:5
**Columbia** [2] - 2:7, 127:13
**COLUMBIA** [1] - 1:1
**column** [1] - 93:22
**comfortable** [2] - 117:15, 118:2
**comfortably** [1] - 61:22
**coming** [11] - 4:19, 8:7, 9:18, 17:2, 17:6, 20:10, 37:15, 75:19, 103:16, 105:13, 123:24
**comment** [1] - 28:10
**comments** [2] - 89:12, 89:13
**commodities** [1] - 56:17
**communicated** [3] - 16:19, 17:5, 26:14
**communication** [1] - 98:13
**communications** [1] - 56:13
**companies** [13] - 7:7, 7:11, 7:15, 80:9, 81:1, 81:4, 81:23, 81:25, 82:16, 82:19, 82:21, 83:14, 83:21
**company** [7] - 55:11, 55:21, 57:1, 57:4, 58:9, 78:2, 117:9
**Compilation** [1] - 53:10
**complaint** [1] - 42:18
**complete** [2] - 114:22, 127:6
**completed** [1] - 104:16

**compliance** [1] - 50:9
**comply** [1] - 49:25
**concern** [5] - 8:11, 13:2, 13:10, 104:5, 113:1
**concerned** [2] - 13:16, 118:16
**concerns** [3] - 16:15, 16:19, 16:22
**conclude** [1] - 6:16
**concluded** [1] - 126:18
**conclusion** [3] - 23:25, 24:2, 24:4
**conduct** [1] - 44:1
**conference** [2] - 12:17, 98:22
**confirm** [1] - 124:1
**confirmed** [1] - 4:17
**confusing** [1] - 70:4
**confusion** [1] - 12:10
**connect** [1] - 68:2
**connection** [6] - 16:18, 50:25, 51:20, 55:14, 56:16, 67:17
**consider** [7] - 11:24, 30:25, 31:4, 32:15, 45:15, 48:18, 49:1
**considered** [3] - 36:24, 37:6, 48:18
**considering** [4] - 10:10, 12:6, 32:3, 101:2
**consistent** [4] - 29:22, 29:24, 39:1, 45:18
**conspiracy** [7] - 32:7, 37:8, 59:11, 61:3, 62:24, 64:25, 69:19
**constitutes** [1] - 127:4
**Constitution** [2] - 2:7, 127:14
**CONT'D** [1] - 2:1
**contact** [6] - 65:9, 65:19, 96:14, 97:9, 103:13, 104:6
**contacted** [4] - 65:4, 96:15, 97:7, 98:9
**contained** [2] - 13:14, 74:2
**contains** [1] - 13:12
**context** [4] - 6:20, 125:14, 125:20, 126:6
**continue** [8] - 35:9, 37:1, 37:3, 101:17, 102:23, 105:7, 116:21, 121:13

**continued** [4] - 99:17, 101:18, 102:25, 104:7
**CONTINUED** [1] - 15:24
**continuing** [5] - 37:7, 45:17, 48:7, 64:19, 103:23
**contract** [1] - 85:15
**contracts** [9] - 7:5, 35:13, 38:10, 38:12, 38:15, 38:25, 39:2, 55:16, 60:14
**contradictory** [1] - 117:3
**contribute** [1] - 52:21
**control** [6] - 13:25, 116:17, 117:11, 118:23, 119:2, 119:12
**controlled** [1] - 119:24
**controversy** [1] - 83:20
**conversation** [24] - 20:19, 20:23, 22:6, 22:8, 27:14, 30:9, 46:12, 46:21, 49:14, 66:13, 67:19, 82:9, 91:14, 97:25, 98:18, 102:1, 112:25, 122:17, 122:20, 122:22, 122:25, 123:2, 123:17
**conversations** [9] - 22:16, 33:4, 49:12, 63:12, 81:9, 81:10, 112:25, 118:12, 118:14
**copies** [2] - 67:1, 90:10
**copy** [5] - 24:7, 28:17, 29:4, 67:1, 114:23
**corporate** [2] - 56:22, 83:18
**correct** [84] - 16:16, 17:4, 23:11, 28:7, 29:21, 31:4, 32:4, 34:21, 41:14, 42:2, 42:22, 49:7, 50:13, 53:10, 54:8, 56:13, 57:19, 58:18, 60:20, 63:20, 68:7, 73:22, 74:10, 77:4, 77:8, 80:5, 83:24, 84:3, 84:16, 85:7, 85:10, 85:17, 85:22, 86:3, 86:6, 86:17, 86:24, 87:1, 87:12, 88:22,

89:10, 89:13, 90:3, 90:13, 90:18, 91:8, 91:24, 92:1, 92:4, 92:13, 93:23, 95:2, 95:4, 96:13, 96:18, 97:4, 97:7, 104:8, 104:10, 104:17, 105:2, 105:22, 106:19, 106:20, 109:21, 110:2, 110:9, 110:23, 111:19, 111:21, 111:24, 112:4, 112:16, 116:1, 116:7, 116:10, 116:11, 116:16, 116:22, 118:6, 120:24, 121:1, 123:18, 125:23
**correcting** [1] - 88:6
**correctly** [6] - 31:18, 34:2, 53:6, 67:10, 119:13, 120:9
**counsel** [15] - 7:2, 9:2, 9:25, 12:23, 14:1, 17:11, 69:10, 70:9, 75:15, 75:17, 77:21, 80:13, 82:6, 82:19, 112:20
**count** [1] - 23:5
**couple** [9] - 6:10, 12:15, 12:20, 16:22, 33:15, 65:5, 88:8, 112:14, 112:15
**course** [4] - 11:22, 16:6, 24:16, 119:18
**COURT** [200] - 1:1, 4:1, 4:4, 4:20, 8:1, 8:22, 9:21, 10:2, 11:4, 14:12, 14:15, 14:23, 15:2, 15:6, 15:9, 15:14, 15:18, 16:6, 17:13, 17:15, 17:21, 17:25, 18:3, 18:8, 18:12, 18:17, 18:19, 18:23, 18:25, 19:6, 19:12, 19:18, 19:20, 19:23, 20:3, 20:6, 21:3, 24:4, 24:14, 24:17, 24:24, 25:2, 25:7, 25:12, 25:18, 26:19, 26:22, 27:2, 27:5, 27:9, 28:3, 28:15, 28:17, 28:21, 28:24, 29:3, 29:6, 29:9, 29:12, 30:2, 31:24, 33:17, 36:8, 36:10, 38:21, 39:7, 39:11, 39:14, 39:19, 40:1, 40:8, 40:11, 40:13, 40:16, 40:20,

40:22, 41:2, 41:7, 43:1, 44:2, 44:7, 46:25, 47:4, 49:19, 50:2, 50:4, 50:16, 51:9, 53:18, 53:20, 58:12, 59:5, 59:8, 60:2, 60:10, 60:17, 60:22, 61:2, 61:4, 63:4, 63:21, 65:15, 67:19, 67:23, 67:25, 68:9, 68:13, 68:22, 69:3, 69:5, 69:9, 69:12, 69:14, 69:21, 70:5, 70:19, 71:3, 71:8, 71:11, 71:20, 71:24, 72:4, 72:8, 72:12, 72:15, 72:22, 72:25, 73:5, 73:8, 73:10, 74:22, 75:1, 75:11, 75:16, 75:23, 76:12, 76:15, 76:17, 76:22, 77:11, 78:12, 78:16, 78:22, 79:2, 79:14, 79:19, 80:17, 81:16, 81:20, 81:22, 82:2, 82:10, 82:14, 82:17, 82:22, 83:1, 83:3, 84:3, 84:5, 84:11, 85:2, 86:21, 88:8, 89:16, 89:20, 91:19, 92:21, 92:25, 93:2, 93:7, 93:12, 93:15, 94:4, 94:8, 94:13, 94:17, 95:9, 95:12, 95:19, 96:7, 101:8, 102:14, 102:17, 104:23, 105:16, 107:24, 108:1, 111:6, 114:2, 120:4, 121:18, 123:2, 123:7, 123:18, 124:5, 124:12, 124:16, 125:1, 125:6, 126:1
**Court** [9] - 2:6, 2:6, 10:22, 77:21, 80:13, 104:21, 112:20, 127:12, 127:13
**court** [7] - 14:17, 16:4, 71:10, 76:21, 83:9, 120:12, 124:15
**Court's** [1] - 123:13
**courthouse** [1] - 122:14
**COURTROOM** [4] - 19:15, 40:18, 72:7, 84:8
**courtroom** [8] - 14:10, 15:4, 15:17, 71:18, 71:22, 72:23, 124:24, 125:4

**Courtyard** [2] - 122:13, 122:15
**covered** [2] - 102:12, 102:19
**create** [3] - 58:8, 105:9, 105:10
**created** [1] - 8:19
**credit** [2] - 67:16, 68:4
**Criminal** [1] - 1:3
**CROSS** [1] - 15:24
**Cross** [1] - 3:3
**cross** [4] - 13:25, 15:12, 15:20, 73:1
**CROSS-EXAMINATION** [1] - 15:24
**cross-examination** [4] - 13:25, 15:12, 15:20, 73:1
**CRR** [3] - 2:5, 127:3, 127:12
**cumulative** [1] - 12:11
**cut** [1] - 83:23
**cutting** [1] - 11:6

**D**

**D.C** [10] - 1:6, 1:16, 1:20, 2:4, 2:8, 61:8, 64:20, 101:24, 102:1, 127:14
**Damion** [1] - 52:6
**Date** [1] - 93:22
**date** [30] - 24:19, 27:17, 27:18, 27:19, 28:9, 28:10, 29:15, 39:22, 46:17, 47:1, 78:1, 79:10, 80:2, 80:5, 80:23, 84:22, 85:5, 93:20, 94:23, 100:9, 102:6, 110:5, 110:17, 110:25, 111:2, 111:4, 111:12, 111:15, 114:21
**date-wise** [1] - 78:1
**Dated** [1] - 127:10
**dated** [4] - 77:2, 92:1, 116:3, 120:23
**dates** [4] - 110:9, 110:11, 110:14, 122:2
**DAVID** [1] - 1:21
**David** [1] - 14:24
**Davis** [9] - 37:2, 41:14, 41:25, 42:9, 43:5, 43:16, 120:9, 120:14, 120:21
**days** [6] - 92:23,

101:19, 112:6, 112:9, 112:14, 112:15
**deal** [17] - 39:3, 56:16, 87:19, 87:22, 88:2, 88:13, 88:14, 88:17, 89:3, 89:7, 89:14, 90:9, 90:18, 90:22, 90:25, 91:2, 92:11
**dealing** [1] - 65:5
**deals** [1] - 55:9
**December** [2] - 52:4, 52:14
**decided** [4] - 31:3, 58:20, 70:9, 118:22
**deciding** [1] - 12:13
**decision** [2] - 31:5, 72:9
**dedication** [1] - 35:11
**Defendant** [4] - 1:7, 4:11, 40:6, 60:16
**DEFENDANT** [2] - 1:21, 2:2
**Defendant's** [3] - 3:13, 40:14, 123:15
**Defense** [3] - 17:21, 18:8, 40:13
**defense** [21] - 4:25, 5:3, 5:8, 5:19, 5:23, 6:3, 6:9, 6:13, 7:8, 8:10, 11:1, 11:15, 11:17, 14:23, 15:1, 40:11, 68:24, 68:25, 69:10, 75:17
**define** [1] - 52:1
**definitely** [2] - 49:3, 52:12
**delineated** [1] - 62:23
**delivered** [3] - 96:18, 115:14
**departed** [1] - 112:11
**DEPARTMENT** [2] - 1:15, 1:18
**Department** [15] - 8:18, 65:6, 65:9, 66:3, 66:23, 66:25, 73:13, 96:20, 99:6, 99:14, 99:22, 99:24, 100:3, 100:4, 121:14
**deposit** [2] - 95:1, 117:14
**DEPUTY** [4] - 19:15, 40:18, 72:7, 84:8
**described** [2] - 9:9, 74:15
**describes** [2] - 9:17, 23:21
**description** [1] -

62:18
**detail** [2] - 4:10, 85:14
**detailed** [1] - 98:5
**details** [1] - 13:20
**determined** [2] - 117:21, 117:23
**developing** [1] - 51:11
**development** [1] - 55:17
**diagram** [2] - 73:17, 73:20
**dies** [1] - 17:16
**difference** [1] - 109:25
**different** [28] - 9:4, 9:14, 10:2, 10:15, 13:8, 13:15, 14:17, 28:18, 34:17, 36:17, 37:12, 37:16, 44:8, 51:15, 52:21, 53:9, 55:15, 57:8, 60:17, 63:12, 71:13, 81:5, 87:24, 91:4, 110:9, 110:11, 125:11, 125:17
**difficult** [3] - 11:9, 47:25, 125:19
**difficulties** [6] - 68:1, 70:5, 70:13, 70:22, 72:13, 83:15
**digested** [1] - 47:19
**diligence** [1] - 106:16
**dinner** [10] - 59:2, 59:4, 59:16, 59:19, 59:23, 60:8, 60:25, 61:1, 61:10, 61:14
**dinners** [1] - 60:15
**Direct** [1] - 3:3
**direct** [1] - 84:14
**directly** [1] - 96:7
**director** [1] - 98:15
**directors** [2] - 55:24, 56:23
**disability** [1] - 114:11
**disbanded** [1] - 116:22
**disclose** [1] - 123:24
**discrete** [2] - 36:19, 52:1
**discretion** [1] - 10:22
**discuss** [2] - 46:3, 46:4, 54:21, 61:18, 74:22, 86:13, 86:14, 126:12
**discussed** [5] - 53:21, 57:20, 76:1,

125:11, 126:5
**discussing** [1] - 20:20
**discussion** [6] - 11:11, 11:13, 11:16, 25:10, 125:14, 126:13
**discussions** [1] - 81:3
**display** [7] - 73:2, 73:5, 80:12, 85:19, 93:25, 94:11, 110:11
**displayed** [2] - 86:20, 94:13
**distinct** [1] - 9:17
**distinction** [2] - 20:15, 44:11
**distinctly** [1] - 106:7
**distinguishable** [1] - 8:9
**distraction** [1] - 12:10
**distribute** [1] - 119:3
**distributed** [1] - 119:9
**District** [3] - 2:6, 2:7, 127:13
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [1] - 127:13
**Document** [1] - 110:16
**document** [54] - 23:22, 24:22, 25:1, 25:3, 26:5, 26:8, 26:9, 27:6, 29:8, 29:11, 30:17, 30:21, 34:11, 39:8, 50:17, 73:13, 73:17, 77:2, 78:7, 78:12, 80:23, 85:9, 85:10, 85:12, 85:14, 86:8, 87:11, 88:12, 88:16, 88:22, 89:4, 89:10, 90:17, 91:21, 91:23, 92:6, 92:8, 93:6, 105:2, 105:8, 105:9, 106:19, 107:2, 107:4, 107:14, 110:1, 110:2, 110:4, 110:17, 113:8, 117:3, 117:10, 117:12, 117:23
**documents** [18] - 23:8, 23:9, 57:12, 77:5, 77:15, 77:18, 78:5, 87:18, 89:6, 90:21, 101:5, 101:7, 106:1, 106:22, 109:10, 110:14, 120:23, 121:23
**DOJ** [2] - 39:12, 73:3, 97:8, 98:19,

99:17, 101:17, 101:18, 102:25
**dollars** [2] - 34:14, 118:17
**done** [12] - 17:19, 31:15, 32:6, 34:2, 34:7, 47:5, 57:16, 81:2, 81:6, 82:15, 90:15, 106:8
**Dorothy** [3] - 18:19, 76:24, 84:7
**double** [1] - 84:6
**double-check** [1] - 84:6
**down** [15] - 8:23, 15:6, 36:10, 38:16, 41:8, 41:10, 70:2, 70:19, 71:25, 75:7, 75:8, 76:24, 83:13, 88:9, 108:25
**dozen** [1] - 59:12
**draft** [4] - 51:3, 52:7, 56:5, 120:2
**drafting** [1] - 56:5
**drafts** [1] - 57:14
**Dubai** [1] - 56:22
**due** [1] - 106:16
**durable** [2] - 114:12, 116:21
**during** [9] - 32:7, 32:24, 37:20, 49:3, 50:21, 59:11, 61:3, 64:8, 64:25

**E**

**E&P** [1] - 86:3
**early** [5] - 21:13, 32:25, 34:11, 41:12, 50:18
**earned** [1] - 74:13
**easier** [2] - 28:19, 28:25
**easily** [1] - 55:25
**East** [1] - 59:15
**eating** [1] - 62:13
**ebbed** [1] - 64:17
**edits** [7] - 57:14, 88:1, 88:16, 90:8, 90:10, 90:15, 92:8
**Edwards** [1] - 127:12
**EDWARDS** [2] - 2:5, 127:3
**effective** [1] - 114:21
**Effective** [1] - 93:22
**effort** [3] - 14:1, 55:19, 55:22
**eight** [1] - 47:24
**either** [6] - 74:23,

76:5, 93:21, 118:19, 118:25, 119:9
**element** [1] - 6:13
**elements** [2] - 40:6, 68:23
**elevate** [1] - 55:22
**Elliott** [1] - 43:16
**email** [15] - 8:4, 33:3, 34:9, 34:11, 43:12, 78:8, 84:15, 84:22, 85:5, 85:22, 86:5, 86:12, 86:23, 89:15, 90:1
**emails** [2] - 4:6, 34:1
**embassy** [20] - 31:8, 34:12, 35:15, 47:11, 47:13, 47:15, 47:21, 96:12, 96:15, 96:16, 96:17, 96:23, 96:24, 97:3, 97:7, 97:16, 98:1, 101:2, 123:12, 125:12
**embroiled** [1] - 83:19
**employed** [1] - 66:3
**employees** [1] - 8:12
**employees'** [1] - 8:12
**Encino** [1] - 1:23
**encounter** [1] - 61:8
**end** [4] - 27:10, 34:19, 63:7, 107:11
**ended** [1] - 34:18
**engaged** [5] - 21:25, 26:12, 49:3, 49:5, 49:10
**engaging** [1] - 37:5
**enlarge** [1] - 27:7
**enlarged** [1] - 105:16
**entered** [10] - 14:10, 15:4, 15:16, 40:15, 72:23, 78:25, 79:22, 80:20, 94:10, 114:5
**entertainment** [5] - 7:6, 7:10, 36:20, 51:22, 66:11
**entertainment-related** [2] - 51:22, 66:11
**entities** [6] - 7:6, 7:7, 7:15, 57:8, 81:9, 83:18
**entrapment** [3] - 68:16, 69:1, 69:3
**entrapping** [1] - 68:16
**entry** [6] - 45:10, 48:6, 48:9, 48:12, 48:16, 103:20
**equipment** [1] - 19:16

**Equity** [2] - 56:2, 56:8
**escrow** [8] - 119:8, 119:20, 119:24, 120:1, 120:2, 120:6, 120:8, 120:17
**ESQ** [6] - 1:14, 1:17, 1:18, 1:21, 1:22, 2:2
**essentially** [2] - 62:19, 68:16
**establish** [2] - 9:25, 68:21
**established** [1] - 117:17
**establishes** [1] - 5:20
**establishing** [1] - 39:17
**ET** [1] - 86:1
**et** [4] - 9:15, 23:20, 97:17, 125:12
**ethical** [4] - 36:5, 36:13, 37:4, 38:1
**ethics** [1] - 100:10
**evaluating** [1] - 55:8
**event** [4] - 87:22, 105:11, 118:24, 119:9
**events** [2] - 63:14, 98:3
**EVIDENCE** [1] - 3:8
**Evidence** [2] - 5:24, 40:2
**evidence** [19] - 6:9, 6:12, 13:11, 13:14, 13:17, 13:18, 13:22, 14:3, 40:15, 46:24, 47:4, 76:11, 78:25, 79:22, 80:20, 94:10, 113:25, 114:5, 121:17
**exact** [4] - 27:18, 47:25, 98:3, 102:6
**exactly** [11] - 12:25, 25:6, 51:25, 54:7, 65:25, 68:9, 100:14, 103:25, 104:18, 112:9, 114:15
**exaggeration** [1] - 22:17
**EXAMINATION** [1] - 15:24
**examination** [5] - 13:25, 15:12, 15:20, 72:25, 73:1
**except** [2] - 108:18, 110:1
**exception** [5] - 6:4, 10:23, 74:21, 89:4, 90:19
**excerpts** [1] - 9:8
**excessively** [1] -

68:19
**exchange** [1] - 106:24
**exclamation** [2] - 31:1, 32:16
**excuse** [4] - 50:3, 113:4, 117:22, 125:2
**executed** [2] - 104:15, 115:1
**Executive** [1] - 23:20
**exhibit** [11] - 5:25, 24:11, 24:19, 40:12, 45:3, 50:15, 75:22, 89:16, 92:25, 93:1, 94:19
**Exhibit** [68] - 3:9, 3:10, 3:10, 3:11, 3:11, 3:13, 5:3, 5:10, 17:21, 18:8, 24:22, 26:17, 26:20, 28:22, 30:6, 39:6, 40:9, 40:13, 40:14, 77:21, 78:15, 78:20, 78:22, 78:24, 79:9, 79:17, 79:19, 79:21, 80:13, 80:18, 80:19, 84:2, 85:1, 85:4, 85:19, 86:19, 86:23, 89:18, 89:22, 89:24, 90:1, 90:3, 91:17, 93:4, 94:1, 94:9, 94:12, 94:20, 96:9, 104:21, 107:23, 108:4, 108:6, 108:13, 108:23, 109:21, 109:23, 109:25, 112:21, 112:22, 113:8, 114:2, 114:4, 114:8, 114:24, 121:24, 123:15
**exhibits** [1] - 4:19
**EXHIBITS** [1] - 3:8
**Exhibits** [1] - 109:12
**existing** [1] - 78:10
**exited** [2] - 71:18, 124:24
**expanded** [1] - 13:19
**expanding** [1] - 68:3
**expect** [3] - 82:10, 82:11, 82:14
**expecting** [3] - 62:4, 67:11, 67:12
**experience** [1] - 119:18
**explain** [2] - 113:6, 118:8
**explained** [1] - 72:1
**explanation** [1] - 116:24
**exploring** [1] - 60:18
**expressed** [2] -

102:22, 113:1
**extensively** [3] - 69:18, 102:13, 103:5
**extent** [1] - 36:3
**extradition** [1] - 118:15
**extralegal** [2] - 37:23, 37:24
**extraordinary** [1] - 120:19
**extrinsic** [1] - 6:12

**F**

**F-A-R-A** [1] - 16:12
**facilitate** [1] - 35:21
**fact** [5] - 18:22, 63:9, 69:23, 75:18, 117:15
**facts** [1] - 46:24
**fading** [1] - 107:19
**failure** [1] - 68:11
**fair** [5] - 45:13, 46:7, 61:17, 61:20, 121:12
**fall** [10] - 22:5, 22:19, 27:23, 27:25, 28:2, 28:5, 65:4, 74:20
**falls** [1] - 51:10
**familiar** [2] - 50:11, 57:1
**familiarize** [1] - 23:6
**family** [1] - 68:3
**far** [5] - 6:6, 35:14, 68:24, 69:22, 119:6
**FARA** [77] - 6:24, 7:3, 16:12, 16:16, 16:22, 17:7, 20:12, 20:13, 20:18, 20:22, 20:24, 21:8, 21:19, 22:1, 22:5, 22:12, 22:20, 23:1, 23:7, 23:9, 23:10, 23:11, 23:18, 23:21, 24:3, 24:12, 25:9, 25:23, 26:11, 26:14, 27:15, 30:10, 30:20, 30:22, 30:25, 31:3, 31:6, 31:17, 31:20, 32:3, 32:10, 32:14, 32:21, 32:24, 33:6, 33:14, 33:23, 34:20, 34:23, 35:1, 35:6, 35:10, 39:18, 40:5, 40:24, 41:12, 45:11, 45:18, 45:21, 46:6, 46:12, 46:14, 47:10, 47:14, 47:18, 47:20, 47:22, 48:2, 48:14, 48:16, 48:17, 49:4, 49:6, 49:15, 49:25, 50:7

**FBI** [6] - 101:24, 102:2, 102:4, 102:23, 103:6, 103:8
**February** [1] - 66:15
**february** [1] - 66:16
**Federal** [2] - 5:24, 40:2
**fee** [1] - 54:16
**fellow** [1] - 66:14
**felt** [3] - 102:23, 103:21, 104:1
**fence** [2] - 45:11, 45:13
**few** [4] - 23:8, 23:9, 60:22, 106:21
**field** [3] - 101:24, 102:1, 103:8
**figure** [1] - 25:18
**filed** [2] - 54:25
**filing** [1] - 81:6
**film** [2] - 55:11, 57:20
**Film** [1] - 57:1
**finances** [2] - 9:15, 70:14
**financial** [8] - 4:12, 7:20, 68:1, 70:13, 70:22, 72:13, 82:7, 105:12
**financially** [1] - 70:1
**findings** [1] - 51:10
**fine** [3] - 19:9, 24:24, 52:2
**finish** [4] - 60:2, 63:5, 95:7, 117:6
**finished** [1] - 32:18
**FIRM** [1] - 1:22
**firm** [4] - 8:11, 8:15, 57:17, 119:19
**first** [34] - 8:24, 12:18, 18:13, 20:22, 20:23, 21:20, 30:24, 32:20, 39:17, 39:20, 40:4, 40:22, 43:8, 45:6, 48:6, 51:3, 59:21, 60:1, 60:8, 61:1, 61:8, 62:8, 66:13, 68:25, 78:17, 99:13, 101:5, 102:3, 103:20, 104:6, 107:6, 108:16, 110:5, 113:24
**fit** [1] - 9:9
**five** [2] - 47:24, 124:17
**fixer** [1] - 36:24
**Florida** [1] - 55:4
**flowed** [1] - 64:18
**flowing** [3] - 75:7, 75:8, 75:9
**followed** [3] - 31:1,

32:16, 115:8
**following** [22] -
14:11, 15:5, 15:17,
67:21, 71:9, 71:19,
71:23, 72:6, 72:24,
74:24, 76:20, 81:18,
83:8, 97:11, 101:1,
104:2, 122:9, 123:5,
124:14, 124:25,
125:5, 126:17
**football** [1] - 62:16
**FOR** [5] - 1:1, 1:14,
1:21, 2:2, 3:4
**foregoing** [2] -
115:12, 127:4
**Foreign** [4] - 16:9,
22:15, 22:22, 23:19
**foreign** [4] - 4:9,
4:24, 7:15, 31:15
**forfeiture** [1] - 42:18
**forget** [1] - 78:16
**form** [1] - 4:10
**formation** [2] -
77:16, 81:9
**formed** [9] - 77:3,
79:4, 79:10, 80:5,
80:7, 80:9, 81:4,
81:13, 83:14
**forming** [1] - 81:1
**forth** [3] - 57:15,
93:14, 115:16
**forward** [7] - 40:25,
102:10, 105:6, 105:7,
117:2, 126:14
**forwarded** [1] -
85:10
**forwarding** [2] -
85:9, 85:15
**foundation** [1] - 11:2
**Four** [1] - 52:14
**four** [3] - 4:4, 12:21,
58:1
**four-day** [1] - 4:4
**fourth** [1] - 7:20
**frankly** [5] - 13:10,
13:14, 13:20, 70:20,
125:18
**free** [1] - 115:14
**freely** [1] - 68:19
**Freeman** [7] -
105:19, 105:21,
105:25, 106:5, 109:7,
109:21, 110:2
**frequently** [2] -
59:14, 59:17
**fresh** [2] - 83:17,
83:22
**friend** [3] - 35:19,
36:1, 36:16
**friends** [2] - 35:24,

58:24
**friendship** [4] -
58:17, 60:19, 62:18,
69:25
**front** [2] - 93:4, 95:15
**fulfilling** [1] - 36:13
**full** [2] - 116:17,
127:5
**function** [1] - 54:6
**Fund** [1] - 57:1
**fund** [1] - 57:5
**funding** [1] - 7:11
**funds** [3] - 7:15,
37:15, 118:21
**funnel** [1] - 7:15
**future** [1] - 69:17

## G

**game** [4] - 62:10,
62:16
**gather** [1] - 45:9
**gathered** [1] - 45:20
**general** [3] - 12:5,
125:15, 126:6
**generalized** [1] -
63:22
**generally** [3] - 11:24,
12:1, 49:12
**gentlemen** [1] -
124:16
**genuinely** [1] - 61:6
**GEORGE** [1] - 15:23
**George** [4] - 3:5,
75:4, 75:7, 75:8
**Georgetown** [1] -
61:9
**gig** [1] - 67:1
**given** [4] - 31:14,
38:8, 50:2, 90:25
**gold** [1] - 56:17
**Gorrilla** [3] - 58:3,
58:5, 58:8
**GOVERNMENT** [3] -
1:14, 3:4, 15:23
**Government** [25] -
4:18, 4:24, 5:7, 5:17,
7:14, 8:3, 9:24, 10:25,
11:25, 14:22, 18:12,
24:14, 29:3, 34:10,
38:10, 43:12, 43:25,
44:1, 44:2, 45:3,
93:25, 103:22, 104:7,
124:3, 124:9
**government** [8] -
7:16, 14:20, 27:11,
74:10, 74:12, 100:21,
102:11, 104:10
**government's** [5] -

3:9, 3:10, 3:10, 3:11,
3:11
**Government's** [39] -
4:8, 4:15, 5:2, 5:10,
8:6, 26:17, 28:22,
39:6, 77:21, 78:15,
78:19, 78:22, 78:24,
79:9, 79:17, 79:19,
79:21, 80:13, 80:18,
80:19, 84:2, 85:1,
85:4, 85:19, 86:19,
89:18, 90:3, 91:17,
94:1, 94:9, 94:11,
94:20, 96:9, 104:21,
108:6, 112:21, 114:2,
114:4, 121:24
**grab** [1] - 28:22
**graduated** [1] -
37:21
**grant** [1] - 116:20
**granted** [1] - 113:15
**granting** [1] - 117:7
**great** [1] - 10:22
**greater** [2] - 64:16,
104:4
**grounds** [1] - 13:24
**group** [1] - 42:11
**Group** [1] - 51:10
**guess** [5] - 9:20,
51:25, 99:19, 100:10,
122:1
**Guo** [13] - 21:1, 21:9,
21:11, 21:13, 22:13,
31:15, 33:1, 36:23,
42:21, 42:23, 43:7,
50:23, 123:25
**GUO** [1] - 21:5
**guys** [1] - 65:12
**GX** [1] - 92:20

## H

**half** [4] - 58:1, 59:12,
108:13, 108:14
**hand** [1] - 36:18
**handled** [1] - 11:16
**handling** [2] - 11:18,
51:23
**handwriting** [4] -
73:22, 115:4, 115:5,
115:7
**hang** [1] - 27:9
**happy** [1] - 116:24
**HASKELL** [2] - 2:2,
2:3
**Haskell** [5] - 5:11,
6:2, 6:25, 14:25,
70:6
**head** [1] - 58:4

**headquarters** [1] -
102:4
**headset** [1] - 17:13
**hear** [13] - 12:1,
12:16, 29:23, 39:15,
43:18, 43:19, 60:3,
60:5, 81:16, 96:8,
100:24, 111:6, 119:16
**heard** [6] - 13:1,
43:8, 44:1, 44:2,
68:25, 103:11
**hearsay** [3] - 39:24,
81:14, 83:6
**heat** [1] - 104:1
**heck** [1] - 106:5
**help** [1] - 42:17
**helpful** [1] - 5:14
**hereby** [1] - 127:3
**hereof** [1] - 114:21
**hereto** [1] - 114:25
**Heuchling** [2] -
101:21, 101:22
**hide** [3] - 74:9,
74:11, 82:16
**hiding** [3] - 35:13,
37:14, 74:15
**HIGGINBOTHAM** [2]
- 14:14, 15:23
**Higginbotham** [33] -
3:5, 5:1, 5:20, 6:23,
7:5, 8:16, 14:6, 14:10,
14:12, 15:10, 15:19,
16:2, 19:24, 24:8,
41:6, 68:17, 73:1,
73:12, 75:4, 75:7,
75:9, 75:19, 77:2,
82:6, 83:11, 84:10,
84:14, 85:4, 89:19,
99:3, 112:20, 125:1
**Higginbotham's** [6] -
5:9, 6:1, 6:6, 8:5,
17:9, 75:12
**high** [2] - 52:1, 52:18
**highlight** [1] - 55:23,
124:3
**highlighted** [1] -
41:3
**highly** [1] - 68:21
**him/her** [1] - 115:16
**himself** [1] - 53:9
**hired** [1] - 54:5
**hiring** [1] - 55:17
**HK** [1] - 78:2
**hoc** [2] - 8:20, 8:22
**hold** [6] - 11:14,
39:11, 40:9, 44:7,
75:16, 75:23
**holes** [1] - 70:2
**home** [6] - 55:4,
62:1, 62:3, 67:12,

67:13, 86:1
**honesty** [1] - 37:7
**Hong** [14] - 31:9,
34:21, 35:5, 35:9,
41:25, 43:4, 44:3,
44:17, 111:9, 112:7,
112:11, 115:23,
121:1, 121:3
**Honor** [77] - 4:2, 4:3,
4:18, 7:25, 9:23,
10:21, 14:9, 14:21,
14:24, 15:13, 15:22,
17:12, 18:18, 23:19,
23:24, 24:13, 24:23,
25:4, 26:24, 28:23,
29:2, 29:5, 29:10,
33:16, 33:20, 36:9,
39:5, 39:13, 39:23,
39:25, 40:7, 40:17,
46:23, 47:7, 50:1,
50:3, 50:14, 51:5,
51:6, 53:16, 58:10,
60:13, 67:18, 69:13,
71:7, 72:2, 72:11,
73:2, 73:7, 73:9,
74:18, 74:19, 77:20,
78:21, 79:1, 79:18,
80:12, 80:16, 81:14,
83:7, 84:4, 89:19,
92:22, 93:9, 94:3,
94:15, 95:7, 102:12,
107:25, 113:25,
114:1, 120:3, 121:16,
121:20, 123:1,
125:25, 126:15
**HONORABLE** [1] -
1:10
**hook** [1] - 68:13
**hooks** [2] - 68:15,
69:21
**hop** [2] - 12:2, 35:8
**hope** [1] - 4:4
**hoping** [1] - 69:16
**hotels** [1] - 61:9
**hotline** [2] - 50:7,
50:11
**hour** [2] - 11:11, 23:2
**hourly** [1] - 23:5
**house** [2] - 58:25,
67:17
**Houston** [1] - 103:20

## I

**idea** [1] - 47:21
**identification** [2] -
24:23, 120:13
**identified** [3] - 5:23,
6:4, 6:22

**identify** [3] - 14:20, 25:8, 26:9
**II** [5] - 7:1, 108:11, 110:1, 110:6, 121:23
**III** [1] - 7:4
**Impact** [2] - 57:1, 57:7
**imparted** [2] - 76:7, 76:9
**impeach** [1] - 11:20
**impeachment** [4] - 5:5, 10:4, 10:7, 11:21
**implicated** [1] - 23:10
**important** [5] - 22:12, 33:9, 39:21, 48:6, 48:24
**impressions** [2] - 5:22, 6:1
**IN** [1] - 3:8
**inaccurate** [3] - 48:20, 48:21, 63:15
**inadmissible** [2] - 13:22, 14:3
**incapacity** [1] - 114:11
**incident** [1] - 48:4
**include** [1] - 8:21
**included** [1] - 38:9
**includes** [1] - 9:13
**including** [4] - 9:14, 51:16, 53:9, 123:22
**incoming** [1] - 95:1
**inconsistency** [6] - 10:1, 10:3, 10:6, 10:11, 123:8
**inconsistent** [5] - 5:5, 11:20, 18:7, 124:3, 126:3
**inconvenience** [1] - 17:4
**inconvenient** [1] - 20:9
**incorporated** [1] - 114:25
**incorporation** [3] - 77:19, 78:1, 87:7
**incorrect** [2] - 116:11, 116:23
**indefinitely** [1] - 114:21
**Indiana** [1] - 2:3
**indicate** [7] - 6:10, 24:8, 25:14, 38:5, 47:1, 125:19, 126:1
**indicated** [16] - 7:14, 12:24, 24:5, 24:6, 33:18, 34:5, 34:25, 39:8, 40:10, 44:9, 47:5, 51:9, 70:10,

75:25, 83:5, 124:23
**indicates** [3] - 7:8, 40:23, 84:15
**indicating** [1] - 9:10
**indicted** [1] - 45:5
**individual** [1] - 52:9
**individuals** [2] - 52:21, 61:12
**information** [11] - 5:14, 13:3, 13:6, 13:12, 26:14, 42:10, 42:12, 43:23, 70:20, 70:22, 103:11
**informed** [2] - 98:8, 98:11
**initial** [2] - 51:10, 56:12
**initials** [4] - 108:25, 109:3, 109:5
**inquiries** [1] - 78:9
**insinuation** [1] - 118:9
**insofar** [1] - 5:25
**instance** [1] - 89:6
**instances** [5] - 12:3, 12:5, 12:21, 12:23, 13:19
**instead** [6] - 11:6, 28:21, 35:24, 70:14, 95:8, 110:2
**institution** [1] - 105:12
**instruction** [1] - 110:24
**instructions** [3] - 7:23, 11:10, 38:8
**Integrity** [1] - 1:19
**intend** [1] - 72:18
**intensity** [1] - 64:16
**intent** [1] - 74:11
**interest** [2] - 71:5, 121:12
**interested** [3] - 70:16, 121:10
**interesting** [1] - 38:6
**interests** [1] - 103:9
**Internal** [1] - 55:3
**interrupt** [1] - 8:2
**interrupted** [1] - 12:25
**interrupting** [1] - 113:4
**interview** [5] - 101:6, 101:13, 101:20, 102:3, 102:5
**introduce** [1] - 39:6, 39:7, 57:18
**introduced** [2] - 43:6, 56:14
**introductions** [1] -

56:12
**investigating** [1] - 74:13
**investigation** [3] - 100:20, 100:22, 101:3
**investor** [2] - 104:16, 105:4
**investors** [1] - 7:11
**Investors** [1] - 108:11
**invited** [1] - 34:12
**involved** [9] - 27:24, 56:20, 61:12, 64:11, 65:5, 81:3, 82:6, 104:3, 118:14
**involving** [1] - 46:16
**IOLTA** [2] - 119:8, 119:20
**irrelevant** [1] - 53:20
**irrevocable** [9] - 113:10, 113:12, 113:15, 114:10, 114:20, 115:14, 117:7, 117:18, 118:3
**Israely** [1] - 14:25
**ISRAELY** [1] - 1:22
**issue** [7] - 6:24, 9:4, 10:15, 55:3, 69:10, 75:13, 83:5
**issues** [9] - 5:3, 5:5, 10:5, 11:17, 12:10, 36:17, 69:1, 104:4, 123:22
**it'll** [2] - 9:11, 53:21
**items** [3] - 27:20, 52:19, 52:24
**itself** [1] - 9:13
**IX** [6] - 113:11, 114:22, 114:24, 116:20, 118:24, 119:2

## J

**January** [10] - 32:2, 50:21, 51:4, 51:14, 56:24, 99:20, 99:21, 100:16, 100:17, 101:18
**Jho** [31] - 31:10, 31:15, 33:1, 41:13, 41:25, 42:4, 42:9, 42:13, 42:15, 42:17, 43:5, 43:17, 43:21, 43:22, 44:9, 44:17, 44:19, 44:24, 46:16, 50:22, 68:18, 73:25, 85:16, 87:9, 87:11, 103:15, 113:1, 118:13, 118:16,

123:24, 123:25
**job** [4] - 34:1, 34:5, 99:24, 100:12
**jobs** [1] - 13:21
**Joel** [5] - 66:14, 115:21, 115:24, 116:5, 116:6
**JOHN** [1] - 1:14
**John** [1] - 14:21
**Journal** [2] - 46:16, 46:20
**judge** [1] - 62:23
**JUDGE** [1] - 1:11
**Judge** [1] - 40:11
**judgment** [2] - 58:22, 69:25
**July** [17] - 51:20, 53:13, 77:2, 77:15, 78:2, 96:12, 96:17, 99:16, 100:19, 101:1, 101:6, 101:16, 101:19, 102:4, 102:9, 104:6, 122:3
**jump** [1] - 12:19
**JUROR** [1] - 17:14
**juror** [3] - 15:13, 15:16, 17:12
**jury** [23] - 4:22, 7:23, 11:10, 11:14, 12:10, 12:11, 13:10, 13:16, 14:3, 15:4, 15:7, 16:15, 16:25, 18:25, 67:22, 70:4, 71:18, 72:7, 72:23, 74:25, 81:19, 123:6, 124:24
**JURY** [2] - 1:10, 15:8
**Justice** [16] - 8:18, 65:7, 65:10, 66:3, 66:23, 67:1, 73:13, 96:21, 98:5, 99:6, 99:14, 99:22, 99:25, 100:3, 100:5, 121:15
**JUSTICE** [2] - 1:15, 1:18
**justifiable** [2] - 120:18, 120:19
**justification** [1] - 103:18

## K

**keep** [4] - 13:22, 23:3, 93:13, 124:20
**keeping** [1] - 35:25
**keller** [1] - 82:17
**KELLER** [2] - 1:14, 4:2
**Keller** [11] - 14:21, 16:8, 24:8, 37:11,

38:18, 38:19, 39:19, 69:12, 83:4, 125:24, 126:2
**KENNER** [232] - 1:21, 1:22, 4:3, 14:24, 15:22, 16:1, 16:4, 16:7, 17:9, 17:17, 17:23, 18:2, 18:5, 18:10, 18:15, 18:21, 18:24, 19:3, 19:9, 19:10, 19:13, 19:19, 19:22, 20:7, 21:7, 23:19, 24:1, 24:13, 24:16, 24:21, 24:25, 25:16, 25:21, 25:22, 26:18, 26:20, 26:24, 27:4, 27:8, 27:12, 27:13, 28:4, 28:16, 28:20, 28:22, 29:1, 29:7, 29:10, 29:17, 30:4, 30:5, 31:25, 32:1, 33:19, 33:21, 36:9, 36:11, 36:12, 38:23, 39:5, 39:10, 39:13, 39:16, 40:17, 40:19, 40:21, 41:1, 41:4, 41:5, 41:9, 41:11, 43:3, 44:3, 44:5, 44:13, 44:14, 47:3, 47:6, 47:8, 49:20, 49:22, 50:3, 50:5, 50:14, 50:20, 51:6, 51:13, 53:19, 54:1, 58:14, 58:15, 59:7, 59:9, 59:10, 59:25, 60:6, 60:7, 60:21, 60:23, 60:24, 61:3, 61:5, 61:16, 63:17, 63:24, 64:1, 65:16, 65:21, 67:24, 68:2, 68:11, 68:15, 69:2, 69:4, 69:6, 69:11, 71:2, 71:7, 72:2, 72:11, 72:14, 72:17, 73:2, 73:7, 73:9, 73:11, 74:17, 75:2, 75:14, 75:18, 76:10, 76:13, 76:16, 76:19, 77:1, 77:13, 77:14, 77:20, 77:23, 78:14, 78:19, 79:1, 79:3, 79:16, 79:23, 80:1, 80:12, 80:21, 80:22, 81:21, 81:25, 82:5, 82:12, 82:15, 83:7, 83:10, 84:1, 84:4, 84:9, 84:13, 84:25, 85:3, 85:19, 85:21, 86:19, 86:22, 88:10, 88:11, 89:17, 89:21, 89:23, 91:17,

91:20, 92:20, 92:22,
93:1, 93:3, 93:8,
93:10, 93:13, 93:16,
93:25, 94:6, 94:11,
94:15, 94:19, 94:22,
95:7, 95:11, 95:18,
95:21, 96:6, 96:9,
96:11, 101:12,
102:15, 102:20,
102:21, 104:12,
104:13, 104:20,
105:1, 105:20, 107:1,
107:3, 107:22,
107:25, 108:3, 108:5,
108:12, 108:15,
109:9, 109:11,
110:11, 110:13,
111:7, 111:11,
111:13, 113:20,
113:22, 113:24,
114:6, 114:7, 120:3,
120:5, 121:20,
121:22, 123:4,
123:10, 124:11,
124:13, 126:15
  **Kenner** [23] - 12:16,
14:25, 15:20, 15:21,
16:3, 19:12, 24:5,
25:8, 28:15, 33:17,
38:21, 38:22, 40:16,
40:25, 44:8, 67:23,
72:9, 75:23, 75:24,
81:20, 125:7, 125:23,
126:2
  **kept** [1] - 26:16
  **kind** [4] - 5:14,
12:11, 62:7, 103:1
  **kinds** [3] - 45:17,
87:23, 103:17
  **knowing** [1] - 63:23
  **knowledge** [1] -
56:16
  **known** [5] - 35:6,
41:21, 63:9, 100:2,
115:11
  **KOLLAR** [1] - 1:10
  **KOLLAR-KOTELLY**
[1] - 1:10
  **Kong** [14] - 31:9,
34:21, 35:5, 35:9,
41:25, 43:4, 44:3,
44:17, 111:9, 112:7,
112:11, 115:23,
121:1, 121:3
  **kosher** [1] - 34:6
  **KOTELLY** [1] - 1:10
  **Kriss** [1] - 14:25
  **Kulak** [2] - 54:3, 54:5

**L**

  **label** [1] - 40:8
  **lack** [2] - 34:23, 68:4
  **ladies** [1] - 124:16
  **lady** [1] - 98:16
  **laid** [2] - 11:1, 121:23
  **landed** [2] - 111:23,
112:1
  **language** [3] - 38:14,
39:1, 45:14
  **Laogumnerd** [9] -
105:18, 109:17,
112:16, 112:17,
113:17, 114:19,
115:11, 116:12,
118:13
  **large** [1] - 103:16
  **last** [17] - 11:17,
13:3, 15:11, 16:8,
16:15, 17:24, 28:9,
28:10, 29:12, 29:15,
37:10, 65:18, 70:6,
105:15, 109:10,
113:20, 119:11
  **late** [1] - 32:25
  **latest** [1] - 5:6
  **latitude** [3] - 118:8,
118:10
  **Lauren** [1] - 54:3
  **law** [7] - 8:17, 35:25,
37:22, 37:24, 49:25,
100:11, 119:19
  **Law** [1] - 45:24
  **LAW** [1] - 1:22, 2:2
  **lawyer** [20] - 23:6,
24:1, 32:21, 33:14,
36:5, 36:14, 36:21,
37:10, 37:20, 37:21,
50:23, 64:11, 82:7,
88:21, 89:9, 91:1,
91:10, 92:10, 106:4,
119:21
  **lawyer's** [1] - 119:19
  **learn** [2] - 50:7,
122:19
  **least** [6] - 7:18, 9:5,
76:4, 78:17, 108:16,
126:7
  **leave** [4] - 97:10,
99:19, 112:7, 112:9
  **leaves** [1] - 112:15
  **led** [1] - 104:4
  **left** [5] - 101:16,
109:20, 112:1, 112:8,
121:1
  **legal** [33] - 23:25,
24:2, 36:6, 36:15,
36:19, 37:4, 37:17,

37:23, 46:8, 60:14,
61:19, 61:22, 64:6,
65:14, 67:4, 68:7,
68:12, 69:7, 69:10,
75:20, 76:7, 85:17,
87:16, 87:25, 88:5,
88:21, 88:24, 89:5,
89:12, 90:15, 92:12,
106:19
  **legally** [1] - 34:2
  **legitimate** [2] - 7:12,
8:10
  **legitimize** [2] - 32:9,
32:13
  **lender** [2] - 109:15,
109:19
  **lengthy** [2] - 23:11,
63:19
  **less** [1] - 28:8
  **letters** [2] - 37:14,
48:17
  **level** [1] - 64:16
  **licenses** [2] - 30:24,
32:12
  **Lidsky** [25] - 99:1,
99:4, 99:8, 100:25,
101:1, 101:6, 101:13,
101:16, 101:21,
101:22, 101:23,
102:3, 103:7, 103:13,
103:19, 111:5, 111:8,
121:4, 121:10,
121:25, 122:7,
122:16, 123:11,
123:17, 123:21
  **Lidsky's** [1] - 121:12
  **lie** [1] - 121:8
  **lies** [1] - 49:11
  **Lijun** [2] - 42:1, 43:6
  **limit** [2] - 37:16,
63:14
  **Limited** [5] - 78:3,
92:3, 93:18, 95:2,
113:11
  **Line** [3] - 17:10,
17:11, 17:19
  **line** [3] - 23:18, 41:3,
53:17
  **lines** [2] - 25:11,
103:12
  **Lines** [1] - 17:10
  **LISA** [2] - 2:5, 127:3
  **Lisa** [1] - 127:12
  **list** [1] - 32:10
  **listed** [1] - 78:18
  **listened** [1] - 122:22
  **litany** [2] - 60:13,
68:4
  **literally** [1] - 68:18
  **lived** [1] - 59:14

**LLC** [1] - 91:23
  **loan** [6] - 56:5,
56:19, 67:16, 104:16,
105:4, 105:11
  **Loan** [1] - 108:11
  **lobby** [1] - 7:16
  **LOCKHART** [1] -
1:18
  **Lockhart** [1] - 14:22
  **longtime** [1] - 105:21
  **look** [21] - 8:20, 9:12,
10:17, 12:10, 17:18,
19:24, 23:22, 25:14,
25:15, 27:19, 28:18,
30:6, 84:25, 95:14,
95:16, 108:18, 109:3,
116:13, 123:20,
124:9, 126:11
  **looked** [15] - 5:7,
9:13, 21:24, 22:12,
22:17, 24:6, 24:9,
25:9, 25:15, 25:19,
25:24, 26:10, 33:25,
90:2, 122:24
  **looking** [14] - 4:15,
12:8, 28:12, 32:7,
34:20, 41:2, 50:17,
67:12, 74:8, 85:4,
86:23, 93:2, 114:8,
126:7
  **looks** [8] - 26:4,
29:15, 29:19, 79:12,
93:21, 105:18,
108:25, 113:17
  **loosely** [1] - 86:18
  **Low** [34] - 7:16, 7:17,
31:10, 31:15, 33:1,
41:13, 42:1, 42:4,
42:9, 42:13, 42:15,
42:17, 43:5, 43:17,
43:21, 43:22, 44:10,
44:17, 44:19, 44:24,
46:16, 50:22, 68:18,
73:25, 85:16, 87:9,
87:11, 103:15, 113:1,
118:13, 118:16,
123:24, 123:25
  **loyalty** [1] - 35:11
  **Lucky** [12] - 77:3,
77:5, 77:9, 77:16,
77:19, 78:2, 93:18,
95:2, 104:16, 105:5,
105:10, 110:23
  **Lum** [9] - 37:2,
41:14, 41:25, 42:9,
43:5, 43:16, 120:9,
120:14, 120:21
  **lunch** [7] - 11:11,
11:12, 59:16, 61:9,
61:14, 124:8, 124:17

**luncheon** [1] -
126:16

**M**

  **ma'am** [1] - 105:17
  **Macao** [14] - 49:11,
103:3, 103:5, 103:10,
103:19, 111:1,
111:17, 113:1,
115:24, 118:11,
119:5, 120:24, 122:6,
122:9
  **Macau** [3] - 31:9,
34:13, 35:16
  **machine** [1] - 67:1
  **Main** [1] - 98:5
  **Malaysia** [1] - 123:23
  **Management** [2] -
53:12, 53:23
  **manager** [2] - 54:14,
54:24
  **manner** [2] - 35:17,
106:13
  **Marc** [4] - 54:11,
54:12, 54:14, 56:13
  **March** [10] - 66:15,
66:16, 78:11, 79:7,
79:12, 79:13, 80:2,
80:24, 84:23
  **Mark** [12] - 77:3,
77:5, 77:9, 77:16,
77:19, 78:2, 93:18,
95:2, 104:16, 105:5,
105:10, 110:23
  **marked** [2] - 24:22,
26:17
  **Markowitz** [2] - 80:8,
81:2
  **material** [9] - 6:22,
12:3, 12:7, 25:19,
39:2, 39:3, 68:23,
87:19, 107:17
  **matter** [16] - 16:18,
19:7, 21:1, 21:9,
21:11, 21:13, 33:1,
33:2, 42:23, 43:8,
54:8, 54:9, 54:21,
61:13, 103:12, 118:15
  **matters** [20] - 21:2,
36:19, 36:23, 50:22,
51:7, 51:16, 51:23,
52:1, 52:9, 54:2,
61:19, 61:24, 65:5,
118:15, 118:19,
118:25, 119:1,
119:10, 121:11
  **meal** [1] - 62:20
  **mean** [9] - 10:11,

38:7, 41:20, 49:9,
70:7, 72:14, 81:22,
125:10, 126:4
  **meaning** [3] - 37:15,
62:14, 105:13
  **means** [3] - 86:13,
103:25, 104:1
  **meant** [4] - 45:15,
49:7, 105:9, 105:10
  **meet** [15] - 31:10,
41:13, 41:25, 42:7,
42:8, 42:9, 42:13,
43:21, 44:18, 97:18,
97:20, 98:10, 98:11,
122:3, 122:7
  **meeting** [22] - 21:11,
42:24, 42:25, 43:1,
43:4, 43:9, 44:17,
44:20, 45:3, 45:6,
45:9, 55:16, 97:7,
97:13, 97:15, 98:2,
99:8, 100:25, 103:7,
103:8, 122:10
  **meetings** [8] - 8:13,
8:14, 42:16, 43:2,
66:22, 102:9, 103:6,
123:23
  **members** [1] - 15:7
  **memberships** [2] -
30:24, 32:12
  **memorialize** [1] -
91:2
  **memory** [4] - 56:7,
58:13, 101:8, 115:17
  **mention** [3] - 21:8,
103:14, 103:15
  **mentioned** [2] -
45:23, 46:14
  **merely** [3] - 37:7,
89:3, 89:6
  **message** [2] - 33:4,
96:18
  **messenger** [2] -
35:14, 37:13
  **met** [11] - 42:1, 42:4,
42:15, 43:5, 43:17,
43:22, 44:24, 61:11,
63:1, 96:2, 121:25
  **meticulously** [1] -
38:10
  **Michel** [199] - 5:21,
6:2, 6:23, 7:8, 8:19,
8:24, 9:16, 10:18,
14:19, 16:20, 16:21,
16:25, 17:5, 20:9,
20:11, 20:19, 20:21,
20:22, 20:23, 21:9,
21:12, 21:19, 22:9,
22:16, 23:1, 23:7,
24:2, 25:10, 26:2,

26:12, 26:15, 27:14,
30:9, 31:8, 31:10,
32:13, 32:21, 33:3,
33:11, 33:13, 33:22,
34:21, 35:8, 35:12,
35:19, 35:24, 36:18,
37:1, 38:6, 38:16,
39:4, 40:23, 41:12,
41:17, 41:24, 42:5,
43:4, 43:9, 43:15,
43:20, 44:18, 44:20,
44:21, 45:12, 46:3,
46:5, 46:6, 46:13,
46:14, 46:21, 47:10,
48:10, 48:22, 49:6,
49:15, 49:24, 51:7,
51:23, 52:19, 53:7,
53:8, 54:3, 54:5,
54:21, 55:2, 56:14,
57:9, 57:18, 57:22,
58:18, 58:24, 59:1,
59:4, 59:13, 59:19,
60:1, 60:9, 61:1, 61:7,
61:19, 61:25, 62:10,
62:19, 63:1, 63:18,
64:3, 64:4, 64:7,
64:10, 64:13, 64:23,
65:13, 65:24, 66:1,
66:2, 66:14, 66:23,
67:2, 67:6, 68:6,
68:17, 68:20, 69:8,
69:17, 69:25, 74:4,
74:7, 74:12, 75:10,
75:12, 75:21, 76:1,
76:2, 76:6, 76:9,
81:11, 82:8, 82:24,
83:4, 83:16, 83:22,
84:20, 85:12, 85:15,
85:24, 86:9, 87:3,
87:10, 87:16, 87:19,
88:4, 88:5, 88:13,
88:19, 89:13, 90:2,
90:16, 90:17, 91:8,
91:12, 92:10, 95:14,
95:15, 96:2, 96:14,
103:24, 105:21,
105:25, 106:9,
106:18, 107:5,
107:13, 109:7, 109:8,
109:18, 110:24,
111:1, 111:21, 112:3,
112:7, 112:8, 112:14,
115:23, 117:13,
118:12, 118:20,
119:4, 119:6, 120:8,
120:17, 120:21,
121:1, 123:12,
123:17, 125:10,
125:13, 125:21
  **MICHEL** [1] - 1:6
  **Michel's** [10] - 21:14,

36:14, 37:10, 37:20,
50:23, 55:4, 75:13,
86:16, 104:7, 106:4
  **microphone** [4] -
72:15, 93:12, 95:10,
96:8
  **mid-2015** [1] - 46:19
  **middle** [2] - 15:11,
15:19
  **midst** [1] - 106:8
  **might** [4] - 28:18,
28:24, 91:13, 95:12
  **million** [9] - 57:23,
58:1, 92:23, 117:11,
117:14, 118:1, 118:6,
119:8, 119:12
  **millions** [1] - 34:14,
118:17
  **mind** [4] - 65:1,
75:13, 115:16, 124:20
  **mine** [2] - 35:19,
71:13
  **Minister** [3] - 42:1,
43:6, 96:2
  **minister** [2] - 43:17,
123:23
  **minutes** [2] - 71:13,
71:14
  **mislead** [1] - 68:6
  **missing** [1] - 15:13
  **misstates** [1] -
121:16
  **moment** [13] - 28:23,
50:3, 50:14, 50:15,
58:16, 76:14, 81:17,
96:1, 111:4, 111:11,
120:3, 123:3, 125:6
  **Monday** [3] - 97:6,
97:13, 97:25
  **money** [29] - 35:14,
54:14, 68:4, 68:8,
68:18, 69:16, 70:11,
70:16, 71:5, 73:24,
74:3, 74:9, 75:2, 75:8,
75:9, 82:16, 87:22,
93:17, 103:16,
105:13, 113:2,
118:14, 118:17,
119:2, 119:19,
120:16, 120:18,
120:20, 123:24
  **Monica** [2] - 106:5,
110:17
  **monies** [1] - 74:13
  **moniker** [1] - 87:8
  **month** [2] - 41:24,
110:21
  **months** [2] - 45:9,
102:7
  **Morning** [1] - 126:18

  **MORNING** [1] - 1:7
  **morning** [14] - 4:1,
4:2, 4:3, 5:7, 8:4,
14:14, 14:15, 14:24,
15:7, 15:8, 16:2, 16:3,
70:24, 71:11
  **Moskowitz** [16] -
54:11, 54:12, 54:14,
56:13, 56:14, 79:4,
79:11, 80:9, 81:7,
81:10, 81:11, 81:12,
81:13, 82:7, 82:18,
82:25
  **most** [2] - 8:24,
87:18
  **motivated** [1] - 70:1
  **motivation** [1] -
70:23
  **move** [18] - 16:4,
33:17, 39:6, 49:23,
72:11, 72:22, 73:24,
74:3, 74:9, 78:14,
79:16, 94:6, 95:12,
105:6, 105:7, 124:10,
126:14
  **moved** [1] - 75:3
  **moves** [1] - 6:9
  **movie** [1] - 55:24
  **moving** [6] - 5:1,
31:16, 32:5, 45:16,
48:7, 123:8
  **MR** [278] - 4:2, 4:3,
4:17, 7:25, 8:2, 9:20,
9:23, 10:21, 14:9,
14:14, 14:21, 14:24,
15:13, 15:22, 16:1,
16:4, 16:7, 17:9,
17:12, 17:17, 17:23,
18:2, 18:5, 18:10,
18:15, 18:18, 18:21,
18:24, 19:3, 19:9,
19:10, 19:13, 19:19,
19:22, 20:7, 21:7,
23:19, 23:24, 24:1,
24:13, 24:16, 24:21,
24:25, 25:3, 25:4,
25:11, 25:16, 25:21,
25:22, 26:18, 26:20,
26:24, 27:4, 27:8,
27:12, 27:13, 28:4,
28:16, 28:20, 28:22,
29:1, 29:5, 29:7,
29:10, 29:17, 30:4,
30:5, 31:25, 32:1,
33:15, 33:19, 33:21,
36:9, 36:11, 36:12,
38:23, 39:5, 39:10,
39:13, 39:16, 39:23,
40:7, 40:17, 40:19,
40:21, 41:1, 41:4,

41:5, 41:9, 41:11,
43:3, 44:3, 44:5,
44:13, 44:14, 46:23,
47:3, 47:6, 47:8,
49:20, 49:22, 50:1,
50:3, 50:5, 50:14,
50:20, 51:5, 51:6,
51:13, 53:16, 53:19,
54:1, 58:10, 58:14,
58:15, 59:7, 59:9,
59:10, 59:24, 59:25,
60:6, 60:7, 60:12,
60:21, 60:23, 60:24,
61:3, 61:5, 61:16,
63:17, 63:24, 64:1,
65:16, 65:21, 67:18,
67:24, 68:2, 68:11,
68:15, 69:2, 69:4,
69:6, 69:11, 69:13,
69:15, 69:23, 70:18,
71:2, 71:7, 72:2,
72:11, 72:14, 72:17,
73:2, 73:7, 73:9,
73:11, 74:17, 74:19,
75:2, 75:14, 75:18,
76:10, 76:13, 76:16,
76:19, 77:1, 77:13,
77:14, 77:20, 77:23,
78:14, 78:19, 78:21,
79:1, 79:3, 79:16,
79:18, 79:23, 80:1,
80:12, 80:15, 80:21,
80:22, 81:14, 81:21,
81:25, 82:5, 82:12,
82:15, 82:18, 82:23,
83:2, 83:7, 83:10,
84:1, 84:4, 84:9,
84:13, 84:25, 85:3,
85:19, 85:21, 86:19,
86:22, 88:10, 88:11,
89:17, 89:21, 89:23,
91:17, 91:20, 92:20,
92:22, 93:1, 93:3,
93:8, 93:10, 93:13,
93:16, 93:25, 94:3,
94:6, 94:11, 94:15,
94:19, 94:22, 95:7,
95:11, 95:18, 95:21,
96:6, 96:9, 96:11,
101:12, 102:12,
102:15, 102:20,
102:21, 104:12,
104:13, 104:20,
105:1, 105:20, 107:1,
107:3, 107:22,
107:25, 108:3, 108:5,
108:12, 108:15,
109:9, 109:11,
110:11, 110:13,
111:7, 111:11,
111:13, 113:20,

113:22, 113:24,
114:1, 114:6, 114:7,
120:3, 120:5, 121:16,
121:20, 121:22,
123:1, 123:4, 123:10,
123:20, 124:11,
124:13, 125:25,
126:15
  **MS** [1] - 29:11
  **Mulryne** [2] - 14:22,
123:18
  **MULRYNE** [46] -
1:17, 4:17, 7:25, 8:2,
9:20, 9:23, 10:21,
14:9, 14:21, 15:13,
17:12, 18:18, 23:24,
25:4, 25:11, 29:5,
33:15, 39:23, 40:7,
46:23, 50:1, 51:5,
53:16, 58:10, 59:24,
60:12, 67:18, 69:13,
69:15, 69:23, 70:18,
74:19, 78:21, 79:18,
80:15, 81:14, 82:18,
82:23, 83:2, 94:3,
102:12, 114:1,
121:16, 123:1,
123:20, 125:25
  **multiple** [1] - 8:11
  **Music** [3] - 58:3,
58:5, 58:8
  **music** [4] - 52:19,
53:1, 58:9, 66:10
  **music-related** [2] -
52:19, 66:10
  **must** [10] - 12:19,
22:9, 22:11, 32:21,
32:23, 33:5, 33:14,
49:24, 58:12, 73:5

# N

  **name** [9] - 21:4,
21:6, 52:16, 57:7,
99:2, 109:16, 115:9,
115:12, 116:6
  **named** [1] - 66:14
  **names** [1] - 52:9
  **national** [4] - 103:9,
103:12, 121:10,
123:22
  **National** [1] - 78:10
  **nature** [1] - 60:19
  **NBC** [2] - 57:9, 57:16
  **near** [2] - 27:10,
29:13
  **necessarily** [5] -
22:3, 41:18, 41:20,
49:8, 49:9

  **necessary** [8] -
31:17, 32:9, 32:13,
33:2, 45:18, 49:2,
71:4, 83:17
  **Need** [1] - 48:17
  **need** [25] - 4:21,
19:7, 19:20, 25:18,
26:13, 30:25, 32:15,
36:10, 48:13, 48:18,
48:25, 63:22, 71:6,
71:25, 72:15, 72:20,
78:16, 93:12, 105:16,
106:21, 106:25,
112:19, 123:20, 125:8
  **needed** [11] - 31:4,
45:11, 45:12, 50:8,
64:8, 68:8, 77:7,
83:22, 102:25, 106:2,
117:10
  **needing** [1] - 48:9
  **needlessly** [1] -
12:11
  **negate** [1] - 63:9
  **negative** [1] - 88:25
  **negotiate** [4] - 51:3,
52:13, 53:12, 54:16
  **negotiated** [4] - 7:5,
53:24, 54:11, 54:12
  **negotiating** [2] -
56:5, 57:9
  **negotiation** [1] -
54:18
  **negotiations** [1] -
88:24
  **neighborhood** [1] -
57:22
  **never** [12] - 44:16,
49:24, 50:12, 74:4,
74:6, 75:11, 75:24,
75:25, 76:2, 76:7,
121:6
  **new** [7] - 17:15,
31:14, 31:16, 66:6,
81:9, 83:23, 114:23
  **New** [6] - 1:15, 1:19,
21:14, 61:10, 61:11,
64:20
  **news** [1] - 42:6
  **next** [10] - 19:21,
46:13, 47:9, 49:14,
64:3, 93:22, 95:14,
97:1, 97:2, 97:6
  **Nickie** [6] - 37:2,
42:9, 43:16, 120:8,
120:14, 120:21
  **NICOLE** [1] - 1:18
  **Nicole** [1] - 14:22
  **night** [1] - 96:23
  **nonadmissible** [1] -
6:12

  **normal** [3] - 88:23,
90:22, 106:24
  **Northwest** [5] - 1:15,
1:19, 2:3, 2:7, 127:14
  **notation** [1] - 30:13
  **note** [8] - 13:21,
27:14, 27:20, 27:22,
29:20, 30:8, 31:19,
48:25
  **notebook** [24] - 5:2,
5:9, 6:5, 6:17, 8:5,
9:8, 9:12, 9:13, 10:16,
10:17, 11:2, 11:20,
11:22, 26:16, 27:15,
28:7, 28:11, 30:6,
30:8, 39:25, 45:10,
48:16, 73:3, 74:2
  **notebooks** [2] - 10:8,
68:5
  **notes** [14] - 5:21,
5:23, 6:3, 6:8, 6:9,
8:13, 8:18, 8:20, 8:21,
11:21, 26:16, 48:19,
127:5
  **nothing** [2] - 18:9,
62:20
  **noticing** [1] - 15:14
  **notwithstanding** [2]
- 34:23, 59:15
  **November** [14] -
29:18, 29:21, 30:7,
30:9, 30:13, 30:22,
31:2, 31:22, 45:10,
48:10, 49:17, 49:19,
49:20
  **number** [31] - 22:6,
24:19, 26:22, 27:3,
27:4, 29:12, 31:10,
32:14, 37:11, 37:16,
49:10, 51:7, 51:15,
51:22, 52:8, 52:18,
52:21, 53:9, 55:15,
57:7, 59:15, 63:12,
64:4, 64:12, 65:18,
73:3, 73:18, 92:25,
93:1, 107:7
  **numbers** [1] - 29:13
  **numerous** [2] -
26:15, 49:11

# O

  **oath** [2] - 10:8, 11:21
  **object** [1] - 12:24
  **objecting** [2] - 8:7,
94:5
  **objection** [30] - 4:19,
11:25, 12:4, 13:9,
13:16, 18:18, 23:24,

46:23, 51:5, 53:16,
58:10, 59:24, 60:11,
60:12, 67:18, 74:19,
76:22, 78:21, 78:23,
79:18, 79:20, 80:15,
80:18, 81:14, 94:3,
94:8, 102:12, 114:1,
121:16, 123:1
  **objections** [3] -
11:18, 11:24, 12:2
  **obligation** [1] - 36:5
  **obviously** [5] - 10:3,
10:4, 10:22, 12:7,
17:16
  **occasion** [5] - 32:24,
47:10, 58:25, 61:11,
62:3
  **occasions** [5] -
16:22, 26:15, 64:5,
64:10, 66:25
  **occur** [2] - 67:4, 98:1
  **occurred** [1] - 34:20
  **October** [4] - 50:21,
51:17, 56:3, 63:7
  **OF** [6] - 1:1, 1:3,
1:10, 1:15, 1:18, 2:2
  **offense** [1] - 6:13
  **offhand** [1] - 111:2
  **office** [11] - 63:10,
66:23, 98:4, 98:5,
98:6, 98:14, 98:15,
101:14, 101:24,
102:1, 103:8
  **OFFICES** [1] - 2:2
  **official** [4] - 100:20,
100:22, 101:3, 127:12
  **Official** [1] - 2:6
  **offshore** [1] - 74:14
  **often** [3] - 59:4,
87:18, 106:9
  **OIG** [2] - 102:23,
103:6
  **once** [5] - 62:2, 73:5,
82:6, 88:23, 90:19
  **one** [48] - 5:13, 7:20,
9:11, 10:4, 10:20,
12:15, 13:21, 17:15,
19:20, 20:12, 22:4,
22:6, 26:23, 27:9,
28:12, 32:14, 32:24,
33:10, 40:3, 40:6,
41:3, 50:3, 51:16,
53:23, 54:23, 59:21,
61:8, 61:12, 65:22,
70:6, 72:8, 75:16,
75:19, 91:6, 102:18,
106:18, 108:13,
109:7, 109:8, 110:21,
113:2, 118:19,
118:25, 119:9, 124:8,

124:18, 125:6
  **one-half** [1] - 108:13
  **ones** [2] - 5:13, 39:3
  **ongoing** [1] - 8:11
  **open** [6] - 71:10,
76:21, 77:8, 78:6,
83:9, 124:15
  **opened** [1] - 100:23
  **opening** [1] - 78:8
  **operate** [3] - 113:10,
113:13, 121:13
  **opinion** [1] - 88:5
  **opportunities** [1] -
7:12
  **opportunity** [2] -
20:3, 70:25
  **opposed** [1] - 70:15
  **opposition** [1] -
114:3
  **orally** [1] - 20:4
  **Order** [1] - 23:20
  **order** [5] - 25:9, 28:7,
29:20, 77:8, 117:25
  **original** [2] - 98:8,
103:7
  **otherwise** [2] - 62:8,
116:22
  **outdoors** [1] -
122:10
  **outside** [6] - 8:17,
67:22, 74:25, 81:19,
100:11, 123:6
  **outweighed** [1] -
12:9
  **owed** [1] - 68:4
  **own** [4] - 9:14, 14:1,
74:2, 75:24
  **owned** [1] - 58:9
  **owner(s)** [1] - 114:23
  **ownership** [4] -
107:9, 107:17,
107:20, 114:22

# P

  **P.A** [1] - 2:3
  **p.m** [2] - 80:3,
124:25
  **Page** [10] - 17:10,
17:11, 17:18, 19:19,
26:20, 28:10, 39:10,
113:23, 114:8
  **PAGE** [1] - 3:8
  **page** [18] - 19:20,
26:22, 27:19, 28:12,
40:3, 40:10, 73:3,
74:18, 105:15, 107:6,
107:12, 108:16,
108:19, 108:24,

109:10, 110:5,
113:20, 117:6
**pages** [4] - 11:2,
26:1, 30:17, 109:12
**paginated** [1] - 26:25
**paid** [1] - 46:9
**Panis** [1] - 56:23
**paper** [2] - 28:17,
29:4
**paragraph** [3] -
107:15, 115:4
**paraphrasing** [1] -
20:11
**part** [12] - 11:5,
24:11, 26:19, 54:19,
75:14, 75:20, 103:18,
116:11, 124:5, 126:3,
126:4
**participate** [2] - 81:1,
81:8
**particular** [16] - 6:7,
6:9, 6:19, 9:8, 20:16,
27:19, 33:11, 36:22,
37:22, 39:9, 45:6,
54:6, 87:17, 89:2,
89:6, 125:14
**particularly** [6] -
5:12, 12:4, 13:22,
36:20, 58:6, 70:20
**particulars** [1] -
96:16
**parties** [6] - 13:20,
53:24, 107:20,
116:16, 118:2, 125:22
**partners** [1] - 56:20
**parts** [1] - 23:9
**party** [3] - 116:3,
116:8, 116:15
**passages** [1] - 26:9
**passed** [1] - 31:7
**paternity** [1] - 97:10
**path** [1] - 71:25
**pay** [1] - 57:22
**paying** [1] - 69:8
**payments** [1] -
103:16
**pen** [3] - 25:17
**people** [3] - 22:22,
50:8, 55:16
**peppered** [1] - 4:6
**perceived** [2] -
35:23, 121:13
**perception** [2] -
35:9, 74:9
**perform** [2] - 54:6,
81:6
**performed** [2] - 6:2,
22:19
**performing** [2] -
22:4, 99:24

**perhaps** [3] - 12:16,
28:17, 70:1
**period** [17] - 37:20,
50:21, 59:5, 59:8,
59:11, 59:18, 62:4,
62:23, 62:25, 63:7,
63:11, 63:14, 63:19,
64:2, 64:5, 64:8,
64:25
**permitted** [1] - 8:17
**person** [9] - 66:20,
96:14, 96:15, 97:14,
97:20, 98:8, 98:20,
100:20, 115:11
**personal** [2] - 54:2,
70:14
**perspective** [1] -
49:1
**Pheng** [6] - 109:16,
110:23, 113:18,
115:1, 115:11, 116:19
**Phengphian** [1] -
109:15
**phone** [7] - 59:17,
65:17, 65:23, 66:5,
66:21, 86:1
**phrase** [1] - 34:24
**phrased** [1] - 70:17
**physically** [1] - 81:2
**place** [8] - 27:20,
66:14, 100:13,
100:15, 100:21,
113:1, 118:12, 118:19
**placed** [1] - 105:25
**plain** [1] - 45:14
**Plaintiff** [1] - 1:4
**plane** [1] - 35:8
**planning** [1] - 41:7
**platform** [3] - 53:1,
55:17, 55:25
**play** [2] - 103:21,
123:13
**played** [1] - 35:15
**pleased** [1] - 11:18
**point** [30] - 4:7, 9:19,
13:4, 13:14, 14:7,
17:16, 30:7, 31:1,
32:16, 39:5, 51:12,
58:12, 64:20, 66:13,
67:10, 67:25, 70:8,
70:9, 70:25, 71:4,
71:12, 74:23, 76:23,
89:18, 103:21,
107:13, 118:1,
121:18, 124:17,
125:18
**pointed** [1] - 105:24
**points** [16] - 39:2,
39:3, 87:20, 88:2,
88:13, 88:14, 88:17,

89:3, 89:7, 89:14,
90:9, 90:18, 90:22,
90:25, 91:2, 92:11
**port** [1] - 103:20
**portion** [4] - 39:21,
74:17, 123:16, 124:2
**portions** [7] - 5:8,
6:17, 23:17, 23:22,
24:6, 25:12, 26:2
**position** [2] - 33:18,
34:23
**positive** [1] - 88:25
**possible** [3] - 53:14,
53:15, 100:20
**possibly** [5] - 26:13,
35:21, 36:25, 90:11
**posting** [1] - 93:20
**potential** [2] - 11:15,
70:3
**potentially** [1] - 9:1
**power** [17] - 113:10,
113:12, 113:15,
114:10, 114:12,
114:20, 115:12,
115:14, 116:20,
116:21, 117:7,
117:18, 117:20,
117:24, 118:3,
118:23, 119:1
**powers** [1] - 117:8
**practice** [4] - 8:13,
8:17, 100:5, 100:11
**practiced** [1] - 22:21
**Prakazrel** [1] - 14:18
**PRAKAZREL** [1] -
1:6
**Pras** [7] - 52:25,
53:1, 53:5, 75:9,
84:20, 85:24, 109:18
**precipitated** [1] -
65:13
**precluded** [1] - 100:4
**precluding** [2] -
9:18, 9:21
**predominantly** [1] -
55:24
**prefer** [1] - 83:13
**prejudice** [2] - 12:8,
12:9
**prejudicial** [1] -
13:23
**presence** [4] - 67:22,
74:25, 81:19, 123:6
**present** [6] - 14:1,
23:21, 44:17, 82:8,
101:21, 106:1
**presented** [5] - 14:3,
38:10, 43:13, 45:3,
53:22
**Presents** [3] - 52:25,

53:1, 53:5
**presumably** [1] -
4:21
**pretty** [2] - 57:17,
103:4
**previous** [2] - 63:11,
83:23
**previously** [19] -
23:4, 31:13, 32:5,
32:17, 33:25, 44:21,
45:19, 46:4, 46:17,
48:22, 57:21, 58:17,
87:8, 87:17, 89:3,
90:8, 91:4, 103:7,
121:9
**PREVIOUSLY** [1] -
15:23
**primarily** [4] - 59:14,
59:15, 61:18, 61:21
**prime** [1] - 123:23
**principal** [7] -
114:12, 114:13,
114:16, 114:18,
114:19, 115:12,
115:15
**private** [1] - 100:5
**Private** [2] - 56:2,
56:8
**privilege** [1] - 36:6
**privy** [2] - 43:23,
45:4
**probative** [7] - 12:5,
12:7, 12:8, 12:14,
70:20, 82:4, 82:5
**problem** [3] - 19:8,
24:7, 124:5
**problems** [2] - 7:21,
70:3
**procedures** [1] -
11:19
**proceed** [4] - 15:18,
72:25, 73:9, 117:16
**proceedings** [19] -
14:11, 15:5, 15:17,
67:21, 71:9, 71:19,
71:23, 72:6, 72:24,
74:24, 76:20, 81:18,
83:8, 123:5, 124:14,
124:25, 125:5,
126:17, 127:6
**proceeds** [2] - 7:9,
7:10
**processed** [1] -
21:22
**produced** [2] - 127:6
**producer** [1] - 52:7
**producers** [2] -
52:22, 55:24
**production** [1] - 53:1
**prohibited** [1] -

100:12
**project** [2] - 57:20,
64:17
**projects** [7] - 7:6,
7:10, 57:5, 64:13,
66:6, 66:8, 66:11
**pronounce** [1] -
109:16
**proper** [4] - 21:6,
36:15, 68:7, 68:12
**properly** [2] - 35:25,
92:12
**proposed** [2] - 57:4,
74:3
**proprietorship** [1] -
119:15
**prosperity** [2] -
57:19, 57:20
**protection** [1] -
103:1
**provide** [5] - 55:25,
68:11, 88:24, 90:15,
116:23
**provided** [15] - 5:7,
5:13, 7:1, 39:3, 46:18,
70:6, 77:18, 87:19,
88:2, 88:17, 89:14,
90:9, 90:22, 96:14,
100:11
**providing** [5] - 46:8,
49:11, 55:7, 89:5,
105:11
**proximity** [1] - 80:10
**Public** [1] - 1:19
**public** [1] - 56:1
**publish** [5] - 74:17,
78:14, 79:2, 89:21,
94:2
**published** [7] -
40:18, 40:20, 46:20,
48:15, 79:24, 94:14,
94:16
**Publishing** [3] -
58:3, 58:5, 58:8
**publishing** [2] -
58:9, 78:16
**pull** [3] - 26:18, 95:9,
111:3
**purely** [2] - 61:23,
63:13
**purported** [1] - 85:15
**purportedly** [1] -
91:23
**purports** [1] - 91:2
**purpose** [19] - 7:9,
18:1, 18:3, 35:14,
37:14, 39:12, 39:17,
71:4, 71:25, 81:23,
81:25, 82:2, 82:10,
82:11, 82:21, 83:12,

88:12, 105:13, 106:17
  **purposes** [1] -
115:15
  **pursue** [1] - 72:12
  **pursuing** [1] - 72:10
  **put** [9] - 9:22, 33:12,
39:20, 40:5, 47:1,
56:19, 59:8, 99:18,
99:19, 108:4, 108:12,
119:8
  **putting** [6] - 48:25,
53:8, 74:13, 89:3,
89:7

---

**Q**

  **questioning** [1] -
53:17
  **questions** [27] -
6:15, 6:18, 9:4, 9:21,
10:15, 11:5, 13:3,
13:11, 13:13, 16:8,
19:25, 28:25, 36:8,
44:8, 44:12, 50:8,
60:13, 60:22, 69:7,
70:7, 77:11, 81:5,
88:8, 97:16, 102:15,
102:18, 105:12
  **quick** [1] - 124:19
  **quickly** [1] - 14:16
  **quite** [5] - 17:5,
23:11, 55:18, 59:13,
102:19
  **quote** [2] - 43:9,
43:11
  **quote-unquote** [1] -
43:9
  **quote-unquote..** [1]
- 43:11

---

**R**

  **rabbit** [1] - 70:2
  **RAE** [1] - 1:18
  **raised** [4] - 5:3, 6:14,
21:20, 21:22
  **ran** [2] - 63:19, 64:20
  **range** [1] - 55:8
  **rational** [1] - 35:17
  **RDR** [3] - 2:5, 127:3,
127:12
  **reaching** [2] - 65:13,
103:18
  **read** [21] - 4:21,
18:16, 19:11, 19:24,
20:3, 20:5, 23:8, 23:9,
23:15, 23:17, 23:23,
26:2, 27:7, 30:23,
32:11, 45:21, 45:24,

46:16, 46:19, 114:9
  **reads** [3] - 48:16,
114:20, 115:10
  **ready** [3] - 14:6,
15:18, 125:2
  **real** [4] - 70:3,
117:20, 117:23,
118:18
  **realize** [1] - 19:13
  **really** [3] - 4:22,
7:20, 122:1
  **realtime** [1] - 126:7
  **reason** [5] - 13:12,
33:8, 33:11, 68:6,
120:19
  **reasons** [3] - 13:8,
20:13, 113:2
  **recalling** [2] - 33:5,
62:13
  **receipt** [1] - 93:17
  **receive** [4] - 42:10,
42:12, 69:8, 118:5
  **RECEIVED** [1] - 3:8
  **received** [2] - 85:5,
103:3
  **receiving** [1] -
113:12
  **recess** [2] - 72:5,
126:16
  **recognize** [9] - 58:5,
89:24, 91:21, 94:23,
105:8, 108:8, 109:5,
109:8, 112:22
  **recollect** [1] - 25:19
  **recollection** [13] -
10:5, 11:19, 17:22,
18:4, 18:6, 20:1, 20:8,
25:5, 48:16, 59:19,
79:10, 111:14, 120:11
  **recommend** [1] -
48:13
  **recommendation** [2]
- 20:25, 88:25
  **recommendations**
[4] - 31:12, 31:13,
32:17, 48:7
  **recommended** [2] -
32:24, 48:1
  **record** [14] - 4:23,
5:20, 8:5, 8:6, 8:7,
10:25, 13:4, 13:20,
13:23, 20:14, 30:17,
70:15, 72:17, 76:4
  **recorded** [2] - 5:21,
28:11
  **recording** [3] -
122:16, 122:19,
122:22
  **records** [8] - 4:9,
4:12, 4:14, 4:24,

10:24, 11:3, 14:4,
74:20
  **red** [1] - 25:17
  **Red** [10] - 3:3,
113:11, 113:13,
113:16, 114:22,
114:24, 116:20,
118:4, 118:23, 119:2
  **reduce** [4] - 45:20,
45:23, 45:25, 46:2
  **reference** [10] -
27:20, 30:22, 39:18,
61:18, 64:2, 73:13,
92:23, 92:24, 96:1,
114:25
  **referenced** [3] -
21:4, 87:25, 107:10
  **references** [1] -
30:20
  **referencing** [2] -
48:4, 95:1
  **referred** [2] - 108:20,
114:13
  **referring** [3] - 98:6,
104:19, 122:5
  **reflect** [3] - 76:9,
85:5, 93:17
  **reflected** [6] - 8:14,
30:8, 68:5, 75:22,
90:17, 92:12
  **reflecting** [1] - 77:3
  **refresh** [11] - 11:19,
17:22, 18:3, 18:5,
20:8, 25:5, 48:15,
56:7, 79:9, 111:14,
120:10
  **refreshes** [1] - 20:1
  **refreshing** [1] - 10:5
  **regard** [15] - 20:12,
22:13, 24:2, 32:6,
41:12, 42:17, 54:2,
54:22, 88:22, 89:9,
89:14, 90:16, 90:20,
99:5, 107:7
  **regarding** [5] - 5:21,
27:15, 46:7, 77:16,
103:2
  **regards** [1] - 21:1
  **register** [18] - 17:1,
20:13, 22:1, 22:10,
22:11, 26:14, 31:17,
32:21, 32:23, 33:2,
33:6, 33:14, 33:23,
45:12, 48:1, 48:10,
48:13, 49:24
  **registered** [1] -
20:17
  **registering** [4] -
31:19, 32:3, 46:22,
48:13

**registration** [11] -
17:7, 20:12, 20:24,
22:20, 31:3, 45:17,
46:7, 47:20, 49:4,
49:6, 77:5
  **Registration** [4] -
16:9, 22:15, 22:22,
23:20
  **registrations** [1] -
32:8
  **regular** [1] - 8:13
  **regularly** [1] - 5:21
  **regulation** [2] -
22:18, 25:9
  **regulations** [3] -
23:11, 67:5, 100:3
  **rejected** [1] - 118:5
  **related** [10] - 7:3,
7:6, 9:16, 10:16,
51:22, 52:19, 66:10,
66:11, 78:9, 123:25
  **relating** [6] - 4:11,
5:3, 5:5, 8:23, 10:18,
40:5
  **relationship** [2] -
62:18, 69:16
  **relative** [1] - 62:4
  **relatively** [1] - 89:7
  **relevance** [12] - 51:5,
53:17, 60:12, 60:16,
67:18, 69:19, 70:3,
72:19, 74:19, 74:21,
81:15, 123:1
  **relevant** [8] - 12:5,
12:7, 12:14, 23:25,
68:21, 82:19, 87:19,
107:20
  **relied** [1] - 36:6
  **religious** [1] - 62:8
  **rely** [2] - 92:12,
106:20
  **relying** [1] - 69:8
  **remember** [28] -
41:22, 46:17, 47:1,
47:5, 48:3, 53:6,
53:15, 53:23, 54:6,
55:18, 58:11, 59:22,
61:9, 61:10, 61:11,
61:14, 98:3, 99:2,
100:9, 100:14, 101:9,
101:10, 105:2, 106:7,
111:2, 112:9, 120:9,
122:1
  **remembers** [1] -
25:13
  **remind** [1] - 110:25
  **remodeling** [1] -
67:13
  **replacement** [1] -
54:15

**report** [1] - 97:11
  **REPORTED** [1] - 2:5
  **reporter** [2] - 14:17,
16:4
  **Reporter** [2] - 2:6,
127:12
  **REPORTER** [3] -
16:6, 21:3, 40:11
  **represent** [3] -
64:23, 67:8, 90:24
  **representation** [4] -
37:17, 37:18, 55:6,
63:16
  **representative** [1] -
97:8
  **representatives** [1] -
57:3
  **represented** [1] -
36:18
  **representing** [2] -
67:2, 67:6
  **represents** [1] - 78:1
  **request** [3] - 4:8,
47:21, 62:22
  **requested** [2] - 4:11,
86:14
  **requesting** [1] - 5:18
  **required** [3] - 31:3,
31:6, 35:10
  **requirements** [2] -
46:7, 50:6
  **research** [1] - 21:24
  **researched** [1] - 5:12
  **reserve** [1] - 6:7
  **residual** [2] - 6:4,
10:23
  **resolve** [1] - 7:23
  **resolved** [3] -
118:25, 119:1, 119:10
  **respond** [1] - 8:4
  **response** [1] - 4:11
  **responsibility** [6] -
36:14, 37:4, 37:5,
38:1, 38:3, 38:4
  **rest** [5] - 9:1, 11:8,
18:17, 44:10, 60:3
  **result** [1] - 97:25
  **retain** [1] - 66:8
  **retainer** [1] - 85:16
  **retaining** [1] - 66:6
  **retired** [2] - 71:22,
125:4
  **return** [1] - 54:25,
111:8
  **returned** [1] - 103:19
  **Revenue** [1] - 55:4
  **Review** [1] - 45:24
  **review** [12] - 52:7,
57:12, 77:15, 86:9,
87:10, 90:5, 91:9,

91:12, 92:6, 106:18, 123:15, 124:4
**reviewed** [6] - 5:6, 26:8, 26:10, 87:7, 88:12
**reviewing** [2] - 55:15, 57:4
**reword** [1] - 121:19
**Rock** [9] - 113:11, 113:13, 113:16, 114:22, 114:24, 116:20, 118:4, 118:23, 119:2
**role** [2] - 35:15, 86:16
**Room** [1] - 2:8
**room** [14] - 21:17, 21:18, 21:21, 21:23, 42:24, 43:10, 43:12, 46:11, 47:10, 47:17, 47:19, 59:1, 98:22
**roughly** [1] - 71:13
**Rousseau** [7] - 68:17, 115:21, 115:24, 116:5, 116:6, 116:7, 118:13
**RU** [1] - 51:17
**Rule** [5] - 5:4, 5:24, 6:4, 10:13, 40:3
**ruled** [2] - 13:7, 40:1
**rules** [4] - 100:2, 100:3, 100:6, 100:8
**Rules** [1] - 40:2
**ruling** [5] - 6:7, 6:20, 9:7, 9:25, 13:19
**rulings** [5] - 4:7, 5:16, 9:1, 12:12, 14:4
**run** [2] - 65:12, 116:22
**running** [2] - 113:16, 119:14

**S**

**sake** [1] - 8:4
**sale** [1] - 114:24
**satisfy** [2] - 5:24, 6:4
**saw** [2] - 64:4, 77:4
**scheduled** [1] - 98:4
**scheme** [1] - 117:17
**scholarly** [2] - 26:11, 45:24
**school** [1] - 37:22
**scope** [3] - 34:15, 34:16, 119:18
**Scott** [1] - 52:6
**screen** [13] - 18:9, 19:2, 19:4, 19:6, 19:8, 29:14, 73:12, 94:18,

94:21, 95:12, 95:14, 95:17, 108:13
**scroll** [6] - 26:1, 105:5, 107:1, 107:4, 117:1, 117:6
**scrolling** [1] - 28:21
**scuttled** [1] - 117:25
**SEAN** [1] - 1:17
**Sean** [1] - 14:21
**seated** [1] - 95:8
**second** [23] - 19:7, 21:16, 21:17, 21:18, 21:21, 22:7, 27:9, 42:24, 43:9, 43:12, 43:16, 44:4, 46:11, 47:10, 47:17, 47:18, 59:1, 63:4, 67:20, 72:8, 75:16, 103:8, 108:19
**Section** [1] - 1:19
**sections** [1] - 9:7
**security** [4] - 103:9, 103:12, 121:10, 123:22
**see** [43] - 9:6, 11:4, 16:5, 18:11, 18:17, 19:4, 24:17, 26:22, 30:20, 32:11, 38:15, 51:11, 64:3, 68:24, 69:21, 71:12, 73:12, 73:15, 73:17, 73:20, 74:22, 76:1, 80:2, 82:3, 93:4, 95:13, 95:16, 95:19, 95:20, 95:22, 104:18, 105:15, 107:5, 108:6, 108:16, 108:23, 109:13, 110:14, 114:8, 114:18, 115:18, 117:2
**seeing** [1] - 63:18, 104:24, 105:2
**seem** [4] - 9:3, 58:13, 70:10, 83:3
**seminar** [1] - 100:10
**send** [2] - 57:14, 78:7
**sending** [2] - 87:10, 113:2
**sense** [3] - 36:4, 104:4, 118:23
**sent** [10] - 78:5, 84:20, 86:5, 87:1, 87:3, 88:19, 90:2, 91:13, 118:14, 118:18
**separate** [2] - 10:10, 10:12
**separately** [1] - 83:13
**September** [14] -

54:4, 110:6, 110:21, 111:14, 111:19, 111:23, 111:25, 112:3, 112:6, 112:12, 115:2, 116:4, 120:22, 122:7
**seq** [1] - 23:20
**sequence** [1] - 98:3
**series** [3] - 9:14, 77:11, 125:10
**Service** [1] - 55:4
**services** [3] - 22:4, 66:6, 85:17
**SESSION** [1] - 1:7
**session** [1] - 126:18
**set** [16] - 6:25, 7:7, 7:13, 7:15, 10:18, 15:3, 20:14, 23:11, 55:5, 82:16, 83:22, 87:17, 89:6, 97:15, 115:16, 125:16
**setting** [1] - 123:22
**settle** [1] - 15:9
**Seven** [1] - 52:14
**seven** [3] - 47:24, 71:13, 92:23
**several** [1] - 10:4
**Shah** [1] - 56:23
**shall** [3] - 114:10, 114:11, 114:20
**shared** [4] - 63:10, 74:4, 74:6, 75:12
**shareholder(s** [1] - 114:23
**shares** [1] - 114:24
**shell** [1] - 82:16
**shifted** [1] - 61:21
**short** [1] - 110:21
**shortly** [3] - 46:12, 119:4
**show** [20] - 18:19, 18:20, 24:7, 24:14, 40:4, 51:6, 76:11, 77:20, 84:1, 91:17, 92:20, 103:21, 104:12, 104:20, 107:12, 107:22, 108:2, 112:19, 123:16, 124:9
**showed** [2] - 75:25, 89:17
**showing** [5] - 18:12, 19:1, 73:6, 79:9, 103:22
**shown** [5] - 18:25, 19:1, 24:18, 25:23, 89:18
**sic** [1] - 81:2
**side** [11] - 52:22, 67:1, 100:5, 100:12,

103:23, 108:14, 110:12, 121:23, 121:24
**sidebar** [4] - 67:22, 74:25, 81:19, 123:6
**sides** [1] - 103:22
**sign** [2] - 101:5, 106:1
**signatories** [4] - 105:14, 107:10, 108:25, 120:6
**signatory** [6] - 107:18, 107:21, 109:12, 109:23, 110:1, 120:7
**signature** [9] - 105:18, 109:24, 114:9, 115:9, 115:25, 116:5, 116:6, 116:9, 116:12
**signed** [8] - 109:15, 110:4, 110:16, 110:17, 114:16, 115:20, 117:10, 120:20
**significant** [5] - 68:5, 117:20, 117:24, 118:17, 123:16
**significantly** [3] - 34:17, 99:10, 99:12
**signing** [3] - 101:7, 106:5, 115:13
**sincerely** [1] - 100:14
**single** [2] - 23:17, 61:14
**sit** [2] - 15:6, 44:25
**six** [6] - 45:9, 47:24, 59:19, 62:13, 62:20, 101:19
**Skeddle** [1] - 8:9
**small** [1] - 27:7
**social** [3] - 61:24, 62:15, 63:13
**socially** [1] - 59:1
**sold** [1] - 116:22
**sole** [1] - 119:14
**someone** [5] - 35:20, 36:24, 47:23, 98:11, 98:17
**someplace** [1] - 90:10
**sometime** [2] - 28:5, 117:19
**sometimes** [2] - 64:14, 64:16
**somewhat** [3] - 52:1, 52:18, 120:19
**somewhere** [1] - 57:22

**songwriters** [1] - 52:22
**sorry** [40] - 8:2, 17:23, 18:14, 18:24, 21:3, 23:13, 26:25, 27:24, 28:1, 28:13, 29:23, 31:25, 32:18, 36:9, 38:20, 38:22, 40:11, 40:19, 49:20, 52:11, 59:7, 60:3, 65:16, 81:12, 84:5, 84:12, 93:13, 94:19, 96:10, 99:11, 100:24, 106:14, 107:19, 109:2, 109:16, 112:2, 116:18, 119:16, 120:8, 122:14
**sort** [1] - 70:14
**sound** [2] - 76:3, 115:16
**sounded** [1] - 103:11
**sounds** [1] - 123:7
**speaking** [5] - 30:2, 47:24, 57:7, 98:16, 98:17
**specific** [18] - 25:11, 25:12, 26:9, 38:8, 44:9, 46:17, 49:23, 52:16, 60:15, 63:22, 76:13, 100:9, 124:1, 124:2, 124:7, 125:9, 126:4, 126:8
**specifically** [7] - 10:24, 44:23, 48:4, 52:10, 62:22, 100:4, 100:17
**spell** [1] - 21:4
**spelling** [1] - 21:6
**spend** [1] - 22:24
**sponte** [1] - 13:22
**sporting** [1] - 63:13
**spring** [1] - 32:25
**stamped** [2] - 39:11, 40:10
**stand** [6] - 11:25, 14:5, 39:24, 50:16, 50:19, 69:24
**standard** [1] - 89:7
**standardized** [1] - 89:4
**standing** [1] - 95:8
**stands** [2] - 5:20, 12:1
**start** [5] - 4:8, 39:10, 59:21, 83:17, 83:22
**started** [2] - 64:22, 67:8
**starting** [3] - 17:18, 32:2, 70:21
**starts** [3] - 11:25,

19:19, 75:3
**state** [1] - 75:12
**statement** [5] -
39:25, 46:8, 90:20,
121:12, 126:3
**statements** [2] - 5:5,
11:20
**STATES** [3] - 1:1,
1:3, 1:11
**States** [4] - 2:6,
14:18, 42:21, 127:13
**statute** [6] - 16:12,
23:7, 25:23, 26:6,
45:21
**stay** [1] - 112:15
**stenographer** [5] -
35:12, 37:12, 38:5,
38:7, 38:16
**stenographic** [1] -
127:5
**steps** [1] - 67:15
**still** [9] - 37:3, 45:1,
45:11, 54:24, 64:6,
69:20, 99:21, 99:24,
118:21
**stipulate** [1] - 4:14
**stipulation** [1] - 4:11
**stipulations** [1] -
4:21
**stood** [1] - 12:23
**stop** [2] - 107:5,
117:2
**stopped** [8] - 15:11,
15:19, 17:2, 17:6,
17:7, 20:17, 20:18,
103:19
**stopping** [1] - 124:22
**straight** [1] - 20:14
**Street** [2] - 46:15,
46:20
**Streets** [1] - 51:18
**stretch** [1] - 50:17
**strictly** [1] - 8:23
**strokes** [1] - 55:22
**strongly** [7] - 31:1,
32:3, 32:15, 45:15,
48:13, 48:18, 49:1
**structure** [1] - 56:22
**study** [2] - 22:15,
22:17
**sua** [1] - 13:21
**subject** [3] - 84:18,
86:1, 87:5
**submission** [2] - 5:6,
5:12
**subscribed** [1] -
115:12
**Subsection** [2] - 5:4,
5:24
**subsequent** [1] -

119:7
**subsequently** [1] -
91:13
**substantially** [1] -
12:9
**Sudan** [2] - 56:16,
61:12
**sufficient** [2] - 11:1,
118:24
**suggest** [1] - 126:1
**suggested** [4] -
22:11, 26:11, 47:20,
54:14
**suggesting** [3] -
30:1, 52:17, 106:13
**suggestion** [2] -
28:15, 70:24
**Suite** [1] - 1:16
**summaries** [4] -
4:12, 4:17, 4:25
**summary** [1] - 4:10
**summer** [5] - 21:14,
32:25, 45:19, 99:15,
99:16
**summertime** [1] -
31:7
**sums** [1] - 103:16
**Sun** [3] - 42:1, 43:6,
96:3
**sun** [2] - 44:17,
44:20
**Sunday** [1] - 97:4
**Super** [2] - 57:10,
57:23
**support** [2] - 75:17,
75:18
**supposed** [5] - 45:3,
67:6, 97:10, 98:6,
104:24
**sustain** [1] - 76:22
**sustained** [1] - 13:9
**swayed** [1] - 58:20
**switch** [1] - 58:16
**SWORN** [1] - 15:23

---

**T**

---

**Taek** [1] - 85:16
**tainted** [1] - 71:5
**Talent** [1] - 92:3
**target** [1] - 68:18
**tasked** [1] - 91:1
**tax** [1] - 54:24
**taxes** [1] - 54:21
**technical** [1] - 99:20
**telephone** [7] -
66:19, 72:20, 97:14,
97:20, 97:21, 97:23,
98:13

**ten** [2] - 124:18,
125:2
**Tenders** [1] - 25:3
**tenders** [1] - 29:11
**tens** [2] - 34:13,
118:17
**term** [2] - 61:3, 99:20
**terminate** [1] -
114:11
**terms** [27] - 6:11,
6:21, 7:23, 9:11, 9:18,
10:10, 10:18, 10:22,
11:8, 25:7, 39:2,
39:21, 40:1, 40:2,
68:22, 68:24, 70:6,
70:23, 72:9, 81:22,
82:3, 83:17, 103:22,
104:3, 106:16,
106:24, 125:11
**testified** [16] - 8:16,
16:21, 20:21, 33:25,
39:24, 58:11, 58:17,
69:15, 69:18, 69:23,
70:7, 89:2, 101:1,
119:11, 121:9, 123:21
**testify** [2] - 20:8,
42:14
**testifying** [1] -
120:23
**testimony** [15] - 6:6,
8:12, 10:8, 11:1,
11:23, 18:6, 21:8,
29:22, 29:24, 35:23,
37:19, 39:20, 43:24,
44:16, 44:19
**text** [1] - 33:3
**THE** [226] - 1:1, 1:10,
1:14, 1:21, 2:2, 3:4,
4:1, 4:4, 4:20, 8:1,
8:22, 9:21, 10:2, 11:4,
14:12, 14:15, 14:23,
15:2, 15:6, 15:8, 15:9,
15:14, 15:18, 16:6,
17:13, 17:15, 17:21,
17:25, 18:3, 18:8,
18:9, 18:12, 18:14,
18:17, 18:19, 18:23,
18:25, 19:6, 19:12,
19:15, 19:17, 19:18,
19:20, 19:23, 20:2,
20:3, 20:5, 20:6, 21:3,
21:5, 24:4, 24:14,
24:17, 24:24, 25:2,
25:7, 25:12, 25:18,
26:19, 26:22, 27:2,
27:5, 27:9, 28:3,
28:15, 28:17, 28:21,
28:24, 29:3, 29:6,
29:9, 29:12, 29:15,
30:2, 31:24, 33:17,

36:8, 36:10, 38:21,
38:22, 39:7, 39:11,
39:14, 39:19, 40:1,
40:8, 40:11, 40:13,
40:16, 40:18, 40:20,
40:22, 41:2, 41:7,
43:1, 44:2, 44:7,
46:25, 47:4, 49:19,
49:21, 50:2, 50:4,
50:16, 51:9, 53:18,
53:20, 53:23, 58:12,
59:5, 59:8, 60:2,
60:10, 60:17, 60:22,
61:2, 61:4, 61:6, 63:4,
63:6, 63:21, 65:15,
65:17, 67:19, 67:23,
67:25, 68:9, 68:13,
68:22, 69:3, 69:5,
69:9, 69:12, 69:14,
69:21, 70:5, 70:19,
71:3, 71:8, 71:11,
71:20, 71:24, 72:4,
72:7, 72:8, 72:12,
72:15, 72:22, 72:25,
73:5, 73:8, 73:10,
74:22, 75:1, 75:11,
75:16, 75:23, 76:12,
76:15, 76:17, 76:22,
77:11, 78:12, 78:16,
78:22, 79:2, 79:14,
79:15, 79:19, 80:17,
81:16, 81:20, 81:22,
82:2, 82:10, 82:14,
82:17, 82:22, 83:1,
83:3, 84:3, 84:5, 84:8,
84:11, 85:2, 86:21,
88:8, 89:16, 89:20,
91:19, 92:21, 92:25,
93:2, 93:7, 93:12,
93:15, 94:4, 94:8,
94:13, 94:17, 95:9,
95:12, 95:19, 96:7,
101:8, 101:10,
102:14, 102:17,
104:23, 105:16,
105:17, 107:24,
108:1, 111:6, 114:2,
120:4, 121:18, 123:2,
123:7, 123:18, 124:5,
124:12, 124:16,
125:1, 125:6, 126:1
**theatrical** [1] - 55:23
**thereabouts** [1] -
77:16
**therefore** [1] - 6:8
**therein** [1] - 115:16
**Thereupon** [6] -
14:10, 15:16, 71:22,
72:5, 125:4, 126:16
**they've** [2] - 9:9,

126:5
**thinking** [2] - 75:25,
76:6
**third** [1] - 44:22,
90:21
**Thompson** [1] -
51:20
**thorough** [2] - 5:12,
5:18
**thoughts** [1] - 74:2
**three** [1] - 12:21
**Thursday** [9] - 15:11,
16:8, 17:24, 37:10,
38:11, 43:13, 85:6,
102:13, 103:5
**tie** [2] - 53:18, 60:13
**tie-up** [1] - 60:13
**tied** [1] - 53:21
**tighter** [1] - 126:10
**timeframe** [6] -
42:16, 43:14, 63:11,
64:21, 79:7, 79:12
**timeline** [1] - 64:22
**timing** [1] - 63:22
**today** [5] - 18:7,
45:1, 90:12, 120:13,
124:21
**together** [4] - 31:9,
56:19, 88:12, 120:22
**tomorrow** [1] -
124:22
**tonight** [1] - 86:13
**took** [8] - 27:20,
34:13, 38:3, 54:19,
100:15, 100:21,
113:1, 118:12
**top** [4] - 32:10, 58:4,
107:1, 117:1
**total** [2] - 114:22,
119:11
**totality** [1] - 6:5
**totally** [3] - 5:4,
10:10, 28:21
**towards** [3] - 27:21,
48:23, 123:8
**tracks** [1] - 58:16
**Trading** [4] - 77:17,
78:3, 93:18, 95:2
**transactions** [1] -
83:19
**TRANSCRIPT** [1] -
1:10
**transcript** [14] -
17:10, 17:23, 122:24,
123:14, 123:20,
124:2, 124:7, 125:8,
125:18, 125:23,
126:2, 126:9, 127:5,
127:6
**transfer** [1] - 93:20

**transpired** [1] - 118:8

**travel** [2] - 49:10, 115:23

**traveled** [8] - 17:2, 31:7, 31:9, 31:10, 42:3, 42:14, 61:7, 118:11

**traveling** [8] - 41:17, 41:19, 42:13, 43:20, 44:21, 47:21, 59:13, 105:25

**travels** [1] - 42:11

**tremendous** [4] - 35:11, 42:10, 106:12, 106:15

**TRIAL** [1] - 1:10

**trip** [11] - 43:16, 44:3, 44:4, 47:11, 47:13, 96:1, 97:6, 101:1, 115:24, 122:9, 125:12

**trips** [5] - 30:24, 32:12, 34:13, 42:3, 44:23, 126:5

**true** [8] - 35:2, 35:13, 37:14, 49:24, 67:11, 105:24, 127:4, 127:5

**trust** [3] - 117:11, 119:20, 120:16

**trusted** [1] - 35:20

**truth** [2] - 37:6, 37:18

**try** [1] - 120:22

**trying** [13] - 14:2, 42:17, 42:20, 60:10, 61:6, 68:1, 68:2, 69:6, 78:6, 82:3, 88:5, 97:8, 103:21

**Tuesday** [1] - 98:7

**turn** [1] - 30:16

**Twenty** [1] - 52:14

**twice** [1] - 62:2

**two** [19] - 4:12, 7:11, 7:14, 8:24, 21:2, 36:17, 43:1, 81:1, 81:5, 103:22, 110:9, 110:14, 112:6, 113:2, 113:3, 118:15, 118:19, 118:25, 121:23

**Tycoon** [1] - 92:3

**typed** [1] - 116:5

**typical** [1] - 87:21

# U

**U.S** [3] - 1:15, 1:18, 75:5

**ultimately** [3] - 68:3,

117:12, 117:25

**unacceptable** [1] - 117:18

**unclear** [1] - 9:24

**under** [17] - 8:7, 10:7, 10:12, 11:21, 22:5, 22:19, 31:3, 32:21, 33:14, 33:23, 49:6, 49:25, 50:9, 94:20, 116:5, 116:20

**undercover** [1] - 121:14

**undersigned** [1] - 115:10

**understood** [4] - 7:12, 9:23, 10:21, 91:12

**undue** [1] - 12:9

**unduly** [1] - 13:23

**unfortunately** [1] - 58:22

**unidentified** [1] - 15:16

**UNIDENTIFIED** [1] - 17:14

**UNITED** [3] - 1:1, 1:3, 1:11

**united** [1] - 2:6

**United** [3] - 14:18, 42:21, 127:13

**unlawful** [1] - 33:23

**unlawfully** [1] - 7:16

**unless** [4] - 11:25, 13:11, 41:7, 76:5

**unquote** [1] - 43:9

**unquote..** [1] - 43:11

**unrelated** [2] - 50:22, 69:18

**up** [49] - 7:8, 7:15, 7:22, 11:14, 12:23, 14:12, 18:23, 19:1, 19:12, 19:24, 21:1, 21:9, 21:11, 21:13, 25:17, 26:18, 27:6, 27:21, 31:6, 33:10, 34:11, 34:18, 47:22, 48:22, 53:18, 53:21, 60:13, 61:13, 65:22, 67:16, 68:13, 68:15, 69:21, 75:19, 82:16, 83:22, 94:17, 99:21, 100:23, 104:14, 107:1, 108:4, 108:12, 111:3, 121:9, 123:22, 125:16, 125:21

**uses** [1] - 115:15

# V

**vacation** [1] - 106:9

**value** [3] - 12:8, 82:4, 82:5

**various** [9] - 4:6, 7:9, 13:7, 14:4, 52:9, 55:16, 106:10, 126:5

**vault** [1] - 28:1

**Ventura** [1] - 1:23

**verify** [1] - 106:3

**Version** [3] - 110:1, 110:7, 121:23

**version** [1] - 110:6

**versus** [1] - 14:18

**Vice** [1] - 43:6

**vice** [1] - 43:17

**view** [1] - 69:9

**vigilant** [1] - 14:2

**violate** [2] - 35:1, 35:9

**violating** [1] - 36:4

**violation** [4] - 23:1, 35:6, 37:24, 38:1

**visit** [3] - 21:16, 96:16, 125:12

**visited** [1] - 55:4

**voice** [1] - 107:19

**voluntarily** [2] - 68:19, 115:15

**vs** [1] - 1:5

# W

**W-E-N-G-U-I** [1] - 21:5

**wait** [3] - 7:22, 19:7, 69:21

**Wall** [2] - 46:15, 46:20

**wants** [4] - 10:25, 82:20, 82:24, 124:1

**warrant** [1] - 49:3

**warranted** [1] - 49:5

**Washington** [6] - 1:6, 1:16, 1:20, 2:4, 2:8, 127:14

**ways** [5] - 10:4, 13:8, 13:15, 14:4, 126:5

**Wednesday** [2] - 97:12, 98:7

**week** [6] - 8:1, 13:3, 16:8, 16:15, 98:7, 119:11

**weekend** [1] - 4:5

**weeks** [3] - 102:7, 102:8

**weighed** [1] - 12:15

**well-researched** [1] - 5:12

**Wengui** [9] - 21:1, 21:13, 22:14, 31:16, 33:2, 36:24, 42:21, 42:23, 43:8

**West** [1] - 59:14

**white** [4] - 11:10, 11:13, 116:13, 126:14

**whole** [10] - 5:19, 9:7, 9:13, 39:7, 53:16, 55:8, 59:18, 71:4, 124:20, 125:10

**wife** [1] - 67:13

**willfulness** [2] - 6:24, 8:25

**willing** [3] - 68:6, 101:23, 101:25

**wire** [2] - 93:18, 95:2

**wise** [1] - 78:1

**wish** [1] - 77:12

**with..** [1] - 42:8

**withdraw** [2] - 44:15, 98:21

**witness** [31] - 11:15, 15:10, 16:5, 17:11, 18:20, 19:15, 23:21, 24:5, 25:1, 25:3, 29:8, 29:11, 69:15, 71:22, 73:3, 73:6, 77:21, 80:13, 84:1, 84:25, 92:20, 95:20, 104:12, 104:20, 115:10, 115:25, 116:4, 116:8, 116:12, 123:10, 125:4

**WITNESS** [17] - 15:23, 18:9, 18:14, 19:17, 20:2, 20:5, 21:5, 29:15, 38:22, 49:21, 53:23, 61:6, 63:6, 65:17, 79:15, 101:10, 105:17

**WITNESSES** [1] - 3:4

**witnessing** [1] - 116:9

**woman** [1] - 98:10

**word** [2] - 38:6, 61:21

**words** [1] - 17:3

**world** [2] - 36:20, 57:19

**write** [3] - 4:22, 33:3, 120:1

**writing** [13] - 33:5, 33:12, 35:13, 37:13, 38:16, 39:21, 40:5, 40:23, 45:20, 45:23, 45:25, 46:2

**writings** [1] - 39:18

**written** [6] - 29:21,

29:25, 88:14, 91:1, 103:1, 115:9

**wrote** [2] - 8:23, 31:23

**WuTang** [2] - 87:5, 87:8

# Y

**year** [6] - 31:14, 31:16, 54:23, 61:2, 61:4, 79:14

**years** [4] - 36:19, 63:11, 64:10, 65:18

**York** [6] - 1:15, 1:19, 21:15, 61:10, 61:11, 64:20

**yourself** [6] - 14:20, 19:11, 19:24, 23:6, 35:24, 110:23