**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 1:19-cr-148** |
| | ) | |
| **PRAKAZREL MICHEL,** | ) | |
| **LOW TAEK JHO** | ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL &
MOTION FOR EXPEDITED RULING ON FINDING OF WAIVER OF
ATTORNEY-CLIENT PRIVILEGE**

After hearing five weeks of evidence, including the defendant's own testimony, and seeing hundreds of exhibits, the jury found the defendant guilty on all ten counts stemming from his efforts to funnel foreign money into the United States to influence a Presidential election in 2012, and to wage an illegal back-channel lobbying campaign in 2017.  The defendant now asks the Court to unsettle the jury's verdict alleging a litany of errors by the Court, the government, and trial counsel.  Because the defendant has not asserted a basis for a new trial, his Motion should be denied.

**STANDARD OF REVIEW**

Rule 33 authorizes a court to vacate a judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A defendant "is entitled to a fair trial but not a perfect one, for there are no perfect trials."  *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (quotations and citations omitted).  "[G]ranting a new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'"  *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)).  A motion for new trial is "committed to the sound discretion of the trial judge."  *United States v. Reese*, 561 F.2d 894, 902 (D.C. Cir. 1977).  Motions for new

1

trial are "not favored and are viewed with great caution." *United States v. Borda*, 786 F. Supp. 2d 25, 31 (D.D.C. 2011) (quoting *United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004) (citations omitted)).   Contrary to the Government's burden at trial to prove guilt beyond a reasonable doubt, the defendant bears the burden of proof under Rule 33 to demonstrate that a new trial is warranted.  *Reese*, 561 F.2d at 902.

## ARGUMENT

I.   **Trial counsel opened the door to the introduction of the Crime-Fraud Order, and its introduction was not error.**

Defendant first argues that the court erred by allowing the government to make brief reference to a pretrial Crime-Fraud Order when cross-examining a defense witness.  Mot. at 5-7. As its first witness, the defendant called Department of Justice – Office of the Inspector General Assistant Special Agent in Charge Harry Lidsky.  Throughout the course of his direct examination, counsel repeatedly asked Agent Lidsky about his investigation, and implied, or directly stated, that the investigators had improperly intruded upon the defendant's attorney-client privilege with George Higginbotham, his attorney.  In one instance, trial counsel asked about Agent Lidsky's review of the results of an e-mail search warrant for both Michel and Higginbotham:

> Q. **And do you recall after reviewing those documents that came back from that search warrant your belief that Mr. Higginbotham had often represented that he was Mr. Michel's lawyer?**
> A. I'm sorry. Could you ask me that one more time, please?
> Q. Yeah. After reviewing what you got back from the search warrant, **you became aware that Mr. Higginbotham often or frequently referenced himself as Mr. Michel's attorney**. Correct?
> A. I'm not sure I'd characterize it as "often" or "frequently." There was enough of an inference that they did have a potential attorney-client relationship where I took appropriate steps to ensure I stayed far clear and above the attorney-client privilege that would exist.
> Q. **So after you had read all of the Google search materials, you decided that you needed to do something to avoid interfering with the attorney-client relationship**?
> A. It was prior to reading the material --
> Q. Okay.
> A. -- that we took those steps.

2

Q. Well, what did you do?

A. We established a taint team or filter team that is a separate team of either attorneys or investigators or both that would look through the material, determine if there was any privileged material; and if there was, come up with a plan to address that, which is what we did in this case.

Q. Did you ever raise the subject with Mr. Higginbotham about privilege?

MR. KELLER: Objection, your Honor. Relevance as to this line of questioning.

Tr. 4/17 PM at 13-14.  At this point, during a bench conference, the Court reiterated a prior ruling

that there was no attorney-client privilege between Higginbotham and Michel.  *Id.* at 15.  Shortly

thereafter, trial counsel then asked Agent Lidsky about a notebook belonging to Higginbotham,

again asking questions implying the investigation had improperly intruded upon the defendant's

attorney-client privilege:

> Q. **Did you tell border patrol to stop Mr. Higginbotham because you had learned that he had a notebook in his possession regarding attorney-client issues and house renovations? Is that why you had them stop him, to get that notebook?**
>
> A. I do recall Mr. Higginbotham having a notebook and referring to it in one or both of the July interviews. I would have likely pointed that out to Customs. I certainly would not have pointed it out as it has attorney-client material and I need it. If I flagged it might contain attorney-client material, it would be for them and certainly me to avoid it.
>
> Q. So your testimony is that you didn't obtain a copy of that notebook as a result of the border stop that you arranged for Mr. Higginbotham on September 7th of 2017?
>
> A. I don't recall obtaining a copy of the notebook, no.
>
> Q. Do you recall ever having read it?
>
> A. The notebook? Not at that time. I do not.
>
> Q. Do you recall reading it at any time?
>
> A. I obtained it later in the investigation when I confronted Mr. Higginbotham, executed a number of consent searches. He turned it over at that time. But because of the attorney-client privilege issue, it went to the filter team. It did not come to me directly. I received pieces of it later that were deemed relevant and non-privileged.
>
> Q. **Is it your testimony that you have never looked at the entirety of the Mr. Higginbotham notebook, that things were deleted from it before you saw it, that they were deleted by a filter team? Is that your testimony?**
>
> A. That's correct. They weren't deleted, per se. They were photocopies of relevant material that was in scope, if it was a warrant, or relevant to the investigation that were not personal and certainly non-privileged were released to the investigative team.
>
> Q. And that included the entire 59 pages of the notebook. Correct?
>
> A. If there was nothing privileged in there, then it would have.

Tr. 4/17 PM at 24-25.  Of course, as defense counsel was well-aware, there was nothing improper about Agent Lidsky's review of communications between Michel and Higginbotham or Higginbotham's notebook, as a separate court had issued an order finding the crime-fraud exception applied, authorizing the review of the subject communications and records (hereinafter "Crime-Fraud Order").

Under the "curative admissibility" doctrine, the introduction of inadmissible or irrelevant evidence by one party justifies or "opens the door to" admission of otherwise inadmissible evidence. *United States v. Brown*, 921 F.2d 1304, 1307 (D.C. Cir. 1990) (citations omitted); *see also Hemphill v. New York*, 595 U.S. 140, 152 (2022) ("[The door-opening principle] is a substantive principle of evidence that dictates what material is relevant and admissible in a case."). "[T]he principle requires a trial court to determine whether one party's evidence and arguments, in the context of the full record, have created a 'misleading impression' that requires correction with additional material from the other side." *Hemphill*, 595 U.S. at 152.  "Introduction of otherwise inadmissible evidence under shield of [curative admissibility] is permitted 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.'" *United States v. Winston*, 447 F.2d 1236, 1240 (D.C. Cir. 1971).

This can extend to the limited use of, or reference, to prior judicial orders.  When the use of prior judicial orders has been limited to specific purposes, with appropriate limiting instructions, courts have not found error in the admission of such evidence. *See United States v. Hassanshahi*, 195 F.Supp.3d 35, 43 n.5 (D.D.C 2016) (admitting an opinion from a prior proceeding involving the defendant given the government's guarantees that it would not introduce "the portions that discuss[ed] the factual background of the case[,]" and "[a]ny concerns about the jury's use of evidence . . . can be accommodated through an appropriate limiting instruction"); *United States v.*

*Davis*, 183 F.3d 231, 255-56 (3d Cir.), *amended*, 197 F.3d 662 (3d Cir. 1999) (finding district court did not abuse discretion in permitting cross-examination that elicited that the defendant had been convicted by police department for the same conduct for which he was on trial); *United States v. Gonzalez*, 905 F.3d 165, 197-98 (3d Cir. 2018) (affirming admission of judicial order when it was not offered for the truth of the findings contained therein, and the court issued limiting instructions for its use).

But when parties seek to introduce substantial portions of orders containing prior judicial factfinding, courts have found this to usurp the role of the jury as factfinder. *Moore v. Hartman*, 102 F. Supp. 3d 35, 144 (D.D.C. 2015) (affirming exclusion of Rule 29 memorandum opinion in related criminal trial from subsequent civil proceeding on Rule 403 grounds); *Hairston v. Washington Metro. Area Transit Auth.*, No. CIV. 93-2127(TFH/DAR, 1997 WL 411946, at *1-*2 (D.D.C. Apr. 10, 1997) (excluding judicial findings of fact from unrelated civil litigation as hearsay and unfairly prejudicial). *But see United States v. Sine*, 493 F.3d 1021, 1034 (9th Cir. 2007) ("Our determination that reference to facts found in a judicial opinion can unfairly prejudice a party does not mean that admission of such facts will always fail the balancing test of Rule 403.").[1]

---

[1]  The defendant relies heavily on a three-paragraph, per curiam state court opinion in support of its position of error. *See* Mot. at 10-11 (citing *People v. Hudson*, 123 Mich. App. 624, 625 (1982)). But even subsequent Michigan appellate court opinions have narrowed the scope of *Hudson* and cast doubt on its broad pronouncement of error. *See, e.g., People v. Christianson*, No. 359421, 2023 WL 5313032, at *4-*5 (Mich. Ct. App. Aug. 17, 2023) (distinguishing *Hudson* and finding no error when trial court instructed jury that it should not consider legality of stop, and that probable cause to arrest is a much lower standard of proof than beyond a reasonable doubt); *People v. Erquhart*, No. 339281, 2019 WL 573369, at *4-*5 (Mich. Ct. App. Feb. 12, 2019) (distinguishing *Hudson* and finding no error in prosecutor's admission of prior protective order against defendant); *People v. Davidson*, No. 295597, 2011 WL 1450655, at *3 (Mich. Ct. App. Apr. 14, 2011) (distinguishing *Hudson* and finding no error when, on cross-examination, prosecutor elicited that additional charges had been added after the preliminary examination); *People v. Moss*, No. 190968, 1997 WL 33350507, at *1 (Mich. Ct. App. May 2, 1997)

Here, given defense counsel's extensive and repeated questioning of Agent Lidsky at multiple points through his examination about purported improper review of documents and communications, the government's subsequent limited cross-examination of Agent Lidsky served only to correct the misimpression left with the jury that such a review was improper, or unauthorized:

> Q. **Mr. Kenner also asked you about attorney-client privilege and about whether some notes of Mr. Higginbotham's were privileged and what steps you took to either review or not review privileged documents. Do you remember those questions**?
> A. I do.
> Q. The filter team, the Government filter team in this case, obtained a crime fraud order from a judge ruling that because there was probable cause to believe that Mr. Michel involved Mr. Higginbotham in criminal activity, there was no valid attorney-client privilege –

Tr. 4/17 PM at 43. The brief questioning on this topic was not designed, nor conveyed to the jury to be, anything other than a correction to the "misleading impression" created by trial counsel. *See Hemphill*, 595 U.S. at 152. The mention of, and basis for, the Crime-Fraud Order was necessary to remediate any harm caused by defense counsel's own questioning. And at no point was the actual Crime-Fraud Order or the underlying Memorandum Opinion entered into evidence or shown to the jury.

The Court also provided a detailed curative instruction the following day explaining the circumstance surrounding the Crime-Fraud Order and the differences in the levels of proof required between obtaining a Crime-Fraud Order and the jury's duty at trial. Tr. 4/18 AM at 48-50. The Court also specifically instructed, in part, that "you may not find that Mr. Michel committed any element of the offense, simply because another judge found that probable cause existed to believe that a particular fact was true at that time based on evidence that the government

---

(distinguishing *Hudson* and finding no error when the trial court instructed the jury regarding the process by which criminal charges are brought).

had provided to that particular judge." *Id.* *See United States v. Crews*, 856 F.3d 91, 97 (D.C. Cir. 2017) ("We generally presume that 'a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it' absent 'an overwhelming probability that the jury will be unable to follow the court's instructions.'") (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).

Even if it was error to allow the testimony that briefly referenced the Crime-Fraud Order, any such error was harmless. *See* Fed. R. Crim. P. 52(a). There was substantial evidence indicating the defendant's guilt and the government made no further use or mention of the crime-fraud order. *See United States v. Brown*, 921 F.2d 1304, 1308 (D.C. Cir. 1990) (introduction of inadmissible hearsay was harmless because of substantial evidence of guilt and government "made no further use of the hearsay testimony").

## II.     The Court did not plainly err in ruling statements were admissible under the co-conspirator exception in the jury's presence.

Like many other of defendant's complaints, trial counsel made no objection to the Court's rulings regarding the admission of statements or documents under Federal Rule of Evidence 801(d)(2)(E), also known as the "co-conspirator exception." Failure to raise an objection at trial results in the forfeiture of the objection, yielding review only under the more forgiving "plain error" standard. *United States v. Wilson*, 605 F.3d 985, 1022 (D.C. Cir. 2010); *United States v. Canty*, 37 F.4th 775, 790 (1st Cir. 2022) (citing and quoting *United States v. Brandao*, 448 F. Supp. 2d 311, 318 (D. Mass. 2006) ("[I]t is not unprecedented for a trial court to apply the plain error standard to an objection raised for the first time in a post-trial motion, because at that stage, the court 'performs something of an appellate role.'")). To establish plain error, the defendant must show there was "(1) a legal error that was (2) 'plain' (a term that is synonymous with 'clear' or 'obvious'), and that (3) affected [their] substantial rights." *Wilson*, 605 F.3d at 1022. Even when

plain error is demonstrated, reversal is appropriate only if "(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* The defendant "bears the burden of proving each element under this standard." *Id.*

The district court did not err, let alone clearly or obviously err, in making evidentiary rulings through trial. Other courts that have addressed this issue have not found reversible error when a trial judge's evidentiary rulings regarding the admissibility of co-conspirator statements, or the existence of a conspiracy, were made in the presence of the jury. In *United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993), the Court told the jury shortly after trial began that, "we'll get to the point eventually where I will be telling you if the government proves a conspiracy" and that he was permitting certain statements from witnesses at trial conditionally and that "if the magic moment comes and the government's able to prove the conspiracy," he would inform the jury that the necessary connection had been established and that the jury could consider the conditionally admitted statements. *Id.* at 1199-1200. At the close of evidence, the judge informed the jury that "the magic moment ha[d] arrived," and the jury could consider the statements. *Id.* at 1200. The Second Circuit found no reversible error, noting, among other things, that the jury had been instructed at the close of evidence that it was the responsibility of the jury, not the judge, to determine guilt. *Id.* at 1200-1201 (citing *United States v. Peters*, 791 F.2d 1270, 1286 (7th Cir. 1986) ("The defendant does not cite, however, nor has this court's research uncovered, any case holding that an instruction of this type is reversible error.")).

Similarly, in *United States v. Lance*, 853 F.2d 1177 (5th Cir. 1988), the judge remarked during trial when making an initial finding regarding the admissibility of statements under the co-conspirator exception, that "this Court has found that there is independent evidence of any statements made by the defendants herein, that a conspiracy existed, that the defendants did and,

in this case, the coconspirator, Mr. Alan Henderson, who is charged in the Indictment, were members of the conspiracy . . ..” *Id.* at 1182.  The Fifth Circuit declined to reverse and noted that the judge made the statement in the course of an evidentiary ruling and did not direct the statement to jurors.  *Id.* at 1183-84.  A “conviction need not be reversed merely because a jury heard a trial judge’s preliminary findings concerning the admissibility of hearsay.”  *Id.* at 1184.

So too with the single case Defendant relies on for their argument, in which trial counsel immediately objected to the Court’s ruling regarding the admission of statements under the co-conspirator exception, and the Court read a curative instruction to the jury. *United States v. Sevilla-Acosta*, 746 F.3d 900, 905 (8th Cir. 2014).  The Court found any error by the district court in making an evidentiary ruling in front of the jury harmless, pointing in part, to the limiting instruction offered.  *Id.  See also United States v. Hester*, 140 F.3d 753, 758 (8th Cir. 1998) (“The district court’s sua sponte ruling on the admissibility of coconspirator evidence before the jury, which included a statement that the evidence was sufficient to find by a preponderance of the evidence that Hester and Allen were members of the conspiracy . . . was not so prejudicial as to require a mistrial or reversal.”).

The district court here merely ruled on the admissibility of certain evidence, and the legal predicate for admission of that evidence, in statements directed at counsel—not the jury as some general commentary on the evidence writ large.  *See, e.g.*, Tr. 4/6 AM at 76 (“He can certainly testify as to what Mr. Michel did as a co-conspirator statement. And at this point there’s sufficient evidence that the government has put on for the Court to consider them as co-conspirator statements and enough for a conspiracy in order to be able to do so.”); *id.* at 17 (“No, it’s a co-conspirator statement.”).    That the Court did so was not error.  And the jurors here were specifically instructed to disregard statements of the Judge in their deliberations and to only

consider evidence properly admitted during trial.  *See* Dkt 290 at 7, Instruction No. 2 – Function

of the Jury ("You may not take anything I may have said or done as indicating how I think you

should decide this case.  If you believe that I have expressed or indicated any such opinion, you

should ignore it.  The verdict in this case is your sole and exclusive responsibility."); *id.* ("Your

function, as the jury, is to determine what the facts are in this case.  You are the sole judges of the

facts.  While it is my responsibility to decide what is admitted as evidence during the trial, you

alone decide what weight, if any, to give to that evidence.  You alone decide the credibility or

believability of the witnesses."); *id.* at 9, Instruction No. 4 – Evidence in the Case ("During your

deliberations, you may consider only the evidence properly admitted in this trial.  The evidence in

this case consists of the sworn testimony of the witnesses and the exhibits that were admitted into

evidence, the facts of which I took judicial notice, and facts stipulated by the parties.").  And juries

are presumed to follow the instructions provided to them by the Court, rendering any error here

harmless.  *United States v. Hall*, 610 F.3d 727, 742 (D.C. Cir. 2010).  The defendant cannot show

error, and even if there was error, it was harmless.  His motion for new trial on this basis should

be denied.

### III.   The admission of Special Agent Heuchling's Testimony was not plain error, and any such error was harmless.

The defendant asserts that the testimony of FBI Special Agent Heuchling was improper,

but at no point did defense counsel object to the scope of his testimony at trial.  Mot. at 12-20.

Failure to raise an objection at trial results in the forfeiture of the objection, yielding review only

under the more forgiving "plain error" standard.[2]   *Wilson*, 605 F.3d at 1022; *United States v.*

*Eiland*, 738 F.3d 338, 352 (D.C. Cir. 2013).  The defendant cannot show that the admission of

---

[2]  The defendant appears to concede that this argument is subject to plain error review. Mot. at 12-13.

Agent Heuchling's testimony was clear or obvious error, and to the extent there was error, any such error was harmless.

The mere fact that a law enforcement agent testifies first at trial does not, without more, give rise to a claim of error. *United States v. Moore*, 651 F.3d 30, 60 (D.C. Cir. 2011) ("The government remains free to call as its first witness a law enforcement officer who is familiar with the pre-indictment investigation or was otherwise personally involved[.]").  And while there are certainly limitations on the scope of a law enforcement agent's testimony, there are many appropriate avenues for such testimony.  In *Eiland*, the law enforcement agent testified first at trial as an expert on investigations of illegal conspiracy cases. 738 F.3d at 351.  His testimony included defining a conspiracy, how conspiracies are conducted, and various investigative techniques used in the course of the investigation.  *Id.*  The Court found that the district court's admission of the agent's testimony "was not error" and "fit[] within the type of *modus operandi* testimony permitted by this and other courts, and his description of investigative techniques provided useful background information."  *Id.* at 352.

Courts have also approved of law enforcement agent testimony when it is based on, or tied to, admissible evidence.  In *United States v. Smith*, 640 F.3d 358 (D.C. Cir. 2011), the first witness was a law enforcement agent who testified, among other things, that the defendant and one of his unindicted coconspirators "were working together putting their money together and going to New York to buy heroin."  *Id.* at 366.  The Court noted that the agent's opinion was based on admissible evidence—the defendant's own statements or his coconspirator's statements from captured recordings—and therefore found no error.  *Id.* at 367-678 (holding, alternatively, that any such error was harmless given the wealth of evidence).  *Accord United States v. Rosado–Perez*, 605 F.3d 48, 55–56 (1st Cir. 2010) (agent's overview of "members of the conspiracy and their roles"

admissible when not based on inadmissible hearsay).  Similarly in *Moore*, the Court determined to the extent that the law enforcement agent's testimony was improper, any prejudice was ameliorated because it was "later confirmed by admissible evidence at trial."  651 F.3d at 61.  The Court, in its admonition and explanation of the dangers of "overview testimony" cautioned against an "overview witness testifying about evidence yet to be admitted before the jury."  *Id.*

Here, Agent Heuchling's testimony was tethered to, or based on, admissible, or already admitted, evidence that he was describing, or merely reading to the jury.  For example, with respect to "straw donors," Agent Heuchling was testifying from admitted exhibits, while admitted exhibits were on the screen for the jury.  *See, e.g.*, Tr. 3/30 AM at 121-22 (testifying about transactions shown on GX71 and GX666 showing financial transfers from Blackstone Asia Real Estate Partners, to the defendant, to three conduit contributors—Moise, Oriol, and Hippolyte—and then to the Obama Victory Fund); *Id.* at 137-39 (testifying about transactions shown on GX667 showing financial transfers from Alsen Chance Holdings to the defendant and then to Ronquillo, Kromka, and Toussaint, and then to the Obama Victory Fund).

The defendant also quibbles with Agent Heuchling's use of the word "co-conspirators" in describing Elliott Broidy, Nickie Lum Davis, and George Higginbotham, relying on *Moore*.  But this argument mischaracterizes the Court's holding in *Moore*.  651 F.3d at 59.  The court did not find, much less discuss, error in calling cooperating witnesses, particularly those had pleaded guilty for their role in the scheme, "co-conspirators."  Rather, the Court instead found error when the law enforcement agent's testimony strayed into "vouch[ing] for the credibility of witnesses the government intended to call at trial, and gave his personal opinion as to guilt or innocence."  *Id*. Specifically on the latter point, in *Moore*, the agent was asked whether he had any doubt in his mind about whether cooperating witnesses were "criminals," and the agent responded, "none

whatsoever." *Id.*   Defendant does not, and cannot, argue that Agent Heuchling strayed into impermissibly vouching for cooperating witnesses.

      Even if the defendant could establish error that is clear or obvious, any such error would be harmless.  *See Eiland*, 738 F.3d at 352-53 (finding plain error but ultimately deciding any such error was harmless); *Moore*, 651 F.3d at 61 (any prejudice from improper agent testimony was ameliorated because, in part, "there was overwhelming evidence of appellants' guilt"); *United States v. Abou-Khatwa*, 40 F.4th 666, 687-88 (D.C. Cir. 2022) (finding agent's improper reference to "dummy" subscribers harmless when the testimony was cumulative of other evidence and "but a small drop in an ocean of evidence").  *But see United States v. Hampton*, 718 F.3d 978, 984 (D.C. Cir. 2013) (error was not harmless when government's evidence consisted primarily of recorded intercepts which agent improperly testified about).  Agent Heuchling's description of the defendant's "co-conspirators" was harmless, given that Broidy and Higginbotham testified at trial that they pleaded guilty for their respective roles in the conspiracy.  And the evidence against the defendant was substantial, and included financial records, emails, evidence of the defendant's efforts to influence witness testimony, the defendant's own testimony inculpating himself, and the testimony of many witnesses, including the defendant's co-conspirators.[3]   *See* Government's Response to Motion for Judgment of Acquittal.  The defendant cannot show plain error in the admission of Agent Heuchling's testimony, but to the extent he could, any such error would be harmless.

---

[3]  The Court also gave a limiting instruction on how jurors should consider Agent Heuchling's testimony, specifically instructing that when: "evaluating the officer's credibility, you should use the same guidelines that you apply to the testimony of any witness.  In no event should you give either greater or lesser weight to the testimony of any witness merely because they are a law enforcement officer."  Dkt. 290 at 26, Instruction No. 15 – Law Enforcement Official's Testimony.

**IV.    Defendant's trial counsel was not ineffective, and he is not entitled to a new trial
on this basis.**

Defendant next claims that his trial counsel, who aggressively litigated his defense through

plentiful motion practice, extensive cross-examination of witnesses, including key cooperating

witnesses, and engaged in lengthy sidebars with the Court advocating for the defendant's position

on myriad issues, was constitutionally ineffective, and that he therefore is entitled to a new trial on

this basis.  Mot. at 20-41.  Not so.

To prevail on a claim of ineffective assistance, the defendant must show both that his

counsel's performance was deficient and that the deficient performance prejudiced him.  *United

States v. Doost*, 3 F.4th 432, 436–37 (D.C. Cir. 2021) (citing *Strickland v. Washington*, 466 U.S.

668 (1984)).  With respect to deficient performance, the court must assess whether counsel's

performance "fell below an objective standard of reasonableness," while "indulg[ing] a strong

presumption that counsel's conduct [fell] within the wide range of reasonable professional

assistance."  *Strickland*, 466 U.S. at 688-89.  "Judicial scrutiny of counsel's performance must be

highly deferential," and "every effort [must] be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time."  *Id.* at 689.

With respect to prejudice, the court consider whether "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 694.  To meet this standard, the defendant must demonstrate a "'probability sufficient to

undermine confidence' in the verdict."  *United States v. Nwoye*, 824 F.3d 1129, 1135 (D.C. Cir.

2016) (quoting *Strickland*, 466 U.S. at 694).  Thus, the "[f]ailure to make the required showing of

either deficient performance or sufficient prejudice defeats the ineffectiveness claim."  *Strickland,*

466 U.S. at 700.  The defendant bears the burden of demonstrating both elements of ineffective

assistance under the *Strickland* standard.

"While perfection may seem a laudable goal, this latter threshold of performance is not

demanded by our Constitution."  *United States v. Bell*, 795 F.3d 88, 96 (D.C. Cir. 2015) (finding

no prejudice when there was a mid-trial substitution of counsel); s*ee United States v. Gonzalez–*

*Lopez*, 548 U.S. 140, 147 (2006) (right to counsel guarantees "effective (not mistake-free)

representation"); *Jackson v. Johnson*, 150 F.3d 520, 525 (5th Cir. 1998) ("A constructive denial

of counsel occurs . . . in only a very narrow spectrum of cases where the circumstances leading to

counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful

assistance at all." (quoting *Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir. 1997))).

The defendant asserts a litany of errors for which trial counsel was purportedly deficient.

Each will be addressed in turn.

**A.  Even if trial counsel was constitutionally deficient, the defendant cannot show that he was prejudiced.**

All of the defendant's arguments that trial counsel was ineffective should be considered

"while keeping in mind that the government's case against him was, in a word, overwhelming."

*United States v. Udo*, 795 F.3d 24, 30 (D.C. Cir. 2015); *see also Strickland*, 466 U.S. at 695 (Courts

"must consider the totality of the evidence before the judge or jury."); *Doost*, 3 F.4th at 443–44

("Doost fails to show he was prejudiced by any of counsel's supposed tactical errors with regard

to the evidence, and even "'considering them in the aggregate'" does not "'change[ ] the strength

of the government's case.'" (quoting *Udo*, 795 F.3d at 33 ("Finally, Udo argues that the cumulative

effect of his counsel's errors merits reversal of his conviction. Again, we disagree. As we have

repeated throughout, the evidence against Udo was overwhelming. None of the errors he alleges

could have overcome that evidence in isolation, and there is nothing about considering them in the aggregate that changes the strength of the government's case.")).

As described more fully in the Government's Response to the Motion for Judgment of Acquittal, the evidence against the defendant was overwhelming: multiple cooperating witnesses testified directly about their scheme and intent; extensive financial records were introduced including analysis tracing the funds from Low through a number of shell companies; numerous emails and documents showing the defendant's own knowledge and role within the schemes; and cellsite analysis showing that the defendant sent obstructive text messages to two witnesses in order to cover his tracks.

## B. Trial counsel's closing argument was not constitutionally ineffective.

The defendant makes several intertwined arguments regarding trial counsel's performance during closing argument or preparation therein, including the use of an artificial intelligence litigation tool,[4] but at bottom, contends that trial counsel's closing argument was deficient.[5] Mot.

---

[4]  The defendant asserts, citing open-sourced information, that trial counsel used an artificial intelligence litigation tool to draft his closing argument.  Public statements from the company's Chief Operating Officer, Neil Katz, indicate that trial counsel could not have used the software to draft his closing argument, and that it was merely a tool used by his team to ingest discovery and trial transcripts and distill that information into a usable format.  *See* Mike Ives, *Fugees Rapper Pras Michel Says Lawyer Used A.I. for 'Ineffectual' Defense*, New York Times, Oct. 19, 2023, available                at                https://www.nytimes.com/2023/10/19/us/fugees-pras-michel-ai.html?searchResultPosition=1; Lindsay Whitehurst, *Fugees Rapper says Lawyer's Use of AI helped tank his case, pushes for new trial*, AP News, Oct. 18, 2023, available at https://apnews.com/article/fugees-pras-appeal-conviction-trial-artificial-intelligence-d2c93aa540 4eba63c3347a05fe8ba091; Victoria Bekiempis, *The Uncharted Territory of Pras Michel's AI Courtroom Claims*, Vulture, Oct. 23, 2023, available at https://www.vulture.com/article/can-lawyers-use-ai-pras-michel-fugees- trial.html#:~:text=Mich% C3%A9l%20is%20demanding%20 a%20new,court%2C%20derailing%20a%20possible%20acquittal.  Because the Court has already scheduled an evidentiary hearing in this matter and both parties are, at this time, relying on open-source information, the government would reserve additional briefing on this topic until after the conclusion of the hearing.

[5]  Separately, the defendant also contends that trial counsel had a financial stake in the company that created the litigation tool, creating a financial conflict of interest under *Cuyler v. Sullivan*, 446

at 22-24.

Trial counsel has "wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003).  While closing arguments should "'sharpen and clarify the issues for resolution by the trier of fact,' . . . which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Id.* (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)).  Therefore, "judicial review of a defense attorney's summation is therefore highly deferential[.]"  *Id.* at 6 (noting that foregoing closing argument altogether could be a legitimate defense strategy).

The defendant points to several purported deficiencies in trial counsel's closing argument. First, the defendant claims that trial counsel admitted to the foreign conduit contribution scheme, through his legal strategy of arguing that Low Taek Jho wanted a photograph with President Obama, and the defendant was helping him get it.  But this argument directly responded to the government's theory that Low and the defendant agreed to funnel Low's illegal contributions through Michel, by denying that Low ever intended that his money be used to make contributions at all.  That is, so trial counsel's argument goes, Low and the defendant did not conspire to funnel foreign money into the election, because Low only wanted a photograph and the defendant intended to help him obtain it, and there was no agreement or discussion regarding any campaign contributions on Low's behalf.  The defendant contends that this argument was the result of trial counsel's conflation of the FARA scheme with the foreign conduit contribution scheme.  Mot. at 23.  But, trial counsel made no mention of the 2017 scheme, and the related FARA or 18 U.S.C. § 951 counts with respect to this portion of the argument.  The defendant now arguing so is the

U.S. 335 (1980).  This argument addressed is addressed *infra*, at Section V.

kind of impermissible hindsight analysis the Supreme Court has cautioned against. *Strickland*, 466 U.S. at 89 ("every effort [must] be made to eliminate the distorting effects of hindsight").

Similarly, the defendant now points to additional arguments trial counsel could have argued with respect to the 2017 scheme, including that the defendant did not act at the "direction or control" of the Chinese government with respect to the § 951 count.  But trial counsel did just that. Trial counsel repeatedly argued that the defendant was not working on behalf of the Chinese or Low, but that he was attempting to do what was in the interest of the United States and followed the appropriate process to do so.  *See, e.g.,* Tr. 4/20 PM at 43 ("All Mr. Michel did in the words of General Sessions was to do what was appropriate, which was to pass the information on to the appropriate American counter-authorities.").  And as with any closing argument when only one conspirator is on trial, trial counsel emphasized the role of other actors and the defendant's own minor role and distance from the key actions.  *See e.g.*, Tr. 4/20 PM at 40 ("And you will recall that [Mr. Pottinger] testified that he picked up papers that had been left with the President's assistant, not by Mr. Michel, but by Nickie Lum-Davis, maybe through Broidy, I don't know."); *id.* at 42 ("[T]he evidence shows that Nickie Lum-Davis had direct communication with Jho Low. That the package that was on the President assistant's desk came from her Google Drive.  You heard that evidence.  That is where it came from."); *id.* at 40 ("Mr. Wynn again said to the President that it would be helpful to extradite Mr. Guo from the United States.").

The defendant's arguments regarding trial counsel's closing argument resembles cases where defendants have attacked closing arguments that, while not perfect, were nevertheless "effective." *See Parker v. Bowersox*, 188 F.3d 923, 928 (8th Cir. 1999) (rejecting ineffective assistance claim where, even though defense counsel's closing argument could have been more "succinct or tightly structured," counsel nevertheless raised a number of points in his client's

defense); *Parker v. United States*, No. 4:03CV00058, 2006 WL 2597770, at *11 (E.D. Ark. Sept. 8, 2006) (finding effective assistance where defense counsel's closing argument pointed out weaknesses in the government's case despite the fact that the defendant "may not have liked his defense counsel's closing argument or have wished that defense counsel stated something different"); *United States v. Frederick*, 775 F. Supp. 2d 1146, 1158-59 (D.S.D. 2011) (finding counsel was not constitutionally ineffective even when there "were arguments available to attorney [] about the facts and testimony that she did not make").

Furthermore, any shortcomings in trial counsel's closing argument do not amount to the sort of extreme facts present in cases where courts have found ineffective assistance of counsel. *See, e.g., Lawhorn v. Allen*, 519 F.3d 1272, 1295–96 (11th Cir. 2008) (Defense counsel's strategic decision to forgo closing argument in a capital case, which was based on mistaken belief that state could not make rebuttal argument if counsel waived closing argument, was ineffective assistance); *Burdine v. Johnson*, 262 F.3d 336, 340–41 (5th Cir. 2001) (finding ineffective assistance where defense counsel repeatedly slept while evidence was being introduced against defendant in capital murder trial); *Stouffer v. Reynolds*, 214 F.3d 1231, 1233–35 (10th Cir. 2000) (Defense counsel was ineffective where he never made opening statement, failed to impeach key witness, did not hire necessary expert witnesses, neglected to call crucial witness, and did not proffer any defense theory at closing); *Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir. 1988) (defense counsel was ineffective where he completely abandoned his duty of loyalty to defendant by intentionally weakening defendant's case).

Even assuming that the closing argument was inadequate in the respects claimed by the defendant, there is no "reasonable probability" that a better closing argument without these defects would have made a significant difference." *Smith v. Spisak*, 558 U.S. 139, 151 (2010).  There was

a wealth of additional evidence of guilt. *See Frederick*, 775 F. Supp. 2d at 1157, 1162 (denying ineffective assistance claim despite the fact that "closing argument was less thorough and evidence-based than typical, but much more emotional in nature than typical," because of substantial evidence of guilt). The defendant has not met his burden of showing any constitutional deficiencies in his trial counsel's closing argument, much less prejudice suffered from any such errors.

### C. Trial counsel was sufficiently prepared for trial, and his use of contract attorneys is not error.

The defendant next argues that trial counsel was insufficiently prepared for trial, citing to several declarations from individuals who briefly interacted with trial counsel, and pointing to trial counsel's purported lack of familiarity with the charged statutes and facts underlying the Superseding Indictment. Mot. at 24-29. But there is no indication that counsel was insufficiently prepared for trial. Trial counsel engaged in extensive motion practice before this Court in the year leading up to trial, communicated with the government in identifying key discovery, and litigated a *Daubert* hearing for a proposed expert witness on the extensive financial transactions at issue in this case among many other steps in advance of trial.

The defendant cannot show his counsel was so ill-prepared as to be ineffective.[6] In *United States v. Gray-Burriss*, 251 F. Supp. 3d 13 (D.D.C. 2017), *aff'd*, 920 F.3d 61 (D.C. Cir. 2019), the defendant alleged, like here, that both of his attorneys at trial were insufficiently prepared to go forward, citing the attorneys own statements that if trial were to proceed, that a "serious injustice [would] result" as well as both attorneys unfamiliarity with the area of law at issue. *Id.* The Court

---

[6]  The defendant also makes general references to how trial counsel's health could have impacted his performance at trial. But, as noted in defendant's motion, when trial counsel felt unable to proceed for the day, trial was concluded and resumed when trial counsel was physically able. The defendant cannot show how trial counsel's performance was impacted by theoretical deficiencies.

noted that "the Sixth Amendment does not demand perfection," and that defendant could not identify any plausible basis to assert ineffective assistance of counsel.  *Id.*  The Court explained that "[a] lawyer can perform proficiently despite qualms about her method of preparation, even if her peers would have pursued a different course."  *Id.* at 25-26 (citing *Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.")).  *See also Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir. 1997) (holding that petitioner's ineffective assistance of counsel claim failed because he did not explain what his attorney "would have found had he investigated further" and failed to explain "what lengthier preparation would have accomplished").

As evidence of the lack of preparation, defendant points to several lines of questioning that could have been raised on cross-examination with various witnesses.  But the litmus test of constitutionally effective counsel is not perfection.  *See also Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) ("There are a few, if any, cross-examinations that could not be improved upon.  If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past muster.") (quoting *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996)).  With the benefit of hindsight and different counsel, the defendant points to a few discrete items that trial counsel did not raise with both cooperating witnesses, Broidy and Higginbotham.  But with each witness, trial counsel spent hours—or with Higginbotham, more than a day—cross-examining the witnesses on their respective roles in the conspiracy, challenging their telling of key events including meetings with the defendant, and going over key documents that the government relied on in its case-in-chief.  Such a performance is not constitutionally defective.  *Coumaris v. United States*, 660 F. Supp. 2d 67, 71 (D.D.C. 2009) ("Given that 'it is all too tempting for a court,

examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable,' counsel's cross-examination of [the witness] was well within the bounds of objectively reasonable behavior." (quoting *Strickland*, 466 U.S. at 689) (internal quotation omitted)).  Nor can the defendant show that he suffered prejudice from trial counsel's purportedly deficient cross-examination of a few, out of many, witnesses.  *See United States v. Gooch*, 842 F.3d 1274, 1280 (D.C. Cir. 2016) ("Against the backdrop of this evidence, Gooch has not shown 'a reasonable probability' that the result of his trial would have been different without the allegedly deficient open-ended questioning by defense counsel on cross-examination.").

Finally, the defendant points to trial counsel's use of his legal team as evidence of trial counsel's own deficiency.  But there is no constitutional requirement that the lead attorney perform all of the work for trial.  *See Stitt v. United States*, 369 F. Supp. 2d 679, 689 (E.D. Va. 2005) ("To assess ineffective assistance of counsel, courts do not isolate the behavior of one member of a defendant's defense team, but rather take the performance of all the counsel together."); *Soering v. Deeds*, 217 F.3d 840 (4th Cir. 2000).

Nor are attorneys required to be experts in the field of law in which they are to represent their clients.  "An attorney can render effective assistance of counsel even if he has had no prior experience in criminal advocacy." *United States v. Lewis*, 786 F.2d 1278, 1281 (5th Cir. 1986) (defendant was not denied effective assistance of counsel by attorney who only had one year of experience practicing law and was unfamiliar with local court rules and rules of evidence where defendant did not point to any specific errors resulting from lack of experience and familiarity with court rules).  Nor has the defendant shown any prejudice resulting from the broader legal team's purported lack of white collar expertise.  *See Motley v. Collins*, 18 F.3d 1223, 1227 (5th Cir. 1994)

(Defendant "failed to demonstrate prejudice resulting from his trial counsel's alleged unfamiliarity with capital sentencing law."); *see also United States v. DePaolo*, 804 F.2d 225, 234 (2d Cir.1986) (defendants "are not entitled to a perfect defense."). The defendant has not met his burden to show that trial counsel was constitutionally ineffective.

### D.  Trial counsel's decision to not move for severance was not constitutionally ineffective.

The defendant also asserts error in trial counsel's failure to move to sever Counts 1-6 from Counts 7, 8, 10, and 12.  Mot. at 29-32.  Because the counts were joined properly under Rule 8(a) as part of a "common scheme or plan," and there was no prejudice sufficient to merit severance under Rule 14, trial counsel did not err in failing to move for severance here.

Joinder of offenses under Rule 8(a) is generally construed liberally.  *United States v. Gooch*, 665 F.3d 1318, 1326 (D.C. Cir. 2012).  Rule 8(a) permits joinder of offenses that are of the same or similar character; that are based on the same act or transaction; or that are based on two or more acts or transactions connected together or constituting part of a "common scheme or plan."  *United States v. Jackson*, 562 F.2d 789, 796 (D.C. Cir. 1977).  "As long as only one defendant is concerned, Rule 8(a) permits joinder of . . . offenses [of the same or similar character], even if they are entirely unrelated to each other."  *Id.*  "When similar but unrelated offenses are jointly charged to a single defendant, some prejudice almost necessarily results . . . Rule 8(a) permits [this] sort of prejudice."  *Id.* (quoting *Cupo v. United States*, 359 F.2d 990, 993 (D.C. Cir. 1966)). When applying Rule 8, the court need only consider whether the facts justifying joinder are properly alleged in the indictment and pre-trial materials.  *Gooch*, 665 F.3d at 1334.

Under Federal Rule of Criminal Procedure 14, the Court "may order separate trials of counts" or "provide any other relief that justice requires" if joining offenses "appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).  "The defendant carries the burden of

demonstrating prejudice resulting from a failure to sever, but such a showing does not result in an automatic grant of the motion."  *Gooch*, 665 F.3d at 1326 (citations omitted) (explaining that a showing of prejudice "does not result in an automatic grant of the motion" and whether to grant the motion remains within the district court's discretion).  "Severance is proper 'only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence.'"  *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).  A showing that the defendant "may have a better chance of acquittal in separate trials" is insufficient.  *United States v. Carson*, 455 F.3d 336, 374 (D.C. Cir. 2006) (quoting *Zafiro*, 506 U.S. at 540).

The defendant argues for misjoinder or severance by generally asserting that the schemes were temporally distinct, had different criminal aims, and different charges were used for the respective schemes.  But this argument ignores the commonalities between the defendant's broader criminal aims:  through both schemes, the defendant accepted tens of millions of dollars from the same foreign benefactor, Low Taek Jho—funds that were funneled and routed through entities unassociated with Low in order to conceal their true source.  In both schemes, the defendant's objectives were to buy access to the respective Presidents for Low to accomplish what he wanted on behalf of, and at the direction of, Low.  In both instances, the defendant lied to cover his tracks— in 2012, to the FEC, and in 2017, to the banks.

The counts against the defendant were properly joined, and the defendant cannot show prejudice sufficient to merit severance of the counts.  And "[f]ailure to raise a meritless claim is not evidence of ineffective assistance."  *United States v. Brown*, 449 F.3d 154, 159 (D.C. Cir. 2006); *see also United States v. Wilson*, 15 F. Supp. 3d 126, 138 (D.D.C. 2014) (concluding that trial counsel "was not ineffective for omitting an argument that lacks merit"); *United States v. Benbow*, No. CR 10-0051-2 (PLF), 2021 WL 3268384, at *8 (D.D.C. July 30, 2021) (finding that

defendant's severance motion would likely have been unsuccessful and therefore counsel was not ineffective). The defendant has failed to overcome the strong presumption that such a decision falls within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

### E. Trial counsel's decision to not object to certain pieces of evidence and testimony was not constitutionally ineffective.

The defendant asserts a litany of purported evidentiary errors by trial counsel including failure to object to the scope of Agent Heuchling's testimony, purported hearsay elicited during the testimony of Matthew Pottinger, the admission or foundation to Government Exhibits 464 and 474, and to purportedly privileged communications between George Higginbotham and the defendant. Mot. at 32-40.

"The tactical and strategic decisions of a defendant's trial counsel are presumed to be part of sound trial strategy and therefore will not be subject to successful attack absent a defendant overcoming such presumption." *United States v. Pole*, No. 09-CR-354-EGS-ZMF, 2022 WL 4128238, at *4 (D.D.C. Sept. 9, 2022) (citing *Darden v. Wainwright*, 477 U.S. 168, 185-87 (1986)). Considering the strong presumption in favor of competence, if an approach taken "might be considered sound trial strategy," then the counsel cannot be incompetent. *Wainwright*, 477 U.S. at 186 (quoting *Strickland*, 466 U.S. at 689) (noting that "there are several reasons why counsel reasonably could have chosen to rely on" the defense strategy).

Because constitutionally effective assistance can be administered in "countless ways," *Strickland*, 466 U.S. at 689, the question is not whether representation "deviated from best practices or most common custom," *Harrington*, 562 U.S. at 105. "[S]trategic decisions . . . are [often] entitled to a 'strong presumption' of reasonableness" because "[d]efense lawyers have 'limited' time and resources, and so must choose from among 'countless' strategic options." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (quoting *Harrington,* 562 U.S. at 104, 106-07) (internal

quotation marks omitted).  Strategic decisions include "the extent of investigation, the risks of a defense requiring defendant's testimony and exposure to cross-examination, the possibility that placing personal background information before a jury will backfire, and so on."  *Roe v. Flores-Ortega*, 528 U.S. 470, 491-92, (2000) (Souter, J., concurring in part).  That a "defense strategy did not work out as well as counsel had hoped" does not mean that earlier efforts were objectively deficient.  *Harrington*, 562 U.S. at 109.

As discussed *supra*, there was no error in trial counsel's failure to object during Agent Heuchling's testimony.  But even if, *arguendo*, trial counsel should have objected to the scope of Agent Heuchling's testimony, this omission was not prejudicial.  Mot. at 32-33.  Trial counsel used Agent Heuchling, and the scope of his testimony, to the defendant's advantage.  For example, featured prominently as part of the defense at trial was the defendant's relationship with Frank White, the National Vice Chair of Finance for the Obama for America campaign committee, and White's relationship with Low.  But the parties understood that White would not be testifying at trial.  Trial counsel, therefore, used Agent Heuchling to bring out key facts in support of his defense, *i.e.*, that White, not the defendant, was the one conspiring with Low to funnel campaign contributions.  *See* Tr. 3/31 AM at 18-24; 27; 30; 34-39; 52-60.  Trial counsel would not have been able to successfully pursue this line of cross-examination had he constrained the scope of Agent Heuchling's testimony as the defendant now suggests.

Nor was it error to not object more strenuously to portions of Matthew Pottinger's testimony.  Mot. at 33-36.  Pottinger testified that he was "working at the White House as a member of the National Security Counsel staff" and "was responsible for Asia policy and staffing the President."  Tr. 4/11 PM at 79.  His responsibilities included being responsible for both national security as well as "talking to the President about anything he really needs with respect to Asia

policy." *Id.* at 80.  Pottinger himself participated in meetings about the requests to extradite Guo Wengui with the President and others, *id.* at 81, with State Department and delegations from the Chinese government, *id.* at 85, and with Steve Wynn, *id.* at 86-87.   Contrary to the defendant's position, Pottinger was not an empty shirt parroting inadmissible hearsay.  Through the course of his testimony, he testified about information learned from others through the course of those meetings, how that information guided his subsequent actions, and how, given his wealth of experience, Pottinger himself had growing concerns regarding the requests to extradite Guo Wengui.  *See, e.g., id.* at 79-90.   Trial counsel objected once during Pottinger's brief direct examination regarding what the President asked Pottinger to do with respect to Guo.  *Id.* at 81.  To the extent that trial counsel should have continued to object, no prejudice resulted from that error.  Pottinger's testimony regarding his meetings and communications with others, could have been offered not for their truth, but to inform why Pottinger took certain actions consistent with Fed. R. Evid. 801(c).

Regardless, "there are several reasons why counsel reasonably [chose not to object]."  *Pole*, 2022 WL 4128238, at *7 (quoting *Wainwright*, 477 U.S. at 186).  Much like with Agent Heuchling, trial counsel used Pottinger to stray into areas that he clearly sought to delve into with witnesses that had been stricken, including President Trump.  On cross-examination, trial counsel elicited hearsay that the Chinese government was communicating directly with the United States government including the President and Department of Justice officials, *id.* at 92-95, likely designed to undercut the government's argument that the lobbying campaign was through backchannel lobbyists like Elliott Broidy and Steve Wynn.  Trial counsel did not err in failing to

object to Pottinger's testimony, and the defendant did not suffer prejudice from the admission of such testimony.[7]

So too with the purported failures to object to the admission or foundation of Government Exhibits 464 and 474. Mot. at 38-40. The defendant does not claim that these exhibits would not have been entered into evidence at all; he merely asserts error in failing to put the government to its paces. Mot. at 39. Nor could he. Those exhibits contained photographs seized from Nickie Lum Davis's Google Drive, an online storage account that allows the user to store records. Tr. 4/13 AM at 91-92. The photographs show communications between various individuals, some named including Steve Wynn, Nickie Lum Davis, Elliott Broidy, the defendant, and others identified by codenames including "T1 Freedom" discussing generally topics generally from the conspiracy including Guo Wengui, communications between the Chinese government and the United States government, and civil forfeiture actions in California. *See generally id.* at 93-99; Tr. 4/13 PM at 7-21. Given this, even if trial counsel had objected for the mere sake of objecting, and the government laid foundation for each individual photograph, the exhibits would have met the admissibility threshold under Rule 401, and any statements therein comfortably fell within the confines of the co-conspirator exception. *Wilson*, 15 F. Supp. 3d at 138 ("Whether . . . a motion to exclude evidence . . . would have been worthwhile was for [defense counsel] to decide within his professional judgment.").

In addition, like with the cross-examination of Pottinger, defense counsel used these exhibits as part of the defense to show that the defendant himself was not involved in many of the

---

[7]   And, even if trial counsel did err, "[m]ere improvident strategy, bad tactics, mistake, carelessness or inexperience do not necessarily amount to ineffective assistance of counsel." *United States v. Board*, No. 91-559-11, 2000 WL 12891, at *4 (D.D.C. Jan. 6, 2000) (quoting *Edwards v. United States*, 256 F.2d 707, 708 (D.C. Cir. 1958)).

communications.  *See, e.g.*, Tr. 4/13 PM at 62-64 ("Is there anything on the first page of this document that indicates that it was sent to or received by Mr. Michel?").  Trial counsel also used these exhibits to introduce that the defendant was purportedly involved in facilitating the return of a pregnant woman from China to the United States.  *Id.* at 66-67.  Trial counsel did not err in failing to object to the admission of these exhibits, and given the proactive use of these exhibits to construct integral portions of the defense at trial, the defendant did not suffer prejudice as a result.

Finally, the defendant argues that trial counsel failed to object to Higginbotham's testimony about his concerns about FARA in relation to the defendant's criminal scheme as attorney-client privileged.  Mot. at 36-37.  As trial counsel was aware, the government sought and received a Crime-Fraud Order governing the communications between Higginbotham and the defendant, which specifically vitiated any privilege "pertaining to the alleged schemes and crimes described in the government's motion."  DOJ-0002453394-95.  Higginbotham's testimony relaying communications with the defendant about the work on behalf of Low to resolve the 1MDB matter, and on behalf of the Chinese government to extradite Guo Wengui, comfortably fell within the scope of that Crime-Fraud Order.  But even without an order previously vitiating the attorney-client privilege, Higginbotham acted as the defendant's co-conspirator in this scheme.  *See In re Grand Jury*, 475 F. 3d 1299, 1305 (D.C. Cir. 2007) ("Attorney-client communications are not privileged if they 'are made in furtherance of a crime, fraud, or other misconduct.'") (quoting *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)); *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986) ("The privilege for communications between client and attorney ceases when the purpose of the privilege is abused, when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act.").  Trial counsel did not err in failing to object to the admission of these statements.

**F.    The defendant was prepared for his testimony.**

The defendant also claims he was not adequately prepared for trial, and trial counsel failed
to prepare the defendant to testify.  Mot. at 41.  The Court engaged in a lengthy colloquy with the
defendant regarding whether he wanted to testify in his own defense.  Tr. 4/18 AM at 59-61.  At
the conclusion, the defendant asked for more time to discuss testifying with his lawyers, which the
Court provided.  *Id.* at 61-62.  After returning after the recess, the defendant indicated that "after
consulting with my attorneys and the universe, I decided I will testify."  *Id.* at 63.

The defendant's own declaration indicates that trial counsel discussed his testimony
including topics he would be asked about.  Dkt. 310-3 at ¶11.  In one case, the D.C. Circuit noted
that trial counsel had discussed the advantages and disadvantages of testifying on his own behalf,
and that trial counsel acted reasonably "in declining to expend time and resources on mock cross
examinations that they believed would be fruitless."  *United States v. Gray-Burriss*, 920 F.3d 61,
69 (D.C. Cir. 2019).  The Court also noted that regardless of any error, the district court correctly
found that the defendant did not suffer prejudice "[b]ased on the magnitude of the evidence
against" the defendant, and "having witnessed his recent cross-examination by the same
government counsel who tried the case."  *Id.*

Nor was the defendant insufficiently prepared for trial.  Through his declaration, the
defendant himself addresses multiple meetings and time spent with trial counsel.  Dkt. 310-3.
*Compare, e.g.*, *United States v. Mitchell*, 796 F. Supp. 13, 16 (D.D.C. 1992) (finding no ineffective
assistance where "trial counsel had three meetings with the defendant, . . . requested and received
documentation, and reviewed the file and discovery materials for the case"), *with* United States v.
Bailey, 2021 WL 5798045, at *3–4 (D.D.C. Dec. 7, 2021) (finding ineffective assistance where

counsel admitted he had not met with defendant or prepared him for trial at all).  The record does not show that trial counsel was constitutionally deficient in its preparation of the defendant.

## V.   Defendant's trial counsel was not laboring under any conflict of interest through trial.

Defendant claims that trial counsel operated under two separate conflicts of interests that adversely affected his performance: (1) trial counsel had an undisclosed financial stake in CaseFile Connect, a company that, according to the defendant, drafted trial counsel's closing argument; and (2) trial counsel was the subject of a contempt proceeding related to the release of protected materials from discovery to reporters.  Mot. at 41-48.  Neither basis satisfies the demanding standard to show a conflict of interest, and the defendant's motion for new trial should be denied.

Conflict of interest claims are a "specific genre" of ineffective assistance of counsel claim. *United States v. Wright*, 745 F.3d 1231, 1233 (D.C. Cir. 2014).  If a defendant can show that "a conflict of interest actually affected the adequacy of [the attorney's] representation," he "need not demonstrate prejudice in order to obtain relief."  *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980). In those circumstances, when counsel "is burdened by an actual conflict of interest," prejudice "is presumed" and the second prong of *Strickland* does not apply.  *See Strickland*, 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 345–50); *see United States v. Gantt*, 140 F.3d 249, 254 (D.C .Cir. 1998). The D.C. Circuit has been careful, however, to reject "defendants' attempts to force their ineffective assistance claims into the 'actual conflict of interest' framework . . . and thereby supplant the strict *Strickland* standard with the far more lenient *Cuyler* test."  *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996); *see, e.g., United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998); *United States v. Leggett*, 81 F.3d 220, 227 (D.C. Cir. 1996).

### a. The use of an artificial intelligence litigation tool does not *ipso facto* result in a conflict.

The defendant asserts, based on open-sourced research, that trial counsel had an undisclosed financial interest in CaseFile Connect, a company associated with the litigation software he purportedly used during trial. Mot. at 42-43. Even if this were true, which public reporting indicates is not,[8] such an arrangement does not create, without more, a conflict of interest under *Cuyler*.

External financial motivations of an attorney are insufficient to support a *Cuyler* claim if the motivations did not cause an adverse effect on counsel's performance. For example, in *United States v. McVeigh*, the defendant argued that counsel had a conflict of interest because counsel was motivated throughout the proceeding by his personal interest in financial reward through the post-trial publication of a book about the case. 118 F. Supp. 2d 1137, 1150-1151 (D. Colo. 2000). However, the Court found that such a motivation does not present a conflict of interest because the defendant failed to show "how any strategic or tactical decision made in the course of the defense was influenced by such a motivation." *Id.* at 1151; *see also Bemore v. Chappell*, 788 F.3d 1151, 1161–62 (9th Cir. 2015) (no financial conflict of interest when defense counsel overpaid investigator—who was aware counsel cheated on his wife—for work not performed because defendant did not show that counsel's misuse of funds "caused him to investigate less thoroughly than he otherwise would have"). *Cf. Pierce v. United States*, 976 F.2d 369, 370–71 (7th Cir. 1992) (finding a financial conflict of interest when defense counsel represented defendant while also representing the opposing side in a civil suit in which counsel had a financial stake).

---

[8]   The Chief Operating Officer for the company, Neil Katz, has relayed in public comments that trial counsel did not have a financial stake in the company. *See* Mike Ives, *Fugees Rapper Pras Michel Says Lawyer Used A.I. for 'Ineffectual' Defense*, New York Times, Oct. 19, 2023, available at https://www.nytimes.com/2023/10/19/us/fugees-pras-michel-ai.html?searchResultPosition=1.

So too here.  The defendant cannot show, beyond rampant speculation, how any purported financial conflict of interest impacted trial counsel's representation.  Nor does trial counsel's failure to disclosure a purported conflict of interest satisfy *Cuyler* without more.  *See United States v. Tucker*, 12 F.4th 804, 819 (D.C. Cir. 2021) ("Without more, the 'inadequate disclosure' of a conflict is 'not an adverse effect on counsel's performance.'") (quoting *United States v. Mett*, 65 F.3d 1531, 1536 (9th Cir. 1995)).

The defendant's argument is merely an attempt to circumvent the demanding *Strickland* standard by reframing as a *Cuyler* conflict of interest an argument already asserted as a basis for ineffective assistance.  *United States v. Gray-Burriss*, 791 F.3d 50, 62 (D.C. Cir. 2015) ("Doctrinally, reframing an alleged deficiency in performance in terms of a conflict of interest makes a world of difference.").  His motion for new trial should be denied.

> **b.  There was no conflict caused by the pending contempt proceedings, but any such conflict was ameliorated by the transfer of the prosecution and court.**

Defendant finally argues that the pendency of the contempt proceedings against trial counsel created an irreconcilable conflict of interest for trial counsel.  Mot. at 43-48.  Not so.

In *Gray-Burriss*, trial counsel failed to meet multiple pretrial deadlines, and lead counsel was unresponsive to secondary counsel and the government in advance of trial.  791 F.3d at 61.  A week in advance of trial, the Court issued an order directing both trial counsels to show cause as to why they should not be sanctioned.  *Id.*  Both trial counsels issued factual responses to the Court for their lapses.  *Id.*  As jury selection was set to begin, secondary counsel informed the court her own counsel was present and asked the court to address the show-cause order noting that with the pendency of the show-cause order, she was concerned it would have "prejudicial effects on her zealous advocacy" of the defendant.  *Id.* at 61-62.  The Court denied the request, noting that it would take the matter up after trial.  *Id.* at 62.  The lead counsel, after closing arguments, noted

that the pendency of the Order had "chilled" the representation of the defendant.  *Id.*  On appeal, the defendant argued that the pending show-cause order chilled his counsels' representation, and that they were left to zealously represent him or themselves.  *Id.*

The Court noted that, "[w]hen a defendant claims a conflict between himself and his attorney, he must show that the attorney was 'forced to make a choice advancing his own interest at the expense of his client's.'"  *Id.* at 63 (quoting *United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998)).  "The mere fact that a court has threatened an attorney with contempt is insufficient to make that showing."  *Id.*   The Court pointed to a string of cases holding the same in D.C. Circuit.  In *United States v. Shark*, 51 F.3d 1072 (D.C. Cir. 1995), for example, the district court complained in open court that defense counsel "doesn't pay any attention to me, . . . and next time I'm going to get his attention and put him in the cell block."  *Id.* at 1074.  Although the defendant maintained that this threat created a conflict "between the defense counsel's personal interest (to mollify the judge) and that of her client," *id.* at 1075, the D.C. Circuit disagreed.  "We very much doubt that mere fear of rebuke from the court could ever give rise to a conflict of interest sufficient to establish a predicate for ineffective assistance."  *Id.* at 1076.  Similarly, in *Taylor*, the D.C. Circuit rejected a defendant's claim that his trial counsel had a conflict of interest because he faced a possible contempt sanction from the district court.  139 F.3d at 931. "Because all attorneys potentially face contempt citations, no particular attorney can be considered ineffective due to a concern that he or she might be so cited."  *Id.* at 932; *see id.* at 930 ("[A] *Cuyler* conflict does not arise from mere 'friction between trial counsel and the court.'" (quoting *Shark*, 51 F.3d at 1076)).

This case readily falls into the framework already decided by the D.C. Circuit.  Moreover, to the extent that any conflict existed, it was ameliorated by the transfer of the matter to a different judge and prosecution office at the beginning of trial.  *See* Mot. at 45.  In addition, the Court

34

conducted a detailed colloquy with the defendant, explaining the exact nature of any potential conflict—that trial counsel could try to seek favor with the Court and the government in order to reduce his own exposure.  Tr. 4/3 AM at 12-15.  And when the defendant expressed a lack of understanding of the Court's explanation, the Court explained the nature of any potential conflict again in a different way.  *Id.* at 14-15.  At the conclusion of the subsequent explanation: the defendant responded, "I'm very satisfied with my attorney."  *Id.* at 15.

No conflict was created with the pendency of the contempt proceedings, but even if it had, the conflict was remedied by the transfer of the matter to a different judge and prosecuting office, as well as a conflict colloquy conducted by the Court with the defendant.  The defendant has not shown a conflict of interest to satisfy *Cuyler*.

### VI.    The defendant has waived any attorney-client privilege through his assertion of ineffective assistance of counsel, and he should be required to provide discovery relevant to his claims.

It is well-settled that when a client raises a claim of ineffective assistance of counsel, courts find a corresponding waiver of the attorney-client privilege with respect to former counsel on matters necessary to decide the claim.  *See, e.g., United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) ("Given the ample, unanimous federal authority on point, we hold that when a habeas petitioner claims ineffective assistance of counsel, he impliedly waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim."); *United States v. Lewis*, 824 F.Supp.2d 169, 172 (D.D.C. 2011) ("[W]here a claim of ineffective assistance of counsel is asserted, there is an 'implied waiver' of the [attorney-client] privilege.") (alteration in original) (citing *Bittaker v. Woodford*, 331 F.3d 715, 719–20 (9th Cir. 2003)).

The waiver of attorney-client privilege in situations involving claims of ineffective assistance of counsel finds further support in Rule 1.6 of the District of Columbia Rules of

Professional Conduct.  *United States v. Straker*, 258 F. Supp. 3d 151, 154 (D.D.C. 2017) (citing Rule 1.6).    D.C. Rule 1.6 states: "A lawyer may use or reveal client confidences or secrets . . . (3) . . . to the extent reasonably necessary to respond to specific allegations by the client concerning the lawyer's representation of the client."

Counsel for Mr. Kenner has notified the government that the defendant's current counsel has issued Mr. Kenner a subpoena seeking documents relevant to the defendant's claims, while asserting that the responsive documents remain privileged effectively shielding those documents from the government.  But "the attorney-client privilege cannot at once be used as a shield and a sword." *In re Lott*, 139 F. App'x 658, 660–61 (6th Cir. 2005) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)).

Because the defendant has put former counsel's performance at issue, and the evidentiary hearing is scheduled for December 14, 2023, the government requests an expedited ruling that the defendant has waived any attorney-client privilege held over those communications and work product relevant to the defendant's many claims.  The government also requests copies of all documents relevant to the defendant's claims, including any materials provided in response to any subpoenas that the defendant may issue.

## **CONCLUSION**

For the foregoing reasons, the defendant's Motion for New Trial should be denied, and the government seeks an Order finding that the defendant has waived any attorney-client privilege with respect to any materials relevant to the defendant's claims.

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By:  */s/ Nicole Lockhart*
    John D. Keller
    Principal Deputy Chief

    Nicole Lockhart
    Trial Attorney
    1301 New York Ave., NW
    Washington, DC 20530
    Telephone:  202-514-1412
    Facsimile:   202-514-3003
    john.keller2@usdoj.gov
    nicole.lockhart@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will serve counsel for the Defendant via electronic notification.


Dated:  November 6, 2023                          _/s/ Nicole Lockhart_
                                                   Nicole Lockhart