```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,       ) CRIMINAL ACTION NO.:
                                      ) 19-00148-1
 4              Plaintiff,            )
           vs.                        )
 5                                    )
      PRAKAZREL MICHEL,               ) Washington, D.C.
 6                                    ) March 31st, 2023
                Defendant.            ) 9:06 a.m.
 7    _____) MORNING SESSION

 8

 9                    TRANSCRIPT OF JURY TRIAL - DAY 5
                 BEFORE The HONORABLE COLLEEN KOLLAR-KOTELLY
10                    UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    FOR THE GOVERNMENT:        John D. Keller, Esquire
                                 U.S. Department of Justice
14                               1301 New York Avenue, NW
                                 Suite 1016
15                               Washington, D.C. 20530

16                               Sean F. Mulryne, Esquire
                                 Nicole Rae Lockhart, Esquire
17                               U.S. Department of Justice
                                 Public Integrity Section
18                               1400 New York Avenue, NW
                                 Washington, D.C. 20005
19

20    For the Defendant:         David E. Kenner, Esquire
                                 Alon Israely, Esquire
21                               Kenner Law Firm
                                 16633 Ventura Boulevard
22                               Encino, California 91436

23

24

25
```

1    <u>APPEARANCES (CONT'D)</u>:

2

3    FOR THE DEFENDANT:        Charles R. Haskell, Esquire
                                Law Offices of Charles R.
4                               Haskell, P.A.
                                641 Indiana Avenue, NW
5                               Washington, D.C. 20004

6    Reported by:              Christine T. Asif, RPR, FCRR
                                Official Court Reporter
7                               United States District Court
                                for the District of Columbia
8                               333 Contitution Avenue, NW
                                Room 6507
9                               Washington, D.C., 20001
                                (202) 354-3247

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX
```

```
 2    Witness Name                                        Page

 3    Special Agent Robert Heuchling

 4        Cross-examination By Mr. Kenner...........................  14

 5        Redirect Examination By Mr. Mulryne.......................  92

 6    Randall Toussaint

 7        Direct Examination By Ms. Lockhart........................ 107

 8        Cross-examination By Mr. Kenner........................... 116

 9    Tysa Wright

10        Direct Examination By Ms. Lockhart........................ 126

11        Cross-examination By Mr. Kenner........................... 133

12        Redirect Examination By Ms. Lockhart..................... 137

13    Loic Gouzer

14        Direct Examination By Mr. Keller.......................... 139

15        Cross-examination By Mr. Kenner........................... 142

16        Redirect Examination By Mr. Keller........................ 149
```

```
17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Good morning, everyone.
 3            MR. KELLER:  Good morning.
 4            MR. KENNER:  Good morning, Your Honor.
 5            THE COURT:  Okay.  Call the case.
 6            THE CLERK:  Criminal Case 19-148-1, the United
 7  States versus Prakazrel Michel.
 8            Counsel, would you please identify yourself for the
 9  record, starting with the government.
10            MR. MULRYNE:  Good morning, Your Honor.  Sean
11  Mulryne, John Keller, and Nicole Lockhart on behalf of the
12  United States.
13            THE COURT:  Good morning.
14            MR. KENNER:  Good morning, Your Honor.  David
15  Kenner, along with Charles Haskell, for the defense.
16            THE COURT:  Good morning.
17            MR. KENNER:  Mr. Michel stepped out to the bathroom,
18  and he will be right back.
19            THE COURT:  Okay.  No problem.
20            All right.  Why don't I wait for a second for him to
21  come back.
22            So do I understand that, let me just ask, for the
23  witness after this one, do you have an agreement?
24            MR. KELLER:  That's correct, Your Honor.  I believe
25  we reached an understanding.  It will avoid needing to deal
```

1   with issues of invocation of 5th Amendment or immunization.

2             MR. KENNER:  That's correct, Your Honor.

3             THE COURT:  Thank you.  I appreciate not having to

4   look stuff up.

5             All right.  Do we have anything else?

6             MR. MULRYNE:  Not here, Your Honor.

7             THE COURT:  Okay.

8             MR. KENNER.  No, Your Honor.

9             THE COURT:  Perfect.  I think we're missing a few

10  more people.  Let me -- today we'll stop just before 4:00.  I

11  have a sentencing, but it's done by Zoom.  So we'll just need

12  to get out of here to do it.

13            April 5th, we will stop at around 11:30 in order for

14  the -- no, that's -- 11:30 so that you can be out by noon,

15  Mr. Kenner.  Does that work for you?

16            MR. KENNER:  Yes, Your Honor.

17            THE COURT:  Okay.  Then April 7th is all day.  April

18  10th is all day.  April 12th we're going to stop at 11:00.  I

19  have that meeting.  But also the one juror, which I think is

20  still here, is on our jury, with the eye thing, and her

21  appointment is 12:45.  So if we stop at 11:00, a little before

22  that, it should work.  So I think those are the days.

23            And I'll mention this again.  I don't believe I have

24  anything in the evening that we have to stop short.

25            Mr. Keller?

1          MR. KELLER:  Your Honor, if we have a moment, we

2     would need the defendant present for this, and maybe there's

3     not time this morning.  One thing I had meant to raise after

4     jury selection, but we ran late, was I think -- I think for

5     the sake of the record, out of an abundance of caution, given

6     the contempt motion that's held in abeyance, it would make

7     sense to just have a brief colloquy with the defendant about

8     waiving any potential conflict of interests that could be

9     imputed to his counsel, given the -- given the contempt motion

10    filed by the government and any -- any issue that that could

11    raise in terms of his counsel wanting to appease the

12    government to try and avoid negative consequences associated

13    with that motion.

14          THE COURT:  Okay.  I mean, that's why I put it after

15    the trial to deal with it, not deal with it at this point.

16          Mr. Kenner?

17          MR. KENNER:  Your Honor, frankly, I very much

18    appreciate Mr. Keller raising that.  It is very uncomfortable

19    for me to vigorously defend my client in front of a judge who

20    may rule on whether or not my conduct has been contemptuous.

21    I would very much like to get that out of the way --

22          THE COURT:  I don't -- I think it's inappropriate,

23    frankly, in terms of -- we could deal with this at the end, in

24    terms of -- and, you know, there's always a possibility,

25    depending on what the -- it depends on what is going to be

1    presented as the issue, which I don't want to know now, in

2    terms of how this is going to be handled.  It may be that some

3    other judge will consider it, as opposed to me, in terms of

4    the contempt.

5            So I don't have a problem at the end, if you want

6    to, you know, make such a request.  As far as I'm concerned,

7    you know, I've looked at the motions, my feeling is this is

8    something to be dealt with at the end.  I would never do it

9    during the course of the trial.  I'm assuming, and you have

10   been, you know, vigorously defending your client.

11           The issue on the contempt is whether -- you know,

12   whether material was released.  It has nothing to do with how

13   you're defending this.  I mean, in terms of the defense

14   itself.  It has to do with whether material that was in the --

15   predominantly, as I recall, in the grand jury given out.  I

16   didn't do a gag order, but obviously grand jury material is

17   usually not, you know -- is not supposed to be made public,

18   but that's the only issue.

19           I don't see how it fits in, frankly, with your

20   defense of your client, unless you see something different.

21   But I'm happy to ask Mr. Michel, if you want.

22           MR. KENNER:  No, that's not necessary, Your Honor.

23           THE COURT:  Okay.  My feeling is -- I put it off.  I

24   didn't want to hear anything.  I asked for a response, just so

25   that we would have something, and it wouldn't be sitting out

1    there, to make sure it didn't affect our going forward.  Your

2    response, as far as I'm concerned, doesn't affect my

3    proceeding along here.

4         If at the end there's any interest in terms of

5    having a different judge consider it, that's fine.  I don't

6    have any problem with that.  I mean, it depends on how it

7    works out.  If it was a full contempt thing, in terms of --

8    then, you know, in many instances, other judges handle it.

9         So I'm perfectly happy to do that at the end, if

10   that seems appropriate.  But at least at this point, I don't

11   see the issue having anything to do, frankly, with the -- how

12   you represent your client.  That has to do with, as I

13   understood it, material being released that is generally not

14   made public, which was the grand jury -- I had no gag order

15   otherwise about talking to the press.

16        One always hopes there is isn't a lot of discussion,

17   because you're always telling the jury not to do something.

18   But I don't see a -- you know, a conflict.  And if you do at

19   the end, that's fine.  I'm happy to, you know, request -- we

20   switch cases all the time, just making sure there isn't any,

21   you know, concern about the judge making the decision.

22        MR. KENNER:  Your Honor, perhaps Mr. Keller and

23   myself can meet and confer about this issue, and we'll go from

24   there.

25        THE COURT:  Okay.  I mean, if you can resolve -- I

1    just didn't see getting into it.  I thought it would be

2    inappropriate for me to consider it when we're going forward

3    to trial, which is why I put it off to the end.  Judges don't

4    consider these contempt things.  Even if you held somebody in

5    contempt in the middle of a trial, you never deal with it

6    until after the trial.  So I -- that's why I put it off.

7            And I don't see it as anything to do with how the

8    trial gets conducted or how you represent your client.  It had

9    to do with giving material to third parties that wound up in

10   the news.

11           MR. KELLER:  Your Honor, I agree.  The government's

12   not asking for the Court to engage in any kind of substantive

13   assessment of the motion.  It's just the fact that the motion

14   is out there and it's known to defense counsel, I just -- I

15   could see an argument being made later that --

16           THE COURT:  Okay.  I'm perfectly happy -- I'll let

17   the two of you have a discussion.  And I have no problem, at

18   some point, talking to Mr. Michel about, you know, the pending

19   motion, which relates to material having been -- the grand

20   jury, particularly, material which is not made public,

21   evidently winding up in the newspaper for an article.  I don't

22   see that as having any relationship, frankly, with how your

23   attorney represents you.

24           And if at the end, everybody would be more

25   comfortable with another judge who has nothing to do with the

1    trial handling it, that's fine with me.  I have no problem

2    with that.  That's always an option as well.

3              MR. KELLER:  Thank you, Your Honor.

4              MR. KENNER:  Thank you, Your Honor.

5              THE COURT:  But I don't have any problem, you know,

6    talking -- the two of you talk, and I have no problem talking

7    to Mr. Michel at some point to make sure he's, you know,

8    comfortable.

9              But I as I said, I can push off the -- you know, the

10   contempt motion and give it to another judge.  We've done that

11   before, and I have no problem with that.  If that makes

12   everybody more comfortable, fine.

13             As I said, I don't see it having anything to do with

14   the actual trial of the case.  It's something totally

15   different, and it doesn't even have to do with an order I've

16   issued.  It has to do with generally that grand jury material

17   is not made public.

18             But if everybody's more comfortable with that,

19   including Mr. Michel, to have a judge handle that motion,

20   another judge, I, you know, we'll put it on the wheel.  It

21   will go randomly to whoever the next judge is who gets them.

22   I mean, it's all a random selection.

23             So that's out there.  I don't have any problem with

24   that.  So have a conversation between the two of you and

25   Mr. Michel.

1          MR. KENNER:  Thank you.

2          MR. KELLER:  Will do, Your Honor.

3          Just so that the record is clear, I do believe that

4     the Court's protective order was, of course, proposed by the

5     parties --

6          THE COURT:  Well, that's true.  But, in general, in

7     terms of materials, I didn't specifically indicate, you know,

8     the grand jury material.  But there is a protective order

9     about a number of different materials that wound up -- but I

10    don't see it affecting how the trial -- it doesn't have to do

11    with your representation.  It has to do with material going to

12    a third party, which is -- should have no effect how you

13    represent Mr. Michel.

14         But if there's concern about you trying the case

15    with the judge who potentially would do the contempt, if

16    there's any discomfort on Mr. Michel's part or yours, I'm

17    happy to put it on the wheel and send it off to another judge

18    so that there's no consideration of conflict.

19         So if you want that done, that's fine.  We can put

20    that on the record so that, you know, there's no concern going

21    forward.

22         MR. KENNER:  May I have an opportunity to meet and

23    confer with Mr. Keller at some point?

24         THE COURT:  Certainly.  And you don't need to give

25    me an answer now, but I'm throwing out that option for you.

```
1    If everybody's more comfortable with that, that's fine,
2    including Mr. Michel.
3              MR. KENNER:  Thank you.
4              MR. KELLER:  Thank you, Your Honor.
5              THE COURT:  I don't have any difficulty with that.
6    As I said, it's been done -- you know, it's been done in the
7    past.
8              MR. KENNER:  Thank you.
9              THE COURT:  Okay.  Let me -- can we check and see --
10   we were missing just a few.  We provide them food in the
11   morning, so most of them show up on time or a little early.
12             Can I mention one other thing?  I had asked -- and
13   you can keep this, I think, confidential so it doesn't get
14   out -- to exchange a list of who you're thinking of calling
15   for, like, the next week.  I would ask that it not be -- I
16   won't do an order, that it not be made public, just so we
17   don't have issues of people trying to come into the
18   courthouse, et cetera.  But it would be helpful, in terms of
19   my looking to see, you know, if there are particular issues,
20   as well as the two of you.  As well as any, you know, limiting
21   instructions, I'd have them prepared.
22             MR. KELLER:  So we have been corresponding at the
23   close of each trial day, last night and the night before, on
24   which witnesses would be called next.
25             THE COURT:  Okay.  Terrific.
```

1          MR. KELLER:  I think we've given enough notice that

2     will probably get us into Monday at this point.  I'm happy to

3     provide more.

4          THE COURT:  That's fine.  You can do it however you

5     want.  If you would let me know.

6          MR. KELLER:  Oh, okay.

7          THE COURT:  For some of these, I have -- you know, I

8     would be doing limiting instructions based on my order.  So it

9     would be helpful to know in advance if, one, there's any

10    issues that have been flagged already or, you know, some

11    limiting instruction, I'll just have everything ready to go,

12    which is helpful.

13          And, again, you know, if you wind up switching

14    people around or whatever, you can't complain that you got the

15    list.

16          MR. KENNER:  No.

17          THE COURT:  It's just an accommodation so that, you

18    know, with a long list of witnesses, that these are the most

19    likely to be handled.

20          MR. KENNER:  Yes.

21          THE COURT:  So if you're exchanging it, that's fine,

22    because that's not public.  Just put me on the list so I know

23    who they are as well.

24          MR. KENNER:  Okay.  Your Honor, just for the record,

25    Mr. Keller been an extraordinarily cooperative in doing that,

```
 1    and I have no complaints.
 2              THE COURT:  Good.  Excellent.
 3              MR. KELLER:  Thank you, Your Honor.
 4              THE COURT:  All right.  I think -- do we have
 5    everybody?  Yes?  No?
 6              THE CLERK:  Yes.
 7              THE COURT:  Oh, good.  So all of the jurors are
 8    here, so we'll be bringing them out.
 9              Sir, if you would come on back.
10              (Jury entered the courtroom.)
11              THE COURT:  Everybody can sit down.
12              Good morning, members of the jury.  Make sure you're
13    all settled.
14              MR. KENNER:  Good morning.
15              THE COURT:  All right.  We're ready to proceed --
16              MR. KENNER:  Thank you, Your Honor.
17              THE COURT:  -- with the cross-examination of the
18    special agent at this point.
19              Mr. Kenner?
20              MR. KENNER:  Yes.
21                          CROSS-EXAMINATION
22    BY MR. KENNER:
23    Q.  Good morning, Mr. Heuchling.
24    A.  Good morning, Mr. Kenner.
25    Q.  How -- let me start with, from your investigation, were
```

1   you able to determine whether Mr. Michel had a pre-existing

2   relationship with President Obama that preceded in time the

3   conduct that you described?

4   **A.** My understanding from my investigation was that the

5   defendant had some involvement in democratic politics,

6   certainly. But I do not know if he had a pre-existing

7   relationship with then-President Obama. Certainly not a

8   personal relationship that I was aware of.

9   **Q.** In the course of your investigation, were you able to

10  ascertain that -- whether or not Mr. Michel actually met

11  President Obama in 2005 in Chicago?

12  **A.** I'm not aware if he did or did not meet President Obama at

13  that time, but I believe -- I believe I may have seen

14  something like that. I think, actually, I may have seen

15  something like that in the press. I don't know if I had any

16  witness directly tell me that information.

17  **Q.** All right. Were you aware, from your investigation, that

18  Mr. Michel was at a fundraiser for then-Senator Obama when he

19  was running for President in 2007 that was hosted by Steven

20  Spielberg and Jeffrey Katzenberg?

21  **A.** I'm not aware specifically of that fact, no.

22  **Q.** I take it, then, you wouldn't be aware of whether

23  Mr. Michel made a donation to be at that event?

24  **A.** No, I'm not aware about that, no.

25  **Q.** All right. Are you aware that in 2008, Mr. Michel made

Cross-examination - Heuchling

1    several appearances as an entertainer on behalf of President

2    Obama?  That is, in the 2008 campaign?

3    **A.**   No.  Again, I was aware that the defendant, Mr. Michel,

4    had some involvement I thought, or I believed, with former

5    President Clinton, but I'm not aware of any events involving

6    the defendant in 2008.

7    **Q.**   Are you aware that Mr. Michel -- or did you discover in

8    the course of your investigation, that Mr. Michel was asked in

9    2009 to perform with the Fugees at one of the inaugural

10   balls?

11          MR. MULRYNE:  Objection, Your Honor.  All of these

12   questions are assuming facts not in the record.

13          THE COURT:  I would agree with that, so I'll -- are

14   these facts that are, frankly, going to be coming out?

15   Otherwise --

16          MR. KENNER:  Yes, Your Honor.

17          THE COURT:  -- we don't have them on the record at

18   this point.

19          MR. KENNER:  Yes, they will be coming out, Your

20   Honor.

21          THE COURT:  All right.  I'll allow the question.

22   **A.**   No, Mr. Kenner, I was not aware of that fact.

23   **Q.**   (BY MR. KENNER)  All right.  So your testimony yesterday

24   was predicated, essentially, on Mr. Michel's conduct between

25   2012 and 2018?

1    **A.**  Yes, that is correct.

2    **Q.**  Would it be a fair statement to say that your perspective

3    about Mr. Michel is based upon that limited frame of time in

4    connection with these charges?

5    **A.**  I based my investigation on the facts that were, you know,

6    available during the investigation.  The activity and the

7    allegations that I was investigating took place from 2012 to

8    2018.  So, yes, that is the time frame in which I focused my

9    attention on the defendant, that is correct.

10   **Q.**  You actually interviewed Mr. Michel, did you not?

11   **A.**  I did.

12   **Q.**  Did you ask Mr. Michel any questions about his prior

13   relationship with President Obama?

14   **A.**  No, the interview I conducted with Mr. Michel related to

15   the conduct in 2017.

16   **Q.**  All right.  You would agree, would you not, that

17   investigating and discussing these kinds of issues about

18   Mr. Michel would bring, perhaps, a different set of inferences

19   to those that you testified to yesterday?

20   **A.**  No, I --

21          MR. MULRYNE:  Objection, Your Honor.  Relevance and

22   argumentative.

23          THE COURT:  I'll sustain it.

24          MR. KENNER:  Okay.

25          THE COURT:  He's already answered it.

1          You need to be careful when he starts to get up --

2          THE WITNESS:  I apologize, Your Honor.

3          THE COURT:  -- so you don't get the answers out.

4  **Q.**  (BY MR. KENNER)  Sir, I would like to refer you to Exhibit

5  728 --

6          THE COURT:  We can't hear you.

7          MR. KENNER:  I'm sorry 728, 726.  Could you

8  please -- they've been admitted.  Could you please publish

9  them?

10         THE COURT:  726 has been admitted, and 728.  Those

11 are the two you're talking about?

12         MR. KENNER:  Yes, Your Honor.

13         THE COURT:  Okay.  They have been admitted.

14 **Q.**  (BY MR. KENNER)  With regard to -- would you look at

15 Exhibit 2 -- I'm sorry, Exhibit 726.

16 **A.**  Yes, I see it.

17 **Q.**  Can you tell me from what e-mail address this exhibit was

18 sent?

19 **A.**  So there are multiple e-mail addresses on there.  Which

20 particular e-mail in that e-mail chain would you like me to

21 comment on?

22 **Q.**  The e-mail from Frank White to -- you know which one I'm

23 talking about.

24 **A.**  I see it now, yes, sir.

25 **Q.**  Okay.

1   **A.**   From F -- so the e-mail from Frank White, or that purports

2   to be from Frank White, is fwhite@barackobama.com.

3   **Q.**   Did your recognition of that e-mail address cause you to

4   believe that Mr. White had some position with regard to the

5   Obama campaign?

6   **A.**   Yes.  Not only from that e-mail address, but the signature

7   block also says, you know, he was the National Vice Chair of

8   Finance.  And I believe, you know, throughout the

9   investigation it was clear that Mr. White was involved with

10  the campaign.

11  **Q.**   All right.  And could you describe for us his position in

12  the campaign?

13  **A.**   Yeah.  It says here National Vice Chair of Finance.  My

14  understanding is that's primarily a fundraising role.

15  **Q.**   Okay.  And in the course of your investigation, you made

16  some assessments about the success of Mr. White as a

17  fundraiser; isn't that correct?

18  **A.**   Yes.  I think during the course of the investigation --

19  and this may even be in some of the e-mails.  I don't recall

20  exactly.  But during the course of the investigation, my

21  understanding was that Mr. White was, you know, one of the top

22  fundraisers for the Obama campaign.

23  **Q.**   Okay.  And he was referred to as a bundler?

24  **A.**   Yes, that's correct, a bundler.

25  **Q.**   And can you describe for the ladies and gentlemen of the

Cross-examination - Heuchling

1   jury what a bundler is?

2   **A.**   Yes.  So a bundler is someone who either hosts fundraisers

3   or other campaign events and encourages others to donate their

4   money to the campaign.  And when those individuals donate

5   their money to the campaign, they note the fact that

6   Mr. White, or another bundler, was a person who had encouraged

7   them or recruited them to donate.

8        And to be clear, Mr. Kenner, there is nothing illegal

9   about being a bundler, and it is distinctly different from the

10  activity that your defendant undertook.

11          MR. KENNER:  Move to strike the last part of that.

12  I didn't ask him about my defendant and bundling.

13          THE COURT:  I'll strike that portion of it.  He had

14  asked specifically about Mr. White.

15          THE WITNESS:  I apologize, Your Honor.

16          I apologize, Mr. Kenner.

17          THE COURT:  If it's stricken, it's not part of the

18  evidence.

19  **Q.**   (BY MR. KENNER)  Sir, did you come to be aware, during

20  your investigation, that the relative position, in connection

21  with a campaign, is largely influenced by how much money is

22  raised for that candidate; is that correct?

23  **A.**   Yes, that is -- I don't know if I came to learn that

24  through the investigation or if that's just something I

25  understand how politics works.  Yes, sir.

Cross-examination - Heuchling

1    **Q.**  Okay.  And going back to 2008, was Mr. White the biggest

2    bundler for President Obama when he ran the first time,

3    No. 1?

4    **A.**  I don't know if he was No. 1.  I believe he was top 3, is

5    my understanding.

6    **Q.**  Okay.  And do you know what his status was amongst the top

7    bundlers in 2012 during the re-election campaign?

8    **A.**  I don't.  I apologize.

9    **Q.**  Are you aware that Mr. White had fallen, by several levels

10   of the amount, being one of the leading bundlers between 2008

11   and 2012?

12            MR. MULRYNE:  Objection, Your Honor.  Relevance.

13            MR. KENNER:  It goes to Mr. --

14            THE COURT:  I would raise a question.  Since he has

15   indicated he didn't investigate during that period of time,

16   it's not the time period that's at issue here.  So I'll

17   sustain it.

18            MR. KENNER:  All right.

19   **Q.**  (BY MR. KENNER)  You would agree, though, that in 2012,

20   Mr. White was getting credit in the administration for the

21   success of his fundraising?

22   **A.**  Yes, that is my understanding, that Mr. White would have

23   been credited with, you know, the success of his

24   fundraising.

25   **Q.**  All right.  So Mr. White himself, based on your

Cross-examination - Heuchling

1    investigation, would personally gain by increasing the number

2    of dollars that he was able to bundle.  Would that be a fair

3    statement?

4    **A.**  Yeah, I guess I -- you know, without knowing the inner

5    workings of the campaign, it would be hard for me to say

6    definitively.  But my understanding generally is that the more

7    a bundler brings in, the higher their, you know, standing with

8    the campaign may be.

9    **Q.**  All right.  Let me -- let me go to -- taking this a little

10   out of order.  I'm sorry.

11        Well, let me start here, how many private fundraisers did

12   you discover, during the course of your investigation, were

13   held during President Obama's re-election campaign in 2012?

14   **A.**  I only investigated two fundraisers.

15   **Q.**  Did you gain any awareness of nationally, across the

16   country, how many fundraisers were held?

17   **A.**  I couldn't say, but I imagine, you know, dozens, if not

18   more.

19   **Q.**  If not thousands?

20   **A.**  Well, yeah, I don't know about thousands, but hundreds

21   perhaps.

22   **Q.**  All right.  And did you determine, during your

23   investigation, of the private fundraisers that Mr. Obama had,

24   either the PAC or himself, how many were in the high end

25   $40,000 a plate category?

1    **A.**  No.  Again, Mr. Kenner, that wasn't part of my

2    investigation.

3    **Q.**  Well, are you not aware, sir, that the level of validating

4    donors by someone on behalf of the party is related to how

5    much money they're being asked to donate?

6    **A.**  My understanding -- I guess there's two things at issue

7    here.  My understanding is that federal election law requires

8    anyone donating more than a minimum amount, which I believe is

9    $200, has to be vetted by the campaign, or all the information

10   from that donor has to be collected and provided to the FEC.

11       And then I don't know what standard a campaign sets on

12   its own for vetting, you know, who they will accept funds from

13   and the large dollar amount.  But, again, my understanding is

14   the vetting has to do as much with the money that is given, as

15   well as with the opportunity that that individual may be in a

16   photograph or otherwise, you know, with the candidate.

17       And there is some, you know, risk to having anyone who

18   might have something in their background that would be

19   unsavory to the campaign in a picture with the president or

20   the candidate.

21   **Q.**  And that responsibility lies with a representative of the

22   campaign; is that true?

23   **A.**  So I guess I'll divide that question into two portions.

24       So, yeah, the campaign as a whole is responsible for

25   collecting the donor information to provide to the FEC.  I

1   don't know if that's a single individual, but I imagine it's a

2   team.

3        And then as far as the decision on who is seen with the

4   President, I imagine there is someone at a fairly high level

5   in the campaign who makes that final decision.

6   **Q.** Did you become aware, during your investigation, that with

7   respect to the Federal Election Commission, the vetting

8   responsibility was in the name of a gentleman by the name of

9   Kevin Snowden?

10  **A.** That -- I'm sorry, did Mr. Snowden work for the campaign,

11  is that what you're saying --

12              THE COURT:  You can't ask him that.

13              THE WITNESS:  Oh, sorry.

14              THE COURT:  You can't ask him a question.  If you

15  don't know --

16              THE WITNESS:  The name is -- it sounds familiar.  I

17  know we spoke to a few different individuals in the campaign

18  who were responsible for facets of the donor, about, like, the

19  process of compiling the donor information and providing it to

20  the FEC.

21  **Q.** (BY MR. KENNER)  So in your FEC investigation, did you

22  talk to Mr. Kevin Snowden?

23  **A.** Again, the name sounds familiar, but I can't exactly place

24  it.

25  **Q.** Well, would you not agree, sir, that it would be, in this

1    kind of an investigation, important to interview the person on

2    behalf of the campaign that was vetting these donations?

3              MR. MULRYNE:  Objection, Your Honor.  Relevance and

4    argumentative.

5              THE COURT:  In terms of pursuing particularly, since

6    he doesn't know this Mr. Snowden or doesn't remember exactly

7    who he is, and it sounds like, based on his earlier answers,

8    there's more than one person.

9              So you've posited in your question that this is the

10   person.  He can't answer it.  He doesn't remember Snowden as

11   to what position he had.

12             So I'll sustain it on that ground.

13   **Q.**  (BY MR. KENNER)  Are you aware that for the vetting of the

14   Obama campaign, with respect to the Federal Election

15   Commission, there was one person, perhaps with the help of

16   others, that made the recommendation or decision as to whether

17   or not that particular person should be allowed to come to an

18   event or make a donation?

19   **A.**  So that's actually not quite my understanding.

20        And to be clear, I did interview multiple people from the

21   Obama campaign, some who were involved in fundraising

22   specifically, others who were involved in processing and

23   putting together the FEC forms that were filed on behalf of

24   the campaign, and some individuals who were more involved in

25   the political side of the campaign.

1          And my understanding is that the -- and, again, I just

2     want to distinguish this, that the decision on who passed

3     vetting was more of a political decision, in the sense that it

4     had more to do with who the campaign was comfortable with

5     having in close proximity or having a picture taken with the

6     President.

7          And my understanding was that, in some cases, that

8     approval could be fairly easy and approved at a lower level if

9     the person was clearly not a risk to the campaign.  But if

10    there were, you know, a foreign national, for example, or

11    someone who had other, you know, baggage, I'll say, that that

12    question may be elevated in the campaign to a higher level.

13         So it's very hard for me to say that there was one person

14    who ultimately decided those -- decided those questions.

15         And I will say, just again, that's -- what I'm answering

16    there is separate from decisions based -- or the collection of

17    information from individuals to provide to the FEC.

18    Q.  Sir, isn't it true that during the vetting process, one of

19    the criteria that's used is comparing the individual's

20    occupation against the amount of the donation?

21    A.  I actually have never heard that before.

22    Q.  And that -- you have no view as to whether or not that's

23    correct?

24    A.  No, I -- I don't know how anyone could ascertain someone's

25    ability to donate solely based on their current occupation.

Cross-examination - Heuchling

1    There are just so many other factors that are unknown.

2    Q.  So is it your testimony that it's hard for you to believe

3    that that would be a criteria?

4    A.  It is --

5                MR. MULRYNE:  Objection, Your Honor.  Asked and

6    answered.

7                THE COURT:  He has answered it.  And, frankly, what

8    his belief is isn't particularly relevant to this particular

9    case, where he doesn't know the answer.

10               MR. KENNER:  Okay.

11   Q.  (BY MR. KENNER)  Would you at least agree that the higher

12   the amount of an event's cost to someone that's going, is

13   directly related to the extent of the vetting?

14   A.  I think -- so to be clear, I think there is probably a

15   correlation but not a causation.  And by that I mean I don't

16   think it's because the person is giving $40,000, that they are

17   vetted more highly.  I think it's because they have donated

18   $40,000, they are, therefore, going to get access to the

19   President at that event.  I think that is why there is a

20   higher level of vetting.

21   Q.  Based on your investigation, are you aware, or have you

22   made note, of how much individual time a donor, for example,

23   at the event at Mr. White's house, got with the president?

24   A.  Yes.  I mean, from both viewing the photographs and

25   talking to some of the straw donors, my understanding is that

Cross-examination - Heuchling

1    most of the straw donors had at least a bit of interaction

2    with the President.  It may not have been direct, but they got

3    to maybe ask a question at the round table or something

4    similar.

5    **Q.**  Are you familiar with the process at that -- let's just

6    talk first about the dinner at Frank White's house.  Isn't it

7    true --

8              THE COURT:  Can you put a date to it?

9    **Q.**  (BY MR. KENNER)  Yes.  It was in September, I believe.

10   **A.**  September 14th, 2012.

11   **Q.**  2012, yes.

12        Were you aware that Mr. Obama, after having dinner, got

13   up and walked around the room and spent on an average of 20

14   seconds per person, shaking their hand, and moving on?

15             MR. MULRYNE:  Your Honor, objection.  Assuming facts

16   and lack of foundation.

17             THE COURT:  I do think this one needs some

18   foundation.  I also think it's somewhat far afield in terms of

19   what the investigation is about.

20             MR. KENNER:  Your Honor, he's been --

21             THE COURT:  In terms, if you want to put some

22   groundwork as to how he would know what happened at the

23   dinner.  Okay?  Without bringing in hearsay.

24   **Q.**  (BY MR. KENNER)  Well, you talked yesterday about a

25   clutch; correct?

Cross-examination - Heuchling

**A.**   Yes, I did.

**Q.**   And what you told us about a clutch, was that based on hearsay?

**A.**   That was based on what I've seen in the investigation, also kind of based on some previous experience I had.

**Q.**   And based on interviewing the individuals?

**A.**   Yes, that the clutch did come up in some of the interviews, that's correct.

**Q.**   And you relied on that?

**A.**   As I said, I can't tell you specifically, you know, from where I drew that knowledge; but it was something that I had understood, even prior to this investigation, what the clutch was.

**Q.**   All right.  Do you understand, generally, at these $40,000 a plate dinners, that after dinner, the president walks around the table and shakes hands and says something for 20 seconds, 30 seconds, at most?

**A.**   So I don't -- I don't know the specifics of the timings, but based on -- again, based on the photographs that we saw, it did appear that the President, you know, made the rounds, if you would, at the event.

**Q.**   Okay.  And is there a photographer that follows Mr. Obama around, giving an opportunity to these people at the $40,000 a plate dinner to end up with a photograph of Mr. Obama shaking hands, hugging, or whatever else he does?

1    **A.**  Yes, there is.

2    **Q.**  All right.  You're aware that -- I think you mentioned

3    Mr. Al-Husseini was present -- was present September 12th or

4    14th of 2012 at Mr. White's house; is that correct?

5    **A.**  Yes, that is correct.

6    **Q.**  Did you determine whether or not Mr. Obama treated

7    Mr. Al-Husseini any differently than he did anybody else at

8    the table?

9    **A.**  No.  My -- you know, the only, I guess, benefit that

10   Mr. Al-Husseini may have received was that he was seated close

11   to the President.

12   **Q.**  Okay.  And did you determine, in the course of your

13   investigation, whether or not Mr. Al-Husseiny was from

14   Kenya?

15   **A.**  Yes.  My understanding is that Mr. Al-Husseiny was born in

16   Kenya, but he was a naturalized U.S. citizen.

17   **Q.**  Yes.  And did you determine, in the course of your

18   investigation, that Mr. Al-Husseiny spoke, in addition to

19   English, in Swahili?

20   **A.**  I was not aware of that.

21   **Q.**  Do you know whether or not President Obama speaks

22   Swahili?

23   **A.**  I do not.

24   **Q.**  Do you know whether or not anything happened in that

25   interaction, had to do with the fact that they both had ties

1    to Kenya?

2    **A.**  I don't.  I don't know what was discussed between the two

3    of them.

4    **Q.**  Okay.  Are you aware of anything discussed at this event

5    that was, in your view, inappropriate?

6    **A.**  Sorry.  Say again?

7    **Q.**  Did you, in the course of your investigation, determine

8    whether or not any of the conversations, either at the dinner

9    as a whole, or individually as the President went around the

10   room, were, in your investigative ability, inappropriate?

11   **A.**  So to be clear, I didn't --

12           MR. MULRYNE:  Objection, Your Honor.  Relevance.

13           THE COURT:  I'm not sure what the relevance is, in

14   terms of the conversations.  They don't seem to be

15   particularly at issue at this point.

16           MR. KENNER:  Your Honor --

17           THE COURT:  Also, as to -- you've got sort of two

18   things in here, in terms of whether -- he'd have to know about

19   the conversations and he'd also have to have decided that it

20   was inappropriate.

21           So you've asked two questions.  Break them down.

22           MR. KENNER:  Thank you, Your Honor.

23   **Q.**  (BY MR. KENNER)  Did you ever become aware of an e-mail,

24   in connection of this investigation, where Mr. Jho Low was

25   expressing to Mr. White how happy he was that the president

1    spoke in Swahili to Al-Husseiny?

2              MR. MULRYNE:  Objection, Your Honor.  Assuming

3    facts.  Lack of foundation.

4              THE COURT:  I think you're going to have to do

5    some -- this has several facts in it as well.  What's the

6    foundation for --

7              MR. KENNER:  I just said "White" in that question.

8    I apologize.  I meant Al-Husseiny, just so the record is

9    clear.

10   **Q.**  (BY MR. KENNER)  Let me digress here for a minute, and

11   we'll come back to the dinner.

12       You testified that after a very careful investigation

13   into the question of whether or not President Obama had

14   knowingly done anything inappropriate, you concluded that he

15   did not; is that correct?

16   **A.**  That is correct.

17   **Q.**  For the record, sir, I totally agree with that assessment.

18             THE COURT:  You're giving statements.  You're

19   supposed to be doing only questions.

20             MR. KENNER:  I'm sorry.

21             MR. MULRYNE:  Your Honor, if the comment can be

22   stricken from the record, please.

23             THE COURT:  I will strike the comment.  Lawyer's

24   aren't supposed to comment on the evidence as it's being

25   given, in terms of giving -- expressing their personal

Cross-examination - Heuchling

1    opinions.  So don't consider his comments.

2              MR. KENNER:  Your Honor, may I ask to have Exhibit

3    728, which has been admitted, posted?

4              THE COURT:  Sure.  It's up there.

5              MR. KENNER:  Thank you.

6    **Q.**  (BY MR. KENNER)  We're referring, again, to an e-mail from

7    Frank White.  I think we made passing reference to it before.

8    **A.**  Yes, I see it.

9    **Q.**  And who did that e-mail get written to?

10   **A.**  Which -- this e-mail from --

11   **Q.**  From Frank White.

12   **A.**  Sorry.  To the defendant.

13   **Q.**  Sure.

14   **A.**  Yes.

15   **Q.**  Okay.  All right.  Can you -- by the way, that particular

16   e-mail, I believe, is incorporated verbatim in the indictment.

17   I think it's paragraph 59 or thereabouts.  Is that true?

18             MR. MULRYNE:  Objection, Your Honor.  Relevance.

19             THE COURT:  I'll sustain that.

20             MR. KENNER:  I can't ask him about what's in the

21   indictment?

22             THE COURT:  What difference does it make whether it

23   is or is not in the indictment?  I mean, you can certainly

24   talk to him about what this --

25             MR. KENNER:  Okay.

Cross-examination - Heuchling

1          THE COURT:  -- what this e-mail says.

2          MR. KENNER:  All right.

3    **Q.**  (BY MR. KENNER)  Can you read the e-mail for us, please,

4    slowly and carefully?

5    **A.**  Yes.  Would you mind going to the top of the e-mail,

6    please?

7          I can see it.

8          "Hey, Pras.  I've informed the team in Chicago in the

9    House great news.  I'll be with the big man tomorrow.

10   Unfortunately, I'm sure you heard about the shooting in

11   Denver, so they're dealing with that today.  But moving

12   forward, let your guys know I'll be sending a follow up e-mail

13   on Monday, July the 23rd, of what we would like the

14   contribution to be at.  We like to have everything handled by

15   the end of next week, July the 27th.  Thanks.

16         "By the way, between you and I, don't tell your guys yet,

17   but the big man has a special bonus for your guy.  He really

18   appreciates his commitment to the campaign, and he takes care

19   of those who take care of him.  Thanks again.  Frank White."

20   **Q.**  Now, you would agree "the big man" in that is referring to

21   President Obama?

22   **A.**  Yes.

23   **Q.**  You would agree with me that President Obama would never

24   make such a statement?

25         MR. MULRYNE:  Objection, Your Honor.  Speculation.

1          THE COURT:  You're asking him for his opinion about

2    something, and I -- he's hardly in a position to give an

3    opinion about what he thinks President Obama would or wouldn't

4    do.

5          MR. KENNER:  Okay.

6          THE COURT:  Sustained.

7    **Q.**  (BY MR. KENNER)  As a result of your investigation, did

8    you determine whether -- or did you try to determine whether

9    or not President Obama actually said what Frank White is

10   saying he said?

11   **A.**  Could you put the e-mail back up, just so that I can look

12   at it real quick?

13   **Q.**  Certainly.

14         THE COURT:  He wants the whole thing up, so put the

15   whole thing up.

16         THE WITNESS:  No, Your Honor, I'm sorry.  This is

17   enough.  Thank you.

18         THE COURT:  Okay.

19   **A.**  So this e-mail doesn't specifically say what President

20   Obama may have or may not have said.  It just indicates that

21   there's a special bonus.  I think whether Mr. Obama was aware

22   that Mr. White was promising a special bonus is not clear from

23   this e-mail.

24   **Q.**  (BY MR. KENNER)  But based on your investigation, you

25   would agree that President Obama would not offer a special

Cross-examination - Heuchling

1    commendation or result for a donor?

2            MR. MULRYNE:  Objection.  Speculation.  Relevance.

3            THE COURT:  I'll sustain it on both.

4    **Q.**  (BY MR. KENNER)  Did you make a determination, based on

5    all of the facts in your investigation, of whether or not --

6    let me withdraw that.

7       Without telling what the answer was specifically, did you

8    ever have a conversation with Frank White about this e-mail?

9            MR. MULRYNE:  Objection, Your Honor.  Relevance.

10           THE COURT:  I'll allow the question.  It's --

11   relevance is harder in this context to be able to say it has

12   absolutely no relevance, since it is part of the -- it's part

13   of the evidence.

14           If you can answer the question.

15           THE WITNESS:  Yes, Your Honor.

16   **A.**  I don't remember specifically, but I would say that

17   generally, as we conduct our interviews, it would be normal

18   conduct for us to present e-mails to the person we're

19   interviewing that they had either written or received.  And so

20   we might have asked -- therefore, we might have asked

21   Mr. White questions about this e-mail.

22   **Q.**  (BY MR. KENNER)  All right.  But you have no recollection

23   specifically of having asked Mr. White questions about this?

24   Again, don't tell me answers.

25   **A.**  Again, I expect that we -- I expect that we did, yes.

1   **Q.**  All right.  And after the conversation, whatever it was

2   with Mr. White, did you make a determination whether or not

3   Mr. White had -- was reflecting what he had heard from

4   President Obama or not?

5   **A.**  And I -- I apologize.  I'm not able to answer that

6   question, only because I don't specifically remember the

7   response.

8        I guess -- I know I'm not supposed to ask you questions,

9   but it appears that you want to know if we made a

10  determination if Mr. Obama had actually promised something

11  from -- or to Mr. White specific to this e-mail.

12  **Q.**  Let me try to rephrase it better than that.

13  **A.**  Thank you.

14  **Q.**  After your intensive investigation into whether or not

15  President Obama was or was not involved in any wrongdoing,

16  would this e-mail, this kind of an e-mail, be relevant to your

17  determining whether President Obama did anything

18  inappropriate?

19              MR. MULRYNE:  Your Honor, objection on the relevance

20  of --

21              THE COURT:  Now, you're getting into, you know,

22  relating to President Obama.  President Obama is not the

23  person that's at -- been charged in this case.  He's already

24  indicated that they found that there was no wrongdoing.  The

25  investigation relates to your client, Mr. Michel, not to

1     President Obama.

2               MR. KENNER:  Okay.

3               THE COURT:  Since they've eliminated President Obama

4     from any wrongdoing, focusing on President Obama, I think, is

5     not relevant at this point.

6               MR. KENNER:  Thank you.

7     **Q.**  (BY MR. KENNER)  Would it be a fair inference, based upon

8     your investigation, that this e-mail is an e-mail sent from

9     Frank White to encourage continued donations from the group of

10    people we're talking about today?

11              MR. MULRYNE:  Objection, Your Honor.  Characterizing

12    the evidence, argumentative.

13              THE COURT:  I agree.

14              You're asking him to come to his own conclusion.

15    You're asking for his opinion about this.  That's not

16    appropriate, especially within the scope of what they

17    presented on direct.

18    **Q.**  (BY MR. KENNER)  Was this e-mail part of your

19    investigation as to whether or not Mr. Obama had done anything

20    wrong?

21    **A.**  So to be clear, and I just want to maybe clear this up

22    from yesterday as well, you've asked me, I think this is the

23    third time now, if something was part of my investigation.

24         And, you know, as an FBI agent and someone conducting a

25    criminal investigation, every piece of evidence, every

1    document, every witness I interview, which would include, as

2    we talked about yesterday, Mr. Bekkedam and Mr. White, all of

3    that becomes part of my case file and part of my

4    investigation.  However, it does not mean that that

5    information is, you know, utilized or becomes a crucial part

6    of the investigation that goes toward, you know, the eventual

7    charges in the case that we bring in court.

8         So when you ask if this was part of my investigation,

9    yes, in the fact that we collected it during the

10   investigation.  I reviewed it.  You know, I tried to

11   objectively make a determination about what it was telling

12   me.

13   **Q.**  What was that objective determination?

14   **A.**  That the -- that Mr. White wrote the defendant an e-mail

15   and it sounded like they were trying to set up a fundraiser;

16   and that for that fundraiser to happen, there had to be so

17   many people willing to donate a certain amount of money.

18        And I believe that's standard for any of these

19   small-gathering fundraisers.  You have to have so many

20   individuals pledge to donate, to get President Obama to take,

21   you know, I would imagine, a pretty pressing part of his

22   schedule and set that aside for the fundraiser.

23   **Q.**  And as part of your objective determination, did that

24   missive appear to you, based on your reading it and your

25   questions for Mr. Frank White, without telling me the answers,

1    did it appear to you that this was motivated by Mr. White's

2    wanting to create more motive for people to give more money by

3    inferring that the president of the United States was going to

4    have something special for them, would that be a fair

5    statement?

6            MR. MULRYNE:  Argumentative.  Calls for opinion.

7    Relevance.

8            THE COURT:  I think the problem, Mr. Kenner, is

9    you're asking him to get into -- to decide what the intentions

10   were, the mental state of Mr. White.  And I don't think that's

11   an appropriate question, in terms of his, basically, opining,

12   which is what he would be doing on your question, as to what

13   the motivations were for Mr. White.  Okay?

14           Motive is -- well, let's leave it at that.  So I'm

15   sustaining the objection.

16   **Q.**  (BY MR. KENNER)  Based on your investigation, did you

17   believe that Frank White had committed violations of FEC

18   regulations?

19   **A.**  No.

20   **Q.**  Did you conclude that Mr. White had committed violations

21   of the FARA Act?

22           MR. MULRYNE:  Objection, Your Honor.  Relevance.

23           THE COURT:  Yeah, I'm not sure that there's any

24   relevance at this point, in terms of what we have as evidence

25   so far.

1              MR. KENNER:  All right.

2    **Q.**  (BY MR. KENNER)  Did part of your investigation

3    investigate the question of whether or not Mr. White violated

4    any FARA laws?

5              MR. MULRYNE:  Relevance again, Your Honor.

6              THE COURT:  I think at this point you're looking at,

7    in terms of potentially somebody that was involved in this,

8    but you're asking him -- let's see -- investigate the question

9    of whether he violated -- so that gets into whether another

10   investigation into conclusions about somebody else.  That's

11   not what the charges are in this particular case.

12   **A.**  (BY MR. KENNER)  With respect to this particular case,

13   were you involved in conversations about who should be charged

14   with crimes and who should not?

15             MR. MULRYNE:  Your Honor, objection again for

16   relevance.

17             THE COURT:  I do think we're getting far afield.  If

18   I could perhaps have a bench conference for a second.

19             MR. KENNER:  Certainly.

20             (Bench conference on the record.)

21             THE COURT:  Okay.  It seems to me that you're -- you

22   know, you're getting into sort of straying off on questions to

23   get into --

24             MR. KENNER:  Hello?

25             THE COURT:  Can you hear me?

1              MR. KELLER:  Yes, Your Honor.

2              THE COURT:  Okay.  Can you hear me, Mr. Kenner?

3              MR. KENNER:  Yes, Your Honor.

4              THE COURT:  Okay.  So tell me what the relevance is

5     for all of this.  I realize you're trying to get information

6     through this witness, which sounds like if Mr. White isn't

7     testifying, that he basically presents the information.

8              Who else they charged is, frankly, not relevant, in

9     terms of -- I don't see any relevance.  I mean, you can't talk

10    about prosecutorial misconduct, in terms of who they're

11    bringing.  I've excluded that.  And, you know, who else they

12    may have decided to charge or not charge doesn't have anything

13    to do with this particular case and Mr. Michel.

14             So tell me what's relevant about it.

15             MR. KENNER:  What's relevant about it, Your Honor,

16    is that I believe the evidence in this case will show that

17    Mr. White was the leader of this conspiracy.  I intend to show

18    that he was a very experienced person in the political and

19    fundraising realm; and that he was the one who instructed

20    Mr. Michel what to do and what not to do, and then Mr. Michel

21    relied on that.

22             So I think it's very relevant that the -- that this

23    witness who was, you know, I'll use the phrase driving the bus

24    of this whole thing, I think that's fair game.

25             THE COURT:  Let me just point out to you that I

Cross-examination - Heuchling

1    think we need to take a break.  I believe that some of these

2    issues are addressed in opinions.  So let me take a break and

3    take a look at it.  It's a March 6 opinion and March 21

4    opinion.

5              So I'm going to take a short break with the jury so

6    we can look at these.

7              MR. KENNER:  Okay.

8              THE COURT:  All right?

9              MR. KENNER:  And let me just say, Your Honor, I am

10   totally aware of your order prohibiting arguing government

11   misconduct.  That's not the purpose for which I'm asking these

12   questions, nor do I intend to suggest that there was any

13   government misconduct.

14             THE COURT:  Well, I'm just saying that eliminates

15   that, but I think there's some other issues here relating to

16   the relevance issue.

17             So let me take a short break, and we'll take a look

18   at them.

19             MR. KENNER:  Thank you, Your Honor.

20             MR. MULRYNE:  Thank you, Your Honor.

21             (The following proceedings were had in open court.)

22             THE COURT:  Members of the jury, we're going to take

23   a quick break.  This will not be your full morning break, but

24   we need a break to be able to look at some things to discuss

25   it more carefully.  Okay?

Cross-examination - Heuchling

1    So we'll say ten minutes, quarter after.  I'll give you

2    your morning break later.

3              THE WITNESS:  Your Honor, would you like me to step

4    out as well?

5              THE COURT:  Yes, if you would.

6              (Jury left the courtroom.)

7              THE COURT:  Some of these issues relating to the

8    March 6th opinion, page 8 and 9, relating to motivations and

9    relation to, also, President Obama, takes care of part of what

10   I've been sustaining.  And let me look at the other issue, in

11   terms of the March 21st consideration.  Let me find that one.

12             So page 9 at the bottom, which talks about -- I

13   believe discusses the -- discussing defendant's proffer about

14   former President Obama, offering testimony about Frank White

15   as to whether, you know, they had lied to the investigators,

16   et cetera.  And it's in the context of President Obama, which

17   is part of -- you're getting into issues that I, frankly,

18   think are not relevant, and I think the two opinions make it

19   clear that you're getting beyond that.

20             So I think, you know, in terms of the issues, one,

21   that I've sustained, and certainly the relevance at this point

22   So this gets into whether or not -- which touches on, seems to

23   me, some of the issues relating to trying to bring out about

24   Mr. White, and I don't think it -- it's irrelevant, in terms

25   of they committed -- by basically trying to undercut, through

1    this witness, conclusions about whether or not Mr. White lied

2    about various things, and I don't see that it's relevant.

3             And I think my opinions, although they didn't deal

4    with it directly, I think dealt with it sufficiently to

5    preclude it.

6             Anything else you want to say, Mr. Mulryne?

7             MR. MULRYNE:  No, the government agrees, Your Honor.

8    In terms of whether or not Mr. White did or didn't do

9    something wrong, was or was not charged, the government's view

10   is that's not relevant.  Your Honor's orders address that

11   directly or indirectly.

12            But the -- to the extent the defense's theory hinges

13   on that, Your Honor, we think it's irrelevant, but also would

14   require admissible evidence.  The questions being posed to the

15   witness are calling for speculation and opinion, and the

16   defense is welcome to rely on what's in the record or

17   anything that they can -- admissible evidence they can put

18   into the record, but this general topic itself, Your Honor, I

19   think goes far afield of the defendant's charges.

20            THE COURT:  Not only the defendant's charges, but I

21   think it also -- although, you are talking about an exhibit

22   that was admitted, certainly some of the questions would --

23   could be viewed as going outside what the direct brought up,

24   but I won't go off on those grounds.

25            I've given you the opinions, and, frankly, getting

1    into whether Mr. White lied or didn't lie, at this point, is

2    irrelevant.

3            MR. KENNER:  Your Honor, may I be heard?

4            THE COURT:  Sure.

5            MR. KENNER:  Your Honor, the theory -- in part, the

6    theory of the defense of this case is that Mr. White is -- is

7    the witness out of the courtroom?

8            MR. MULRYNE:  Yes.

9            MR. KENNER:  Yeah.  Is that Mr. White was calling

10   the shots and advising Mr. Michel what to do.  You'll notice

11   in all of the e-mail exchanges between Mr. White and Mr.

12   Rousseau, Pras is -- Mr. Michel is just taking the e-mail from

13   Frank White, forwarding it to Mr. Rousseau, taking an e-mail

14   from Mr. Rousseau, forwarding it to Mr. White.

15           I believe the evidence will show, if I'm allowed to

16   develop the theory of the defense, that Mr. Michel was a pawn

17   of Mr. White, who used his knowledge of what's right and

18   what's wrong, which I believe he clearly knew, to cause

19   Mr. Michel to do things that Mr. Michel didn't understand

20   whether they were right or wrong in the same way that

21   Mr. White did.

22           He was alleged as part of the conspiracy.  I think a

23   valid defense is -- and it goes to the knowledge and it goes

24   to willfulness and it goes to intent of Mr. Michel -- is to

25   show that he was relying on Mr. White entirely in what he was

Cross-examination - Heuchling

1    communicating to the other parties, and relying on what the

2    other party said to Mr. White.

3           He wasn't altering anything.  He wasn't changing

4    anything.  I think that a valid theory of the defense is that

5    the co-conspirator, Mr. White, was the man, I'll use the

6    phrase driving the bus.  He was the -- it was his scheme that

7    was done to manipulate the situation for a variety of reasons,

8    which I'm happy to go -- we were talking yesterday --

9           THE COURT:  Let me stop you here.  I mean, the

10   problem that I see, leaving aside whether or not -- and I'll

11   hear from Mr. Mulryne -- whether that's your theory of the

12   defense.

13          I think one of the problems is that this is not the

14   witness that you're trying to get.  In essence, you're trying

15   to get this witness to indicate what his thoughts are or what

16   other people may have thought as to whether or not Mr. White

17   was truthful or not, which is why you went into the other

18   things.

19          This is not the witness -- leaving aside the other

20   question.  This is not the witness to get this information

21   from.

22          Mr. Mulryne, in terms of his theory?

23          MR. MULRYNE:  The government agrees, Your Honor,

24   that is the defense's theory, perhaps is their argument, and

25   they're characterizing the evidence accordingly, but this

1    is -- this witness is not the witness though which that

2    evidence can come in.  He is not Mr. White.  He can't testify

3    as to anything Mr. White said or didn't say.

4        So that is left for argument, Your Honor.

5        THE COURT:  All right.  Mr. Kenner, I don't think

6    this is the witness that you get.  I'll leave aside any other

7    issue, but this is not the witness.  You're asking him

8    questions as he's supposed to be in the mindset of Mr. White,

9    as to what Mr. White's -- and motive, frankly, has some issues

10   with it anyway, but what the mindset of Mr. White was.  This

11   witness cannot talk about that, frankly.

12       And whether or not they investigated Mr. White or

13   didn't investigate Mr. White, evidently -- he answered that he

14   wasn't charged and that they didn't find that he did any

15   FARA -- although he objected to it, we got an answer that said

16   no.  So I don't think --

17       MR. KENNER:  Your Honor, that's what --

18       THE COURT:  Not this witness, and we're dealing with

19   this witness at this point.

20       MR. KENNER:  Okay.  The answer of no was the answer

21   I was trying to get, and I got it, but --

22       THE COURT:  All right.  So that's the end of it.

23   You're not getting anything more from him, making an effort to

24   try and bring out things about what former President Obama

25   thought, which is contra- -- you know, crossing the line of

Cross-examination - Heuchling

1    what I had in my order, but we've moved on from that.

2            And, frankly, you're trying to get at what either

3    President Obama or this witness thought of Mr. White.  You

4    can't do that.  It's not relevant.  Okay?

5            So the last set of questions, you know, I've -- I'm

6    going to sustain in front of the jury the last question.  You

7    can ask other questions.

8            MR. KENNER:  Thank you, Your Honor.

9            THE COURT:  And I'm not suggesting anything about

10   your theory.  You'll have to develop that, if that's your

11   theory, in some other way, but not through this witness.

12           MR. KENNER:  Just so I'm crystal clear, Your Honor

13   is ruling that it is objectionable for me to probe the extent

14   to which this witness relied on what he learned during his

15   investigation about Mr. White's role in this, and that I

16   can't -- I can't ask --

17           THE COURT:  Well, you're going beyond what was

18   presented in the case.  You're asking him to give opinions.

19   He explained they collected a lot of information.  Some

20   information was used in this particular case.

21           Your questions earlier about, well, did you

22   consider -- they may have had collected information.  The

23   question is, what did they use in deciding to go forward in

24   their investigation of Mr. Michel.

25           And the government was very careful to bring out the

1    particular things that they relied on, in terms of -- you're

2    getting far afield, in terms of asking him broadly about what

3    they found out in their investigation.  It isn't relevant,

4    okay, in terms of what other information they may have

5    gathered, apart from being beyond the scope of the direct.

6           But you're also asking him indirectly in various

7    ways, which you have done, in terms of having him opine as to

8    whether or not Mr. White was truthful or was lying or what his

9    role was or exaggerating, whatever, which would mean that he

10   would be giving an opinion about Mr. White.  Okay?  That's not

11   relevant.

12          MR. KENNER:  Okay.  Your Honor, just for the record,

13   yesterday this witness' testimony was these are some facts and

14   this is what I inferred from those facts or what I concluded

15   those facts meant with regard to my investigation.

16          THE COURT:  Right.  And the point is, is then there

17   were objections when you started to get far afield.

18          He explained today that they collected a great deal

19   of information, and all of it they considered and had

20   together.  But when they went forward, they went forward with

21   the evidence that related to -- they didn't use all of that

22   information going forward in their investigation.

23          So talking to him about other information he

24   gathered that was not connected to their investigation of

25   Mr. Michel isn't relevant.

Cross-examination - Heuchling

1          MR. KENNER:  Your Honor, I understand, and I know
2    this is not the subject for now.  I will submit a brief on it.
3    But as you know, it's inordinately difficult when Mr. White's
4    going to take the 5th Amendment and I don't know what the
5    Court's ruling will be.
6          THE COURT:  I don't know what he's going to do, but
7    that's the last thing that we've heard.  All I'm saying is you
8    can't have him opining, which is what you're doing.  I mean,
9    you're trying to get him to opine as to the truthfulness of
10   Mr. White and to have him indicate what he thinks Mr. White's
11   role was relating to Mr. Michel.  That goes -- is relevant to
12   some degree, but goes beyond the scope of what he can talk
13   about.
14          He's explained they collected a lot of information.
15   So they have a lot of information about various people, but
16   they had nothing to do with what they ultimately went forward,
17   which is what the testimony was.  If you stick to that, I
18   don't have a problem.  You're going far afield.
19          And I realize what you're trying to do and -- you
20   know, but you can't do it through this witness.  You may not
21   be able to do it with others, but you certainly can't do it
22   with him.
23          MR. KENNER:  Thank you, Your Honor.
24          THE COURT:  All right.  Let's get the witness -- I
25   don't know -- let's go forward, and we'll take a break at

1     around 11:15.  Get the witness back.

2              (Jury entered the courtroom.)

3              THE COURT:  All right.  Go ahead and sit down,

4     everyone.  We'll proceed at this point.

5              I'll sustain the objection to the last question.

6              MR. KENNER:  Thank you, Your Honor.

7              Could I see Exhibit 105, please, that's been

8     admitted?

9     **Q.**  (BY MR. KENNER)  You testified yesterday with regard to

10    Exhibit 105 -- I'm sorry.

11        Do you see Exhibit 105 in front of you?

12    **A.**  Yes.

13    **Q.**  And that is a photograph taken at the fundraising dinner

14    at Mr. Frank White's house in September of 2012; is that

15    correct?

16    **A.**  Yes, that's correct.

17    **Q.**  And you identified in the picture Jho Low's father on the

18    left?

19    **A.**  Yes.

20    **Q.**  And Mr. White's wife in the center?

21    **A.**  Correct.

22    **Q.**  And Mr. Michel next to Mr. White's wife?

23    **A.**  Correct.

24             MR. KENNER:  Okay.  May I have the next photograph,

25    please.

Cross-examination - Heuchling

1   **Q.**  (BY MR. KENNER)  Then you showed us a picture of President

2   Obama shaking hands with Mr. White, with Mr. Low's father to

3   the left?

4   **A.**  The defendant, Mr. Michel.

5   **Q.**  I'm sorry.  The defendant, Mr. Michel, and Mr. Jho Low's

6   father on the left?

7           THE COURT:  Is that still part of Exhibit 105, or is

8   that exhibit --

9           MR. KENNER:  Yes, Your Honor.

10          THE COURT:  Just for the record.  That's fine.

11          MR. KENNER:  Thank you.

12  **Q.**  (BY MR. KENNER)  The last two exhibits that you looked at,

13  are they reflective of any illegal conduct?

14  **A.**  No.

15  **Q.**  Okay.  The next picture that you looked at was, this is a

16  picture that appears to be the back of Mr. Obama talking to

17  Mr. Al-Husseiny; is that correct?

18  **A.**  That's correct.

19  **Q.**  Does this the picture depict anything illegal?

20  **A.**  Not on the face of it.  But in so much that

21  Mr. Al-Husseiny, and going back to the other picture, Jho

22  Low's father had access to the President, potentially based on

23  the funds that the defendant had collected from Mr. Low and

24  given to a straw donors, I guess it's tangentially

25  connected.

54

Cross-examination - Heuchling

1    **Q.**  Let me ask you this:  You don't know what they were saying

2    to each other; correct?

3    **A.**  No, but I don't understand the relevance of what they're

4    saying --

5    **Q.**  I'm not asking you to understand the relevance of my

6    question, sir.  That's for the judge to decide.  Can we agree

7    on that?

8            THE COURT:  No, that --

9    **A.**  I didn't mean for it to be argumentative, Mr. Kenner.

10   **Q.**  (BY MR. KENNER)  Thank you.

11       What I'm asking you is, looking at this photograph, does

12   this depict any illegal conduct to you?

13   **A.**  The photograph, taken as it is, does not depict any

14   illegal conduct.

15   **Q.**  Thank you.

16           MR. KENNER:  May I see the next photograph?

17   **Q.**  (BY MR. KENNER)  Now, let's talk a little bit about this.

18   This is a --

19           THE COURT:  Which is this?  Is this still 105?

20           MR. KENNER:  Yes, it's still -- it's the next

21   picture in Exhibit 105.

22   **Q.**  (BY MR. KENNER)  With regard to this particular picture --

23   and I'm going to ask you a few questions about it -- this is a

24   picture of the table around which people are seated at

25   Mr. Frank White's house; is that correct?

Cross-examination - Heuchling

1  **A.**  That is correct.

2  **Q.**  And can you tell me how many people are -- by the way, is

3  this a photograph in Mr. White's condominium in New York?

4  **A.**  My understanding that picture is taken from Mr. White's

5  condominium in Washington D.C.

6  **Q.**  I'm sorry.  I apologize.  That's fair.

7      So this was a picture from Mr. White's condo where he

8  lived in Washington, D.C.; is that correct?

9  **A.**  Yes, that's my understanding.

10  **Q.**  And do you know which room of the condo this picture is

11  of?

12  **A.**  No.

13  **Q.**  Can you tell me how many people you count to be around

14  that table?

15  **A.**  Yes.

16      I see about 22 people immediately around the table, but

17  there may be one or two more outside of the picture.

18  **Q.**  All right.  So there's roughly 22 or 24 people in

19  Mr. White's condominium in Washington, D.C.  Mr. Michel didn't

20  do the seating arrangement for this, did he?

21  **A.**  Not that I'm aware of.

22  **Q.**  All right.  Would you agree it would have been Mr. Michel,

23  at whose house it was, that did the seating?

24  **A.**  Sorry.  Are you asking me if Mr. White did the seating?

25  **Q.**  Yes.

Cross-examination - Heuchling

1    **A.**  Again, I don't know if Mr. White would make that decision

2    or someone else in the campaign might make that decision.

3    **Q.**  All right.  But you would agree, would you not, that this

4    was not -- the seating arrangement was not done by Mr. Michel;

5    correct?

6    **A.**  I've seen no evidence to indicate that Mr. Michel was

7    involved in who sat where.

8    **Q.**  Okay.  And you made a point yesterday that President Obama

9    is -- I'm sorry -- this is another view of this table in

10   Mr. White's condominium, and you made the observation

11   yesterday that President Obama, to his -- to President Obama's

12   right is Mr. Michel sitting next to him; is that correct?

13   **A.**  That is correct.

14   **Q.**  And to his left was Mr. Low's father; correct?

15   **A.**  Correct.

16   **Q.**  And you have no evidence whatsoever that Mr. Michel

17   dictated that arrangement?

18   **A.**  No.  My understanding is that, you know, Mr. Michel and

19   Mr. White communicated about, you know, who were the kind of

20   VIPs or the important person --

21            MR. KENNER:  Objection, Your Honor.  Calls for

22   speculation and hearsay, his understanding.

23            MR. MULRYNE:  Your Honor, interrupting the witness'

24   response.

25            THE COURT:  Well, I think we may need to hear what

1    the answer is.  You asked him, "And you have no evidence

2    whatsoever that Mr. Michel dictated the arrangement?"

3              No.  My understanding is that Mr. Michel and White

4    communicated about stuff.

5              He's answering your question.

6              MR. KENNER:  Okay.  That's fine.

7    **Q.**  (BY MR. KENNER)  What evidence do you have, or have you

8    seen, that indicated to you that Mr. White had a conversation

9    with Mr. Michel about where people should be seated?

10   **A.**  So not specifically a conversation, just the e-mails

11   that -- or the e-mails that we looked at earlier where it

12   appears clear that Mr. Al-Husseiny and Mr. Low's father, or

13   Larry Low, were given, you know, a kind of higher level of

14   vetting.

15            So I believe that the importance for them at the event

16   would have been made clear to Mr. White by the defendant.

17   **Q.**  That's what you think?

18   **A.**  That's what the e-mails indicate, yes.

19   **Q.**  Can you point to what e-mail you're referring to?

20   **A.**  I can't by exhibit number, but there are e-mails that --

21   from Mr. -- that were provided by Mr. White, I believe, where

22   Mr. White is asking Mr. Michel urgently for -- and Mr. Low's

23   father's passport, for Mr. Al-Husseiny's number.

24   **Q.**  Okay.  And isn't it true that the e-mails that you're

25   talking about were passed by Mr. Michel from Mr. White to Mr.

1    Rousseau, exactly as he got them from Mr. White?  He didn't

2    change them or alter them; correct?

3    **A.**  So I think we're talking about potentially different

4    e-mails now; is that correct?

5    **Q.**  You tell me.  You're the witness.

6    **A.**  Well, then I'm going to have to ask you to be more

7    specific, because there are a lot of e-mails that we looked at

8    yesterday.

9    **Q.**  All right.  I made an observation with regard to the

10   e-mails that had to do with the subject matter of Jho Low, Jho

11   Low's father, Mr. Al-Husseiny, and perhaps others, that those

12   e-mails would -- while they were transmitted by Mr. Michel

13   from Mr. White to Mr. Rousseau, he did not alter them.  He

14   just passed on the same -- he forwarded the e-mail that he got

15   as he got it; is that correct?

16           MR. MULRYNE:  Objection, Your Honor.  Speculation

17   and characterization of the evidence.

18           THE COURT:  I have to say that, doing it in a

19   vacuum, I would agree, without being able to look at what

20   you're talking about.

21           MR. KENNER:  Okay.

22           THE COURT:  So I'll sustain the objection.

23           MR. KENNER:  All right.

24   **Q.**  (BY MR. KENNER)  Can you tell me what e-mail supports your

25   theory that Mr. Michel was telling Mr. White about who's

Cross-examination - Heuchling

1    important?

2    **A.**  So, again, there's not explicit language in any of the

3    e-mails, that I can recall, specifically about who's

4    important.  But if you look at the totality of the e-mails, I

5    think it's indicative, or it is indicative, that Mr. Michel

6    was -- and Mr. White were more concerned about certain

7    individuals clearing vetting.  Therefore, it would have been

8    clear to Mr. White which of the individuals were important for

9    Mr. Michel and, therefore, you know, Mr. Rousseau and Mr. Low

10   to get into the event.

11   **Q.**  Everything you just said is your opinion, based on your

12   read of the e-mails; is that correct?

13   **A.**  That is -- that is based on my reading of the e-mails,

14   that is correct.

15   **Q.**  All right.  So you read e-mails, and then you added your

16   own inference to those e-mails as to what they really meant?

17           MR. MULRYNE:  Objection, Your Honor.

18   Argumentative.

19           THE COURT:  I have to say, the way you've worded it

20   is argumentative.  There's other ways of asking it.

21           MR. KENNER:  Thank you, Your Honor.

22   **Q.**  (BY MR. KENNER)  You would agree, would you not, that the

23   communications between the Low-related people and Mr. White

24   were passed between them by Mr. Michel?

25   **A.**  Yes.  Based on the e-mails that we've looked at today, the

Cross-examination - Heuchling

1    e-mails from Mr. Low and Mr. Tan often came through Mr.

2    Rousseau, then through the defendant, and then on to

3    Mr. White.

4    **Q.**  And have you read any e-mail in which Mr. Michel said or

5    suggested directly as to where people should be seated?

6    **A.**  No, not explicitly.

7    **Q.**  So in short, you don't know who's responsible for the

8    seating arrangement there?

9    **A.**  No, and I thought I had made that clear in the beginning.

10   I believe that seating arrangement would have been finalized

11   by people at the campaign and perhaps with Mr. White's

12   input.

13   **Q.**  All right.  And one last question about that.  You would

14   agree that there is no evidence to support the notion that it

15   was Mr. Michel who did that?

16   **A.**  No, I've seen no evidence that suggests that Mr. Michel

17   had any -- you know, explicit or was ever asked who should sit

18   where.  I've seen no evidence of that.

19   **Q.**  Thank you.  Let me switch to another area, if I may.

20              MR. KENNER:  Excuse me one second, Your Honor.

21              THE COURT:  Certainly.

22   **Q.**  (BY MR. KENNER)  In the course of your investigation about

23   Mr. Jho Low, did you determine whether or not he spoke

24   English?

25   **A.**  Yes.

Cross-examination - Heuchling

1  **Q.** Did you determine that he spoke English with no foreign

2  accent?

3  **A.** So I've never had the opportunity to speak to Mr. Low

4  directly. In online recordings and other media, he does have

5  a slight accent.

6  **Q.** Your opinion is he has a very slight accent?

7  **A.** It's a slight accent. So he went to school -- his

8  finishing school was in England, and so in the same way that

9  the English have an accent, he has an accent as well.

10 **Q.** So he went to Oxford in England for his undergraduate

11 work; correct?

12 **A.** No, that's not correct. He went to Penn.

13 **Q.** No, that was for his master's, wasn't it?

14 **A.** No. He went to Penn for his undergraduate work, but he

15 went to the -- he always liked to note that it was the Wharton

16 School at Penn, but my understanding was it was a business

17 undergrad degree.

18     In England, he went to the Harrow School. It's a

19 high-end private high school, is my understanding.

20 **Q.** Okay. So when he -- after Mr. Jho Low came to the United

21 States, he went to Wharton School of Business, as he likes to

22 say; correct?

23 **A.** Yeah. Again, that's my understanding, it was just an

24 undergrad degree.

25 **Q.** Okay. And where is Wharton School of Business located?

Cross-examination - Heuchling

1    **A.**   University of Pennsylvania.

2    **Q.**   Okay.  Did you ever review or look at a list of properties

3    that Mr. Michel purchased -- I'm sorry, Mr. Jho Low

4    purchased?

5    **A.**   Yes.  We seized or forfeited -- I couldn't tell you the

6    exact number, but five or six properties that belonged to

7    Mr. Low in the United States, as well as properties in the UK

8    and in Paris, and we were aware of other properties that he

9    might have purchased as well.

10   **Q.**   All right.  Mr. Low purchased the Park Lane Hotel in New

11   York, which was later forfeited; is that correct?

12   **A.**   Yes, that's correct.

13   **Q.**   And how long was it between the time he purchased it until

14   the time of the allegations to forfeit it?

15   **A.**   I believe the Park Lane Hotel deal closed in 2011 or

16   2012 -- I might be wrong there -- and I believe we seized that

17   in 2016.

18        But we filed forfeiture complaints against Mr. Low in

19   2016 and 2017.  I believe we might have filed again in 2018.

20   I forget, but we've done a series of them.

21        So I couldn't tell you exactly in what year, but I

22   believe it was 2016.

23   **Q.**   All right.  So between 2011 and 2016, it appeared that

24   Mr. Jho Low legitimately owned the Park Lane Hotel; isn't that

25   correct?

Cross-examination - Heuchling

1   **A.**  I guess, it appeared to whom?

2   **Q.**  Anybody that looked at who owned the Park Lane Hotel.

3   **A.**  Yeah.  So to be clear, I guess I would -- when I started

4   to look at this, it was clear, you know, very early on that he

5   did not legitimately own it.

6       But if what you're asking is between the time period of

7   2011, or whenever he purchased it, to 2015 or '16, before the

8   allegations and the forfeiture was filed, yeah, I think people

9   would have thought he was a legitimate owner, yes.

10  **Q.**  Okay.  And that would include Mr. Michel; correct?

11  **A.**  I don't know if Mr. Michel was aware of Mr. Low's

12  ownership of the Park Lane --

13  **Q.**  I'm not asking you that.  I'm asking you, would it appear

14  to Mr. Michel, as anybody else, that between 2011 and 2016,

15  Jho Low owned the Park Lane Hotel?

16          MR. MULRYNE:  Objection, Your Honor.  That calls for

17  speculation, and this whole line of questioning is

18  irrelevant.

19          THE COURT:  I'll sustain it.

20          MR. KENNER:  Are you sustaining it with regard to

21  the whole line of questions?

22          THE COURT:  I'm sustaining it both grounds.

23          MR. KENNER:  I'm sorry?

24          THE COURT:  I'm sustaining it on both grounds.

25          MR. KENNER:  May we have a conference, Your Honor?

Cross-examination - Heuchling

1              THE COURT:  We can if you want.

2              (Bench conference on the record.)

3              THE COURT:  Okay.  You're asking him to speculate as

4    to what Mr. Michel may have had other reasons to know, in

5    terms of whether it was legitimate or not.  So I don't think

6    he's asking -- you're asking him to figure out what Michel

7    would know.  That's not appropriate.

8              I'm also not sure what the Park Lane Hotel has to do

9    with, at this point, what you're asking him about, in terms of

10   Mr. Michel.

11             MR. KENNER:  Your Honor, I -- my intention -- I'll

12   drop the Mr. Michel part.  My -- the purpose of this line of

13   questioning is to establish that somebody that was with or had

14   become friends with somebody, and the things that they

15   observed about them would support the fact that they were a

16   legitimate person in the United States.

17             And I think that the places he purchased in terms of

18   residences, the businesses he purchased, the fact that he

19   spoke fluent English, all support the fact that there was

20   nothing that would tip Mr. Michel off that he was other than

21   what he purported to be, which was an international

22   businessman.

23             THE COURT:  Mr. Mulryne?

24             MR. MULRYNE:  Your Honor, I don't quite understand

25   that argument or theory.  I think it continues to be

1    irrelevant, whether or not he presented himself to be a

2    legitimate international businessman or otherwise, as to the

3    charges and the elements of the offenses here as to whether

4    the defendant, Mr. Low, and others conspired to put foreign

5    money into elections and using conduits.

6              So I don't think the appearance of -- and certainly

7    real estate, property ownership, and transactions regarding

8    conduct clearly outside the scope of this trial, how that

9    relates to or is relevant to the current matter.

10             MR. KENNER:  Your Honor --

11             THE COURT:  Yes.  Nobody is suggesting -- yeah, I

12   would agree with Mr. Mulryne.  I think we've had enough.

13             So let's -- I'm sustaining the objection.  And it

14   does seem to me, you know, you're asking him basically as to

15   what other people would -- whether it's Mr. Michel or others,

16   what conclusions they would have reached.  Who knows what

17   conclusions people would reach, based on -- and, frankly, I

18   don't know that has anything to do with Mr. Michel.

19             I don't know that the government's theory is that he

20   had to know, you know, that he was, you know, somebody who was

21   doing things that were legitimate.  The question is the money

22   that Mr. Low, according to the government, gave to Mr. Michel,

23   and Mr. Michel used straw donors.

24             I don't know.  Is it a key part, Mr. Mulryne, that

25   he had to know that the money was, you know, from ill-gotten

1    gains?

2              MR. MULRYNE:  It is not, Your Honor.

3              THE COURT:  All right.  So that's not --

4              MR. KENNER:  Your Honor, just briefly.  The

5    government alleges that Mr. Michel was operating as an

6    unregistered foreign agent on behalf of both Mr. Low and the

7    government -- the People's Republic of China.

8              Evidence that everything that Mr. Michel, and the

9    world, knew about Mr. Jho Low is in contradiction to the

10   notion that there's any reason for Mr. Michel to have

11   suspected that he was a foreign agent, and I think to be

12   precluded from doing this is wrong.

13             THE COURT:  Mr. Mulryne, you want to respond to

14   that?

15             MR. MULRYNE:  Well, Your Honor, in terms of the

16   foreign agency, that's the 2017 conspiracy, which, at this

17   point, would be way beyond the scope of what we're covering

18   here.

19             But separate and apart from that, separate and apart

20   from that, Your Honor, in terms of what the defendant knew or

21   didn't know, the agent is not going to be able to provide any

22   evidence -- no evidence is going to be able to come through

23   the agent, in terms of the defendant's knowledge pertaining to

24   any of that.

25             So it's just the wrong witness, the wrong course

Cross-examination - Heuchling

1   of -- wrong course of questioning in order to establish or

2   address that issue.

3            MR. KENNER:  Your Honor --

4            THE COURT:  And, frankly, what other people would

5   have been impressed or not impressed with his investments,

6   et cetera, is totally irrelevant.

7            So I am precluding it through this witness.  We're

8   finished.

9            (The following proceedings were had in open court.)

10           THE COURT:  I'll sustain the objection.

11  **Q.**  (BY MR. KENNER)  Sir, in the course and scope of your

12  investigation, did you ultimately -- did the government

13  ultimately file an action to forfeit monies that the

14  government believed were ill-gotten gains as respect to

15  Mr. Jho Low?

16  **A.**  Yes, specifically on various assets, that's correct.

17  **Q.**  Can you describe what those assets were?

18  **A.**  Yes.  In general terms or -- sorry, I can't ask you

19  questions.

20       Generally, we seized high-end properties in Los Angeles

21  that belonged to Mr. Low and other co-conspirators.  We seized

22  luxury condominiums and apartments in New York City that

23  belonged to Mr. Low and other co-conspirators.  We seized the

24  Park Lane Hotel, which we discussed.  We seized the rights to

25  the Viceroy Hotel in Los Angeles.

1        We seized the rights to *The Wolf of Wall Street*, the

2   film, as well as *Daddy's Home* and *Dumb and Dumber 2*, and a few

3   others.

4        We seized the rights to a -- or we seized a $250 million

5   yacht that Mr. Low had purchased.  We seized a private jet

6   that was worth tens of millions of dollars.  We seized some

7   very expensive high-end artworks, including, you know,

8   impression works by Monet.

9        I think that probably covers most of it.  But if there

10  are any specific assets you'd like to ask me about, please

11  do.

12  **Q.**  I would like, but I -- let me leave it there.

13       I'm sorry.  Did you mention the EMI Publishing?

14  **A.**  I didn't, but that's correct.  We also seized Mr. Low's

15  rights to EMI Publishing, a catalog of songs that he had

16  purchased.

17  **Q.**  Do you know how much money Mr. Low paid for that?

18  **A.**  I believe he paid around $100 million, and I think it was

19  later valued at $200 or $300 million.

20  **Q.**  Okay.  Did you determine, during the course of your

21  investigation, whether Mr. Low lived in any of the residences

22  in Los Angeles or New York or elsewhere?

23  **A.**  So, in the course of the investigation, I know Mr. Low

24  spent time in both New York and Los Angeles.  I couldn't tell

25  you for certain whether he lived in any one of them for a

Cross-examination - Heuchling

1    particular length of time or, you know, when he was in New

2    York or L.A., which residence he may have been in.

3    **Q.**  Thank you.

4        You started your answer about these various assets, the

5    properties, to begin with, that were owned by Mr. Low and his

6    co-conspirators.  Which co-conspirators do you think had joint

7    ownership in any of the assets that you seized from Mr. Jho

8    Low?

9            MR. MULRYNE:  Objection, Your Honor.  Relevance.

10           THE COURT:  I'll sustain it.

11   **Q.**  (BY MR. KENNER)  Would you agree that Mr. Michel had no

12   interests, financial interests, in any of those assets?

13   **A.**  Yeah.  And to be clear, I meant assets seized from other

14   co-conspirators, not assets -- not assets that had a joint

15   interest with Mr. -- or not co-conspirators having a joint

16   interest with Mr. Low.

17       But, no, I did not.  To answer your question, no, no

18   evidence that Mr. Michel, the defendant, had any interest in

19   any of the assets that were seized from Mr. Low.

20   **Q.**  Thank you.

21       Let me move to a different subject, if I might.  You

22   indicated that Mr. Michel, in or around 2012, received

23   $20 million; is that correct?

24   **A.**  Yes, that's correct.

25   **Q.**  And you indicated that, in your view, he had received that

Cross-examination - Heuchling

1    from Jho Low; is that correct?

2    **A.**  Yes, based on -- again, based on the evidence in the

3    investigation, yes, that's correct.

4    **Q.**  So that was your opinion, he got $20 million, and you are

5    opining that that came from Jho Low; correct?

6    **A.**  No, I'm -- I've reviewed the evidence, I've reviewed the

7    facts that I've collected in this case, and the evidence is

8    all indicative that that money came from Jho Low.

9    **Q.**  What do you mean by indicative?

10   **A.**  Well, for example, your client wrote e-mails to his

11   financial advisor saying he was going to receive money from

12   Jho Low.

13   **Q.**  Okay.  Did you ever get bank records to trace the funds in

14   and out of 1MDB or in and out of Mr. Jho Low's account?

15   **A.**  So, yes, throughout the course of the investigation, we

16   received bank records, foreign bank accounts, that trace money

17   from 1MDB and into the Blackstone and Alsen Chance accounts,

18   as well as other accounts controlled by Mr. Low.

19   **Q.**  And you have bank records you said that you got?

20   **A.**  Yes, that's correct.

21   **Q.**  Okay.  So let's go back to the $20 million.

22       If Mr. Michel received $20 million from -- let's, for

23   purposes of this line of questions, only say from Jho Low.

24   And you say he did that to gain influence with the Obama

25   campaign or with President Obama; is that true?

1  **A.**  So it's not exactly clear to me what Mr. Low's intent was

2  for sending these contributions to the Obama Victory Fund or,

3  sorry, Mr. Low sending these contributions to the defendant to

4  further give to the campaign.

5      But, you know, as we discussed earlier, those who donate

6  to campaigns do -- or sometimes are able to get access.  It

7  was my understanding that Mr. Low had an affinity for partying

8  with or being seen with celebrities and, therefore, would have

9  liked a picture of himself and the President.

10  **Q.**  All right.  I'll go back to that affinity to be with

11  celebrities.

12      But let me ask you this:  If I understood your testimony

13  yesterday, sir, you indicated that approximately $1.1 million

14  went to Black Men Vote during this time period, and

15  approximately $700,000 went to the Obama Victory Fund; is that

16  correct?

17  **A.**  Those are approximate amounts, but, yes.

18  **Q.**  Well, if that's true, then 90 percent of the money,

19  assuming Jho Low sent it, didn't go for the purpose of

20  influencing the Obama campaign; is that correct?  It went

21  somewhere else.

22  **A.**  It did not go to the campaign.

23  **Q.**  All right.  Did you do anything to trace where those funds

24  went?

25  **A.**  Yes, we did look at where those funds went.

Cross-examination - Heuchling

1    **Q.**  Okay.

2              THE COURT:  Are we still talking about the

3    20 million?

4              MR. KENNER:  Yes, Your Honor.

5    **Q.**  (BY MR. KENNER)  So you would concede then, sir, that it

6    was roughly $2 million out of the $20 million that went to

7    support Obama, either through the Obama Victory Fund or

8    through Black Men Vote?

9    **A.**  Yes, I believe that's accurate.

10   **Q.**  But you testified that you believed that Jho Low sent that

11   money to donate to the campaign to gain influence?

12   **A.**  When you say "that money," are you talking --

13   **Q.**  The $20 million.

14   **A.**  Yes, that's correct.  Mr. Low sent the defendant

15   $20 million.  I've seen no evidence that Mr. Low knew exactly

16   how much was going to be donated to the campaign, and it may

17   have been that Mr. Low thought the full 20 million was going

18   to be donated to the campaign.

19   **Q.**  So you have no opinion, obviously, on what Mr. Low thought

20   was happening with the money?

21   **A.**  No, I can't -- I'm sorry, I can't tell you what -- I can't

22   tell you with any certainty what Mr. Low thought was happening

23   with the money.

24   **Q.**  Okay.  Can you tell us with any certainty that Mr. Jho

25   Low's intent was for that $20 million to be given to Black Men

Cross-examination - Heuchling

1    Vote and the Obama Victory Fund?

2    **A.**  So, again --

3           MR. MULRYNE:  Your Honor, it's starting to get into

4    speculation and opinion.

5           MR. KENNER:  I asked him if he had any evidence,

6    Your Honor.

7           THE COURT:  Hold on.  Well, you're getting into --

8    he's indicated he doesn't know what totally the intent is, so

9    you're asking him to speculate about what he's indicated he

10   doesn't know.

11          So I'll sustain the objection.

12          MR. KENNER:  Thank you.

13          Your Honor, would it be possible to have our morning

14   recess now?

15          THE COURT:  Sure.  I was going to do it around this

16   time anyway.

17          So this is our morning break.  So it's 5 of 11:00.

18   Let's reconvene at 11:15.  Okay?  We'll come and get you.

19          (Jury left the courtroom.)

20          THE COURT:  All right.  We're on a break, and you

21   shouldn't talk about the case with anybody.

22          THE WITNESS:  I haven't, Your Honor.

23          THE COURT:  I know.  I just want to make sure.

24          THE WITNESS:  Yes.  Yes, Your Honor.

25          THE COURT:  All right.  We're on a break.

Cross-examination - Heuchling

1              (A recess was taken.)

2              THE COURT:  All right.  Good morning, again.  We're

3       lining up the jury.  I do want to supplement a little bit

4       the -- my rulings relating to through this witness trying to

5       impeach Mr. White.  I went back and looked at the opinions.

6              MR. MULRYNE:  Your Honor --

7              THE WITNESS:  You want me to step out?

8              THE COURT:  I've already -- I've eliminated these

9       questions.  So I've ruled on them.  I'm adding, besides 401,

10      which -- based on my opinions, which I went back and looked

11      at.  608(b) in terms of extrinsic evidence, bad acts.  As well

12      as 403 in terms of being confusing.  So they're in my opinions

13      and off the top of my head I couldn't remember all of the

14      grounds.  So I'm just supplementing what we did with the

15      sidebar.  It doesn't change my ruling, it just adds some

16      things based on having had an opportunity to look at the --

17             MR. KENNER:  Thank you, Your Honor.

18             THE COURT:  -- the opinion itself.  Okay.  Let's get

19      the jury in.

20             (Jury entered the courtroom.)

21             THE COURT:  Everybody can sit down.  All right.

22      Good morning again, members of the jury.

23             PROSPECTIVE JUROR  Good morning.

24             THE COURT:  All right.  We'll resume the

25      cross-examination of the special agent.

1          MR. KENNER:  Thank you, Your Honor.

2     **Q.**  (BY MR. KENNER)  Good morning again, how are you?

3     **A.**  Still well.  Thank you, Mr. Kenner.

4     **Q.**  Good.  Let me talk to you a little bit now about your

5     testimony yesterday about a cell phone, which I think you

6     described as a burner phone?

7     **A.**  Yes.

8     **Q.**  All right.  Now, as I understood yesterday -- do we have

9     the picture -- you looked at a photograph of a store front in

10    Manhattan; is that correct?

11    **A.**  That is correct.

12    **Q.**  And I want to bring that up here, if I might.

13         MR. KENNER:  I'm sorry, the computer's just coming

14    up here.

15         THE COURT:  Do we have an exhibit number?

16         MR. KENNER:  732.

17         THE COURT:  Okay.

18         MR. KENNER:  I'll come back to the picture.  Let me

19    proceed in the meantime.

20         THE COURT:  Go ahead.

21    **Q.**  (BY MR. KENNER)  The picture, just to describe it

22    generically, was a small store front on a street in Manhattan;

23    correct?

24    **A.**  Correct.

25    **Q.**  And it appeared to sell a variety of products?

Cross-examination - Heuchling

1    **A.**  Yes, that's correct.

2    **Q.**  And one of those, I gather, is cell phones?

3    **A.**  Yes, that's correct.

4    **Q.**  Did you go out to that store yourself?

5    **A.**  I did.

6    **Q.**  And did you take that picture?

7    **A.**  No, that picture I believe comes from Google maps.

8    **Q.**  Okay.  And when you went to that store, did you interview

9    anyone there?

10   **A.**  I did.

11   **Q.**  And who did you interview?

12   **A.**  I interviewed the store owner.

13   **Q.**  Was the store owner able -- let me withdraw that.  Did you

14   take a picture of Mr. Michel with you?

15   **A.**  I don't believe so.

16   **Q.**  You never showed the person that you talked to from the

17   store a picture of Mr. Michel and asked did he come in here,

18   do you recognize this person as having come in here and bought

19   a cell phone?

20   **A.**  I don't recall specifically.  I will say that is, you

21   know, something that you know, in a -- as part of an

22   investigation that we might have done.  I apologize, Mr.

23   Kenner, I don't remember specifically in this instance.

24            THE COURT:  You don't remember whether you did it or

25   not or you don't remember that you did it.

Cross-examination - Heuchling

1          THE WITNESS:  I don't remember whether we did it or
2     not.  Yeah, I don't remember if we did it or not.
3     **Q.**  (BY MR. KENNER)  Okay.  If you did do it, I gather that is
4     not something that formed the basis of any of your impressions
5     about the cell phone testimony?
6     **A.**  Sorry, do you mind rephrasing, Mr. Kenner?
7     **Q.**  Sure.  You did not, in forming the opinions that you
8     expressed to the jury yesterday, you did not have in mind a
9     person telling you that they identified Mr. Michel as
10    purchasing the phone; is that correct?
11    **A.**  That is correct.  In our investigation no person
12    explicitly identified Mr. Michel as purchasing the phone.
13    **Q.**  Thank you.  In your testimony yesterday, I believe you
14    also testified that you knew or had learned the day that that
15    particular phone was purchased; is that correct?
16    **A.**  That is correct.
17    **Q.**  And did you seek to get from the store any -- let me
18    withdraw that.  Do you know whether or not the store had any
19    video surveillance equipment?
20    **A.**  So we -- yeah, the store did not have surveillance
21    equipment they could -- or surveillance that they could
22    provide us for that date.
23    **Q.**  Okay.  And you are aware, as an FBI agent, that there's
24    more cameras for public -- for the FBI and law enforcement's
25    use than anywhere else in the country?

Cross-examination - Heuchling

1    **A.**  I am aware of that, yes.

2    **Q.**  All right.  And did you do anything to seek footage from

3    cameras in or around that store to look to see whether or not

4    Mr. Michel walked into that store on the date in question?

5    **A.**  Yes, we did.  We reviewed New York -- NYPD has cameras

6    throughout -- I guess throughout the city.  We were able to

7    access one of those cameras, probably not exposing anything

8    here that surprises anyone, but as I recall, one of the

9    cameras wasn't functioning, and the other one provided very

10   blurry footage.  And we weren't able to draw any conclusions

11   based on what we saw there.

12   **Q.**  All right.  So based on looking at the cameras that you

13   did look at, you saw nothing to indicate that Mr. Michel was

14   at the store that day?

15   **A.**  Yeah, based on the video footage alone there was no

16   evidence that we could draw on for establishing that

17   Mr. Michel was at the store that day.

18   **Q.**  All right.  So it would be fair to say that based on the

19   facts you testified to yesterday about that store, it is your

20   inference about who purchased the phone, and you believe it

21   was Mr. Michel; is that correct?

22   **A.**  So again, based on the evidence that we discussed

23   yesterday, yes, based on that evidence I think it indicates

24   that Mr. Michel purchased that cell phone.

25   **Q.**  And that's your opinion; is that correct?

Cross-examination - Heuchling

1    **A.**  Again, based on the evidence, yes.

2    **Q.**  Thank you, sir.

3        I want to talk to you next about the gift letter that you

4    testified to yesterday.  And if I understood your testimony

5    correctly, Mr. Michel had hired someone named Barry Bekkedam

6    to be his financial advisor; is that correct?

7    **A.**  Yes, I believe the -- you know, relationship between Mr.

8    Bekkedam and Mr. Michel, as far as Mr. Bekkedam being

9    Mr. Michel's financial advisor, started sometime prior to the

10   activity that we are looking at, but yes.

11   **Q.**  Okay.  Did you determine how long prior to this activity

12   Mr. Bekkedam served as Mr. Michel's financial advisor?

13   **A.**  I probably did, but I don't remember sitting here

14   offhand.

15   **Q.**  Okay.  Did you -- I'm sorry, apologize.  Did you

16   determine, based on your investigation what accounts

17   Mr. Michel, bank accounts he had that Mr. Bekkedam also had

18   signing authority on?

19   **A.**  I did.

20   **Q.**  And how many of those accounts are there?

21   **A.**  I believe Mr. Bekkedam had signatory authorities on the

22   BRB Holdings account as well as the PJ 2012 and the SPM

23   accounts.  And I say accounts because both of those entities

24   had multiple accounts in their names.

25   **Q.**  All right.  And Mr. Bekkedam was a signatory on all of

Cross-examination - Heuchling

1    those multiple accounts?

2    **A.**  I believe he was, yes.

3    **Q.**  And when I say and you say signatory, you mean that he was

4    authorized to be the sole person signing a check from any of

5    those accounts and it did not require Mr. Michel to also sign

6    it?

7    **A.**  So just to be clear there's a distinction between a sole

8    signatory, which would mean that Mr. Bekkedam was the only

9    person on the account.  Mr. Michel was a, you know,

10   cosignatory on those accounts.  But yes, just generally

11   because Mr. Bekkedam was a signatory on the account, he would

12   have some limited ability to transact on those accounts,

13   yes.

14   **Q.**  What were the limitations on his ability to transact on

15   those accounts?  What stopped him from writing a check and

16   signing it out of any of those accounts without Mr. Michel's

17   knowledge?

18   **A.**  I've seen no evidence that Mr. Bekkedam --

19   **Q.**  I didn't ask you that, sir?

20   **A.**  Based on my understanding of account -- you know, how a

21   financial advisor would work --

22   **Q.**  I'm not asking you about your general understanding about

23   how financial --

24            THE COURT:  You asked him -- excuse me, you asked

25   him what were the limitations on his ability.  So he's trying

Cross-examination - Heuchling

1    to give you answers, you stopped him -- that's the question

2    that you asked.

3              MR. KENNER:  Yes.

4              THE COURT:  Either he answers it or you change your

5    question.

6              MR. KENNER:  Please.

7    **A.**  I was just saying based on my understanding of the world

8    of financial advisor, and a financial advisor having signatory

9    authority, I believe Mr. Bekkedam would have near full access

10   if not full access to those accounts.

11   **Q.**  (BY MR. KENNER)  Okay.  Is that a long way of saying Mr.

12   Bekkedam could have written a check on any of those accounts,

13   signed it, and it would be transacted even if Mr. Michel had

14   not signed it?

15   **A.**  I believe that is right, yes.

16   **Q.**  In the course of your investigation did you look at Mr.

17   Bekkedam and Mr. Bekkedam's conduct during a period of time

18   that he was Mr. Michel's financial advisor?

19             MR. MULRYNE:  Objection.  Relevance and outside the

20   scope.

21             THE COURT:  I would -- I'll sustain it in terms of

22   being certainly outside the scope.  And it gets into other

23   areas, 401, 403, 608.

24   **Q.**  (BY MR. KENNER)  So let's talk about the gift letter for a

25   minute and we'll come back to that.  You looked at a chain of

1   e-mails yesterday regarding whether or not the money that came

2   in, for purposes of our conversation, from Jho Low, should be

3   treated as income or as a gift?

4   **A.**  Yes.

5   **Q.**  And did you look at an e-mail that Mr. Bekkedam wrote to

6   Mr. Michel about that subject?

7   **A.**  I believe we looked at a couple of e-mails that Mr.

8   Bekkedam wrote to Mr. Michel, yes.

9   **Q.**  Okay.  And who -- are you familiar with an accounting

10  firm, I think you mentioned it yesterday, Marcum?

11  **A.**  Yes, I am.

12  **Q.**  And Marcum is a major league accounting firm, would you

13  agree?

14  **A.**  Yes, that's my understanding, yes.

15  **Q.**  And did Mr. Bekkedam communicate with people at

16  Marcadum -- at Marcum, I'm sorry, with regard to giving him

17  further advice on how to characterize the money that came from

18  Jho Low as a gift or as income?

19  **A.**  Yes.

20  **Q.**  And did they respond to Mr. Bekkedam?

21  **A.**  Yes.

22  **Q.**  And do you recall what their response was?

23          MR. MULRYNE:  Your Honor, objection.  Getting into

24  hearsay.

25          THE COURT:  I'm sorry, I missed what you said.

1          MR. MULRYNE:  Hearsay, Your Honor.

2          THE COURT:  Unless there's something in writing, if

3    it was an oral response, then it is hearsay.

4    **Q.**  (BY MR. KENNER)  Did you review something in writing where

5    representatives from Marcum communicated with Mr. Bekkedam?

6    **A.**  Yes, I believe there were e-mails between representatives

7    from Marcum and Mr. Bekkedam.

8    **Q.**  And those e-mails expressed the Marcum people's views of

9    how to characterize that money; is that correct?

10   **A.**  I don't have, obviously, the e-mails in front of me.  But

11   I believe it's -- you may be putting the -- you're reversing

12   it slightly.  My understanding is that Mr. Bekkedam informed

13   Marcum that they were characterizing it as a gift.  And Marcum

14   was providing guidance on what information they would need to

15   feel comfortable with that characterization.

16   **Q.**  Okay.  So would it be a fair statement to say that

17   Mr. Michel charged Mr. Bekkedam with evaluating the question

18   of whether it's a gift or whether it's income, Mr. Bekkedam in

19   turn sought the opinion of very sophisticated tax counsel, and

20   got a response, correct?

21         MR. MULRYNE:  Your Honor, objection.  Speculation.

22         THE COURT:  I'll sustain it.

23   **Q.**  (BY MR. KENNER)  Is it -- you don't believe that it was

24   Mr. Michel who came up with the distinction between gift

25   versus income, do you?

Cross-examination - Heuchling

1              MR. MULRYNE:  Calls for speculation, Your Honor.

2              THE COURT:  It does.  What his belief is has nothing

3    to do with it.

4              MR. KENNER:  Your Honor, I will need a moment to

5    pull it up, but I would like to at this point introduce a tape

6    recorded conversation and transcript between Mr. Bekkedam and

7    a Mr. Hassan regarding gift.

8              THE COURT:  Mr. Mulryne.

9              MR. MULRYNE:  Your Honor, I think we object on

10   relevance and foundation and hearsay, Your Honor.

11             THE COURT:  Okay.  Let's have a discussion.

12             (Bench conference on the record.)

13             THE COURT:  Can you pick up the phone.

14             MR. MULRYNE:  Government's here.

15             THE COURT:  Okay.  Mr. Kenner, what is the -- Mr.

16   Bekkedam and talking to Mr. Hassan, who is Mr. -- identify

17   Mr. Hassan for me.  Hello, can you hear me?

18             MR. KENNER:  I'm sorry, he works for Marcum.

19             THE COURT:  Okay.  And so what relevance does it

20   have in terms of Mr. Bekkedam and Mr. Hassan, in terms of what

21   discussion they may have had relating to this, what is on this

22   tape?  Let me ask it that way.

23             MR. KENNER:  Your Honor, it's just their

24   conversation about how to do it.  I'll withdraw the request.

25   I don't think I need to go into the transcript, I take Your

Cross-examination - Heuchling

1   Honor's point.

2          THE COURT:  Okay.

3          (The following proceedings were had in open court.)

4          THE COURT:  I believe you're not going forward with

5   the exhibit; is that correct?

6          MR. KENNER:  I will not, Your Honor, attempt to

7   introduce those exhibits.

8   **Q.**  (BY MR. KENNER)  In the course of your experience

9   investigating financial crimes, have you had occasion to

10  investigate other celebrities aside from Mr. Michel?

11  **A.**  Yes.

12  **Q.**  And based on this investigation and the investigation of

13  other celebrities, did you become aware that successful

14  celebrities often surround themselves with a team of advisors;

15  a financial advisor, a booking agent, an attorney, a business

16  manager?

17         MR. MULRYNE:  Your Honor, objection on relevance.

18         THE COURT:  I'll sustain it.

19         MR. KENNER:  I'm sorry, may I just have a moment

20  here?

21         THE COURT:  Certainly.

22  **Q.**  (BY MR. KENNER)  You introduced, or identified an exhibit

23  yesterday that I think had the first four pages of a document

24  that had many more pages.  And it had to do with the

25  documents, the forms, that the FEC uses in vetting the

Cross-examination - Heuchling

1    propriety of the contributor?

2    **A.**  So if you're referring to the FEC 3X documents, those

3    aren't documents that the FEC uses to vet contributors.  Those

4    are the forms that are filed with the FEC by the campaign,

5    including the information that the campaign provides to the

6    FEC.

7    **Q.**  Okay.  And you told us yesterday that -- you identified

8    several handwritten documents, I think you said they came with

9    the invitation that individuals filled out in their

10   handwriting and presumably turned over to the campaign?

11   **A.**  I don't remember identifying those documents.

12            MR. KENNER:  May I just have a moment?

13            THE COURT:  Are you talking about documents that

14   have already been filled out, Mr. Kenner?

15            MR. KENNER:  I'm sorry?

16            THE COURT:  Are you talking about documents that had

17   already been filled out?

18            MR. KENNER:  No --

19            THE COURT:  Okay.

20   **A.**  Mr. Kenner, yes, there was a donor form that could be

21   filled out by hand.  I thought you indicated that there was

22   one that had been filled out.

23   **Q.**  (BY MR. KENNER)  Okay.  Do you know how many of what you

24   have categorized as "straw donors" filled out that handwritten

25   form?

Cross-examination - Heuchling

1    **A.**  So, Mr. Kenner, we subpoenaed the campaign -- the Obama

2    Victory Fund and the Obama campaign for those records, but

3    because they were, I think, five, six years old at the point

4    that we requested them, they no longer maintained those

5    records.

6    **Q.**  But they did give you some records that did have forms

7    filled out in handwriting with regard to the donors that came

8    to that particular event, did they not?

9    **A.**  I think we received some forms.  My recollection was that

10   the campaign had not maintained all of the records from the

11   2000 -- the September 2012 event or from all of the donations

12   from 2012 in general.

13   **Q.**  So do I understand you correctly that the campaign kept

14   some of these documents and can't find others of these

15   documents?

16   **A.**  Yes, that's -- as I recall the campaign informed us that

17   they were unable to locate or they may not -- you know, they

18   may have thrown out or not kept some of the documents that

19   they had collected, you know, five or six years earlier.  And

20   you know, with the understanding that the president wasn't

21   going to be running for office again.

22   **Q.**  Okay.  Did you ask them what their criteria was for which

23   of the documents related to this case were thrown out as

24   opposed to the ones that were kept?

25            MR. MULRYNE:  Objection.  Relevance.

Cross-examination - Heuchling

1           THE COURT:  No, I'll allow the question.

2    **A.**  I don't recall specifically if we asked, you know, why

3    certain forms may have been thrown out or not thrown out.

4    Again, my recollection is that we were trying to locate these

5    forms and we requested them from the campaign.  And their

6    explanation was just that in, you know, in the process of

7    boxing things up, they had either thrown them away or put them

8    some place where they weren't able to locate them.  They did

9    ensure us they had done an exhaustive search for them.  And --

10          MR. KENNER:  Move to strike that last answer as

11   hearsay.

12          THE COURT:  All right.  I'll strike it.

13          MR. KENNER:  Thank you.

14   **Q.**  (BY MR. KENNER)  Did you --

15          THE COURT:  Well, you did ask him about what kind of

16   search -- what the criteria was.  But I'll strike it, it's an

17   additional comment on his part.

18          MR. KENNER:  Thank you.

19   **Q.**  (BY MR. KENNER)  Did you ever ask anyone from the campaign

20   to go back and look for the documents that they threw away?

21   **A.**  I mean, yes, but with not trying to reiterate what I just

22   said that you objected to --

23          THE COURT:  No, the only objection was it wasn't

24   responsive and added to his question.  He's now asked the

25   question so you can answer it.

Cross-examination - Heuchling

1    **A.**   Okay.  They informed us they did an exhaustive search and

2    we took them at their word.

3    **Q.**   (BY MR. KENNER)  Isn't it true that the event at Mr. Frank

4    White's home included these forms, as you said, having been

5    sent with the invitation for the individuals to fill out; is

6    that correct?

7    **A.**   Yes, my understanding is that some of the straw donors

8    received these forms that -- either from Mr. White, from the

9    defendant, or from the campaign somehow, yes.  That's my

10   understanding.

11   **Q.**   Is it your understanding that those documents were

12   reviewed by Kevin Snowden?

13   **A.**   Again, I can't tell you specifically who may have reviewed

14   those documents in the campaign.

15   **Q.**   Do you know whether or not Mr. White is the one that

16   ultimately collected all of those documents to forward on?

17   **A.**   I don't know if that's accurate.

18   **Q.**   So you don't know whether or not Mr. White removed the

19   documents that allegedly now can't be found, is that

20   correct?

21           MR. MULRYNE:  Objection, Your Honor.  Argumentative.

22   Asked and answered.

23           THE COURT:  He's answered the question.  And it is

24   argumentative.

25           MR. KENNER:  Don't want to argue, Your Honor.

Cross-examination - Heuchling

1    Sorry.

2    **Q.**  (BY MR. KENNER)  Did you form any opinion on Mr. White's

3    knowledge of the rules and regulations relating to the Federal

4    Election Commission?

5            MR. MULRYNE:  Objection.  Calls for opinion.

6    Relevance.  Speculation.

7            THE COURT:  It's an opinion, relevance, 401, 403.

8    If you looked at my -- I've included it in two of the

9    opinions.

10           MR. KENNER:  Thank you, Your Honor.

11   **Q.**  (BY MR. KENNER)  Let me ask you a few questions about Eric

12   Feigenbaum, do you know who he is?

13   **A.**  I do.

14   **Q.**  And did you interview Mr. Feigenbaum?

15   **A.**  I believe I did.

16   **Q.**  And did you form an opinion as to whether or not

17   Mr. Feigenbaum vetted Frank White's straw donors after that

18   conversation?

19           MR. MULRYNE:  Objection.  Calls for an opinion.

20           THE COURT:  It calls for an opinion and it's going

21   into the areas I've already precluded, having somebody else

22   opine about the veracity or not of Mr. White.

23   **Q.**  (BY MR. KENNER)  Can you tell me who Mr. William Kirk

24   is?

25   **A.**  Yes.  Mr. Kirk was -- I actually don't recall his exact

1    title, it may have been director or treasurer of the Black Men

2    Vote super PAC.

3    **Q.**  And did you determine any -- by the way is Mr. Kirk a

4    lawyer?

5    **A.**  Yes, he is.

6    **Q.**  Do you know what law firm he's from?

7    **A.**  I don't recall, but I believe it was a major law firm.

8    **Q.**  All right.  And did you make any determination about a

9    relationship between Frank White and William Kirk?

10         MR. MULRYNE:  Objection, Your Honor.  Relevance,

11   same grounds as before.

12         THE COURT:  I must admit, I don't see any probative

13   value to that.

14   **Q.**  (BY MR. KENNER)  Let me ask you this:  In your view is it

15   illegal for foreign nationals to attend a fundraising event in

16   the absence of a contribution?

17   **A.**  So, according to federal election law it is not -- or

18   there is no election law that I'm aware of that prohibits a

19   foreign national from participating or being present at a

20   fundraising event, barring that they did not donate to the

21   event.

22   **Q.**  Okay.

23         MR. KENNER:  May I just have a moment, Your Honor.

24         THE COURT:  Certainly.

25   **Q.**  (BY MR. KENNER)  Just a couple more questions, sir.  In

Redirect Examination - Heuchling

1    the forfeiture complaint that included the purchase of EMI

2    that was then forfeited, did you allege or do you know the

3    date that that purchase by Mr. Jho Low was made, the year?

4              MR. MULRYNE:  Objection, Your Honor.  Relevance.

5              MR. KENNER:  Just the year.

6              THE COURT:  I think we're getting back to the areas

7    where we got into all the different properties et cetera, so

8    I. --

9              MR. KENNER:  Just that one question.  That's my last

10   question.  Could I get that one?

11             THE COURT:  I know, but I don't see any probative

12   value to it, especially after our earlier discussion.

13             MR. KENNER:  Okay.  I have nothing further, Your

14   Honor.

15             THE COURT:  All right.  Redirect?

16             MR. MULRYNE:  Yes, Your Honor.

17                     REDIRECT EXAMINATION

18   BY MR. MULRYNE:

19   Q.  Good morning, Agent Heuchling.

20   A.  Good morning.

21   Q.  Agent Heuchling, moments ago, on cross-examination, Mr.

22   Kenner had asked you some questions regarding Barry Bekkedam,

23   the defendant's financial advisor during this relevant time

24   frame.  Do you recall those questions?

25   A.  I do.

Redirect Examination - Heuchling

1  **Q.** And among those questions Mr. Kenner had asked you about

2  Mr. Bekkedam being the signatory, or I believe as you

3  testified, the cosignatory on a number of accounts with the

4  defendant; is that right?

5  **A.** Yes, but just, you know, to be clear for the record, I'm

6  not certain if Mr. Michel was a cosignatory on the BRB

7  Holdings account.  I believe only on the accounts that Mr.

8  Bekkedam had opened for Mr. Michel.

9  **Q.** Okay.  Pulling up Government Exhibit 666, which has been

10 previously admitted.  So Agent Heuchling, we're looking here

11 at the summary chart that we looked at yesterday, involving

12 some of the money that the defendant received from Blackstone

13 and then distributed to conduits.  You just testified a moment

14 ago about BRB Holdings.  With respect to the defendant's

15 Citibank account, his personal account, was Mr. Bekkedam a

16 signatory on the personal account?

17 **A.** No, he wasn't.

18 **Q.** Okay.  Can we go to Government Exhibit 667, also

19 previously admitted.  And so, Agent Heuchling, looking here at

20 some of the conduit contributions that the defendant made

21 after receiving $600,000 from Alsen Chance, any evidence

22 developed during your investigation to suggest that Mr.

23 Bekkedam had any involvement in any of these political

24 contributions or conduit contributions?

25 **A.** No, none.

Redirect Examination - Heuchling

1   **Q.**  Any evidence that Mr. Bekkedam had any involvement in the

2   any of the conduit contributions generally?

3   **A.**  None.

4   **Q.**  You can take that down.  Thank you, Ms. Orozco.

5        Agent Heuchling, also during your cross-examination,

6   defense counsel asked you some questions about Mr. Low's

7   intent behind the $21 million that he sent to the defendant in

8   2012, do you recall those questions?

9   **A.**  I do.

10  **Q.**  All right.  Can we pull up Government Exhibit 290,

11  please?

12              THE COURT:  And that's been admitted?

13              MR. MULRYNE:  Yes, Your Honor, this has been

14  admitted.

15  **Q.**  (BY MR. MULRYNE)  So, again, with respect to Mr. Low's

16  understanding and intent involving that $21 million that he

17  received in 2012, do you recognize this as again as an e-mail

18  we looked at yesterday involving the defendant and ultimately

19  in which Mr. Low receives this e-mail?

20  **A.**  I do.

21  **Q.**  All right.  And if we drop down just to the bottom portion

22  of the first page here.  If we could zoom into the bottom

23  portion of the first page.

24       So Agent Heuchling, here on May 24th, 2012, an e-mail

25  from the defendant to Mr. Gaspard you testified yesterday

1    about Mr. Gaspard being with the Democratic National
2    Committee.
3    **A.**   That's correct.
4    **Q.**   All right.  And here did we see the defendant e-mailing
5    about wanting to do a fundraiser for BO, and speaking about a
6    contribution of $5 to $10 million toward that fundraiser?
7    **A.**   Yes.
8    **Q.**   And if we pull back, and indeed if I could just note,
9    what's the subject line of this e-mail chain?
10    **A.**   President Obama fundraiser.
11    **Q.**   All right.  And so this e-mail from the defendant
12    referencing $5 to $10 million contribution to the fund
13    raiser?
14             MR. KENNER:  Your Honor, excuse me, the e-mail is
15    being displayed is --
16             THE COURT:  I'm -- I can't hear you at all, Mr.
17    Kenner.
18             MR. KENNER:  I apologize, the e-mail being displayed
19    is from Patrick Gaspard to Mr. Michel, it's not from
20    Mr. Michel.
21    **Q.**   (BY MR. MULRYNE)  Agent Heuchling, based on your review of
22    this e-mail, who does that portion about the $5 to $10 million
23    contribution involving a fundraiser, where does -- who appears
24    to have written that e-mail?
25    **A.**   That --

Redirect Examination - Heuchling

1          MR. KENNER:  Objection.  Speculation.

2          THE COURT:  No, excuse me.  He can indicate what --

3    and why he thinks so.  Go ahead.

4    **A.**  Based on this e-mail, which says in part

5    prasmichel@gmail.com wrote, "Hey Patrick, how are you?"

6    Continuing, the end of the e-mail indicates that the defendant

7    wrote that e-mail.

8    **Q.**  (BY MR. MULRYNE)  Okay.  And then who responds to that

9    e-mail that the defendant wrote about the $5 to $10 million

10   contribution?

11   **A.**  Mr. Gaspard responds to the defendant.

12   **Q.**  Can we work up the chain here on page 1 of this exhibit.

13   Upon -- if we can go to the middle portion just above Mr.

14   Gaspard's response.  Upon receiving Mr. Gaspard's response to

15   the defendant's indication of doing a fundraiser, what does

16   the defendant do with this e-mail?

17   **A.**  The defendant forwards the e-mail to Mr. Rousseau.

18   **Q.**  And if we pull back and go to the upper portion of this

19   exhibit.  This e-mail that involves a President Obama

20   fundraiser and it references a contribution, who ultimately

21   receives this e-mail?

22   **A.**  This e-mail is forwarded -- pardon me -- forwarded to

23   Mr. Low.

24   **Q.**  And this e-mail to Mr. Low, what's being referenced

25   generally -- we went through this in detail yesterday, but

Redirect Examination - Heuchling

1    what's being referenced generally in this e-mail?

2    **A.**  Generally, it's information about how to donate to the

3    Obama campaign or get money into the Obama campaign.

4    **Q.**  And looking at that paragraph toward the bottom where it

5    begins "very important, though," does it go on to specifically

6    donations of $40,000?

7    **A.**  Yes, it does.

8    **Q.**  And the campaign events that you've testified about, the

9    one in June in Miami, the one in September in D.C., what --

10   what were the contribution amounts oftentimes by the conduits

11   whom you uncovered during your investigation?

12   **A.**  In almost every case the donation amount was $40,000.

13   **Q.**  Can we pull up Government Exhibit 294, please, also

14   previously admitted.

15        Oh, I'm sorry.  Sorry.  If we can leave this up for one

16   moment, Ms. Orozco, my apologies.  So this is still 290.

17        Agent Heuchling, I don't remember if I asked you about

18   this, but the last two lines of this e-mail to Mr. Low, can

19   you read those last two lines?

20   **A.**  They also guarantee you a maximum 15 minutes audience with

21   the president, one-on-one.  That's huge, brother.  Just wanted

22   to share this with you.  As to see, it's real.  Just going

23   through the process.

24   **Q.**  And this e-mail received by Mr. Low?

25   **A.**  Yes, that's correct.

1    **Q.**  Can we now go to Government Exhibit 294, previously

2    admitted.

3         Agent Heuchling, again, you recognize this as an e-mail

4    chain involving the defendant, Mr. Tan, Mr. Rousseau regarding

5    the campaign event and a contribution?

6    **A.**  Yes, I do.

7    **Q.**  If we can go to page 2, zoom in on the bottom portion.

8         So here again Agent Heuchling, I won't have you go

9    through all of this in detail as you covered much of this

10   yesterday, but again, in regard to your testimony on

11   cross-examination, there was references in this e-mail to the

12   main event and dress code and to attending the event, do you

13   see those?

14   **A.**  Yes.

15   **Q.**  No. 4, when is the main event, dress code?

16   **A.**  Yes, I see that.

17   **Q.**  No. 6, referring to three guests attending the event?

18   **A.**  Yes.

19   **Q.**  All right.  I believe, and I can be corrected, but I

20   believe on cross-examination Mr. Kenner asked you with respect

21   to another e-mail about the reference to "main guy" or what

22   that may mean.  In the context of this e-mail, the reference

23   to main guy, which we see a few different places, including

24   No. 5, paragraph No. 5 and below paragraph No. 6, who did you

25   understand that to be a reference to?

Redirect Examination - Heuchling

1    **A.**  Main guy would be President Barack Obama.

2    **Q.**  Okay.  And this portion that's currently highlighted on

3    your screen that begins, "One of them whom you know who is a

4    Malaysian citizen."  Again, what is the citizenship of

5    Mr. Low?

6    **A.**  He's Malaysian.

7    **Q.**  And then does it continue "to meet with the main guy and

8    be at the event"?

9    **A.**  Yes.

10   **Q.**  All right.  And we see the first couple lines of this

11   e-mail reference amounts to be contributed.  Do you see

12   that?

13   **A.**  I do.

14   **Q.**  I believe that's line No. 1 in particular?

15   **A.**  Yes.

16   **Q.**  If we go up this chain, please.

17            THE COURT:  Can you slow down a little bit.

18            MR. MULRYNE:  Yes, Your Honor.

19   **Q.**  (BY MR. MULRYNE)  If we can do the upper portion above

20   that e-mail, the upper half.

21       So to whom does Mr. Rousseau send this e-mail?

22   **A.**  Mr. Rousseau forwards it to Mr. Michel, writes "FYI please

23   read".

24   **Q.**  Okay.  And Mr. Michel, we see him provide the transaction

25   information, the account information for BRB Holdings there in

Redirect Examination - Heuchling

1    No. 2; is that right?

2    **A.**  Yes, he does.

3    **Q.**  No. 4, there's a reference to main event is on June 26th.

4    Based on your investigation what did you understand that date

5    to be?

6    **A.**  That was the date of the Miami fundraiser that we

7    discussed previously.

8    **Q.**  All right.  Do you see a reference there to a donation,

9    there in that line 4?

10   **A.**  Yes.  It reads once they receive the donation, they give

11   us the address where the event is taking place.

12   **Q.**  And then below that, do you see references about meetings

13   with the main guy?

14   **A.**  Yes.

15   **Q.**  Okay.  If we continue up this chain.  And you testified

16   moments ago you understood references to main guy to be

17   President Obama?

18   **A.**  Correct.

19   **Q.**  Zoom into the lower half.  So you -- we see here, who does

20   Mr. Rousseau provide the defendant's response to?

21   **A.**  Mr. Rousseau provides it to Mr. Tan.

22   **Q.**  And Mr. Tan -- and there's a reference in this e-mail we

23   see to "1 mill"; do you see that?

24   **A.**  Yes.

25   **Q.**  In Mr. Rousseau's e-mail?

Redirect Examination - Heuchling

1    **A.** Yes, I see that.

2    **Q.** Okay. And then Mr. Tan, how does he respond?

3    **A.** He responds, "1 mill sent. They should have gotten it."

4    **Q.** All right. Again, based on your investigation what was

5    the relationship between Mr. Tan and Mr. Low?

6    **A.** Mr. Tan acted as a proxy or a cutout for Mr. Low. He was

7    the signatory on some of Mr. Low's accounts.

8    **Q.** And this reference in mid-June, this reference on June

9    15th, June 16th, to $1 million from Mr. Tan that he's

10   referencing here, did the defendant receive $1 million on or

11   about June 15th?

12   **A.** Yes.

13          MR. KENNER: Your Honor, just in the interest of

14   time, all of these e-mails were shown to the witness and

15   testified to yesterday. I would object to it as cumulative to

16   have him reread the same e-mails again.

17          THE COURT: He can point out certain aspects that

18   he's responding to in terms of your cross-examination. And

19   they're directed at what you have raised in the

20   cross-examination. So I'll allow him to do it.

21   **Q.** (BY MR. MULRYNE) Can we pull up --

22          MR. MULRYNE: Bear with me please, one moment, Your

23   Honor.

24   **Q.** (BY MR. MULRYNE) Just two more e-mails, Agent Heuchling,

25   Government's Exhibit 726.

Redirect Examination - Heuchling

1          THE COURT:  I'm sorry, which one was it?

2          MR. MULRYNE:  This is 726, your Honor, previously

3    admitted.

4          THE COURT:  All right.  You need to slow down

5    some.

6          MR. MULRYNE:  Yes, Your Honor.

7    **Q.**  (BY MR. MULRYNE)  Can we zoom into the bottom half, the

8    e-mail from the defendant to himself.

9       And Agent Heuchling, within that e-mail from the

10   defendant to himself we see this message involving Mr. White;

11   is that right?

12         MR. KENNER:  Excuse me, Your Honor, I would request

13   the government refer to Mr. Michel by name, not by

14   defendant.

15         THE COURT:  All right.  I would ask that you do that

16   as well.

17         MR. MULRYNE:  Very well, Your Honor.

18   **Q.**  (BY MR. MULRYNE)  This e-mail from Mr. Michel to himself,

19   we see the message involving Mr. White, do you see that,

20   sir?

21   **A.**  Yes, I do.

22   **Q.**  Okay.  And the e-mail down below from -- involving

23   Mr. White, what did you understand that to be pertaining to?

24   **A.**  Mr. White is describing generally the circumstances

25   surrounding what it would take to get a fundraiser set up

Redirect Examination - Heuchling

1   for -- I believe this would be in September, or they were

2   still contemplating whether it was going to be in August or

3   September at this point.  But Mr. White is generally

4   describing what it will take to get an event set up for a

5   fundraiser, as well as providing other information that may be

6   required.  And saying that certain actions have already taken

7   place on the side of the campaign to make that fundraiser

8   happen.

9   **Q.**  And we see if we look in the second line there toward the

10  end of the second line, it reads, "I made all the arrangements

11  for your guy to meet the big man.  I personally spoke to him

12  at the house"; do you see that?

13  **A.**  I do.

14  **Q.**  All right.  If we -- and if we go up, please, up the

15  chain.  If we enlarge the upper portion.  To whom does

16  Mr. Michel send this e-mail?

17  **A.**  Mr. Michel forwards it to Mr. Rousseau.

18  **Q.**  And this e-mail chain with the subject "meeting and

19  fundraising," as you see at the top who ultimately is the

20  recipient of this e-mail?

21  **A.**  That e-mail ultimately is forwarded to Mr. Low.

22  **Q.**  All right.  And lastly, if we can pull up Government

23  Exhibit 728, also previously admitted.  If we can go to the

24  second page -- well, if we just look first, Agent Heuchling,

25  before we go to the second page, if you can see the bottom

Redirect Examination - Heuchling

1    half of this page, do you see this is an e-mail from

2    Mr. Michel to himself?

3    **A.**  Yes.

4    **Q.**  All right.  And does this again appear to have a message

5    attributed to Mr. White?

6    **A.**  Yes, that's correct.

7    **Q.**  And if we can zoom in on that bottom -- bottom part of

8    page 1 into page 2, please, Ms. Orozco.

9        So, Agent Heuchling, here do you see the -- do you see

10   I'm going to pick it up sort of midway through where it begins

11   "by the way."  It reads, "By the way, between you and I, don't

12   tell your guys yet but the big man has a special bonus for

13   your guy.  He really appreciates his commitment to the

14   campaign.  He takes care of those who take care of him."  Do

15   you see that?

16   **A.**  I see it.

17   **Q.**  Just above it, a line or two above it it reads, "But

18   moving forward, let your guys know I'll be sending a follow up

19   e-mail on Monday July the 23rd of what we like the

20   contribution to be at."  Do you see that?

21   **A.**  I do.

22   **Q.**  So we see the reference here to contribution.  Can we move

23   up the e-mail chain, please.  And if we can earn large the

24   upper half portion of page 1.

25       And, Agent Heuchling, who is the -- until the defendant,

Redirect Examination - Heuchling

1    ultimately the defendant gets this e-mail chain sent back to

2    him by Mr. Rousseau; is that correct?

3    **A.**  Yes, this e-mail is forwarded from Mr. Rousseau to

4    Mr. Low.  Mr. Low replies to Mr. Rousseau.  And Mr. Rousseau

5    forwards that response to Mr. Michel.  But yes, this e-mail is

6    forwarded to Mr. Low.

7    **Q.**  And I was going to ask, before Mr. Michel gets it back,

8    who is the recipient of this e-mail chain?

9    **A.**  Mr. Low.

10   **Q.**  And in reference, we saw earlier the reference to a

11   contribution, at the end of this e-mail chain, how does

12   Mr. Low respond?

13   **A.**  "Done."

14             MR. MULRYNE:  No further questions, Your Honor.

15             THE COURT:  All right.  You can step down.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Are we moving to the next witness?

18             I do want to remind the jury that -- which I gave in

19   my preliminary instruction, is that the evidence in the case

20   is the answers that the witnesses give you and not the

21   questions that the lawyers ask.  Okay.

22             MS. LOCKHART:  Good afternoon, Your Honor.  The

23   government would like to call Randall Toussaint next.

24             THE COURT:  Sir, if you would step up over here.  If

25   you'd just come around or come down the center either way.  If

Redirect Examination - Heuchling

1    you'd go ahead and step up, we need to swear you in.  Yes, if

2    you'd stand up and we're going to swear you in.

3              THE CLERK:  Raise your right hand, please.

4                        RANDALL TOUSSAINT,

5    called as a witness, being first duly sworn, was examined and

6    testified as follows:

7              THE WITNESS:  I do swear.

8              THE COURT:  All right.  You can sit down.  Make

9    yourself comfortable.  Go ahead.  You can adjust the

10   microphone.  You need to make sure you do speak into it.  You

11   can also take your mask down so that we can actually hear

12   you.

13             THE WITNESS:  Okay.

14             THE COURT:  All right.  And I would just ask that

15   you allow counsel to finish their question before you start to

16   answer, even if you know what they're asking you.  So we have

17   the question and then you answer.  And they should do the same

18   thing for you.  If you're asked a question and you see counsel

19   at either of the tables either say objection or start to

20   stand, which means they are going to object, if you have not

21   started to answer, don't; if you're in the middle of your

22   answer, please stop.  Let me hear the objection and then I'll

23   tell you whether you can go forward with the answer.  All

24   right?

25             THE WITNESS:  Okay.

Direct Examination - Toussaint

```
1                       DIRECT EXAMINATION

2    BY MS. LOCKHART:

3    Q.  Good afternoon, Mr. Toussaint.  Can you please state and

4    spell your name for the record?

5    A.  My name is Jean Randall Toussaint, J-e-a-n, Randall,

6    R-a-n-d-a-l-l, Toussaint, T as in Thomas, o-u-s-s-a-i-n-t as

7    in Thomas.

8    Q.  Thank you.  Mr. Toussaint, what do you do for work?

9    A.  I'm in construction and trade.  I go back and forth from

10   Haiti to Miami, but mostly work in Haiti.

11   Q.  Do you know a person by the name of Prakazrel or Pras

12   Michel?

13   A.  Yes.

14   Q.  And do you see him in the courtroom today?

15   A.  Yes, behind you.

16   Q.  Can you identify him based on an article of --

17           MR. KENNER:  Stipulate, referring to the

18   defendant.

19           THE COURT:  All right.  Then they've agreed that

20   Mr. Toussaint would identify Mr. Michel.

21   Q.  (BY MS. LOCKHART)  Mr. Toussaint, how do you know

22   Mr. Michel?

23   A.  I know Mr. Michel through my partner, Gilbert Hyppolite.

24   Q.  And for the sake of the record can you spell

25   Mr. Hyppolite's name?
```

Direct Examination - Toussaint

1    **A.**  G as in garage, i-l-b-e-r-t, Hyppolite,

2    H-y-p-p-o-l-i-t-e.

3    **Q.**  And what kind of relationship did you have with

4    Mr. Michel?

5    **A.**  Well, I met Mr. Michel through Gilbert and we became -- we

6    had more contact during the campaign that he was involved with

7    for the Haitian president, Michel Martelly.

8    **Q.**  And when you said that you had more contact during that

9    campaign in Haiti, what does that mean?

10   **A.**  That means he was coming to Haiti more often.  And through

11   my partner Gilbert were in contact.  And sometimes when we

12   needed help, you know, for the campaign, you know, I gave my

13   car, my driver, you know, food, whatever I could help with, I

14   contributed.

15   **Q.**  And about how often did you communicate with Mr. Michel?

16   **A.**  I communicated with Mr. Michel mostly when he was coming

17   to Haiti or when he was in Haiti.

18   **Q.**  Turning to 2012, did you become aware of an event for

19   President Obama in 2012?

20   **A.**  Yes.

21   **Q.**  How did you learn about that?

22   **A.**  I believe through my partner Gilbert.

23   **Q.**  Did you ever talk to Mr. Michel about that event?

24   **A.**  Yes.

25   **Q.**  What was the nature of that conversation with

Direct Examination - Toussaint

1   Mr. Michel?

2   **A.**  He had invited me, you know, and when he told me the

3   amount, you know, that I needed to pay.  You know, I said you

4   know, I cannot afford that amount.  And I also reminded him,

5   you know, that I help out a lot during the campaign in Haiti.

6   You know, that it would be nice for him to contribute because

7   of all the contribution I've done, you know, in the past, you

8   know.

9   **Q.**  How much was the event?

10  **A.**  $40,000.

11  **Q.**  And if I understand you correctly, you suggested to

12  Mr. Michel that it would be nice if he could pay; is that

13  right?

14  **A.**  Yes.

15  **Q.**  Did Mr. Michel ever say to you that the amount was a

16  repayment in any way?

17  **A.**  No, no.

18  **Q.**  And did Mr. Michel agree to give you that amount?

19  **A.**  Yes.

20  **Q.**  And did you have $40,000 to attend the event?

21  **A.**  I had money, but I would not pay $40,000 for that event,

22  because I have a family, you know, to take care of.

23  **Q.**  So you had the money, but that's -- without the money for

24  Mr. Michel you weren't going to?

25  **A.**  No.

Direct Examination - Toussaint

1           THE COURT:  One at a time.  Remember what I said.

2           MS. LOCKHART:  Thanks, Your Honor.  For the sake

3    of -- we have a court reporter sitting in front of you, she

4    has to record what both of us are saying.

5    **Q.**  (BY MS. LOCKHART)  So Mr. Michel agreed to give you the

6    $40,000?

7    **A.**  Yes.

8    **Q.**  And did he, in fact, give you the $40,000?

9    **A.**  Yes.

10   **Q.**  When he gave you the $40,000, was it for you to do

11   anything you wanted to with it?

12   **A.**  No, no, it was to contribute to the campaign.

13   **Q.**  And to go to the event?

14   **A.**  Yes.

15   **Q.**  Did you think twice about accepting that money from

16   Mr. Michel?

17   **A.**  No.

18           MR. KENNER:  Objection, Your Honor.

19           THE COURT:  No, I'll allow, you have to -- okay.

20   You have to speak up, but I'll -- I'll allow the answer to

21   stand.

22   **Q.**  (BY MS. LOCKHART)  Had you ever made a political

23   contribution previously?

24   **A.**  Previously to --

25   **Q.**  To the --

Direct Examination - Toussaint

1    **A.**  -- the $40,000.

2    **Q.**  To the $40,000?

3    **A.**  Yes to other campaigns, yes.

4    **Q.**  Had you ever been involved in campaigns other than your

5    work on the Haitian presidential campaign you'd mentioned?

6    **A.**  I was not involved in any presidential campaign.  The one

7    in Haiti I help out, you know, but I was not physically or

8    personally, you know, if I had my car, my driver, something I

9    could help out with, yes.  But -- but yes, I guess you could

10   call it involvement, yes.  But, no.

11   **Q.**  Am I understanding you correctly you volunteered with that

12   campaign, but you didn't necessarily work on the campaign?

13   **A.**  Yes, I volunteered.

14          THE COURT:  Are we still talking about the Haitian

15   presidential campaign?

16   **A.**  Yes.

17          THE COURT:  Okay.

18   **Q.**  (BY MS. LOCKHART)  But no involvement with United States

19   campaigns; is that right?

20   **A.**  No, no.

21   **Q.**  Did you at some point receive money from Mr. Michel to

22   attend the event?

23   **A.**  Yes.

24   **Q.**  And how did you receive that money from him?

25   **A.**  Okay.  Until he sent me I thought it was a wire that they

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Direct Examination - Toussaint

1    made in my account and you see on my -- until you showed me

2    the bank I saw it was a deposit in my account, you know.

3    **Q.**  Let's go ahead and look at that.  If we could pull up

4    what's been marked as Government's Exhibit 97, which is

5    previously admitted.  Page 1.  If we could look at the top

6    here.  Thank you, Ms. Johnson.

7         Mr. Toussaint do you recognize this document?

8    **A.**  Yes.

9    **Q.**  What is that?

10   **A.**  That is my bank account.

11   **Q.**  And what is the time period covered by this statement?

12   **A.**  July 13 to August 12, 2012.

13   **Q.**  Ms. Johnson, if we could please go to page 4.  And if we

14   could highlight the deposit on August 3rd.

15        MS. LOCKHART:  Just a moment, Mr. Toussaint, brief

16   technical difficulties.

17   **Q.**  (BY MS. LOCKHART)  Thank you, Ms. Johnson.  Looking at the

18   transaction that's been highlighted here, do you know what

19   that transaction is from your statement?

20   **A.**  Yes, it's the money that Mr. Pras gave me.

21   **Q.**  Were you receiving $40,000 from anybody else at this

22   time?

23   **A.**  No.

24   **Q.**  And what was this money for?

25   **A.**  To contribute to the campaign.

Direct Examination - Toussaint

1    THE COURT:  If you could keep your voice up, please.
2    And make sure you speak in the microphone.
3    **A.**  Sorry.  Sorry.
4    **Q.**  (BY MS. LOCKHART)  And Ms. Johnson if we could go to the
5    transaction on August 8th, please.  And if we could highlight
6    that.  Thank you.
7      So now looking at a transaction noted here on August 8th,
8    noting a cash withdrawal for $40,000, do you know what that
9    is?
10    **A.**  That is to purchase a cashier check.
11    **Q.**  And what was that cashier's check?
12    **A.**  To the Obama Victory Fund, I think.
13    **Q.**  Ms. Johnson --
14    THE COURT:  Excuse me, you need to speak in the
15    microphone.
16    THE WITNESS:  Oh, sorry, sorry it was to --
17    THE COURT:  Excuse me.  Move it in front of you.
18    You can move it around.
19    **A.**  It was to buy a check for the Obama Victory Fund.
20    **Q.**  (BY MS. LOCKHART)  Ms. Johnson, if we could please pull up
21    what's previously been admitted as Government's Exhibit 98.
22    And if we could highlight the check, please.
23      Mr. Toussaint is this the check that you just
24    mentioned?
25    **A.**  That is correct.

114

Direct Examination - Toussaint

1    **Q.**  After you purchased this check, what did you do with it?

2    **A.**  I mailed it.

3    **Q.**  Do you know to who?

4    **A.**  I don't remember, to the victory fund, you know, I don't

5    have the paper, but I remember I mailed it immediately.

6    **Q.**  Let's -- Ms. Johnson you can take this down.  Thank you.

7        Let's turn to the event itself that you mentioned.  Did

8    you attend?

9    **A.**  Yes.

10   **Q.**  Could you tell the jury a little bit about what that event

11   was like?

12   **A.**  It was a very casual, very nice event, where you know we

13   got to meet the president, and there were other people there.

14   We got to ask questions, you know, about anything, any

15   interest, you know that they wanted to ask.

16   **Q.**  Did you know anybody else at that event?

17   **A.**  Yes, I knew another person called Joelle.  And there was a

18   Haitian singer called King Kino that was there, you know, that

19   I knew.

20   **Q.**  And Joelle you mentioned, who is that?

21   **A.**  Rousseau a friend of mine, through Gilbert also.

22   **Q.**  Are you aware whether Mr. Rousseau also knows

23   Mr. Michel?

24   **A.**  Yeah, I think so.  They know each other, yes.

25   **Q.**  Ms. Johnson, if we could please pull up Government's

Direct Examination - Toussaint

1    Exhibit 105 that was previously admitted, and go to page 5 of

2    that exhibit.

3        Mr. Toussaint, do you recognize what's pictured in this

4    photo?

5    **A.**  Yes.

6    **Q.**  What is this?

7    **A.**  That's a picture of the event I went to.

8    **Q.**  Do you see yourself in this photo?

9    **A.**  Yes.

10   **Q.**  Where are you located?

11   **A.**  I'm the second person --

12            THE COURT:  You can touch the screen, actually.

13   **A.**  Yes, the second right here (indicating).  The second

14   person after Mr. Michel.

15   **Q.**  (BY MS. LOCKHART)  Thank you.  And, Ms. Johnson, you can

16   pull this down.

17       Mr. Toussaint, since this time, have you repaid the

18   $40,000 to Mr. Michel?

19   **A.**  No.

20   **Q.**  Why not?

21   **A.**  Because I was under the understanding it was not a

22   repayment, it was a donation to me to give to the campaign.

23            MS. LOCKHART:  Nothing further, Your Honor.

24            MR. KENNER:  Excuse me, for the noise.

25            THE COURT:  If you could wait one second here let me

Cross-examination - Toussaint

1    just -- we're taking the circle off the screen.

2                MR. KENNER:  Okay.

3                THE COURT:  Go ahead.  Cross.

4                MR. KENNER:  Thank you.

5                          CROSS-EXAMINATION

6    BY MR. KENNER:

7    **Q.**  I hope I'm pronouncing this right, good afternoon, sir, is

8    your pronunciation of your last name Toussaint?

9    **A.**  Yes, it's Toussaint.

10   **Q.**  Thank you.  Good afternoon, sir.

11   **A.**  Good afternoon.

12   **Q.**  Were you interviewed on March 26th of 2018 by someone from

13   the FBI?

14   **A.**  Yes.

15   **Q.**  Do you see that person here in court today?

16   **A.**  I don't remember it was -- you know, I was interviewed by

17   several person.

18   **Q.**  May I ask Mr. Heuchling to remove the mask for just a

19   moment?

20                THE COURT:  I'm sorry?

21                MR. KENNER:  Can I ask Mr. Heuchling to remove the

22   mask for a moment.

23   **Q.**  (BY MR. KENNER)  Is that the person who interviewed you?

24   **A.**  Yes.

25   **Q.**  Thank you.  And if I understand you correctly, you were

Cross-examination - Toussaint

1    very, very helpful with your time and your money in Haiti when

2    Mr. Pras was campaigning for Michel Martelly's presidential

3    election in Haiti; is that a fair statement?

4    **A.**  I was very helpful with my driver and my -- whatever I

5    could, you know, but I was not involved, you know, a lot with

6    my time.

7    **Q.**  No, I -- you weren't involved in the campaign, but you

8    were providing assistance to Mr. Michel?

9    **A.**  Yes.

10   **Q.**  In a variety of ways?

11   **A.**  Yes.

12   **Q.**  To help him be involved in the campaign?

13   **A.**  Yes.  That is correct.

14           THE COURT:  You need to let him finish his question.

15           THE WITNESS:  Oh, sorry.

16   **Q.**  (BY MR. KENNER)  Did you get any money from Mr. Michel for

17   doing that?

18   **A.**  No.

19   **Q.**  All right.  Did you expect to get reimbursed for that?

20   **A.**  No.

21   **Q.**  All right.  Now, in 2012, Mr. Michel called you to ask you

22   if you would like to meet President Obama; is that right?

23   **A.**  My partner Gilbert told me Mr. Michel paid for him to see

24   Obama and if I want to go.  I said yes, I would be interested.

25   So Mr. Michel called me, yes, and I said yes I want to -- I

1    would love to see.

2    **Q.**  You'd love to see --

3    **A.**  Of course.

4    **Q.**  -- the president?  Did Mr. Michel then ask to tell you

5    that to do that there would be a $40,000 contribution that

6    needed to be made; is that correct?

7    **A.**  That is correct.

8    **Q.**  And did you respond to Pras by saying, I would love to see

9    Obama.  I did so much for you, referring to Mr. Michel, and

10   you were ungrateful, you owe me, you should have to pay for

11   me; is that correct?

12   **A.**  No, that is not correct.  I said to Mr. Michel, you know,

13   I think you should pay for me because I know you have money.

14   And I helped a lot in the campaign in Haiti, you know, so you

15   could pay for me.  But I would never -- I never said anything

16   about being ungrateful.  I was not expecting anything in

17   return.  No.

18   **Q.**  All right.

19            MR. KENNER:  Your Honor, may I -- Your Honor, I

20   would like to show only the witness a particular document.

21            THE COURT:  Okay.  Is it an exhibit number?

22            MR. KENNER:  It is not an exhibit number yet, Your

23   Honor.  I can give you a DOJ number for it.

24            THE COURT:  Well, is it one of your exhibits or

25   what?  Or is it one of theirs?

1              MR. KENNER:  No, this is for impeachment, Your

2     Honor.

3              THE COURT:  I understand.  But we still need to know

4     what the document is.

5              MR. KENNER:  The document --

6              THE COURT:  Excuse me, if you're going to show him

7     something I need to have it be, you know, doesn't have to be

8     admitted, but it needs to be marked as an exhibit of some

9     sort.  So somebody can figure out at a later point what it

10    is.

11             MR. KENNER:  Certainly, Your Honor.  This is a --

12             THE COURT:  Okay.  Excuse me a minute.

13             MS. LOCKHART:  Your Honor, he's referring to a 302,

14    which is not Mr. Toussaint's *Jencks,* it's the Agent's

15    *Jencks.*

16             THE COURT:  I didn't hear that.

17             MS. LOCKHART:  I'm sorry.  It's a 302.  It's an

18    interview report of an interview with Mr. Toussaint, which is

19    the agent who authored it's *Jencks* but not Mr. Toussaint, it's

20    improper impeachment.

21             MR. KENNER:  Your Honor, I can certainly use it to

22    refresh his recollection and I --

23             THE COURT:  That's a different issue that's not how

24    you presented it.

25             MR. KENNER:  All right.

Cross-examination - Toussaint

1            THE COURT:  Are you doing it to refresh his

2   recollection?

3            MR. KENNER:  Let's start there, yes.

4            MS. LOCKHART:  Your Honor, he hasn't said that he

5   doesn't remember that.  So we're not to that place of

6   refreshing his recollection.

7            THE COURT:  All right.  So there isn't any

8   refreshing recollection.  He's indicated what his testimony

9   is, which is not indicated that he doesn't remember what you

10  had asked him about and whether he made those comments.  So I

11  don't see it being refreshed.

12           MR. KENNER:  Okay.  Then I will use it for

13  impeachment purposes, Your Honor.

14           THE COURT:  I think there's a problem with in terms

15  of impeaching this witness with what somebody else wrote down.

16  And -- counsel, let's have a discussion about this.

17           (Bench conference on the record.)

18           MR. KENNER:  Hello.

19           THE COURT:  Can everybody hear?

20           MR. KENNER:  Yes.

21           MS. LOCKHART:  Yes, Your Honor.

22           THE COURT:  Okay.  So explain in terms of your

23  objection relating to the use of the 302 for impeachment.

24           MS. LOCKHART:  The 302 is authored by the agent in

25  this case.  It's an interview report.  What would be -- the

Cross-examination - Toussaint

1    only thing proper to use for impeachment for Mr. Toussaint

2    would be his grand jury transcript, which was also provided to

3    defense counsel here.

4              MR. KENNER:  I intend to use that also --

5              THE COURT:  Okay.  But --

6              MR. KENNER:  -- I also want to use this report.

7              THE COURT:  But I understand that it's -- you can't

8    use -- it's the statement of the agent, not the statement of

9    Mr. Toussaint.

10             MR. KENNER:  Okay.

11             THE COURT:  So you can't impeach him with what the

12   agent wrote.  It's the agent's statement, it's not

13   Mr. Toussaint's statement.  If you want to move to the grand

14   jury one, fine.

15             MR. KENNER:  I will.  I believe I should be entitled

16   to ask him if he made that statement in the interview?

17             MS. LOCKHART:  Your Honor, he's already asked that

18   question.

19             THE COURT:  You've asked -- you already asked him

20   whether or not he ever made that statement.  He's indicated

21   what he said and what he didn't say.  So it's already asked

22   and answered.

23             MR. KENNER:  Okay.  Thank you, Your Honor.

24             THE COURT:  But you can move to the grand jury, if

25   there's something in that.

Cross-examination - Toussaint

1          MR. KENNER:  Thank you.

2              (The following proceedings were had in open court.)

3    **Q.**  (BY MR. KENNER)  Sir, let me -- did you testify, in

4    addition to the interview with Agent Heuchling, did you

5    testify in front of the grand jury in connection with this

6    case?

7    **A.**  I testified, yes, in the jury, but I don't know the term

8    grand jury, which one it was, but I went to testify.

9    **Q.**  Okay.  Do you recall coming to this courthouse on Monday,

10   May the 14th, of 2018?

11   **A.**  Yes.

12   **Q.**  And do you recall being taken in a room where there were,

13   I believe, 17 people that were sitting as grand jurors?

14   **A.**  Yes.

15   **Q.**  And was the government attorneys or any of them present at

16   that time?

17   **A.**  Yes.

18   **Q.**  And did one of those attorneys ask you questions?

19   **A.**  Yes.

20   **Q.**  All right.  Sir, did you testify in front of the jury that

21   their -- grand jury, you were asked this question:  Did there

22   come a time in 2012 when Mr. Michel discussed with you

23   attending an event with President Obama?

24          MS. LOCKHART:  Your Honor, could we get the page

25   number that he's referring to?

Cross-examination - Toussaint

1          MR. KENNER:  Yes, I'm sorry, it's page 5, line 13.

2     I'm sorry, line 9.  Page 5, line 9.

3          THE COURT:  And what is it -- line 9 to what.

4          MR. KENNER:  It's going to ultimately go through

5     line 19.

6          THE COURT:  Okay.  Let the government take a look at

7     it first before we get into an issue.

8          MR. KENNER:  Yes, Your Honor.  Absolutely.

9          MS. LOCKHART:  Your Honor, I'm looking at the

10    transcript here and it is -- we're entering into improper

11    impeachment territory there's nothing in this transcript

12    that's inconsistent with what Mr. Toussaint testified on

13    either direct or on cross-examination.

14          THE COURT:  Okay.  Since I don't have it in front of

15    me I have no way of knowing what it says.  Do you have a copy

16    that I could look at?

17          MR. KENNER:  Yes, Your Honor, you want the whole

18    transcript or just --

19          THE COURT:  No, I need the portion that shows what

20    you were planning on asking and the answers that you feel

21    impeach.

22          MR. KENNER:  May I hand it up to your clerk?

23          THE COURT:  Yes.  Ms. Patterson will hand it to

24    me.

25          This doesn't impeach him.  It's not inconsistent

Cross-examination - Toussaint

1    with what he said.

2            MR. KENNER:  Your Honor, what he said was --

3            THE COURT:  I have what he had said and that does

4    not impeach either the question -- the answer he gave on

5    direct or when you asked him this time, in terms of the quote

6    that you gave, is not what he said here.

7            MR. KENNER:  Okay.

8    **Q.**  (BY MR. KENNER)  Do you have any recollection of telling

9    Mr. Michel that because of the work you did in assisting him

10   in Haiti that he should pay the $40,000, because he

11   essentially owed that to you?

12           MS. LOCKHART:  Your Honor, objection.  Asked and

13   answered.

14           THE COURT:  It has been.

15   **Q.**  (BY MR. KENNER)  So, bottom line, you are a friend of

16   Mr. Michel's, you both came from Haiti, Mr. Michel asked you

17   to come to this event, you indicated to him you wanted to come

18   to the event, he indicated it would be $40,000, and did you

19   then say to him, I think you should pay?

20   **A.**  Yes.

21           MR. KENNER:  Thank you.  I have nothing further.

22           THE COURT:  Redirect?

23           MS. LOCKHART:  Nothing further, Your Honor.

24           THE COURT:  All right.  You can step down, sir.

25   You're excused.

Cross-examination - Toussaint

```
1              Is he excused altogether or not?
2              MR. KENNER:  I'm sorry?
3              THE COURT:  Is he excused altogether?
4              MR. KENNER:  Yes, Your Honor.
5              THE COURT:  All right.  You're excused at this time.
6   You can step down.
7              THE WITNESS:  Thank you.
8              THE COURT:  Who's your next witness?
9              MS. LOCKHART:  Tysa Wright, Your Honor.
10             THE COURT:  I'm sorry, I missed -- oh, I see.  Thank
11  you.
12             If you would come down here or around and step over
13  to my left.  If you would step up.  And if you would remain
14  standing so we can swear you in.
15             THE CLERK:  Raise your right hand, please.
16                       TYSA WRIGHT,
17  called as a witness, being first duly sworn, was examined and
18  testified as follows:
19             THE WITNESS:  Yes.
20             THE CLERK:  Please be seated.
21             THE COURT:  Okay.  You can sit down.  The chair
22  moves up.  Make yourself comfortable.  You need to speak
23  directly into the microphone.  You can take your mask off so
24  we can actually hear you.  All right.
25             THE WITNESS:  Okay.
```

Direct Examination - Wright

1    THE COURT:  Now, what I'm going to ask is they're

2    going to ask you questions.  Let them finish their question

3    before you start to answer, even if you know what they're

4    going to ask you, so we have a record of the question and the

5    answer.  And they should do the same thing for you.  If you

6    hear the word "objection" or you see counsel at either of

7    these tables stand or start to stand, they're going to object.

8    If you haven't started to answer, don't.  If you're in the

9    middle of your answer, please stop.  Let me hear the objection

10   and then I'll tell you whether you can answer.  All right.

11        THE WITNESS:  Thank you.

12                  DIRECT EXAMINATION

13   BY MS. LOCKHART:

14   **Q.**  Good afternoon, Ms. Wright.

15   **A.**  Hi, how are you?

16   **Q.**  Can you please state and spell your name for the record?

17   **A.**  Yes, Tysa, T-y-s-a, Wright, W-r-i-g-h-t.

18   **Q.**  Ms. Wright, where do you work?

19   **A.**  I have a clothing line.

20   **Q.**  What's the name of your clothing line?

21   **A.**  Tysa.

22   **Q.**  Do you know an individual by the name of Prakazrel or Pras

23   Michel?

24   **A.**  Yes.

25   **Q.**  How do you know him?

Direct Examination - Wright

1    **A.**  Just a personal friend.

2    **Q.**  And do you see Mr. Michel in the courtroom today?

3    **A.**  I do.

4    **Q.**  Could you please identify him by an article of clothing

5    he's wearing and where he's seated?

6          MR. KENNER:  Stipulate referring to Mr. Michel, Your

7    Honor.

8          THE COURT:  All right.  So the record will reflect

9    that she has identified the defendant without objection.  You

10   need to slow down a little bit.

11         MS. LOCKHART:  Yes, Your Honor.

12         MR. KENNER:  Your Honor, identified Mr. Michel,

13   please, not the defendant.

14         THE COURT:  Oh, Mr. Michel.

15         MR. KENNER:  Thank you.

16   **Q.**  (BY MS. LOCKHART)  When did you meet Mr. Michel?

17   **A.**  In 2012.

18   **Q.**  And how did you meet Mr. Michel?

19   **A.**  Through a mutual friend.

20   **Q.**  When was the last time you saw Mr. Michel?

21   **A.**  Probably October 2012, or sorry, whenever we were here for

22   the dinner was the last time I saw him.

23   **Q.**  And what dinner are you referring to?

24   **A.**  The Obama dinner.

25   **Q.**  And was that in 2012?

Direct Examination - Wright

1   **A.**  It was.

2   **Q.**  So speaking about that dinner, how did you end up

3   attending that dinner?

4   **A.**  I was invited by Pras.

5   **Q.**  And what did Mr. Michel tell you about that dinner?

6   **A.**  He invited me.

7   **Q.**  Did he say that it was for any specific group of people?

8   **A.**  Entrepreneurs, friends.

9   **Q.**  Did you know at that time whether there was a cost to

10  attend the dinner?

11  **A.**  I did not.

12  **Q.**  So how did you end up going to the event?

13  **A.**  I was invited, later was told that there was a cost to go

14  to the event and that he wanted to purchase my ticket.  And --

15  **Q.**  And how much was that ticket?

16  **A.**  $40,000.

17  **Q.**  And did Mr. Michel say anything to you about when he had

18  to buy your ticket, about why he had to buy you a ticket

19  instead of buying it himself?

20  **A.**  That he had reached his contribution cap, I believe, or

21  max contribution, the amount he could make.

22  **Q.**  And did Mr. Michel end up giving you money to attend the

23  event?

24  **A.**  He did.

25  **Q.**  How did he give you that money?

Direct Examination - Wright

1  **A.** Wired it into my bank account.

2  **Q.** Did you have any concerns about receiving that money from

3  Mr. Michel?

4  **A.** At the time, no.

5  **Q.** And was there a reason why you didn't have any concerns at

6  that time?

7  **A.** I think just being naive and early 30s, I don't know.

8  **Q.** Were you excited to attend the event?

9  **A.** Very excited.

10  **Q.** Had you ever made a political contribution before?

11  **A.** I mean, nothing upwards of $100.

12  **Q.** Ever been involved in any campaigns?

13  **A.** No.

14  **Q.** I'm going to show you what's previously been admitted as

15  Government's Exhibit 591.  Ms. Johnson, if you could please

16  pull that up.

17      All right.  Ms. Wright, do you recognize this as an

18  e-mail from you?

19  **A.** Yes.

20  **Q.** Is that your e-mail address?

21  **A.** Yes.

22  **Q.** And what were you sending in this e-mail?

23  **A.** A bank statement.

24  **Q.** Ms. Johnson, if we could please go to page 2 of

25  Government's Exhibit 591.  If we could highlight the entry

Direct Examination - Wright

1  that's starred there.

2      All right.  Ms. Wright, do you see a transaction with a

3  little -- what appears to be a handwritten star next to it on

4  August 13th?

5  **A.**  I do.

6  **Q.**  What is that?

7  **A.**  I believe it is -- it says PJ 2012 Holdings, so the

8  wire.

9          THE COURT:  You need to speak into the microphone.

10 **A.**  I'm sorry, it says PJ 2012 Holdings, I believe it was the

11 wire.

12 **Q.**  (BY MS. LOCKHART)  Were you receiving wires of $40,000

13 from anybody else during this time period?

14 **A.**  No.

15 **Q.**  So is this wire from Mr. Michel in your understanding?

16 **A.**  Yes.

17         THE COURT:  Let her finish her question.

18         THE WITNESS:  Oh, I'm sorry.

19 **Q.**  (BY MS. LOCKHART)  All right.  Ms. Johnson, you can take

20 this down for me.  And, Ms. Johnson, if you can pull up what's

21 previously admitted as Government's Exhibit 99.  And if we

22 could highlight the check in the bottom part there,

23 Ms. Johnson.  Thank you.

24     Ms. Wright, do you recognize what this is?

25 **A.**  Yes.

Direct Examination - Wright

1    **Q.**  What is it?

2    **A.**  It is the check to the Obama Victory Fund, 2012.

3    **Q.**  Was this check your payment to be able to attend the

4    dinner?

5    **A.**  Yes.

6    **Q.**  And there at the bottom, it looks -- what is shown here at

7    the bottom, I see the YSA in the corner, what is that?

8    **A.**  Oh, my signature, wait --

9    **Q.**  Sorry, in the kind of bottom half of this exhibit --

10   **A.**  Oh, the address.

11   **Q.**  The address, yeah.

12   **A.**  Sorry.

13   **Q.**  What is this address shown here?

14   **A.**  Do you want me to --

15   **Q.**  No, I'm sorry, why did -- is this where you sent the

16   check?

17   **A.**  Yes.

18   **Q.**  Why did you sent the check to that address?

19   **A.**  That's what I was told to do.

20   **Q.**  And who were you --

21           THE COURT:  You need to keep your voice up.  I

22   didn't hear the answer.

23           THE WITNESS:  I'm sorry.  That's what I was told to

24   do.

25   **Q.**  (BY MS. LOCKHART)  Do you know who told you to do that?

Direct Examination - Wright

1   **A.**  Again, it was a while ago, but I'm sure Pras.

2   **Q.**  Were you communicating with anybody other than Mr. Michel

3   about the event?

4   **A.**  I was not.

5   **Q.**  Ms. Johnson, you can take this down.

6        Did you ultimately send that check into the campaign to

7   attend the event?

8   **A.**  I did.

9   **Q.**  And can you describe for the jury a little bit about what

10  that event was like?

11  **A.**  It was a 20 or 25 person dinner at someone's private

12  residence, with President Obama.

13  **Q.**  Did you get to talk to President Obama?

14  **A.**  I did.

15  **Q.**  Ms. Johnson, if you could please pull up what's been

16  admitted as Government's Exhibit 105, page 6.

17       Ms. Wright, do you recognize what's shown here?

18  **A.**  Yes, the dinner.

19  **Q.**  Is this the dinner you attended?

20  **A.**  It is.

21  **Q.**  Do you see yourself in this photo?

22  **A.**  I do.

23  **Q.**  So I think you can actually use the monitor to point to

24  yourself and we can see it?

25              THE COURT:  Just use your finger and circle it.

Cross-examination - Wright

1              THE WITNESS:  (Indicating)

2    **Q.**  (BY MS. LOCKHART)  Thank you.  And we can take this down.

3    Thank you, Ms. Johnson.

4         Did you know anybody else at the dinner?

5    **A.**  I knew Pras and one woman that I just knew through the

6    fashion world.

7    **Q.**  Ms. Wright, would you have paid to attend this event

8    yourself with your own money?

9    **A.**  I would not have.

10   **Q.**  Would you have had the personal funds to pay for this

11   event yourself?

12   **A.**  No.

13   **Q.**  Without Mr. Michel's money would you have been able to

14   attend this event?

15   **A.**  No.

16              MS. LOCKHART:  Nothing further.

17              THE COURT:  Cross.

18                    CROSS-EXAMINATION

19   BY MR. KENNER:

20   **Q.**  Good afternoon.

21   **A.**  Hi.

22   **Q.**  How are you?

23   **A.**  I'm well, how are you?

24   **Q.**  Good.  Thank you.

25              THE COURT:  We're just getting rid of the -- there

Cross-examination - Wright

1    we go.

2    **Q.**  (BY MR. KENNER)  Were you a fan of President Obama's in

3    2012?

4    **A.**  Yes.

5    **Q.**  Was it significant to you to have an opportunity to go to

6    an event that he was at?

7    **A.**  Not particularly.

8    **Q.**  Okay.  Did you have occasion to talk to Mr.  -- former

9    President Obama that night?

10   **A.**  Just an hello.

11   **Q.**  A hello?

12   **A.**  Yeah, hello.

13   **Q.**  Okay.  If I understand your testimony correctly, you

14   wanted to go to this event, Mr. Michel was a friend, he

15   offered to pay for your ticket; is that correct?

16   **A.**  Correct.

17   **Q.**  All right.  And did you get an invitation to this event?

18   **A.**  I don't believe so.

19   **Q.**  Did you -- were you ever asked to fill out any kind of a

20   paperwork about you and your attendance there for the Federal

21   Election Commission?

22   **A.**  I don't recall.

23   **Q.**  But you may have or you may not have?

24   **A.**  I -- it was 2012, so I -- I just truly don't remember.

25   **Q.**  I understand.

Cross-examination - Wright

1          THE COURT:  So does that mean -- your best remember

2     is that you did do it or your best memory --

3          THE WITNESS:  Best memory is that I did not do it.

4          THE COURT:  Okay.  Don't recall can be interpreted

5     as different ways.  You don't remember one way or the other,

6     or your memory is that you didn't.

7     **Q.**  (BY MR. KENNER)  Did you ever get a --

8          THE COURT:  Let her finish if she's explained what

9     her don't recall.

10          MR. KENNER:  I'm sorry.  Please.

11     **A.**  My I don't recall is I don't remember filling anything

12     out.

13     **Q.**  (BY MR. KENNER)  Okay.  Do you recall whether or not you

14     ever got any follow-up paperwork from the Obama campaign with

15     regard to your attendance at that event?

16     **A.**  No.

17     **Q.**  Were you ever asked by the campaign to fill out any

18     paperwork?

19     **A.**  I truly don't remember.

20     **Q.**  Again, as per the judge that means you may have, you may

21     not have?

22     **A.**  I don't remember filling anything out.

23     **Q.**  And you don't -- and you don't remember being asked to

24     fill anything out?

25     **A.**  I don't -- I'm -- I don't remember.

Cross-examination - Wright

1    **Q.**  Are you familiar with the term "vetting"?

2    **A.**  No.

3    **Q.**  Vetting a candidate or vetting a person, finding out

4    what's --

5    **A.**  Yeah, I mean, yes.

6    **Q.**  Okay.  Were you aware that you would have had to have been

7    vetted in order to be allowed to attend that event?

8    **A.**  I mean, of course that makes sense, yes.

9    **Q.**  Do you know whether or not you were?

10            MS. LOCKHART:  Your Honor, it calls for speculation.

11   Objection.

12            THE COURT:  I'm sorry.

13            MS. LOCKHART:  Objection.  It calls for speculation

14   from the witness, whether the campaign vetted her or not is

15   outside the scope of her own personal knowledge.

16            THE COURT:  I also think at this point you've gone

17   as far as you can go with it.

18            MR. KENNER:  All right.

19   **Q.**  (BY MR. KENNER)  Let me just ask one final question, did

20   the Obama campaign ever refund the $40,000 to you?

21   **A.**  No.

22            MR. KENNER:  I have nothing further.

23            THE COURT:  Redirect?

24            MS. LOCKHART:  Yes, Your Honor.

25

Redirect Examination - Wright

1                        REDIRECT EXAMINATION

2     BY MS. LOCKHART:

3     **Q.**  Good afternoon, again.

4     **A.**  Good afternoon.

5     **Q.**  Ms. Wright, you heard about the -- or can you remind the

6     jury where you heard about this event from?

7     **A.**  From Pras.

8                    THE COURT:  When you say Pras, could you give his

9     last name?

10    **A.**  Michel.

11    **Q.**  (BY MS. LOCKHART)  Had you otherwise heard about this

12    event?

13    **A.**  No.

14    **Q.**  Would you have attended this event without Mr. Michel

15    telling you about it?

16    **A.**  No.

17    **Q.**  Or without Mr. Michel giving you the money?

18    **A.**  No.

19                    MS. LOCKHART:  Nothing further.

20                    THE COURT:  All right.  Can she be excused?

21                    MR. KENNER:  Yes, Your Honor.

22                    THE COURT:  All right.  You're excused at this time.

23    You can step down.

24                    And the next witness is?

25                    MR. KELLER:  Loic Gouzer, Your Honor, who will be a

Redirect Examination - Wright

1   short witness.  I think we can get him in before the lunch

2   break.

3               THE COURT:  Okay.  Sorry, what was his name again.

4               MR. KELLER:  It's Loic Gouzer.

5               THE COURT:  Oh, I see.  I see him.  Loic Gouzer.

6               If you could step up here, please.  All right.  If

7   you would stand up and go ahead and step up, we're going to

8   swear you in.

9               THE CLERK:  Raise your right hand please.

10                           Loic Gouzer,

11  called as a witness, being first duly sworn, was examined and

12  testified as follows:

13              THE WITNESS:  Yes.

14              THE CLERK:  Please be seated.

15              THE COURT:  All right.  You can sit down.  Make

16  yourself comfortable with the chair, you can move around.  You

17  need to situate the microphone so you can speak directly into

18  it.  You can take your mask down so we can hear you.  If you

19  would allow counsel to finish their question, even if you know

20  what they're asking you, before you start to answer.  And they

21  should do the same thing.  So we have the question and the

22  answer on the record and for the jury.  If you hear the word

23  "objection," or you see counsel at either of the tables start

24  to stand, or stand, they're objecting.  If you haven't started

25  to answer, don't.  If you're in the middle of your answer,

Direct Examination - Gouzer

1  please stop.  Let me hear what the objection is and then I'll

2  tell you whether you can answer.  All right?

3            THE WITNESS:  Okay.

4                      DIRECT EXAMINATION

5  BY MR. KELLER:

6  **Q.**  Good afternoon, Mr. Gouzer.

7  **A.**  Hi.

8  **Q.**  Can you state your name and spell your name for the

9  record?

10  **A.**  Loic Gouzer, L-o-i-c, G-o-u-z-e-r.

11            THE COURT:  Can you speak up a little bit more.  You

12  can move the microphone down a little bit.

13            THE WITNESS:  Loic Gouzer, L-o-i-c, G-o-u-z-e-r.

14  **Q.**  (BY MR. KELLER)  What line of work are you in

15  Mr. Gouzer?

16  **A.**  In the art business.

17  **Q.**  And what specifically do you do in the art business?

18  **A.**  I'm an art dealer and I have a little auction house and I

19  sell contemporary and Post-war art.

20  **Q.**  Were you in the art industry back in the 2012, 2013 time

21  frame?

22  **A.**  Correct.

23  **Q.**  Where did you work at that point?

24  **A.**  At Christie's.

25  **Q.**  What is Christie's?

Direct Examination - Gouzer

1    **A.**  Christie's is an international auction house selling

2    artworks and artifacts all around the world.

3    **Q.**  And at what Christie's location did you work back in 2012

4    or 2013?

5    **A.**  In Manhattan, New York.

6    **Q.**  Did you have a client at that time named Low Taek Jho or

7    Jho Low?

8    **A.**  Yes.

9    **Q.**  And what was the nature of that relationship?

10   **A.**  I was advising him for his art purchases.

11   **Q.**  Did he make multiple purchases through Christie's at that

12   time?

13   **A.**  Correct, he bought significant amount of artworks.

14   **Q.**  What was the price range for the pieces that he was

15   buying?

16   **A.**  I would say between $250,000 and up to like around $50

17   million.

18            MR. KENNER:  I'm sorry, I didn't hear the last

19   number?

20            THE WITNESS:  Up to 50 million.

21            MR. KENNER:  15 or 50?

22            THE WITNESS:  50.

23            THE COURT:  15, one five.

24   **Q.**  (BY MS. LOCKHART)  And did Mr. Low make some of those

25   purchases in his own name?

Direct Examination - Gouzer

1    **A.**  Yes.

2    **Q.**  How else did he make purchases of art from Christie's?

3    **A.**  So he purchased them in his own name and he purchased

4    under a company called Tenore.

5    **Q.**  And did Mr.  --

6            THE COURT:  Can you spell the name of the company.

7    **A.**  I think it's T-a-n-a-r-o-e -- no T-a-n-o-r-e.

8    **Q.**  (BY MR. KELLER)  Did Mr. Low make an effort to separate

9    his personal purchases from purchases through Tanore?

10           MR. KENNER:  Objection.  Calls for speculation.  No

11   foundation.

12           THE COURT:  Why don't you ask some foundation

13   questions as to whether he knows this.

14   **Q.**  (BY MR. KELLER)  Did you have e-mail and personal

15   communication -- in-person communications with Mr. Low about

16   his purchases?

17   **A.**  Yes.

18   **Q.**  Were you his primary contact at Christie's regarding his

19   purchases?

20   **A.**  Yes.

21   **Q.**  And based on that contact, did Mr. Low make an effort to

22   separate his personal purchases of art from his purchases

23   through Tanore?

24   **A.**  Sometimes he would make a distinction; he would say this

25   is for me and this is for Tanore.

Cross-examination - Gouzer

1    **Q.** And with respect to purchases made through Tanore, who did

2    you deal with for payment for those purchases?

3    **A.** So I didn't really deal on the payment side, but our team

4    at Christie's dealt with this guy called Eric Tan, and

5    sometimes also with him.

6            MR. KENNER:  I'm sorry, Your Honor, did the witness

7    say he dealt with Eric Tan?

8            THE COURT:  This guy called Eric Tan and sometimes

9    also with him.

10           MR. KELLER:  No further questions, Your Honor.

11   Thank you.

12           THE COURT:  Cross.

13           MR. KENNER:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15   BY MR. KENNER:

16   **Q.** Sir, to your knowledge were you a subject of the

17   investigation concerning this case, was the government

18   investigating you to your knowledge?

19   **A.** This one here?

20   **Q.** Yes.

21           THE COURT:  Regarding Mr. Michel.

22   **A.** No.

23   **Q.** (BY MR. KENNER)  Let me ask you this:  How did you meet

24   Mr. Jho Low?

25   **A.** I met Jho Low through Leonardo DiCaprio, who introduced

Cross-examination - Gouzer

1    him to me.

2    **Q.**  And did Leonardo DiCaprio also buy a lot of art from

3    you?

4    **A.**  He was a collector.  He bought a few things if I recall.

5    Yeah.

6    **Q.**  And did he personally introduce you to Mr. Jho Low?

7    **A.**  Yes.

8    **Q.**  And was that at Christie's?

9    **A.**  At Christie's, yes.

10   **Q.**  Did you ever indicate in -- have you ever made a statement

11   with regard to Eric Tan that you don't recall specifically, I

12   know I met him, but I'm pretty sure that's only based on vague

13   memory?

14   **A.**  I don't recall the statement, no.  I know I met him.

15   **Q.**  Okay.  Did you testify in front of the grand jury in

16   connection with this case?

17   **A.**  Yes.

18   **Q.**  Is it pretty common with investors that sometimes they buy

19   under different names when they buy artwork?

20   **A.**  Yes, it happens.

21   **Q.**  So there was nothing unusual or suspicious to you that in

22   Mr. Jho Low's case he apparently brought some art in his own

23   name and some art under the name Tanore?

24   **A.**  No.

25   **Q.**  And that didn't raise any red flags to you because that

Cross-examination - Gouzer

1    was sort of not uncommon?

2    **A.**  It's not uncommon, correct.

3    **Q.**  Did this Eric Tan purchase anything from Christie's?

4    **A.**  He was acting -- again, the final part is not exactly my

5    purview of Christie's, but he was the guy Christie's was

6    dealing who execute the payments.  To my knowledge the

7    purchase were made for Jho Low.

8    **Q.**  Okay.

9            MR. KENNER:  Your Honor, may I just have a moment to

10   bring -- to find that grand jury testimony that I just asked

11   him about.

12           THE COURT:  You need to indicate page and lines.

13           MR. KENNER:  Yes, let me do that.  It's grand jury

14   testimony on September 18th of 2018, it's on page 7.  Let me

15   get the line number for you.  Your Honor, I'm going to display

16   that page on your screen and the witness's screen only.

17           THE COURT:  No, I think you need to indicate what

18   the lines and page so the government can look at it and see

19   whether we have an objection.

20           MR. KELLER:  Your Honor, could I just also

21   understand what the purpose of showing the witness is at this

22   point?

23           THE COURT:  He didn't indicate that he had a lack of

24   recollection of what it is that you asked him.  And you need

25   to put the lines on, so all we have is page 7, and I don't

Cross-examination - Gouzer

1    know what the lines are, what are they?

2              MR. KENNER:  Lines 9 through 18, Your Honor.

3              THE COURT:  Okay.

4              MR. KELLER:  Your Honor, could we just have defense

5    counsel state the purpose for showing the witness the

6    transcript at this point.

7              THE COURT:  Okay.  What's the reason?

8              MR. KENNER:  Because, Your Honor --

9              THE COURT:  Well, just indicate what the purpose

10   is.

11             MR. KENNER:  To show that on September --

12             THE COURT:  I can't hear you.

13             MR. KENNER:  I'm sorry, to show that on September of

14   2018 his memory about Eric Tan was that he didn't --

15             MR. KELLER:  I apologize for interrupting, Mr.

16   Kenner.  I guess I should have been more precise, is this for

17   impeachment or is this to refresh his recollection?

18             MR. KENNER:  I can start with refreshing his

19   recollection.

20             MR. KELLER:  Understood, thank you.

21             THE COURT:  All right.  Is that what you're -- if

22   you want to do it that way, then fine.

23             MR. KENNER:  Thank you.

24   Q.  (BY MR. KENNER)  Sir, do you see a document on the

25   screen?

Cross-examination - Gouzer

1        THE COURT:  Okay.  You need to label it as some sort

2    of an exhibit, defense exhibit what?

3        MR. KENNER:  Next in order, Your Honor.

4        THE COURT:  All right.  I don't have a -- I don't

5    actually have a list of your exhibits.  I'm sure we have it

6    somewhere.

7        MR. KENNER:  The next exhibit would be 118, your

8    Honor.

9        THE COURT:  Okay.  Defense Exhibit 118.  And you're

10   using it to refresh recollection.  So what I'd ask you to do,

11   sir, is to read this is page 7, lines 9 to 18, you can see the

12   lines on the side.  Read it to yourself and when you're

13   finished, look up.

14       THE WITNESS:  Okay.

15   **Q.**  (BY MR. KENNER)  Sir, does reading that refresh your

16   recollection -- does that refresh your recollection with

17   regard to the state of your memory with regard to Eric Tan in

18   September of 2018, when you testified at the grand jury?

19   **A.**  Yeah, I think it's consistent with what I remember.

20   **Q.**  I can't hear you, sir.

21   **A.**  I think it's consistent with what I remember today.

22   **Q.**  Okay.  So what you remembered three years ago or five

23   years ago, your recollection five years ago was that you

24   didn't recall Eric Tan specifically?

25   **A.**  What I said there, and I don't know if it's clear, is that

Cross-examination - Gouzer

1  I -- I don't know what I meant, I think it's what I'm saying

2  here, is that I don't exactly know the first time I, you know,

3  I met him.  He wasn't -- it was always groups of people around

4  Jho.  And I presume that he was in this group.  I remember the

5  time I formally met him.

6  **Q.**  You remember what?

7  **A.**  The time I formally met him.

8  **Q.**  Okay.  Did you -- that's the only time that you really

9  remember?

10            THE COURT:  Can you put the question up there.

11  **Q.**  (BY MR. KENNER)  Yes, is that the only time that

12  you remember specifically meeting Mr. Tan?

13  **A.**  When I can hundred percent say that I met him in person,

14  it was one time, yeah.  But it was clearly indicated to me,

15  hi, this is -- you know, meet Eric, say hi, nice to meet

16  you.

17  **Q.**  Thank you.  Sir, are you currently, as you sit there

18  today, under investigation by the United States Attorney's

19  Office?

20  **A.**  That is correct.

21  **Q.**  And is that in connection with a case in the Southern

22  District of New York?

23  **A.**  Correct.

24  **Q.**  Has a decision been made to your knowledge whether or not

25  to indict you?

Cross-examination - Gouzer

1   **A.**  I don't know.

2   **Q.**  All right.  You would be aware then that one of the

3   considerations, amongst many others, as to whether or not you

4   will get indicted in this investigation is your testimony

5   today and how you answer these questions; is that correct,

6   sir?

7              MR. KELLER:  Objection, Your Honor.  Calls for

8   speculation.

9              THE COURT:  If there's nothing formal then I'm not

10  sure what you're basing it on.  Unless he's got some -- some

11  indication from it.  You've asked in this indication in your

12  testimony, which makes it sound like there's some agreement.

13  I haven't heard of anything.

14             MR. KENNER:  No, my question --

15             THE COURT:  -- re-ask the question.

16  **Q.**  (BY MR. KENNER)  The only question, I believe, I was

17  allowed to ask is are you -- you are aware of this federal

18  investigation; correct?

19  **A.**  Correct.

20  **Q.**  And do you believe in any way that how you answer the

21  questions here today might have some impact on whether or not

22  the U.S. Attorney's Office decides to indict you in this

23  current investigation?

24  **A.**  No.

25             MR. KENNER:  Thank you.  Nothing further.

Redirect Examination - Gouzer

 1              THE COURT:  Redirect.

 2                       REDIRECT EXAMINATION

 3   BY MR. KELLER:

 4   **Q.**  I think it's clear, Mr. Gouzer, but just to make sure

 5   because we went back and forth about prior testimony and

 6   testimony today, who introduced you to Eric Tan?

 7   **A.**  Jho, Jho Low.

 8   **Q.**  And who did you understand Eric Tan to be associated with

 9   in terms of any art purchases from Christie's?

10   **A.**  Jho Low.

11              MR. KELLER:  No further questions.  Thank you, Your

12   Honor.

13              THE COURT:  All right.  The exhibit that you showed

14   in terms of the grand jury, by the way, has to be 217, you

15   already have 118.

16              MR. KENNER:  Oh, I'm sorry.

17              THE COURT:  Okay.  Can he be excused?

18              MR. KENNER:  Yes.

19              THE COURT:  You're excused at this time, sir.

20              THE WITNESS:  Thank you very much.

21              THE COURT:  All right.  We'll take a break for

22   lunch.  So don't talk about the case.  And I'll see you back

23   at 2:15.

24              PROSPECTIVE JUROR:  2:50.

25              THE COURT:  2:15, 15 minutes after 2:00.  Keep in

Redirect Examination - Gouzer

1    mind you're going to stop just before 4:00 today.

2              (Jury left the courtroom.)

3              THE COURT:  Mr. Kenner, I had no problem with the

4    way you asked it the last time.  The first one made it sound

5    like there was some agreement, it had been indicated to you is

6    the term, so that's why I sustained the objection, because as

7    far as I can tell there's no agreement.  However, your second

8    question was not a problem, you reworded it.

9              MR. KENNER:  Thank you, Your Honor.

10             THE COURT:  All right.  We'll see you back at 2:15.

11             (A recess was taken at 1:10 p.m.)

12

13             I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
14   record of proceedings in the above-entitled matter.

15                       _____/s/_____
                              Christine T. Asif
16                          Official Court Reporter

17

18

19

20

21

22

23

24

25

Redirect Examination - Gouzer

< Dates >.
19-148-1 3:6.
April 5th 4:13.
April 7th 4:17.
August 12, 2012
  111:12.
August 3rd 111:14.
August 8th 112:5,
  112:7.
July 13 111:12.
June 15th 100:11.
June 15th, June 16th
  100:8.
June 26th 99:3.
March 21 42:3.
March 21st 43:11.
March 26th 115:12.
March 31st, 2023
  1:11.
March 6 42:3.
March 6th 43:8.
May 24th 93:24.
October 2012
  126:21.
September 14th, 2012
  27:10.
September 18th
  143:14.
September 2012
  86:11.
"1 99:23, 100:3.
"one 98:3.
$1 100:9, 100:10.
$1.1 70:13.
$10 94:6, 94:12,
  94:22, 95:9.
$100 67:18, 128:11.
$2 71:6.
$20 68:23, 69:4,
  69:21, 69:22, 71:6,
  71:13, 71:15,
  71:25.
$200 22:9, 67:19.
$21 93:7, 93:16.
$250 67:4.
$250,000 139:16.
$300 67:19.
$40,000 21:25, 26:16,
  26:18, 28:14,
  28:23, 96:6, 96:12,

108:10, 108:20,
  108:21, 109:6,
  109:8, 109:10,
  110:1, 110:2,
  111:21, 112:8,
  114:18, 117:5,
  123:10, 123:18,
  127:16, 129:12,
  135:20.
$5 94:6, 94:12,
  94:22, 95:9.
$50 139:16.
$600,000 92:21.
$700,000 70:15.
'16 62:7.
.
.
.
< 1 >.
1 20:3, 20:4, 95:12,
  98:14, 103:8,
  103:24, 111:5.
1016 1:28.
105 51:7, 51:10,
  51:11, 52:7, 53:19,
  53:21, 114:1,
  131:16.
10th 4:18.
118 145:7, 145:9,
  148:15.
11:00 4:18, 4:21,
  72:17.
11:15 51:1, 72:18.
11:30 4:13, 4:14.
12:45 4:21.
12th 4:18, 29:3.
13 122:1.
1301 1:27.
13th 129:4.
1400 1:35.
14th 29:4, 121:10.
15 96:20, 139:21,
  139:23, 148:25.
16633 1:42.
17 121:13.
18 144:2, 145:11.
19 122:5.
19-00148-1 1:6.
1:10 149:11.
1MDB 69:14, 69:17.
.

.
< 2 >.
2 17:15, 67:2, 97:7,
  99:1, 103:8,
  128:24.
20 27:13, 28:16,
  71:3, 71:17,
  131:11.
2000 86:11.
20001 2:17.
20004 2:9.
20005 1:36.
2005 14:11.
2007 14:19.
2008 14:25, 15:2,
  15:6, 20:1,
  20:10.
2009 15:9.
2011 61:15, 61:23,
  62:7, 62:14.
2012 15:25, 16:7,
  20:7, 20:11, 20:19,
  21:13, 27:11, 29:4,
  51:14, 61:16,
  68:22, 78:22,
  86:12, 93:8, 93:17,
  93:24, 107:18,
  107:19, 116:21,
  121:22, 126:17,
  126:25, 129:7,
  129:10, 130:2,
  133:3, 133:24,
  138:20, 139:3.
2013 138:20, 139:4.
2015 62:7.
2016 61:17, 61:19,
  61:22, 61:23,
  62:14.
2017 16:15, 61:19,
  65:16.
2018 15:25, 16:8,
  61:19, 115:12,
  121:10, 143:14,
  144:14, 145:18.
202 2:18.
20530 1:29.
217 148:14.
22 54:16, 54:18.
23rd 33:13, 103:19.
24 54:18.

Redirect Examination - Gouzer

25 131:11.
27th 33:15.
290 93:10, 96:16.
294 96:13, 97:1.
2:00 148:25.
2:15 148:23, 148:25,
   149:10.
2:50 148:24.
.
.
< 3 >.
3 20:4.
30 28:17.
302 118:13, 118:17,
   119:23, 119:24.
30s 128:7.
333 2:15.
354-3247 2:18.
3X 85:2.
.
.
< 4 >.
4 97:15, 99:3, 99:9,
   111:13.
401 73:9, 80:23,
   89:7.
403 73:12, 80:23,
   89:7.
4:00 4:10, 149:1.
.
.
< 5 >.
5 1:17, 72:17, 97:24,
   114:1, 122:1,
   122:2.
50 139:20, 139:21,
   139:22.
59 32:17.
591 128:15, 128:25.
5th 4:1, 50:4.
.
.
< 6 >.
6 97:17, 97:24,
   131:16.
608 80:23.
608(b 73:11.
641 2:8.
6507 2:16.
666 92:9.

667 92:18.
.
.
< 7 >.
7 143:14, 143:25,
   145:11.
726 17:7, 17:10,
   17:15, 100:25,
   101:2.
728 17:5, 17:7,
   17:10, 32:3,
   102:23.
732 74:16.
.
.
< 8 >.
8 43:8.
.
.
< 9 >.
9 43:8, 43:12, 122:2,
   122:3, 144:2,
   145:11.
90 70:18.
91436 1:43.
97 111:4.
98 112:21.
99 129:21.
9:06 1:12.
_____/s/_____
_____ 149:17.
.
.
< A >.
a.m. 1:12.
abeyance 5:6.
ability 25:25, 30:10,
   79:12, 79:14,
   79:25.
able 14:1, 14:9,
   21:2, 35:11, 36:5,
   42:24, 50:21,
   57:19, 65:21,
   65:22, 70:6, 75:13,
   77:6, 77:10, 87:8,
   130:3, 132:13.
above 95:13, 98:19,
   103:17.
above-entitled
   149:15.

absence 90:16.
Absolutely 35:12,
   122:8.
abundance 5:5.
accent 60:2, 60:5,
   60:6, 60:7, 60:9.
accept 22:12.
accepting 109:15.
access 26:18, 52:22,
   70:6, 77:7, 80:9,
   80:10.
accommodation
   12:17.
according 64:22,
   90:17.
accordingly 46:25.
account 69:14, 78:22,
   79:9, 79:11, 79:20,
   92:7, 92:15, 92:16,
   98:25, 111:1,
   111:2, 111:10,
   128:1.
accounting 81:9,
   81:12.
accounts 69:16,
   69:17, 69:18,
   78:16, 78:17,
   78:20, 78:23,
   78:24, 79:1, 79:5,
   79:10, 79:12,
   79:15, 79:16,
   80:10, 80:12, 92:3,
   92:7, 100:7.
accurate 71:9,
   88:17.
across 21:15.
Act 39:21.
acted 100:6.
acting 143:4.
ACTION 1:5, 66:13.
actions 102:6.
activity 16:6, 19:10,
   78:10, 78:11.
acts 73:11.
actual 9:14.
actually 14:10,
   14:14, 16:10,
   24:19, 25:21, 34:9,
   36:10, 89:25,
   105:11, 114:12,

Redirect Examination - Gouzer

124:24, 131:23,
 145:5.
added 58:15, 87:24.
adding 73:9.
addition 29:18,
 121:4.
additional 87:17.
address 17:17, 18:3,
 18:6, 44:10, 66:2,
 99:11, 128:20,
 130:10, 130:11,
 130:13, 130:18.
addressed 42:2.
addresses 17:19.
adds 73:15.
adjust 105:9.
administration
 20:20.
admissible 44:14,
 44:17.
admit 90:12.
admitted 17:8, 17:10,
 17:13, 32:3, 44:22,
 51:8, 92:10, 92:19,
 93:12, 93:14,
 96:14, 97:2, 101:3,
 102:23, 111:5,
 112:21, 114:1,
 118:8, 128:14,
 129:21, 131:16.
advance 12:9.
advice 81:17.
advising 45:10,
 139:10.
advisor 69:11, 78:6,
 78:9, 78:12, 79:21,
 80:8, 80:18, 84:15,
 91:23.
advisors 84:14.
affect 7:1, 7:2.
affecting 10:10.
affinity 70:7,
 70:10.
afford 108:4.
afield 27:18, 40:17,
 44:19, 49:2, 49:17,
 50:18.
afternoon 104:22,
 106:3, 115:7,
 115:10, 115:11,

125:14, 132:20,
 136:3, 136:4,
 138:6.
agency 65:16.
Agent 13:18, 37:24,
 65:6, 65:11, 65:21,
 65:23, 73:25,
 76:23, 84:15,
 91:19, 91:21,
 92:10, 92:19, 93:5,
 93:24, 94:21,
 96:17, 97:3, 97:8,
 100:24, 101:9,
 102:24, 103:9,
 103:25, 118:14,
 118:19, 119:24,
 120:8, 120:12,
 121:4.
ago 91:21, 92:14,
 99:16, 131:1,
 145:22, 145:23.
agree 8:11, 15:13,
 16:16, 20:19,
 23:25, 26:11,
 31:17, 33:20,
 33:23, 34:25,
 37:13, 53:6, 54:22,
 55:3, 57:19, 58:22,
 59:14, 64:12,
 68:11, 81:13,
 108:18.
agreed 106:19,
 109:5.
agreement 3:23,
 147:12, 149:5,
 149:7.
agrees 44:7, 46:23.
ahead 51:3, 74:20,
 95:3, 105:1, 105:9,
 111:3, 115:3,
 137:7.
Al-husseini 29:3,
 29:7, 29:10.
Al-husseiny 29:13,
 29:15, 29:18, 31:1,
 31:8, 52:17, 52:21,
 56:12, 56:23,
 57:11.
allegations 16:7,
 61:14, 62:8.

allege 91:2.
alleged 45:22.
allegedly 88:19.
alleges 65:5.
allow 15:21, 35:10,
 87:1, 100:20,
 105:15, 109:19,
 109:20, 137:19.
allowed 24:17, 45:15,
 135:7, 147:17.
almost 96:12.
Alon 1:40.
alone 77:15.
already 12:10, 16:25,
 36:23, 73:8, 85:14,
 85:17, 89:21,
 102:6, 120:17,
 120:19, 120:21,
 148:15.
Alsen 69:17, 92:21.
alter 57:2, 57:13.
altering 46:3.
although 44:3, 44:21,
 47:15.
altogether 124:1,
 124:3.
Amendment 4:1,
 50:4.
AMERICA 1:5.
among 92:1.
amongst 20:6,
 147:3.
amount 20:10, 22:8,
 22:13, 25:20,
 26:12, 38:17,
 96:12, 108:3,
 108:4, 108:15,
 108:18, 127:21,
 139:13.
amounts 70:17, 96:10,
 98:11.
Angeles 66:20, 66:25,
 67:22, 67:24.
answered 16:25, 26:6,
 26:7, 47:13, 88:22,
 88:23, 120:22,
 123:13.
answering 25:15,
 56:5.
answers 17:3, 24:7,

Redirect Examination - Gouzer

35:24, 38:25, 80:1,
80:4, 104:20,
122:20.
Anybody 29:7, 62:2,
62:14, 72:21,
111:21, 113:16,
129:13, 131:2,
132:4.
anyway 47:10,
72:16.
apart 49:5, 65:19.
apartments 66:22.
apologies 96:16.
apologize 17:2,
19:15, 19:16, 20:8,
31:8, 36:5, 54:6,
75:22, 78:15,
94:18, 144:15.
apparently 142:22.
appear 28:20, 38:24,
39:1, 62:13,
103:4.
appearance 64:6.
APPEARANCES 1:23,
2:1, 15:1.
appeared 61:23, 62:1,
74:25.
appears 36:9, 52:16,
56:12, 94:23,
129:3.
appease 5:11.
appointment 4:21.
appreciate 4:3,
5:18.
appreciates 33:18,
103:13.
appropriate 7:10,
37:16, 39:11,
63:7.
approval 25:8.
approved 25:8.
approximate 70:17.
approximately 70:13,
70:15.
April 4:17, 4:18.
area 59:19.
areas 80:23, 89:21,
91:6.
argue 88:25.
arguing 42:10.

argument 8:15, 46:24,
47:4, 63:25.
Argumentative 16:22,
24:4, 37:12, 39:6,
53:9, 58:18, 58:20,
88:21, 88:24.
around 4:13, 12:14,
27:13, 28:15,
28:23, 30:9, 51:1,
53:24, 54:13,
54:16, 67:18,
68:22, 72:15, 77:3,
104:25, 112:18,
124:12, 137:16,
139:2, 139:16,
146:3.
arrangement 54:20,
55:4, 55:17, 56:2,
59:8, 59:10.
arrangements
102:10.
art 138:16, 138:17,
138:18, 138:19,
138:20, 139:10,
140:2, 140:22,
142:2, 142:22,
142:23, 148:9.
article 8:21, 106:16,
126:4.
artifacts 139:2.
artwork 142:19.
artworks 67:7, 139:2,
139:13.
ascertain 14:10,
25:24.
aside 38:22, 46:10,
46:19, 47:6,
84:10.
Asif 2:11, 149:13,
149:18.
aspects 100:17.
assessment 8:13,
31:17.
assessments 18:16.
assets 66:16, 66:17,
67:10, 68:4, 68:7,
68:12, 68:13,
68:14, 68:19.
assistance 116:8.
assisting 123:9.

associated 5:12,
148:8.
Assuming 6:9, 15:12,
27:15, 31:2,
70:19.
at. 103:20.
attempt 84:6.
attend 90:15, 108:20,
110:22, 113:8,
127:10, 127:22,
128:8, 130:3,
131:7, 132:7,
132:14, 135:7.
attendance 133:20,
134:15.
attended 131:19,
136:14.
attending 97:12,
97:17, 121:23,
127:3.
attention 16:9.
Attorney 8:23, 84:15,
146:18, 147:22.
attorneys 121:15,
121:18.
attributed 103:5.
auction 138:18,
139:1.
audience 96:20.
August 102:2,
129:4.
authored 118:19,
119:24.
authorities 78:21.
authority 78:18,
80:9.
authorized 79:4.
available 16:6.
Avenue 1:27, 1:35,
2:8, 2:15.
average 27:13.
avoid 3:25, 5:12.
awareness 21:15.
away 87:7, 87:20.
.
.
< B >.
back 3:18, 3:21,
13:9, 20:1, 31:11,
34:11, 51:1, 52:16,

Redirect Examination - Gouzer

52:21, 69:21,
70:10, 73:5, 73:10,
74:18, 80:25,
87:20, 91:6, 94:8,
95:18, 104:1,
104:7, 106:9,
138:20, 139:3,
148:5, 148:22,
149:10.
background 22:18.
bad 73:11.
baggage 25:11.
balls 15:10.
bank 69:13, 69:16,
69:19, 78:17,
111:2, 111:10,
128:1, 128:23.
Barack 98:1.
barring 90:20.
Barry 78:5, 91:22.
basically 39:11,
41:7, 43:25,
64:14.
basing 147:10.
basis 76:4.
bathroom 3:17.
Bear 100:22.
became 107:5.
become 23:6, 30:23,
63:14, 84:13,
107:18.
becomes 38:3, 38:5.
begin 68:5.
beginning 59:9.
begins 96:5, 98:3,
103:10.
behalf 3:11, 15:1,
22:4, 24:2, 24:23,
65:6.
behind 93:7,
106:15.
belief 26:8, 83:2.
believed 15:4, 66:14,
71:10.
belonged 61:6, 66:21,
66:23.
below 97:24, 99:12,
101:22.
Bench 40:18, 40:20,
63:2, 83:12,

119:17.
benefit 29:9.
besides 73:9.
Best 134:1, 134:2,
134:3.
better 36:12.
beyond 43:19, 48:17,
49:5, 50:12,
65:17.
big 33:9, 33:17,
33:20, 102:11,
103:12.
biggest 20:1.
bit 27:1, 53:17,
73:3, 74:4, 98:17,
113:10, 126:10,
131:9, 138:11,
138:12.
Black 70:14, 71:8,
71:25, 90:1.
Blackstone 69:17,
92:12.
block 18:7.
blurry 77:10.
BO 94:5.
bonus 33:17, 34:21,
34:22, 103:12.
booking 84:15.
born 29:15.
bottom 43:12, 93:21,
93:22, 96:4, 97:7,
101:7, 102:25,
103:7, 123:15,
129:22, 130:6,
130:7, 130:9.
bought 75:18, 139:13,
142:4.
Boulevard 1:42.
boxing 87:7.
BRB 78:22, 92:6,
92:14, 98:25.
Break 30:21, 42:1,
42:2, 42:5, 42:17,
42:23, 42:24, 43:2,
50:25, 72:17,
72:20, 72:25,
137:2, 148:21.
brief 5:7, 50:2,
111:15.
briefly 65:4.

bring 16:18, 38:7,
43:23, 47:24,
48:25, 74:12,
143:10.
bringing 13:8, 27:23,
41:11.
brings 21:7.
broadly 49:2.
brother 96:21.
brought 44:23,
142:22.
bundle 21:2.
bundler 18:23, 18:24,
19:1, 19:2, 19:6,
19:9, 20:2, 21:7.
bundlers 20:7,
20:10.
bundling 19:12.
burner 74:6.
bus 41:23, 46:6.
Business 60:16,
60:21, 60:25,
84:15, 138:16,
138:17.
businesses 63:18.
businessman 63:22,
64:2.
buy 112:19, 127:18,
142:2, 142:18,
142:19.
buying 127:19,
139:15.
.
.
< C >.
California 1:43.
Call 3:5, 104:23,
110:10.
called 11:24, 105:5,
113:17, 113:18,
116:21, 116:25,
124:17, 137:11,
140:4, 141:4,
141:8.
calling 11:14, 44:15,
45:9.
Calls 39:6, 55:21,
62:16, 83:1, 89:5,
89:19, 89:20,
135:10, 135:13,

Redirect Examination - Gouzer

140:10, 147:7.
cameras 76:24, 77:3,
  77:5, 77:7, 77:9,
  77:12.
campaigning 116:2.
campaigns 70:6,
  110:3, 110:4,
  110:19, 128:12.
candidate 19:22,
  22:16, 22:20,
  135:3.
cap 127:20.
car 107:13, 110:8.
care 33:18, 33:19,
  43:9, 103:14,
  108:22.
careful 17:1, 31:12,
  48:25.
carefully 33:4,
  42:25.
Case 3:5, 3:6, 9:14,
  10:14, 26:9, 36:23,
  38:3, 38:7, 40:11,
  40:12, 41:13,
  41:16, 45:6, 48:18,
  48:20, 69:7, 72:21,
  86:23, 96:12,
  104:19, 119:25,
  121:6, 141:17,
  142:16, 142:22,
  146:21, 148:22.
cases 7:20, 25:7.
cash 112:8.
cashier 112:10,
  112:11.
casual 113:12.
catalog 67:15.
categorized 85:24.
category 21:25.
causation 26:15.
cause 18:3, 45:18.
caution 5:5.
celebrities 70:8,
  70:11, 84:10,
  84:13, 84:14.
cell 74:5, 75:2,
  75:19, 76:5,
  77:24.
center 51:20,
  104:25.

certain 38:17, 58:6,
  67:25, 87:3, 92:6,
  100:17, 102:6.
Certainly 10:24,
  14:6, 14:7, 32:23,
  34:13, 40:19,
  43:21, 44:22,
  50:21, 59:21, 64:6,
  80:22, 84:21,
  90:24, 118:11,
  118:21.
certainty 71:22,
  71:24.
certify 149:13.
cetera 11:18, 43:16,
  66:6, 91:7.
chain 17:20, 80:25,
  94:9, 95:12, 97:4,
  98:16, 99:15,
  102:15, 102:18,
  103:23, 104:1,
  104:8, 104:11.
Chair 18:7, 18:13,
  124:21, 137:16.
Chance 69:17,
  92:21.
change 57:2, 73:15,
  80:4.
changing 46:3.
characterization
  57:17, 82:15.
characterize 81:17,
  82:9.
Characterizing 37:11,
  46:25, 82:13.
charge 41:12.
charged 36:23, 40:13,
  41:8, 44:9, 47:14,
  82:17.
charges 16:4, 38:7,
  40:11, 44:19,
  44:20, 64:3.
Charles 2:5, 2:6,
  3:15.
chart 92:11.
check 11:9, 79:4,
  79:15, 80:12,
  112:10, 112:11,
  112:19, 112:22,
  112:23, 113:1,

129:22, 130:2,
  130:3, 130:16,
  130:18, 131:6.
Chicago 14:11,
  33:8.
China 65:7.
Christie 138:24,
  138:25, 139:1,
  139:3, 139:11,
  140:2, 140:18,
  141:4, 142:8,
  142:9, 143:3,
  143:5, 148:9.
Christine 2:11,
  149:13, 149:18.
circle 115:1,
  131:25.
circumstances
  101:24.
Citibank 92:15.
citizen 29:16.
citizen. 98:4.
citizenship 98:4.
City 66:22, 77:6.
clear 10:3, 18:9,
  19:8, 24:20, 26:14,
  30:11, 31:9, 34:22,
  37:21, 43:19,
  48:12, 56:12,
  56:16, 58:8, 59:9,
  62:3, 62:4, 68:13,
  70:1, 79:7, 92:5,
  145:25, 148:4.
clearing 58:7.
clearly 25:9, 45:18,
  64:8, 146:14.
CLERK 3:6, 122:22,
  137:9.
client 5:19, 6:10,
  6:20, 7:12, 8:8,
  36:25, 69:10,
  139:6.
Clinton 15:5.
close 11:23, 25:5,
  29:10.
closed 61:15.
clothing 125:19,
  125:20, 126:4.
clutch 27:25, 28:2,
  28:7, 28:12.

Redirect Examination - Gouzer

co-conspirator
   46:5.
co-conspirators
   66:21, 66:23, 68:6,
   68:14, 68:15.
code 97:12, 97:15.
collected 22:10,
   38:9, 48:19, 48:22,
   49:18, 50:14,
   52:23, 69:7, 86:19,
   88:16.
collecting 22:25.
collection 25:16.
collector 142:4.
COLLEEN
   KOLLAR-KOTELLY
   1:18.
colloquy 5:7.
Columbia 2:14.
COLUMBIA 1:2.
comes 75:7.
comfortable 8:25,
   9:8, 9:12, 9:18,
   11:1, 25:4, 82:15,
   105:9, 124:22,
   137:16.
coming 15:14, 15:19,
   74:13, 107:10,
   107:16, 121:9.
commendation 35:1.
comment 17:21, 31:21,
   31:23, 31:24,
   87:17.
comments 32:1,
   119:10.
Commission 23:7,
   24:15, 89:4,
   133:21.
commitment 33:18,
   103:13.
committed 39:17,
   39:20, 43:25.
Committee 94:2.
common 142:18.
communicate 81:15,
   107:15.
communicated 55:19,
   56:4, 82:5,
   107:16.
communicating 46:1,

131:2.
communication
   140:15.
communications 58:23,
   140:15.
company 140:4,
   140:6.
comparing 25:19.
compiling 23:19.
complain 12:14.
complaint 91:1.
complaints 13:1,
   61:18.
computer 74:13.
concede 71:5.
concern 7:21, 10:14,
   10:20.
concerned 6:6, 7:2,
   58:6.
concerning 141:17.
concerns 128:2,
   128:5.
conclude 39:20.
concluded 31:14,
   49:14.
conclusion 37:14.
conclusions 40:10,
   44:1, 64:16, 64:17,
   77:10.
condo 54:7, 54:10.
condominium 54:3,
   54:5, 54:19,
   55:10.
condominiums 66:22.
conduct 5:20, 14:3,
   15:24, 16:15,
   35:17, 35:18,
   52:13, 53:12,
   53:14, 64:8,
   80:17.
conducted 8:8,
   16:14.
conducting 37:24.
conduit 92:20, 92:24,
   93:2.
conduits 64:5, 92:13,
   96:10.
confer 7:23, 10:23.
conference 40:18,
   40:20, 62:25, 63:2,

83:12, 119:17.
confidential 11:13.
conflict 5:8, 7:18,
   10:18.
confusing 73:12.
connected 49:24,
   52:25.
connection 16:4,
   19:20, 30:24,
   121:5, 142:16,
   146:21.
consequences 5:12.
consider 6:3, 7:5,
   8:2, 8:4, 32:1,
   48:22.
consideration 10:18,
   43:11.
considerations
   147:3.
considered 49:19.
consistent 145:19,
   145:21.
conspiracy 41:17,
   45:22, 65:16.
conspired 64:4.
construction 106:9.
CONT'D 2:1.
contact 107:6, 107:8,
   107:11, 140:18,
   140:21.
contemplating
   102:2.
contemporary
   138:19.
contempt 5:6, 5:9,
   6:4, 6:11, 7:7,
   8:4, 8:5, 9:10,
   10:15.
contemptuous 5:20.
context 35:11, 43:16,
   97:22.
continue 98:7,
   99:15.
continued 37:9.
continues 63:25.
Continuing 95:6.
Contitution 2:15.
contra- 47:25.
contradiction 65:9.
contribute 108:6,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Redirect Examination - Gouzer

109:12, 111:25.
contributed 98:11,
    107:14.
contribution 33:14,
    90:16, 94:6, 94:12,
    94:23, 95:10,
    95:20, 96:10, 97:5,
    103:20, 103:22,
    104:11, 108:7,
    109:23, 117:5,
    127:20, 127:21,
    128:10.
contributions 70:2,
    70:3, 92:20, 92:24,
    93:2.
contributor 85:1.
contributors 85:3.
controlled 69:18.
conversation 9:24,
    35:8, 36:1, 56:8,
    56:10, 81:2, 83:6,
    83:24, 89:18,
    107:25.
conversations 30:8,
    30:14, 30:19,
    40:13.
cooperative 12:25.
copy 122:15.
corner 130:7.
corrected 97:19.
correctly 78:5,
    86:13, 108:11,
    110:11, 115:25,
    133:13.
correlation 26:15.
corresponding
    11:22.
cosignatory 79:10,
    92:3, 92:6.
cost 26:12, 127:9,
    127:13.
Counsel 3:8, 5:9,
    5:11, 8:14, 82:19,
    93:6, 105:15,
    105:18, 119:16,
    120:3, 125:6,
    137:19, 137:23,
    144:5.
count 54:13.
country 21:16,

76:25.
couple 81:7, 90:25,
    98:10.
course 6:9, 10:4,
    14:9, 15:8, 18:15,
    18:18, 18:20,
    21:12, 29:12,
    29:17, 30:7, 59:22,
    65:25, 66:1, 66:11,
    67:20, 67:23,
    69:15, 80:16, 84:8,
    117:3, 135:8.
court. 42:21, 66:9,
    84:3, 121:2.
courthouse 11:18,
    121:9.
courtroom 45:7,
    106:14, 126:2.
courtroom. 13:10,
    43:6, 51:2, 72:19,
    73:20, 149:2.
covered 97:9,
    111:11.
covering 65:17.
covers 67:9.
create 39:2.
credit 20:20.
credited 20:23.
crimes 40:14, 84:9.
Criminal 1:5, 3:6,
    37:25.
criteria 25:19, 26:3,
    86:22, 87:16.
Cross 115:3, 132:17,
    141:12.
CROSS-EXAMINATION
    13:17, 13:21,
    73:25, 91:21, 93:5,
    97:11, 97:20,
    100:18, 100:20,
    115:5, 122:13,
    132:18, 141:14.
crossing 47:25.
crucial 38:5.
crystal 48:12.
cumulative 100:15.
current 25:25, 64:9,
    147:23.
currently 98:2,
    146:17.

cutout 100:6.
.
.
< D >.
Daddy 67:2.
date 27:8, 76:22,
    77:4, 91:3, 99:4,
    99:6.
David 3:14.
David E. Kenner
    1:39.
DAY 1:17, 4:17, 4:18,
    11:23, 76:14,
    77:14, 77:17.
days 4:22.
deal 3:25, 5:15,
    5:23, 8:5, 44:3,
    49:18, 61:15,
    141:2, 141:3.
dealer 138:18.
dealing 33:11, 47:18,
    143:6.
dealt 6:8, 44:4,
    141:4, 141:7.
decide 39:9, 53:6.
decided 25:14, 30:19,
    41:12.
decides 147:22.
deciding 48:23.
decision 7:21, 23:3,
    23:5, 24:16, 25:2,
    25:3, 55:1, 55:2,
    146:24.
decisions 25:16.
defend 5:19.
defending 6:10,
    6:13.
Defense 3:15, 6:13,
    6:20, 8:14, 44:12,
    44:16, 45:6, 45:16,
    45:23, 46:4, 46:12,
    46:24, 93:6, 120:3,
    144:4, 145:2,
    145:9.
definitively 21:6.
degree 50:12, 60:17,
    60:24.
Democratic 14:5,
    94:1.
Denver 33:11.

Redirect Examination - Gouzer

Department 1:26,
  1:33.
depending 5:25.
depends 5:25, 7:6.
depict 52:19, 53:12,
  53:13.
deposit 111:2,
  111:14.
describe 18:11,
  18:25, 66:17,
  74:21, 131:9.
described 14:3,
  74:6.
describing 101:24,
  102:4.
detail 95:25, 97:9.
determination 35:4,
  36:2, 36:10, 38:11,
  38:13, 38:23,
  90:8.
determine 14:1,
  21:22, 29:6, 29:12,
  29:17, 30:7, 34:8,
  59:23, 60:1, 67:20,
  78:11, 78:16,
  90:3.
determining 36:17.
develop 45:16,
  48:10.
developed 92:22.
Dicaprio 141:25,
  142:2.
dictated 55:17,
  56:2.
difference 32:22.
different 6:20, 7:5,
  9:15, 10:9, 16:18,
  19:9, 23:17, 57:3,
  68:21, 91:7, 97:23,
  118:23, 134:5,
  142:19.
differently 29:7.
difficult 50:3.
difficulties
  111:16.
difficulty 11:5.
digress 31:10.
dinner 27:6, 27:12,
  27:23, 28:15,
  28:24, 30:8, 31:11,

51:13, 126:22,
  126:23, 126:24,
  127:2, 127:3,
  127:5, 127:10,
  130:4, 131:11,
  131:18, 131:19,
  132:4.
dinners 28:15.
DIRECT 27:2, 37:17,
  44:23, 49:5, 106:1,
  122:13, 123:5,
  125:12, 138:4.
directed 100:19.
directly 14:16,
  26:13, 44:4, 44:11,
  59:5, 60:4, 124:23,
  137:17.
director 90:1.
discomfort 10:16.
discover 15:7,
  21:12.
discuss 42:24.
discussed 30:2, 30:4,
  66:24, 70:5, 77:22,
  99:7, 121:22.
discusses 43:13.
discussing 16:17,
  43:13.
discussion 7:16,
  8:17, 83:11, 83:21,
  91:12, 119:16.
display 143:15.
displayed 94:15,
  94:18.
distinction 79:7,
  82:24, 140:24.
distinctly 19:9.
distinguish 25:2.
distributed 92:13.
District 1:1, 1:2,
  1:19, 2:13, 2:14,
  146:22.
divide 22:23.
document 38:1, 84:23,
  111:7, 117:20,
  118:4, 118:5,
  144:24.
documents 84:25,
  85:2, 85:3, 85:8,
  85:11, 85:13,

85:16, 86:14,
  86:15, 86:18,
  86:23, 87:20,
  88:11, 88:14,
  88:16, 88:19.
doing 12:8, 12:25,
  31:19, 39:12, 50:8,
  57:18, 64:21,
  65:12, 95:15,
  116:17, 119:1.
DOJ 117:23.
dollar 22:13.
dollars 21:2, 67:6.
donate 19:3, 19:4,
  19:7, 22:5, 25:25,
  38:17, 38:20, 70:5,
  71:11, 90:20,
  96:2.
donated 26:17, 71:16,
  71:18.
donating 22:8.
donation 14:23,
  24:18, 25:20,
  96:12, 99:8, 99:10,
  114:22.
donations 24:2, 37:9,
  86:11, 96:6.
done 4:11, 9:10,
  10:19, 11:6, 31:14,
  37:19, 46:7, 49:7,
  55:4, 61:20, 75:22,
  87:9, 108:7.
Done. 104:13.
donor 22:10, 22:25,
  23:18, 23:19,
  26:22, 35:1,
  85:20.
donors 22:4, 26:25,
  27:1, 52:24, 64:23,
  85:24, 86:7, 88:7,
  89:17.
down 13:11, 30:21,
  51:3, 73:21, 93:4,
  93:21, 98:17,
  101:4, 101:22,
  104:15, 104:25,
  105:8, 105:11,
  113:6, 114:16,
  119:15, 123:24,
  124:6, 124:12,

Redirect Examination - Gouzer

124:21, 126:10,
129:20, 131:5,
132:2, 136:23,
137:15, 137:18,
138:12.
dozens 21:17.
draw 77:10, 77:16.
dress 97:12, 97:15.
drew 28:11.
driver 107:13, 110:8,
116:4.
driving 41:23,
46:6.
drop 63:12, 93:21.
duly 105:5, 124:17,
137:11.
Dumb 67:2.
Dumber 67:2.
during 6:9, 16:6,
18:18, 18:20,
19:19, 20:7, 20:15,
21:12, 21:13,
21:22, 23:6, 25:18,
38:9, 48:14, 67:20,
70:14, 80:17,
91:23, 92:22, 93:5,
96:11, 107:6,
107:8, 108:5,
129:13.
.
.
< E >.
e-mailing 94:4.
e-mails 18:19, 35:18,
56:10, 56:11,
56:18, 56:20,
56:24, 57:4, 57:7,
57:10, 57:12, 58:3,
58:4, 58:12, 58:13,
58:15, 58:16,
58:25, 59:1, 69:10,
81:1, 81:7, 82:6,
82:8, 82:10,
100:14, 100:16,
100:24.
earlier 24:7, 48:21,
56:11, 70:5, 86:19,
91:12, 104:10.
early 11:11, 62:4,
128:7.

earn 103:23.
easy 25:8.
effect 10:12.
effort 47:23, 140:8,
140:21.
Either 19:2, 21:24,
30:8, 35:19, 48:2,
71:7, 80:4, 87:7,
88:8, 104:25,
105:19, 122:13,
123:4, 125:6,
137:23.
Election 22:7, 23:7,
24:14, 89:4, 90:17,
90:18, 116:3,
133:21.
elections 64:5.
elements 64:3.
elevated 25:12.
eliminated 37:3,
73:8.
eliminates 42:14.
elsewhere 67:22.
EMI 67:13, 67:15,
91:1.
Encino 1:43.
encourage 37:9.
encouraged 19:6.
encourages 19:3.
end 5:23, 6:5, 6:8,
7:4, 7:9, 7:19,
8:3, 8:24, 21:24,
28:24, 33:15,
47:22, 95:6,
102:10, 104:11,
127:2, 127:12,
127:22.
enforcement 76:24.
engage 8:12.
England 60:8, 60:10,
60:18.
English 29:19, 59:24,
60:1, 60:9,
63:19.
enlarge 102:15.
enough 12:1, 34:17,
64:12.
ensure 87:9.
entered 13:10, 51:2,
73:20.

entering 122:10.
entertainer 15:1.
entirely 45:25.
entities 78:23.
entitled 120:15.
Entrepreneurs
127:8.
entry 128:25.
equipment 76:19,
76:21.
Eric 89:11, 141:4,
141:7, 141:8,
142:11, 143:3,
144:14, 145:17,
145:24, 146:15,
148:6, 148:8.
especially 37:16,
91:12.
Esquire 1:25, 1:31,
1:32, 1:39, 1:40,
2:5.
essence 46:14.
essentially 15:24,
123:11.
establish 63:13,
66:1.
establishing 77:16.
estate 64:7.
et 11:18, 43:16,
66:6, 91:7.
evaluating 82:17.
evening 4:24.
events 15:5, 19:3,
96:8.
eventual 38:6.
Everybody 8:24, 9:12,
9:18, 11:1, 13:5,
13:11, 73:21,
119:19.
everyone 3:2, 51:4.
Everything 12:11,
33:14, 58:11,
65:8.
evidently 8:21,
47:13.
exact 61:6, 89:25.
exactly 18:20, 23:23,
24:6, 57:1, 61:21,
70:1, 71:15, 143:4,
146:2.

exaggerating 49:9.
EXAMINATION 91:17,
  106:1, 125:12,
  136:1, 138:4,
  148:2.
examined 105:5,
  124:17, 137:11.
example 25:10, 26:22,
  69:10.
Excellent 13:2.
exchange 11:14.
exchanges 45:11.
exchanging 12:21.
excited 128:8,
  128:9.
excluded 41:11.
Excuse 59:20, 79:24,
  94:14, 95:2,
  101:12, 112:14,
  112:17, 114:24,
  118:6, 118:12.
excused 123:25,
  124:1, 124:3,
  124:5, 136:20,
  136:22, 148:17,
  148:19.
execute 143:6.
exhaustive 87:9,
  88:1.
exhibits 52:12, 84:7,
  117:24, 145:5.
expect 35:25,
  116:19.
expecting 117:16.
expensive 67:7.
experience 28:5,
  84:8.
experienced 41:18.
explain 119:22.
explained 48:19,
  49:18, 50:14,
  134:8.
explanation 87:6.
explicit 58:2,
  59:17.
explicitly 59:6,
  76:12.
exposing 77:7.
expressed 76:8,
  82:8.

expressing 30:25,
  31:25.
extent 26:13, 44:12,
  48:13.
extraordinarily
  12:25.
extrinsic 73:11.
eye 4:20.
.
.
< F >.
F. 1:31.
face 52:20.
facets 23:18.
fact 8:13, 14:21,
  15:22, 19:5, 29:25,
  38:9, 63:15, 63:18,
  63:19, 109:8.
factors 26:1.
facts 15:12, 15:14,
  16:5, 27:15, 31:3,
  31:5, 35:5, 49:13,
  49:14, 49:15, 69:7,
  77:19.
fair 16:2, 21:2,
  37:7, 39:4, 41:24,
  54:6, 77:18, 82:16,
  116:3.
fairly 23:4, 25:8.
fallen 20:9.
familiar 23:16,
  23:23, 27:5, 81:9,
  135:1.
family 108:22.
fan 133:2.
far 6:6, 7:2, 23:3,
  27:18, 39:25,
  40:17, 44:19, 49:2,
  49:17, 50:18, 78:8,
  135:17, 149:7.
FARA 39:21, 40:4,
  47:15.
fashion 132:6.
father 51:17, 52:2,
  52:6, 52:22, 55:14,
  56:12, 56:23,
  57:11.
FBI 37:24, 76:23,
  76:24, 115:13.
FCRR 2:11, 149:13.

FEC 22:10, 22:25,
  23:20, 23:21,
  24:23, 25:17,
  39:17, 84:25, 85:2,
  85:3, 85:4, 85:6.
Federal 22:7, 23:7,
  24:14, 89:3, 90:17,
  133:20, 147:17.
feel 82:15, 122:20.
feeling 6:7, 6:23.
Feigenbaum 89:12,
  89:14, 89:17.
few 4:9, 11:10,
  23:17, 53:23, 67:2,
  89:11, 97:23,
  142:4.
figure 63:6, 118:9.
file 38:3, 66:13.
filed 5:10, 24:23,
  61:18, 61:19, 62:8,
  85:4.
fill 88:5, 133:19,
  134:17, 134:24.
filled 85:9, 85:14,
  85:17, 85:21,
  85:22, 85:24,
  86:7.
filling 134:11,
  134:22.
film 67:2.
final 23:5, 135:19,
  143:4.
finalized 59:10.
Finance 18:8,
  18:13.
financial 68:12,
  69:11, 78:6, 78:9,
  78:12, 79:21,
  79:23, 80:8, 80:18,
  84:9, 84:15,
  91:23.
find 43:11, 47:14,
  86:14, 143:10.
finding 135:3.
fine 7:5, 7:19, 9:1,
  9:12, 10:19, 11:1,
  12:4, 12:21, 52:10,
  56:6, 120:14,
  144:22.
finger 131:25.

Redirect Examination - Gouzer

finish 105:15,
  116:14, 125:2,
  129:17, 134:8,
  137:19.
finished 66:8,
  145:13.
finishing 60:8.
Firm 1:41, 81:10,
  81:12, 90:6,
  90:7.
first 20:2, 27:6,
  84:23, 93:22,
  93:23, 98:10,
  102:24, 105:5,
  122:7, 124:17,
  137:11, 146:2,
  149:4.
fits 6:19.
five 61:6, 86:3,
  86:19, 139:23,
  145:22, 145:23.
flagged 12:10.
flags 142:25.
fluent 63:19.
focused 16:8.
focusing 37:4.
follow 33:12,
  103:18.
follow-up 134:14.
following 42:21,
  66:9, 84:3,
  121:2.
follows 28:22, 105:6,
  124:18, 137:12.
food 11:10, 107:13.
footage 77:2, 77:10,
  77:15.
foregoing 149:14.
foreign 25:10, 60:1,
  64:4, 65:6, 65:11,
  65:16, 69:16,
  90:15, 90:19.
forfeit 61:14,
  66:13.
forfeited 61:5,
  61:11, 91:2.
forfeiture 61:18,
  62:8, 91:1.
forget 61:20.
form 85:20, 85:25,

  89:2, 89:16.
formal 147:9.
formally 146:5,
  146:7.
formed 76:4.
former 15:4, 43:14,
  47:24, 133:8.
forming 76:7.
forms 24:23, 84:25,
  85:4, 86:6, 86:9,
  87:3, 87:5, 88:4,
  88:8.
forth 106:9, 148:5.
forward 7:1, 8:2,
  10:21, 33:12,
  48:23, 49:20,
  49:22, 50:16,
  50:25, 84:4, 88:16,
  103:18, 105:23.
forwarded 57:14,
  95:22, 102:21,
  104:3, 104:6.
forwarding 45:13,
  45:14.
forwards 95:17,
  98:22, 102:17,
  104:5.
found 36:24, 49:3,
  88:19.
foundation 27:16,
  27:18, 31:3, 31:6,
  83:10, 140:11,
  140:12.
four 84:23.
frame 16:3, 16:8,
  91:24, 138:21.
Frank 17:22, 18:1,
  18:2, 27:6, 32:7,
  32:11, 33:19, 34:9,
  35:8, 37:9, 38:25,
  39:17, 43:14,
  45:13, 51:14,
  53:25, 88:3, 89:17,
  90:9.
frankly 5:17, 5:23,
  6:19, 7:11, 8:22,
  15:14, 26:7, 41:8,
  43:17, 44:25, 47:9,
  47:11, 48:2, 64:17,
  66:4.

friend 113:21,
  123:15, 126:1,
  126:19, 133:14.
friends 63:14,
  127:8.
front 5:19, 48:6,
  51:11, 74:9, 74:22,
  82:10, 109:3,
  112:17, 121:5,
  121:20, 122:14,
  142:15.
Fugees 15:9.
full 7:7, 42:23,
  71:17, 80:9,
  80:10.
functioning 77:9.
Fund 70:2, 70:15,
  71:7, 72:1, 86:2,
  94:12, 112:12,
  112:19, 113:4,
  130:2.
fundraiser 14:18,
  18:17, 38:15,
  38:16, 38:22, 94:5,
  94:6, 94:10, 94:23,
  95:15, 95:20, 99:6,
  101:25, 102:5,
  102:7.
fundraisers 18:22,
  19:2, 21:11, 21:14,
  21:16, 21:23,
  38:19.
fundraising 18:14,
  20:21, 20:24,
  24:21, 41:19,
  51:13, 90:15,
  90:20, 102:19.
funds 22:12, 52:23,
  69:13, 70:23,
  70:25, 132:10.
fwhite@barackobama.co
  m 18:2.
FYI 98:22.
.
.
< G >.
G-o-u-z-e-r 138:10,
  138:13.
gag 6:16, 7:14.
gain 21:1, 21:15,

Redirect Examination - Gouzer

69:24, 71:11.
gains 65:1, 66:14.
game 41:24.
garage 107:1.
Gaspard 93:25, 94:1,
    94:19, 95:11,
    95:14.
gather 75:2, 76:3.
gathered 49:5,
    49:24.
gave 64:22, 104:18,
    107:12, 109:10,
    111:20, 123:4,
    123:6.
general 10:6, 44:18,
    66:18, 79:22,
    86:12.
Generally 7:13, 9:16,
    21:6, 28:14, 35:17,
    66:20, 79:10, 93:2,
    95:25, 96:1, 96:2,
    101:24, 102:3.
generically 74:22.
gentleman 23:8.
gentlemen 18:25.
gets 8:8, 9:21, 40:9,
    43:22, 80:22,
    104:1, 104:7.
Getting 8:1, 20:20,
    36:21, 40:17,
    40:22, 43:17,
    43:19, 44:25,
    47:23, 49:2, 72:7,
    81:23, 91:6,
    132:25.
gift 78:3, 80:24,
    81:3, 81:18, 82:13,
    82:18, 82:24,
    83:7.
Gilbert 106:23,
    107:5, 107:11,
    107:22, 113:21,
    116:23.
give 9:10, 10:24,
    34:2, 39:2, 43:1,
    48:18, 70:4, 80:1,
    86:6, 99:10,
    104:20, 108:18,
    109:5, 109:8,
    114:22, 117:23,

127:25, 136:8.
given 5:5, 5:9, 6:15,
    12:1, 22:14, 31:25,
    44:25, 52:24,
    56:13, 71:25.
giving 8:9, 26:16,
    28:23, 31:18,
    31:25, 49:10,
    81:16, 127:22,
    136:17.
Google 75:7.
gotten 100:3.
Gouzer 136:25, 137:4,
    137:5, 137:10,
    138:6, 138:10,
    138:13, 138:15,
    148:4.
grand 6:15, 6:16,
    7:14, 8:19, 9:16,
    10:8, 120:2,
    120:13, 120:24,
    121:5, 121:8,
    121:13, 121:21,
    142:15, 143:10,
    143:13, 145:18,
    148:14.
great 33:9, 49:18.
ground 24:12.
grounds 44:24, 62:22,
    62:24, 73:14,
    90:11.
groundwork 27:22.
group 37:9, 127:7,
    146:4.
groups 146:3.
guarantee 96:20.
guess 21:4, 22:6,
    22:23, 29:9, 36:8,
    52:24, 62:1, 62:3,
    77:6, 110:9,
    144:16.
guests 97:17.
guidance 82:14.
guy 33:17, 97:21,
    97:23, 98:1, 98:7,
    99:13, 99:16,
    102:11, 103:13,
    141:4, 141:8,
    143:5.
guys 33:12, 33:16,

103:12, 103:18.
.
.
< H >.
H-y-p-p-o-l-i-t-e
    107:2.
Haiti 106:10, 107:9,
    107:10, 107:17,
    108:5, 110:7,
    116:1, 116:3,
    117:14, 123:10,
    123:16.
Haitian 107:7, 110:5,
    110:14, 113:18.
half 98:20, 99:19,
    101:7, 103:1,
    103:24, 130:9.
hand 27:14, 85:21,
    105:3, 122:22,
    122:23, 124:15,
    137:9.
handle 7:8, 9:19.
handled 6:2, 12:19,
    33:14.
handling 9:1.
hands 28:16, 28:25,
    52:2.
handwriting 85:10,
    86:7.
handwritten 85:8,
    85:24, 129:3.
happen 38:16,
    102:8.
happened 27:22,
    29:24.
happening 71:20,
    71:22.
happens 142:20.
happy 6:21, 7:9,
    7:19, 8:16, 10:17,
    12:2, 30:25,
    46:8.
hard 21:5, 25:13,
    26:2.
harder 35:11.
hardly 34:2.
Harrow 60:18.
Haskell 2:5, 2:7,
    3:15.
Hassan 83:7, 83:16,

Redirect Examination - Gouzer

83:17, 83:20.
head 73:13.
hear 6:24, 17:6,
    40:25, 41:2, 46:11,
    55:25, 83:17,
    94:16, 105:11,
    105:22, 118:16,
    119:19, 124:24,
    125:6, 125:9,
    130:22, 137:18,
    137:22, 138:1,
    139:18, 144:12,
    145:20.
heard 25:21, 33:10,
    36:3, 45:3, 50:7,
    136:5, 136:6,
    136:11, 147:13.
Hearsay 27:23, 28:3,
    55:22, 81:24, 82:1,
    82:3, 83:10,
    87:11.
held 5:6, 8:4, 21:13,
    21:16.
Hello 40:24, 83:17,
    119:18, 133:10,
    133:11, 133:12.
help 24:15, 107:12,
    107:13, 108:5,
    110:7, 110:9,
    116:12.
helped 117:14.
helpful 11:18, 12:9,
    12:12, 116:1,
    116:4.
hereby 149:13.
Heuchling 13:23,
    91:19, 91:21,
    92:10, 92:19, 93:5,
    93:24, 94:21,
    96:17, 97:3, 97:8,
    100:24, 101:9,
    102:24, 103:9,
    103:25, 115:18,
    115:21, 121:4.
high 21:24, 23:4,
    60:19.
high-end 60:19,
    66:20, 67:7.
higher 21:7, 25:12,
    26:11, 26:20,

56:13.
highlight 111:14,
    112:5, 112:22,
    128:25, 129:22.
highlighted 98:2,
    111:18.
highly 26:17.
him. 103:14.
hinges 44:12.
hired 78:5.
Hold 72:7.
Holdings 78:22, 92:7,
    92:14, 98:25,
    129:7, 129:10.
Home 67:2, 88:4.
HONORABLE 1:18.
hope 115:7.
hopes 7:16.
hosted 14:19.
hosts 19:2.
Hotel 61:10, 61:15,
    61:24, 62:2, 62:15,
    63:8, 66:24,
    66:25.
House 26:23, 27:6,
    29:4, 33:9, 51:14,
    53:25, 54:23,
    102:12, 138:18,
    139:1.
huge 96:21.
hugging 28:25.
hundred 146:13.
hundreds 21:20.
Hyppolite 106:23,
    106:25, 107:1.
.
.
< I >.
i-l-b-e-r-t 107:1.
I. 91:8.
identified 51:17,
    76:9, 76:12, 84:22,
    85:7, 126:9,
    126:12.
identify 3:8, 83:16,
    106:16, 106:20,
    126:4.
identifying 85:11.
ill-gotten 64:25,
    66:14.

illegal 19:8, 52:13,
    52:19, 53:12,
    53:14, 90:15.
imagine 21:17, 23:1,
    23:4, 38:21.
immediately 54:16,
    113:5.
immunization 4:1.
impact 147:21.
impeach 73:5, 120:11,
    122:21, 122:25,
    123:4.
impeaching 119:15.
impeachment 118:1,
    118:20, 119:13,
    119:23, 120:1,
    122:11, 144:17.
importance 56:15.
important 24:1,
    55:20, 58:1, 58:4,
    58:8, 96:5.
impressed 66:5.
impression 67:8.
impressions 76:4.
improper 118:20,
    122:10.
imputed 5:9.
in-person 140:15.
in. 47:2, 73:19,
    105:1.
inappropriate 5:22,
    8:2, 30:5, 30:10,
    30:20, 31:14,
    36:18.
inaugural 15:9.
include 38:1,
    62:10.
included 88:4, 89:8,
    91:1.
including 9:19, 11:2,
    67:7, 85:5,
    97:23.
income 81:3, 81:18,
    82:18, 82:25.
inconsistent 122:12,
    122:25.
incorporated 32:16.
increasing 21:1.
Indiana 2:8.
indicate 10:7, 46:15,

Redirect Examination - Gouzer

50:10, 55:6, 56:18,
77:13, 95:2,
142:10, 143:12,
143:17, 143:23,
144:9.
indicated 20:15,
36:24, 56:8, 68:22,
68:25, 70:13, 72:8,
72:9, 85:21, 119:8,
119:9, 120:20,
123:17, 123:18,
146:14, 149:5.
indicates 34:20,
77:23, 95:6.
Indicating 114:13,
132:1.
indication 95:15,
147:11.
indicative 58:5,
69:8, 69:9.
indict 146:25,
147:22.
indicted 147:4.
indictment 32:16,
32:21, 32:23.
indirectly 44:11,
49:6.
individual 22:15,
23:1, 25:19, 26:22,
125:22.
individually 30:9.
individuals 19:4,
23:17, 24:24,
25:17, 28:6, 38:20,
58:7, 58:8, 85:9,
88:5.
industry 138:20.
inference 37:7,
58:16, 77:20.
inferences 16:18.
inferred 49:14.
inferring 39:3.
influence 69:24,
71:11.
influenced 19:21.
influencing 70:20.
information 14:16,
22:9, 22:25, 23:19,
25:17, 38:5, 41:5,
41:7, 46:20, 48:19,

48:20, 48:22, 49:4,
49:19, 49:22,
49:23, 50:14,
50:15, 82:14, 85:5,
96:2, 98:25,
102:5.
informed 33:8, 82:12,
86:16, 88:1.
inner 21:4.
inordinately 50:3.
input 59:12.
instance 75:23.
instances 7:8.
instead 127:19.
instructed 41:19.
instruction 12:11,
104:19.
instructions 11:21,
12:8.
Integrity 1:34.
intend 41:17, 42:12,
120:4.
intensive 36:14.
intent 45:24, 70:1,
71:25, 72:8, 93:7,
93:16.
intention 63:11.
intentions 39:9.
interaction 27:1,
29:25.
interest 7:4, 68:15,
68:16, 68:18,
100:13, 113:15.
interested 116:24.
interests 5:8,
68:12.
international 63:21,
64:2, 139:1.
interpreted 134:4.
interrupting 55:23,
144:15.
interview 16:14,
24:1, 24:20, 38:1,
75:8, 75:11, 89:14,
118:18, 119:25,
120:16, 121:4.
interviewed 16:10,
75:12, 115:12,
115:16, 115:23.
interviewing 28:6,

35:19.
interviews 28:8,
35:17.
introduce 83:5, 84:7,
142:6.
introduced 84:22,
141:25, 148:6.
investigate 20:15,
40:3, 40:8, 47:13,
84:10.
investigated 21:14,
47:12.
investigating 16:7,
16:17, 84:9,
141:18.
investigative
30:10.
investigators
43:15.
investments 66:5.
investors 142:18.
invitation 85:9,
88:5, 133:17.
invited 108:2, 127:4,
127:6, 127:13.
invocation 4:1.
involved 18:9, 24:21,
24:22, 24:24,
36:15, 40:7, 40:13,
55:7, 107:6, 110:4,
110:6, 116:5,
116:7, 116:12,
128:12.
involvement 14:5,
15:4, 92:23, 93:1,
110:10, 110:18.
involves 95:19.
involving 15:5,
92:11, 93:16,
93:18, 94:23, 97:4,
101:10, 101:19,
101:22.
irrelevant 43:24,
44:13, 45:2, 62:18,
64:1, 66:6.
Israely 1:40.
issue 5:10, 6:1,
6:11, 6:18, 7:11,
7:23, 20:16, 22:6,
30:15, 42:16,

Redirect Examination - Gouzer

43:10, 47:7, 66:2,
118:23, 122:7.
issued 9:16.
issues 4:1, 11:17,
11:19, 12:10,
16:17, 42:2, 42:15,
43:7, 43:17, 43:20,
43:23, 47:9.
it. 100:3.
itself 6:14, 44:18,
73:18, 113:7.
.
.
< J >.
J-e-a-n 106:5.
Jean 106:5.
Jeffrey 14:20.
Jencks 118:14,
118:19.
jet 67:5.
Joelle 113:17,
113:20.
John 3:11.
John D. Keller
1:25.
Johnson 111:6,
111:13, 111:17,
112:4, 112:13,
112:20, 113:6,
113:25, 114:15,
128:15, 128:24,
129:19, 129:20,
129:23, 131:5,
131:15, 132:3.
joint 68:6, 68:14,
68:15.
JUDGE 1:19, 5:19,
6:3, 7:5, 7:21,
8:25, 9:10, 9:19,
9:20, 9:21, 10:15,
10:17, 53:6,
134:20.
Judges 7:8, 8:3.
July 33:13, 33:15,
103:19.
June 96:9.
JUROR 4:19, 148:24.
jurors 13:7,
121:13.
Justice 1:26, 1:33.

.
.
< K >.
Katzenberg 14:20.
Keep 11:13, 112:1,
130:21, 148:25.
KELLER 3:11, 4:25,
5:18, 7:22, 10:23,
12:25, 138:14.
Kenya 29:14, 29:16,
30:1.
kept 86:13, 86:18,
86:24.
Kevin 23:9, 23:22,
88:12.
key 64:24.
kind 8:12, 24:1,
28:5, 36:16, 55:19,
56:13, 87:15,
107:3, 130:9,
133:19.
kinds 16:17.
King 113:18.
Kino 113:18.
Kirk 89:23, 89:25,
90:3, 90:9.
knowing 21:4,
122:15.
knowingly 31:14.
knowledge 28:11,
45:17, 45:23,
65:23, 79:17, 89:3,
135:15, 141:16,
141:18, 143:6,
146:24.
known 8:14.
knows 64:16, 113:22,
140:13.
.
.
< L >.
L-o-i-c 138:10,
138:13.
label 145:1.
Lack 27:16, 31:3,
143:23.
ladies 18:25.
Lane 61:10, 61:15,
61:24, 62:2, 62:12,
62:15, 63:8,

66:24.
language 58:2.
large 22:13,
103:23.
largely 19:21.
Larry 56:13.
last 11:23, 19:11,
48:5, 48:6, 50:7,
51:5, 52:12, 59:13,
87:10, 91:9, 96:18,
96:19, 115:8,
126:20, 126:22,
136:9, 139:18,
149:4.
lastly 102:22.
late 5:4.
later 8:15, 43:2,
61:11, 67:19,
118:9, 127:13.
Law 1:41, 2:6, 22:7,
76:24, 90:6, 90:7,
90:17, 90:18.
laws 40:4.
Lawyer 31:23, 90:4.
lawyers 104:21.
leader 41:17.
leading 20:10.
league 81:12.
learn 19:23,
107:21.
learned 48:14,
76:14.
least 7:10, 26:11,
27:1.
leave 39:14, 47:6,
67:12, 96:15.
leaving 46:10,
46:19.
left 43:6, 47:4,
51:18, 52:3, 52:6,
55:14, 72:19,
124:13, 149:2.
legitimate 62:9,
63:5, 63:16, 64:2,
64:21.
legitimately 61:24,
62:5.
length 68:1.
Leonardo 141:25,
142:2.

Redirect Examination - Gouzer

letter 78:3, 80:24.
level 22:3, 23:4,
  25:8, 25:12, 26:20,
  56:13.
levels 20:9.
lie 45:1.
lied 43:15, 44:1,
  45:1.
lies 22:21.
likely 12:19.
likes 60:21.
limitations 79:14,
  79:25.
limited 16:3,
  79:12.
limiting 11:20, 12:8,
  12:11.
line 47:25, 62:17,
  62:21, 63:12,
  69:23, 94:9, 98:14,
  99:9, 102:9,
  102:10, 103:17,
  122:1, 122:2,
  122:3, 122:5,
  123:15, 125:19,
  125:20, 138:14,
  143:15.
Lines 96:18, 96:19,
  98:10, 143:12,
  143:18, 143:25,
  144:1, 144:2,
  145:11, 145:12.
lining 73:3.
list 11:14, 12:15,
  12:18, 12:22, 61:2,
  145:5.
little 4:21, 11:11,
  21:9, 53:17, 73:3,
  74:4, 98:17,
  113:10, 126:10,
  129:3, 131:9,
  138:11, 138:12,
  138:18.
lived 54:8, 67:21,
  67:25.
locate 86:17, 87:4,
  87:8.
located 60:25,
  114:10.
location 139:3.

LOCKHART 1:32, 3:11,
  130:25, 135:13.
Loic 136:25, 137:4,
  137:5, 137:10,
  138:10, 138:13.
long 12:18, 61:13,
  78:11, 80:11.
longer 86:4.
look 4:4, 17:14,
  34:11, 42:3, 42:6,
  42:17, 42:24,
  43:10, 57:19, 58:4,
  61:2, 62:4, 70:25,
  73:16, 77:3, 77:13,
  80:16, 81:5, 87:20,
  102:9, 102:24,
  111:3, 111:5,
  122:6, 122:16,
  143:18, 145:13.
looked 6:7, 52:12,
  52:15, 56:11, 57:7,
  58:25, 62:2, 73:5,
  73:10, 74:9, 80:25,
  81:7, 89:8, 92:11,
  93:18.
Looking 11:19, 40:6,
  53:11, 77:12,
  78:10, 92:10,
  92:19, 96:4,
  111:17, 112:7,
  122:9.
looks 130:6.
Los 66:20, 66:25,
  67:22, 67:24.
lot 7:16, 48:19,
  50:14, 50:15, 57:7,
  108:5, 116:5,
  117:14, 142:2.
love 117:1, 117:2,
  117:8.
Low-related 58:23.
lower 25:8, 99:19.
lunch 137:1,
  148:22.
luxury 66:22.
lying 49:8.
.
.
< M >.
mailed 113:2,

113:5.
Main 97:12, 97:15,
  97:21, 97:23, 98:1,
  98:7, 99:3, 99:13,
  99:16.
maintained 86:4,
  86:10.
major 81:12, 90:7.
Malaysian 98:4,
  98:6.
man 33:9, 33:17,
  33:20, 46:5,
  102:11, 103:12.
manager 84:16.
Manhattan 74:10,
  74:22, 139:5.
manipulate 46:7.
maps 75:7.
Marcadum 81:16.
Marcum 81:10, 81:12,
  81:16, 82:5, 82:7,
  82:8, 82:13,
  83:18.
marked 111:4,
  118:8.
Martelly 107:7,
  116:2.
mask 105:11, 115:18,
  115:22, 124:23,
  137:18.
master 60:13.
material 6:12, 6:14,
  6:16, 7:13, 8:9,
  8:19, 8:20, 9:16,
  10:8, 10:11.
materials 10:7,
  10:9.
matter 57:10, 64:9,
  149:15.
max 127:21.
maximum 96:20.
mean 5:14, 6:13, 7:6,
  7:25, 9:22, 26:15,
  26:24, 32:23, 38:4,
  41:9, 46:9, 49:9,
  50:8, 53:9, 69:9,
  79:3, 79:8, 87:21,
  97:22, 107:9,
  128:11, 134:1,
  135:5, 135:8.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Redirect Examination - Gouzer

means 105:20, 107:10,
    134:20.
meant 5:3, 31:8,
    49:15, 58:16,
    68:13, 146:1.
meantime 74:19.
media 60:4.
meet 7:23, 10:22,
    14:12, 98:7,
    102:11, 113:13,
    116:22, 126:16,
    126:18, 141:23,
    146:15.
meeting 4:19, 102:18,
    146:12.
meetings 99:12.
Members 13:12, 42:22,
    73:22.
memory 134:2, 134:3,
    134:6, 142:13,
    144:14, 145:17.
Men 70:14, 71:8,
    71:25, 90:1.
mental 39:10.
mention 4:23, 11:12,
    67:13.
mentioned 29:2,
    81:10, 110:5,
    112:24, 113:7,
    113:20.
message 101:10,
    101:19, 103:4.
met 14:10, 107:5,
    141:25, 142:12,
    142:14, 146:3,
    146:5, 146:7,
    146:13.
Miami 96:9, 99:6,
    106:10.
microphone 105:10,
    112:2, 112:15,
    124:23, 129:9,
    137:17, 138:12.
mid-june 100:8.
middle 8:5, 95:13,
    105:21, 125:9,
    137:25.
midway 103:10.
mill 99:23, 100:3.
million 67:4, 67:18,

67:19, 68:23, 69:4,
    69:21, 69:22,
    70:13, 71:3, 71:6,
    71:13, 71:15,
    71:17, 71:25, 93:7,
    93:16, 94:6, 94:12,
    94:22, 95:9, 100:9,
    100:10, 139:17,
    139:20.
millions 67:6.
mind 33:5, 76:6,
    76:8, 149:1.
mindset 47:8,
    47:10.
mine 113:21.
minimum 22:8.
minute 31:10, 80:25,
    118:12.
minutes 43:1, 96:20,
    148:25.
misconduct 41:10,
    42:11, 42:13.
missed 81:25,
    124:10.
missing 4:9, 11:10.
missive 38:24.
moment 5:1, 83:4,
    84:19, 85:12,
    90:23, 92:13,
    96:16, 100:22,
    111:15, 115:19,
    115:22, 143:9.
moments 91:21,
    99:16.
Monday 12:2, 33:13,
    103:19, 121:9.
Monet 67:8.
monies 66:13.
monitor 131:23.
MORNING 1:13, 3:2,
    3:3, 3:4, 3:10,
    3:13, 3:14, 3:16,
    5:3, 11:11, 13:12,
    13:14, 13:23,
    13:24, 42:23, 43:2,
    72:13, 72:17, 73:2,
    73:22, 73:23, 74:2,
    91:19, 91:20.
mostly 106:10,
    107:16.

motion 5:6, 5:9,
    5:13, 8:13, 8:19,
    9:10, 9:19.
motions 6:7.
motivated 39:1.
motivations 39:13,
    43:8.
Motive 39:2, 39:14,
    47:9.
Move 19:11, 68:21,
    87:10, 103:22,
    112:17, 112:18,
    120:13, 120:24,
    137:16, 138:12.
moved 48:1.
moves 124:22.
moving 27:14, 33:11,
    103:18, 104:17.
MR. KELLER 3:3, 3:24,
    5:1, 8:11, 9:3,
    10:2, 11:4, 11:22,
    12:1, 12:6, 13:3,
    41:1, 136:25,
    137:4, 138:5,
    140:8, 140:14,
    141:10, 143:20,
    144:4, 144:15,
    144:20, 147:7,
    148:3, 148:11.
Mulryne 1:31, 3:11,
    44:6, 46:11, 46:22,
    63:23, 64:12,
    64:24, 65:13,
    83:8.
multiple 17:19,
    24:20, 78:24, 79:1,
    139:11.
mutual 126:19.
myself 7:23.
.
.
< N >.
naive 128:7.
name 23:8, 23:16,
    23:23, 101:13,
    106:4, 106:5,
    106:11, 106:25,
    115:8, 125:16,
    125:20, 125:22,
    136:9, 137:3,

Redirect Examination - Gouzer

138:8, 139:25,
140:3, 140:6,
142:23.
named 78:5, 139:6.
names 78:24,
142:19.
National 18:7, 18:13,
25:10, 90:19,
94:1.
nationally 21:15.
nationals 90:15.
naturalized 29:16.
nature 107:25,
139:9.
near 80:9.
necessarily 110:12.
necessary 6:22.
need 4:11, 5:2,
10:24, 17:1, 42:1,
42:24, 55:25,
82:14, 83:4, 83:25,
101:4, 105:1,
105:10, 112:14,
116:14, 118:3,
118:7, 122:19,
124:22, 126:10,
129:9, 130:21,
137:17, 143:12,
143:17, 143:24,
145:1.
needed 107:12, 108:3,
117:6.
needing 3:25.
needs 27:17, 118:8.
negative 5:12.
New 1:27, 1:35, 54:3,
61:10, 66:22,
67:22, 67:24, 68:1,
77:5, 139:5,
146:22.
news 8:10, 33:9.
newspaper 8:21.
Next 9:21, 11:15,
11:24, 33:15,
51:22, 51:24,
52:15, 53:16,
53:20, 55:12, 78:3,
104:17, 104:23,
124:8, 129:3,
136:24, 145:3,

145:7.
nice 108:6, 108:12,
113:12, 146:15.
Nicole 1:32, 3:11.
night 11:23, 133:9.
No. 1:5, 15:3, 20:3,
20:4, 22:1, 29:9,
47:16, 55:18, 56:3,
60:14, 97:15,
97:17, 97:24,
98:14, 99:1, 99:3,
110:10, 142:14.
Nobody 64:11.
noise 114:24.
None 92:25, 93:3.
noon 4:14.
nor 42:12.
normal 35:17.
note 19:5, 26:22,
60:15, 94:8.
noted 112:7.
Nothing 6:12, 8:25,
19:8, 50:16, 63:20,
77:13, 83:2, 91:13,
114:23, 122:11,
123:21, 123:23,
128:11, 132:16,
135:22, 136:19,
142:21, 147:9,
147:25.
notice 12:1, 45:10.
noting 112:8.
notion 59:14,
65:10.
number 10:9, 21:1,
56:20, 56:23, 61:6,
74:15, 92:3,
117:21, 117:22,
117:23, 121:25,
139:19, 143:15.
NW 1:27, 1:35, 2:8,
2:15.
NYPD 77:5.
.
.
< O >.
o-u-s-s-a-i-n-t
106:6.
object 83:9, 100:15,
105:20, 125:7.

objected 47:15,
87:22.
objecting 137:24.
objectionable
48:13.
objections 49:17.
objective 38:13,
38:23.
objectively 38:11.
observation 55:10,
57:9.
observed 63:15.
obviously 6:16,
71:19, 82:10.
occasion 84:9,
133:8.
occupation 25:20,
25:25.
offenses 64:3.
offer 34:25.
offered 133:15.
offering 43:14.
offhand 78:14.
Office 86:21, 146:19,
147:22.
Offices 2:6.
Official 2:12,
149:19.
often 59:1, 84:14,
107:10, 107:15.
oftentimes 96:10.
old 86:3.
once 99:10.
one-on-one 96:21.
ones 86:24.
online 60:4.
open 42:21, 66:9,
84:3, 121:2.
opened 92:8.
operating 65:5.
opine 49:7, 50:9,
89:22.
opining 39:11, 50:8,
69:5.
opinion 34:1, 34:3,
37:15, 39:6, 42:3,
42:4, 43:8, 44:15,
49:10, 58:11, 60:6,
69:4, 71:19, 72:4,
73:18, 77:25,

Redirect Examination - Gouzer

82:19, 89:2, 89:5,
89:7, 89:16, 89:19,
89:20.
opinions 32:1, 42:2,
43:18, 44:3, 44:25,
48:18, 73:5, 73:10,
73:12, 76:7,
89:9.
opportunity 10:22,
22:15, 28:23, 60:3,
73:16, 133:5.
opposed 6:3, 86:24.
option 9:2, 10:25.
oral 82:3.
order 4:13, 6:16,
7:14, 9:15, 10:4,
10:8, 11:16, 12:8,
21:10, 42:10, 48:1,
66:1, 135:7,
145:3.
orders 44:10.
Orozco 93:4, 96:16,
103:8.
others 19:3, 24:16,
24:22, 50:21,
57:11, 64:4, 64:15,
67:3, 86:14,
147:3.
Otherwise 7:15,
15:15, 22:16, 64:2,
136:11.
outside 44:23, 54:17,
64:8, 80:19, 80:22,
135:15.
owe 117:10.
owed 123:11.
own 22:12, 37:14,
58:16, 62:5, 132:8,
135:15, 139:25,
140:3, 142:22.
owned 61:24, 62:2,
62:15, 68:5.
owner 62:9, 75:12,
75:13.
ownership 62:12,
64:7, 68:7.
Oxford 60:10.
.
.
< P >.

p.m. 149:11.
PAC 21:24, 90:2.
Page 43:8, 43:12,
93:22, 93:23,
95:12, 97:7,
102:24, 102:25,
103:1, 103:8,
103:24, 111:5,
111:13, 114:1,
121:24, 122:1,
122:2, 128:24,
131:16, 143:12,
143:14, 143:16,
143:18, 143:25,
145:11.
pages 84:23, 84:24.
paid 67:17, 67:18,
116:23, 132:7.
paper 113:5.
paperwork 133:20,
134:14, 134:18.
paragraph 32:17,
96:4, 97:24.
pardon 95:22.
Paris 61:8.
Park 61:10, 61:15,
61:24, 62:2, 62:12,
62:15, 63:8,
66:24.
part 10:16, 19:11,
19:17, 22:1, 35:12,
37:18, 37:23, 38:3,
38:5, 38:8, 38:21,
38:23, 40:2, 43:9,
43:17, 45:5, 45:22,
52:7, 63:12, 64:24,
75:21, 87:17, 95:4,
103:7, 129:22,
143:4.
participating
90:19.
particular 11:19,
17:20, 24:17, 26:8,
32:15, 40:11,
40:12, 41:13,
48:20, 49:1, 53:22,
68:1, 76:15, 86:8,
98:14, 117:20.
particularly 8:20,
24:5, 26:8, 30:15,

133:7.
parties 8:9, 10:5,
46:1.
partner 106:23,
107:11, 107:22,
116:23.
party 10:12, 22:4,
46:2.
partying 70:7.
passed 25:2, 56:25,
57:14, 58:24.
passing 32:7.
passport 56:23.
past 11:7, 108:7.
Patrick 94:19,
95:5.
Patterson 122:23.
pawn 45:16.
pay 108:3, 108:12,
108:21, 117:10,
117:13, 117:15,
123:10, 123:19,
132:10, 133:15.
payment 130:3, 141:2,
141:3.
payments 143:6.
pending 8:18.
Penn 60:12, 60:14,
60:16.
Pennsylvania 61:1.
People 4:10, 11:17,
12:14, 24:20,
28:23, 37:10,
38:17, 39:2, 46:16,
50:15, 53:24, 54:2,
54:13, 54:16,
54:18, 56:9, 58:23,
59:5, 59:11, 62:8,
64:15, 64:17, 65:7,
66:4, 81:15, 82:8,
113:13, 121:13,
127:7, 146:3.
per 27:14, 134:20.
percent 70:18,
146:13.
Perfect 4:9.
perfectly 7:9,
8:16.
perform 15:9.
perhaps 7:22, 16:18,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Redirect Examination - Gouzer

21:21, 24:15,
40:18, 46:24,
57:11, 59:11.
period 20:15, 20:16,
62:6, 70:14, 80:17,
111:11, 129:13.
personal 14:8, 31:25,
92:15, 92:16,
126:1, 132:10,
135:15, 140:9,
140:14, 140:22.
personally 21:1,
102:11, 110:8,
142:6.
perspective 16:2.
pertaining 65:23,
101:23.
phone 74:5, 74:6,
75:19, 76:5, 76:10,
76:12, 76:15,
77:20, 77:24,
83:13.
phones 75:2.
photo 114:4, 114:8,
131:21.
photograph 22:16,
28:24, 51:13,
51:24, 53:11,
53:13, 53:16, 54:3,
74:9.
photographer 28:22.
photographs 26:24,
28:19.
phrase 41:23, 46:6.
physically 110:7.
pick 83:13, 103:10.
picture 22:19, 25:5,
51:17, 52:1, 52:15,
52:16, 52:19,
52:21, 53:21,
53:22, 53:24, 54:4,
54:7, 54:10, 54:17,
70:9, 74:9, 74:18,
74:21, 75:6, 75:7,
75:14, 75:17,
114:7.
pictured 114:3.
piece 37:25.
pieces 139:14.
PJ 78:22, 129:7,

129:10.
place 16:7, 23:23,
87:8, 99:11, 102:7,
119:5.
places 63:17,
97:23.
Plaintiff 1:7.
planning 122:20.
plate 21:25, 28:15,
28:24.
pledge 38:20.
political 24:25,
25:3, 41:18, 92:23,
109:22, 128:10.
politics 14:5,
19:25.
portion 19:13, 93:21,
93:23, 94:22,
95:13, 95:18, 97:7,
98:2, 98:19,
102:15, 103:24,
122:19.
portions 22:23.
posed 44:14.
posited 24:9.
position 18:4, 18:11,
19:20, 24:11,
34:2.
possibility 5:24.
possible 72:13.
Post-war 138:19.
posted 32:3.
potential 5:8.
potentially 10:15,
40:7, 52:22,
57:3.
Prakazrel 3:7,
106:11, 125:22.
PRAKAZREL MICHEL
1:10.
Pras 33:8, 45:12,
106:11, 111:20,
116:2, 117:8,
125:22, 127:4,
131:1, 132:5,
136:7, 136:8.
prasmichel@gmail.com
95:5.
pre-existing 14:1,
14:6.

preceded 14:2.
precise 144:16.
preclude 44:5.
precluded 65:12,
89:21.
precluding 66:7.
predicated 15:24.
predominantly 6:15.
preliminary 104:19.
prepared 11:21.
present 5:2, 29:3,
35:18, 90:19,
121:15.
presented 6:1, 37:17,
48:18, 64:1,
118:24.
presents 41:7.
presidential 110:5,
110:6, 110:15,
116:2.
press 7:15, 14:15.
pressing 38:21.
presumably 85:10.
presume 146:4.
pretty 38:21, 142:12,
142:18.
previous 28:5.
Previously 92:10,
92:19, 96:14, 97:1,
99:7, 101:2,
102:23, 109:23,
109:24, 111:5,
112:21, 114:1,
128:14, 129:21.
price 139:14.
primarily 18:14.
primary 140:18.
prior 16:12, 28:12,
78:9, 78:11,
148:5.
private 21:11, 21:23,
60:19, 67:5,
131:11.
Probably 12:2, 26:14,
67:9, 77:7, 78:13,
126:21.
probative 90:12,
91:11.
probe 48:13.
problem 3:19, 6:5,

Redirect Examination - Gouzer

7:6, 8:17, 9:1,
9:5, 9:6, 9:11,
9:23, 39:8, 46:10,
50:18, 119:14,
149:3, 149:8.
problems 46:13.
proceed 13:15, 51:4,
74:19.
proceeding 7:3.
proceedings 42:21,
66:9, 84:3, 121:2,
149:15.
process 23:19, 25:18,
27:5, 87:6,
96:23.
processing 24:22.
products 74:25.
proffer 43:13.
prohibiting 42:10.
prohibits 90:18.
promised 36:10.
promising 34:22.
pronouncing 115:7.
pronunciation
115:8.
proper 120:1.
properties 61:2,
61:6, 61:7, 61:8,
66:20, 68:5,
91:7.
property 64:7.
proposed 10:4.
propriety 85:1.
prosecutorial
41:10.
PROSPECTIVE 148:24.
PROSPECTIVE JUROR
73:23.
protective 10:4,
10:8.
provide 11:10, 12:3,
22:25, 25:17,
65:21, 76:22,
98:24, 99:20.
provided 22:10,
56:21, 77:9,
120:2.
provides 85:5,
99:21.
providing 23:19,

82:14, 102:5,
116:8.
proximity 25:5.
proxy 100:6.
Public 1:34, 6:17,
7:14, 8:20, 9:17,
11:16, 12:22,
76:24.
publish 17:8.
Publishing 67:13,
67:15.
pull 83:5, 93:10,
94:8, 95:18, 96:13,
100:21, 102:22,
111:3, 112:20,
113:25, 114:16,
128:16, 129:20,
131:15.
Pulling 92:9.
purchase 91:1, 91:3,
112:10, 127:14,
143:3, 143:7.
purchased 61:3, 61:4,
61:9, 61:10, 61:13,
62:7, 63:17, 63:18,
67:5, 67:16, 76:15,
77:20, 77:24,
113:1, 140:3.
purchases 139:10,
139:11, 139:25,
140:2, 140:9,
140:16, 140:19,
140:22, 141:1,
141:2, 148:9.
purchasing 76:10,
76:12.
purported 63:21.
purports 18:1.
purpose 42:11, 63:12,
70:19, 143:21,
144:5, 144:9.
purposes 69:23, 81:2,
119:13.
pursuing 24:5.
purview 143:5.
push 9:9.
put 5:14, 6:23, 8:3,
8:6, 9:20, 10:17,
10:19, 12:22, 27:8,
27:21, 34:11,

34:14, 44:17, 64:4,
87:7, 143:25,
146:10.
putting 24:23,
82:11.
.
.
< Q >.
quarter 43:1.
questioning 62:17,
63:13, 66:1.
quick 34:12, 42:23.
quite 24:19, 63:24.
quote 123:5.
.
.
< R >.
R-a-n-d-a-l-l
106:6.
R. 2:5, 2:6.
Rae 1:32.
Raise 5:3, 5:11,
20:14, 105:3,
124:15, 137:9,
142:25.
raised 19:22,
100:19.
raiser 94:13.
raising 5:18.
ran 5:4, 20:2.
Randall 104:23,
105:4, 106:5.
random 9:22.
randomly 9:21.
range 139:14.
re-ask 147:15.
re-election 20:7,
21:13.
reach 64:17.
reached 3:25, 64:16,
127:20.
Read 33:3, 58:12,
58:15, 59:4, 96:19,
98:23, 145:11,
145:12.
reading 38:24, 58:13,
145:15.
reads 99:10, 102:10,
103:11, 103:17.
ready 12:11, 13:15.

Redirect Examination - Gouzer

real 34:12, 64:7,
  96:22.
realize 41:5,
  50:19.
really 33:17, 58:16,
  103:13, 141:3,
  146:8.
realm 41:19.
reason 65:10, 128:5,
  144:7.
reasons 46:7, 63:4.
recall 6:15, 18:19,
  58:3, 75:20, 77:8,
  81:22, 86:16, 87:2,
  89:25, 90:7, 91:24,
  93:8, 121:9,
  121:12, 133:22,
  134:4, 134:9,
  134:11, 134:13,
  142:4, 142:11,
  142:14, 145:24.
receive 69:11, 99:10,
  100:10, 110:21,
  110:24.
received 29:10,
  35:19, 68:22,
  68:25, 69:16,
  69:22, 86:9, 88:8,
  92:12, 93:17,
  96:24.
receives 93:19,
  95:21.
receiving 92:21,
  95:14, 111:21,
  128:2, 129:12.
recess 72:14, 73:1,
  149:11.
recipient 102:20,
  104:8.
recognition 18:3.
recognize 75:18,
  93:17, 97:3, 111:7,
  114:3, 128:17,
  129:24, 131:17.
recollection 35:22,
  86:9, 87:4, 118:22,
  119:2, 119:6,
  119:8, 123:8,
  143:24, 144:17,
  144:19, 145:10,

  145:16, 145:23.
recommendation
  24:16.
reconvene 72:18.
record 3:9, 5:5,
  10:3, 10:20, 12:24,
  15:12, 15:17, 31:8,
  31:17, 31:22,
  44:16, 44:18,
  49:12, 52:10, 92:5,
  106:4, 106:24,
  109:4, 125:4,
  125:16, 126:8,
  137:22, 138:9,
  149:15.
record. 40:20, 63:2,
  83:12, 119:17.
recorded 83:6.
recordings 60:4.
records 69:13, 69:16,
  69:19, 86:2, 86:5,
  86:6, 86:10.
recruited 19:7.
red 142:25.
REDIRECT 91:15,
  91:17, 123:22,
  135:23, 136:1,
  148:1, 148:2.
refer 17:4, 101:13.
reference 32:7,
  97:21, 97:22,
  97:25, 98:11, 99:3,
  99:8, 99:22, 100:8,
  103:22, 104:10.
referenced 95:24,
  96:1.
references 95:20,
  97:11, 99:12,
  99:16.
referencing 94:12,
  100:10.
referred 18:23.
referring 32:6,
  33:20, 56:19, 85:2,
  97:17, 106:17,
  117:9, 118:13,
  121:25, 126:6,
  126:23.
reflect 126:8.
reflecting 36:3.

reflective 52:13.
refresh 118:22,
  119:1, 144:17,
  145:10, 145:15,
  145:16.
refreshed 119:11.
refreshing 119:6,
  119:8, 144:18.
refund 135:20.
regard 17:14, 18:4,
  49:15, 51:9, 53:22,
  57:9, 62:20, 81:16,
  86:7, 97:10,
  134:15, 142:11,
  145:17.
Regarding 64:7, 81:1,
  83:7, 91:22, 97:4,
  140:18, 141:21.
regulations 39:18,
  89:3.
reimbursed 116:19.
reiterate 87:21.
related 16:14, 22:4,
  26:13, 49:21,
  86:23.
relates 8:19, 36:25,
  64:9.
relating 36:22,
  42:15, 43:7, 43:8,
  43:23, 50:11, 73:4,
  83:21, 89:3,
  119:23.
relation 43:9.
relationship 8:22,
  14:2, 14:7, 14:8,
  16:13, 78:7, 90:9,
  100:5, 107:3,
  139:9.
relative 19:20.
released 6:12,
  7:13.
relevant 26:8, 36:16,
  37:5, 41:8, 41:14,
  41:15, 41:22,
  43:18, 44:2, 44:10,
  48:4, 49:3, 49:11,
  49:25, 50:11, 64:9,
  91:23.
relied 28:9, 41:21,
  48:14, 49:1.

Redirect Examination - Gouzer

rely 44:16.
relying 45:25,
   46:1.
remain 124:13.
remembered 145:22.
remind 104:18,
   136:5.
reminded 108:4.
remove 115:18,
   115:21.
removed 88:18.
repaid 114:17.
repayment 108:16,
   114:22.
rephrase 36:12.
rephrasing 76:6.
replies 104:4.
report 118:18,
   119:25, 120:6.
Reported 2:11.
Reporter 2:12, 109:3,
   149:19.
represent 7:12, 8:8,
   10:13.
representation
   10:11.
representative
   22:21.
representatives 82:5,
   82:6.
represents 8:23.
Republic 65:7.
request 6:6, 7:19,
   83:24, 101:12.
requested 86:4,
   87:5.
require 44:14,
   79:5.
required 102:6.
requires 22:7.
reread 100:16.
residence 68:2,
   131:12.
residences 63:18,
   67:21.
resolve 7:25.
respect 23:7, 24:14,
   40:12, 66:14,
   92:14, 93:15,
   97:20, 141:1.

respond 65:13, 81:20,
   100:2, 104:12,
   117:8.
responding 100:18.
responds 95:8, 95:11,
   100:3.
response 6:24, 7:2,
   36:7, 55:24, 81:22,
   82:3, 82:20, 95:14,
   99:20, 104:5.
responsibility 22:21,
   23:8.
responsible 22:24,
   23:18, 59:7.
responsive 87:24.
result 34:7, 35:1.
resume 73:24.
return 117:17.
reversing 82:11.
review 61:2, 82:4,
   94:21.
reviewed 38:10, 69:6,
   77:5, 88:12,
   88:13.
reworded 149:8.
rid 132:25.
rights 66:24, 67:1,
   67:4, 67:15.
risk 22:17, 25:9.
role 18:14, 48:15,
   49:9, 50:11.
Room 2:16, 27:13,
   30:10, 54:10,
   121:12.
roughly 54:18,
   71:6.
round 27:3.
rounds 28:20.
Rousseau 45:12,
   45:13, 45:14, 57:1,
   57:13, 58:9, 59:2,
   95:17, 97:4, 98:21,
   98:22, 99:20,
   99:21, 99:25,
   102:17, 104:2,
   104:3, 104:4,
   113:21, 113:22.
RPR 2:11, 149:13.
rule 5:20.
ruled 73:9.

rules 89:3.
ruling 48:13, 50:5,
   73:15.
rulings 73:4.
running 14:19,
   86:21.
.
.
< S >.
sake 5:5, 106:24,
   109:2.
sat 55:7.
saw 28:19, 77:11,
   77:13, 104:10,
   111:2, 126:20,
   126:22.
saying 23:11, 34:10,
   42:14, 50:7, 53:1,
   53:4, 69:11, 80:7,
   80:11, 102:6,
   109:4, 117:8,
   146:1.
says 18:7, 18:13,
   28:16, 33:1, 95:4,
   122:15, 129:7,
   129:10.
schedule 38:22.
scheme 46:6.
School 60:7, 60:8,
   60:16, 60:18,
   60:19, 60:21,
   60:25.
scope 37:16, 49:5,
   50:12, 64:8, 65:17,
   66:11, 80:20,
   80:22, 135:15.
screen 98:3, 114:12,
   115:1, 143:16,
   144:25.
Sean 1:31, 3:10.
search 87:9, 87:16,
   88:1.
seated 29:10, 53:24,
   56:9, 59:5, 124:20,
   126:5, 137:14.
seating 54:20, 54:23,
   54:24, 55:4, 59:8,
   59:10.
second 3:20, 40:18,
   59:20, 102:9,

Redirect Examination - Gouzer

102:10, 102:24,
102:25, 114:11,
114:13, 114:25,
149:7.
seconds 27:14, 28:16,
28:17.
Section 1:34.
seek 76:17, 77:2.
seem 30:14, 64:14.
seems 7:10, 40:21,
43:22.
seen 14:13, 14:14,
23:3, 28:4, 55:6,
56:8, 59:16, 59:18,
70:8, 71:15,
79:18.
seized 61:5, 61:16,
66:20, 66:21,
66:23, 66:24, 67:1,
67:4, 67:5, 67:6,
67:14, 68:7, 68:13,
68:19.
selection 5:4,
9:22.
sell 74:25, 138:19.
selling 139:1.
send 10:17, 98:21,
102:16, 131:6.
sending 33:12, 70:2,
70:3, 103:18,
128:22.
sense 5:7, 25:3,
135:8.
sent 17:18, 37:8,
70:19, 71:10,
71:14, 88:5, 93:7,
100:3, 104:1,
110:25, 130:15,
130:18.
sentencing 4:11.
separate 25:16,
65:19, 140:8,
140:22.
September 27:9, 29:3,
51:14, 96:9, 102:1,
102:3, 144:11,
144:13, 145:18.
series 61:20.
served 78:12.
SESSION 1:13.

set 16:18, 38:15,
38:22, 48:5,
101:25, 102:4.
sets 22:11.
settled 13:13.
several 15:1, 20:9,
31:5, 85:8,
115:17.
shakes 28:16.
shaking 27:14, 28:24,
52:2.
share 96:22.
shooting 33:10.
short 4:24, 42:5,
42:17, 59:7,
137:1.
shots 45:10.
shouldn't 72:21.
show 11:11, 41:16,
41:17, 45:15,
45:25, 117:20,
118:6, 128:14,
144:11, 144:13.
showed 52:1, 75:16,
111:1, 148:13.
showing 143:21,
144:5.
shown 100:14, 130:6,
130:13, 131:17.
shows 122:19.
side 24:25, 102:7,
141:3, 145:12.
sidebar 73:15.
sign 79:5.
signatory 78:21,
78:25, 79:3, 79:8,
79:11, 80:8, 92:2,
92:16, 100:7.
signature 18:6,
130:8.
signed 80:13,
80:14.
significant 133:5,
139:13.
signing 78:18, 79:4,
79:16.
similar 27:4.
singer 113:18.
single 23:1.
sit 13:11, 51:3,

59:17, 73:21,
105:8, 124:21,
137:15, 146:17.
sitting 6:25, 55:12,
78:13, 109:3,
121:13.
situate 137:17.
situation 46:7.
six 61:6, 86:3,
86:19.
slight 60:5, 60:6,
60:7.
slightly 82:12.
slow 98:17, 101:4,
126:10.
slowly 33:4.
small 74:22.
small-gathering
38:19.
Snowden 23:9, 23:10,
23:22, 24:6, 24:10,
88:12.
sole 79:4, 79:7.
solely 25:25.
somebody 8:4, 40:7,
40:10, 63:13,
63:14, 64:20,
89:21, 118:9,
119:15.
somehow 88:9.
someone 19:2, 22:4,
23:4, 25:11, 25:24,
26:12, 37:24, 55:2,
78:5, 115:12,
131:11.
sometime 78:9.
Sometimes 70:6,
107:11, 140:24,
141:5, 141:8,
142:18.
somewhat 27:18.
somewhere 70:21,
145:6.
songs 67:15.
sophisticated
82:19.
sort 30:17, 40:22,
103:10, 118:9,
143:1, 145:1.
sought 82:19.

Redirect Examination - Gouzer

sound 147:12,
  149:4.
sounded 38:15.
sounds 23:16, 23:23,
  24:7, 41:6.
Southern 146:21.
speaking 94:5,
  127:2.
speaks 29:21.
special 13:18, 33:17,
  34:21, 34:22,
  34:25, 39:4, 73:25,
  103:12.
specific 36:11, 57:7,
  67:10, 127:7.
specifically 10:7,
  14:21, 19:14,
  24:22, 28:10,
  34:19, 35:7, 35:16,
  35:23, 36:6, 56:10,
  58:3, 66:16, 75:20,
  75:23, 87:2, 88:13,
  96:5, 138:17,
  142:11, 145:24,
  146:12.
specifics 28:18.
speculate 63:3,
  72:9.
Speculation 33:25,
  35:2, 44:15, 55:22,
  57:16, 62:17, 72:4,
  82:21, 83:1, 89:6,
  95:1, 135:10,
  135:13, 140:10,
  147:8.
spell 106:4, 106:24,
  125:16, 138:8,
  140:6.
spent 27:13, 67:24.
Spielberg 14:20.
SPM 78:22.
spoke 23:17, 29:18,
  31:1, 59:23, 60:1,
  63:19, 102:11.
stand 105:2, 105:20,
  109:21, 125:7,
  137:7, 137:24.
standard 22:11,
  38:18.
standing 21:7,

124:14.
star 129:3.
starred 129:1.
start 13:25, 21:11,
  105:15, 105:19,
  119:3, 125:3,
  125:7, 137:20,
  137:23, 144:18.
started 49:17, 62:3,
  68:4, 78:9, 105:21,
  125:8, 137:24.
starting 3:9, 72:3.
starts 17:1.
state 39:10, 106:3,
  125:16, 138:8,
  144:5, 145:17.
statement 16:2, 21:3,
  33:24, 39:5, 82:16,
  111:11, 111:19,
  116:3, 120:8,
  120:12, 120:13,
  120:16, 120:20,
  128:23, 142:10,
  142:14.
statements 31:18.
States 1:1, 1:5,
  1:19, 2:13, 3:7,
  3:12, 39:3, 60:21,
  61:7, 63:16,
  110:18, 146:18.
status 20:6.
stenographic
  149:14.
step 43:3, 73:7,
  104:15, 104:24,
  105:1, 123:24,
  124:6, 124:12,
  124:13, 136:23,
  137:6, 137:7.
stepped 3:17.
Steven 14:19.
stick 50:17.
Stipulate 106:17,
  126:6.
stop 4:10, 4:13,
  4:18, 4:21, 4:24,
  46:9, 105:22,
  125:9, 138:1,
  149:1.
stopped 79:15,

80:1.
store 74:9, 74:22,
  75:4, 75:8, 75:12,
  75:13, 75:17,
  76:17, 76:18,
  76:20, 77:3, 77:4,
  77:14, 77:17,
  77:19.
straw 26:25, 27:1,
  52:24, 64:23,
  85:24, 88:7,
  89:17.
straying 40:22.
Street 67:1, 74:22.
stricken 19:17,
  31:22.
strike 19:11, 19:13,
  31:23, 87:10,
  87:12, 87:16.
stuff 4:4, 56:4.
subject 50:2, 57:10,
  68:21, 81:6, 94:9,
  102:18, 141:16.
submit 50:2.
subpoenaed 86:1.
substantive 8:12.
success 18:16, 20:21,
  20:23.
successful 84:13.
sufficiently 44:4.
suggest 42:12,
  92:22.
suggested 59:5,
  108:11.
suggesting 48:9,
  64:11.
suggests 59:16.
Suite 1:28.
summary 92:11.
super 90:2.
supplement 73:3.
supplementing
  73:14.
support 59:14, 63:15,
  63:19, 71:7.
supports 57:24.
supposed 6:17, 31:19,
  31:24, 36:8,
  47:8.
surprises 77:8.

Redirect Examination - Gouzer

surround 84:14.
surrounding 101:25.
surveillance 76:19,
  76:20, 76:21.
suspected 65:11.
suspicious 142:21.
sustain 16:23, 20:17,
  24:12, 32:19, 35:3,
  48:6, 51:5, 57:22,
  62:19, 66:10,
  68:10, 72:11,
  80:21, 82:22,
  84:18.
Sustained 34:6,
  43:21, 149:6.
sustaining 39:15,
  43:10, 62:20,
  62:22, 62:24,
  64:13.
Swahili 29:19, 29:22,
  31:1.
swear 105:1, 105:2,
  105:7, 124:14,
  137:8.
switch 7:20, 59:19.
switching 12:13.
sworn 105:5, 124:17,
  137:11.
.
.
< T >.
T-a-n-a-r-o-e
  140:7.
T-a-n-o-r-e 140:7.
T-y-s-a 125:17.
T. 2:11, 149:18.
table 27:3, 28:16,
  29:8, 53:24, 54:14,
  54:16, 55:9.
tables 105:19, 125:7,
  137:23.
Taek 139:6.
taken. 73:1.
talked 27:24, 38:2,
  75:16.
talks 43:12.
Tan 59:1, 97:4,
  99:21, 99:22,
  100:2, 100:5,
  100:6, 100:9,

141:4, 141:7,
  141:8, 142:11,
  143:3, 144:14,
  145:17, 145:24,
  146:12, 148:6,
  148:8.
tangentially 52:24.
Tanore 140:9, 140:23,
  140:25, 141:1,
  142:23.
tape 83:5, 83:22.
tax 82:19.
team 23:2, 33:8,
  84:14, 141:3.
technical 111:16.
ten 43:1.
Tenore 140:4.
tens 67:6.
term 121:7, 135:1,
  149:6.
Terrific 11:25.
territory 122:11.
testified 16:19,
  31:12, 51:9, 71:10,
  76:14, 77:19, 78:4,
  92:3, 92:13, 93:25,
  96:8, 99:15,
  100:15, 105:6,
  121:7, 122:12,
  124:18, 137:12,
  145:18.
testify 47:2, 121:3,
  121:5, 121:8,
  121:20, 142:15.
testifying 41:7.
testimony 15:23,
  26:2, 43:14, 49:13,
  50:17, 70:12, 74:5,
  76:5, 76:13, 78:4,
  97:10, 119:8,
  133:13, 143:10,
  143:14, 147:4,
  147:12, 148:5,
  148:6.
Thanks 33:15, 33:19,
  109:2.
THE CLERK 13:6,
  105:3, 124:15,
  124:20, 137:14.
THE WITNESS 73:7,

104:16, 105:13,
  105:25, 112:16,
  124:7, 125:11,
  129:18, 130:23,
  132:1, 134:3,
  138:3, 138:13,
  145:14, 148:20.
theirs 117:25.
themselves 84:14.
then-president
  14:7.
then-senator 14:18.
theory 44:12, 45:5,
  45:6, 45:16, 46:4,
  46:11, 46:22,
  46:24, 48:10,
  48:11, 57:25,
  63:25, 64:19.
thereabouts 32:17.
they've 17:8, 37:3,
  106:19.
thinking 11:14.
thinks 34:3, 50:10,
  95:3.
third 8:9, 10:12,
  37:23.
Thomas 106:6,
  106:7.
though 20:19, 47:1,
  96:5.
thoughts 46:15.
thousands 21:19,
  21:20.
three 97:17,
  145:22.
threw 87:20.
throughout 18:8,
  69:15, 77:6.
throwing 10:25.
thrown 86:18, 86:23,
  87:3, 87:7.
ticket 127:14,
  127:15, 127:18,
  133:15.
ties 29:25.
timings 28:18.
tip 63:20.
title 90:1.
today 4:10, 33:11,
  37:10, 49:18,

Redirect Examination - Gouzer

58:25, 106:14,
115:15, 126:2,
145:21, 146:18,
147:5, 147:21,
148:6, 149:1.
together 24:23,
49:20.
tomorrow 33:9.
took 16:7, 88:2.
top 18:21, 20:4,
20:6, 33:5, 73:13,
102:19, 111:5.
topic 44:18.
totality 58:4.
totally 9:14, 31:17,
42:10, 66:6,
72:8.
touch 114:12.
touches 43:22.
Toussaint 104:23,
105:4, 106:3,
106:5, 106:6,
106:8, 106:20,
106:21, 111:7,
111:15, 112:23,
114:3, 114:17,
115:8, 115:9,
118:14, 118:18,
118:19, 120:1,
120:9, 120:13,
122:12.
toward 38:6, 94:6,
96:4, 102:9.
trace 69:13, 69:16,
70:23.
trade 106:9.
transact 79:12,
79:14.
transacted 80:13.
transaction 98:24,
111:18, 111:19,
112:5, 112:7,
129:2.
transactions 64:7.
TRANSCRIPT 1:17,
83:6, 83:25, 120:2,
122:10, 122:11,
122:18, 144:6,
149:14.
transmitted 57:12.

treasurer 90:1.
treated 29:6, 81:3.
TRIAL 1:17, 5:15,
6:9, 8:3, 8:5, 8:6,
8:8, 9:1, 9:14,
10:10, 11:23,
64:8.
tried 38:10.
true 10:6, 22:22,
25:18, 27:7, 32:17,
56:24, 69:25,
70:18, 88:3.
truly 133:24,
134:19.
truthful 46:17,
49:8.
truthfulness 50:9.
try 5:12, 34:8,
36:12, 47:24.
trying 10:14, 11:17,
38:15, 41:5, 43:23,
43:25, 46:14,
47:21, 48:2, 50:9,
50:19, 73:4, 79:25,
87:4, 87:21.
turn 82:19, 113:7.
turned 85:10.
Turning 107:18.
twice 109:15.
two 8:17, 9:6, 9:24,
11:20, 17:11,
21:14, 22:6, 22:23,
30:2, 30:17, 30:21,
43:18, 52:12,
54:17, 89:8, 96:18,
96:19, 100:24,
103:17.
Tysa 124:9, 124:16,
125:17, 125:21.
.
.
< U >.
UK 61:7.
ultimately 25:14,
50:16, 66:12,
66:13, 88:16,
93:18, 95:20,
102:19, 102:21,
104:1, 122:4,
131:6.

unable 86:17.
uncomfortable 5:18.
uncommon 143:1,
143:2.
uncovered 96:11.
undercut 43:25.
undergrad 60:17,
60:24.
undergraduate 60:10,
60:14.
understand 3:22,
19:25, 28:14,
45:19, 50:1, 53:3,
53:5, 63:24, 86:13,
97:25, 99:4,
101:23, 108:11,
115:25, 118:3,
120:7, 133:13,
133:25, 143:21,
148:8.
Understood 7:13,
28:12, 70:12, 74:8,
78:4, 99:16,
144:20.
undertook 19:10.
Unfortunately
33:10.
ungrateful 117:10,
117:16.
United 1:1, 1:5,
1:19, 2:13, 3:6,
3:12, 39:3, 60:20,
61:7, 63:16,
110:18, 146:18.
University 61:1.
unknown 26:1.
Unless 6:20, 82:2,
147:10.
unregistered 65:6.
unsavory 22:19.
Until 8:6, 61:13,
103:25, 110:25,
111:1.
unusual 142:21.
upper 95:18, 98:19,
98:20, 102:15,
103:24.
upwards 128:11.
urgently 56:22.
uses 84:25, 85:3.

Redirect Examination - Gouzer

using 64:5, 145:10.
utilized 38:5.
.
.
< V >.
vacuum 57:19.
vague 142:12.
valid 45:23, 46:4.
validating 22:3.
value 90:13, 91:12.
valued 67:19.
variety 46:7, 74:25,
 116:10.
various 44:2, 49:6,
 50:15, 66:16,
 68:4.
Ventura 1:42.
veracity 89:22.
verbatim 32:16.
versus 3:7, 82:25.
vet 85:3.
vetted 22:9, 26:17,
 89:17, 135:7,
 135:14.
Vetting 22:12, 22:14,
 23:7, 24:2, 24:13,
 25:3, 25:18, 26:13,
 26:20, 56:14, 58:7,
 84:25, 135:1,
 135:3.
Vice 18:7, 18:13.
Viceroy 66:25.
Victory 70:2, 70:15,
 71:7, 72:1, 86:2,
 112:12, 112:19,
 113:4, 130:2.
video 76:19, 77:15.
view 25:22, 30:5,
 44:9, 55:9, 68:25,
 90:14.
viewed 44:23.
viewing 26:24.
views 82:8.
vigorously 5:19,
 6:10.
violated 40:3,
 40:9.
violations 39:17,
 39:20.
Vips 55:20.

voice 112:1,
 130:21.
volunteered 110:11,
 110:13.
Vote 70:14, 71:8,
 72:1, 90:2.
vs 1:8.
.
.
< W >.
W-r-i-g-h-t 125:17.
wait 3:20, 114:25,
 130:8.
waiving 5:8.
walked 27:13, 77:4.
walks 28:15.
Wall 67:1.
wanted 96:21, 109:11,
 113:15, 123:17,
 127:14, 133:14.
wanting 5:11, 39:2,
 94:5.
wants 34:14.
Washington 1:10,
 1:29, 1:36, 2:9,
 2:17, 54:5, 54:8,
 54:19.
way. 103:11.
ways 49:7, 58:20,
 116:10, 134:5.
wearing 126:5.
week 11:15, 33:15.
welcome 44:16.
Wharton 60:15, 60:21,
 60:25.
whatever 12:14,
 28:25, 36:1, 49:9,
 107:13, 116:4.
whatsoever 55:16,
 56:2.
wheel 9:20, 10:17.
whenever 62:7,
 126:21.
White. 33:19.
whoever 9:21.
whole 22:24, 30:9,
 34:14, 34:15,
 41:24, 62:17,
 62:21, 122:17.
whom 62:1, 96:11,

98:3, 98:21,
 102:15.
wife 51:20, 51:22.
Will 3:18, 3:25,
 4:13, 6:3, 9:21,
 10:2, 12:2, 15:19,
 22:12, 25:15,
 31:23, 41:16,
 42:23, 45:15, 50:2,
 50:5, 75:20, 83:4,
 84:6, 102:4,
 119:12, 120:15,
 122:23, 126:8,
 136:25, 147:4.
willfulness 45:24.
William 89:23,
 90:9.
willing 38:17.
wind 12:13.
winding 8:21.
wire 110:25, 129:8,
 129:11, 129:15.
Wired 128:1.
wires 129:12.
withdraw 35:6, 75:13,
 76:18, 83:24.
withdrawal 112:8.
within 37:16,
 101:9.
Without 21:4, 27:23,
 35:7, 38:25, 57:19,
 79:16, 108:23,
 126:9, 132:13,
 136:14, 136:17.
witnesses 11:24,
 12:18, 104:20.
Wolf 67:1.
woman 132:5.
word 88:2, 125:6,
 137:22.
worded 58:19.
work 4:15, 4:22,
 23:10, 60:11,
 60:14, 79:21,
 95:12, 106:8,
 106:10, 110:5,
 110:12, 123:9,
 125:18, 138:14,
 138:23, 139:3.
workings 21:5.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Redirect Examination - Gouzer

works 7:7, 19:25,
  67:8, 83:18.
world 65:9, 80:7,
  132:6, 139:2.
worth 67:6.
wound 8:9, 10:9.
Wright 124:9, 124:16,
  125:14, 125:17,
  125:18, 128:17,
  129:2, 129:24,
  131:17, 132:7,
  136:5.
writes 98:22.
writing 79:15, 82:2,
  82:4.
written 32:9, 35:19,
  80:12, 94:24.
wrongdoing 36:15,
  36:24, 37:4.
wrote 38:14, 69:10,
  81:5, 81:8, 95:5,
  95:7, 95:9, 119:15,
  120:12.
.
.
< Y >.
yacht 67:5.
year 61:21, 91:3,
  91:5.
years 86:3, 86:19,
  145:22, 145:23.
yesterday 15:23,
  16:19, 27:24,
  37:22, 38:2, 46:8,
  49:13, 51:9, 55:8,
  55:11, 57:8, 70:13,
  74:5, 74:8, 76:8,
  76:13, 77:19,
  77:23, 78:4, 81:1,
  81:10, 84:23, 85:7,
  92:11, 93:18,
  93:25, 95:25,
  97:10, 100:15.
York 1:27, 1:35,
  54:3, 61:11, 66:22,
  67:22, 67:24, 68:2,
  77:5, 139:5,
  146:22.
yourself 3:8, 75:4,
  105:9, 114:8,

124:22, 131:21,
  131:24, 132:8,
  132:11, 137:16,
  145:12.
YSA 130:7.
.
.
< Z >.
Zoom 4:11, 93:22,
  97:7, 99:19, 101:7,
  103:7.