```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,    ) CRIMINAL ACTION NO.:
                                  ) 19-00148-1
 4           Plaintiff,           )
         vs.                      )
 5                                )
     PRAKAZREL MICHEL,            ) Washington, D.C.
 6                                ) April 3rd, 2023
             Defendant.          ) 2:25 p.m.
 7   _____) AFTERNOON SESSION

 8

 9              TRANSCRIPT OF JURY TRIAL - DAY 6
          BEFORE The HONORABLE COLLEEN KOLLAR-KOTELLY
10                UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   FOR THE GOVERNMENT:      John D. Keller, Esquire
                              U.S. Department of Justice
14                            1301 New York Avenue, NW
                              Suite 1016
15                            Washington, D.C. 20530

16                            Sean F. Mulryne, Esquire
                              Nicole Rae Lockhart, Esquire
17                            U.S. Department of Justice
                              Public Integrity Section
18                            1400 New York Avenue, NW
                              Washington, D.C. 20005
19

20   For the Defendant:       David E. Kenner, Esquire
                              Alon Israely, Esquire
21                            Kenner Law Firm
                              16633 Ventura Boulevard
22                            Encino, California 91436

23

24

25
```

```
 1    APPEARANCES (CONT'D):

 2

 3    FOR THE DEFENDANT:        Charles R. Haskell, Esquire
                                Law Offices of Charles R.
 4                              Haskell, P.A.
                                641 Indiana Avenue, NW
 5                              Washington, D.C. 20004

 6    Reported by:             Christine T. Asif, RPR, FCRR
                                Official Court Reporter
 7                              United States District Court
                                for the District of Columbia
 8                              333 Contitution Avenue, NW
                                Room 6507
 9                              Washington, D.C., 20001
                                (202) 354-3247
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX
```

```
2   Witness Name                                      Page
3   Rudolph Moise
4       Cross-examination By Mr. Kenner...........................   4
5   Richard Kromka
6       Direct Examination By Ms. Lockhart........................  16
7       Cross-examination By Mr. Kenner...........................  33
8   David Sugarman
9       Direct Examination By Mr. Keller..........................  45
10      Cross-examination By Mr. Kenner...........................  55
11  Jack Brewer
12      Direct Examination By Mr. Keller..........................  66
13      Cross-examination By Mr. Kenner...........................  79
14  Michael Hartsock
15      Direct Examination By Mr. Mulryne.........................  86
```

```
16
17
18
19
20
21
22
23
24
25
```

```
1                      P R O C E E D I N G S
2              THE COURT:  Good afternoon, everyone.
3              ALL:  Good afternoon, Your Honor.
4              THE COURT:  Jury will be in in a minute.
5              (Jury entered the courtroom.)
6              THE COURT:  Please go ahead and sit down.
7              All right.  I believe we were at the point of doing
8    cross-examination, Mr. Kenner.
9              MR. KENNER:  Yes, Your Honor.
10                        CROSS-EXAMINATION
11   BY MR. KENNER:
12   Q.  Good afternoon, Doctor.
13   A.  Good afternoon, sir.
14   Q.  Let me first start with, when you testified in front --
15   you did testify in front of the grand jury; is that correct?
16   A.  Yes, sir.
17   Q.  And were you given immunity for that testimony?
18   A.  Yes, sir.
19   Q.  And did you have a lawyer that -- without telling me what
20   the contents of any of your conversations were, that
21   negotiated this immunity for you?
22   A.  Yes, sir.
23   Q.  And did you feel that you had committed any crimes that
24   you needed immunity for?
25   A.  Just -- just to be sure sir, I don't do anything without
```

Cross-examination - Moises

1   my attorney's advice, and that's why he recommended that I

2   have to rely on him.

3   **Q.**   I'm sorry, sir, I didn't follow that answer.  I didn't

4   hear it, actually.  Could you say it louder again?

5   **A.**   Sure.  I said that that was my attorney's advice, so

6   that's what I followed.

7   **Q.**   Okay.  And as part of that immunity, you agreed to testify

8   truthfully; is that correct?

9   **A.**   That is correct.

10  **Q.**   And did you tell the government what you thought the truth

11  was before you signed and they gave you this immunity

12  agreement, or after they gave you the immunity agreement?

13  **A.**   I don't understand, sir.

14  **Q.**   Did the government sit with you and say, Tell me -- it's

15  called a proffer.  Tell me what you have to say, and if we

16  want to use it, we will give you immunity for saying it.

17      Is that what happened?

18  **A.**   My attorney handled all that, sir.

19  **Q.**   Okay.  Let me ask you this, sir:  You indicated that you

20  ran for Congress; is that correct?

21  **A.**   Yes, sir.

22  **Q.**   And that was, I believe, on two different occasions?

23  **A.**   That is correct.

24  **Q.**   And did you attempt to raise money during those

25  campaigns?

Cross-examination - Moises

1    **A.**  Yes, sir.

2    **Q.**  And did you have any fundraisers?

3    **A.**  Yes, sir.

4    **Q.**  Did you do anything to familiarize yourself with the

5    Federal Election Commission rules that govern what you are

6    allowed and not allowed to do in raising money?

7    **A.**  I had a campaign staff, and they followed this and advised

8    me on this.

9    **Q.**  Okay.  Then you would have been aware, would you not, from

10   your campaign staff, that you are not supposed to make conduit

11   contributions?  Do you understand what that means?

12          MR. MULRYNE:  Objection, Your Honor.  Relevance as

13   to this witness, as opposed --

14          THE COURT:  I'll sustain it.

15   **Q.**  (BY MR. KENNER)  In -- at the time you made the donation

16   to the Obama fund, the $30,000, were you aware of anything

17   that you learned from when you ran for office about the FEC

18   rules regarding what kinds of contributions you could and

19   could not make?

20          MR. MULRYNE:  Same objection.

21          THE COURT:  Not sure.  Why don't we talk for a

22   second.

23          (Bench conference on the record.)

24          THE COURT:  Mr. Kenner, you know, if you're trying

25   to make this sort of like a comparator, in terms of what he

Cross-examination - Moises

1    knew, I mean, that's -- or he didn't follow through with what
2    he's supposed to, I'm not sure what the purpose of this is.
3              MR. KENNER:  The purpose of it is to indicate that,
4    separate from the form that would have been attached or
5    supposedly is attached to the invitation, he would have had
6    independent knowledge from when he ran for office about what
7    was prohibited and not prohibited from the FEC.
8              THE COURT:  And what's the -- what is the relevance,
9    in terms of from his perspective, as to whether he knew this
10   or didn't know this?
11             MR. KENNER:  I believe that it would indicate
12   that -- whether or not he made a contribution knowing it not
13   to be appropriate, not to be proper, not to be legal, separate
14   from the advice on the form.
15             THE COURT:  Well, he received the information -- the
16   money from Mr. Michel, as I understand it.  He didn't --
17   wouldn't he have known it came from Mr. Low, right?  At least
18   I haven't heard anything that suggested that he knew that.
19             If I'm incorrect, Government, correct me.
20             MR. MULRYNE:  You are correct, Your Honor.
21             THE COURT:  So it seems to me that it's
22   Mr. Michel -- is there a problem in terms of doing the money
23   from Mr. Michel?
24             MR. KENNER:  Well, the government's theory is
25   they're not supposed to make conduit contributions.

Cross-examination - Moises

1        THE COURT:  Well, that's conduit contributions,
2   that's true.
3        MR. KENNER:  That's what --
4        THE COURT:  Well, he -- all right.  What is your
5   objection, Government?
6        MR. MULRYNE:  Your Honor, the objection is
7   relevance.  The issue is the defendant's knowledge, intent,
8   state of mind, not that of the witnesses.  So what the witness
9   knew or didn't know doesn't have relevance to the -- it's
10  about what the defendant knew.
11       THE COURT:  Okay.  So what's your response to that?
12  It makes sense to me that you're going off on what other
13  people knew, as opposed to -- he can't speak to what
14  Mr. Michel knew or didn't know.  In terms of Mr. Michel giving
15  the money to him, he's indicated he doesn't -- you know, he
16  relied on his campaign staff.
17       So it doesn't sound like he particularly knew
18  anything, and the issue is whether Mr. Michel gave the -- knew
19  that he was giving this money to Mr. Moise, who then would
20  give it to Obama.
21       So what he knew or didn't know, I'm not sure how
22  it's relevant.
23       MR. KENNER:  I'll go at it a different way, Your
24  Honor.  Thank you.
25       THE COURT:  No, tell me what it is so we don't have

Cross-examination - Moises

1    to continue --
2              MR. KENNER:  I'm going to ask him about
3    conversations with Mr. Michel about the contribution.
4              THE COURT:  About what about the contribution?
5              MR. KENNER:  About what he understand -- what did he
6    discuss with Mr. Michel.  Did he ask Mr. Michel if this was
7    proper or appropriate?  Did he do any of his own investigation
8    to determine --
9              THE COURT:  And is that -- what does that go to, in
10   terms of -- it doesn't go to anything about Mr. Michel.
11             MR. KENNER:  Certainly it does, Your Honor.
12             THE COURT:  What?
13             MR. KENNER:  If he says Mr. Michel, you know, told
14   him this was fine, that's one thing.  If he says, I never had
15   any such conversation, I did what I did on my own, without
16   influence from Mr. Michel, that's another thing.
17             THE COURT:  Government, what's your position on
18   this?
19             MR. MULRYNE:  Your Honor, it remains the same.  It's
20   backdooring some sort of hearsay into the mix.  But to the
21   extent he's already testified that he relied on his campaign
22   folks for his knowledge, understanding of FECA and what is or
23   isn't allowed under campaign finance, it's already in the
24   record, and he -- and what he himself thought is irrelevant.
25   What's relevant is the defendant.  It seems as if the defense

Cross-examination - Moises

1    is trying to backdoor the defendant's knowledge, or lack

2    thereof, allegedly, through this witness.

3           MR. KENNER:  So does the government concede this is

4    not one of the others involved in the conspiracy that they

5    allege?

6           MR. MULRYNE:  This witness is not charged in this

7    case, Your Honor.

8           MR. KENNER:  I know he's not charged.  My question

9    is, does the government view him in the charge that says "and

10   others" --

11          THE COURT:  As a co-conspirator?

12          MR. KENNER:  Yes.

13          MR. MULRYNE:  I'm sorry, could you clarify that,

14   Your Honor?  I had trouble hearing the last piece.

15          THE COURT:  He is asking if he was a

16   co-conspirator.

17          MR. MULRYNE:  No, Your Honor.

18          THE COURT:  Then that ends that, Mr. Kenner.

19          MR. KENNER:  Okay.  Thank you, Your Honor.

20          (The following proceedings were had in open court.)

21   **Q.**  (BY MR. KENNER)  When you talked to Mr. Michel about

22   making this contribution, what did he tell you?

23          MR. MULRYNE:  Your Honor.

24          THE COURT:  We just went over that.  I sustained

25   their objection.

Cross-examination - Moises

1            MR. KENNER:  Okay.

2    **Q.**  (BY MR. KENNER)  Did you have any conversation with

3    Mr. Michel about what he wanted you to do with respect to

4    making a donation?

5    **A.**  Yes.  He told me about the event.

6    **Q.**  Okay.  And he asked you if you would like to come?

7    **A.**  He invited me to come.

8    **Q.**  And you said yes?

9    **A.**  Correct.

10   **Q.**  All right.  And then the subject of having to make a

11   contribution came up; is that correct?

12   **A.**  That is correct.

13   **Q.**  Okay.  Did Mr. Michel describe anything about the nature

14   of the contribution, where it came from, was it Mr. Michel's

15   money, was it somebody else's money?

16           MR. MULRYNE:  Objection, Your Honor.

17           THE COURT:  Sustained.

18   **Q.**  (BY MR. KENNER)  Let me ask you something else.  You

19   mentioned viewing a documentary that you viewed at an awards

20   show that Mr. Michel invited to you, I think you said called

21   *Sweet Micky*?

22   **A.**  It was on the campaign of the president of Haiti, *Sweet

23   Micky*, that's correct.

24   **Q.**  All right.  And did you view that movie?

25   **A.**  Yes, I did.

Cross-examination - Moises

1    **Q.**  And did that movie depict Mr. Michel doing things to help
2    the president of Haiti --
3            MR. MULRYNE:  Objection, Your Honor.  Relevance.
4            THE COURT:  I -- yeah, unless you want to talk to me
5    about it, but I don't see any relevance to what this case is
6    about.
7    **Q.**  (BY MR. KENNER)  Did you get a written invitation to this
8    event?
9    **A.**  No, sir.
10   **Q.**  Did you get a form to fill out with regard to the nature
11   of the contribution?
12   **A.**  No, sir.
13   **Q.**  Did you ever fill out such a form?
14   **A.**  I do not recall.
15   **Q.**  Were you ever contacted by the Obama campaign or any of
16   its representatives asking you to complete a form that gave
17   your name, your date of birth, your Social Security number?
18           MR. MULRYNE:  Objection, Your Honor.  Relevance.
19           THE COURT:  I think it goes to what we had
20   discussed, in terms of this whole line of inquiry, I don't
21   think is probative of what this case is about, your defenses
22   as you've explained it to me.
23   **Q.**  (BY MR. KENNER)  Did you ever get a refund from anybody
24   for the $30,000 that you donated to the Obama campaign?
25           MR. MULRYNE:  Objection.  Relevance.

13
Cross-examination - Moises

```
1              THE COURT:  I'll allow that one.
2    A.  No, sir.
3    Q.  (BY MR. KENNER)  I want to be sure the party or the dinner
4    that you were invited to in Miami -- that was in Miami, not in
5    New York; right?
6    A.  Miami, correct.
7    Q.  Was the host of that event Marc Anthony?
8    A.  I had -- I do not know, sir.
9              MR. KENNER:  May I have Exhibit 302 for Your Honor
10   and the witness only first.
11             I apologize.  It's been admitted already, Your
12   Honor.  Excuse me.
13             THE COURT:  Hold on a second.
14             Yes, 302 has been admitted.
15             MR. KENNER:  Thank you, Your Honor.
16   Q.  (BY MR. KENNER)  Referring you to Exhibit 302 that's on
17   the screen in front of you, do you recall ever seeing that
18   invitation?
19   A.  No, sir.
20   Q.  Is June 26th of 2012 the date that the event you were
21   supposed to go to was taking place?
22   A.  I don't remember.  All I remember is that it was supposed
23   to be at Fisher Island.
24   Q.  At what?
25   A.  Fisher Island, which is a location -- a different location
```

Cross-examination - Moises

1    than this one.

2    **Q.**  You don't have any recollection of it being at the home of

3    Abigail and F.J. Pollack?

4    **A.**  No, sir.

5    **Q.**  Sir, the letter that you were shown a while ago from a

6    lawyer, do you remember the government showing you that?

7    **A.**  Yes, sir.

8    **Q.**  You never saw that before the government showed it to you,

9    did you?

10   **A.**  No, sir.

11   **Q.**  You had no idea what its contact was -- content, I'm

12   sorry, was?

13   **A.**  No, sir.

14   **Q.**  Did that have any influence on you with respect to any of

15   the issues in this case?

16   **A.**  What do you mean?

17   **Q.**  Well, if you didn't know about it, did it have any

18   influence on you with regard to the facts of this case?

19   **A.**  I know it was not -- whatever the content it was, that it

20   was a loan, and I knew it was not a loan, so --

21   **Q.**  So it was unknown to you so it had no influence on you?

22   **A.**  Correct.

23   **Q.**  Thank you.

24       Are you of Haitian decent?

25   **A.**  Yes, sir.

Cross-examination - Moises

1   **Q.**  And you know Mr. Michel to be of Haitian decent?  Not

2   himself born there, but of Haitian decent?

3   **A.**  Yes, sir.

4   **Q.**  Is that the basis of your original friendship?

5   **A.**  Well, he was introduced by another Haitian.  So between

6   Haitians, yes.

7   **Q.**  Okay.  Did Mr. Michel say anything to you about why he

8   wanted to provide you with this money to go to the party?

9   **A.**  No.

10              MR. KENNER:  I have nothing further.

11              THE COURT:  Redirect?

12              MR. MULRYNE:  No further questions, Your Honor.

13              THE COURT:  All right.  Can he be excused?

14              MR. MULRYNE:  Yes, Your Honor.

15              THE COURT:  Mr. Kenner, can he be excused?

16              MR. KENNER:  Yes, he can be excused.

17              THE COURT:  All right.  You're excused, sir.

18              Your next witness.

19              MS. LOCKHART:  Your Honor, the government calls

20   Richard Kromka.

21              THE COURT:  Sir, if you would step up over here.  If

22   you'd come this way.  If you would step up, and we're going to

23   swear you in.

24              THE CLERK:  Raise your right hand, please.

25                          RICHARD KROMKA,

Direct Examination - Kromka

1    called as a witness, being first duly sworn, was examined and

2    testified as follows:

3              THE WITNESS:  I do.

4              THE CLERK:  Please be seated.

5              THE COURT:  All right.  Sir, you can sit down and

6    move the chair around.  Make yourself comfortable.  We need to

7    have you speak into the microphone in a loud clear voice.  You

8    can take your mask off so we can hear what you're saying.

9    Yes, take it off.

10             THE WITNESS:  Okay.  Thank you.

11             THE COURT:  I would ask that you let counsel finish

12   their question, even if you know what they're asking you,

13   before you start to speak so we have the question and then

14   your answer.  They should do the same for you.

15             If you hear the word "objection" or, more likely,

16   counsel stand up at the tables, they're going to object.  If

17   you haven't started to answer, don't.  If you're in the middle

18   of your answer, please stop.  Let me hear the objection, and

19   then I'll let you know whether you can answer.  All right?

20             Do you need -- Dorothy, do you have a cup?  We have

21   a cup here so you can pour water.

22             THE WITNESS:  Thank you.

23                         DIRECT EXAMINATION

24   BY MS. LOCKHART:

25   Q.  Good afternoon, Mr. Kromka.

Direct Examination - Kromka

1    **A.**  Good afternoon.

2    **Q.**  If you could state and spell your name for the record.

3    **A.**  Richard Kromka, K-r-o-m-k-a.

4    **Q.**  I'd like to show you what has not been admitted yet as

5    Government's Exhibit 538.

6          MS. LOCKHART:  And I think we may need to switch

7    over to the government's --

8          THE COURT:  And this has been already admitted?

9          MS. LOCKHART:  It has not yet, Your Honor.

10         THE COURT:  Okay.

11   **Q.**  (BY MS. LOCKHART)  Mr. Kromka, do you recognize this as an

12   immunity agreement between yourself and the government?

13   **A.**  I do.

14   **Q.**  Does this agreement require that you tell the truth here

15   today?

16   **A.**  It does.

17   **Q.**  And that if you provide truthful testimony, you won't be

18   prosecuted for anything that you say here today?

19   **A.**  Yes.

20   **Q.**  But that if you were to lie, that you could be prosecuted

21   for those statements?

22   **A.**  Yes.

23         MS. LOCKHART:  Your Honor, we would move to admit

24   and publish.

25         THE COURT:  Any objection?

Direct Examination - Kromka

1      MR. KENNER:  No objection.

2      THE COURT:  All right.  Then I'll admit 538,

3  Government's Exhibit, without objection.

4      MS. LOCKHART:  And if we could take a look at Page

5  No. 2, Ms. Johnson, of Government's Exhibit 53.

6  **Q.**  (BY MS. LOCKHART)  Is that your signature there?

7  **A.**  It is.

8  **Q.**  All right.

9      MS. LOCKHART:  Ms. Johnson, we can take this down.

10  Thank you.

11  **Q.**  (BY MS. LOCKHART)  Mr. Kromka, what do you do for work?

12  **A.**  I'm an investment banker.

13      THE COURT:  We can't hear you.

14  **A.**  Oh, I'm sorry.  I'm an investment banker.

15  **Q.**  (BY MS. LOCKHART)  Where do you live?

16  **A.**  Most of the time in Beijing.  With COVID, I've been

17  recently living in Los Angeles.

18  **Q.**  Do you know an individual by the name of Joseph Vincent

19  Ronquillo?

20  **A.**  I do.

21  **Q.**  Who is that?

22  **A.**  That's my husband.

23  **Q.**  How long have you been married?

24  **A.**  Five years.

25  **Q.**  Were you together before that as well?

Direct Examination - Kromka

1    **A.**  Twenty-two years.

2    **Q.**  Do you know an individual by the name of Prakazrel, or

3    Pras, Michel?

4    **A.**  I do.

5    **Q.**  Do you see him here in the courtroom?

6    **A.**  I do.

7    **Q.**  Can you identify him by an article of clothing he's

8    wearing?

9           MR. KENNER:  Stipulate referring to the defendant,

10   Mr. Michel.

11          THE COURT:  All right.  The record will reflect an

12   agreement that he's been -- that Mr. Michel has been

13   identified by this witness.

14          You need to slow down, please.

15          MS. LOCKHART:  Will do, Your Honor.

16   **Q.**  (BY MS. LOCKHART)  How did you meet Mr. Michel?

17   **A.**  Mr. Michel and I were introduced to each other by a mutual

18   friend.

19   **Q.**  And about when was that?

20   **A.**  Late '90s.  Oh -- yes, that's correct.

21   **Q.**  What's the nature of your relationship with Mr. Michel?

22   **A.**  We were friends.

23   **Q.**  Did you ever have a business together?

24   **A.**  We did.

25   **Q.**  What kind of business?

Direct Examination - Kromka

1   **A.**  It was an entertainment company.

2   **Q.**  About when was this?

3   **A.**  Three years -- 1999 through 2003.

4   **Q.**  And after 2003, did you have any other business

5   relationship with Mr. Michel?

6   **A.**  No.

7   **Q.**  After your business ended, what was the nature of your

8   relationship with Mr. Michel --

9   **A.**  We were friends.

10  **Q.**  -- with Mr. Michel?

11      Sorry, you have to let me -- for the sake of -- the

12  person sitting in front of you is typing everything, so it

13  makes it easier if one of us goes at a time.

14      How did you communicate with Mr. Michel?

15  **A.**  Generally by text.

16  **Q.**  Did there come a point in which Mr. Michel approached you

17  about donating to President Obama?

18  **A.**  Yes.

19  **Q.**  What happened?

20  **A.**  Sometime in the summer of 2012, Mr. Michel reached out to

21  see if I had -- if me or my husband had made any contributions

22  to the Obama re-election campaign.

23  **Q.**  And after -- what was your response to that question?

24  **A.**  We had not.

25  **Q.**  And is your husband Mr. Ronquillo, who you mentioned

Direct Examination - Kromka

1    earlier?

2    **A.**  Yes.

3    **Q.**  After you said that you hadn't donated, did you talk with

4    Mr. Michel further about that?

5    **A.**  We did.  He had mentioned to me that he had maxed out his

6    contributions to the Obama re-election campaign and asked me

7    if I would be willing to contribute to that campaign.

8    **Q.**  When he asked you if you would be willing to contribute to

9    the campaign, was that with your own money?

10   **A.**  No.  He was going to provide the money from himself.

11   **Q.**  Did he say why he wanted you to make that donation?

12   **A.**  He had -- from what I understood, he had maxed out his

13   contribution for that period for that campaign.

14   **Q.**  How much money did Mr. Michel want to send you to

15   contribute to the campaign?

16   **A.**  $40,000 for me and $40,000 for my husband.

17   **Q.**  And did Mr. Michel end up sending you that money?

18   **A.**  He did.

19         MS. LOCKHART:  Ms. Johnson, if we can pull up what's

20   previously been admitted as Government's Exhibit 86, page 1.

21   **Q.**  (BY MS. LOCKHART)  Mr. Kromka, do you recognize this as

22   your bank account statement?

23   **A.**  At the time, yes.

24   **Q.**  What is the time period covered here?

25   **A.**  July 18th to August 19th, 2012.

Direct Examination - Kromka

1          MS. LOCKHART:  Ms. Johnson, if we could go to page

2   2, and if we could highlight that transaction on August 3rd, I

3   think.

4          Ms. Johnson, I think it's further up than that.

5   **Q.**  (BY MR. LOCKHART)  So here it indicates on your statement

6   a deposit on August 3rd for $80,000; is that correct?

7   **A.**  That's correct.

8   **Q.**  Are you aware of who that $80,000 was from?

9   **A.**  It was from Mr. Michel.

10  **Q.**  Would you have received $80,000 from anyone else during

11  this time period?

12  **A.**  No.

13         MS. LOCKHART:  All right.  Ms. Johnson, if we could

14  click out of this, and then we're going to go down to that

15  transaction you had on August 6th.  Still on Government's

16  Exhibit 86.

17  **Q.**  (BY MS. LOCKHART)  So on August 6th, it notes a transfer

18  to savings plus of $40,000.  What's that transaction?

19  **A.**  That transaction was put into my husband's and my combined

20  account so that he could make the contribution himself.

21  **Q.**  And there's another $40,000 transfer a few lines below the

22  same day, noting a wire to American Express for $40,000.

23  What's that?

24  **A.**  That's correct.  I wired the money to American Express

25  because I was living abroad, and the most efficient way to

Direct Examination - Kromka

1    make that contribution was by American Express online, so it

2    was a prepayment for that.

3    **Q.**  And was that a credit card?

4    **A.**  Yes.

5          MS. LOCKHART:  Thank you, Ms. Johnson.

6          If we could go to Government's Exhibit 87, which has

7    also previously been admitted.

8    **Q.**  (BY MS. LOCKHART)  Do you recognize this account --

9    **A.**  Yes.

10   **Q.**  -- or this statement?

11   **A.**  Yes.

12   **Q.**  And what is this?

13   **A.**  This looks to be our joint account.

14   **Q.**  Is this the joint account you just mentioned?

15   **A.**  Yes.

16          MS. LOCKHART:  And, Ms. Johnson, if we could go to

17   page 2, please, and the transaction, I think, on August 8th --

18   or August 6th.

19   **Q.**  (BY MS. LOCKHART)  So here on August 6th, it says amount

20   added, $40,000.  Is that the transaction you just mentioned

21   that you had moved over?

22   **A.**  Yes.

23   **Q.**  Are you aware of what the transaction is directly beneath

24   it?

25   **A.**  That was transferred to his checking account from -- so he

1    could write a check for it.

2    **Q.**   Did Mr. Ronquillo, have a separate checking account?

3    **A.**   He does and did.

4    **Q.**   Thank you.

5         MS. LOCKHART:  Ms. Johnson, if you could take this

6    down, please.

7    **Q.**   (BY MS. LOCKHART)  And why did you transfer those funds to

8    Mr. Ronquillo?

9    **A.**   Because it was, in our discussion with Mr. Michel, that

10   Mr. Ronquillo would make that donation on his behalf to the

11   Obama for re-election campaign.

12   **Q.**   Are you aware of whether Mr. Ronquillo was talking to

13   Mr. Michel?

14   **A.**   He was not.

15   **Q.**   And did you end up donating the $40,000?

16   **A.**   That $40,000 he did.  I donated a separate $40,000.

17   **Q.**   Right.  So you made a contribution of $40,000 and your

18   husband, Mr. Ronquillo, also made a contribution of $40,000?

19   **A.**   That's correct.

20   **Q.**   This money from Mr. Michel, was it for you to do anything

21   you wanted to with it?

22   **A.**   No.

23   **Q.**   Did it have a specific purpose?

24   **A.**   To go to the Obama for re-election campaign.

25   **Q.**   Had you made any political contributions before this?

1    **A.**   No.

2    **Q.**   Did you have any hopes that making a contribution of this

3    size may, you know, get you invited to things or get you a

4    picture with the President?

5    **A.**   I think tangentially I had assumed that it would have some

6    derivative benefit, none of which was entirely clear, but it

7    was a possibility.

8    **Q.**   Since 2012, have you heard from Mr. Michel?

9    **A.**   Periodically.

10   **Q.**   Was there a point in time in which you stopped

11   communicating with Mr. Michel?

12   **A.**   Following an inquiry by the FBI in 2018.

13   **Q.**   And the inquiry from the FBI, was that in connection to

14   this case?

15   **A.**   It was.

16   **Q.**   I'm going to show you what has not yet been admitted as

17   Government's Exhibit 590.  Mr. Kromka, do you recognize this

18   message?

19   **A.**   Yes.

20   **Q.**   Is this a message with Mr. Michel?

21   **A.**   It is.

22          MS. LOCKHART:  Your Honor, we would move to admit

23   and publish Government's Exhibit 590.

24          THE COURT:  Any objections?

25          MR. KENNER:  I would object on relevance grounds.

Direct Examination - Kromka

1          THE COURT:  I assume this is going to be followed up
2    with something else, or not?
3          MS. LOCKHART:  Your Honor, I can ask one additional
4    question that might make this more relevant.
5          THE COURT:  All right.  Why don't you do that?
6    **Q.** (BY MS. LOCKHART)  There's no date shown here; correct?
7    **A.** Uh-huh.
8    **Q.** Are you familiar or do you know what date these messages
9    were sent, or approximately when these messages were sent?
10   **A.** This was approximately March 2018.
11   **Q.** And this was after you had been approached by the FBI?
12   **A.** Yes.
13         MS. LOCKHART:  We would again move to admit and
14   publish these messages, Your Honor.
15         MR. KENNER:  Objection.  Relevance.
16         MS. LOCKHART:  It shows Mr. Michel reaching out to
17   Mr. Kromka, both after Mr. Michel was approached in connection
18   this investigation and after Mr. Kromka was approached with
19   this investigation.
20         THE COURT:  I think it does have probative value
21   based on that.
22         MS. LOCKHART:  Can we move to admit --
23         THE COURT:  Yes, it's -- I'll admit it.
24         MS. LOCKHART:  Thank you.  And if we could we
25   show --

Direct Examination - Kromka

```
1                    THE COURT:  I also don't see any 403 for the
2       defendant.
3                    Okay.  Why don't you pick up the phone and we'll
4       talk.
5                    (Bench conference on the record.)
6                    MR. KENNER:  Your Honor, there's nothing there on
7       this document that indicates where the missing -- missed voice
8       call came from.
9                    THE COURT:  Presumably, are you going to be doing
10      some further phone calls -- discussion, Ms. Lockhart?
11                   MR. KENNER:  I can't hear what she's saying, Your
12      Honor.
13                   THE COURT:  She's having a problem with the phone.
14      She has to pick up another one.
15                   MS. LOCKHART:  Sorry, Your Honor.
16                   THE COURT:  That's okay.
17                   MS. LOCKHART:  Sorry.  Go ahead.
18                   THE COURT:  So Mr. Kenner has raised an issue in
19      terms of what the -- why don't I let you say what you said,
20      instead of my interpreting it.
21                   MR. KENNER:  Yes, Your Honor.  The -- there is
22      nothing on this document that reflects or indicates what
23      telephone numbers the missed voice call came from or that they
24      came from the same telephone.  And absent that, it has no
25      probative value.
```

1          THE COURT:  Okay.  Can you indicate --

2          MS. LOCKHART:  The witness testified that these were

3    messages with Mr. Michel.  I can also ask him whether these

4    voice calls were also with Mr. Michel.  But given the nature

5    of this communication, this is a stream of communications with

6    Mr. Michel.

7          THE COURT:  Okay.  He has said that this is what

8    he's -- you know, he's given the context of it and has

9    identified it that way.  I mean, it goes more to the weight,

10   that seems to me, than the probative value.

11         MR. KENNER:  I'll cross on it, Your Honor.  Thank

12   you.

13         THE COURT:  All right.

14         (The following proceedings were had in open court.)

15         THE COURT:  Admitted.

16   **Q.**  (BY MS. LOCKHART)  All right.  Mr. Kromka, the jury can

17   now see these.  Is there a name on these messages of who

18   they're from?

19   **A.**  You mean on the current exhibit?

20   **Q.**  Yes.

21   **A.**  No.

22   **Q.**  Did you provide these in response to a grand jury subpoena

23   through this investigation?

24   **A.**  Yes.

25   **Q.**  At that time, were you aware that these were messages from

Direct Examination - Kromka

1    Mr. Michel?

2            MR. KENNER:  Objection to what he knew at that time,

3    Your Honor.  The question is what he knows now.

4            THE COURT:  No.  I mean, they're -- for different

5    purposes, I think that you can ask it.  Go ahead.

6    **Q.**  (BY MS. LOCKHART)  Did you know that when you provided

7    these, that they were messages from Mr. Michel?

8    **A.**  Yes.

9    **Q.**  And here -- there's a number of missed voice calls here.

10   Who are those missed voice calls from, if you know?

11   **A.**  From Mr. Michel.

12   **Q.**  And if we could go to page 2 of this exhibit.  Who are

13   these messages with?

14   **A.**  From Mr. Michel.

15   **Q.**  And what is this messaging platform we're looking at

16   here?

17   **A.**  This is a WeChat, the Chinese version of WhatsApp.

18   **Q.**  And what is the date of the last message here?

19   **A.**  March 29th, 2018.

20   **Q.**  About when were you approached by the FBI in connection

21   with this investigation?

22   **A.**  Sometime in late March.

23   **Q.**  Was it before this message?

24   **A.**  Very likely, yes.  20 -- I think the number was the 27th.

25           MS. LOCKHART:  Thank you, Ms. Johnson.  You can take

Direct Examination - Kromka

1    these down.

2    **Q.**  (BY MS. LOCKHART)  I'd like to show you what's been

3    previously admitted as Government's Exhibit 432.

4         MS. LOCKHART:  All right.  Ms. Johnson, if you could

5    highlight the "to" line here.

6    **Q.**  (BY MS. LOCKHART)  Mr. Kromka, do you recognize that

7    e-mail address?

8    **A.**  I do.

9    **Q.**  And is that your e-mail address?

10   **A.**  It is.

11   **Q.**  And looking at the subject line or the body of this

12   e-mail, do you recall receiving this e-mail?

13   **A.**  I do not.

14   **Q.**  Was this your e-mail at the time this was sent in February

15   of 2019?

16   **A.**  It was.

17        MS. LOCKHART:  If we could take a look at the

18   attachment, Ms. Johnson, which has previously been admitted as

19   Government's Exhibit 433.

20   **Q.**  (BY MS. LOCKHART)  And so here we have a letter.  Do you

21   recall receiving this letter?

22   **A.**  I do not.

23        MS. LOCKHART:  I want you to take a look at the

24   second paragraph, Ms. Johnson.

25        MR. KENNER:  Objection, Your Honor.  If he doesn't

Direct Examination - Kromka

1    recall receiving it, I object to --

2            THE COURT:  She can ask questions as to whether or

3    not the material information in there is factual or not, which

4    I assume is what she's moving towards.

5            MS. LOCKHART:  That's correct, Your Honor.

6    **Q.**  (BY MS. LOCKHART)  Mr. Kromka, the first line here says

7    Mr. Michel loaned you $80,000 and you have failed to repay any

8    portion of that loan.  Did Mr. Michel loan you $80,000?

9    **A.**  No.

10   **Q.**  Did you receive $80,000 from Mr. Michel at any other time

11   than in connection with the contributions he wanted you to

12   make?

13   **A.**  I'm sorry.  Can you rephrase the question?

14   **Q.**  I can.

15        Did you receive $80,000 from Mr. Michel at any other time

16   than in connection with the donations to the Obama campaign?

17   **A.**  At any other time?  No, just once.

18   **Q.**  Did you have a contract with Mr. Michel?

19   **A.**  No.

20   **Q.**  When Mr. Michel gave you the $80,000 to contribute, did he

21   tell you that he wanted it to be repaid?

22   **A.**  No.

23   **Q.**  Prior to the date of this letter of February 27th, 2019,

24   had Mr. Michel ever asked for that money back from you?

25   **A.**  No.

1    **Q.**  Ever mentioned a contract to you?

2    **A.**  No.

3    **Q.**  I'm going to show you what's been previously admitted as

4    Government's Exhibit 435.  So this letter is dated a bit

5    later, March 8th, 2019.  Like before, do you recall receiving

6    this letter?

7    **A.**  I do not.

8          MS. LOCKHART:  And if you could highlight the last

9    two sentences, Ms. Johnson, of the first paragraph.

10          MR. KENNER:  Objection again, Your Honor.  He

11    doesn't recall it.  This is not --

12          THE COURT:  I can't hear you.  You're not speaking

13    into the microphone, sir.

14          MR. KENNER:  There is no fact being confirmed in

15    this letter that would relate to this matter, especially --

16          THE COURT:  I -- are you asking him something that's

17    factual in those lines?

18          MS. LOCKHART:  Yes, Your Honor.

19          THE COURT:  All right.  I believe that she can ask

20    that.

21    **Q.**  (BY MS. LOCKHART)  So this letter is dated a few weeks

22    after the fact.  Between mid February and March 8th, 2019, did

23    you in that period have a contract with Mr. Michel about the

24    $80,000?

25    **A.**  No.

Cross-examination - Kromka

1    **Q.**  Other than these letters, which I know you haven't seen,

2    has Mr. Michel ever asked for that amount to be repaid?

3    **A.**  No.

4    **Q.**  Have you ever repaid Mr. Michel back?

5    **A.**  No.

6    **Q.**  Why not?

7    **A.**  Because it wasn't to be repaid back.  If it were, I would

8    presume there would be a contract that would have interest,

9    tenor, et cetera on it, and I would have that contract.

10            MS. LOCKHART:  Nothing further.

11            THE COURT:  Cross.

12                     CROSS-EXAMINATION

13   BY MR. KENNER:

14   **Q.**  Good afternoon, Mr. Kromka.  How are you today?

15   **A.**  Fine.

16   **Q.**  Good.

17       Let's start you -- let me just start with the last thing

18   you said.  You had no contract with Mr. Michel with regard to

19   this money; isn't that correct?

20   **A.**  That's correct.

21   **Q.**  And there was really nothing Mr. Michel could have done if

22   you didn't give this money to the Obama campaign.  He relied

23   on your good faith to do that.  Would that be fair?

24            THE COURT:  You asked two questions there.

25            MR. KENNER:  I'm sorry?

Cross-examination - Kromka

1          THE COURT:  You've asked two questions.

2          MR. KENNER:  I'm sorry.

3   **Q.**  (BY MR. KENNER)  Let me ask the first one.  Did Mr. Michel

4   tell you when he gave you this money that it had to be -- that

5   it was a loan?

6   **A.**  No.

7   **Q.**  And you didn't do any contract with him; is that

8   correct?

9   **A.**  That's correct.

10  **Q.**  So when Mr. Michel provided you and your partner with

11  $80,000, it would be up to you whether or not to pass it on to

12  the campaign or not; isn't that correct?

13  **A.**  It was given to me for that explicit purpose.

14  **Q.**  But there was no contractual obligation to you to do that,

15  was there?

16  **A.**  No.

17  **Q.**  So Mr. Michel, in essence, you're saying, relied on your

18  friendship or your good faith to do that?

19  **A.**  Yes.

20  **Q.**  All right.  Sir, you testified that you lived in Beijing

21  for a long time?

22  **A.**  I live in Beijing.

23  **Q.**  You still live in Beijing?

24  **A.**  Uh-huh.

25  **Q.**  And did you live in Beijing during 2012?

Cross-examination - Kromka

1   **A.**  No, I lived in Hong Kong.

2   **Q.**  All right.  When -- how long have you been living in

3   either Beijing or Hong Kong?

4   **A.**  Since 2011.

5   **Q.**  All right.  And I think you said there was some point that

6   you came back to The States during COVID?

7   **A.**  January 25th, 2020.

8   **Q.**  And then after COVID, you went back?

9   **A.**  I have not been back yet.

10  **Q.**  Okay.  Thank you.

11  **A.**  Visas are not allowing that.

12  **Q.**  Thank you.

13      Let me understand this:  As an investment banker, were

14  you trying to work on a deal to get Chinese companies to

15  invest in Haiti?

16          MS. LOCKHART:  Objection, Your Honor.  Outside the

17  scope.

18          THE COURT:  I'm not sure.  Let's -- let me --

19          (Bench conference on the record.)

20          THE COURT:  Okay.  So what is the purpose?  I

21  haven't heard anything in here that they had a business

22  relationship.  It's a personal friendship, and then he gave

23  this money, according to him, to put in the campaign.

24          So you're going off into something totally

25  different.  It's not as if they had a business relationship,

1    which you are bringing up.

2              MR. KENNER:  Your Honor, they also had a business

3    relationship, which I'm bringing, up and this --

4              THE COURT:  Well, there's no predicate for that at

5    this point.  The testimony that we have is he discussed a

6    personal relationship.  He did not discuss in any way any kind

7    of a business relationship.

8              So you're jumping in as if he already has a business

9    relationship.  So there's no testimony to that effect for you

10   to ask the question that you're asking.

11             MR. KENNER:  I will ask it a different way.  Thank

12   you.

13             THE COURT:  All right.  Hold on.

14             Is there going to be another objection in terms of

15   his asking if they had a business relationship besides the

16   personal relationship?

17             MS. LOCKHART:  Your Honor, he did elicit, at the

18   beginning of his testimony, that Mr. Kromka had a limited

19   business relationship with Mr. Michel in the early 2000s.

20   However, I think the questions that Mr. Kenner was attempting

21   to elicit answers to were an extension beyond that and outside

22   the scope of direct.

23             THE COURT:  I'm assuming it would have been in the

24   timeframe that they were talking about that's at issue here,

25   so I'm not sure what the -- let me ask it this way:  What is

Cross-examination - Kromka

1    the relevance or probative value here of getting into whether

2    or not they had -- do you know whether -- let me ask it this

3    way:  Do you know whether they had any kind of business

4    relationship that you've talked about the Chinese and Haiti,

5    or are you just asking?

6              MR. KENNER:  No, I -- my understanding is that this

7    witness was in Beijing, he knew Mr. Michel to be connected to

8    Haiti --

9              THE COURT:  Right.

10             MR. KENNER:   -- and in furtherance with his

11   investment banking business, when he was trying to put deals

12   together to send Chinese investment money to Haiti to rebuild

13   the Haitian infrastructure, he reached out to Mr. Michel to

14   assist on the Haiti end.

15             I can also tell you now that I believe in their --

16   you know what?  I can't remember if it's been in testimony or

17   in the opening statement.  But at some point, there is and

18   will be testimony that Mr. Higginbotham went to the Chinese

19   Embassy sometime in 2017.

20             THE COURT:  Let's leave Mr. Higginbotham out.  Let's

21   focus on this.

22             I'm trying to figure out -- let's assume that he

23   says he was trying -- sent to Mr. Michel to do some Chinese,

24   you know, relation -- doing some investments in Haiti.  What's

25   the probative value of what we have?  What's the point of it?

Cross-examination - Kromka

1          MR. KENNER:  The probative value is that the
2     government has depicted a very minimal relationship, and all
3     of a sudden Mr. Michel asks --
4          THE COURT:  What difference does it make?  What I'm
5     trying to figure out is what difference does it make?  Let's
6     assume that he says, yes, I was -- the Chinese wanted to
7     invest in Haiti, or he was thinking of it and he reached out
8     to Mr. Michel.  What difference does it make?  What does it go
9     to --
10         MR. KENNER:  I think he is going to testify that, in
11    making this donation, he was hoping or expecting to get a
12    photograph of President Obama.  And that that, in China and
13    the Middle East, was a very effective thing to have on your
14    wall to do business there.
15         THE COURT:  And that is probative of what?
16         MR. KENNER:  Probative of another reason that he
17    made the contribution.  That's what he wanted out of it.
18         THE COURT:  He's given -- so I -- so the idea is it
19    wasn't just because Mr. Michel asked him to do this, it's
20    because he wanted a photograph.  Is that what you're saying?
21         MR. KENNER:  Yeah.  He wanted to enhance the
22    business that he was in China in being an investment banker,
23    and a connection to President Obama would enhance that, and
24    that's what I want to show.
25         THE COURT:  Okay.  Well, Government, what's your

Cross-examination - Kromka

1     position on that?  Let's leave out his -- let's indicate --
2     let's leave out the business about whether he wanted to invest
3     in Haiti or whatever else and just look at in terms of this
4     business relationship in terms of Obama.  Anything which would
5     be, presumably, according to Mr. Kenner, additional reason why
6     he would have donated the money?

7                 MS. LOCKHART:  Your Honor, Mr. Kromka's motivation
8     here is not what matters.  What matters is Mr. Michel's intent
9     in giving the money to Mr. Kromka to make the contribution.
10    Whether Mr. Kromka was hoping for a benefit -- all the
11    conduits have testified about how they're attending events or
12    they have something else.

13                 What is relevant here is why Mr. Michel gave the
14    money to Mr. Kromka, which he has already testified about.
15    The rest is irrelevant.

16                 THE COURT:  Okay.  I have to say, Mr. Kenner, that
17    you have been looking at motivations of others, and, frankly,
18    the motivation of Mr. Kromka for taking the money and donating
19    it is not relevant, and it certainly is 403, in terms of
20    confusing the issue.

21                 The only motive, generally, isn't included -- it's
22    certainly not an element.  But his motivation, Mr. Kromka's,
23    is -- I don't see probative, and I think it's more confusing
24    to the jury in terms of going off a track.  That has nothing
25    to do with the actual ultimate charges here.

1          So I'll preclude you from going through this because

2   you're basically getting into Mr. Kromka's motivation.

3          MR. KENNER:  Your Honor, I'll need to send to

4   chambers a very specific offer of proof, and I won't ask any

5   further questions.  I'll just stop, and depending on how you

6   rule on the offer of proof --

7          THE COURT:  -- go into the motivation of

8   Mr. Kromka.

9          MR. KENNER:  No, it's going in -- not just the

10  motivation of Mr. Kromka --

11         THE COURT:  Well, that's what you've described.

12         MR. KENNER:  It's the motivation of Mr. Michel.  Why

13  was Mr. Michel interested in dealing with this man.

14  Mr. Michel was attached to Haiti.  He's a fan of Haiti.  He

15  wants to help Haiti.  That's all part of his motive,

16  Mr. Michel's motivation.

17         THE COURT:  So had -- well, you just described a

18  motivation for getting a photo of Obama, so I don't see how

19  that gets into the motivation of Mr. Michel.

20         MR. KENNER:  Your Honor, I understand -- I don't

21  agree, but I understand what you're saying.  I'm asking if I

22  can submit an offer of proof in writing tonight.

23         THE COURT:  For what?  Do you intend to call this

24  witness back?

25         MR. KENNER:  Yes.  If not, I'm going to call him

1    back in my case.

2            THE COURT:  Well, I'm not going to let you proceed

3    with it at this point the way you've described it.

4            Now, you described various reasons for doing it, but

5    none of them at this point sticks.  You're either looking at

6    motivations, which is not probative, and it certainly is 403.

7    A number of this seems to be getting into things that are

8    going to be very distracting and confusing to the jury; that

9    don't go to the elements and the issue of what Mr. Michel's

10   doing, not they're doing.

11           All right.  At this point -- you can do whatever you

12   wish to, in terms of if you want to call him back; but at this

13   point, based on the record I've got, I'm not allowing you to

14   go through it.

15           MR. KENNER:  Thank you.

16           (The following proceedings were had in open court.)

17           THE COURT:  All right.  I'll sustain the objection

18   as it's -- at this point, for the reasons I've stated on the

19   record.

20           MR. KENNER:  May I have just a moment, Your Honor?

21           THE COURT:  Certainly.

22   Q.  (BY MR. KENNER)  Let me go to a different area at this

23   point, sir.

24           THE COURT:  Before -- let me just indicate that part

25   of this discussion that we've had, I've done at least an order

1    on one of these.  But let's proceed with the next, just for

2    your own information when you go back and look.  But go ahead

3    in terms of the new area you're going to go into.

4              MR. KENNER:  Thank you, Your Honor.

5    **Q.**  (BY MR. KENNER)  You've told us that you were in an

6    entertainment business with Mr. Michel?

7    **A.**  Yes.

8    **Q.**  And you said that ended naturally; right?

9    **A.**  It did.

10   **Q.**  Does that mean it was a three-year contract and at the end

11   of the three years it ended?

12   **A.**  No.  The company didn't sustain revenues, and eventually

13   we decided to close it.

14   **Q.**  And that was a mutual decision?

15   **A.**  It was.

16   **Q.**  And you remained friends with Mr. Michel after that?

17   **A.**  I did.

18   **Q.**  And you remained friends with him throughout the time

19   period -- when did you -- do you consider your friendship with

20   Mr. Michel to have been ended?

21   **A.**  I'm sorry, I'm not sure I understand the question.

22   **Q.**  Do you -- is it your view that no longer have a -- you're

23   no longer a friend of Mr. Michel or he's no longer a friend of

24   yours?

25   **A.**  No.

Cross-examination - Kromka

1          THE COURT:  No, he's no longer a friend of yours, or
2    that's not correct?
3          THE WITNESS:  I'm sorry.  Excuse me.  He is
4    currently a friend of mine.
5    **Q.**  (BY MR. KENNER)  Okay.  And in that friendship, do you
6    talk any business?
7    **A.**  Before 2018, yes.
8    **Q.**  All right.  And what kind of business did you talk with
9    him about prior to 2018?
10         MS. LOCKHART:  Objection, Your Honor.  Relevance.
11         THE COURT:  We've also gone through this already in
12   terms of a discussion off the record.
13         MR. KENNER:  Your Honor, I have nothing further.
14         THE COURT:  Redirect.
15         MS. LOCKHART:  No, Your Honor, nothing further.
16         THE COURT:  All right.  I'm going to excuse you at
17   this point, but it may be that you need to talk to defense
18   counsel as to whether you may be needed.  Okay?
19         Not right this instant, but --
20         THE WITNESS:  Thank you very much.
21         THE COURT:  I'm not excusing you altogether if
22   you've been subpoenaed.  All right?
23         THE WITNESS:  So should I leave Washington, or no?
24         THE COURT:  No, not yet, not until you have a
25   further discussion.

```
 1              THE WITNESS:  Okay.  Thank you.
 2              THE COURT:  Your next witness.
 3              MR. MULRYNE:  The government calls David Sugarman.
 4              THE COURT:  If you would step up over here, please.
 5    If you would step up and we can swear you in.  Raise your
 6    right hand.
 7                      DAVID SUGARMAN,
 8    called as a witness, being first duly sworn, was examined and
 9    testified as follows:
10              THE WITNESS:  Yes.
11              THE CLERK:  Please be seated.
12              THE COURT:  The chair moves around, so you can make
13    yourself comfortable.  You need to speak into the microphone
14    in a loud, clear voice.  You can take the mask down so we can
15    actually hear you.  All right?
16              And I -- let counsel finish their question before
17    you start to answer, even if you know what they're asking you,
18    so we have a question and an answer.  If you hear the word
19    "objection" or you see counsel, more likely, at the table
20    stand, they're going to object.  If you haven't started to
21    answer, don't.  If you're in the middle of your answer, please
22    stop, let me hear what the objection is, and then I'll tell
23    you whether you can answer.  All right?
24              THE WITNESS:  Yes, ma'am.
25              MR. MULRYNE:  Thank you, Your Honor.
```

```
 1                       DIRECT EXAMINATION
 2   BY MR. KELLER:
 3   Q.  Good afternoon, Mr. Sugarman.
 4   A.  Good afternoon.
 5   Q.  Could you please state and spell your full name for the
 6   Court and the court reporter.
 7   A.  David Sugarman, D-a-v-i-d, S-u-g-a-r-m-a-n.
 8            THE COURT:  Can you speak up a little bit?  Think of
 9   talking to somebody at the back door.  Okay?
10            THE WITNESS:  Okay.
11   Q.  (BY MR. MULRYNE)  Mr. Sugarman, how are you currently
12   employed?
13   A.  I do private equity, self-employed.
14   Q.  And we're going to be talking in a moment about events
15   back in 2012.  Were you doing similar work back then, or
16   something different?
17   A.  In 2012, I was a vice president at, I believe, Morgan
18   Stanley or Merrill Lynch.
19   Q.  In what city and state do you reside?
20   A.  Miami, Florida.
21   Q.  Okay.  Are you familiar with a individual named Prakazrel
22   Michel?
23   A.  Yes, sir.
24   Q.  Or Pras Michel?
25   A.  Yes, sir.
```

Direct Examination - Sugarman

1    **Q.**  Do you see Mr. Michel in the courtroom here today?

2          MR. KENNER:  Stipulate the witness would identify

3    Mr. Michel.

4          THE COURT:  All right.  The record will reflect that

5    there's -- that there's no objection to Mr. Michel being

6    identified by this witness.

7    **Q.**  (BY MR. MULRYNE)  Mr. Sugarman, one other question about

8    your business back in 2012.  Are you familiar with an entity

9    called Sugartime Sports and Entertainment?

10   **A.**  Yes.

11   **Q.**  What was that entity back in 2012?

12   **A.**  I had a sports management firm.  That was the -- the name

13   of the company.  This was before I was an agent with the NBA.

14   I did sports management, so it was a sports management firm.

15   **Q.**  Okay.  So I asked you a moment ago about Mr. Michel.  Can

16   you tell the jury how it is that you first met Mr. Michel?

17   **A.**  I met Pras in, I believe, 2006 or 2007 in an elevator.

18   I'm sorry for my voice.  I'm a little nervous.  In an elevator

19   in New York City, at the Soho House.

20   **Q.**  And just generally what transpired during this meeting in

21   New York?

22   **A.**  I just struck a conversation with him in the elevator.  He

23   seemed like a superintelligent guy, and I remember we went to

24   the roof, and I spent probably an hour or two just talking

25   with him.

Direct Examination - Sugarman

**Q.**  Did you and Mr. Michel develop a friendship thereafter?

**A.**  I thought the closest, yes.

**Q.**  Okay.  And can you just tell us generally over the years the nature of your friendship, your relationship with Mr. Michel?

**A.**  He was like a brother to me.  You know, he's a brother.

**Q.**  When you first met Mr. Michel in the approximate 2006 time frame, based on your observations, your experience, how would you describe his financial status around that time?

**A.**  I'm sorry.  Can you say that one more time?

**Q.**  Sure.

        When you -- around the time when you first met and got to know Mr. Michel in or around 2006, I believe you testified, how would you describe Mr. Michel's financial status or condition as you observed it?

**A.**  I -- it wasn't -- it wasn't -- it wasn't anything significant where we were going to do business together.  You have to understand, at that point, being a money manager, my clients were sports and entertainment.  So when I recognized what Pras's industry was, I tried to solicit his business to do business with him, but it never came to fruition, so we didn't do business together.

**Q.**  Okay.  From the time that you met Mr. Michel in 2006, and as time progressed closer to or around 2012, did you notice a change in Mr. Michel's financial well-being?

Direct Examination - Sugarman

1    **A.** Yes.

2    **Q.** How so?

3    **A.** It was -- I mean, he was living very well, dressing

4    incredible, had a beautiful home.  63 Greene Street, I believe

5    it was.  I recall the address.  He was a different person.

6    Not a different person like that, but looked different.

7    **Q.** Different than when you had first met him in or around

8    2006?

9    **A.** Different, yes.

10   **Q.** I want to talk to you about campaign contributions.

11       So in 2012, did Mr. Michel approach you about possibly

12   attending a fundraising event in Washington, D.C.?

13   **A.** Yes, sir.

14   **Q.** Can you tell the jury about that, what Mr. Michel shared

15   with you?

16   **A.** Like I said earlier in the grand jury, I recall that he

17   was doing fundraising for the -- for the President Obama --

18   something with President Obama.  And he was super active in it

19   and really passionate about it, like super passionate about

20   it.  And he would tell me about it and I would listen to him,

21   and then he gave me the opportunity to go to one of the events

22   here in Washington.

23   **Q.** And can you tell the jury about that?  What did Mr. Michel

24   tell you about the event in Washington?

25   **A.** I don't remember specifically what he told me.  I remember

1   the event and what transpired to get to the event.  I don't

2   remember specifically what he told me about the event,

3   though.

4   **Q.**  What transpired to get to the event?

5   **A.**  Well, there was a donation that needed to be made to go to

6   the event.  I didn't have that type of money, let alone to

7   donate to this -- the event, and it was -- so he gave it to me

8   with my wife, the two of us together.

9   **Q.**  How much was the amount that would need to be contributed

10  to attend the event for you and your wife?

11  **A.**  I don't want to -- I don't want to guess.  I don't

12  remember.  75,000, I think, in total.  I don't remember the

13  exact dollar amount.

14  **Q.**  Okay.  Did you -- during this investigation, did you

15  testify before a grand jury here in Washington, D.C.?

16  **A.**  Yes, sir.

17  **Q.**  Might it help your recollection if I were to show you a

18  copy of your grand jury transcript?

19  **A.**  I remember -- it's the same thing I'm going to say today,

20  but you can show it to me.

21          MR. MULRYNE:  If we could just pull up what's marked

22  for identification as Government Exhibit 208, and this has not

23  been admitted.

24          THE COURT:  Could you give the page and lines you're

25  going to be reading?

Direct Examination - Sugarman

1          MR. MULRYNE:  Yes, Your Honor.  It's page 8, and if

2    we could go to lines, let's say, 11 -- 11 through 16.

3    Q.  (BY MR. MULRYNE)  And, Mr. Sugarman, this is going to

4    appear on your screen.  Just take a moment and take a look at

5    that.  When you're done reviewing it, please just indicate.

6          THE COURT:  So it's for refreshing --

7          MR. MULRYNE:  Your Honor, it's on the screen.  We're

8    not publishing it.

9          THE COURT:  It needs to be off.

10         So it's going to show on the screen.  Read it to

11   yourself, and when you're finished, please look up.  We're

12   trying to see whether that helps your memory or not.

13   Q.  (BY MR. MULRYNE)  So page 8, lines 11 through 16, sort of

14   in middle of the page.

15   A.  Yes.

16         MR. MULRYNE:  Okay.  You can take that down,

17   Mr. Johnson.

18   Q.  (BY MR. MULRYNE)  Mr. Sugarman, did that help refresh your

19   recollection?

20   A.  It was 75,000.

21   Q.  Okay.  Did Mr. Michel ultimately provide you that $75,000

22   to contribute and attend the event?

23   A.  Yes.

24   Q.  And how is it that he got you the money?

25   A.  We went to bank -- to Wells Fargo in Miami Beach on Alton

Direct Examination - Sugarman

1    Road and I think 23rd Street, and we went inside.  I had a

2    relationship with them because that's where my business and

3    personal accounts were.

4        And he went to the -- we were at somebody's desk, and I

5    stepped away from the desk, and he was speaking with the

6    gentleman, and A to B.  It just -- he did a transfer.

7    **Q.**  Upon receiving that $75,000 from Mr. Michel, what did you

8    do with the money?

9    **A.**  The instructions were -- the instructions were I had to

10   contact somebody -- I don't remember who I had to contact --

11   and then send.

12       I said this in my grand jury, and I don't know if I

13   recalled then either, if it was one donation or two donations

14   that I did, because it was my wife at the time and myself.  So

15   there were two different donations.

16   **Q.**  And from whom did you get the information to know where to

17   send it?

18   **A.**  I don't -- that I don't remember.  It was somebody that

19   Pras put me in contact with.  I don't remember who it was.

20   **Q.**  Did -- and did you understand that that $75,000 that

21   Mr. Michel was giving you was for you to contribute so that

22   you could attend that event in Washington, D.C.?

23   **A.**  Yes.

24   **Q.**  Did you attend the event in Washington, D.C.?

25   **A.**  Yes.

Direct Examination - Sugarman

1   **Q.**  Did you see the defendant there at the event?

2   **A.**  Yes.

3           THE COURT:  You mean Mr. Michel?

4           MR. MULRYNE:  I'm sorry.  Mr. Michel.

5   **Q.**  (BY MR. MULRYNE)  Did you see Mr. Michel at the event?

6   **A.**  Yes, sir.

7   **Q.**  Did there come a time before or after the event in which

8   Mr. Michel -- you had testified a moment ago that he was

9   involved in fundraising; is that right?

10  **A.**  Yes.

11  **Q.**  Did he ever ask you to help him out in terms of

12  fundraising for President Obama's campaign?

13  **A.**  Not specifically.  He had asked if I knew anybody.  He was

14  pretty dialed into the community in Miami.  He knew a lot of

15  people that had that type of money.

16  **Q.**  Did Mr. Michel ever mention to you he having an

17  opportunity to attend a film screening of the movie *Lincoln* at

18  the White House?

19  **A.**  He did.

20  **Q.**  And what did you understand how that he was able to attend

21  that event?

22  **A.**  I was blown away when he told me about it, because I

23  believe it was a movie had just come out, and he said that he

24  was going to -- he was going to D.C.  He actually went to D.C.

25  to see this movie.  I didn't -- I wasn't part of it.  I

Direct Examination - Sugarman

1    just -- that's hearsay from what he told me.

2    **Q.**  And why did -- how did you -- based on your knowledge, how

3    was it that Mr. Michel was able to attend an event like

4    that?

5    **A.**  I -- my personal impression, from being at the --

6            MR. KENNER:  Objection to his impression, Your

7    Honor.

8            THE COURT:  I'll sustain it the way it is being

9    worded and the question you phrased it.

10           MR. MULRYNE:  I'm sorry, Your Honor, what was that

11   last part?

12           THE COURT:  The way you phrased it, I think you need

13   to rework the question, in terms of getting an appropriate

14   answer --

15           MR. MULRYNE:  Yes, Your Honor.

16           THE COURT:  -- that does not create issues, legal

17   issues.

18           MR. MULRYNE:  Understood, Your Honor.

19   **Q.**  (BY MR. MULRYNE)  Mr. Sugarman, understanding that

20   Mr. Michel had told you that he had attended this event at the

21   White House, did he explain to you how he was able to attend

22   that event?

23   **A.**  I'm sorry, can you ask that one more time, please?

24   **Q.**  Did Mr. Michel tell you how he was able to get an

25   opportunity to see that particular movie at the White House?

Direct Examination - Sugarman

1    **A.**  No.  I created my own impression.

2    **Q.**  You said moments ago that you testified before the grand

3    jury in this matter; is that correct?

4    **A.**  Yes, sir.

5    **Q.**  Prior to your testimony in the grand jury, did Mr. Michel

6    contact you?

7    **A.**  Prior to my speaking with the grand jury?  No, I contacted

8    Pras a few times.  He didn't contact me.

9    **Q.**  And when you contacted Mr. Michel, what is it that he

10   had -- what is it that you had shared with him prior to your

11   grand jury testimony?

12   **A.**  The first time that I -- when all this started, I told him

13   that the FBI was at my parent's house looking for me, and he

14   told me to tell the truth.  You know, tell -- I said they're

15   there with a subpoena, and he told me to tell the truth.

16   **Q.**  Did you -- and you testified in the grand jury; is that

17   right?

18   **A.**  Yes.

19   **Q.**  And then following your testimony in the grand jury, did

20   Mr. Michel contact you or did you contact Mr. Michel?

21   **A.**  He contacted me shortly thereafter.  That was the last

22   time we spoke.

23   **Q.**  And what is it that he conveyed to you during that

24   contact?

25   **A.**  He wasn't happy.

1    **Q.**  In what way?

2    **A.**  He said that I lied to the grand jury.

3          MR. MULRYNE:  No further questions, Your Honor.

4          THE COURT:  Cross.

5          MR. KENNER:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. KENNER:

8    **Q.**  Good afternoon, Mr. Sugarman.  How are you?

9    **A.**  I'm well.  Good afternoon, sir.

10   **Q.**  Good.  Good.  Good.

11        You testified about seeing Mr. Michel, I believe, at the

12   Soho House in New York City?

13   **A.**  Yes, sir.

14   **Q.**  And you described it as having been a contact initially in

15   an elevator?

16   **A.**  Yes, sir.

17   **Q.**  All right.  And did you tell the grand jury that before

18   the 2012 election --

19          MR. MULRYNE:  Objection, Your Honor.  This may be

20   hearsay.  I'm not sure why we're referring to the

21   transcript.

22          THE COURT:  Well, it also -- it's not clear to me

23   wether it has -- the prior question has to do with the

24   elevator.  Does the grand jury material have to do with that,

25   or something else?

Cross-examination - Sugarman

```
 1              MR. KENNER:  Your Honor, I'll withdraw the question
 2      and move on.
 3      Q.  (BY MR. KENNER)  When you saw Mr. Michel in 2012 charging
 4      his phone, you observed that he didn't have a place to charge
 5      the phone.  Do you recall that?
 6      A.  Are you referring to in the diner?
 7      Q.  Yes.
 8      A.  Yes, I recall this.
 9      Q.  And what made you think that Mr. Michel didn't have a
10      place to charge his phone?
11      A.  He told me.
12      Q.  Okay.  Did you take that to mean he was homeless?
13      A.  I don't know if I would say he was living on the streets
14      type homeless, so I don't -- I didn't think that he was living
15      homeless.  I just didn't think -- I should respond
16      differently.
17          He -- I don't know where he was living.  I don't know
18      where he was living.
19      Q.  Okay.  But based on, apparently, the way he was -- the way
20      he was dressed and the conversation you had with him, did you
21      form an opinion that he must have been homeless?
22      A.  No, I didn't form an opinion.  It was obviously a
23      conversation he and I had that we were both -- let me just
24      answer the question.
25          We were both -- it was difficult times in both of our
```

Cross-examination - Sugarman

1    lives, and we were friends, so we were communicating about

2    life.

3    **Q.**   Okay.  And the next time you see him is in this

4    elevator?

5    **A.**   No.

6    **Q.**   So you saw him in the diner after the elevator?

7    **A.**   Yeah.  I met -- the first time I met Pras was in the Soho

8    House in New York City.

9    **Q.**   All right.  And at the Soho House, you had a conversation

10   with him on the rooftop?

11   **A.**   Yes, sir.

12   **Q.**   And did you learn in that conversation that Mr. Michel was

13   a founding member of the Fugees?

14   **A.**   Yeah, I did learn that.  It was -- yes, I did.  Yes.

15   **Q.**   Okay.  And I think the word you used, you wanted to

16   prospect him to see if you could manage his portfolio?

17             MR. MULRYNE:  Your Honor, objection.  It seems like

18   we're reading from the transcript.

19             THE COURT:  If you are --

20             MR. KENNER:  I am not reading from the transcript.

21   I'm reading from my notes.

22             Would you like to see, Counsel, what I'm reading

23   from?

24             THE COURT:  I don't think that's necessary.

25   **Q.**   (BY MR. KENNER)  Soho House is an expensive private club;

Cross-examination - Sugarman

1    correct?

2    **A.**  Yes, I believe so.

3    **Q.**  You wouldn't expect to find any paupers there, would

4    you?

5    **A.**  I don't know what -- I don't know what you're referring to

6    as a pauper, but -- I don't understand the question.  I was

7    there.  I was there and I couldn't afford the place.  Just, I

8    was there.

9    **Q.**  All right.  But Mr. Michel, as I think you testified, did

10   not want you or ask you to manage his money; is that

11   correct?

12   **A.**  Did not want me to?

13   **Q.**  Did not ask you to manage his money.

14   **A.**  Well, these are conversation -- I mean, we would talk

15   business for years.  You're referring to one comment I made

16   about managing or wanting to work with Pras.

17   **Q.**  Okay.

18   **A.**  You're referring to one, but this was years.

19   **Q.**  So you were, for years, trying to get Mr. Michel to let

20   you be his portfolio manager; is that fair?

21   **A.**  I don't know "let me," but it was part of my -- we were

22   friends, and I wanted a shot at the title of Pras.  He was

23   Pras, and he was my friend, and I wanted the opportunity to

24   work for him, yes.

25   **Q.**  All right.  Did you see Mr. Michel in the Miami area from

Cross-examination - Sugarman

1    time to time between 2006 and 2012?

2    **A.**   Did I see Pras?

3    **Q.**   Did you see Pras --

4    **A.**   All the time.

5    **Q.**   -- in the Miami area --

6    **A.**   All the time.

7    **Q.**   All the time.

8            THE COURT:   Okay.   Can we discuss that as

9    Mr. Michel?

10           MR. KENNER:   Mr. Michel.   I'm sorry.

11           THE WITNESS:   Sorry.

12   **Q.**   (BY MR. KENNER)   Did you ever have occasion to review

13   Mr. Michel's portfolio or investments during that period of

14   time?   Did he ever show you his investment --

15   **A.**   I don't think so.

16   **Q.**   All right.   And you have -- other than your observation,

17   you have no real knowledge of what was or was not in

18   Mr. Michel's portfolio; is that fair?

19   **A.**   Absolutely no knowledge.

20   **Q.**   All right.   Before you attended the Obama fundraiser in

21   2012, you had determined that Mr. Michel was flush in cash?

22   **A.**   I didn't determine it.   I was -- I was with him.   It

23   wasn't something I determined.

24   **Q.**   So it's your observation, prior to the fundraiser,

25   Mr. Michel did not appear to you to be someone in great need

Cross-examination - Sugarman

1    of money?

2    **A.**  No.  No.  No.

3          THE COURT:  No what?  He did not appear or --

4          THE WITNESS:  He did not appear --

5          THE COURT:  Excuse me.  No, he did not appear to

6    need money, or, no, you disagree with him?  What's the answer

7    to the no?

8          THE WITNESS:  I see.  No, he didn't appear to need

9    money.  No.

10   **Q.**  (BY MR. KENNER)  And did you think that he was living a

11   very nice life, from what you saw at that time?

12   **A.**  Yes.

13   **Q.**  If -- would you take issue with somebody portraying

14   Mr. Michel in 2012 as needing money and willing to do anything

15   to get it?

16          MR. MULRYNE:  Objection, Your Honor.

17          THE COURT:  Sustained.

18   **A.**  Sir, I'm sorry --

19          THE COURT:  I sustained it, so you don't answer.

20   **Q.**  (BY MR. KENNER)  I just want to be sure I heard this

21   correctly.  Mr. Michel, prior to your grand jury testimony,

22   told you to be honest?

23   **A.**  Yes, he did, that's correct.

24   **Q.**  And I think you said afterwards he took issue with whether

25   you were honest or not?

Cross-examination - Sugarman

1    **A.**  He said -- I never spoke -- yeah, we spoke one more time,

2    and he said I was not honest, but I was honest.  I didn't say

3    anything that I'm not saying here.  I was honest.

4    **Q.**  Okay.

5    **A.**  But we never spoke again.

6    **Q.**  All right.  Do you currently have any ill will towards

7    Mr. Michel?

8    **A.**  I love Pras.

9              MR. KENNER:  I have nothing further.

10             THE COURT:  Redirect.

11             MR. MULRYNE:  No, Your Honor.  Thank you.

12             THE COURT:  All right.  Can he be excused?

13             MR. MULRYNE:  Yes, Your Honor.

14             MR. KENNER:  Yes, Your Honor.

15             THE COURT:  All right.  You're excused, sir.

16             I think before we start the next witness, I'll take

17    the afternoon break and then pick up at that point.

18             So we're breaking --

19             MR. KENNER:  Excuse me, Your Honor, I have one

20    additional question before this witness leaves.  May I reopen

21    the cross just to ask that question?

22             THE COURT:  All right.  Please come back.  Sir, come

23    back.  Go ahead and sit down.  He has one additional question.

24    So you can take your mask off, so we're back to cross.

25    **Q.**  (BY MR. KENNER)  Just one question.

Cross-examination - Sugarman

1    **A.**  Yes, sir.

2    **Q.**  Did you ever receive the money that you spent to go to

3    this event back?

4           MR. MULRYNE:  Objection.  Relevance.

5           THE COURT:  I'm sorry.  Did you ever receive -- you

6    mean the 75,000, is that what you're referring to?

7           MR. KENNER:  Yes.  Yes.

8    **A.**  Did I ever receive the money that I gave back?

9    **Q.**  (BY MR. MULRYNE)  Yes.

10          THE COURT:  I'll sustain the objection.

11   **Q.**  (BY MR. KENNER)  Sorry you had to walk back up.

12   **A.**  I'm good.

13          THE COURT:  Now you are excused.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  All right.  So let's take the afternoon

16   break, and I'll ask you to come back at 4:00.  Okay?

17          Don't talk about the case.

18          (Jury left the courtroom.)

19          THE COURT:  Mr. Kenner, I'd like to bring up --

20   we've discussed this before, and I think it's in one of my

21   opinions, but I have to go back and look.  All of these

22   witnesses, in terms of what their motivations for, you know,

23   getting the money and if they had an additional motivation

24   besides, according to their testimony, Mr. Michel asking them

25   to pay it, is totally irrelevant.  And, frankly, Mr. Michel's

1    relevance -- you know, his motivation doesn't matter either.

2           The question is whether he conspired with others to

3    cause these straw contributions, which the people are talking

4    about here, to be made, and whether he acted willfully and

5    knowingly.  And his motivations for doing it, frankly, are not

6    probative.  And your questioning these additional witnesses

7    and getting into it, frankly, gets into 403.

8           So I'm mentioning this again because we keep sort of

9    having the same issue come up, but I'll go back and look at

10   where I wrote this down for you.

11          MR. KENNER:  Thank you, Your Honor.  I understand

12   that that's your view, and I appreciate it.

13          MS. LOCKHART:  Your Honor, could we get briefly just

14   clarity on Mr. Kromka.  I understand Mr. Kenner's going to

15   make an offer of proof as to whether he's going to be recalled

16   in the defense case, but defense case won't start for

17   approximately a week.

18          THE COURT:  Well, let me just -- the reason I

19   mentioned the motivation is if what he's bringing him back to

20   is to discuss either Mr. Michel's motivation or his

21   motivation, it's not probative and it's 403.

22          So if that's your reason for keeping him,

23   Mr. Kenner, then I think there's no reason to keep him.

24          MR. KENNER:  I understand, Your Honor.

25          THE COURT:  So are we letting him go or not?

Cross-examination - Sugarman

1          MR. KENNER:  No, I'm submitting the offer of proof

2     and --

3          THE COURT:  But if the offer of proof is what I've

4     already ruled on, it's going nowhere.

5          So is there something else you're doing?  Is there

6     some other reason you're bringing it up, other than motive?

7          MR. KENNER:  If Your Honor wants to let him go,

8     that's --

9          THE COURT:  No, I'm not letting him go.  I'm asking

10    you what's the reason to keep him.  If it's around motivation,

11    I've indicated to you that it's not probative or -- and it

12    certainly gets into 403, distracting and confusing the jury.

13    If you're keeping him for another reason, that's a different

14    issue.  I'm just -- that's why I raised the issue of the

15    motivation.

16         MR. KENNER:  Yes.  I intend to review the record and

17    see if there's anything else that I can ask this witness that

18    is not in violation of Your Honor's ruling.  If there's

19    nothing I can ask, you'll hear from me tonight in an e-mail

20    that he can be released.

21         THE COURT:  All right.  So Mr. Kromka appears to

22    have to wait.

23         MS. LOCKHART:  But given that he wouldn't be

24    recalled for another week at the earliest, he's happy to come

25    back, but he would like to get home in the intervening time.

1            THE COURT:  I'm not going to get into the

2   arrangements.  We're going to need to hear from Mr. Kenner as

3   to what he wants to talk to him about, as to whether there's

4   some reason for doing it, and then we can discuss logistics.

5            MS. LOCKHART:  Understood.  Thank you, Your Honor.

6            (A recess was taken.)

7            THE COURT:  Good afternoon, everyone.

8            JURORS:  Good afternoon.

9            THE COURT:  Okay.  I'm sorry, I forgot the name of

10   the next witness.

11            MR. KELLER:  Jack Brewer, Your Honor.

12            THE COURT:  Okay.  If you would step up over here.

13   You can come down the center aisle or off to the side.  Step

14   up over here to my left.  Thank you.

15            And if you could stand up, we're going to swear you

16   in.

17            THE CLERK:  Raise your right hand, please.

18                      JACK BREWER,

19   called as a witness, being first duly sworn, was examined and

20   testified as follows:

21            THE WITNESS:  Yes.  In the name of Jesus, I do.

22            THE COURT:  All right.  If you could sit down, you

23   can move the chair back and forth.  You need to speak into the

24   microphone.  You can take your mask off so we can hear you.

25            THE WITNESS:  Okay.  Thank you.

1          THE COURT:  So make sure you let counsel finish

2     their question before you start to answer so you're not

3     speaking at the same time and we hear the question and the

4     answer.

5          Also, importantly, if you see counsel start to stand

6     or you heard the word "objection," they're objecting to

7     usually it's the question.  If you haven't started to answer,

8     please stop, wait for my ruling.  If you're in the middle of

9     your answer, don't go on, stop, and, again, wait for my

10    ruling, and I'll tell you whether you can answer.  All right?

11         THE WITNESS:  Yes, ma'am.

12         THE COURT:  Go ahead.

13                    DIRECT EXAMINATION

14    BY MR. KELLER:

15    **Q.**  Good afternoon, Mr. Brewer.

16    **A.**  Good afternoon.

17    **Q.**  Can you state your name and spell your name for the

18    record?

19    **A.**  Jack Brewer, J-a-c-k.  Last name is B-r-e-w-e-r.

20    **Q.**  Sir, what kind of work are you in?

21    **A.**  I work at a nonprofit that does economic development

22    around the world.  We also primarily work on the

23    fatherlessness issue across America, working in prisons and

24    jails across the country.

25         MR. KENNER:  Excuse me, Your Honor.  I couldn't

Direct Examination - Brewer

1     hear.

2              THE COURT:  Yeah, if you could speak up a little bit

3     more.

4              THE WITNESS:  Okay.  I'm sorry.  Happy to tell you

5     what I do again.

6              My name is Jack Brewer.  I run a nonprofit called

7     the Jack Brewer Foundation.  We do economic development across

8     the world, focusing on orphan care programs, as well as

9     feeding programs; and we do medical aid and relief in Haiti,

10    as well as Malawi.

11             Here locally, we work on the fatherhood crisis.  We

12    have programs with juveniles in prisons across America,

13    working with individuals who have kids but are locked up, as

14    well as juveniles who are victims of the system and trying to

15    get them rehabilitated to go back into society.

16    **Q.**  (BY MR. KELLER)  When you say "here locally," in what city

17    and state do you live?

18    **A.**  When I say "locally," I mean America, because we do work

19    across the globe.  But we're based in Florida, in Coral

20    Springs, Florida, but we have programs in different states as

21    well.

22    **Q.**  Prior to your charitable work, did you spend some time in

23    the NFL?

24    **A.**  Yes, sir.  I played in the National Football League.

25    Oftentimes, forget about that, because it's been a little

Direct Examination - Brewer

1   while ago.  But I was a captain on three NFL teams:  The

2   Minnesota Vikings, New York Giants, and Philadelphia Eagles.

3   **Q.**  Do you know the defendant in this case, Mr. Pras Michel?

4   **A.**  Yes, I do.

5        MR. KELLER:  Counsel, stipulation as to

6   identification?

7        MR. KENNER:  Absolutely.  Stipulate this witness

8   would identify Mr. Michel.

9   **Q.**  (BY MR. KELLER)  Mr. Brewer, how were you introduced to

10  Mr. Michel?

11       THE COURT:  We need to put into the record that he's

12  agreed to the identification of Mr. Michel.  Go ahead.

13       MR. KELLER:  Thank you, Your Honor.

14  **Q.**  (BY MR. KELLER)  Mr. Brewer, how were you first introduced

15  to Mr. Michel?

16  **A.**  I met Mr. Michel, I believe, in New York, but I also met

17  him in Haiti as well.

18  **Q.**  And do you remember roughly what time frame that was?

19  **A.**  After the earthquake in 2010, sometime after that.

20  **Q.**  And how did you meet Mr. Michel or why were you

21  interacting with him in Haiti?

22  **A.**  Because I was there serving, and our nonprofit was one of

23  the first on the ground bringing aid there, and Mr. Michel was

24  friends with a number of the people I was friends with.

25  **Q.**  Was one of those people a man named Gilbert Hippolyte?

Direct Examination - Brewer

1   **A.**  Yes.

2   **Q.**  And did you also know Mr. Hippolyte's wife, Claudine

3   Oriol?

4   **A.**  Yes.  Yes, sir.  I actually consider them good friends.

5   **Q.**  I'm sorry, what was that last thing?

6   **A.**  I said I consider them good friends, yes.

7   **Q.**  Oh, good friends.

8   **A.**  Uh-huh.

9   **Q.**  So drawing your attention to roughly the summer of 2012,

10  did there come a time where Mr. Michel talked to you about a

11  fundraiser for then-President Obama?

12  **A.**  Yes, sir.

13  **Q.**  And what was the context of that conversation?  What did

14  Mr. Michel tell you?

15  **A.**  Well, I didn't talk to him as much about it, but I

16  remember there were other gentleman that I was put in contact

17  through him to be involved.  Beforehand, I was a big Obama

18  supporter and was very actively in, kind of, grass roots

19  campaigning for him.  So I was obviously interested, as well,

20  as getting a chance to meet him.

21  **Q.**  Do you remember who Mr. Michel put you in contact with at

22  the campaign?

23  **A.**  Was it Frank or Fred?  I don't remember the guy's name

24  exactly.

25  **Q.**  Okay.

Direct Examination - Brewer

1  **A.**  It's been a while, man.  And I did play football, so --

2  just keeping it 100.  I'm sorry.

3  **Q.**  And what were you contacts with this individual, Frank or

4  Fred, with the campaign?  What information were you getting or

5  were you providing?

6  **A.**  You know, I think he was -- you know, I was also helping

7  Obama in regards to just, you know, telling people to go out

8  and vote for him.  I was kind of like a grass roots guy.  I

9  started the NFL Players for Obama.  You know, it was trying to

10  find people who support Obama and that type of thing.  I think

11  I may have referred him to a couple people that I knew in

12  different places, in different areas, but I don't remember the

13  specifics.

14  **Q.**  Okay.  But with respect to this one specific fundraising

15  event, did you discuss that with Mr. Michel, this Obama

16  fundraising event?

17  **A.**  Yes, I did.

18  **Q.**  And did Mr. Michel invite you to the event?

19  **A.**  Yes.

20  **Q.**  What was your response?

21  **A.**  Of course, yeah.  I get a chance to meet Obama, I was

22  going, no doubt.  It was -- yeah, I -- yes, was my response.

23  **Q.**  Were you aware of whether or not there was a cost

24  associated with attending the event?

25  **A.**  At first I didn't.  And then later on, you know, they

Direct Examination - Brewer

1    started telling me about, I think, it was, like, a max

2    donation event that they were having in Miami.

3    **Q.**  Did you understand what the maximum donation was or what

4    contribution you were expected to make?

5    **A.**  Yeah.  They were saying it was 32,000, and I didn't have

6    $32,000.  I played in the NFL, but I was a minimum guy.  The

7    most I ever made was 200 grand before taxes, so I couldn't

8    afford 32 grand.

9    **Q.**  Did you tell Mr. Michel you couldn't afford to go?

10   **A.**  Oh, yeah.  I tell anybody.  I'm pretty straight-up, man.

11   I haven't lost that.

12   **Q.**  What was Mr. Michel's response?

13   **A.**  Well, they had said that they could sponsor me or pay for

14   me to be able to go, and so I was kind of -- you know, I

15   questioned that a lot.  Didn't really understand how that

16   worked, but I remember that was the offer.

17          THE COURT:  When you say "they," can you specify who

18   the "they" is?

19          THE WITNESS:  Well, it was -- ma'am, I don't

20   remember exactly.  I was on so many phone calls, being a long

21   time ago, but I don't remember exactly who I was speaking to

22   at that time.

23   **Q.**  (BY MR. KELLER)  I guess regardless of which specific

24   conversation was with which individual, was Mr. Michel

25   involved in these conversations?

Direct Examination - Brewer

**A.**  Yes, sir.

**Q.**  And did you ever provide your bank account information to Mr. Michel for him to transfer you the money?

**A.**  Yes, sir.

**Q.**  And did he, in fact, transfer you the $30,000?

**A.**  Yeah, I think it was $32,000.

**Q.**  And what did you do upon receiving that money?

**A.**  Well, it came before I thought it was going to come, because I remember asking, like, Well, can I pay it back?  Is it going to be a loan, some documents?  I was a bit confused as to the transaction specifics.

**Q.**  Were there any documents that you were provided regarding the money?

**A.**  No.

**Q.**  And so because you were confused, what did you do after you received the money?

**A.**  Man, I sent it back.  I'm from Texas.  I -- it was -- it just felt funny to me.  I -- I sent it right back as soon as I could.

**Q.**  Did you consult a lawyer?  Without getting into anything that your lawyer told you, did you consult a lawyer?

**A.**  Yes, I did.  I called my attorney and asked him -- I just didn't know the rules.  You know, I didn't know what I was doing.  Before I go donate money -- I mean, I think I've given a few hundred bucks before then to campaigns -- I was like,

Direct Examination - Brewer

1    Can you do this?

2        So, yeah, I sent the money back.  Long story short.

3    **Q.**  Did you have concerns that if you had actually contributed

4    the money that you had been provided by Mr. Michel, that that

5    could be illegal?

6    **A.**  Definitely.  That's why I called my attorney.

7    **Q.**  Did you tell Mr. Michel that you were returning the

8    money?

9    **A.**  Yeah, because I had to get the information to -- you know,

10   when you get it -- when you receive a wire, you can't send one

11   back until you get the information, and I think that's why it

12   took me a couple days to send it back.

13   **Q.**  Did you tell him about your concerns?

14   **A.**  I don't remember exactly.

15   **Q.**  So you remember sending the money back and telling him

16   that you were going to send the money back?  Do you remember

17   that?

18   **A.**  Yes, I remember that.  I just don't remember if it was

19   Mr. Michel that I told about the concerns or if it was

20   somebody else, but I know that I obviously spoke that concern

21   to whoever I was dealing with.

22   **Q.**  Prior to this transaction, this $32,000 that, as I

23   understand it, came into your account and then you wired it

24   back out of your account; is that right?

25   **A.**  Yes.

Direct Examination - Brewer

1    **Q.**  Prior to that, did you have any other financial

2    relationship or dealings with Mr. Michel?

3    **A.**  No, not that I remember.  No.

4    **Q.**  Any kind of business relationship with Mr. Michel?

5    **A.**  Not that I remember.  I mean, nonprofit stuff.  You know,

6    I remember seeing him in Haiti a couple of times when I'd go

7    on trips.  I don't consider that business.  But, you know, he

8    was -- I considered Mr. Michel a friend.  Still do.

9    **Q.**  No contracts --

10   **A.**  No.

11   **Q.**  -- with Mr. Michel, no loan agreements, and no exchange of

12   funds at all that you remember?

13   **A.**  No, I don't -- I don't remember.  It may have -- I don't

14   know.  I don't remember.  I'd have to look back.

15   **Q.**  After returning the money, did you have any further

16   contact with Mr. Michel about the money or about the

17   contribution?

18   **A.**  Not until I got the -- I got a letter several years after

19   that.  But, no, I had really -- had forgot about it, to be

20   honest with you.

21        MR. KELLER:  Ms. Johnson, can we pull up what's been

22   previously admitted as Government's Exhibit 420.

23   **Q.**  (BY MR. KELLER)  Mr. Brewer, I'm showing you what's been

24   previously admitted as Government's Exhibit 420.  Do you

25   recognize this as the letter you were just describing?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Direct Examination - Brewer

1    **A.**  Yeah, I do.

2            MR. KELLER:  And, Ms. Johnson, if we could highlight

3    the second paragraph, starting with "Mr. Michel loaned you."

4    **Q.**  (BY MR. KELLER)  Mr. Brewer, do you see that paragraph

5    where it reads, "Mr. Michel loaned you $32,000, and you have

6    failed to repay any portion of that loan.  This is a material

7    breach of your contractual obligation.  Be advised that you

8    must pay the entire amount of $32,000 to my client

9    immediately."

10       Do you see that?

11   **A.**  Yes, I do.

12   **Q.**  Did you owe Mr. Michel $32,000?

13   **A.**  No.

14   **Q.**  Were you in breach of any contractual obligation to

15   Mr. Michel?

16   **A.**  No, sir.

17   **Q.**  Had you already sent back the $32,000 because you had

18   concerns that the arrangement could be illegal?

19   **A.**  Yes, sir.

20   **Q.**  What was your reaction to receiving this letter?

21   **A.**  Man, I'm a man of God.  And I got to admit, when I got

22   this letter, it tested my faith.  I gave my life to God.  But,

23   man, I was shocked because I had always thought of Mr. Michel

24   as my friend, first off.  If you made a mistake, I'm like,

25   call me, text me, something.  But to just try to sue me out

Direct Examination - Brewer

1   the blue, like, you know, it tested my faith.  Tested my
2   faith, man.  I had to go in prayer.
3   **Q.**  Did you send a response to Mr. Michel's attorney after
4   receiving this letter?
5   **A.**  Yes, I did.
6          MR. KELLER:  Ms. Johnson, if we could pull up what
7   has not been admitted, for the witness only, Government's
8   Exhibit 447.
9          And if you could cull out just the top, the header
10  of that, for the witness, Ms. Johnson.
11  **Q.**  (BY MR. KELLER)  Mr. Brewer, I'm showing you what's been
12  marked for identification purposes as Government's Exhibit
13  447.  Do you recognize this as an e-mail from you to the
14  attorneys who had sent you that letter on behalf of
15  Mr. Michel, and the date of the e-mail is March 6th, 2019?
16  **A.**  Yes, I do.
17  **Q.**  And this is regarding the loan repayment to Mr. Michel?
18  **A.**  Yes, sir.
19         MR. KELLER:  Move for admission of Government's
20  Exhibit 447, your Honor.
21         THE COURT:  Any objection?
22         MR. KENNER:  No objection.
23         THE COURT:  All right.  Then I'll admit Government's
24  447 without objection.
25         MR. KELLER:  Could we publish that, Ms. Patterson?

Direct Examination - Brewer

1           Thank you.

2           Ms. Johnson --

3           THE COURT:  Did you want it published, or you don't

4   want it published?

5           MR. KELLER:  I do.  I believe it's been published,

6   Your Honor.

7           THE COURT:  I'm sorry?

8           MR. KELLER:  I do want it published, Your Honor.  I

9   believe it's published.

10          THE COURT:  Okay.

11          MR. KELLER:  Ms. Johnson, could we cull out from

12  "Hello," down through the first two paragraphs.

13  **Q.**  (BY MR. KELLER)  And so, Mr. Brewer, in your response,

14  reading from that first paragraph, did you provide, "Is this

15  in regards to the shady scheme Pras was getting people

16  involved in when he was fundraising or whatever he was doing

17  for Obama?"

18      Is that what you wrote, sir?

19  **A.**  Yes.

20  **Q.**  And then if we skip down to the line starting with "Pras."

21      "Pras sent me money with no promissory note or agreement

22  and asked me to donate the money to Obama.  I immediately

23  discussed this with counsel, as it felt shady, and I sent all

24  of the money right back to him."

25      Was that included in your response, sir?

1    **A.**   Yes, sir.

2    **Q.**   And then the first line of the next paragraph, "I got a

3    visit from some unexpected guest asking about this shadiness a

4    while ago, so I am shocked to see that this scheme has morphed

5    into now trying to rip me off of $32,000 that Pras Michel

6    knows that I don't owe him."

7        Did I read that correctly, sir?

8    **A.**   Yes, sir.

9             MR. KELLER:  Could we drop this, Ms. Johnson?

10            And then could you cull out the last paragraph

11   there, Ms. Johnson?

12   **Q.**   (BY MR. KELLER)  And starting with that first sentence,

13   "It's very revealing that Pras would try to extort me without

14   a phone call or text.  I sure hope that he is not scrambling

15   and trying to use me to cover up shadiness."

16       Did I read that correctly, sir?

17   **A.**   Yes, sir.

18   **Q.**   Did you feel like you were being extorted when you

19   received this letter?

20   **A.**   Of course.  I mean, I met Pras doing charity work, man.

21   Like, I run a nonprofit.  Like, I just felt like I would have

22   more respect from him and just everyone that I deal with.  I

23   don't ask anybody for anything, man.  I serve.  Every day of

24   my life, I get up in the morning and serve.

25       And for somebody to hit -- like, this threatens my

Cross-examination - Brewer

1    family, this threatens my organization, everything that I do

2    each and every day.  Of course I thought I was being extorted.

3    Without a phone call?

4        I mean, I'm sure there's a lot of other people involved

5    in this mess, but why bring me into it, after I poured my

6    heart and soul into your country, into the people that you

7    know.  I just felt like I deserve more respect than that,

8    man.

9    **Q.**  And the letter that you received talking about a loan

10   repayment, did that letter falsely characterize the $32,000 as

11   a loan?

12   **A.**  A hundred percent.  If it was a loan, I wouldn't have had

13   to send the money back.  I was trying to ask -- that was the

14   question I was asking.  Is this supposed to be a loan?  What

15   is this?  You're just sending money, and then I got to send it

16   to a campaign?  Come on.  That sounds shady to me, so I didn't

17   do it.

18            MR. KELLER:  No further questions, Your Honor.

19            THE COURT:  Cross.

20            MR. KENNER:  Yes, Your Honor.

21                      CROSS-EXAMINATION

22   BY MR. KENNER:

23   **Q.**  Good afternoon.  How are you doing today?

24   **A.**  I'm doing good.  God bless you, sir.

25   **Q.**  Good.

Cross-examination - Brewer

1    Let me talk to you a little bit about the time when you
2    started getting communication from Mr. Michel and you said
3    someone else who you thought was Frank or Fred?
4    **A.**  Yes, sir.
5    **Q.**  Do you recall the name Frank White?
6    **A.**  Frank White, yeah, I think that's who it was.  Yes, sir.
7    Sorry for the -- I just didn't remember the name exactly.
8    **Q.**  Okay.  And when you were first interviewed by the FBI, you
9    told them that it was Mr. Michel and/or Mr. Frank White that
10   was making these requests to you?
11           MR. KELLER:  Objection, Your Honor.  That calls for
12   hearsay and is not inconsistent with the witness' testimony.
13           THE COURT:  If you're reading -- doing things from
14   302s, you can't use them that way, Mr. Kenner.  We've gone
15   over this multiple times now.  Obviously, he told the FBI.  I
16   assume it's in a 302.  You can't use it that way.  I told you
17   this before.
18   **Q.**  (BY MR. KENNER)  Sir, is it your recollection now that
19   Mr. Frank White was, along with or instead of Mr. Michel,
20   making these requests of you to donate this money in this
21   way?
22   **A.**  Sir, I don't -- I wasn't that involved with it to know
23   where it was coming from.  I can't answer that question.
24   **Q.**  Do you have any recollection of talking to Frank White,
25   Jr., on the telephone?

Cross-examination - Brewer

1    **A.**  I'm sure I did.  I just don't remember when.  I couldn't

2    accurately state that.

3    **Q.**  Was it during this period of time when funds were being

4    solicited from you?

5    **A.**  Probably.

6    **Q.**  Was Mr. White the one that provided the details of the

7    fundraising event in Miami that you were being asked to come

8    to?

9    **A.**  Likely, yes.

10   **Q.**  Do you remember at this point who Mr. Frank White was

11   relative to the Obama campaign?

12   **A.**  I don't.  I just know he was some part of the campaign,

13   that he said -- you know, I didn't ever get a chance to fully

14   verify who he was, but I don't -- I don't know exactly what

15   his position was.

16   **Q.**  Okay.  And did Mr. Michel and/or Mr. White tell you that

17   they could loan you the money and you could donate it and pay

18   it back later?

19           MR. KELLER:  Objection, Your Honor.  Hearsay.

20   **A.**  I don't remember --

21           THE COURT:  Sir, hold on.  I have an objection.

22           I didn't hear your objection.

23           MR. KELLER:  Hearsay, Your Honor.

24           THE COURT:  Well, it depends on what the source of

25   it is.

Cross-examination - Brewer

1          MR. KENNER:  I'm asking him if he remembers that.

2          THE COURT:  Let's discuss this.

3          (Bench conference on the record.)

4          THE COURT:  Dorothy.

5          MR. KENNER:  Hello?  Yes.

6          THE COURT:  Okay.  Mr. Keller.

7          MR. KELLER:  Your Honor, whether it's from Mr. White

8    or from the defendant, it's an out-of-court statement being

9    offered for its truth.  It's hearsay.

10          THE COURT:  Okay.  So you're presumably offering it

11   for the truth of the matter; right?

12          MR. KENNER:  I'm going to ask Mr. Brewer with

13   respect to his reaction to it, not for the truth of the

14   matter.

15          THE COURT:  And what difference does his reaction to

16   it have?  What probative value does his reaction have?

17          Actually, let me ask it this way:  What do you

18   expect his reaction to be?

19          MR. KENNER:  I believe that his reaction will be

20   that Mr. White was connected to the campaign in some official

21   way and he relied on that in his actions.

22          THE COURT:  Okay.  This creates a couple of issues,

23   certainly in terms of his hearsay, in terms of what you're

24   discussing.  Also, it seems to me that you're trying to get

25   into -- and I'm not sure -- his reaction as to whether Mr. --

1    let's see.  Let me see what you had.

2            So you want to bring out that his reaction was that

3    Mr. White said he was in some official way, and then so he

4    relied on his actions?

5            MR. KENNER:  Yes.

6            THE COURT:  So you're down the path that we have

7    talked about before, in terms of discussing whether Mr. White

8    somehow was the ring leader.  Is that what you're getting at?

9            MR. KENNER:  This is a piece of evidence toward

10   eventually getting to that, yes.

11           THE COURT:  You know, if you're going to have a path

12   of what Mr. White thought or whether he knew his conduct was

13   unlawful or his state of mind or anything else, it's

14   Mr. Michel's and not Mr. White's.

15           So, frankly, I think you're veering into something

16   that doesn't have probative value, and it, also, frankly, is

17   going to be very distracting and confusing to the jury, in

18   terms of going off on Mr. White and what he's thinking of

19   doing, as opposed to Mr. Michel, which is what the charges are

20   about.

21           So I'm not going to let you go down this line.

22           MR. KENNER:  Thank you, Your Honor.

23           (The following proceedings were had in open court.)

24           THE COURT:  I'll sustain the objection.

25           You don't have to answer the question.

Cross-examination - Brewer

1   **Q.**  (BY MR. KENNER)  Did I understand that you originally came

2   into contact with Mr. Michel after the major earthquake, I

3   want to say, 2010, I'm not sure, in Haiti?

4   **A.**  Yes, sir.

5   **Q.**  All right.  And did Mr. Michel work in -- with you and

6   others in connection with bringing assistance to the people of

7   Haiti as a result?

8          MR. KELLER:  Objection, Your Honor.  Relevance.

9          MR. KENNER:  They asked it in direct, Your Honor.

10          THE COURT:  In terms of good works, that's not

11   particularly -- that's not relevant, in terms of -- we

12   discussed this, and it's in orders as well.

13   **Q.**  (BY MR. KENNER)  You indicated, if I understood you

14   correctly, that you were a friend of Mr. Michel's?

15   **A.**  Yes.

16   **Q.**  And I believe, if I got this right, you testified that you

17   are, in fact, still a friend of Mr. Michel?

18   **A.**  I love him.

19          MR. KENNER:  I have nothing further.

20          THE COURT:  Redirect.

21          MR. KELLER:  No, Your Honor.

22          THE COURT:  All right.  You can step down, sir.

23          Does the -- can he be excused?  Mr. Kenner, can he

24   be excused?

25          MR. KENNER:  Yes, Your Honor.  I'm sorry.

1              THE COURT:  All right.  You're excused, sir.

2              THE WITNESS:  Thank you.

3              THE COURT:  Your next witness.

4              MR. MULRYNE:  Your Honor, the government calls

5    Michael Hartsock.

6              THE COURT:  Sir, if you could step up over here.

7    Step up, and she's going to swear you in.

8              THE CLERK:  Raise your right hand, please.

9                      MICHAEL HARTSOCK,

10   called as a witness, being first duly sworn, was examined and

11   testified as follows:

12             THE WITNESS:  I do.

13             THE CLERK:  Please be seated.

14             THE COURT:  All right.  You can sit down.  You can

15   move the chair around.  Make sure you speak into the

16   microphone in a loud voice so we can hear you.

17             THE WITNESS:  Yes, ma'am.

18             THE COURT:  I'd ask that you allow counsel to finish

19   their question, even if you know what they're asking you,

20   before you start to answer, so we have the question and the

21   answer.  They should do the same for you.

22             And also, if you hear the word "objection," or more

23   likely counsel at either table stands, then if you haven't

24   started to answer, don't.  If you're in the middle of your

25   answer, please stop and let me hear what the objection is, and

Direct Examination Hartsock

1    then I'll tell you whether you can answer it.  All right?

2                THE WITNESS:  Yes, ma'am.

3                THE COURT:  Okay.

4                        DIRECT EXAMINATION

5    BY MR. MULRYNE:

6    **Q.**  Good afternoon, Mr. Hartsock.

7    **A.**  Good afternoon, sir.

8    **Q.**  Can you please state and spell your name for the Court and

9    the court reporter?

10   **A.**  Michael Hartsock, H-a-r-t-s-o-c-k.

11               THE COURT:  Keep your voice up just a little bit.

12   **Q.**  (BY MR. MULRYNE)  Mr. Hartsock, where are you employed?

13   **A.**  I work for the Federal Election Commission.

14   **Q.**  Also known as the FEC?

15   **A.**  Yes.

16   **Q.**  Where is the FEC headquarters located?

17   **A.**  Washington, D.C.

18   **Q.**  And can you tell the jury briefly, what is it that the FEC

19   does?  What is it?

20   **A.**  The FEC is a small, independent regulatory agency of the

21   federal government.  The primary purpose of the agency is to

22   administer and enforce the federal election campaign finance

23   laws.

24   **Q.**  And how, generally, does the FEC enforce and administer

25   the federal campaign finance laws?

Direct Examination Hartsock

1    **A.**   Through oversight, making sure that committees disclose

2    activity that they have to disclose; and then, of course, for

3    any types of violations, perhaps taking enforcement action

4    against those committees.

5    **Q.**   How long have you worked at the FEC?

6    **A.**   I've been with the FEC for 19 years.

7    **Q.**   And what is your position or title at the FEC currently?

8    **A.**   I serve as a branch chief in the reports analysis

9    division.

10   **Q.**   What is it that the reports analysis division does?

11   **A.**   In the reports analysis division, our purpose is to review

12   and analyze all the financial disclosure reports that are

13   filed by political committees.  We review these reports to

14   make sure that they include all the information that is

15   required, and we also check the reports for any types of

16   potential violations of the campaign finance laws.

17   **Q.**   So I want to talk to you more about these financial

18   filings and reports that political committees submit to the

19   FEC.

20       Do political committees associated with or supporting the

21   United States presidential candidates, are they required to

22   file reports with the FEC?

23   **A.**   Yes.

24   **Q.**   How about joint fundraising committees, are they required

25   to file reports with the FEC?

Direct Examination Hartsock

1    **A.**  Yes.

2    **Q.**  Could you just tell the jury very briefly, what is a joint

3    fundraising committee?

4    **A.**  A joint fundraising committee is when one or more

5    registered political committees join together in a joint

6    fundraising effort.  They usually establish a separate

7    committee that will handle the intake of those joint

8    contributions.

9    **Q.**  Talking about a different type of committee, are you

10   familiar with what is known as an independent expenditure-only

11   committee?

12   **A.**  Yes.

13   **Q.**  Are those also often referred to as super PACs?

14   **A.**  Yes.

15   **Q.**  And again just generally -- briefly, what is a super

16   PAC?

17   **A.**  A super PAC, or an independent expenditure-only PAC, is a

18   committee that is established with the purpose of making

19   independent expenditures to promote or oppose a candidate for

20   federal office.  They can take in unlimited contributions.

21   **Q.**  Are super PACs also required to file financial reports

22   with the FEC?

23   **A.**  Yes.

24   **Q.**  All right.  And how often are these reports submitted to

25   the FEC?

1  **A.**  There are two filing frequencies with FEC reports, either

2  monthly or quarterly.

3  **Q.**  And how would a political committee submit those reports?

4  How are they transmitted and received by the FEC?

5  **A.**  The vast majority of committees file the reports

6  electronically.  So they will generate the report in

7  electronic filing software and then ultimately upload that

8  electronic file to the FEC website.

9  **Q.**  Okay.  I'm going to show you what's been previously

10  admitted into evidence, Government Exhibit 518.

11        MR. MULRYNE:  If we can just zoom in a little bit to

12  the body of that document.  Top to bottom would be -- I'm

13  sorry.  We can pull that down, please, the call out.

14  **Q.**  (BY MR. MULRYNE)  Mr. Hartsock, so this here, we see an

15  FEC Form 3X, Report of Receipts and Disbursements.  Do you see

16  that?

17  **A.**  Yes.

18  **Q.**  Can you tell us generally, what kind of -- is this what

19  you're referring to when you talk about political committees

20  submitting financial reports to the FEC?

21  **A.**  Yes.

22  **Q.**  Generally speaking, what sort of information is reflected

23  in this type of report?

24  **A.**  This report would contain all the information regarding

25  the receipts coming into the committee's account, as well as

Direct Examination Hartsock

1    any disbursements or expenditures leaving the committee's

2    account.

3    **Q.**  Let me show you what's been previously admitted as

4    Government Exhibit 687.  This form here, Mr. Hartsock, looking

5    at the upper left, Schedule A, says FEC Form 3X, Itemized

6    Receipts.

7        Is this a form or an excerpt of what we would typically

8    see in the FEC Form 3X that I just showed you a moment ago?

9    **A.**  Yes.

10   **Q.**  And again, just generally speaking, what sort of

11   information would be reflected in a Schedule A, Itemized

12   Receipts document?

13   **A.**  Schedule A is the portion of the Form 3X where the

14   committee would itemize individual contributions received from

15   individuals.

16       So if an individual contributes in excess of $200 in a

17   calendar year, the committee is required to itemize the

18   information about that contributor on this portion of the

19   form.

20   **Q.**  Why is it that political committees are required to file

21   these financial reports with the FEC?

22   **A.**  It's required by laws and statute for public disclosure to

23   make anyone aware, that wants to look at these reports, who's

24   making contribution to a committee, for example.

25   **Q.**  So upon receiving these reports, what does the FEC do with

Direct Examination Hartsock

1    them?

2    **A.**   Once the report is received by the FEC, ultimately it will

3    be published on our public website so anyone would be able to

4    go on our website and take a look at these reports.

5    **Q.**   Can anyone in the public view these reports on the FEC

6    website?

7    **A.**   Yes.

8    **Q.**   And are these reports through the FEC website searchable

9    in order to be able to identify particular political

10   committees, particular contributors, anything like that?

11   **A.**   Yes.

12   **Q.**   Without these reports, would the public have a direct

13   window into how political committees are receiving and

14   spending their money?

15   **A.**   No.

16   **Q.**   And is it important to the FEC whether the information in

17   these reports are true and accurate?

18   **A.**   Yes.

19   **Q.**   Why is that important?

20   **A.**   I would say for two reasons.  First and foremost, for

21   public disclosure.  We want to provide the public, or anyone

22   that's interested in seeing the campaign finance activity,

23   access to this information.  I would also say it's important,

24   from the FEC's standpoint, that these reports are published

25   and available so we have access to the information in order to

Direct Examination Hartsock

1    perform an analysis on the reports themselves.

2    **Q.**   So to that latter point about its relevance, it's

3    important to the FEC.  Why does your division, the reports

4    analysis division, review the reports, for what purpose?

5    **A.**   We're looking to, first of all, make sure that all the

6    information that is required to be disclosed is on the

7    reports, and we're also checking for any types of potential

8    violations.  So it's important that we have accurate

9    information to work with so our analysis would be accurate.

10   **Q.**   And I've asked you generally if it's important to the FEC

11   and your work, your duties, responsibilities, that the

12   information in these reports is accurate.  But let me ask you

13   even more specifically, does it matter, is it important to the

14   FEC, that the contributor information, the true source of the

15   contributions, is accurate?

16   **A.**   Yes.

17   **Q.**   Why?

18   **A.**   From my perspective in the reports analysis division, it's

19   important to have accurate contributor information so I can --

20   if I was reviewing the report, to be able to determine whether

21   or not a contribution limit was met or exceeded, for example,

22   as well as be able to ensure that, you know, the contributor

23   that's disclosed on the report is the information that I

24   should be using.

25   **Q.**   And why is that important for the work that you and the

Direct Examination Hartsock

1    FEC do?

2    **A.** If we don't have accurate information when we analyze and

3    look at the reports, the -- any potential actions that we take

4    after reviewing those reports would be inaccurate,

5    potentially.

6                 MR. MULRYNE:  No further questions, Your Honor.

7                 THE COURT:  Cross.

8                 MR. KENNER:  Your Honor, may I ask of the Court that

9    I start my cross in the morning?

10                MR. MULRYNE:  Your Honor, the government would

11   object to that request.

12                THE COURT:  Let me hear what the problem is.

13                (Bench conference on the record.)

14                THE COURT:  You know, we're losing a lot of time,

15   Mr. Kenner, this week, based on the Jewish holiday, as well as

16   the other two days that -- you know, that we're off on Friday,

17   and next week I've got stuff.  Is there a particular reason,

18   in terms of not going forward?  I mean, his testimony is

19   pretty limited.

20                MR. KENNER:  Yes.  My -- the reason I'm asking is

21   because my knee is hurting very badly and so is my lower back.

22   It's difficult for me to concentrate, but if Your Honor wants

23   me to --

24                THE COURT:  No.  No.  No.

25                MR. KENNER:  -- I'll do the best I can.

1          THE COURT:  I'm asking for a reason, in terms of

2     doing it.  We'll have them come tomorrow.

3          (The following proceedings were had in open court.)

4          THE COURT:  All right.  Members of the jury, you're

5     going to get to go home 15 minutes early.

6          So tomorrow we'll be starting at -- we'll bring you

7     back in at 9:15, and tomorrow we need to stop at 4:15.  I have

8     an executive committee with the other -- it's a monthly

9     meeting with all the judges on the Court, so I need to stop at

10    that point to be able to do it.  Okay?

11         And so take care of yourselves.  Be well.  Don't

12    talk about the case.  And, again, if there's anything out

13    there, you know, in the media or anything else, ignore it.

14    You're here.  You know what's going on.  You don't need to

15    read or hear about it.  All right?

16         Take care.

17         You can just wait one second.

18         (Jury left the courtroom.)

19         THE COURT:  Okay.  I'm going to ask you to come back

20    tomorrow at 9:15.  In the meantime, please don't talk about

21    your testimony with anybody.  All right?

22         THE WITNESS:  Yes, Your Honor.

23         THE COURT:  All right.  You can go ahead.  Let me

24    excuse you.

25         In terms of the -- go ahead and sit down.

1          In terms of the proffer that you're going to

2     provide, I would ask if you could do that this evening.  I'll

3     give you an opportunity to respond in the morning, the way we

4     usually do, on Mr. Kromka, so that we can figure out logistics

5     if it appears that he's going to be needed for some

6     testimony.

7               MR. KENNER:  Yes, Your Honor, I will do that.

8               THE COURT:  Is there anything else we need to

9     discuss at this point?

10              MR. KENNER:  No, Your Honor, for the defense.

11              MR. MULRYNE:  Not from the government.

12              THE COURT:  All right.  Has anybody bothered to take

13    a look at part 2, in terms of what's in the -- which it goes

14    to the charges, the elements, et cetera?  Has anybody looked

15    at it?

16              MR. KELLER:  We have reviewed it, Your Honor.  I

17    believe there are a couple of factual corrections, but -- but,

18    yes, we've reviewed it.

19              THE COURT:  Okay.  Mr. Kenner, have you?

20              MR. KENNER:  No, I have not yet reviewed them, Your

21    Honor.  I'll try to do that tonight.

22              THE COURT:  Okay.  Can we receive something that

23    indicates what you think are factually incorrect?

24              MR. KELLER:  Yes, Your Honor.  Would the Court

25    prefer a red line or just, like, a page and line cite?

1          THE COURT:  Red line would be nice.  That certainly

2     makes it easier.

3          MR. KELLER:  All right.

4          THE COURT:  And if you would send it to both of us

5     so we can take a look at it.  Why don't you take a look at it

6     and see if there's an issue before you respond.

7          MR. KENNER:  Certainly, Your Honor.

8          THE COURT:  And since you're doing the other, I can

9     wait another day for you to look at this.  I'd rather you

10    focused on Mr. Kromka and get that resolved.

11         MR. KENNER:  Thank you, Your Honor.

12         THE COURT:  All right.  So you'll send us -- because

13    you already looked at it, right?

14         MR. KELLER:  Correct, Your Honor.

15         THE COURT:  You'll send that tonight, and then

16    tomorrow you'll respond to whatever it is he's filing.

17         MR. KELLER:  Will do, Your Honor.

18         THE COURT:  All right.  Thank you.  Parties are

19    excused.

20         MR. KENNER:  Your Honor, while we're all still here,

21    just very briefly.

22         This morning, the Marshal that was downstairs,

23    although a very nice gentleman, while I believe there were

24    jurors were in line, had us take off our jackets and other

25    things, and I -- while I saw people from the government

1    badge -- not from this defense team, but using their badge to

2    walk through.  It was really embarrassing, Your Honor.

3            THE COURT:  I -- you know, I've told you, this isn't

4    something that I get involved with.  I -- you know, this is

5    something that the safety people do, both the Marshals Service

6    and the liaisons with the Court.  I have no -- I'm not getting

7    into what their security concerns are.

8            As I've indicated to you before, not necessarily

9    you, but there is heightened security at the court, and there

10   have been threats.  So they're being very careful and they

11   don't want to make exceptions for one set of defense attorney,

12   when they don't do it for everybody else.

13           MR. KENNER:  Would Your Honor consider a jury

14   instruction on that later?

15           THE COURT:  I frankly think you're making -- I mean,

16   we can talk about it.  You're making a bigger deal than they

17   probably have noticed, in terms of -- since everybody else has

18   to go through it.  They don't know who is going, unless

19   they've seen them specifically.

20           MR. KENNER:  Thank you, Your Honor.

21           THE COURT:  Parties are excused.

22           (The proceedings were concluded.)

23   I, Christine Asif, RPR, FCRR, do hereby certify that the
     foregoing is a correct transcript from the stenographic record
24   of proceedings in the above-entitled matter.

25                    _____/s/_____
                      Christine T. Asif, Official Court Reporter

< Dates >.
April 3rd, 2023
    1:11.
August 19th, 2012
    21:25.
August 3rd 22:2,
    22:6.
August 6th 22:15,
    22:17, 23:18,
    23:19.
August 8th 23:17.
February 27th
    31:23.
January 25th, 2020
    35:7.
July 18th 21:25.
June 26th 13:20.
March 2018 26:10.
March 29th, 2018
    29:19.
March 6th, 2019
    76:15.
March 8th 32:22.
March 8th, 2019
    32:5.
$200 90:16.
$30,000 6:16, 12:24,
    72:5.
$32,000 71:6, 72:6,
    73:22, 75:5, 75:8,
    75:12, 75:17, 78:5,
    79:10.
$40,000 21:16, 22:18,
    22:21, 22:22,
    23:20, 24:15,
    24:16, 24:17,
    24:18.
$75,000 50:21, 51:7,
    51:20.
$80,000 22:6, 22:8,
    22:10, 31:7, 31:8,
    31:10, 31:15,
    31:20, 32:24,
    34:11.
.
.
< 1 >.
1 21:20.
100 70:2.
1016 1:28.

11 50:2, 50:13.
1301 1:27.
1400 1:35.
15 94:5.
16 50:2, 50:13.
16633 1:42.
19 87:6.
19-00148-1 1:6.
1999 20:3.
.
.
< 2 >.
2 18:5, 22:2, 23:17,
    29:12, 95:13.
20 29:24.
200 71:7.
20001 2:17.
20004 2:9.
20005 1:36.
2000s 36:19.
2003 20:3, 20:4.
2006 46:17, 47:7,
    47:13, 47:23, 48:8,
    59:1.
2007 46:17.
2010 68:19, 84:3.
2011 35:4.
2012 13:20, 20:20,
    25:8, 34:25, 45:15,
    45:17, 46:8, 46:11,
    47:24, 48:11,
    55:18, 56:3, 59:1,
    59:21, 60:14,
    69:9.
2017 37:19.
2018 25:12, 43:7,
    43:9.
2019 30:15, 31:23,
    32:22.
202 2:18.
20530 1:29.
208 49:22.
23rd 51:1.
27th 29:24.
2:25 1:12.
.
.
< 3 >.
302 13:9, 13:14,
    13:16, 80:16.

302s 80:14.
32 71:8.
32,000 71:5.
333 2:15.
354-3247 2:18.
3X 89:15, 90:5, 90:8,
    90:13.
.
< 4 >.
403 27:1, 39:19,
    41:6, 63:7, 63:21,
    64:12.
420 74:22, 74:24.
432 30:3.
433 30:19.
435 32:4.
447 76:8, 76:13,
    76:20, 76:24.
4:00 62:16.
4:15 94:7.
.
.
< 5 >.
5 1:17.
518 89:10.
53 18:5.
538 17:5, 18:2.
590 25:17, 25:23.
.
.
< 6 >.
63 48:4.
641 2:8.
6507 2:16.
687 90:4.
.
.
< 7 >.
75,000 49:12, 50:20,
    62:6.
.
.
< 8 >.
8 50:1, 50:13.
86 21:20, 22:16.
87 23:6.
.
.
< 9 >.

90s 19:20.
91436 1:43.
9:15 94:7, 94:20.
_____/s/_____
_____ 97:27.
.
.
< A >.
Abigail 14:3.
able 52:20, 53:3,
  53:21, 53:24,
  71:14, 91:3, 91:9,
  92:20, 92:22,
  94:10.
above-entitled
  97:25.
abroad 22:25.
absent 27:24.
Absolutely 59:19,
  68:7.
access 91:23,
  91:25.
according 35:23,
  39:5, 62:24.
account 21:22, 22:20,
  23:8, 23:13, 23:14,
  23:25, 24:2, 72:2,
  73:23, 73:24,
  89:25, 90:2.
accounts 51:3.
accurate 91:17, 92:8,
  92:9, 92:12, 92:15,
  92:19, 93:2.
accurately 81:2.
across 66:23, 66:24,
  67:7, 67:12,
  67:19.
acted 63:4.
ACTION 1:5, 87:3.
actions 82:21, 83:4,
  93:3.
active 48:18.
actively 69:18.
activity 87:2,
  91:22.
actual 39:25.
Actually 5:4, 44:15,
  52:24, 69:4, 73:3,
  82:17.
added 23:20.

additional 26:3,
  39:5, 61:20, 61:23,
  62:23, 63:6.
address 30:7, 30:9,
  48:5.
administer 86:22,
  86:24.
admission 76:19.
admit 17:23, 18:2,
  25:22, 26:13,
  26:22, 26:23,
  75:21, 76:23.
Admitted 13:11,
  13:14, 17:4, 17:8,
  21:20, 23:7, 25:16,
  28:15, 30:3, 30:18,
  32:3, 49:23, 74:22,
  74:24, 76:7, 89:10,
  90:3.
advice 5:1, 5:5,
  7:14.
advised 6:7, 75:7.
afford 58:7, 71:8,
  71:9.
AFTERNOON 1:13, 4:2,
  4:3, 4:12, 4:13,
  16:25, 17:1, 33:14,
  45:3, 45:4, 55:8,
  55:9, 61:17, 62:15,
  65:7, 65:8, 66:15,
  66:16, 79:23, 86:6,
  86:7.
afterwards 60:24.
agency 86:20,
  86:21.
agent 46:13.
ago 14:5, 46:15,
  52:8, 54:2, 68:1,
  71:21, 78:4,
  90:8.
agree 40:21.
agreed 5:7, 68:12.
agreement 5:12,
  17:12, 17:14,
  19:12, 77:21.
agreements 74:11.
ahead 4:6, 27:17,
  29:5, 42:2, 61:23,
  66:12, 68:12,
  94:23, 94:25.

aid 67:9, 68:23.
aisle 65:13.
allege 10:5.
allegedly 10:2.
allow 13:1, 85:18.
allowed 6:6, 9:23.
allowing 35:11,
  41:13.
Alon 1:40.
alone 49:6.
already 9:21, 9:23,
  13:11, 17:8, 36:8,
  39:14, 43:11, 64:4,
  75:17, 96:13.
although 96:23.
altogether 43:21.
Alton 50:25.
America 1:5, 66:23,
  67:12, 67:18.
American 22:22,
  22:24, 23:1.
amount 23:19, 33:2,
  49:9, 49:13,
  75:8.
analysis 87:8, 87:10,
  87:11, 92:1, 92:4,
  92:9, 92:18.
analyze 87:12,
  93:2.
and/or 80:9, 81:16.
Angeles 18:17.
answer 5:3, 16:14,
  16:17, 16:18,
  16:19, 44:17,
  44:18, 44:21,
  44:23, 53:14,
  56:24, 60:6, 60:19,
  66:2, 66:4, 66:7,
  66:9, 66:10, 80:23,
  83:25, 85:20,
  85:21, 85:24,
  85:25, 86:1.
answers 36:21.
Anthony 13:7.
anybody 12:23, 52:13,
  71:10, 78:23,
  94:21, 95:12,
  95:14.
apologize 13:11.
apparently 56:19.

appear 50:4, 59:25,
  60:3, 60:4, 60:5,
  60:8.
APPEARANCES 1:23,
  2:1.
appears 64:21,
  95:5.
appreciate 63:12.
approach 48:11.
approached 20:16,
  26:11, 26:17,
  26:18, 29:20.
appropriate 7:13,
  9:7, 53:13.
approximate 47:7.
approximately 26:9,
  26:10, 63:17.
area 41:22, 42:3,
  58:25, 59:5.
areas 70:12.
around 16:6, 44:12,
  47:9, 47:12, 47:13,
  47:24, 48:7, 64:10,
  66:22, 85:15.
arrangement 75:18.
arrangements 65:2.
article 19:7.
Asif 2:11, 97:23,
  97:28.
asks 38:3.
assist 37:14.
assistance 84:6.
associated 70:24,
  87:20.
assume 26:1, 31:4,
  37:22, 38:6,
  80:16.
assumed 25:5.
assuming 36:23.
attached 7:4, 7:5,
  40:14.
attachment 30:18.
attempt 5:24.
attempting 36:20.
attend 49:10, 50:22,
  51:22, 51:24,
  52:17, 52:20, 53:3,
  53:21.
attended 53:20,
  59:20.

attending 39:11,
  48:12, 70:24.
attention 69:9.
attorney 5:1, 5:5,
  5:18, 72:22, 73:6,
  76:3, 97:11.
attorneys 76:14.
available 91:25.
Avenue 1:27, 1:35,
  2:8, 2:15.
awards 11:19.
aware 6:9, 6:16,
  22:8, 23:23, 24:12,
  28:25, 70:23,
  90:23.
away 51:5, 52:22.
.
.
< B >.
B-r-e-w-e-r 66:19.
B. 51:6.
backdoor 10:1.
backdooring 9:20.
badge 97:1.
badly 93:21.
bank 21:22, 50:25,
  72:2.
banker 18:12, 18:14,
  35:13, 38:22.
banking 37:11.
based 26:21, 41:13,
  47:8, 53:2, 56:19,
  67:19, 93:15.
basically 40:2.
basis 15:4.
Beach 50:25.
beautiful 48:4.
Beforehand 69:17.
beginning 36:18.
behalf 24:10,
  76:14.
Beijing 18:16, 34:20,
  34:22, 34:23,
  34:25, 35:3,
  37:7.
believe 4:7, 5:22,
  7:11, 32:19, 37:15,
  45:17, 46:17,
  47:13, 48:4, 52:23,
  55:11, 58:2, 68:16,

  77:5, 77:9, 82:19,
  84:16, 95:17,
  96:23.
below 22:21.
Bench 6:23, 27:5,
  35:19, 82:3,
  93:13.
beneath 23:23.
benefit 25:6,
  39:10.
besides 36:15,
  62:24.
best 93:25.
beyond 36:21.
big 69:17.
bigger 97:16.
birth 12:17.
bit 32:4, 45:8, 67:2,
  72:10, 80:1, 86:11,
  89:11.
bless 79:24.
blown 52:22.
blue 76:1.
body 30:11, 89:12.
born 15:2.
bothered 95:12.
bottom 89:12.
Boulevard 1:42.
branch 87:8.
breach 75:7, 75:14.
break 61:17, 62:16.
breaking 61:18.
Brewer 65:11, 65:18,
  66:15, 66:19, 67:6,
  67:7, 68:9, 68:14,
  74:23, 75:4, 76:11,
  77:13, 82:12.
briefly 63:13, 86:18,
  88:2, 88:15,
  96:21.
bring 62:19, 79:5,
  83:2, 94:6.
bringing 36:1, 36:3,
  63:19, 64:6, 68:23,
  84:6.
brother 47:6.
bucks 72:25.
business 19:23,
  19:25, 20:4, 20:7,
  35:21, 35:25, 36:2,

36:7, 36:8, 36:15,
36:19, 37:3, 37:11,
38:14, 38:22, 39:2,
39:4, 42:6, 43:6,
43:8, 46:8, 47:17,
47:20, 47:21,
47:22, 51:2, 58:15,
74:4, 74:7.
.
.
< C >.
calendar 90:17.
California 1:43.
call 27:8, 27:23,
40:23, 40:25,
41:12, 75:25,
78:14, 79:3,
89:13.
called 5:15, 11:20,
16:1, 44:8, 46:9,
65:19, 67:6, 72:22,
73:6, 85:10.
calls 15:19, 27:10,
28:4, 29:9, 29:10,
44:3, 71:20, 80:11,
85:4.
campaigning 69:19.
campaigns 5:25,
72:25.
candidate 88:19.
candidates 87:21.
captain 68:1.
card 23:3.
care 67:8, 94:11,
94:16.
careful 97:10.
case 10:7, 12:5,
12:21, 14:15,
14:18, 25:14, 41:1,
62:17, 63:16, 68:3,
94:12.
cash 59:21.
cause 63:3.
center 65:13.
Certainly 9:11,
39:19, 39:22, 41:6,
41:21, 64:12,
82:23, 96:1,
96:7.
certify 97:23.

cetera 33:9, 95:14.
chair 16:6, 44:12,
65:23, 85:15.
chambers 40:4.
chance 69:20, 70:21,
81:13.
change 47:25.
characterize 79:10.
charge 10:9, 56:4,
56:10.
charged 10:6, 10:8.
charges 39:25, 83:19,
95:14.
charging 56:3.
charitable 67:22.
charity 78:20.
Charles 2:5, 2:6.
check 24:1, 87:15.
checking 23:25, 24:2,
92:7.
chief 87:8.
China 38:12, 38:22.
Chinese 29:17, 35:14,
37:4, 37:12, 37:18,
37:23, 38:6.
Christine 2:11,
97:23, 97:28.
cite 95:25.
City 45:19, 46:19,
55:12, 57:8,
67:16.
clarify 10:13.
clarity 63:14.
Claudine 69:2.
clear 16:7, 25:6,
44:14, 55:22.
click 22:14.
client 75:8.
clients 47:19.
close 42:13.
closer 47:24.
closest 47:2.
clothing 19:7.
club 57:25.
co-conspirator 10:11,
10:16.
COLLEEN
KOLLAR-KOTELLY
1:18.
COLUMBIA 1:2.

Columbia 2:14.
combined 22:19.
comfortable 16:6,
44:13.
coming 80:23,
89:25.
comment 58:15.
Commission 6:5,
86:13.
committed 4:23.
committee 88:3, 88:4,
88:7, 88:9, 88:11,
88:18, 89:3, 89:25,
90:1, 90:14, 90:17,
90:24, 94:8.
committees 87:1,
87:4, 87:13, 87:18,
87:20, 87:24, 88:5,
89:5, 89:19, 90:20,
91:10, 91:13.
communicate 20:14.
communicating 25:11,
57:1.
communication 28:5,
80:2.
communications
28:5.
community 52:14.
companies 35:14.
company 20:1, 42:12,
46:13.
comparator 6:25.
complete 12:16.
concede 10:3.
concentrate 93:22.
concern 73:20.
concerns 73:3, 73:13,
73:19, 75:18,
97:7.
concluded. 97:22.
condition 47:15.
conduct 83:12.
conduit 6:10, 7:25,
8:1.
conduits 39:11.
conference 6:23,
27:5, 35:19, 82:3,
93:13.
confirmed 32:14.
confused 72:10,

72:15.
confusing 39:20,
  39:23, 41:8, 64:12,
  83:17.
Congress 5:20.
connected 37:7,
  82:20.
connection 25:13,
  26:17, 29:20,
  31:11, 31:16,
  38:23, 84:6.
consider 42:19, 69:4,
  69:6, 74:7,
  97:13.
considered 74:8.
conspiracy 10:4.
conspired 63:2.
consult 72:20,
  72:21.
CONT'D 2:1.
contact 14:11, 51:10,
  51:19, 54:6, 54:8,
  54:20, 54:24,
  55:14, 69:16,
  69:21, 74:16,
  84:2.
contacted 12:15,
  54:7, 54:9,
  54:21.
contacts 70:3.
contain 89:24.
content 14:11,
  14:19.
contents 4:20.
context 28:8,
  69:13.
continue 9:1.
Contitution 2:15.
contract 31:18, 32:1,
  32:23, 33:8, 33:9,
  33:18, 34:7,
  42:10.
contracts 74:9.
contractual 34:14,
  75:7, 75:14.
contribute 21:7,
  21:8, 21:15, 31:20,
  50:22, 51:21.
contributed 49:9,
  73:3.

contributes 90:16.
contribution 7:12,
  9:3, 9:4, 10:22,
  11:11, 11:14,
  12:11, 21:13,
  22:20, 23:1, 24:17,
  24:18, 25:2, 38:17,
  39:9, 71:4, 74:17,
  90:24, 92:21.
contributions 6:11,
  6:18, 7:25, 8:1,
  20:21, 21:6, 24:25,
  31:11, 48:10, 63:3,
  88:8, 88:20, 90:14,
  92:15.
contributor 90:18,
  92:14, 92:19,
  92:22.
contributors 91:10.
conversation 9:15,
  11:2, 46:22, 56:20,
  56:23, 57:9, 57:12,
  58:14, 69:13,
  71:24.
conversations 4:20,
  9:3, 71:25.
conveyed 54:23.
copy 49:18.
Coral 67:19.
corrections 95:17.
correctly 60:21,
  78:7, 78:16,
  84:14.
cost 70:23.
Counsel 16:11, 16:16,
  43:18, 44:16,
  44:19, 57:22, 66:1,
  66:5, 68:5, 77:23,
  85:18, 85:23.
country 66:24,
  79:6.
couple 70:11, 73:12,
  74:6, 82:22,
  95:17.
course 70:21, 78:20,
  79:2, 87:2.
court. 10:20, 28:14,
  41:16, 83:23,
  94:3.
courtroom 19:5,

46:1.
courtroom. 4:5,
  62:18, 94:18.
cover 78:15.
covered 21:24.
COVID 18:16, 35:6,
  35:8.
create 53:16.
created 54:1.
creates 82:22.
credit 23:3.
crimes 4:23.
CRIMINAL 1:5.
crisis 67:11.
Cross 28:11, 33:11,
  55:4, 61:21, 61:24,
  79:19, 93:7,
  93:9.
CROSS-EXAMINATION
  4:8, 4:10, 33:12,
  55:6, 79:21.
cull 76:9, 77:11,
  78:10.
cup 16:20, 16:21.
current 28:19.
currently 43:4,
  45:11, 61:6,
  87:7.
.
.
< D >.
D-a-v-i-d 45:7.
date 12:17, 13:20,
  26:6, 26:8, 29:18,
  31:23, 76:15.
dated 32:4, 32:21.
David 44:3, 44:7,
  45:7.
David E. Kenner
  1:39.
DAY 1:17, 22:22,
  78:23, 79:2,
  96:9.
days 73:12, 93:16.
deal 35:14, 78:22,
  97:16.
dealing 40:13,
  73:21.
dealings 74:2.
deals 37:11.

decent 14:24, 15:1,
  15:2.
decided 42:13.
decision 42:14.
DEFENDANT 1:12, 1:39,
  2:5, 8:7, 8:10,
  9:25, 10:1, 19:9,
  27:2, 52:1, 68:3,
  82:8.
defense 9:25, 43:17,
  63:16, 95:10, 97:1,
  97:11.
defenses 12:21.
Definitely 73:6.
Department 1:26,
  1:33.
depending 40:5.
depends 81:24.
depict 12:1.
depicted 38:2.
deposit 22:6.
derivative 25:6.
describe 11:13, 47:9,
  47:14.
described 40:11,
  40:17, 41:3, 41:4,
  55:14.
describing 74:25.
deserve 79:7.
desk 51:4, 51:5.
details 81:6.
determine 9:8, 59:22,
  92:20.
determined 59:21,
  59:23.
develop 47:1.
development 66:21,
  67:7.
dialed 52:14.
difference 38:4,
  38:5, 38:8,
  82:15.
Different 5:22, 8:23,
  13:25, 29:4, 35:25,
  36:11, 41:22,
  45:16, 48:5, 48:6,
  48:7, 48:9, 51:15,
  64:13, 67:20,
  70:12, 88:9.
differently 56:16.

difficult 56:25,
  93:22.
diner 56:6, 57:6.
dinner 13:3.
DIRECT 16:23, 36:22,
  45:1, 66:13, 84:9,
  86:4, 91:12.
directly 23:23.
disagree 60:6.
Disbursements 89:15,
  90:1.
disclose 87:1,
  87:2.
disclosed 92:6,
  92:23.
disclosure 87:12,
  90:22, 91:21.
discuss 9:6, 36:6,
  59:8, 63:20, 65:4,
  70:15, 82:2,
  95:9.
discussed 12:20,
  36:5, 62:20, 77:23,
  84:12.
discussing 82:24,
  83:7.
discussion 24:9,
  27:10, 41:25,
  43:12, 43:25.
distracting 41:8,
  64:12, 83:17.
District 1:1, 1:2,
  1:19, 2:13, 2:14.
division 87:9, 87:10,
  87:11, 92:3, 92:4,
  92:18.
Doctor 4:12.
document 27:7, 27:22,
  89:12, 90:12.
documentary 11:19.
documents 72:10,
  72:12.
doing 4:7, 7:22,
  12:1, 27:9, 37:24,
  41:4, 41:10, 45:15,
  48:17, 63:5, 64:5,
  65:4, 72:24, 77:16,
  78:20, 79:23,
  79:24, 80:13,
  83:19, 94:2,

  96:8.
dollar 49:13.
donate 49:7, 72:24,
  77:22, 80:20,
  81:17.
donated 12:24, 21:3,
  24:16, 39:6.
donating 20:17,
  24:15, 39:18.
donation 6:15, 11:4,
  21:11, 24:10,
  38:11, 49:5, 51:13,
  71:2, 71:3.
donations 31:16,
  51:13, 51:15.
done 33:21, 41:25,
  50:5.
door 45:9.
Dorothy 16:20,
  82:4.
doubt 70:22.
down 4:6, 16:5, 18:9,
  19:14, 22:14, 24:6,
  30:1, 44:14, 50:16,
  61:23, 63:10,
  65:13, 65:22,
  77:12, 77:20, 83:6,
  83:21, 84:22,
  85:14, 89:13,
  94:25.
downstairs 96:22.
drawing 69:9.
dressed 56:20.
dressing 48:3.
drop 78:9.
duly 16:1, 44:8,
  65:19, 85:10.
during 5:24, 22:10,
  34:25, 35:6, 46:20,
  49:14, 54:23,
  59:13, 81:3.
duties 92:11.
.
.
< E >.
e-mail 30:7, 30:9,
  30:12, 30:14,
  64:19, 76:13,
  76:15.
Eagles 68:2.

earlier 21:1,
 48:16.
earliest 64:24.
early 36:19, 94:5.
earthquake 68:19,
 84:2.
easier 20:13, 96:2.
East 38:13.
economic 66:21,
 67:7.
effect 36:9.
effective 38:13.
efficient 22:25.
effort 88:6.
either 35:3, 41:5,
 51:13, 63:1, 63:20,
 85:23, 89:1.
Election 6:5, 55:18,
 86:13, 86:22.
electronic 89:7,
 89:8.
electronically
 89:6.
element 39:22.
elements 41:9,
 95:14.
elevator 46:17,
 46:18, 46:22,
 55:15, 55:24, 57:4,
 57:6.
elicit 36:17,
 36:21.
embarrassing 97:2.
Embassy 37:19.
employed 45:12,
 86:12.
Encino 1:43.
end 21:17, 24:15,
 37:14, 42:10.
ended 20:7, 42:8,
 42:11, 42:20.
ends 10:18.
enforce 86:22,
 86:24.
enforcement 87:3.
enhance 38:21,
 38:23.
ensure 92:22.
entered 4:5.
Entertainment 20:1,

 42:6, 46:9,
 47:19.
entire 75:8.
entirely 25:6.
entity 46:8, 46:11.
equity 45:13.
especially 32:15.
Esquire 1:25, 1:31,
 1:32, 1:39, 1:40,
 2:5.
essence 34:17.
establish 88:6.
established 88:18.
et 33:9, 95:14.
evening 95:2.
event 11:5, 12:8,
 13:7, 13:20, 48:12,
 48:24, 49:1, 49:2,
 49:4, 49:6, 49:7,
 49:10, 50:22,
 51:22, 51:24, 52:1,
 52:5, 52:7, 52:21,
 53:3, 53:20, 53:22,
 62:3, 70:15, 70:16,
 70:18, 70:24, 71:2,
 81:7.
events 39:11, 45:14,
 48:21.
eventually 42:12,
 83:10.
everybody 97:12,
 97:17.
everyone 4:2, 65:7,
 78:22.
everything 20:12,
 79:1.
evidence 83:9,
 89:10.
exact 49:13.
exactly 69:24, 71:20,
 71:21, 73:14, 80:7,
 81:14.
EXAMINATION 16:23,
 45:1, 66:13,
 86:4.
examined 16:1, 44:8,
 65:19, 85:10.
example 90:24,
 92:21.
exceeded 92:21.

exceptions 97:11.
excerpt 90:7.
excess 90:16.
exchange 74:11.
Excuse 13:12, 43:3,
 43:16, 60:5, 61:19,
 66:25, 94:24.
excused 15:13, 15:15,
 15:16, 15:17,
 61:12, 61:15,
 62:13, 84:23,
 84:24, 85:1, 96:19,
 97:21.
excusing 43:21.
executive 94:8.
Exhibit 13:9, 13:16,
 17:5, 18:3, 18:5,
 21:20, 22:16, 23:6,
 25:17, 25:23,
 28:19, 29:12, 30:3,
 30:19, 32:4, 49:22,
 74:22, 74:24, 76:8,
 76:12, 76:20,
 89:10, 90:4.
expect 58:3, 82:18.
expected 71:4.
expecting 38:11.
expenditure-only
 88:10, 88:17.
expenditures 88:19,
 90:1.
expensive 57:25.
experience 47:8.
explain 53:21.
explained 12:22.
explicit 34:13.
Express 22:22, 22:24,
 23:1.
extension 36:21.
extent 9:21.
extort 78:13.
extorted 78:18,
 79:2.
.
.
.
< F >.
F. 1:31.
fact 32:14, 32:22,
 72:5, 84:17.
facts 14:18.

factual 31:3, 32:17,
  95:17.
factually 95:23.
failed 31:7, 75:6.
fair 33:23, 58:20,
  59:18.
faith 33:23, 34:18,
  75:22, 76:1,
  76:2.
falsely 79:10.
familiar 26:8, 45:21,
  46:8, 88:10.
familiarize 6:4.
family 79:1.
fan 40:14.
Fargo 50:25.
fatherhood 67:11.
fatherlessness
  66:23.
FBI 25:12, 25:13,
  26:11, 29:20,
  54:13, 80:8,
  80:15.
FCRR 2:11, 97:23.
February 30:14,
  32:22.
FECA 9:22.
Federal 6:5, 86:13,
  86:21, 86:22,
  86:25, 88:20.
feeding 67:9.
feel 4:23, 78:18.
felt 72:18, 77:23,
  78:21, 79:7.
few 22:21, 32:21,
  54:8, 72:25.
figure 37:22, 38:5,
  95:4.
file 87:22, 87:25,
  88:21, 89:5, 89:8,
  90:20.
filed 87:13.
filing 89:1, 89:7,
  96:16.
filings 87:18.
fill 12:10, 12:13.
film 52:17.
finance 9:23, 86:22,
  86:25, 87:16,
  91:22.

financial 47:9,
  47:14, 47:25, 74:1,
  87:12, 87:17,
  88:21, 89:20,
  90:21.
find 58:3, 70:10.
Fine 9:14, 33:15.
finish 16:11, 44:16,
  66:1, 85:18.
finished 50:11.
Firm 1:41, 46:12,
  46:14.
First 4:14, 13:10,
  16:1, 31:6, 32:9,
  34:3, 44:8, 46:16,
  47:7, 47:12, 48:7,
  54:12, 57:7, 65:19,
  68:14, 68:23,
  70:25, 75:24,
  77:12, 77:14, 78:2,
  78:12, 80:8, 85:10,
  91:20, 92:5.
Fisher 13:23,
  13:25.
Five 18:24.
Florida 45:20, 67:19,
  67:20.
flush 59:21.
focus 37:21.
focused 96:10.
focusing 67:8.
folks 9:22.
follow 5:3, 7:1.
followed 5:6, 6:7,
  26:1.
Following 10:20,
  25:12, 28:14,
  41:16, 54:19,
  83:23, 94:3.
follows 16:2, 44:9,
  65:20, 85:11.
Football 67:24,
  70:1.
foregoing 97:24.
foremost 91:20.
forget 67:25.
forgot 65:9, 74:19.
Form 7:4, 7:14,
  12:10, 12:13,
  12:16, 56:21,

56:22, 89:15, 90:4,
  90:5, 90:7, 90:8,
  90:13, 90:19.
forth 65:23.
forward 93:18.
Foundation 67:7.
founding 57:13.
frame 47:8, 68:18.
Frank 69:23, 70:3,
  80:3, 80:5, 80:6,
  80:9, 80:19, 80:24,
  81:10.
frankly 39:17, 62:25,
  63:5, 63:7, 83:15,
  83:16, 97:15.
Fred 69:23, 70:4,
  80:3.
frequencies 89:1.
Friday 93:16.
friend 19:18, 42:23,
  43:1, 43:4, 58:23,
  74:8, 75:24, 84:14,
  84:17.
friends 19:22, 20:9,
  42:16, 42:18, 57:1,
  58:22, 68:24, 69:4,
  69:6, 69:7.
friendship 15:4,
  34:18, 35:22,
  42:19, 43:5, 47:1,
  47:4.
front 4:14, 4:15,
  13:17, 20:12.
fruition 47:21.
Fugees 57:13.
full 45:5.
fully 81:13.
fund 6:16.
fundraiser 59:20,
  59:24, 69:11.
fundraisers 6:2.
fundraising 48:12,
  48:17, 52:9, 52:12,
  70:14, 70:16,
  77:16, 81:7, 87:24,
  88:3, 88:4, 88:6.
funds 24:7, 74:12,
  81:3.
funny 72:18.
furtherance 37:10.

.
.
< G >.
gave 5:11, 5:12,
   8:18, 12:16, 31:20,
   34:4, 35:22, 39:13,
   48:21, 49:7, 62:8,
   75:22.
Generally 20:15,
   39:21, 46:20, 47:3,
   86:24, 88:15,
   89:18, 89:22,
   90:10, 92:10.
generate 89:6.
gentleman 51:6,
   69:16, 96:23.
gets 40:19, 63:7,
   64:12.
getting 37:1, 40:2,
   40:18, 41:7, 53:13,
   62:23, 63:7, 69:20,
   70:4, 72:20, 77:15,
   80:2, 83:8, 83:10,
   97:6.
Giants 68:2.
Gilbert 68:25.
give 5:16, 8:20,
   33:22, 49:24,
   95:3.
given 4:17, 28:4,
   28:8, 34:13, 38:18,
   64:23, 72:24.
giving 8:14, 8:19,
   39:9, 51:21.
globe 67:19.
God 75:21, 75:22,
   79:24.
govern 6:5.
grand 4:15, 28:22,
   48:16, 49:15,
   49:18, 51:12, 54:2,
   54:5, 54:7, 54:11,
   54:16, 54:19, 55:2,
   55:17, 55:24,
   60:21, 71:7,
   71:8.
grass 69:18, 70:8.
great 59:25.
Greene 48:4.
ground 68:23.

grounds 25:25.
guess 49:11, 71:23.
guest 78:3.
guy 46:23, 69:23,
   70:8, 71:6.
.
.
< H >.
H-a-r-t-s-o-c-k
   86:10.
Haiti 11:22, 12:2,
   35:15, 37:4, 37:8,
   37:12, 37:14,
   37:24, 38:7, 39:3,
   40:14, 40:15, 67:9,
   68:17, 68:21, 74:6,
   84:3, 84:7.
Haitian 14:24, 15:1,
   15:2, 15:5,
   37:13.
Haitians 15:6.
hand 15:24, 44:6,
   65:17, 85:8.
handle 88:7.
handled 5:18.
happened 5:17,
   20:19.
Happy 54:25, 64:24,
   67:4.
Hartsock 85:5, 85:9,
   86:6, 86:10, 86:12,
   89:14, 90:4.
Haskell 2:5, 2:7.
header 76:9.
headquarters 86:16.
hear 5:4, 16:8,
   16:15, 16:18,
   18:13, 27:11,
   32:12, 44:15,
   44:18, 44:22,
   64:19, 65:2, 65:24,
   66:3, 67:1, 81:22,
   85:16, 85:22,
   85:25, 93:12,
   94:15.
heard 7:18, 25:8,
   35:21, 60:20,
   66:6.
hearing 10:14.
Hearsay 9:20, 53:1,

55:20, 80:12,
   81:19, 81:23, 82:9,
   82:23.
heart 79:6.
heightened 97:9.
Hello 77:12, 82:5.
help 12:1, 40:15,
   49:17, 50:18,
   52:11.
helping 70:6.
helps 50:12.
hereby 97:23.
Higginbotham 37:18,
   37:20.
highlight 22:2, 30:5,
   32:8, 75:2.
him. 77:24, 78:6.
Hippolyte 68:25,
   69:2.
hit 78:25.
Hold 13:13, 36:13,
   81:21.
holiday 93:15.
home 14:2, 48:4,
   64:25, 94:5.
homeless 56:12,
   56:14, 56:15,
   56:21.
honest 60:22, 60:25,
   61:2, 61:3,
   74:20.
Hong 35:1, 35:3.
HONORABLE 1:18.
hope 78:14.
hopes 25:2.
hoping 38:11,
   39:10.
host 13:7.
hour 46:24.
House 46:19, 52:18,
   53:21, 53:25,
   54:13, 55:12, 57:8,
   57:9, 57:25.
hundred 72:25,
   79:12.
hurting 93:21.
husband 18:22, 20:21,
   20:25, 21:16,
   22:19, 24:18.
.

.
< I >.
idea 14:11, 38:18.
identification 49:22,
  68:6, 68:12,
  76:12.
identified 19:13,
  28:9, 46:6.
identify 19:7, 46:2,
  68:8, 91:9.
ignore 94:13.
ill 61:6.
illegal 73:5,
  75:18.
immediately 77:22.
immediately. 75:9.
immunity 4:17, 4:21,
  4:24, 5:7, 5:11,
  5:12, 5:16,
  17:12.
important 91:16,
  91:19, 91:23, 92:3,
  92:8, 92:10, 92:13,
  92:19, 92:25.
importantly 66:5.
impression 53:5,
  53:6, 54:1.
in. 44:5.
inaccurate 93:4.
include 87:14.
included 39:21,
  77:25.
inconsistent 80:12.
incorrect 7:19,
  95:23.
incredible 48:4.
independent 7:6,
  86:20, 88:10,
  88:17, 88:19.
Indiana 2:8.
indicate 7:3, 7:11,
  28:1, 39:1, 41:24,
  50:5.
indicated 5:19, 8:15,
  64:11, 84:13,
  97:8.
indicates 22:5, 27:7,
  27:22, 95:23.
individual 18:18,
  19:2, 45:21, 70:3,

71:24, 90:14,
  90:16.
individuals 67:13,
  90:15.
industry 47:20.
influence 9:16,
  14:14, 14:18,
  14:21.
information 7:15,
  31:3, 42:2, 51:16,
  70:4, 72:2, 73:9,
  73:11, 87:14,
  89:22, 89:24,
  90:11, 90:18,
  91:16, 91:23,
  91:25, 92:6, 92:9,
  92:12, 92:14,
  92:19, 92:23,
  93:2.
infrastructure
  37:13.
initially 55:14.
inquiry 12:20, 25:12,
  25:13.
inside 51:1.
instant 43:19.
instead 27:20,
  80:19.
instruction 97:14.
instructions 51:9.
intake 88:7.
Integrity 1:34.
intend 40:23,
  64:16.
intent 8:7, 39:8.
interacting 68:21.
interest 33:8.
interested 40:13,
  69:19, 91:22.
interpreting 27:20.
intervening 64:25.
interviewed 80:8.
introduced 15:5,
  19:17, 68:9,
  68:14.
invest 35:15, 38:7,
  39:2.
investigation 9:7,
  26:18, 26:19,
  28:23, 29:21,

49:14.
investment 18:12,
  18:14, 35:13,
  37:11, 37:12,
  38:22, 59:14.
investments 37:24,
  59:13.
invitation 7:5, 12:7,
  13:18.
invite 70:18.
invited 11:7, 11:20,
  13:4, 25:3.
involved 10:4, 52:9,
  69:17, 71:25,
  77:16, 79:4, 80:22,
  97:4.
irrelevant 9:24,
  39:15, 62:25.
Island 13:23,
  13:25.
Israely 1:40.
issue 8:7, 8:18,
  27:18, 36:24,
  39:20, 41:9, 60:13,
  60:24, 63:9, 64:14,
  66:23, 96:6.
issues 14:15, 53:16,
  53:17, 82:22.
itemize 90:14,
  90:17.
Itemized 90:5,
  90:11.
.
.
< J >.
J-a-c-k 66:19.
Jack 65:11, 65:18,
  66:19, 67:6,
  67:7.
jackets 96:24.
jails 66:24.
Jesus 65:21.
Jewish 93:15.
John D. Keller
  1:25.
Johnson 18:5, 18:9,
  21:19, 22:1, 22:4,
  22:13, 23:5, 23:16,
  24:5, 29:25, 30:4,
  30:18, 30:24, 32:9,

50:17, 74:21, 75:2,
76:6, 76:10, 77:2,
77:11, 78:9,
78:11.
join 88:5.
joint 23:13, 23:14,
87:24, 88:2, 88:4,
88:5, 88:7.
Joseph 18:18.
Jr 80:25.
JUDGE 1:19.
judges 94:9.
jumping 36:8.
JURORS 65:8, 96:24.
Justice 1:26, 1:33.
juveniles 67:12,
67:14.
.
.
< K >.
K-r-o-m-k-a 17:3.
Keep 63:8, 63:23,
64:10, 86:11.
keeping 63:22, 64:13,
70:2.
Keller 68:5, 68:14,
71:23, 74:21,
74:23, 75:2, 75:4,
76:6, 76:11, 77:11,
77:13, 78:9, 78:12,
82:6.
Kenner 1:41, 4:8,
6:24, 9:13, 10:18,
10:21, 13:9, 15:15,
27:18, 36:20, 39:5,
39:16, 61:25,
62:11, 62:19,
63:14, 63:23, 65:2,
80:14, 84:23,
93:15, 95:19.
kids 67:13.
kind 19:25, 36:6,
37:3, 43:8, 66:20,
69:18, 70:8, 71:14,
74:4, 89:18.
kinds 6:18.
knee 93:21.
knowing 7:12.
knowingly 63:5.
knowledge 7:6, 8:7,

9:22, 10:1, 53:2,
59:17, 59:19.
known 7:17, 86:14,
88:10.
knows 29:3, 78:6.
Kong 35:1, 35:3.
Kromka 15:20, 15:25,
16:25, 17:3, 17:11,
18:11, 21:21,
25:17, 26:17,
26:18, 28:16, 30:6,
31:6, 33:14, 36:18,
39:7, 39:9, 39:10,
39:14, 39:18,
39:22, 40:2, 40:8,
40:10, 63:14,
64:21, 95:4,
96:10.
.
.
< L >.
lack 10:1.
Last 10:14, 29:18,
32:8, 33:17, 53:11,
54:21, 66:19, 69:5,
78:10.
Late 19:20, 29:22.
later 32:5, 70:25,
81:18, 97:14.
latter 92:2.
Law 1:41, 2:6.
laws 86:23, 86:25,
87:16, 90:22.
lawyer 4:19, 14:6,
72:20, 72:21.
leader 83:8.
League 67:24.
learn 57:12, 57:14.
learned 6:17.
least 7:17, 41:25.
leave 37:20, 39:1,
39:2, 43:23.
leaves 61:20.
leaving 90:1.
left 62:18, 65:14,
90:5, 94:18.
legal 7:13, 53:16.
letter 14:5, 30:20,
30:21, 31:23, 32:4,
32:6, 32:15, 32:21,

74:18, 74:25,
75:20, 75:22, 76:4,
76:14, 78:19, 79:9,
79:10.
letters 33:1.
letting 63:25,
64:9.
liaisons 97:6.
lie 17:20.
lied 55:2.
life 57:2, 60:11,
75:22, 78:24.
Likely 16:15, 29:24,
44:19, 81:9,
85:23.
limit 92:21.
limited 36:18,
93:19.
Lincoln 52:17.
line 12:20, 30:5,
30:11, 31:6, 77:20,
78:2, 83:21, 95:25,
96:1, 96:24.
lines 22:21, 32:17,
49:24, 50:2,
50:13.
listen 48:20.
little 45:8, 46:18,
67:2, 67:25, 80:1,
86:11, 89:11.
live 18:15, 34:22,
34:23, 34:25,
67:17.
lived 34:20, 35:1.
lives 57:1.
living 18:17, 22:25,
35:2, 48:3, 56:13,
56:14, 56:17,
56:18, 60:10.
loan 14:20, 31:8,
34:5, 72:10, 74:11,
75:6, 76:17, 79:9,
79:11, 79:12,
79:14, 81:17.
loaned 31:7, 75:3,
75:5.
locally 67:11, 67:16,
67:18.
located 86:16.
location 13:25.

locked 67:13.
LOCKHART 1:32, 17:6,
  18:4, 18:6, 18:9,
  18:11, 18:15,
  21:19, 21:21, 22:1,
  22:5, 22:13, 22:17,
  23:5, 23:8, 23:16,
  23:19, 24:5, 24:7,
  26:6, 26:22, 27:10,
  29:25, 30:2, 30:4,
  30:6, 30:17, 30:20,
  30:23, 32:8.
logistics 65:4,
  95:4.
Long 18:23, 34:21,
  35:2, 71:20, 73:2,
  87:5.
longer 42:22, 42:23,
  43:1.
look 18:4, 30:17,
  30:23, 39:3, 42:2,
  50:4, 50:11, 62:21,
  63:9, 74:14, 90:23,
  91:4, 93:3, 95:13,
  96:5, 96:9.
looked 48:6, 95:14,
  96:13.
looking 29:15, 30:11,
  39:17, 41:5, 54:13,
  90:4, 92:5.
looks 23:13.
Los 18:17.
losing 93:14.
lost 71:11.
lot 52:14, 71:15,
  79:4, 93:14.
loud 16:7, 44:14,
  85:16.
louder 5:4.
love 61:8, 84:18.
Low 7:17.
lower 93:21.
Lynch 45:18.
.
.
< M >.
ma'am 44:24, 66:11,
  71:19, 85:17,
  86:2.
major 84:2.

majority 89:5.
Malawi 67:10.
Man 40:13, 68:25,
  70:1, 71:10, 72:17,
  75:21, 75:23, 76:2,
  78:20, 78:23,
  79:8.
manage 57:16, 58:10,
  58:13.
management 46:12,
  46:14.
manager 47:18,
  58:20.
managing 58:16.
Marc 13:7.
March 29:22.
marked 49:21,
  76:12.
married 18:23.
Marshal 96:22.
Marshals 97:5.
mask 16:8, 44:14,
  61:24, 65:24.
material 31:3, 55:24,
  75:6.
matter 32:15, 54:3,
  63:1, 82:11, 82:14,
  92:13, 97:25.
matters 39:8.
max 71:1.
maxed 21:5, 21:12.
maximum 71:3.
mean 7:1, 14:16,
  28:9, 28:19, 29:4,
  42:10, 48:3, 52:3,
  56:12, 58:14, 62:6,
  67:18, 72:24, 74:5,
  78:20, 79:4, 93:18,
  97:15.
means 6:11.
meantime 94:20.
media 94:13.
medical 67:9.
meet 19:16, 68:20,
  69:20, 70:21.
meeting 46:20,
  94:9.
member 57:13.
Members 94:4.
memory 50:12.

mention 52:16.
mentioned 11:19,
  20:25, 21:5, 23:14,
  23:20, 32:1,
  63:19.
mentioning 63:8.
Merrill 45:18.
mess 79:5.
message 25:18, 25:20,
  29:18, 29:23.
messages 26:8, 26:9,
  26:14, 28:3, 28:17,
  28:25, 29:7,
  29:13.
messaging 29:15.
met 46:16, 46:17,
  47:7, 47:12, 47:23,
  48:7, 57:7, 68:16,
  78:20, 92:21.
Miami 13:4, 13:6,
  45:20, 50:25,
  52:14, 58:25, 59:5,
  71:2, 81:7.
Michael 85:5, 85:9,
  86:10.
Micky 11:21, 11:23.
microphone 16:7,
  32:13, 44:13,
  65:24, 85:16.
mid 32:22.
Middle 16:17, 38:13,
  44:21, 50:14, 66:8,
  85:24.
mind 8:8, 83:13.
mine 43:4.
minimal 38:2.
minimum 71:6.
Minnesota 68:2.
minute 4:4.
minutes 94:5.
missed 27:7, 27:23,
  29:9, 29:10.
missing 27:7.
mistake 75:24.
mix 9:20.
Moise 8:19.
moment 41:20, 45:14,
  46:15, 50:4, 52:8,
  90:8.
moments 54:2.

monthly 89:2, 94:8.
Morgan 45:17.
morning 78:24, 93:9,
 95:3, 96:22.
morphed 78:4.
motivation 39:7,
 39:18, 39:22, 40:2,
 40:7, 40:10, 40:12,
 40:16, 40:18,
 40:19, 62:23, 63:1,
 63:19, 63:20,
 63:21, 64:10,
 64:15.
motivations 39:17,
 41:6, 62:22,
 63:5.
motive 39:21, 40:15,
 64:6.
Move 16:6, 17:23,
 25:22, 26:13,
 26:22, 56:2, 65:23,
 76:19, 85:15.
moved 23:21.
moves 44:12.
movie 11:24, 12:1,
 52:17, 52:23,
 52:25, 53:25.
moving 31:4.
MR. KELLER 45:2,
 65:11, 66:14,
 67:16, 68:9, 68:13,
 76:19, 76:25, 77:5,
 77:8, 79:18, 80:11,
 81:19, 81:23, 82:7,
 84:8, 84:21, 95:16,
 95:24, 96:3, 96:14,
 96:17.
MS. LOCKHART 15:19,
 16:24, 17:9, 17:11,
 17:23, 19:15,
 19:16, 25:22, 26:3,
 26:13, 26:16,
 26:24, 27:15,
 27:17, 28:2, 28:16,
 29:6, 31:5, 31:6,
 32:18, 32:21,
 33:10, 35:16,
 36:17, 39:7, 43:10,
 43:15, 63:13,
 64:23, 65:5.

MULRYNE 1:31, 44:25,
 49:21, 50:3, 50:16,
 50:18, 52:5, 62:9,
 89:11, 89:14.
multiple 80:15.
mutual 19:17,
 42:14.
myself 51:14.
.
.
< N >.
name 12:17, 17:2,
 18:18, 19:2, 28:17,
 45:5, 46:12, 65:9,
 65:21, 66:17,
 66:19, 67:6, 69:23,
 80:5, 80:7, 86:8.
named 45:21, 68:25.
National 67:24.
naturally 42:8.
nature 11:13, 12:10,
 19:21, 20:7, 28:4,
 47:4.
NBA 46:13.
necessarily 97:8.
necessary 57:24.
need 16:6, 16:20,
 17:6, 19:14, 40:3,
 43:17, 44:13, 49:9,
 53:12, 59:25, 60:6,
 60:8, 65:2, 65:23,
 68:11, 94:7, 94:9,
 94:14, 95:8.
needed 4:24, 43:18,
 49:5, 95:5.
needing 60:14.
needs 50:9.
negotiated 4:21.
nervous 46:18.
New 1:27, 1:35, 13:5,
 42:3, 46:19, 46:21,
 55:12, 57:8, 68:2,
 68:16.
next 15:18, 42:1,
 44:2, 57:3, 61:16,
 65:10, 78:2, 85:3,
 93:17.
NFL 67:23, 68:1,
 70:9, 71:6.
nice 60:11, 96:1,

 96:23.
Nicole 1:32.
No. 1:5, 18:5, 21:10,
 22:12, 29:4, 42:12,
 54:1, 60:2,
 93:24.
none 25:6, 41:5.
nonprofit 66:21,
 67:6, 68:22, 74:5,
 78:21.
note 77:21.
notes 22:17, 57:21.
Nothing 15:10, 27:6,
 27:22, 33:10,
 33:21, 39:24,
 43:13, 43:15, 61:9,
 64:19, 84:19.
notice 47:24.
noticed 97:17.
noting 22:22.
nowhere 64:4.
number 12:17, 29:9,
 29:24, 41:7,
 68:24.
numbers 27:23.
NW 1:27, 1:35, 2:8,
 2:15.
.
.
< O >.
Obama 6:16, 8:20,
 12:15, 12:24,
 20:17, 20:22, 21:6,
 24:11, 24:24,
 31:16, 33:22,
 38:12, 38:23, 39:4,
 40:18, 48:17,
 48:18, 52:12,
 59:20, 69:11,
 69:17, 70:7, 70:9,
 70:10, 70:15,
 70:21, 77:17,
 77:22, 81:11.
object 16:16, 25:25,
 31:1, 44:20,
 93:11.
objecting 66:6.
objections 25:24.
obligation 34:14,
 75:7, 75:14.

observation 59:16,
  59:24.
observations 47:8.
observed 47:15,
  56:4.
Obviously 56:22,
  69:19, 73:20,
  80:15.
occasion 59:12.
occasions 5:22.
offer 40:4, 40:6,
  40:22, 63:15, 64:1,
  64:3, 71:16.
offered 82:9.
offering 82:10.
office 6:17, 7:6,
  88:20.
Offices 2:6.
Official 2:12, 82:20,
  83:3, 97:28.
often 88:13, 88:24.
Oftentimes 67:25.
Once 31:17, 91:2.
one 9:14, 10:4, 13:1,
  14:1, 20:13, 26:3,
  27:14, 34:3, 42:1,
  46:7, 47:10, 48:21,
  51:13, 53:23,
  58:15, 58:18, 61:1,
  61:19, 61:23,
  61:25, 62:20,
  68:22, 68:25,
  70:14, 73:10, 81:6,
  88:4, 94:17,
  97:11.
online 23:1.
open 10:20, 28:14,
  41:16, 83:23,
  94:3.
opening 37:17.
opinion 56:21,
  56:22.
opinions 62:21.
opportunity 48:21,
  52:17, 53:25,
  58:23, 95:3.
oppose 88:19.
opposed 6:13, 8:13,
  83:19.
order 41:25, 91:9,

  91:25.
orders 84:12.
organization 79:1.
original 15:4.
originally 84:1.
Oriol 69:3.
orphan 67:8.
others 10:4, 10:10,
  39:17, 63:2,
  84:6.
out-of-court 82:8.
Outside 35:16,
  36:21.
oversight 87:1.
owe 75:12, 78:6.
own 9:7, 9:15, 21:9,
  42:2, 54:1.
.
.
< P >.
p.m. 1:12.
PAC 88:16, 88:17.
Pacs 88:13, 88:21.
Page 18:4, 21:20,
  22:1, 23:17, 29:12,
  49:24, 50:1, 50:13,
  50:14, 95:25.
paragraph 30:24,
  32:9, 75:3, 75:4,
  77:14, 78:2,
  78:10.
paragraphs 77:12.
parent 54:13.
part 5:7, 40:15,
  41:24, 52:25,
  53:11, 58:21,
  81:12, 95:13.
particular 53:25,
  91:9, 91:10,
  93:17.
particularly 8:17,
  84:11.
Parties 96:18,
  97:21.
partner 34:10.
party 13:3, 15:8.
pass 34:11.
passionate 48:19.
path 83:6, 83:11.
Patterson 76:25.

pauper 58:6.
paupers 58:3.
pay 62:25, 71:13,
  72:9, 75:8,
  81:17.
people 8:13, 52:15,
  63:3, 68:24, 68:25,
  70:7, 70:10, 70:11,
  77:15, 79:4, 79:6,
  84:6, 96:25,
  97:5.
percent 79:12.
perform 92:1.
perhaps 87:3.
period 21:13, 21:24,
  22:11, 32:23,
  42:19, 59:13,
  81:3.
Periodically 25:9.
person 20:12, 48:5,
  48:6.
personal 35:22, 36:6,
  36:16, 51:3,
  53:5.
perspective 7:9,
  92:18.
Philadelphia 68:2.
phone 27:3, 27:10,
  27:13, 56:4, 56:5,
  56:10, 71:20,
  78:14, 79:3.
photo 40:18.
photograph 38:12,
  38:20.
phrased 53:9,
  53:12.
pick 27:3, 27:14,
  61:17.
picture 25:4.
piece 10:14, 83:9.
place 13:21, 56:4,
  56:10, 58:7.
places 70:12.
Plaintiff 1:7.
platform 29:15.
play 70:1.
played 67:24, 71:6.
Players 70:9.
Please 4:6, 15:24,
  16:4, 16:18, 19:14,

23:17, 24:6, 44:4,
44:11, 44:21, 45:5,
50:5, 50:11, 53:23,
61:22, 65:17, 66:8,
85:8, 85:13, 85:25,
86:8, 89:13,
94:20.
plus 22:18.
point 4:7, 20:16,
25:10, 35:5, 36:5,
37:17, 37:25, 41:3,
41:5, 41:11, 41:13,
41:18, 41:23,
43:17, 47:18,
61:17, 81:10, 92:2,
94:10, 95:9.
political 24:25,
87:13, 87:18,
87:20, 88:5, 89:3,
89:19, 90:20, 91:9,
91:13.
Pollack 14:3.
portfolio 57:16,
58:20, 59:13,
59:18.
portion 31:8, 75:6,
90:13, 90:18.
portraying 60:13.
position 9:17, 39:1,
81:15, 87:7.
possibility 25:7.
possibly 48:11.
potential 87:16,
92:7, 93:3.
potentially 93:5.
pour 16:21.
poured 79:5.
Prakazrel 19:2,
45:21.
PRAKAZREL MICHEL
1:10.
Pras 19:3, 45:24,
46:17, 47:20,
51:19, 54:8, 57:7,
58:16, 58:22,
58:23, 59:2, 59:3,
61:8, 68:3, 77:15,
77:21, 78:5, 78:13,
78:20.
Pras. 77:20.

prayer 76:2.
preclude 40:1.
predicate 36:4.
prefer 95:25.
prepayment 23:2.
President 11:22,
12:2, 20:17, 25:4,
38:12, 38:23,
45:17, 48:17,
48:18, 52:12.
presidential 87:21.
Presumably 27:9,
39:5, 82:10.
presume 33:8.
pretty 52:14, 71:10,
93:19.
previously 21:20,
23:7, 30:3, 30:18,
32:3, 74:22, 74:24,
89:9, 90:3.
primarily 66:22.
primary 86:21.
Prior 31:23, 43:9,
54:5, 54:7, 54:10,
55:23, 59:24,
60:21, 67:22,
73:22, 74:1.
prisons 66:23,
67:12.
private 45:13,
57:25.
Probably 46:24, 81:5,
97:17.
Probative 12:21,
26:20, 27:25,
28:10, 37:1, 37:25,
38:1, 38:15, 38:16,
39:23, 41:6, 63:6,
63:21, 64:11,
82:16, 83:16.
problem 7:22, 27:13,
93:12.
proceed 41:2, 42:1.
proceedings 10:20,
28:14, 41:16,
83:23, 94:3, 97:22,
97:25.
proffer 5:15, 95:1.
programs 67:8, 67:9,
67:12, 67:20.

progressed 47:24.
prohibited 7:7.
promissory 77:21.
promote 88:19.
proof 40:4, 40:6,
40:22, 63:15, 64:1,
64:3.
proper 7:13, 9:7.
prosecuted 17:18,
17:20.
prospect 57:16.
provide 15:8, 17:17,
21:10, 28:22,
50:21, 72:2, 77:14,
91:21, 95:2.
provided 29:6, 34:10,
72:12, 73:4,
81:6.
providing 70:5.
Public 1:34, 90:22,
91:3, 91:5, 91:12,
91:21.
publish 17:24, 25:23,
26:14, 76:25.
published 77:3, 77:4,
77:5, 77:8, 77:9,
91:3, 91:24.
publishing 50:8.
pull 21:19, 49:21,
74:21, 76:6,
89:13.
purpose 7:2, 7:3,
24:23, 34:13,
35:20, 86:21,
87:11, 88:18,
92:4.
purposes 29:5,
76:12.
put 22:19, 35:23,
37:11, 51:19,
68:11, 69:16,
69:21.
.
.
< Q >.
quarterly 89:2.
questioned 71:15.
questioning 63:6.
questions 15:12,
31:2, 33:24, 34:1,

36:20, 40:5, 55:3,
79:18, 93:6.
.
.
< R >.
R. 2:5, 2:6.
Rae 1:32.
Raise 5:24, 15:24,
44:5, 65:17,
85:8.
raised 27:18,
64:14.
raising 6:6.
ran 5:20, 6:17,
7:6.
rather 96:9.
re-election 20:22,
21:6, 24:11,
24:24.
reached 20:20, 37:13,
38:7.
reaching 26:16.
reaction 75:20,
82:13, 82:15,
82:16, 82:18,
82:19, 82:25,
83:2.
Read 50:10, 78:7,
78:16, 94:15.
reading 49:25, 57:18,
57:20, 57:21,
57:22, 77:14,
80:13.
reads 75:5.
real 59:17.
really 33:21, 48:19,
71:15, 74:19,
97:2.
reason 38:16, 39:5,
63:18, 63:22,
63:23, 64:6, 64:10,
64:13, 65:4, 93:17,
93:20, 94:1.
reasons 41:4, 41:18,
91:20.
rebuild 37:12.
recall 12:14, 13:17,
30:12, 30:21, 31:1,
32:5, 32:11, 48:5,
48:16, 56:5, 56:8,

80:5.
recalled 51:13,
63:15, 64:24.
Receipts 89:15,
89:25, 90:6,
90:12.
receive 31:10, 31:15,
62:2, 62:5, 62:8,
73:10, 95:22.
received 7:15, 22:10,
72:16, 78:19, 79:9,
89:4, 90:14,
91:2.
receiving 30:12,
30:21, 31:1, 32:5,
51:7, 72:7, 75:20,
76:4, 90:25,
91:13.
recently 18:17.
recess 65:6.
recognize 17:11,
21:21, 23:8, 25:17,
30:6, 74:25,
76:13.
recognized 47:19.
recollection 14:2,
49:17, 50:19,
80:18, 80:24.
recommended 5:1.
record 9:24, 17:2,
19:11, 41:13,
41:19, 43:12, 46:4,
64:16, 66:18,
68:11, 97:24.
record. 6:23, 27:5,
35:19, 82:3,
93:13.
Red 95:25, 96:1.
Redirect 15:11,
43:14, 61:10,
84:20.
referred 70:11,
88:13.
Referring 13:16,
19:9, 55:20, 56:6,
58:5, 58:15, 58:18,
62:6, 89:19.
reflect 19:11,
46:4.
reflected 89:22,

90:11.
reflects 27:22.
refresh 50:18.
refreshing 50:6.
refund 12:23.
regard 12:10, 14:18,
33:18.
regarding 6:18,
72:12, 76:17,
89:24.
regardless 71:23.
regards 70:7,
77:15.
registered 88:5.
regulatory 86:20.
rehabilitated
67:15.
relate 32:15.
relation 37:24.
relationship 19:21,
20:5, 20:8, 35:22,
35:25, 36:3, 36:6,
36:7, 36:9, 36:15,
36:16, 36:19, 37:4,
38:2, 39:4, 47:4,
51:2, 74:2, 74:4.
relative 81:11.
released 64:20.
Relevance 6:12, 7:8,
8:7, 8:9, 12:3,
12:5, 12:18, 12:25,
25:25, 26:15, 37:1,
43:10, 62:4, 63:1,
84:8, 92:2.
relevant 8:22, 9:25,
26:4, 39:13, 39:19,
84:11.
relied 8:16, 9:21,
33:22, 34:17,
82:21, 83:4.
relief 67:9.
rely 5:2.
remained 42:16,
42:18.
remains 9:19.
remembers 82:1.
reopen 61:20.
repaid 31:21, 33:2,
33:4, 33:7.
repay 31:7, 75:6.

repayment 76:17,
   79:10.
rephrase 31:13.
Report 89:6, 89:15,
   89:23, 89:24, 91:2,
   92:20, 92:23.
Reported 2:11.
Reporter 2:12, 45:6,
   86:9, 97:28.
representatives
   12:16.
request 93:11.
requests 80:10,
   80:20.
require 17:14.
required 87:15,
   87:21, 87:24,
   88:21, 90:17,
   90:20, 90:22,
   92:6.
reside 45:19.
resolved 96:10.
respect 11:3, 14:14,
   70:14, 78:22, 79:7,
   82:13.
respond 56:15, 95:3,
   96:6, 96:16.
response 8:11, 20:23,
   28:22, 70:20,
   70:22, 71:12, 76:3,
   77:13, 77:25.
responsibilities
   92:11.
rest 39:15.
result 84:7.
returning 73:7,
   74:15.
revealing 78:13.
revenues 42:12.
review 59:12, 64:16,
   87:11, 87:13,
   92:4.
reviewed 95:16,
   95:18, 95:20.
reviewing 50:5,
   92:20, 93:4.
rework 53:13.
Richard 15:20, 15:25,
   17:3.
ring 83:8.

rip 78:5.
Road 51:1.
Ronquillo 18:19,
   20:25, 24:2, 24:8,
   24:10, 24:12,
   24:18.
roof 46:24.
rooftop 57:10.
Room 2:16.
roots 69:18, 70:8.
roughly 68:18,
   69:9.
RPR 2:11, 97:23.
rule 40:6.
ruled 64:4.
rules 6:5, 6:18,
   72:23.
ruling 64:18, 66:8,
   66:10.
run 67:6, 78:21.
.
.
< S >.
S-u-g-a-r-m-a-n
   45:7.
safety 97:5.
sake 20:11.
savings 22:18.
saw 14:8, 56:3, 57:6,
   60:11, 96:25.
saying 5:16, 16:8,
   27:11, 34:17,
   38:20, 40:21, 61:3,
   71:5.
says 9:13, 9:14,
   10:9, 23:19, 31:6,
   37:23, 38:6,
   90:5.
Schedule 90:5, 90:11,
   90:13.
scheme 77:15, 78:4.
scope 35:17, 36:22.
scrambling 78:14.
screen 13:17, 50:4,
   50:7, 50:10.
screening 52:17.
Sean 1:31.
searchable 91:8.
seated 16:4, 44:11,
   85:13.

second 6:22, 13:13,
   30:24, 75:3,
   94:17.
Section 1:34.
Security 12:17, 97:7,
   97:9.
seeing 13:17, 55:11,
   74:6, 91:22.
seemed 46:23.
seems 7:21, 9:25,
   28:10, 41:7, 57:17,
   82:24.
seen 33:1, 97:19.
self-employed
   45:13.
send 21:14, 37:12,
   40:3, 51:11, 51:17,
   73:10, 73:12,
   73:16, 76:3, 79:13,
   79:15, 96:4, 96:12,
   96:15.
sending 21:17, 73:15,
   79:15.
sense 8:12.
sent 26:9, 30:14,
   37:23, 72:17,
   72:18, 73:2, 75:17,
   76:14, 77:21,
   77:23.
sentence 78:12.
sentences 32:9.
separate 7:4, 7:13,
   24:2, 24:16,
   88:6.
serve 78:23, 78:24,
   87:8.
Service 97:5.
serving 68:22.
SESSION 1:13.
set 97:11.
several 74:18.
shadiness 78:3.
shadiness. 78:15.
shady 77:15, 77:23,
   79:16.
shared 48:14,
   54:10.
shocked 75:23,
   78:4.
short 73:2.

shortly 54:21.
shot 58:22.
show 11:20, 17:4,
   25:16, 26:25, 30:2,
   32:3, 38:24, 49:17,
   49:20, 50:10,
   59:14, 89:9,
   90:3.
showed 14:8, 90:8.
showing 14:6, 74:23,
   76:11.
shown 14:5, 26:6.
shows 26:16.
side 65:13.
signature 18:6.
signed 5:11.
significant 47:17.
similar 45:15.
sit 4:6, 5:14, 16:5,
   61:23, 65:22,
   85:14, 94:25.
sitting 20:12.
size 25:3.
skip 77:20.
slow 19:14.
small 86:20.
Social 12:17.
society 67:15.
software 89:7.
Soho 46:19, 55:12,
   57:7, 57:9,
   57:25.
solicit 47:20.
solicited 81:4.
somebody 11:15, 45:9,
   51:4, 51:10, 51:18,
   60:13, 73:20,
   78:25.
somehow 83:8.
someone 59:25,
   80:3.
Sometime 20:20,
   29:22, 37:19,
   68:19.
soon 72:18.
Sorry 5:3, 10:13,
   14:12, 18:14,
   20:11, 27:15,
   27:17, 31:13,
   33:25, 34:2, 42:21,

43:3, 46:18, 47:10,
52:4, 53:10, 53:23,
59:10, 59:11,
60:18, 62:5, 62:11,
65:9, 67:4, 69:5,
70:2, 77:7, 80:7,
84:25, 89:13.
sort 6:25, 9:20,
50:13, 63:8, 89:22,
90:10.
soul 79:6.
sound 8:17.
sounds 79:16.
source 81:24,
92:14.
speaking 32:12, 51:5,
54:7, 66:3, 71:21,
89:22, 90:10.
specific 24:23, 40:4,
70:14, 71:23.
specifically 48:25,
49:2, 52:13, 92:13,
97:19.
specifics 70:13,
72:11.
specify 71:17.
spell 17:2, 45:5,
66:17, 86:8.
spend 67:22.
spending 91:14.
spent 46:24, 62:2.
spoke 54:22, 61:1,
61:5, 73:20.
sponsor 71:13.
Sports 46:9, 46:12,
46:14, 47:19.
Springs 67:20.
staff 6:7, 6:10,
8:16.
stand 16:16, 44:20,
65:15, 66:5.
standpoint 91:24.
stands 85:23.
Stanley 45:18.
start 4:14, 16:13,
33:17, 44:17,
61:16, 63:16, 66:2,
66:5, 85:20,
93:9.
started 16:17, 44:20,

54:12, 66:7, 70:9,
71:1, 80:2,
85:24.
starting 75:3, 77:20,
78:12, 94:6.
state 8:8, 17:2,
45:5, 45:19, 66:17,
67:17, 81:2, 83:13,
86:8.
stated 41:18.
statement 21:22,
22:5, 23:10, 37:17,
82:8.
statements 17:21.
States 1:1, 1:5,
1:19, 2:13, 35:6,
67:20, 87:21.
status 47:9, 47:14.
statute 90:22.
stenographic 97:24.
Step 15:21, 15:22,
44:4, 44:5, 65:12,
65:13, 84:22, 85:6,
85:7.
stepped 51:5.
sticks 41:5.
Stipulate 19:9, 46:2,
68:7.
stipulation 68:5.
stop 16:18, 40:5,
44:22, 66:8, 66:9,
85:25, 94:7,
94:9.
stopped 25:10.
story 73:2.
straight-up 71:10.
straw 63:3.
stream 28:5.
Street 48:4, 51:1.
streets 56:13.
struck 46:22.
stuff 74:5, 93:17.
subject 11:10,
30:11.
submit 40:22, 87:18,
89:3.
submitted 88:24.
submitting 64:1,
89:20.
subpoena 28:22,

54:15.
subpoenaed 43:22.
sudden 38:3.
sue 75:25.
Sugarman 44:3, 44:7,
  45:3, 45:7, 45:11,
  46:7, 50:3, 50:18,
  53:19, 55:8.
Sugartime 46:9.
suggested 7:18.
Suite 1:28.
summer 20:20, 69:9.
super 48:18, 48:19,
  88:13, 88:15,
  88:17, 88:21.
superintelligent
  46:23.
support 70:10.
supporter 69:18.
supporting 87:20.
supposed 6:10, 7:2,
  7:25, 13:21, 13:22,
  79:14.
supposedly 7:5.
sustain 6:14, 41:17,
  42:12, 53:8, 62:10,
  83:24.
Sustained 10:24,
  11:17, 60:17,
  60:19.
swear 15:23, 44:5,
  65:15, 85:7.
Sweet 11:21, 11:22.
switch 17:6.
sworn 16:1, 44:8,
  65:19, 85:10.
system 67:14.
.
.
< T >.
T. 2:11, 97:28.
table 44:19, 85:23.
tables 16:16.
taken. 65:6.
talked 10:21, 37:4,
  69:10, 83:7.
tangentially 25:5.
taxes 71:7.
team 97:1.
teams 68:1.

telephone 27:23,
  27:24, 80:25.
tenor 33:9.
terms 6:25, 7:9,
  7:22, 8:14, 9:10,
  12:20, 27:19,
  36:14, 39:3, 39:4,
  39:19, 39:24,
  41:12, 42:3, 43:12,
  52:11, 53:13,
  62:22, 82:23, 83:7,
  83:18, 84:10,
  84:11, 93:18, 94:1,
  94:25, 95:1, 95:13,
  97:17.
Tested 75:22, 76:1.
testified 4:14, 9:21,
  16:2, 28:2, 34:20,
  39:11, 39:14, 44:9,
  47:13, 52:8, 54:2,
  54:16, 55:11, 58:9,
  65:20, 84:16,
  85:11.
testify 4:15, 5:7,
  38:10, 49:15.
testimony 4:17,
  17:17, 36:5, 36:9,
  36:18, 37:16,
  37:18, 54:5, 54:11,
  54:19, 60:21,
  62:24, 80:12,
  93:18, 94:21,
  95:6.
Texas 72:17.
text 20:15, 75:25,
  78:14.
THE CLERK 15:24,
  16:4, 44:11, 65:17,
  85:8, 85:13.
THE WITNESS 16:10,
  43:20, 43:23,
  59:11, 62:14,
  65:25, 66:11, 67:4,
  85:2, 85:17, 86:2,
  94:22.
themselves 92:1.
then-president
  69:11.
theory 7:24.
thereafter 47:1,

54:21.
thereof 10:2.
they've 97:19.
thinking 38:7,
  83:18.
though 49:3.
threatens 78:25,
  79:1.
threats 97:10.
Three 20:3, 42:11,
  68:1.
three-year 42:10.
throughout 42:18.
timeframe 36:24.
title 58:22, 87:7.
today 17:15, 17:18,
  33:14, 46:1, 49:19,
  79:23.
together 18:25,
  19:23, 37:12,
  47:17, 47:22, 49:8,
  88:5.
tomorrow 94:2, 94:6,
  94:7, 94:20,
  96:16.
tonight 40:22, 64:19,
  95:21, 96:15.
took 60:24, 73:12.
Top 76:9, 89:12.
total 49:12.
totally 35:24,
  62:25.
toward 83:9.
towards 31:4, 61:6.
track 39:24.
transaction 22:2,
  22:15, 22:18,
  22:19, 23:17,
  23:20, 23:23,
  72:11, 73:22.
TRANSCRIPT 1:17,
  49:18, 55:21,
  57:18, 57:20,
  97:24.
transfer 22:17,
  22:21, 24:7, 51:6,
  72:3, 72:5.
transferred 23:25.
transmitted 89:4.
transpired 46:20,

49:1, 49:4.
TRIAL 1:17.
tried 47:20.
trips 74:7.
trouble 10:14.
true 8:2, 91:17,
  92:14.
truth 5:10, 17:14,
  54:14, 54:15, 82:9,
  82:11, 82:13.
truthful 17:17.
truthfully 5:8.
try 75:25, 78:13,
  95:21.
trying 6:24, 10:1,
  35:14, 37:11,
  37:22, 37:23, 38:5,
  50:12, 58:19,
  67:14, 70:9, 78:5,
  78:15, 79:13,
  82:24.
Twenty-two 19:1.
two 5:22, 32:9,
  33:24, 34:1, 46:24,
  49:8, 51:13, 51:15,
  77:12, 89:1, 91:20,
  93:16.
type 49:6, 52:15,
  56:14, 70:10, 88:9,
  89:23.
types 87:3, 87:15,
  92:7.
typically 90:7.
typing 20:12.
.
.
< U >.
ultimate 39:25.
ultimately 50:21,
  89:7, 91:2.
understand 5:13,
  6:11, 7:16, 9:5,
  35:13, 40:20,
  40:21, 42:21,
  47:18, 51:20,
  52:20, 58:6, 63:11,
  63:14, 63:24, 71:3,
  71:15, 73:23,
  84:1.
understanding 9:22,

37:6, 53:19.
Understood 21:12,
  53:18, 65:5,
  84:13.
unexpected 78:3.
United 1:1, 1:5,
  1:19, 2:13,
  87:21.
unknown 14:21.
unlawful 83:13.
unless 12:4, 97:18.
unlimited 88:20.
until 43:24, 73:11,
  74:18.
upload 89:7.
upper 90:5.
using 92:24, 97:1.
.
.
< V >.
value 26:20, 27:25,
  28:10, 37:1, 37:25,
  38:1, 82:16,
  83:16.
various 41:4.
vast 89:5.
veering 83:15.
Ventura 1:42.
verify 81:14.
version 29:17.
vice 45:17.
victims 67:14.
view 10:9, 11:24,
  42:22, 63:12,
  91:5.
viewed 11:19.
viewing 11:19.
Vikings 68:2.
Vincent 18:18.
violation 64:18.
violations 87:3,
  87:16, 92:8.
Visas 35:11.
visit 78:3.
voice 16:7, 27:7,
  27:23, 28:4, 29:9,
  29:10, 44:14,
  46:18, 85:16,
  86:11.
vote 70:8.

vs 1:8.
.
.
< W >.
wait 64:22, 66:8,
  66:9, 94:17,
  96:9.
walk 62:11, 97:2.
wall 38:14.
wanted 11:3, 15:8,
  21:11, 24:21,
  31:11, 31:21, 38:6,
  38:17, 38:20,
  38:21, 39:2, 57:15,
  58:22, 58:23.
wanting 58:16.
wants 40:15, 64:7,
  65:3, 90:23,
  93:22.
Washington 1:10,
  1:29, 1:36, 2:9,
  2:17, 43:23, 48:12,
  48:22, 48:24,
  49:15, 51:22,
  51:24, 86:17.
water 16:21.
wearing 19:8.
website 89:8, 91:3,
  91:4, 91:6, 91:8.
Wechat 29:17.
week 63:17, 64:24,
  93:15, 93:17.
weeks 32:21.
weight 28:9.
well-being 47:25.
Wells 50:25.
wether 55:23.
whatever 14:19, 39:3,
  41:11, 77:16,
  96:16.
Whatsapp 29:17.
Whether 7:9, 7:12,
  8:18, 16:19, 24:12,
  28:3, 31:2, 34:11,
  37:1, 37:2, 37:3,
  39:2, 39:10, 43:18,
  44:23, 50:12,
  60:24, 63:2, 63:4,
  63:15, 65:3, 66:10,
  70:23, 82:7, 82:25,

83:7, 83:12, 86:1,
   91:16, 92:20.
White 52:18, 53:21,
   53:25, 80:5, 80:6,
   80:9, 80:19, 80:24,
   81:6, 81:10, 81:16,
   82:7, 82:20, 83:3,
   83:7, 83:12, 83:14,
   83:18.
whoever 73:21.
whole 12:20.
whom 51:16.
wife 49:8, 49:10,
   51:14, 69:2.
Will 4:4, 5:16,
   19:11, 19:15,
   36:11, 37:18, 46:4,
   61:6, 82:19, 88:7,
   89:6, 91:2, 95:7,
   96:17.
willfully 63:4.
willing 21:7, 21:8,
   60:14.
window 91:13.
wire 22:22, 73:10.
wired 22:24, 73:23.
wish 41:12.
withdraw 56:1.
Without 4:19, 4:25,
   9:15, 18:3, 72:20,
   76:24, 78:13, 79:3,
   91:12.
witnesses 8:8, 62:22,
   63:6.
word 16:15, 44:18,
   57:15, 66:6,
   85:22.
worded 53:9.
work 18:11, 35:14,
   45:15, 58:16,
   58:24, 66:20,
   66:21, 66:22,
   67:11, 67:18,
   67:22, 78:20, 84:5,
   86:13, 92:9, 92:11,
   92:25.
worked 71:16, 87:5.
working 66:23,
   67:13.
works 84:10.

world 66:22, 67:8.
write 24:1.
writing 40:22.
written 12:7.
wrote 63:10, 77:18.
.
.
< Y >.
year 90:17.
years 18:24, 19:1,
   20:3, 42:11, 47:3,
   58:15, 58:18,
   58:19, 74:18,
   87:6.
York 1:27, 1:35,
   13:5, 46:19, 46:21,
   55:12, 57:8, 68:2,
   68:16.
you. 75:3.
yourself 6:4, 16:6,
   17:12, 44:13,
   50:11.
yourselves 94:11.
.
.
< Z >.
zoom 89:11.