```
                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       ) CRIMINAL ACTION NO.:
                                ) 19-00148-1
          Plaintiff,            )
     vs.                        )
                                )
PRAKAZREL MICHEL,               ) Washington, D.C.
                                ) April 4th, 2023
          Defendant.            ) 2:04 p.m.
_____ ) AFTERNOON SESSION



               TRANSCRIPT OF JURY TRIAL - DAY 7
          BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                 UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE GOVERNMENT:        John D. Keller, Esquire
                           U.S. Department of Justice
                           1301 New York Avenue, NW
                           Suite 1016
                           Washington, D.C. 20530

                           Sean F. Mulryne, Esquire
                           Nicole Rae Lockhart, Esquire
                           U.S. Department of Justice
                           Public Integrity Section
                           1400 New York Avenue, NW
                           Washington, D.C. 20005


For the Defendant:         David E. Kenner, Esquire
                           Alon Israely, Esquire
                           Kenner Law Firm
                           16633 Ventura Boulevard
                           Encino, California 91436
```

```
 1   APPEARANCES (CONT'D):

 2

 3   FOR THE DEFENDANT:          Charles R. Haskell, Esquire
                                 Law Offices of Charles R.
 4                               Haskell, P.A.
                                 641 Indiana Avenue, NW
 5                               Washington, D.C. 20004

 6   Reported by:               Christine T. Asif, RPR, FCRR
                                Official Court Reporter
 7                              United States District Court
                                for the District of Columbia
 8                              333 Contitution Avenue, NW
                                Room 6507
 9                              Washington, D.C., 20001
                                (202) 354-3247
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2   Witness Name                                        Page

 3   Elliott B. Broidy

 4       Cross-examination By Mr. Kenner ........................... 4

 5       Redirect Examination By Mr. Mullryne .................... 70

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2              THE COURT:  All right.
 3              MR. KENNER:  Sorry, Your Honor.  I may need a
 4    moment.  Somehow my team has abandoned me, and I'm here by
 5    myself.
 6              THE COURT:  Dorothy's not here either, so we'll
 7    wait.
 8              While we're waiting for one last juror, and
 9    Dorothy's out there waiting for the person, is there anything
10    we need the talk about before we start?
11              MR. KENNER:  Not from the defense, Your Honor.
12              MR. MULRYNE:  Not from the government, Your Honor.
13              THE COURT:  Okay.  Good.  So we're just waiting for
14    one juror.
15              (Jury entered the courtroom.)
16              THE COURT:  All right.  Everybody can sit down.  Get
17    settled.
18              All right.  Good afternoon, everyone.
19              JURORS:  Good afternoon.
20              THE COURT:  All right.  We're ready to proceed.  We
21    have Mr. Broidy and cross-examination.
22              Mr. Kenner?
23              MR. KENNER:  Thank you, Your Honor.
24                            CROSS-EXAMINATION
25    BY MR. KENNER:
```

1    **Q.**  Good afternoon, Mr. Broidy.

2    **A.**  Good afternoon.

3    **Q.**  You worked with Nickie Lum Davis for several years at

4    least before you met Mr. Michel; is that true?

5    **A.**  We knew each other, we were friendly.

6    **Q.**  She was an acquaintance of yours.  You talked to her?

7    **A.**  Oh, yes.  Yes, that's correct.

8    **Q.**  You knew her, you knew who she was, what she did?

9    **A.**  Yes.

10   **Q.**  And did you know that she had a history of working in the

11   entertainment industry before she started working with you?

12   **A.**  Generally, yes.

13   **Q.**  Now, let me ask to take you back, if I might, to 2017.

14        What was your primary business in 2017?

15   **A.**  My primary business?

16   **Q.**  Yes, sir.

17   **A.**  Oh, managing my investments.

18   **Q.**  And was one of your primary businesses Circinus?

19   **A.**  Yes.

20   **Q.**  And in connection with Circinus, in May of 2017 --

21            THE COURT:  If you could spell that for the court

22   reporter.

23            MR. KENNER:  I'm sorry.  C-i-r-c-i-n-u-s.

24   **Q.**  (BY MR. KENNER)  Am I pronouncing that correctly,

25   Mr. Broidy?

1    **A.**  Yes.

2    **Q.**  Thank you.

3        Did you prepare for Malaysia a report on May 5th of 2017,

4    Circinus Capabilities and Proposal?

5    **A.**  Yes.

6    **Q.**  And that was in connection with your desire to have your

7    company Circinus do business in Malaysia with the government

8    of Malaysia; correct?

9    **A.**  Yes.

10   **Q.**  And if I might be able to see here.

11            MR. KENNER:  I'm going to, counsel, page 4 of

12   Exhibit 328.  I don't know --

13            THE COURT:  Is this exhibit yours or what?

14            MR. KENNER:  It's the government's exhibit, Your

15   Honor, but I'm not certain it's been admitted.  If it hasn't,

16   I'd ask that it be admitted.

17            THE COURT:  228 has not been --

18            MR. KENNER:  328, Your Honor.

19            THE COURT:  I'm sorry?

20            MR. KENNER:  328.  I'm sorry.

21            THE COURT:  328.  Okay.  Hold on.

22            THE CLERK:  No, it hasn't.

23            THE COURT:  That does not appear to be admitted.

24            MR. KENNER:  Okay.  I move for its admission, Your

25   Honor.

1          THE COURT:  Well, you want to show it to the
2    government so they know what they're talking about?
3          MR. KENNER:  It's their Exhibit 328.
4          THE COURT:  It doesn't matter, you still need to
5    take it -- hand it --
6          MR. MULRYNE:  Your Honor, it's published.  If we
7    could take it down, please.
8          THE COURT:  Yes.
9          MR. MULRYNE:  Government objects on relevance.
10          THE COURT:  Well, looking at just what's up here,
11    I'm not sure what it is.  Perhaps a few more questions so that
12    we can figure out -- I can figure out what the purpose of this
13    is.
14          MR. KENNER:  Certainly, Your Honor.
15    **Q.**  (BY MR. KENNER)  Circinus was a company that you made
16    money from; isn't that true?
17    **A.**  Yes.
18    **Q.**  And you've described events with Malaysia and prime
19    minister in Malaysia.
20          Wasn't it, in fact, in part your desire to make money
21    with your company Circinus by selling its services to
22    Malaysia?
23    **A.**  Yes.
24    **Q.**  All right.  And would it be -- I'm going to read you
25    something and ask you whether or not this is a fair statement

Cross-examination - Broidy

```
1    about a summary of Circinus as it pertains to business in
2    Malaysia.
3                  MR. KENNER:  Counsel, if you want, it's from
4    page 4.
5                  THE COURT:  Okay.  He's --
6                  MR. MULRYNE:  Objection, Your Honor, this isn't in
7    evidence.
8                  MR. KENNER:  I move --
9                  THE COURT:  It's not in evidence, and I'm not
10   sure what -- can we not talk all at the same time?  I'll let
11   you talk, but let me just ask a question.
12       What is the source of what you're reading?
13                  MR. KENNER:  I got it from the government, Your
14   Honor.
15                  THE COURT:  It doesn't matter.  You know, we have
16   over how many exhibits, 700 exhibits.  Where did you get it
17   from the government?  What's the source of it?
18                  MR. KENNER:  It is a document that --
19                  THE COURT:  So it's not the one you have up, it's
20   something else?
21                  MR. KENNER:  It is this document -- this is a multi,
22   multipage document.  I've put up page 1 just to remind the
23   witness of what I'm referring to.
24                  THE COURT:  All I'm asking, Mr. Kenner, is, is the
25   statement that you're reading from this particular exhibit or
```

Cross-examination - Broidy

1    something else?

2            MR. KENNER:  From this exhibit, Your Honor.

3            THE COURT:  Okay.  So you're reading something that

4    hasn't been admitted.  I mean, you can ask him whether, you

5    know, this is basically what the company does, if that's the

6    purpose, some kind of connection in terms of getting it

7    admitted.

8            MR. KENNER:  I'm sorry.

9    **Q.**  (BY MR. KENNER)  Sir, is the purpose of the company to

10   ingest high volumes of open source information, derive meaning

11   from it, and correlate it against other structured or

12   unstructured data sets, and to have access to reports based

13   upon open source information via the cloud that has previously

14   been impossible?

15       The Circinus --

16           MR. MULRYNE:  Objection, Your Honor.

17           MR. KENNER:  I'm asking him if --

18           MR. MULRYNE:  Relevance, and I don't know if that

19   was a question.  I think he's reading from the exhibit, Your

20   Honor.

21           THE COURT:  I just asked you to ask generally so

22   that we could get some idea of what the purpose of this

23   particular exhibit in order to get it admitted.  All right?

24   So reading statements from something that has not been

25   admitted is not going to work.

1          So either discuss, you know, what the company was or

2     whatever, and then you can get the exhibit admitted.

3               MR. KENNER:  Thank you.

4     **Q.**  (BY MR. KENNER)  Sir, what was the business of Circinus?

5     **A.**  Circinus provides intel analysts to the Department of

6     Defense and also has capabilities in open source intelligence,

7     which is, I'm sure, partly the purpose of this document,

8     although I haven't looked at it in years.

9          If you want to show me --

10    **Q.**  Absolutely.

11    **A.**  -- more specifically, I can look at it.

12    **Q.**  Absolutely.

13              MR. KENNER:  Your Honor, may I put up for the

14    witness page 4 of what has been marked for identification, but

15    not admitted, Exhibit 328?

16              THE COURT:  Go ahead.

17    **Q.**  (BY MR. KENNER)  Sir, do you recognize this to be a page

18    from the report prepared for submission to the Malaysian

19    government regarding Circinus services?

20    **A.**  I believe so.

21    **Q.**  And the paragraph on the bottom that says --

22              THE COURT:  It hasn't been admitted.

23    **Q.**  (BY MR. KENNER)  I'm sorry.

24         Do you summarize in this document the services that

25    Circinus offers?

1    **A.**  With respect to open source intelligence, yes.

2    **Q.**  Okay.  And is it also in terms of analyzing training for

3    local analysts and constantly develop and refining information

4    for the client?

5           THE COURT:  Without reading it from the document, it

6    hasn't been admitted, sir.

7           MR. KENNER:  No.

8           THE COURT:  So he's asking you, apart from that,

9    what the information is.

10   **A.**  I'm not sure.  Can you repeat it, so I can try to follow?

11   **Q.**  (BY MR. KENNER)  Are you telling me you don't remember

12   Circinus and what it did?

13   **A.**  No, I do.  I don't remember the sentence you just read.

14   **Q.**  Okay.  I'm not asking you to remember a sentence, sir.

15   I'm asking -- let me just ask you this.

16        Was page 4 a part of a report for a proposal to get the

17   government of Malaysia to hire your company Circinus?

18   **A.**  I believe so.

19   **Q.**  All right.  And did you describe in this report what the

20   benefit would be to the country of Malaysia by hiring

21   Circinus?

22   **A.**  Yes.

23   **Q.**  And what was that?

24          MR. MULRYNE:  Your Honor, objection.  We're using a

25   document that's not in evidence --

Cross-examination - Broidy

1          THE COURT:  All right.

2          MR. MULRYNE:  -- as the grounds for all these

3    questions.

4          THE COURT:  It would be helpful to ask some

5    additional questions, Mr. Kenner --

6          MR. KENNER:  Thank you.

7          THE COURT:  -- in terms of the --

8          MR. KENNER:  Thank you.

9          THE COURT:  -- probative value of this particular

10   proposal, and then we can consider getting the exhibit

11   admitted.

12         MR. KENNER:  Thank you.

13   **Q.**  (BY MR. KENNER)  Was this proposal done to solicit

14   business from the government of Malaysia?

15   **A.**  Yes.

16   **Q.**  And the fees for that business would have been very

17   profitable to you; would they not?

18   **A.**  Yes.

19   **Q.**  Am I correct in saying the amount due within ten years of

20   the agreement you were proposing would be slightly north of

21   $25 million?

22   **A.**  I don't recall, but sounds at least that.

23   **Q.**  Okay.  Now, Ms. Lum Davis approached you, I think you

24   said, sometime in early 2017 about meeting with Mr. Michel to

25   help Jho Low with some legal problems here in the U.S.; is

1    that correct?

2    **A.**  Yes.

3    **Q.**  All right.  And did you know who Mr. Michel was before

4    Ms. Davis told you about him?

5    **A.**  Only vaguely.  Only as a musician.

6    **Q.**  Okay.  Do you know why Ms. Lum Davis wanted you to meet

7    Mr. Michel?

8    **A.**  She said it was to -- for him to consider including me on

9    the team to assist Jho Low with his 1MDB forfeiture issue.

10   **Q.**  All right.  Mr. Broidy, in fact, were you told by

11   Ms. Davis that Mr. Michel was trying to assist Jho Low in

12   finding legal representation here in the United States, and

13   she wanted him to meet you in that regard?

14   **A.**  That's not what she told me.

15   **Q.**  Okay.  Tell me what she did tell you, then.

16   **A.**  She told me what I testified to earlier, that they were

17   trying to put a team together.  There could be lawyers on the

18   team, but, you know, certainly she knows I'm not a lawyer, and

19   we didn't discuss legal matters when we met.

20   **Q.**  Okay.  But your wife is a lawyer; correct?

21   **A.**  My wife is a lawyer, that is correct.

22   **Q.**  And did your -- did you discuss with your wife whether or

23   not engaged in the way that you were proposed to be engaged

24   would be a violation of FARA?

25   **A.**  At the very beginning, we talked about my wife

1    representing Jho Low or -- and then it morphed into her

2    representing Pras.  In both cases, there were some draft

3    engagement letters that never went anywhere.  And over time,

4    it became a situation that the only purpose of using Colfax

5    was Nickie wanting attorney-client privilege.

6    **Q.**  All right.  Wasn't it -- wasn't it your wife, Robin

7    Rosenzweig's idea to have this retainer done between her

8    Colfax law firm, if you will, and Jho Low?

9              MR. MULRYNE:  Objection, Your Honor.  Relevance.

10   **A.**  Well, the idea to include Robin --

11             THE COURT:  Sir, there's an objection.  Let me

12   finish.  No, I'll allow it.  Go ahead.

13   **A.**  So could I give you the history for a moment?

14   **Q.**  (BY MR. KENNER)  Certainly, if you'd like.

15   **A.**  Yeah.  So it was Nickie's idea to include and involve

16   Robin, and the two of them began speaking directly.  And then

17   Robin, being a lawyer, had to have an engagement letter with a

18   client.  Over time, it became evident that -- to her

19   frustration, that there was no engagement with the client, and

20   it morphed into this only consulting arrangement.

21       So although we thought that it would be -- Robin thought

22   and we thought maybe a legal exemption could apply over time,

23   we weren't really doing legal work.

24   **Q.**  Okay.  So your testimony -- is Nickie Lum a lawyer, by the

25   way, Nickie Lum Davis?

Cross-examination - Broidy

1  **A.**  Can you say that again?

2  **Q.**  Is Nickie Lum Davis a lawyer?

3  **A.**  No.

4  **Q.**  Do you know whether or not she has any legal training?

5  **A.**  No idea.

6  **Q.**  So your testimony is that Nickie Lum Davis came to your

7  wife, suggesting to your wife that it would be better if the

8  retainer agreement between Jho Low and you were done through

9  her law firm.

10      Is that your testimony?

11  **A.**  Not exactly.

12  **Q.**  Well, tell me where I'm wrong.

13  **A.**  Yeah.  She thought it was a good idea to have Robin --

14          THE COURT:  Sir, who is the "she"?

15          THE WITNESS:  Oh, so sorry.

16          THE COURT:  If you would indicate that --

17          THE WITNESS:  Robin Rosenzweig, my wife.

18          THE COURT:  Sir, you're talking at the same time.

19  They're not going to get it, and we don't get a record.

20      So I interrupted you only because I want to -- if you say

21  "she," and we have two women, it's hard to tell.  So start

22  your answer over and identify who the people are.

23          THE WITNESS:  Yes, Your Honor.

24  **A.**  Robin Rosenzweig is my wife.  My wife, Robin Rosenzweig,

25  at Nickie Lum Davis's suggestion, got involved initially, and

1    the two of them spoke about having her be a lawyer on this

2    engagement.  And she thought, Robin thought, and I think

3    Nickie may have believed the same, that the client would be

4    Jho Low, and that, therefore, some kind of a legal exemption

5    may or may not apply.  But at least for the time being, she

6    felt comfortable about it.

7    **Q.**  (BY MR. KENNER)  Are you telling me that she thought that

8    Jho Low might be the client; that is, your wife?

9    **A.**  That Jho Low might be the client?

10             MR. MULRYNE:  Objection, Your Honor.  We're starting

11   to get into speculation what other people thought.

12             THE COURT:  Well, we're now talking about the

13   thought, so if you can put it back into thinking, then you

14   have -- asking him what other people's thoughts are.  That's

15   not exactly his testimony.

16             MR. KENNER:  Okay.

17   **Q.**  (BY MR. KENNER)  Weren't you, in fact, aware that your

18   wife, Robin Rosenzweig, was very well aware that the name of

19   the client involved was Jho Low, from the beginning?

20   **A.**  That's what we thought from the beginning, only Jho Low

21   never retained her.

22   **Q.**  Okay.  Did your wife --

23   **A.**  And then my wife --

24   **Q.**  Excuse me?

25             THE COURT:  Go ahead and answer.

1          MR. KENNER:  I apologize, go ahead.

2    **A.**  Sorry, I didn't mean to talk over you.

3        Then Robin switched to Pras Michel being the client, and

4    she was talking to Nickie about this.  I was not entirely on

5    the -- in the loop on this matter, this part of it.  And then

6    ultimately neither were her client.

7    **Q.**  (BY MR. KENNER)  Did you ever hear Nickie Lum Davis

8    suggest that Mr. Michel become the client instead of Mr. Jho

9    Low?  Did you ever hear her say that?

10   **A.**  All I know is she prepared an engagement letter that --

11   and gave it to Nickie, and Nickie gave it -- Nickie said that

12   she provided it to Mr. Michel.

13   **Q.**  Okay.  So the first agreement that Ms. Rosenzweig prepared

14   was a retainer agreement for legal services with the client

15   specified to be Jho Low; is that correct?

16   **A.**  That's my recollection.

17   **Q.**  Well, do you want me to show it to you, or is that

18   correct?

19   **A.**  I believe it's correct, but I can't --

20          MR. MULRYNE:  Objection, Your Honor.  Argumentative.

21   Asked and answered.

22          MR. KENNER:  May I just have a moment?

23          THE WITNESS:  Yeah, show it to me.

24          MR. KENNER:  I'm sorry.

25   **A.**  If you want to show it to me, I can --

1    **Q.**  (BY MR. KENNER)  If you don't remember, I will show it to

2    you.  If you do remember, I don't have to show it to you.

3    **A.**  Yeah, please show it to me.

4    **Q.**  Thank you.

5              MR. KENNER:  May I just a moment to pull up the --

6    may I just have a moment, Your Honor?

7              Your Honor, it is Government's Exhibit 165.  I don't

8    believe it's been admitted yet, but I'm not certain.

9              THE COURT:  I don't believe it has been, at least

10   not my record, Dorothy?

11             MR. KENNER:  May I show it to the witness first,

12   Your Honor?

13             THE COURT:  Yes.  Why don't you put it up without

14   the jury seeing it so the witness and the government can see

15   what you're talking about.

16             MR. KENNER:  Yes, we will do that, Your Honor.

17             THE COURT:  So are you asking him to read this to

18   refresh --

19             MR. KENNER:  Yes, I'm asking you --

20             THE COURT:  Okay.  So --

21   **Q.**  (BY MR. KENNER)  Let me ask you to read it first and see

22   if it refreshes your recollection.

23             THE COURT:  Okay.  So in refreshing your

24   recollection, Mr. Broidy, I'll give you a chance to read

25   through it.  When you're finished, please look over here.

Cross-examination - Broidy

1    You're not going to be reading it.  The question is whether

2    this helps your memory of what.

3              THE WITNESS:  Yes, I think I recognize it.  Can you

4    just page through really quickly?

5              MR. KENNER:  Yes.  Can you scroll through the

6    document for him, please?

7              THE WITNESS:  Thank you.

8    Q.  (BY MR. KENNER)  Are you ready for the next page, sir?

9              THE COURT:  Let him --

10             THE WITNESS:  Yes.

11             THE COURT:  Let him finish.  He hasn't finished.

12             THE WITNESS:  No, that's fine.

13             THE COURT:  Just let me know when you're finished

14   reviewing it.

15             MR. KENNER:  There are still more pages if he wants

16   to see any more.

17             THE WITNESS:  Okay.

18             THE COURT:  All right.  So you can take it down.

19   Q.  (BY MR. KENNER)  Sir, does that refresh your recollection

20   with regard to the parties to the retainer agreement between

21   Robin Rosenzweig and Jho Low?

22   A.  Yes.  I remember it as an early draft that went nowhere.

23   Q.  Okay.  What you saw, do you -- you can testify is a true

24   and correct copy of the draft of that agreement?

25   A.  I believe so, yes.

Cross-examination - Broidy

1      MR. KENNER:  May I publish it to the jury, Your
2   Honor?
3           THE COURT:  You have to get it admitted first.
4           MR. KENNER:  May I have it admitted first?
5           THE COURT:  Government?
6           MR. MULRYNE:  No objection, Your Honor.
7           THE COURT:  All right.  I'll admit, is it 165; is
8   that correct?  Without objection.
9   **Q.**  (BY MR. KENNER)  Sir, directing your attention to the
10   first -- oh, let me withdraw that.
11       You recognize the writing on top to be Colfax Law
12   Offices, Inc.; correct?
13   **A.**  Yes.
14   **Q.**  And there's an address listed on Santa Monica Boulevard;
15   is that correct?
16   **A.**  Yes.
17   **Q.**  Was that a brick-and-mortar actual office?
18   **A.**  No.
19   **Q.**  Was that a post office drop?
20   **A.**  Yes.  Instead of using her home address, she worked from
21   home.
22   **Q.**  Okay.  And would you look at the -- read the first
23   paragraph that's displayed.
24           THE COURT:  He's finished looking at it.
25           MR. KENNER:  Oh, I'm sorry.

Cross-examination - Broidy

1   **Q.**  (BY MR. KENNER)  May I just ask you to -- I'm going to

2   read:

3       "This letter constitutes a formal agreement between you

4   and Low -- you, comma, Low Taek Jho, an individual, on behalf

5   of yourself and on behalf of all other corporations in which

6   you have a controlling interest or with respect to which you

7   have the authority to bind, that are related to the matter

8   hereinafter referred to collectively as "you" or "client" and

9   the Colfax Law Offices, a corporation, incorporated and

10  registered as a law corporation and doing business in the

11  state of California, hereinafter referred to as "attorney" or

12  "firm," regarding the general legal services that attorney

13  will provide to you, when executed by you, constitutes our

14  understanding and agreement with respect to the determination

15  and payment of legal fees incurred by you in connection with

16  attorney's representation to you."

17      Correct?

18  **A.**  Yes, you read that correctly.

19  **Q.**  Thank you.

20      And in reading that -- did you talk to Ms. Rosenzweig

21  about the subject matter of Mr. Jho Low's case or situation

22  before she drafted this?

23  **A.**  Minimally.  She spoke with Nickie more than me about it.

24  **Q.**  Were you a recipient of those conversations?  Did you hear

25  them?

Cross-examination - Broidy

1    **A.**  No.

2              MR. KENNER:  Move to strike what she talked to

3    Nickie about, Your Honor.

4              THE COURT:  He just says minimally.  It doesn't

5    indicate what it is.  You asked the question, and he answered

6    it.

7              MR. KENNER:  Okay.

8              THE COURT:  It's not a basis to strike it.

9    **Q.**  (BY MR. KENNER)  All right.  Do you know, then, what

10   Nickie Lum Davis described, of your own knowledge, to your

11   wife with regard to the subject matter of her

12   representation?

13   **A.**  That Jho Low did not want her to represent him as an

14   attorney, that he did not want an agreement.

15   **Q.**  So when she wrote this, she wrote it because she knew

16   Mr. Jho Low didn't want to have --

17   **A.**  No, Nickie -- Nickie thought that he did, and then she

18   came back and said he doesn't.  And so this was an early

19   draft, and it was rejected.

20   **Q.**  Okay.  So all of this seems to be going through Nickie.

21        Is that your testimony?

22              THE COURT:  All of what?  That's very broad.

23              MR. KENNER:  The conversations between the lawyer

24   and --

25              THE COURT:  Well, let me just ask.  Are you talking

1   about in the context of this particular agreement or something

2   else?  We've had a lot of testimony.

3          MR. KENNER:  Right now just this agreement, Your

4   Honor.

5          THE COURT:  Okay.

6   **A.**  I'm saying Nickie and Robin worked on the retention or

7   retainer agreements together.

8   **Q.**  (BY MR. KENNER)  All right.  Did you ever review that

9   after they worked on them together?

10  **A.**  Enough to be familiar with it now.

11  **Q.**  Okay.  And when you read it, what was your understanding

12  of what the agreement was being written for?

13  **A.**  I thought it was being written that Jho Low would be a

14  client of Robin, but then we learned that he had no interest

15  in that approach.

16  **Q.**  So would it be fair to say that Ms. Rosenzweig accepted

17  Ms. Lum Davis's representations on behalf of Jho Low that he

18  wanted your wife to be his lawyer?

19         MR. MULRYNE:  Objection, Your Honor.

20         THE WITNESS:  No.

21         MR. MULRYNE:  I think that mischaracterizes the

22  testimony.

23         THE COURT:  Yeah, that's not the way I would

24  interpret what his testimony is.

25         MR. KENNER:  Okay.

1   **Q.**   (BY MR. KENNER)   Can you tell me what the compensation was
2   pursuant to this agreement?
3               THE COURT:   Assuming it became an agreement.
4               MR. KENNER:   I'm -- pursuant to what's written
5   here.
6   **A.**   It's the same as what I testified to earlier.
7   **Q.**   (BY MR. KENNER)   Can you repeat it, please?
8   **A.**   Would you like me to repeat it?
9   **Q.**   Yes, please.
10  **A.**   Oh, sure.   $8 million retainer and a performance fee of 50
11  to 75 million depending upon the duration of the engagement,
12  assuming success would be achieved.
13  **Q.**   Is that your recollection of what this agreement says?
14  **A.**   When you just thumbed through it, it looked like it.   We
15  can look at the page again if you want, but --
16              THE COURT:   The question should be what you knew at
17  the time, not what you're learning now.
18              MR. KENNER:   Yes.
19              THE COURT:   So at the time of this --
20  **A.**   At the time, I think that's what they were trying to
21  reduce and put into an agreement.
22  **Q.**   (BY MR. KENNER)   Okay.
23  **A.**   And the agreement is not something Mr. Jho Low wanted.
24  **Q.**   Okay.   Did your wife, Ms. Rosenzweig, also write a
25  retainer agreement between Colfax law firm and you?

1          THE COURT:  About what?

2          MR. KENNER:  About the subject matter that's

3    referred to in the representation letter.

4          THE COURT:  Okay.

5    **A.**  Not that I know of.

6          MR. KENNER:  May I have just a moment, Your Honor?

7    **Q.**  (BY MR. KENNER)  Let me withdraw the question for the

8    moment.  I'm come right back to it.

9          Let me ask you first, did your wife write a retainer

10   agreement between herself and Nickie Lum Davis?

11   **A.**  There may be some kind of a fee or commission or

12   consulting agreement.  I don't -- I remember that being talked

13   about, but you need to show it to me.  It's six years ago, I

14   don't remember.

15         MR. KENNER:  May I display just for the witness and

16   Your Honor and counsel, Exhibit 166, marked for

17   identification, not yet admitted?  It's a government exhibit,

18   Your Honor.

19         THE COURT:  Okay.  So -- and what is the purpose of

20   using it, refreshing recollection or what?

21         MR. KENNER:  Initially to refresh recollection.

22         THE COURT:  Okay.  So, again, it's to refresh

23   recollection.  If you would read through it, and then he has

24   some further questions.

25   **A.**  Do we have an executed copy?

Cross-examination - Broidy

1          MR. KENNER:  I'm sorry?

2    **A.**  Is there an executed copy of this?

3          MR. KENNER:  I don't believe there's an executed

4    copy of the Jho Low agreement or this agreement or any

5    purported agreement with --

6    **A.**  So I think her -- I think her fee that she negotiated was

7    30 percent, and this says 25.  But I don't know -- my

8    recollection is that Nickie wanted such an agreement, but I

9    don't know that it was ever executed.  I'm assuming it was,

10   but I don't really know.  I'm guessing this is an earlier

11   draft because the fee is different from what was settled

12   upon.

13   **Q.**  (BY MR. KENNER)  Okay.  Was this essentially described --

14   let me withdraw that.

15          MR. KENNER:  I move to admit Exhibit 166 into

16   evidence.

17          MR. MULRYNE:  No objection, Your Honor.

18          THE COURT:  All right.  I'll admit 166 without

19   objection.

20          MR. KENNER:  Thank you.

21   **Q.**  (BY MR. KENNER)  Directing your attention to paragraph

22   2(a).  Paragraph 2(a) starts, Fees for consulting services.

23   In consideration of the consulting services set forth above,

24   Colfax hereby agrees to pay the following:  Initial fee:  25

25   percent of the amount equal to the retainer fee, as defined in

1     the retainer agreement, less any finder's fee required to be

2     paid by Colfax to a third party, paid no later than two

3     business days after receipt by Colfax of the retainer fee set

4     forth in the retainer agreement.

5         Is that correct?

6     **A.**  Yes, you read it correctly.

7     **Q.**  So this was written to first exclude -- what do you mean

8     when you say finder's fee?  Is that like a referral fee?

9             MR. MULRYNE:  Objection, Your Honor.  That's in the

10    document.  I don't know that the witness testified about a

11    finder's fee.

12            THE COURT:  And it's not clear, have you seen this

13    document before?

14    **A.**  I don't recall seeing it.  I can't swear to it, but I

15    don't recall seeing it.

16    **Q.**  (BY MR. KENNER)  Do you recall --

17            THE COURT:  There's a limitation if he doesn't

18    recall seeing the document itself.

19            MR. KENNER:  He previously said he did, but now he

20    said he doesn't.  That's fine.

21            THE COURT:  Now -- excuse me, Mr. -- that's not

22    appropriate commentary.

23            MR. KENNER:  Sorry, Your Honor.

24    **Q.**  (BY MR. KENNER)  Do you recall the negotiated fee between

25    your wife and her firm Colfax law and Nickie Lum Davis?

Cross-examination - Broidy

1    **A.**  Yes.

2    **Q.**  And what was that fee that was negotiated?

3    **A.**  30 percent.

4    **Q.**  30 percent of what?

5    **A.**  Of amounts as and when received by Colfax.

6    **Q.**  Okay.  And that was in return for doing what?  What is

7    your recollection, if any, of that money -- what was that

8    being paid for Nickie Lum Davis to do?

9    **A.**  She referred the business.

10   **Q.**  So this was, in essence, a referral fee?

11   **A.**  I think so.

12   **Q.**  So Ms. Lum Davis asked your wife through her firm, Colfax,

13   to pay her 30 percent of any legal fees received in return for

14   the referral?

15          MR. MULRYNE:  Objection, Your Honor, to the

16   characterization of the question.

17          THE COURT:  Yeah, that's not exactly the way he said

18   it.  So --

19   **A.**  So --

20          THE COURT:  -- you need to be more careful.

21          MR. KENNER:  Okay.

22   **A.**  Can I try to clarify?

23   **Q.**  (BY MR. KENNER)  Absolutely.

24   **A.**  Okay.  Nickie negotiated the fee with me.

25   **Q.**  Okay.

Cross-examination - Broidy

1    **A.**  So I don't know where the 25 came from.  30 percent is

2    what she asked for, and that's what was paid.

3    **Q.**  But why was a -- an agreement being prepared between

4    Colfax law and Nickie Lum Davis for an agreement you say you

5    made with Nickie Lum Davis?

6    **A.**  I think it's at Nickie's request, that's my

7    recollection.

8    **Q.**  Did you do anything Nickie asked?

9              MR. MULRYNE:  Objection, Your Honor.

10   Argumentative.

11             THE COURT:  Sustained.

12   **Q.**  (BY MR. KENNER)  Sir, did there come a time when you hired

13   Chris Clark, an attorney from Latham & Watkins, to negotiate

14   with the Department of Justice regarding a proffer of what

15   your testimony would be about various things?

16             MR. MULRYNE:  Objection, Your Honor.  Relevance.

17             THE COURT:  Let's have a conversation on the

18   intercom.

19             (Bench conference on the record.)

20             THE COURT:  Okay.  Mr. Kenner, are you talking about

21   a proffer in terms of his testimony now, or are we switching

22   topic.

23             MR. KENNER:  No, it's his proffer in negotiating the

24   plea agreement.

25             THE COURT:  Right.  Okay.

1          MR. KENNER:  It's his attorney representing to the

2    Department of Justice the variety and panoply of people and

3    information that he could provide in order to induce them to

4    enter into a plea agreement.

5          THE COURT:  Okay.  I'm not sure -- so you're asking

6    what the cooperation agreement was?  I'm not sure what you're

7    asking for.

8          MR. KENNER:  I'm -- the first communication that set

9    the stage for the cooperation agreement is a roughly 26-page

10   letter on behalf of Mr. Broidy to people in Mr. Keller's unit,

11   proffering what they could expect to get out of an agreement

12   with Mr. Broidy.

13         THE COURT:  And this is -- was from Mr. Broidy, or

14   is this --

15         MR. KENNER:  No.

16         THE COURT:  -- letter sent from a lawyer?

17         MR. KENNER:  This was sent from Mr. Broidy's lawyer

18   on Mr. Broidy's behalf.

19         THE COURT:  Okay.  And what's the relevance to this?

20         MR. KENNER:  I think it goes to the nature of the

21   plea agreement, and I think it --

22         THE COURT:  In terms of what?  You know, we have

23   testimony that he had a plea agreement, and he was to be

24   cooperative.  So what exactly is in there that you think is of

25   importance, that you want to bring out?

1          MR. KENNER:  The number of different people and

2     different events that he was offering to cooperate against in

3     order to induce the government to enter into this agreement.

4          THE COURT:  All right.  Mr. Mulryne?

5          MR. MULRYNE:  Your Honor, the defense proffering a

6     letter from a -- from an attorney on Mr. Broidy's behalf

7     constitutes hearsay.  It's also irrelevant and gets to

8     essentially attorney negotiations of sort.  It's not

9     underlying evidence, it's not statements made here in court by

10     Mr. Broidy.  And as I understand what Mr. Kenner is proposing,

11     it's nothing specific to his plea agreement or the statement

12     of offense or anything else that he -- that Mr. Broidy was

13     questioned about or that's come into evidence.

14     So, for those reasons, hearsay, relevance, and otherwise,

15     the government would object.

16          THE COURT:  Okay.  I still think --

17          MR. KENNER:  They're relevant to these

18     proceedings.

19          THE COURT:  No.  Let me just simply say, one, it's

20     hearsay.  There are other problems in terms of this is the

21     attorney negotiating on behalf of Mr. Broidy.

22     You could certainly ask Mr. Broidy what information he

23     had that he -- information on various people, assuming that

24     that's probative of anything, beyond the group that we have

25     that are involved in the conspiracies and not some separate

1    stuff.  But assuming that that -- you can certainly ask him

2    that.  But there is a problem, it seems to me, if this

3    attorney is acting on his behalf in terms of doing it.

4         It's certainly hearsay.  I mean, it's basically the

5    attorney saying what Mr. Broidy presumably has said to him

6    that would be in there.  So, from that perspective, there's a

7    problem.

8         There's a problem also, frankly, under 403 in terms of

9    bringing in I don't know what other people in terms of --

10   involved with it.  If you want to ask him, you know, what

11   information he was proffering, assuming it's some probative

12   value to this -- I mean, he's indicated that obviously what

13   he's testified to is what he offered in terms to provide the

14   testimony so he -- you know, they would accept the plea

15   agreement.  That's a pretty obvious, and it's already on the

16   record.

17        There's a statement of offense, which sets a lot of this

18   up -- well, it doesn't have all of it because it's a FARA.

19   But I'm not sure -- you know, as I said, I think for one thing

20   it's just plain hearsay and also gets into the attorney-client

21   issue of what he's repeating.  So I'm not allowing it the way

22   you've set it up.

23             MR. KENNER:  Thank you.

24             (The following proceedings were had in open court.)

25   Q.  (BY MR. KENNER)  Mr. Broidy, did you retain an attorney by

1    the name of Chris Clark from Latham & Watkins prior to

2    July 26th of 2019 in connection with this matter?

3    **A.**  Yes.

4    **Q.**  And are you aware of the contents of a letter that he sent

5    to the Department of Justice with regard to what your proffer

6    would be?  Did you -- did you go over that?

7              MR. MULRYNE:  Objection, Your Honor.  Same objection

8    as before.

9              THE COURT:  It seems to me that the way you're

10   getting at it, you're basically going into what I've just

11   indicated is a problem.  There's other ways of asking this

12   information in terms of getting whatever probative value you

13   want out of it.

14             MR. KENNER:  Thank you, Your Honor.

15   **Q.**  (BY MR. KENNER)  Mr. Broidy, let's just talk about the

16   proffer agreement that you had with the government.  Okay?

17        Do you remember that, they showed it to you?

18   **A.**  Who showed it to me?

19   **Q.**  The government today.

20             THE COURT:  Are you talking about the statement of

21   offense or --

22             MR. KENNER:  Yes, I'm sorry, the statement of

23   offense.

24   **A.**  Oh, that's not a proffer agreement.

25   **Q.**  (BY MR. KENNER)  Okay.

1    **A.**  I remember the statement of offense being shown to me

2    today, yes.

3    **Q.**  All right.  And did the statement of offense -- was that

4    drafted by the government?

5              MR. MULRYNE:  Objection, Your Honor.  Relevance.

6              THE COURT:  I'll allow it.  Go ahead.

7              Well, do you know?

8    **A.**  I'm -- I think it -- I think it's a negotiated agreement

9    with attorneys and the government, my lawyers and the

10   government, but I don't --

11   **Q.**  (BY MR. KENNER)  Okay.

12   **A.**  I'm not an expert on that.

13   **Q.**  And that negotiated agreement or -- and your testimony,

14   you indicated that one of the conditions of the plea agreement

15   was that you be truthful; is that correct?

16   **A.**  Yes.

17   **Q.**  And when you entered that agreement to be truthful, that

18   was based upon the negotiated statement of facts or statement

19   of the offense; isn't that correct?

20             MR. MULRYNE:  Objection, Your Honor.

21   Characterization of the question.

22             THE COURT:  Yeah, it's not clear to me whether

23   you're talking strictly about the statement of offense or

24   whether you're talking about the plea agreement which may have

25   had other terms.  Are you asking him just about the statement

Cross-examination - Broidy

1    of offense?

2           MR. KENNER:  No.  I'm asking him whether or not the

3    plea agreement required to be -- you to be truthful.

4    **A.**  Yes, that's true.

5    **Q.**  (BY MR. KENNER)  And at the time you entered into the

6    agreement to be truthful, had you already agreed to the

7    statement of the offense?

8    **A.**  I don't recall.

9    **Q.**  Well, did you understand how the government was going to

10   determine whether you told the truth or not when you

11   testified?

12          MR. MULRYNE:  Objection, Your Honor.  That calls for

13   speculation.

14          THE COURT:  I mean, you're asking him about what the

15   government -- how they were going to consider whether they

16   were telling the truth.  You're asking him to indicate what

17   the government thought or what their procedure would be.

18   **Q.**  (BY MR. KENNER)  All right.  What is your understanding,

19   at the time you entered into this agreement, of how the

20   determination would be made by the government as to whether or

21   not you were being truthful?

22   **A.**  I don't know exactly.  I'm not sure if it's just limited

23   to the statement of offense.  Could be asked anything and not

24   be truthful, and you would be guilty of perjury.  So I'm not

25   sure I understand.

1      I'm not an attorney, and I -- it's hard for me to answer

2   these kind of questions.

3   **Q.**  Well, I know you're not an attorney, and I apologize.

4   These are interesting, shall I say, questions.

5      The question is, you had a frame of mind when you entered

6   this agreement that you were being required to tell the truth;

7   correct?

8   **A.**  Yes.

9   **Q.**  And you had an understanding that if you didn't tell the

10  truth, the government was telling you you could be prosecuted

11  for perjury, and you said I think maybe even obstruction of

12  justice; is that correct?

13  **A.**  Yes.

14  **Q.**  Who did you understand to be the person or persons to make

15  the decision after you testified about whether or not what you

16  said was truthful?

17  **A.**  I assume the government, but I don't really know.

18  **Q.**  Okay.  But is it your understanding that the determination

19  that had to be made about your being truthful is a

20  determination that was going to be made by the prosecutors in

21  this case?

22  **A.**  I believe so.

23  **Q.**  All right.  Now, you entered into a plea agreement

24  initially in 2020; isn't that true?

25  **A.**  Yes.

1    **Q.**  And after that plea agreement in 2020 -- let me talk to

2    you a little bit about that agreement.

3         Do you remember what the date of that plea agreement

4    was?

5    **A.**  No.

6    **Q.**  Do you remember how long you had to make up your mind as

7    to whether or not to accept the plea agreement?

8    **A.**  It was a short time frame, but I don't remember.

9    **Q.**  Isn't it true that it was -- September 30th of 2018 is the

10   date on the proffer letter, and in that letter you're asked to

11   make the decision by September 30th?

12            MR. MULRYNE:  Objection, Your Honor.  I'm not sure

13   what proffer letter we're referencing.

14            MR. KENNER:  I'll pull it --

15            THE COURT:  Are you talking about a proffer --

16            MR. KENNER:  Yeah.

17            THE COURT:  -- or are you talking about the plea

18   agreement itself?  Let's be specific about the terms.

19            MR. KENNER:  Let me bring up the plea agreement,

20   Your Honor.

21            THE COURT:  Okay.  So we're talking about the plea

22   agreement that he entered into?

23            MR. KENNER:  Yes.

24            THE COURT:  The first one, all right.

25            MR. KENNER:  530 -- may I show the witness only

1   Exhibit 531?

2          THE COURT:  All right.  So, again, we're refreshing

3   his recollection, presumably?

4          MR. KENNER:  At this point, yes.

5   **Q.**  (BY MR. KENNER)  Sir, do you recognize --

6   **A.**  Yes, this was shown to me earlier.

7          THE COURT:  Okay.  531 has been admitted.

8          MR. KENNER:  Thank you.

9   **Q.**  (BY MR. KENNER)  And in Exhibit 531 --

10         THE COURT:  I can't hear you, you're not speaking --

11         MR. KENNER:  I'm sorry.

12  **Q.**  (BY MR. KENNER)  In Exhibit 531, at the top of the letter,

13  a little bit to the right of the middle, there is a date, and

14  that date is September 30th, 2020.

15     You see that?

16  **A.**  Yes.

17  **Q.**  That would be the date that this letter was given to you,

18  is that correct?  Or sometime thereafter, certainly not

19  before.

20         MR. MULRYNE:  Objection, Your Honor.  The date

21  doesn't indicate when the letter was given.

22         THE COURT:  Yeah, the way you've worded it, I agree.

23  That is the date that's on there, though.

24  **Q.**  (BY MR. KENNER)  You would agree the date September 30,

25  2020, is on --

Cross-examination - Broidy

1   **A.**  Yes.

2   **Q.**  -- this letter?

3   **A.**  Yes.

4   **Q.**  And --

5          MR. KENNER:  Just a moment to scroll down, Your

6   Honor.

7   **Q.**  (BY MR. KENNER)  Do you see the very last paragraph -- can

8   you call that paragraph out above the signature lines?

9   **A.**  Yes.

10  **Q.**  And does that last paragraph read:  If the foregoing terms

11  and conditions are satisfactory, your client may so indicate

12  by signing this agreement and the statement of offense and

13  returning both to me no later than September 30th, 2020?

14  **A.**  Yes, I see that.

15  **Q.**  Is it your understanding that you were asked to return

16  this signed agreement on the same day that you saw it?

17  **A.**  No.  Can we look and see the date next to the signatures

18  on the last page?

19  **Q.**  Sure.  Absolutely.

20  **A.**  I just want to see if that's also September 30, because I

21  don't really remember.

22  **Q.**  Please.

23  **A.**  And it all is September 30.

24       So it must have --

25  **Q.**  You signed it on September 30th?

Cross-examination - Broidy

1    **A.** I'm guessing it was negotiated in the days leading up to

2    September 30, because I don't know how we could do 12 pages in

3    an hour or a few hours, to sign it.

4    **Q.** Neither do I. But my question is --

5    **A.** Yeah, I don't --

6    **Q.** -- what was expected of you --

7         THE COURT: You're talking both at the same time.

8    Can you let him finish before you move on to the next

9    question.

10        MR. KENNER: Certainly.

11   **A.** So I don't really know. My guess is this was a

12   negotiation that went on for some time, where they went over

13   the terms back and forth and then memorialized it and agreed

14   it had to be signed on that date. I don't see how they could

15   have agreed, my lawyers and the government, in one day, the

16   same day, in fact. It doesn't seem reasonable.

17   **Q.** (BY MR. KENNER) Mr. Broidy, isn't it true that one of

18   your motivations in getting this plea agreement done quickly

19   was so that it would be in effect, your plea, prior to the

20   time then President Trump left office?

21   **A.** No.

22   **Q.** Well, you applied for a pardon from President Trump;

23   correct?

24   **A.** Yes.

25   **Q.** Did you have any thoughts of doing that at the time you

1    entered into the plea agreement?

2    **A.**   I don't think so.

3    **Q.**   You didn't think about whether or not you might get a

4    pardon from President Trump?

5              MR. MULRYNE:  Asked and answered.

6    **A.**   I'd have to look at when -- I think I retained a pardon

7    attorney much later than this.

8    **Q.**   (BY MR. KENNER)  Yeah, I'm not asking when you retained

9    the attorney.  You --

10   **A.**   Yeah, I wasn't --

11             THE COURT:  You're both talking at the same time.

12   Now, stop that.  That's not -- you're very hard to follow.

13       So let him -- if he objects, let me hear the objection.

14   Let him finish his question before you start to answer.  And,

15   Mr. Kenner, you need to wait till he finishes his answer so

16   you're not all talking at the same time.

17             MR. KENNER:  Certainly, Your Honor.

18             THE WITNESS:  May I say something?

19             THE COURT:  Only if it's in answer to the question

20   that's been asked.

21   **Q.**   (BY MR. KENNER)  Can you answer the question that was

22   asked?

23   **A.**   Can you restate it?  I'm sorry.

24   **Q.**   Yes.

25       Did you contemplate or have any conversations with

Cross-examination - Broidy

1    anybody, without telling me the exact words in the

2    conversation, about the possibility or probability of

3    President Trump pardoning you before he left office?

4    **A.**  At what point in time?  As of September 30?

5    **Q.**  Yes.

6    **A.**  No.

7    **Q.**  At what point in time did you first think about getting a

8    pardon?

9            MR. MULRYNE:  Objection.  Relevance.

10           THE COURT:  No, I'll allow it.

11   **A.**  Sometime after that.  But if there was pressure here to

12   get this done, it was the government, not me.  Okay?

13   **Q.**  (BY MR. KENNER)  All right.

14   **A.**  I'll just tell you right now, the government wanted to

15   resolve this matter --

16   **Q.**  Okay.

17   **A.**  -- and I think they gave a September 30 date.

18        I can't imagine my lawyer -- and I don't think this was

19   all done in the same day either.

20   **Q.**  Okay.  But you --

21   **A.**  I don't think that that's what happened.

22   **Q.**  Did I understand you correctly that if there was any

23   pressure involved in this agreement, it came from the

24   government towards your side?

25           MR. MULRYNE:  Objection, Your Honor.

1    **A.**  Yeah, it wasn't --

2            MR. MULRYNE:  Mischaracterization.

3    **A.**  It wasn't because I wanted a pardon.

4            THE COURT:  Can I -- he stood up and said something,

5    okay, so let me look at that for a sec.

6        Okay.  You didn't quite word it the way he did,

7    Mr. Kenner.

8            MR. KENNER:  I'm sorry.

9    **Q.**  (BY MR. KENNER)  You were personal friends with President

10   Trump; isn't that true?

11   **A.**  I wouldn't say that, no.

12   **Q.**  Well, he was a friend of yours.  Would you say that?

13   **A.**  Yes, but it was more of a professional relationship.  We

14   were not personal friends.  We didn't, you know, go out for

15   dinner together the two of us and talk.  I mean, I was -- I

16   was a person involved with Republican politics, and we got to

17   know each other and had a good relationship, but we were not

18   personal friends.

19   **Q.**  Isn't it true, sir, that during the period of time we're

20   discussing when President Trump won the election, that you

21   believed and portrayed that you had virtually unlimited access

22   to him?

23   **A.**  Just wasn't the case.  I didn't portray that I had

24   unlimited access.

25   **Q.**  I'm sorry.  I didn't hear you.

**A.** I did not portray that I had unlimited access. There's no one that has unlimited access to the President of any -- any president.

**Q.** Did you portray that you had significantly more access to President Trump than other people, that were not directly in the government?

**A.** Yes.

**Q.** Would it be a fair statement to say that both you and Mr. Steve Wynn were -- had a lot of influence on the Trump Administration? Would that be a fair statement?

**A.** I -- Mr. Wynn knew Trump for 30 years, and they were personal friends.

**Q.** Okay. Is that why you --

**A.** I'm not sure --

**Q.** I'm sorry, I apologize. I didn't mean to talk over you.

**A.** Melania and Donald Trump were at Steve Wynn's wedding. I mean, that's different. I was not a personal friend of President Trump.

**Q.** Okay. Did you then go to Steve Wynn to help you with the Guo matter because you knew he had a long-standing personal relationship with President Trump?

**A.** That was a factor, yes.

**Q.** Was there any other factor that you went --

**A.** He had a lot of knowledge of Asia and China, and I thought I could also get a good read from him of what he thought of

1     Guo and this request, whether it was --

2     **Q.**   To your -- sorry.  Are you finished?

3     **A.**   That's okay.  I'm done.

4     **Q.**   Okay.  What was your understanding, if you had one, about

5     whether or not Mr. Wynn or one of his companies owned casinos

6     in Macau?

7             MR. MULRYNE:  Objection, Your Honor.  Relevance as

8     to this witness.

9             THE COURT:  I don't see any relevance.  If you want

10    to tell me what it is, I'd be happy to hear it.

11            MR. KENNER:  Certainly.

12            (Bench conference on the record.)

13            THE COURT:  Put the husher on, Dorothy, please.

14      So tell me what difference it makes whether Wynn had some

15    stuff with Macau or anything in terms of the testimony that he

16    is giving?

17            MR. KENNER:  Because I think part of the reason that

18    he went to Mr. Wynn was because he knew that Mr. Wynn had an

19    interest in appeasing the Chinese so as to get other casino

20    licenses that he wanted and to extend the life of the casinos

21    that he had there already.

22            THE COURT:  Let me just simply say, all of these

23    motivations of other people, frankly, are not particularly, as

24    far as I can see, relevant to, you know, his going -- what

25    relation -- what he asked of Wynn, et cetera.

Cross-examination - Broidy

1   What motivations Mr. Wynn had, frankly, I think is

2   distracting to the jury as to what Mr. Broidy did and what

3   relationship Mr. Broidy had with Mr. Wynn and what their

4   doings were together, not what Mr. Wynn might have had as

5   other reasons for doing this.

6           MR. KENNER:  Your Honor --

7           THE COURT:  So you're getting far afield.

8           MR. KENNER:  Thank you.

9           (The following proceedings were had in open court.)

10          THE COURT:  Sustained.

11  **Q.**  (BY MR. KENNER)  Sir, let me go back to the requirement

12  that you testify truthfully.

13          Can I do that with you, sir?  Is that okay?

14  **A.**  Yes.

15  **Q.**  All right.  When was the first time you entered a plea in

16  this case?  Was that back in 2020?

17  **A.**  I believe that's right.

18  **Q.**  All right.  And after you entered that plea, was a date

19  set for you to be sentenced?

20  **A.**  I think so.

21  **Q.**  And do -- you probably don't -- recall what that date

22  was?

23  **A.**  No, sir.

24  **Q.**  Do you recall, though, that when that date -- prior to the

25  time that date came around, your sentencing date was extended

Cross-examination - Broidy

1    to a further out date?  Do you recall that?

2            MR. MULRYNE:  Objection, Your Honor.  Foundation,

3    and that's assuming a fact not in the record.

4            MR. KENNER:  Let me pull up the docket sheet, then,

5    Your Honor.

6            THE COURT:  Well, I think you could ask him if he

7    knows he got sentenced on the first date or not, if that's

8    what you're getting at.

9    **Q.**  (BY MR. KENNER)  Did you get sentenced on the first date

10   that was set for your sentencing?

11   **A.**  No.

12   **Q.**  The sentencing was put over to a later date; is that

13   correct?

14   **A.**  Yes.

15   **Q.**  And at that later date that it was put over to, you didn't

16   get sentenced then either, did you?

17   **A.**  That's correct.

18   **Q.**  It was put over to yet a later date?

19   **A.**  Correct.

20   **Q.**  Do you recall how many times, based on your first plea in

21   2020, the date of your sentencing was extended?

22   **A.**  No.

23   **Q.**  Now, after you got a pardon, you entered into new

24   negotiations with the government regarding a second plea

25   agreement; is that correct?

**A.** My lawyers did, yes.

**Q.** Did they do that without your instruction?

**A.** They advised that they thought it was a good idea, and so that's what happened.

**Q.** Okay.  Did they advise you that --

THE COURT:  You've worded it the way they're not going to be able to talk about --

MR. KENNER:  I'm sorry.

THE COURT:  -- attorney-client.

MR. KENNER:  I'm sorry.

THE COURT:  Why don't you reword this.

MR. KENNER:  I appreciate that.  Thank you, Your Honor.

**Q.** (BY MR. KENNER)  Sir, as part of your determination as to whether or not to enter into a second plea agreement, did you consider whether --

MR. MULRYNE:  Objection, Your Honor, as to a second plea agreement.  That's mischaracterizing the agreement.

MR. KENNER:  Okay.  There are two, No. 1 and No. 2.

THE COURT:  I'm not sure that -- Mr. Mulryne, how would you characterize the second agreement?

MR. MULRYNE:  I believe Mr. Broidy testified it was a cooperation agreement.

THE COURT:  Okay.  Cooperation agreement, which is,

1    I believe, the way it was labeled and not a plea agreement.

2           MR. KENNER:  Okay.

3    **Q.**  (BY MR. KENNER)  Let's call it -- I apologize if I in any

4    way misled you.  Let's call it a cooperation agreement.

5           Did you enter into the second cooperation agreement after

6    the pardon because you had some question in your mind whether

7    the government could charge you again with the offense

8    notwithstanding the pardon?

9    **A.**  I don't -- I don't have an answer.  It's a legal

10   conclusion that I can't --

11   **Q.**  I'm not asking for a legal conclusion, sir.

12          I'm asking what --

13   **A.**  Well, as far as I was concerned, all the conduct was

14   already in the plea agreement.  The lawyers gave me certain

15   advice that I'm not going to disclose, but --

16   **Q.**  I don't want you to.

17   **A.**  Okay.  That's where we ended up.

18   **Q.**  Okay.  And was there a conversation that you're aware of

19   with the government regarding other cases that you were under

20   investigation for that the government could determine whether

21   to pursue or not to pursue?

22   **A.**  Not that I'm aware of.

23          MR. KENNER:  Your Honor, would this be a good time

24   for the afternoon recess?

25          THE COURT:  Okay.  We're going to, you know, 4:00 or

1    4:15, but that's -- we'll do a break.

2              MR. KENNER:  Thank you.

3              THE COURT:  Till 3:30?

4              MR. KENNER:  That's fine.

5              THE COURT:  Can we make it to 3:25, since we're

6    going to be stopping at 4:00 or 4:15 at the latest?

7              THE WITNESS:  Your Honor, would it be appropriate --

8              THE COURT:  You can't say something off the record.

9              (Jury left the courtroom.)

10             THE COURT:  All right.  The jury has left.

11        And Mr. Broidy has indicated he wanted to say something,

12   so I'm not sure what it's about.  Is it about your answer or

13   something else?

14             THE WITNESS:  No, just about the schedule.

15             THE COURT:  Oh, schedule.  Okay.  We understand your

16   schedule -- the government has made it clear to us when you

17   have to leave tomorrow in terms of your -- your observation of

18   the Jewish holiday.  We're aware of it.  Okay.  If that's what

19   you're worried about, we all know it.

20        Okay.  We're on a break.  Don't talk about the testimony.

21   And I'd like everybody to be back promptly since we have to

22   stop early today.

23             (A recess was taken.)

24             THE COURT:  All right.  I will try and we can go --

25   I'll just be a little late for my next meeting.  We'll try and

Cross-examination - Broidy

1   go till 4:30 so we can get as much testimony out as possible.

2             (Jury entered the courtroom.)

3             THE COURT:  Everybody sit down, please.

4             All right.  Good afternoon, members of the jury.

5             JURORS:  Good afternoon.

6             THE COURT:  What I'm going to do is I'm going to

7   go -- instead of stopping between 4:00 and 4:15, I'm going to

8   go till 4:30, but then I really need to get off the bench to

9   go to an executive session of all the judges on the Court, so

10  that we get a little bit of extra time today -- since we get a

11  little extra time today of going instead of 4:00 or 4:15 to

12  4:30, then I do need to get off, because we're going to have a

13  shorter day tomorrow so we get as much testimony as possible.

14            All right.  Mr. Kenner?

15            MR. KENNER:  Thank you, Your Honor.

16  **Q.**  (BY MR. KENNER)  Mr. Broidy, with your permission, I'll

17  get back to the continuances in a little bit.

18            MR. KENNER:  But for right now, Exhibit 530, I

19  believe it's been admitted.  If it's not, I'll just show it to

20  the witness.

21            THE COURT:  530 has been admitted.

22            MR. KENNER:  Thank you.  Can we have Exhibit 530.

23  **Q.**  (BY MR. KENNER)  Sir, Exhibit 530 reflects that you

24  entered a plea agreement initially on September the 30th of

25  2020; is that correct?

Cross-examination - Broidy

1   **A.**  Yes.

2   **Q.**  And does it reflect the date that you entered a plea of

3   guilty based upon that plea agreement?

4   **A.**  Yes.

5   **Q.**  And what date did you enter the plea based on the plea

6   agreement?

7   **A.**  September 30, 2020.

8   **Q.**  And does the letter -- does the letter reflect when you

9   were pardoned?

10  **A.**  Yes.

11  **Q.**  And what's the date of the pardon?

12  **A.**  January 19, 2021.

13  **Q.**  So you were pardoned, if my math is correct, about three

14  and a half months after you entered the plea; is that

15  correct?

16  **A.**  Something like that.

17  **Q.**  When you say "something like that" --

18  **A.**  Well, I think so.  Close to that, yeah.

19  **Q.**  Okay.  But you didn't even start to look for pardon

20  attorneys until sometime after your plea?

21          MR. MULRYNE:  Asked and answered, Your Honor.

22          THE COURT:  He did answer this already.

23  **Q.**  (BY MR. KENNER)  All right.  Do you have -- do you recall

24  how long it was between the time -- or let me withdraw that.

25      You caused to be filed or filed a -- an application for

Cross-examination - Broidy

1    pardon; is that correct?

2    **A.** Yes.

3    **Q.** And did you sign that?

4    **A.** I believe so.

5    **Q.** Did you submit a letter in support of it?

6    **A.** I don't recall that.

7    **Q.** Are you familiar with the term "pardon package"?

8    **A.** Yes.

9    **Q.** Is that -- does that refer to a group of materials that

10   one would submit to the appropriate office in order to solicit

11   a pardon?

12   **A.** I believe that's right.

13   **Q.** And does that contain typically an analysis of your

14   case?

15   **A.** Yes.

16   **Q.** And does it contain an analysis of your background, going

17   back to literally when you were born?

18   **A.** I believe so.

19   **Q.** And does it contain letters of reference from other

20   people?

21   **A.** Yes.

22   **Q.** Do you recall approximately how many letters of reference

23   were collected and submitted on behalf of your pardon?

24            MR. MULRYNE:  Your Honor, objection to this line of

25   questioning on relevance grounds.

1          THE COURT:  I'll allow a certain amount of it, but

2     it does seem to me that trying to have him recall what he's

3     doing -- if there's another way of moving this quickly on this

4     topic, it would be helpful.

5          MR. KENNER:  Yes.

6     **Q.**  (BY MR. KENNER)  Do you have any recollection of the time

7     period between your desire to get a pardon or your thought

8     about getting a pardon and the time the pardon application was

9     filed?

10    **A.**  No.  It was quick.  And there were numerous letters to

11    answer your other question.

12    **Q.**  Okay.

13    **A.**  I don't know how many, but there were numerous letters.

14    **Q.**  Okay.  So the decision about the pardon was at least

15    quickly after the plea; is that correct?

16    **A.**  I'd have to go back and look at the documents, but it was

17    after the plea, I believe.

18    **Q.**  Within three months after the plea, correct, three and a

19    half?

20    **A.**  Yes.

21    **Q.**  Sir, when you went to, I believe it was, Bangkok initially

22    and you met with Jho Low, was there any conversation about

23    FARA, the Foreign Agent Registration Act?

24    **A.**  No.

25    **Q.**  Was there any conversation about whether or not you had to

1    evaluate whether you needed to file under FARA?

2    **A.**   No.

3    **Q.**   Did Mr. Jho Low ever tell you don't register under FARA?

4    **A.**   I don't believe it came up at all.

5    **Q.**   Okay.  At any time, did Mr. Jho Low tell you don't

6    register under FARA?  He didn't, did he?

7    **A.**   I don't believe so.

8    **Q.**   At any time, did Nickie Lum Davis tell you don't register

9    under FARA?

10   **A.**   No.

11   **Q.**   And at no time did you tell Nickie Lum Davis to register

12   under FARA; isn't that true?

13   **A.**   That's true.

14   **Q.**   And at no time did you tell Mr. Michel not to register

15   under FARA; correct?

16   **A.**   Correct.

17   **Q.**   So there was -- would it be fair to say there was no

18   agreement between yourself, Ms. Davis, Mr. Michel, Jho Low, or

19   anybody else, to not register under FARA?

20           MR. MULRYNE:  Objection, Your Honor.

21   Mischaracterization in terms of "agreement."

22           THE COURT:  What you talked about, asked him about

23   is whether he told these various people.  That's different

24   than having an agreement.

25           MR. KENNER:  Okay.  All right.

1    THE COURT:  So in terms of telling them, that's --

2    you asked it in the context of whether he told them something.

3    MR. KENNER:  All right.

4    THE COURT:  That doesn't mean there's an

5    agreement.

6    MR. KENNER:  Okay.

7    **Q.**  (BY MR. KENNER)  Did you, to your knowledge, or do you

8    feel like you ever entered into an agreement to not register

9    under FARA with Mr. Michel, Ms. Davis, Jho Low, or anybody

10   else?

11   **A.**  No.

12   **Q.**  Did there come a time -- excuse me.

13   Did you have the feeling during the course of the events

14   in this case -- I'm sorry -- that Ms. Lum Davis was the

15   taskmaster and pushing things along?  Is that your view?

16   THE COURT:  You've asked him two questions.

17   MR. KENNER:  Okay.  Pick one.

18   THE COURT:  One is his feelings, and feelings

19   aren't really what --

20   MR. KENNER:  All right.

21   THE COURT:  You know, his feelings aren't

22   relevant.

23   MR. KENNER:  All right.

24   **Q.**  (BY MR. KENNER)  Would you describe Ms. Lum Davis's

25   activities in connection with this case as a -- the taskmaster

Cross-examination - Broidy

1  and the one pushing things along?

2  **A.**  With regard to me?

3  **Q.**  With regard to Mr. Low.

4  **A.**  I wouldn't know what she did with everyone else.  With

5  regard to me, she was very organized and pressing all the

6  time.

7  **Q.**  Okay.

8  **A.**  With regard to other people, I have no idea.

9  **Q.**  Okay.  In the exchange of e-mails that you made reference

10  to, they were sometimes copied to Mr. Michel or not?

11  **A.**  No.

12  **Q.**  Okay.  So the e-mails are not copied to Mr. Michel; that's

13  correct?

14  **A.**  Correct.

15  **Q.**  And let me ask you this:  Over what period of time was it

16  from the time that you first were approached by Nickie Lum

17  Davis about this possible Jho Low business until the time that

18  the government filed its indictment?

19  **A.**  Well, the case began in March -- not case, but the --

20  Nickie reached out to me in early March, we established here.

21  I don't know when -- I don't know if there was an indictment.

22  Wasn't there a -- an agreement reached September 30, that

23  you're --

24  **Q.**  You reached an agreement to avoid an indictment,

25  correct?

Cross-examination - Broidy

1    **A.**  That's my understanding.

2    **Q.**  Okay.  Instead, the government filed what's called an

3    information rather than an indictment; is that correct?

4    **A.**  I think so.

5    **Q.**  Okay.  And you testified that you talked with Mr. Michel

6    when the -- when he first came in to talk about the Jho Low

7    matter with Ms. Davis, yourself, and perhaps your wife?

8    **A.**  No, I didn't say my wife was there.

9    **Q.**  Okay.  Other than your wife, did Mr. Michel come in with

10   Ms. Davis to talk about possible business with Jho Low?

11   **A.**  Yes.

12   **Q.**  And is that the first time you met Mr. Michel?

13   **A.**  Yes.

14   **Q.**  And approximately, if you recall, how long did that

15   conversation take?  Half hour?

16   **A.**  I'd be guessing, less than an hour.

17   **Q.**  Okay.  And did there come a time when you had -- I think

18   you testified Mr. Michel was present in Bangkok; is that

19   correct?

20   **A.**  Yes.

21   **Q.**  Did you talk to Mr. Michel in Bangkok?

22   **A.**  He was part of the conversation, so -- everyone was that I

23   mentioned, so I'd say yes.

24   **Q.**  Do you recall what, if anything, Mr. Michel said at that

25   meeting?

1    **A.**  Not much, no.

2    **Q.**  Okay.  And when was the -- how long was that meeting, by

3    the way?

4    **A.**  I don't really want to guess.  Two hours.  It's a guess,

5    though.  I could be off by some --

6    **Q.**  All right.  I don't want a guess.

7         If you don't know --

8    **A.**  All right.  I can't tell you precisely.

9    **Q.**  Okay.  And did there come a time after that meeting in

10   Bangkok, I think you said at the Trump hotel, when Mr. Sun was

11   here and Mr. Michel and Ms. Davis and yourself went to speak

12   with him; is that -- did I get that right?

13   **A.**  No.

14   **Q.**  Okay.  Did there come a time when -- did there come a time

15   at the Trump hotel when you had another conversation that

16   Mr. Michel was part of?

17   **A.**  Yes.

18   **Q.**  And when was that?

19   **A.**  That was immediately preceding the Malaysian prime

20   minister's bilateral meeting in 2017.

21   **Q.**  And how long did that conversation --

22            THE COURT:  Excuse me.  Keep your voice up, please.

23   Keep your voice up.

24        Okay.  What was your question?

25   **Q.**  (BY MR. KENNER)  How long did that meeting or conversation

1  last?

2  **A.**  The one with just --

3  **Q.**  The one about the bilateral meeting.

4  **A.**  Including the prime minister you're asking?

5  **Q.**  Yes.

6  **A.**  I don't know.  An hour or so.

7  **Q.**  Mr. Michel was in no way a major part of that

8  conversation, was he?

9  **A.**  Correct, he was not.

10  **Q.**  In fact, he, other than being there, hardly said anything;

11  correct?

12  **A.**  Correct.

13  **Q.**  Are there any other occasions that you had to talk with

14  Mr. Michel?

15  **A.**  Yes.

16  **Q.**  And when was that?

17  **A.**  We had a couple meetings in Los Angeles, other meetings.

18  One was at the Soho Club, and one was at Wally's liquor

19  store.

20         THE COURT:  You need to keep your voice up.  I know

21  you're getting tired, but think of somebody at the back door

22  and talk there.

23         THE WITNESS:  Okay.

24         MR. KENNER:  I'm getting tired, too, Your Honor.

25         THE COURT:  I know, I'm sure everybody is.  But I

```
 1    just want to make sure people keep their voice up so we can
 2    hear.
 3              MR. KENNER:  Thank you.
 4    Q.  (BY MR. KENNER)  With regard to the meeting at Soho Club,
 5    who was present at that?
 6    A.  Nickie Lum Davis, Pras Michel, and myself.
 7    Q.  And did you have dinner or lunch?  If you recall.
 8    A.  I think it was in the evening.  I don't recall if we had
 9    dinner.
10    Q.  Did you have a drink maybe?
11    A.  Perhaps.
12    Q.  Do you recall any of that conversation?
13    A.  I'd have to think about it.  I --
14    Q.  As you sit there now, without thinking more about it, you
15    don't recall whether you had any conversation with
16    Mr. Michel that night?
17    A.  No, we did have conversation then at Wally's liquor
18    store --
19    Q.  You were still at the Soho --
20              THE COURT:  Let him finish his answer.
21    A.  And there was maybe one other meeting.
22    Q.  (BY MR. KENNER)  Besides Soho?
23    A.  It might have been at my office.
24    Q.  I'm sorry.  I apologize.
25        I think you said --
```

Cross-examination - Broidy

1            THE WITNESS:  Am I interrupting him or is he

2       interrupting me?

3            THE COURT:  Can you all just take a beat after --

4            THE WITNESS:  I'm sorry.

5            THE COURT:  -- or before so that we're not --

6            THE WITNESS:  It's me.

7            THE COURT:  -- talking at the same time?

8        Nobody is going to be able to keep track of this.  I'm

9       going to let you finish your answer, and then he can move on

10      to --

11           THE WITNESS:  Okay.  I have nothing to add.

12      **Q.**  (BY MR. KENNER)  Okay.  One of these meetings, as you call

13      it, was at Soho; is that right?

14      **A.**  Right.

15      **Q.**  And that's when you maybe had a drink?

16      **A.**  Maybe had something to eat, probably had a drink.  I --

17      **Q.**  But you have no present recollection of any of that

18      conversation; correct?

19      **A.**  It was about the same topics, all of these meetings.

20      **Q.**  Do you recall what was said by Mr. Michel?  It's a long

21      time ago.  If you don't, you don't.

22           THE COURT:  Are you asking him to give a -- repeat

23      an exact thing, or are you asking him just what the subject

24      matter is?

25           MR. KENNER:  I'm asking him if he recalls statements

1    made by Mr. Michel at the Soho hotel when you were having a

2    drink and/or dinner.

3    **A.**   It's not -- it's at a club.

4    **Q.**   (BY MR. KENNER)   A club, I'm sorry.   I apologize.

5    **A.**   No problem.

6         I don't recall precisely what was said.   I think -- I

7    believe at the Wally's meeting he talked about the civil

8    forfeiture or his assets had been frozen, something to that

9    effect.   And then there was another meeting where we talked

10   about a lack of productivity, you know, the lack of success in

11   terms of what we were doing.

12   **Q.**   Okay.   Did you -- were you a part of the -- I apologize.

13        Did you represent Jho Low in arriving at the -- at a

14   settlement with regard to the forfeiture complaint that was

15   filed against him, 1MDB and others?

16   **A.**   There wasn't a settlement that I'm aware of.   Did he

17   settle the forfeiture?   I don't recall.

18   **Q.**   Do you recall that the forfeiture case was in Los

19   Angeles?

20   **A.**   Yes.   We -- did the case settle?

21             THE COURT:   You can't ask him a question.   If you

22   don't know, just --

23   **A.**   Oh, sorry.

24        I don't recall if the case settled.   I know later there

25   was a criminal indictment of Jho Low.   I don't know what

1  finally happened with the civil forfeiture.

2  **Q.**  (BY MR. KENNER)  But did I misunderstand, sir?  You're

3  saying that you were retained initially to help Jho Low

4  resolve the forfeiture matter in connection with himself and

5  1MDB?  Did I misunderstand that?

6  **A.**  No, we did that, but we were unsuccessful.  We played no

7  part in settlement of anything.

8  **Q.**  Okay.  When you say you did that, will you describe the

9  "that" that you did, please?

10  **A.**  Can you repeat it?

11  **Q.**  Yeah.

12      I asked you a question about the 1MDB case and the

13  forfeiture against it and Jho Low, and you -- I believe your

14  answer was we did that, and I don't know what the "that" is.

15  **A.**  No, I meant we were retained to work on that, I'm saying

16  on the civil forfeiture matter involving 1MDB with the United

17  States Government, Department of Justice.  What I'm saying is

18  we played no role in whatever the disposition of the case was.

19  You're indicating the case settled.

20  **Q.**  Okay.  What did you do pursuant to your retainer to assist

21  in the 1MDB and Jho Low forfeiture actions?  What did you

22  do?

23  **A.**  We tried to arrange a golf game; talked to different

24  government officials; provided information to government

25  officials.

Cross-examination - Broidy

1    **Q.**  Okay.  So you -- your understanding, then, that Mr. Low

2    was not expecting you or Colfax Law to work on the case

3    involving the 1MDB forfeiture or the Jho Low forfeiture?

4    **A.**  Work on the case --

5          MR. KELLER:  Objection, Your Honor.

6    Mischaracterization about Mr. Broidy's work on the matter.

7          THE COURT:  Yeah, you've also included a whole bunch

8    of separate facts together that --

9          MR. KENNER:  I'm sorry, Your Honor.

10         THE COURT:  -- need to be sorted out.

11         MR. KENNER:  Let me try it again.

12   **Q.**  (BY MR. KENNER)  Did you understand Mr. Low to contemplate

13   any legal work being done by Colfax Law in connection with the

14   forfeiture matters that we've been discussing?

15   **A.**  I don't believe so.

16     At the beginning, I thought that was the case, and we

17   were included in one conversation with Kobre & Kim toward the

18   beginning.  But I think it was not anything to do with legal

19   work.

20   **Q.**  Tell me about the -- you said you had a conversation with

21   Cobra [sic] and Kim.  Is that a law firm?

22   **A.**  Yeah.  I was asked to be on a call with Kobre & Kim and

23   Nickie and I'm not sure -- there were a number of people on

24   the call -- if Pras was on the call or not, I just don't

25   recall at the moment.

Cross-examination - Broidy

1   **Q.**  You can't testify that Pras was on the call, correct?

2   **A.**  Sorry?

3   **Q.**  You cannot testify now that Pras was on the call,

4   correct?

5          THE COURT:  Can you call him by his full name?

6          MR. KENNER:  I'm sorry, Mr. Michel.

7   **A.**  Yeah, I don't recall today, as I sit here, whether he was

8   on the call or not.

9   **Q.**  (BY MR. KENNER)  Okay.

10  **A.**  But I'm saying, other than that, there was really no legal

11  engagement.  Everything was based on using influence to try --

12  or contacts, influence on the government to try to resolve the

13  matter.

14  **Q.**  Without telling me what was said at this point in a

15  meeting with Cobra and Kim, was part of the subject matter of

16  that meeting whether or not you should register under FARA?

17  **A.**  No.

18  **Q.**  Did you ever seek any legal counsel other than from your

19  wife, Ms. Rosenberg [sic], about whether or not you needed to

20  register under FARA?

21  **A.**  I can't go into what lawyers told me.

22  **Q.**  You can't what?

23  **A.**  Go into what lawyers told me.

24  **Q.**  I'm not asking you what lawyers told you.

25      I'm asking --

Cross-examination - Broidy

**A.**  Very late -- very late in the game there were
conversations with counsel.

**Q.**  About FARA?

**A.**  Yes.

**Q.**  And when you say "very late in the game," can you give me
a time frame with reference to how long before you became
aware that you were being investigated in that connection?

**A.**  It was after.

**Q.**  So you sought no legal advice about registering under FARA
until after you knew you were the -- being investigated by the
government, correct?

**A.**  Correct.

**Q.**  But you did discuss that with Ms. Rosenzweig?

**A.**  I think I have spousal privilege.  I don't know how to
answer your questions.

**Q.**  Did you ever discuss -- without telling me what the
conversation was --

**A.**  I can't thread --

**Q.**  -- did you ever seek --

          THE COURT:  Hold on.

**A.**  I can't thread the needle well enough to answer his
questions.

**Q.**  (BY MR. KENNER)  Sir, I'm not trying -- there's no needle,
and I'm not trying to thread anything.

**A.**  It seems like after -- I'm not a lawyer.

Cross-examination - Broidy

1          THE COURT:  You're both talking at the same time,

2     which is --

3     **A.**   I'm not a lawyer, so I can't really answer these.

4          You ask me about the facts of the case, I'll do my best.

5     Honestly, I am doing my very, very best.

6     **Q.**   (BY MR. KENNER)  I know you're -- at this point, I know

7     you're not a lawyer.

8          My question to you is, did you ever have a

9     conversation -- don't tell me what was said.  Did you ever

10    seek the advice of your wife, Robin Rosenzweig, with regard to

11    whether or not you needed to register under FARA?

12    **A.**   It was discussed.

13    **Q.**   And can you tell me in what time frame relative to the

14    events in this case that was discussed with your wife?

15    **A.**   At the --

16         MR. MULRYNE:  Your Honor, objection as to the

17    relevance to the defendant on this line of questioning.

18         THE COURT:  Let's pick up this so we can -- let's

19    pick up the intercom.

20         (Bench conference on the record.)

21         THE COURT:  Mr. Kenner?

22         MR. KENNER:  Yes.

23         THE COURT:  Yeah, you know, he obviously, as a

24    practical matter, you know, pled to his plea that he didn't

25    sign his -- you know, sign up for FARA when he should have, so

Redirect Examination - Broidy

1    I'm not sure what the -- you know, the idea that -- he

2    obviously didn't do anything before that.

3        You're starting to get into some issues in terms of his

4    wife, advice, et cetera, and I don't see any probative value.

5    He obviously didn't do it because he pled to it, so I'm not

6    sure what more you need.

7        And, frankly, comparisons don't work.  The fact that he

8    did or did not sign has nothing to do with whether Mr. Michel

9    should have.

10           MR. KENNER:  Your Honor, may I just have a moment to

11   grab a document, and I can tell you why I think it is highly

12   relevant?

13           THE COURT:  All right.

14           MR. KENNER:  Your Honor, I'll withdraw the

15   question.

16           THE COURT:  Okay.

17           (The following proceedings were had in open court.)

18           THE COURT:  I'll sustain the objection.

19           MR. KENNER:  Thank you.

20           Can I just have a moment, Your Honor?

21           THE COURT:  Yes.

22           MR. KENNER:  Your Honor, I have no further

23   questions.  Thank you.

24           THE COURT:  All right.  Redirect.

25                       REDIRECT EXAMINATION

Redirect Examination - Broidy

1   BY MR. MULRYNE:

2   **Q.**  Good afternoon again, Mr. Broidy.

3   **A.**  Good afternoon.

4   **Q.**  Did you testify moments ago -- you were being asked

5   questions by defense counsel regarding your wife,

6   Ms. Rosenzweig, contracts, legal representation.

7       Do you recall that line of questioning?

8   **A.**  Yes.

9   **Q.**  And you testified moments ago that you understood that

10  this arrangement had to do with political influence; is that

11  right?  This arrangement with Jho Low.

12  **A.**  Yes.

13  **Q.**  All right.  Did you understand, then, that you were being

14  paid for influence, not for legal services?

15  **A.**  It became evident fairly quickly, yes.

16  **Q.**  Okay.  You're not an attorney, are you?

17  **A.**  No.

18  **Q.**  Did you provide any legal services during the course of

19  your dealings with Mr. Low?

20  **A.**  No.

21  **Q.**  With respect to Ms. Rosenzweig, did she ever represent Jho

22  Low in any legal capacity?

23  **A.**  No.  At the beginning I think she envisioned that, but

24  that was not the case.

25  **Q.**  Did that ever come to fruition?

Redirect Examination - Broidy

1    **A.**  No.

2    **Q.**  Did she ever appear in court on behalf of Mr. Low?

3    **A.**  No.

4    **Q.**  Did she ever travel abroad, as you had done, to meet with

5    Mr. Low?

6    **A.**  No.

7    **Q.**  To your knowledge, did she ever speak with Mr. Low?

8    **A.**  No.

9    **Q.**  Are you aware of any legal work or legal services that

10   Ms. Rosenzweig provided on behalf of Mr. Low?

11   **A.**  No.

12          MR. MULRYNE:  If we could pull up Government Exhibit

13   165, which was admitted on cross-examination.

14   **Q.**  (BY MR. MULRYNE)  Mr. Broidy, you were shown and asked

15   about this contract during your cross-examination.

16        Do you recall that?

17   **A.**  Yes.

18   **Q.**  Does your name appear anywhere in this draft unexecuted

19   agreement?

20   **A.**  No.

21   **Q.**  And that agreement -- the other agreement also that you

22   were shown on cross-examination, did you testify on

23   cross-examination that you understood that Ms. Lum Davis was

24   seeking those agreements or contracts in order to invoke an

25   attorney-client privilege?

Redirect Examination - Broidy

**A.**   Yes.  And I think to memorialize the money that she felt she would earn, to have a written agreement that she would be paid.

**Q.**   But Ms. Lum Davis did not have a attorney-client relationship with Ms. Rosenzweig, did she, during this time?

**A.**   No.

**Q.**   And so was it your understanding that Ms. Lum Davis was seeking these contracts seeking the appearance of that arrangement in order to have a privilege to cloak these dealings?

**A.**   Yes.

**Q.**   You were asked multiple questions on cross-examination about plea negotiations during this case.

    Do you recall that?

**A.**   Yes.

**Q.**   And you were shown, for example, that the date on your plea agreement was September 30th, 2020; is that right?

**A.**   Correct.

**Q.**   And according to the date on the same agreement, it appears it was executed on that date; is that right?

**A.**   Yes.

**Q.**   Do you recall, in the lead-up to on or about September 30th, 2020, there being ongoing negotiations between your attorneys and the government attorneys?

**A.**   Yes.

Redirect Examination - Broidy

1  **Q.**  And prior to your counsel that worked out that plea

2  agreement, did you in fact have different counsel, different

3  attorneys that had represented you?

4  **A.**  Yes.

5  **Q.**  And had there been negotiations between those attorneys

6  and the government also with respect to this matter?

7  **A.**  Correct.

8  **Q.**  All right.  Did those attorneys -- did they ultimately

9  leave this matter, they no longer represented you on it?

10  **A.**  Correct.

11  **Q.**  And was it only thereafter with new attorneys in which

12  further negotiations, further -- a plea agreement was

13  struck?

14  **A.**  Yes, correct.

15  **Q.**  So is it your recollection that that happened over a

16  period of time?

17  **A.**  I think so, yes.

18  **Q.**  You were asked several questions on cross-examination

19  about -- about your various meetings with Mr. Michel and

20  meetings at which Mr. Michel was present.

21      Do you recall that?

22  **A.**  Yes.

23  **Q.**  Did you understand during this entire time frame, 2017,

24  that Ms. Lum Davis was in communication with Mr. Michel?

25  **A.**  Yes.

Redirect Examination - Broidy

**Q.** And did you understand Ms. Lum Davis was relaying messages and updates you provided her to Mr. Michel?

**A.** Yes.

**Q.** And for what purpose?

**A.** To keep him informed of what was happening, so that he would keep Jho Low informed.  That was kind of the way the communication worked between us all.

**Q.** Turning back to FARA, defense counsel was asking you questions regarding your knowledge or awareness of FARA.

Do you recall that?

**A.** Yes.

**Q.** After you traveled to Bangkok with Mr. Michel and others, and after you met with Mr. Low and realized that he was not interested in retaining Ms. Rosenzweig -- you testified about that on cross, is that right, that he wasn't looking to retain your wife in a legal capacity?

**A.** I don't think it was that specific at that moment.  I think it may have been a little bit later.

**Q.** Yes.  I -- let me clarify the question.

So putting aside the time frame, did you testify on cross-examination that you came to realize that Mr. Low was not interested in retaining Ms. Rosenzweig --

**A.** Yeah.

**Q.** -- in a legal capacity?

**A.** There came a point -- there came a point in time that that

Redirect Examination - Broidy

1    happened, yes.

2    **Q.**  And you testified just moments ago that indeed he never

3    did retain -- Mr. Low never did retain Ms. Rosenzweig as an

4    attorney; is that right?

5    **A.**  That's right.

6    **Q.**  And so after you went to Bangkok and met with Mr. Low and

7    realized that Ms. Rosenzweig would not be retained as an

8    attorney, did you realize at some point then or thereafter

9    that you -- it was necessary to register for FARA based on the

10   work that you were going to be doing?

11              MR. KENNER:  Objection.  Leading.

12              THE COURT:  No, I'll allow it.

13   **A.**  There came a point -- I think it was later than that, but

14   there came a point in time when -- when I realized that.

15   **Q.**  (BY MR. MULRYNE)  You testified during your earlier

16   exam -- earlier questions, earlier examination that you didn't

17   want to disclose to government officials or otherwise your

18   arrangement and your agreement with Mr. Low; is that

19   correct?

20   **A.**  Yes.

21   **Q.**  And why was that?

22   **A.**  I thought we would be less effective.  I felt that likely

23   wouldn't get the business done if it was disclosed.  The

24   client wanted it to not be disclosed, also.  I thought it was

25   reputationally damaging.

Redirect Examination - Broidy

1          There are a number of reasons why it seemed like keeping

2    it confidential was the right thing.  In retrospect, it was

3    exactly the wrong thing.

4          MR. MULRYNE:  Your Honor, one moment, please.

5          THE COURT:  Certainly.

6    **Q.**  (BY MR. MULRYNE)  Last question.

7          Mr. Broidy, you recall on cross-examination being asked

8    about the -- following your guilty plea in September of 2020,

9    your sentencing date being moved multiple times.

10         Do you recall those questions?

11   **A.**  Yes.

12   **Q.**  All right.

13         MR. MULRYNE:  If we can pull up -- and this has not

14   been admitted -- Government Exhibit 740.  If we can blow up

15   this image, please.

16         THE COURT:  So this is a -- an additional one.

17         MR. MULRYNE:  It -- Your Honor, this is a copy of

18   the docket in that case.

19         THE COURT:  Okay.

20         MR. MULRYNE:  The government would ask to take

21   judicial notice of this docket.

22         MR. KENNER:  No objection, Your Honor.

23         THE COURT:  All right.

24         MR. MULRYNE:  And, Your Honor, the government would

25   further seek judicial notice that no sentencing date had been

Redirect Examination - Broidy

1    scheduled in Mr. Broidy's case following his guilty plea, let

2    alone any sentencing date that was pushed or extended or

3    continued.

4          THE COURT:  All right.  Judicial notice is with an

5    official record the Court can accept as fact, and I'll have to

6    look at it.  But if it's correct that there is no -- the

7    docket would be whatever court proceedings, they're supposed

8    to list what happens next, what happened at the last hearing,

9    when's the next things that are scheduled.

10      If there's no scheduling date for a sentencing, then I

11   would note that that is a fact that you can consider.

12         MR. MULRYNE:  No further questions, Your Honor.

13         MR. KENNER:  Your Honor, just -- I forgot a few

14   things, it's not very long, and in the interest of not having

15   to inconvenience Mr. Broidy, may I ask just a few more

16   questions?

17         MR. MULRYNE:  Your Honor, the government would

18   object to recross.

19         THE COURT:  Let's pick up the phone.

20         (Bench conference on the record.)

21         THE COURT:  This is recrossing.  You're getting into

22   something new or something that's been brought up --

23         MR. KENNER:  Something that I have not yet brought

24   up.

25         THE COURT:  What is it?

1          MR. KENNER:  It's regarding whether or not his fees

2    were forfeited.  And also with regarding to whether or not he

3    expects to be sentenced on this case.

4          THE COURT:  On what case?

5          MR. KENNER:  His case, the case that he -- the

6    information that was filed that he pled to.  I don't see

7    anything on the docket.

8          THE COURT:  Okay.  Is there something else?  As far

9    as I know -- let's see.

10      I think that the criminal case is closed.  He pled

11   guilty.  They never sentenced.  He got a pardon.  He did a

12   cooperation agreement, which indicates that, you know, he's

13   supposed to be truthful and provide this information; and if

14   he's truthful, they don't charge him.  There's nothing else

15   left as far as I know from the dockets.

16      Am I correct, Mr. Mulryne?

17          MR. MULRYNE:  You're correct, Your Honor.

18          THE COURT:  Okay.  So there's no criminal case at

19   all.

20          MR. KENNER:  Okay.  I won't do that.  May I just ask

21   about the forfeiture of his fees?

22          THE COURT:  And what's the probative value of that,

23   as to whether --

24          MR. KENNER:  The probative value --

25          THE COURT:  What do you expect the answer to be?

1          MR. KENNER:  I expect the answer to be they were not

2     forfeited.

3          THE COURT:  And what difference does that make in

4     terms of any of the cases that we've got here?

5          I mean, what possible --

6          MR. KENNER:  It's another benefit that Mr. Broidy

7     got out of his cooperating.

8          MR. MULRYNE:  Your Honor, the government objects on

9     relevance.  That's related to the pardon, not anything

10    specific to this case.

11         THE COURT:  Okay.  The fees were related to the

12    materials that would have come up with the FARA violation.

13    And in terms of if they were going to forfeit something, the

14    forfeiture would have been part of the sentencing with -- I

15    didn't look at the plea agreement that carefully.

16         Did it originally have a forfeiture in it, Mr. Mulryne?

17         MR. MULRYNE:  It did, Your Honor.

18         THE COURT:  Okay.  So the original case would have

19    had a forfeiture in it.  He got pardoned, so he doesn't have

20    to forfeit the money, and he has no other -- other than this

21    cooperation agreement, which is not a plea agreement.

22         So there's -- you know, the pardon took care of the

23    forfeiture, so I don't think that that frankly has anything

24    more to do with it.  I don't see any relevance bringing it

25    out.

1          MR. KENNER:  Your Honor, I believe that one of the

2    benefits Mr. Broidy got as a result of being pardoned was that

3    he was allowed to keep 8 or 9 million dollars, and I think

4    that was --

5          THE COURT:  And what difference does that make in

6    terms of Mr. Michel and his case?  Tell me what's relevant

7    about Mr. Michel and his case.

8          MR. KENNER:  What's relevant is -- Your Honor, I'll

9    withdraw it.  Never mind.

10         THE COURT:  Okay.

11         (The following proceedings were had in open court.)

12         THE COURT:  All right.  The -- all right.  So at

13   this point, can we excuse Mr. Broidy altogether?

14         MR. MULRYNE:  Yes, Your Honor.

15         THE COURT:  Mr. Kenner?

16         MR. KENNER:  Yes, Your Honor.

17         THE COURT:  All right.  You're excused, sir.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  All right.  It's 4:15, so I can get to

20   my meeting on time.

21       All right.  Let me -- if people will pick up for a

22   second, I want to talk about scheduling for tomorrow for a

23   minute.

24         (Bench conference on the record.)

25         THE COURT:  So I think -- who are your witnesses

1   tomorrow?

2          MR. KELLER:  Your Honor, the government plans to

3   call Ron Vinder and then either financial analyst Eric Van

4   Dorn or possibly George Higginbotham depending on timing.

5          THE COURT:  Okay.  Do we have any issues that are

6   going to come up this evening?

7          MR. KENNER:  The only issue that would come up is I

8   would respectfully request the government tells me whether or

9   not they're going to call Mr. Higginbotham or Mr. Van Dorn.

10  They're both significant witnesses on cross, and I would like

11  to know which one to prepare for first.

12         MR. KELLER:  Your Honor, the only reason why I'm not

13  not hedging -- or I'm hedging is because I don't know exactly

14  how long the testimony of Mr. Vinder is going to take with

15  cross, and I know we're stopping at 11:30 tomorrow.

16      Is that right?

17         THE COURT:  No, that's because -- I did 11:30

18  because Mr. Kenner, as I understand it, wanted to, you know,

19  be done by noon, so I made it half an hour earlier to make

20  sure that we actually finish.

21      So he's told you, Mr. Kenner, the order of them, as I

22  understand it, so it depends on how long they take.

23         MR. KELLER:  No.

24         THE COURT:  Is that correct?

25         MR. KELLER:  It's not, Your Honor.  If Mr. Vinder is

1    done fairly quickly in the morning, then --

2          THE COURT:  You'll get to the other two.  I'm saying

3    to you, he's told you the three witnesses they're hoping to

4    call in the order, and that's the order you're going to do,

5    right, Mr. Mulryne, or not?

6          MR. KELLER:  Sorry, Your Honor, it's --

7          THE COURT:  Assuming the first guy goes quick, are

8    you then -- what choices are you --

9          MR. KELLER:  Then it would be Higginbotham, Your

10   Honor.

11         THE COURT:  All right.  So it would be Mr. Vinder,

12   is it?

13         MR. KELLER:  Yes.

14         THE COURT:  Vinder would be first.

15         MR. KELLER:  Yes.

16         THE COURT:  If he's quick, then you're putting

17   Higginbotham.

18         MR. KELLER:  Yes, Your Honor.

19         THE COURT:  If it's not quick, you're doing the

20   other person; is that correct?

21         MR. KELLER:  That's probably right, Your Honor,

22   yes.

23         THE COURT:  Okay.  Because you want Higginbotham to

24   basically go all the way through and not have the afternoon.

25         MR. KELLER:  Or at least to be able to get close to

1    finishing him or finish him, that's right.

2             THE COURT:  Okay.  So what they've told you is

3    they're doing Vinder.  If he takes a long time, they'll put

4    the other guy on.  If he takes a short time, they'll put

5    Higginbotham.  That's as close as you're going to get, and I'm

6    certainly not requiring them to tell you anything more.  You

7    now know the three people that are potentially up.

8        My suggestion is that we start at 9:00 if everybody can

9    be here, say, at a quarter of 9:00, and I tell the jury to

10   come at 9:00.  You all come 15 minutes earlier so that we get

11   all set up and ready to go.  And the jury has been -- other

12   than one person, we've been pretty good about getting

13   everybody here, you know, actually on time.

14       So are you willing to do that, start at 9:00?

15             MR. KENNER:  I have no objection, Your Honor.

16             MR. KELLER:  Yes, Your Honor.

17             THE COURT:  Okay.  All right.  So do we have an

18   issue for this evening or not?

19             MR. KENNER:  Not that I'm aware of, Your Honor.

20             THE COURT:  Mr. --

21             MR. KELLER:  No, Your Honor.

22             THE COURT:  Okay.  The only reason I say that is

23   that it takes time for us in the morning to talk about it.  If

24   we don't have something to talk about, then we can immediately

25   go into the testimony.

1          MR. KENNER:  Thank you, Your Honor.

2          THE COURT:  All right.  Thanks.

3          MR. KELLER:  Thank you.

4          (The following proceedings were had in open court.)

5          THE COURT:  Again, you know, don't talk about the

6     case, don't read, don't listen, whatever.

7     I'm going to ask you to come at 9:00 or before 9:00.

8     We're going to bring you out at that point.  We're coming a

9     little early, so if there's something to talk about, we can

10    take care of it, and so that way we have a fuller morning.

11    We'll go probably around 11:30, but certainly no later

12    than noon, and then you have the afternoon free.  All right?

13          So take care, be well.  See you all tomorrow.  It's

14    important everybody be on time so we can get out here and

15    start at 9:00.

16          (Jury left the courtroom.)

17          THE COURT:  All right.  I'll see you all tomorrow at

18    quarter of.

19          MR. KELLER:  Your Honor, I know the Court is running

20    to a meeting.  Can I just make one more point on the phones,

21    Your Honor?

22          THE COURT:  Okay.

23          (Bench conference redacted.)

24          (The proceedings were concluded at 4:18 p.m.)

25

1        I, Christine Asif, RPR, FCRR, do hereby certify that
the foregoing is a correct transcript from the stenographic

2  record of proceedings in the above-entitled matter.

3                _____/s/_____
                  Christine T. Asif

4               Official Court Reporter

< Dates >.
April 4th, 2023
   1:11.
January 19,
   2021 52:12.
July 26th
   33:2.
May 5th 6:3.
September 30
   38:24, 39:20,
   39:23, 40:2,
   42:4, 42:17,
   57:22.
September 30,
   2020 52:7.
$25 12:21.
$8 24:10.
.
.
< 1 >.
1 8:22,
   48:19.
1016 1:28.
11:30 81:15,
   81:17,
   84:11.
12 40:2.
1301 1:27.
1400 1:35.
15 83:10.
165 18:7, 20:7,
   71:13.
166 25:16,
   26:15,
   26:18.
16633 1:42.
19-00148-1
   1:6.
1MDB 13:9,
   63:15, 64:5,
   64:12, 64:16,
   64:21,
   65:3.
.
.
< 2 >.
2 48:20.
2(a 26:22.
20001 2:17.
20004 2:9.

20005 1:36.
2017 5:13,
   5:14, 5:20,
   6:3, 12:24,
   59:20,
   73:23.
2018 37:9.
2019 33:2.
202 2:18.
2020 36:24,
   37:1, 38:14,
   38:25, 39:13,
   46:16, 47:21,
   51:25, 72:17,
   72:23,
   76:8.
20530 1:29.
228 6:17.
25 26:7, 26:24,
   29:1.
26-page 30:9.
2:04 1:12.
.
.
< 3 >.
30 26:7, 28:3,
   28:4, 28:13,
   29:1,
   44:11.
30th 37:9,
   37:11, 38:14,
   39:13, 39:25,
   51:24, 72:17,
   72:23.
328 6:12, 6:18,
   6:20, 6:21,
   7:3, 10:15.
333 2:15.
354-3247
   2:18.
3:25 50:5.
3:30 50:3.
.
.
< 4 >.
4 3:7, 6:11,
   8:4, 10:14,
   11:16.
403 32:8.
4:00 49:25,

   50:6, 51:7,
   51:11.
4:15 50:1,
   50:6, 51:7,
   51:11,
   80:19.
4:18 84:24.
4:30 51:1,
   51:8,
   51:12.
.
.
< 5 >.
50 24:10.
530 37:25,
   51:18, 51:21,
   51:22,
   51:23.
531 38:1, 38:7,
   38:9,
   38:12.
.
.
< 6 >.
641 2:8.
6507 2:16.
.
.
< 7 >.
7 1:17.
70 3:9.
700 8:16.
740 76:14.
75 24:11.
.
.
< 8 >.
8 80:3.
.
.
< 9 >.
9 80:3.
91436 1:43.
9:00 83:8,
   83:9, 83:10,
   83:14, 84:7,
   84:15.
[sic] 65:21,
   66:19.

_____/s/___

_____
   85:5.
.
.
< A >.
abandoned
   4:4.
able 6:10,
   48:7, 62:8,
   82:25.
above 26:23,
   39:8.
above-entitled
   85:3.
abroad 71:4.
Absolutely
   10:10, 10:12,
   28:23,
   39:19.
accept 32:14,
   37:7, 77:5.
accepted
   23:16.
access 9:12,
   43:21, 43:24,
   44:1, 44:2,
   44:4.
according
   72:19.
achieved
   24:12.
acquaintance
   5:6.
Act 54:23.
acting 32:3.
ACTION 1:5.
actions
   64:21.
activities
   56:25.
actual 20:17.
actually 81:20,
   83:13.
add 62:11.
additional
   12:5,
   76:16.
address 20:14,
   20:20.
Administration

44:10.
admission
  6:24.
admit 20:7,
  26:15,
  26:18.
admitted 6:15,
  6:16, 6:23,
  9:4, 9:7,
  9:23, 9:25,
  10:2, 10:15,
  10:22, 11:6,
  12:11, 18:8,
  20:3, 20:4,
  25:17, 38:7,
  51:19, 51:21,
  71:13,
  76:14.
advice 49:15,
  67:9, 68:10,
  69:4.
advise 48:5.
advised 48:3.
afield 46:7.
AFTERNOON 1:13,
  4:18, 4:19,
  5:1, 5:2,
  49:24, 51:4,
  51:5, 70:2,
  70:3, 82:24,
  84:12.
Agent 54:23.
ago 25:13,
  62:21, 70:4,
  70:9, 75:2.
agree 38:22,
  38:24.
agreed 35:6,
  40:13,
  40:15.
agreement.
  55:21.
agreements
  23:7,
  71:24.
agrees 26:24.
ahead 10:16,
  14:12, 16:25,
  17:1, 34:6.
allow 14:12,

34:6, 42:10,
  54:1,
  75:12.
allowed 80:3.
allowing
  32:1.
Alon 1:40.
alone 77:2.
already 32:15,
  35:6, 45:21,
  49:14,
  52:22.
although 10:8,
  14:21.
altogether
  80:13.
AMERICA 1:5.
amount 12:19,
  26:25,
  54:1.
amounts 28:5.
analysis 53:13,
  53:16.
analyst 81:3.
analysts 10:5,
  11:3.
analyzing
  11:2.
and/or 63:2.
Angeles 60:17,
  63:19.
answer 15:22,
  16:25, 36:1,
  41:14, 41:15,
  41:19, 41:21,
  49:9, 50:12,
  52:22, 54:11,
  61:20, 62:9,
  64:14, 67:15,
  67:21, 68:3,
  78:25,
  79:1.
answered 17:21,
  22:5, 41:5,
  52:21.
anybody 42:1,
  55:19,
  56:9.
apart 11:8.
apologize 17:1,

36:3, 44:15,
  49:3, 61:24,
  63:4,
  63:12.
appear 6:23,
  71:2,
  71:18.
appearance
  72:8.
APPEARANCES
  1:23, 2:1.
appears
  72:20.
appeasing
  45:19.
application
  52:25,
  54:8.
applied
  40:22.
apply 14:22,
  16:5.
appreciate
  48:12.
approach
  23:15.
approached
  12:23,
  57:16.
appropriate
  27:22, 50:7,
  53:10.
approximately
  53:22,
  58:14.
Argumentative
  17:20,
  29:10.
around 46:25,
  84:11.
arrange
  64:23.
arrangement
  14:20, 70:10,
  70:11, 72:9,
  75:18.
arriving
  63:13.
Asia 44:24.
aside 74:20.

Asif 2:11,
  85:1, 85:6.
assets 63:8.
assist 13:9,
  13:11,
  64:20.
assume 36:17.
Assuming 24:3,
  24:12, 26:9,
  31:23, 32:1,
  32:11, 47:3,
  82:7.
attention 20:9,
  26:21.
attorney 21:11,
  21:12, 21:16,
  22:14, 29:13,
  30:1, 31:6,
  31:8, 31:21,
  32:3, 32:5,
  32:25, 36:1,
  36:3, 41:7,
  41:9, 70:16,
  75:4, 75:8.
attorney-client
  14:5, 32:20,
  48:9, 71:25,
  72:4.
attorneys 34:9,
  52:20, 72:24,
  73:3, 73:5,
  73:8,
  73:11.
authority
  21:7.
Avenue 1:27,
  1:35, 2:8,
  2:15.
avoid 57:24.
aware 16:17,
  16:18, 33:4,
  49:18, 49:22,
  50:18, 63:16,
  67:7, 71:9,
  83:19.
awareness
  74:9.
.
.
< B >.

B. 3:5.
back 5:13,
   16:13, 22:18,
   25:8, 40:13,
   46:11, 46:16,
   50:21, 51:17,
   53:17, 54:16,
   60:21,
   74:8.
background
   53:16.
Bangkok 54:21,
   58:18, 58:21,
   59:10, 74:12,
   75:6.
based 9:12,
   34:18, 47:20,
   52:3, 52:5,
   66:11,
   75:9.
basically 9:5,
   32:4, 33:10,
   82:24.
basis 22:8.
beat 62:3.
became 14:4,
   14:18, 24:3,
   67:6,
   70:15.
become 17:8.
began 14:16,
   57:19.
beginning
   13:25, 16:19,
   16:20, 65:16,
   65:18,
   70:23.
behalf 21:4,
   21:5, 23:17,
   30:10, 30:18,
   31:6, 31:21,
   32:3, 53:23,
   71:2,
   71:10.
believe 10:20,
   11:18, 17:19,
   18:8, 18:9,
   19:25, 26:3,
   36:22, 46:17,
   48:23, 49:1,

   51:19, 53:4,
   53:12, 53:18,
   54:17, 54:21,
   55:4, 55:7,
   63:7, 64:13,
   65:15,
   80:1.
believed 16:3,
   43:21.
Bench 29:19,
   45:12, 51:8,
   68:20, 77:20,
   80:24,
   84:23.
benefit 11:20,
   79:6.
benefits
   80:2.
Besides
   61:22.
best 68:4,
   68:5.
better 15:7.
beyond 31:24.
bilateral
   59:20,
   60:3.
bind 21:7.
bit 37:2,
   38:13, 51:10,
   51:17,
   74:18.
blow 76:14.
born 53:17.
bottom 10:21.
Boulevard 1:42,
   20:14.
break 50:1,
   50:20.
brick-and-morta
   r 20:17.
bring 30:25,
   37:19,
   84:8.
bringing 32:9,
   79:24.
broad 22:22.
brought 77:22,
   77:23.
bunch 65:7.

business 5:14,
   5:15, 6:7,
   8:1, 10:4,
   12:14, 12:16,
   21:10, 27:3,
   28:9, 57:17,
   58:10,
   75:23.
businesses
   5:18.
.
.
< C >.
C-i-r-c-i-n-u-s
   5:23.
California
   1:43,
   21:11.
call 39:8,
   49:3, 49:4,
   62:12, 65:22,
   65:24, 66:1,
   66:3, 66:5,
   66:8, 81:3,
   81:9, 82:4.
called 58:2.
calls 35:12.
Capabilities
   6:4, 10:6.
capacity 70:22,
   74:16,
   74:24.
care 79:22,
   84:10,
   84:13.
careful
   28:20.
carefully
   79:15.
cases 14:2,
   49:19,
   79:4.
casino 45:19.
casinos 45:5,
   45:20.
caused 52:25.
certain 6:15,
   18:8, 49:14,
   54:1.
Certainly 7:14,

   13:18, 14:14,
   31:22, 32:1,
   32:4, 38:18,
   40:10, 41:17,
   45:11, 76:5,
   83:6,
   84:11.
certify 85:1.
cetera 45:25,
   69:4.
chance 18:24.
Characterizatio
   n 28:16,
   34:21.
characterize
   48:22.
charge 49:7,
   78:14.
Charles 2:5,
   2:6.
China 44:24.
Chinese
   45:19.
choices 82:8.
Chris 29:13,
   33:1.
Christine 2:11,
   85:1, 85:6.
Circinus 5:18,
   5:20, 6:4,
   6:7, 7:15,
   7:21, 8:1,
   9:15, 10:4,
   10:5, 10:19,
   10:25, 11:12,
   11:17,
   11:21.
civil 63:7,
   64:1,
   64:16.
clarify 28:22,
   74:19.
Clark 29:13,
   33:1.
clear 27:12,
   34:22,
   50:16.
CLERK 6:22.
client 11:4,
   14:18, 14:19,

16:3, 16:8,
16:9, 16:19,
17:3, 17:6,
17:8, 17:14,
21:8, 23:14,
39:11,
75:24.
cloak 72:9.
Close 52:18,
82:25,
83:5.
closed 78:10.
cloud 9:13.
Club 60:18,
61:4, 63:3,
63:4.
Cobra 65:21,
66:15.
Colfax 14:4,
14:8, 15:9,
21:9, 24:25,
26:24, 27:2,
27:3, 27:25,
28:5, 28:12,
29:4, 65:2,
65:13.
collected
53:23.
collectively
21:8.
COLLEEN
KOLLAR-KOTELL
Y 1:18.
Columbia
2:14.
COLUMBIA 1:2.
comfortable
16:6.
coming 84:8.
comma 21:4.
commentary
27:22.
commission
25:11.
communication
30:8, 73:24,
74:7.
companies
45:5.
company 6:7,

7:15, 7:21,
9:5, 9:9,
10:1,
11:17.
comparisons
69:7.
compensation
24:1.
complaint
63:14.
concerned
49:13.
concluded
84:24.
conclusion
49:10,
49:11.
conditions
34:14,
39:11.
conduct
49:13.
conference
29:19, 45:12,
68:20, 77:20,
80:24,
84:23.
confidential
76:2.
connection
5:20, 6:6,
9:6, 21:15,
33:2, 56:25,
64:4, 65:13,
67:7.
consider 12:10,
13:8, 35:15,
48:16,
77:11.
consideration
26:23.
conspiracies
31:25.
constantly
11:3.
constitutes
21:3, 21:13,
31:7.
consulting
14:20, 25:12,

26:22,
26:23.
CONT'D 2:1.
contacts
66:12.
contain 53:13,
53:16,
53:19.
contemplate
41:25,
65:12.
contents
33:4.
context 23:1,
56:2.
continuances
51:17.
continued
77:3.
Contitution
2:15.
contract
71:15.
contracts 70:6,
71:24,
72:8.
controlling
21:6.
conversation
29:17, 42:2,
49:18, 54:22,
54:25, 58:15,
58:22, 59:15,
59:21, 59:25,
60:8, 61:12,
61:15, 61:17,
62:18, 65:17,
65:20, 67:17,
68:9.
conversations
21:24, 22:23,
41:25,
67:2.
cooperate
31:2.
cooperating
79:7.
Cooperation
30:6, 30:9,
48:24, 48:25,

49:4, 49:5,
78:12,
79:21.
cooperative
30:24.
copied 57:10,
57:12.
copy 19:24,
25:25, 26:2,
26:4,
76:17.
corporation
21:9,
21:10.
corporations
21:5.
correctly 5:24,
21:18, 27:6,
42:22.
correlate
9:11.
Counsel 6:11,
8:3, 25:16,
66:18, 67:2,
70:5, 73:1,
73:2, 74:8.
country
11:20.
couple 60:17.
course 56:13,
70:18.
court. 32:24,
46:9, 69:17,
80:11,
84:4.
courtroom.
4:15, 50:9,
51:2,
84:16.
CRIMINAL 1:5,
63:25, 78:10,
78:18.
cross 74:15,
81:10,
81:15.
CROSS-EXAMINATI
ON 3:7, 4:21,
4:24, 71:13,
71:15, 71:22,
71:23, 72:12,

73:18, 74:21,
76:7.
.
.
< D >.
damaging
75:25.
data 9:12.
David E. Kenner
1:39.
DAY 1:17,
39:16, 40:15,
40:16, 42:19,
51:13.
days 27:3,
40:1.
dealings 70:19,
72:10.
decision 36:15,
37:11,
54:14.
DEFENDANT 1:12,
1:39, 2:5,
68:17.
Defense 4:11,
10:6, 31:5,
70:5, 74:8.
defined
26:25.
Department
1:26, 1:33,
10:5, 29:14,
30:2, 33:5,
64:17.
depending
24:11,
81:4.
depends
81:22.
derive 9:10.
describe 11:19,
56:24,
64:8.
described 7:18,
22:10,
26:13.
desire 6:6,
7:20, 54:7.
determination
21:14, 35:20,

36:18, 36:20,
48:14.
determine
35:10,
49:20.
develop 11:3.
difference
45:14, 79:3,
80:5.
different
26:11, 31:1,
31:2, 44:17,
55:23, 64:23,
73:2.
dinner 43:15,
61:7, 61:9,
63:2.
Directing 20:9,
26:21.
directly 14:16,
44:5.
disclose 49:15,
75:17.
disclosed
75:23,
75:24.
discuss 10:1,
13:19, 13:22,
67:13,
67:16.
discussed
68:12,
68:14.
discussing
43:20,
65:14.
display
25:15.
displayed
20:23.
disposition
64:18.
distracting
46:2.
District 1:1,
1:2, 1:19,
2:13, 2:14.
docket 47:4,
76:18, 76:21,
77:7, 78:7.

dockets
78:15.
document 8:18,
8:21, 8:22,
10:7, 10:24,
11:5, 11:25,
19:6, 27:10,
27:13, 27:18,
69:11.
documents
54:16.
doing 14:23,
21:10, 28:6,
32:3, 40:25,
46:5, 54:3,
63:11, 68:5,
75:10, 82:19,
83:3.
doings 46:4.
dollars 80:3.
Donald 44:16.
done 12:13,
14:7, 15:8,
40:18, 42:12,
42:19, 45:3,
65:13, 71:4,
75:23, 81:19,
82:1.
door 60:21.
Dorn 81:4,
81:9.
Dorothy 4:6,
4:9, 18:10,
45:13.
down 4:16, 7:7,
19:18, 39:5,
51:3.
draft 14:2,
19:22, 19:24,
22:19, 26:11,
71:18.
drafted 21:22,
34:4.
drink 61:10,
62:15, 62:16,
63:2.
drop 20:19.
due 12:19.
duration
24:11.

during 43:19,
56:13, 70:18,
71:15, 72:5,
72:13, 73:23,
75:15.
.
.
< E >.
e-mails 57:9,
57:12.
earlier 13:16,
24:6, 26:10,
38:6, 75:15,
75:16, 81:19,
83:10.
early 12:24,
19:22, 22:18,
50:22, 57:20,
84:9.
earn 72:2.
eat 62:16.
effect 40:19,
63:9.
effective
75:22.
either 4:6,
10:1, 42:19,
47:16,
81:3.
election
43:20.
Elliott 3:5.
Encino 1:43.
ended 49:17.
engaged
13:23.
engagement
14:3, 14:17,
14:19, 16:2,
17:10, 24:11,
66:11.
Enough 23:10,
67:21.
enter 30:4,
31:3, 48:15,
49:5, 52:5.
entered 4:15,
34:17, 35:5,
35:19, 36:5,
36:23, 37:22,

41:1, 46:15,
46:18, 47:23,
51:2, 51:24,
52:2, 52:14,
56:8.
entertainment
5:11.
entire 73:23.
entirely
17:4.
envisioned
70:23.
equal 26:25.
Eric 81:3.
Esquire 1:25,
1:31, 1:32,
1:39, 1:40,
2:5.
essence
28:10.
essentially
26:13,
31:8.
established
57:20.
et 45:25,
69:4.
evaluate
55:1.
evening 61:8,
81:6,
83:18.
events 7:18,
31:2, 56:13,
68:14.
Everybody 4:16,
50:21, 51:3,
60:25, 83:8,
83:13,
84:14.
everyone 4:18,
57:4,
58:22.
Everything
66:11.
evidence 8:7,
8:9, 11:25,
26:16, 31:9,
31:13.
evident 14:18,

70:15.
exact 42:1,
62:23.
exactly 15:11,
16:15, 28:17,
30:24, 35:22,
76:3,
81:13.
exam 75:16.
EXAMINATION
3:9, 69:25,
75:16.
example
72:16.
exchange
57:9.
exclude 27:7.
Excuse 16:24,
27:21, 56:12,
59:22,
80:13.
excused
80:17.
executed 21:13,
25:25, 26:2,
26:3, 26:9,
72:20.
executive
51:9.
exemption
14:22,
16:4.
Exhibit 6:12,
6:13, 6:14,
7:3, 8:25,
9:2, 9:19,
9:23, 10:2,
10:15, 12:10,
18:7, 25:16,
25:17, 26:15,
38:1, 38:9,
38:12, 51:18,
51:22, 51:23,
71:12,
76:14.
exhibits
8:16.
expect 30:11,
78:25,
79:1.

expected
40:6.
expecting
65:2.
expects 78:3.
expert 34:12.
extend 45:20.
extended 46:25,
47:21,
77:2.
extra 51:10,
51:11.
.
.
< F >.
F. 1:31.
fact 7:20,
13:10, 16:17,
40:16, 47:3,
60:10, 69:7,
73:2, 77:5,
77:11.
factor 44:22,
44:23.
facts 34:18,
65:8, 68:4.
fair 7:25,
23:16, 44:8,
44:10,
55:17.
fairly 70:15,
82:1.
familiar 23:10,
53:7.
far 45:24,
46:7, 49:13,
78:8,
78:15.
FARA 13:24,
32:18, 54:23,
55:1, 55:3,
55:6, 55:9,
55:12, 55:15,
55:19, 56:9,
66:16, 66:20,
67:3, 67:9,
68:11, 68:25,
74:8, 74:9,
75:9,
79:12.

FCRR 2:11,
85:1.
fee 24:10,
25:11, 26:6,
26:11, 26:24,
26:25, 27:1,
27:3, 27:8,
27:11, 27:24,
28:2, 28:10,
28:24.
feel 56:8.
feeling
56:13.
feelings 56:18,
56:21.
Fees 12:16,
21:15, 26:22,
28:13, 78:1,
78:21,
79:11.
felt 16:6,
72:1,
75:22.
few 7:11, 40:3,
77:13,
77:15.
figure 7:12.
file 55:1.
filed 52:25,
54:9, 57:18,
58:2, 63:15,
78:6.
finally 64:1.
financial
81:3.
finder 27:1,
27:8,
27:11.
finding
13:12.
fine 19:12,
27:20,
50:4.
finish 14:12,
19:11, 40:8,
41:14, 61:20,
62:9, 81:20,
83:1.
finished 18:25,
19:11, 19:13,

20:24,
45:2.
finishes
41:15.
finishing
83:1.
Firm 1:41,
14:8, 15:9,
21:12, 24:25,
27:25, 28:12,
65:21.
first 17:13,
18:11, 18:21,
20:3, 20:4,
20:10, 20:22,
25:9, 27:7,
30:8, 37:24,
42:7, 46:15,
47:7, 47:9,
47:20, 57:16,
58:6, 58:12,
81:11, 82:7,
82:14.
follow 11:10,
41:12.
following
26:24, 32:24,
46:9, 69:17,
76:8, 77:1,
80:11,
84:4.
foregoing
39:10,
85:2.
Foreign
54:23.
forfeit 79:13,
79:20.
forfeited 78:2,
79:2.
forfeiture
13:9, 63:8,
63:14, 63:17,
63:18, 64:1,
64:4, 64:13,
64:16, 64:21,
65:3, 65:14,
78:21, 79:14,
79:16, 79:19,
79:23.

forgot 77:13.
formal 21:3.
forth 26:23,
27:4,
40:13.
Foundation
47:2.
frame 36:5,
37:8, 67:6,
68:13, 73:23,
74:20.
frankly 32:8,
45:23, 46:1,
69:7,
79:23.
free 84:12.
friend 43:12,
44:17.
friendly 5:5.
friends 43:9,
43:14, 43:18,
44:12.
frozen 63:8.
fruition
70:25.
frustration
14:19.
full 66:5.
fuller 84:10.
.
.
< G >.
game 64:23,
67:1, 67:5.
gave 17:11,
42:17,
49:14.
general
21:12.
Generally 5:12,
9:21.
George 81:4.
gets 31:7,
32:20.
getting 9:6,
12:10, 33:10,
33:12, 40:18,
42:7, 46:7,
47:8, 54:8,
60:21, 60:24,

77:21,
83:12.
give 14:13,
18:24, 62:22,
67:5.
given 38:17,
38:21.
giving 45:16.
golf 64:23.
grab 69:11.
grounds 12:2,
53:25.
group 31:24,
53:9.
guess 40:11,
59:4, 59:6.
guessing 26:10,
40:1,
58:16.
guilty 35:24,
52:3, 76:8,
77:1,
78:11.
Guo 44:20,
45:1.
guy 82:7,
83:4.
.
.
< H >.
Half 52:14,
54:19, 58:15,
81:19.
hand 7:5.
happened 42:21,
48:4, 64:1,
73:15, 75:1,
77:8.
happening
74:5.
happens 77:8.
happy 45:10.
hard 15:21,
36:1,
41:12.
hardly 60:10.
Haskell 2:5,
2:7.
hear 17:7,
17:9, 21:24,

38:10, 41:13,
43:25, 45:10,
61:2.
hearing 77:8.
hearsay 31:7,
31:14, 31:20,
32:4,
32:20.
hedging
81:13.
help 12:25,
44:19,
64:3.
helpful 12:4,
54:4.
helps 19:2.
hereby 26:24,
85:1.
hereinafter
21:8,
21:11.
herself
25:10.
Higginbotham
81:4, 81:9,
82:9, 82:17,
82:23,
83:5.
high 9:10.
highly 69:11.
hire 11:17.
hired 29:12.
hiring 11:20.
history 5:10,
14:13.
Hold 6:21,
67:20.
holiday
50:18.
home 20:20,
20:21.
Honestly
68:5.
HONORABLE
1:18.
hoping 82:3.
hotel 59:10,
59:15,
63:1.
hour 40:3,

58:15, 58:16,
   60:6,
   81:19.
hours 40:3,
   59:4.
husher 45:13.
.
.
< I >.
I. 40:4.
idea 9:22,
   14:7, 14:10,
   14:15, 15:5,
   15:13, 48:3,
   57:8, 69:1.
identification
   10:14,
   25:17.
identify
   15:22.
image 76:15.
imagine
   42:18.
immediately
   59:19,
   83:24.
importance
   30:25.
important
   84:14.
impossible
   9:14.
Inc. 20:12.
include 14:10,
   14:15.
included 65:7,
   65:17.
Including 13:8,
   60:4.
inconvenience
   77:15.
incorporated
   21:9.
incurred
   21:15.
INDEX 3:1.
Indiana 2:8.
indicate 15:16,
   22:5, 35:16,
   38:21,

39:11.
indicated
   32:12, 33:11,
   34:14,
   50:11.
indicates
   78:12.
indicating
   64:19.
indictment
   57:18, 57:21,
   57:24, 58:3,
   63:25.
individual
   21:4.
induce 30:3,
   31:3.
industry
   5:11.
influence 44:9,
   66:11, 66:12,
   70:10,
   70:14.
information
   9:10, 9:13,
   11:3, 11:9,
   30:3, 31:22,
   31:23, 32:11,
   33:12, 58:3,
   64:24, 78:6,
   78:13.
informed 74:5,
   74:6.
ingest 9:10.
Initial
   26:24.
Initially
   15:25, 25:21,
   36:24, 51:24,
   54:21,
   64:3.
Instead 17:8,
   20:20, 51:7,
   51:11,
   58:2.
instruction
   48:2.
Integrity
   1:34.
intel 10:5.

intelligence
   10:6, 11:1.
intercom 29:18,
   68:19.
interest 21:6,
   23:14, 45:19,
   77:14.
interested
   74:14,
   74:22.
interesting
   36:4.
interpret
   23:24.
interrupted
   15:20.
interrupting
   62:1, 62:2.
investigated
   67:7,
   67:10.
investigation
   49:20.
investments
   5:17.
invoke 71:24.
involve
   14:15.
involved 15:25,
   16:19, 31:25,
   32:10, 42:23,
   43:16.
involving
   64:16,
   65:3.
irrelevant
   31:7.
Israely 1:40.
issue 13:9,
   32:21, 81:7,
   83:18.
issues 69:3,
   81:5.
itself 27:18,
   37:18.
.
.
< J >.
Jewish 50:18.
John D. Keller

1:25.
JUDGE 1:19.
judges 51:9.
Judicial 76:21,
   76:25,
   77:4.
juror 4:8,
   4:14.
JURORS 4:19,
   51:5.
Jury 1:17,
   4:15, 18:14,
   20:1, 46:2,
   50:9, 50:10,
   51:2, 51:4,
   83:9, 83:11,
   84:16.
Justice 1:26,
   1:33, 29:14,
   30:2, 33:5,
   36:12,
   64:17.
.
< K >.
Keep 59:22,
   59:23, 60:20,
   61:1, 62:8,
   74:5, 74:6,
   80:3.
keeping 76:1.
Keller 30:10.
Kenner 1:41,
   3:7, 4:22,
   6:11, 8:3,
   8:24, 12:5,
   22:2, 24:22,
   28:21, 29:20,
   31:10, 37:16,
   40:10, 41:15,
   43:7, 43:8,
   48:10, 51:14,
   51:18, 55:25,
   56:3, 56:20,
   60:24, 68:21,
   80:15, 81:18,
   81:21.
Kim 65:17,
   65:21, 65:22,
   66:15.

kind 9:6, 16:4,
  25:11, 36:2,
  74:6.
knowledge
  22:10, 44:24,
  56:7, 71:7,
  74:9.
knows 13:18,
  47:7.
Kobre 65:17,
  65:22.
.
.
< L >.
labeled 49:1.
lack 63:10.
Last 4:8, 39:7,
  39:10, 39:18,
  60:1, 76:6,
  77:8.
late 50:25,
  67:1, 67:5.
later 27:2,
  39:13, 41:7,
  47:12, 47:15,
  47:18, 63:24,
  74:18, 75:13,
  84:11.
latest 50:6.
Latham 29:13,
  33:1.
Law 1:41, 2:6,
  14:8, 15:9,
  20:11, 21:9,
  21:10, 24:25,
  27:25, 29:4,
  65:2, 65:13,
  65:21.
lawyer 13:18,
  13:20, 13:21,
  14:17, 14:24,
  15:2, 16:1,
  22:23, 23:18,
  30:16, 30:17,
  42:18, 67:25,
  68:3, 68:7.
lawyers 13:17,
  34:9, 40:15,
  48:1, 49:14,
  66:21, 66:23,

66:24.
lead-up
  72:22.
Leading 40:1,
  75:11.
learned
  23:14.
learning
  24:17.
least 5:4,
  12:22, 16:5,
  18:9, 54:14,
  82:25.
leave 50:17,
  73:9.
left 40:20,
  42:3, 50:9,
  50:10, 78:15,
  84:16.
legal 12:25,
  13:12, 13:19,
  14:22, 14:23,
  15:4, 16:4,
  17:14, 21:12,
  21:15, 28:13,
  49:9, 49:11,
  65:13, 65:18,
  66:10, 66:18,
  67:9, 70:6,
  70:14, 70:18,
  70:22, 71:9,
  74:16,
  74:24.
less 27:1,
  58:16,
  75:22.
letter 14:17,
  17:10, 21:3,
  25:3, 30:10,
  30:16, 31:6,
  33:4, 37:10,
  37:13, 38:12,
  38:17, 38:21,
  39:2, 52:8,
  53:5.
letters 14:3,
  53:19, 53:22,
  54:10,
  54:13.
licenses

45:20.
life 45:20.
likely 75:22.
limitation
  27:17.
limited
  35:22.
line 53:24,
  68:17,
  70:7.
lines 39:8.
liquor 60:18,
  61:17.
list 77:8.
listed 20:14.
listen 84:6.
literally
  53:17.
little 37:2,
  38:13, 50:25,
  51:10, 51:11,
  51:17, 74:18,
  84:9.
local 11:3.
Lockhart
  1:32.
long 37:6,
  52:24, 58:14,
  59:2, 59:21,
  59:25, 62:20,
  67:6, 77:14,
  81:14, 81:22,
  83:3.
long-standing
  44:20.
longer 73:9.
look 10:11,
  18:25, 20:22,
  24:15, 39:17,
  41:6, 43:5,
  52:19, 54:16,
  77:6,
  79:15.
looked 10:8,
  24:14.
looking 7:10,
  20:24,
  74:15.
loop 17:5.
Los 60:17,

63:18.
lot 23:2,
  32:17, 44:9,
  44:24.
Lum 5:3, 12:23,
  13:6, 14:24,
  14:25, 15:2,
  15:6, 15:25,
  17:7, 22:10,
  23:17, 25:10,
  27:25, 28:8,
  28:12, 29:4,
  29:5, 55:8,
  55:11, 56:14,
  56:24, 57:16,
  61:6, 71:23,
  72:4, 72:7,
  73:24,
  74:1.
lunch 61:7.
.
.
< M >.
Macau 45:6,
  45:15.
major 60:7.
Malaysia 6:3,
  6:7, 6:8,
  7:18, 7:19,
  7:22, 8:2,
  11:17, 11:20,
  12:14.
Malaysian
  10:18,
  59:19.
managing
  5:17.
March 57:19,
  57:20.
marked 10:14,
  25:16.
materials 53:9,
  79:12.
math 52:13.
matter 7:4,
  8:15, 17:5,
  21:7, 21:21,
  22:11, 25:2,
  33:2, 42:15,
  44:20, 58:7,

62:24, 64:4,
64:16, 65:6,
66:13, 66:15,
68:24, 73:6,
73:9, 85:3.
matters 13:19,
65:14.
mean 9:4, 17:2,
27:7, 32:4,
32:12, 35:14,
43:15, 44:15,
44:17, 56:4,
79:5.
meaning 9:10.
meant 64:15.
meet 13:6,
13:13,
71:4.
meeting 12:24,
50:25, 58:25,
59:2, 59:9,
59:20, 59:25,
60:3, 61:4,
61:21, 63:7,
63:9, 66:15,
66:16, 80:20,
84:20.
meetings 60:17,
62:12, 62:19,
73:19,
73:20.
Melania
44:16.
members 51:4.
memorialize
72:1.
memorialized
40:13.
memory 19:2.
mentioned
58:23.
messages
74:1.
met 5:4, 13:19,
54:22, 58:12,
74:13,
75:6.
middle 38:13.
million 12:21,
24:10, 24:11,

80:3.
mind 36:5,
37:6, 49:6,
80:9.
Minimally
21:23,
22:4.
minister 7:19,
59:20,
60:4.
minute 80:23.
minutes
83:10.
Mischaracteriza
tion 43:2,
55:21,
65:6.
mischaracterize
s 23:21.
mischaracterizi
ng 48:18.
misled 49:4.
misunderstand
64:2, 64:5.
moment 4:4,
14:13, 17:22,
18:5, 18:6,
25:6, 25:8,
39:5, 65:25,
69:10, 69:20,
74:17,
76:4.
moments 70:4,
70:9, 75:2.
money 7:16,
7:20, 28:7,
72:1,
79:20.
Monica 20:14.
months 52:14,
54:18.
morning 82:1,
83:23,
84:10.
morphed 14:1,
14:20.
motivations
40:18, 45:23,
46:1.
Move 6:24, 8:8,

22:2, 26:15,
40:8, 62:9.
moved 76:9.
moving 54:3.
MR. KELLER
65:5, 81:2,
81:12, 81:23,
81:25, 82:6,
82:9, 82:13,
82:15, 82:18,
82:21, 82:25,
83:16, 83:21,
84:3,
84:19.
Mullryne 3:9.
Mulryne 1:31,
31:4, 48:21,
76:13, 78:16,
79:16,
82:5.
multi 8:21.
multipage
8:22.
multiple 72:12,
76:9.
musician
13:5.
myself 4:5,
61:6.
.
.
.
< N >.
Name 3:3,
16:18, 33:1,
66:5,
71:18.
nature 30:20.
necessary
75:9.
need 4:3, 4:10,
7:4, 25:13,
28:20, 41:15,
51:8, 51:12,
60:20, 65:10,
69:6.
needed 55:1,
66:19,
68:11.
needle 67:21,
67:23.

negotiate
29:13.
negotiated
26:6, 27:24,
28:2, 28:24,
34:8, 34:13,
34:18,
40:1.
negotiating
29:23,
31:21.
negotiation
40:12.
negotiations
31:8, 47:24,
72:13, 72:23,
73:5,
73:12.
Neither 17:6,
40:4.
New 1:27, 1:35,
47:23, 73:11,
77:22.
next 19:8,
39:17, 40:8,
50:25, 77:8,
77:9.
Nicole 1:32.
night 61:16.
No. 1:5, 31:19,
35:2, 39:17,
48:19, 48:20,
54:10,
70:23.
Nobody 62:8.
noon 81:19,
84:12.
north 12:20.
note 77:11.
nothing 31:11,
62:11, 69:8,
78:14.
notice 76:21,
76:25,
77:4.
notwithstanding
49:8.
nowhere
19:22.
number 31:1,

65:23,
76:1.
numerous 54:10,
54:13.
NW 1:27, 1:35,
2:8, 2:15.
.
.
< O >.
object 31:15,
77:18.
objects 7:9,
41:13,
79:8.
observation
50:17.
obstruction
36:11.
obvious
32:15.
obviously
32:12, 68:23,
69:2, 69:5.
occasions
60:13.
offense 31:12,
32:17, 33:21,
33:23, 34:1,
34:3, 34:19,
34:23, 35:1,
35:7, 35:23,
39:12,
49:7.
offered
32:13.
offering
31:2.
offers 10:25.
office 20:17,
20:19, 40:20,
42:3, 53:10,
61:23.
Offices 2:6,
20:12,
21:9.
Official 2:12,
77:5, 85:7.
officials
64:24, 64:25,
75:17.

One 4:8, 4:14,
5:18, 8:19,
31:19, 32:19,
34:14, 37:24,
40:15, 40:17,
44:2, 45:4,
45:5, 53:10,
56:17, 56:18,
57:1, 60:2,
60:3, 60:18,
61:21, 62:12,
65:17, 76:4,
76:16, 80:1,
81:11, 83:12,
84:20.
ongoing
72:23.
open 9:10,
9:13, 10:6,
11:1, 32:24,
46:9, 69:17,
80:11,
84:4.
order 9:23,
30:3, 31:3,
53:10, 71:24,
72:9, 81:21,
82:4.
organized
57:5.
original
79:18.
originally
79:16.
others 63:15,
74:12.
otherwise
31:14,
75:17.
own 22:10.
owned 45:5.
.
.
< P >.
p.m. 1:12,
84:24.
package 53:7.
Page 3:3, 6:11,
8:4, 8:22,
10:14, 10:17,

11:16, 19:4,
19:8, 24:15,
39:18.
pages 19:15,
40:2.
paid 27:2,
28:8, 29:2,
70:14,
72:3.
panoply 30:2.
Paragraph
10:21, 20:23,
26:21, 26:22,
39:7, 39:8,
39:10.
pardon 40:22,
41:4, 41:6,
42:8, 43:3,
47:23, 49:6,
49:8, 52:11,
52:19, 53:1,
53:7, 53:11,
53:23, 54:7,
54:8, 54:14,
78:11, 79:9,
79:22.
pardoned 52:9,
52:13, 79:19,
80:2.
pardoning
42:3.
part 7:20,
11:16, 17:5,
45:17, 48:14,
58:22, 59:16,
60:7, 63:12,
64:7, 66:15,
79:14.
particular
8:25, 9:23,
12:9, 23:1.
particularly
45:23.
parties
19:20.
partly 10:7.
party 27:2.
pay 26:24,
28:13.
payment

21:15.
people 15:22,
16:11, 16:14,
30:2, 30:10,
31:1, 31:23,
32:9, 44:5,
45:23, 53:20,
55:23, 57:8,
61:1, 65:23,
80:21,
83:7.
percent 26:7,
26:25, 28:3,
28:4, 28:13,
29:1.
performance
24:10.
Perhaps 7:11,
58:7,
61:11.
period 43:19,
54:7, 57:15,
73:16.
perjury 35:24,
36:11.
permission
51:16.
person 4:9,
36:14, 43:16,
82:20,
83:12.
personal 43:9,
43:14, 43:18,
44:12, 44:17,
44:20.
persons
36:14.
perspective
32:6.
pertains 8:1.
phone 77:19.
phones 84:20.
Pick 56:17,
68:18, 68:19,
77:19,
80:21.
plain 32:20.
Plaintiff
1:7.
plans 81:2.

played 64:6,
  64:18.
Please 7:7,
  18:3, 18:25,
  19:6, 24:7,
  24:9, 39:22,
  45:13, 51:3,
  59:22, 64:9,
  76:4,
  76:15.
pled 68:24,
  69:5, 78:6,
  78:10.
point 38:4,
  42:4, 42:7,
  66:14, 68:6,
  74:25, 75:8,
  75:13, 75:14,
  80:13, 84:8,
  84:20.
political
  70:10.
politics
  43:16.
portray 43:23,
  44:1, 44:4.
portrayed
  43:21.
possibility
  42:2.
possible 51:1,
  51:13, 57:17,
  58:10,
  79:5.
possibly
  81:4.
post 20:19.
potentially
  83:7.
practical
  68:24.
PRAKAZREL
  MICHEL
  1:10.
Pras 14:2,
  17:3, 61:6,
  65:24, 66:1,
  66:3.
preceding
  59:19.

precisely 59:8,
  63:6.
prepare 6:3,
  81:11.
prepared 10:18,
  17:10, 17:13,
  29:3.
present 58:18,
  61:5, 62:17,
  73:20.
President
  40:20, 40:22,
  41:4, 42:3,
  43:9, 43:20,
  44:2, 44:3,
  44:5, 44:18,
  44:21.
pressing
  57:5.
pressure 42:11,
  42:23.
presumably
  32:5, 38:3.
pretty 32:15,
  83:12.
previously
  9:13,
  27:19.
primary 5:14,
  5:15, 5:18.
prime 7:18,
  59:19,
  60:4.
prior 33:1,
  40:19, 46:24,
  73:1.
privilege 14:5,
  67:14, 71:25,
  72:9.
probability
  42:2.
probably 46:21,
  62:16, 82:21,
  84:11.
probative 12:9,
  31:24, 32:11,
  33:12, 69:4,
  78:22,
  78:24.
problem 32:2,

32:7, 32:8,
  33:11,
  63:5.
problems 12:25,
  31:20.
procedure
  35:17.
proceed 4:20.
proceedings
  31:18, 32:24,
  46:9, 69:17,
  77:7, 80:11,
  84:4, 84:24,
  85:3.
productivity
  63:10.
professional
  43:13.
proffer 29:14,
  29:21, 29:23,
  33:5, 33:16,
  33:24, 37:10,
  37:13,
  37:15.
proffering
  30:11, 31:5,
  32:11.
profitable
  12:17.
promptly
  50:21.
pronouncing
  5:24.
Proposal 6:4,
  11:16, 12:10,
  12:13.
proposed
  13:23.
proposing
  12:20,
  31:10.
prosecuted
  36:10.
prosecutors
  36:20.
provide 21:13,
  30:3, 32:13,
  70:18,
  78:13.
provided 17:12,

64:24, 71:10,
  74:2.
provides
  10:5.
Public 1:34.
publish 20:1.
published
  7:6.
pull 18:5,
  37:14, 47:4,
  71:12,
  76:13.
purported
  26:5.
purpose 7:12,
  9:6, 9:9,
  9:22, 10:7,
  14:4, 25:19,
  74:4.
pursuant 24:2,
  24:4,
  64:20.
pursue 49:21.
pushed 77:2.
pushing 56:15,
  57:1.
Put 8:22,
  10:13, 13:17,
  16:13, 18:13,
  24:21, 45:13,
  47:12, 47:15,
  47:18, 83:3,
  83:4.
putting 74:20,
  82:16.
.
.
< Q >.
quarter 83:9,
  84:18.
question 8:11,
  9:19, 19:1,
  22:5, 24:16,
  25:7, 28:16,
  34:21, 36:5,
  40:4, 40:9,
  41:14, 41:19,
  41:21, 49:6,
  54:11, 59:24,
  63:21, 64:12,

68:8, 69:15,
74:19,
76:6.
questioned
31:13.
questioning
53:25, 68:17,
70:7.
questions 7:11,
12:3, 12:5,
25:24, 36:2,
36:4, 56:16,
67:15, 67:22,
69:23, 70:5,
72:12, 73:18,
74:9, 75:16,
76:10, 77:12,
77:16.
quick 54:10,
82:7, 82:16,
82:19.
quickly 19:4,
40:18, 54:3,
54:15, 70:15,
82:1.
quite 43:6.
.
.
< R >.
R. 2:5, 2:6.
Rae 1:32.
rather 58:3.
reached 57:20,
57:22,
57:24.
read 7:24,
11:13, 18:17,
18:21, 18:24,
20:22, 21:2,
21:18, 23:11,
25:23, 27:6,
39:10, 44:25,
84:6.
reading 8:12,
8:25, 9:3,
9:19, 9:24,
11:5, 19:1,
21:20.
ready 4:20,
19:8,

83:11.
realize 74:21,
75:8.
realized 74:13,
75:7,
75:14.
really 14:23,
19:4, 26:10,
36:17, 39:21,
40:11, 51:8,
56:19, 59:4,
66:10,
68:3.
reason 45:17,
81:12,
83:22.
reasonable
40:16.
reasons 31:14,
46:5, 76:1.
recalls
62:25.
receipt 27:3.
received 28:5,
28:13.
recess 49:24,
50:23.
recipient
21:24.
recognize
10:17, 19:3,
20:11,
38:5.
recollection
17:16, 18:22,
18:24, 19:19,
24:13, 25:20,
25:21, 25:23,
26:8, 28:7,
29:7, 38:3,
54:6, 62:17,
73:15.
record 15:19,
18:10, 32:16,
47:3, 50:8,
77:5, 85:3.
record. 29:19,
45:12, 68:20,
77:20,
80:24.

recross
77:18.
recrossing
77:21.
redacted.
84:23.
REDIRECT 3:9,
69:24,
69:25.
reduce 24:21.
refer 53:9.
reference
53:19, 53:22,
57:9, 67:6.
referencing
37:13.
referral 27:8,
28:10,
28:14.
referred 21:8,
21:11, 25:3,
28:9.
referring
8:23.
refining
11:3.
reflect 52:2,
52:8.
reflects
51:23.
refresh 18:18,
19:19, 25:21,
25:22.
refreshes
18:22.
refreshing
18:23, 25:20,
38:2.
regard 13:13,
19:20, 22:11,
33:5, 57:2,
57:3, 57:5,
57:8, 61:4,
63:14,
68:10.
regarding
10:19, 21:12,
29:14, 47:24,
49:19, 70:5,
74:9, 78:1,

78:2.
register 55:3,
55:6, 55:8,
55:11, 55:14,
55:19, 56:8,
66:16, 66:20,
68:11,
75:9.
registered
21:10.
registering
67:9.
Registration
54:23.
rejected
22:19.
related 21:7,
79:9,
79:11.
relation
45:25.
relationship
43:13, 43:17,
44:21, 46:3,
72:5.
relative
68:13.
relaying
74:1.
Relevance 7:9,
9:18, 14:9,
29:16, 30:19,
31:14, 34:5,
42:9, 45:7,
45:9, 53:25,
68:17, 79:9,
79:24.
relevant 31:17,
45:24, 56:22,
69:12, 80:6,
80:8.
remember 11:11,
11:13, 11:14,
18:1, 18:2,
19:22, 25:12,
25:14, 33:17,
34:1, 37:3,
37:6, 37:8,
39:21.
remind 8:22.

repeat 11:10,
  24:7, 24:8,
  62:22,
  64:10.
repeating
  32:21.
report 6:3,
  10:18, 11:16,
  11:19.
Reported
  2:11.
Reporter 2:12,
  5:22, 85:7.
reports 9:12.
represent
  22:13, 63:13,
  70:21.
representation
  13:12, 21:16,
  22:12, 25:3,
  70:6.
representations
  23:17.
represented
  73:3, 73:9.
representing
  14:1, 14:2,
  30:1.
Republican
  43:16.
reputationally
  75:25.
request 29:6,
  45:1, 81:8.
required 27:1,
  35:3, 36:6.
requirement
  46:11.
requiring
  83:6.
resolve 42:15,
  64:4,
  66:12.
respect 11:1,
  21:6, 21:14,
  70:21,
  73:6.
respectfully
  81:8.
restate

41:23.
result 80:2.
retain 32:25,
  74:15,
  75:3.
retained 16:21,
  41:6, 41:8,
  64:3, 64:15,
  75:7.
retainer 14:7,
  15:8, 17:14,
  19:20, 23:7,
  24:10, 24:25,
  25:9, 26:25,
  27:1, 27:3,
  27:4,
  64:20.
retaining
  74:14,
  74:22.
retention
  23:6.
retrospect
  76:2.
return 28:6,
  28:13,
  39:15.
returning
  39:13.
review 23:8.
reviewing
  19:14.
reword 48:11.
Robin 14:6,
  14:10, 14:16,
  14:17, 14:21,
  15:13, 15:17,
  15:24, 16:2,
  16:18, 17:3,
  19:21, 23:6,
  23:14,
  68:10.
role 64:18.
Ron 81:3.
Room 2:16.
Rosenberg
  66:19.
Rosenzweig
  14:7, 15:17,
  15:24, 16:18,

17:13, 19:21,
  21:20, 23:16,
  24:24, 67:13,
  68:10, 70:6,
  70:21, 71:10,
  72:5, 74:14,
  74:22, 75:3,
  75:7.
roughly 30:9.
RPR 2:11,
  85:1.
running
  84:19.
.
.
< S >.
Santa 20:14.
satisfactory
  39:11.
saw 19:23,
  39:16.
saying 12:19,
  23:6, 32:5,
  64:3, 64:15,
  64:17, 66:10,
  82:2.
says 10:21,
  22:4, 24:13,
  26:7.
schedule 50:14,
  50:15,
  50:16.
scheduled 77:1,
  77:9.
scheduling
  77:10,
  80:22.
scroll 19:5,
  39:5.
Sean 1:31.
sec 43:5.
second 47:24,
  48:15, 48:17,
  48:22, 49:5,
  80:22.
Section 1:34.
seeing 18:14,
  27:14, 27:15,
  27:18.
seek 66:18,

67:19, 68:10,
  76:25.
seeking 71:24,
  72:8.
seem 40:16,
  54:2.
seemed 76:1.
seems 22:20,
  32:2, 33:9,
  67:25.
seen 27:12.
selling 7:21.
sent 30:16,
  30:17,
  33:4.
sentence 11:13,
  11:14.
sentenced
  46:19, 47:7,
  47:9, 47:16,
  78:3,
  78:11.
sentencing
  46:25, 47:10,
  47:12, 47:21,
  76:9, 76:25,
  77:2, 77:10,
  79:14.
separate 31:25,
  65:8.
September 37:9,
  37:11, 38:14,
  39:13, 39:25,
  51:24, 72:17,
  72:23,
  76:8.
services 7:21,
  10:19, 10:24,
  17:14, 21:12,
  26:22, 26:23,
  70:14, 70:18,
  71:9.
SESSION 1:13,
  51:9.
set 26:23,
  27:3, 30:8,
  32:22, 46:19,
  47:10,
  83:11.
sets 9:12,

32:17.
settle 63:17,
  63:20.
settled 4:17,
  26:11, 63:24,
  64:19.
settlement
  63:14, 63:16,
  64:7.
several 5:3,
  73:18.
shall 36:4.
sheet 47:4.
short 37:8,
  83:4.
shorter
  51:13.
show 7:1, 10:9,
  17:17, 17:23,
  17:25, 18:1,
  18:2, 18:3,
  18:11, 25:13,
  37:25,
  51:19.
showed 33:17,
  33:18.
shown 34:1,
  38:6, 71:14,
  71:22,
  72:16.
side 42:24.
sign 40:3,
  53:3, 68:25,
  69:8.
signature
  39:8.
signatures
  39:17.
signed 39:16,
  39:25,
  40:14.
significant
  81:10.
significantly
  44:4.
signing
  39:12.
simply 31:19,
  45:22.
Sir 5:16, 9:9,

10:4, 10:17,
  11:6, 11:14,
  14:11, 15:14,
  15:18, 19:8,
  19:19, 20:9,
  29:12, 38:5,
  43:19, 46:11,
  46:13, 46:23,
  48:14, 49:11,
  51:23, 54:21,
  64:2, 67:23,
  80:17.
sit 4:16, 51:3,
  61:14,
  66:7.
situation 14:4,
  21:21.
six 25:13.
slightly
  12:20.
Soho 60:18,
  61:4, 61:19,
  61:22, 62:13,
  63:1.
solicit 12:13,
  53:10.
somebody
  60:21.
Somehow 4:4.
Sometime 12:24,
  38:18, 42:11,
  52:20.
sometimes
  57:10.
Sorry 4:3,
  5:23, 6:19,
  6:20, 9:8,
  10:23, 15:15,
  17:2, 17:24,
  20:25, 26:1,
  27:23, 33:22,
  38:11, 41:23,
  43:8, 43:25,
  44:15, 45:2,
  48:8, 48:10,
  56:14, 61:24,
  62:4, 63:4,
  63:23, 65:9,
  66:2, 66:6,
  82:6.

sort 31:8.
sorted 65:10.
sought 67:9.
sounds 12:22.
source 8:12,
  8:17, 9:10,
  9:13, 10:6,
  11:1.
speaking 14:16,
  38:10.
specific 31:11,
  37:18, 74:17,
  79:10.
specifically
  10:11.
specified
  17:15.
speculation
  16:11,
  35:13.
spell 5:21.
spoke 16:1,
  21:23.
spousal
  67:14.
stage 30:9.
start 4:10,
  15:21, 41:14,
  52:19, 83:8,
  83:14,
  84:15.
started 5:11.
starting 16:10,
  69:3.
starts 26:22.
state 21:11.
statement 7:25,
  8:25, 31:11,
  32:17, 33:20,
  33:22, 34:1,
  34:3, 34:18,
  34:23, 34:25,
  35:7, 35:23,
  39:12, 44:8,
  44:10.
statements
  9:24, 31:9,
  62:25.
States 1:1,
  1:5, 1:19,

2:13, 13:12,
  64:17.
stenographic
  85:2.
Steve 44:9,
  44:16,
  44:19.
stood 43:4.
stop 41:12,
  50:22.
stopping 50:6,
  51:7,
  81:15.
store 60:19,
  61:18.
strictly
  34:23.
strike 22:2,
  22:8.
struck 73:13.
structured
  9:11.
stuff 32:1,
  45:15.
subject 21:21,
  22:11, 25:2,
  62:23,
  66:15.
submission
  10:18.
submit 53:5,
  53:10.
submitted
  53:23.
success 24:12,
  63:10.
suggest 17:8.
suggesting
  15:7.
suggestion
  15:25,
  83:8.
Suite 1:28.
summarize
  10:24.
summary 8:1.
Sun 59:10.
support 53:5.
supposed 77:7,
  78:13.

sustain
    69:18.
Sustained
    29:11,
    46:10.
swear 27:14.
switched
    17:3.
switching
    29:21.
.
.
< T >.
T. 2:11,
    85:6.
Taek 21:4.
taken. 50:23.
talked 5:6,
    13:25, 22:2,
    25:12, 55:22,
    58:5, 63:7,
    63:9,
    64:23.
taskmaster
    56:15,
    56:25.
team 4:4, 13:9,
    13:17,
    13:18.
tells 81:8.
ten 12:19.
term 53:7.
terms 9:6,
    11:2, 12:7,
    29:21, 30:22,
    31:20, 32:3,
    32:8, 32:9,
    32:13, 33:12,
    34:25, 37:18,
    39:10, 40:13,
    45:15, 50:17,
    55:21, 56:1,
    63:11, 69:3,
    79:4, 79:13,
    80:6.
testified
    13:16, 24:6,
    27:10, 32:13,
    35:11, 36:15,
    48:23, 58:5,

58:18, 70:9,
    74:14, 75:2,
    75:15.
testify 19:23,
    46:12, 66:1,
    66:3, 70:4,
    71:22,
    74:20.
testimony
    14:24, 15:6,
    15:10, 16:15,
    22:21, 23:2,
    23:22, 23:24,
    29:15, 29:21,
    30:23, 32:14,
    34:13, 45:15,
    50:20, 51:1,
    51:13, 81:14,
    83:25.
Thanks 84:2.
THE WITNESS
    19:7, 50:14,
    80:18.
thereafter
    38:18, 73:11,
    75:8.
they'll 83:3,
    83:4.
they've 83:2.
thinking 16:13,
    61:14.
third 27:2.
though 38:23,
    46:24,
    59:5.
thoughts 16:14,
    40:25.
thread 67:18,
    67:21,
    67:24.
three 52:13,
    54:18, 82:3,
    83:7.
thumbed
    24:14.
Till 41:15,
    50:3, 51:1,
    51:8.
timing 81:4.
tired 60:21,

60:24.
today 33:19,
    34:2, 50:22,
    51:10, 51:11,
    66:7.
together 13:17,
    23:7, 23:9,
    43:15, 46:4,
    65:8.
tomorrow 50:17,
    51:13, 80:22,
    81:1, 81:15,
    84:13,
    84:17.
took 79:22.
top 20:11,
    38:12.
topic 29:22,
    54:4.
topics 62:19.
toward 65:17.
towards
    42:24.
track 62:8.
training 11:2,
    15:4.
TRANSCRIPT
    1:17, 85:2.
travel 71:4.
traveled
    74:12.
TRIAL 1:17.
tried 64:23.
true 5:4, 7:16,
    19:23, 35:4,
    36:24, 37:9,
    40:17, 43:10,
    43:19, 55:12,
    55:13.
Trump 40:20,
    40:22, 41:4,
    42:3, 43:10,
    43:20, 44:5,
    44:9, 44:11,
    44:16, 44:18,
    44:21, 59:10,
    59:15.
truth 35:10,
    35:16, 36:6,
    36:10.

truthful 34:15,
    34:17, 35:3,
    35:6, 35:21,
    35:24, 36:16,
    36:19, 78:13,
    78:14.
truthfully
    46:12.
try 11:10,
    28:22, 50:24,
    50:25, 65:11,
    66:11,
    66:12.
trying 13:11,
    13:17, 24:20,
    54:2, 67:23,
    67:24.
Turning 74:8.
Two 14:16,
    15:21, 16:1,
    27:2, 43:15,
    48:19, 56:16,
    59:4, 82:2.
typically
    53:13.
.
.
< U >.
ultimately
    17:6, 73:8.
underlying
    31:9.
understand
    31:10, 35:9,
    35:25, 36:14,
    42:22, 50:15,
    65:12, 70:13,
    73:23, 74:1,
    81:18,
    81:22.
understanding
    21:14, 23:11,
    35:18, 36:9,
    36:18, 39:15,
    45:4, 58:1,
    65:1, 72:7.
understood
    70:9,
    71:23.
unexecuted

71:18.
unit 30:10.
United 1:1,
    1:5, 1:19,
    2:13, 13:12,
    64:16.
unlimited
    43:21, 43:24,
    44:1, 44:2.
unstructured
    9:12.
unsuccessful
    64:6.
until 52:20,
    57:17,
    67:10.
updates 74:2.
using 11:24,
    14:4, 20:20,
    25:20,
    66:11.
.
.
< V >.
vaguely 13:5.
value 12:9,
    32:12, 33:12,
    69:4, 78:22,
    78:24.
Van 81:3,
    81:9.
variety 30:2.
various 29:15,
    31:23, 55:23,
    73:19.
Ventura 1:42.
via 9:13.
view 56:15.
Vinder 81:3,
    81:14, 81:25,
    82:11, 82:14,
    83:3.
violation
    13:24,
    79:12.
virtually
    43:21.
voice 59:22,
    59:23, 60:20,
    61:1.

volumes 9:10.
vs 1:8.
.
.
< W >.
wait 4:7,
    41:15.
waiting 4:8,
    4:9, 4:13.
Wally 60:18,
    61:17,
    63:7.
wanted 13:6,
    13:13, 23:18,
    24:23, 26:8,
    42:14, 43:3,
    45:20, 50:11,
    75:24,
    81:18.
wanting 14:5.
wants 19:15.
Washington
    1:10, 1:29,
    1:36, 2:9,
    2:17.
Watkins 29:13,
    33:1.
ways 33:11.
wedding
    44:16.
whatever 10:2,
    33:12, 64:18,
    77:7, 84:6.
whole 65:7.
wife 13:20,
    13:21, 13:22,
    13:25, 14:6,
    15:7, 15:17,
    15:24, 16:8,
    16:18, 16:22,
    16:23, 22:11,
    23:18, 24:24,
    25:9, 27:25,
    28:12, 58:7,
    58:8, 58:9,
    66:19, 68:10,
    68:14, 69:4,
    70:5,
    74:16.
will 14:8,

18:1, 18:16,
    21:13, 50:24,
    64:8,
    80:21.
willing
    83:14.
withdraw 20:10,
    25:7, 26:14,
    52:24, 69:14,
    80:9.
Within 12:19,
    54:18.
Without 11:5,
    18:13, 20:8,
    26:18, 42:1,
    48:2, 61:14,
    66:14,
    67:16.
WITNESS 3:3,
    8:23, 10:14,
    15:15, 15:17,
    15:23, 17:23,
    18:11, 18:14,
    19:3, 19:10,
    19:12, 19:17,
    23:20, 25:15,
    27:10, 37:25,
    41:18, 45:8,
    50:7, 51:20,
    60:23, 62:1,
    62:4, 62:6,
    62:11.
witnesses
    80:25, 81:10,
    82:3.
women 15:21.
won 43:20.
word 43:6.
worded 38:22,
    48:6.
words 42:1.
Work 9:25,
    14:23, 64:15,
    65:2, 65:4,
    65:6, 65:13,
    65:19, 69:7,
    71:9,
    75:10.
worked 5:3,
    20:20, 23:6,

23:9, 73:1,
    74:7.
working 5:10,
    5:11.
worried
    50:19.
write 24:24,
    25:9.
writing
    20:11.
written 23:12,
    23:13, 24:4,
    27:7, 72:2.
wrote 22:15.
Wynn 44:9,
    44:11, 44:16,
    44:19, 45:5,
    45:14, 45:18,
    45:25, 46:1,
    46:3, 46:4.
.
.
< Y >.
years 5:3,
    10:8, 12:19,
    25:13,
    44:11.
York 1:27,
    1:35.
you. 21:16.
yourself 21:5,
    55:18, 58:7,
    59:11.