```
 1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,      ) CRIMINAL ACTION NO.:
                                      ) 19-00148-1
 4              Plaintiff,            )
            vs.                       )
 5                                    )
       PRAKAZREL MICHEL,              ) Washington, D.C.
 6                                    ) April 5th, 2023
                Defendant.            ) 9:10 a.m.
 7     _____)

 8

 9                   TRANSCRIPT OF JURY TRIAL - DAY 8
                BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
10                   UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     FOR THE GOVERNMENT:          John D. Keller, Esquire
                                    U.S. Department of Justice
14                                  1301 New York Avenue, NW
                                    Suite 1016
15                                  Washington, D.C. 20530

16                                  Sean F. Mulryne, Esquire
                                    Nicole Rae Lockhart, Esquire
17                                  U.S. Department of Justice
                                    Public Integrity Section
18                                  1400 New York Avenue, NW
                                    Washington, D.C. 20005
19

20     For the Defendant:          David E. Kenner, Esquire
                                    Alon Israely, Esquire
21                                  Kenner Law Firm
                                    16633 Ventura Boulevard
22                                  Encino, California 91436

23

24

25
```

1    <u>APPEARANCES (CONT'D)</u>:

2

3    FOR THE DEFENDANT:          Charles R. Haskell, Esquire
                                 Law Offices of Charles R.
4                                Haskell, P.A.
                                 641 Indiana Avenue, NW
5                                Washington, D.C. 20004

6    Reported by:               Christine T. Asif, RPR, FCRR
                                 Official Court Reporter
7                                United States District Court
                                 for the District of Columbia
8                                333 Contitution Avenue, NW
                                 Room 6507
9                                Washington, D.C., 20001
                                 (202) 354-3247

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            INDEX

 2   Witness Name                                        Page

 3   Ron Vinder
```

```
 4      Direct Examination By Mr. Keller.........................    7

 5      Cross-examination By Mr. Kenner.........................   34

 6      Redirect Examination By Mr. Keller......................   81
```

```
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Good morning, everyone.
 3          MR. KELLER:  Good morning, Your Honor.
 4          MR. MULRYNE:  Good morning.
 5          MR. KENNER:  Good morning.
 6          THE COURT:  Okay.  Call the case.
 7          THE CLERK:  Criminal Case 19-148-1, the United
 8   States versus Prakazrel Michel.
 9      Counsel, would you please identify yourself for the
10   record starting with the Government.
11          MR. KELLER:  John Keller, Sean Mulryne, and Nicole
12   Lockhart for the Government, Your Honor.  Good morning.
13          MR. KENNER:  Good morning, Your Honor.  David
14   Kenner, Charles Haskell, Kriss Anne Carlstrom and that's it
15   for counsel today, Your Honor.
16          THE COURT:  All right.  Good morning, everyone.  In
17   terms of Kathryn Lestelle, who is that?
18          MR. HASKELL:  Right here, Your Honor.
19          THE COURT:  Okay, so is she --
20          MR. KENNER:  She's my investigator, Your Honor.
21          THE COURT:  I'm sorry?
22          MR. KENNER:  She is my investigator.
23          THE COURT:  Okay.  So we have a doctor's note
24   indicating you can't wear a mask, right?  So I won't require
25   it.  As I said, I'm trying to set this up so we don't get
```

5

1    sick.  I don't have a problem with that.

2            Mr. Kenner, why don't -- in terms of when we've been

3    doing the examination of the witnesses, I don't have a problem

4    in terms of your -- since it's difficult, evidently, for you

5    to get up and down, to have you -- as long as you've got the

6    microphone where you can stay seated, but I have to be able to

7    hear you.  If you don't stand up, I don't always pick up that

8    you're objecting if I can't -- if I can't see you standing,

9    then I at least need to hear you.

10            MR. KENNER:  I understand, Your Honor.  I'll make

11    sure I do that.

12            THE COURT:  Okay.  If you do that, that would be

13    great.  All right.  So obviously there are some issues in

14    terms of physically to -- I don't want to overtax you.

15            All right.  I think we're ready to go with the

16    witnesses.  Let's get the jury in and we'll stop no later than

17    noon, somewhere between 11:30 and noon depending on where we

18    are with the witnesses.

19            (Jury entered the courtroom.)

20            THE COURT:  Please sit down.  Good morning, members

21    of the jury.

22            JURORS:  Good morning.

23            MR. KENNER:  Good morning, Your Honor.

24            THE COURT:  Get settled.

25            Mr. Keller.

1      MR. KELLER:  Yes, Your Honor, the Government calls

2  Ron Vinder.

3      THE COURT:  All right.  Mr. Vinder, if you would

4  step up over here to my left.  And if you would step up and

5  remain standing so we can swear you in.

6      THE CLERK:  Can you raise your right hand, please.

7                    RON VINDER,

8  called as a witness, being first duly sworn, was examined and

9  testified as follows:

10      THE WITNESS:  I do.

11      THE CLERK:  Thank you.

12      THE COURT:  All right.  Mr. Vinder, you can sit

13  down.  The chair moves up and down, so make yourself

14  comfortable.  You need to speak into the microphone, really

15  the head, so we can hear you.  You can take the mask off so we

16  can actually hear you and get a record.

17      So what I would ask is that counsel will be asking you

18  questions.  Please let them finish their question, even if you

19  know what they're asking you before you start to answer.  And

20  they should do the same thing so we get a record and we can

21  hear what the question is and what your answer is.

22      Also, if you hear the word "objection" or somebody

23  stands at the counsel table, what I'd ask, if you haven't

24  started to answer, don't.  If you're in the middle of your

25  answer, please stop.  Let me hear what the objection is and

Direct Examination - Vinder

1    then I'll tell you whether to go forward with a response,

2    okay.  So it's either going to be objection, which you hear,

3    or somebody standing, okay.  All right.  Mr. Keller.

4                MR. KELLER:  Thank you, Your Honor.

5                          DIRECT EXAMINATION

6    BY MR. KELLER:

7    **Q.**  Good morning, Mr. Vinder.

8    **A.**  Good morning.

9    **Q.**  Can you state your name and spell your name for the

10   record.

11   **A.**  Ron Vinder, R-o-n, V-i-n-d-e-r.

12   **Q.**  Where do you currently work, sir?

13   **A.**  Morgan Stanley.

14   **Q.**  How long have you worked at Morgan Stanley?

15   **A.**  Seven years.

16   **Q.**  And what kind of work do you do for Morgan Stanley?

17   **A.**  I'm a financial advisor in private wealth management.

18   **Q.**  Is that what you've done for the majority of your

19   career?

20   **A.**  33, 34 years.

21   **Q.**  Through your work, were you introduced at some point to

22   the business manager for an individual named Wyclef Jean?

23   **A.**  Yes.

24   **Q.**  And who was Wyclef Jean or who is Wyclef Jean?

25   **A.**  He's one of the founders of the Fugees.  He's an

1    artist/performer.

2    **Q.**  Through those connections, through the business manager I

3    guess specifically, at some point were you connected to the

4    defendant Mr. Pras Michel?

5    **A.**  Yes.

6          MR. KELLER:  Counsel, would you stipulate to this

7    witness identifying Mr. Michel?

8          MR. KENNER:  Yes, Counsel.

9          THE COURT:  All right.  Which, for the record then,

10   Mr. Michel has been identified by this witness.

11   **Q.**  (BY MR. KELLER)  Was there any kind of urgency to your

12   introduction to Mr. Michel?

13   **A.**  Yes, I got introduced to him and from what I understood,

14   he needed to -- wanted to open an account with a new financial

15   institution because he was leaving his prior financial

16   institution.

17   **Q.**  And do you recall roughly when that was?

18   **A.**  Around October of 2017.

19          THE COURT:  Could I ask if you could spell the name

20   of the manager, the business manager.

21   **A.**  It's -- me?

22          THE COURT:  If you could, sir, if you know.

23   **A.**  C-h-a-r-m-a-n-t, and last name is N-o-n-c-e-n-t.

24          THE COURT:  Go ahead.

25   **A.**  I think that's right.

Direct Examination - Vinder

1    **Q.**  (BY MR. KELLER)  As part of you being connected to

2    Mr. Michel, did you have an initial phone conversation with

3    him?

4    **A.**  I did.

5    **Q.**  And what was the nature of that conversation, what did

6    Mr. Michel tell you?

7    **A.**  That he had an account at a prior financial institution,

8    and he was having some trouble with them and charging -- they

9    were charging him too many fees and he wanted to open up a new

10   account and wanted me to help him manage the money.

11   **Q.**  And was this during that same time period that you

12   mentioned, October 2017?

13   **A.**  Yes.

14           MR. KELLER:  Ms. Orozco, if we could show just the

15   witness what has not yet been admitted as Government Exhibit

16   59.

17           THE COURT:  Is that 59?

18           MR. KELLER:  Yes, Your Honor.

19       And, Ms. Orozco, just for defense counsel's benefit and

20   the witness's benefit, can you scroll to the second page and

21   then the third page of that document as well.  And the next

22   page.  I think there's a couple more.

23   **Q.**  (BY MR. KELLER)  All right.  Mr. Vinder, do you recognize

24   those documents?

25   **A.**  I do.

Direct Examination - Vinder

1    **Q.**  Were those documents related to the initial deposit that

2    Mr. Michel made with you at Morgan Stanley?

3    **A.**  Yes.

4         MR. KELLER:  Your Honor, Government would move for

5    admission of Exhibit 59.

6         MR. KENNER:  No objection.

7         THE COURT:  All right.  Then I'll admit 59 without

8    objection.

9         MR. KELLER:  And, Ms. Orozco, if we could go to page

10   2 and then --

11        THE COURT:  Do you want it published?

12        MR. KELLER:  -- publish for the jury.  Thank you,

13   Your Honor.

14   **Q.**  (BY MR. KELLER)  So looking at page 2, Mr. Vinder, is this

15   the cashier's check that you were provided for the initial

16   deposit into Morgan Stanley from Mr. Michel?

17   **A.**  Yes.

18   **Q.**  And the entity that's listed in the "pay to the order of,"

19   Anicorn LLC, did you know that to be an entity associated with

20   Mr. Michel?

21   **A.**  Yes.

22   **Q.**  The amount there is a little bit over 37 and a half

23   million dollars; is that right?

24   **A.**  Yes.

25   **Q.**  Did you question at all how Mr. Michel had so much money

1    that he wanted to deposit with you?

2    **A.** Yes.

3    **Q.** Why did you question it?

4    **A.** It was a lot of money. And, you know, from my experience

5    with Wyclef I kind of had an idea of his finances, and I felt

6    that, you know, Wyclef had a more substantial career and this

7    seemed like a lot of money to me for -- for Pras to have.

8    **Q.** In that initial phone conversation, did Mr. Michel say

9    anything about this money being associated with an individual

10   named Jho Low?

11   **A.** No.

12   **Q.** Did he say anything about this money being related to work

13   for the Chinese government?

14   **A.** No.

15   **Q.** Did he say anything about the money being related to an

16   effort to extradite or remove a Chinese national who was

17   living in the United States and send him back to China?

18   **A.** No.

19   **Q.** After the initial conversation with Mr. Michel, at some

20   point did he refer you to someone else to have further

21   conversations with?

22   **A.** Yes.

23   **Q.** Who was that, if you remember?

24   **A.** His attorney, George Higginbotham.

25   **Q.** Did you meet with Mr. Higginbotham?

1    **A.**  I did.

2    **Q.**  Where was that?

3    **A.**  In Washington, D.C.

4    **Q.**  What did Mr. Higginbotham say about the money, about the

5    source of the money or the purpose of the money?

6    **A.**  That it was that Pras had met someone --

7           THE COURT:  Can you use his full -- his last name,

8    Mr. Michel.

9           THE WITNESS:  I'm sorry.  Okay, sorry.

10          THE COURT:  Sure.

11   **A.**  Mr. Michel met somebody at -- on a boat in Hong Kong and

12   he was very wealthy.  And he was going to provide money to --

13   for Pras to produce albums, make movies, and just use his

14   creative -- to make movies and albums.

15   **Q.**  (BY MR. KELLER)  And the amount of money that we're

16   talking about being invested that Mr. Higginbotham relayed to

17   you, this was tens of millions of dollars or do you recall?

18   **A.**  I don't recall.

19   **Q.**  Did Mr. Higginbotham give you any contracts or agreements

20   or any details about the business arrangement that would have

21   governed these investments?

22   **A.**  No.

23   **Q.**  How did that compare with any other investments or

24   business plans that you had encountered over your career?

25   **A.**  I had never seen anything like it.

1    **Q.**  What do you mean by that?

2    **A.**  So usually if there's business arrangements, there's

3    contracts.  I'd never -- there was no contracts, it didn't

4    make sense that they gave him money without the contract.  So

5    -- and this wasn't something that I had ever been a part of

6    before.

7    **Q.**  With respect to that conversation with Mr. Higginbotham in

8    D.C., did he ever mention that the money was connected to Jho

9    Low at all?

10    **A.**  No.

11    **Q.**  The People's Republic of China?

12    **A.**  No.

13    **Q.**  An extradition effort related to a Chinese national?

14    **A.**  No.

15            MR. KELLER:  Ms. Orozco, could we show, again, just

16    for the witness and counsel, an exhibit that has not yet been

17    admitted, Exhibit 385.  And just for identification purposes,

18    Ms. Orozco, can you call out the header of the e-mail.

19    Actually, I realize that may have covered up the substance

20    for -- Mr. Kenner, were you able to -- are you familiar with

21    this e-mail, or do you need the content blown up?

22            MR. KENNER:  No, I don't.

23            MR. KELLER:  Okay.

24    **Q.**  (BY MR. KELLER)  Mr. Vinder, do you recognize this as an

25    e-mail from Mr. Higginbotham to you on October 9th, 2017?

14

Direct Examination - Vinder

1   **A.**  Yes.

2   **Q.**  And was this related to opening accounts at Morgan Stanley

3   with the money that we've been talking about?

4   **A.**  Yes.

5           MR. KELLER:  Your Honor, Government would --

6   **Q.**  (BY MR. KELLER)  Oh, and are there also attachments listed

7   relating to Anicorn, Artemus and Prosperity?

8   **A.**  You're asking me?

9   **Q.**  I'm sorry, yes.  Do you see in the header attachments --

10  **A.**  Yes.

11          MR. KELLER:  Your Honor, the Government would move

12  for admission of Government's Exhibit 385.

13          THE COURT:  Mr. Kenner.

14          MR. KENNER:  No objection.

15          THE COURT:  All right.  Admit 385 without

16  opposition.

17          MR. KELLER:  Ms. Orozco, you can drop that call-out

18  box.

19  **Q.**  (BY MR. KELLER)  So after your initial conversation with

20  Mr. Higginbotham --

21          THE COURT:  Do you want it published or not?

22          MR. KELLER:  I believe it has been published, Your

23  Honor.  Thank you, yes.

24  **Q.**  (BY MR. KELLER)  After your initial conversation with

25  Mr. Higginbotham in D.C., and then this e-mail providing some

1    initial background information, what did you do next?

2    **A.** I don't recall.

3    **Q.** Well, I guess what I was getting at is, at some point did

4    you open accounts with that cashier's check that we saw and

5    based on some of this initial information that was provided?

6    **A.** Yes.

7              MR. KENNER: Objection, leading. Move to strike.

8              THE COURT: No, I'll allow that one, but you should

9    be careful.

10             MR. KELLER: Yes, Your Honor.

11   **Q.** (BY MR. KELLER) So, after getting some of this initial

12   background information and opening the accounts, did you have

13   any further contact with Mr. Michel or Mr. Higginbotham?

14   **A.** Yes.

15   **Q.** And did you meet with Mr. Michel?

16   **A.** Yes.

17   **Q.** Can you describe that meeting.

18   **A.** I still didn't understand where the money was coming from.

19   I explained to them that I needed to understand that before I

20   could invest the money. They -- I had a meeting with

21   Mr. Michel in my apartment and the purpose of the meeting was

22   for him to explain to me where the money came from. And so

23   that was where we met and why.

24   **Q.** So what did Mr. Michel tell you about where the money had

25   come from?

1    **A.**  It was, again, that he met somebody on a boat in Hong Kong

2    that was very wealthy and he was -- he gave him this money to

3    make movies and albums.

4    **Q.**  Did that conversation satisfy your concerns or answer your

5    questions?

6    **A.**  Actually, no.  I mean, when he left my apartment I felt

7    like I knew less than I did before he came in.

8    **Q.**  During that conversation did Mr. Michel mention Jho Low?

9    **A.**  No.

10   **Q.**  Did he mention the Chinese government?

11   **A.**  No.

12   **Q.**  Did he mention any political influence efforts related to

13   1MDB?

14   **A.**  No.

15   **Q.**  Did he mention any efforts related to extraditing a

16   Chinese national from the United States and sending him back

17   to China?

18   **A.**  No.

19   **Q.**  After that conversation, do you recall a proposal to send

20   $25 million from Mr. Michel's account to an individual named

21   Steven Plotnick and then have $10 million sent back to

22   Mr. Michel?

23   **A.**  I do.

24   **Q.**  What was your reaction to that proposal?

25   **A.**  I called them both up and said, you know, I can't wire

Direct Examination - Vinder

1    money right out after I just deposited, that's money

2    laundering 101, what are you guys up to?

3    **Q.**  Who was that conversation with where you said "That's

4    money laundering 101, what are you guys up to"?

5    **A.**  Both of them.

6    **Q.**  You said both of them --

7    **A.**  Mr. Michel and George Higginbotham.

8    **Q.**  Does Morgan Stanley require you to take regular money --

9    anti-money laundering training?

10   **A.**  Yes, annually.

11        MR. KELLER:  Ms. Orozco, if we could pull up just

12   for counsel and the witness, Government's Exhibit 396, which

13   has not yet been admitted.  Mr. Vin --

14        MR. KENNER:  Can I see it without the call-out box.

15   Make it larger.  Thank you.

16   **Q.**  (BY MR. KELLER)  While counsel's reviewing this,

17   Mr. Vinder, do you recognize Government's Exhibit 396 as an

18   e-mail from Mr. Higginbotham to you copying the Defendant,

19   Mr. Michel, on October 26th, 2017?

20   **A.**  Yes.

21   **Q.**  And was this e-mail exchange related to your questions

22   about the source and purpose of the funds?

23   **A.**  Yes.

24        MR. KELLER:  Your Honor, Government would move for

25   admission of Government's Exhibit 396.

1          THE COURT:  Okay.  396 is described in the list as

2    an e-mail from Vinder to Higginbotham.  It's actually

3    Higginbotham to Vinder; is that correct?

4          MR. KELLER:  The top e-mail, Your Honor, is an

5    e-mail from Mr. Higginbotham to Mr. Vinder.  It's a chain that

6    embedded within it is an e-mail from Mr. Vinder to

7    Mr. Higginbotham.

8          THE COURT:  Okay.  I just want to make sure that

9    we're describing it correctly.  Mr. Kenner, any objection?

10          MR. KENNER:  No, Your Honor.

11          THE COURT:  All right then.  I'll admit 396 without

12    objection.

13          MR. KELLER:  Ms. Orozco, if we could just call out

14    the bottom half with the subparagraphs 1, 2, and 3.  I see

15    it's published for the jury.

16    **Q.**  (BY MR. KELLER)  Mr. Vinder, were these some of your

17    questions to Mr. Higginbotham and Mr. Michel about the source

18    and purpose of the money that had been deposited at Morgan

19    Stanley?

20    **A.**  Yes.

21          MR. KELLER:  Ms. Orozco, if we could bring up for

22    the witness Government's Exhibit 57.

23        This has not been admitted, Your Honor.

24          THE COURT:  Okay.

25    **Q.**  (BY MR. KELLER)  Mr. Vinder, do you recognize this as an

Direct Examination - Vinder

1  account application and client agreement with Morgan Stanley

2  for Anicorn LLC?

3  **A.**  Yes.

4        MR. KELLER:  Your Honor, the Government would move

5  for admission of Government's Exhibit 57.

6        THE COURT:  Mr. Kenner, have you seen enough or do

7  you need more?

8        MR. KENNER:  No objection, Your Honor.

9        THE COURT:  I'll admit 57 without objection.

10        MR. KELLER:  And could we publish that.

11     Ms. Orozco, could we go to page 4, the second half of

12  that page.

13  **Q.**  (BY MR. KELLER)  Mr. Vinder, who signed this account

14  agreement with Morgan Stanley for Anicorn LLC?

15  **A.**  Pras Michel.

16  **Q.**  And the date of that signature?

17  **A.**  October 23rd, 2017.

18        MR. KELLER:  If we could go back to page 3 of the

19  document, Ms. Orozco.

20  **Q.**  (BY MR. KELLER)  Mr. Vinder, is this just a standard

21  agreement that Morgan Stanley has executed any time there's a

22  new account opened or at least the types of accounts that you

23  worked with?

24  **A.**  Yes.

25        MR. KELLER:  And, Ms. Orozco, if we could call out

1    subparagraph 5.  Thank you.

2    **Q.**  (BY MR. KELLER)  Mr. Vinder, do you see the reference in

3    subparagraph 5 about asking the client to affirm that neither

4    them or any person who has an ownership interest in or

5    authority over the account is or has been a

6    politically-exposed person?

7    **A.**  Yes.

8    **Q.**  Again, during any of this time frame, did Mr. Michel ever

9    disclose to you that this money was associated with an

10   individual named Low Taek Jho or Jho Low?

11   **A.**  No.

12   **Q.**  Did he ever disclose to you that the money was related to

13   efforts on behalf of the prime minister of Malaysia?

14   **A.**  No.

15   **Q.**  Did he ever disclose to you this money was related to

16   efforts on behalf of the People's Republic of China?

17   **A.**  No.

18           MR. KELLER:  Ms. Orozco, if we could pull up for the

19   witness and counsel what's not been admitted yet, Government's

20   Exhibit 402.  And if you can just call out the -- thank you.

21           THE COURT:  Wait a second.  Okay.

22   **Q.**  (BY MR. KELLER)  Mr. Vinder, do you recognize what's been

23   marked for identification purposes Government's Exhibit 402 as

24   another e-mail from Mr. Higginbotham to Mr. Michel from

25   November 7th, 2017?

1   **A.**  Yes.

2   **Q.**  And were these responses that were ultimately provided to

3   you based on the questions that you had asked?

4   **A.**  Yes.

5          MR. KELLER:  Your Honor, move for admission of

6   Government's Exhibit 402.

7          MR. KENNER:  No objection.

8          THE COURT:  All right.  I'll admit 402 without

9   objection.

10         MR. KELLER:  And just if we could -- I see it's

11  published.

12  **Q.**  (BY MR. KELLER)  If we could just look at the answer to

13  the first bullet.  So is that -- that first bullet, "Whose

14  money is it," was that one of your questions?

15  **A.**  Yes.

16  **Q.**  And the answer there, "The funds originated with Lucky

17  Mark Limited, incorporation documents attached, who is an

18  investor in a slate of projects.  The as-read are currently

19  under review and subject to further discussion.  Long form

20  agreement is currently in draft."

21       Did this sufficiently answer your question?

22  **A.**  No, it actually did the opposite, because I -- you know,

23  you don't send money in before a contract is finalized.

24  **Q.**  So this didn't resolve your concerns about the source or

25  the purpose of the money?

1    **A.**   No.

2    **Q.**   And then if we could look at a couple of the attachments.

3            MR. KELLER:  Ms. Orozco, if we could pull up for the

4    witness Government's Exhibit 403.

5    **Q.**   (BY MR. KELLER)  Do you recognize this as one of the

6    documents that was attached and provided to you regarding

7    Lucky Mark Trading Limited, a Hong Kong company?

8    **A.**   Yes.

9            MR. KELLER:  And, Ms. Orozco, if we could pull up

10   just for the witness again, Government's Exhibit 404.  Oh, I'm

11   sorry, Ms. Patterson.  These have not yet been admitted.  Can

12   we pull those down.

13   **Q.**   (BY MR. KELLER)  Mr. Vinder, do you recognize this as

14   another one of the attachments related to Lucky Mark?

15   **A.**   Yes.

16   **Q.**   And Exhibit 405, just for the witness.  Again, was this

17   another attachment related to this Hong Kong company, Lucky

18   Mark Trading Limited?

19   **A.**   Yes.

20           MR. KELLER:  Government would move for admission of

21   Exhibits 403, 404, and 405, Your Honor.

22           MR. KENNER:  May we have a sidebar, Your Honor.

23           (Bench conference on the record.)

24           THE COURT:  All right.  So we're all right.  We're

25   all set.  So Mr. Kenner, Mr. Keller should -- Mr. Keller, Mr.

1    Kenner and the court reporter can all hear; am I correct?

2              MR. KENNER:  Yes.

3              MR. KELLER:  Yes.

4              THE COURT:  Okay.  So let me make sure, as I

5    understand it, Mr. Kenner indicated that when he stipulated,

6    he stipulated to documents that were not from overseas to put

7    it in summary form.  And so my question is that you were

8    objecting to these documents.

9              MR. KENNER:  Yes, Your Honor, I am.

10             THE COURT:  Okay.  And Mr. Keller.

11             MR. KELLER:  Your Honor, these aren't being offered

12   as business records or pursuant to the stipulation, they're

13   being offered for the effect on the recipient, who was

14   Mr. Vinder.  So they're not being offered for their truth.

15             THE COURT:  As to whether they're accurate or not?

16             MR. KELLER:  Correct, Your Honor.

17             THE COURT:  All right.  Then I would give an

18   instruction that they're not to consider whether they're

19   accurate or not, but having received them, what did Mr. Vinder

20   do next.

21             MR. KELLER:  Correct, Your Honor.

22             THE COURT:  Mr. Kenner.

23             MR. KENNER:  Your Honor, if this is not stipulated

24   as to foundation, I don't think he can show it to the witness,

25   whether it's to get his reaction or otherwise.

1              THE COURT:  Well, he received -- presumably, he

2    received this with the e-mail.  He's already identified the

3    e-mail and they had attachments, and he's indicated, as far as

4    I know, although we can double check, that he received these

5    attachments along with the e-mail.

6              MR. KELLER:  Correct.

7              MR. KENNER:  That is correct, but it doesn't solve

8    the problem that I am raising.

9              THE COURT:  I'm not sure I understand why it

10   wouldn't resolve the problem.  If he agrees, if he testified

11   that he received the document, if he received these e-mails

12   along with it, you've stipulated to the e-mail, I take it, but

13   not the documents, the attachments, right.

14             MR. KENNER:  That's correct, I did not -- I

15   specifically did not stipulate to any document authenticity or

16   chain of custody that was created outside of the United

17   States.

18             THE COURT:  So I'm not sure what you're expecting

19   they would need to do.  I mean, he's identified that he got

20   these.  We're not admitting them for what's the content in

21   there.  It's being admitted strictly -- he got these and what

22   did he do next, so they're not being admitted in terms of

23   what, you know, what's in them.  They're not going to be

24   discussing what's in them.  But he did indicate that he

25   received these.  So this isn't like they're bringing something

1    up that nobody's identified.  He's identified it as being

2    connected to the e-mail.  And the e-mail you did agree to,

3    just not the documents.

4        So I'm not sure that they can't indicate that he received

5    them and based on that he did something else.  Now, the other

6    possibility is to not have them admitted and just have them

7    discussed as he received e-mails from Lucky, whatever it is,

8    Lucky Mark, and what did he do next if we're not admitting it

9    for the truth of the matter.  How about that, Mr. Keller?

10            MR. KELLER:  Your Honor, they were sent by the

11    Defendant and his co-conspirator Mr. Higginbotham.

12            THE COURT:  So they're from -- I didn't look at the

13    beginning of it, so there's some from both of them or one of

14    them or what?

15            MR. KELLER:  This particular e-mail --

16            THE COURT:  Back to the -- let's go back to the

17    e-mail.  The e-mail is what, 403 -- no, 402.

18            MR. KELLER:  Correct, Your Honor.

19            THE COURT:  Okay.  Can somebody put 402 up just for

20    me, just for us.  Okay.  And if you could highlight who it's

21    coming from again so I've got that information.  Okay.  So Mr.

22    Higginbotham has sent this to -- the question to Mr. Michel,

23    okay.  And what does it show that Mr. Michel answered these

24    questions.

25            MR. KELLER:  Mr. Vinder testified that he received

```
 1     these answers and the attachments.

 2              THE COURT:  Okay.  And he received them from -- what

 3     I'm asking is:  Goes from Higginbotham to Michel and then he

 4     gets the answers.  Does it show that the answers came from

 5     Mr. Michel?

 6              MR. KELLER:  His testimony is that they came from

 7     Mr. Higginbotham and Mr. Michel.

 8              MR. KENNER:  Do we have an exhibit that reflects

 9     that in the "from" line?

10              THE COURT:  Is there anything in the exhibit that

11     indicates, you know, who provided the answers?

12              MR. KELLER:  The exhibit suggests that

13     Mr. Higginbotham, I think, was drafting the answers and

14     sending them to Mr. Michel along with the attachments, all of

15     which Mr. -- the witness testified that he received from

16     Mr. Higginbotham and Mr. Michel.

17              THE COURT:  All right.  So we have Mr. Higginbotham,

18     but he received them from Mr. Higginbotham and Mr. Michel, and

19     how is he -- what shows that it came from Mr. Michel, the

20     testimony or something on the e-mail?

21              MR. KELLER:  The testimony, the testimony, Your

22     Honor.  These are statements in furtherance of the

23     conspiracy.

24              THE COURT:  Okay.

25              MR. KENNER:  Your Honor, they do not reflect from
```

1    the document that they came from Mr. Michel.  If this witness

2    is adding, after seeing it, that he thinks it came from

3    Mr. Michel, then he's using it as a fact statement for the

4    truth of the matter to which he then wants an inference as to

5    where it came from that's not reflected on the document.

6            MR. KELLER:  It's not an inference, Your Honor, it's

7    his testimony.

8            THE COURT:  But he did testify -- not that he was

9    guessing.  He testified that it came from Higginbotham in

10   Vinder's answers, and it was shared with Mr. Michel and then

11   you get the answers.  It also indicates the additional things

12   with Lucky Mark, et cetera, at the beginning there to show

13   that the e-mail actually -- that the e-mail does include these

14   additional documents.  So the e-mail has already been

15   admitted, which is 403, and the e-mail indicates Higginbotham

16   sends it to Michel.  So Michel is aware of the questions from

17   Mr. Vinder and the answers, and is aware of what the

18   attachments are.  And Mr. -- the witness has indicated that

19   they were of -- the answers came from the two of them;

20   otherwise, they would be -- you know, the questions there

21   obviously include the information from Mr. Michel.  Is that

22   your position, Mr. Keller?  Am I correct?

23           MR. KELLER:  Yes, Your Honor.

24           THE COURT:  So I'm not sure what --

25           MR. KENNER:  Your Honor, this is hear --

1              THE COURT:  There isn't hearsay, you've already

2     agreed to the e-mail coming in.  So the only question is

3     whether these -- they did have these documents come along with

4     it, they're not being admitted to indicate what the content

5     was -- was, you know, was accurate or to be considered with

6     it.  And I can give an instruction relating to it.  All it's

7     going to be is that he received these.  And based on receiving

8     them, he took whatever action he did or did not take.  So

9     it's -- they're not being admitted for the truth of the matter

10    in terms of the attachments.  I would admit them in the

11    context of since it involves, clearly, Mr. Higginbotham and

12    Mr. Michel.

13              MR. KENNER:  Your Honor --

14              THE COURT:  And they're co-conspirators.

15              MR. KENNER:  With all due respect, this e-mail is

16    from Mr. Higginbotham and it's written to --

17              THE COURT:  Mr. Michel.

18              MR. KENNER:  -- Michel.

19              THE COURT:  Right.

20              MR. KENNER:  It is hearsay with respect to anything

21    that Mr. Vinder can testify -- can specify about it, if he's

22    not -- he's not on this e-mail.

23              THE COURT:  Who's not on this e-mail?

24              MR. KENNER:  Mr. Vinder.

25              THE COURT:  Right.  But the point is you've already

Direct Examination - Vinder

 1    agreed that it can be admitted as co-conspirator statements,

 2    Higginbotham and Michel, as to what's in there.  All he can

 3    say is he received it, which is all he has said.  He received

 4    this.  He got this e-mail.  He got the things and then the

 5    next question is, okay, what did you do next.  And that's it.

 6    So all he has said is he got it.  He's not attesting to the

 7    content.  All right.  He's not attesting to what's in there.

 8    He's attesting to this is what he received.  And he's

 9    testified he wasn't, you know, satisfied with the answers,

10    that was it.  So it doesn't go to whether the answers are

11    accurate or not accurate.

12            MR. KENNER:  I could also add to the objection, Your

13    Honor, that it's attorney-client privilege.

14    Mr. Higginbotham --

15            THE COURT:  Well, we don't -- at this point we don't

16    have established whether or not -- and there, you know,

17    they're co-conspirators in addition, to these can be

18    considered co-conspirator statements.  So as far as I'm

19    concerned, at this point nobody is -- has -- since it includes

20    him, I don't see that working at this point.  We can always go

21    back and, you know, if there's something that indicates that

22    somehow they -- the attorney-client privilege affects this,

23    that's fine.  At this point, all the jury has seen is that he

24    got this and what did he do next.  So I'll admit it with that

25    understanding.

1          Now, one thing, Mr. Keller, is that you could say they

2    got these and we can hold off in terms of there's some other

3    way of bringing in.  If you're not going to use them other

4    than he got them, I'm not sure that we need to actually have

5    them see them, but it's up to you.

6               MR. KELLER:  Your Honor, is there -- I guess I don't

7    see any 403 issue with showing the documents to inform the

8    witness's reaction.

9               THE COURT:  Okay.  I don't know what's in the

10   documents, okay.  All I've done is we propped them up, so I

11   don't know if there's anything in there that's a problem.  Is

12   there some problem that, Mr. Kenner, you're concerned about

13   that's in the documents?

14              MR. KENNER:  I believe there will be, yes, Your

15   Honor.

16              THE COURT:  Well, what's in the documents, Mr.

17   Keller, what do they talk about?

18              MR. KELLER:  They are Articles of Incorporation for

19   Lucky Mark, and they're all in Chinese.

20              THE COURT:  Okay.  That's what I thought.  I just

21   wanted to make sure I had not missed something in English.

22   All right.  I'm going to allow them, with the understanding

23   since they can't read them in Chinese, number one.  Number

24   two, it seems to me that they -- he has testified that -- and

25   the e-mail itself has been admitted that it's Higginbotham to

1    Mr. Michel with the questions and the answers.  And all we're

2    getting from Mr. Vinder is he got this and what did he do

3    next, without getting into whether or not the answers that

4    Mr. Higginbotham and Michel may have provided are correct or

5    not correct.  All right.  So I'll admit it that way.  I don't

6    see a 403 problem.  If they're all in Chinese, there's nobody

7    that's going to be reading them.  You're just identifying what

8    they are.  All right.  So I've made my ruling.

9                (The following proceedings were had in open court.)

10               THE COURT:  So, exhibits, based on the discussion,

11   403, 404, 405, I will admit them, but they're not being

12   admitted for the truth of the matter.  So what it means is --

13   and frankly, the documents appear to be in Chinese, so you're

14   not going to be able to read them anyway.  But they're being

15   admitted simply to show -- not for the contents, okay.  You're

16   not to consider if somebody tells you what the contents are.

17   Not being admitted for that, simply to indicate what -- upon

18   receiving it, what Mr. Vinder did next.  Okay.  His reaction

19   to it.

20               MR. KELLER:  Thank you, Your Honor.  Could we first

21   publish Government's Exhibit 403.

22   **Q.**  (BY MR. KELLER)  And so, Mr. Vinder, this is one of the

23   documents we were talking about before the break there.

24        This is one of the documents that you received regarding

25   Lucky Mark, the Hong Kong company?

Direct Examination - Vinder

1    **A.**  Yes.

2    **Q.**  And who did you receive this from?

3    **A.**  I don't recall.

4    **Q.**  Do you recall whether it was --

5    **A.**  I think it was George, but it could have come from Pras.

6    **Q.**  And if we could go to Government's Exhibit 404.

7         Was this another one of the documents that was provided

8    as part of the same e-mail?

9    **A.**  Yes.

10   **Q.**  And Government's Exhibit 405.

11        Another one of those documents?

12   **A.**  Yes.

13   **Q.**  What was your reaction to receiving these documents?

14   **A.**  I was -- when I saw it, I mean, I couldn't read it,

15   couldn't understand it, and didn't want anything to do with

16   it.  So I told them both that I'm going to close the accounts

17   and asked them where they want the money sent to.

18   **Q.**  If you had been provided these documents at the time that

19   Mr. Michel wanted to open the account, would you have opened

20   the account?

21   **A.**  No.

22            MR. KENNER:  Objection, calls for speculation.

23            THE COURT:  I'm sorry, what?  I didn't hear what you

24   said.

25            MR. KENNER:  Calls for speculation.

1              THE COURT:  No, I'll allow it.

2    **Q.**  (BY MR. KELLER)  Similarly --

3              MR. KELLER:  Well, I'm sorry.  Did we get the answer

4    from the witness?

5              THE COURT REPORTER:  (Reading) "No."

6              MR. KELLER:  No.

7    **Q.**  (BY MR. KELLER)  Mr. Vinder, if you had been provided

8    these documents at the time that Mr. Michel asked you to open

9    the accounts at Morgan Stanley, would you have opened the

10   accounts?

11   **A.**  No.

12   **Q.**  If you had been informed that the money was associated

13   with Jho Low, would you have opened the accounts?

14   **A.**  No.

15             MR. KENNER:  Objection.  Hypothetical, hasn't

16   qualified the witness --

17             THE COURT:  No.  In terms of he's a financial

18   manager, he makes decisions about what accounts he's going to

19   open or not.  He's indicating what he would do.

20   **Q.**  (BY MR. KELLER)  If you had been informed that the money

21   was related to an effort to extradite a Chinese national in

22   the United States and send him back to China, would you have

23   opened the accounts?

24   **A.**  No.

25             MR. KENNER:  Objection, Your Honor.

1              THE COURT:  I understand, but I'm overruling them.

2              MR. KELLER:  No further questions, Your Honor.

3              THE COURT:  Cross.

4                          CROSS-EXAMINATION

5    BY MR. KENNER:

6    **Q.**  Good morning, Mr. Vinder.  How are you?

7    **A.**  Well, thank you.

8    **Q.**  Good.

9        I want to take you back to October of 2017.  Were you

10   located in -- or were you in London and then contacted by

11   business on behalf of Wyclef Jean, another founder member of

12   the Fugees?

13   **A.**  Can you repeat the question, please?

14   **Q.**  Yeah.

15       Were you in London in 2017 when you got a telephone call

16   from Wyclef Jean's manager indicating they might be interested

17   in using you as their financial advisor?

18   **A.**  I got contacted by his business manager, but not for

19   Wyclef.

20   **Q.**  Okay.  And as a result of your contact from his business

21   manager, did there -- a relationship ensue?

22             THE COURT:  But he's -- okay.  You got contacted by

23   a business manager.  Whose business manager?

24             THE WITNESS:  Wyclef's.

25             THE COURT:  Okay.  Go ahead.

1  **Q.**  (BY MR. KENNER)  And was that out of the ordinary for you

2  to be contacted by somebody's business manager rather than be

3  contacted by the person itself?

4  **A.**  I have a personal relationship with Charmant, so we talked

5  regularly.  So it didn't seem out of the ordinary for him to

6  call me and say that one of their bandmates needed help with a

7  financial advisor.

8  **Q.**  Okay.

9       THE COURT:  Excuse me.  Could you indicate who is --

10  you said Sean, and we didn't get the rest of the name.

11       THE WITNESS:  Charmant Noncent is the business

12  manager -- Wyclef's business manager's name, Charmant.

13  **Q.**  (BY MR. KENNER)  Okay.  And did you take on managing the

14  money for Mr. Wyclef Jean?

15  **A.**  No.

16  **Q.**  Did you take on setting up accounts for him?

17  **A.**  No.

18  **Q.**  Did you do any business with him?

19  **A.**  No.

20  **Q.**  Did you turn down their business?

21  **A.**  No.

22       MR. KELLER:  Objection, Your Honor.  Relevance.

23       THE COURT:  I'll allow a little bit of this.

24  **Q.**  (BY MR. KENNER)  Was their business ever offered to you?

25  **A.**  I've had over -- I've known them a long time, and I've had

1    discussions with them.  They've -- when they needed help in

2    certain things, they would call me and ask for my advice.

3    **Q.**  Okay.  And did you give that advice?

4    **A.**  Yes.

5    **Q.**  Did you get paid for it?

6    **A.**  No.

7    **Q.**  At some point when you were in England or London, you

8    called Mr. Michel; is that correct?

9    **A.**  Yes.

10   **Q.**  And what was the purpose of your call to Mr. Michel?

11   **A.**  Charmant had told me that he needed a financial advisor

12   and that he asked me to contact Mr. Michel.

13   **Q.**  Okay.  You say he needed a finance --

14   **A.**  Mr. Michel needed a financial advisor.

15   **Q.**  All right.  And you reached out to him to discuss that

16   with him; did you not?

17   **A.**  Correct.

18   **Q.**  And how many times did you talk to Mr. Michel while you

19   were still in London?

20   **A.**  Just once, I believe.

21   **Q.**  You believe?

22   **A.**  I believe it was just once.

23   **Q.**  Okay.  And then did you have a meeting or meet Mr. Michel

24   someplace other than London?

25   **A.**  I've never met him in London.  I just had a phone

1    conversation with him.

2    **Q.**  Okay.  Now, was it Mr. Michel that came to you to open up

3    the bank account that you've been asked about?

4    **A.**  Yes.

5    **Q.**  Did he come in himself?

6    **A.**  It was initially over the phone.

7    **Q.**  I'm sorry?

8    **A.**  It was over the phone.

9    **Q.**  Okay.  And who called you over the phone?  Was it

10   Mr. Michel, Mr. Higginbotham?

11   **A.**  Mr. Michel.

12   **Q.**  Okay.  And can you describe for me the conversation to the

13   best of your recollection; that is, what did you say and what

14   did Mr. Michel say in that conversation?

15   **A.**  I explained to him a little bit about what I do for a

16   living.  He explained to me that he had a bad relationship

17   with a prior financial institution, that they were trying to

18   charge him way too many in fees, and he wanted to move the

19   money out of there.

20   **Q.**  Okay.  Do you know where the "there" was that he wanted to

21   move the money out of?

22   **A.**  I think I do, but I don't want to guess at it.

23   **Q.**  I'm sorry?

24   **A.**  I said I think I do, but I don't want to guess at it.

25   **Q.**  Was it in the -- was it a United States bank?

**A.** Yes.

**Q.** What's your best recollection of the name of that bank?

**A.** City National.

**Q.** Okay. And did Mr. Michel explain to you why he wanted to move money from City National Bank into Morgan Stanley?

**A.** Because he was being taken advantage of. They were charging him too many fees.

**Q.** So he didn't think he was being charged fairly; correct?

**A.** I'm sorry?

**Q.** Mr. Michel told you he didn't believe he was being treated properly or fairly?

**A.** Correct.

       THE COURT: If you could move back just a teeny bit from the microphone. I know I told you to speak into it, but there's a little bit of a reverberation.

       THE WITNESS: Okay.

**Q.** (BY MR. KENNER) Did you have a discussion with him about the ways in which he was being treated unfairly?

**A.** Yes.

**Q.** And what kinds of things did Mr. Michel tell you that caused him to believe he was being taken advantage of and being treated badly?

**A.** That they were charging him 5 percent on his assets that were held --

       THE COURT: Now you do need to move a little closer,

1    just not quite as close.  I'm sorry.

2    **A.**  That he was being charged 5 percent on the assets that

3    were held at the bank.

4    **Q.**  (BY MR. KENNER)  Five percent on the total portfolio;

5    correct?

6    **A.**  Total assets that were held at the bank.

7    **Q.**  Total assets.

8        Having nothing to do with whether they increased the

9    value of those assets or not; correct?

10   **A.**  He didn't mention that.

11   **Q.**  Did you understand that he was paying 5 percent of the

12   assets and might have been paying more if they made more from

13   the assets on top of the 5 percent?

14   **A.**  I understood that he said he was being charged 5 percent,

15   but I didn't know that he was actually being charged

16   5 percent.

17   **Q.**  Okay.  And in the conversation, did -- and we're talking

18   about the initial conversation now --

19   **A.**  Okay.

20   **Q.**  -- back here in the States.

21       Did Mr. Michel talk about a -- any particular business

22   manager that he had working for him that he was unhappy

23   with?

24               MR. KELLER:  Objection, Your Honor.  Hearsay.

25               THE COURT:  It does seem to be getting far afield.

1    Let's just talk for a quick second so we can -- if you're

2    going to go down this line.

3                (Bench conference on the record.)

4                THE COURT:  So what's -- what's -- business manager,

5    what does this have to do with what's been testified to so

6    far?

7                MR. KENNER:  Your Honor, one of the witnesses that

8    they're calling I believe today or Thursday is Mark Moscowitz.

9    There will be testimony about what Mark Moscowitz's role was

10   in causing Pras to become unhappy where his accounts were and

11   wanting them -- him to move those accounts.  Pras discussed

12   with this man not -- it negates that it was for some -- some

13   idea from China or elsewhere.  Pras was unhappy at a bank he

14   was at, wanted to change banks; had a conversation with him

15   about it and explained to him why he wanted to do it.  I think

16   that's relevant.

17               THE COURT:  Well, we've had the testimony about why

18   he wanted to switch banks and to go to Morgan Stanley.  The

19   business manager -- why he might be unhappy with his own

20   business manager, this is Mr. Michel, you're doing a

21   conversation, he's not a co-conspirator.  As a practical

22   matter, it's hearsay.  So --

23               MR. KENNER:  Your Honor, I think it's relevant to

24   show the effects on this man having been told what he was told

25   about Mr. Moscowitz.

1          THE COURT:  I don't see anything that the testimony

2    so far in terms of -- you know, he gave an explanation of his

3    being willing to take the money.  He hasn't conditioned in any

4    way his testimony so far that would suggest that he only took

5    it because of, you know, he is indicating and complaining

6    about the other bank or the other manager.  This is pure

7    hearsay in terms of the -- what he is saying about

8    Mr. Moscowitz.

9      Whether the problems with Mr. Moscowitz can be brought

10   out frankly with Moscowitz or Michel or somebody else, I see

11   it as -- is there any other argument, Mr. Keller?  You know

12   the case better than I do.

13          MR. KELLER:  No, Your Honor.  Based on the reason

14   that defense counsel has set forth, it sounds like this is

15   being offered for the truth of the matter to attack

16   Mr. Moscowitz and put in the defendant's defense as hearsay

17   through this witness.

18          THE COURT:  I would agree.  I mean you've already

19   indicated why you wanted to do it based on Mr. Moscowitz being

20   a government witness later, so I'll preclude it at this

21   point.

22          MR. KENNER:  Thank you.

23          (The following proceedings were had in open court.)

24          THE COURT:  I'll sustain the objection.

25   **Q.**  (BY MR. KENNER)  During the times that we've been talking

Cross-examination - Vinder

1    about, you -- your work included high-net-worth individuals;

2    is that correct?

3    **A.**  Yes.

4    **Q.**  That's what you did for the bank, you dealt with

5    high-net-worth individuals?

6    **A.**  Correct.

7    **Q.**  All right.  And when Mr. Michel contacted you about your

8    becoming his financial advisor, isn't it true that he asked

9    you to contact his attorney George Higginbotham?

10   **A.**  Yes.

11   **Q.**  And did you contact his attorney George Higginbotham?

12   **A.**  Yes.

13   **Q.**  And what was the purpose of -- did you ask a question of

14   Mr. Michel that prompted him to ask you to get in touch with

15   his attorney?

16          THE COURT:  You've asked two questions.  Which one

17   do you want him to answer?  Rephrase it or do it again.

18   **Q.**  (BY MR. KENNER)  What did Mr. Michel tell you about why he

19   wanted you to contact his attorney?

20   **A.**  When I was trying to figure out where the money came from,

21   he said that I should have a conversation with his attorney.

22   **Q.**  Okay.  Did he tell you that his attorney worked for the

23   Department of Justice?

24   **A.**  Yes.

25   **Q.**  And did he say something to the effect of he had him as

1    his attorney because his job was to make sure --

2              MR. KELLER:  Objection, Your Honor.  Hearsay.

3              MR. KENNER:  -- with regard to the money, everything

4    was kosher?

5              THE COURT:  You're, again, bringing in testimony

6    that -- let's discuss it.

7              (Bench conference on the record.)

8              THE COURT:  Mr. Keller, I'll let you indicate your

9    objection.  Then I can hear from Mr. Kenner.

10             MR. KELLER:  Your Honor, he's trying to elicit from

11   this witness a statement from the defendant that he was using

12   Mr. Higginbotham to vet the financial transactions at issue in

13   this case.  Again, he's trying to put in his defense through

14   hearsay statements of his client through this witness.

15             THE COURT:  Okay.  Mr. Kenner, that's correct.

16             MR. KENNER:  If the criticism is that I'm trying to

17   put forth my defense by asking questions to this witness, then

18   I think the answers will do just that.  I'm not sure I

19   understand the basis --

20             THE COURT:  It's hearsay.  It's hearsay.  You're

21   basically bringing in statements of your client.  This is not

22   a co-conspirator here, it's Mr. Vinder.  In terms of repeating

23   things that would further the conspiracy, it's straight

24   hearsay in terms of his repeating your client's statement.  I

25   understand your purpose.  That doesn't make it less hearsay --

1    less than hearsay.

2         I also think, as a practical matter, that you're getting

3    into things that have -- you're starting to stray into beyond

4    what was presented on the direct and also getting into things

5    that we haven't heard yet, so I think it's going to be

6    confusing to the jury under 403.  I won't let you do it.

7              MR. KENNER:  Well, you want me to call him back.

8              (The following proceedings were had in open court.)

9              THE COURT:  I'll sustain the objection.

10   **Q.**  (BY MR. KENNER)  Sir, after you -- did you, in fact, then

11   talk to Mr. Higginbotham?

12   **A.**  Yes.

13   **Q.**  And after you had that conversation with Mr. Higginbotham,

14   whatever it was, did it cause you to take some following

15   steps?

16   **A.**  I don't recall.

17   **Q.**  Do you recall whether, after the conversation with

18   Mr. Higginbotham, you believed that there were more questions

19   that you had to justify the source of the money?

20   **A.**  Yes.

21   **Q.**  Okay.  And what were those questions that you had?

22   **A.**  Where the money came from.

23   **Q.**  Did Mr. Higginbotham say anything to you that you used to

24   assist you in trying to get an understanding of where the

25   money came from?

Cross-examination - Vinder

1    **A.**  Can you repeat the question?

2    **Q.**  Yes.

3        Did Mr. Higginbotham say anything to you that you thought

4    was helpful to further pursue the source of the funds?

5    **A.**  Not that I recall.

6    **Q.**  So you felt you came away from that call with

7    Mr. Higginbotham with no more information with regard to what

8    you were trying to find out then you had before that

9    conversation.  Fair statement?

10   **A.**  It was a meeting, not a call.  And, correct, I didn't have

11   what I needed to feel comfortable that I understood where the

12   money came from.

13   **Q.**  Okay.  Where was that meeting?

14   **A.**  In Washington, D.C.

15   **Q.**  Your office is in New York?

16   **A.**  Correct.

17   **Q.**  Why was the meeting held in Washington, D.C.?

18   **A.**  I was -- my son was attending University of Maryland, and

19   he was located here.  And so I was coming down to visit my

20   son, so we had lunch in Washington.

21   **Q.**  "We" meaning you and Mr. Higginbotham?

22   **A.**  Correct.

23   **Q.**  Is that lunch for the purpose of furthering the analysis

24   of your understanding the source of the funds?

25   **A.**  Correct.

1    **Q.**  You had that lunch?

2    **A.**  Yes.

3    **Q.**  When that lunch was over, did you have any better

4    understanding, without telling me what was said, but following

5    what was ever said, did you feel you had a better

6    understanding of the answer to your quest where did the money

7    come from?

8            MR. KELLER:  Objection, Your Honor.  Asked and

9    answered.

10           MR. KENNER:  It's a different --

11           THE COURT:  I think you have asked it, but I'll let

12   you answer one more time.  Then we need to move on.

13   **A.**  I didn't.

14   **Q.**  (BY MR. KENNER)  Did there come a time when you had

15   another conversation with Mr. Higginbotham?

16   **A.**  I had multiple conversations with him.

17   **Q.**  I'm trying to track them so I understand them.

18       After the last one that you just testified to, was there

19   yet another conversation with Mr. Higginbotham?

20   **A.**  Yes.

21   **Q.**  And was that conversation in person or --

22   **A.**  Over the phone.

23   **Q.**  -- over the phone?

24       Okay.  And do you recall where you were and where

25   Mr. Higginbotham was at that time?

Cross-examination - Vinder

1  **A.**  On the very next conversation after the meeting?

2  **Q.**  Yes.

3  **A.**  I don't.

4  **Q.**  Do you know whether you called him or he called you?

5  **A.**  I don't.

6  **Q.**  Do you know whether you had yet made a decision on the

7  source of the funds that you were discussing with him?

8  **A.**  I'm sorry?

9  **Q.**  Had you by that point made a decision about your view of

10  the source of the funds that were being discussed?

11  **A.**  No.

12  **Q.**  And it would be fair to say, would it not, sir, that you

13  were meeting with Mr. Higginbotham because Mr. Higginbotham

14  was Mr. Michel's attorney; correct?

15  **A.**  I was meeting with him because Mr. Michel asked me to meet

16  with him.

17  **Q.**  He told you he was an attorney; right?

18  **A.**  Yes.

19  **Q.**  And Mr. Higginbotham told you that he was Mr. Michel's

20  attorney; correct?

21  **A.**  Correct.

22  **Q.**  In fact, he even wrote you some letters that started out

23  by saying I represent Pras Michel, coming from Higginbotham;

24  correct?

25  **A.**  I don't recall.

Cross-examination - Vinder

1    **Q.**  Let me ask a different way.

2        In your work with high-net-worth people, is it frequently

3    the case that there are lawyers involved in advising them

4    about these kinds of questions?

5            MR. KELLER:  Objection, relevance, Your Honor.

6            THE COURT:  I'm not sure that it's relevant in terms

7    of what other people do.

8    **Q.**  (BY MR. KENNER)  Well, was it at all unusual to you that

9    Mr. Michel kept directing you to George Higginbotham, his

10   attorney, to follow up with you to resolve these issues?

11   **A.**  Yes.

12   **Q.**  And it was unusual why?

13   **A.**  Because usually someone can explain to me where their

14   money came from.  They don't need an attorney to do that.

15   **Q.**  Okay.  And if it was -- if they thought it was a

16   complicated answer that they didn't understand the legality

17   of, is it your testimony they wouldn't seek assistance from an

18   attorney?

19           MR. KELLER:  Objection, Your Honor.  Assumes facts

20   not in evidence.

21           THE COURT:  You're asking for an opinion about

22   something that's in the -- it's speculating, so I'll sustain

23   the objection.

24   **Q.**  (BY MR. KENNER)  Did Mr. Higginbotham tell you that he had

25   provided legal representation for Mr. Michel for years before

1    he started his, Mr. Higginbotham's job at the DOJ, the

2    Department of Justice?

3    **A.**  I don't know if he said years, but he said prior to him

4    working at the DOJ, he was his personal attorney.

5    **Q.**  Yeah.

6       And going well back before that, you understood

7    Mr. Higginbotham to be Mr. Michel's -- I'm sorry --

8    Mr. Michel's entertainment lawyer; correct?

9    **A.**  Again, I don't know how back.  I don't know how long of a

10   period of time it was before.

11   **Q.**  Okay.  But you did have an understanding that Mr. Michel

12   had -- previous to his dealings with you, had used

13   Mr. Higginbotham for an attorney; correct?

14   **A.**  Correct.

15   **Q.**  And when you talked to Mr. Higginbotham at some point,

16   what, if anything, did Mr. Higginbotham tell you with regard

17   to the nature of these funds?  Did he tell you they were

18   foreign funds?

19   **A.**  He told me that they came from someone that Pras met on a

20   boat in Hong Kong, which is the same thing that Pras told

21   me.

22   **Q.**  Okay.  Was that the sum and substance of what he told you

23   about the funds?

24   **A.**  Yes.

25   **Q.**  Have we yet come to the time at which you were being asked

Cross-examination - Vinder

1   to accept this money as deposits into your -- accounts that

2   you managed?

3   **A.**  I don't recall the time frame of when -- what conversation

4   happened when the accounts were opened or -- if that's what

5   you're asking me.

6           THE COURT:  You need to keep your voice up a little

7   bit.

8   **Q.**  (BY MR. KENNER)  Sir, you wouldn't also consider it

9   unusual for attorneys to advise clients with regard to banking

10  laws that would control a transaction of money from out of the

11  country to into the country?

12          MR. KELLER:  Objection, Your Honor.  Relevance.

13          THE COURT:  Well, leaving aside relevance, you're

14  asking him for an opinion in terms of what's usual about other

15  clients in terms of other things, and I don't see the

16  probative value of it at this point in terms of what he does

17  with other clients.

18  **Q.**  (BY MR. KENNER)  Okay.  Was Mr. Higginbotham helping to be

19  the intermediary between you and Pras to help --

20          THE COURT:  Mr. Michel.

21  **Q.**  (BY MR. KENNER)  I'm sorry, between Mr. Michel and

22  yourself to assist in the explanation of the particulars of

23  the transactions so that you could make a decision?

24  **A.**  I was having conversations with both of them.

25  **Q.**  I understand that.

Cross-examination - Vinder

1      Didn't Mr. Michel often tell you he didn't understand the

2  conversations and asked you to pursue them further with his

3  attorney?

4          MR. KELLER:  Objection, hearsay, Your Honor.

5          THE COURT:  Sustained.

6  **Q.**  (BY MR. KENNER)  At one point after speaking with

7  Mr. Higginbotham, did you ask Morgan Stanley to do an

8  extensive background check?

9          THE COURT:  On who?

10         MR. KENNER:  Mr. Higginbotham.

11 **A.**  Before meeting with -- before meeting with

12 Mr. Higginbotham, I asked my team, not -- you know, not Morgan

13 Stanley, but the people that work for me on my team, to do

14 a -- not an extensive check, but just whenever I meet with

15 somebody, they do, like, a Google search on that person.

16 **Q.**  (BY MR. KENNER)  So you had your team do a Google search

17 on Mr. Higginbotham; correct?

18 **A.**  Correct.

19 **Q.**  And as a result of that Google search on Mr. Higginbotham,

20 did you take some specific further action?

21 **A.**  Just confirmed that he actually did work for the DOJ.

22 **Q.**  Was that significant to you?

23 **A.**  Yeah.

24 **Q.**  In what way?

25 **A.**  It --

Cross-examination - Vinder

1                 MR. KELLER:  Objection, Your Honor.  Relevance as to

2       this witness's significance or impressions.

3                 THE COURT:  Yeah, let's talk about this.

4                 (Bench conference on the record.)

5                 THE COURT:  Okay.  I mean, if you're trying to back

6       door, you know, in terms of that -- you know, because he was

7       with the Department of Justice that somehow he would be more

8       reliable, in that way Mr. Michel could be relying on his -- on

9       what his advice was, that's what it sounds like to me.  So I'm

10      not sure what probative value it has as to his decisions or

11      his lack of decisions as to what -- you know, whether he

12      thought because he worked for Justice there was an issue.

13      They obviously never consummated anything.

14                MR. KENNER:  Well, I'm past that, Your Honor.  All

15      I'm asking him now is he testified that he did a Google

16      search -- his team did a Google search about Mr. Higginbotham.

17      And all I want to ask him is, after that Google search, what

18      did you do next.

19                THE COURT:  No, you didn't ask that.  What you did

20      ask him was whether he learned he was from Justice.  He said

21      yes.  And the question that you asked that they objected to

22      was whether that was significant and why it was significant.

23      It's the why it was significant that Mr. Keller's objecting

24      to.

25                Am I correct, Mr. Keller?

Cross-examination - Vinder

1              MR. KELLER:  Yes, Your Honor.

2              MR. KENNER:  I can rephrase it, Your Honor.

3              THE COURT:  Okay.  Well, and what are you getting at

4     is, I guess, my point.  I guessed at the beginning of this as

5     to what your purpose was, which isn't particularly probative

6     in terms of trying to bolster Mr. Michel's relying on

7     Mr. Higginbotham when it isn't -- at this point isn't

8     relevant.

9              MR. KENNER:  I think what this man did in assessing

10    whether or not there was a reason to not take the money

11    because of some suggestion that there were -- irregularity,

12    which is what the government is suggesting --

13             THE COURT:  Well, why don't you --

14             MR. KENNER:  -- ask him what he did.

15             THE COURT:  If you want to ask him whether his

16    working for the Department of Justice was part of the reason

17    he didn't accept it, that's a different issue, and that I

18    would allow.  But that's not the question you asked.

19             MR. KENNER:  Thank you.

20             (The following proceedings were had in open court.)

21             MR. KELLER:  Your Honor, if I could just

22    accommodate, I believe maybe the witness is requesting

23    water.

24             THE WITNESS:  Yeah, this is empty.

25             THE COURT:  I'm sorry.  Do you have a glass of

Cross-examination - Vinder

 1   water?

 2              THE WITNESS:  This is empty.  I have cups.

 3              THE COURT:  Oh, it's empty.  Sorry.

 4              THE WITNESS:  Thank you.

 5       This feels full, but it won't come out.  You're trying to

 6   trick me.

 7              THE CLERK:  Press the top.

 8              THE WITNESS:  Oh, it worked.

 9              THE COURT:  Sorry.

10              Mr. Kenner, go ahead.

11   **Q.**  (BY MR. KENNER)  Do you recall receiving any letters from

12   Mr. Higginbotham on letterhead that reflected that he was

13   running a private law firm?

14   **A.**  I don't.

15   **Q.**  Did you ever get letters from Mr. Higginbotham on private

16   law firm stationery as opposed to DOJ stationery?

17   **A.**  I don't recall.

18   **Q.**  Do you recall what Mr. Higginbotham's e-mail address

19   was?

20   **A.**  It was a Gmail.

21   **Q.**  Was it ghesquire@gmail.com?

22   **A.**  I don't -- I can't -- I don't recall off the top of my

23   head.

24              MR. KENNER:  Ask for Exhibit 65, Your Honor.

25              THE CLERK:  The government or defendant?

Cross-examination - Vinder

1            THE COURT:  Is it --

2            MR. KENNER:  I'm sorry.

3            THE COURT:  -- the government's or yours or what?

4            MR. KENNER:  It's Exhibit 402 I'm told.

5            THE COURT:  I'm sorry.  I can't hear you.

6            MR. KENNER:  I'm told it's Exhibit 402.  I

7     apologize.

8            THE COURT:  402 of the government?

9            MR. KENNER:  Yes, 402 of the government.

10           THE COURT:  Okay.  So 402 of the government has been

11    admitted.

12           MR. KENNER:  Has this been admitted, counsel?

13           MR. KELLER:  Yes.

14           MR. KENNER:  All right.  Can I show -- can you see

15    Exhibit 402?

16    **Q.**  (BY MR. KENNER)  You can -- you see Exhibit 402?

17    **A.**  Yes.

18    **Q.**  I've called out the top portion of the e-mail.

19         Who is that e-mail from?

20    **A.**  George Higginbotham.

21    **Q.**  And do you see George Higginbotham's e-mail address on

22    that e-mail?

23    **A.**  I do.

24    **Q.**  And what is his e-mail address?

25    **A.**  Ghesquire@gmail.com.

Cross-examination - Vinder

1    **Q.**  Okay.  And can you tell us what the subject of this e-mail

2    is?

3    **A.**  Vinder questions answered.

4    **Q.**  And this e-mail was sent from Mr. Higginbotham to Pras

5    Michel; correct?

6    **A.**  Looks that way, yes.

7    **Q.**  And then --

8            MR. KENNER:  Take the callout down.

9        Now let's go to Exhibit 65, please.

10           THE COURT:  We're talking about still the

11   government, right?

12           MR. KENNER:  Yes, government.

13           THE COURT:  Okay.  This has not been admitted, as

14   far as I know.  Ms. Patterson?  No, it's not been admitted.

15           THE CLERK:  65?

16           THE COURT:  55 or -- six five or five five?

17           MR. KENNER:  Six five, Your Honor.

18           THE COURT:  Six five should not be shown to the

19   jury.  It has not been admitted.

20           MR. KENNER:  It is not being shown to the jury.

21   **Q.**  (BY MR. KENNER)  Sir, do you recognize --

22   **A.**  Yes.

23   **Q.**  Okay.

24           THE COURT:  Let him finish his question, please.

25           THE WITNESS:  Sorry.

1    **Q.**  (BY MR. KENNER)  Do you recognize the header portion of

2    this exhibit?

3    **A.**  Yes.

4    **Q.**  And who is that an e-mail from?

5    **A.**  Me.

6    **Q.**  And what is your e-mail address?

7    **A.**  Ron.vinder@morganstanleypwm.com.

8    **Q.**  And was this sent on October the 6th, 2017?

9    **A.**  Yes.

10          THE COURT:  You need to speak into the microphone

11   more.

12          MR. KENNER:  I'm sorry, Your Honor.

13   **Q.**  (BY MR. KENNER)  And who was it sent to?

14   **A.**  George Higginbotham.

15   **Q.**  And you know that because that's the e-mail address that

16   you see there?

17   **A.**  Correct.

18   **Q.**  And the subject is?

19   **A.**  Pras Michel.

20   **Q.**  Does this e-mail start off by saying --

21          THE COURT:  You haven't admitted it.  It's not

22   admitted already, Mr. Kenner, so --

23   **Q.**  (BY MR. KENNER)  Okay.  Do you recognize this e-mail?

24   **A.**  Yes.

25   **Q.**  True and correct copy of an e-mail you wrote?

Cross-examination - Vinder

1    **A.**  I'm sorry?

2    **Q.**  It's a true and correct copy of an e-mail you wrote?

3    **A.**  Yes.

4           MR. KENNER:  May it be admitted, Your Honor?

5           MR. KELLER:  Objection, Your Honor.  This exhibit is

6    approximately 300 pages.  I believe much of what's in this

7    document is hearsay and is irrelevant.

8           THE COURT:  Okay.  You need to -- let's talk about

9    what's in here, then.

10          (Bench conference on the record.)

11          THE COURT:  Okay.  Mr. Kenner, can you hear me?

12       300 pages, and we'd have to look through it.  If it does

13   have hearsay matters in it, then there's a problem.  So is

14   there something in particular out of 65 you want?

15          MR. KENNER:  First with regard to what's in it, it

16   was given to me by the government.

17          THE COURT:  That doesn't make it -- the government

18   gives you things, that doesn't mean they're admissible in the

19   trial, nor are they particularly relevant.  But what is it

20   that, one, you think is relevant?  And, two, what do you want

21   out of it?

22      They've objected to admitting 300 pages, which I would

23   agree with.  If part of it they claim has hearsay in it, we

24   have to go through it.  So tell me what's the relevance, and

25   what do you want out of it?  I assume not all 300 pages.

1          MR. KENNER:  Your Honor, I'll start with the part --

2    the first page of the exhibit.

3          THE COURT:  So is that all you want out of it?

4          MR. KENNER:  Your Honor, I have to go through 300

5    pages of what I thought was okay with them because they -- as

6    evidence, if it's not okay with them, I'll have to at a

7    different time.  I am not going to do it -- make the jury wait

8    while I do that now.

9          THE COURT:  Okay.  All right.  Then I'll -- as I

10   said, I don't know what the exhibit is.  The fact that they

11   listed it doesn't mean they're going to use it or that they

12   would use all of it.  Anyway, so have you decided not to use

13   it?

14         MR. KENNER:  No, Your Honor, I want to use this, and

15   I want to use page 5 and page 6.

16         THE COURT:  All right.  So you want to use what out

17   of it, the first page, the header, what?

18         MR. KENNER:  May I have a moment?

19         THE COURT:  Sure.

20         MR. KENNER:  Yes, Your Honor, I would cite the

21   e-mail through page 6.

22         THE COURT:  All right.  So we're doing a header

23   and -- through page 6, there's a header, and then presumably

24   the rest of that first page, right?

25         MR. KENNER:  The header on that e-mail on page 1,

1    then there's another header.

2              THE COURT:  So what are you -- okay.  What are you

3    asking to have admitted?

4              MR. KENNER:  I want to admit these e-mails written

5    by Mr. Vinder.

6              THE COURT:  That's -- okay.  You need to give the

7    pages so that I can find out from Mr. Keller what his position

8    is as to whether it's hearsay or what other aspects of it.

9    You need to be specific out of the 300 pages what you want.

10             MR. KENNER:  Page 1 and page 2.

11             THE COURT:  Is that it?

12             MR. KENNER:  At this point, that's it, Your Honor.

13             THE COURT:  Okay.  So, Mr. Keller, tell me, and I'll

14   try to read it.

15             MR. KELLER:  Your Honor, so two things.  I do

16   believe it's hearsay.  You could just ask the witness about

17   the information in the e-mail and refresh him if he needs to.

18   But if -- I don't really have a problem with the substance.

19       The one problem I do have is that the OIG investigator's

20   information is listed in the header, and so they would -- they

21   should redact that before admitting these exhibits.

22             THE COURT:  All right.  Mr. Kenner, assuming we

23   redact that portion since that's not come in at this point.

24       So, Mr. Keller, I'm still trying to figure out, are you

25   objecting to pages 1 and 2, or you're not objecting to it, or

Cross-examination - Vinder

1    you're suggesting that you are objecting to it, but he can ask

2    the questions -- position is --

3            MR. KELLER:  Fair, Your Honor.  If he redacts the

4    OIG notation at the top of pages 1 and 2, the government has

5    no objection.

6            THE COURT:  So pages 1 and 2 out of this exhibit.

7            MR. KELLER:  The rest of the exhibit we have an

8    objection to.  If he's just trying --

9            THE COURT:  So as I understand it, Mr. Kenner, you

10   want to admit pages 1 and 2.  If you redact the OIG business,

11   then there's no objection.  Is that what you want out of the

12   300 pages?

13           MR. KENNER:  Yes, Your Honor.

14           THE COURT:  All right.  So I'm not sure how they

15   redact the OIG stuff in terms of showing it to the jury.

16           MR. KENNER:  Thank you.

17           MR. KELLER:  They would need to redact it in --

18           MR. KENNER:  We're working on that redaction right

19   now.  It will take a moment or two.

20           THE COURT:  No problem.

21           (The following proceedings were had in open court.)

22           THE COURT:  Okay.  Out of Exhibit -- and what's the

23   exhibit number again?

24           MR. KENNER:  65, Your Honor.

25           THE COURT:  65, Government's Exhibit 65, I am

1    admitting pages 1 and 2 out of the 300 pages, not the rest,

2    with a relevant redaction at the top.  And the government has

3    agreed to the -- as long as we have the redaction, to pages 1

4    and 2 being admitted.  So once you get the redaction, we can

5    proceed.

6              MR. KENNER:  May this exhibit be admitted and

7    published, Your Honor?

8              THE COURT:  Okay.  I've admitted pages 1 and 2 out

9    of 65, not the rest.  So it's admitted, it can be published.

10              MR. KENNER:  Thank you.

11        Sorry for the delay, Mr. Vinder.

12    **Q.**  (BY MR. KENNER)  Do you see in front of you an e-mail

13    written by you?

14    **A.**  Yes.

15    **Q.**  And will you read me, from the top block, who this e-mail

16    is from and who it's to and what the subject is?

17    **A.**  It's from me to George Higginbotham requesting account

18    opening information.

19    **Q.**  Okay.  And do you then ask some other questions about

20    Mr. Michel's account to Mr. Higginbotham?

21    **A.**  Do I ask other questions about his account?

22    **Q.**  Yeah.

23        Do -- did you indicate to him what information you would

24    need to open the account for one or for both people?

25    **A.**  Yes.

1   **Q.**  All right.  And what information did you need?

2   **A.**  Social Security number, date of birth, legal address,

3   where they want the -- what -- the address they want the

4   statements to, the last bank they did business with.

5   **Q.**  Okay.  And did you receive that information after this?

6   **A.**  I believe so.

7   **Q.**  Okay.  As to Mr. Higginbotham; correct?

8   **A.**  Did I get the information from Mr. Higginbotham?

9   **Q.**  Yes.

10  **A.**  I don't recall.

11  **Q.**  And I read, I would suggest that you don't provide this

12  information over e-mail, and that we get the information over

13  the phone.

14      Can you tell me why you were writing that?

15  **A.**  When you put information like Social Security number, date

16  of birth, over e-mail, it could be hacked, and it's not

17  secure.

18  **Q.**  Okay.  And the next sentence seems to be directed to

19  Mr. Michel and reads, Pras, if you let me know where you are

20  staying in Miami, I can call you the closest Morgan Stanley --

21  **A.**  I can tell you.

22  **Q.**  I can tell you, I apologize, the closest Morgan Stanley

23  office, and you can drop off the check there.  Or if easier,

24  I'll have a FedEx come pick it up and deliver it to our

25  address below.

Cross-examination - Vinder

1          Do you see that there?

2    **A.**  Yup.

3    **Q.**  That would indicate that you had made a decision to open

4    an account for Mr. Michel?

5    **A.**  I mean, at this point, I thought it was just in his name,

6    but yeah.

7    **Q.**  Yeah, you --

8    **A.**  Yes, I was okay opening an account at this point.

9    **Q.**  Okay.  And was there another account opened in connection

10   with Mr. Michel at the same time?

11   **A.**  You know, I don't know which account was opened when.  I

12   can't recall.

13   **Q.**  Was there a second account related to or -- relating to

14   Mr. Higginbotham and/or Mr. Michel?

15   **A.**  There was an entity account, a couple entity accounts.  I

16   can't recall if we ever opened an account in just Pras's

17   name.

18   **Q.**  Okay.  Did you have a client trust account for

19   Mr. Higginbotham's law company?

20   **A.**  Did I have a what?

21   **Q.**  Did you open a client trust account for Mr. Higginbotham's

22   private practice?

23   **A.**  No.

24   **Q.**  Did you understand -- and let me read the next sentence.

25   George, please CC Pras so he can see the e-mail and that I

1    will have his e-mail address.  I'm around all weekend if

2    either of you have any questions.

3         Do you see that to be true?

4    **A.** Yes.

5    **Q.** All right.  And that was asking George to follow up with

6    Pras?

7    **A.** That was asking George to CC Pras so he could see the

8    e-mail.

9    **Q.** Why didn't you CC Pras in the first place?

10   **A.** I said it right there, I didn't have his e-mail address.

11   **Q.** Okay.  And did you ask Mr. Higginbotham in this e-mail,

12   will the account just be in Pras's name or joint?

13   **A.** Yes.

14   **Q.** And did you get an answer to that question?

15   **A.** I don't recall.

16   **Q.** Did you say if the account is -- or you said, If joint,

17   then I will need all the following information for both

18   people.

19        You see that?

20   **A.** Yes.

21   **Q.** Did you ever get this following information from

22   Mr. Higginbotham?

23   **A.** No.  When I was referring to joint was if he was

24   married.

25   **Q.** It was what?

Cross-examination - Vinder

1    **A.**  It was if Pras was married.

2    **Q.**  Oh, you were inquiring whether there was a second

3    signatory because Pras might have been married?

4    **A.**  If he wanted an account in his name or joint with his

5    wife.

6    **Q.**  I get you.  Thank you so much.

7         Sir, did there ever come a time at which you raised a

8    concern with Mr. Higginbotham about whether or not there might

9    be money laundering going on?

10   **A.**  Yes.

11   **Q.**  And did you warn them that Mr. Michel and Mr. Higginbotham

12   might have been being used as puppets in that regard?

13   **A.**  What I said was I felt that there was money laundering

14   happening.  I wasn't sure at the time if it was them that are

15   doing it or they're involved -- that someone's doing it to

16   them or, you know, it wasn't clear to me at the time, which is

17   what I was trying to get to.

18   **Q.**  Okay.  So at that point in time when you made that

19   comment, it's not because you were aware that Mr. Higginbotham

20   or Mr. Michel were laundering any money?

21   **A.**  No.

22   **Q.**  No, that's true?

23   **A.**  No that -- no, I was not aware.

24   **Q.**  Thank you.

25        And following that conversation, did Mr. Higginbotham

1    respond -- without telling me what he said, did

2    Mr. Higginbotham respond to that question or that statement?

3    **A.**  I don't recall.

4    **Q.**  Would it be a fair statement to say that after that

5    conversation at that point in time, you did not terminate the

6    account; correct?

7    **A.**  Correct.

8    **Q.**  Did you ever feel, sir, that when you were going back and

9    forth about these various subjects with Mr. Higginbotham and

10   Mr. Michel, you frequently thought that Mr. Michel didn't

11   understand what you were saying; isn't that true?

12            MR. KELLER:  Objection, Your Honor.  Relevance as to

13   this witness.

14            THE COURT:  Let me hear what your --

15            (Bench conference on the record.)

16            THE COURT:  Mr. Keller, your objection is what?

17            MR. KELLER:  Relevance, this witness's perception of

18   what Mr. Michel understood or didn't understand.

19            THE COURT:  Okay.  Tell me what the relevance is as

20   to whether he -- and the question is what he did or didn't

21   understand about what?

22            MR. KENNER:  That this witness felt that when he

23   would explain things about the legalities of moving money and

24   money laundering, that after doing that, he felt that Pras was

25   not understanding what he was saying, and that -- and I think

1    that's significant and that's important.

2         And I'm not asking for the truth of the --

3              THE COURT:  Mr. Keller?

4              MR. KENNER:  -- matter of whether Pras understood.

5    I'm asking him whether it appeared to him that Pras was

6    understanding and following what he said.  He either did

7    appear to be or didn't appear to be, it's not for the truth of

8    the matter.

9              THE COURT:  Mr. -- so it's his opinion as to whether

10   he understood it?

11             MR. KENNER:  It's his observation as to whether he

12   believed that Mr. Michel was understanding what he was

13   saying.

14             THE COURT:  It's basically his opinion about whether

15   or not he did, but it seems to have some minimal probative

16   value, Mr. Keller.  Can you --

17             MR. KELLER:  All right.  I'll withdraw the

18   objection.

19             THE COURT:  Okay.

20             (The following proceedings were had in open court.)

21             THE COURT:  I'll allow it depending on how you ask

22   it.

23             MR. KENNER:  Thank you.

24   Q.  (BY MR. KENNER)  Mr. Vinder, was it your observation,

25   after discussing money and the legality of money movement with

Cross-examination - Vinder

1   Mr. Michel, it appeared to you that Mr. Michel didn't

2   understand what you were saying; isn't that true?

3   **A.**  I don't remember that to be true.  I wasn't talking a

4   different language.

5          THE COURT:  You have to keep your voice up.

6   **A.**  I don't remember that to be true.  I wasn't talking in a

7   different language.

8   **Q.**  (BY MR. KENNER)  When you say -- I didn't get -- you have

9   to make sure you weren't talking a different language?

10  **A.**  No.  I was saying I don't recall him not understanding

11  what I was saying.

12  **Q.**  Okay.  Did you ever pass that view that you didn't think

13  Mr. Michel understood what you were saying when talking about

14  the money to anyone else?

15         MR. KELLER:  Objection, Your Honor.

16  Mischaracterizes the testimony.  He just testified that he

17  didn't think that Mr. Michel failed to understand.

18         THE COURT:  Yeah, he -- that's correct.  He

19  indicated that he didn't have that impression.

20     Plus you're bringing out statements that would have been

21  made out of court, a whole series of different things to other

22  people.  You've got your answer.

23  **Q.**  (BY MR. KENNER)  Sir, at some point you became aware of

24  the 1MDB forfeiture claims?

25  **A.**  At some point in my life?

Cross-examination - Vinder

1   **Q.** Yeah.

2   **A.** Yes.

3   **Q.** All right.  Around 2015, I would say?

4   **A.** I don't think I was aware of it in 2015.

5   **Q.** Okay.  When do you think you first became aware of it?

6   **A.** I don't recall.

7   **Q.** Okay.  When you became aware of that situation, did your

8   bank have a forfeiture action against it, Morgan Stanley?

9          MR. KELLER:  Objection, Your Honor.  Relevance.

10         THE COURT:  I agree, I don't see it's relevant.  We

11  have no testimony relating to 1MDB as part of this particular

12  witness.  For that matter, relating to Morgan Stanley on the

13  testimony.

14  **Q.** (BY MR. KENNER)  Did you at some time start to work

15  closely with the government, the Department of Justice or the

16  United States Attorney's Office, to help prosecute this

17  case?

18         MR. KELLER:  Objection, Your Honor.  Argumentative

19  and relevance.

20         MR. KENNER:  It's not argue --

21         THE COURT:  Let me hear what the purpose of it is.

22         (Bench conference on the record.)

23         THE COURT:  I'm not sure the way you've asked the

24  question what you're getting at.  Obviously, the government

25  contacted him, and he provided information.  So where is this

Cross-examination - Vinder

1  going?

2      I mean, you're allowed to provide information if the

3  government contacts you.  What are you trying to get at?

4          MR. KENNER:  What I'm trying to get at, Your Honor,

5  is -- hold on.  Let me try withdrawing the question and asking

6  it a different way.

7          THE COURT:  Well, let me hear what the question is

8  so we don't keep popping back and forth.

9          MR. KENNER:  The question is, did you derive any

10  benefits from your role in working with the government in this

11  case?

12          THE COURT:  Is there any evidence that he did?

13          MR. KENNER:  Yes, Your Honor.

14          THE COURT:  Mr. Keller, is there?

15          MR. KELLER:  I'm not sure what Mr. Kenner's talking

16  about.

17          THE COURT:  Okay.  Mr. Kenner, can you be specific?

18          MR. KENNER:  Yes.

19      He was given an opportunity without bid to pay

20  $18.7 million for the Park Lane $57 million condominium that

21  the government seized from Mr. Low and then sold to this man

22  for 18.7 without following the rules of the bidding

23  procedures, in effect the homeowner's association rules.  And

24  I think that I can ask a couple more questions to show that he

25  gives information to the government, he worked with the

Cross-examination - Vinder

1    government, and he walked away with about a $55 million

2    windfall.  I think that's clearly relevant.

3              THE COURT:  Mr. Kenner -- or Mr. Keller?

4              MR. KELLER:  Your Honor, he purchased a condominium

5    that was auctioned by DOJ.  I'm not aware of anything being

6    improper about that purchase, so I'm not aware of him having

7    the opportunity to make that purchase based on his

8    cooperation.

9              THE COURT:  So, I mean, you're linking it together

10    as if it had some aspect of it.  If he bought it at auction, I

11    mean, everybody's out there -- you know, at auction, it's

12    whatever the highest bidder.

13              MR. KENNER:  Your Honor, the CC&Rs for that building

14    provided that the homeowner's associa- -- very expensive

15    building, provided the homeowner's association had the right

16    to first refusal to purchase any unit in that building that

17    became available.  The government did not extend that right of

18    first refusal to the homeowner's association.  The government

19    got sued over it.  And I -- this -- this is clearly a benefit

20    that he got.

21              THE COURT:  Well, the point is, is that we don't

22    seem to have -- do you have evidence of all of this?

23              MR. KENNER:  Yes.

24              THE COURT:  Okay.  Mr. Keller?

25              MR. KELLER:  I'm not sure what evidence he has.

1          THE COURT:  Why don't we take a break at this point,

2  and you can share -- I mean, if it's such that he got some

3  advantage, fine, but at this point --

4          (The following proceedings were had in open court.)

5          THE COURT:  All right.  We're going to take a break

6  at this point so we can have a further brief discussion about

7  this, as to whether it's appropriate or not to go into it.

8          So I realize that we're -- I'm hoping we can resolve

9  this before we have to break for the day.  So at this point,

10 I'll -- we'll do it at 10 after 11:00.  If it turns out it's

11 going to take us longer, I'll get back to you.  Okay?

12     If you could just wait, Mr. Vinder, to let them get by.

13         THE WITNESS:  What's that?

14         THE COURT:  If you could let them get by for a

15 second.

16         (Jury left the courtroom.)

17         THE COURT:  All right.  Mr. Vinder, you can step

18 down.  Please don't talk about the testimony with anybody, all

19 right?  And then come back at 10 of, and I'll tell you where

20 we are.  Okay?

21         THE WITNESS:  Okay.

22         THE COURT:  So I think, Mr. Kenner, you need to

23 share whatever it is that you've got that you have to support

24 it before we go down this road, and including whether, you

25 know, even if there was a lawsuit, who won.  So I'll give you

1    an opportunity to have some discussion before we go into it.

2              MR. KELLER:  Your Honor --

3              THE COURT:  No, I meant 10 after.

4              MR. KELLER:  I understood that the defense was going

5    to be making a proffer of what evidence he was just talking

6    about --

7              THE COURT:  Presumably he's got some paperwork, not

8    just his oral -- if he's got paperwork, I want him to show it

9    to me before we have a discussion.

10             MR. KENNER:  Can we have the witness excused?

11             THE COURT:  Do you have paperwork, Mr. Kenner?

12             MR. KENNER:  Yes.

13             THE COURT:  All right.  So show it to the government

14   so we can have an intelligent discussion about it, information

15   to support what you wish to ask and what you have claimed.

16   Okay?  And we won't say anything further -- well, the witness

17   is out.

18        Okay.  So if you've got something to support the claims

19   that you have made, most of which in terms of -- the sale

20   itself doesn't -- by itself, I don't think, goes anywhere.  He

21   can certainly, you know, bid on something.  The question of

22   whether there was some impropriety, you need to have some

23   evidence of that.

24        So I'm getting off the bench at this point.  Let me know

25   when you're ready to talk about it.

Cross-examination - Vinder

1           (A recess was taken.)

2           THE COURT:  All right.  Okay.  So in the interest of

3    moving this along, my understanding is that the government is

4    objecting; is that correct?

5           MR. KELLER:  Your Honor, if counsel wants to ask

6    whether Mr. Vinder purchased a property from the government as

7    part of a forfeiture sale or auction, the government has no

8    objection.

9       But I believe what counsel was seeking to inquire into or

10   suggest to the jury was that Mr. Vinder somehow got inside

11   information or was provided --

12          THE COURT:  Or some -- well, got a windfall because

13   of the cooperation basically.

14          MR. KELLER:  Correct, Your Honor.  And there's no

15   evidence of that.

16          THE COURT:  Okay.  So I've -- in the interest of

17   getting a hold of the same material you would have given to

18   the defendants because of the timing of this.

19      So as I understand it, Mr. Kenner, you want to impeach

20   the witness through bias, that you're claiming that the

21   witness received a windfall as a result of cooperation with

22   the government in terms of being able to buy this condo; and,

23   therefore, relevance depends on that fact.

24      Now, to decide on relevance, under Rule 104(a) and (b), I

25   have to find by a preponderance of the evidence that the fact

Cross-examination - Vinder

1    actually is true, that the witness received a windfall because

2    of the cooperation with the government.

3        Based on the material that you've provided me, I can't do

4    that.  All I have before me is a newspaper article noting that

5    the witness bought an apartment at auction from the government

6    to the purported detriment of a condo board -- of the condo

7    board.  The condo board was also owned by someone connected to

8    the 1MDB scandal.

9        I have a sent -- a state court opinion featuring the

10   condo board suing the witness.  None of these materials

11   establish by a preponderance of the evidence that the witness

12   earned the windfall because of cooperation with the

13   government.  The auction frankly is incidental.

14       I would also point out that the opinion and the article

15   also indicate that the board lost in litigation, in both

16   federal and state court.  So it's not relevant to impeach by

17   bias, and I exclude the question getting into this whole thing

18   of the auction and his potentially getting a windfall and that

19   somehow is associated with his testimony and cooperation with

20   the government.

21       So based on the grounds that I've provided and the

22   material you've given me, I'm not allowing you to pursue

23   that.

24            MR. KENNER:  Understood, Your Honor.

25            THE COURT:  So do we have something left in terms of

 1  additional questions you want to ask?

 2          MR. KENNER:  Yes, Your Honor.

 3          THE COURT:  Okay.  Then let's get the jury out.

 4          MR. KELLER:  Your Honor, the witness can resume the

 5  stand?

 6          THE COURT:  Yes.  Yeah, let's move this along.

 7          (Jury entered the courtroom.)

 8          THE COURT:  Please, everybody sit down.

 9      All right.  I'm sustaining the objection.  I've made my

10  findings.  And the questions that you were planning on

11  pursuing I'm precluding, Mr. Kenner, so move to another

12  area.

13          MR. KENNER:  Thank you, Your Honor.

14  **Q.**  (BY MR. KENNER)  Mr. Vinder, there came a time when you

15  made a decision to close the account in question; correct?

16  **A.**  Correct.

17  **Q.**  And when you closed -- was that based on your belief that

18  there was money laundering involved in that account or

19  something else?

20  **A.**  That was one of the thing -- I wasn't sure what was going

21  on, but one of my concerns was money laundering.

22  **Q.**  Okay.  So there was never a determination of whether or

23  not there was any money laundering in connection with this

24  money.  You were concerned that there might be.

25      Is that a fair statement?

1    **A.**   Yes.

2    **Q.**   And at some point -- was it you unilaterally that made a

3    decision to close the account?

4    **A.**   Yes.

5    **Q.**   When an account is closed for money laundering, is that

6    typically taken to a committee of some sort at the institution

7    to make a decision about that?

8    **A.**   I've never been involved with a process like that, so I

9    don't know.

10   **Q.**   Are there processes like that available at your bank?

11   **A.**   I'm not aware -- I don't know.

12   **Q.**   So would it be fair to say, then, sir, that you had some

13   concerns about money laundering, you decided to close the

14   account, and you did?

15   **A.**   Correct.

16   **Q.**   Now, at the time that you decided to close that account,

17   how much money was in it?

18   **A.**   I don't remember.

19   **Q.**   Does $37 million refresh your recollection?

20   **A.**   I think that's the number that was in there.

21   **Q.**   I'm sorry.  I didn't hear you.

22   **A.**   I think so, but I don't remember.

23   **Q.**   And did you call Mr. Michel in to tell him you were

24   closing the account and you needed to return his money to

25   him?

Cross-examination - Vinder

1   **A.**  I didn't call him in.  I called him over the phone and

2   said that I'm closing the account, and where do you want the

3   money to go to.

4   **Q.**  All right.  And did Mr. Michel come into the bank to talk

5   to you about that?

6   **A.**  He came into the -- to my office to pick up a cashier's

7   check.

8   **Q.**  This was at or about the time that Bitcoin was becoming a

9   big thing, isn't it?

10              MR. KELLER:  Objection, Your Honor.  Relevance.

11              THE COURT:  I'm not sure what relevance this has.

12              MR. KENNER:  I'll be happy to tell you.

13              (Bench conference on the record.)

14              THE COURT:  Okay.  What does Bitcoin got to do with

15   any of this at this point?  Mr. Kenner, can you hear me?

16              MR. KENNER:  I can hear you.  Do you hear me?

17              THE COURT:  Yes.  So what does Bitcoin have to do

18   with this?

19              MR. KENNER:  When Mr. Michel came to pick up that

20   check, Mr. Vinder offered to turn it into Bitcoin for him so

21   that it could be hidden, the money could be hidden.

22   Mr. Michel turned that down and took the check.

23              THE COURT:  It seems to me -- and who is going to

24   testify to that?  Do you have some -- a good faith basis that

25   that actually occurred?

1          MR. KENNER:  Yes, Your Honor.

2          THE COURT:  Mr. Keller?

3          MR. KELLER:  If he wants to ask the question about

4   whether he offered to turn it into Bitcoin so it could be

5   hidden, no objection.

6          THE COURT:  Okay.  Go ahead.

7          (The following proceedings were had in open court.)

8          THE COURT:  You can ask the question, go ahead.

9          MR. KENNER:  Thank you.

10  **Q.**  (BY MR. KENNER)  Isn't it true, sir, that when Mr. Michel

11  came to pick up a check for $37 million, you asked him if he'd

12  rather have you put it into Bitcoin so that it could be

13  hidden?

14  **A.**  No.

15  **Q.**  Was the bank -- was Morgan Stanley precluded from doing

16  business in Bitcoin at that time?

17         MR. KELLER:  Objection, Your Honor.  Relevance.

18         THE COURT:  I'll allow that one question.

19  **A.**  We were prohibited from doing -- transacting in Bitcoin.

20  **Q.**  (BY MR. KENNER)  If you had -- let me withdraw that.

21     How long was this money in your bank?

22  **A.**  I don't remember the exact timeline.

23  **Q.**  Do you have any idea how much money the bank earned as a

24  result of having the money there for whatever time it was

25  there?

Redirect Examination - Vinder

1    **A.**  I don't know the number, but it was -- there was no fees

2    that were generated off of the money that was there.

3    **Q.**  But you made money based on having the use of $30 million;

4    correct?

5    **A.**  I did not make any money on it.

6    **Q.**  The bank did?

7    **A.**  I don't know their -- how they profit on deposits.

8    **Q.**  And had Mr. Michel wanted you to turn it into Bitcoin, you

9    would have made money by doing that; correct?

10   **A.**  I couldn't turn it into Bitcoin.

11   **Q.**  You didn't know how?

12   **A.**  We were precluded from doing -- from purchasing Bitcoin

13   and still are.

14   **Q.**  But you could do it outside of that bank, couldn't you?

15   **A.**  No.  I work for Morgan Stanley.

16           THE COURT:  You need to keep your voice up, too.

17           THE WITNESS:  I'm sorry.

18           MR. KENNER:  I don't have anything further, Your

19   Honor.

20           THE COURT:  All right.  Redirect.

21           MR. KELLER:  Thank you, Your Honor.

22                        REDIRECT EXAMINATION

23   BY MR. KELLER:

24   **Q.**  Mr. Vinder, at the beginning of your cross-examination,

25   defense counsel asked you some questions about fees that

1    Mr. Michel or Mr. Higginbotham told you Mr. Michel was being

2    charged at his prior bank.

3        Do you recall those questions?

4    **A.**  Yes.

5    **Q.**  Did Mr. Michel tell you that City National Bank had closed

6    his accounts for the same reasons that you ultimately closed

7    his accounts?

8    **A.**  No.

9    **Q.**  Did Mr. Michel tell you that City National Bank had

10   concerns about money laundering?

11   **A.**  No.

12           MR. KENNER:  Objection, hearsay.

13           THE COURT:  No, I think he's allowed to ask it in

14   the context of what you asked him.

15   **Q.**  (BY MR. KELLER)  So, again, did Mr. Michel tell you that

16   City National Bank had concerns about money laundering?

17   **A.**  No.

18   **Q.**  On cross-examination, defense counsel asked you a number

19   of questions about your calls or communications or meetings

20   with Mr. Higginbotham.

21       Do you recall those questions?

22   **A.**  I do.

23   **Q.**  Did you also have communications directly with

24   Mr. Michel?

25   **A.**  Yes.

1    **Q.**  Who was the ultimate client as far as you understood?

2    **A.**  Mr. Michel.

3           MR. KENNER:  Objection, vague as to "ultimate

4    client."

5           THE COURT:  I'm sorry?

6           MR. KENNER:  Vague as to "ultimate client."

7           THE WITNESS:  Ultimate he said.

8           THE COURT:  Ultimate client in terms of who is it --

9    I don't think that's vague.  It's the specific person between

10   the two people he was dealing with.

11       Is that presumably what you're asking?

12           MR. KELLER:  Correct, Your Honor.

13   **A.**  Mr. Michel is -- was the client.

14   **Q.**  (BY MR. KELLER)  And did you then rely on information from

15   Mr. Michel before you made any final decisions about the

16   account?

17   **A.**  Yes.

18   **Q.**  Did you meet in person with Mr. Michel?

19   **A.**  Yes.

20   **Q.**  Where did that meeting take place?

21   **A.**  In my apartment.

22   **Q.**  Was Mr. Higginbotham present for that meeting?

23   **A.**  No.

24   **Q.**  Did Mr. Michel try to explain to you the source and

25   purpose of the funds?

1    **A.** Yes.

2    **Q.** Were you satisfied with his explanations?

3    **A.** No.

4    **Q.** Did you still have concerns about money laundering?

5    **A.** Yes.

6    **Q.** Did you feel like Mr. Michel was being transparent and was

7    providing you accurate information?

8            MR. KENNER:  Objection, calls for a conclusion.

9            THE COURT:  No, you asked him questions about --

10   around this area.  He can answer.

11   **A.** Can you repeat the question?

12   **Q.** (BY MR. KELLER)  Did you believe that Mr. Michel was being

13   transparent and forthcoming and was providing you accurate

14   information about the source and purpose of the funds?

15   **A.** It wasn't clear to me the source of the funds, so no.

16   **Q.** Did you tell both Mr. Michel and Mr. Higginbotham that

17   this was, quote, money laundering 101?

18   **A.** Yes.

19   **Q.** Did Mr. Michel respond that he didn't understand?

20   **A.** No.

21           MR. KELLER:  No further questions, Your Honor.

22           THE COURT:  All right.  Can he be excused

23   altogether?

24           MR. KENNER:  Yes, Your Honor.

25           MR. KELLER:  Yes, Your Honor.

1        THE COURT:  All right.  You're excused, sir.

2        THE WITNESS:  Thank you.

3        THE COURT:  I think at this point I won't start

4  another witness.  It's too close to the time that we had

5  indicated we would be taking off.  If we could pick up for a

6  second so I can tell them timing wise.

7        (Bench conference on the record.)

8        THE COURT:  Do we anticipate -- obviously, we're off

9  for the rest of the day -- again, I assume with

10  Mr. Higginbotham on Thursday, tomorrow.  Is there any issue

11  that we expect to get today that needs to be resolved?

12        MR. KELLER:  Not from the government, Your Honor.

13     I would just request, we lost at least 30 minutes today

14  on a frivolous objection about baseless accusations to try and

15  impeach one of our witnesses.  If counsel had intended to

16  raise that, he should have flagged it for the Court and

17  government last night and provided whatever documentation he

18  thought supported that last night so that we did not lose half

19  of the day today on a frivolous objection -- or a frivolous

20  line of questioning.

21        THE COURT:  Mr. Kenner, that would help that -- you

22  know, the whole purpose of having these things the night

23  before, et cetera, is to try and resolve these things in

24  advance.  The information is there.  You're not prejudiced by

25  letting us know in advance.  There's nothing they can do about

1    it, it's either correct or not correct.

2        So I would appreciate it if you -- that's why I set up

3    all these motions in limine and stuff, understanding that

4    before the trial there may be instances where you don't know

5    you're bringing things in.  But it certainly would have helped

6    to have had this last night.  We could have looked at it,

7    discussed it and, you know, resolved it before the witness got

8    on the stand.

9        At any rate, are there any issues, Mr. Kenner?

10                MR. KENNER:  No, Your Honor.

11                THE COURT:  All right.  So I will ask us to come in

12    at 9:00 and for them to be ready to come out at 9:15.  And for

13    Thursday, I don't have anything at the end of the day, so

14    we'll go through till 5:00 o'clock.

15                MR. KELLER:  Thank you, Your Honor.

16                MR. KENNER:  Thank you, Your Honor.

17                THE COURT:  All right.  Okay.  I have a few things I

18    need to say once the jury leaves.

19                MR. KENNER:  Thank you.

20                (The following proceedings were had in open court.)

21                THE COURT:  All right.  Members of the jury, at this

22    point, as we had indicated, in observance of the Jewish

23    holiday we're going to be breaking, and we'll resume tomorrow.

24    So you get the afternoon to enjoy, I hope, the nice weather

25    outside.

1    Don't talk about the case.  Don't read anything.  Please,

2    don't even think about it.  And we're not going to tell your

3    work or anything where you are, so...

4    Anyway, if you'd come tomorrow, and if you're -- we're

5    going to bring you out at 9:15 to start, so, you know, just

6    make sure that we get you here before that.  All right?  Take

7    care and be well and leave the -- you know, your notebooks.

8            (Jury left the courtroom.)

9            THE COURT:  Okay.  In terms of the jury

10    instructions, the part two which sets out the charges, the

11    government did go through them.  They have some minor changes.

12    Some of it's sort of the factual thing, and then there was one

13    change that I disagree with.

14            Mr. Kenner, my understanding is you hadn't looked at

15    it, so don't.  What I'm going to do is send another version

16    back which has the changes that I've adopted, which are, you

17    know, the number of counts and a bunch of other stuff that are

18    minor.

19            I do have a question about the one -- I'm sorry, I

20    should have brought it out -- the one question relating to how

21    you describe the elements.  I'm relying on a Fourth Circuit

22    case, which I will cite to and will hopefully either today --

23    I think today or tomorrow at the latest, I'll send out the new

24    version which has adopted the redlined -- as I said, they're

25    factual stuff, they're not really the legal.  And then I'll

1    indicate why I'm going back to some of the language that I had

2    suggested, okay, and then you can take a look.  I cite the

3    case.  There aren't a lot of cases on the FARA, so it makes it

4    hard to come up with jury instructions.  Okay?

5           Once we've done that, I would ask, Mr. Kenner, if

6    you could let me know by Friday, okay, I want to move on it so

7    we're not stuck running around at the end.  Obviously, we'll

8    go through it again, but if you've got issues, it's easier to

9    legally look at things along the way.

10        I will then probably by Monday, if not before, give you

11   part one, which is, you know, the typical things, function of

12   the Court, et cetera.  So we've sort of been waiting to see

13   which ones of -- you know, there's the immunity, there's the

14   various other things, and I've put in who the witnesses' names

15   are so they know what they apply to.  So I don't want to give

16   it to you too early where we keep having to give you different

17   versions or substituting different pages.  But that is

18   strictly the Red Book language, you know, in terms of just

19   pulling things out, so I'll give that to you a little bit

20   later.

21          You did give me the witnesses, Mr. Keller.  Are

22   those it, or do we have more witnesses after this group or

23   you're not sure?

24          MR. KELLER:  No, Your Honor, there are additional

25   witnesses after this group.

1          THE COURT:  Okay.  I would assume so, I was just

2     checking.

3         All right.  Anything else, Mr. Keller, that we need to

4     discuss at this point?

5          MR. KELLER:  Not for the government, Your Honor.

6          THE COURT:  Mr. Kenner?

7          MR. KENNER:  Not for the defense, Your Honor.

8          THE COURT:  All right.  Then let me let you go.

9     Take care.  Take care of yourself, Mr. Kenner.

10          MR. KENNER:  Thank you.  You too, Your Honor.

11         (The proceedings were concluded 11:43 a.m.)

12

13          I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
      record of proceedings in the above-entitled matter.

14

                    _____/s/_____
15                       Christine T. Asif
                     Official Court Reporter
16

17

18

19

20

21

22

23

24

25

< Dates >.
19-148-1 4:7.
April 5th, 2023
  1:11.
November 7th, 2017
  20:25.
October 2017 9:12.
October 23rd, 2017
  19:17.
October 26th, 2017
  17:19.
October 9th, 2017
  13:25.
$10 16:21.
$18.7 71:20.
$25 16:20.
$30 81:3.
$37 78:19, 80:11.
$55 72:1.
$57 71:20.
.
.
< 1 >.
1 18:14, 59:25,
  60:10, 60:25, 61:4,
  61:6, 61:10, 62:1,
  62:3, 62:8.
10 73:10, 73:19,
  74:3.
101 17:2, 17:4,
  84:17.
1016 1:28.
104(a 75:24.
11:00 73:10.
11:30 5:17.
11:43 89:11.
1301 1:27.
1400 1:35.
16633 1:42.
18.7 71:22.
19-00148-1 1:6.
1MDB 16:13, 69:24,
  70:11, 76:8.
.
.
< 2 >.
2 10:10, 10:14,
  18:14, 60:10,
  60:25, 61:4, 61:6,
  61:10, 62:1, 62:4,

62:8.
20001 2:17.
20004 2:9.
20005 1:36.
2015 70:3, 70:4.
2017 8:18, 34:9,
  34:15, 57:8.
202 2:18.
20530 1:29.
.
.
< 3 >.
3 18:14, 19:18.
30 85:13.
300 58:6, 58:12,
  58:22, 58:25, 59:4,
  60:9, 61:12,
  62:1.
33 7:20.
333 2:15.
34 7:20.
354-3247 2:18.
37 10:22.
385 13:17, 14:12,
  14:15.
396 17:12, 17:17,
  17:25, 18:1,
  18:11.
.
.
< 4 >.
4 19:11.
402 20:20, 20:23,
  21:6, 21:8, 25:17,
  25:19, 55:4, 55:6,
  55:8, 55:9, 55:10,
  55:15, 55:16.
403 22:4, 22:21,
  25:17, 27:15, 30:7,
  31:6, 31:11, 31:21,
  44:6.
404 22:10, 22:21,
  31:11, 32:6.
405 22:16, 22:21,
  31:11, 32:10.
.
.
< 5 >.
5 20:1, 20:3, 38:23,
  39:2, 39:11, 39:13,

39:14, 39:16,
  59:15.
55 56:16.
57 18:22, 19:5,
  19:9.
59 9:16, 9:17, 10:5,
  10:7.
5:00 86:14.
.
.
< 6 >.
6 59:15, 59:21,
  59:23.
641 2:8.
65 54:24, 56:9,
  56:15, 58:14,
  61:24, 61:25,
  62:9.
6507 2:16.
6th 57:8.
.
.
< 8 >.
8 1:17.
.
.
< 9 >.
91436 1:43.
9:00 86:12.
9:10 1:12.
9:15 86:12, 87:5.
_____/s/_____
  _____ 89:17.
.
.
< A >.
a.m. 1:12, 89:11.
able 5:6, 13:20,
  31:14, 75:22.
above-entitled
  89:15.
accept 50:1, 53:17.
accommodate 53:22.
accounts 14:2, 15:4,
  15:12, 19:22,
  32:16, 33:9, 33:10,
  33:13, 33:18,
  33:23, 35:16,
  40:10, 40:11, 50:1,
  50:4, 64:15, 82:6,

82:7.
accurate 23:15,
  23:19, 28:5, 29:11,
  84:7, 84:13.
accusations 85:14.
ACTION 1:5, 28:8,
  51:20, 70:8.
Actually 6:16, 13:19,
  16:6, 18:2, 21:22,
  27:13, 30:4, 39:15,
  51:21, 76:1,
  79:25.
add 29:12.
adding 27:2.
addition 29:17.
additional 27:11,
  27:14, 77:1,
  88:24.
address 54:18, 55:21,
  55:24, 57:6, 57:15,
  63:2, 63:3, 63:25,
  65:1, 65:10.
admissible 58:18.
admission 10:5,
  14:12, 17:25, 19:5,
  21:5, 22:20.
Admit 10:7, 14:15,
  18:11, 19:9, 21:8,
  28:10, 29:24, 31:5,
  31:11, 60:4,
  61:10.
admitted 9:15, 13:17,
  17:13, 18:23,
  20:19, 22:11,
  24:21, 24:22, 25:6,
  27:15, 28:4, 28:9,
  29:1, 30:25, 31:12,
  31:15, 31:17,
  55:11, 55:12,
  56:13, 56:14,
  56:19, 57:21,
  57:22, 58:4, 60:3,
  62:4, 62:6, 62:8,
  62:9.
admitting 24:20,
  25:8, 58:22, 60:21,
  62:1.
adopted 87:16,
  87:24.
advance 85:24,

85:25.
advantage 38:6,
  38:21, 73:3.
advice 36:2, 36:3,
  52:9.
advise 50:9.
advising 48:3.
advisor 7:17, 34:17,
  35:7, 36:11, 36:14,
  42:8.
affects 29:22.
affirm 20:3.
afield 39:25.
afternoon 86:24.
agree 25:2, 41:18,
  58:23, 70:10.
agreed 28:2, 29:1,
  62:3.
agreement 19:1,
  19:14, 19:21,
  21:20.
agreements 12:19.
agrees 24:10.
ahead 8:24, 34:25,
  54:10, 80:6,
  80:8.
albums 12:13, 12:14,
  16:3.
allow 15:8, 30:22,
  33:1, 35:23, 53:18,
  68:21, 80:18.
allowed 71:2,
  82:13.
allowing 76:22.
Alon 1:40.
already 24:2, 27:14,
  28:1, 28:25, 41:18,
  57:22.
although 24:4.
altogether 84:23.
AMERICA 1:5.
amount 10:22,
  12:15.
analysis 45:23.
and/or 64:14.
Anicorn 10:19, 14:7,
  19:2, 19:14.
Anne 4:14.
annually 17:10.
answer 6:19, 6:21,

6:24, 6:25, 16:4,
  21:12, 21:16,
  21:21, 33:3, 42:17,
  46:6, 46:12, 48:16,
  65:14, 69:22,
  84:10.
answered 25:23, 46:9,
  56:3.
answers 26:1, 26:4,
  26:11, 26:13,
  27:10, 27:11,
  27:17, 27:19, 29:9,
  29:10, 31:1, 31:3,
  43:18.
anti-money 17:9.
anticipate 85:8.
anybody 73:18.
Anyway 31:14, 59:12,
  87:4.
apartment 15:21,
  16:6, 76:5,
  83:21.
apologize 55:7,
  63:22.
appear 31:13, 68:7.
APPEARANCES 1:23,
  2:1.
appeared 68:5,
  69:1.
application 19:1.
apply 88:15.
appreciate 86:2.
appropriate 73:7.
approximately 58:6.
area 77:12, 84:10.
argue 70:20.
argument 41:11.
Argumentative
  70:18.
Around 8:18, 65:1,
  70:3, 84:10,
  88:7.
arrangement 12:20.
arrangements 13:2.
Artemus 14:7.
article 76:4,
  76:14.
Articles 30:18.
artist/performer
  8:1.

as-read 21:18.
aside 50:13.
Asif 2:11, 89:13,
   89:18.
aspect 72:10.
aspects 60:8.
assessing 53:9.
assets 38:23, 39:2,
   39:6, 39:7, 39:9,
   39:12, 39:13.
assist 44:24,
   50:22.
assistance 48:17.
associa- 72:14.
associated 10:19,
   11:9, 20:9, 33:12,
   76:19.
association 71:23,
   72:15, 72:18.
assume 58:25, 85:9,
   89:1.
Assumes 48:19.
assuming 60:22.
attached 21:17,
   22:6.
attachment 22:17.
attachments 14:6,
   14:9, 22:2, 22:14,
   24:3, 24:5, 24:13,
   26:1, 26:14, 27:18,
   28:10.
attack 41:15.
attending 45:18.
attesting 29:6, 29:7,
   29:8.
Attorney 11:24, 42:9,
   42:11, 42:15,
   42:19, 42:21,
   42:22, 43:1, 47:14,
   47:17, 47:20,
   48:10, 48:14,
   48:18, 49:4, 49:13,
   51:3, 70:16.
attorney-client
   29:13, 29:22.
attorneys 50:9.
auction 72:10, 72:11,
   75:7, 76:5, 76:13,
   76:18.
auctioned 72:5.

authenticity 24:15.
authority 20:5.
available 72:17,
   78:10.
Avenue 1:27, 1:35,
   2:8, 2:15.
aware 27:16, 27:17,
   66:19, 66:23,
   69:23, 70:4, 70:5,
   70:7, 72:5, 72:6,
   78:11.
away 45:6, 72:1.
.
.
< B >.
Back 11:17, 16:16,
   16:21, 19:18,
   25:16, 29:21,
   33:22, 34:9, 38:13,
   39:20, 44:7, 49:6,
   49:9, 52:5, 67:8,
   71:8, 73:11, 73:19,
   87:16, 88:1.
background 15:1,
   15:12, 51:8.
bad 37:16.
badly 38:22.
bandmates 35:6.
Bank 37:3, 37:25,
   38:2, 38:5, 39:3,
   39:6, 40:13, 41:6,
   42:4, 63:4, 70:8,
   78:10, 79:4, 80:15,
   80:21, 80:23, 81:6,
   81:14, 82:2, 82:5,
   82:9, 82:16.
banking 50:9.
banks 40:14, 40:18.
Based 15:5, 21:3,
   25:5, 28:7, 31:10,
   41:13, 41:19, 72:7,
   76:3, 76:21, 77:17,
   81:3.
baseless 85:14.
basically 43:21,
   68:14, 75:13.
basis 43:19, 79:24.
became 69:23, 70:5,
   70:7, 72:17.
become 40:10.

becoming 42:8,
   79:8.
beginning 25:13,
   27:12, 53:4,
   81:24.
behalf 20:13, 20:16,
   34:11.
belief 77:17.
believe 14:22, 30:14,
   36:20, 36:21,
   36:22, 38:10,
   38:21, 40:8, 53:22,
   58:6, 60:16, 63:6,
   75:9, 84:12.
believed 44:18,
   68:12.
below 63:25.
Bench 22:23, 40:3,
   43:7, 52:4, 58:10,
   67:15, 70:22,
   74:24, 79:13,
   85:7.
benefit 9:19, 9:20,
   72:19.
benefits 71:10.
best 37:13, 38:2.
better 41:12, 46:3,
   46:5.
beyond 44:3.
bias 75:20, 76:17.
bid 71:19, 74:21.
bidder 72:12.
bidding 71:22.
big 79:9.
birth 63:2, 63:16.
bit 10:22, 35:23,
   37:15, 38:13,
   38:15, 50:7,
   88:19.
Bitcoin 79:8, 79:14,
   79:17, 79:20, 80:4,
   80:12, 80:16,
   80:19, 81:8, 81:10,
   81:12.
block 62:15.
blown 13:21.
board 76:6, 76:7,
   76:10, 76:15.
boat 12:11, 16:1,
   49:20.

bolster 53:6.
Book 88:18.
bottom 18:14.
bought 72:10, 76:5.
Boulevard 1:42.
box 14:18, 17:14.
break 31:23, 73:1,
  73:5, 73:9.
breaking 86:23.
brief 73:6.
bring 18:21, 87:5.
bringing 24:25, 30:3,
  43:5, 43:21, 69:20,
  86:5.
brought 41:9,
  87:20.
building 72:13,
  72:15, 72:16.
bullet 21:13.
bunch 87:17.
business 7:22, 8:2,
  8:20, 12:20, 12:24,
  13:2, 23:12, 34:11,
  34:18, 34:20,
  34:23, 35:2, 35:11,
  35:12, 35:18,
  35:20, 35:24,
  39:21, 40:4, 40:19,
  40:20, 61:10, 63:4,
  80:16.
buy 75:22.
.

.

< C >.
C-h-a-r-m-a-n-t
  8:23.
California 1:43.
Call 4:6, 13:18,
  18:13, 19:25,
  20:20, 34:15, 35:6,
  36:2, 36:10, 44:7,
  45:6, 45:10, 63:20,
  78:23, 79:1.
call-out 14:17,
  17:14.
called 6:8, 16:25,
  36:8, 37:9, 47:4,
  55:18, 79:1.
calling 40:8.
callout 56:8.

Calls 6:1, 32:22,
  32:25, 82:19,
  84:8.
care 87:7, 89:9.
career 7:19, 11:6,
  12:24.
careful 15:9.
Carlstrom 4:14.
Case 4:6, 4:7, 41:12,
  43:13, 48:3, 70:17,
  71:11, 87:1, 87:22,
  88:3.
cases 88:3.
cashier 10:15, 15:4,
  79:6.
cause 44:14.
caused 38:21.
causing 40:10.
CC 64:25, 65:7,
  65:9.
Cc&rs 72:13.
certain 36:2.
certainly 74:21,
  86:5.
certify 89:13.
cetera 27:12, 85:23,
  88:12.
chain 18:5, 24:16.
chair 6:13.
change 40:14,
  87:13.
changes 87:11,
  87:16.
charge 37:18.
charged 38:8, 39:2,
  39:14, 39:15,
  82:2.
charges 87:10.
charging 9:8, 9:9,
  38:7, 38:23.
Charles 2:5, 2:6,
  4:14.
Charmant 35:4, 35:11,
  35:12, 36:11.
check 10:15, 15:4,
  24:4, 51:8, 51:14,
  63:23, 79:7, 79:20,
  79:22, 80:11.
checking 89:2.
China 11:17, 13:11,

16:17, 20:16,
  33:22, 40:13.
Chinese 11:13, 11:16,
  13:13, 16:10,
  16:16, 30:19,
  30:23, 31:6, 31:13,
  33:21.
Christine 2:11,
  89:13, 89:18.
Circuit 87:21.
cite 59:20, 87:22,
  88:2.
City 38:3, 38:5,
  82:5, 82:9,
  82:16.
claim 58:23.
claimed 74:15.
claiming 75:20.
claims 69:24,
  74:18.
clear 66:16, 84:15.
clearly 28:11, 72:2,
  72:19.
CLERK 6:11, 54:7,
  54:25.
client 19:1, 20:3,
  43:14, 43:21,
  43:24, 64:18,
  64:21, 83:1, 83:8,
  83:13.
client. 83:4, 83:6.
clients 50:9, 50:15,
  50:17.
close 32:16, 39:1,
  77:15, 78:3, 78:13,
  78:16, 85:4.
closed 77:17, 78:5,
  82:5, 82:6.
closely 70:15.
closer 38:25.
closest 63:20,
  63:22.
closing 78:24,
  79:2.
co-conspirator 25:11,
  29:1, 29:18, 40:21,
  43:22.
co-conspirators
  28:14, 29:17.
COLLEEN

KOLLAR-KOTELLY
1:18.
Columbia 2:14.
COLUMBIA 1:2.
comfortable 6:14,
45:11.
coming 15:18, 25:21,
28:2, 45:19,
47:23.
comment 66:19.
committee 78:6.
communications 82:19,
82:23.
company 22:7, 22:17,
31:25, 64:19.
compare 12:23.
complaining 41:5.
complicated 48:16.
concern 66:8.
concerned 29:19,
30:12, 77:24.
concerns 16:4, 21:24,
77:21, 78:13,
82:10, 82:16,
84:4.
concluded 89:11.
conclusion 84:8.
conditioned 41:3.
condo 75:22, 76:6,
76:7, 76:10.
condominium 71:20,
72:4.
conference 22:23,
40:3, 43:7, 52:4,
58:10, 67:15,
70:22, 79:13,
85:7.
confirmed 51:21.
confusing 44:6.
connected 8:3, 9:1,
13:8, 25:2, 76:7.
connection 64:9,
77:23.
connections 8:2.
consider 23:18,
31:16, 50:8.
considered 28:5,
29:18.
conspiracy 26:23,
43:23.

consummated 52:13.
CONT'D 2:1.
contact 15:13, 34:20,
36:12, 42:9, 42:11,
42:19.
contacted 34:10,
34:18, 34:22, 35:2,
35:3, 42:7,
70:25.
contacts 71:3.
content 13:21, 24:20,
28:4, 29:7.
contents 31:15,
31:16.
context 28:11,
82:14.
Contitution 2:15.
contract 13:4,
21:23.
contracts 12:19,
13:3.
control 50:10.
conversation 9:2,
9:5, 11:8, 11:19,
13:7, 14:19, 14:24,
16:4, 16:8, 16:19,
17:3, 37:1, 37:12,
37:14, 39:17,
39:18, 40:14,
40:21, 42:21,
44:13, 44:17, 45:9,
46:15, 46:19,
46:21, 47:1, 50:3,
66:25, 67:5.
conversations 11:21,
46:16, 50:24,
51:2.
cooperation 72:8,
75:13, 75:21, 76:2,
76:12, 76:19.
copy 57:25, 58:2.
copying 17:18.
correctly 18:9.
Counsel 4:9, 4:15,
6:17, 6:23, 8:6,
8:8, 9:19, 13:16,
17:12, 17:16,
20:19, 41:14,
55:12, 75:5, 75:9,
81:25, 82:18,

85:15.
country 50:11.
counts 87:17.
couple 9:22, 22:2,
64:15, 71:24.
court. 31:9, 41:23,
44:8, 53:20, 61:21,
68:20, 73:4, 80:7,
86:20.
courtroom. 5:19,
73:16, 77:7,
87:8.
covered 13:19.
created 24:16.
creative 12:14.
Criminal 1:5, 4:7.
criticism 43:16.
Cross 34:3.
CROSS-EXAMINATION
34:4, 81:24,
82:18.
cups 54:2.
currently 7:12,
21:18, 21:20.
custody 24:16.
.
.
.
< D >.
date 19:16, 63:2,
63:15.
David 4:13.
David E. Kenner
1:39.
DAY 1:17, 73:9, 85:9,
85:19, 86:13.
dealing 83:10.
dealings 49:12.
dealt 42:4.
decide 75:24.
decided 59:12, 78:13,
78:16.
decision 47:6, 47:9,
50:23, 64:3, 77:15,
78:3, 78:7.
decisions 33:18,
52:10, 52:11,
83:15.
Defendant 1:12, 1:39,
2:5, 8:4, 17:18,
25:11, 41:16,

43:11, 54:25.
defendants 75:18.
defense 9:19, 41:14,
  41:16, 43:13,
  43:17, 74:4, 81:25,
  82:18, 89:7.
delay 62:11.
deliver 63:24.
Department 1:26,
  1:33, 42:23, 49:2,
  52:7, 53:16,
  70:15.
depending 5:17,
  68:21.
depends 75:23.
deposit 10:1, 10:16,
  11:1.
deposited 17:1,
  18:18.
deposits 50:1,
  81:7.
derive 71:9.
describe 15:17,
  37:12, 87:21.
described 18:1.
describing 18:9.
details 12:20.
determination
  77:22.
detriment 76:6.
different 46:10,
  48:1, 53:17, 59:7,
  69:4, 69:7, 69:9,
  69:21, 71:6, 88:16,
  88:17.
difficult 5:4.
DIRECT 7:5, 44:4.
directed 63:18.
directing 48:9.
directly 82:23.
disagree 87:13.
disclose 20:9, 20:12,
  20:15.
discuss 36:15, 43:6,
  89:4.
discussed 25:7,
  40:11, 47:10,
  86:7.
discussing 24:24,
  47:7, 68:25.

discussion 21:19,
  31:10, 38:17, 73:6,
  74:1, 74:9,
  74:14.
discussions 36:1.
District 1:1, 1:2,
  1:19, 2:13, 2:14.
doctor 4:23.
document 9:21, 19:19,
  24:11, 24:15, 27:1,
  27:5, 58:7.
documentation
  85:17.
documents 9:24, 10:1,
  21:17, 22:6, 23:6,
  23:8, 24:13, 25:3,
  27:14, 28:3, 30:7,
  30:10, 30:13,
  30:16, 31:13,
  31:23, 31:24, 32:7,
  32:11, 32:13,
  32:18, 33:8.
doing 5:3, 40:20,
  59:22, 66:15,
  67:24, 80:15,
  80:19, 81:9,
  81:12.
DOJ 49:1, 49:4,
  51:21, 54:16,
  72:5.
dollars 10:23,
  12:17.
done 7:18, 30:10,
  88:5.
door 52:6.
double 24:4.
down 5:5, 5:20, 6:13,
  22:12, 35:20, 40:2,
  45:19, 56:8, 73:18,
  73:24, 77:8,
  79:22.
draft. 21:20.
drafting 26:13.
drop 14:17, 63:23.
due 28:15.
duly 6:8.
During 9:11, 16:8,
  20:8, 41:25.
.
.

< E >.
e-mails 24:11, 25:7,
  60:4.
early 88:16.
earned 76:12,
  80:23.
easier 63:23, 88:8.
effect 23:13, 42:25,
  71:23.
effects 40:24.
effort 11:16, 13:13,
  33:21.
efforts 16:12, 16:15,
  20:13, 20:16.
either 7:2, 65:2,
  68:6, 86:1,
  87:22.
elements 87:21.
elicit 43:10.
elsewhere 40:13.
embedded 18:6.
empty 53:24, 54:2,
  54:3.
Encino 1:43.
encountered 12:24.
end 86:13, 88:7.
England 36:7.
English 30:21.
enjoy 86:24.
enough 19:6.
ensue 34:21.
entered 5:19, 77:7.
entertainment 49:8.
entity 10:18, 10:19,
  64:15.
Esquire 1:25, 1:31,
  1:32, 1:39, 1:40,
  2:5.
establish 76:11.
established 29:16.
et 27:12, 85:23,
  88:12.
everybody 72:11,
  77:8.
everyone 4:2, 4:16.
everything 43:3.
evidence 48:20, 59:6,
  71:12, 72:22,
  72:25, 74:5, 74:23,
  75:15, 75:25,

76:11.
evidently 5:4.
exact 80:22.
EXAMINATION 5:3, 7:5,
  81:22.
examined 6:8.
exchange 17:21.
exclude 76:17.
Excuse 35:9.
excused 74:10, 84:22,
  85:1.
executed 19:21.
Exhibits 22:21,
  31:10, 60:21.
expect 85:11.
expecting 24:18.
expensive 72:14.
experience 11:4.
explain 15:22, 38:4,
  48:13, 67:23,
  83:24.
explained 15:19,
  37:15, 37:16,
  40:15.
explanation 41:2,
  50:22.
explanations 84:2.
extend 72:17.
extensive 51:8,
  51:14.
extradite 11:16,
  33:21.
extraditing 16:15.
extradition 13:13.
.
.
< F >.
F. 1:31.
fact 27:3, 44:10,
  47:22, 59:10,
  75:25, 75:25.
facts 48:19.
factual 87:12,
  87:25.
failed 69:17.
Fair 45:9, 47:12,
  61:3, 67:4, 77:25,
  78:12.
fairly 38:8, 38:11.
faith 79:24.

familiar 13:20.
far 24:3, 29:18,
  39:25, 40:6, 41:2,
  41:4, 56:14,
  83:1.
FARA 88:3.
FCRR 2:11, 89:13.
featuring 76:9.
federal 76:16.
Fedex 63:24.
feel 45:11, 46:5,
  67:8, 84:6.
feels 54:5.
fees 9:9, 37:18,
  38:7, 81:1,
  81:25.
felt 11:5, 16:6,
  45:6, 66:13, 67:22,
  67:24.
few 86:17.
figure 42:20,
  60:24.
final 83:15.
finalized 21:23.
finance 36:13.
finances 11:5.
financial 7:17, 8:14,
  8:15, 9:7, 33:17,
  34:17, 35:7, 36:11,
  36:14, 37:17, 42:8,
  43:12.
find 45:8, 60:7,
  75:25.
findings 77:10.
fine 29:23, 73:3.
finish 6:18, 56:24.
Firm 1:41, 54:13,
  54:16.
First 6:8, 21:13,
  31:20, 58:15, 59:2,
  59:17, 59:24, 65:9,
  70:5, 72:16,
  72:18.
Five 39:4, 56:16,
  56:17, 56:18.
flagged 85:16.
follow 48:10, 65:5.
following 31:9,
  41:23, 44:8, 44:14,
  46:4, 53:20, 61:21,

65:17, 65:21,
  66:25, 68:6, 68:20,
  71:22, 73:4, 80:7,
  86:20.
follows 6:9.
foregoing 89:14.
foreign 49:18.
forfeiture 69:24,
  70:8, 75:7.
form 21:19, 23:7.
forth 41:14, 43:17,
  67:9, 71:8.
forthcoming 84:13.
forward 7:1.
foundation 23:24.
founder 34:11.
founders 7:25.
Fourth 87:21.
frame 20:8, 50:3.
frankly 31:13, 41:10,
  76:13.
frequently 48:2,
  67:10.
Friday 88:6.
frivolous 85:14,
  85:19.
front 62:12.
Fugees 7:25, 34:12.
full 12:7, 54:5.
function 88:11.
funds 17:22, 21:16,
  45:4, 45:24, 47:7,
  47:10, 49:17,
  49:18, 49:23,
  83:25, 84:14,
  84:15.
furtherance 26:22.
furthering 45:23.
.
.
< G >.
gave 13:4, 16:2,
  41:2.
generated 81:2.
George 11:24, 17:7,
  32:5, 42:9, 42:11,
  48:9, 55:20, 55:21,
  57:14, 62:17,
  64:25, 65:5,
  65:7.

gets 26:4.
getting 15:3, 15:11,
  31:2, 31:3, 39:25,
  44:2, 44:4, 53:3,
  70:24, 74:24,
  75:17, 76:17,
  76:18.
Ghesquire@gmail.com
  54:21, 55:25.
give 12:19, 23:17,
  28:6, 36:3, 60:6,
  73:25, 88:10,
  88:15, 88:16,
  88:19, 88:21.
given 58:16, 71:19,
  75:17, 76:22.
gives 58:18, 71:25.
glass 53:25.
Gmail 54:20.
Google 51:15, 51:16,
  51:19, 52:15,
  52:16, 52:17.
governed 12:21.
great 5:13.
grounds 76:21.
group 88:22, 88:25.
guess 8:3, 15:3,
  30:6, 37:22, 37:24,
  53:4.
guessed 53:4.
guessing 27:9.
guys 17:2, 17:4.
.
.
< H >.
hacked 63:16.
half 10:22, 18:14,
  19:11, 85:18.
hand 6:6.
happened 50:4.
happening 66:14.
happy 79:12.
hard 88:4.
Haskell 2:5, 2:7,
  4:14.
head 6:15, 54:23.
header 13:18, 14:9,
  57:1, 59:17, 59:22,
  59:23, 59:25, 60:1,
  60:20.

hear 5:7, 5:9, 6:15,
  6:16, 6:21, 6:22,
  6:25, 7:2, 23:1,
  27:25, 32:23, 43:9,
  55:5, 58:11, 67:14,
  70:21, 71:7, 78:21,
  79:15, 79:16.
heard 44:5.
Hearsay 28:1, 28:20,
  39:24, 40:22, 41:7,
  41:16, 43:2, 43:14,
  43:20, 43:24,
  43:25, 44:1, 51:4,
  58:7, 58:13, 58:23,
  60:8, 60:16,
  82:12.
held 38:24, 39:3,
  39:6, 45:17.
help 9:10, 35:6,
  36:1, 50:19, 70:16,
  85:21.
helped 86:5.
helpful 45:4.
helping 50:18.
hereby 89:13.
hidden 79:21, 80:5,
  80:13.
high-net-worth 42:1,
  42:5, 48:2.
highest 72:12.
highlight 25:20.
hold 30:2, 71:5,
  75:17.
holiday 86:23.
homeowner 71:23,
  72:14, 72:15,
  72:18.
Hong 12:11, 16:1,
  22:7, 22:17, 31:25,
  49:20.
HONORABLE 1:18.
hope 86:24.
hopefully 87:22.
hoping 73:8.
Hypothetical 33:15.
.
.
< I >.
idea 11:5, 40:13,
  80:23.

identification 13:17,
  20:23.
identified 8:10,
  24:2, 24:19,
  25:1.
identify 4:9.
identifying 8:7,
  31:7.
immunity 88:13.
impeach 75:19, 76:16,
  85:15.
important 68:1.
impression 69:19.
impressions 52:2.
improper 72:6.
impropriety 74:22.
in. 28:2, 30:3, 79:1,
  86:5.
incidental 76:13.
include 27:13,
  27:21.
included 42:1.
includes 29:19.
including 73:24.
Incorporation 21:17,
  30:18.
increased 39:8.
Indiana 2:8.
indicate 24:24, 25:4,
  28:4, 31:17, 35:9,
  43:8, 62:23, 64:3,
  76:15, 88:1.
indicated 23:5, 24:3,
  27:18, 41:19,
  69:19, 85:5,
  86:22.
indicates 26:11,
  27:11, 27:15,
  29:21.
indicating 4:24,
  33:19, 34:16,
  41:5.
individual 7:22,
  11:9, 16:20,
  20:10.
individuals 42:1,
  42:5.
inference 27:4,
  27:6.
influence 16:12.

inform 30:7.
information 15:1,
  15:5, 15:12, 25:21,
  27:21, 45:7, 60:17,
  60:20, 62:18,
  62:23, 63:1, 63:5,
  63:8, 63:12, 63:15,
  65:17, 65:21,
  70:25, 71:2, 71:25,
  74:14, 75:11,
  83:14, 84:7, 84:14,
  85:24.
informed 33:12,
  33:20.
initial 9:2, 10:1,
  10:15, 11:8, 11:19,
  14:19, 14:24, 15:1,
  15:5, 15:11,
  39:18.
initially 37:6.
inquire 75:9.
inquiring 66:2.
inside 75:10.
instances 86:4.
institution 8:15,
  8:16, 9:7, 37:17,
  78:6.
instruction 23:18,
  28:6.
instructions 87:10,
  88:4.
Integrity 1:34.
intelligent 74:14.
intended 85:15.
interest 20:4, 75:2,
  75:16.
interested 34:16.
intermediary 50:19.
introduced 7:21,
  8:13.
introduction 8:12.
invest 15:20.
invested 12:16.
investigator 4:20,
  4:22, 60:19.
investments 12:21,
  12:23.
investor 21:18.
involved 48:3, 66:15,
  77:18, 78:8.

involves 28:11.
irregularity 53:11.
irrelevant 58:7.
Israely 1:40.
issue 30:7, 43:12,
  52:12, 53:17,
  85:10.
issues 5:13, 48:10,
  86:9, 88:8.
itself 30:25, 35:3,
  74:20.
.
.
< J >.
Jean 7:22, 7:24,
  34:11, 34:16,
  35:14.
Jewish 86:22.
Jho 11:10, 13:8,
  16:8, 20:10,
  33:13.
job 43:1, 49:1.
John 4:11.
John D. Keller
  1:25.
joint 65:12, 65:16,
  65:23, 66:4.
JUDGE 1:19.
JURORS 5:22.
Jury 1:17, 5:16,
  5:19, 5:21, 10:12,
  18:15, 29:23, 44:6,
  56:19, 56:20, 59:7,
  61:15, 73:16,
  75:10, 77:3, 77:7,
  86:18, 86:21, 87:8,
  87:9, 88:4.
Justice 1:26, 1:33,
  42:23, 49:2, 52:7,
  52:12, 52:20,
  53:16, 70:15.
justify 44:19.
.
.
< K >.
Kathryn 4:17.
keep 50:6, 69:5,
  71:8, 81:16,
  88:16.
kept 48:9.

kind 7:16, 8:11,
  11:5.
kinds 38:20, 48:4.
known 35:25.
Kong 12:11, 16:1,
  22:7, 22:17, 31:25,
  49:20.
kosher 43:4.
Kriss 4:14.
.
.
< L >.
lack 52:11.
Lane 71:20.
language 69:4, 69:7,
  69:9, 88:1,
  88:18.
larger 17:15.
last 8:23, 12:7,
  46:18, 63:4, 85:17,
  85:18, 86:6.
later 5:16, 41:20,
  88:20.
latest 87:23.
laundering 17:2,
  17:4, 17:9, 66:9,
  66:13, 66:20,
  67:24, 77:18,
  77:21, 77:23, 78:5,
  78:13, 82:10,
  82:16, 84:4,
  84:17.
Law 1:41, 2:6, 54:13,
  54:16, 64:19.
laws 50:10.
lawsuit 73:25.
lawyer 49:8.
lawyers 48:3.
leading 15:7.
learned 52:20.
least 5:9, 19:22,
  85:13.
leave 87:7.
leaves 86:18.
leaving 8:15,
  50:13.
left 6:4, 16:6,
  73:16, 76:25,
  87:8.
legal 48:25, 63:2,

87:25.
legalities 67:23.
legality 48:16,
 68:25.
legally 88:9.
less 16:7, 43:25,
 44:1.
Lestelle 4:17.
letterhead 54:12.
letters 47:22, 54:11,
 54:15.
letting 85:25.
life 69:25.
limine 86:3.
Limited 21:17, 22:7,
 22:18.
line 26:9, 40:2,
 85:20.
linking 72:9.
list 18:1.
listed 10:18, 14:6,
 59:11, 60:20.
litigation 76:15.
little 10:22, 35:23,
 37:15, 38:15,
 38:25, 50:6,
 88:19.
living 11:17,
 37:16.
LLC 10:19, 19:2,
 19:14.
located 34:10,
 45:19.
Lockhart 1:32,
 4:12.
London 34:10, 34:15,
 36:7, 36:19, 36:24,
 36:25.
Long 5:5, 7:14,
 21:19, 35:25, 49:9,
 62:3, 80:21.
longer 73:11.
look 21:12, 22:2,
 25:12, 58:12, 88:2,
 88:9.
looked 86:6, 87:14.
looking 10:14.
Looks 56:6.
lose 85:18.
lost 76:15, 85:13.

lot 11:4, 11:7,
 88:3.
Low 11:10, 13:9,
 16:8, 20:10, 33:13,
 71:21.
Lucky 21:16, 22:7,
 22:14, 22:17, 25:7,
 25:8, 27:12, 30:19,
 31:25.
lunch 45:20, 45:23,
 46:1, 46:3.
.
.
.
< M >.
majority 7:18.
Malaysia 20:13.
man 40:12, 40:24,
 53:9, 71:21.
manage 9:10.
managed 50:2.
management 7:17.
manager 7:22, 8:2,
 8:20, 33:18, 34:16,
 34:18, 34:21,
 34:23, 35:2, 35:12,
 39:22, 40:4, 40:19,
 40:20, 41:6.
managing 35:13.
Mark 21:17, 22:7,
 22:14, 22:18, 25:8,
 27:12, 30:19,
 31:25, 40:8,
 40:9.
marked 20:23.
married 65:24, 66:1,
 66:3.
Maryland 45:18.
mask 4:24, 6:15.
material 75:17, 76:3,
 76:22.
materials 76:10.
matter 25:9, 27:4,
 28:9, 31:12, 40:22,
 41:15, 44:2, 68:4,
 68:8, 70:12,
 89:15.
matters 58:13.
mean 13:1, 16:6,
 24:19, 32:14,
 41:18, 52:5, 58:18,

59:11, 64:5, 71:2,
 72:9, 72:11,
 73:2.
meaning 45:21.
means 31:12.
meant 74:3.
meet 11:25, 15:15,
 36:23, 47:15,
 51:14, 83:18.
meeting 15:17, 15:20,
 15:21, 36:23,
 45:10, 45:13,
 45:17, 47:1, 47:13,
 47:15, 51:11,
 83:20, 83:22.
meetings 82:19.
member 34:11.
Members 5:20,
 86:21.
mention 13:8, 16:8,
 16:10, 16:12,
 16:15, 39:10.
mentioned 9:12.
met 12:6, 12:11,
 15:23, 16:1, 36:25,
 49:19.
Miami 63:20.
microphone 5:6, 6:14,
 38:14, 57:10.
middle 6:24.
million 10:23, 16:20,
 16:21, 71:20, 72:1,
 78:19, 80:11,
 81:3.
millions 12:17.
minimal 68:15.
minister 20:13.
minor 87:11, 87:18.
minutes 85:13.
Mischaracterizes
 69:16.
missed 30:21.
moment 59:18,
 61:19.
Monday 88:10.
Morgan 7:13, 7:14,
 7:16, 10:2, 10:16,
 14:2, 17:8, 18:18,
 19:1, 19:14, 19:21,
 33:9, 38:5, 40:18,

51:7, 51:12, 63:20,
63:22, 70:8, 70:12,
80:15, 81:15.
morning 4:2, 4:3,
4:4, 4:5, 4:12,
4:13, 4:16, 5:20,
5:22, 5:23, 7:7,
7:8, 34:6.
Moscowitz 40:8, 40:9,
40:25, 41:8, 41:9,
41:10, 41:16,
41:19.
motions 86:3.
Move 10:4, 14:11,
15:7, 17:24, 19:4,
21:5, 22:20, 37:18,
37:21, 38:5, 38:13,
38:25, 40:11,
46:12, 77:6, 77:11,
88:6.
movement 68:25.
moves 6:13.
movies 12:13, 12:14,
16:3.
moving 67:23, 75:3.
MR. HASKELL 4:18.
MR. MULRYNE 4:4.
Ms 9:14, 9:19, 10:9,
13:15, 13:18,
14:17, 17:11,
18:13, 18:21,
19:11, 19:19,
19:25, 20:18, 22:3,
22:9, 22:11,
56:14.
Mulryne 1:31, 4:11.
multiple 46:16.
.
.
< N >.
N-o-n-c-e-n-t 8:23.
name 7:9, 8:19, 8:23,
12:7, 35:10, 35:12,
38:2, 64:5, 64:17,
65:12, 66:4.
named 7:22, 11:10,
16:20, 20:10.
names 88:14.
National 11:16,
13:13, 16:16,

33:21, 38:3, 38:5,
82:5, 82:9,
82:16.
nature 9:5, 49:17.
need 5:9, 6:14,
13:21, 19:7, 24:19,
30:4, 38:25, 46:12,
48:14, 50:6, 57:10,
58:8, 60:6, 60:9,
61:17, 62:24, 63:1,
65:17, 73:22,
74:22, 81:16,
86:18, 89:3.
needed 8:14, 15:19,
35:6, 36:1, 36:11,
36:13, 36:14,
45:11, 78:24.
needs 60:17, 85:11.
negates 40:12.
neither 20:3.
New 1:27, 1:35, 8:14,
9:9, 19:22, 45:15,
87:23.
newspaper 76:4.
next 9:21, 15:1,
23:20, 24:22, 25:8,
29:5, 29:24, 31:3,
31:18, 47:1, 52:18,
63:18, 64:24.
nice 86:24.
Nicole 1:32, 4:11.
night 85:17, 85:18,
85:22, 86:6.
No. 5:1, 11:18, 16:6,
33:5, 33:6, 33:17,
65:23, 69:10,
81:15.
nobody 25:1, 29:19,
31:6.
Noncent 35:11.
None 76:10.
noon 5:17.
nor 58:19.
notation 61:4.
note 4:23.
notebooks 87:7.
nothing 39:8,
85:25.
noting 76:4.
Number 30:23, 61:23,

63:2, 63:15, 78:20,
81:1, 82:18,
87:17.
NW 1:27, 1:35, 2:8,
2:15.
.
.
< O >.
o'clock 86:14.
objected 52:21,
58:22.
objecting 5:8, 23:8,
52:23, 60:25, 61:1,
75:4.
observance 86:22.
observation 68:11,
68:24.
Obviously 5:13,
27:21, 52:13,
70:24, 85:8,
88:7.
occurred 79:25.
October 8:18, 34:9,
57:8.
offered 23:11, 23:13,
23:14, 35:24,
41:15, 79:20,
80:4.
Office 45:15, 63:23,
70:16, 79:6.
Offices 2:6.
Official 2:12,
89:19.
often 51:1.
OIG 60:19, 61:4,
61:10, 61:15.
Once 36:20, 36:22,
62:4, 86:18,
88:5.
one 7:25, 15:8,
21:14, 22:5, 22:14,
25:13, 30:1, 30:23,
31:22, 31:24, 32:7,
32:11, 35:6, 40:7,
42:16, 46:12,
46:18, 51:6, 58:20,
60:19, 62:24,
77:20, 77:21,
80:18, 85:15,
87:12, 87:19,

87:20, 88:11.
ones 88:13.
open 8:14, 9:9, 15:4,
  31:9, 32:19, 33:8,
  33:19, 37:2, 41:23,
  44:8, 53:20, 61:21,
  62:24, 64:3, 64:21,
  68:20, 73:4, 80:7,
  86:20.
opened 19:22, 32:19,
  33:9, 33:13, 33:23,
  50:4, 64:9, 64:11,
  64:16.
opening 14:2, 15:12,
  62:18, 64:8.
opinion 48:21, 50:14,
  68:9, 68:14, 76:9,
  76:14.
opportunity 71:19,
  72:7, 74:1.
opposed 54:16.
opposite 21:22.
opposition 14:16.
oral 74:8.
order 10:18.
ordinary 35:1,
  35:5.
originated 21:16.
Orozco 9:14, 9:19,
  10:9, 13:15, 13:18,
  14:17, 17:11,
  18:13, 18:21,
  19:11, 19:19,
  19:25, 20:18, 22:3,
  22:9.
otherwise 23:25,
  27:20.
outside 24:16, 81:14,
  86:25.
overruling 34:1.
overseas 23:6.
overtax 5:14.
own 40:19.
owned 76:7.
ownership 20:4.
.
.
< P >.
Page 9:20, 9:21,
  9:22, 10:9, 10:14,

19:11, 19:12,
  19:18, 59:2, 59:15,
  59:17, 59:21,
  59:23, 59:24,
  59:25, 60:10.
pages 58:6, 58:12,
  58:22, 58:25, 59:5,
  60:7, 60:9, 60:25,
  61:4, 61:6, 61:10,
  61:12, 62:1, 62:3,
  62:8, 88:17.
paid 36:5.
paperwork 74:7, 74:8,
  74:11.
Park 71:20.
part 9:1, 13:5, 32:8,
  53:16, 58:23, 59:1,
  70:11, 75:7, 87:10,
  88:11.
particular 25:15,
  39:21, 58:14,
  70:11.
particularly 53:5,
  58:19.
particulars 50:22.
pass 69:12.
past 52:14.
Patterson 22:11,
  56:14.
pay 10:18, 71:19.
paying 39:11,
  39:12.
People 13:11, 20:16,
  48:2, 48:7, 51:13,
  62:24, 65:18,
  69:22, 83:10.
percent 38:23, 39:2,
  39:4, 39:11, 39:13,
  39:14, 39:16.
perception 67:17.
period 9:11, 49:10.
person 20:4, 20:6,
  35:3, 46:21, 51:15,
  83:9, 83:18.
personal 35:4,
  49:4.
phone 9:2, 11:8,
  36:25, 37:6, 37:8,
  37:9, 46:22, 46:23,
  63:13, 79:1.

physically 5:14.
pick 5:7, 63:24,
  79:6, 79:19, 80:11,
  85:5.
place 65:9, 83:20.
Plaintiff 1:7.
planning 77:10.
plans 12:24.
Please 4:9, 5:20,
  6:6, 6:18, 6:25,
  34:13, 56:9, 56:24,
  64:25, 73:18, 77:8,
  87:1.
Plotnick 16:21.
Plus 69:20.
political 16:12.
politically-exposed
  20:6.
popping 71:8.
portfolio 39:4.
portion 55:18, 57:1,
  60:23.
position 27:22, 60:7,
  61:2.
possibility 25:6.
potentially 76:18.
practical 40:21,
  44:2.
practice 64:22.
Prakazrel 4:8.
PRAKAZREL MICHEL
  1:10.
Pras 8:4, 11:7, 12:6,
  12:13, 19:15, 32:5,
  40:10, 40:11,
  40:13, 47:23,
  49:19, 49:20,
  50:19, 56:4, 57:19,
  63:19, 64:16,
  64:25, 65:6, 65:7,
  65:9, 65:12, 66:1,
  66:3, 67:24, 68:4,
  68:5.
preclude 41:20.
precluded 80:15,
  81:12.
precluding 77:11.
prejudiced 85:24.
preponderance 75:25,
  76:11.

present 83:22.
presented 44:4.
Press 54:7.
Presumably 24:1,
    59:23, 74:7,
    83:11.
previous 49:12.
prime 20:13.
prior 8:15, 9:7,
    37:17, 49:3,
    82:2.
private 7:17, 54:13,
    54:15, 64:22.
privilege 29:13,
    29:22.
probably 88:10.
probative 50:16,
    52:10, 53:5,
    68:15.
problem 5:1, 5:3,
    24:8, 24:10, 30:11,
    30:12, 31:6, 58:13,
    60:18, 60:19,
    61:20.
problems 41:9.
procedures 71:23.
proceed 62:5.
proceedings 31:9,
    41:23, 44:8, 53:20,
    61:21, 68:20, 73:4,
    80:7, 86:20, 89:11,
    89:15.
process 78:8.
processes 78:10.
produce 12:13.
proffer 74:5.
profit 81:7.
prohibited 80:19.
projects 21:18.
prompted 42:14.
properly 38:11.
property 75:6.
proposal 16:19,
    16:24.
propped 30:10.
prosecute 70:16.
Prosperity 14:7.
provide 12:12, 63:11,
    71:2.
provided 10:15, 15:5,

21:2, 22:6, 26:11,
    31:4, 32:7, 32:18,
    33:7, 48:25, 70:25,
    72:14, 72:15,
    75:11, 76:3, 76:21,
    85:17.
providing 14:25,
    84:7, 84:13.
Public 1:34.
publish 10:12, 19:10,
    31:21.
published 10:11,
    14:21, 14:22,
    18:15, 21:11, 62:7,
    62:9.
pull 17:11, 20:18,
    22:3, 22:9,
    22:12.
pulling 88:19.
puppets 66:12.
purchase 72:6, 72:7,
    72:16.
purchased 72:4,
    75:6.
purchasing 81:12.
pure 41:6.
purported 76:6.
purpose 12:5, 15:21,
    17:22, 18:18,
    21:25, 36:10,
    42:13, 43:25,
    45:23, 53:5, 70:21,
    83:25, 84:14,
    85:22.
purposes 13:17,
    20:23.
pursuant 23:12.
pursue 45:4, 51:2,
    76:22.
pursuing 77:11.
put 23:6, 25:19,
    41:16, 43:13,
    43:17, 63:15,
    80:12, 88:14.
.
.
< Q >.
qualified 33:16.
quest 46:6.
questioning 85:20.

questions 6:18, 16:5,
    17:21, 18:17, 21:3,
    21:14, 25:24,
    27:16, 27:20, 31:1,
    34:2, 42:16, 43:17,
    44:18, 44:21, 48:4,
    56:3, 61:2, 62:19,
    62:21, 65:2, 71:24,
    77:1, 77:10, 81:25,
    82:3, 82:19, 82:21,
    84:9, 84:21.
quick 40:1.
quite 39:1.
quote 84:17.
.
.
< R >.
R-o-n 7:11.
R. 2:5, 2:6.
Rae 1:32.
raise 6:6, 85:16.
raised 66:7.
raising 24:8.
rate 86:9.
rather 35:2, 80:12.
reached 36:15.
reaction 16:24,
    23:25, 30:8, 31:18,
    32:13.
read 30:23, 31:14,
    32:14, 60:14,
    62:15, 63:11,
    64:24, 87:1.
Reading 31:7, 33:5.
reads 63:19.
ready 5:15, 74:25,
    86:12.
realize 13:19,
    73:8.
really 6:14, 60:18,
    87:25.
reason 41:13, 53:10,
    53:16.
reasons 82:6.
recall 8:17, 12:17,
    12:18, 15:2, 16:19,
    32:3, 32:4, 44:16,
    44:17, 45:5, 46:24,
    47:25, 50:3, 54:11,
    54:17, 54:18,

54:22, 63:10,
  64:12, 64:16,
  65:15, 67:3, 69:10,
  70:6, 82:3,
  82:21.
receive 32:2, 63:5.
received 23:19, 24:1,
  24:2, 24:4, 24:11,
  24:25, 25:4, 25:7,
  25:25, 26:2, 26:15,
  26:18, 28:7, 29:3,
  29:8, 31:24, 75:21,
  76:1.
receiving 28:7,
  31:18, 32:13,
  54:11.
recess 75:1.
recipient 23:13.
recognize 9:23,
  13:24, 17:17,
  18:25, 20:22, 22:5,
  22:13, 56:21, 57:1,
  57:23.
recollection 37:13,
  38:2, 78:19.
record 4:10, 6:16,
  6:20, 7:10, 8:9,
  89:15.
record. 22:23, 40:3,
  43:7, 52:4, 58:10,
  67:15, 70:22,
  79:13, 85:7.
records 23:12.
Red 88:18.
redact 60:21, 60:23,
  61:10, 61:15,
  61:17.
redaction 61:18,
  62:2, 62:3, 62:4.
redacts 61:3.
REDIRECT 81:20,
  81:22.
redlined 87:24.
refer 11:20.
reference 20:2.
referring 65:23.
reflect 26:25.
reflected 27:5,
  54:12.
reflects 26:8.

refresh 60:17,
  78:19.
refusal 72:16,
  72:18.
regard 43:3, 45:7,
  49:16, 50:9, 58:15,
  66:12.
regarding 22:6,
  31:24.
regular 17:8.
regularly 35:5.
related 10:1, 11:12,
  11:15, 13:13, 14:2,
  16:12, 16:15,
  17:21, 20:12,
  20:15, 22:14,
  22:17, 33:21,
  64:13.
relating 14:7, 28:6,
  64:13, 70:11,
  70:12, 87:20.
relationship 34:21,
  35:4, 37:16.
relayed 12:16.
Relevance 35:22,
  48:5, 50:12, 50:13,
  52:1, 58:24, 67:12,
  67:17, 67:19, 70:9,
  70:19, 75:23,
  75:24, 79:10,
  79:11, 80:17.
relevant 40:16,
  40:23, 48:6, 53:8,
  58:19, 58:20, 62:2,
  70:10, 72:2,
  76:16.
reliable 52:8.
rely 83:14.
relying 52:8, 53:6,
  87:21.
remain 6:5.
remember 11:23, 69:3,
  69:6, 78:18, 78:22,
  80:22.
remove 11:16.
repeat 34:13, 45:1,
  84:11.
repeating 43:22,
  43:24.
Rephrase 42:17,

53:2.
Reported 2:11.
Reporter 2:12, 23:1,
  33:5, 89:19.
represent 47:23.
representation
  48:25.
Republic 13:11,
  20:16.
request 85:13.
requesting 53:22,
  62:17.
require 4:24, 17:8.
resolve 21:24, 24:10,
  48:10, 73:8,
  85:23.
resolved 85:11,
  86:7.
respect 13:7, 28:15,
  28:20.
respond 67:1, 67:2,
  84:19.
response 7:1.
responses 21:2.
rest 35:10, 59:24,
  61:7, 62:1, 62:9,
  85:9.
result 34:20, 51:19,
  75:21, 80:24.
resume 77:4, 86:23.
return 78:24.
reverberation
  38:15.
review 21:19.
reviewing 17:16.
road 73:24.
role 40:9, 71:10.
Ron 6:2, 6:7, 7:11.
Ron.vinder@morganstan
  leypwm.com 57:7.
Room 2:16.
roughly 8:17.
RPR 2:11, 89:13.
Rule 75:24.
rules 71:22, 71:23.
ruling 31:8.
running 54:13,
  88:7.
.

.

< S >.
sale 74:19, 75:7.
satisfied 29:9,
  84:2.
satisfy 16:4.
saw 15:4, 32:14.
saying 41:7, 47:23,
  57:20, 67:11,
  67:25, 68:13, 69:2,
  69:10, 69:11,
  69:13.
scandal 76:8.
scroll 9:20.
Sean 1:31, 4:11,
  35:10.
search 51:15, 51:16,
  51:19, 52:16,
  52:17.
seated 5:6.
second 9:20, 19:11,
  20:21, 40:1, 64:13,
  66:2, 73:15,
  85:6.
Section 1:34.
secure 63:17.
Security 63:2,
  63:15.
seeing 27:2.
seek 48:17.
seeking 75:9.
seem 35:5, 39:25,
  72:22.
seemed 11:7.
seems 30:24, 63:18,
  68:15, 79:23.
seen 12:25, 19:6,
  29:23.
seized 71:21.
send 11:17, 16:19,
  21:23, 33:22,
  87:15, 87:23.
sending 16:16,
  26:14.
sends 27:16.
sense 13:4.
sent 16:21, 25:10,
  25:22, 32:17, 56:4,
  57:8, 57:13,
  76:9.
sentence 63:18,

64:24.
series 69:21.
set 4:25, 22:25,
  41:14, 86:2.
sets 87:10.
setting 35:16.
settled 5:24.
Seven 7:15.
share 73:2, 73:23.
shared 27:10.
show 9:14, 13:15,
  23:24, 25:23, 26:4,
  27:12, 31:15,
  40:24, 55:14,
  71:24, 74:8,
  74:13.
showing 30:7,
  61:15.
shown 56:18, 56:20.
shows 26:19.
sick 5:1.
sidebar 22:22.
signatory 66:3.
signature 19:16.
signed 19:13.
significance 52:2.
significant 51:22,
  52:22, 52:23,
  68:1.
Similarly 33:2.
simply 31:15,
  31:17.
Sir 7:12, 8:22,
  44:10, 47:12, 50:8,
  56:21, 66:7, 67:8,
  69:23, 78:12,
  80:10, 85:1.
sit 5:20, 6:12,
  77:8.
situation 70:7.
Six 56:16, 56:17,
  56:18.
slate 21:18.
Social 63:2, 63:15.
sold 71:21.
solve 24:7.
somebody 6:22, 7:3,
  12:11, 16:1, 25:19,
  31:16, 35:2, 41:10,
  51:15.

somehow 29:22, 52:7,
  75:10, 76:19.
someone 11:20, 12:6,
  48:13, 49:19,
  66:15, 76:7.
someplace 36:24.
somewhere 5:17.
son 45:18, 45:20.
Sorry 4:21, 12:9,
  14:9, 22:11, 32:23,
  33:3, 37:7, 37:23,
  38:9, 39:1, 47:8,
  49:7, 50:21, 53:25,
  54:3, 54:9, 55:2,
  55:5, 56:25, 57:12,
  58:1, 62:11, 78:21,
  81:17, 83:5,
  87:19.
sort 78:6, 87:12,
  88:12.
sounds 41:14, 52:9.
source 12:5, 17:22,
  18:17, 21:24,
  44:19, 45:4, 45:24,
  47:7, 47:10, 83:24,
  84:14, 84:15.
speaking 51:6.
specific 51:20, 60:9,
  71:17, 83:9.
specifically 8:3,
  24:15.
specify 28:21.
speculating 48:22.
speculation 32:22,
  32:25.
spell 7:9, 8:19.
stand 5:7, 77:5,
  86:8.
standard 19:20.
standing 5:8, 6:5,
  7:3.
stands 6:23.
Stanley 7:13, 7:14,
  7:16, 10:2, 10:16,
  14:2, 17:8, 18:19,
  19:1, 19:14, 19:21,
  33:9, 38:5, 40:18,
  51:7, 51:13, 63:20,
  63:22, 70:8, 70:12,
  80:15, 81:15.

start 6:19, 57:20,
  59:1, 70:14, 85:3,
  87:5.
started 6:24, 47:22,
  49:1.
starting 4:10,
  44:3.
state 7:9, 76:9,
  76:16.
statement 27:3,
  43:11, 43:24, 45:9,
  67:2, 67:4,
  77:25.
statements 26:22,
  29:1, 29:18, 43:14,
  43:21, 63:4,
  69:20.
States 1:1, 1:5,
  1:19, 2:13, 4:8,
  11:17, 16:16,
  24:17, 33:22,
  37:25, 39:20,
  70:16.
stationery 54:16.
stay 5:6.
staying 63:20.
stenographic 89:14.
step 6:4, 73:17.
steps 44:15.
Steven 16:21.
stipulate 8:6,
  24:15.
stipulated 23:5,
  23:6, 23:23,
  24:12.
stipulation 23:12.
stop 5:16, 6:25.
straight 43:23.
stray 44:3.
strictly 24:21,
  88:18.
strike 15:7.
stuck 88:7.
stuff 61:15, 86:3,
  87:17, 87:25.
subject 21:19, 56:1,
  57:18, 62:16.
subjects 67:9.
subparagraph 20:1,
  20:3.

subparagraphs
  18:14.
substance 13:19,
  49:22, 60:18.
substantial 11:6.
substituting 88:17.
sued 72:19.
sufficiently 21:21.
suggest 41:4, 63:11,
  75:10.
suggested 88:2.
suggesting 53:12,
  61:1.
suggestion 53:11.
suggests 26:12.
suing 76:10.
Suite 1:28.
sum 49:22.
summary 23:7.
support 73:23, 74:15,
  74:18.
supported 85:18.
sustain 41:24, 44:9,
  48:22.
Sustained 51:5.
sustaining 77:9.
swear 6:5.
switch 40:18.
sworn 6:8.
.
.
< T >.
T. 2:11, 89:18.
table 6:23.
Taek 20:10.
taken. 75:1.
talked 35:4, 49:15.
team 51:12, 51:13,
  51:16, 52:16.
teeny 38:13.
telephone 34:15.
tells 31:16.
tens 12:17.
terminate 67:5.
terms 4:17, 5:2, 5:4,
  5:14, 24:22, 28:10,
  30:2, 33:17, 41:2,
  41:7, 43:22, 43:24,
  48:6, 50:14, 50:15,
  50:16, 52:6, 53:6,

  61:15, 74:19,
  75:22, 76:25, 83:8,
  87:9, 88:18.
testified 6:9, 24:10,
  25:25, 26:15, 27:9,
  29:9, 30:24, 40:5,
  46:18, 52:15,
  69:16.
testify 27:8, 28:21,
  79:24.
testimony 26:6,
  26:20, 26:21, 27:7,
  40:9, 40:17, 41:1,
  41:4, 43:5, 48:17,
  69:16, 70:11,
  70:13, 73:18,
  76:19.
THE CLERK 4:7, 6:6,
  56:15.
THE WITNESS 53:24,
  54:2, 54:4, 54:8,
  56:25, 73:13,
  81:17, 85:2.
They've 36:1,
  58:22.
thinks 27:2.
third 9:21.
Thursday 40:8, 85:10,
  86:13.
till 86:14.
timeline 80:22.
timing 75:18, 85:6.
today 4:15, 40:8,
  85:11, 85:13,
  85:19, 87:22,
  87:23.
together 72:9.
tomorrow 85:10,
  86:23, 87:4,
  87:23.
took 28:8, 41:4,
  79:22.
top 18:4, 39:13,
  54:7, 54:22, 55:18,
  61:4, 62:2,
  62:15.
Total 39:4, 39:6,
  39:7.
touch 42:14.
track 46:17.

Trading 22:7,
    22:18.
training 17:9.
transacting 80:19.
transaction 50:10.
transactions 43:12,
    50:23.
TRANSCRIPT 1:17,
    89:14.
transparent 84:6,
    84:13.
treated 38:10, 38:18,
    38:22.
TRIAL 1:17, 58:19,
    86:4.
trick 54:6.
trouble 9:8.
True 42:8, 57:25,
    58:2, 65:3, 66:22,
    67:11, 69:2, 69:3,
    69:6, 76:1,
    80:10.
trust 64:18, 64:21.
truth 23:14, 25:9,
    27:4, 28:9, 31:12,
    41:15, 68:2,
    68:7.
try 60:14, 71:5,
    83:24, 85:14,
    85:23.
trying 4:25, 37:17,
    42:20, 43:10,
    43:13, 43:16,
    44:24, 45:8, 46:17,
    52:5, 53:6, 54:5,
    60:24, 61:8, 66:17,
    71:3, 71:4.
turn 35:20, 79:20,
    80:4, 81:8,
    81:10.
turned 79:22.
turns 73:10.
two 27:19, 30:24,
    42:16, 58:20,
    60:15, 61:19,
    83:10, 87:10.
types 19:22.
typical 88:11.
typically 78:6.
.

.
< U >.
Ultimate 83:1, 83:3,
    83:6, 83:7, 83:8.
ultimately 21:2,
    82:6.
understand 5:10,
    15:18, 15:19, 23:5,
    24:9, 32:15, 34:1,
    39:11, 43:19,
    43:25, 46:17,
    48:16, 50:25, 51:1,
    61:9, 64:24, 67:11,
    67:18, 67:21, 69:2,
    69:17, 75:19,
    84:19.
understanding 29:25,
    30:22, 44:24,
    45:24, 46:4, 46:6,
    49:11, 67:25, 68:6,
    68:12, 69:10, 75:3,
    86:3, 87:14.
Understood 8:13,
    39:14, 45:11, 49:6,
    67:18, 68:4, 68:10,
    69:13, 74:4, 76:24,
    83:1.
unfairly 38:18.
unhappy 39:22, 40:10,
    40:13, 40:19.
unilaterally 78:2.
unit 72:16.
United 1:1, 1:5,
    1:19, 2:13, 4:7,
    11:17, 16:16,
    24:16, 33:22,
    37:25, 70:16.
University 45:18.
unusual 48:8, 48:12,
    50:9.
urgency 8:11.
using 27:3, 34:17,
    43:11.
usual 50:14.
.

.
< V >.
V-i-n-d-e-r 7:11.
Vague 83:3, 83:6,
    83:9.

value 39:9, 50:16,
    52:10, 68:16.
various 67:9,
    88:14.
Ventura 1:42.
version 87:15,
    87:24.
versions 88:17.
versus 4:8.
vet 43:12.
view 47:9, 69:12.
Vin 17:13.
visit 45:19.
voice 50:6, 69:5,
    81:16.
vs 1:8.
.

.
< W >.
Wait 20:21, 59:7,
    73:12.
waiting 88:12.
walked 72:1.
wanted 8:14, 9:9,
    9:10, 11:1, 30:21,
    32:19, 37:18,
    37:20, 38:4, 40:14,
    40:15, 40:18,
    41:19, 42:19, 66:4,
    81:8.
wanting 40:11.
wants 27:4, 75:5,
    80:3.
warn 66:11.
Washington 1:10,
    1:29, 1:36, 2:9,
    2:17, 12:3, 45:14,
    45:17, 45:20.
water 53:23, 54:1.
ways 38:18.
wealth 7:17.
wealthy 12:12,
    16:2.
wear 4:24.
weather 86:24.
weekend 65:1.
whatever 25:7, 28:8,
    44:14, 72:12,
    73:23, 80:24,
    85:17.

whenever 51:14.
whole 69:21, 76:17,
  85:22.
wife 66:5.
will 6:17, 30:14,
  31:11, 40:9, 43:18,
  61:19, 62:15, 65:1,
  65:12, 65:17,
  86:11, 87:22,
  88:10.
willing 41:3.
windfall 72:2, 75:12,
  75:21, 76:1, 76:12,
  76:18.
wire 16:25.
wise 85:6.
wish 74:15.
withdraw 68:17,
  80:20.
withdrawing 71:5.
within 18:6.
without 10:7, 13:4,
  14:15, 17:14,
  18:11, 19:9, 21:8,
  31:3, 46:4, 67:1,
  71:19, 71:22.
witnesses 5:3, 5:16,
  5:18, 40:7, 85:15,
  88:14, 88:21,
  88:22, 88:25.
won 73:25.
word 6:22.
work 7:12, 7:16,
  7:21, 11:12, 42:1,
  48:2, 51:13, 51:21,
  70:14, 81:15,
  87:3.
worked 7:14, 19:23,
  42:22, 52:12, 54:8,
  71:25.
working 29:20, 39:22,
  49:4, 53:16, 61:18,
  71:10.
writing 63:14.
written 28:16, 60:4,
  62:13.
wrote 47:22, 57:25,
  58:2.
Wyclef 7:22, 7:24,
  11:5, 11:6, 34:11,

34:16, 34:19,
  34:24, 35:12,
  35:14.
.
.
< Y >.
years 7:15, 7:20,
  48:25, 49:3.
York 1:27, 1:35,
  45:15.
yourself 4:9, 6:13,
  50:22, 89:9.
Yup 64:2.