```
 1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      ) CRIMINAL ACTION NO.:
                                    ) 19-00148-1
 4            Plaintiff,            )
         vs.                        )
 5                                  )
     PRAKAZREL MICHEL,              ) Washington, D.C.
 6                                  ) April 12th, 2023
              Defendant.            ) 9:16 a.m.
 7   _____)

 8

 9                     TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
10                 UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   FOR THE GOVERNMENT:        John D. Keller, Esquire
                                U.S. Department of Justice
14                              1301 New York Avenue, NW
                                Suite 1016
15                              Washington, D.C. 20530

16                              Sean F. Mulryne, Esquire
                                Nicole Rae Lockhart, Esquire
17                              U.S. Department of Justice
                                Public Integrity Section
18                              1400 New York Avenue, NW
                                Washington, D.C. 20005
19

20   For the Defendant:        David E. Kenner, Esquire
                                Alon Israely, Esquire
21                              Kenner Law Firm
                                16633 Ventura Boulevard
22                              Encino, California 91436

23

24

25
```

```
1    APPEARANCES (CONT'D):

2

3    FOR THE DEFENDANT:        Charles R. Haskell, Esquire
                               Law Offices of Charles R.
4                              Haskell, P.A.
                               641 Indiana Avenue, NW
5                              Washington, D.C. 20004

6    Reported by:             Christine T. Asif, RPR, FCRR
                              Official Court Reporter
7                             United States District Court
                              for the District of Columbia
8                             333 Contitution Avenue, NW
                              Room 6507
9                             Washington, D.C., 20001
                              (202) 354-3247
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                              INDEX
2    Witness Name                                        Page
3    Matthew Pottinger
4        Cross-examination By Mr. Kenner...........................   6
5        Redirect Examination By Mr. Keller.......................  17
6    Leticia Santos
7        Direct Examination By Mr. Keller.........................  20
8        Cross-examination By Mr. Kenner..........................  31
9    Heather Hilliard Hunt
10       Direct Examination By Mr. Mulryne........................  55
11       Cross-examination By Mr. Kenner..........................  58
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

```
1                     P R O C E E D I N G S
2            THE COURT:  Good morning, everyone.
3            MR. KENNER:  Good morning, Your Honor.
4            MR. MULRYNE:  Good morning.
5            THE COURT:  Do you want me to call the case, or do
6    you want to do it?
7            THE CLERK:  Criminal case 19-148-1, the United
8    States versus Pras Michel.  Counsel, would you please identify
9    yourself for the record, starting with the government.
10           MR. KELLER:  Good morning, John Keller, along with
11   Sean Mulryne and Nicole Lockhart for the government.
12           THE COURT:  Good morning.
13           MR. KENNER:  Good morning, Your Honor, David Kenner,
14   along with Alon Israely, Charles Haskell, and Kriss Anne
15   Carlstrom.
16           THE COURT:  Okay.  We're ready to go.  As I
17   understand it, there are no additional issues.  We will be --
18   I'm hopeful to stop before -- just before 11.  We're leaving
19   at 11:00 partly for my meeting, but more importantly, because
20   one of the jurors has a doctor's appointment and if she leaves
21   at 11:00, she can make it without any trouble.  So I want to
22   make sure we don't go beyond that.  So I told them no morning
23   break.  So I'm telling you as well, if you need restrooms or
24   anything.
25           MR. KENNER:  Thank you, Your Honor.
```

1          THE COURT:  Okay.  All right.  Then if we can have

2      the witness come back and we'll bring the jury out.

3          THE WITNESS:  Good morning.

4          THE COURT:  Good morning, sir.

5          Can you move the computer over just a bit so you can

6      see and we can see you?

7          MR. KENNER:  Yes.

8          THE COURT:  Or, you know, we might move the podium

9      over a little bit --

10          MR. KENNER:  Yes.

11          THE COURT:  -- if you're not really going to be

12      using it.  I'd move it that way and then we can actually see

13      you.  Perfect.  Okay.  Then I can see when you're objecting

14      and stuff.  It's easier.

15          MR. KENNER:  Thank you.

16          THE COURT:  Well, while we're waiting, I'm hopeful

17      to get the jury instructions, part 2, back to you by the end

18      of the week but no later than that.  And then we're sort of

19      working on the first part.  But it depends on, you know, what

20      happens in terms of whether things are stricken or not in

21      terms of, you know, fixing it.  But we have it according to

22      what was requested.

23          (Jury entered the courtroom.)

24          THE COURT:  All right.  Good morning, members of the

25      jury.

Cross-examination - Pottinger

1           THE JURY:  Good morning.

2           THE COURT:  All right.  Everybody can sit down.

3           All right.  We were in the middle of the

4   cross-examination of Mr. Pottinger.

5           Mr. Kenner.

6           MR. KENNER:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8   BY MR. KENNER:

9   **Q.**  Good morning again, Mr. Pottinger.

10  **A.**  Good morning.

11  **Q.**  I want to direct your attention to Exhibit 395.

12          THE COURT:  Is that a government?

13          MR. KENNER:  It's been admitted, Your Honor.

14  **Q.**  (BY MR. KENNER)  And I just want to show you the first

15  page.

16          THE COURT:  I can't hear you, sir.

17  **Q.**  (BY MR. KENNER)  I just want to show you the first page of

18  that exhibit.  Do you --

19          MR. KENNER:  Can you put that up for the witness?

20  **Q.**  (BY MR. KENNER)  Okay.  Page 1 of Exhibit 30 -- 395

21  appears to be an e-mail from Pras Michel to Pras Michel?

22          THE COURT:  Are you asking him if that's what it

23  says?

24          MR. KENNER:  Yes.

25  **Q.**  (BY MR. KENNER)  Is that what it --

Cross-examination - Pottinger

1          THE COURT:  Can you read it?

2  **A.**  That's what I'm seeing, yes, a to and from Mr. Michel.

3  **Q.**  (BY MR. KENNER)  All right.  And this was part of -- let

4  me withdraw that.

5          How did this document come to you?  Well, it was from

6  Mr. Michel to Mr. Michel.  How did it come to you as part of

7  Exhibit 395, if it did?

8  **A.**  So at that meeting in the Oval Office that we were talking

9  about yesterday, one of the President's aides brought a stack

10  of papers about Guo Wengui.  And I don't recall all the

11  specifics of what was in that stack other than the points that

12  I referred to yesterday, the photographs of him in the red,

13  red notice.

14  **Q.**  Okay.  Thank you, sir.

15          Did there come a time in May of 2017 --

16      MR. KENNER:  Can -- Exhibit 140, I believe it's been

17  admitted.  Exhibit 140, it's previously been admitted.

18  **Q.**  (BY MR. KENNER)  I'm going to show that to you, sir, and

19  ask if you --

20          THE COURT:  That has been admitted.

21  **Q.**  (BY MR. KENNER)  Exhibit 140 appears to be an e-mail to

22  Attorney General Jeff Sessions from Elliott Broidy dated May

23  21st, 2017.  Is that your understanding of what this document

24  is?

25          MR. KELLER:  Objection, Your Honor, lack of personal

1    knowledge.  The witness has already testified that the only

2    information he has about Elliott Broidy was from the media.

3             THE COURT:  The way you've asked it, he doesn't --

4    he wouldn't know that.  All he can say is what the document

5    actually says at the top.

6             MR. KENNER:  Okay.

7             THE COURT:  So I'll sustain it.

8    **Q.**  (BY MR. KENNER)  Did you ever, previously to your

9    testimony today, see Exhibit 140?

10   **A.**  Not to my knowledge.  It does not look familiar.

11   **Q.**  Okay.  Do you know whether or not there were attempts

12   by -- let me withdraw that.

13            MR. KENNER:  Sir, Exhibit 118, can that be placed

14   before the witness?

15            THE COURT:  Okay.  118 has been admitted.

16            MR. KELLER:  Same objection, Your Honor.  This is an

17   e-mail from Mr. Broidy.

18            THE COURT:  He's indicated he hasn't -- he

19   doesn't -- other than what he has indicated he did actually

20   see, he didn't see the rest of them.  So it's not clear to me

21   how he would see this document.

22            MR. KENNER:  All right.

23   **Q.**  (BY MR. KENNER)  Were you aware of the Chinese government

24   talking point with regard to getting the U.S. to return Guo,

25   that one of those talking points had to do with North Korea

1  being shut down with respect to their missile program?

2          MR. KELLER:  Objection.

3          THE COURT:  We have two questions in there.  One is

4  whether he knows the talking points, and the next one is it

5  assumes that he does, is to ask whether one of the talking

6  points was as you described it.  So first we need to find out

7  if he knows anything about the talking points.

8          MR. KELLER:  Your Honor, both these questions were

9  asked and answered yesterday.

10         THE COURT:  I believe they were as well.  So I'll

11  sustain the objection.

12 **Q.**  (BY MR. KENNER)  Sir, are you aware of whether or not one

13  of the Chinese talking points in connection with Mr. Guo

14  Wengui was to tamp down North Korea and the rhetoric about

15  missiles and the United States?

16         MR. KELLER:  Same objection, Your Honor, asked and

17  answered.  We went through this yesterday.

18         THE COURT:  You did ask this yesterday.  I'll

19  sustain it.

20 **Q.**  (BY MR. KENNER)  Do you remember what your answer was

21  yesterday?

22         THE COURT:  That's not an appropriate question.

23  He's given testimony already.  It's on the record.

24 **Q.**  (BY MR. KENNER)  Are you familiar with the U.S.

25  government, I believe, wanting to get back from China American

1    citizens that were being detained or not allowed to leave

2    China?

3    **A.**  Yes, there were a number of U.S. citizens, some of whom

4    were under arrest in China and others who were unable to leave

5    under what China calls an exit ban.  In other words, they

6    weren't -- these were people who were not under arrest but who

7    simply could not leave China.  So there were a number of

8    Americans under that status.

9    **Q.**  Do you recall whether or not there was a -- an interest in

10   three particular people that weren't being allowed to exit

11   China to come back to the United States that were United

12   States citizens?

13   **A.**  To my recollection, there were somewhere north of a dozen

14   people that, at one point or another, my team and I were

15   tracking and trying to get out of China.

16   **Q.**  Okay.  Are you aware of whether or not Attorney General

17   Sessions wrote a letter to Mr. Sun, the minister, Minister

18   Sun, with regard to a desire to have three particularly named

19   American citizens to be released from China?

20   **A.**  Yeah, I don't have any memory of that.

21   **Q.**  Do you recall the name Emily Wang?

22   **A.**  Yeah, I don't recall.

23   **Q.**  So you wouldn't know whether Mr. Sessions had written a

24   letter to the Chinese party asking them to release Mr. -- I'm

25   sorry, Ms. Emily Wang?

Cross-examination - Pottinger

1          MR. KELLER:  Objection, asked and answered, lack of
2    personal knowledge.
3          THE COURT:  If he doesn't know who that person is,
4    how would he know that something had been written about them?
5          MR. KENNER:  Well, he may not know the person, but
6    he may be aware of the communication.
7          THE COURT:  Answer it.
8    **A.**  I'm not.
9    **Q.**  (BY MR. KENNER)  Okay.
10          MR. KENNER:  Your Honor, may I publish Government's
11    Exhibit 132, which has already been admitted?
12          THE COURT:  That's correct, it's been admitted?
13          MR. KENNER:  That's what my records show, yes, Your
14    Honor.
15          THE COURT:  Is there a question?
16          MR. KENNER:  There will be, yes.
17          THE COURT:  Well, then may I suggest let's move to
18    it.
19          MR. KENNER:  Thank you.
20    **Q.**  (BY MR. KENNER)  Sir, are you familiar with a letter from
21    the embassy of the People's Republic of China through its
22    ambassador to the United States that was written to Jeff
23    Sessions?
24    **A.**  I'm not.
25    **Q.**  You've not seen this document before?

1    **A.**   No.

2    **Q.**   Doesn't this document come under your area of specialty in

3    China for the National Security Council?

4    **A.**   Well, if a letter from the Chinese ambassador were written

5    to the White House, that would come under my purview.  But

6    since this appears to be one to the Department of Justice, it

7    was not something that I -- I was aware of.

8    **Q.**   To your recollection, was this letter written after you

9    had advised the President that the matter should be handled

10   through the Department of Justice and not through the

11   Executive Branch?

12            MR. KELLER:  Objection, Your Honor.  He says he has

13   no recollection or familiarity with this letter.

14            THE COURT:  He didn't get the letter, he didn't --

15   and he hasn't been involved with it.

16   **Q.**   (BY MR. KENNER)  Can you just tell us the date that's on

17   this letter?

18   **A.**   It says May 19th, 2017.

19   **Q.**   Thank you.

20            MR. KENNER:  May I ask -- I'd like to show just to

21   the witness, Court and counsel, it has not yet been admitted,

22   Government's Exhibit 33 -- I'm sorry, Defense Exhibit 33.

23            THE COURT:  So are you showing it to the witness or

24   are you --

25            MR. KENNER:  Yes, Your Honor.

Cross-examination - Pottinger

1          THE COURT:  And to the government, presumably.

2     **Q.**  (BY MR. KENNER)  Are you familiar with the subject matter

3     of this document?

4     **A.**  No.

5     **Q.**  Do you recognize SW on top to be referencing Steve Wynn?

6          MR. KELLER:  Objection, Your Honor.  He's not

7     familiar with the document.  I believe counsel asked him about

8     these messages yesterday.

9          THE COURT:  I thought you had as well.  But he isn't

10    familiar with the document, so asking him about the document,

11    he doesn't have any basis for it, other than what's written in

12    there, which speaks for itself.

13         MR. KENNER:  All right.

14         THE COURT:  And I -- I don't think you did use the

15    exhibit particularly, but you did discuss these.

16    **Q.**  (BY MR. KENNER)  You did meet with Ricky Waddell and the

17    President in connection with the Guo matter; correct?

18    **A.**  So I met with the President in that Oval meeting.  That's

19    the only time I recall discussing the Guo matter with the

20    President.  And Rick Waddell and I were in the meeting with

21    Steve Wynn, and I also staffed Mr. Waddell on a phone call to

22    a senior Chinese official, from a senior Chinese official,

23    discussing the Guo matter.

24    **Q.**  Okay.  But you have no recollection of Steve Wynn -- of

25    having seen this e-mail written by Steve Wynn?

Cross-examination - Pottinger

1    MR. KELLER:  Objection, asked and answered, Your

2    Honor.

3    THE COURT:  He told you he doesn't -- this is

4    something he has not seen, not that he doesn't remember it.

5    **Q.**  (BY MR. KENNER)  Did you speak with Mr. Wynn at the White

6    House at length about the Guo matter?

7    MR. KELLER:  Objection, Your Honor, asked and

8    answered.  This was the subject of his whole testimony --

9    THE COURT:  I'll let -- this is slightly different.

10   Although you've gone through all these, Mr. Kenner, you can't

11   keep going back over things that you've already talked about.

12   But I will allow that question as to whether you met at length

13   with Mr. Wynn.

14   **A.**  I can't remember how long the meeting was.  My guess is

15   somewhere in the vicinity of 20 minutes, something like

16   that.

17   **Q.**  (BY MR. KENNER)  Is the word "extensively" refer to a

18   20-minute conversation?

19   **A.**  I wouldn't think of 20 minutes as an extensive

20   conversation.  But --

21   **Q.**  Might it have been longer than 20 minutes?

22   **A.**  It's possible, but not much.

23   THE COURT:  The document should be taken down.

24   MR. KENNER:  I'd like to ask to show the witness,

25   and Court and counsel, Exhibit 226, Your Honor.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Cross-examination - Pottinger

1              THE COURT:  Is that the government or the defense?

2              MR. KENNER:  It's a government exhibit, Your

3    Honor.

4              THE COURT:  Okay.  That has not been admitted.

5    **Q.**  (BY MR. KENNER)  Sir, looking at Government's Exhibit

6    226 -- let me scroll through five pages of this document.

7              THE COURT:  Can you move your microphone over?  I'm

8    having trouble hearing you.

9              MR. KENNER:  Yes.  Let me --

10             Mr. Campbell, will you scroll through the five or

11   six pages of this document so Mr. Pottinger can see it?

12             THE COURT:  This is -- has material in it that I've

13   excluded.

14             MR. KENNER:  I'm sorry?

15             THE COURT:  If that's what you're going to ask

16   about.

17             MR. KENNER:  What I'm going to ask about?

18             THE COURT:  Well, if that's what you're getting into

19   in terms of part of what's in this memo.

20             MR. KENNER:  Yes, I -- okay.

21             THE COURT:  Let's pick up.

22             (Bench conference on the record.)

23             THE COURT:  Okay.  Part of this -- I can't read it

24   that carefully, but seems to get into his -- Mr. Pottinger's

25   father.  I'm ruling that out.  I believe I told you yesterday

Cross-examination - Pottinger

1    it was inappropriate.  So as far as I'm concerned, it should

2    not be discussed with him, if that's what you're asking about.

3              MR. KENNER:  No, that's not -- that's not what I'm

4    asking about, Your Honor.

5              THE COURT:  What are you going to ask?

6              MR. KENNER:  Whether or not he was familiar or has

7    seen the letter that describes the request to return three

8    Chinese -- three American citizens that were being held in

9    China.  I believe it's on the bottom of page 1.

10             MR. KELLER:  He's already testified that he has no

11   recollection or awareness of any specific request as to

12   three --

13             THE COURT:  Yeah, he doesn't --

14             MR. KELLER:  He doesn't know --

15             MR. KENNER:  If he's -- if he did see it, then it's

16   going to refresh his recollection.

17             THE COURT:  Well, he hasn't indicated that he needs

18   his recollection to be refreshed, if that's what you're using

19   it for.  He's indicated, unequivocally, that he wasn't in --

20   you know, didn't know anything about the three particular

21   people that you've talked about.  So I'm not sure if you're --

22   if it's for refreshing recollection, he has to indicate he

23   needs it refreshed.  He was unequivocal and he answered it.

24       So for the purposes of refreshing his recollection, then,

25   you know, this isn't -- you don't have the foundation to do

Redirect Examination - Pottinger

1    it.  If it's just to go through to ask about something, he's

2    already indicated he didn't know any -- have any knowledge

3    about it, then it's a waste of time to show it to him.  So if

4    the point is to refresh his recollection, there's no

5    foundation for it.

6            MR. KENNER:  My first question is did he ever read

7    this letter.

8            THE COURT:  I've ruled, and there's no basis to use

9    it to refresh his recollection.

10           MR. KENNER:  I'm sorry, Your Honor.  Thank you.

11           (The following proceedings were had in open court.)

12           THE COURT:  So take it down, please.

13           MR. KENNER:  May I just have a moment, Your Honor.

14           THE COURT:  Certainly.

15           MR. KENNER:  I have no further questions, Your

16   Honor.

17           THE COURT:  All right.  Redirect.

18                     REDIRECT EXAMINATION

19   BY MR. KELLER:

20   **Q.**  Good morning, Mr. Pottinger.

21   **A.**  Good morning.

22   **Q.**  Defense counsel asked you about an individual named

23   Minister Sun, or Vice Minister Sun.  Are you familiar with a

24   Chinese official named Sun Lijun, or Sun Lijun?

25   **A.**  Yes.

Redirect Examination - Pottinger

1    **Q.** What was his position back in 2017, if you know?

2    **A.** I believe that he was the vice minister of public security

3    for China. The ministry of public security is both a law

4    enforcement agency and an intelligence collection agency.

5    **Q.** And was he involved in the efforts to try and get Mr. Guo

6    to either return to China as part of that delegation that you

7    referenced and later request, through official channels, to

8    try to get Guo extradited?

9    **A.** Yes.

10            MR. KELLER: No further questions, Your Honor.

11            THE COURT: All right. Can he be excused at this

12   point?

13            MR. KENNER: Yes, Your Honor.

14            THE COURT: All right. You're excused, sir.

15            THE WITNESS: Thank you.

16            THE COURT: Thank you.

17            Your next witness.

18            MR. KELLER: Your Honor, the government calls

19   Leticia Santos.

20            THE COURT: Ms. Santos, if you would step up over

21   here, please. If you would step up and we're going to swear

22   you in. So if you can remain standing.

23            THE CLERK: Can you raise your right hand, please.

24                     LETICIA SANTOS,

25   called as a witness, being first duly sworn, was examined and

Redirect Examination - Pottinger

1    testified as follows:

2              THE WITNESS:  I swear.

3              THE CLERK:  Be seated.

4              THE COURT:  Okay.  You can sit down, please.  You

5    can move the chair up and down.  We need to make sure you can

6    speak into the microphone.  You can take your mask off so that

7    we can actually hear what you have to say.  I'd ask that you

8    speak in a loud, clear voice so we get a record and everybody

9    can hear you.

10             THE WITNESS:  Okay.

11             THE COURT:  Also allow counsel to finish their

12   question even if you know what they're asking you before you

13   start to answer, and they should wait for you to finish your

14   answer before they move on so we get the question and the

15   answer.  If you hear the word "objection" or if you see

16   counsel at the table start to stand, they're going to object.

17   If you haven't started to answer, don't.  If you're in the

18   middle of your answer, please stop, let me hear what the

19   objection is, and then I'll tell you whether you can answer.

20   All right?

21             THE WITNESS:  I understand.

22             MR. KELLER:  Your Honor, before we begin this

23   witness's testimony, permission to read in the stipulation

24   regarding the Federal Deposit Insurance Corporation?

25             THE COURT:  Yes.  A stipulation -- it's a

1  stipulation of fact?

2          MR. KELLER:  Yes, Your Honor.

3          THE COURT:  All right.  So a stipulation of fact

4  means that the parties have agreed to the particular facts in

5  the stipulation, which he's going to read.  So you can

6  consider this as undisputed factual facts in the case.

7          MR. KELLER:  "The government and the defense

8  stipulate that City National Bank, Morgan Stanley, and

9  Citibank all had accounts insured by the Federal Deposit

10  Insurance Corporation throughout 2017."

11          MR. KENNER:  So stipulated.

12          THE COURT:  All right.  So that's undisputed

13  evidence in the case.

14          MR. KELLER:  Thank you, Your Honor.

15                        DIRECT EXAMINATION

16  BY MR. KELLER:

17  **Q.**  Good morning, Ms. Santos.

18  **A.**  Good morning.

19  **Q.**  Can you state your name and spell your name for the

20  record?

21  **A.**  Sure.  My name is Leticia Santos, L-e-t-i-c-i-a, Santos,

22  S-a-n-t-o-s.

23          THE COURT:  Can I ask you to move the microphone up

24  just a little bit?  Yeah, okay.  Talk as if you're talking to

25  somebody at the back door.  All right.

1  **Q.**  (BY MR. KELLER)  Ms. Santos, where do you currently

2  work?

3  **A.**  I work at City National Bank.

4  **Q.**  And what do you do for the bank?

5  **A.**  I'm currently the quality assurance manager for our

6  financial crimes area.

7           MR. KENNER:  I'm sorry, could the witness repeat

8  that just a little bit slower so I can hear it?

9  **A.**  Repeat it?

10 **Q.**  (BY MR. KELLER)  Yes, please, Ms. Santos.

11 **A.**  I'm currently the quality assurance manager for our

12 financial crimes area.

13 **Q.**  And what do you do as the quality assurance manager for

14 financial crimes?

15 **A.**  I make sure that our process and procedures are being done

16 as written and that we are in compliance with our BSA laws and

17 regulations.

18 **Q.**  What does BSA stand for?

19 **A.**  Bank Secrecy Act.

20 **Q.**  And generally, what do those laws require of a bank?

21 **A.**  We're required to monitor accounts, clients' activities,

22 to make sure that the financial institution and our financial

23 system is not being used for illicit purposes and for other --

24 anything that has to do with financial crime.

25 **Q.**  How long have you been in your current role?

Direct Examination - Santos

1    **A.**  In my current role, I have been since 2020.

2    **Q.**  How long have you been with City National Bank in total?

3    **A.**  I've been at City National for 17 years now.

4    **Q.**  What role were you in back in 2017, if you remember?

5    **A.**  In 2017, I was a AML supervisor.  I oversaw the alert

6    monitoring for anti-money laundering.

7    **Q.**  And generally, what -- just for the jury's benefit, what

8    is the alert monitoring system?  How did that work at the

9    bank?

10   **A.**  So our alert monitoring system, it's in -- a learning

11   mechanism that oversees all transactions that come through the

12   bank.  And it alerts us on a daily basis, any type of activity

13   that is deviating or that is out of the ordinary or

14   extraordinary on the client's history.

15           MR. KELLER:  If we could show Ms. Santos what's been

16   previously admitted as Government's Exhibit 4, Ms. Orozco.

17           THE COURT:  Was that the stipulation, I assume?

18           MR. KELLER:  No, Your Honor.  I'm sorry,

19   Government's Exhibit 4, I believe was previously admitted.

20   It's a government exhibit.

21           THE COURT:  I don't have it listed, but --

22           Do we have it listed?

23           THE CLERK:  It was included in the stipulation.

24           THE COURT:  Stipulation, okay.  That's fine.

25           MR. KELLER:  And, Ms. Patterson, if we could

1    publish.

2            THE COURT:  If you can move the microphone back a

3    tad because there's a little bit of -- I know it's hard.

4    Yeah, that's fine.  That's good.

5    **Q.**  (BY MR. KELLER)  Ms. Santos, do you recall doing some work

6    on a couple of accounts in 2017 named Artemus and Anicorn?

7    **A.**  I do.

8    **Q.**  And is Government's Exhibit 4, that I'm showing you, the

9    business account agreement that City National Bank had for

10   Artemus Group, LLC?

11   **A.**  That's correct.

12           MR. KELLER:  If we could go to page 2 of the

13   exhibit, Ms. Orozco.  And if you could call out the signature

14   line.

15   **Q.**  (BY MR. KELLER)  Who's listed as the managing member for

16   this Artemus account, Ms. Santos?

17   **A.**  That would be Prakazrel S. Michel.

18           MR. KELLER:  And if we could go to page 3, Ms.

19   Orozco.  And if you can call out the text there at the top

20   half.

21   **Q.**  (BY MR. KELLER)  Who's listed as the authorized agent

22   here, Ms. Santos?

23   **A.**  Marc Moscowitz.

24           MR. KELLER:  And if we could go to page 4 of the

25   exhibit, Ms. Orozco.  If we could call out the top box.

1    That's perfect.

2    **Q.**  (BY MR. KELLER)  What's the date that this agreement was

3    entered into in the top left there, Ms. Santos?

4    **A.**  March 30, 2017.

5            MR. KELLER:  And then, Ms. Orozco, if we could show

6    Ms. Santos what's been admitted as Government's Exhibit 13.

7    **Q.**  (BY MR. KELLER)  Do you recognize this as a similar

8    business account agreement for the other entity that I

9    mentioned, Anicorn, LLC?

10           MR. KENNER:  Objection.  Leading, Your Honor.

11           THE COURT:  I'm sorry?

12           MR. KENNER:  Objection.  Leading.

13           THE COURT:  On that particular one, I don't have a

14   problem.  Just be careful with the rest.  Go ahead.

15           MR. KELLER:  Ms. Patterson, could you publish

16   Government Exhibit 13 as well, please.

17   **Q.**  (BY MR. KELLER) So again, Ms. Santos, do you recognize

18   this as the business account agreement for the other entity

19   that I mentioned, Anicorn, LLC?

20   **A.**  That's correct.

21           MR. KELLER:  And if we could go to page 2 of this

22   exhibit, Ms. Orozco, and call out the signature line again.

23   **Q.**  (BY MR. KELLER)  Who's listed as the managing member for

24   Anicorn?

25   **A.**  Prakazrel S. Michel.

Direct Examination - Santos

1          MR. KELLER:  And if we could go to page 4 for the

2     date, Ms. Orozco.

3     Q.  (BY MR. KELLER)  Was this also entered into on March 30th,

4     2017?

5     A.  That's correct.

6     Q.  Ms. Santos, do you recall any details or information that

7     Mr. Moscowitz or Mr. Michel provided about these accounts,

8     about the purpose of these accounts?

9     A.  Yes.  So when an account is opened, they are provided a

10    set of questions in our KYC form, which is our know your

11    client form.  Both were listed as media consulting entities.

12    They were -- they listed Mr. Michel as the beneficial owner.

13    They also have a number of activity questions, expected

14    activity that they answer, including whether there would be

15    cash, wires, and other type of specific activity.

16    Q.  As part of that account opening documentation, was the

17    bank informed that these accounts would be receiving large

18    international financial transfers from Low Taek Jho or his

19    associates?

20    A.  No, there was nothing listed.

21    Q.  Was the bank informed that funds transferred into the

22    accounts could be the subject of pending United States DOJ

23    forfeiture actions?

24    A.  No.

25    Q.  Was the bank informed that the accounts would be receiving

Direct Examination - Santos

1    funds to pay for lobbying of the Trump administration to drop

2    forfeiture actions against Jho Low?

3    **A.**  No.

4    **Q.**  Was the bank informed that the accounts would be receiving

5    funds to pay for lobbying of the Trump administration to send

6    a Chinese national and critic of the Chinese government back

7    to China?

8    **A.**  No.

9    **Q.**  Was the bank informed that the funds being transferred

10   into the accounts at times would be almost immediately

11   transferred out to pay the deputy finance chair for the

12   Republican National Committee, Elliott Broidy?

13   **A.**  No.

14           MR. KENNER:  Objection, Your Honor.

15           THE COURT:  I'm sorry?

16           MR. KENNER:  Assumes facts not in evidence, and that

17   would be in the records.

18           THE COURT:  You want to respond to that?  It seems

19   to me that we do have some evidence of this.

20           MR. KELLER:  The record -- the financial records

21   underlying the transactions are already in evidence, Your

22   Honor.  And the question was whether the bank was informed of

23   the nature of these transactions.

24           THE COURT:  Right.  Then I'll allow the question.

25   **Q.**  (BY MR. KELLER)  Ms. Santos, was the bank informed that

Direct Examination - Santos

1  funds being transferred into the accounts would be almost

2  immediately transferred out to pay the deputy finance chair

3  for the Republican National Committee, Elliott Broidy?

4  **A.**  No.

5  **Q.**  Would the bank have opened these accounts if provided that

6  information?

7  **A.**  The bank does have -- they do cooperate, but typically we

8  would not open an account.

9  **Q.**  Do you recall, after these accounts were opened,

10  compliance inquiries regarding the activity in these two

11  accounts, Anicorn and Artemus?

12  **A.**  I do.

13  **Q.**  What was the nature of the compliance inquiries?

14  **A.**  The client or the accounts began to alert because of the

15  activity coming in.  That with the fact that it was a new

16  account, it typically scores higher for us to be on the

17  lookout, because there is no historical activity to compare

18  to.  So once we see the activity that is alerting, we compare

19  it to the activity questions form that was -- that was filled

20  out during -- at the account opening.

21  **Q.**  And did the transactions that were alerting, did they

22  match the account activity form that you referenced?

23  **A.**  They did not match.

24  **Q.**  What did you do in response to the alerts that your team

25  received?

Direct Examination - Santos

1    **A.** I was the AML supervisor, so my analyst came to me with

2    the activity. We looked at the activity and decided to

3    question the alerting activity, and then the purpose of the

4    accounts.

5    **Q.** Do you recall what the nature was of the financial

6    activity that was being alerted on?

7    **A.** There was incoming wires. There was foreign transactions

8    coming in. And there was cash activity.

9    **Q.** Was the bank able to confirm any actual business activity

10   of the entities, Anicorn and Artemus?

11   **A.** No, our research did not find anything that would provide

12   us any comfort with the activity or the answers that we

13   received from the account officer and the business manager.

14   **Q.** And was the bank able to confirm any legitimate business

15   activities of the foreign accounts where the funds originated

16   for Lucky Mark Trading?

17   **A.** No, we were unable to find anything.

18   **Q.** Did you have concerns about the activity in the accounts

19   that was being alerted on?

20   **A.** We did have concerns initially because we could not find

21   anything. And then when the responses were provided by the

22   business manager, it made it a little bit more concerning for

23   us.

24   **Q.** Why was that? What was it about those responses that made

25   it more concerning?

Direct Examination - Santos

1    **A.**  Typically in our area, if we have some type of avoidance

2    of ask -- answering the specific questions, some of the

3    answers that we received, they were more of him trying to

4    rationalize why the activity was okay.  We were being told

5    that they were legitimate banking sources, that they were

6    legitimate business transactions.  We weren't questioning

7    whether they were legitimate.  We were just asking plain

8    questions, you know, what was the purpose of the account.  We

9    never really got an answer, other than initially that it was a

10   media consulting and then that it went into international

11   consulting.

12   **Q.**  Are you familiar with the term in the banking regulation

13   industry, "velocity of funds"?

14   **A.**  Yes.  That's also one of the alerts we received.

15   **Q.**  What does that phrase mean in the banking industry,

16   "velocity of funds"?

17   **A.**  So essentially, when money comes in and out rapidly, as if

18   it was a pass-through account.

19   **Q.**  And you said that you received alerts on these two

20   accounts, Anicorn and Artemus, for velocity of funds

21   activity?

22   **A.**  For Anicorn we did.  I do not recall if we received it for

23   Artemus.

24   **Q.**  You said at the time you were working in the AML

25   department?

Direct Examination - Santos

1    **A.**   Correct.

2    **Q.**   And that stands for anti-money laundering?

3    **A.**   Correct.

4    **Q.**   Did you have money laundering concerns about this

5    activity?

6    **A.**   It certainly had red flags that we needed to be concerned

7    with.

8    **Q.**   In the -- in the additional communications that you had

9    regarding these accounts with the business manager, were

10   you -- you said you were never able to determine the true

11   purpose of the transactions?

12   **A.**   Right.  We -- the answers that we received didn't really

13   pan out with our -- with the further research that we did.

14   **Q.**   Were you ever told that the accounts or the financial

15   transactions had anything to do with Jho Low, 1MDB, Guo

16   Wengui, Elliott Broidy, any of those individuals?

17   **A.**   No.

18   **Q.**   Were you ever told that the money had anything to do with

19   the Chinese government?

20   **A.**   No.

21   **Q.**   What did you do based on the information that you received

22   and the alerts that were coming in?

23   **A.**   We continued the investigation.  Once we received the

24   answers, we did not feel comfortable with it, and we escalated

25   it to our other investigation unit.

1    **Q.** And what did the bank ultimately do with these accounts,

2    if you know?

3    **A.** The bank -- the accounts were closed.

4            MR. KELLER:  No further questions, Your Honor.

5            THE COURT:  Cross.

6                        CROSS-EXAMINATION

7    BY MR. KENNER:

8    **Q.** Good morning, Ms. Santos.  How are you today?

9    **A.** Good morning.  I'm okay, thank you.

10   **Q.** Good.  Good.  Good.

11       Can you tell me how many different clients of the bank

12   you were responsible for doing work in the type you described

13   in 2017?

14   **A.** That's hard to say.  There was three AML supervisors at

15   that time.  Our alerts --

16   **Q.** I'm sorry, there were three what?

17   **A.** AML supervisors.

18   **Q.** Okay.

19   **A.** And there were anywhere between six to ten thousand alerts

20   in total per month.  So each of us required a certain number

21   of alerts.  Each client had multiple alerts.  Some of them had

22   single.  So it's hard to say how many clients.

23   **Q.** Okay.  Can you give me a ballpark, 10, 50, a hundred, a

24   thousand, more?

25   **A.** I -- I could honestly not tell you specifically, but if

1    that month had anywhere -- let's say that month had ten

2    thousand, would try to split it up as much as possible, so

3    let's say about three thousand.

4    **Q.**  Okay.  And do you remember any other account during 2017

5    that you were doing money laundering checks for?

6    **A.**  At this time, I do not.

7              THE COURT:  Can I clarify, you said six to ten

8    thousand.  Is it six thousand or just six to twelve -- to ten

9    thousand?

10             THE WITNESS:  I'm sorry, six thousand to ten

11   thousand.

12             THE COURT:  Okay.

13   **Q.**  (BY MR. KENNER)  So the only accounts that you remember

14   anything about are Artemus and Anicorn.  Is that a fair

15   statement?

16   **A.**  Yes.  I remember it because when I was questioned about

17   it, I had to revisit it.

18   **Q.**  You had to what?

19   **A.**  I had to revisit the investigation.

20   **Q.**  Okay.  And when were you questioned about it and had to

21   revisit the investigation?

22   **A.**  I do not recall the date, but a few months ago.

23   **Q.**  Okay.  So would it be a fair statement that up until a few

24   months ago, you didn't remember anything about Artemus or

25   Anicorn either, did you?

Cross-examination - Santos

1    **A.** I did remember the case because we did go a couple of

2    months going through it.

3    **Q.** Because, I'm sorry, you did what?

4    **A.** We went through the case a couple of months. We went

5    through the case, so I do remember the names. I do remember

6    that we ended up escalating it and closing it out. But I

7    really had to revisit it to remember the details of it.

8    **Q.** Okay. And were you with somebody when you were revisiting

9    the Artemus and Anicorn matters?

10   **A.** No.

11   **Q.** Did you ever meet with any -- with Mr. Keller or any other

12   of the U.S. Attorney's investigators in connection with this

13   case?

14   **A.** Eventually I had a call with them, a virtual call.

15   **Q.** All right. And when -- what was that call, if you

16   recall?

17   **A.** I don't recall the date; I'm sorry.

18   **Q.** Can you give me an approximation, going back from today,

19   how long that review was, how long ago you reviewed it with

20   the government?

21   **A.** Maybe a few months.

22   **Q.** Okay. And was that the first time you reviewed it with

23   the government?

24   **A.** After I had reviewed it on my own, yes.

25   **Q.** So you reviewed it in 2017, put it away, essentially, and

1    didn't review it again until two months ago; correct?

2    **A.**  A few months ago, yes.

3    **Q.**  Okay.  And that -- was that review done on this virtual

4    interview between Mr. Keller and others from the U.S.

5    Attorney's Office and investigators by -- virtually over Zoom

6    or --

7    **A.**  I'm sorry, could you repeat the question?

8    **Q.**  Yeah.  Did the -- did the review of the case a couple of

9    months ago take place in a video conference of some sort?

10   **A.**  Yes, a virtual call.

11   **Q.**  Okay.  And do you recall who was present on that virtual

12   conference, who was there, who was attending?

13   **A.**  Actually, the first one that I had was with Peter and

14   Catherine, Peter Koski and Catherine McGrath.

15   **Q.**  Okay.  And were they from the Department of Justice?

16   **A.**  No.

17   **Q.**  Where were they from?

18   **A.**  I believe it's Covington.

19   **Q.**  I'm sorry?

20   **A.**  Covington, a law firm.

21   **Q.**  Okay.  So did your bank bring in a law firm to review the

22   transactions?

23          MR. KELLER:  Objection.  Relevance at this point,

24   Your Honor.

25          MR. KENNER:  I don't understand that objection, Your

1    Honor.

2            THE COURT:  Well, I'll allow you to -- you know, who

3    she reviewed it with.  I'm not sure it's pertinent, but I'll

4    allow this question.  Let's see where it goes.

5            MR. KENNER:  Thank you.

6    **Q.**  (BY MR. KENNER)  Who did you review the case with before

7    you talked to Mr. Keller and others from the Department of

8    Justice?

9    **A.**  I initially reviewed it on my own, and then I reviewed it

10   with -- or I -- I went through it with Peter and Catharine of

11   Covington.

12   **Q.**  Okay.  And are Peter and Catharine lawyers?

13   **A.**  Yes.

14   **Q.**  And were they hired by your bank to help you review this

15   case?

16   **A.**  That is correct.

17   **Q.**  Can you tell me what precipitated your bank hiring a law

18   firm to review this case with you?

19           MR. KELLER:  Objection, Your Honor.  Relevance.

20           THE COURT:  I think so.  And it also assumes that

21   she knows what -- what the bank officials or whatever, in

22   terms of their decision about -- it sort of borders on getting

23   into their attorney-client discussions.  I mean, I don't see

24   it going anywhere.

25   **Q.**  (BY MR. KENNER)  Without telling me what was said during

1    the -- how many meetings were there with these lawyers?

2              MR. KELLER:  Your Honor, same objection.

3              THE COURT:  All right.

4              (Bench conference on the record.)

5              THE COURT:  Mr. Kenner, what difference does it make

6    if the bank decided to hire a bunch of lawyers to go through

7    it?  I mean, it's -- she's indicated she looked at this stuff

8    on her own.  She's had meetings with other people.  I could

9    see, you know, requesting in terms of the government, but the

10   fact is the bank decided to hire somebody.  She didn't hire

11   them.  So you're basically getting hearsay from what the bank

12   said.

13             But I don't see any relevance, probative value at

14   all, and it sort of gets off on a tangent from the jury's

15   perspective.  So tell me what's probative about the bank

16   deciding to have, you know, lawyers take a look at and discuss

17   with her after she looked at this material.

18             MR. KENNER:  What's probative, Your Honor, is that

19   the bank had an interest in protecting itself from what I

20   think it perceived to be internal wrongdoing.  And then

21   preparation, I think the government -- the line of questioning

22   will show that in preparation for the meeting with the

23   government, it hired a law firm to help this witness

24   understand what was going on.  I haven't asked the question

25   yet, but I think I have a good-faith basis to ask whether

1      these lawyers were present during the proffer.

2              THE COURT:  Well, that, potentially, you could ask,

3      but you decided that somehow that there was some wrongdoing.

4      It seems to me that it's not that unusual if the Department of

5      Justice comes to talk to people through an entity, that the

6      entity might want to have someone there who would know what

7      was involved legally.  There's nothing nefarious about that,

8      and you have put a spin on it.  Unless you know that they did

9      something wrong.  I haven't heard anything in this case that

10     suggests that.

11             It's also, frankly, that the bank got this, had

12     concerns about it, got alerts and then closed it out.  So they

13     took certain actions.  They're not indicating that there was

14     money laundering.  They obviously had concerns and closed it.

15     That's the extent of the bank's role.  So it seems to me that

16     you're going off on a tangent.

17             Now, what I will allow you is, she didn't hire them,

18     so what reasons they had or whatever else, you can ask if they

19     were present when, you know, there was a discussion.  You've

20     assumed it was Mr. Keller.  She hasn't said who it was.  But

21     at any rate, you can ask if they had a meeting with the

22     government.  You can ask if they were present for it.  And

23     that's it.  The rest of it is, you know, totally off the mark

24     and not probative.

25             And, frankly, you know, I think at this point it's

1    an addition -- so you've indicated probative.  I also think

2    that there's a problem in terms of 403 from the jury's

3    perspective.  I mean, the probative value has to substantially

4    outweigh any prejudice.  You're confusing the issues.  You're

5    distracting them, and, you know, I don't see any purpose with

6    it.

7            You don't have any information that they've done

8    anything wrong.  And to say that the bank, not her, but that

9    the bank hired somebody somehow suggests that they did

10   something wrong is inappropriate.  Unless you have something

11   that says the bank did something wrong.  All they did was

12   look, get a bunch of alerts, weren't satisfied in their

13   judgment with the responses and they closed the accounts,

14   period.

15           So I'm -- I'll allow you to ask if they were present

16   at the -- at the meeting with the government.  But that's it.

17           MR. KENNER:  All right.  Would you allow me to ask

18   the question of --

19           (The following proceedings were had in open court.)

20           THE COURT:  So I'll sustain the question as asked.

21   **Q.**  (BY MR. KENNER)  Ms. Santos, who was on the interview on

22   Zoom or some other type program, who was present on behalf of

23   the government?

24   **A.**  When I spoke to them?  I do not recall the names.  I don't

25   recall the names; I'm sorry.

Cross-examination - Santos

1   **Q.**  Okay.  Did you see the people on the screen as they were

2   talking?

3   **A.**  Yes, a couple of people.

4   **Q.**  Okay.  Do you recognize anybody at the government's

5   counsel table that's --

6   **A.**  Yes.

7   **Q.**  -- straight ahead of you?

8   **A.**  Yes.

9   **Q.**  And who do you recognize to have been on that call?

10  **A.**  The gentleman on the corner, that just waved.

11  **Q.**  The corner closest to you?

12  **A.**  Yes.

13  **Q.**  Thank you.

14          THE COURT:  She's identified Mr. Keller.

15          MR. KENNER:  Thank you.

16  **Q.**  (BY MR. KENNER)  Do you recognize anybody else from the

17  government?

18  **A.**  I do not.

19  **Q.**  Okay.  Was the -- were the attorneys that you mentioned

20  from the Covington law firm, were they in attendance on this

21  Zoom-type call?

22  **A.**  Yes, they were.

23  **Q.**  Were they there representing you?

24  **A.**  They were there to I guess oversee my conversation with

25  them.

Cross-examination - Santos

1          MR. KENNER:  I'm sorry, can I have that read back,

2    please?

3          THE COURT:  "They were there to I guess oversee my

4    conversation."

5          MR. KENNER:  All right.

6    **Q.**  (BY MR. KENNER)  How long did this video conference

7    last?

8    **A.**  I don't recall, but about an hour.

9    **Q.**  Okay.  Is that the only time you've interviewed, in person

10   or by video, with the government?

11   **A.**  There might have been another call when I was told that I

12   would be coming here.

13   **Q.**  And who -- who made that call to you, if you know?

14   **A.**  I believe it was Peter and Catharine who called me.

15   **Q.**  Those --

16   **A.**  And then.

17   **Q.**  Those were the lawyers?

18   **A.**  The lawyers from Covington.

19   **Q.**  Okay.  So if I understand this correctly, the government

20   reached out to the lawyers from Covington to let you know that

21   they wanted you to come in?

22   **A.**  That is correct.

23   **Q.**  Okay.  And is that one-hour, roughly, meeting the only

24   substantive conversation that you've had with the government

25   prior to your testimony today?

Cross-examination - Santos

1    **A.**  That I recall, yes.

2    **Q.**  Have you talked to the government since you got to

3    Washington to testify?

4    **A.**  I've had brief conversations with them.

5    **Q.**  Who is "them"?

6    **A.**  The gentleman I spoke about --

7    **Q.**  Mr. Keller?

8    **A.**  Yes.  A few other people that stopped by to say hi.

9    **Q.**  Okay.

10   **A.**  That's about it.

11   **Q.**  All right.  Is it your testimony then, other than stopping

12   by to say hi, you had no conversation with anyone on behalf of

13   the government about your testimony today; is that correct?

14   **A.**  That's correct.

15   **Q.**  Okay.  You never spoke directly with Mr. Michel, did

16   you?

17   **A.**  No, we do not have client contact.

18   **Q.**  It's not on your form?

19   **A.**  I'm sorry?

20   **Q.**  It's not on the form that you asked questions to, to

21   contact who the account holder is and their contact

22   information, are you telling us you don't know that?

23   **A.**  All of the information is on the form; however, our unit,

24   our department, we do not have client contact.

25   **Q.**  Okay.  Who do you report to?

Cross-examination - Santos

1          THE COURT:  Back in 2017 or now?

2          MR. KENNER:  2017; I'm sorry.  I apologize.

3     **A.**  I reported to my department's manager.

4     **Q.**  (BY MR. KENNER)  Okay.  Did you ever speak -- well,

5     withdraw.

6          Do you know -- recognize the name Marc Moscowitz?

7     **A.**  Yes.  He was listed as the business manager on the account

8     agreement.

9     **Q.**  I'm sorry, can you say that again?

10    **A.**  He was listed as the business manager on the KYC form;

11    sorry.

12    **Q.**  And was Mr. Moscowitz a person well known to your bank?

13    **A.**  Not to my knowledge.

14    **Q.**  But you knew Mr. Moscowitz to be a business manager;

15    correct?

16    **A.**  Correct.  He was listed as the business manager.

17    **Q.**  You knew he was a financial advisor?

18    **A.**  I speculated based on the information provided.

19    **Q.**  Okay.  To your knowledge, were there ever any

20    conversations between Mr. Moscowitz and anyone in your

21    department at the bank about the Anicorn account?

22    **A.**  To my knowledge, not with my department, other than

23    e-mails.

24    **Q.**  To your knowledge, did Mr. Moscowitz communicate with

25    people in the bank outside of your unit about the Anicorn

1   account?

2   **A.**   Yes.   We requested information from the account officer.

3   The account officer then requested the information from

4   Mr. Moscowitz.

5   **Q.**   Okay.   And did you get a response, to your knowledge,

6   from -- not you individually.   Did the bank get a response

7   from Mr. Moscowitz?

8   **A.**   Yes, we did.

9   **Q.**   And did that response purport to address the concerns that

10  the bank was raising with regard to the account?

11  **A.**   He did provide some information.   Initially, he said that

12  he would contact Mr. Michel's attorneys and that they would

13  get back to us.

14  **Q.**   Okay.   To your knowledge, did you ever receive -- did you

15  ever have contact with Mr. Michel's attorney in 2017 with

16  regard to the questions that were being raised?

17  **A.**   We did not have contact with them.

18  **Q.**   Did anyone at the bank have contact with them?

19  **A.**   Once we escalated the matter, I'm not sure who they had

20  contact with.

21  **Q.**   Okay.   So you have no recollection of whether or not --

22  let me withdraw that.

23      Do you -- do you know the name George Higginbotham?

24  **A.**   That name I recognize from one of the pays, the wire

25  pays.

1    **Q.**  I'm sorry, one of the?

2    **A.**  The wire pays, some of the outgoing funds.

3    **Q.**  Okay.  And what do you recognize that name to be connected

4    to?

5    **A.**  I -- I don't recognize it to be anything.  I do remember

6    the name though, because it was one of the immediate outgoing

7    funds when we were looking at the use of funds that were

8    coming in.

9    **Q.**  Okay.  Did -- to your knowledge, did Mr. Higginbotham open

10   a client trust account at your bank?

11         MR. KELLER:  Objection, Your Honor.  Lack of

12   personal knowledge.

13         MR. KENNER:  We don't know that until she answers.

14         THE COURT:  Well, I think you're going to have to

15   ask whether she would have some basis to know this.

16         MR. KENNER:  Okay.

17         THE COURT:  She's indicated she's in a very specific

18   unit, which does not have anything to do with accounts being

19   opened.

20         MR. KENNER:  Thank you, Your Honor.

21   **Q.**  (BY MR. KENNER)  Do you know whether or not

22   Mr. Higginbotham opened a client trust account at your bank?

23   **A.**  I do not know.

24   **Q.**  Thank you.

25         And you don't recall receiving any -- or let me withdraw

Cross-examination - Santos

1    that.

2        Do you recall reviewing any communication between George

3    Higginbotham and your bank?

4    **A.**  Not myself, no.

5    **Q.**  Did somebody else do that?

6    **A.**  Once we escalate it, it's out of my scope.  I don't know

7    if anybody else did.

8    **Q.**  Okay.  So just so I'm not confused, can you describe,

9    step-by-step, the due diligence that you undertook with regard

10   to -- let's start with Artemus?

11   **A.**  Once the accounts begin to alert, we go ahead and begin

12   our investigation.  Once we determined whether we need to

13   question something or not, we make the decision to either

14   close the alerts or continue doing -- or continue questioning

15   what we're looking at.

16   **Q.**  Okay.

17   **A.**  Once we identify what to question, we go ahead and we send

18   that out, the inquiry.  Once we get the information back, we

19   determine what we want to do.

20   **Q.**  Okay.  Are you familiar with the content of the inquiry

21   that you or someone at -- from the bank sent out?

22   **A.**  Yes.

23   **Q.**  And what were the -- what were the bank inquiring about?

24   **A.**  We inquired about cash activity, incoming wires,

25   international.  We had a foreign exchange account in Euros,

Cross-examination - Santos

1  and we requested what the purpose of the -- both the foreign

2  exchange account and the accounts were.

3  **Q.**  Okay.  When you say you had a foreign exchange account,

4  was that account in England?

5  **A.**  Could you repeat the question?

6  **Q.**  Yes.  Was this foreign exchange account located at a bank

7  in England?

8  **A.**  The foreign exchange account was with us, but it was being

9  exchanged in Euros.

10  **Q.**  Okay.  And do you recall whether or not your bank sent out

11  a letter to its clients to look at the exchange rate between

12  Euros and dollars before they elected in which way they wanted

13  to receive the money?

14  **A.**  I would not have knowledge of that.

15  **Q.**  So you've told us about communication you recall from Marc

16  Moscowitz; correct?

17  **A.**  Correct.

18  **Q.**  Do you recall any communication with regard to the Artemus

19  account from anybody other than Marc Moscowitz?

20  **A.**  I do not.

21  **Q.**  And with regard to the Anicorn account, I believe you

22  testified that you also communicated with Mr. Moscowitz about

23  that account?

24  **A.**  We didn't --

25  **Q.**  Or your department did?

1    **A.**   Correct.

2    **Q.**   And do you recall in that case, was it the same inquiries

3    as to both accounts?

4    **A.**   That I recall, it was on the same e-mail.

5    **Q.**   Okay.  And did Mr. Moscowitz respond to that e-mail

6    providing you with answers to the questions that you were

7    asking?

8    **A.**   He responded to the account officer initially to tell us

9    that he would speak to counsel.  He did provide some

10   information.  That information did not help us.

11   **Q.**   Okay.  But you do recall Mr. Moscowitz said the --

12   somebody in your department, you should talk Mr. Michel's

13   lawyer; correct?

14          MR. KELLER:  Objection.  Asked and answered, Your

15   Honor.

16          THE COURT:  Sustained.

17   **Q.**   (BY MR. KENNER)  You had indicated, I believe, that the

18   alerts associated with Mr. Michel's accounts were triggered

19   because the activity was out of pattern; is that correct?

20   **A.**   It triggered because it was a new account, first of all,

21   and because there is no historical activity to compare it to.

22   Then it automatically, once it hits a threshold, it provides

23   us an alert.

24   **Q.**   Okay.  And the only way in which Mr. Michel's -- let me

25   withdraw that.

Cross-examination - Santos

1      The only way that you determine that in both -- was it
2  both Anicorn and Artemus that were out of pattern?
3  **A.** They -- Anicorn had alerts. I cannot recall if Artemus
4  had alerts during the same time.
5  **Q.** Okay. And the thing that was out of pattern first was
6  that it was a new account; is that correct?
7  **A.** I wouldn't say that's out of pattern. It was just a
8  characteristic that alerts for us.
9  **Q.** It was the what?
10 **A.** A characteristic that alerts for us.
11 **Q.** Okay. And what characteristic was that?
12 **A.** That it was a new account.
13 **Q.** So it was a new account. In what other way -- by the way,
14 people open new accounts at your bank all the time, don't
15 they?
16 **A.** Yes, they do.
17 **Q.** And are all of those out of pattern?
18 **A.** No. Again, I wouldn't say it was out of pattern. It's a
19 characteristic that is combined with any other alert that
20 passes a certain threshold.
21 **Q.** Okay. And what was that characteristic?
22 **A.** The characteristic was the new account. The alerts were
23 velocity.
24 **Q.** I'm sorry, the alert what?
25 **A.** The alerts were a combination of velocity of activity, so

Cross-examination - Santos

1    pass-through activity, wires, and the foreign exchange

2    activity.

3    **Q.**  Okay.  Who requested that Mr. Michel's accounts be closed?

4    Was it Marc Moscowitz?

5    **A.**  No.  Once we escalated it to a different department, I --

6    it's my understanding that they requested account closure.

7    **Q.**  Did City National Bank lose any money as a result of the

8    Anicorn account?

9    **A.**  Not to my knowledge.

10   **Q.**  Did City National Bank lose any money because of the

11   Artemus account?

12   **A.**  Not to my knowledge.

13   **Q.**  So with respect to your knowledge, you have no reason to

14   believe that the bank lost any money at all; correct?

15              MR. KELLER:  Asked and answered, Your Honor.

16              THE COURT:  She's answered it as to both accounts.

17              MR. KENNER:  May I have a moment, Your Honor.

18   **Q.**  (BY MR. KELLER)  During the interview that you had with

19   the government by video, were you shown various documents and

20   asked about them?

21   **A.**  I was shown a few documents.

22   **Q.**  Okay.  Do you recall the few documents you were shown?

23   **A.**  Some of them were the ones that I saw this -- here, the

24   account agreements, the e-mails.  Those are the ones that I

25   recall.

Cross-examination - Santos

1    **Q.**  Okay.  Do you recall what e-mails you went over with the

2    government?

3    **A.**  The initial e-mail that we sent out with the questions.

4    And both responses from Mr. Moscowitz.

5    **Q.**  With no responses from anybody else?

6    **A.**  I don't recall anything else.

7    **Q.**  Did you tell the government that you didn't recall

8    anything else?

9    **A.**  I don't recall.

10           MR. KENNER:  Your Honor, I would like to show to the

11   witness, Court, and counsel, Government's Exhibit 151.  I'm

12   sorry, I can't tell from my own notes whether this was --

13           THE COURT:  151 has been admitted.

14           MR. KENNER:  Okay.  So, Mr. Campbell, would you

15   publish Exhibit 151, please.

16           Thank you.

17   **Q.**  (BY MR. KENNER)  Do you recognize -- first tell us, who is

18   Allan Maragh?

19   **A.**  Allan is the account officer that we reached out to.

20   **Q.**  Okay.  With regard to Artemus and --

21   **A.**  And Anicorn.

22   **Q.**  And Anicorn, okay.

23       And did you reach out to him -- did he respond to your

24   reaching out to him with an e-mail on Wednesday, August 2nd of

25   2017?

1  **A.**  Correct.

2         MR. KENNER:  And scroll down.

3  **Q.**  (BY MR. KENNER)  You saw this e-mail; correct?

4  **A.**  That's correct.

5  **Q.**  All right.

6         MR. KENNER:  Mr. Campbell, can you call out the --

7  thank you.

8  **Q.**  (BY MR. KENNER)  You see that it indicates that the

9  importance of this is high; correct?

10 **A.**  That's correct.

11 **Q.**  And it was regard to -- it was with regard to

12 international compliance; is that correct?

13 **A.**  The -- the e-mail that Jayme sent out, the analyst, she's

14 the one who marked it high, because we were trying to get the

15 information as soon as we could.  If you can see, our subject

16 line was different.  I believe Allan -- or maybe in the

17 response, the attachment was called International

18 Compliance.

19 **Q.**  Okay.  And does this document, the bottom portion of this

20 document, is that your request to get further additional

21 information?

22 **A.**  That is part of it, yes.

23 **Q.**  And that went to the account executive on the account,

24 Mr. Allan Maragh; right?

25 **A.**  Correct, the account officer.

Cross-examination - Santos

1   **Q.**  And there are a list of issues that the Financial

2   Intelligence Unit is reaching out to gather with regard to

3   Anicorn and Artemus; correct?

4   **A.**  Yes.  We had multiple questions.

5   **Q.**  Okay.  And these -- are these questions that were sent

6   from you to Allan Maragh or somebody in your unit?

7               MR. KELLER:  Objection.  Asked and answered, Your

8   Honor.

9               THE COURT:  I think she's already testified that

10  they passed the information on and the other unit was the one

11  who reached out to the individuals.  They didn't.  She

12  didn't.

13  **Q.**  (BY MR. KENNER)  What, if any, information did you get

14  back from Mr. Moscowitz about the -- excuse me one moment.

15      One of the questions that was being asked to provide

16  additional information is an incoming wire for $8,903,000 and

17  change from Lucky Mark Trading; is that correct?

18  **A.**  There was three incoming wires totaling that, yes.

19  **Q.**  Okay.  And the question being asked here is, what is Lucky

20  Mark Trading Limited's primary business activity; correct?

21  **A.**  That's correct.

22  **Q.**  Did you get a response from Mr. Moscowitz about that

23  question, what is Lucky Mark's primary business activity?

24  **A.**  Eventually, he did provide some information that we

25  weren't able to corroborate.

Cross-examination - Santos

1  **Q.**  And who provided that information, Mr. Moscowitz or

2  someone else?

3  **A.**  I recall him saying that he received information from

4  Mr. Michel's counsel.

5  **Q.**  Okay.  Did you receive information about that from

6  Mr. Michel's counsel?

7  **A.**  Can you repeat the question?

8  **Q.**  Yes.  Did you receive information from Mr. Michel's lawyer

9  in 2017 that provided an answer to that question?

10             MR. KELLER:  Objection.  Asked and answered, Your

11  Honor.  We've been through this multiple times.

12             THE COURT:  I think she's already -- you already

13  asked her this question, and she's given an answer in terms of

14  what her unit did and what she's aware of.

15  **Q.**  (BY MR. KENNER)  Do you recall whose decision it was to

16  close this account?

17             MR. KELLER:  Objection, Your Honor.  Asked and

18  answered.

19             THE COURT:  That's been asked and answered not that

20  long ago.

21             MR. KENNER:  I have no further questions, Your

22  Honor.

23             THE COURT:  Redirect?

24             MR. KELLER:  No redirect, Your Honor.

25             THE COURT:  All right.  Can this witness be excused?

Cross-examination - Santos

1              MR. KENNER:  No objection.

2              THE COURT:  All right.  You're excused.  Thank you.

3              THE WITNESS:  Thank you.

4              THE COURT:  Excuse me a moment.  I need to do

5    something.  They have a safety thing on the computer so you

6    now have to use your iPhone.  Hold on a second.

7              And this witness is who?

8              MR. MULRYNE:  Your Honor, the government calls

9    Heather Hunt.

10             THE COURT:  All right.  If you would step up over

11   here, please.  If you would raise your right hand, we need to

12   swear you in.

13                    HEATHER HILLIARD HUNT,

14   called as a witness, being first duly sworn, was examined and

15   testified as follows:

16             THE WITNESS:  Yes, I do.

17             THE CLERK:  Please be seated.

18             THE COURT:  You can take the mask off, as you have.

19   You can lift the microphone so we make sure that we can hear

20   what you say.  You can move the chair up.  I'd ask that you

21   let counsel finish their question before you start to answer.

22   They should do the same for you so we have the question and

23   the answer.  If you hear the word "objection" or see counsel

24   start to stand, they're going to object.  If you're in the

25   middle of the answer, stop.  If you haven't started the

Direct Examination - Hunt

1   answer, please don't go forward.  Let me hear the objection

2   and then I'll make a ruling.  All right?

3                          DIRECT EXAMINATION

4   BY MR. MULRYNE:

5   **Q.**  Good morning, Ms. Hunt.

6   **A.**  Good morning.

7   **Q.**  Could you please state and spell your full name for the

8   Court and the court reporter?

9   **A.**  My full name is Heather Hilliard Hunt.  H-e-a-t-h-e-r,

10  Hilliard, H-i-l-l-i-a-r-d, Hunt, H-u-n-t.

11  **Q.**  Ms. Hunt, where are you employed?

12  **A.**  The U.S. Department of Justice.

13  **Q.**  And where within the Department of Justice are you

14  employed?

15  **A.**  The National Security Division, Counterintelligence and

16  Export Control section, and the Foreign Agents Registration

17  unit.

18  **Q.**  How long have you worked within the Counterintelligence

19  and Export section?

20  **A.**  I've been -- well, I've been with the Department of

21  Justice and in that section since February of 1984.

22  **Q.**  And you mentioned the Foreign Agents and Registration Act

23  unit, or FARA unit; is that right?

24  **A.**  Yes.

25  **Q.**  How long have you worked with the FARA unit?

Direct Examination - Hunt

1    **A.**  Since February of 1984.

2    **Q.**  Could you just tell us in short -- I trust through your

3    work you're familiar with the federal statute, the Foreign

4    Agents Registration Act?

5    **A.**  Yes.

6    **Q.**  Could you just tell us very briefly and in summary, what

7    is FARA?

8    **A.**  FARA is a disclosure statute that is -- the purpose is to

9    provide the U.S. government and the American people

10   information about who is representing foreign interests in the

11   United States.

12   **Q.**  And what is the role of the FARA unit with respect to that

13   statute and its compliance?

14   **A.**  We administer the Foreign Agent Registration Act, and

15   we -- we basically take in the forms that people file under

16   the Foreign Agents Registration Act, and we make those filings

17   public.

18   **Q.**  Prior to your testimony here today, did you run a check

19   through your agency's records concerning Pras Michel?

20   **A.**  Yes, I did.

21   **Q.**  And did your check -- was your check designed to determine

22   whether or not Mr. Michel ever registered under the -- under

23   FARA?

24   **A.**  Yes.

25   **Q.**  And what did your check show?

Direct Examination - Hunt

1    **A.** I found no record of any registration under FARA.

2    **Q.** Prior to your testimony here today, did you also run

3    similar checks for several individuals; namely, Elliott

4    Broidy, Nickie Lum Davis, and George Higginbotham?

5    **A.** Yes, I did.

6    **Q.** And what did your checks of those records show?

7    **A.** I found no record of a registration under the Foreign

8    Agents Registration Act.

9    **Q.** I'd like to now turn your attention to a different federal

10   law.  This is Title 18 Section 951 of the United States Code.

11   Are you familiar with that statute?

12   **A.** Yes.

13   **Q.** I'll refer to that as Section 951.

14       Could you just tell us, again, very briefly and in

15   summary, what is Section 951?

16   **A.** That is a notification statute where agents of foreign

17   governments notify certain places in the U.S. government of

18   the -- of the fact that they're agents of a foreign

19   government.

20   **Q.** What role does the FARA unit where you work play with

21   respect to Section 951?

22   **A.** We receive notifications that are made to the Foreign

23   Agents Registration unit on 951, and we take those

24   notifications and we plug that information into a database.

25   **Q.** Prior to your testimony here, did you run a check of your

1  agency's records with respect to Mr. Michel and whether he

2  ever provided notice of serving as an agent for a foreign

3  government?

4  **A.**  Yes, I did.

5  **Q.**  And what did your check show?

6  **A.**  I found no record of a notification under 18 U.S.C. 951.

7  **Q.**  And similarly, did you run checks for the other

8  individuals whom I previously mentioned, Elliott Broidy,

9  Nickie Lum Davis, George Higginbotham?

10  **A.**  Yes, I did.

11  **Q.**  What did your check show?

12  **A.**  I found no record of a notification under 18 U.S.C. 951.

13  **Q.**  Are you aware of any notification provided by Mr. Michel

14  or any of those other individuals that was provided under or

15  made consistent with 18 U.S.C. 951?

16  **A.**  I'm not aware of one.

17          MR. MULRYNE:  No further questions, Your Honor.

18          THE COURT:  Cross.

19          MR. KENNER:   Thank you, Your Honor.

20                   CROSS-EXAMINATION

21  BY MR. KENNER:

22  **Q.**  All right.  So, I'm sorry, Ms. Hunt, I apologize for the

23  delay.  Ms. Hunt, can you tell me when the first FARA case has

24  been filed since -- let's go back to 2001?

25          MR. MULRYNE:  Objection, Your Honor.  Relevance.

Cross-examination - Hunt

1      THE COURT:  I don't see the history of the

2   registration as being relevant.  But let's talk.

3      (Bench conference on the record.)

4      THE COURT:  What possible relevance has it in terms

5   of whether other cases have been filed or not filed or going

6   back to a period that these are even covered in this?  I mean,

7   I don't see it being, you know, any probative value.  Tell me

8   what it is.

9      MR. KENNER:  The probative value is that the first

10  time that FARA started being utilized as a prosecutorial tool

11  against individuals was in 2019 -- I'm sorry, around March of

12  2018.

13      THE COURT:  Okay.

14      MR. KENNER:  Prior to that, there were no

15  prosecutions under FARA.  And this goes to knowledge and

16  intent to not want to testify.  Nobody was being prosecuted

17  under that until 2018.

18      THE COURT:  I don't see that.  One, it sounds more

19  like a selective prosecution thing in terms of what -- at

20  least that's the way I would interpret the way you've

21  presented it.  And the fact that they have not brought

22  prosecutions has really nothing to do with whether or not you

23  should have registered.

24      It seems to me in terms of, you know, some sort of

25  mental state, it's a stretch to say that they would know, you

1    know, particularly we have no record that -- about

2    prosecutions or the reason they didn't file is because they

3    thought they wouldn't get prosecuted.  There's absolutely no

4    evidence on the record relating to that.

5            So from that perspective, I don't see -- and this

6    really goes, as far as I'm concerned, it would be interpreted

7    I think by the jury that this is a selective prosecution based

8    on if you're trying to bring out that it's 2019.  Do not see

9    it going to the mental state or anything else.

10           I do need to correct my -- my ruling on the

11   402 that -- 403 that I did earlier.  I inverted them.  It

12   should be obviously prejudice is substantially outweighed the

13   probative value on my earlier 403.  But I certainly, on this

14   one, see no particular value.  Is there any value, Mr. Keller,

15   that I'm missing here?

16           MR. MULRYNE:  This is Mr. Mulryne, Your Honor.

17           THE COURT:  Mr. Mulryne; I'm sorry.

18           MR. MULRYNE:  No, no value at all, other than the

19   reasons the Court's already articulated.

20           MR. KENNER:  Your Honor, may I just say, please --

21           THE COURT:  Go ahead.

22           MR. KENNER:  -- that there is an international

23   archive site called WayBack Machine.

24           THE COURT:  Okay.

25           MR. KENNER:  And you can look on that internet site

Cross-examination - Hunt

1    to see what was happening with regard to a particular subject

2    matter.  And I believe the fact that the DOJ was not actively

3    enforcing FARA in 2017 -- I'm not talking about it being

4    selective for that they did it just to Pras.  I'm saying they

5    weren't doing it at all, not that they -- this is a selective

6    prosecution as to Mr. Michel.  Quite to the contrary.

7            THE COURT:  Let's leave the selective prosecution

8    issue, although I think it still is a live one, but I think

9    the problem with it here is we have absolutely all of the

10   people that have testified so far have not indicated in any

11   way that the reason that they didn't file under FARA was

12   because they knew they wouldn't get prosecuted.  There is no

13   evidence to support that.

14           And I, frankly, think what minimal -- and I think

15   it's minimal -- you know, you'd have to conclude that because

16   they haven't prosecuted somebody from before, that somehow

17   that would be a reason why you could decide that you would act

18   illegally and not -- you know, not do what you're required by

19   law because you didn't think you'd get prosecuted.

20           I'm not allowing it.  So I will say it correctly, I

21   don't see it as probative.  And what minimal there might be,

22   403 definitely is the prejudice, prejudice, undue

23   substantially outweighs any minor, if there is any, probative

24   value.

25           Frankly, based on the record we have now, there's

1   absolutely no reason to do it.  The discussions with

2   Mr. Michel that we have on the record, the discussions of all

3   of the other witnesses that didn't sign up, none of them

4   indicated any concern about that they wouldn't be prosecuted

5   and therefore they thought they could act illegally.  So you

6   cannot go down this line of questioning.

7             MR. KENNER:  Thank you, Your Honor.

8             (The following proceedings were had in open court.)

9             THE COURT:  I sustain the objection for the reasons

10  I've said on the record.

11  **Q.**  (BY MR. KENNER)  Ms. Hunt, does FARA mean that the

12  office -- your office, I guess that administers FARA, does it

13  maintain a hotline for people that might have questions about

14  whether or not they should become registered and related

15  matters?

16  **A.**  Well, we actually -- I don't know I'd call it a hotline.

17  We have a public e-mail address, and we also have two

18  telephone lines where people can call.  And we're quite

19  customer oriented, so we answer those phones regularly.  And

20  if somebody e-mails our FARA.public e-mail address, they're

21  probably getting an answer within 15, 20 minutes.

22  **Q.**  Within what?

23  **A.**  Within about 15 or 20 minutes.  Everybody's monitoring it

24  on a regular basis during the work hours.  So --

25  **Q.**  All right.  Did you do anything to research written

Cross-examination - Hunt

1    records of inquiries on the hotline relating to Mr. Michel?

2    **A.** We do a -- it's a regular process to review the e-mails on

3    a regular basis.  I'm not aware of one from Mr. Michel.

4    **Q.** Did you search for one with regard to Mr. Michel?

5    **A.** Not on our e-mail address, no.

6    **Q.** Did you search records of the telephone calls that came

7    into the hotline with regard to whether there was such an

8    inquiry by Mr. Michel?

9    **A.** I did not search for an inquiry, but when there are

10   inquiries or any notifications or registration questions that

11   come in, or if there's any notifications, they would be logged

12   into our database, and I checked that database.

13   **Q.** You checked the database of telephone calls that came into

14   your advisory line?

15   **A.** I checked the database for notifications that would come

16   through, in any written notification that would come through,

17   whether it be through the mail, through our e-mail address,

18   when those come in, they're logged into our database, and I

19   checked the database.

20   **Q.** And what about telephone calls?

21         MR. MULRYNE:  Objection, Your Honor.  Asked and

22   answered.

23         THE COURT:  She has answered it.  She answered that

24   specifically at the beginning.  She's given the other answer

25   as to the e-mails are written.

Cross-examination - Hunt

1    **Q.**  (BY MR. KENNER)   All right.   Did you search the records

2    for any inquiries from a person named George Higginbotham?

3    **A.**   What do you mean by "inquiries"?

4    **Q.**   Is there any record of an inquiry by Mr. Higginbotham with

5    regard to when FARA becomes applicable and when you should

6    register under it?

7    **A.**   I -- I'm not aware of any inquiry made by

8    Mr. Higginbotham.

9    **Q.**   Did you do a search for that question?

10            MR. MULRYNE:   Objection, Your Honor.   Asked and

11   answered.

12            MR. KENNER:   Not for Mr. Higginbotham.

13            THE COURT:   Well, I will ask in terms of the

14   database, if that's what you're asking about, whether she

15   checked the database for Mr. Broidy?

16            MR. KENNER:   Yes.   For Mr. Higginbotham, not

17   Broidy.

18            THE COURT:   Higginbotham, excuse me.

19   **A.**   I did check the database for registration under the

20   Foreign Agents Registration Act, and the database for

21   notifications under 18 U.S.C. 951 for Mr. Higginbotham, yes.

22   **Q.**  (BY MR. KENNER)   And when you say "checked the database,"

23   is that a database that Mr. Higginbotham could have accessed

24   by telephone?

25   **A.**   If someone wants to register under the Foreign Agents

Cross-examination - Hunt

1    Registration Act and has an obligation, they can go online and

2    register online.  So anybody can do that who is an agent

3    required to register under FARA.

4    **Q.**  What about somebody who's not sure whether or not

5    activities that have occurred as of a specific time required

6    registration?  That person could make a -- like George

7    Higginbotham, could make a telephone call inquiring about

8    that; correct?

9            MR. MULRYNE:  Objection, Your Honor.  Relevance and

10    outside the scope.

11            THE COURT:  You're getting somewhat beyond it.

12    She's also already talked about the system for telephone,

13    e-mails, written, and what is included in the database, and

14    that she's checked the database for the individual that you're

15    speaking about.  It also goes somewhat behind it.  So she's

16    actually answered the question in checking through the

17    database as to what's included on the database.

18            MR. KENNER:  Thank you.

19    **Q.**  (BY MR. KENNER)  And when did the advent of being able to

20    file online occur?  As of what point in time did that become

21    an option by way of registering?

22    **A.**  For registering under the Foreign Agents Registration Act,

23    you -- we've had an online e-file database since 2011.

24    **Q.**  For somebody that should register under FARA, what

25    information are they required to disclose?

Cross-examination - Hunt

**A.**   Under the Foreign Agents Registration Act, they would initially file what we call a registration statement.  That is their name, their address, who they're going to be representing, where they're located, the foreign -- where the foreign principal is located.

We have an Exhibit A form, which basically tells all about the foreign principal, who the foreign principal is, are they a government, foreign government, are they a foreign political party, are they some other foreign organization or some other foreign individual.  That would be reported on what's the Exhibit A, and the makeup of that organization or the financial backing from that organization.

Then there's an Exhibit B, which is the terms of the agreement with the foreign principal.  You can have a written agreement, you could have a letter of agreement, or you could have an oral agreement.  If it's a written agreement or a letter of agreement, that's going to be attached to the Exhibit B.  If it's an oral agreement, it's going to be the terms of the oral agreement.  And all of that information is posted on our website and made public.

**Q.**   All right.  And is there a civil enforcement division for FARA separate from the criminal enforcement?

MR. MULRYNE:  Objection.  Relevance.

THE COURT:  I'll allow this one question.

**A.**   Could you repeat your question, please?  I'm sorry.

Cross-examination - Hunt

1    **Q.**  (BY MR. KENNER)  Yes.  Is there a separate civil violation

2    section that enforces failure to register under FARA civilly

3    rather than criminally?

4    **A.**  We have the Foreign Agents Registration unit that handles

5    the administrative enforcement of FARA, which would be more,

6    we would say, the civil side.  But we're all under the

7    Counterintelligence and Export Control section.  So they --

8    the section as a whole handles that.

9        The FARA unit itself really is focused more on handling

10   the administrative, bringing in the forms, reviewing the

11   forms, posting the forms, helping people, giving advisory

12   opinions on whether or not you have an obligation to register,

13   sending out notices to people that may have an obligation to

14   register.  So that's what the FARA unit is focused on.

15   **Q.**  Okay.  And just so I understand, does the FARA unit look

16   to information available either, you know, in public

17   publications or websites, to look to identify people that

18   you -- FARA might believe should be registering which you

19   didn't have a registration from?

20   **A.**  We, on a regular basis, review public source document --

21   information.  We review articles and other websites and

22   whatnot to determine whether or not we think someone might

23   have an obligation to register.  And we may -- if there's

24   enough in an article or some public source document, we

25   would -- there are many times we will reach out to the

1    individual or the organization and say it's come to our

2    attention that based on this particular article you may have

3    an obligation to register, give us some information so that we

4    can make the determination.

5    **Q.**  Okay.  And did you become aware in an -- in or around

6    2017, that there was a lot of publicly available information

7    about the -- a company called 1MDB?  Were you -- did you

8    become aware of that?

9              MR. MULRYNE:  Your Honor, objection.  Relevance and

10   outside the scope of this witness's testimony on direct.

11             THE COURT:  No, I think -- let me have -- we're also

12   going to have to stop soon.

13             (Bench conference on the record.)

14             THE COURT:  Tell me in terms of, you know, whether

15   the idea is what -- that somehow they should be reaching out

16   because there's a bunch of articles about 1MDB?  As a

17   practical matter, Mr. Michel was not involved with that unless

18   you suddenly decided he is.

19             MR. KENNER:  No, he is not, Your Honor.

20             THE COURT:  Okay.  Then why would you ask about --

21   it doesn't have any relevance since he didn't have anything to

22   do with 1MDB.

23             MR. KENNER:  Your Honor, the relevance is that it's

24   common practice, according to this witness, to become aware of

25   information either by websites or by press --

Cross-examination - Hunt

1          THE COURT:  I understand that, but tell me what the

2    relevance in this case is.  Mr. Michel has nothing to do with

3    1MDB.  So you're asking whether she would have read about it.

4    Tell me what the connection is, if Mr. Michel isn't involved

5    with it.

6          MR. KENNER:  Let me move on from that person to

7    other persons.

8          THE COURT:  All right.  One more.  One more question

9    and then we have to stop, because I don't want to make the

10   lady -- one of the jurors who's going to the -- you know, has

11   a doctor's appointment.

12         MR. KENNER:  Thank you.

13         (The following proceedings were had in open court.)

14         THE COURT:  I'm sustaining the objection.

15   **Q.**  (BY MR. KENNER)  Did you become aware of information about

16   a person named Jho Low?

17         MR. MULRYNE:  Your Honor, again, objection.

18   Relevance and outside the scope.

19         THE COURT:  I -- I do as well.  Let's have one last

20   discussion so we can finish this.

21         (Bench conference on the record.)

22         THE COURT:  What does it matter?  Jho Low isn't the

23   one who has to sign up, okay, it's the other people.  So if

24   they're aware that Jho Low is floating out there, there's no

25   relevance in terms of connecting unless Jho Low is connected

1    to the people that he was working with, which does include

2    your client.

3           I don't see probative value here.  It's well beyond

4    the scope.  And, frankly, I mean, I don't know whether you're

5    opening a door to have some discussions or whether they should

6    have looked at Jho Low and Mr. Michel, unless that's what

7    you're thinking of.  So I don't see anything that has anything

8    to do with it in terms of whether she would have looked at it.

9    That -- that -- Jho Low isn't somebody who would sign up.  I

10   mean, she's looking at whether individuals out there doing

11   things that would bring it to their attention, not people that

12   potentially they would hire or get involved with.

13          So it has no probative value.  And it most

14   certainly -- you know, they're -- the prejudice substantially

15   outweighs the probative value.  You're going down tracks that

16   are distracting to the jury and have no relevance in terms of

17   this case.

18          MR. KENNER:  Thank you, Your Honor.

19          (The following proceedings were had in open court.)

20          THE COURT:  I think we need to stop at this point

21   because I had indicated 11:00.

22          All right.  Members of the jury, I had promised that

23   we would stop at this point so people could make appointments.

24   So you've got the rest of the afternoon off.  Don't talk about

25   the case.  We will not say what you're doing.

1          Anyway, we will see you on Thursday.  I'd ask again,

2     if you could -- if you could come by 9:15.  And we'll be ready

3     to go.  All right.  Take care.

4          (Jury left the courtroom.)

5          THE COURT:  Ms. Hunt, I'm sorry to make you come

6     back, but we obviously haven't finished.  So I would ask that

7     you be prepared to come back Thursday at 9:15, and you'll be

8     the first witness on.  Thank you.  Oh, and don't talk about

9     the case in the meantime.  I know you don't -- you won't.  All

10    right?

11         Then I'll see you all back at 9:00.  I would

12    expect that if there's -- is there anything that anybody

13    anticipates at this point that I'm going to get as a missive

14    tonight?

15         MR. MULRYNE:  Not from the government, Your Honor.

16         THE COURT:  Mr. Kenner?

17         MR. KENNER:  Not from the defense, Your Honor.

18         THE COURT:  All right.  Then parties are excused.

19    I'll see you on Thursday.

20         (The proceedings were concluded at 11:05 a.m.)

21

22         I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
      record of proceedings in the above-entitled matter.

23

                    _____/s/_____
24                      Christine T. Asif
                     Official Court Reporter

25

< Dates >.
19-148-1 4:7.
August 2nd
  50:24.
March 30, 2017
  24:4.
May 19th, 2017
  12:18.
May 21st, 2017
  7:22.
$8,903,000
  52:16.
.
.
< 1 >.
1 6:20, 16:9.
10 31:23.
1016 1:28.
11 4:18.
118 8:13,
  8:15.
11:00 4:19,
  4:21,
  70:21.
11:05 71:20.
12th 1:11.
13 24:6,
  24:16.
1301 1:27.
132 11:11.
140 7:16, 7:17,
  7:21, 8:9.
1400 1:35.
15 62:21,
  62:23.
151 50:11,
  50:13,
  50:15.
16633 1:42.
17 22:3.
18 57:10, 58:6,
  58:12, 58:15,
  64:21.
19-00148-1
  1:6.
1984 55:21,
  56:1.
1MDB 30:15,
  68:7, 68:16,
  68:22,

69:3.
.
.
< 2 >.
2 5:17, 23:12,
  24:21.
20 14:15,
  14:19, 14:21,
  62:21,
  62:23.
20-minute
  14:18.
20001 2:17.
20004 2:9.
20005 1:36.
2001 58:24.
2011 65:23.
2017 7:15,
  18:1, 20:10,
  22:4, 22:5,
  23:6, 25:4,
  31:13, 32:4,
  33:25, 42:1,
  42:2, 43:15,
  50:25, 53:9,
  61:3, 68:6.
2018 59:12,
  59:17.
2019 59:11,
  60:8.
202 2:18.
2020 22:1.
2023 1:11.
20530 1:29.
226 14:25,
  15:6.
.
.
< 3 >.
3 23:18.
30 6:20.
30th 25:3.
33 12:22.
333 2:15.
354-3247
  2:18.
395 6:11, 6:20,
  7:7.
.
.

< 4 >.
4 22:16, 22:19,
  23:8, 23:24,
  25:1.
402 60:11.
403 38:2,
  60:11, 60:13,
  61:22.
.
.
< 5 >.
50 31:23.
.
.
< 6 >.
641 2:8.
6507 2:16.
.
.
< 9 >.
91436 1:43.
951 57:10,
  57:13, 57:15,
  57:21, 57:23,
  58:6, 58:12,
  58:15,
  64:21.
9:00 71:11.
9:15 71:2,
  71:7.
9:16 1:12.
_____/s/___
  _____
  71:26.
.
.
< A >.
a.m. 1:12,
  71:20.
able 28:9,
  28:14, 30:10,
  52:25,
  65:19.
above-entitled
  71:24.
absolutely
  60:3, 61:9,
  62:1.
accessed
  64:23.

according 5:21,
  68:24.
Act 21:19,
  55:22, 56:4,
  56:14, 56:16,
  57:8, 61:17,
  62:5, 64:20,
  65:1, 65:22,
  66:1.
ACTION 1:5.
actions 25:23,
  26:2,
  37:13.
actively
  61:2.
activities
  21:21, 28:15,
  65:5.
activity 22:12,
  25:13, 25:14,
  25:15, 27:10,
  27:15, 27:17,
  27:18, 27:19,
  27:22, 28:2,
  28:3, 28:6,
  28:8, 28:9,
  28:12, 28:18,
  29:4, 29:21,
  30:5, 45:24,
  47:19, 47:21,
  48:25, 49:1,
  49:2, 52:20,
  52:23.
actual 28:9.
Actually 5:12,
  8:5, 8:19,
  19:7, 34:13,
  62:16,
  65:16.
addition
  38:1.
additional
  4:17, 30:8,
  51:20,
  52:16.
address 43:9,
  62:17, 62:20,
  63:5, 63:17,
  66:3.
administer

56:14.
administers
    62:12.
administration
    26:1, 26:5.
administrative
    67:5,
    67:10.
admitted 6:13,
    7:17, 7:20,
    8:15, 11:11,
    11:12, 12:21,
    15:4, 22:16,
    22:19, 24:6,
    50:13.
advent 65:19.
advised 12:9.
advisor
    42:17.
advisory 63:14,
    67:11.
afternoon
    70:24.
agency 18:4,
    56:19,
    58:1.
Agent 23:21,
    56:14, 58:2,
    65:2.
Agents 55:16,
    55:22, 56:4,
    56:16, 57:8,
    57:16, 57:18,
    57:23, 64:20,
    64:25, 65:22,
    66:1, 67:4.
ago 32:22,
    32:24, 33:19,
    34:1, 34:2,
    34:9,
    53:20.
agreed 20:4.
agreement 23:9,
    24:2, 24:8,
    24:18, 42:8,
    66:14, 66:15,
    66:16, 66:17,
    66:18,
    66:19.
agreements

49:24.
ahead 24:14,
    39:7, 45:11,
    45:17,
    60:21.
aides 7:9.
alert 22:5,
    22:8, 22:10,
    27:14, 45:11,
    47:23, 48:19,
    48:24.
alerted 28:6,
    28:19.
alerting 27:18,
    27:21,
    28:3.
alerts 22:12,
    27:24, 29:14,
    29:19, 30:22,
    31:15, 31:19,
    31:21, 37:12,
    38:12, 45:14,
    47:18, 48:3,
    48:4, 48:8,
    48:10, 48:22,
    48:25.
Allan 50:18,
    50:19, 51:16,
    51:24,
    52:6.
allow 14:12,
    19:11, 26:24,
    35:2, 35:4,
    37:17, 38:15,
    38:17,
    66:24.
allowed 10:1,
    10:10.
allowing
    61:20.
almost 26:10,
    27:1.
Alon 1:40,
    4:14.
already 8:1,
    9:23, 11:11,
    14:11, 16:10,
    17:2, 26:21,
    52:9, 53:12,
    60:19,

65:12.
Although 14:10,
    61:8.
ambassador
    11:22,
    12:4.
AMERICA 1:5.
American 9:25,
    10:19, 16:8,
    56:9.
Americans
    10:8.
AML 22:5, 28:1,
    29:24, 31:14,
    31:17.
analyst 28:1,
    51:13.
Anicorn 23:6,
    24:9, 24:19,
    24:24, 27:11,
    28:10, 29:20,
    29:22, 32:14,
    32:25, 33:9,
    42:21, 42:25,
    46:21, 48:2,
    48:3, 49:8,
    50:21, 50:22,
    52:3.
Anne 4:14.
Answer 9:20,
    11:7, 19:13,
    19:14, 19:15,
    19:17, 19:18,
    19:19, 25:14,
    29:9, 53:9,
    53:13, 54:21,
    54:23, 54:25,
    55:1, 62:19,
    62:21,
    63:24.
answered 9:9,
    9:17, 11:1,
    14:1, 14:8,
    16:23, 47:14,
    49:15, 49:16,
    52:7, 53:10,
    53:18, 53:19,
    63:22, 63:23,
    64:11,
    65:16.

answering
    29:2.
answers 28:12,
    29:3, 30:12,
    30:24, 44:13,
    47:6.
anti-money
    22:6, 30:2.
anticipates
    71:13.
anybody 39:4,
    39:16, 45:7,
    46:19, 50:5,
    65:2,
    71:12.
Anyway 71:1.
apologize 42:2,
    58:22.
APPEARANCES
    1:23, 2:1.
appears 6:21,
    7:21, 12:6.
applicable
    64:5.
appointment
    4:20,
    69:11.
appointments
    70:23.
appropriate
    9:22.
approximation
    33:18.
April 1:11.
archive
    60:23.
area 12:2,
    21:6, 21:12,
    29:1.
around 59:11,
    68:5.
arrest 10:4,
    10:6.
Artemus 23:6,
    23:10, 23:16,
    27:11, 28:10,
    29:20, 29:23,
    32:14, 32:24,
    33:9, 45:10,
    46:18, 48:2,

48:3, 49:11,
50:20,
52:3.
article 67:24,
68:2.
articles 67:21,
68:16.
articulated
60:19.
Asif 2:11,
71:22,
71:27.
associated
47:18.
associates
25:19.
assume 22:17.
assumed
37:20.
Assumes 9:5,
26:16,
35:20.
assurance 21:5,
21:11,
21:13.
attached
66:17.
attachment
51:17.
attempts
8:11.
attendance
39:20.
attending
34:12.
attention 6:11,
57:9, 68:2,
70:11.
Attorney 7:22,
10:16, 33:12,
34:5,
43:15.
attorney-client
35:23.
attorneys
39:19,
43:12.
authorized
23:21.
automatically

47:22.
available
67:16,
68:6.
Avenue 1:27,
1:35, 2:8,
2:15.
avoidance
29:1.
aware 8:23,
9:12, 10:16,
11:6, 12:7,
53:14, 58:13,
58:16, 63:3,
64:7, 68:5,
68:8, 68:24,
69:15,
69:24.
awareness
16:11.
away 33:25.
.
.
< B >.
B. 66:18.
Back 5:2, 5:17,
9:25, 10:11,
14:11, 18:1,
20:25, 22:4,
23:2, 26:6,
33:18, 40:1,
42:1, 43:13,
45:18, 52:14,
58:24, 59:6,
71:6, 71:7,
71:11.
backing
66:12.
ballpark
31:23.
ban 10:5.
banking 29:5,
29:12,
29:15.
based 30:21,
42:18, 60:7,
61:25,
68:2.
basically
36:11, 56:15,

66:6.
basis 13:11,
17:8, 22:12,
36:25, 44:15,
62:24, 63:3,
67:20.
become 62:14,
65:20, 68:5,
68:8, 68:24,
69:15.
becomes 64:5.
began 27:14.
begin 19:22,
45:11.
beginning
63:24.
behalf 38:22,
41:12.
behind 65:15.
believe 7:16,
9:10, 9:25,
13:7, 15:25,
16:9, 18:2,
22:19, 34:18,
40:14, 46:21,
47:17, 49:14,
51:16, 61:2,
67:18.
Bench 15:22,
36:4, 59:3,
68:13,
69:21.
beneficial
25:12.
benefit 22:7.
beyond 4:22,
65:11,
70:3.
bit 5:5, 5:9,
20:24, 21:8,
23:3,
28:22.
borders
35:22.
bottom 16:9,
51:19.
Boulevard
1:42.
box 23:25.
Branch 12:11.

break 4:23.
brief 41:4.
briefly 56:6,
57:14.
bring 5:2,
34:21, 60:8,
70:11.
bringing
67:10.
Broidy 7:22,
8:2, 8:17,
26:12, 27:3,
30:16, 57:4,
58:8, 64:15,
64:17.
brought 7:9,
59:21.
BSA 21:16,
21:18.
bunch 36:6,
38:12,
68:16.
business 23:9,
24:8, 24:18,
28:9, 28:13,
28:14, 28:22,
29:6, 30:9,
42:7, 42:10,
42:14, 42:16,
52:20,
52:23.
.
.
< C >.
California
1:43.
call 4:5,
13:21, 23:13,
23:19, 23:25,
24:22, 33:14,
33:15, 34:10,
39:9, 39:21,
40:11, 40:13,
51:6, 62:16,
62:18, 65:7,
66:2.
called 18:25,
40:14, 51:17,
54:14, 60:23,
68:7.

calls 10:5,
  18:18, 54:8,
  63:6, 63:13,
  63:20.
Campbell 15:10,
  50:14,
  51:6.
care 71:3.
careful
  24:14.
carefully
  15:24.
Carlstrom
  4:15.
case 4:5, 4:7,
  20:6, 20:13,
  33:1, 33:4,
  33:5, 33:13,
  34:8, 35:6,
  35:15, 35:18,
  37:9, 47:2,
  58:23, 69:2,
  70:17, 70:25,
  71:9.
cases 59:5.
cash 25:15,
  28:8,
  45:24.
Catharine
  35:10, 35:12,
  40:14.
Catherine
  34:14.
certain 31:20,
  37:13, 48:20,
  57:17.
Certainly
  17:14, 30:6,
  60:13,
  70:14.
certify
  71:22.
chair 19:5,
  26:11, 27:2,
  54:20.
change 52:17.
channels
  18:7.
characteristic
  48:8, 48:10,

48:11, 48:19,
  48:21,
  48:22.
Charles 2:5,
  2:6, 4:14.
check 56:18,
  56:21, 56:25,
  57:25, 58:5,
  58:11,
  64:19.
checked 63:12,
  63:13, 63:15,
  63:19, 64:15,
  64:22,
  65:14.
checking
  65:16.
checks 32:5,
  57:3, 57:6,
  58:7.
China 9:25,
  10:2, 10:4,
  10:5, 10:7,
  10:11, 10:15,
  10:19, 11:21,
  12:3, 16:9,
  18:3, 18:6,
  26:7.
Chinese 8:23,
  9:13, 10:24,
  12:4, 13:22,
  16:8, 17:24,
  26:6,
  30:19.
Christine 2:11,
  71:22,
  71:27.
Citibank
  20:9.
citizens 10:1,
  10:3, 10:12,
  10:19,
  16:8.
City 20:8,
  21:3, 22:2,
  22:3, 23:9,
  49:7,
  49:10.
civil 66:21,
  67:1, 67:6.

civilly 67:2.
clarify 32:7.
clear 8:20,
  19:8.
CLERK 4:7.
client 22:14,
  25:11, 27:14,
  31:21, 41:17,
  41:24, 44:10,
  44:22,
  70:2.
clients 21:21,
  31:11, 31:22,
  46:11.
close 45:14,
  53:16.
closed 31:3,
  37:12, 37:14,
  38:13,
  49:3.
closest
  39:11.
closing 33:6.
closure 49:6.
Code 57:10.
collection
  18:4.
COLLEEN
  KOLLAR-KOTELL
  Y 1:18.
Columbia
  2:14.
COLUMBIA 1:2.
combination
  48:25.
combined
  48:19.
comes 29:17,
  37:5.
comfort
  28:12.
comfortable
  30:24.
coming 27:15,
  28:8, 30:22,
  40:12,
  44:8.
Committee
  26:12,
  27:3.

common 68:24.
communicate
  42:24.
communicated
  46:22.
communication
  11:6, 45:2,
  46:15,
  46:18.
communications
  30:8.
company 68:7.
compare 27:17,
  27:18,
  47:21.
Compliance
  21:16, 27:10,
  27:13, 51:12,
  51:18,
  56:13.
computer 5:5,
  54:5.
concern 62:4.
concerned 16:1,
  30:6, 60:6.
concerning
  28:22, 28:25,
  56:19.
concerns 28:18,
  28:20, 30:4,
  37:12, 37:14,
  43:9.
conclude
  61:15.
concluded
  71:20.
conference
  15:22, 34:9,
  34:12, 36:4,
  40:6, 59:3,
  68:13,
  69:21.
confirm 28:9,
  28:14.
confused
  45:8.
confusing
  38:4.
connected 44:3,
  69:25.

connecting 69:25.
connection 9:13, 13:17, 33:12, 69:4.
consider 20:6.
consistent 58:15.
consulting 25:11, 29:10, 29:11.
CONT'D 2:1.
contact 41:17, 41:21, 41:24, 43:12, 43:15, 43:17, 43:18, 43:20.
content 45:20.
continue 45:14.
continued 30:23.
Contitution 2:15.
contrary 61:6.
Control 55:16, 67:7.
conversation 14:18, 14:20, 39:24, 40:24, 41:12.
conversation. 40:4.
conversations 41:4, 42:20.
cooperate 27:7.
corner 39:10, 39:11.
Corporation 19:24, 20:10.
correctly 40:19, 61:20.

corroborate 52:25.
Council 12:3.
Counsel 4:8, 12:21, 13:7, 14:25, 17:22, 19:11, 19:16, 39:5, 47:9, 50:11, 53:4, 53:6, 54:21, 54:23.
Counterintellig ence 55:15, 55:18, 67:7.
couple 23:6, 33:1, 33:4, 34:8, 39:3.
court. 17:11, 38:19, 62:8, 69:13, 70:19.
courtroom. 5:23, 71:4.
covered 59:6.
Covington 34:18, 34:20, 35:11, 39:20, 40:18, 40:20.
crime 21:24.
crimes 21:6, 21:12, 21:14.
Criminal 1:5, 4:7, 66:22.
criminally 67:3.
critic 26:6.
Cross 31:5, 58:18.
CROSS-EXAMINATI ON 6:4, 6:7, 31:6, 58:20.
current 21:25, 22:1.
currently 21:1, 21:5, 21:11.

customer 62:19.

.

.

< D >.
daily 22:12.
database 57:24, 63:12, 63:13, 63:15, 63:18, 63:19, 64:14, 64:15, 64:19, 64:20, 64:22, 64:23, 65:13, 65:14, 65:17, 65:23.
date 12:16, 24:2, 25:2, 32:22, 33:17.
dated 7:22.
David 4:13.
David E. Kenner 1:39.
Davis 57:4, 58:9.
decide 61:17.
decided 28:2, 36:6, 36:10, 37:3, 68:18.
deciding 36:16.
decision 35:22, 45:13, 53:15.
DEFENDANT 1:12, 1:39, 2:5.
Defense 12:22, 15:1, 17:22, 20:7, 71:17.
definitely 61:22.
delay 58:23.
delegation 18:6.
Department 1:26, 1:33, 12:6, 12:10, 29:25, 34:15,

35:7, 37:4, 41:24, 42:3, 42:21, 42:22, 46:25, 47:12, 49:5, 55:12, 55:13, 55:20.
depends 5:19.
Deposit 19:24, 20:9.
deputy 26:11, 27:2.
describe 45:8.
described 9:6, 31:12.
describes 16:7.
designed 56:21.
desire 10:18.
details 25:6, 33:7.
detained 10:1.
determination 68:4.
determine 30:10, 45:19, 48:1, 56:21, 67:22.
determined 45:12.
deviating 22:13.
difference 36:5.
different 14:9, 31:11, 49:5, 51:16, 57:9.
diligence 45:9.
DIRECT 6:11, 20:15, 55:3, 68:10.
directly 41:15.
disclose 65:25.

disclosure
  56:8.
discuss 13:15,
  36:16.
discussed
  16:2.
discussing
  13:19,
  13:23.
discussion
  37:19,
  69:20.
discussions
  35:23, 62:1,
  62:2, 70:5.
distracting
  38:5,
  70:16.
District 1:1,
  1:2, 1:19,
  2:13, 2:14.
Division 55:15,
  66:21.
doctor 4:20,
  69:11.
document 7:5,
  7:23, 8:4,
  8:21, 11:25,
  12:2, 13:3,
  13:7, 13:10,
  14:23, 15:6,
  15:11, 51:19,
  51:20, 67:20,
  67:24.
documentation
  25:16.
documents
  49:19, 49:21,
  49:22.
doing 23:5,
  31:12, 32:5,
  45:14, 61:5,
  70:10,
  70:25.
DOJ 25:22,
  61:2.
dollars
  46:12.
done 21:15,
  34:3, 38:7.

door 20:25,
  70:5.
down 6:2, 9:1,
  9:14, 14:23,
  17:12, 19:4,
  19:5, 51:2,
  62:6,
  70:15.
dozen 10:13.
drop 26:1.
due 45:9.
duly 18:25,
  54:14.
During 27:20,
  32:4, 35:25,
  37:1, 48:4,
  49:18,
  62:24.

.
.
< E >.
e-file 65:23.
e-mail 6:21,
  7:21, 8:17,
  13:25, 47:4,
  47:5, 50:3,
  50:24, 51:3,
  51:13, 62:17,
  62:20, 63:5,
  63:17.
e-mails 42:23,
  49:24, 50:1,
  62:20, 63:2,
  63:25,
  65:13.
earlier 60:11,
  60:13.
easier 5:14.
efforts 18:5.
either 18:6,
  32:25, 45:13,
  67:16,
  68:25.
elected
  46:12.
Elliott 7:22,
  8:2, 26:12,
  27:3, 30:16,
  57:3, 58:8.
embassy

  11:21.
Emily 10:21,
  10:25.
employed 55:11,
  55:14.
Encino 1:43.
end 5:17.
ended 33:6.
enforcement
  18:4, 66:21,
  66:22,
  67:5.
enforces
  67:2.
enforcing
  61:3.
England 46:4,
  46:7.
enough 67:24.
entered 5:23,
  24:3, 25:3.
entities 25:11,
  28:10.
entity 24:8,
  24:18, 37:5,
  37:6.
escalate
  45:6.
escalated
  30:24, 43:19,
  49:5.
escalating
  33:6.
Esquire 1:25,
  1:31, 1:32,
  1:39, 1:40,
  2:5.
essentially
  29:17,
  33:25.
Euros 45:25,
  46:9,
  46:12.
Eventually
  33:14,
  52:24.
Everybody 6:2,
  19:8,
  62:23.
everyone 4:2.

evidence 20:13,
  26:16, 26:19,
  26:21, 60:4,
  61:13.
EXAMINATION
  17:18, 20:15,
  55:3.
examined 18:25,
  54:14.
exchange 45:25,
  46:2, 46:3,
  46:6, 46:8,
  46:11,
  49:1.
exchanged
  46:9.
excluded
  15:13.
Excuse 52:14,
  54:4,
  64:18.
excused 18:11,
  18:14, 53:25,
  54:2,
  71:18.
Executive
  12:11,
  51:23.
Exhibit 6:11,
  6:18, 6:20,
  7:7, 7:16,
  7:17, 7:21,
  8:9, 8:13,
  11:11, 12:22,
  13:15, 14:25,
  15:2, 15:5,
  22:16, 22:19,
  22:20, 23:8,
  23:13, 23:25,
  24:6, 24:16,
  24:22, 50:11,
  50:15, 66:6,
  66:11, 66:13,
  66:18.
exit 10:5,
  10:10.
expect 71:12.
expected
  25:13.
Export 55:16,

55:19,
67:7.
extensive
14:19.
extensively
14:17.
extent 37:15.
extradited
18:8.
extraordinary
22:14.
.
.
< F >.
F. 1:31.
fact 20:1,
20:3, 27:15,
36:10, 57:18,
59:21,
61:2.
facts 20:4,
20:6,
26:16.
factual 20:6.
failure 67:2.
fair 32:14,
32:23.
familiar 8:10,
9:24, 11:20,
13:2, 13:7,
13:10, 16:6,
17:23, 29:12,
45:20, 56:3,
57:11.
familiarity
12:13.
far 16:1, 60:6,
61:10.
FARA 55:23,
55:25, 56:7,
56:8, 56:12,
56:23, 57:1,
57:20, 58:23,
59:10, 59:15,
61:3, 61:11,
62:11, 62:12,
64:5, 65:3,
65:24, 66:22,
67:2, 67:5,
67:9, 67:14,

67:15,
67:18.
Fara.public
62:20.
father 15:25.
FCRR 2:11,
71:22.
February 55:21,
56:1.
Federal 19:24,
20:9, 56:3,
57:9.
feel 30:24.
few 32:22,
32:23, 33:21,
34:2, 41:8,
49:21,
49:22.
file 56:15,
60:2, 61:11,
65:20,
66:2.
filed 58:24,
59:5.
filings
56:16.
filled 27:19.
finance 26:11,
27:2.
Financial 21:6,
21:12, 21:14,
21:22, 21:24,
25:18, 26:20,
28:5, 30:14,
42:17, 52:1,
66:12.
find 9:6,
28:11, 28:17,
28:20.
fine 22:24,
23:4.
finish 19:11,
19:13, 54:21,
69:20.
finished
71:6.
Firm 1:41,
34:20, 34:21,
35:18, 36:23,
39:20.

first 5:19,
6:14, 6:17,
9:6, 17:6,
18:25, 33:22,
34:13, 47:20,
48:5, 50:17,
54:14, 58:23,
59:9, 71:8.
five 15:6,
15:10.
fixing 5:21.
flags 30:6.
floating
69:24.
focused 67:9,
67:14.
following
17:11, 38:19,
62:8, 69:13,
70:19.
follows 19:1,
54:15.
foregoing
71:23.
forfeiture
25:23,
26:2.
form 25:10,
25:11, 27:19,
27:22, 41:18,
41:20, 41:23,
42:10,
66:6.
forms 56:15,
67:10,
67:11.
forward 55:1.
found 57:1,
57:7, 58:6,
58:12.
foundation
16:25,
17:5.
Frankly 37:11,
37:25, 61:14,
61:25,
70:4.
full 55:7,
55:9.
funds 25:21,

26:1, 26:5,
26:9, 27:1,
28:15, 29:13,
29:16, 29:20,
44:2, 44:7.
.
.
< G >.
gather 52:2.
General 7:22,
10:16.
generally
21:20,
22:7.
gentleman
39:10,
41:6.
George 43:23,
45:2, 57:4,
58:9, 64:2,
65:6.
gets 36:14.
getting 8:24,
15:18, 35:22,
36:11, 62:21,
65:11.
give 31:23,
33:18,
68:3.
given 9:23,
53:13,
63:24.
giving 67:11.
good-faith
36:25.
governments
57:17.
Group 23:10.
guess 14:14,
39:24, 40:3,
62:12.
Guo 7:10, 8:24,
9:13, 13:17,
13:19, 13:23,
14:6, 18:5,
18:8,
30:15.
.
.
< H >.

H-e-a-t-h-e-r
  55:9.
H-i-l-l-i-a-r-d
  55:10.
H-u-n-t
  55:10.
half 23:20.
hand 18:23,
  54:11.
handled 12:9.
handles 67:4,
  67:8.
handling
  67:9.
happening
  61:1.
happens 5:20.
hard 23:3,
  31:14,
  31:22.
Haskell 2:5,
  2:7, 4:14.
hear 6:16,
  19:7, 19:9,
  19:15, 19:18,
  21:8, 54:19,
  54:23,
  55:1.
heard 37:9.
hearing 15:8.
hearsay
  36:11.
Heather 54:9,
  54:13,
  55:9.
held 16:8.
help 35:14,
  36:23,
  47:10.
helping
  67:11.
hereby 71:22.
Higginbotham
  43:23, 44:9,
  44:22, 45:3,
  57:4, 58:9,
  64:2, 64:4,
  64:8, 64:12,
  64:16, 64:18,
  64:21, 64:23,

65:7.
high 51:9,
  51:14.
higher 27:16.
Hilliard 54:13,
  55:9,
  55:10.
hire 36:6,
  36:10, 37:17,
  70:12.
hired 35:14,
  36:23,
  38:9.
hiring 35:17.
historical
  27:17,
  47:21.
history 22:14,
  59:1.
hits 47:22.
Hold 54:6.
holder 41:21.
honestly
  31:25.
HONORABLE
  1:18.
hopeful 4:18,
  5:16.
hotline 62:13,
  62:16, 63:1,
  63:7.
hour 40:8.
hours 62:24.
House 12:5,
  14:6.
hundred
  31:23.
Hunt 54:9,
  54:13, 55:5,
  55:9, 55:10,
  55:11, 58:22,
  58:23, 62:11,
  71:5.

.

.

< I >.
idea 68:15.
identified
  39:14.
identify 4:8,

45:17,
  67:17.
illegally
  61:18,
  62:5.
illicit
  21:23.
immediate
  44:6.
immediately
  26:10,
  27:2.
importance
  51:9.
importantly
  4:19.
in. 18:22,
  27:15,
  28:8.
inappropriate
  16:1,
  38:10.
include 70:1.
included 22:23,
  65:13,
  65:17.
including
  25:14.
incoming 28:7,
  45:24, 52:16,
  52:18.
Indiana 2:8.
indicate
  16:22.
indicated 8:18,
  8:19, 16:17,
  16:19, 17:2,
  36:7, 38:1,
  44:17, 47:17,
  61:10, 62:4,
  70:21.
indicates
  51:8.
indicating
  37:13.
individual
  17:22, 65:14,
  66:10,
  68:1.
individually

43:6.
individuals
  30:16, 52:11,
  57:3, 58:8,
  58:14, 59:11,
  70:10.
industry 29:13,
  29:15.
informed 25:17,
  25:21, 25:25,
  26:4, 26:9,
  26:22,
  26:25.
initial 50:3.
Initially
  28:20, 29:9,
  35:9, 43:11,
  47:8, 66:2.
inquired
  45:24.
inquiries
  27:10, 27:13,
  47:2, 63:1,
  63:10, 64:2,
  64:3.
inquiring
  45:23,
  65:7.
inquiry 45:18,
  45:20, 63:8,
  63:9, 64:4,
  64:7.
institution
  21:22.
instructions
  5:17.
Insurance
  19:24,
  20:10.
insured 20:9.
Integrity
  1:34.
Intelligence
  18:4, 52:2.
intent 59:16.
interest 10:9,
  36:19.
interests
  56:10.
internal

36:20.
International
  25:18, 29:10,
  45:25, 51:12,
  51:17,
  60:22.
internet
  60:25.
interpret
  59:20.
interpreted
  60:6.
interview 34:4,
  38:21,
  49:18.
interviewed
  40:9.
inverted
  60:11.
investigation
  30:23, 30:25,
  32:19, 32:21,
  45:12.
investigators
  33:12,
  34:5.
involved 12:15,
  18:5, 37:7,
  68:17, 69:4,
  70:12.
iphone 54:6.
Israeli 1:40,
  4:14.
issue 61:8.
issues 4:17,
  38:4, 52:1.
itself 13:12,
  36:19,
  67:9.
.
.
< J >.
Jayme 51:13.
Jeff 7:22,
  11:22.
Jho 25:18,
  26:2, 30:15,
  69:16, 69:22,
  69:24, 69:25,
  70:6, 70:9.

John 4:10.
John D. Keller
  1:25.
JUDGE 1:19.
judgment
  38:13.
jurors 4:20,
  69:10.
Jury 1:17, 5:2,
  5:17, 5:23,
  5:25, 6:1,
  22:7, 36:14,
  38:2, 60:7,
  70:16, 70:22,
  71:4.
Justice 1:26,
  1:33, 12:6,
  12:10, 34:15,
  35:8, 37:5,
  55:12, 55:13,
  55:21.
.
.
< K >.
keep 14:11.
Keller 4:10,
  16:14, 20:14,
  22:15, 23:12,
  23:15, 23:18,
  23:21, 23:24,
  24:2, 24:5,
  24:7, 24:17,
  24:21, 24:23,
  25:1, 25:3,
  33:11, 34:4,
  35:7, 37:20,
  39:14, 41:7,
  60:14.
Kenner 1:41,
  4:13, 5:7,
  5:10, 6:5,
  6:14, 6:19,
  6:20, 6:24,
  7:3, 7:16,
  7:18, 8:13,
  8:22, 12:20,
  14:10, 26:16,
  36:5, 39:16,
  40:1, 40:5,
  44:16, 50:17,

51:2, 51:3,
  51:6, 51:8,
  53:21,
  71:16.
knowledge 8:1,
  8:10, 11:2,
  17:2, 42:13,
  42:19, 42:22,
  42:24, 43:5,
  43:14, 44:9,
  44:12, 46:14,
  49:9, 49:12,
  49:13,
  59:15.
known 42:12.
knows 9:4, 9:7,
  35:21.
Korea 8:25,
  9:14.
Koski 34:14.
Kriss 4:14.
KYC 25:10,
  42:10.
.
.
< L >.
L-e-t-i-c-i-a
  20:21.
Lack 7:25,
  11:1,
  44:11.
lady 69:10.
large 25:17.
last 40:7,
  69:19.
later 5:18,
  18:7.
laundering
  22:6, 30:2,
  30:4, 32:5,
  37:14.
Law 1:41, 2:6,
  18:3, 34:20,
  34:21, 35:17,
  36:23, 39:20,
  57:10,
  61:19.
laws 21:16,
  21:20.
lawyer 47:13,

53:8.
lawyers 35:12,
  36:1, 36:6,
  36:16, 37:1,
  40:17, 40:18,
  40:20.
Leading 24:10,
  24:12.
learning
  22:10.
least 59:20.
leave 10:1,
  10:4, 10:7,
  61:7.
leaves 4:20.
leaving 4:18.
left 24:3,
  71:4.
legally 37:7.
legitimate
  28:14, 29:5,
  29:6, 29:7.
length 14:6,
  14:12.
Leticia 18:19,
  18:24,
  20:21.
letter 10:17,
  10:24, 11:20,
  12:4, 12:8,
  12:13, 12:14,
  12:17, 16:7,
  17:7, 46:11,
  66:15,
  66:17.
lift 54:19.
Lijun 17:24.
Limited
  52:20.
line 23:14,
  24:22, 36:21,
  51:16, 62:6,
  63:14.
lines 62:18.
list 52:1.
listed 22:21,
  22:22, 23:15,
  23:21, 24:23,
  25:11, 25:12,
  25:20, 42:7,

42:10,
42:16.
little 5:9,
20:24, 21:8,
23:3,
28:22.
live 61:8.
LLC 23:10,
24:9,
24:19.
lobbying 26:1,
26:5.
located 46:6,
66:4, 66:5.
Lockhart 1:32,
4:11.
logged 63:11,
63:18.
long 14:14,
21:25, 22:2,
33:19, 40:6,
53:20, 55:18,
55:25.
longer 14:21.
look 8:10,
36:16, 38:12,
46:11, 60:25,
67:15,
67:17.
looked 28:2,
36:7, 36:17,
70:6, 70:8.
looking 15:5,
44:7, 45:15,
70:10.
lookout
27:17.
lose 49:7,
49:10.
lost 49:14.
lot 68:6.
loud 19:8.
Low 25:18,
26:2, 30:15,
69:16, 69:22,
69:24, 69:25,
70:6, 70:9.
Lucky 28:16,
52:17, 52:19,
52:23.

Lum 57:4,
58:9.
.
.
< M >.
Machine
60:23.
mail 63:17.
maintain
62:13.
makeup 66:11.
manager 21:5,
21:11, 21:13,
28:13, 28:22,
30:9, 42:3,
42:7, 42:10,
42:14,
42:16.
managing 23:15,
24:23.
Maragh 50:18,
51:24,
52:6.
Marc 23:23,
42:6, 46:15,
46:19,
49:4.
March 25:3,
59:11.
Mark 28:16,
37:23, 52:17,
52:20,
52:23.
marked 51:14.
mask 19:6,
54:18.
match 27:22,
27:23.
material 15:12,
36:17.
matter 12:9,
13:2, 13:17,
13:19, 13:23,
14:6, 43:19,
61:2, 68:17,
69:22,
71:24.
matters 33:9,
62:15.
Mcgrath

34:14.
mean 29:15,
35:23, 36:7,
38:3, 59:6,
62:11, 64:3,
70:4,
70:10.
means 20:4.
meantime
71:9.
mechanism
22:11.
media 8:2,
25:11,
29:10.
meet 13:16,
33:11.
meeting 4:19,
7:8, 13:18,
13:20, 14:14,
36:22, 37:21,
38:16,
40:23.
meetings 36:1,
36:8.
member 23:15,
24:23.
Members 5:24,
70:22.
memo 15:19.
memory 10:20.
mental 59:25,
60:9.
mentioned 24:9,
24:19, 39:19,
55:22,
58:8.
messages
13:8.
met 13:18,
14:12.
microphone
15:7, 19:6,
20:23, 23:2,
54:19.
middle 6:3,
19:18,
54:25.
minimal 61:14,
61:15,

61:21.
Minister 10:17,
17:23,
18:2.
ministry
18:3.
minor 61:23.
minutes 14:15,
14:19, 14:21,
62:21,
62:23.
missile 9:1.
missiles
9:15.
missing
60:15.
missive
71:13.
moment 17:13,
49:17, 52:14,
54:4.
money 29:17,
30:4, 30:18,
32:5, 37:14,
46:13, 49:7,
49:10,
49:14.
monitor
21:21.
monitoring
22:6, 22:8,
22:10,
62:23.
month 31:20,
32:1.
months 32:22,
32:24, 33:2,
33:4, 33:21,
34:1, 34:2,
34:9.
Morgan 20:8.
morning 4:2,
4:3, 4:4,
4:10, 4:12,
4:13, 4:22,
5:3, 5:4,
5:24, 6:1,
6:9, 6:10,
17:20, 17:21,
20:17, 20:18,

31:8, 31:9,
55:5, 55:6.
Moscowitz
23:23, 25:7,
42:6, 42:12,
42:14, 42:20,
42:24, 43:4,
43:7, 46:16,
46:19, 46:22,
47:5, 47:11,
49:4, 50:4,
52:14, 52:22,
53:1.
move 5:5, 5:8,
5:12, 11:17,
15:7, 19:5,
19:14, 20:23,
23:2, 54:20,
69:6.
MR. MULRYNE
4:4, 54:8,
55:4, 58:17,
58:25, 60:16,
60:18, 63:21,
64:10, 65:9,
66:23, 68:9,
69:17,
71:15.
Mulryne 1:31,
4:11, 60:16,
60:17.
multiple 31:21,
52:4,
53:11.
myself 45:4.
.
< N >.
name 10:21,
20:19, 20:21,
42:6, 43:23,
43:24, 44:3,
44:6, 55:7,
55:9, 66:3.
named 10:18,
17:22, 17:24,
23:6, 64:2,
69:16.
namely 57:3.
names 33:5,

38:24,
38:25.
National 12:3,
20:8, 21:3,
22:2, 22:3,
23:9, 26:6,
26:12, 27:3,
49:7, 49:10,
55:15.
nature 26:23,
27:13,
28:5.
need 4:23, 9:6,
19:5, 45:12,
54:4, 54:11,
60:10,
70:20.
needed 30:6.
needs 16:17,
16:23.
nefarious
37:7.
New 1:27, 1:35,
27:15, 47:20,
48:6, 48:12,
48:13, 48:14,
48:22.
next 9:4,
18:17.
Nickie 57:4,
58:9.
Nicole 1:32,
4:11.
No. 1:5, 48:18,
49:5.
Nobody 59:16.
none 62:3.
North 8:25,
9:14,
10:13.
notes 50:12.
nothing 25:20,
37:7, 59:22,
69:2.
notice 7:13,
58:2.
notices
67:13.
notification
57:16, 58:6,

58:12, 58:13,
63:16.
notifications
57:22, 57:24,
63:10, 63:11,
63:15,
64:21.
notify 57:17.
number 10:3,
10:7, 25:13,
31:20.
NW 1:27, 1:35,
2:8, 2:15.
.
.
< O >.
object 19:16,
54:24.
objecting
5:13.
obligation
65:1, 67:12,
67:13, 67:23,
68:3.
obviously
37:14, 60:12,
71:6.
occur 65:20.
occurred
65:5.
Office 7:8,
34:5,
62:12.
officer 28:13,
43:2, 43:3,
47:8, 50:19,
51:25.
Offices 2:6.
Official 2:12,
13:22, 17:24,
18:7,
71:28.
officials
35:21.
Once 27:18,
30:23, 43:19,
45:6, 45:11,
45:12, 45:17,
45:18, 47:22,
49:5.

One 4:20, 7:9,
8:25, 9:3,
9:4, 9:5,
9:12, 10:14,
12:6, 24:13,
29:14, 34:13,
43:24, 44:1,
44:6, 51:14,
52:10, 52:14,
52:15, 58:16,
59:18, 60:14,
61:8, 63:3,
63:4, 66:24,
69:8, 69:10,
69:19,
69:23.
one-hour
40:23.
ones 49:23,
49:24.
online 65:1,
65:2, 65:20,
65:23.
open 17:11,
27:8, 38:19,
44:9, 48:14,
62:8, 69:13,
70:19.
opened 25:9,
27:5, 27:9,
44:19,
44:22.
opening 25:16,
27:20,
70:5.
opinions
67:12.
option 65:21.
oral 66:16,
66:18,
66:19.
ordinary
22:13.
organization
66:9, 66:11,
66:12,
68:1.
oriented
62:19.
originated

28:15.
Orozco 22:16,
  23:13, 23:19,
  23:25, 24:5,
  24:22,
  25:2.
others 10:4,
  34:4, 35:7.
outgoing 44:2,
  44:6.
outside 42:25,
  65:10, 68:10,
  69:18.
outweigh
  38:4.
outweighed
  60:12.
outweighs
  61:23,
  70:15.
Oval 7:8,
  13:18.
oversaw 22:5.
oversee 39:24,
  40:3.
oversees
  22:11.
own 33:24,
  35:9, 36:8,
  50:12.
owner 25:12.
.
.
< P >.
Page 6:15,
  6:17, 6:20,
  16:9, 23:12,
  23:18, 23:24,
  24:21,
  25:1.
pages 15:6,
  15:11.
pan 30:13.
papers 7:10.
Part 5:17,
  5:19, 7:3,
  7:6, 15:19,
  15:23, 18:6,
  25:16,
  51:22.

particular
  10:10, 16:20,
  20:4, 24:13,
  60:14, 61:1,
  68:2.
particularly
  10:18, 13:15,
  60:1.
parties 20:4,
  71:18.
partly 4:19.
party 10:24,
  66:9.
pass-through
  29:18,
  49:1.
passed 52:10.
passes 48:20.
pattern 47:19,
  48:2, 48:5,
  48:7, 48:17,
  48:18.
Patterson
  22:25,
  24:15.
pay 26:1, 26:5,
  26:11,
  27:2.
pays 43:24,
  43:25,
  44:2.
pending
  25:22.
People 10:6,
  10:10, 10:14,
  11:21, 16:21,
  36:8, 37:5,
  39:1, 39:3,
  41:8, 42:25,
  48:14, 56:9,
  56:15, 61:10,
  62:13, 62:18,
  67:11, 67:13,
  67:17, 69:23,
  70:1, 70:11,
  70:23.
per 31:20.
perceived
  36:20.
Perfect 5:13,

24:1.
period 38:14,
  59:6.
permission
  19:23.
person 11:3,
  11:5, 40:9,
  42:12, 64:2,
  65:6, 69:6,
  69:16.
personal 7:25,
  11:2,
  44:12.
persons 69:7.
perspective
  36:15, 38:3,
  60:5.
pertinent
  35:3.
Peter 34:13,
  34:14, 35:10,
  35:12,
  40:14.
phone 13:21.
phones 62:19.
photographs
  7:12.
phrase 29:15.
pick 15:21.
place 34:9.
placed 8:13.
places 57:17.
plain 29:7.
Plaintiff
  1:7.
play 57:20.
Please 4:8,
  17:12, 18:21,
  18:23, 19:4,
  19:18, 21:10,
  24:16, 40:2,
  50:15, 54:11,
  54:17, 55:1,
  55:7, 60:20,
  66:25.
plug 57:24.
podium 5:8.
point 8:24,
  10:14, 17:4,
  18:12, 34:23,

37:25, 65:20,
  70:20, 70:23,
  71:13.
points 7:11,
  8:25, 9:4,
  9:6, 9:7,
  9:13.
political
  66:9.
portion
  51:19.
position
  18:1.
possible 14:22,
  32:2, 59:4.
posted 66:20.
posting
  67:11.
potentially
  37:2,
  70:12.
Pottinger 6:4,
  6:9, 15:11,
  15:24,
  17:20.
practical
  68:17.
practice
  68:24.
Prakazrel
  23:17,
  24:25.
PRAKAZREL
  MICHEL
  1:10.
Pras 4:8, 6:21,
  56:19,
  61:4.
precipitated
  35:17.
prejudice 38:4,
  60:12, 61:22,
  70:14.
preparation
  36:21,
  36:22.
prepared
  71:7.
present 34:11,
  37:1, 37:19,

37:22, 38:15,
38:22.
presented
59:21.
President 7:9,
12:9, 13:17,
13:18,
13:20.
press 68:25.
presumably
13:1.
previously
7:17, 8:8,
22:16, 22:19,
58:8.
primary 52:20,
52:23.
principal 66:5,
66:7,
66:14.
Prior 40:25,
56:18, 57:2,
57:25,
59:14.
probably
62:21.
probative
36:13, 36:15,
36:18, 37:24,
38:1, 38:3,
59:7, 59:9,
60:13, 61:21,
61:23, 70:3,
70:13,
70:15.
problem 24:14,
38:2, 61:9.
procedures
21:15.
proceedings
17:11, 38:19,
62:8, 69:13,
70:19, 71:20,
71:24.
process 21:15,
63:2.
proffer 37:1.
program 9:1,
38:22.
promised

70:22.
prosecuted
59:16, 60:3,
61:12, 61:16,
61:19,
62:4.
prosecution
59:19, 60:7,
61:6, 61:7.
prosecutions
59:15, 59:22,
60:2.
prosecutorial
59:10.
protecting
36:19.
provide 28:11,
43:11, 47:9,
52:15, 52:24,
56:9.
provided 25:7,
25:9, 27:5,
28:21, 42:18,
53:1, 53:9,
58:2, 58:13,
58:14.
provides
47:22.
providing
47:6.
Public 1:34,
18:2, 18:3,
56:17, 62:17,
66:20, 67:16,
67:20,
67:24.
publications
67:17.
publicly
68:6.
publish 11:10,
23:1, 24:15,
50:15.
purport 43:9.
purpose 25:8,
28:3, 29:8,
30:11, 38:5,
46:1, 56:8.
purposes 16:24,
21:23.

purview 12:5.
put 6:19,
33:25,
37:8.

.

.

< Q >.
quality 21:5,
21:11,
21:13.
question 9:22,
11:15, 14:12,
17:6, 19:12,
19:14, 26:22,
26:24, 28:3,
34:7, 35:4,
36:24, 38:18,
38:20, 45:13,
45:17, 46:5,
52:19, 52:23,
53:7, 53:9,
53:13, 54:21,
54:22, 64:9,
65:16, 66:24,
66:25,
69:8.
questioned
32:16,
32:20.
questioning
29:6, 36:21,
45:14,
62:6.
questions 9:3,
9:8, 17:15,
18:10, 25:10,
25:13, 27:19,
29:2, 29:8,
31:4, 41:20,
43:16, 47:6,
50:3, 52:4,
52:5, 52:15,
53:21, 58:17,
62:13,
63:10.
Quite 61:6,
62:18.

.

.

< R >.

R. 2:5, 2:6.
Rae 1:32.
raise 18:23,
54:11.
raised 43:16.
raising
43:10.
rapidly
29:17.
rate 37:21,
46:11.
rather 67:3.
rationalize
29:4.
reach 50:23,
67:25.
reached 40:20,
50:19,
52:11.
reaching 50:24,
52:2,
68:15.
read 7:1,
15:23, 17:6,
19:23, 20:5,
40:1, 69:3.
ready 4:16,
71:2.
really 5:11,
29:9, 30:12,
33:7, 59:22,
60:6, 67:9.
reason 49:13,
60:2, 61:11,
61:17,
62:1.
reasons 37:18,
60:19,
62:9.
receive 43:14,
46:13, 53:5,
53:8,
57:22.
received 27:25,
28:13, 29:3,
29:14, 29:19,
29:22, 30:12,
30:21, 30:23,
53:3.
receiving

25:17, 25:25,
26:4,
44:25.
recognize 13:5,
24:7, 24:17,
39:4, 39:9,
39:16, 42:6,
43:24, 44:3,
44:5,
50:17.
recollection
10:13, 12:8,
12:13, 13:24,
16:11, 16:16,
16:18, 16:22,
16:24, 17:4,
17:9,
43:21.
record 4:9,
9:23, 19:8,
20:20, 26:20,
57:1, 57:7,
58:6, 58:12,
60:1, 60:4,
61:25, 62:2,
62:10, 64:4,
71:24.
record. 15:22,
36:4, 59:3,
68:13,
69:21.
records 11:13,
26:17, 26:20,
56:19, 57:6,
58:1, 63:1,
63:6, 64:1.
red 7:12, 7:13,
30:6.
Redirect 17:17,
17:18, 53:23,
53:24.
refer 14:17,
57:13.
referenced
18:7,
27:22.
referencing
13:5.
referred
7:12.

refresh 16:16,
17:4, 17:9.
refreshed
16:18,
16:23.
refreshing
16:22,
16:24.
regard 8:24,
10:18, 43:10,
43:16, 45:9,
46:18, 46:21,
50:20, 51:11,
52:2, 61:1,
63:4, 63:7,
64:5.
regarding
19:24, 27:10,
30:9.
register 64:6,
64:25, 65:2,
65:3, 65:24,
67:2, 67:12,
67:14, 67:23,
68:3.
registered
56:22, 59:23,
62:14.
registering
65:21, 65:22,
67:18.
Registration
55:16, 55:22,
56:4, 56:14,
56:16, 57:1,
57:7, 57:8,
57:23, 59:2,
63:10, 64:19,
64:20, 65:1,
65:6, 65:22,
66:1, 66:2,
67:4,
67:19.
regular 62:24,
63:2, 63:3,
67:20.
regularly
62:19.
regulation
29:12.

regulations
21:17.
related
62:14.
relating 60:4,
63:1.
release
10:24.
released
10:19.
Relevance
34:23, 35:19,
36:13, 58:25,
59:4, 65:9,
66:23, 68:9,
68:21, 68:23,
69:2, 69:18,
69:25,
70:16.
relevant
59:2.
remain 18:22.
remember 9:20,
14:4, 14:14,
22:4, 32:4,
32:13, 32:16,
32:24, 33:1,
33:5, 33:7,
44:5.
Repeat 21:7,
21:9, 34:7,
46:5, 53:7,
66:25.
report 41:25.
Reported 2:11,
42:3,
66:10.
Reporter 2:12,
55:8,
71:28.
representing
39:23, 56:10,
66:4.
Republic
11:21.
Republican
26:12,
27:3.
request 16:7,
16:11, 18:7,

51:20.
requested 5:22,
43:2, 43:3,
46:1, 49:3,
49:6.
requesting
36:9.
require
21:20.
required 21:21,
31:20, 61:18,
65:3, 65:5,
65:25.
research 28:11,
30:13,
62:25.
respect 9:1,
49:13, 56:12,
57:21,
58:1.
respond 26:18,
47:5,
50:23.
responded
47:8.
response 27:24,
43:5, 43:6,
43:9, 51:17,
52:22.
responses
28:21, 28:24,
38:13, 50:4,
50:5.
responsible
31:12.
rest 8:20,
24:14, 37:23,
70:24.
restrooms
4:23.
result 49:7.
return 8:24,
16:7, 18:6.
review 33:19,
34:1, 34:3,
34:8, 34:21,
35:6, 35:14,
35:18, 63:2,
67:20,
67:21.

reviewed 33:19,
  33:22, 33:24,
  33:25, 35:3,
  35:9.
reviewing 45:2,
  67:10.
revisit 32:17,
  32:19, 32:21,
  33:7.
revisiting
  33:8.
rhetoric
  9:14.
Rick 13:20.
Ricky 13:16.
role 21:25,
  22:1, 22:4,
  37:15, 56:12,
  57:20.
Room 2:16.
roughly
  40:23.
RPR 2:11,
  71:22.
ruled 17:8.
ruling 15:25,
  55:2,
  60:10.
run 56:18,
  57:2, 57:25,
  58:7.
.
.
< S >.
S-a-n-t-o-s
  20:22.
S. 23:17,
  24:25.
safety 54:5.
Santos 18:19,
  18:20, 18:24,
  20:17, 20:21,
  21:1, 21:10,
  22:15, 23:5,
  23:16, 23:22,
  24:3, 24:6,
  24:17, 25:6,
  26:25, 31:8,
  38:21.
satisfied

38:12.
saw 49:23,
  51:3.
saying 53:3,
  61:4.
says 6:23, 8:5,
  12:12, 12:18,
  38:11.
scope 45:6,
  65:10, 68:10,
  69:18,
  70:4.
scores 27:16.
screen 39:1.
scroll 15:6,
  15:10,
  51:2.
Sean 1:31,
  4:11.
search 63:4,
  63:6, 63:9,
  64:1, 64:9.
seated 19:3,
  54:17.
second 54:6.
Secrecy
  21:19.
Section 1:34,
  55:16, 55:19,
  55:21, 57:10,
  57:13, 57:15,
  57:21, 67:2,
  67:7, 67:8.
Security 12:3,
  18:2, 18:3,
  55:15.
seeing 7:2.
seems 15:24,
  26:18, 37:4,
  37:15,
  59:24.
seen 11:25,
  13:25, 14:4,
  16:7.
selective
  59:19, 60:7,
  61:4, 61:5,
  61:7.
send 26:5,
  45:17.

sending
  67:13.
senior 13:22.
sent 45:21,
  46:10, 50:3,
  51:13,
  52:5.
separate 66:22,
  67:1.
serving 58:2.
Sessions 7:22,
  10:17, 10:23,
  11:23.
set 25:10.
several 57:3.
short 56:2.
show 6:14,
  6:17, 7:18,
  11:13, 12:20,
  14:24, 17:3,
  22:15, 24:5,
  36:22, 50:10,
  56:25, 57:6,
  58:5,
  58:11.
showing 12:23,
  23:8.
shown 49:19,
  49:21,
  49:22.
shut 9:1.
side 67:6.
sign 62:3,
  69:23,
  70:9.
signature
  23:13,
  24:22.
similar 24:7,
  57:3.
similarly
  58:7.
simply 10:7.
single 31:22.
Sir 5:4, 6:16,
  7:14, 7:18,
  8:13, 9:12,
  11:20, 15:5,
  18:14.
sit 6:2,

19:4.
site 60:23,
  60:25.
six 15:11,
  31:19, 32:7,
  32:8,
  32:10.
slightly
  14:9.
slower 21:8.
somebody 20:25,
  33:8, 36:10,
  38:9, 45:5,
  47:12, 52:6,
  61:16, 62:20,
  65:4, 65:24,
  70:9.
somehow 37:3,
  38:9, 61:16,
  68:15.
someone 37:6,
  45:21, 53:2,
  64:25,
  67:22.
somewhat 65:11,
  65:15.
somewhere
  10:13,
  14:15.
soon 51:15,
  68:12.
sorry 10:25,
  12:22, 15:14,
  17:10, 21:7,
  22:18, 24:11,
  26:15, 31:16,
  32:10, 33:3,
  33:17, 34:7,
  34:19, 38:25,
  40:1, 41:19,
  42:2, 42:9,
  42:11, 44:1,
  48:24, 50:12,
  58:22, 59:11,
  60:17, 66:25,
  71:5.
sort 5:18,
  34:9, 35:22,
  36:14,
  59:24.

sounds 59:18.
source 67:20,
  67:24.
sources 29:5.
speaking
  65:15.
speaks 13:12.
specialty
  12:2.
specific 16:11,
  25:15, 29:2,
  44:17,
  65:5.
specifically
  31:25,
  63:24.
specifics
  7:11.
speculated
  42:18.
spell 20:19,
  55:7.
spin 37:8.
split 32:2.
spoke 38:24,
  41:6,
  41:15.
stack 7:9,
  7:11.
staffed
  13:21.
stand 19:16,
  21:18,
  54:24.
standing
  18:22.
stands 30:2.
Stanley 20:8.
start 19:13,
  19:16, 45:10,
  54:21,
  54:24.
started 19:17,
  54:25,
  59:10.
starting 4:9.
state 20:19,
  55:7, 59:25,
  60:9.
statement

32:15, 32:23,
  66:2.
States 1:1,
  1:5, 1:19,
  2:13, 4:8,
  9:15, 10:11,
  10:12, 11:22,
  25:22, 56:11,
  57:10.
status 10:8.
statute 56:3,
  56:8, 56:13,
  57:11,
  57:16.
stenographic
  71:23.
step 18:20,
  18:21,
  54:10.
step-by-step
  45:9.
Steve 13:5,
  13:21, 13:24,
  13:25.
stipulate
  20:8.
stipulated
  20:11.
Stipulation
  19:23, 19:25,
  20:1, 20:3,
  20:5, 22:17,
  22:23,
  22:24.
stop 4:18,
  19:18, 54:25,
  68:12, 69:9,
  70:20,
  70:23.
stopped 41:8.
stopping
  41:11.
straight
  39:7.
stretch
  59:25.
stricken
  5:20.
stuff 5:14,
  36:7.

subject 13:2,
  14:8, 25:22,
  51:15,
  61:1.
substantially
  38:3, 60:12,
  61:23,
  70:14.
substantive
  40:24.
suddenly
  68:18.
suggest
  11:17.
suggests 37:10,
  38:9.
Suite 1:28.
summary 56:6,
  57:15.
Sun 10:17,
  10:18, 17:23,
  17:24.
Sun. 17:23.
supervisor
  22:5, 28:1.
supervisors
  31:14,
  31:17.
support
  61:13.
sustain 8:7,
  9:11, 9:19,
  38:20,
  62:9.
Sustained
  47:16.
sustaining
  69:14.
SW 13:5.
swear 18:21,
  19:2,
  54:12.
sworn 18:25,
  54:14.
system 21:23,
  22:8, 22:10,
  65:12.
.
.
< T >.

T. 2:11,
  71:27.
table 19:16,
  39:5.
tad 23:3.
Taek 25:18.
talked 14:11,
  16:21, 35:7,
  41:2,
  65:12.
tamp 9:14.
tangent 36:14,
  37:16.
team 10:14,
  27:24.
telephone
  62:18, 63:6,
  63:13, 63:20,
  64:24, 65:7,
  65:12.
tells 66:6.
ten 31:19,
  32:1, 32:7,
  32:8,
  32:10.
term 29:12.
terms 5:20,
  5:21, 15:19,
  35:22, 36:9,
  38:2, 53:13,
  59:4, 59:19,
  59:24, 64:13,
  66:13, 66:19,
  68:14, 69:25,
  70:8,
  70:16.
testified 8:1,
  16:10, 19:1,
  46:22, 52:9,
  54:15,
  61:10.
testify 41:3,
  59:16.
testimony 8:9,
  9:23, 14:8,
  19:23, 40:25,
  41:11, 41:13,
  56:18, 57:2,
  57:25,
  68:10.

text 23:19.
THE CLERK
    18:23, 19:3,
    22:23,
    54:17.
THE WITNESS
    5:3, 18:15,
    19:10,
    19:21.
they've 38:7.
thinking
    70:7.
though 44:6.
thousand 31:19,
    31:24, 32:2,
    32:3, 32:8,
    32:9, 32:10,
    32:11.
three 10:10,
    10:18, 16:7,
    16:8, 16:12,
    16:20, 31:14,
    31:16, 32:3,
    52:18.
threshold
    47:22,
    48:20.
throughout
    20:10.
Thursday 71:1,
    71:7,
    71:19.
Title 57:10.
today 8:9,
    31:8, 33:18,
    40:25, 41:13,
    56:18,
    57:2.
tonight
    71:14.
took 37:13.
tool 59:10.
top 8:5, 13:5,
    23:19, 23:25,
    24:3.
total 22:2,
    31:20.
totaling
    52:18.
totally

37:23.
tracking
    10:15.
tracks 70:15.
Trading 28:16,
    52:17,
    52:20.
transactions
    22:11, 26:21,
    26:23, 27:21,
    28:7, 29:6,
    30:11, 30:15,
    34:22.
TRANSCRIPT
    1:17,
    71:23.
transferred
    25:21, 26:9,
    26:11, 27:1,
    27:2.
transfers
    25:18.
TRIAL 1:17.
triggered
    47:18,
    47:20.
trouble 4:21,
    15:8.
true 30:10.
Trump 26:1,
    26:5.
trust 44:10,
    44:22,
    56:2.
try 18:5, 18:8,
    32:2.
trying 10:15,
    29:3, 51:14,
    60:8.
turn 57:9.
twelve 32:8.
two 9:3, 27:10,
    29:19, 34:1,
    62:17.
type 22:12,
    25:15, 29:1,
    31:12,
    38:22.
Typically 27:7,
    27:16,

29:1.
.
.
< U >.
ultimately
    31:1.
unable 10:4,
    28:17.
underlying
    26:21.
understand
    4:17, 19:21,
    34:25, 36:24,
    40:19, 67:15,
    69:1.
understanding
    7:23, 49:6.
undertook
    45:9.
undisputed
    20:6,
    20:12.
undue 61:22.
unequivocal
    16:23.
unequivocally
    16:19.
Unit 30:25,
    41:23, 42:25,
    44:18, 52:2,
    52:6, 52:10,
    53:14, 55:17,
    55:23, 55:25,
    56:12, 57:20,
    57:23, 67:4,
    67:9, 67:14,
    67:15.
United 1:1,
    1:5, 1:19,
    2:13, 4:7,
    9:15, 10:11,
    11:22, 25:22,
    56:11,
    57:10.
Unless 37:8,
    38:10, 68:17,
    69:25,
    70:6.
until 32:23,
    34:1, 44:13,

59:17.
unusual 37:4.
using 5:12,
    16:18.
utilized
    59:10.
.
.
< V >.
value 36:13,
    38:3, 59:7,
    59:9, 60:13,
    60:14, 60:18,
    61:24, 70:3,
    70:13,
    70:15.
various
    49:19.
velocity 29:13,
    29:16, 29:20,
    48:23,
    48:25.
Ventura 1:42.
versus 4:8.
Vice 17:23,
    18:2.
vicinity
    14:15.
video 34:9,
    40:6, 40:10,
    49:19.
violation
    67:1.
virtual 33:14,
    34:3, 34:10,
    34:11.
virtually
    34:5.
voice 19:8.
vs 1:8.
.
.
< W >.
Waddell 13:16,
    13:20,
    13:21.
wait 19:13.
waiting 5:16.
Wang 10:21,
    10:25.

wanted 40:21,
  46:12.
wanting 9:25.
wants 64:25.
Washington
  1:10, 1:29,
  1:36, 2:9,
  2:17, 41:3.
waste 17:3.
waved 39:10.
Wayback
  60:23.
website
  66:20.
websites 67:17,
  67:21,
  68:25.
Wednesday
  50:24.
week 5:18.
Wengui 7:10,
  9:14,
  30:16.
whatever 35:21,
  37:18.
whatnot
  67:22.
White 12:5,
  14:5.
whole 14:8,
  67:8.
whom 10:3,
  58:8.
will 4:17,
  11:16, 14:12,
  15:10, 36:22,
  37:17, 61:20,
  64:13, 67:25,
  70:25,
  71:1.
wire 43:24,
  44:2,
  52:16.
wires 25:15,
  28:7, 45:24,
  49:1,
  52:18.
withdraw 7:4,
  8:12, 42:5,
  43:22, 44:25,

47:25.
Within 55:13,
  55:18, 62:21,
  62:22,
  62:23.
Without 4:21,
  35:25.
WITNESS 5:2,
  6:19, 8:1,
  8:14, 12:21,
  12:23, 14:24,
  18:17, 18:25,
  19:2, 19:23,
  21:7, 32:10,
  36:23, 50:11,
  53:25, 54:3,
  54:7, 54:14,
  54:16, 68:10,
  68:24,
  71:8.
witnesses
  62:3.
word 14:17,
  19:15,
  54:23.
words 10:5.
work 21:2,
  21:3, 22:8,
  23:5, 31:12,
  56:3, 57:20,
  62:24.
worked 55:18,
  55:25.
working 5:19,
  29:24,
  70:1.
written 10:23,
  11:4, 11:22,
  12:4, 12:8,
  13:11, 13:25,
  21:16, 62:25,
  63:16, 63:25,
  65:13, 66:14,
  66:16.
wrongdoing
  36:20,
  37:3.
wrote 10:17.
Wynn 13:5,
  13:21, 13:24,

13:25, 14:5,
  14:13.
.
.
< Y >.
years 22:3.
yesterday 7:9,
  7:12, 9:9,
  9:17, 9:18,
  9:21, 13:8,
  15:25.
York 1:27,
  1:35.
yourself 4:9.
.
.
< Z >.
Zoom 34:5,
  38:22.
Zoom-type
  39:21.