```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,     ) CRIMINAL ACTION NO.:
                                   ) 19-00148-1
 4             Plaintiff,          )
          vs.                      )
 5                                 )
     PRAKAZREL MICHEL,             ) Washington, D.C.
 6                                 ) April 13th, 2023
                Defendant.         ) 2:22 p.m.
 7   _____) Afternoon Session

 8

 9                    TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
10                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   FOR THE GOVERNMENT:        John D. Keller, Esquire
                                U.S. Department of Justice
14                              1301 New York Avenue, NW
                                Suite 1016
15                              Washington, D.C. 20530

16                              Sean F. Mulryne, Esquire
                                Nicole Rae Lockhart, Esquire
17                              U.S. Department of Justice
                                Public Integrity Section
18                              1400 New York Avenue, NW
                                Washington, D.C. 20005
19

20   For the Defendant:        David E. Kenner, Esquire
                                Alon Israely, Esquire
21                              Kenner Law Firm
                                16633 Ventura Boulevard
22                              Encino, California 91436

23

24

25
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

```
 1    APPEARANCES (CONT'D):

 2

 3    FOR THE DEFENDANT:        Charles R. Haskell, Esquire
                                Law Offices of Charles R.
 4                              Haskell, P.A.
                                641 Indiana Avenue, NW
 5                              Washington, D.C. 20004

 6    Reported by:             Christine T. Asif, RPR, FCRR
                                Official Court Reporter
 7                              United States District Court
                                for the District of Columbia
 8                              333 Contitution Avenue, NW
                                Room 6507
 9                              Washington, D.C., 20001
                                (202) 354-3247
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          INDEX

2  Witness Name                                    Page

3  Special Agent Robert Heuchling

4      Direct Examination By Ms. Lockhart ....................... 6

5      Cross-examination By Mr. Kenner .......................... 33

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2          THE COURT:  All right.  I'm going to give a short
3   instruction on the exhibits we admitted not for the truth of
4   the matter asserted so that it's a little clearer about it.
5          MS. LOCKHART:  Understood.
6          (Jury entered the courtroom.)
7          THE COURT:  Good afternoon, members of the jury.
8          THE JURY:  Good afternoon.
9          THE COURT:  I'm going to give you instructions
10  obviously at the end, but I wanted to give you a little bit of
11  an instruction about some of the information in terms of how
12  you're to consider it about two exhibits that were admitted
13  before we took the lunch break.
14         So I gave you what has generally been termed a
15  hearsay instruction regarding two exhibits.  One was Exhibit
16  475, which was a purported news report, it was an attachment
17  to an e-mail; and Exhibit 654, also attachment to an e-mail,
18  which was alleged to be a summary of the structural parts of
19  the Chinese government.
20         So let me define hearsay, and you probably have
21  heard me say this in other contexts.  But hearsay is a legal
22  term of art, and what it means is that statements that are
23  admitted for the truth of the matter asserted in the
24  statement.
25         Take, for example, the following example:  It rained
```

1    last night.  If a witness testified on the stand that someone

2    told the witness that it rained last night -- not that the

3    witness saw it, but somebody told the witness that it rained

4    last night -- that statement that it rained last night from

5    the other person who told the witness is hearsay if the

6    purpose of presenting the statement for your consideration is

7    to show that, in fact, it did rain last night.  In other

8    words, did the witness see it himself, or did they hear it

9    from somebody else.

10          But you can also have statements offered for other

11   purposes, and if they're offered for other purposes, they may

12   not be hearsay.  So, for example, if the purpose of presenting

13   that statement is to show that the witness believed that it

14   had rained the night before, that statement would not be

15   hearsay if the issue of their belief or their mental state was

16   at issue.

17          So here Agent Heuchling, I'm hoping I'm pronouncing

18   it correctly, has testified about a news report regarding

19   Mr. Guo Wengui, and that was Exhibit 475, and a summary of the

20   structural parts of the government of the People's Republic of

21   China.  So the news reports in it claimed that Mr. Guo fled

22   China for the United States as a political dissident and

23   planned to expose corruption in the Chinese government.

24          As I told you earlier, you're not to consider the

25   news report in determining whether or not Mr. Guo was, in

1    fact, a Chinese dissident and campaigner against political

2    corruption.  You may only consider the statement in

3    determining whether Mr. Michel believed or did not believe

4    that Mr. Guo was a political dissident before, during or after

5    his alleged meeting with the Chinese security official.

6            Again, you're not to speculate on whether Mr. Guo

7    was, in fact, involved in any of the activities in the news

8    report.  You're only to use them to determine what Mr. Michel

9    knew, believed, and what he intended through this to his

10   actions.  So it goes to his -- Mr. Michel's state of mind.

11           That also applies to the structure of the Chinese

12   government, that exhibit, where you're not to consider the

13   contents of the document as true or false in terms of their

14   description of the Chinese government, but, again, as to what

15   Mr. Michel, through this document, having received it, knew or

16   believed based on that information, which, again, goes to his

17   state of mind.

18           So hopefully this clarifies it a little more.

19           Go ahead.

20           MS. LOCKHART:  Thank you, Your Honor.

21                   DIRECT EXAMINATION (Cont'd)

22   BY MS. LOCKHART:

23   Q.  Good afternoon again, Agent Heuchling.

24   A.  Good afternoon.

25   Q.  I'd like to resume with the exhibit we were looking at

1    before the lunch break.

2            MS. LOCKHART:  Ms. Orozco, if you could pull up

3    Government's Exhibit 474, which we admitted prior to lunch,

4    and page 7.

5    **Q.**  (BY MS. LOCKHART)  So, again for the jury's benefit after

6    the lunch break, was this image and all the images seized in

7    Government's Exhibit 474 from Ms. Lum Davis's Google Drive

8    account?

9    **A.**  Yes, they were.

10   **Q.**  For this message, are you able to tell who this message is

11   from?

12   **A.**  This is from Mr. Broidy.

13   **Q.**  Looking at the bottom message there, it makes a reference

14   to somebody named Xi Jinping.

15        Do you know who that is?

16   **A.**  Yes.  That was then and is still the President of China.

17   **Q.**  Does this message make reference to requesting -- or

18   President Xi requesting a call?

19   **A.**  Yes.  It says that President Xi had requested a conference

20   call with McMaster; that's General McMaster.  He was then the

21   national security advisor.

22   **Q.**  With who?

23   **A.**  Oh, with Mr. Wang Yongqing and it identifies him as a

24   secretary general in various, you know, Chinese political and

25   governmental circles and goes on to list his various titles.

1    It also says that the Ambassador for China has been briefed on

2    this and is waiting for contact.

3    **Q.**  And what was the Ambassador for China waiting to be

4    contacted to discuss?

5    **A.**  To discuss the deportation of Mr. Guo.

6            MS. LOCKHART:  Ms. Orozco, if we could go to page 9

7    of Government's Exhibit 474.

8    **Q.**  (BY MS. LOCKHART)  From this image, are we able to tell

9    any information about the sender or recipient of this

10   message?

11   **A.**  No, we can't tell who sent or received this message.  But,

12   again, it was recovered from Ms. Davis's cloud -- Google

13   Drive.

14   **Q.**  This message mentions a call at 11:30 a.m. Beijing time

15   and asks SW to call Sharp.

16    Are you aware whether Steve Wynn was involved in efforts

17   of reaching out to the White House on the extradition of Guo

18   matter?

19   **A.**  Yes, Mr. Steve Wynn was involved.

20   **Q.**  Looking at the phone number there, it lists +86 as the

21   country code; is that right?

22   **A.**  That is correct.

23   **Q.**  Do you know what the +86 country code corresponds to?

24   **A.**  Yes.  That's the Chinese country code.

25   **Q.**  And what does the rest of this message goes on to explain

DIrect Examination- Heuchling

1    about the nature of the call?

2    **A.**   So it appears to direct -- request Mr. Steve Wynn to call

3    Mr. -- or President Xi's envoy on this matter, Vice Minister

4    Sun or Mr. Sun.

5            MS. LOCKHART:  Ms. Orozco, if we could go to page 10

6    of Government's Exhibit 474.

7    **Q.**   (BY MS. LOCKHART)  Agent Heuchling, this appears to be a

8    different type of messaging service than the ones we've looked

9    at.

10       Are you familiar with what kind of messaging service or

11   what kind of phone is being used here?

12           MR. KENNER:  Sorry, Your Honor, I didn't hear the

13   last part of the question; the voice fell.

14           MS. LOCKHART:  The question was whether Agent

15   Heuchling was familiar with the type of messaging app being

16   used here or the type of phone.

17   **A.**   Yes.  Throughout the investigation, I came to learn that

18   this particular image is consistent with a device called the

19   silencer -- a silent circle black phone, which was then

20   considered one of the most secure methods of communication in

21   high -- in some of the highest levels of encryption.

22   **Q.**   The name at the top here, T1 Freedom, do you know who that

23   person is?

24   **A.**   I can't say with certainty who that individual is.

25           MS. LOCKHART:  Thank you, Ms. Orozco.

DIrect Examination- Heuchling

1    **Q.**  (BY MS. LOCKHART)  Looking at the second message down, it

2    reads, "Please urgently ask WH to call before 5:00 p.m.

3    Eastern time today."

4        Did I read that correctly?

5    **A.**  You did, yes.

6    **Q.**  Who is this message requesting that the White House

7    call?

8    **A.**  This message requests that the White House calls one of

9    two individuals, both Chinese officials who are staffers to

10   the Chinese Ambassador to the United States.

11   **Q.**  And who is listed there as the name of the Chinese

12   Ambassador?

13   **A.**  Ambassador Cui Tiankai.

14   **Q.**  Is that the same ambassador and individual who

15   Mr. Higginbotham met with?

16   **A.**  It is.

17   **Q.**  At the bottom of this message, it reads, "They have been

18   informed WH will call today."

19       Did I read that correctly?

20   **A.**  Yes.

21   **Q.**  And "Calling and request to setting up a meeting or a call

22   between the Chinese official on an urgent basis from the

23   national security advisor."

24       Is that right?

25   **A.**  Yes, it is.

1          MS. LOCKHART:  Ms. Orozco, if we could do pages 11

2    and 12 of 474 side by side.

3    **Q.**  (BY MS. LOCKHART)  All right.  So we're putting two images

4    side by side together here.

5          Agent Heuchling, does this appear to be one long message

6    that's captured over two photos?

7    **A.**  Yes, that's right.

8    **Q.**  And for the person at the top of who this message is being

9    communicated with, who is that?

10   **A.**  Yeah, this appears to be a message from Mr. Steve Wynn.

11   **Q.**  Can you read the first sentence on the top of the --

12   beginning of the message on the left-hand side?

13   **A.**  Yes.  "Please advise Minister Wang to have his ambassador

14   in D.C. contact the Deputy Director of NSC, National Security

15   Council, General Ricky Waddell or NSC Asian Director Matthew

16   Pottinger directly."

17   **Q.**  And what does NSC stand for?

18   **A.**  National Security Council.

19         MS. LOCKHART:  Thank you, Ms. Orozco.  You can drop

20   the callout box.

21   **Q.**  (BY MS. LOCKHART)  Generally what does Mr. Wynn write in

22   this message?

23   **A.**  Mr. Wynn is saying that he had previously contacted or

24   spoke with both General Waddell and Mr. Pottinger, and that

25   they are aware of the matter, and this is a reference to the

DIrect Examination- Heuchling

1  Guo deportation matter.  And that Mr. Wynn is -- appears to be

2  kind of handing off his handling of this and telling the --

3  Minister Wang to reach out to both Mr. Waddell -- or General

4  Waddell and Mr. Pottinger.

5       MS. LOCKHART:  Ms. Orozco, if we could do pages 21

6  and 22 of Government's Exhibit 474 side by side.

7  **Q.**  (BY MS. LOCKHART)  All right.  So looking at these

8  messages, are you able to tell who these messages appear to be

9  with?

10  **A.**  Yeah, these are messages that are from Mr. Michel, and

11  they're written to Ms. Davis.

12  **Q.**  All right.

13       MS. LOCKHART:  Ms. Orozco, if we could look at the

14  image at the top of the left-hand side.  Thank you.

15  **Q.**  (BY MS. LOCKHART)  Looking at subsection C at the top of

16  this message, what does this say in reference to special

17  envoys to President Xi of China?

18  **A.**  So the writer is saying that there are two special envoys

19  to President Xi who are in the United States who are looking

20  for a meeting directly with President Trump, and they're

21  trying to schedule that immediately.

22  **Q.**  For subsection D, the next section down, it reads, "My

23  name is Sun Ning from China's foreign ministry."

24       Does that appear to be written from the perspective of

25  this Chinese official?

1    **A.**  Yes.

2         MR. KENNER:  Objection, Your Honor.  Calls for

3    speculation.  It says what it says.

4         THE COURT:  I'm not sure that -- I do think it's

5    somewhat speculative to make a decision that -- that it's

6    necessarily from the -- you know, from the perspective of the

7    Chinese official.

8         MS. LOCKHART:  Understood.

9         THE COURT:  Is there something else that -- besides

10   just looking at it?

11        MS. LOCKHART:  No, Your Honor.

12        THE COURT:  All right.  Then I'll sustain the

13   objection.

14   **Q.**  (BY MS. LOCKHART)  Agent Heuchling, could you read

15   paragraph D?

16   **A.**  Yes.  "My name is Sun Ning from China's foreign ministry

17   representing the special envoys, and I will be the translator

18   for the proposed urgent direct meeting with President Trump.

19   I can be reached on sun_ning@mfa.gov.cn, spell it out, or

20   directly at +86," then he lists his Chinese phone number.

21        THE COURT:  Actually --

22        MR. KENNER:  Your Honor --

23        THE COURT:  -- I do think --

24        MR. KENNER:  -- he just read the portion that --

25        THE COURT:  -- that that question was appropriate.

DIrect Examination- Heuchling

1      MR. KENNER:  I'm sorry?

2      THE COURT:  It's "my name is" so I do think actually

3  the question would appear to -- the question you asked, I

4  think, was allowable.

5  **Q.**  (BY MS. LOCKHART)  Looking at the next paragraph down,

6  what does the writer of this document ask to be done?

7  **A.**  The writer asks that this message be conveyed to General

8  Kelly.  And, again, General Kelly was the Director of the

9  National Security Council.

10  **Q.**  I think you said General McMaster was --

11  **A.**  Sorry.

12  **Q.**  -- the director of the National Security Council.

13  **A.**  Yes, deputy director.

14  **Q.**  Are you aware of who the Chief of Staff was at this

15  time?

16  **A.**  Yes.

17  **Q.**  Do you know who that person was?

18  **A.**  Reince Priebus.

19  **Q.**  Are you aware whether Mr. Priebus was replaced by an

20  individual by the name of John Kelly?

21  **A.**  Yes, he was.  Thank you for the history lesson.

22  **Q.**  And so General Kelly here --

23  **A.**  Would have -- would have been the Chief of Staff who

24  replaced Mr. Priebus.

25      MS. LOCKHART:  Ms. Orozco, you can drop this callout

DIrect Examination- Heuchling

1   box.  If we could look at the next photo down.

2   **Q.**  (BY MS. LOCKHART)  Agent Heuchling, what's the date listed

3   here at the top?

4   **A.**  August 28th, 2017.

5   **Q.**  Looking at the top message, it makes reference to E double

6   or read to see if they're meeting POTUS, which I think you

7   said before was the President.

8       Were you aware of whether Elliott Broidy was involved in

9   the efforts to get meetings in this time period?

10  **A.**  Yes, extensively involved.

11  **Q.**  The e-mail address at the bottom here references Joshua

12  Cartin at NSC.

13      Do you know who that individual is?

14  **A.**  Yes.  Mr. Cartin was a member of the National Security

15  Council, and you can see that in his e-mail address as well.

16          MS. LOCKHART:  Ms. Orozco, you can drop this

17  callout.

18          THE COURT:  You're starting to speed up again.

19          MS. LOCKHART:  I'll slow back down.

20          THE WITNESS:  Sorry.

21  **Q.**  (BY MS. LOCKHART)  On the right-hand side here, does this

22  appear to be a continuation of the message?

23  **A.**  Yes, it does.

24  **Q.**  Looking at the bottom message there that's semi cut off,

25  are you able to read what that says?

1    **A.**  Yes.  It appears Ms. Davis writes, "Wait, call me."  And

2    then Mr. Michel writes, "I can't.  It's like I'm about to get

3    executed."

4         MS. LOCKHART:  Ms. Orozco, if we could go to page 20

5    of Government's Exhibit 474.

6    **Q.**  (BY MS. LOCKHART)  All right.  So a different message

7    here.

8         Are you able to tell who or to this message was sent?

9    **A.**  No, it's not clear.  But, again, this was recovered from

10   Ms. Davis's Google Drive.

11   **Q.**  There's a reference at the top to Joshua Cartin of the

12   National Security Council.

13        Do you know who that might be a reference to?

14   **A.**  Yes.  That appears to be the reference to the individual

15   whose e-mail address we just saw in the previous messages.

16   **Q.**  There's also a mention in the next sentence to Sun Ning.

17        Have you seen that name in some of these other images

18   that we've looked at?

19   **A.**  Yes, including where he was identified as the writer of

20   one of the messages or appeared to be the writer of one of the

21   messages.

22   **Q.**  What does this message say about what Mr. Cartin of the

23   National Security Council conveyed to Mr. Ning?

24   **A.**  So this message says that Mr. Cartin or Mr. Cartin wrote

25   an e-mail to Mr. Ning or Mr. Sun and said that the Chinese

DIrect Examination- Heuchling

1    authorities should take the appropriate legal avenues or

2    authorities in handling the matter.  And the matter would be

3    the reference to the deportation of Mr. Guo.

4         The reaction here is -- on the Chinese side, is that --

5              MR. KENNER:  Objection to his characterization of

6    the reaction on the Chinese side.

7              MS. LOCKHART:  Your Honor, I believe he's about to

8    read the reaction in the highlighted portion.

9              THE COURT:  Yeah, I think he can go ahead and say

10   that.  Go ahead.

11   **A.**  Yeah, just based on reading this, the reaction on the

12   Chinese side is that this e-mail was reported to President Xi

13   and the Premier of China, and it was considered an

14   embarrassing response.  And they are trying to get a meeting

15   scheduled again with President Trump and the Chinese officials

16   at the White House.

17   **Q.**  (BY MS. LOCKHART)  There's a couple references in this

18   message to appropriate legal channels or appropriate legal

19   avenues, authorities.

20        Are you aware of what the appropriate legal channels are

21   to handle the extradition of a foreign citizen living in the

22   United States?

23             MR. KENNER:  Objection, lack of foundation, Your

24   Honor.

25             MS. LOCKHART:  The question is whether he's aware of

1    the processes.

2              THE COURT:  Yes, either he knows or he doesn't

3    know.

4    **A.**  Yes, I've been involved on extraditions both domestically

5    where we were extraditing individuals and also where we had

6    requested extraditions from other countries.

7    **Q.**  (BY MS. LOCKHART)  And generally at a high level, what

8    does that process look like?

9    **A.**  So generally the individual in question is arrested, and

10   then he is given due process at an extradition hearing.  It's

11   all handled through the Department of Justice.  And then a

12   judge makes a decision on whether that individual will be

13   extradited back to his or her home country.

14             MS. LOCKHART:  Ms. Orozco, if we could go to pages

15   30 and 31 side by side of Government's Exhibit 474.

16   **Q.**  (BY MS. LOCKHART)  Agent Heuchling, is this another

17   message from T1 Freedom?

18   **A.**  Yes, it is.

19   **Q.**  Agent Heuchling, I'm going to have you read this.  If you

20   could read the first paragraph on the left-hand side.

21   **A.**  "I just need a straight answer if it can or can't be done.

22   No point dragging people out.  That's not how it works in C.

23   We are dealing with serious guys and making promises since

24   Monday, and now is Wednesday is terrible.  We are seen as

25   complete joke to them."

**Q.**  And if you could read the next paragraph.

**A.**  Yes.  Someone responds, "I totally with you, copy this and sending to the guy and will send to E," or Mr. Broidy.

**Q.**  And to the next one?

**A.**  "I should never vouched" -- again, the writer is writing.

"I should never vouched for these guys.  Now I am in hot soup, and he has walked away with the dough doing nothing while my relations will definitely suffer now in C," meaning China.

**Q.**  Are you aware, through the course of your investigation, where Mr. Low was living in 2017?

**A.**  Yeah.  At this time period, Mr. Low was known to be residing or in some cases hiding out in China.

MS. LOCKHART:  If we could go to the next message at the -- on the right-hand side of the screen.  And, Your Honor, permission for Agent Heuchling to read the message with the expletives included.

He also can skip over them.

THE COURT:  Yes.  No, you can go ahead.

**A.**  Okay.  "Bro, I don't give a fuck.  This is fucking" --

MR. KENNER:  Your Honor, I'm going to object.  We don't know who this is from or to.

MS. LOCKHART:  Your Honor, it's already in evidence.  These were all seized --

THE COURT:  It is in evidence, and it's obviously a

1    conversation back and forth --

2                MR. KENNER:  Between?

3                THE COURT:  We know where it was taken from, which I

4    believe is from Ms. Davis; is that correct?

5                MS. LOCKHART:  That's correct.

6                THE COURT:  So this is on something that she

7    possessed, and this is the material -- information that she

8    has on her -- I believe it was her phone.

9                MS. LOCKHART:  It's her Google Drive account.

10               THE COURT:  Google -- Google -- so, and it's already

11   been admitted.  So I see no reason why -- we've read the other

12   portions, why you can't read this portion of it.

13   **A.**  "This is fucking irresponsible.  You guys don't fucking

14   understand whom you are dealing with.  They will fucking put a

15   bullet through our heads any part of the globe for jerking

16   them around.  And now we have taken part of their money and

17   not delivered what was promised since money," or Monday.  "I

18   don't think you understand how serious this shit is.  Try

19   taking money from Putin, promising him and not delivering.

20   Same story."

21   **Q.**  (BY MS. LOCKHART)  In 2017, approximately how much money

22   did Mr. Michel receive?

23   **A.**  $100 million.

24   **Q.**  During 2017, was Mr. Guo extradited back to China?

25   **A.**  No, he was not.

DIrect Examination- Heuchling

1    **Q.**  If you could read the final message at the bottom.

2    **A.**  "I suggest they return every single cent by this Friday if

3    they don't get shit done by today, or else I assure you we

4    will all be in deep shit Mafia style."

5         MS. LOCKHART:  Thank you, Ms. Orozco.  You can take

6    this down.

7    **Q.**  (BY MS. LOCKHART)  In addition to e-mails and photos

8    obtained, did you also obtain text messages through search

9    warrants during the course of your investigation?

10   **A.**  Yes, we did.

11        MS. LOCKHART:  Show, just for the witness and

12   counsel -- this has not yet been admitted -- Government's

13   Exhibit 522.

14   **Q.**  (BY MS. LOCKHART)  Are these text messages obtained

15   through a search warrant on Ms. Lum Davis's cell phone?

16   **A.**  Yes.

17   **Q.**  And do they show messages with Mr. Michel?

18   **A.**  Yes, they do.

19   **Q.**  In March and April of 2017?

20   **A.**  That's correct.

21        MS. LOCKHART:  Your Honor, we would move to admit

22   and publish at this time Government's Exhibit 522.

23        MR. KENNER:  Object, Your Honor.

24        THE COURT:  Why?  What's the objection?

25        MR. KENNER:  It's --

DIrect Examination- Heuchling

1          THE COURT:  As I understand it, they're text

2    messages between Ms. Davis and Mr. Michel.

3          MR. KENNER:  I don't -- I don't --

4          THE COURT:  Is there something that indicates --

5          MR. KENNER:  I'm sorry.  Yes, there is.

6          MS. LOCKHART:  Sorry, what was that?

7          THE COURT:  Is there something that indicates that

8    it includes Mr. Michel?

9          MS. LOCKHART:  Yes, Your Honor.

10         Ms. Orozco, if we could drop to the messages that

11   list Pras NY.  I think if you go down two messages, you'll see

12   that.  Yep.  So the bottom message.

13         THE COURT:  All right.  So there it includes

14   Mr. Michel.  So these are the co-conspirators, that includes

15   your client.

16         Are you still objecting or not?

17         MR. KENNER:  No, Your Honor.

18         THE COURT:  All right.  Then what exhibit was this?

19         MS. LOCKHART:  522.

20         THE COURT:  All right.  So I'll admit 522 without

21   objection.

22         MS. LOCKHART:  And if we could publish.

23         Thank you, Ms. Patterson.

24   Q.  (BY MS. LOCKHART)  I'd like to point you to, first, the

25   name Pras NY 2013 and then the phone number to the side.

DIrect Examination- Heuchling

1        First to the phone number, who do you understand that

2    phone number to be associated with?

3    **A.**  That's the phone number associated with Mr. Michel's

4    iPhone.

5    **Q.**  And then that name, Pras NY 2013, do you recall seeing

6    that in some of the photos we just looked at?

7    **A.**  Yes, we saw that previously in a couple of the messages.

8    **Q.**  Looking to the top two messages here from Ms. Lum Davis to

9    Mr. Michel, what is Ms. Lum Davis sending to Mr. Michel?

10   **A.**  So she's sending the name of Elliott Broidy, and then she

11   sends a brief description about Mr. Broidy underneath.

12           MS. LOCKHART:  Ms. Orozco, you can drop this callout

13   box.

14   **Q.**  (BY MS. LOCKHART)  Agent Heuchling, throughout these

15   messages, do you see several references with Ms. Lum Davis or

16   Mr. Michel asking each of the others to call each other?

17   **A.**  Yes, multiple times.

18   **Q.**  In your experience in law enforcement, have you

19   experienced a reason why people may want to call each other

20   rather than communicate via text message?

21           MR. KENNER:  Objection, Your Honor, no foundation.

22           THE COURT:  No, he's in -- it's experience in terms

23   of law enforcement, that he's described the work that he has.

24   I think you can answer.

25   **A.**  Yes.  Based on my experience, co-conspirators are aware

1    that their text messages may sometimes be recovered by law

2    enforcement, and so they'll often move substantive

3    communications off of a text platform to a phone or an

4    in-person meeting.

5              MS. LOCKHART:  Ms. Orozco, if we could look at the

6    bottom message from Mr. Michel on April 13th, 2017.

7              Can you expand the top message a little bit --

8              THE COURT:  It's a little harder to read.

9              MS. LOCKHART:  -- so you can see the whole thing?

10             Thank you, Ms. Orozco.

11   **Q.**  (BY MS. LOCKHART)  So, again, is this a message from

12   Mr. Michel?

13   **A.**  Yes.

14   **Q.**  And what is Mr. Michel sending here in this reference to

15   Wickr?

16   **A.**  He's sending Ms. Davis a link to download Wickr.  And

17   Wickr is a encrypted messaging app as we discussed before.

18   **Q.**  Is Wickr one of the encrypted messaging apps in which

19   communications can disappear after a certain period of time?

20   **A.**  Yes, that is one of the features.

21             MS. LOCKHART:  Thank you, Ms. Orozco.  You can take

22   this down.

23   **Q.**  (BY MS. LOCKHART)  Did you have an opportunity to review

24   phone records as part of this case?

25   **A.**  I did.

DIrect Examination- Heuchling

1    **Q.**  What types of records did you review?

2    **A.**  So we reviewed what we generally call two different types

3    of records.  One is toll records, which include the phone

4    numbers called or received by a certain phone.  We also

5    reviewed subscriber records, which are the information that

6    the provider has associated with that phone and that phone

7    number.

8    **Q.**  Did some of the phone records you reviewed include phone

9    numbers associated with Mr. Michel?

10   **A.**  Yes.

11   **Q.**  Did you also review phone records for other individuals?

12   **A.**  Yes.  For Ms. Davis, for Mr. Higginbotham, and for

13   Mr. Broidy.

14   **Q.**  And were charts created showing the communications between

15   Mr. Michel, Mr. Broidy, Ms. Lum Davis, and Mr. Higginbotham?

16   **A.**  Yes, they were.

17   **Q.**  Do they show text messages?

18   **A.**  The charts -- these charts only reflect phone contact --

19   or phone call contacts.

20   **Q.**  Would iMessages, messages between iPhones or encrypted

21   messaging apps, would those show up on the type of phone

22   records that you reviewed?

23   **A.**  No.  Again, these only capture voice calls back and

24   forth.

25            MS. LOCKHART:  If we could show what has been

DIrect Examination- Heuchling

1    previously admitted subject to the stipulation Government's

2    Exhibit 550.

3    **Q.**  (BY MS. LOCKHART)  All right.  Agent Heuchling, who does

4    this show phone contacts between?

5    **A.**  This shows phone contacts between Mr. Higginbotham --

6    Mr. Higginbotham and Mr. Michel from early 2017 to early

7    2018.

8    **Q.**  Through the course of your investigation, did you learn

9    how many phone numbers were associated with Mr. Michel and

10   used in this time period?

11   **A.**  Yes.  Mr. Michel used at least two phones that we captured

12   on this chart, an iPhone and a blackberry.

13   **Q.**  Did you also execute a search warrant for Mr. Michel's

14   phones at one point?

15   **A.**  Yes, I did.

16   **Q.**  And how many phones did you seize?

17   **A.**  When we stopped Mr. Michel to execute that search warrant,

18   we seized two phones off of Mr. Michel, both the blackberry

19   and the iPhone.

20   **Q.**  And where was that?

21   **A.**  That was right out in front of Mr. Michel's house on

22   Mercer Street.

23   **Q.**  And for this chart, does -- for the contacts with

24   Mr. Michel, does it show contacts between Mr. Higginbotham and

25   both of Mr. Michel's phone numbers?

1   **A.**  Yes, this is inclusive of both phones that Mr. Michel was

2   using.

3   **Q.**  Can you explain briefly the layout of this chart for the

4   jury?

5   **A.**  Sure.

6       So on the bottom, you'll see the month of the year

7   starting in 2017 and finishing in 2018.  And on the left -- on

8   the left side, you'll see a numerical tally corresponding to

9   the number of calls that were made in a certain month between

10  the two.

11  **Q.**  Generally what does this show about the nature of the

12  communications between Mr. Higginbotham and Mr. Michel?

13  **A.**  It shows that Mr. Higginbotham and Mr. Michel had

14  extensive communications throughout 2017 and 20 -- or early

15  2017 and into 2018 when this -- these allegations and this

16  scheme were taking place.

17      And you'll notice the only real drop is around July and

18  August and September of 2017, which is after Mr. Higginbotham

19  went into the Chinese embassy and was approached by U.S. law

20  enforcement.  But soon after, Mr. Michel and Mr. Higginbotham

21  are right back at it calling each other again.

22          MS. LOCKHART:  I'd like to take a look at another

23  chart similar to this one, also previously admitted subject to

24  the stipulation, Government's Exhibit 549.

25  **Q.**  (BY MS. LOCKHART)  All right.  So for this chart, who are

DIrect Examination- Heuchling

1    we now looking at phone contacts between?

2    **A.**  These are calls between Ms. Davis and Mr. Broidy from

3    early 2017 to early 2018 as well.

4    **Q.**  Was there at one point a significant uptick in the

5    frequency of communications between Ms. Lum Davis and

6    Mr. Broidy?

7    **A.**  Yes.  You can see in July, August, and September of 2017,

8    which is when Mr. -- Ms. Davis, Mr. Broidy, and Mr. Michel

9    were getting a lot of pressure from Mr. Low and from the

10   Chinese government to get something done and were working

11   extremely hard to try to make -- set up contacts and meetings

12   with the U.S. Government.  You know, during that time,

13   Ms. Davis and Mr. Broidy are talking almost -- I guess that

14   would be almost ten times per day on average.

15   **Q.**  Did Mr. Broidy communicate directly with Mr. Michel?

16   **A.**  No.

17            MR. KENNER:  Your Honor, I didn't hear the

18   question.

19   **Q.**  (BY MS. LOCKHART)  Did Mr. Broidy communicate directly

20   with Mr. Michel?

21   **A.**  No.  I came to learn through the course of the

22   investigation that, at least as it pertained to telephonic

23   contact, Mr. Michel communicated with Mr. Broidy through

24   Ms. Davis.

25            MS. LOCKHART:  If we could take a look now at what's

DIrect Examination- Heuchling

1    been marked as Government's Exhibit 548, also previously

2    admitted subject to the stipulation.

3          THE COURT:  What we should do is indicate that and

4    then have me admit it so it's actually on the record.

5          MS. LOCKHART:  So I believe, Your Honor, at the

6    beginning of Agent Heuchling's testimony, Mr. Mulryne --

7          THE COURT:  Admitted all of them?

8          MS. LOCKHART:  Admitted all of them.

9          THE COURT:  All right.  In terms of the original

10   stipulation, you've had some afterwards, but in terms of the

11   original ones?

12         MS. LOCKHART:  Yes.

13         THE COURT:  And that's -- this would be involved

14   with that?

15         MS. LOCKHART:  This was included in that batch, Your

16   Honor.

17         THE COURT:  Okay.

18   Q.  (BY MS. LOCKHART)  So who are we now looking at phone

19   contacts between?

20   A.  These are calls between Ms. Davis and Mr. Michel.

21   Q.  Were there months where you can see a significant number

22   of contacts?

23   A.  Yes.  For example, if you look at May 2017 when Mr. Michel

24   was first getting paid millions of dollars and passing

25   millions of dollars on to Ms. Davis, Mr. Michel and Ms. Davis

DIrect Examination- Heuchling

1    are speaking almost, you know, 15 times a day on average.

2    **Q.**   What are the other months with a significant number of

3    contacts in addition to May?

4    **A.**   So the next is August.  And, again, it's another month in

5    which Mr. Davis -- or Mr. Michel received tens of millions of

6    dollars and paid out Ms. Davis.

7            MS. LOCKHART:  Ms. Orozco, you can take this down.

8    Thank you.

9    **Q.**   (BY MS. LOCKHART)  During the course of your

10   investigation, did you interview Mr. Michel?

11   **A.**   Yes, we did.

12   **Q.**   When was that?

13   **A.**   January 8th, 2018.

14   **Q.**   What were the circumstances surrounding that interview?

15   **A.**   Special Agent Harry Lidsky reached out to Mr. Michel, and

16   Mr. Michel agreed to meet with us.  It was a consensual

17   interview.  We did it at Mr. Michel's studio and his residence

18   in Los Angeles.

19   **Q.**   Prior to that meeting, had Mr. Michel met with the FBI

20   previously?

21   **A.**   Yes.  Mr. Michel had met not with me or anyone on --

22   investigating on this case, but he had met with, as we had

23   mentioned, Special Agent Andrew Zitman and at least one other

24   agent.

25   **Q.**   Did Mr. Michel say that he had met with Mr. Sun Lijun?

DIrect Examination- Heuchling

1    **A.**  Yes, he had -- he had said that to Mr. Zitman.

2    **Q.**  And discussed the extradition of Mr. Guo?

3    **A.**  Yes, correct.

4         THE COURT:  Start slowing down again.

5    **Q.**  (BY MS. LOCKHART)  Getting into the substance of your

6    interview with Mr. Michel, did you ask Mr. Michel about the

7    allegations related to the 2017 conduct in this case that

8    you've testified about today?

9    **A.**  Yes.  The interview with Mr. Michel focused on the 2017

10   allegations.  We intentionally did not bring up the

11   allegations related to Mr. Michel's 2012 conduct.

12   **Q.**  Did you ask Mr. Michel about the $41 million that was

13   deposited into Mr. Higginbotham's account in October 2017?

14   **A.**  Yes, we did.  And Mr. Michel told us that money had

15   nothing to do with Mr. Low, and that was a lie.

16   **Q.**  Did you ask Mr. Michel --

17        MR. KENNER:  Objection, move to strike "and that was

18   a lie."

19        THE COURT:  I'll strike that last bit.

20   **Q.**  (BY MS. LOCKHART)  Did you ask Mr. Michel about

21   Mr. Higginbotham's visit to the Chinese embassy?

22   **A.**  Yes, we did.  And Mr. Michel told us he directed

23   Mr. Higginbotham into the Chinese embassy as it related to

24   Chinese and Haiti relations.  And he told us that that visit

25   had nothing to do with Low and nothing to do with

1    Mr. Laogumnerd had nothing to do with the money that

2    Mr. Michel had received, and we came to learn that that was

3    not true.

4    **Q.**  Did you ask about Nickie Lum Davis?

5    **A.**  Yes, we did.

6    **Q.**  About Mr. Broidy?

7    **A.**  Yes.

8    **Q.**  Anicorn, Artemus?

9    **A.**  Yes, we asked about all those.

10   **Q.**  About the money paid out of Anicorn and Artemus to

11   Mr. Broidy and Ms. Lum Davis?

12   **A.**  Yes, we did.

13   **Q.**  At any point, did Mr. Michel admit to the true purpose of

14   the money he received?

15   **A.**  No, he did not.

16   **Q.**  And finally, through the course of your interview, did you

17   confront Mr. Michel with facts showing that what he was

18   telling you was not true?

19   **A.**  Yes.  Throughout the interview, although we didn't tell

20   Mr. Michel everything that we knew on our investigation, we

21   confronted Mr. Michel with some of the facts and the truth.

22   And during the course of that interview, when confronted with

23   those facts, Mr. Michel changed his story and admitted to us

24   that what he had just told us wasn't true.

25       Throughout the course of the interview, we gave

Cross-examination - Heuchling

1    Mr. Michel every opportunity to tell us the truth.  We gave

2    him every opportunity to tell us the real reason why he had

3    met and worked with Mr. Broidy, Mr. Low, Mr. Michel, and

4    Ms. Davis.  We gave him every opportunity to tell us why he

5    had received $100 million into his bank account and every

6    opportunity to tell us why he had given tens of millions of

7    dollars to the co-conspirators, and he never once told us the

8    whole story.

9             MS. LOCKHART:  Nothing further, Your Honor.

10            THE COURT:  Cross.

11            MR. KENNER:  Thank you, Your Honor.

12            Let me just finish a note here, and I'll start.

13            Mr. Campbell, would you please put Exhibit 506 up

14    for the witness.

15            THE COURT:  You need to speak into the microphone,

16    Mr. Kenner.  I can't hear you.

17            MR. KENNER:  I'm sorry.  Exhibit 506, already

18    admitted.

19                       CROSS-EXAMINATION

20    BY MR. KENNER:

21    **Q.**  You see Exhibit 506?

22    **A.**  Yes.

23            THE COURT:  506 has been admitted, yes.

24    **Q.**  (BY MR. KENNER)  It says "Statement of Account" --

25    **A.**  Yes.

1    **Q.**  -- is that correct?

2    **A.**  Yes.

3    **Q.**  And this is a statement of account for M/S Blackstone Asia

4    Real Estate Partners; is that correct?

5    **A.**  That is correct.

6    **Q.**  And what is the date of this statement?

7    **A.**  June 21st, 2012.

8    **Q.**  Can you tell us what time period is covered by this

9    statement?

10   **A.**  It would appear this statement covers the time period from

11   May 21st to June 21st, 2012.

12   **Q.**  Okay.  And did you also review records for M/S Blackstone

13   Asia Real Estate Partners in 2017?

14   **A.**  No, I did not.  My understanding is this account had been

15   closed by that date.

16   **Q.**  What is your understanding of when the account was

17   closed?

18   **A.**  I don't know the exact date.  My -- again, my

19   understanding is that after we had filed the forfeiture

20   complaints on Mr. Low and his assets in 2016, he had to close

21   many of his accounts because they were identified as being

22   connected with him.

23   **Q.**  Okay.  Who opened the account reflected in Exhibit 506?

24   **A.**  The signatory on that account --

25   **Q.**  I'm asking first who opened it.

Cross-examination - Heuchling

1    **A.**  I can't tell you exactly who opened it.

2    **Q.**  You can tell me it wasn't Mr. Jho Low; correct?

3    **A.**  I can't.  I don't know who sat down with the banker and

4    actually had that account opened.

5             MR. KENNER:  Can I please show this witness,

6    Mr. Campbell, Exhibit 580 and 581, already admitted.

7             THE COURT:  I don't have 580 or 581, unless it was

8    part of the stipulation.

9             THE CLERK:  It's not part of the stipulation.

10            THE COURT:  Okay.  Then it hasn't been admitted.

11            MR. KENNER:  I believe it is part of the

12   stipulation, Your Honor --

13            THE COURT:  Which stipulation --

14            MR. KENNER:  -- Government's Exhibit 580 and

15   Government's Exhibit 581.

16            THE COURT:  All right.  Mr. Kenner, in terms of the

17   original stipulation, according to my deputy courtroom clerk,

18   it is not listed, so -- unless there's some other stipulation

19   I'm not aware of.  I know you stipulated to other things.

20            MR. KENNER:  It's not listed in the original

21   stipulation?

22            THE COURT:  Ms. Lockhart, is this a stipulated

23   account -- exhibit or not?

24            MS. LOCKHART:  It was not part of the stipulation,

25   Your Honor, but I don't believe we have an objection to their

Cross-examination - Heuchling

1    admission.

2             THE COURT:  Okay.  So it's not already admitted.

3             Are you asking to have it admitted?

4             MR. KENNER:  Yes, Your Honor.

5             THE COURT:  And so we're talking about 580 and 581?

6             MR. KENNER:  Yes, Your Honor.

7             THE COURT:  All right.  I'll admit 580 and 581

8    without objection.

9    Q.  (BY MR. KENNER)  I'm showing you Exhibit 5 -- showing you

10   Exhibit 580 on the left.

11        Exhibit 580 is a certificate of incorporation; is that

12   correct?

13   A.  Yes, correct.

14   Q.  And who are the -- who is the incorporator of the

15   Blackstone account that we were just talking about?

16             THE COURT:  Do you need to -- can you make it any

17   bigger so people can read it?

18   A.  I don't -- I mean -- oh, the British -- I mean, it's

19   incorporated in the British Virgin Islands.  Is that what

20   you're asking?

21   Q.  (BY MR. KENNER)  Yes.

22   A.  Yes.  It's incorporated in the British Virgin Islands.

23   Q.  Okay.  And does it have Mr. -- Jho Low's signature

24   anyplace on it?

25   A.  No, not on this record.

Cross-examination - Heuchling

1    **Q.** Okay. Let's look at Exhibit 580 -- Exhibit 581 is the

2    same, I'm sorry.

3        All right. Did you look to determine from the 2012

4    statement with regard to Blackstone who signed the signatory

5    card?

6    **A.** Yes. The signatory on the Blackstone account was Mr. Eric

7    Tan.

8    **Q.** And there was somebody else?

9    **A.** If there is, I'm -- it escapes me now.

10   **Q.** Are you telling me you can't recall whether or not there

11   was another signature?

12   **A.** I don't recall off the top of my head if there was a

13   second signatory.

14   **Q.** All right. And can you tell me what on Exhibit 506 led

15   you to believe that in 2012 Jho Low was the beneficiary of

16   this account?

17   **A.** Would you mind bringing Exhibit 506 back up for me,

18   please?

19   **Q.** Certainly. No, I don't mind. I certainly will.

20   **A.** Oh, yeah.

21            THE COURT: Do you need to have something enlarged?

22   **A.** Yeah, if you wouldn't mind just making it a little more

23   clearer.

24            THE COURT: Do you want something enlarged on it?

25   **A.** No, I mean, it's -- I can kind of read it.

1      Yeah, just based on the totality of the ins and outs on
2  this account, and based on what I came to learn in my
3  investigation about -- about Mr. Low and about the accounts
4  that he was using to move his money around, it became, you
5  know, clear and evident that this was an account that Mr. Low
6  controlled.
7      If you'd like, I can -- I can't see it now, but there's
8  some ins, the large flows of funds.  I think it's almost
9  $300 million.  Again, I -- unfortunately I can't see it right
10  now.
11  **Q.**  Well, here, let's blow this up so you can see it.
12  **A.**  Okay.  So, look, if you look at an early transaction in --
13  in late May where there's a nearly 300 million deposit -- a
14  $300 million into -- into Blackstone, that is from an account,
15  again, that we knew was controlled by -- by Mr. Low.  And I
16  can continue to go into the details in tracing those funds
17  back to 1MDB if you would like.
18  **Q.**  Okay.  Sir, in this particular --
19          MR. KENNER:  I'm sorry.  May I show Exhibit 239,
20  please?  This has been stipulated to, but not admitted, Your
21  Honor.
22          THE COURT:  Is that correct?
23          MR. KENNER:  Defendant's Exhibit 239.
24          THE CLERK:  Yes.
25          THE COURT:  Yes?

Cross-examination - Heuchling

1          THE CLERK:  Yes.

2          THE COURT:  All right.  So I'll admit 239 if there's

3  a stipulation as to its admissibility.

4          MR. KENNER:  Thank you.

5  **Q.**  (BY MR. KENNER)  If you look at Exhibit 239, does the

6  signature card for two different people appear there in the

7  summary on top -- well, first let's start, what's the name at

8  the very top?

9  **A.**  That says Najib Razak.

10  **Q.**  And remind us who Najib Razak was?

11  **A.**  He was the prime minister of Malaysia at the time.

12  **Q.**  Okay.  And why is his name on the top of this account?

13  **A.**  So I didn't prepare this, but you'll see both Mr. Najib's

14  name, and then under it is a FBI case number.  It appears that

15  whoever prepared this -- this would have been done by a

16  forensic accountant in our office, but it appears that they

17  titled the account Mr. Razak because at the time he was one of

18  the named subjects in our investigation.

19  **Q.**  Okay.  And is one of the signatures on the signature card

20  Tan Kim Loong?

21  **A.**  Yes, it is.

22  **Q.**  And is the other signature on the signature card Seet,

23  S-e-e-t, Li, L-i, last name Lin, L-i-n?

24  **A.**  Yes.  I didn't -- again, I didn't want to guess, but that

25  is a -- another individual who was close to Mr. Low, and who

Cross-examination - Heuchling

1    is one of his associates who Mr. Low often used to handle his

2    accounts.

3    **Q.**  And your theory is that this account was utilized to

4    launder money from 1MDB?

5    **A.**  It's a fact, yes.

6    **Q.**  It's a fact?

7    **A.**  Yes.

8    **Q.**  I'd ask you to look at that same exhibit, the payor or

9    payee.

10        Do you see the name 1Malaysian Development Berhad?

11   **A.**  I do.

12   **Q.**  And do you see a disbursement out of this account to

13   1Malaysia Development Berhad?

14   **A.**  I do.

15   **Q.**  And how much is the disbursement from this account into

16   the 1MDB account?

17   **A.**  So just -- it's $77 million.  But if you look at the

18   account flows and the dates, this doesn't include those,

19   you'll see that the money that is sent to 1MDB here, this

20   $77 million, is money that Blackstone received from Aabar,

21   which is the actually next line down -- whoops, I didn't

22   realize I could highlight, but here, that one.

23        That's the money that -- that's taken from the money that

24   the Blackstone account received from Aabar, and the funds from

25   Aabar came from 1MDB.

Cross-examination - Heuchling

1    **Q.**  Okay.  And where did one -- we'll go back to Aabar in a

2    moment.

3        Did funds come from some company called Abu, A-b-u,

4    Dhabi, D-h-a-b-i, dash Kuwait, K-u-w-a-i-t, Malaysia

5    Investment Corporation?

6    **A.**  Yes.  So Abu Dhabi Kuwait Malaysia Investment Corporation,

7    or as we came to call it, ADKMIC, that was another account

8    that Mr. Jho Low had set up that he had used -- it was another

9    account he had used to steal money from the Malaysian

10   government.

11   **Q.**  Did Mr. Low -- was he a signatory on this account?

12   **A.**  On the ADKMIC account?

13   **Q.**  Yes.

14   **A.**  I don't know for sure.  No, I don't know.

15   **Q.**  He's -- you wouldn't agree that he is not a signor on that

16   account?

17   **A.**  I wouldn't be able to tell you either way.  I could say

18   that that account was opened, I think, prior to 2009, which is

19   prior to him having a lot of publicity.  So it very well may

20   have been that he had -- he was still using his own name on

21   accounts at that time.

22   **Q.**  Okay.  And there's $34 million from Alsen Chance Holdings

23   Limited; correct?

24   **A.**  Yes, correct.

25        If you -- again, if you follow the flow fun -- or the

1    flow of funds here, what you'll see is that Blackstone sends

2    money to Alsen Chance and then inexplicably -- but, again,

3    this goes to the point we've had about these funds don't have

4    a real purpose except to move money around -- Alsen Chance

5    sends the money back to Blackstone.

6    **Q.**   The Alsen Chance account, who was the signatory on that

7    account?

8    **A.**   That was Eric Tan as well.

9    **Q.**   Eric Tan Kim Loong?

10   **A.**   Yes.

11   **Q.**   And on the Blackstone account, is the signatory Eric Tan

12   Kim Loong?

13   **A.**   Yes, it is.

14   **Q.**   Not Mr. Jho Low, correct?

15   **A.**   Yes, that's correct.

16   **Q.**   Okay.  So -- the Aabar account that you made reference to,

17   is -- did that count -- account, was that Aabar Investments

18   PJS Limited?

19           MS. LOCKHART:  Your Honor, can we have a

20   conversation about relevance in relation to this line of

21   questioning?

22           THE COURT:  All right.

23           (Bench conference on the record.)

24           THE COURT:  Mr. Kenner?

25           MR. KENNER:  Yes.  I didn't request this.

Cross-examination - Heuchling

1          THE COURT:  No, she did.  She said she was

2    requesting a discussion of whether it's relevant before she

3    considers objecting.  So tell me what the theory is here.

4          MR. KENNER:  The theory is that the chart originally

5    introduced by the government that shows money going from

6    Blackstone to Alsen Chance to 1MDB is not accurate.  The money

7    went in the opposite direction.  It went to 1MDB, not from

8    1MDB.  And I think that's a serious problem, and I should be

9    entitled to bring that out.

10          MS. LOCKHART:  Your Honor, two things.  The chart

11    he's referring to was not introduced into evidence

12    purposefully because we have not charged or elicited evidence

13    that this money was sourced from 1MDB, or that Mr. Michel had

14    any connection to 1MDB.  So I guess I'm confused particularly

15    given counsel's objection at the beginning of my examination

16    of Agent Heuchling about the connection to 1MDB, that he's

17    trying to insert additional evidence about the sourcing of the

18    funds back to 1MDB when we've purposefully not brought that

19    into evidence, nor is it relevant to the theory of money

20    laundering here.

21          THE COURT:  Okay.  So are you -- it does sound like

22    if the chart isn't in there, it has not been admitted.

23          MR. KENNER:  I will seek to admit it, Your Honor.

24          MS. LOCKHART:  Not -- I think the chart he's

25    referring to shows a general flow of funds from 1MDB down to

1    Blackstone and Alsen Chance.  But even then, where the money

2    was ultimately sourced from is not relevant.  And this is a

3    serious 403 problem for confusing the jury given the fact that

4    this ultimate source, whether it was sourced from 1MDB and the

5    ultimate theft is not relevant, and this can drag us down a

6    many hours long rabbit hole of financial tracing.

7        THE COURT:  Okay.  So what is 1MDB?  I mean, am I

8    correct that the government is not indicating that necessarily

9    all of the money came from 1MDB, and we've indicated

10   Mr. Michel has nothing to do with it.  It sounds to me as if

11   you're trying to connect -- you're opening the door to

12   connecting Mr. Michel to it when the government has indicated

13   they're not -- they have no -- they're not -- that's not what

14   their evidence shows.

15       I'm not sure what -- I must admit I'm somewhat

16   confused as to what you're getting into.

17       MR. KENNER:  Well --

18       THE COURT:  The theory -- the theory, as I

19   understand it -- so I'm saying why doesn't the government

20   indicate the theory of the source of the money.

21       MR. KENNER:  The government has made --

22       THE COURT:  No, listen.  May I ask Ms. -- in terms

23   of being able to let the government indicate what their theory

24   is as to where the money comes from, in terms of Ms. Lockhart,

25   if you would indicate your theory so we can discuss it in

Cross-examination - Heuchling

1    terms of what Mr. Kenner is declaring.

2              MS. LOCKHART:  Yes, Your Honor.

3              So, first and foremost, Blackstone and Alsen Chance,

4    which is the entities we're looking at here, relate to the

5    2012 conduct.  They have no relation to the 2017 conduct.  So

6    as an initial matter, there are no money laundering charges

7    related to the 2012 conduct in Blackstone and Alsen Chance.

8    So for that reason alone, stemming back to 1MDB is irrelevant.

9              What we have alleged is that Low directed or

10   controlled the funds in Blackstone or Alsen Chance to

11   Mr. Michel for the purposes laid out in the conspiracy in

12   Count 1.

13             For Count 7, in relation to the money laundering

14   theories, there's two prongs.  There's first the international

15   promotional money laundering.  And, again, it's not that it is

16   sourced back to 1MDB, it's that it's Low's money and it was

17   the proceeds of the illegal FARA agreement in Bangkok at the

18   beginning of May and then was sent into the United States with

19   the intent to promote a violation of the Foreign Agents

20   Registration Act.

21             To the second prong of the money laundering, that's

22   a domestic money laundering count for concealment money

23   laundering, and that's Mr. Michel funneling the money through

24   multiple accounts to disguise and conceal the true source and

25   purpose of those funds.

1              THE COURT:  Okay.  So the 212, Mr. Kenner, doesn't

2    have anything to do, it sounds -- they haven't charged him

3    with that, and there's no reason to get into it, so that is

4    not relevant.

5              In terms of the rest, they're indicating -- they're

6    not saying that all of the money that Mr. Low sent came from

7    1MDB, as I understand it.  So you're going down -- presenting

8    something that they're not -- he had access to it, but they're

9    not indicating, as I understand it, that this -- the only

10   source for Mr. Low sending the money is from that.  They're

11   indicating that Mr. Low had access to money that may be part

12   of what he had, and he's -- the issue is Mr. Low sending money

13   that he had.

14             As I understand it, you're not claiming, government,

15   that it has to be 1MDB; am I correct?

16             MS. LOCKHART:  Absolutely not, Your Honor.  That's

17   absolutely correct.  We have not claimed that.  We have not

18   presented evidence on that point, nor will we argue it in

19   closing.

20             THE COURT:  All right.  So then you're going down

21   something that's totally irrelevant.  Tell me what's relevant

22   here.

23             MR. KENNER:  Your Honor, what I believe to be

24   relevant is the government is telling you that it is not

25   putting on evidence and will not argue the money came from

Cross-examination - Heuchling

1    1MDB.  But they have been putting on evidence that Jho Low was

2    a thief, that he stole this money from 1MDB and thereby taking

3    it from the people of the country.

4             And I -- we've talked about this before.  I just

5    want to be sure --

6             THE COURT:  But, Mr. Kenner, you're confusing and

7    you are creating problems in this case, one, by getting into

8    things that are not -- the 2012 that have nothing to do with

9    this case, and that is distracting and creating a problem for

10   the jury.

11            Two, we've made it -- the government's made it very

12   clear, and I have it in my orders, that Mr. Michel is not

13   associated with whatever theft Mr. Low is accused of with

14   1MDB.  He had access to that fund, but they are not, as far as

15   I can see, nor have they presented, that that necessarily is

16   the source of the money.  So -- in terms of Mr. Low, but just

17   that money came from Mr. Low to Mr. Michel.

18            So you're going back and forth with 1MDB is,

19   frankly, distracting to the jury and doesn't go anywhere, and

20   you're bringing up something that ties Mr. Michel to something

21   the government isn't charging him with, so it doesn't seem

22   useful to bring in information that doesn't go to it.

23            MR. KENNER:  I'll move on, Your Honor.

24            THE COURT:  Thank you.

25            (The following proceedings were had in open court.)

1    THE COURT:  I'll sustain the objection to this line

2    of inquiry.

3    **Q.**  (BY MR. KENNER)  Mr. Heuchling, when --

4    THE COURT:  I can't hear you, sir.

5    If you could talk into --

6    MR. KENNER:  I'm sorry.

7    **Q.**  (BY MR. KENNER)  Mr. Heuchling, when did you first

8    determine that Mr. Michel was violating the FARA laws?  What

9    year, what month?

10   **A.**  I -- I couldn't point to any -- any specific year or

11   month, but we got turned on to Mr. Michel's scheme as it

12   relates to FARA in July of 2017 after Mr. Higginbotham entered

13   the Chinese embassy.

14   **Q.**  So would it be a fair statement, then, as of July of 2017,

15   Mr. Michel was in violation of FARA?

16   **A.**  I -- I couldn't tell you exactly when -- when Mr. Michel

17   would have been in violation of FARA, so that -- you asked me

18   when I became aware of it.  My understanding of the statute,

19   though, is that it applies as soon as any individual starts

20   acting on behalf of a foreign principal.  So, therefore, I

21   assume that he would have been in violation of the law prior

22   to that.

23   **Q.**  What I want to know -- you're the lead investigator on

24   this case or one of two of them?

25   **A.**  One, yes.

Cross-examination - Heuchling

1    **Q.**  Yes.

2         And in your expertise as an investigator, you were

3    investigating whether or not Mr. Michel violated the FARA

4    laws; is that correct?

5    **A.**  Yes.

6    **Q.**  And when did you start investigating whether or not

7    Mr. Michel had violated the FARA laws?

8    **A.**  So, again, I can't tell you exactly when that would have

9    been, but sometime in late -- mid, late July or early August

10   of 2017 would be my best estimation.

11   **Q.**  (BY MR. KENNER)  So would it be a fair statement to say

12   that you believe Mr. Michel was in violation of FARA laws for

13   about three years before he was indicted for it?

14         MS. LOCKHART:  Your Honor, it's -- this question is

15   both confusing and seems to call for a legal opinion from the

16   agent as to when exactly Mr. Michel violated a law.

17         THE COURT:  Yeah, I -- it does seem to me.  I mean,

18   the indictment indicates the time period that's at issue that

19   he's being charged with, and that would be the time period to

20   consider, not when they would have started or looked into it.

21   And I do think in terms of -- that that is the time period

22   that would be at issue that's in the indictment.  And

23   obviously they had a broad range investigation of a number of

24   different people.  So I don't see pinpoint -- trying to

25   pinpoint legally exactly when it is that he would have

1    violated.  He's indicated generally when he -- Mr. Michel came

2    to his attention, which is different than when it is that

3    Mr. Michel might have started violating FARA.

4    **Q.**  (BY MR. KENNER)  Mr. Heuchling, is it your opinion that

5    Jho Low wanted to hide the fact that he was the true owner of

6    Blackstone and Alsen Chance?

7              MS. LOCKHART:  Your Honor, objection.  The agent's

8    opinion on something doesn't matter.  It's irrelevant.

9              MR. KENNER:  Let me rephrase it.

10             THE COURT:  Excuse me.  Excuse me.  Let me just look

11   at the question.

12             MR. KENNER:  I'll rephrase it.

13   **Q.**  (BY MR. KENNER)  In the course of your investigation in

14   this case, as one of the lead investigators, did you come to

15   believe that Jho Low wanted to hide the fact that he was the

16   true owner of Blackstone and Alsen Chance?

17   **A.**  Yes, I came to believe that Mr. Low took certain steps to

18   distance himself from the fact that he controlled and was a

19   beneficial owner of those accounts.

20   **Q.**  And it's also your opinion that Jho Low --

21             THE COURT:  In terms -- I would not get into

22   opinions in terms of here, he's a factual witness.

23             MR. KENNER:  Thank you.

24   **Q.**  (BY MR. KENNER)  Have you worked on 1MDB -- this 1MDB

25   matter outside of the context of this case?

1    **A.**  Yes, I've -- this is a subset of that -- of the larger

2    1MDB investigation.

3    **Q.**  Have you and your unit been involved in the civil

4    forfeiture proceeding involving 1MDB?  I believe you said

5    that.

6    **A.**  Yes, we were responsible for those.

7    **Q.**  Would you agree -- let me withdraw that.

8        Did you make a determination during your investigation as

9    to whether or not, during the period that the government

10   alleges that Jho Low was involved in embezzling and laundering

11   money, is it not also true that Jho Low listed himself as the

12   beneficial owner of several companies that allegedly received

13   1MDB funds in the forfeiture?

14             THE COURT:  You have too many facts in there that

15   he'd have to agree to to put it together.  You're going to

16   have to make it a different question.

17             MR. KENNER:  I think, Your Honor, I'm just going to

18   verify, I believe the forfeiture complaint is Exhibit 124, and

19   I believe it was admitted.

20   **A.**  Mr. Kenner, if it's helpful, at least one account I can

21   think of off the top of my head that he was the -- the named

22   signatory on it for one period of time.

23   **Q.**  (BY MR. KENNER)  If you looked at the complaint, would it

24   refresh your recollection about more than one company that

25   Mr. Jho Low was listed as the beneficial owner in the course

Cross-examination - Heuchling

1  of the forfeiture action you brought against him?

2  **A.** Yeah, it might.  Yes.

3  **Q.** Okay.

4          MR. KENNER:  I believe the exhibit is Government's

5  Exhibit 124, and I believe that it has been admitted.

6          THE COURT:  124 has been admitted, but it doesn't --

7  the description doesn't sound like what you're asking for, but

8  why don't we put it up and look.

9          MS. LOCKHART:  I'd also ask, if it's just for the

10 purposes of refreshing the witness's recollection, that it not

11 be shown to the jury.

12         THE COURT:  Yes, it is strictly refreshing.

13         THE WITNESS:  I apologize, Your Honor, is there a

14 way to remove this?

15         THE COURT:  Yes.  Ms. Patterson is going to show you

16 how to take it off.

17         THE WITNESS:  I apologize.

18         THE COURT:  All right.  Now, you're asking him to

19 review to refresh his recollection.

20         Which means that you would read it to -- oops, it

21 dropped down.

22 **A.** Mr. Kenner, this is over a hundred pages.

23         MR. KELLER:  And, Your Honor, could we take it down?

24         Thank you, Ms. Patterson.

25         THE COURT:  So read it to yourself, and then when

Cross-examination - Heuchling

1    you're finished, look up.  The idea is just, does this refresh

2    your recollection.

3             THE WITNESS:  Okay.  Next page, please.

4             MR. KELLER:  Two things, Your Honor.  It's published

5    to the jury and if it's for the purpose of refreshing, I don't

6    believe it should be.

7             THE COURT:  No, it's not.  It shouldn't be.

8             MS. LOCKHART:  And then the second thing, I'm not

9    sure what the question is that Agent Heuchling is being asked

10   to refresh his memory on if it's a 400-page document.

11            MR. KENNER:  The question he's being asked is

12   whether or not, in his forfeiture complaint, Mr. Low listed

13   himself as the beneficial owner of accounts that were being

14   forfeited.

15   **A.**  Mr. Kenner, if you can point me to a specific page, that

16   would speed things up.  As I said, I do remember at least one

17   account.

18            MR. KENNER:  May I have a moment?

19   **Q.**  (BY MR. KENNER)  Look at page 96.

20            MR. KENNER:  Display that for the witness.

21            THE COURT:  Excuse me.  Let me suggest at this point

22   that we take a ten-minute afternoon break so I can discuss

23   something with counsel.

24            THE WITNESS:  Do you want me to step out, ma'am?

25            THE COURT:  Yeah.

1            So we'll take a short break.  We're going to 5:00

2     today.

3            (A recess was taken.)

4            THE COURT:  I wanted to look at the --

5            MR. HASKELL:  Your Honor, just one minute.

6            THE COURT:  Sure.

7            (Pause in the proceedings.)

8            THE COURT:  What I would like to do is to -- instead

9     of doing it in the open courtroom, is to have a discussion

10    about this line of questioning.

11           (Bench conference on the record.)

12           THE COURT:  So let me just indicate that I wanted to

13    go back.  I hadn't had a chance to take a look at the

14    forfeiture complaint, and I wanted to go back and reread my

15    order that I had issued.  So on October 14th, 2022, I largely

16    excluded testimony that the graft from 1MDB and Mr. Low's

17    efforts to hide the proceeds that he allegedly stole from

18    1MDB.  I permitted the government to provide very limited

19    testimony regarding 1MDB insofar as it creates context for the

20    beginning of the second charge conspiracy, but excluded

21    everything else to prevent prejudice to the defendant.  And

22    the government has stayed within the limits that I've set out.

23    So I'm going to exclude all future questions, government or

24    defense, which is where we are now, regarding the 1MDB scandal

25    and how Mr. Low structured his alleged shell companies related

1    to 1MDB.

2              MR. KENNER:  Your Honor --

3              THE COURT:  Okay.  I would like to also indicate --

4    I'd like to have a -- an ex parte conversation, very briefly,

5    with the defense in terms of an additional reason that I think

6    needs to be in terms of, for the record, to discuss with him,

7    okay.

8              MS. LOCKHART:  Certainly.  Would you like us to

9    leave the courtroom, Your Honor?

10             THE COURT:  No, you can just hang up on the phone.

11             MS. LOCKHART:  Thanks.

12             THE COURT:  So this small little portion here is

13   going to be under seal.  Okay.  That's one thing.

14             (Sealed portion redacted.)

15             THE COURT:  Mr. Kenner, I already review -- I

16   reviewed the forfeiture complaint.  The allegations were --

17   regarding financial structuring mirror almost exactly Agent

18   Heuchling's allegations just now, that Mr. Low uses particular

19   entities and individuals as conduits to anonymize his

20   involvement.  If the agent answers these questions, some of

21   which you have been posing, it will provide support for the

22   government's theory, because the comparison of the two lend

23   support to the government's theories that this is what

24   happened between Low and Mr. Michel.  I don't see a tactical

25   reason to go down this line of questioning.

1          MR. KENNER:  Your Honor --

2          THE COURT:  You're opening up something that is not

3    relevant, but you're also leaving it open that the 1MDB manner

4    in which Mr. Low structured is similar to what the

5    government's theory is that it's similar to what Mr. Low did

6    with Mr. Michel.  And I think it's not a good idea.

7          MR. KENNER:  Your Honor, my only point is -- and I

8    can direct you to specific pages, is there are six companies

9    that Mr. Low both was the signatory and listed as the

10   beneficial owner of in about six different paragraphs of this

11   forfeiture complaint.

12         THE COURT:  Right.  They're all related to money

13   from 1MDB; right?

14         MR. KENNER:  No, they're money from different --

15         THE COURT:  Well, companies, but he's using to

16   anonymize it, which is what the government claims in the civil

17   forfeiture; correct?

18         MR. KENNER:  No, he's not anonymizing it, he's

19   putting himself out there.  There's a company called Good Star

20   on page 43 and 46 --

21         THE COURT:  Okay.  Let me see if I understand it.

22   Your view is that this shows that the -- that he was out

23   there, and therefore he wouldn't be doing this with --

24   anonymizing it with Mr. Michel.  Is that your point for this?

25         MR. KENNER:  Yes.

1          THE COURT:  It's not the point I took from it.  And

2     I would be -- think very carefully tactically whether you wish

3     to go down there.  But I also think, as a practical matter,

4     you're getting into the 1MDB scandal, which I've kept

5     everybody out of.  I do not see getting into it in this

6     particular way.  Okay.  I think that there's a -- I think

7     there's a major problem.

8          I don't see, looking at the -- he's using particular

9     entities.  Some of these entities he has used -- has used to

10    anonymize the -- or at least to have it go through different

11    other entities in terms of the money that supposedly Mr. Low

12    stole from 1MDB, that they go through different entities.

13    That's my reading of this civil forfeiture and what they

14    indicated, which it seems to me tracks a little too closely to

15    what the government's theory is relating to Mr. Michel.

16          MR. KENNER:  I believe, Your Honor, the other

17    relevance of this is that it shows a list of companies that

18    Mr. Low had that he -- he was not anonymizing himself.  He was

19    listing himself as the opener of the account, the signatory on

20    the account, and the beneficial owner on the account.  There

21    are five or six --

22          THE COURT:  Do you see this -- this --

23          MR. KENNER:  I see this as showing that Mr. Low had

24    other monies --

25          THE COURT:  Okay.  I tell you what, Mr. Kenner, if

Cross-examination - Heuchling

1  you've decided that that -- you think that is useful, I'm not

2  going to prevent you.  I was simply trying to point something

3  out that, looking at this, my take on looking at this is that

4  he used other entities to basically funnel the money through

5  1MDB to put it in different entities with different people,

6  which, one, tracks a little too closely to the government's

7  theory.  If you don't say -- think it's that, I certainly am

8  not going to tell you how to try your case.

9          MR. KENNER:  Thank you.  Oh, Your Honor, you had

10  some question about --

11          (The following proceedings were had in open court.)

12          MR. KENNER:  Excuse, Your Honor.  Your Honor?

13          THE COURT:  Yes, I wanted to -- I was waiting for

14  the witness list so that I can make some plans in terms of

15  other cases I have.

16          MR. KENNER:  Thank you.  Your Honor, we'll give that

17  to you --

18          THE COURT:  I just need to know roughly the number

19  of people.  If you talked into the microphone, please.

20          MR. KENNER:  Yes, I believe there are either seven

21  or eight.  I'd have to recount.

22          THE COURT:  Okay.  All right.  I was asking because

23  the original was 30.  So I proceeded to -- it's --

24          MR. KENNER:  Yes.  No, no, it's --

25          THE COURT:  -- changed some issues with it.

1          All right.  Let's bring the agent back.

2          MS. LOCKHART:  And, Your Honor, just on that note,

3  we've known of one witness so far from the defense, but we

4  haven't heard on the other six or seven.

5          THE COURT:  By the end of the day, you need to

6  provide whatever it is, since obviously we're at -- this is

7  their last witness.  The Court also needs to take a look at

8  it.  And I want to make sure that if there are issues with it,

9  we take care of it not in the middle of the trial.

10          MS. LOCKHART:  Thank you, Your Honor.

11          THE COURT:  I do think there needs to be a limited

12  amount of 1MDB since, as a practical matter, Mr. Michel is not

13  connected to it.  And the more you connect -- to have a

14  discussion about it, the more the jury may think that he is

15  connected to it.  So I'd be very careful about how far you

16  want to go down that track.  The government has stuck to my

17  order as I've set it out.

18          MR. KENNER:  Your Honor, may I just inquire before I

19  decide how to proceed here?  Is Your Honor -- will Your Honor

20  consider giving a jury instruction that the defendant,

21  Mr. Michel in this case, is not alleged to have been --

22          THE COURT:  I think we've -- you know, we have said

23  that, and certainly the charges don't -- don't have it.

24  They're going to wonder why we're going into, frankly, 1MDB

25  and Mr. Low, if Mr. Michel is has nothing to do with it.  So I

Cross-examination - Heuchling

1    don't see giving that instruction as you then go into 1MDB

2    and, you know, the money with it, which has nothing to do with

3    Mr. Michel.

4              MR. KENNER:  Your Honor, I -- the -- I'm responding

5    to what this witness said in direct examination, and the last

6    status of the record, the last question he said I'm aware of

7    one company where Mr. Low listed --

8              THE COURT:  You have your theory, which you've

9    indicated to me.  I indicated to you what my concerns were.

10              MR. KENNER:  Okay.

11              THE COURT:  You handle your case as you see fit.  I

12    would just simply point out to you that if the 1MDB -- and I

13    have -- they've done strictly context, the more you bring in

14    1MDB, when Michel has nothing to do with it, the more you

15    connect the two.  So you need to make a strategic decision,

16    tactical --

17              Hold on.  Hold on, Dorothy.  Hold on.  Quick.  Hold

18    on.

19              A tactical decision as to how much you want to get

20    into it.  And, frankly, going through this, it seems to me

21    you've given me a theory of why you're doing it.  I have a

22    question about it.  But if you think that shows something that

23    you think is important, I'll let you do it with that

24    understanding.

25              MR. KENNER:  Your Honor, I also just want to state

Cross-examination - Heuchling

1    for the record, in the government's opening statement, they

2    referred to the money came from Malaysian fugitive -- from

3    Malaysia, that was taken from the citizens of the country.

4    That's what they said --

5            THE COURT:  Well, some of the money came from 1MDB,

6    but you can't say that all of it did.  And as a practical

7    matter, opening statements are not evidence in the case.  I

8    don't -- I haven't heard anything that says Mr. Michel has

9    anything to do with the graft or, you know, knowingly did

10   something with it, as far as I can tell.  That's not the

11   government's theory.  I would leave the, you know -- well, you

12   decide, strategically and tactically, what you wish to do,

13   Mr. Kenner.

14           MR. KENNER:  Thank you.

15           THE COURT:  I'm just pointing out to you that you're

16   connecting the two, and I don't think it's a good idea.

17           MR. KENNER:  Thank you.

18           THE COURT:  And there's a limit to -- how you've

19   indicated to me your one purpose.  I'll allow that one

20   question if you think it's going to actually help.

21           MS. LOCKHART:  Understood, Your Honor.

22           And, Your Honor, just so I understand on that point,

23   with respect to additional 1MDB questioning, I know there was

24   an ex parte conversation, and that you have additional

25   information.  Should I continue to object on relevance ground

Cross-examination - Heuchling

1    to the extent --

2            THE COURT:  Yeah.  I'm not in any way stopping you

3    from doing what you need to do on your end.

4            MS. LOCKHART:  Okay.  Understood.

5            THE COURT:  I was simply trying to figure out a

6    tactical theory that I thought should be done ex parte, as

7    opposed to before we go into it.  So --

8            MS. LOCKHART:  Understood, Your Honor.  And from the

9    government's perspective, on the 1MDB point, I think there was

10   an -- a trial in EDNY that lasted several weeks tracing the

11   funds to 1MDB, and we are trying -- we have not alleged --

12           THE COURT:  No, I -- you have followed my order to

13   the T.  I have no object- -- no complaints about what the

14   government has done with it.

15           MS. LOCKHART:  Understood.  Thank you, Your Honor.

16           THE COURT:  Okay.

17           (Jury entered the courtroom.)

18           THE COURT:  All right.  Good afternoon again.  All

19   right we're ready to proceed.  Mr. Kenner.

20   Q.  (BY MR. KENNER)  Mr. Heuchling, let me direct your

21   attention to Exhibit 474 that's been admitted.  This is --

22           THE COURT:  You need to speak into the microphone.

23           MR. KENNER:  I'm sorry.

24   Q.  (BY MR. KENNER)  This is a list of e-mails, or text

25   messages rather, that came from a phone you don't know?

Cross-examination - Heuchling

1   **A.**  Are you asking me this specific --

2   **Q.**  No.  Do you want me to scroll through exhibit --

3   **A.**  So, yeah, I just wanted to be clear if it was the one that

4   you were -- the page you were showing me.  So Exhibit 474 did

5   not come from a phone.  It came from Ms. Davis's Google Drive.

6   Is that what you're asking?

7   **Q.**  Okay.  And what did you search to come up with this group

8   of documents?

9   **A.**  So I didn't personally execute the search warrant on

10  Ms. Davis's Google Drive.  It was executed by another agent on

11  the investigation.  And he or she would have seized all

12  documents that were relevant and pursuant to the warrant.

13  **Q.**  So how -- you have no idea where this came from, other

14  than an agent went to Google, whatever, and got it?

15  **A.**  So, I mean, how -- how this would work is we would

16  receive, you know, a search warrant from a court, from a

17  judge.  That warrant would be served on Google.  Google

18  normally would provide the documents of -- all of the

19  documents on Ms. Davis's Google Drive.  That would then be

20  downloaded and then an agent would -- or agents would conduct

21  the search and then they would seize all the relevant

22  materials, those that are deemed responsive to the search

23  warrant.

24  **Q.**  All right.  Are these screenshots in Exhibit 474?

25  **A.**  It appears to be a series of -- some appear to be

Cross-examination - Heuchling

1    screenshots, some appear to be pictures taken with a -- what I

2    would expect would be a camera -- a telephone's camera.  And

3    some -- of both, you know, screens, and some appear just to be

4    saved documents.

5    **Q.**  Okay.  Let's start with page 1, which you see on the

6    screen.  It says, "Call me.  Urgent"; correct?

7    **A.**  Yes.

8    **Q.**  And the first paragraph is, "The DOJ filed asset

9    forfeiture actions against three additional assets last Friday

10   via California courts.  Assets are in London.  They are

11   clearly not stopping, and we need it shut down ASAP."

12        Is it the forfeiture action that you are testifying

13   needed -- in London that needed to be shut down?

14   **A.**  No.  This looks to me that they're saying is they, meaning

15   the FBI and the Department of Justice, are not stopping,

16   meaning we had not ceased our investigation.  So whatever

17   efforts that had been made at this point to, you know,

18   influence the government to drop the investigation were not

19   working.  And then the "we" I take to be the co-conspirators,

20   need to shut down the investigation, to stop us from seizing

21   assets and continuing to investigate.

22   **Q.**  Okay.  Is there anything on the first page of this

23   document that indicates that it was sent to or received by

24   Mr. Michel?

25   **A.**  No, there's nothing explicitly on here.

Cross-examination - Heuchling

**Q.** And the second paragraph, which reads, "I am still waiting
on the document which was given to Nickie on minister meetings
and persons originally scheduled in the USA, please load
ASAP."

**A.** Yes.

THE COURT:  We can take them down.

**Q.** (BY MR. KENNER)  And what do you believe -- what in the
course of your investigation was this referring to?

**A.** So in the course of the investigation, there were numerous
documents that were sent between Mr. Michel, Ms. Davis,
Mr. Broidy.  This, presumably, is messages around June.  So
there were multiple documents that I imagine were e-mailed
around the same time.  And they're directing one of those
documents to be sent or provided to Ms. Davis related to the
meeting Mr. Sun Lijun was trying to schedule in the United
States.

**Q.** What on this document tells you that it was around June of
2017?

**A.** Well, in June of 2017, we filed three forfeiture
complaints against three assets in London, and I won't forget
that because that was five days after my son was born.

**Q.** Okay.  And paragraph three reads, "Need the lady name that
was sent back from China to USA"; is that correct?

**A.** It does.

**Q.** So your testimony -- well, I'll withdraw that.

Cross-examination - Heuchling

1      Was there a -- an American citizen, woman, that was, in

2  fact, sent from -- back from China, given an exit Visa to come

3  back to the United States?

4  **A.**  Yes.  My understanding there was a woman who was being

5  held in China who was released around this time and returned

6  to the United States.

7  **Q.**  And that person's name was Emily Wang; correct?

8  **A.**  Yes, that sounds right.

9  **Q.**  And Emily Wang was pregnant at that time?

10 **A.**  Yes.

11 **Q.**  And this -- whenever it was this e-mail was is after the

12 lady came back from China; correct?

13 **A.**  Yes, it appears to be so.

14 **Q.**  Do you know who arranged for this lady to be sent back

15 from China?

16 **A.**  I don't.

17 **Q.**  You don't know whether or not Mr. Michel requested the

18 Chinese to send this pregnant woman back?

19 **A.**  I -- I am aware that -- that Mr. Michel had made that

20 request to a Chinese official.

21 **Q.**  And you're aware that as a result of that request, this

22 Emily Wang was returned to the United States; correct?

23 **A.**  I'm not --

24      MS. LOCKHART:  Objection, Your Honor.  He already

25 testified that he wasn't aware of, I think, the nature of how

Cross-examination - Heuchling

1    she was returned, and so it's mischaracterizing the

2    evidence.

3             MR. KENNER:  I didn't ask him how --

4             THE COURT:  I would sustain the objection.  He

5    indicated he was aware of this happening, that she was

6    returned.  He didn't know the circumstances of how that

7    occurred.  So you're asking him something he's indicated he

8    doesn't know, have any knowledge of.

9             MR. KENNER:  Okay.

10   Q.  (BY MR. KENNER)  Did you become aware, in the course of

11   your investigation, of a letter authored by former Attorney

12   General Jeff Sessions to the Chinese government requesting

13   that this woman be sent back?

14   A.  I'm not familiar with that letter.

15   Q.  Are you familiar with the fact that as a result of that

16   letter, Ms. Wang was not sent back?

17            MS. LOCKHART:  Objection, Your Honor.  That evidence

18   hasn't come in.

19            MR. KENNER:  I'm asking him.

20            MS. LOCKHART:  He says that he's not aware of the

21   letter.  Then the second question was --

22            THE COURT:  If he doesn't know anything about the

23   circumstances of how she came back and doesn't -- hasn't had

24   any contact or seen the letter, I don't see asking questions

25   that require knowing something about the letter.  So I'll

Cross-examination - Heuchling

1    sustain the objection.

2    **Q.**  (BY MR. KENNER)  In the course of your investigation, were

3    you ever able to determine how Ms. Wang came back?

4              MS. LOCKHART:  Asked and answered, Your Honor.

5              THE COURT:  Sustained.

6    **Q.**  (BY MR. KENNER)  Let's go to the second page of

7    Exhibit 474.  Do you see page 2 of that document?

8    **A.**  I do.

9    **Q.**  And is there a date on this?

10   **A.**  No, I don't see a date.

11   **Q.**  And at the top of this e-mail is the names Robin and

12   Elliott Broidy; is that correct?

13   **A.**  Yes.

14   **Q.**  Did that suggest to you that this e-mail was either to or

15   from both Robin and Elliott Broidy?

16   **A.**  No, it suggested to me that someone had put the contact

17   information for both Robin and Elliott into their phone and --

18   associated with this number.

19   **Q.**  Okay.  What on this suggests that somebody else put the

20   name Robin and Elliott Broidy on this?

21   **A.**  I just -- that's generally how -- how phones work.

22   **Q.**  You can tell from this document that generally, phones

23   work where somebody puts somebody else's name in the top

24   line?

25   **A.**  Yes.  Well, I can't tell that specifically from this

Cross-examination - Heuchling

1    picture, but my understanding, again, about how most

2    communication applications work is that you -- when you create

3    the contact information, you have the option to, you know,

4    name it whatever you'd like.  And so in this case it was named

5    Robin and Elliott Broidy.

6             MR. KENNER:  Can we call out the paragraph?

7    **Q.**  (BY MR. KENNER)  I believe there is an "R and."  You can't

8    see a "B," but "R and"; is that correct?

9    **A.**  Yes, I see that.

10   **Q.**  Does that indicate somebody else was putting Robin and

11   Elliott Broidy's name here?

12   **A.**  No, that's -- that indicates that the contact associated

13   with the contact here, Robin and Elliott Broidy, has been

14   shortened by the application to R ampersand, and then it

15   provides the message, similar to what we saw where, you know,

16   Steve Wynn's name was shortened to SW.

17   **Q.**  Okay.  Page 2 of Exhibit 274 starts by saying,

18   "Understood."  Do you see that?

19   **A.**  I do.

20   **Q.**  And below that is, "Spoke" --

21            MR. KENNER:  Can you call that out, please,

22   Mr. Campbell?

23   **Q.**  (BY MR. KENNER)  "Spoke with Mr. Ricky Waddell, deputy

24   national security advisor.  Meeting for PM of Malaysia, Najib

25   Razak, with POTUS, is being set for month end July or early

1    August.  Working to get precise date.  This information will

2    be received soon, and we will make sure contact is made

3    through proper channels ASAP.  When I get to D.C. tomorrow, I

4    will work to receive precise date.  Please feel comfortable

5    that the meeting with POTUS will take place."

6         So does this -- to you consistent with whoever it was

7    that was sending or receiving this, seeking to set up a

8    meeting with Ricky Waddell, deputy national security

9    advisor?

10   **A.**  No, this appears to me that the sender is saying that they

11   spoke to Mr. Waddell, the deputy national security advisor,

12   and that Mr. Waddell confirmed with the sender, who I said --

13   or I think indicates based on this is Mr. Broidy, and

14   Mr. Waddell, or General Waddell, confirmed that a meeting

15   would be set up between the prime minister of Malaysia and the

16   President for end of July or early August.

17   **Q.**  So now you understand this e-mail to be sent from Robin

18   and Elliott Broidy?

19   **A.**  No, not -- no, I understand it to be sent from Mr. Broidy.

20   As we know, or as we've learned through the -- or I've learned

21   through the course of the investigation, Mr. Broidy had

22   multiple contacts with high-level officials in the White House

23   and in the National Security Council.  We have seen no

24   evidence that Ms. Rosenzweig, Robin, Mr. Broidy's wife, had

25   any such contacts.

Cross-examination - Heuchling

1  **Q.** She's never been to the inaugurations for President Trump

2  or other political events and parties. Is that your

3  testimony?

4  **A.** That's -- that's not what I said, Mr. Kenner. I just said

5  based on this investigation, we saw that Mr. Broidy had

6  multiple contacts with high-level individuals in the White

7  House and that in the course of this investigation, I did not

8  uncover similar contacts for Mr. Broidy's wife.

9  **Q.** You did determine, though, that Mr. Broidy's wife was the

10 owner of Colfax Law; correct?

11 **A.** Yes, that's correct.

12 **Q.** And you did determine that Colfax Law got a check for

13 multimillions of dollars; correct?

14 **A.** It received multiple millions of dollars in wires,

15 approximately 9 million, and I think one check worth $740,000

16 from Mr. Michel.

17 **Q.** And you saw in the course of your investigation that

18 Colfax Law sent a check for $1 million to Robin Rosenzweig,

19 did you not?

20 **A.** I did see that, yes.

21 **Q.** And did you investigate what she did to earn that from

22 Colfax?

23 **A.** Yes. She did nothing to earn that money from Colfax.

24 That appeared to be a payment to benefit Mr. Broidy,

25 Ms. Rosenzweig, and their family.

Cross-examination - Heuchling

1    **Q.**  Okay.  So you would agree that part of the money that

2    came -- let me withdraw that.

3        You also learned that Colfax Law wrote a contract between

4    Jho Low and Colfax Law firm; correct?

5    **A.**  Yeah, it's not clear to me who wrote that contract, but

6    yes, there was a contract between Colfax and Mr. Low.

7    **Q.**  You've never seen an e-mail from Robin Rosenzweig to

8    anybody else attaching that contract?

9    **A.**  I may have, and I may not be recalling it now.

10   **Q.**  So you may have seen it, you just don't remember?

11   **A.**  I don't recall, but I --

12   **Q.**  Does that mean you don't know or that you just --

13   **A.**  Yeah, that's right.  As I sit here, I don't know for sure

14   if I saw that.

15             THE COURT:  You're talking about the e-mail?

16             THE WITNESS:  Yes, Your Honor.  I don't recall

17   seeing, as it sit here specifically, an e-mail from

18   Ms. Rosenzweig.

19   **Q.**  (BY MR. KENNER)  But you have doubts that Robin Rosenzweig

20   authored that letter -- I mean, that agreement?

21   **A.**  I would have no evidence either way.

22             THE COURT:  You're making a distinction between the

23   e-mail or the contract, Mr. Kenner?

24             MR. KENNER:  The contract that was e-mailed, is what

25   I'm asking.

1           THE COURT:  That's slightly different.

2    **A.**  Okay.  That's what I understood.

3           THE COURT:  That's the difference.  There's two

4    different things.  One is the contract, whether it was

5    e-mailed or not.  You've asked him two separate questions.

6           MR. KENNER:  Okay.

7           THE COURT:  He's given a different answer as to the

8    contract.

9    **Q.**  (BY MR. KENNER)  Let me withdraw those questions and say,

10   is the person who authored this e-mail indicating that they

11   would make sure that the contact between the Malaysian people

12   and Ricky Waddell would be done through proper channels?  Do

13   you see that there?

14   **A.**  Yeah, I do.  It's not exactly clear to me if that

15   indicates that the contact would be between the Malaysians and

16   Mr. Waddell with them directly or potentially between, you

17   know, the Malaysian, you know, Ministry of State and the U.S.

18   Department of State or something similar.

19   **Q.**  You're telling me you're not sure who this e-mail was

20   about in terms of someone from Malaysia?

21   **A.**  No, what I'm saying just is -- your question, as I

22   understood it, was whether the writer was saying someone will

23   make contact between the Malaysians and -- and Mr. Waddell,

24   and I just said that's not clear to me.  What it appears to me

25   is being said is, now that we have, you know, kind of used the

1    back channel to get this -- this meeting between the prime

2    minister of Malaysia and the President, generally on the

3    books, now that that is done, we will, you know, notify

4    whomever it would be to kind of make it official.  And my

5    expectation I guess would be that would be the Department of

6    State in the United States and then whatever the equivalent

7    body is in Malaysia.

8    **Q.**  Let me go back up to the first paragraph, the first

9    sentence, which reads --

10           MR. KENNER:  Can you pull that up?  I can't see it,

11    though.

12    **Q.**  (BY MR. KENNER)  Which reads, "Spoke with MG Ricky

13    Waddell, deputy national security advisor.  Meeting for PM of

14    Malaysia, Najib Razak, with POTUS, is being set for month end

15    July or early August."

16      Does that help you remember who the party for Malaysia

17    was that this was referencing?

18    **A.**  No.  I mean, it -- I didn't forget.  I didn't need this to

19    remind me.  So the answer to your question is no.

20    **Q.**  Okay.  Did I hear wrong when you just said you didn't know

21    who on Malaysia's side this was referring to?

22    **A.**  No, I was just saying in the reference to proper channels,

23    I wouldn't know exactly who on the Malaysian side the proper

24    channels would be, but I would expect it would be, you know,

25    maybe someone from the prime minister's staff or their

Cross-examination - Heuchling

1  equivalent of the Department of State.

2  **Q.** But do you agree that it says, "Meeting for PM of

3  Malaysia, Najib Razak, with POTUS, is being set for month

4  end"?  Is that your understanding?

5          MS. LOCKHART:  Your Honor, objection.  Asked and

6  answered.

7          THE COURT:  I think it has been a couple times.  So

8  let's move on.

9  **Q.** (BY MR. KENNER)  You know what, I'm going to change

10  direction for a moment and come back to this, but you

11  testified that the fact that Mr. Michel and whoever else went

12  to China, went through Hong Kong and then to Szechwan, I

13  believe you said?

14  **A.** Shenzhen, yes.

15  **Q.** Chen Juan?

16  **A.** Shenzhen.

17  **Q.** Shenzhen.  Thank you.

18      And is it your belief that that shows that something

19  nefarious or bad was happening because that was the flight

20  path?

21  **A.** No, that alone doesn't necessarily mean something

22  nefarious or bad was happening, but it -- it does -- the route

23  of travel and the way they passed through passport control

24  would allow them to maintain some sort of an anonymity to the

25  fact that they traveled to China.

1    **Q.**  Okay.  How long is the flight from LAX to Shenzhen,

2    China?

3              MS. LOCKHART:  Objection.  Relevance.

4              MR. KENNER:  The relev- --

5              THE COURT:  I'll sustain it.

6    **Q.**  (BY MR. KENNER)  Sir, aren't you aware that most everybody

7    that goes to Shenzhen goes through Hong Kong?

8    **A.**  I know there are direct flights from Los Angeles to Hong

9    Kong -- or, yeah, one-way flights.

10   **Q.**  And as part of your investigation, did you learn that you

11   save 12 hours of flying time by flying to Hong Kong and taking

12   the ferry for 45 minutes to Shenzhen?

13             MS. LOCKHART:  Objection, relevance and

14   mischaracterizing the evidence.  The ferry related to Macau.

15   I think they traveled by car to Shenzhen.

16             THE COURT:  I believe that the -- am I correct that

17   it was by car?

18             MR. KENNER:  What she just said is not accurate,

19   Your Honor.

20             THE COURT:  Well, what she just said --

21             MS. LOCKHART:  The relevance point still stands,

22   Your Honor.

23             THE COURT:  I'm sorry?

24             MS. LOCKHART:  I said the relevance objection still

25   stands in terms of --

1          THE COURT:  In terms of, you know, how you could go,

2    fly, or whatever, I'm not sure it's particularly relevant.  If

3    you want to -- we've already put on the record how they did

4    go, which evidently did not go through passport control.

5    That's the extent of the testimony.

6          MR. KENNER:  Your Honor, I'm not now talking about

7    passport control.  I will in a moment --

8          THE COURT:  You're talking about how to go there,

9    whether you go by -- you can go directly by flight or not, and

10   I'm just pointing out to you that I think there's some lack of

11   relevance.  Also, I don't know whether he has checked flights

12   and how else to get there in terms of being able to tell you

13   what it is.  And I don't see any particular relevance.

14         MR. KENNER:  I have all of the flight records, Your

15   Honor --

16         THE COURT:  But that's --

17         MR. KENNER:  If you'd like, I'll go through all of

18   them.  They were given --

19         THE COURT:  You may -- excuse me.  You may know

20   them, but the question is whether he has -- as part of his

21   investigation or otherwise, knows this kind of information,

22   that you're asking him things that, as far as I can tell, he

23   doesn't necessarily know.

24   Q.  (BY MR. KENNER)  Did you review flight records for

25   Mr. Pras Michel to and from the United States to Hong Kong and

Cross-examination - Heuchling

1    then China?

2    **A.**  I saw flight records for Mr. Michel.  Some of those

3    flights were directly into Hong Kong.  Some of those flights,

4    as I recall, went into China without passing through Hong

5    Kong.

6    **Q.**  You recall that?

7    **A.**  I do.  Not -- not to Shenzhen.

8    **Q.**  To someplace else in China?

9    **A.**  Yes, I believe so.

10   **Q.**  And where was that?

11   **A.**  I believe it was Beijing.

12   **Q.**  That's nowhere near Shenzhen, is it?  Shenzhen or --

13   **A.**  No.

14   **Q.**  Shenzhen -- whatever.

15   **A.**  No.  No, it's not.  Shenzhen is, you know, southern

16   China.

17   **Q.**  Right.  And it is not uncommon for people to fly --

18              MR. KENNER:  Excuse me, Your Honor.  I apologize.

19              (Laughter.)

20              THE COURT:  Can we get back to something serious?

21   **Q.**  (BY MR. KENNER)  So you are aware that Mr. Michel,

22   you believe -- well, you think Mr. Michel flew from the United

23   States to Beijing; correct?

24   **A.**  Yes, that is my understanding.

25   **Q.**  Okay.  And tell me where geographically Beijing is in

1    comparison to -- I'm not going to say it again or I'll start

2    laughing.

3    **A.**   Beijing is in central China, and Shenzhen is in southern

4    China.

5                THE COURT:  Do you have a time frame for this?

6                THE WITNESS:  I think it's moved, but I -- I don't

7    know the answer.

8    **Q.**   (BY MR. KENNER)  So if you wanted to end up in Shenzhen,

9    if I'm saying it right, if you flew to Beijing, you would be

10   flying a lot further and then you would have to fly back the

11   way you just came from, from Beijing to Shenzhen?

12               MS. LOCKHART:  Your Honor, objection, relevance.

13   We've spent a lot of time on this issue.

14               THE COURT:  Yeah, I'm not sure, ultimately, what

15   this has to do with the issues in this case in terms of where

16   he -- whether he flew to Beijing or didn't fly to Beijing.

17   He's indicated one -- at least one or maybe more than one

18   flight where they went to Hong Kong and then went into

19   Shenzhen on their own, okay, throughout -- without going

20   through passport control.  That's the only evidence we have.

21   You've brought out other things that I, frankly, don't see any

22   particular relevance.  I think we need to move on.

23               MR. KENNER:  Yeah.  Your Honor, this witness

24   testified to, on direct, was that there -- it was suspicious

25   to him in his investigation.  It was a fact he considered that

1   Mr. Michel and/or others flew through Hong Kong and then took

2   a ferry for 45 minutes to Shenzhen.

3           MS. LOCKHART:  Your Honor, that's mischaracterizing

4   the evidence.  I don't think Agent Heuchling ever testified

5   that it was suspicious --

6           THE COURT:  I can't hear you.

7           MS. LOCKHART:  Oh, sorry, Your Honor.  It

8   mischaracterizes the evidence.  I don't think Agent Heuchling

9   ever said that it was suspicious.  He merely noted that

10  traveling through Hong Kong and passing by passport and custom

11  control means that you evade having to report or detection by

12  the FBI when you ultimately end up in China.  He didn't

13  characterize the evidence.

14          THE COURT:  And that's the testimony that we have,

15  you know, as she has stated it.  So I'm not sure in terms of

16  other trips, whether, timingwise, we don't know the trips, the

17  timing of it is.  We don't know whether there -- it ties into

18  other purposes of why we have this evidence that Mr. Michel

19  and others traveled to that area.  So I think we've done with

20  whatever relevant testimony you've got.  Time to move on.

21          MR. KENNER:  Okay.

22  **Q.**  (BY MR. KENNER)  You testified on multiple occasions that

23  Mr. Michel and others were whisked through customs.  Do you

24  recall that?

25  **A.**  I do.

1    **Q.**  And what do you mean by "whisked through"?

2    **A.**  So my understanding, from the investigation, is that they

3    were greeted at -- greeted when the plane landed and afforded

4    special circumstances.  As I recall, their passports were

5    taken from them and then they received their passports back at

6    a later date.  So, you know, they didn't go through the

7    normal -- the normal line that you or I would go through when

8    we landed in a foreign country.

9    **Q.**  But you've testified that he got whisked through without

10   showing passports.

11          MS. LOCKHART:  Your Honor, objection, relevance.

12   Agent Heuchling's given his testimony, and counsel's trying to

13   characterize it.

14          THE COURT:  He's indicated he said whisked through,

15   I don't know about without showing passports or not, frankly,

16   at this point, but I do know that he would -- he's admitted

17   that he -- that was the language that he used in terms of

18   whisked through, not going through the normal procedures.

19          MR. KENNER:  Thank you.

20   **Q.**  (BY MR. KENNER)  Are you aware, when a group of people

21   come in that have made arrangements to come into any country,

22   like a tour, like a group of tourists, they often hand their

23   passport to somebody who takes a group of passports to have

24   them stamped?

25   **A.**  I --

Cross-examination - Heuchling

**Q.** Do you know that?

**A.** I don't.  I've never done that before.

THE COURT:  All right.  Can I talk to you all?

(Bench conference on the record.)

THE COURT:  This is -- Mr. Kenner?  Mr. Kenner, this is really getting far afield.  I mean, he tied these trips to particular other documents that indicated meetings.  So it wasn't we don't know when he went to Beijing, we don't know when he may have done other things.  As I understand it, the trips that they did through Hong Kong and then went into the Province, where there's other documents that tie what the reason for having -- meeting with people within China, am I correct?

MR. KENNER:  Yes --

THE COURT:  Okay.  Right.  So all of these are connected with that particular thing, not whether he went on a group thing or some other thing.  You've spent enough time on this.  It's time to move on.  It has minimal relevance, and what you're leaving out of the whole picture is the timing of this and the way it occurred and the reason for going into meeting and meeting with these officials in China, okay.  Nobody has --

MR. KENNER:  May I --

THE COURT:  There's no evidence that he, you know, was going as a tour group.

83

Cross-examination - Heuchling

1          MR. KENNER:  Okay.  May I at least ask if he --

2     what's the basis for whether or not he investigated or whether

3     the passports were presented and stamped?

4          THE COURT:  I -- you know, he's never said anything

5     about whether they were stamped or not.  So that's not -- that

6     wasn't the issue.  As I understand, the issue was he didn't go

7     through the normal procedures when he landed in Hong Kong in

8     terms of being able to be taken elsewhere.  And it's tied to

9     meetings that he had with people in China.  So there's a

10    particular time frame when this occurred, not just any old

11    trip.  So you're getting -- you're separating out the reason,

12    the trips and how the trips occurred from the timing of these

13    particular meetings, as to whether or not these meetings

14    would -- you know, you would perhaps not want to have it be as

15    obvious that you were going to that.

16         Now, you've asked a number of questions, and whether

17    the passports were stamped or not really doesn't get to the

18    issue here in terms of the manner in which he went or if

19    you're trying to undercut somehow that you could get into

20    China otherwise.  The point was not that you could get into

21    China otherwise.  The point is the way they went into China

22    for these particular meetings, it's tied to the meetings.

23    You've had enough in terms of trying to bring all this out.

24    It's wasting time.  Let's move on.

25              (The following proceedings were had in open court.)

Cross-examination - Heuchling

1          THE COURT:  Let's move on.

2  **Q.**  (BY MR. KENNER)  Directing your attention back to

3  Exhibit 474.

4          THE COURT:  If you could speak into the

5  microphone.

6  **Q.**  (BY MR. KENNER)  Directing your attention back to

7  Exhibit 474.  On page 3.

8  **A.**  I see it.

9  **Q.**  Yes.  This appears to be reflecting the travel time to get

10  from Grand Central Station, Metro North train departing at

11  4:08, get off at Grand Central terminal at 5:17, one-way

12  off-peak fare, station TVM, $13.25, reduced fare, $8.75.  Can

13  you explain to me the -- first of all, what is this document?

14  Is this something that you also got back from the Google

15  search or Google one or --

16  **A.**  Yes.  This -- this was a document that was seized from

17  Ms. Davis's Google Drive account.  It appears to be a

18  screenshot of a cell phone.  On that cell phone is information

19  from the MTA, the Mass Transit Authority, on the travel time

20  and the cost of a train from Grand Central Station in New York

21  to Westport station in Westport, Connecticut.

22  **Q.**  And what do you believe this document, if anything, to be

23  relevant to?

24  **A.**  So first off, I would just reiterate that I didn't execute

25  this search warrant, so I didn't seize this, so I can't tell

Cross-examination - Heuchling

1    you what the agent who seized it saw as relevant.  But

2    generally, as part of our investigations, what is key and

3    important to us is where co-conspirators might be traveling.

4    And so I presume that whoever seized this thought that -- that

5    it was important to know that at this time, presumably whoever

6    took this screenshot, perhaps Ms. Davis, was either in New

7    York or going to be in New York and traveling to

8    Connecticut.

9    **Q.**  Does this document tell us who was in New York?

10   **A.**  No, it does not.

11   **Q.**  Does this document confirm that this person did take this

12   trip?

13   **A.**  No.

14   **Q.**  This is essentially somebody inquiring about the off-peak

15   fare to go from Grand Central in New York to Connecticut;

16   correct?

17   **A.**  Yes, that's what it appears to be.

18   **Q.**  Let's go to page 4, please, of the same exhibit.  Scroll

19   up to the top please.  What is this document, did you get this

20   also from Google Drive or Google something?

21   **A.**  Yes, everything from this exhibit came from Ms. Davis's

22   Google Drive.

23   **Q.**  Okay.  And on the top it says 20171007, GWG in caps,

24   paren, official with APPE, what does that mean?

25   **A.**  So I'll break it down as best I can, GWG would refer to

Cross-examination - Heuchling

1    Guo Wengui, 20171007 appears to be a date.  However, I would
2    suggest this is written in the European or the international
3    form, which would be day before month.  So we would be looking
4    at a document that was drafted in 2017, on July 10th or dated
5    July 10th.  Then it says official with APPE, and I wouldn't
6    tell you what that last part meant.
7    Q.  And does this document appear to contain talking points in
8    favor of the United States deporting Mr. Guo?
9    A.  It's a little bit hard for me to read, but I've seen this
10   document in the course of the investigation other places,
11   including in Mr. Michel's e-mails, where there's a cleaner
12   copy.  But yes, it appears to suggest that there are benefits
13   to the Chinese government or reasons why the Chinese
14   government wants Mr. Guo deported and by a certain time.  And
15   again it mentions that July 15, 2017 date.
16   Q.  Okay.  And is it your understanding that these talking
17   points were given to somebody to give to somebody else?
18   A.  It's not clear if they were given to someone to give to
19   someone else, or given to someone so that person could, you
20   know, incorporate them into their conversations or their
21   meetings or to write, you know, draft new talking points.
22   That's not exactly clear to me.  But it does appear they came
23   from someone, someone drafted them and provided them to the
24   co-conspirators.
25   Q.  Okay.  I'm going to direct -- I'm going to direct you to

1    under VI, further conditions and benefits to USA, do you see
2    that?
3                THE COURT:  It's hard to read.
4                THE WITNESS:  You could maybe blow it up a little
5    less.
6                MR. KENNER:  Make it bigger or smaller?
7                THE WITNESS:  I can try to read it, go ahead.
8                THE COURT:  Can you make it clearer or is the
9    original print blurred --
10               THE WITNESS:  I think I can make it out Your
11    Honor.
12               MR. KENNER:  I'm happy to show you the actual
13    exhibit if you think that would be better.
14   **A.**  No, I think I can make it out, Mr. Kenner.
15   **Q.**  (BY MR. KENNER)  Okay.  Under paragraph 2, under VI
16   consideration, do you see reference to Attorney General
17   Jeff -- then Attorney General Jeff Sessions?
18   **A.**  Are you saying there's a check mark then it says, Attorney
19   Jeff Sessions in a letter.
20   **Q.**  Yes.
21   **A.**  Yes, I see that.
22   **Q.**  Did you review this document in the course of your
23   investigation?
24   **A.**  I did, yes.
25   **Q.**  And did you see when you reviewed this document that

Cross-examination - Heuchling

1  attorney Jeff Sessions, in a letter at the end of May 2017, to

2  the People's Republic of China's ambassador to the U.S.,

3  requested for three U.S. persons to be sent from PRC back to

4  USA, you saw that when you reviewed the document; correct?

5  A.  Yes, I've never seen -- or I don't believe I've seen that

6  letter, but I must have seen this line, yes.

7  Q.  You've not seen this before?

8  A.  No, no, I apologize.  I've seen this.  I have not seen the

9  letter that it references, though.  At least I don't recall

10  seeing it.

11  Q.  But you do recall becoming aware of the fact that Jeff

12  Sessions sent a letter at the end of May to the PRC?

13          MS. LOCKHART:  Objection, Your Honor.  Asked and

14  answered.  His testimony is that he's seen this line in this

15  document, but he's testified multiple times that he does not

16  recall and has not seen the actual letter itself.

17          THE COURT:  He's indicated --

18          MR. KENNER:  He just said he reviewed it.

19          THE COURT:  -- the letter, he's seen what you have

20  in there.  You've asked him in terms of the letter and he

21  indicated that he had not seen it.  So you're asking him again

22  if he's seen something he's already testified to.

23  Q.  (BY MR. KENNER)  When you reviewed this document, did you

24  consider its contents in terms of your investigation?

25  A.  I -- yes, and I answer that because I think you asked me a

1  question like this last time I was on the stand.  I mean, it's

2  my responsibility as an investigator to consider all the

3  evidence that I review.  So I, of course, would have also

4  considered the contents of this document.

5  **Q.**  All right.  Did you consider the fact that this document

6  reflected that Emily Huang with a passport number, has already

7  immediately been sent back to the USA?

8  **A.**  That particular point was not relevant specifically to

9  what I was investigating.

10  **Q.**  And did you consider this -- that part of this document

11  that refers to two other USA persons as being requested to be

12  sent back to the United States?

13          MS. LOCKHART:  Your Honor, objection to the

14  question.  Agent Heuchling has already testified he's

15  considered this document and he considers all of the evidence

16  in the case.

17          THE COURT:  He said that a couple of times.  So

18  unless you're asking something else.  He's indicated what

19  evidence he went through and how he considered it.

20          MR. KENNER:  Thank you, Your Honor.

21          THE COURT:  Let's move on.

22  **Q.**  (BY MR. KENNER)  Going to the next page of this document,

23  page 5, I believe.

24  **A.**  I see it.

25  **Q.**  And does this to be -- purport to be additional talking

1  points regarding Guo Wengui coming back to the -- to be

2  deported to China?

3  **A.**  Yes, this is the document we looked at earlier.

4          THE COURT:  You need to speak into the microphone,

5  Mr. Kenner.

6          THE WITNESS:  Sorry.

7  **Q.**  (BY MR. KENNER)  And this document on the top says Mr. Guo

8  Wengui, forward slash, Mr. Kwok Ho Wen, paren, quote, G-U-O,

9  close paren, same person official information?

10  **A.**  Yes.

11  **Q.**  And do you know who prepared this document?

12  **A.**  No, it appears to be prepared by the Chinese government as

13  they would be the only ones who had access to this official

14  information on Mr. Guo.

15  **Q.**  And to your understanding was that document forwarded on

16  by Elliott Broidy to the White House?

17  **A.**  I'm not aware if this document in its entirety was

18  forwarded on.

19  **Q.**  So you -- it may have been, it may not, you don't know?

20  **A.**  Correct, I don't know.

21  **Q.**  And on the following page, page 6 I believe of the

22  exhibit, it reads --

23          THE COURT:  If you could speak into the microphone a

24  little more.

25          MR. KENNER:  Yes, I apologize again, Your Honor.

1          THE COURT:  Thank you.

2     **Q.**  (BY MR. KENNER)  Do you see on top of this document China

3     ambassador in USA has been informed?

4     **A.**  I see that.

5     **Q.**  And is it your belief that the Chinese ambassador in the

6     U.S. was informed by Mr. George Higginbotham?

7     **A.**  No, not in this instance.  This letter appears to be sent

8     prior to Mr. Higginbotham's going into the embassy as it

9     references the July 12th date and the July 15th date.  And

10    Mr. Higginbotham went to the embassy on July 16th.

11    **Q.**  So this led up to the visit to the embassy; is that

12    correct?

13    **A.**  It appears that this would be prior to that, yes.

14    **Q.**  And then it reads, directly to nominated coordinator from

15    China NSA equivalent, who did you know that to be, if you

16    did?

17    **A.**  So that would be the Chinese equivalent in the national

18    security, their national security -- or their national

19    security advisor, I don't know who that equivalent would have

20    been.

21    **Q.**  To your understanding was that person in the United States

22    at the time this document came up?

23    **A.**  I don't know who that person is, so I couldn't tell you if

24    they were or were not in the United States.

25    **Q.**  And No. 3 says, call to take place urgently between NSA

1   and the below mentioned individuals before July 12th, 10:00

2   p.m. Eastern Standard Time?

3   A.  Yes.

4   Q.  And in paragraph 8 -- I'm sorry, paragraph A, under No. 3,

5   does that indicate --

6           THE COURT:  Need to talk into the microphone.

7           MR. KENNER:  Yes, I'm sorry.

8   Q.  (BY MR. KENNER)  In paragraph A under 3, does it indicate

9   the people that want to meet with the U.S. Government?

10  A.  It indicates the people who want, appears to want a call

11  with -- with the U.S. Government, yes.

12  Q.  And does that indicate the secretary general of central

13  political and legal affairs commission, minister rank?

14  A.  Yes.

15  Q.  And does it indicate, which covers, oversees all

16  enforcement authorities in China, such as the ministry of

17  state security, ministry of public security, Supreme Court,

18  ministry of justice, central public security comprehensive

19  management commission, and others; is that correct?

20  A.  That's what it says, yes.

21  Q.  Okay.  And this is what was being asked to be conveyed to

22  the U.S. Government, correct, to make a call?

23  A.  Yes.

24  Q.  And B is Sun Lijun vice minister of public security of the

25  People's Republic of China, correct?

Cross-examination - Heuchling

1    **A.**  Yes.

2    **Q.**  And under that it says agenda to discuss, A, under the

3    agenda, Guo arrest and deportation to HK by 15 July, see that

4    there?

5    **A.**  I do.

6    **Q.**  And B is, People's Republic of China sending back two

7    persons to U.S.A. by July 15?

8    **A.**  Yes.

9    **Q.**  And does this indicate that the People's Republic of China

10   will be taking back 60 illegal immigrants from the United

11   States?

12   **A.**  It says that's on the agenda.

13   **Q.**  All right.  And then underneath it says, note, please send

14   this to N and E double, time lines need to be met as it is

15   final.  Big guy has been briefed and thus assigned Wang too in

16   addition to Sun.  All goods ready for July 15th; do you see

17   that there?

18   **A.**  I do.

19   **Q.**  And you see the reference to "E double"?

20   **A.**  Yes.

21   **Q.**  What does that mean?

22   **A.**  So Elliott Broidy's full name is Elliott Brian Broidy, and

23   E is his first initial, double would be a reference to the

24   double B in his middle and last name.  So that would be E

25   Broidy or Broidy.

Cross-examination - Heuchling

1   **Q.**  Are you aware of whether -- you've heard the phrase "body
2   double" before?
3   **A.**  Yes.
4   **Q.**  Do you -- isn't I true that the E double refers to the
5   body double for Eric trump?
6   **A.**  No.
7   **Q.**  How do you know?
8   **A.**  Based on the totality of all the communications I've seen
9   and I've looked at -- I have not seen any other communications
10  where something would be sent both to Nickie -- or Ms. Davis
11  and Eric Trump.
12  **Q.**  Have you seen the name Eric Trump in connection with your
13  investigation in this case?
14  **A.**  Yes.  Mr. Eric Trump's name has come up.
15  **Q.**  And in what way did Mr. Eric Trump's name come up?
16  **A.**  As I recall there were going to be efforts made to try to
17  reach out to him.
18  **Q.**  All right.  And if that were the case, the person they'd
19  reach out to would be referred to as his body double;
20  correct?
21  **A.**  I can't --
22         MS. LOCKHART:  Your Honor, asked and answered.  He's
23  already testified to this.
24         THE COURT:  It also sounds rather speculative in
25  terms of the way you have phrased and the conclusions you have

Cross-examination - Heuchling

1    reached.  Let's move on.

2              MR. KENNER:  Thank you, Your Honor.

3    **Q.**  (BY MR. KENNER)  Going to the next page of this document,

4    again you see Robin and Elliott Broidy on the top?

5    **A.**  I do.

6    **Q.**  But we don't know whether this was from or to Elliott

7    Broidy, do we?

8    **A.**  Yeah, based on -- based on how this is set -- well, I

9    guess I don't know exactly -- maybe just clarify quickly, you

10   can tell which messages were sent from the account associated

11   with Elliott Broidy and which is the response, but you can't

12   tell exactly who this was sent to.

13   **Q.**  Okay.  But you can tell it was sent from Robin and Elliott

14   Broidy e-mail?

15   **A.**  Not an e-mail, but I can tell that the person who was

16   using this app device had associated the messages that --

17             MR. KENNER:  Objection to what somebody else did.

18   I'm asking you what you know.

19             THE COURT:  You asked him -- excuse me, let's hear

20   what the answer is.  And then we'll see whether it needs to

21   be -- it will stand or not.  Go ahead.

22   **A.**  Mr. Kenner, can you repeat the question.

23   **Q.**  (BY MR. KENNER)  May it be read back, Your Honor?

24             THE COURT:  It's farther up than I can get.  You can

25   ask the question again, go ahead.

1    MR. KENNER:  Thank you.

2    **Q.**  (BY MR. KENNER)  I just want to understand, is it your

3    testimony that this came from a Robin and Elliott Broidy

4    account?

5    **A.**  Okay.  I recall your question, I can't -- what I was

6    saying is I can't say it came from an e-mail account.  Yes, it

7    appears that this came from a -- an account associated with

8    Robin and Elliott Broidy, or such an account that the person

9    who was using this application device assigned the -- that

10   account this name, Robin and Elliott Broidy.

11   **Q.**  But again you can't tell who this was sent to; is that

12   correct?

13        MS. LOCKHART:  Your Honor, asked and answered.

14        THE COURT:  Don't keep asking the same question, Mr.

15   Kenner.  You've got the answer.  Let's move on.

16   **Q.**  (BY MR. KENNER)  Okay.  The next line on this page has in

17   a circle, capital R and the and sign.  And next to it is, one

18   more thing, Kasowitz threatened to quit today.  Trump has his

19   hands full, do you see that?

20   **A.**  I do.

21   **Q.**  Do you know what that's referring to?

22   **A.**  Not the specifics, but someone in Mr. Trump's

23   administration threatening to quit and President Trump being

24   preoccupied with that.

25   **Q.**  And this was Robin and Elliott Broidy notifying somebody

Cross-examination - Heuchling

1    of that fact?

2    **A.**  It appears to be that, yes.

3    **Q.**  All right.  And the next entry is a capital R and an and

4    sign, need your text again, asap, do you see that?

5    **A.**  I do.

6    **Q.**  Do you see anything in there that gives context to that

7    statement?

8    **A.**  Yes, this is on an encrypted messaging app.  And as we

9    talked about they self-destruct.  So it's possible that that

10   message had been previously sent and then had destructed after

11   12 hours.  And the sender was saying, I need you to resend the

12   information because I no longer have it.

13   **Q.**  That's your speculation, correct?

14   **A.**  I thought that's what you --

15           MS. LOCKHART:  Your Honor, he asked the question and

16   Agent Heuchling answered.

17           THE COURT:  You asked him if he knew, what his

18   interpretation, he's giving it to you.  Let's move on.

19           MR. KENNER:  Let's move on.  Thank you, Your

20   Honor.

21   **Q.**  (BY MR. KENNER)  The next box reads X-i J-i-p-i-n-g, I

22   believe that's Xi Jiping; is that correct?

23   **A.**  Yes the former and current president of China.

24   **Q.**  And he's, Xi Jiping, is requesting a prior to 10:00 p.m.

25   Eastern Standard Time today, a conference call between

Cross-examination - Heuchling

1    McMaster and his Excellency Wang Yongqing, secretary general

2    of the central political and legal affairs commission, which

3    oversees all enforcement authorities in China, such as

4    ministry of state security, ministry of public security,

5    supreme court, ministry of justice, comprehensive management

6    commission.  Then it says, the ambassador for China has been

7    briefed and is waiting to be contacted to arrange a call to

8    discuss Guo deportation and return of two American prisoners

9    and take back 60 illegal Chinese criminals.  Do you know what

10   ambassador has been briefed about that?

11   **A.**  The ambassador from China has been briefed.  I guess it

12   goes two ways, it could be the Chinese ambassador to the

13   United States or it could be the American ambassador to

14   China.

15   **Q.**  Okay.  Did you choose between those two alternatives and

16   interpret it?

17   **A.**  I mean, yeah, based on the investigation, it would be the

18   Chinese ambassador to the United States.

19   **Q.**  Okay.  And this was apparently after the ambassador was

20   briefed by someone?

21   **A.**  Yes, but it's not clear, you know, who or when.

22   **Q.**  Okay.  This -- in your view this could be referring to the

23   Chinese government briefing their Chinese ambassador to the

24   United States about a call; is that correct?

25   **A.**  It could be, yes.

Cross-examination - Heuchling

1    **Q.**  All right.  And do you know -- there's nothing on this

2    document that indicates when it was -- the date that it was

3    sent, is there?

4    **A.**  If you can scroll back I'll take one more look at it, but

5    I don't believe so.

6    **Q.**  Sure.

7    **A.**  No, there's no indication of the date there.

8    **Q.**  All right.  And if we can go to the next page, which

9    reads, I just --

10            THE COURT:  Can I ask how many pages, since we're

11    going through this page by page?

12            MR. KENNER:  33 pages, Your Honor.

13            THE COURT:  So are you planning on going through all

14    33.

15            MR. KENNER:  Yes, I am, Your Honor.

16            MS. LOCKHART:  Your Honor, I would question the use

17    of the jury's time in reading every single message aloud.

18            THE COURT:  I think we should have a discussion

19    about it.  I -- so let me have a discussion now and then we're

20    looking like we're close to the -- we're 5:00 o'clock, so we

21    can have a discussion.

22            (Bench conference on the record.)

23            THE COURT:  Mr. Kenner, you're having him read

24    everything.  He's already read a lot of things and it's

25    already been admitted.  So it's a waste of time to have him

1    read into the record what's already been read into the record.

2    If you want to say, you know, have you looked at this, and you

3    have a specific question about it, then ask the question.  I

4    cannot help but feel that this is an effort to prolong the

5    trial.  And this is a waste of time and you're losing -- and

6    maybe that doesn't bother you, but frankly, this is getting

7    beyond, you know, in terms of going through it, we've heard

8    multiple times.  I could probably quote what's in some of this

9    from the times that you have brought it up.

10            If you have a question about each of the documents,

11   you can ask it.  But you don't have to have him read it in.

12   It's been read in already prior to this time when it went

13   through.  You don't need to do it a second time.  If it turns

14   out he can't remember, it's a different issue in terms of what

15   you're relating to.  But you need to focus on asking what

16   seems to be a particular question.  I must admit I'm having

17   trouble figuring out what the pertinence of most of these

18   questions are.  Can you tell me.

19            MR. KENNER:  Yes, Your Honor, this is a government

20   admitted exhibit.

21            THE COURT:  Right.

22            MR. KENNER:  It purports to explain what is

23   represented here.  I will be certainly willing tonight, Your

24   Honor, to go through and mark the ones that have already been

25   read and I will only ask a question about them and not ask him

1    to read them again.

2              THE COURT:  Thank you.  That -- all I'm saying the

3    fact that it's a government admitted exhibit doesn't change

4    the fact that there has to be something pertinent that is not

5    self-explanatory and looking at this document.  If you want to

6    get into that, then you need to focus in.  At this point, I

7    don't know about the jury, but frankly, I'm not sure where

8    you're going with a good portion of the questions.  So I would

9    ask if you would go through --

10              MR. KENNER:  I will, Your Honor.

11              THE COURT:  -- if it's been read and focus in on

12    what specifically you want to talk about.

13              MR. KENNER:  I will be happy to do that for Your

14    Honor.

15              THE COURT:  All right.

16              (The following proceedings were had in open court.)

17              THE COURT:  All right.  Members of the jury, let me

18    excuse you for this evening.  Going to ask you to come back at

19    9:00 so we can start at 9:00 o'clock from your perspective.

20    We'll get in a little early on our end.  Okay?  So have a good

21    evening, take care, be well, and don't talk about the case.

22              (Jury left the courtroom.)

23              MR. KENNER:  Your Honor, when Your Honor made

24    reference to "you're losing" I believe the reference was

25    you're losing the jury?

1          MS. LOCKHART:  Your Honor, briefly may the agent be

2   excused before this conversation happens.

3          THE COURT:  I believe he should step out.

4          In terms of bringing in a lot of information, that

5   it's not clear cut what relevance it has, particularly where

6   you're repeating what they've already heard.  So I'm just

7   suggesting to you that keeping the jury's attention requires

8   that there be some -- something probative that stands out of

9   what they've heard at least twice now, in terms of going

10  through it.  So that's my comment.

11         MR. KENNER:  Thank you, Your Honor.

12         THE COURT:  Okay.  Now, for tomorrow, we'll --

13  obviously, we'll start at 9:00.  I'm going to ask you all to

14  come at a quarter to 9:00, so we can discuss whatever issues

15  we need to talk about.

16         This evening I want now the list of who the

17  witnesses are that you're purporting to call.  So we have an

18  idea of who they are.  I'd like it right now.  I want to

19  discuss it.  And hand It to the government if you haven't

20  already.  Or tell me who they are.

21         MR. KENNER:  I don't have them memorized, but I can

22  tell by looking at my list.

23         THE COURT:  If you could I'd appreciate it.

24         MR. KENNER:  The defense witnesses that we intend to

25  call are Jeff Sessions, Harry Lidsky, George Higginbotham.

```
1                THE COURT:  I'm sorry, who was the other?

2                MR. KENNER:  Harry Lidsky.

3                THE COURT:  Okay.

4                MR. KENNER:  George Higginbotham, Aarons -- I'm

5    sorry, Shomik Dutta, but I believe that he may well -- I

6    haven't heard it from his lawyer, but I am -- I would

7    anticipate that he would take the fifth, but I don't know that

8    to be the case.

9                THE COURT:  Okay.  Can you spell whoever that name

10   is.

11               MR. KENNER:  S-h-o-m-i-k, last name D-u-t-t-a.

12               THE COURT:  Okay.

13               MR. KENNER:  The next --

14               THE COURT:  Have you subpoenaed Sessions?

15               MR. KENNER:  Yes, Your Honor.  And we filed the

16   appropriate letter and got an appropriate response saying that

17   we can do it.

18               THE COURT:  Okay.  So --

19               MR. KENNER:  A Touhy --

20               THE COURT:  So Sessions is prepared to come

21   testify.

22               MR. KENNER:  Yes, Your Honor he's been served.

23               THE COURT:  I'm asking last minute motion to quash

24   that I'm doing tonight.  Okay.  All right.  Who else, so one,

25   two, three, four, who else.
```

1          MR. KENNER:  Rick Gates, Rufus Gifford, William

2    Kirk, Jason McCall, Michael O'Neal, John Kelly, H.R. McMaster,

3    and that's it, Your Honor.

4          THE COURT:  Okay.

5          MR. KENNER:  Oh, I'm sorry, we did subpoena Marc

6    Moscowitz also the government didn't call him, I will -- I'll

7    withdraw it, Your Honor.

8          THE COURT:  Certainly, in terms of Mr. Higginbotham,

9    what are you calling him back for?  I thought that we had

10   actually done the questions that could go for both the

11   government as well as the defense, so -- which I allowed

12   leeway for you to ask questions that probably would have gone

13   certainly beyond the scope of direct.  So what are you calling

14   him back for?

15         MR. KENNER:  Your Honor, I'm doing that direct right

16   now, I will advise --

17         THE COURT:  You obviously have an area that you're

18   pursuing with it?

19         MR. KENNER:  Yes, Your Honor.

20         THE COURT:  What is it?

21         MR. KENNER:  The area that I want to pursue is his

22   testimony essentially that everything he did, he did because

23   Mr. Michel told him to.  I want to bring him back to testify

24   that he was the lawyer, Michel was his client, and that's what

25   happened.  The government came back --

1      THE COURT:  You already.  You went through -- I've

2  looked at the testimony on that.  You went through with a fine

3  comb about all the different relationships you asked him about

4  the attorney, I don't think there's a question -- go back and

5  take a look to the transcripts, since you have access to it,

6  and see if there's one single question that's left that you

7  have not asked, having looked at this for the issue of the

8  advice of counsel.  Mr. Higginbotham, you asked him in terms

9  of the various relationships he had legally and what he did

10  and et cetera, I don't think there's anything left.  I

11  challenge you to come and tell me tomorrow what isn't there

12  that you didn't ask that's probative that is not included

13  already.

14      MR. KENNER:  I accept the challenge, Your Honor.

15      THE COURT:  All right.  Take a look at it.  I don't

16  think there's anything that he hasn't.  The other one who

17  else had we -- somebody else that has been called, maybe not.

18  All right.  Any issues from the government.  I want to know it

19  now.

20      MR. KELLER:  Your Honor, he wasn't on the -- she

21  wasn't on the list, so I'm assuming that means you're not

22  calling Heather Hunt?

23      MR. KENNER:  I'm sorry, yes, I am calling Heather

24  Hunt.  I apologize.

25      MR. KELLER:  So the defense is not --

1          THE COURT:  In terms of -- let me just ask, sorry,

2    what are you calling Ms. Hunt about?

3          MR. KENNER:  I'm sorry?

4          THE COURT:  What are you calling Ms. Hunt about?

5          MR. KENNER:  I believe I can qualify her as an

6    expert.

7          THE COURT:  If you want to have -- I will give you

8    some case law this evening, and put out an opinion about being

9    able to ask somebody a round of questions that you were

10   asking, which are questions about the legality of certain

11   things, which are not appropriate to have an expert come and

12   talk about, particularly when it's the jury's decision.  And

13   jury instructions will include it, but I will expand it

14   greatly.  But if you're calling her as a legal expert then I

15   will address that.

16         What else Mr. Keller, anything else?

17         MR. KELLER:  Well, just that we haven't received

18   Touhy compliance or Rule 16 compliance for Ms. Hunt in

19   addition to the other issues.  With respect to Shomik Dutta

20   and Michael O'Neal, the only relevant information that I'm

21   aware of in discovery with respect to those witnesses relates

22   to Frank White.  And I believe that the Court has already

23   excluded testimony about other bad acts or prior conduct of

24   Mr. White.  And so --

25         THE COURT:  Right.  So go back and look at my

1    opinion, Mr. Kenner, relating to that.  And have you

2    provided -- you need to provide them with reverse discovery.

3         MR. KENNER:  I'm --

4         THE COURT:  Assuming there is something for some of

5    these witnesses.

6         MR. KENNER:  No, I've given them discovery,

7    reciprocal discovery.  I haven't given them anything about

8    Heather Hunt, if that's the question.

9         THE COURT:  Well, Heather Hunt it sounds like you

10   did on the fly today, to be frank.  But at any rate, in terms

11   of she's coming as a legal expert.  I'll put something out

12   about whether you can do something like that.

13        MR. KENNER:  Thank you.

14        THE COURT:  Anything else on any of the other

15   issues?  This is a good time to bring it up.

16        MR. KELLER:  It's just not clear to me --

17        THE COURT:  -- I don't know most of these witnesses,

18   that's why I'm asking.

19        MR. KELLER:  It's not clear to me how final of a

20   list this is, this seemed a little haphazard.  We started

21   with --

22        THE COURT:  I expect him to put it in writing and

23   give it -- I'm asking him orally today so while we're all here

24   I can at least hear from you if you have any issues about it,

25   so that if they need to be addressed this evening they can be

1   addressed.  So it looks like --

2           MR. KELLER:  Thank you, Your Honor.

3           THE COURT:  The Heather Hunt is the key one.

4           MR. KENNER:  I will e-mail that list to Your Honor

5   and to Mr. Keller within the hour.

6           THE COURT:  All right.  Okay.  If there's nothing

7   else, you can take a look at.  If there is something, you

8   know, we set up the system, you file it, we get an opposition,

9   a reply.  And if you want to do more than that you need to ask

10  permission from the Court.

11          The other thing that you should be aware of, Mr.

12  Kenner, is that I don't know what you've decided in terms --

13  Mr. Michel, don't disappear yet -- when I do his decision

14  about whether he wishes to testify is obviously his own

15  decision in conjunction with advice from you.  I do an inquiry

16  at some point that simply advises him of his rights, to make

17  sure that he's making a voluntary decision, whatever his

18  decision is.  And that he understands it's his decision, not

19  yours, although, he obviously should get advice.  So I do an

20  inquiry and I'll do it appropriately whenever you think -- if

21  you want to do it after you've put everybody on and at that

22  point he'd either go on or wouldn't go on.

23          MR. KENNER:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. KENNER:  Yes, I would prefer it at that point.

1          THE COURT:  But I want to make sure that you know I

2   do an inquiry, so that there's no issue at a later point --

3          MR. KENNER:  I appreciate your doing that, Your

4   Honor.

5          THE COURT:  -- that it's a voluntary decision.

6          Okay.  Anything else, government?

7          MR. KELLER:  No, Your Honor.

8          THE COURT:  All right.  Mr. Kenner?

9          MR. KENNER:  No, Your Honor.

10         THE COURT:  All right.  Everybody's excused then.

11         (The proceedings were concluded at 5:15 p.m.)

12

13         I, Christine Asif, RPR, FCRR, do hereby certify that
    the foregoing is a correct transcript from the stenographic
    record of proceedings in the above-entitled matter.

14

                    _____/s/_____

15                    Christine T. Asif
                   Official Court Reporter

16

17

18

19

20

21

22

23

24

25

< Dates >.
15 July 93:3.
August 28th,
  2017 15:4.
January 8th,
  2018 30:13.
July 15 93:7.
July 15, 2017
  86:15.
July 15th 91:9,
  93:16.
July 16th
  91:10.
July, August
  28:7.
June 21st, 2012
  34:7,
  34:11.
May 2017 29:23,
  88:1.
May 21st
  34:11.
October 14th
  54:15.
October 2017
  31:13.
$1 71:18.
$100 20:23,
  33:5.
$13.25 84:12.
$300 38:9,
  38:14.
$34 41:22.
$41 31:12.
$740,000
  71:15.
$77 40:17,
  40:20.
$8.75 84:12.
+86 8:20, 8:23,
  13:20.
.
.
< 1 >.
1 45:12,
  64:5.
10 9:5.
1016 1:28.
10:00 92:1,
  97:24.

10th 86:4,
  86:5.
11 11:1.
11:30 8:14.
12 11:2, 76:11,
  97:11.
124 51:18,
  52:5, 52:6.
12th 91:9,
  92:1.
1301 1:27.
13th 1:11,
  24:6.
1400 1:35.
15 30:1.
16 106:18.
16633 1:42.
19-00148-1
  1:6.
1malaysia
  40:13.
1malaysian
  40:10.
.
.
< 2 >.
2 1:12, 68:7,
  69:17,
  87:15.
20 16:4,
  27:14.
20001 2:17.
20004 2:9.
20005 1:36.
2009 41:18.
2012 31:11,
  37:3, 37:15,
  45:5, 45:7,
  47:8.
2013 22:25,
  23:5.
2016 34:20.
2017 19:11,
  20:21, 20:24,
  21:19, 24:6,
  26:6, 27:7,
  27:14, 27:15,
  27:18, 28:3,
  28:7, 31:7,
  31:9, 34:13,

  45:5, 48:12,
  48:14, 49:10,
  65:18, 65:19,
  86:4.
20171007 85:23,
  86:1.
2018 26:7,
  27:7, 27:15,
  28:3.
202 2:18.
2022 54:15.
2023 1:11.
20530 1:29.
21 12:5.
212 46:1.
22 12:6.
239 38:19,
  38:23, 39:2,
  39:5.
274 69:17.
2:22 1:12.
.
.
< 3 >.
3 84:7, 91:25,
  92:4, 92:8.
30 18:15,
  58:23.
300 38:13.
31 18:15.
33 3:9, 99:12,
  99:14.
333 2:15.
354-3247
  2:18.
.
.
< 4 >.
4 85:18.
400-page
  53:10.
403 44:3.
43 56:20.
45 76:12,
  80:2.
46 56:20.
474 7:3, 7:7,
  8:7, 9:6,
  11:2, 12:6,
  16:5, 18:15,

  62:21, 63:4,
  63:24, 68:7,
  84:3, 84:7.
475 4:16,
  5:19.
4:08 84:11.
.
.
< 5 >.
5 36:9,
  89:23.
506 33:13,
  33:17, 33:21,
  33:23, 34:23,
  37:14,
  37:17.
522 21:13,
  21:22, 22:19,
  22:20.
548 29:1.
549 27:24.
550 26:2.
580 35:6, 35:7,
  35:14, 36:5,
  36:7, 36:10,
  36:11,
  37:1.
581 35:6, 35:7,
  35:15, 36:5,
  36:7, 37:1.
5:00 10:2,
  54:1,
  99:20.
5:15 109:11.
5:17 84:11.
.
.
< 6 >.
6 3:7, 90:21.
60 93:10,
  98:9.
641 2:8.
6507 2:16.
654 4:17.
.
.
< 7 >.
7 7:4, 45:13.
.
.

< 8 >.
8 92:4.
.
.
< 9 >.
9 8:6, 71:15.
91436 1:43.
96 53:19.
9:00 101:19,
 102:13,
 102:14.
_____/s/___
 _____
 109:17.
.
.
< A >.
A-b-u 41:3.
a.m. 8:14.
Aabar 40:20,
 40:24, 40:25,
 41:1, 42:16,
 42:17.
Aarons 103:4.
able 7:10, 8:8,
 12:8, 15:25,
 16:8, 41:17,
 44:23, 68:3,
 77:12, 83:8,
 106:9.
above-entitled
 109:15.
Absolutely
 46:16,
 46:17.
Abu 41:3,
 41:6.
accept
 105:14.
access 46:8,
 46:11, 47:14,
 90:13,
 105:5.
according
 35:17.
accountant
 39:16.
accounts 34:21,
 38:3, 40:2,
 41:21, 45:24,

50:19,
 53:13.
accurate 43:6,
 76:18.
accused
 47:13.
Act 45:20.
acting 48:20.
ACTION 1:5,
 52:1,
 64:12.
actions 6:10,
 64:9.
activities
 6:7.
acts 106:23.
actual 87:12,
 88:16.
Actually 13:21,
 14:2, 29:4,
 35:4, 40:21,
 61:20,
 104:10.
addition 21:7,
 30:3, 93:16,
 106:19.
additional
 43:17, 55:5,
 61:23, 61:24,
 64:9,
 89:25.
address 15:11,
 15:15, 16:15,
 106:15.
addressed
 107:25,
 108:1.
ADKMIC 41:7,
 41:12.
administration
 96:23.
admissibility
 39:3.
admission
 36:1.
admit 21:21,
 22:20, 29:4,
 32:13, 36:7,
 39:2, 43:23,
 44:15,

100:16.
Admitted 4:3,
 4:12, 4:23,
 7:3, 20:11,
 21:12, 26:1,
 27:23, 29:2,
 29:7, 29:8,
 32:23, 33:18,
 33:23, 35:6,
 35:10, 36:2,
 36:3, 38:20,
 43:22, 51:19,
 52:5, 52:6,
 62:21, 81:16,
 99:25,
 100:20,
 101:3.
advice 105:8,
 108:15,
 108:19.
advise 11:13,
 104:16.
advises
 108:16.
advisor 7:21,
 69:24, 70:9,
 70:11, 74:13,
 91:19.
advisor.
 10:23.
affairs 92:13,
 98:2.
afforded
 81:3.
afield 82:6.
Afternoon 1:13,
 4:7, 4:8,
 6:23, 6:24,
 53:22,
 62:18.
afterwards
 29:10.
agenda 93:2,
 93:3,
 93:12.
Agents 45:19,
 63:20.
agree 41:15,
 51:7, 51:15,
 72:1, 75:2.

agreed 30:16.
agreement
 45:17,
 72:20.
ahead 6:19,
 17:9, 17:10,
 19:19, 87:7,
 95:21,
 95:25.
allegations
 27:15, 31:7,
 31:10, 31:11,
 55:16,
 55:18.
alleged 4:18,
 6:5, 45:9,
 54:25, 59:21,
 62:11.
allegedly
 51:12,
 54:17.
alleges
 51:10.
allow 61:19,
 75:24.
allowable
 14:4.
allowed
 104:11.
almost 28:13,
 28:14, 30:1,
 38:8,
 55:17.
Alon 1:40.
alone 45:8,
 75:21.
aloud 99:17.
already 19:23,
 20:10, 33:17,
 35:6, 36:2,
 55:15, 66:24,
 77:3, 88:22,
 89:6, 89:14,
 94:23, 99:24,
 99:25, 100:1,
 100:12,
 100:24,
 102:6,
 102:20,
 105:1,

105:13,
106:22.
Alsen 41:22,
42:2, 42:4,
42:6, 43:6,
44:1, 45:3,
45:7, 45:10,
50:6,
50:16.
alternatives
98:15.
although 32:19,
108:19.
Ambassador 8:1,
8:3, 10:10,
10:12, 10:13,
10:14, 11:13,
88:2, 91:3,
91:5, 98:6,
98:10, 98:11,
98:12, 98:13,
98:18, 98:19,
98:23.
AMERICA 1:5.
American 66:1,
98:8,
98:13.
amount 59:12.
ampersand
69:14.
and. 69:7.
and/or 80:1.
Andrew 30:23.
Angeles 30:18,
76:8.
Anicorn 32:8,
32:10.
anonymity
75:24.
anonymize
55:19, 56:16,
57:10.
anonymizing
56:18, 56:24,
57:18.
answer 18:21,
23:24, 73:7,
74:19, 79:7,
88:25, 95:20,
96:15.

answered 68:4,
75:6, 88:14,
94:22, 96:13,
97:16.
answers
55:20.
anticipate
103:7.
anybody 72:8.
anyplace
36:24.
apologize
52:13, 52:17,
78:18, 88:8,
90:25,
105:24.
app 9:15,
24:17, 95:16,
97:8.
apparently
98:19.
APPE 85:24,
86:5.
appear 11:5,
12:8, 12:24,
14:3, 15:22,
34:10, 39:6,
63:25, 64:1,
64:3, 86:7,
86:22.
APPEARANCES
1:23, 2:1.
appeared 16:20,
71:24.
appears 9:2,
9:7, 11:10,
12:1, 16:1,
16:14, 39:14,
39:16, 63:25,
66:13, 70:10,
73:24, 84:9,
84:17, 85:17,
86:1, 86:12,
90:12, 91:7,
91:13, 92:10,
96:7, 97:2.
application
69:14,
96:9.
applications

69:2.
applies 6:11,
48:19.
appreciate
102:23,
109:3.
approached
27:19.
appropriate
13:25, 17:1,
17:18, 17:20,
103:16,
106:11.
appropriately
108:20.
approximately
20:21,
71:15.
apps 24:18,
25:21.
April 1:11,
21:19,
24:6.
area 80:19,
104:17,
104:21.
argue 46:18,
46:25.
around 20:16,
27:17, 38:4,
42:4, 65:11,
65:13, 65:17,
66:5.
arrange 98:7.
arranged
66:14.
arrangements
81:21.
arrest 93:3.
arrested
18:9.
art 4:22.
Artemus 32:8,
32:10.
ASAP 70:3,
97:4.
ASAP. 64:11,
65:4.
Asia 34:3,
34:13.

Asian 11:15.
Asif 2:11,
109:13,
109:18.
asks 8:15,
14:7.
asserted 4:4,
4:23.
asset 64:8.
Assets 34:20,
64:9, 64:10,
64:21,
65:20.
assigned 93:15,
96:9.
associated
23:2, 23:3,
25:6, 25:9,
26:9, 47:13,
68:18, 69:12,
95:10, 95:16,
96:7.
associates
40:1.
assume 48:21.
Assuming
105:21,
107:4.
assure 21:3.
attaching
72:8.
attachment
4:16, 4:17.
attention 50:2,
62:21, 84:2,
84:6,
102:7.
Attorney 67:11,
87:16, 87:17,
87:18, 88:1,
105:4.
August 27:18,
30:4, 49:9,
70:1,
70:16.
August.
74:15.
authored 67:11,
72:20,
73:10.

authorities 17:1, 17:2, 17:19, 92:16, 98:3.
Authority 84:19.
Avenue 1:27, 1:35, 2:8, 2:15.
avenues 17:1, 17:19.
average 28:14, 30:1.
aware 8:16, 11:25, 14:14, 14:19, 15:8, 17:20, 17:25, 19:10, 23:25, 35:19, 48:18, 60:6, 66:19, 66:21, 66:25, 67:5, 67:10, 67:20, 76:6, 78:21, 81:20, 88:11, 90:17, 94:1, 106:21, 108:11.
away 19:7.
.
.
< B >.
bad 75:19, 75:22, 106:23.
Bangkok 45:17.
bank 33:5.
banker 35:3.
Based 6:16, 17:11, 23:25, 38:1, 38:2, 70:13, 71:5, 94:8, 95:8, 98:17.
basically 58:4.
basis 10:22, 83:2.
batch 29:15.
became 38:4,

48:18.
become 67:10.
becoming 88:11.
beginning 11:12, 29:6, 43:15, 45:18, 54:20.
behalf 48:20.
Beijing 8:14, 78:11, 78:23, 78:25, 79:3, 79:9, 79:11, 79:16, 82:8.
belief 5:15, 75:18, 91:5.
believed 5:13, 6:3, 6:9, 6:16.
below 69:20, 92:1.
Bench 42:23, 54:11, 82:4, 99:22.
beneficial 50:19, 51:12, 51:25, 53:13, 56:10, 57:20.
beneficiary 37:15.
benefit 7:5, 71:24.
benefits 86:12, 87:1.
Berhad 40:10, 40:13.
besides 13:9.
best 49:10, 85:25.
better 87:13.
beyond 100:7, 104:13.
Big 93:15.
bigger 36:17, 87:6.
bit 4:10, 24:7, 31:19,

86:9.
black 9:19.
blackberry 26:12, 26:18.
Blackstone 34:3, 34:12, 36:15, 37:4, 37:6, 38:14, 40:20, 40:24, 42:1, 42:5, 42:11, 43:6, 44:1, 45:3, 45:7, 45:10, 50:6, 50:16.
blow 38:11, 87:4.
blurred 87:9.
body 74:7, 94:1, 94:5, 94:19.
books 74:3.
born 65:21.
bother 100:6.
bottom 7:13, 10:17, 15:11, 15:24, 21:1, 22:12, 24:6, 27:6.
Boulevard 1:42.
box 11:20, 15:1, 23:13, 97:21.
break 4:13, 7:1, 7:6, 53:22, 54:1, 85:25.
Brian 93:22.
brief 23:11.
briefed 8:1, 93:15, 98:7, 98:10, 98:11, 98:20.
briefing 98:23.
briefly 27:3, 55:4, 102:1.

bring 31:10, 43:9, 47:22, 59:1, 60:13, 83:23, 104:23, 107:15.
bringing 37:17, 47:20, 102:4.
British 36:18, 36:19, 36:22.
Bro 19:20.
broad 49:23.
brought 43:18, 52:1, 79:21, 100:9.
bullet 20:15.
.
.
< C >.
C. 18:22.
California 1:43, 64:10.
Call 7:18, 7:20, 8:14, 8:15, 9:1, 9:2, 10:2, 10:7, 10:18, 10:21, 16:1, 23:16, 23:19, 25:2, 25:19, 41:7, 49:15, 64:6, 69:6, 69:21, 91:25, 92:10, 92:22, 97:25, 98:7, 98:24, 102:17, 102:25, 104:6.
called 9:18, 25:4, 41:3, 56:19, 105:17.
Calling 10:21, 27:21, 104:9, 104:13, 105:22,

105:23,
106:2, 106:4,
106:14.
callout 11:20,
14:25, 15:17,
23:12.
Calls 10:8,
13:2, 25:23,
27:9, 28:2,
29:20.
camera 64:2.
campaigner
6:1.
Campbell 33:13,
35:6,
69:22.
capital 96:17,
97:3.
caps 85:23.
capture
25:23.
captured 11:6,
26:11.
car 76:15,
76:17.
card 37:5,
39:6, 39:19,
39:22.
care 59:9,
101:21.
careful
59:15.
carefully
57:2.
Cartin 15:12,
15:14, 16:11,
16:22,
16:24.
case 24:24,
30:22, 31:7,
39:14, 47:7,
47:9, 48:24,
50:14, 50:25,
58:8, 59:21,
60:11, 61:7,
69:4, 79:15,
89:16, 94:13,
94:18,
101:21,
103:8,

106:8.
cases 19:13,
58:15.
ceased 64:16.
cell 21:15,
84:18.
cent 21:2.
Central 79:3,
84:10, 84:11,
84:20, 85:15,
92:12, 92:18,
98:2.
certain 24:19,
25:4, 27:9,
50:17, 86:14,
106:10.
Certainly
37:19, 55:8,
58:7, 59:23,
100:23,
104:8,
104:13.
certainty
9:24.
certificate
36:11.
certify
109:13.
cetera
105:10.
challenge
105:11,
105:14.
Chance 41:22,
42:2, 42:4,
42:6, 43:6,
44:1, 45:3,
45:7, 45:10,
50:6, 50:16,
54:13.
change 75:9,
101:3.
changed 32:23,
58:25.
channel 74:1.
channels 17:18,
17:20, 70:3,
73:12, 74:22,
74:24.
characterizatio

n 17:5.
characterize
80:13,
81:13.
charge 54:20.
charged 43:12,
46:2,
49:19.
charges 45:6,
59:23.
charging
47:21.
Charles 2:5,
2:6.
chart 26:12,
26:23, 27:3,
27:23, 27:25,
43:4, 43:10,
43:22,
43:24.
charts 25:14,
25:18.
check 71:12,
71:15, 71:18,
87:18.
checked
77:11.
Chen 75:15.
Chief 14:14,
14:23.
choose 98:15.
Christine 2:11,
109:13,
109:18.
circle 9:19,
96:17.
circles 7:25.
circumstances
30:14, 67:6,
67:23,
81:4.
citizen 17:21,
66:1.
citizens
61:3.
civil 51:3,
56:16,
57:13.
claimed 5:21,
46:17.

claiming
46:14.
claims 56:16.
clarifies
6:18.
clarify 95:9.
cleaner
86:11.
clear 16:9,
38:5, 47:12,
63:3, 72:5,
73:14, 73:24,
86:18, 86:22,
98:21, 102:5,
107:16,
107:19.
clearer 4:4,
37:23,
87:8.
clearly
64:11.
CLERK 35:9,
35:17.
client 22:15,
104:24.
close 34:20,
39:25, 90:9,
99:20.
closed 34:15,
34:17.
closely 57:14,
58:6.
closing
46:19.
cloud 8:12.
co-conspirators
22:14, 23:25,
33:7, 64:19,
85:3,
86:24.
code 8:21,
8:23, 8:24.
Colfax 71:10,
71:12, 71:18,
71:22, 71:23,
72:3, 72:4,
72:6.
COLLEEN
KOLLAR-KOTELL
Y 1:18.

Columbia
  2:14.
COLUMBIA 1:2.
comb 105:3.
comes 44:24.
comfortable
  70:4.
coming 90:1,
  107:11.
comment
  102:10.
commission
  92:13, 92:19,
  98:2, 98:6.
communicate
  23:20, 28:15,
  28:19.
communicated
  11:9,
  28:23.
communication
  9:20, 69:2.
communications
  24:3, 24:19,
  25:14, 27:12,
  27:14, 28:5,
  94:8, 94:9.
companies
  51:12, 54:25,
  56:8, 56:15,
  57:17.
company 41:3,
  51:24, 56:19,
  60:7.
comparison
  55:22,
  79:1.
complaint
  51:18, 51:23,
  53:12, 54:14,
  55:16,
  56:11.
complaints
  34:20, 62:13,
  65:20.
complete
  18:25.
compliance
  106:18.
comprehensive

92:18,
  98:5.
conceal
  45:24.
concealment
  45:22.
concerns
  60:9.
concluded
  109:11.
conclusions
  94:25.
conditions
  87:1.
conduct 31:7,
  31:11, 45:5,
  45:7, 63:20,
  106:23.
conduits
  55:19.
conference
  7:19, 42:23,
  54:11, 82:4,
  97:25,
  99:22.
confirm
  85:11.
confirmed
  70:12,
  70:14.
confront
  32:17.
confronted
  32:21,
  32:22.
confused 43:14,
  44:16.
confusing 44:3,
  47:6,
  49:15.
conjunction
  108:15.
connect 44:11,
  59:13,
  60:15.
connected
  34:22, 59:13,
  59:15,
  82:16.
Connecticut

84:21, 85:8,
  85:15.
connecting
  44:12,
  61:16.
connection
  43:14, 43:16,
  94:12.
consensual
  30:16.
consider 4:12,
  5:24, 6:2,
  6:12, 49:20,
  59:20, 88:24,
  89:2, 89:5,
  89:10.
consideration
  5:6, 87:16.
considered
  9:20, 17:13,
  79:25, 89:4,
  89:15,
  89:19.
considers 43:3,
  89:15.
consistent
  9:18, 70:6.
conspiracy
  45:11,
  54:20.
Cont'd 2:1,
  6:21.
contact 8:2,
  11:14, 25:18,
  28:23, 67:24,
  68:16, 69:3,
  69:12, 69:13,
  70:2, 73:11,
  73:15,
  73:23.
contacted 8:4,
  11:23,
  98:7.
contacts 25:19,
  26:4, 26:5,
  26:23, 26:24,
  28:1, 28:11,
  29:19, 29:22,
  30:3, 70:22,
  70:25, 71:6,

71:8.
contain 86:7.
contents 6:13,
  88:24,
  89:4.
context 50:25,
  54:19, 60:13,
  97:6.
contexts
  4:21.
continuation
  15:22.
continue 38:16,
  61:25.
continuing
  64:21.
Contitution
  2:15.
contract 72:3,
  72:5, 72:6,
  72:8, 72:23,
  72:24, 73:4,
  73:8.
control 75:23,
  77:4, 77:7,
  79:20,
  80:11.
controlled
  38:6, 38:15,
  45:10,
  50:18.
conversation
  20:1, 42:20,
  55:4, 61:24,
  102:2.
conversations
  86:20.
conveyed 14:7,
  16:23,
  92:21.
coordinator
  91:14.
copy 19:2,
  86:12.
Corporation
  41:5, 41:6.
correctly 5:18,
  10:4,
  10:19.
corresponding

27:8.
corresponds
   8:23.
corruption
   5:23, 6:2.
cost 84:20.
Council 11:15,
   11:18, 14:9,
   14:12, 15:15,
   16:12, 16:23,
   70:23.
counsel 21:12,
   43:15, 53:23,
   81:12,
   105:8.
Count 42:17,
   45:12, 45:13,
   45:22.
countries
   18:6.
country 8:21,
   8:23, 8:24,
   18:13, 47:3,
   61:3, 81:8,
   81:21.
couple 17:17,
   23:7, 75:7,
   89:17.
course 19:10,
   21:9, 26:8,
   28:21, 30:9,
   32:16, 32:22,
   32:25, 50:13,
   51:25, 65:8,
   65:9, 67:10,
   68:2, 70:21,
   71:7, 71:17,
   86:10, 87:22,
   89:3.
court. 47:25,
   58:11, 83:25,
   101:16.
courtroom
   35:17, 54:9,
   55:9.
courtroom. 4:6,
   62:17,
   101:22.
courts 64:10.
covered 34:8.

covers 34:10,
   92:15.
create 69:2.
created
   25:14.
creates
   54:19.
creating 47:7,
   47:9.
CRIMINAL 1:5.
criminals
   98:9.
Cross 33:10.
CROSS-EXAMINATI
   ON 3:9,
   33:19.
Cui 10:13.
current
   97:23.
custom 80:10.
customs
   80:23.
cut 15:24,
   102:5.
.
.
< D >.
D-h-a-b-i
   41:4.
D-u-t-t-a
   103:11.
dash 41:4.
date 15:2,
   34:6, 34:15,
   34:18, 68:9,
   68:10, 70:1,
   70:4, 81:6,
   86:1, 86:15,
   91:9, 99:2,
   99:7.
dated 86:4.
dates 40:18.
David E. Kenner
   1:39.
day 28:14,
   30:1, 59:5,
   86:3.
days 65:21.
dealing 18:23,
   20:14.

decide 59:19,
   61:12.
decided 58:1,
   108:12.
decision 13:5,
   18:12, 60:15,
   60:19,
   106:12,
   108:13,
   108:15,
   108:17,
   108:18,
   109:5.
declaring
   45:1.
deemed 63:22.
deep 21:4.
Defendant 1:12,
   1:39, 2:5,
   38:23, 54:21,
   59:20.
defense 54:24,
   55:5, 59:3,
   102:24,
   104:11,
   105:25.
define 4:20.
definitely
   19:8.
delivered
   20:17.
delivering
   20:19.
departing
   84:10.
Department
   1:26, 1:33,
   18:11, 64:15,
   73:18, 74:5,
   75:1.
deportation
   8:5, 12:1,
   17:3, 93:3,
   98:8.
deported 86:14,
   90:2.
deporting
   86:8.
deposit
   38:13.

deposited
   31:13.
Deputy 11:14,
   14:13, 35:17,
   69:23, 70:8,
   70:11,
   74:13.
described
   23:23.
description
   6:14, 23:11,
   52:7.
destructed
   97:10.
details
   38:16.
detection
   80:11.
determination
   51:8.
determine 6:8,
   37:3, 48:8,
   68:3, 71:9,
   71:12.
determining
   5:25, 6:3.
Development
   40:10,
   40:13.
device 9:18,
   95:16,
   96:9.
Dhabi 41:4,
   41:6.
difference
   73:3.
different 9:8,
   16:6, 25:2,
   39:6, 49:24,
   50:2, 51:16,
   56:10, 56:14,
   57:10, 57:12,
   58:5, 73:1,
   73:4, 73:7,
   100:14,
   105:3.
DIRECT 3:7,
   6:21, 9:2,
   13:18, 56:8,
   60:5, 62:20,

76:8, 79:24,
86:25,
104:13,
104:15.
directed 31:22,
45:9.
Directing
65:13, 84:2,
84:6.
direction 43:7,
75:10.
directly 12:20,
13:20, 28:15,
28:19, 73:16,
77:9, 78:3,
91:14.
directly.
11:16.
Director 11:14,
11:15, 14:8,
14:12,
14:13.
disappear
24:19,
108:13.
disbursement
40:12,
40:15.
discovery
106:21,
107:2, 107:6,
107:7.
discuss 8:4,
8:5, 44:25,
53:22, 55:6,
93:2, 98:8,
102:14,
102:19.
discussed
24:17,
31:2.
discussion
43:2, 54:9,
59:14, 99:18,
99:19,
99:21.
disguise
45:24.
Display
53:20.

dissident 5:22,
6:1, 6:4.
distance
50:18.
distinction
72:22.
distracting
47:9,
47:19.
District 1:1,
1:2, 1:19,
2:13, 2:14.
documents 63:8,
63:12, 63:18,
63:19, 64:4,
65:10, 65:12,
65:14, 82:7,
82:11,
100:10.
doing 19:7,
54:9, 56:23,
60:21, 62:3,
103:24,
104:15,
109:3.
DOJ 64:8.
dollars 29:24,
29:25, 30:6,
33:7, 71:13,
71:14.
domestic
45:22.
domestically
18:4.
done 14:6,
18:21, 21:3,
28:10, 39:15,
60:13, 62:6,
62:14, 73:12,
74:3, 80:19,
82:2, 82:9,
104:10.
door 44:11.
Dorothy
60:17.
double 15:5,
93:14, 93:19,
93:23, 93:24,
94:2, 94:4,
94:5,

94:19.
doubts 72:19.
dough 19:7.
down 10:1,
12:22, 14:5,
15:1, 15:19,
21:6, 22:11,
24:22, 30:7,
31:4, 35:3,
40:21, 43:25,
44:5, 46:7,
46:20, 52:21,
52:23, 55:25,
57:3, 59:16,
64:11, 64:13,
64:20, 65:6,
85:25.
download
24:16.
downloaded
63:20.
draft 86:21.
drafted 86:4,
86:23.
drag 44:5.
dragging
18:22.
Drive 7:7,
8:13, 16:10,
20:9, 63:5,
63:10, 63:19,
84:17, 85:20,
85:22.
drop 11:19,
14:25, 15:16,
22:10, 23:12,
27:17,
64:18.
dropped
52:21.
due 18:10.
During 6:4,
20:24, 21:9,
28:12, 30:9,
32:22, 51:8,
51:9.
Dutta 103:5,
106:19.
.
.

< E >.
e-mail 4:17,
15:11, 15:15,
16:15, 16:25,
17:12, 66:11,
68:11, 68:14,
70:17, 72:7,
72:15, 72:17,
72:23, 73:10,
73:19, 95:14,
95:15, 96:6,
108:4.
e-mailed 65:12,
72:24,
73:5.
e-mails 21:7,
62:24,
86:11.
earlier 5:24,
90:3.
early 26:6,
27:14, 28:3,
38:12, 49:9,
69:25, 70:16,
74:15,
101:20.
earn 71:21,
71:23.
Eastern 10:3,
92:2,
97:25.
EDNY 62:10.
effort 100:4.
efforts 8:16,
15:9, 54:17,
64:17,
94:16.
eight 58:21.
either 18:2,
41:17, 58:20,
68:14, 72:21,
85:6,
108:22.
elicited
43:12.
Elliott 15:8,
23:10, 68:12,
68:15, 68:17,
68:20, 69:5,
69:11, 69:13,

70:18, 90:16,
93:22, 95:4,
95:6, 95:11,
95:13, 96:3,
96:8, 96:10,
96:25.
elsewhere
83:8.
embarrassing
17:14.
embassy 27:19,
31:21, 31:23,
48:13, 91:8,
91:10,
91:11.
embezzling
51:10.
Emily 66:7,
66:9, 66:22,
89:6.
Encino 1:43.
encrypted
24:17, 24:18,
25:20,
97:8.
encryption
9:21.
end 4:10, 59:5,
62:3, 69:25,
70:16, 74:14,
75:4, 79:8,
80:12, 88:1,
88:12,
101:20.
enforcement
23:18, 23:23,
24:2, 27:20,
92:16,
98:3.
enlarged 37:21,
37:24.
enough 82:17,
83:23.
entered 4:6,
48:12,
62:17.
entirety
90:17.
entities 45:4,
55:19, 57:9,

57:11, 57:12,
58:4, 58:5.
entitled
43:9.
entry 97:3.
envoy 9:3.
envoys 12:17,
12:18,
13:17.
equivalent
74:6, 75:1,
91:15, 91:17,
91:19.
Eric 37:6,
42:8, 42:9,
42:11, 94:5,
94:11, 94:12,
94:14,
94:15.
escapes 37:9.
Esquire 1:25,
1:31, 1:32,
1:39, 1:40,
2:5.
essentially
85:14,
104:22.
Estate 34:4,
34:13.
estimation
49:10.
et 105:10.
European
86:2.
evade 80:11.
evening 101:18,
101:21,
102:16,
106:8,
107:25.
events 71:2.
Everybody 57:5,
76:6, 108:21,
109:10.
everything
32:20, 54:21,
85:21, 99:24,
104:22.
evidence 19:23,
19:25, 43:11,

43:12, 43:17,
43:19, 44:14,
46:18, 46:25,
47:1, 61:7,
67:2, 67:17,
70:24, 72:21,
76:14, 79:20,
80:4, 80:8,
80:13, 80:18,
82:24, 89:3,
89:15,
89:19.
evident 38:5.
evidently
77:4.
ex 55:4, 61:24,
62:6.
exact 34:18.
exactly 35:1,
48:16, 49:8,
49:16, 49:25,
55:17, 73:14,
74:23, 86:22,
95:9,
95:12.
EXAMINATION
3:7, 6:21,
43:15,
60:5.
example 4:25,
5:12,
29:23.
Excellency
98:1.
except 42:4.
exclude
54:23.
excluded 54:16,
54:20,
106:23.
Excuse 50:10,
53:21, 58:12,
77:19, 78:18,
95:19,
101:18.
excused 102:2,
109:10.
execute 26:13,
26:17, 63:9,
84:24.

executed
63:10.
executed.
16:3.
exhibits 4:3,
4:12, 4:15.
exit 66:2.
expand 24:7,
106:13.
expect 64:2,
74:24,
107:22.
expectation
74:5.
experience
23:18, 23:22,
23:25.
experienced
23:19.
expert 106:6,
106:11,
106:14,
107:11.
expertise
49:2.
explain 8:25,
27:3, 84:13,
100:22.
expletives
19:17.
explicitly
64:25.
expose 5:23.
extensive
27:14.
extensively
15:10.
extent 62:1,
77:5.
extradited
18:13,
20:24.
extraditing
18:5.
extradition
8:17, 17:21,
18:10,
31:2.
extraditions
18:4, 18:6.

extremely
  28:11.
.
.
< F >.
F. 1:31.
fact 5:7, 6:1,
  6:7, 40:5,
  40:6, 44:3,
  50:5, 50:15,
  50:18, 66:2,
  67:15, 75:11,
  75:25, 79:25,
  88:11, 89:5,
  97:1, 101:3,
  101:4.
facts 32:17,
  32:21, 32:23,
  51:14.
factual
  50:22.
fair 48:14,
  49:11.
false 6:13.
familiar 9:10,
  9:15, 67:14,
  67:15.
family 71:25.
far 47:14,
  59:3, 59:15,
  61:10, 77:22,
  82:6.
FARA 45:17,
  48:8, 48:12,
  48:15, 48:17,
  49:3, 49:7,
  49:12,
  50:3.
fare 84:12,
  85:15.
farther
  95:24.
favor 86:8.
FBI 30:19,
  39:14, 64:15,
  80:12.
FCRR 2:11,
  109:13.
features
  24:20.

feel 70:4,
  100:4.
fell 9:13.
ferry 76:12,
  76:14,
  80:2.
fifth 103:7.
figure 62:5.
figuring
  100:17.
file 108:8.
filed 34:19,
  64:8, 65:19,
  103:15.
final 21:1,
  93:15,
  107:19.
finally
  32:16.
financial 44:6,
  55:17.
fine 105:2.
finish 33:12.
finished
  53:1.
finishing
  27:7.
Firm 1:41,
  72:4.
First 11:11,
  18:20, 22:24,
  23:1, 29:24,
  34:25, 39:7,
  45:3, 45:14,
  48:7, 64:8,
  64:22, 74:8,
  84:13, 84:24,
  93:23.
fit 60:11.
five 57:21,
  65:21.
fled 5:21.
flew 78:22,
  79:9, 79:16,
  80:1.
flight 75:19,
  76:1, 77:9,
  77:14, 77:24,
  78:2,
  79:18.

flights 76:8,
  76:9, 77:11,
  78:3.
flow 41:25,
  42:1,
  43:25.
flows 38:8,
  40:18.
fly 77:2,
  78:17, 79:10,
  79:16,
  107:10.
flying 76:11,
  79:10.
focus 100:15,
  101:6,
  101:11.
focused 31:9.
follow 41:25.
followed
  62:12.
following 4:25,
  47:25, 58:11,
  83:25, 90:21,
  101:16.
foregoing
  109:14.
Foreign 12:23,
  13:16, 17:21,
  45:19, 48:20,
  81:8.
foremost
  45:3.
forensic
  39:16.
forfeited
  53:14.
forfeiture
  34:19, 51:4,
  51:13, 51:18,
  52:1, 53:12,
  54:14, 55:16,
  56:11, 56:17,
  57:13, 64:9,
  64:12,
  65:19.
forget 65:20,
  74:18.
form 86:3.
former 67:11,

  97:23.
forth 20:1,
  25:24,
  47:18.
forward 90:8.
forwarded
  90:15,
  90:18.
foundation
  17:23,
  23:21.
four 103:25.
frame 79:5,
  83:10.
Frank 106:22,
  107:10.
frankly 47:19,
  59:24, 60:20,
  79:21, 81:15,
  100:6,
  101:7.
Freedom 9:22,
  18:17.
frequency
  28:5.
Friday 21:2,
  64:9.
front 26:21.
fuck 19:20.
fucking 19:20,
  20:13,
  20:14.
fugitive
  61:2.
full 93:22,
  96:19.
fun 41:25.
fund 47:14.
funds 38:8,
  38:16, 40:24,
  41:3, 42:1,
  42:3, 43:18,
  43:25, 45:10,
  45:25, 51:13,
  62:11.
funnel 58:4.
funneling
  45:23.
future 54:23.
.

.
< G >.
G-U-O 90:8.
Gates 104:1.
gave 4:14,
  32:25, 33:1,
  33:4.
General 7:20,
  7:24, 11:15,
  11:24, 12:3,
  14:7, 14:8,
  14:10, 14:22,
  43:25, 67:12,
  70:14, 87:16,
  87:17, 92:12,
  98:1.
Generally 4:14,
  11:21, 18:7,
  18:9, 25:2,
  27:11, 50:1,
  68:21, 68:22,
  74:2, 85:2.
geographically
  78:25.
George 91:6,
  102:25,
  103:4.
Getting 28:9,
  29:24, 31:5,
  44:16, 47:7,
  57:4, 57:5,
  82:6, 83:11,
  100:6.
Gifford
  104:1.
give 4:2, 4:9,
  4:10, 19:20,
  58:16, 86:17,
  86:18, 106:7,
  107:23.
given 18:10,
  33:6, 43:15,
  44:3, 60:21,
  65:2, 66:2,
  73:7, 77:18,
  81:12, 86:17,
  86:18, 86:19,
  107:6,
  107:7.
gives 97:6.

giving 59:20,
  60:1,
  97:18.
globe 20:15.
goods 93:16.
Google 7:7,
  8:12, 16:10,
  20:9, 20:10,
  63:5, 63:10,
  63:14, 63:17,
  63:19, 84:14,
  84:15, 84:17,
  85:20,
  85:22.
governmental
  7:25.
graft 54:16,
  61:9.
Grand 84:10,
  84:11, 84:20,
  85:15.
greatly
  106:14.
greeted 81:3.
ground 61:25.
group 63:7,
  81:20, 81:22,
  81:23, 82:17,
  82:25.
guess 28:13,
  39:24, 43:14,
  74:5, 95:9,
  98:11.
Guo 5:19, 5:21,
  5:25, 6:4,
  6:6, 8:5,
  8:17, 12:1,
  17:3, 20:24,
  31:2, 86:1,
  86:8, 86:14,
  90:1, 90:7,
  90:14, 93:3,
  98:8.
guy 19:3,
  93:15.
guys 18:23,
  19:6,
  20:13.
GWG 85:23,
  85:25.

.
.
< H >.
Haiti 31:24.
hand 81:22,
  102:19.
handing 12:2.
handle 17:21,
  40:1,
  60:11.
handled
  18:11.
handling 12:2,
  17:2.
hands 96:19.
hang 55:10.
haphazard
  107:20.
happened 55:24,
  104:25.
happening 67:5,
  75:19,
  75:22.
happens
  102:2.
happy 87:12,
  101:13.
hard 28:11,
  86:9, 87:3.
harder 24:8.
Harry 30:15,
  102:25,
  103:2.
Haskell 2:5,
  2:7.
head 37:12,
  51:21.
heads 20:15.
hear 5:8, 9:12,
  28:17, 33:16,
  48:4, 74:20,
  80:6, 95:19,
  107:24.
heard 4:21,
  59:4, 61:8,
  94:1, 100:7,
  102:6, 102:9,
  103:6.
hearing
  18:10.

hearsay 4:15,
  4:20, 4:21,
  5:5, 5:12,
  5:15.
Heather 105:22,
  105:23,
  107:8, 107:9,
  108:3.
held 66:5.
help 61:20,
  74:16,
  100:4.
helpful
  51:20.
hereby
  109:13.
Heuchling 3:5,
  5:17, 6:23,
  9:7, 9:15,
  11:5, 13:14,
  15:2, 18:16,
  18:19, 19:16,
  23:14, 26:3,
  29:6, 43:16,
  48:3, 48:7,
  50:4, 53:9,
  55:18, 62:20,
  80:4, 80:8,
  81:12, 89:14,
  97:16.
hide 50:5,
  50:15,
  54:17.
hiding 19:13.
Higginbotham
  10:15, 25:12,
  25:15, 26:5,
  26:6, 26:24,
  27:12, 27:13,
  27:18, 27:20,
  31:13, 31:21,
  31:23, 48:12,
  91:6, 91:8,
  91:10,
  102:25,
  103:4, 104:8,
  105:8.
high 9:21,
  18:7.
high-level

70:22,
71:6.
highest 9:21.
highlight
40:22.
highlighted
17:8.
history
14:21.
HK 93:3.
Ho 90:8.
Hold 60:17.
Holdings
41:22.
hole 44:6.
home 18:13.
Hong 75:12,
76:7, 76:8,
76:11, 77:25,
78:3, 78:4,
79:18, 80:1,
80:10, 82:10,
83:7.
HONORABLE
1:18.
hopefully
6:18.
hoping 5:17.
hot 19:6.
hour 108:5.
hours 44:6,
76:11,
97:11.
House 8:17,
10:6, 10:8,
17:16, 26:21,
70:22, 71:7,
90:16.
Huang 89:6.
hundred
52:22.
Hunt 105:22,
105:24,
106:2, 106:4,
106:18,
107:8, 107:9,
108:3.
.
.
< I >.

idea 53:1,
56:6, 61:16,
63:13,
102:18.
identified
16:19,
34:21.
identifies
7:23.
illegal 45:17,
93:10,
98:9.
image 7:6, 8:8,
9:18,
12:14.
images 7:6,
11:3,
16:17.
imagine
65:12.
imessages
25:20.
immediately
12:21,
89:7.
immigrants
93:10.
important
60:23, 85:3,
85:5.
in-person
24:4.
in. 100:11,
101:6.
inaugurations
71:1.
include 25:3,
25:8, 40:18,
106:13.
included 19:17,
29:15,
105:12.
includes 22:8,
22:13,
22:14.
including
16:19,
86:11.
inclusive
27:1.

incorporate
86:20.
incorporated
36:19,
36:22.
incorporation
36:11.
incorporator
36:14.
INDEX 3:1.
Indiana 2:8.
indicate 29:3,
44:20, 44:23,
44:25, 54:12,
55:3, 69:10,
92:5, 92:8,
92:12, 92:15,
93:9.
indicated 44:9,
44:12, 50:1,
57:14, 60:9,
61:19, 67:5,
67:7, 79:17,
81:14, 82:7,
88:17, 88:21,
89:18.
indicates 22:4,
22:7, 49:18,
64:23, 69:12,
70:13, 73:15,
92:10,
99:2.
indicating
44:8, 46:5,
46:9, 46:11,
73:10.
indication
99:7.
indicted
49:13.
indictment
49:18,
49:22.
individual
9:24, 10:14,
14:20, 15:13,
16:14, 18:9,
18:12, 39:25,
48:19.
individuals

10:9, 18:5,
25:11, 55:19,
71:6, 92:1.
inexplicably
42:2.
influence
64:18.
information
4:11, 6:16,
8:9, 20:7,
25:5, 47:22,
61:25, 68:17,
69:3, 70:1,
77:21, 84:18,
90:9, 90:14,
97:12, 102:4,
106:20.
informed 10:18,
91:3, 91:6.
initial 45:6,
93:23.
inquire
59:18.
inquiring
85:14.
inquiry 48:2,
108:15,
108:20,
109:2.
ins 38:1,
38:8.
insert 43:17.
insofar
54:19.
instance
91:7.
instead 54:8.
instruction
4:3, 4:11,
4:15, 59:20,
60:1.
instructions
4:9,
106:13.
Integrity
1:34.
intend
102:24.
intended 6:9.
intent 45:19.

intentionally
  31:10.
international
  45:14,
  86:2.
interpret
  98:16.
interpretation
  97:18.
interview
  30:10, 30:14,
  30:17, 31:6,
  31:9, 32:16,
  32:19, 32:22,
  32:25.
introduced
  43:5,
  43:11.
investigate
  64:21,
  71:21.
investigated
  83:2.
investigating
  30:22, 49:3,
  49:6, 89:9.
investigations
  85:2.
investigator
  48:23, 49:2,
  89:2.
investigators
  50:14.
Investment
  41:5, 41:6.
Investments
  42:17.
involved 6:7,
  8:16, 8:19,
  15:8, 15:10,
  18:4, 29:13,
  51:3,
  51:10.
involvement
  55:20.
involving
  51:4.
iphone 23:4,
  26:12,
  26:19.

iphones
  25:20.
irrelevant
  45:8, 46:21,
  50:8.
irresponsible
  20:13.
Islands 36:19,
  36:22.
Israely 1:40.
issue 5:15,
  5:16, 46:12,
  49:18, 49:22,
  79:13, 83:6,
  83:18,
  100:14,
  105:7,
  109:2.
issued 54:15.
issues 58:25,
  59:8, 79:15,
  102:14,
  105:18,
  106:19,
  107:15,
  107:24.
itself 88:16.
.
.
< J >.
J-i-p-i-n-g
  97:21.
Jason 104:2.
Jeff 67:12,
  87:17, 87:19,
  88:1, 88:11,
  102:25.
jerking
  20:15.
Jho 35:2,
  36:23, 37:15,
  41:8, 42:14,
  47:1, 50:5,
  50:15, 50:20,
  51:10, 51:11,
  51:25,
  72:4.
Jinping 7:14.
Jiping 97:22,
  97:24.

John 14:20,
  104:2.
John D. Keller
  1:25.
joke 18:25.
Joshua 15:11,
  16:11.
Juan 75:15.
JUDGE 1:19,
  18:12,
  63:17.
July 27:17,
  48:12, 48:14,
  49:9, 69:25,
  70:16, 74:15,
  86:4, 86:5,
  91:9, 92:1.
June 65:11,
  65:17,
  65:19.
Jury 1:17, 4:6,
  4:7, 4:8,
  7:5, 27:4,
  44:3, 47:10,
  47:19, 52:11,
  53:5, 59:14,
  59:20, 62:17,
  99:17, 101:7,
  101:17,
  101:22,
  101:25,
  102:7,
  106:12,
  106:13.
Justice 1:26,
  1:33, 18:11,
  64:15, 92:18,
  98:5.
.
.
< K >.
K-u-w-a-i-t
  41:4.
Kasowitz
  96:18.
keep 96:14.
keeping
  102:7.
Keller 106:16,
  108:5.

Kelly 14:8,
  14:20, 14:22,
  104:2.
kept 57:4.
key 85:2,
  108:3.
Kim 39:20,
  42:9,
  42:12.
kind 9:10,
  9:11, 12:2,
  37:25, 73:25,
  74:4,
  77:21.
Kirk 104:2.
knowing
  67:25.
knowingly
  61:9.
knowledge
  67:8.
known 19:12,
  59:3.
knows 18:2,
  77:21.
Kong 75:12,
  76:7, 76:9,
  76:11, 77:25,
  78:3, 78:5,
  79:18, 80:1,
  80:10, 82:10,
  83:7.
Kuwait 41:4,
  41:6.
Kwok 90:8.
.
.
< L >.
L-i 39:23.
L-i-n 39:23.
lack 17:23,
  77:10.
lady 65:22,
  66:12,
  66:14.
laid 45:11.
landed 81:3,
  81:8, 83:7.
language
  81:17.

Laogumnerd
  32:1.
large 38:8.
largely
  54:15.
larger 51:1.
last 5:1, 5:2,
  5:4, 5:7,
  9:13, 31:19,
  39:23, 59:7,
  60:5, 60:6,
  64:9, 86:6,
  89:1, 93:24,
  103:11,
  103:23.
lasted 62:10.
late 38:13,
  49:9.
later 81:6,
  109:2.
laughing
  79:2.
Laughter.
  78:19.
launder 40:4.
laundering
  43:20, 45:6,
  45:13, 45:15,
  45:21, 45:22,
  45:23,
  51:10.
Law 1:41, 2:6,
  23:18, 23:23,
  24:1, 27:19,
  48:21, 49:16,
  71:10, 71:12,
  71:18, 72:3,
  72:4,
  106:8.
laws 48:8,
  49:4, 49:7,
  49:12.
lawyer 103:6,
  104:24.
LAX 76:1.
layout 27:3.
lead 48:23,
  50:14.
learn 9:17,
  26:8, 28:21,

32:2, 38:2,
  76:10.
learned 70:20,
  72:3.
least 26:11,
  28:22, 30:23,
  51:20, 53:16,
  57:10, 79:17,
  83:1, 88:9,
  102:9,
  107:24.
leave 55:9,
  61:11.
leaving 56:3,
  82:19.
led 37:14,
  91:11.
leeway
  104:12.
left 27:7,
  27:8, 36:10,
  101:22,
  105:6,
  105:10.
left-hand
  11:12, 12:14,
  18:20.
legal 4:21,
  17:1, 17:18,
  17:20, 49:15,
  92:13, 98:2,
  106:14,
  107:11.
legality
  106:10.
legally 49:25,
  105:9.
lend 55:22.
less 87:5.
lesson 14:21.
letter 67:11,
  67:14, 67:17,
  67:21, 67:24,
  67:25, 72:20,
  87:19, 88:1,
  88:6, 88:9,
  88:12, 88:16,
  88:19, 88:20,
  91:7,
  103:16.

level 18:7.
levels 9:21.
Li 39:23.
Lidsky 30:15,
  102:25,
  103:2.
lie 31:15.
lie. 31:18.
Lijun 30:25,
  65:15,
  92:24.
limit 61:18.
Limited 41:23,
  42:18, 54:18,
  59:11.
limits 54:22.
Lin 39:23.
line 40:21,
  42:20, 48:1,
  54:10, 55:25,
  68:24, 81:7,
  88:6, 88:14,
  96:16.
lines 93:14.
link 24:16.
list 7:25,
  22:11, 57:17,
  58:14, 62:24,
  102:16,
  102:22,
  105:21,
  107:20,
  108:4.
listed 10:11,
  15:2, 35:18,
  35:20, 51:11,
  51:25, 53:12,
  56:9, 60:7.
listen 44:22.
listing
  57:19.
lists 8:20,
  13:20.
little 4:4,
  4:10, 6:18,
  24:7, 24:8,
  37:22, 55:12,
  57:14, 58:6,
  86:9, 87:4,
  90:24,

101:20,
  107:20.
living 17:21,
  19:11.
load 65:3.
LOCKHART 1:32,
  3:7, 6:20,
  7:2, 8:6,
  9:5, 9:25,
  11:1, 11:19,
  12:5, 12:13,
  14:25, 15:16,
  16:4, 18:14,
  19:14, 21:5,
  21:11, 23:12,
  24:5, 24:9,
  24:21, 25:25,
  27:22, 28:25,
  30:7, 35:22,
  44:24,
  62:4.
London 64:10,
  64:13,
  65:20.
long 11:5,
  44:6, 76:1.
longer 97:12.
Look 12:13,
  15:1, 18:8,
  24:5, 27:22,
  28:25, 29:23,
  37:1, 37:3,
  38:12, 39:5,
  40:8, 40:17,
  50:10, 52:8,
  53:1, 53:19,
  54:4, 54:13,
  59:7, 99:4,
  105:5,
  105:15,
  106:25,
  108:7.
looked 9:8,
  16:18, 23:6,
  49:20, 51:23,
  90:3, 94:9,
  100:2, 105:2,
  105:7.
Looking 6:25,
  7:13, 8:20,

10:1, 12:7,
12:15, 12:19,
13:10, 14:5,
15:5, 15:24,
23:8, 28:1,
29:18, 45:4,
57:8, 58:3,
86:3, 99:20,
101:5,
102:22.
looks 64:14,
108:1.
Loong 39:20,
42:9,
42:12.
Los 30:18,
76:8.
losing 100:5,
101:24,
101:25.
lot 28:9,
41:19, 79:10,
79:13, 99:24,
102:4.
Lum 7:7, 21:15,
23:8, 23:9,
23:15, 25:15,
28:5, 32:4,
32:11.
lunch 4:13,
7:1, 7:3,
7:6.
.
.
< M >.
M/S 34:3,
34:12.
ma'am 53:24.
Macau 76:14.
Mafia 21:4.
maintain
75:24.
major 57:7.
Malaysia 39:11,
41:4, 41:6,
61:3, 69:24,
70:15, 73:20,
74:2, 74:7,
74:14, 74:16,
74:21,

75:3.
Malaysian 41:9,
61:2, 73:11,
73:17,
74:23.
Malaysians
73:15,
73:23.
management
92:19,
98:5.
manner 56:3,
83:18.
Marc 104:5.
March 21:19.
mark 87:18,
100:24.
marked 29:1.
Mass 84:19.
material
20:7.
materials
63:22.
matter 4:4,
4:23, 8:18,
9:3, 11:25,
12:1, 17:2,
45:6, 50:8,
50:25, 57:3,
59:12, 61:7,
109:15.
Matthew
11:15.
Mccall 104:2.
Mcmaster 7:20,
14:10, 98:1,
104:2.
me. 16:1.
mean 36:18,
37:25, 44:7,
49:17, 63:15,
72:12, 72:20,
74:18, 75:21,
81:1, 82:6,
85:24, 89:1,
93:21,
98:17.
meaning 19:8,
64:14,
64:16.

means 4:22,
52:20, 80:11,
105:21.
meant 86:6.
meet 30:16,
92:9.
Meeting 6:5,
10:21, 12:20,
13:18, 15:6,
17:14, 24:4,
30:19, 65:15,
69:24, 70:5,
70:8, 70:14,
74:1, 74:13,
75:2, 82:12,
82:21.
meetings 15:9,
28:11, 65:2,
82:7, 83:9,
83:13, 83:22,
86:21.
member 15:14.
Members 4:7,
101:17.
memorized
102:21.
memory 53:10.
mental 5:15.
mention
16:16.
mentioned
30:23,
92:1.
mentions 8:14,
86:15.
Mercer 26:22.
merely 80:9.
messages 12:8,
12:10, 16:15,
16:20, 16:21,
21:8, 21:14,
21:17, 22:2,
22:10, 22:11,
23:7, 23:8,
23:15, 24:1,
25:17, 25:20,
62:25, 65:11,
95:10,
95:16.
messaging 9:8,

9:10, 9:15,
24:17, 24:18,
25:21,
97:8.
met 10:15,
30:19, 30:21,
30:22, 30:25,
33:3,
93:14.
methods 9:20.
Metro 84:10.
MG 74:12.
Michael 104:2,
106:20.
microphone
33:15, 58:19,
62:22, 84:5,
90:4, 90:23,
92:6.
mid 49:9.
middle 59:9,
93:24.
million 20:23,
31:12, 33:5,
38:9, 38:13,
38:14, 40:17,
40:20, 41:22,
71:15,
71:18.
millions 29:24,
29:25, 30:5,
33:6,
71:14.
mind 6:10,
6:17, 37:17,
37:19,
37:22.
minimal
82:18.
Minister 9:3,
11:13, 12:3,
39:11, 65:2,
70:15, 74:2,
74:25, 92:13,
92:24.
Ministry 13:16,
73:17, 92:16,
92:17, 92:18,
98:4, 98:5.
ministry.

12:23.
minute 54:5,
  103:23.
minutes 76:12,
  80:2.
mirror 55:17.
mischaracterize
  s 80:8.
mischaracterizi
  ng 67:1,
  76:14,
  80:3.
moment 41:2,
  53:18, 75:10,
  77:7.
Monday 18:24,
  20:17.
monies 57:24.
month 27:6,
  27:9, 30:4,
  48:9, 48:11,
  69:25, 74:14,
  75:3, 86:3.
months 29:21,
  30:2.
Moscowitz
  104:6.
motion
  103:23.
move 21:21,
  24:2, 31:17,
  38:4, 42:4,
  47:23, 75:8,
  79:22, 80:20,
  82:18, 83:24,
  84:1, 89:21,
  95:1, 96:15,
  97:18,
  97:19.
moved 79:6.
MR. HASKELL
  54:5.
MR. KELLER
  52:23, 53:4,
  105:20,
  105:25,
  106:17,
  107:16,
  107:19,
  108:2,

109:7.
MTA 84:19.
Mulryne 1:31,
  29:6.
multimillions
  71:13.
multiple 23:17,
  45:24, 65:12,
  70:22, 71:6,
  71:14, 80:22,
  88:15,
  100:8.
.
.
< N >.
Najib 39:9,
  39:10, 39:13,
  69:24, 74:14,
  75:3.
named 7:14,
  39:18, 51:21,
  69:4.
names 68:11.
National 7:21,
  10:23, 11:14,
  11:18, 14:9,
  14:12, 15:14,
  16:12, 16:23,
  69:24, 70:8,
  70:11, 70:23,
  74:13, 91:17,
  91:18.
nature 9:1,
  27:11,
  66:25.
near 78:12.
nearly 38:13.
necessarily
  13:6, 44:8,
  47:15, 75:21,
  77:23.
Need 18:21,
  33:15, 36:16,
  37:21, 58:18,
  59:5, 60:15,
  62:3, 62:22,
  64:11, 64:20,
  65:22, 74:18,
  79:22, 90:4,
  92:6, 93:14,

97:4, 97:11,
  100:13,
  100:15,
  101:6,
  102:15,
  107:2,
  107:25,
  108:9.
needed 64:13.
needs 55:6,
  59:7, 59:11,
  95:20.
nefarious
  75:19,
  75:22.
New 1:27, 1:35,
  84:20, 85:6,
  85:7, 85:9,
  85:15,
  86:21.
news 4:16,
  5:18, 5:21,
  5:25, 6:7.
Next 12:22,
  14:5, 15:1,
  16:16, 19:1,
  19:4, 19:14,
  30:4, 40:21,
  53:3, 89:22,
  95:3, 96:16,
  96:17, 97:3,
  97:21, 99:8,
  103:13.
Nickie 32:4,
  65:2,
  94:10.
Nicole 1:32.
night 5:1, 5:2,
  5:4, 5:7,
  5:14.
Ning 12:23,
  13:16, 16:16,
  16:23,
  16:25.
No. 1:5, 25:23,
  28:16, 28:21,
  63:2, 64:14,
  74:18, 78:13,
  78:15, 91:25,
  92:4.

Nobody 82:22.
nominated
  91:14.
nor 43:19,
  46:18,
  47:15.
normal 81:7,
  81:18,
  83:7.
normally
  63:18.
North 84:10.
note 33:12,
  59:2,
  93:13.
noted 80:9.
Nothing 19:7,
  31:15, 31:25,
  32:1, 33:9,
  44:10, 47:8,
  59:25, 60:2,
  60:14, 64:25,
  71:23, 99:1,
  108:6.
notice 27:17.
notify 74:3.
notifying
  96:25.
nowhere
  78:12.
NSA 91:15,
  91:25.
NSC 11:14,
  11:15, 11:17,
  15:12.
number 8:20,
  13:20, 22:25,
  23:1, 23:2,
  23:3, 25:7,
  27:9, 29:21,
  30:2, 39:14,
  49:23, 58:18,
  68:18, 83:16,
  89:6.
numbers 25:4,
  25:9, 26:9,
  26:25.
numerical
  27:8.
numerous

65:9.
NW 1:27, 1:35,
2:8, 2:15.
NY 22:11,
22:25,
23:5.
.
.
< O >.
o'clock 99:20,
101:19.
O'neal 104:2,
106:20.
Object 19:21,
21:23,
61:25.
object-
62:13.
objecting
22:16,
43:3.
Objection 13:2,
13:13, 17:5,
17:23, 21:24,
22:21, 23:21,
31:17, 35:25,
36:8, 43:15,
48:1, 50:7,
66:24, 67:4,
67:17, 68:1,
75:5, 76:3,
76:13, 76:24,
79:12, 81:11,
88:13, 89:13,
95:17.
obtain 21:8.
obtained 21:8,
21:14.
obvious
83:15.
obviously 4:10,
19:25, 49:23,
59:6, 102:13,
104:17,
108:14,
108:19.
occasions
80:22.
occurred 67:7,
82:20, 83:10,

83:12.
off-peak 84:12,
85:14.
offered 5:10,
5:11.
office 39:16.
Offices 2:6.
Official 2:12,
6:5, 10:22,
12:25, 13:7,
66:20, 74:4,
85:24, 86:5,
90:9, 90:13,
109:19.
officials 10:9,
17:15, 70:22,
82:21.
often 24:2,
40:1,
81:22.
old 83:10.
once 33:7.
one-way 76:9,
84:11.
ones 9:8,
29:11, 90:13,
100:24.
oops 52:20.
open 47:25,
54:9, 56:3,
58:11, 83:25,
101:16.
opened 34:23,
34:25, 35:1,
35:4,
41:18.
opener 57:19.
opening 44:11,
56:2, 61:1,
61:7.
opinion 49:15,
50:4, 50:8,
50:20, 106:8,
107:1.
opinions
50:22.
opportunity
24:23, 33:1,
33:2, 33:4,
33:6.

opposed 62:7.
opposite
43:7.
opposition
108:8.
option 69:3.
orally
107:23.
order 54:15,
59:17,
62:12.
orders 47:12.
original 29:9,
29:11, 35:17,
35:20, 58:23,
87:9.
originally
43:4, 65:3.
Orozco 7:2,
8:6, 9:5,
9:25, 11:1,
11:19, 12:5,
12:13, 14:25,
15:16, 16:4,
18:14, 21:5,
22:10, 23:12,
24:5, 24:10,
24:21,
30:7.
others 23:16,
80:1, 80:19,
80:23,
92:19.
otherwise
77:21, 83:20,
83:21.
outs 38:1.
outside
50:25.
oversees 92:15,
98:3.
own 41:20,
79:19,
108:14.
owner 50:5,
50:16, 50:19,
51:12, 51:25,
53:13, 56:10,
57:20,
71:10.

.
.
< P >.
p.m. 1:12,
10:2, 92:2,
97:24,
109:11.
Page 3:3, 7:4,
8:6, 9:5,
16:4, 53:3,
53:15, 53:19,
56:20, 63:4,
64:5, 64:22,
68:6, 68:7,
69:17, 84:7,
85:18, 89:22,
89:23, 90:21,
95:3, 96:16,
99:8,
99:11.
pages 11:1,
12:5, 18:14,
52:22, 56:8,
99:10,
99:12.
paid 29:24,
30:6,
32:10.
paragraph
13:15, 14:5,
18:20, 19:1,
64:8, 65:1,
65:22, 69:6,
74:8, 87:15,
92:4, 92:8.
paragraphs
56:10.
paren 85:24,
90:8, 90:9.
part 9:13,
20:15, 20:16,
24:24, 35:8,
35:9, 35:11,
35:24, 46:11,
72:1, 76:10,
77:20, 85:2,
86:6,
89:10.
parte 55:4,
61:24,

62:6.
particular
9:18, 38:18,
55:18, 57:6,
57:8, 77:13,
79:22, 82:7,
82:16, 83:10,
83:13, 83:22,
89:8,
100:16.
particularly
43:14, 77:2,
102:5,
106:12.
parties 71:2.
Partners 34:4,
34:13.
parts 4:18,
5:20.
party 74:16.
passed 75:23.
passing 29:24,
78:4,
80:10.
passport 75:23,
77:4, 77:7,
79:20, 80:10,
81:23,
89:6.
passports 81:4,
81:5, 81:10,
81:15, 81:23,
83:3,
83:17.
path 75:20.
Patterson
22:23, 52:15,
52:24.
Pause 54:7.
payee 40:9.
payment
71:24.
payor 40:8.
People 5:20,
18:22, 23:19,
36:17, 39:6,
47:3, 49:24,
58:5, 58:19,
73:11, 78:17,
81:20, 82:12,

83:9, 88:2,
92:9, 92:10,
92:25, 93:6,
93:9.
per 28:14.
perhaps 83:14,
85:6.
period 15:9,
19:12, 24:19,
26:10, 34:8,
34:10, 49:18,
49:19, 49:21,
51:9,
51:22.
permission
19:16,
108:10.
permitted
54:18.
person 5:5,
9:23, 11:8,
14:17, 66:7,
73:10, 85:11,
86:19, 90:9,
91:21, 91:23,
94:18, 95:15,
96:8.
personally
63:9.
persons 65:3,
88:3, 89:11,
93:7.
perspective
12:24, 13:6,
62:9,
101:19.
pertained
28:22.
pertinence
100:17.
pertinent
101:4.
phones 26:11,
26:14, 26:16,
26:18, 27:1,
68:21,
68:22.
photo 15:1.
photos 11:6,
21:7, 23:6.

phrase 94:1.
phrased
94:25.
picture 69:1,
82:19.
pictures
64:1.
pinpoint 49:24,
49:25.
PJS 42:18.
place 27:16,
91:25.
place. 70:5.
places 86:10.
Plaintiff
1:7.
plane 81:3.
planned 5:23.
planning
99:13.
plans 58:14.
platform
24:3.
Please 10:2,
11:13, 33:13,
35:5, 37:18,
38:20, 53:3,
58:19, 65:3,
69:21, 70:4,
85:18, 85:19,
93:13.
PM 69:24,
74:13,
75:2.
point 18:22,
22:24, 26:14,
28:4, 32:13,
42:3, 46:18,
48:10, 53:15,
53:21, 56:7,
56:24, 57:1,
58:2, 60:12,
61:22, 62:9,
64:17, 76:21,
81:16, 83:20,
83:21, 89:8,
101:6,
108:16,
108:22,
108:25,

109:2.
pointing 61:15,
77:10.
points 86:7,
86:17, 86:21,
90:1.
political 5:22,
6:1, 6:4,
7:24, 71:2,
92:13,
98:2.
portion 13:24,
17:8, 20:12,
55:12, 55:14,
101:8.
portions
20:12.
posing 55:21.
possessed
20:7.
possible
97:9.
potentially
73:16.
Pottinger
11:16, 11:24,
12:4.
POTUS 15:6,
69:25, 70:5,
74:14,
75:3.
practical 57:3,
59:12,
61:6.
PRAKAZREL
MICHEL
1:10.
Pras 22:11,
22:25, 23:5,
77:25.
PRC 88:3,
88:12.
precise 70:1,
70:4.
prefer
108:25.
pregnant 66:9,
66:18.
prejudice
54:21.

Premier
  17:13.
preoccupied
  96:24.
prepare
  39:13.
prepared 39:15,
  90:11, 90:12,
  103:20.
presented
  46:18, 47:15,
  83:3.
presenting 5:6,
  5:12, 46:7.
President 7:16,
  7:18, 7:19,
  9:3, 12:17,
  12:19, 12:20,
  13:18, 15:7,
  17:12, 17:15,
  70:16, 71:1,
  74:2, 96:23,
  97:23.
pressure
  28:9.
presumably
  65:11,
  85:5.
presume 85:4.
prevent 54:21,
  58:2.
previous
  16:15.
previously
  11:23, 23:7,
  26:1, 27:23,
  29:1, 30:20,
  97:10.
Priebus 14:18,
  14:19,
  14:24.
prime 39:11,
  70:15, 74:1,
  74:25.
principal
  48:20.
print 87:9.
Prior 7:3,
  30:19, 41:18,
  41:19, 48:21,

91:8, 91:13,
  97:24,
  100:12,
  106:23.
prisoners
  98:8.
probably 4:20,
  100:8,
  104:12.
probative
  102:8,
  105:12.
problem 43:8,
  44:3, 47:9,
  57:7.
problems
  47:7.
procedures
  81:18,
  83:7.
proceed 59:19,
  62:19.
proceeded
  58:23.
proceeding
  51:4.
proceedings
  47:25, 58:11,
  83:25,
  101:16,
  109:11,
  109:15.
proceedings.
  54:7.
proceeds 45:17,
  54:17.
process 18:8,
  18:10.
processes
  18:1.
prolong
  100:4.
promised
  20:17.
promises
  18:23.
promising
  20:19.
promote
  45:19.

promotional
  45:15.
prong 45:21.
prongs 45:14.
pronouncing
  5:17.
proper 70:3,
  73:12, 74:22,
  74:23.
proposed
  13:18.
provide 54:18,
  55:21, 59:6,
  63:18,
  107:2.
provided 65:14,
  86:23,
  107:2.
provider
  25:6.
provides
  69:15.
Province
  82:11.
Public 1:34,
  92:17, 92:18,
  92:24,
  98:4.
publicity
  41:19.
publish 21:22,
  22:22.
published
  53:4.
pull 7:2,
  74:10.
purport
  89:25.
purported
  4:16.
purporting
  102:17.
purports
  100:22.
purpose 5:6,
  5:12, 32:13,
  42:4, 45:25,
  53:5,
  61:19.
purposefully

43:12,
  43:18.
purposes 5:11,
  45:11, 52:10,
  80:18.
pursuant
  63:12.
pursue
  104:21.
pursuing
  104:18.
put 20:14,
  33:13, 51:15,
  52:8, 58:5,
  68:16, 68:19,
  77:3, 106:8,
  107:11,
  107:22,
  108:21.
Putin 20:19.
puts 68:23.
putting 11:3,
  46:25, 47:1,
  56:19,
  69:10.
.
.
< Q >.
qualify
  106:5.
quarter
  102:14.
quash 103:23.
questioning
  42:21, 54:10,
  55:25,
  61:23.
questions
  54:23, 55:20,
  67:24, 73:5,
  73:9, 83:16,
  100:18,
  101:8,
  104:10,
  104:12,
  106:9,
  106:10.
Quick 60:17.
quickly 95:9.
quit 96:18,

96:23.
quote 90:8,
  100:8.
.
.
< R >.
R. 2:5, 2:6.
rabbit 44:6.
Rae 1:32.
rain 5:7.
rained 4:25,
  5:2, 5:3,
  5:4, 5:14.
range 49:23.
rank 92:13.
rate 107:10.
rather 23:20,
  62:25,
  94:24.
Razak 39:9,
  39:10, 39:17,
  69:25, 74:14,
  75:3.
reach 12:3,
  94:17,
  94:19.
reached 13:19,
  30:15,
  95:1.
reaching
  8:17.
reaction 17:4,
  17:6, 17:8,
  17:11.
reading 17:11,
  57:13,
  99:17.
reads 10:2,
  10:17, 12:22,
  65:1, 65:22,
  74:9, 74:12,
  90:22, 91:14,
  97:21,
  99:9.
ready 62:19,
  93:16.
Real 27:17,
  33:2, 34:4,
  34:13,
  42:4.

realize
  40:22.
really 82:6,
  83:17.
reason 20:11,
  23:19, 33:2,
  45:8, 46:3,
  55:5, 55:25,
  82:12, 82:20,
  83:11.
reasons
  86:13.
recall 23:5,
  37:10, 37:12,
  72:11, 72:16,
  78:4, 78:6,
  80:24, 81:4,
  88:9, 88:11,
  88:16, 94:16,
  96:5.
recalling
  72:9.
receive 20:22,
  63:16,
  70:4.
received 6:15,
  8:11, 25:4,
  30:5, 32:2,
  32:14, 33:5,
  40:20, 40:24,
  51:12, 64:23,
  70:2, 71:14,
  81:5,
  106:17.
receiving
  70:7.
recess 54:3.
recipient
  8:9.
reciprocal
  107:7.
recollection
  51:24, 52:10,
  52:19,
  53:2.
record 29:4,
  36:25, 55:6,
  60:6, 61:1,
  77:3, 100:1,
  109:15.

record. 42:23,
  54:11, 82:4,
  99:22.
records 24:24,
  25:1, 25:3,
  25:5, 25:8,
  25:11, 25:22,
  34:12, 77:14,
  77:24,
  78:2.
recount
  58:21.
recovered 8:12,
  16:9, 24:1.
redacted.
  55:14.
reduced
  84:12.
refer 85:25.
reference 7:13,
  7:17, 11:25,
  12:16, 15:5,
  16:11, 16:13,
  16:14, 17:3,
  24:14, 42:16,
  74:22, 87:16,
  93:19, 93:23,
  101:24.
references
  15:11, 17:17,
  23:15, 88:9,
  91:9.
referencing
  74:17.
referred 61:2,
  94:19.
referring
  43:11, 43:25,
  65:8, 74:21,
  96:21,
  98:22.
refers 89:11,
  94:4.
reflect
  25:18.
reflected
  34:23,
  89:6.
reflecting
  84:9.

refresh 51:24,
  52:19, 53:1,
  53:10.
refreshing
  52:10, 52:12,
  53:5.
regard 37:4.
regarding 4:15,
  5:18, 54:19,
  54:24, 55:17,
  90:1.
Registration
  45:20.
Reince 14:18.
reiterate
  84:24.
relate 45:4.
related 31:7,
  31:11, 31:23,
  45:7, 54:25,
  56:12, 65:14,
  76:14.
relates 48:12,
  106:21.
relating 57:15,
  100:15,
  107:1.
relation 42:20,
  45:5,
  45:13.
relations 19:8,
  31:24.
relationships
  105:3,
  105:9.
released
  66:5.
relev- 76:4.
Relevance
  42:20, 57:17,
  61:25, 76:3,
  76:13, 76:21,
  76:24, 77:11,
  77:13, 79:12,
  79:22, 81:11,
  82:18,
  102:5.
relevant 43:2,
  43:19, 44:2,
  44:5, 46:4,

46:21, 46:24,
56:3, 63:12,
63:21, 77:2,
80:20, 84:23,
85:1, 89:8,
106:20.
remember 53:16,
72:10, 74:16,
100:14.
remind 39:10,
74:19.
remove 52:14.
repeat 95:22.
repeating
102:6.
rephrase 50:9,
50:12.
replaced 14:19,
14:24.
reply 108:9.
report 4:16,
5:18, 5:25,
6:8, 80:11.
Reported 2:11,
17:12.
Reporter 2:12,
109:19.
reports 5:21.
represented
100:23.
representing
13:17.
Republic 5:20,
88:2, 92:25,
93:6, 93:9.
request 9:2,
10:21, 42:25,
66:20,
66:21.
requested 7:19,
18:6, 66:17,
88:3,
89:11.
requesting
7:17, 7:18,
10:6, 43:2,
67:12,
97:24.
requests
10:8.

require
67:25.
requires
102:7.
reread 54:14.
resend 97:11.
residence
30:17.
residing
19:13.
respect 61:23,
106:19,
106:21.
responding
60:4.
responds
19:2.
response 17:14,
95:11,
103:16.
responsibility
89:2.
responsible
51:6.
responsive
63:22.
rest 8:25,
46:5.
result 66:21,
67:15.
resume 6:25.
return 21:2,
98:8.
returned 66:5,
66:22, 67:1,
67:6.
reverse
107:2.
review 24:23,
25:1, 25:11,
34:12, 52:19,
55:15, 77:24,
87:22,
89:3.
reviewed 25:2,
25:5, 25:8,
25:22, 55:16,
87:25, 88:4,
88:18,
88:23.

Rick 104:1.
Ricky 11:15,
69:23, 70:8,
73:12,
74:12.
right-hand
15:21,
19:15.
rights
108:16.
Robert 3:5.
Robin 68:11,
68:15, 68:17,
68:20, 69:5,
69:10, 69:13,
70:17, 70:24,
71:18, 72:7,
72:19, 95:4,
95:13, 96:3,
96:8, 96:10,
96:25.
Room 2:16.
Rosenzweig
70:24, 71:18,
71:25, 72:7,
72:18,
72:19.
roughly
58:18.
round 106:9.
route 75:22.
RPR 2:11,
109:13.
Rufus 104:1.
Rule 106:18.
.
.
< S >.
S-e-e-t
39:23.
S-h-o-m-i-k
103:11.
sat 35:3.
save 76:11.
saved 64:4.
saw 5:3, 16:15,
23:7, 69:15,
71:5, 71:17,
72:14, 78:2,
85:1, 88:4.

saying 11:23,
12:18, 44:19,
46:6, 64:14,
69:17, 70:10,
73:21, 73:22,
74:22, 79:9,
87:18, 96:6,
97:11, 101:2,
103:16.
says 7:19, 8:1,
13:3, 15:25,
16:24, 33:24,
39:9, 61:8,
64:6, 67:20,
75:2, 85:23,
86:5, 87:18,
90:7, 91:25,
92:20, 93:2,
93:12, 93:13,
98:6.
scandal 54:24,
57:4.
schedule 12:21,
65:15.
scheduled
17:15,
65:3.
scheme 27:16,
48:11.
scope 104:13.
screen 19:15,
64:6.
screens 64:3.
screenshot
84:18,
85:6.
screenshots
63:24,
64:1.
Scroll 63:2,
85:18,
99:4.
seal 55:13.
Sealed 55:14.
Sean 1:31.
search 21:8,
21:15, 26:13,
26:17, 63:7,
63:9, 63:16,
63:21, 63:22,

84:15,
84:25.
second 10:1,
37:13, 45:21,
53:8, 54:20,
65:1, 67:21,
68:6,
100:13.
secretary 7:24,
92:12,
98:1.
Section 1:34,
12:22.
secure 9:20.
Security 6:5,
7:21, 10:23,
11:14, 11:18,
14:9, 14:12,
15:14, 16:12,
16:23, 69:24,
70:8, 70:11,
70:23, 74:13,
91:18, 91:19,
92:17, 92:18,
92:24,
98:4.
seeing 23:5,
72:17,
88:10.
seek 43:23.
seeking 70:7.
seem 47:21,
49:17.
seemed
107:20.
seems 49:15,
57:14, 60:20,
100:16.
seen 16:17,
18:24, 67:24,
70:23, 72:7,
72:10, 86:9,
88:5, 88:6,
88:7, 88:8,
88:14, 88:16,
88:19, 88:21,
88:22, 94:8,
94:9,
94:12.
Seet 39:22.

seize 26:16,
63:21,
84:25.
seized 7:6,
19:24, 26:18,
63:11, 84:16,
85:1, 85:4.
seizing
64:20.
self-destruct
97:9.
self-explanator
y 101:5.
semi 15:24.
send 19:3,
66:18,
93:13.
sender 8:9,
70:10, 70:12,
97:11.
sending 19:3,
23:9, 23:10,
24:14, 24:16,
46:10, 46:12,
70:7, 93:6.
sends 23:11,
42:1, 42:5.
sent 8:11,
16:8, 40:19,
45:18, 46:6,
64:23, 65:10,
65:14, 65:23,
66:2, 66:14,
67:13, 67:16,
70:17, 70:19,
71:18, 88:3,
88:12, 89:7,
89:12, 91:7,
94:10, 95:10,
95:12, 95:13,
96:11, 97:10,
99:3.
sentence 11:11,
16:16,
74:9.
separate
73:5.
separating
83:11.
September

27:18,
28:7.
series 63:25.
serious 18:23,
20:18, 43:8,
44:3,
78:20.
served 63:17,
103:22.
service 9:8,
9:10.
Session 1:13.
Sessions 67:12,
87:17, 87:19,
88:1, 88:12,
102:25,
103:14,
103:20.
set 28:11,
41:8, 54:22,
59:17, 69:25,
70:7, 70:15,
74:14, 75:3,
95:8,
108:8.
setting
10:21.
seven 58:20,
59:4.
several 23:15,
51:12,
62:10.
Sharp 8:15.
shell 54:25.
Shenzhen 75:14,
75:16, 75:17,
76:1, 76:7,
76:12, 76:15,
78:7, 78:12,
78:14, 78:15,
79:3, 79:8,
79:11, 79:19,
80:2.
shit 20:18,
21:3, 21:4.
Shomik 103:5,
106:19.
short 4:2,
54:1.
shortened

69:14,
69:16.
shouldn't
53:7.
Show 5:7, 5:13,
21:11, 21:17,
25:17, 25:21,
25:25, 26:4,
26:24, 27:11,
35:5, 38:19,
52:15,
87:12.
showing 25:14,
32:17, 36:9,
57:23, 63:4,
81:10,
81:15.
shown 52:11.
shows 26:5,
27:13, 43:5,
43:25, 44:14,
56:22, 57:17,
60:22,
75:18.
shut 64:11,
64:13,
64:20.
side 11:2,
11:4, 11:12,
12:6, 12:14,
15:21, 17:4,
17:6, 17:12,
18:15, 18:20,
19:15, 22:25,
27:8, 74:21,
74:23.
sign 96:17,
97:4.
signatory
34:24, 37:4,
37:6, 37:13,
41:11, 42:6,
42:11, 51:22,
56:9,
57:19.
signature
36:23, 37:11,
39:6, 39:19,
39:22.
signatures

39:19.
signed 37:4.
significant
  28:4, 29:21,
  30:2.
signor 41:15.
silencer
  9:19.
silent 9:19.
similar 27:23,
  56:4, 56:5,
  69:15, 71:8,
  73:18.
simply 58:2,
  60:12, 62:5,
  108:16.
single 21:2,
  99:17,
  105:6.
Sir 38:18,
  48:4, 76:6.
sit 72:13,
  72:17.
six 56:8,
  56:10, 57:21,
  59:4.
skip 19:18.
slash 90:8.
slightly
  73:1.
slow 15:19.
slowing 31:4.
small 55:12.
smaller 87:6.
somebody 5:3,
  5:9, 7:14,
  37:8, 68:19,
  68:23, 69:10,
  81:23, 85:14,
  86:17, 95:17,
  96:25,
  105:17,
  106:9.
somehow
  83:19.
Someone 5:1,
  19:2, 68:16,
  73:20, 73:22,
  74:25, 86:18,
  86:19, 86:23,

96:22,
98:20.
someplace
  78:8.
sometime
  49:9.
sometimes
  24:1.
somewhat 13:5,
  44:15.
son 65:21.
soon 27:20,
  48:19,
  70:2.
Sorry 9:12,
  14:1, 14:11,
  15:20, 22:5,
  22:6, 33:17,
  37:2, 38:19,
  48:6, 62:23,
  76:23, 80:7,
  90:6, 92:4,
  92:7, 103:1,
  103:5, 104:5,
  105:23,
  106:1,
  106:3.
sort 75:24.
sound 43:21,
  52:7.
sounds 44:10,
  46:2, 66:8,
  94:24,
  107:9.
soup 19:7.
source 44:4,
  44:20, 45:24,
  46:10,
  47:16.
sourced 43:13,
  44:2, 44:4,
  45:16.
sourcing
  43:17.
southern 78:15,
  79:3.
speaking
  30:1.
Special 3:5,
  12:16, 12:18,

13:17, 30:15,
  30:23,
  81:4.
specific 48:10,
  53:15, 56:8,
  63:1,
  100:3.
specifically
  68:25, 72:17,
  89:8,
  101:12.
specifics
  96:22.
speculate
  6:6.
speculation
  13:3,
  97:13.
speculative
  13:5,
  94:24.
speed 15:18,
  53:16.
spell 13:19,
  103:9.
spent 79:13,
  82:17.
Spoke 11:24,
  69:20, 69:23,
  70:11,
  74:12.
Staff 14:14,
  14:23,
  74:25.
staffers
  10:9.
stamped 81:24,
  83:3, 83:5,
  83:17.
stand 5:1,
  11:17, 89:1,
  95:21.
Standard 92:2,
  97:25.
stands 76:21,
  76:25,
  102:8.
Star 56:19.
Start 31:4,
  33:12, 39:7,

49:6, 64:5,
  79:1, 101:19,
  102:13.
started 49:20,
  50:3,
  107:20.
starting 15:18,
  27:7.
starts 48:19,
  69:17.
State 5:15,
  6:10, 6:17,
  60:25, 73:17,
  73:18, 74:6,
  75:1, 92:17,
  98:4.
stated 80:15.
Statement 4:24,
  5:4, 5:6,
  5:13, 5:14,
  6:2, 33:24,
  34:3, 34:6,
  34:9, 34:10,
  37:4, 48:14,
  49:11, 61:1,
  97:7.
statements
  4:22, 5:10,
  61:7.
States 1:1,
  1:5, 1:19,
  2:13, 5:22,
  10:10, 12:19,
  17:22, 45:18,
  65:16, 66:3,
  66:6, 66:22,
  74:6, 77:25,
  78:23, 86:8,
  89:12, 91:21,
  91:24, 93:11,
  98:13, 98:18,
  98:24.
Station 84:10,
  84:12, 84:20,
  84:21.
status 60:6.
statute
  48:18.
stayed 54:22.
steal 41:9.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

stemming
  45:8.
stenographic
  109:14.
step 53:24,
  102:3.
steps 50:17.
Steve 8:16,
  8:19, 9:2,
  11:10,
  69:16.
stipulated
  35:19, 35:22,
  38:20.
stipulation
  26:1, 27:24,
  29:2, 29:10,
  35:8, 35:9,
  35:12, 35:13,
  35:17, 35:18,
  35:21, 35:24,
  39:3.
stole 47:2,
  54:17,
  57:12.
stop 64:20.
stopped
  26:17.
stopping 62:2,
  64:11,
  64:15.
story 32:23,
  33:8.
story. 20:20.
straight
  18:21.
strategic
  60:15.
strategically
  61:12.
Street 26:22.
strictly 52:12,
  60:13.
strike 31:17,
  31:19.
structural
  4:18, 5:20.
structure
  6:11.
structured

54:25,
  56:4.
structuring
  55:17.
stuck 59:16.
studio 30:17.
style. 21:4.
subject 26:1,
  27:23,
  29:2.
subjects
  39:18.
subpoena
  104:5.
subpoenaed
  103:14.
subscriber
  25:5.
subsection
  12:15,
  12:22.
subset 51:1.
substance
  31:5.
substantive
  24:2.
suffer 19:8.
suggest 21:2,
  53:21, 68:14,
  86:2,
  86:12.
suggested
  68:16.
suggesting
  102:7.
suggests
  68:19.
Suite 1:28.
summary 4:18,
  5:19, 39:7.
Sun 9:4, 12:23,
  13:16, 16:16,
  16:25, 30:25,
  65:15,
  92:24.
Sun. 93:16.
sun_ning@mfa.go
  v.cn 13:19.
support 55:21,
  55:23.

supposedly
  57:11.
Supreme 92:17,
  98:5.
surrounding
  30:14.
suspicious
  79:24, 80:5,
  80:9.
sustain 13:12,
  48:1, 67:4,
  68:1, 76:5.
Sustained
  68:5.
SW 8:15,
  69:16.
system 108:8.
Szechwan
  75:12.
.
.
< T >.
T. 2:11, 62:13,
  109:18.
T1 9:22,
  18:17.
tactical 55:24,
  60:16, 60:19,
  62:6.
tactically
  57:2,
  61:12.
taken. 54:3.
talked 47:4,
  58:19,
  97:9.
tally 27:8.
Tan 37:7,
  39:20, 42:8,
  42:9,
  42:11.
telephone
  64:2.
telephonic
  28:22.
tells 65:17.
ten 28:14.
ten-minute
  53:22.
tens 30:5,

33:6.
term 4:22.
termed 4:14.
terminal
  84:11.
terrible
  18:24.
testified 5:1,
  5:18, 31:8,
  66:25, 75:11,
  79:24, 80:4,
  80:22, 81:9,
  88:15, 88:22,
  89:14,
  94:23.
testify 103:21,
  104:23,
  108:14.
testifying
  64:12.
testimony 29:6,
  54:16, 54:19,
  65:25, 71:3,
  77:5, 80:14,
  80:20, 81:12,
  88:14, 96:3,
  104:22,
  105:2,
  106:23.
text 21:8,
  21:14, 22:1,
  23:20, 24:1,
  24:3, 25:17,
  62:24,
  97:4.
Thanks 55:11.
THE CLERK
  38:24,
  39:1.
THE WITNESS
  15:20, 52:17,
  53:24,
  90:6.
theft 44:5,
  47:13.
them. 18:25.
theories 45:14,
  55:23.
theory 40:3,
  43:3, 43:4,

43:19, 44:18,
44:20, 44:23,
44:25, 55:22,
56:5, 57:15,
58:7, 60:8,
60:21, 61:11,
62:6.
thereby 47:2.
they'll 24:2.
they've 60:13,
102:6,
102:9.
thief 47:2.
though 48:19,
71:9, 74:11,
88:9.
threatened
96:18.
threatening
96:23.
three 49:13,
64:9, 65:19,
65:20, 65:22,
88:3,
103:25.
Throughout
9:17, 23:14,
27:14, 32:19,
32:25,
79:19.
Tiankai
10:13.
tie 82:11.
tied 82:6,
83:8,
83:22.
ties 47:20,
80:17.
timing 80:17,
82:19,
83:12.
timingwise
80:16.
titled 39:17.
titles 7:25.
today 21:3,
31:8, 54:2,
96:18, 97:25,
107:10,
107:23.

today. 10:3,
10:18.
together 11:4,
51:15.
toll 25:3.
tomorrow 70:3,
102:12,
105:11.
tonight 100:23,
103:24.
took 4:13,
50:17, 57:1,
80:1, 85:6.
top 9:22, 11:8,
11:11, 12:14,
12:15, 15:3,
15:5, 16:11,
23:8, 24:7,
37:12, 39:7,
39:8, 39:12,
51:21, 68:11,
68:23, 85:19,
85:23, 90:7,
91:2, 95:4.
totality 38:1,
94:8.
totally 19:2,
46:21.
Touhy 103:19,
106:18.
tour 81:22,
82:25.
tourists
81:22.
tracing 38:16,
44:6,
62:10.
track 59:16.
tracks 57:14,
58:6.
train 84:10,
84:20.
transaction
38:12.
TRANSCRIPT
1:17,
109:14.
transcripts
105:5.
Transit

84:19.
translator
13:17.
travel 75:23,
84:9,
84:19.
traveled 75:25,
76:15,
80:19.
traveling
80:10, 85:3,
85:7.
TRIAL 1:17,
59:9, 62:10,
100:5.
trip 83:11,
85:12.
trips 80:16,
82:6, 82:10,
83:12.
trouble
100:17.
true 6:13,
32:3, 32:13,
32:18, 32:24,
45:24, 50:5,
50:16, 51:11,
94:4.
Trump 12:20,
13:18, 17:15,
71:1, 94:5,
94:11, 94:12,
94:14, 94:15,
96:18, 96:22,
96:23.
truth 4:3,
4:23, 32:21,
33:1.
Try 20:18,
28:11, 58:8,
87:7,
94:16.
trying 12:21,
17:14, 43:17,
44:11, 49:24,
58:2, 62:5,
62:11, 65:15,
81:12, 83:19,
83:23.
turned 48:11.

turns 100:13.
TVM 84:12.
twice 102:9.
Two 4:12, 4:15,
10:9, 11:3,
11:6, 12:18,
22:11, 23:8,
25:2, 26:11,
26:18, 27:10,
39:6, 43:10,
45:14, 47:11,
48:24, 53:4,
55:22, 60:15,
61:16, 73:3,
73:5, 89:11,
93:6, 98:8,
98:12, 98:15,
103:25.
type 9:8, 9:15,
9:16,
25:21.
types 25:1,
25:2.
.
.
< U >.
ultimate 44:4,
44:5.
ultimately
44:2, 79:14,
80:12.
uncommon
78:17.
uncover 71:8.
undercut
83:19.
underneath
23:11,
93:13.
understand
20:14, 20:18,
22:1, 23:1,
44:19, 46:7,
46:9, 46:14,
56:21, 61:22,
70:17, 70:19,
82:9, 83:6,
96:2.
understanding
34:14, 34:16,

34:19, 48:18,
60:24, 66:4,
69:1, 75:4,
78:24, 81:2,
86:16, 90:15,
91:21.
understands
108:18.
Understood 4:5,
13:8, 61:21,
62:4, 62:8,
62:15, 73:2,
73:22.
Understood.
69:18.
unfortunately
38:9.
unit 51:3.
United 1:1,
1:5, 1:19,
2:13, 5:22,
10:10, 12:19,
17:22, 45:18,
65:15, 66:3,
66:6, 66:22,
74:6, 77:25,
78:22, 86:8,
89:12, 91:21,
91:24, 93:10,
98:13, 98:18,
98:24.
unless 35:7,
35:18,
89:18.
uptick 28:4.
Urgent 10:22,
13:18,
64:6.
urgently 10:2,
91:25.
USA 65:3,
65:23, 87:1,
88:4, 89:7,
89:11,
91:3.
useful 47:22,
58:1.
uses 55:18.
using 27:2,
38:4, 41:20,

56:15, 57:8,
95:16,
96:9.
utilized
40:3.
.
.
< V >.
various 7:24,
7:25,
105:9.
Ventura 1:42.
verify 51:18.
VI 87:1,
87:15.
via 23:20,
64:10.
Vice 9:3,
92:24.
view 56:22,
98:22.
violated 49:3,
49:7, 49:16,
50:1.
violating 48:8,
50:3.
violation
45:19, 48:15,
48:17, 48:21,
49:12.
Virgin 36:19,
36:22.
Visa 66:2.
visit 31:21,
31:24,
91:11.
voice 9:13,
25:23.
voluntary
108:17,
109:5.
vouched 19:5,
19:6.
vs 1:8.
.
.
< W >.
Waddell 11:15,
11:24, 12:3,
12:4, 69:23,

70:8, 70:11,
70:12, 70:14,
73:12, 73:16,
73:23,
74:13.
Wait 16:1.
waiting 8:2,
8:3, 58:13,
65:1, 98:7.
walked 19:7.
Wang 7:23,
11:13, 12:3,
66:7, 66:9,
66:22, 67:16,
68:3, 93:15,
98:1.
wanted 4:10,
50:5, 50:15,
54:4, 54:12,
54:14, 58:13,
63:3, 79:8.
wants 86:14.
warrant 21:15,
26:13, 26:17,
63:9, 63:12,
63:16, 63:17,
63:23,
84:25.
warrants
21:9.
Washington
1:10, 1:29,
1:36, 2:9,
2:17.
waste 99:25,
100:5.
wasting
83:24.
ways 98:12.
Wednesday
18:24.
weeks 62:10.
Wen 90:8.
Wengui 5:19,
86:1, 90:1,
90:8.
Westport
84:21.
WH 10:2,
10:18.

whatever 47:13,
59:6, 63:14,
64:16, 69:4,
74:6, 77:2,
78:14, 80:20,
102:14,
108:17.
whenever 66:11,
108:20.
whisked 80:23,
81:1, 81:9,
81:14,
81:18.
White 8:17,
10:6, 10:8,
17:16, 70:22,
71:6, 90:16,
106:22,
106:24.
whoever 39:15,
70:6, 75:11,
85:4, 85:5,
103:9.
whole 24:9,
33:8,
82:19.
whom 20:14.
whomever
74:4.
whoops 40:21.
Wickr 24:15,
24:16, 24:17,
24:18.
wife 70:24,
71:8, 71:9.
William
104:1.
willing
100:23.
wires 71:14.
wish 57:2,
61:12.
wishes
108:14.
withdraw 51:7,
65:25, 72:2,
73:9,
104:7.
within 54:22,
82:12,

108:5.
without 22:20,
  36:8, 78:4,
  79:19, 81:9,
  81:15.
WITNESS 3:3,
  5:1, 5:2,
  5:3, 5:5,
  5:8, 5:13,
  21:11, 33:14,
  35:5, 50:22,
  52:10, 52:13,
  53:3, 53:20,
  58:14, 59:3,
  59:7, 60:5,
  72:16, 79:6,
  79:23, 87:4,
  87:7,
  87:10.
witnesses
  102:17,
  102:24,
  106:21,
  107:5,
  107:17.
woman 66:1,
  66:4, 66:18,
  67:13.
wonder 59:24.
words 5:8.
work 23:23,
  63:15, 68:21,
  68:23, 69:2,
  70:4.
worked 33:3,
  50:24.
Working 28:10,
  64:19,
  70:1.
works 18:22.
worth 71:15.
write 11:21,
  86:21.
writer 12:18,
  14:6, 14:7,
  16:19, 16:20,
  19:5,
  73:22.
writes 16:1,
  16:2.

writing 19:5,
  107:22.
written 12:11,
  12:24,
  86:2.
wrote 16:24,
  72:3, 72:5.
Wynn 8:16,
  8:19, 9:2,
  11:10, 11:21,
  11:23, 12:1,
  69:16.
.
.
< X >.
X-i 97:21.
Xi 7:14, 7:18,
  7:19, 9:3,
  12:17, 12:19,
  17:12, 97:22,
  97:24.
.
.
< Y >.
year 27:6,
  48:9,
  48:10.
years 49:13.
Yep 22:12.
Yongqing 7:23,
  98:1.
York 1:27,
  1:35, 84:20,
  85:7, 85:9,
  85:15.
yourself
  52:25.
.
.
< Z >.
Zitman 30:23,
  31:1.