**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 1:19-cr-148** |
| | ) | |
| **PRAKAZREL MICHEL** | ) | |
| | ) | |

## GOVERNMENT SENTENCING MEMORANDUM

Prakazrel Michel betrayed his country for money. He funneled millions of dollars in prohibited foreign contributions into a United States presidential election and attempted to manipulate a sitting president to serve a foreign criminal and a foreign power. Over nearly a decade, Michel's conspiracies sought to exploit and deceive the White House, the Attorney General, the Secretary of State, political committees, the Federal Election Commission, straw donors, FBI agents, multiple financial institutions, and his own co-conspirators. Michel lied unapologetically and unrelentingly to carry out his schemes.

Michel's illicit foreign malign influence effort is extraordinary—he and his co-conspirators targeted the highest levels of American government through illegal contributions and backchannel influence. They tried to end the DOJ investigation into 1MDB, the largest foreign embezzlement scheme in history, and endeavored to send a PRC national back to China without due process. For his willingness to elevate foreign interests over those of the United States, Michel obtained more than $120 million from the architect of 1MDB, Low Taek Jho. After Michel was caught, he tampered with witnesses and then perjured himself at trial. His sentence should reflect the breadth and depth of his crimes, his indifference to the risks to his country, and the magnitude of his greed.

## I.    The United States Sentencing Guidelines

### A.  Guidelines Sentencing Calculation

The defendant's guidelines should be calculated as set forth below:

**Count One: Conspiracy to Defraud the United States & to Make Foreign & Conduit
Campaign Contributions
(18 U.S.C. § 371)**

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2C1.8(a) | 8 |
| Offense Involved More than $1.5 Million in Illegal Transactions, U.S.S.G. §§ 2C1.8(b) & 2B1.1(b)(1)(I) | +16 |
| Offense Involved an Illegal Transaction Made by a Foreign National, U.S.S.G. § 2C1.8(b)(2) | +2 |
| Obstruction of Justice, U.S.S.G. § 3C1.1 (witness tampering and false testimony) | +2 |
| Aggravating Role, U.S.S.G. § 3B1.1(b) (manager or supervisor) | +3 |
| Total Offense Level for Count One | 31 |

**Count Two: Concealment of Material Facts
(18 U.S.C. § 1001(a)(1))**

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2B1.1(a)(2) | 6 |
| Obstruction of Justice, U.S.S.G. § 3C1.1 (witness tampering & false testimony) | +2 |
| Total Offense Level for Count 2 | 8 |

**Count Three: False Records
(18 U.S.C. § 1519)**

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2J1.2(a) | 14 |
| Fabrication of a Substantial Number of Records or Especially Probative Records or was Otherwise Extensive in Scope, Planning, or Preparation, U.S.S.G. § 2J1.2(b)(3) | +2 |
| Obstruction of Justice, U.S.S.G. § 3C1.1 (witness tampering & false testimony) | +2 |
| Total Offense Level for Count 3 | 18 |

**Count Four: False Records
(18 U.S.C. § 1519)**

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2J1.2(a) | 14 |
| Fabrication of a Substantial Number of Records or Especially Probative Records or was Otherwise Extensive in Scope, Planning, or Preparation, U.S.S.G. § 2J1.2(b)(3) | +2 |
| Obstruction of Justice, U.S.S.G. § 3C1.1 (witness tampering & false testimony) | +2 |
| Total Offense Level for Count 4 | 18 |

### Count Five: Witness Tampering
### (18 U.S.C. § 1512(b)(1))

| Base Offense Level, U.S.S.G. § 2J1.2(a) | 14 |
| Obstruction of Justice, U.S.S.G. § 3C1.1 (false testimony) | +2 |
| Total Offense Level for Count 5 | 16 |

### Count Six: Witness Tampering
### (18 U.S.C. 1512(b)(1))

| Base Offense Level, U.S.S.G. § 2J1.2(a) | 14 |
| Obstruction of Justice, U.S.S.G. § 3C1.1 (false testimony) | +2 |
| Total Offense Level for Count 6 | 16 |

### Count Seven: Conspiracy to Violate FARA, § 951, and to Commit International
### Promotional and Concealment Money Laundering
### (18 U.S.C. § 371)

| Base Offense Level, U.S.S.G. §§ 2S1.1(a)(2) & 2B1.1(b)(1)(K) (between $9.5 and $25 million in laundered funds) | 28 |
| Promotion of Offense Involving National Security, U.S.S.G. § 2S1.1(b)(1) | +6 |
| Conviction under 18 U.S.C. § 1956, U.S.S.G. §§ 1B1.3, cmt. n.7 & 2S1.1(b)(2)(B) | +2 |
| Sophisticated Laundering, U.S.S.G. § 2S1.1(b)(3) | +2 |
| Obstruction of Justice, U.S.S.G. § 3C1.1 (false testimony) | +2 |
| Aggravating Role, U.S.S.G. § 3B1.1(b) (manager or supervisor) | +3 |
| Total Offense Level for Count 7 | 43 |

### Count Eight: Foreign Agents Registration Act
### (22 U.S.C. §§ 612 & 618)

| No Applicable Guideline (Sentence pursuant to 18 U.S.C. § 3553(a)) |

### Count Ten: Agent of a Foreign Government
### (18 U.S.C. § 951)

| No Applicable Guideline (Sentence pursuant to 18 U.S.C. § 3553(a)) |

**Count Twelve: Conspiracy to Make False Statements to a Financial Institution
(18 U.S.C. § 371)**

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | 7 |
| Obstruction of Justice, U.S.S.G. § 3C1.1 (false testimony) | +2 |
| Total Offense Level for Count 12 | 9 |

**Grouping**

| | |
|---|---|
| Total Offense Level for Counts 1-6, U.S.S.G. §§ 3D1.1, 3D1.2, & 3D1.3 ("Group 1") | 31 |
| Total Offense Level for Counts 7-12 ("Group 2") | 43 |
| Number of Units, U.S.S.G. § 3D1.4. | 1 |
| **Final Offense Level** | **43** |
| **Estimated Criminal History Category** | **I** |
| **Guideline Range ("Total Punishment"), U.S.S.G. § 5G1.2(b) & (d)** | **Life** |

B.  <u>Specific Offense Characteristics & Adjustments</u>

1.  *Application of 2X1.1(a)*

The defendant has objected to specific offense characteristics applicable to the offenses underlying the conspiracies charged in Counts One and Seven.  He argues that the conspiracy guideline, 2X1.1(a), permits only inclusion of the base offense level applicable to the substantive offense and excludes specific offense characteristics.  This argument ignores the plain language of guideline 2X1.1(a) and the related commentary.

Guideline 2X1.1(a) provides that for a conspiracy, the base offense level is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline." U.S.S.G. § 2X1.1(a).  "[S]uch guideline" refers to the guideline for the substantive offense, and "adjustments" refers to alternative base offense levels, specific offense characteristics, cross references, and special instructions included in the guideline for the substantive offense.  *See* U.S.S.G. § 1B1.1(a)(2).  The commentary to Guideline 2X1.1(a) confirms that the offense level calculation should include applicable specific offense characteristics: "the only specific offense

characteristics from the guideline for the substantive offense that apply are those that are determined to have been specifically intended or actually occurred." U.S.S.G. § 2X1.1 cmt. n.2. Further, the Guidelines explicitly include specific offense characteristics in the application of "adjustments." U.S.S.G. § 1B1.1 cmt. n.4 (describing "adjustments" as specific offense characteristics and stating, "[t]he offense level adjustments from more than one specific offense characteristic within an offense guideline are applied cumulatively."); *id.* ("Within each specific offense characteristic subsection, however, the offense level adjustments are alternative."). The defendant's position is contrary to the language of Guideline 2X1.1(a), the commentary, and the broader application of the Guidelines generally. No Court has ever adopted the defendant's flawed interpretation. The Court should apply specific offense characteristics under the controlling guidelines for each group of counts, 2C1.8 and 2S1.1, respectively.

2.  *Enhancement for Obstruction of Justice*

The Court should apply a two-level enhancement under Guideline 3C1.1 to the offense levels for Group 1 and Group 2. After Michel was charged in the initial indictment in May 2019 with the same offenses charged in Counts One through Four of the Superseding Indictment, he criminally tampered with two witnesses. Superseding Indictment, ECF No. 84 at 19-23. He also perjured himself at trial. *See, e.g.*, Trial Tr. 4/18 P.M. at 55-56 (Michel testifying that "[i]t was a million dollars to figure out if I can help him get this photo with President Obama" and denying that the money was for a political contribution); *id.* at 82 (Michel testifying that "he thought it was legitimate" to make conduit contributions through straw donors); *id.* at 87 (Michel testifying that the money from Low was not for political contributions and that he "could have went and bought 12 elephants with it."). Michel's witness tampering and false testimony are quintessential forms of obstruction under Guideline 3C1.1. *See* U.S.S.G. § 3C1.1 cmt. n.4 (listing "unlawfully

influencing a . . . witness" and "committing . . . perjury" as the first two examples of covered conduct.). Count One does not involve any obstructive conduct. Contrary to the defendant's objection, the application of the § 3C1.1 obstruction enhancement to Count One, even when grouped with Counts Two through Six, does not result in double-counting. The commentary to Guideline 3C1.1 contemplates this precise scenario: "If the defendant is convicted both of an obstruction offense . . . and an underlying offense . . ., the count for the obstruction offense will be grouped with the count for the underlying offense. . . . The offense level for that group . . . will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section." U.S.S.G. § 3C1.1 cmt. n.8.

The same analysis applies to the two-level enhancement for obstruction of justice applied to the Group 2 offenses based on Michel's false testimony. *See, e.g.*, Trial Tr. 4/19 A.M. at 15 (Michel testifying that "Low did not direct any of [the] $100 million that [Michel] received in 2017."); *id.* at 17 (Michel: "2017, Pheng paid me for an investment."). A two-level enhancement for obstruction should be applied to both Group 1 and Group 2.

3. *Aggravating Role*

The Court should apply a three-level increase to the offense levels for Group 1 and Group 2 under Guideline 3B1.1 based on Michel's status as a "manager or supervisor" of "criminal activity involv[ing] five or more participants or [that] was otherwise extensive." U.S.S.G. § 3B1.1(b). In the 2012 conspiracy to funnel Low's money into the reelection campaign for the then-sitting President, Michel organized a political fundraising event with a campaign fundraiser, *see, e.g.*, Trial Tr. 4/18 A.M. ("[I]t was Pras' event . . . [a]nytime you have someone who has volunteered and offered to anchor an event for you and bring all of their people to the event and help them raise money, you try to keep them happy"); conspired with a domestic co-conspirator to

direct wire transfers from Low through a foreign co-conspirator to fund the illegal foreign contributions, *see, e.g.*, Ex. 294; identified, recruited, reimbursed, and directed over a dozen straw donors to make conduit contributions, *see, e.g.*, Ex. 270, 601; arranged attendance for some of the straw donors at the fundraising event *see, e.g.*, Trial Tr. 3/31 A.M. at 128; arranged for access and accompanied Low's relative to the fundraising event, *see, e.g.*, Ex. 511, 105; and made his own conduit contributions with Low's money to a separate political action committee, *see, e.g.*, Ex. 513. The co-conspirators include Michel, Low, a domestic co-conspirator, and a foreign proxy for Low and the participants include the straw donors directed by Michel to make conduit contributions. The straw donors made illegal campaign contributions and several entered into immunity agreements because of their criminal exposure. Ex. 423 (Proffer Agreement); Ex. 528 (Immunity Agreement); Ex. 536 (Immunity Agreement); Ex. 537 (Immunity Agreement); Ex. 538 (Immunity Agreement). Immunized subjects with criminal exposure involved in a criminal scheme count as participants under the Guidelines. *See United States v. Tavares*, 705 F.3d 4, 30 (1st Cir. 2013) ("In light of our sister circuit's reasoning and the clear language of the Guideline, we also hold that a 'participant' can be an immunized witness against the defendant."). The use of over a dozen straw donors also constitutes criminal activity that is "otherwise extensive." *See* U.S.S.G. § 3B1.1 cmt. n.3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.") *id.* ("Thus a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."); *United States v. Wilson*, 240 F.3d 39, 47 (D.C. Cir, 2001) (adopting the *Carrozzella* test for determining whether an organization is otherwise extensive, focusing on "the number of persons involved in the criminal activity, criminally or noncriminally."). Michel managed every aspect of the foreign and conduit contribution scheme and took in nearly $20

million in profits for himself, paying his domestic co-conspirator a much smaller share of the proceeds. Ex. 600. Trial Tr. 4/18 A.M. (Michel: "I gave [co-conspirator] $300,000 and whatever else was left from that point."). A three-level increase under Guideline 3B1.1(b) should be applied for Michel's role in the Count One conspiracy. U.S.S.G. § 3B1.1 cmt. n.4 (referencing "the recruitment of accomplices" and "the claimed right to a larger share of the fruits of the illegal activity" as weighing in favor of the larger four-level enhancement for a leadership role in an offense).

In the 2017 conspiracy charged in Count Seven, the co-conspirators included Michel, Low, Broidy, Lum Davis, and Higginbotham. Michel recruited Broidy and Lum Davis into the scheme and directed them on Low's behalf. Trial Tr. Ex. 4/6 A.M. at 26 (Higginbotham: "Mr. Michel had told me that Nickie Lum Davis had very strong contacts within the Republican party, and that she's the one who facilitated the introduction to Elliott Broidy. . . . Elliott Broidy not only seemed to have, but in fact did have, a very strong relationship with the sitting president . . . to work towards a resolution of the 1MDB matter."); Trial Tr. 4/4 A.M. at 66-67 (Broidy: "[Michel] was putting a team together and ultimately it would be Mr. Low's decision whether I would be part of that team; but he was looking for people to be on the team to work on the [1MDB] matter."). Michel organized two trips for Lum Davis and Broidy to meet with Low, Ex. 130, 322, 681, relayed direction from Low to Broidy and Lum Davis regarding their activities, and relayed progress back to Low. *See, e.g.*, Trial Tr. 4/4 A.M. at 93 (Broidy testifying that Michel was the "facilitator" between Low and Lum Davis and Broidy); *see id.* at 94 (Broidy testifying that Michel relayed information back and forth to Low regarding a proposed golf game that Broidy would try to set up between the then-President of the United States and the then-Prime Minister of Malaysia.); *see id.*

at 116 (Broidy: "I believe that Mr. Low was pressuring Mr. -- in this chain of conversations, pressuring Mr. Michel, who was pressuring Nickie, who was pressuring me.").

The defendant also recruited and directed Higginbotham. *See, e.g.*, Trial Tr. 4/6 A.M. at 7 ("In March of 2017, Mr. Michel approached me about trying to help him identify an attorney that had the ability to resolve a civil forfeiture matter for Jho Low having to do with the 1MDB case."); *id.* at 8 (Higginbotham testifying that Michel directed him to lie to banks about money from Low). Michel organized a trip to Macau, China, and tasked Higginbotham with posing as Broidy's representative to meet with Low and discuss the 1MDB and Guo matters. *Id.* at 78-79; Ex. 681.

Michel also claimed, by far, the largest share of the profits from the scheme. Ex. 671-80. Out of the $104.24 million that Michel received, he paid Broidy $9 million, Ex. 672; paid Lum Davis $10.933 million, Ex. 673; and paid Higginbotham $170,000, Ex. 674, 677. Michel kept over $80 million for himself until the remaining funds were seized. Michel was a manager or supervisor of the criminal activity. The court should apply a three-level increase in offense level to Group 2 based on Michel's role in the Count Seven conspiracy.

### 4. *Amount of Laundered Funds*

The Court should increase the offense level for Group 2 by twenty levels under Guidelines 2S1.1(a)(2) & 2B1.1(b)(1)(K) based on the amount of laundered funds involved in the Count Seven conspiracy. Because the offense underlying the money laundering conspiracy is a FARA violation and there is no guideline for FARA, the offense level for the money laundering conspiracy is eight plus the number of levels from Guideline 2B1.1 corresponding to the amount of laundered funds. U.S.S.G. § 2S1.1(a). A conservative estimate of the minimum amount of laundered funds involved in the conspiracy is $21.3 million, though the amount is arguably as high as $60.24 million. Low caused the transfer of $104.24 million to the defendant as payment for the FARA and Guo schemes. Ex. 671. This was evident from the contracts, *e.g.* Ex. 165 (draft retainer

agreement between Low and Colfax), Ex. 439 (contract between Michel and Pheng Laogumnerd setting the initial retainer at €19 million); the sequencing of meetings with Low and the payments that followed, *e.g.* Ex. 681 (trip and transaction timeline); the co-conspirators' communications, *e.g.* Ex. 297 at 27 (text message from Broidy to Lum Davis: "Hammer them for the next 2 wires"); and the payments themselves, *e.g.* Ex. 662 at 1 (listing wires from Lucky Mark to Anicorn roughly matching the schedule set forth in the fee agreement, Ex. 439). Contemporaneous communications among the co-conspirators and the testimony of both Higginbotham and Broidy confirm that all of the money that Michel received from Low was due, at least in part, to the FARA conspiracy. Ex. 297 at 27, 35; Ex. 118 at 1-2; Ex. 149 at 5-6; Ex. 498; Trial Tr. 4/6 A.M. at 80-81, 88 (Higginbotham testifying that the meetings with and transfers from Low were related to both 1MDB and Guo); 4/4 A.M. at 77-80, 86-92 (Broidy testifying that he entered into a retainer agreement with Low related to 1MDB and later agreed to work on the Guo matter with some expectation of a potential success fee).

Although the final transfer of $41 million from Red Rock IX to Higginbotham PC was especially focused on Guo, Trial Tr. 4/6 A.M. at 129, the contract between Michel and the front company for Low, Tycoon Talent Ltd., stated that the purpose of the 2017 wire transfers was to retain the co-conspirators for their efforts to convince government officials to end the 1MDB investigation. Ex. 439 at 2. The contract called for a €19 million retainer payment to be made pursuant to a payment schedule. *Id.* Michel was initially paid $8.5 million in three installments that roughly match the payment schedule listed in the contract. *Compare* Ex. 439 at 2 *with* Ex. 681. Michel was then paid $12.8 million on August 9, which appears to be a catch-up payment, bringing the total amount to $21.3 million as of August 9. The Euro to dollar exchange rate as of August 9, 2017, was €1 to $1.17634. The €19 million retainer would have converted to $22.3

million less transaction fees, approximating the $21.3 million that Michel received in the first four payments. The contract, the payments, and the evidence at trial establish that the $21.3 million laundered by Michel was directly related to the 1MDB FARA scheme. While an additional $40 million in payments were related to both the 1MDB and Guo schemes, Ex. 681, and even the final $41 million payment related to Guo is arguably the proceeds of a FARA conspiracy because the PRC government constitutes a foreign principal under FARA, 22 U.S.C. § 611, the government only seeks an increase in offense level corresponding to the $9.5 million-$25 million range provided in 2B1.1(b)(1)(K). The Group 2 offense level should accordingly be increased by twenty levels.

### 5. *Promotion of Offense Involving National Security*

The Court should apply a six-level increase to Group 2 under Guideline 2S1.1(b)(1)(iii) because Michel laundered funds that were proceeds of, or were intended to promote, an offense involving national security. Because FARA offenses involve secret work for a foreign principal, they virtually always present national security concerns. *See Attorney Gen. of the United States v. Wynn*, 104 F.4th 348, 353-54 (D.C. Cir. 2024) (describing FARA enforcement as "touching on sensitive areas of national security and foreign policy."); *Attorney Gen. of the United States v. Irish People, Inc.*, 684 F.2d 928, 945 (D.C. Cir. 1982) ("A review of the language, history, and case law of the Foreign Agents Registration Act demonstrates that it was inspired by national security, international political, and foreign policy considerations."). The facts in this case involved an effort to shut down an international criminal investigation into the largest kleptocracy scheme in history perpetrated by individuals in the United States and Malaysia and related forfeiture proceedings. Michel and his co-conspirators, among other efforts: (1) attempted to arrange a golf game between the then-President of the United States and the then-Prime Minister of Malaysia to

allow the Prime Minister to request an end to the 1MDB investigation; (2) successfully set up a meeting for the Prime Minister with the President at the White House; (3) drafted a letter for the President in anticipation of the meeting with the Prime Minister and prepared the Prime Minister for the meeting in person; (4) sent talking points to the then-Secretary of State in advance of an earlier meeting with the Malaysian Prime Minister; and (5) obtained a personal meeting between Broidy and the President for Broidy to purportedly lobby for an end to the 1MDB investigation. *See, e.g.*, Ex. 118; Ex. 144; Ex. 149; Ex. 498; Ex. 499; Trial Tr. 4/4 A.M. at 97 (Broidy testifying about a proposed round of golf that Broidy asked President Trump to agree to play with Prime Minister of Malaysia.).

Prematurely terminating international law enforcement investigations where related assets and defendants are present in the United States implicates national security. Agreeing to influence executive action on matters of foreign policy and international criminal enforcement while concealing that the purported advice from trusted U.S. advisors is actually in service of foreign principals threatens national security. Attempting to arrange the extrajudicial removal of foreign nationals at the secret direction of the PRC government threatens national security. Michel recognized as much. *See* Trial Tr. 4/19 A.M. at 44 (Michel: "I'm meeting because I feel like it's a national security issue here."). Michel may not have believed that his conduct threatened national security, but all that is necessary is that he understood that his criminal conduct involved national security. *See United States v. Hanna*, 661 F.3d 271, 294 (6th Cir. 2011) ("Though no one asserts that [defendant] believed her exports would "threaten" national security, that is not required under the sentencing provision: it merely requires that she knew the offense 'involved' national security."). The Court should apply a six-level enhancement to Group 2 because Michel laundered proceeds of an offense involving national security.

*6.  Increase for Conviction for a § 1956 Offense*

The Court should apply a two-level increase to Group 2 because Michel was convicted of conspiracy to violate 18 U.S.C. § 1956.  U.S.S.G. § 2S1.1(b)(2)(B).  Count Seven charged Michel with a multi-object conspiracy to violate 18 U.S.C. §§ 1956(a)(2)(A) & (a)(1)(B), 22 U.S.C. §§ 612 and 618, and 18 U.S.C. § 951.  Superseding Indictment, ECF No. 84 at 26.  The applicable guideline—Section 2S1.1—includes a specific offense characteristic adding two-levels where the defendant was convicted under Section 1956.  U.S.S.G. § 2S1.1(b)(2)(B).  Although Michel was convicted of a Section 371 conspiracy to violate Section 1956 rather than Section 1956 itself, Application Note Seven to Guideline 1B1.3 provides that guideline enhancements apply to a conspiracy just as they would to a substantive offense.  U.S.S.G. § 1B1.3 cmt. n.7 ("an express direction to apply a particular factor only if the defendant was convicted of a particular statute includes the determination of the offense level where the defendant was convicted of conspiracy . . . in respect to that particular statute."); *see United States v. Mapp*, 990 F.2d 58, 61 (2d Cir. 1993) (relying on U.S.S.G. § 1B1.3 to affirm application of guideline cross-reference triggered by conviction under 18 U.S.C. § 1791(a)(1) where the defendant was only convicted under 18 U.S.C. § 371 with a § 1791(a)(1) object); *United States v. Ugoh*, 537 F. App'x 126, 129 (3d Cir. 2013) (finding sentencing error where the district court failed to apply two-level increase under § 2S1.1(b)(2)(B) for a § 371 multi-object conspiracy that included a § 1956 object and stating "[i]t is of no significance that, for purposes of an entry of judgment, the defendants were technically convicted of conspiracy pursuant to 18 U.S.C. § 371").

Finally, although the conspiracy conviction in Count Seven included both Section 1956 and non-1956 objects, the Guidelines treat a conviction on a multi-object conspiracy as if the defendant had been separately convicted of conspiracy as to each object. U.S.S.G. § 1B1.2(d) ("A

conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.").  The Court has already determined that there was sufficient evidence to support a conviction for both money laundering objects.  Memorandum Opinion Denying Motion for Judgment of Acquittal, ECF No. 355 at 39-45.  The Court should increase the Group 2 offense level by two levels based on the defendant's conviction for an offense under 18 U.S.C. § 1956.

       *7.  Sophisticated Laundering*

       The Court should apply a two-level increase to Group 2 because Michel engaged in sophisticated laundering.  U.S.S.G. § 2S1.1(b)(3).  Michel's money laundering involved transfers from offshore entities and accounts, *i.e.* Lucky Mark Trading Ltd. and Red Rock IX Ltd; Michel formed and used his own shell companies to launder funds domestically, *i.e.* Anicorn LLC and Artemus LLC; and Michel and his co-conspirators layered Low's payments through multiple different levels in different transactions, using Lucky Mark, Red Rock IX, Anicorn, Artemus, Colfax Law Office, and Higginbotham PC to disguise the source and purpose of the funds and to make the payments appear legitimate.  *See, e.g.* Exs. 275, 306, 308, 374, 439, 674, 675, 680; Trial Tr. 4/6/ A.M. at 46-47 (Higginbotham testifying that Lucky Mark and Red Rock IX were shell companies used to send money from Low); *id.* at 35-36, 41 (Higginbotham testifying that Colfax Law Office was not engaged in any work for Low or Anicorn and that the co-conspirators used fake contracts and layered transactions to disguise the true source and purpose of the funds from Low); *id.* at 43-45 (Higginbotham testifying that Anicorn was used as a shell entity to disguise the source and purpose of funds received from Low); *id.* at 52 (Higginbotham testifying that a foreign proxy for Low was a "straw man . . . that helped anonymize Jho Low as part of these

transactions."); *id.* at 106 (Higginbotham testifying about the use of "fake documents and fake business agreements to lie to the bank about the purpose of the money").  This use of fake contracts and agreements, shell companies, layered transactions, offshore entities and accounts, and misrepresentations to multiple financial institutions constitutes sophisticated laundering under guideline 2S1.1(b)(3).  *See* U.S.S.G. § 2S1.1, cmt. n.5 (referencing any of the following factors as indicative of sophisticated laundering: "shell corporations"; "two or more levels (*i.e.* layering) of transactions"; or "offshore financial accounts"); *United States v. Otunyo*, 63 F.4th 948, 957 (D.C. Cir. 2023) ("[Defendant]'s money laundering involved separate 'complex and intricate' means of concealing the funds, including fictitious entities, shell corporations, and several levels of transactions or 'layering.').  The Court should apply the two-level enhancement for sophisticated laundering to Group 2.

C.  <u>Total Punishment</u>

Based on the Guideline calculations, the final offense level should be 43 with a corresponding total punishment of life.  U.S.S.G. Ch. 5, Part A, Sentencing Table.  Pursuant to Section 5G1.1(d) of the Guidelines, because none of the statutes under which the defendant was convicted include a statutory maximum sentence of life, the Guidelines direct the Court to impose the statutory maximum sentence on each count to run consecutively to the extent necessary to equal a life sentence.  U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.").  The government notes the advisory nature of this sentencing guidance, which should be considered in the broader context of 18 U.S.C. § 3553(a).  *See United States v. Booker*, 543 U.S. 220 (2005) ("The district courts, while not bound

to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

**II.      Sentencing Factors under 18 U.S.C. § 3553(a)**

Section 3553(a) of Title 18 of the United States Code governs sentencing in federal criminal cases and provides that the Court shall consider, in relevant part: "the offense . . . the history and characteristics of the defendant . . . respect for the law . . . just punishment . . . adequate deterrence . . . the sentencing range . . . and the need to avoid unwarranted sentencing disparities," in imposing a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). These factors warrant an extended, significant sentence.

The seriousness of the defendant's offense is apparent. In 2012, the defendant worked to funnel $2 million in illegal foreign campaign contributions into the election for the Office of the President of the United States. He profited nearly $20 million from the offense. The defendant knew that foreign contributions were illegal but willfully helped to funnel Low's money through a network of straw donors. The foreign donations allowed the defendant and Low's relative to attend a campaign event and privately meet with the then-President. The defendant's offense demonstrates the dangerous potential for foreign contributions to inject foreign interests into our domestic public officials' decision-making, compromising our national security and domestic and foreign policies. *See United States v. Singh*, 979 F.3d 697, 710 (2d Cir. 2020) (rejecting a constitutional challenge to the foreign contribution prohibition and noting that "Congress has made a judgment on a matter of foreign affairs and national security by barring foreign nationals from contributing to our election processes."). The defendant prioritized his own pecuniary interests and Low's foreign agenda over the U.S. national interest in avoiding foreign financial influence on U.S. government officials.

In 2017, the defendant and his co-conspirators worked on behalf of Low and the PRC government to illegally influence the President and his Administration to take actions that were also contrary to U.S. national interests: dropping a massive kleptocracy case and accommodating a request from the PRC for the extrajudicial removal of a vocal political critic.  To fully exploit their influence, the defendant and his co-conspirators hid that they were working on behalf of Low and the PRC government.  "This deliberate effort to obscure the facts, this disregard for truth undermines our political discourse and it infects our policy making.  If the people don't have the facts, democracy can't work." *United States v. Manafort*, No. 17-cr-201, Transcript of Sentencing, ECF No. 554 at 63:17-20 (D.D.C. Mar. 19, 2019).

FARA plays a fundamental role in our democracy.  The purpose of FARA is disclosure "to protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities and other activities for or on behalf of foreign governments, foreign political parties and other foreign principals so that the Government and the people of the United States may be informed of the identity of such persons and may apprise their statements and actions in light of their associations and activities." 22 U.S.C. § 611, note on Policy and Purpose, 56 Stat. 248-49 (1942).  In short, FARA protects the integrity of the American political system by enabling Americans to consider and evaluate the identity of foreign persons behind certain efforts to influence our government.  The defendant undermined that integrity for personal profit, and his motives were not benevolent.  He sought to help one of the largest international fraudsters in history avoid prosecution and sought to assist the PRC government in seizing one of its nationals from the United States without due process of law.

Other defendants who have committed similar money laundering crimes—without also executing a $20 million foreign contribution scheme and tampering with witnesses—have been

sentenced to extended terms of imprisonment.  During the last five fiscal years (FY2019-2023), there were 59 defendants whose primary guideline was §2S1.1, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 59 defendants who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 282 months and the median length of imprisonment imposed was 280 months.  *See* United States Sentencing Commission, Judiciary Sentencing Information, Data for U.S.S.G. § 2S1.1 with a Final Offense Level of 43, available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard.[1]

In addition to the multi-object money laundering conspiracy, foreign contribution scheme, and obstruction offenses, the defendant was also convicted of substantive violations of FARA and 18 U.S.C. § 951.  No guidelines range applies to the substantive FARA and § 951 charges, but other defendants convicted of violating FARA and § 951 for engaging in similar illicit foreign lobbying campaigns have received significant sentences.

In *United States v. Zuberi*, No. 2:19-cr-642-VAP (C.D. Cal.), for example, the defendant pleaded guilty to (1) willfully violating FARA, (2) tax evasion, and (3) making illegal campaign contributions.  He also pleaded guilty to one count of obstruction of justice in a separate case that was consolidated with the previous charges for sentencing.  Zuberi, a venture capitalist and political fundraiser, falsified records to conceal his work as a foreign agent while lobbying high-level U.S. government officials, evading the payment of millions of dollars in taxes, making illegal campaign contributions, and obstructing a federal investigation into the source of donations to a

---

[1] With respect to the defendant's convicted co-conspirators, each of them pleaded guilty and cooperated, at least initially; none were convicted of a money laundering offense; none were involved in Michel's 2012 foreign and conduit contribution scheme or his related obstruction and witness tampering; and none faced the significant guideline range applicable to Michel.  They are not similarly situated defendants.

presidential inauguration committee. Zuberi was sentenced to the statutory maximum of 60 months imprisonment on the FARA charge, to be served concurrently with 60-month sentences on the tax evasion and illegal contribution charges. Zuberi was also sentenced to 84-months imprisonment for the obstruction of justice conviction, to be served consecutively to the other sentences—yielding a total of 144 months imprisonment.

In *United States v. Manafort*, No. 1:17-cr-201 (D.D.C.), the defendant pleaded guilty to (1) conspiracy to violate FARA, commit tax fraud, file false foreign bank account reports ("FBARs"), and launder money, and (2) conspiracy to obstruct justice by tampering with witnesses. Manafort worked as an unregistered agent of the Government of Ukraine, the Ukrainian Party of Regions, and former President Yanukovych. The Court sentenced Manafort to 73 months' imprisonment, including the statutory maximum 60 months imprisonment for the conspiracy to violate FARA. Manafort's parallel sentence for tax and fraud offenses resulted in a total term of incarceration of 90 months' imprisonment. These similarly situated defendants make clear that an extended term of imprisonment is appropriate for Michel.

Michel's characteristics also demand a serious sentence. He has not demonstrated contrition, respect for the law, or acceptance of responsibility. He threatened witnesses and provided false testimony to avoid the consequences of his crime. He lied repeatedly and extensively during his offenses and continued to lie after he was caught. When confronted, he blamed those around him to distort the facts and minimize his own responsibility. The defendant's attempts at distortion did not deceive the jury, and he was convicted on all counts.

"[C]ourt is one of those places where facts still matter." *Manafort*, ECF No. 554 at 68:9-17. The facts are clear. The defendant committed serious offenses for immense profit; he then obstructed justice and perjured himself to try to avoid conviction; and other defendants convicted

of similar crimes have been sentenced to terms of imprisonment between eight and nearly twenty-five years.  The Court's sentence should reflect the seriousness of Michel's offenses, ensure just punishment, and account for the sentences imposed on similarly situated defendants.  The sentence should deter others willing to sell their access to U.S. elections and government insiders or officials to foreign criminals and foreign powers.  The Court should sentence the defendant to a severe term of imprisonment and order the defendant to forfeit $64,923,226.40 in criminal proceeds.  *See* Mot. for Preliminary Order of Forfeiture, ECF No. 378.

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By:  */s/ John D. Keller*
    John D. Keller
    Principal Deputy Chief

    Nicole Lockhart
    Trial Attorney
    1301 New York Ave., NW
    Washington, DC 20530
    Telephone:  202-514-1412
    Facsimile:   202-514-3003
    john.keller2@usdoj.gov
    nicole.lockhart@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will serve counsel for the Defendant via electronic notification.


Dated:  December 20, 2024                    */s/ John D. Keller*
                                             John D. Keller