## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | **Criminal No. 19cr148-1 (CKK)** |
| PRAKAZREL MICHEL,<br>Defendant. | |

### MEMORANDUM OPINION
(October 30, 2025)

Pending before this Court is the United States' [378] Motion for a Preliminary Order of Forfeiture in the Form of a Personal Money Judgment, whereby the Government moves for "a preliminary order of forfeiture imposing a personal money judgment of $64,923,226.40, against the defendant, Prakazrel Michel" (hereinafter referenced as the "Count Twelve forfeiture"). This Count Twelve forfeiture amount is alleged by the Government to represent "the illegal proceeds Michel derived from the offenses charged in Counts Seven, Eight, and Twelve, less the amounts already forfeited in the other, related proceedings." Govt. Mot., ECF No. 278, at 1. The Government alternatively seeks a lesser forfeiture amount of $42.24 million based upon the Foreign Agents Registration Act ("FARA") offenses in Counts Seven and Eight (hereinafter refenced as the "FARA forfeiture"). Because the forfeiture motion is contested by Defendant, the Court held a hearing on the motion on October 24, 2025.[1]    *See* Rule 32.3(b)(1)(B) ("If the

---

[1] In ruling on the Government's Motion, the Court has considered: (1) the Government's [378] Motion for a Preliminary Order of Forfeiture in the Form of a Personal Money Judgment ("Govt. Mot."); (2) Defendant Prakazrel Michel's [388] Memorandum in Opposition thereto (Def.'s Opp'n"); (3) the Government's [389] Reply ("Govt. Reply"); (4) the Government's [393] Supplement ("Govt. Supp."); (5) Defendant's [394] Reply to the Supplement ("Def.'s Supp."); (6) the record in this case; and (7) the parties' oral arguments.

forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.")    For the reasons explained in detail herein, the Government's Motion is GRANTED.  A separate Order accompanies this Memorandum Opinion.

## I. BACKGROUND

On November 30, 2018, the Government filed a civil complaint for forfeiture *in rem* as to four bank accounts (the "civil action"), alleging an illicit scheme by Mr. Michel and others to launder money provided by Jho Low, a Malaysian businessman, into the United States.  *See* Complaint, ECF No. 1, in *United States v. $37,564,565.25 in Account Number XXXXXXXX9515 at Morgan Stanley, in the Name of Anicorn LLC, et al.,* Civil Action No. 18-2795.  That Complaint alleges that the funds in the four bank accounts are subject to forfeiture pursuant to 18 U.S.C. §981(a)(1)(A) (authorizing the forfeiture of property involved in one or more money laundering transactions or attempted transactions or traceable to such property) and §981(a)(1)(C) (authorizing the forfeiture of property constituting or derived from proceeds traceable to an offense constituting a specified unlawful activity).  Complaint, ECF No. 1, ¶1.  The total amount at issue in the civil action is as follows: $37,564,565.25, in an account in the name of Anicorn LLC; $21,113.21, in an account in the name of Artemus Group LLC; and $36,316,773.60 from two accounts in the name of Higginbotham Law P.C.  As explained in more detail later in this Opinion, that civil action has been stayed pending resolution of the forfeiture proceeding in this criminal case.

Approximately six months after filing the civil action, on May 2, 2019, the Government initiated the instant criminal case by obtaining an indictment against Mr. Michel and Mr. Low. *See* Indictment, ECF No. 1.  The June 10, 2021 Superseding Indictment in this case provided notice

to Defendant that, pursuant to 28 U.S.C. §2461(c) and 18 U.S.C. §981(a)(1)(C), in the event of conviction on the offenses charged in Counts Seven, Eight, and Twelve, in addition to the other charged offenses, the United States would seek to forfeit all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses. Superseding Indictment, ECF No. 84, ¶¶182-183. Defendant was also provided notice that the Government would seek a money judgment and that it could substitute property pursuant to 21 U.S.C. §853(p). *Id.*

On April 26, 2023, after a five-week trial, a jury found Mr. Michel guilty on all counts, including the offenses charged in Counts Seven, Eight, and Twelve. Verdict Form, ECF No. 273. Count Seven charged a multi-object conspiracy to: (1) act as an unregistered agent of a foreign principal in violation of FARA, 22 U.S.C. §§612 & 618; (2) act as an agent of the government of the People's Republic of China ("PRC Government") in violation of 18 U.S.C. §951; (3) commit international promotional money laundering in violation of 18 U.S.C. §1956(a)(2)(A); and (4) commit concealment money laundering in violation of 18 U.S.C. §1956(a)(1)(B). Count Eight charged a substantive violation of FARA. Count Twelve charged a conspiracy to make false statements to a financial institution in violation of 18 U.S.C. §1014.

After completion of briefing on post-trial motions, the Court issued lengthy opinions denying Defendant's motions for judgment of acquittal and for a new trial. Subsequently, this Court set deadlines for the Probation Office to file a Presentence Report and for the parties to file sentencing memoranda. During the time that sentencing memoranda were being filed, the Government filed the instant forfeiture motion, on December 19, 2024, and the Court set a briefing schedule on the motion. Because Defendant contested the forfeiture and requested a hearing, the Court vacated the sentencing date, with the intent of resolving the forfeiture motion prior to

sentencing.[2] Subsequently the Court requested additional briefing by the parties regarding the forfeiture motion. *See* Feb. 28, 2025 Minute Order.  After that supplemental briefing was completed, the Court set a hearing on the forfeiture motion, and, after two continuances requested by Defendant, that hearing was held on October 24, 2025. The Court now considers the arguments set forth in the parties' briefs and presented at the hearing.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 32.2(b)(1)(A) provides that the Court "must determine the amount of money that the defendant will be ordered to pay" where the government seeks a personal money judgment.  Fed. R. Crim. P. 32.2(b)(1)(A).  Forfeiture is mandatory in criminal cases in which forfeiture is authorized by statute; *see* 28 U.S.C. §2461(c) (providing that if a defendant is convicted of an offense giving rise to forfeiture, "the court shall order the forfeiture of the property.")  The imposition of a personal money judgment in criminal forfeiture cases has been approved by the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit").  *See United States v. Day*, 524 F.3d 1361, 1378 (D.C. Cir. 2008) (joining sister circuits in holding "that money judgments are appropriate in the criminal forfeiture context.")  A money judgment may be imposed against a defendant in the amount of proceeds that the defendant acquired or obtained from a criminal offense.  *United States v. Honeycutt*, 581 U.S. 443, 449-450 (2017).  "[C]ourts have typically authorized money judgments when established proceeds of the defendant's criminal activity are no longer in the defendant's possession at the time of sentencing and the government has not otherwise recovered such proceeds."  *United States v. Young*, 330 F.

---

[2] The Court notes that Defendant has made several objections to the calculation of his offense level, and those objections will be resolved, separately, prior to sentencing.

Supp. 3d 424, 430 (D.D.C. 2018).

The Court is responsible for determining the proper amount of the money judgment, as a defendant may elect a jury determination on forfeiture only where the government seeks to forfeit "specific property." *Compare* Rule 32.2(b)(1)(A) with 32.2(b)(5)(A). The government "must prove its forfeiture allegations by a preponderance of the evidence." *United States v. DeFries*, 129 F.3d 1293, 1312 (D.C. Cir. 1997). Rule 32.2 (b)(1)(B) provides that the Court's forfeiture determination "may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

## III. ANALYSIS

In his briefing, Mr. Michel contests generally (1) the idea that there are parallel forfeiture proceedings, (2) the timing and notice of the forfeiture request, which includes his claim of waiver, and (3) the lack of forfeiture findings from the jury; and he specifically alleges that (4) the Government's proposed order violates the Eighth Amendment Excessive Fines Clause, and (5) the Government fails to establish the mandatory criteria for entry of a personal money judgment of forfeiture, both based on (a) the amount of the judgment and (b) its theory of recovery. During oral argument, Defendant relied extensively on his interpretation of the *Young* case for the proposition that a personal money judgment is not permissible in this case. Defendant's objections to forfeiture are addressed in more detail below, beginning with Defendant's objection to parallel proceedings and the imposition of a personal money judgment.

### A. Parallel Proceedings

As a preliminary matter, the Government's Reply indicates, and this Court agrees, that

5

"[p]arallel civil and criminal forfeiture proceedings are well-established, and civil forfeiture provides no equitable basis to bar criminal forfeiture." Govt. Reply, ECF No. 389, at 1; *see United States v. Ursery*, 518 U.S. 267, 274 (1996) ("Since the earliest years of this Nation, Congress has authorized the Government to seek parallel *in rem* civil forfeiture actions and criminal prosecutions based on the same underlying events."). The civil forfeiture statute itself contemplates parallel proceedings in providing for a stay of civil forfeiture proceedings where there is a related criminal case. 18 U.S.C. §981(g). Furthermore, the Government asserts correctly that "[c]riminal forfeiture is authorized for violations of FARA, Section 1014, and conspiracy to commit those crimes" and the "civil forfeiture proceedings . . . have no bearing on criminal forfeiture other than limiting the amount imposed to avoid double recovery." Govt. Reply, ECF No. 389, at 1.

Moreover, the Court notes that the civil action continues to be "stayed pending resolution of the related criminal forfeiture proceedings before this Court in conjunction with Mr. Michel's criminal sentencing." *See* 02/04/2025 Minute Order, in Civil Action No. 18-2795. This stay was requested by the Government and consented to by the Defendant in the context of the civil action. *See* Civil Action No. 18-2795, ECF No. 70 (Government's position requesting a continuation of the stay), ECF No. 71 (Claimants' position indicating no opposition). Accordingly, Defendant's claim of some sort of irregularity –because there are civil and criminal forfeiture proceedings – is unwarranted.

### 1. Availability of a Personal Money Judgment under the Circumstances of this Case

During the hearing on forfeiture, Defendant alluded to the *Young* case as authority for the proposition that the Government cannot obtain a personal money judgment from Defendant in this criminal case on grounds that the proceeds [bank accounts] are already under governmental control

by this Court in the context of the civil action.[3] The Government countered by proffering that the *Young* case centers around the issue of double counting, which is not applicable here, as Defendant is being given credit for monies received by or collected from his co-conspirators.

The Court agrees with the Government that the primary import of the *Young* case is that double counting is impermissible. In that case, the government not only confiscated from the defendant's residence two kilograms of heroin with an estimated value of $180,000, but the government also requested that the court order defendant to forfeit the $180,000 that defendant allegedly used to purchase that heroin. The Honorable Ketanji Brown Jackson (then, a District Court judge) denied the Government's request, finding "no legal basis for the government's contention that Congress has authorized *both* the relinquishment of forfeitable property that the government has seized from a criminal defendant *and* the amount of money that the defendant purportedly previously used to acquire that same property." 330 F. Supp. 3d at 426 (emphasis in original). "[S]uch a forfeiture order constitutes improper double counting that the criminal forfeiture statutes neither direct nor envision." *Id.* Accordingly, having reviewed the *Young* case, this Court does not agree with Defendant's overly broad reading of that case to bar a recovery of a personal money judgment here.

Furthermore, at the oral hearing in this case, Defendant urged this Court to proceed on forfeiture claims in the context of the civil action as opposed to this criminal action. Upon questioning by the Court, counsel explained that there is "more process in the civil" action, such as the ability to engage in discovery. This Court notes however that the Government is claiming

---

[3] The Court notes that the bank accounts in the civil action are not accessible to the Government unless and until a forfeiture order is entered by the Court in the context of either the civil action or this criminal case.

a forfeiture based on $104.24 million, and only a portion of the alleged forfeitable proceeds claimed by the Government (approximately $37.5 million for the Anicorn and Artemus accounts remaining after the default judgment on the Higginbotham Law accounts) is addressed in the civil action. As previously noted herein, through counsel, Mr. Michel indicated in that civil action that "[c]laimants do not oppose the Government's request that this case remain paused pending resolution of the related criminal forfeiture proceedings." Claimants' Resp., ECF No. 71 (in Civil Action 18-2795). Moreover, the Government's calculations of the two forfeiture amounts in this criminal case consider money paid to co-conspirators (FARA forfeiture) and money already forfeited (Count 12 forfeiture) so there is no issue of double counting. Accordingly, in the interest of judicial efficiency, the Court will determine the forfeiture amount in connection with this criminal case, where the parties have extensively briefed their arguments and a forfeiture hearing has been held. The Court looks now to Defendant's claims about the timing and notice of the Government's request for forfeiture.

### B. Timing and Notice of the Forfeiture Request

Defendant asserts that the Government should not be permitted to proceed with forfeiture because of the timing and allegedly deficient notice of its forfeiture request. Rule 32.2 provides that the court must make forfeiture determinations "as soon as practicable after a verdict." Rule 32.2(b)(1)(A). In this case, Defendant was found guilty on April 26, 2023, but he filed a motion to obtain new counsel and sought to extend the deadline for post-trial motions. *See* Def.'s Letter to the Court, ECF No. 292. Post-trial motions were not filed until October 2023, with the last motion resolved on August 30, 2024. The Government filed its Motion for Preliminary Order of Forfeiture on December 19, 2024, more than a month before the then-scheduled sentencing. *See*

ECF No. 378. The Government asserts that the timing of its forfeiture motion is reasonable insofar as the post-trial motions that were filed may have mooted or impacted the forfeiture, and forfeiture is regularly litigated in close timing to sentencing as it "is an aspect of sentencing." Govt. Reply, ECF No. 389, at 3 (citing *Boyd v. United States*, 209 F. Supp. 3d 160, 166 (D.D.C. 2016)). Defendant's opposition to the untimeliness of the forfeiture request is without merit as both parties have been permitted ample time, prior to sentencing, to brief forfeiture issues, and a hearing has been held prior to any forfeiture determination being made.

Furthermore, the Court notes that the Superseding Indictment provided sufficient notice of the Government's intention to seek forfeiture, and therefore Mr. Michel's claim that the Government's request for forfeiture was "last-minute maneuvering," Def.'s Opp'n, ECF No. 388, at 6, is contradicted by the record. In fact, Defendant acknowledges that "the forfeiture allegations in the Superseding Indictment provided notice that the Government intended to seek forfeiture against Mr. Michel with respect to Counts One through Nine and Twelve," but he asserts that the "Superseding Indictment was flawed and incomprehensible with regard to [such] forfeiture" because many of the counts charged "do not statutorily authorize forfeiture." Def.'s Opp'n, ECF No. 388, at 14. Defendant argues further that "[b]ecause there was no notice given [in the Superseding Indictment] of the intent to seek forfeiture pursuant to Section 982, the Court is not authorized to enter a forfeiture order pursuant to that statute. Def.'s Opp'n, ECF No. 388, at 15, *see* Rule 32.2(a) (requiring "notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute").

The Court finds that the Government's response to Defendant's argument that the superseding indictment was "flawed and incomprehensible" sufficiently counters Defendant's

argument, as follows:

> The defendant argues that the forfeiture notice in the Superseding Indictment was deficient because it was overbroad and referenced counts for which there was not statutory forfeiture authority. Def. Response in Opposition to Forfeiture, ECF No. 388 at 14. While the government agrees that there are no forfeitable "proceeds" that the defendant obtained from Counts Two, Five, and Six, those counts also include statutory authority for forfeiture. Counts One, Three, Four, Eight, and Ten do not include statutory authority for forfeiture. The fact that the notice of forfeiture in the Superseding Indictment was overinclusive and included additional counts for which the government is not seeking forfeiture does not prejudice the defendant. Technical errors in the forfeiture language of the indictment do not deprive the defendant of the required notice under Rule 32.2. *See United States v. Silvious*, 512 F.3d 364, 370 (7th Cir. 2008) ("Listing the wrong forfeiture statute did not prevent [Defendant] from receiving notice under Rule 32.2(a).").

Govt. Reply, ECF No. 389, at 6. Accordingly, considering the Government's response, the Court finds that the "defects" noted by Defendant, which allegedly preclude the Government from being able to proceed with a forfeiture, are without merit.

Finally, Defendant asserts that, in its motion for forfeiture regarding Count Twelve, the Government relied on 18 U.S.C. §982(a)(2)(A), instead of 18 U.S.C. §981(a)(1)(C), and therefore the Government "waived its ability to seek forfeiture pursuant to Section 981." Def.'s Opp'n, ECF No. 388, at 15. The Government proffers however that "[a] conspiracy to violate Section 1014 is statutorily authorized for both civil forfeiture under 18 U.S.C. §981(a)(1)(C) and criminal forfeiture under 18 U.S.C. §982(a)(2)." Govt. Reply, ECF No. 389, at 7; *see* 28 U.S.C. §2461(c) (indicating that the government may pursue forfeiture in a criminal indictment for any offense "for which the civil or criminal forfeiture of property is authorized").

The Government explains that its "reference to Section 982 in its initial Motion distinguished the dual available authorities for forfeiture for the Section 1014 conspiracy from the FARA offenses statutorily authorized only for civil forfeiture under Section 981." Govt. Reply, ECF No. 389, at 7. Furthermore, the Government notes that "the inclusion of 28 U.S.C. §2461(c)

in the Superseding Indictment incorporated both civil and criminal forfeiture authority [and accordingly,] there is no error or prejudice to defendant." *Id.*, *cf. United States v. Silvious*, 512 F.3d 364, 369 (7th Cir. 2008) ("[Defendant] contends the forfeiture nevertheless is invalid because the substitution of the statutory basis amounted to a 'constructive amendment' of the indictment and a violation of the notice requirements of Rule 32.2(a). . . We reject this argument; the indictment was not broadened in any way by the substitution of the proper statute.") Similarly, in this criminal case, the Court does not find the notice of forfeiture to be deficient in any meaningful way.

Accordingly, the Court finds that Defendant's general protestations – regarding the timing and notice of the forfeiture request, the fact that there are parallel proceedings, and his claim of waiver – are not persuasive arguments against granting the Government's request for forfeiture in this criminal case. The Court turns now to Defendant's next claim.

### C. Forfeiture Findings by the Jury

Throughout his Opposition, Mr. Michel mentions repeatedly that the jury was not asked to consider evidence or make findings on the issue of forfeiture in this criminal case. *See* Def.'s Opp'n, ECF No. 388, at 5, 8, 9 (noting that there was no forfeiture guidance to the jury "in the form of jury instructions, a special verdict form, or a post-conviction presentation of evidence regarding forfeiture"), 10, 12, & 17 n.5. In this case, the Government seeks to forfeit a money judgment, and, pursuant to Rule 32.2, "the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim P. 32.2 (b)(1)(A). In contrast, where the Government seeks to forfeit "specific property," either party may request a jury determination. Rule 32.2(b)(5)(A). "[S]ince the government is seeking a criminal forfeiture money judgment

rather than forfeiture of specific property, there is no nexus determination to be made by the jury." *United States v. Perkins*, 994 F. Supp. 2d 272, 275 (E.D.N.Y. 2014).    Accordingly, the Court concludes that Defendant's references to the need for a jury determination are misplaced.

### D. Eighth Amendment Issues

The Court turns now to Defendant's allegation that "the amount of money sought is grossly disproportionate to the offenses of conviction and therefore violates the Eighth Amendment." Def.'s Opp'n, ECF No. 388, at 19.    The Government contends that the proposed forfeiture is "commensurate with the defendant's crimes" as the "defendant engaged in multiple related serious offenses seeking to derail the largest kleptocracy prosecution in history and obtained over $100 million in the process."    Govt. Reply, ECF No. 389, at 8; *see United States v. Segal*, 495 F.3d 826, 840 (7th Cir. 2007) ("It is true that the forfeiture is large.    It is only excessive, however, if it is disproportional to the offense.    We cannot say that was.    This was a massive fraud.    When a defendant commits a multimillion-dollar crime, he can be required to forfeit assets also running into the millions.")    In this case, the millions requested through forfeiture are on par with the large amounts of money that were being funneled through and/or paid to Mr. Michel and his co-conspirators, and therefore, the Court does not find Defendant's Eighth Amendment argument to be persuasive.    Accordingly, the Court turns its focus to the Government's two alternative forfeiture amounts – based on the FARA forfeiture and the Count Twelve forfeiture – and the Defendant's objections thereto.

### E.  Forfeiture Amounts

### 1. Government's Position

In its Motion and Reply, the Government posits two alternative forfeiture scenarios, a

forfeiture of the entire amount sought, which is based on Count Twelve, or alternatively, a

forfeiture of a lesser amount based on FARA violations in Counts Seven and Eight.

### a. Forfeiture based on Count Twelve

Looking at Defendant's violations of Count Twelve, the Government contends that:

> Michel and Higginbotham created false contracts and agreements and repeatedly lied to multiple financial institutions as part of their conspiracy to fraudulently obtain access to the U.S. banking system for the $104.24 million from Low. *E.g.* Trial Tr. 4/6 A.M. 102-29; Trial Tr. 4/12 A.M. at 25-31; Ex. 372-374; Trial Tr. 4/5 A.M. at 9-12, 32; *see also* ECF No. 320 (Response to Motion for Judgment of Acquittal) at 10-12. Without the accounts opened under false pretenses, Michel could not have obtained the money from Low.

Govt. Mot., ECF No. 378, at 5. Furthermore, the Government argues that:

> As described by this Court in its Order denying the defendant's motion to dismiss in the parallel civil forfeiture proceedings, the $104.24 million may be considered "proceeds" of the Section 1014 conspiracy because the defendant and Higginbotham fraudulently induced multiple banks to trade "pre-deposit money" from Low for "post-deposit bank accounts" or to accept and retain the foreign funds from Low and transfer ownership of the funds to Michel and Higginbotham's accounts.

*Id.* at 6 (relying on Order Denying Motion to Dismiss, ECF No. 26 at 10-11, *United States v.*

*$37,564,565.25*, No. 1:18-cv-2795 (CKK) (D.D.C. October 17, 2019)). Accordingly, the

Government concludes that "Michel obtained $104.24 million from Low as a direct result of [the]

1014 conspiracy." *Id.* at 7. The Government seeks an order of forfeiture in this criminal case in

the form of a personal money judgment against Mr. Michel for the $104.24 million, less the

$39,316,773.63 already forfeited in the related proceedings (Higginbotham default judgment –

approximately $37 million, and Lum-Davis – approximately $3 million), leaving a forfeiture

amount of $64,923,226.40. Govt. Mot. ECF No 378, at 7.[4]

---

[4] In its Reply, ECF No. 389, at 5, n.4, the Government notes that "the definition of proceeds from Section 981(a)(2)(A) controls because the amount of proceeds obtained by Michel as a result of

**b. Forfeiture based on Counts Seven and Eight**

Alternatively, with a focus on Defendant's violations of the offenses charged in Counts Seven and Eight, the Government contends that "Low caused the transfer of $104.24 million to the defendant as payment for the FARA and Guo schemes," recognizing that the "final transfer of $41 million from Red Rock I to Higginbotham PC was especially focused on Guo[.]" Govt. Mot., ECF No. 378, at 4 (internal citations omitted). Accordingly, the Government notes that "[i]f the Court were to determine the forfeiture amount based solely on the FARA offenses, the definition in Section 981(a)(2)(B) should control, and Michel should be credited for the amounts paid to co-conspirators Broidy, Lum Davis, and Higginbotham, totaling $20.103 million." Govt. Reply, ECF No. 389, at 5-6 n.4.[5] The "resulting total forfeiture amount based solely on FARA offenses would be $42.24 million. . . [which] excludes funds already forfeited in related proceedings." *Id.*

**c. Evidence in support of both theories**

In its Motion, the Government proffers, and this Court agrees, that the record evidence in this case supports its claims for forfeiture in this criminal case, namely that:

> With respect to the FARA conspiracy charged in Count Seven and the substantive FARA offense charged in Count Eight, the Court heard evidence that Low caused the transfer of $104.24 million to the defendant as payment for the FARA and the Guo schemes. Ex. 671. This was evident from the contracts, *e.g.*, Ex. 165 (draft retainer agreement between Low and Colfax), Ex. 439 (contract between Michel and Pheng Laogumnerd); the sequencing of meetings with Low and the payments that followed, *e.g.* Ex. 681 (trip and transaction timeline); the co-conspirators' communications, *e.g.,* Ex. 297 at 27 (text message from

---

the Section 1014 conspiracy exceeds the amount of proceeds that Michel obtained as a result of the FARA conspiracy and substantive offense."

5 That section applies to cases involving "lawful goods or lawful services that are sold or provided in an illegal manner," and it provides that "proceeds" means "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods and services." 18 U.S.C. §981(a)(2)(B).

Broidy to Lum Davis: "Hammer them for the next 2 wires"); and the payments themselves, *e.g.*, Ex. 662 at 1 (listing wires from Lucky Mark to Anicorn roughly matching the schedule set forth in the fee agreement, Ex. 439). The contracts stated that the purpose of the 2017 wire transfers was to retain the co-conspirators for their efforts to convince government officials to end the 1MDB investigation. *E.g.* Ex. 439 at 2. Contemporaneous communications among the co-conspirators and the testimony of both Higginbotham and Broidy confirm that the money that Michel received from Low was due, at least in part, to the FARA conspiracy. Ex. 297 at 27, 35; Ex. 118 at 1-2; Ex. 149 at 5-6; Ex. 498; Trial Tr. 4/6 A.M. at 80-81, 88 (Higginbotham testifying that the meetings with and transfers from Low were related to both 1MDB and Guo); 4/4 A.M. at 77-80, 86-92 (Broidy testifying that he entered into a retainer agreement with Low related to 1MDB and later agreed to work on the Guo matter with some expectation of a potential success fee). Although the final transfer of $41 million from red Rock IX to Higginbotham PC was especially focused on Guo, Trial Tr. 4/6 A.M. at 129, at a minimum, the defendant received $60.24 million from Low at least in part for the unregistered FARA scheme. These funds constitute proceeds and are subject to forfeiture.

Govt. Mot., ECF No. 378, at 4-5. The Government elaborates also on Mr. Michel's representations to the various financial institutions with whom he dealt. *Id.* at 5-6 (containing numerous citations from the record).

### 2. Defendant's Objections regarding the Government's Evidence

Mr. Michel poses a general challenge to forfeiture on grounds that the Government's evidence in support of forfeiture in this criminal case is somehow deficient. In this case, Defendant contends that "the Government's argument concerning violations of Counts Seven and Eight seems to be distilled to a claim that: "(1) Mr. Michel was convicted of violating FARA; (2) there were numerous money transfers that had something to do with FARA violations; and (3) therefore, the funds must be proceeds that were obtained by Mr. Michel." Def.'s Opp'n, ECF No. 388, at 15-16. At the hearing, Defendant argued that nothing suggests that registering with FARA or not registering with FARA led to the $41 million claimed by the Government.

Furthermore, regarding the Section 1014 violation, Defendant argues that the record cited by the Government does not include "any evidence that any money originating from Jho Low was

ever deposited into an account owned or controlled by Mr. Michel" or that "the relevant accounts

are in Mr. Michel's name or demonstrate who was the source of the funds in the accounts." *Id.* at

16. Defendant contends that:

> Indeed, the allegations suggest that the funds transferred came from other members of the
> conspiracy–such as through accounts held by Phengphian Laogumnerd.  The evidence
> entered at trial by the Government does not show funds going from Mr. Low to Mr. Michel
> and instead shows the transfer of funds from Phengphian Laogumnerd, Lucky Mark (HK)
> Trading, LTD & Red Rock IX, LTD Hong Kong to Mr. Michel.  Gov. Ex. 671 (chart
> showing funds transferred from Phengphian Laogumnerd, Lucky Mark (HK) Trading,
> LTD & Red Rock IX, LTD, Hong Kong).  *See* April 18, 2023 PM Tr. at 51:7-15 (Mr.
> Michel testified "[i]n 2017, money came from Pheng [Laogumnerd].  That's who gave me
> money in 2017."); April 19, 2023 AM Tr. at 15:12-21 (when questioned about Gov. Ex.
> 671, Michel testified "Q. Your testimony is that Jho Low did not direct any of that $100
> million that you received in 2017.  Right? A. That's correct . . . Q. . . . The money that
> came from Lucky Mark and Red Rock IX? A. Yes.").  Thus, there is no evidence to establish
> that funds in the accounts cited by the Government represent proceeds of violations of
> Section 1014.

Def.'s Opp'n, ECF No. 388, at 17-18.

### 3. Government's Reply and Additional Evidence Cited

The Government's response to Defendant's objections relies on citations to record

evidence to counter such objections.  While calculation of a forfeiture amount is not an exact

science, the Government must provide information to the court to show that any extrapolation as

to proper forfeiture amount is reasonable.  *United States v. Ahmed*, No. 14-CR-277 (DLI), 2017

WL 3149336, at *19 (E.D.N.Y. July 25, 2017).  In the instant case, the Government contends that

it "presented extensive evidence at trial regarding the source, purpose, and circumstances

surrounding the $104.24 million Michel received from Low during the 2017 FARA and Section

1014 schemes."  Govt. Reply, ECF No. 389, at 4.  More specifically, the Government explains

that:

The contracts between the parties made clear that the initial transfers from Low were payment for the FARA scheme; Broidy and Higginbotham both testified that the money from Low was for 1MDB and Guo; the bank records and travel records connected the payments to international meetings with Low; and even Michel admitted that he had to do FARA work regarding 1MDB in order to obtain the money; *see* Trial Tr. 4/19 A.M. (Michel: "Pheng paid me for an investment. . . In order for me to be able to tap into this investment money, I had to be able to bring in someone that can help Jho Low with his civil forfeiture in 2017.") The defendant argues that the government's evidence at trial was too general to prove that the defendant obtained $104.24 million in proceeds, claiming that the government's summary financial exhibits are unsupported by underlying evidence. Def. Response in Opposition to Forfeiture, ECF No. 388 at 12-13. The government's financial summaries and timelines were supported by detailed financial, travel, and contractual records that were also admitted at trial. *See, e.g.*, Ex. 1-53; 56-65; 372-406; 439; 473; 506-07; 551; 662-63.

These records and related testimony proved that Michel controlled the Anicorn and Artemis accounts, *e.g.*, Ex. 4, 13; Trial Tr. 4/12 A.M. at 25 (Santos: "Both were listed as media consulting entities. They were - - they listed Mr. Michel as the beneficial owner.") They also proved that Michel obtained tens of millions of dollars for his agreement to persuade the government to drop the 1MDB case. *Compare* Ex. 439 at 2 *with* Ex. 662 at 1, 4. The 2017 contract between Michel and the front company for Low, Tycoon Talent Ltd., listed the purpose of the 2017 wire transfers as paying for an influence effort to end the 1MDB investigation. Ex. 439 at 2. The contract called for a €19 million retainer payment to be made pursuant to a payment schedule. *Id.* Low initially paid Michel approximately €8 million in three installments that closely approximated the payment schedule listed in the contract. Low then paid Michel €10.95 million on August 9, bringing the total amount to almost exactly €19 million. Low made an additional $40 million in payments to Michel related to both the 1MDB and Guo schemes. Ex. 297 at 27, 35; Ex. 118 at 1-2; Ex. 149 at 5-6; Ex. 498; Trial Tr. 4/6 A.M. at 80-81, 88 (Higginbotham testifying that the meetings with and transfers from Low were related to both 1MDB and Guo); 4/4/ A.M. at 77-80, 86-92 (Broidy testifying that he entered into a retainer agreement with Low related to 1MDB and later agreed to work on the Guo matter with some expectation of a potential success fee); Ex. 681. A final $41 million payment was focused on Guo and the Section 951 scheme and was outside the scope of the FARA scheme. Nonetheless, Michel obtained all of the money as proceeds of his Section 1014 conspiracy to lie to the banks to obtain access to the funds.

Govt. Reply, ECF No. 389, at 4-5.

This Court presided over the 5-week trial of this case; it observed the witnesses' demeanor, heard their testimony, and reviewed the record evidence by both sides, which was presented in the

form of exhibits. As such this Court can assess the import of the Government's record references, which support the source, purpose, and circumstances surrounding the money Mr. Michel received. Furthermore, this Court notes that it assessed much of this evidence when ruling on Defendant's motion for an acquittal and motion for a new trial in this criminal case. *See* Memorandum Opinion (denying acquittal), ECF No. 355, at 29-35 (addressing Count Eight); at 35-46 (addressing Count Seven); and at 48-50 (addressing Count Twelve); *see also* Memorandum Opinion (denying a new trial), ECF No. 371, at 3-8 (summarizing the "voluminous" evidence supporting Mr. Michel's convictions and noting that his testimony "largely either corroborated the Government's evidence or did not controvert it" and further, that it was "reasonable to infer that the jury did not credit Michel's testimony as it related to defenses he proffered based on their verdicts").[6] As such, the Court finds that Mr. Michel's general objections about the sufficiency of the evidence relied upon by the Government are without merit, as there is adequate record evidence cited by the Government in support of its allegations about the direct and indirect payments made by Mr. Low to Mr. Michel. Accordingly, the Court finds that the Government's requested forfeiture of $42.24 million (after excluding funds already forfeited), based on the FARA violations in Counts Seven and Eight, is well-supported by the record, and a forfeiture in that amount is granted.

However, the Government requests the forfeiture of $42.24 million for Counts Seven and Eight only as an alternative to its requested forfeiture of $64,923,226.40 for the Section 1014 violation contained in Count Twelve. The Government's requested forfeiture of $64,923,226.40

---

[6] The Court notes further that the applicability of Section 1014 to "false statements made to induce a bank to accept a deposit" was addressed in its Memorandum Opinion denying Defendant's motion for judgment of acquittal in this criminal case. ECF No. 355, at 48-52.

for the violation contained in Count Twelve is based on the entire amount of money—$104.24 million—originating from Jho Low and obtained by Mr. Michel, less the funds already forfeited by Defendant's co-conspirators. In order to grant the Government's requested forfeiture of $64,923,226.40 for Count Twelve, the Court must find not only that the money was ultimately obtained by Mr. Michel from Jho Low but also that the money constituted the "proceeds" of the Count Twelve violation, as that term is defined in 18 U.S.C. §981(a)(2)(A). While this Court finds that the Government has demonstrated by a preponderance of the evidence that such money was ultimately obtained by Mr. Michel, the question remaining is whether the way in which Mr. Michel obtained that money fits under the definition of "proceeds" set forth in 18 U.S.C. §981(a)(2)(A).

### F. Proceeds Defined

In the forfeiture statute, the term "proceeds" means "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).[7] Defendant argues that the Government "fails to explain how making misrepresentations about the source and purpose of transferred funds means that the funds were "obtained" as proceeds within the meaning of the statute, or that they were ever obtained by Mr. Michel." Def's Opp'n, ECF No. 388, at 16. The Government asserts that "Michel obtained all of the money as proceeds of his Section 1014 conspiracy to lie to the banks to obtain access to the funds." Govt. Reply, ECF No. 389, at 5 (referencing its Motion, ECF No. 378, at 5-7).[8] The

---

[7] Section 981(a)(2)(A) is the statutory section relied upon by the Government. Govt. Reply, ECF No. 389, at 5 n.4; *see also* Def's Opp'n, ECF No. 388, at 16 (noting that the Government is relying on Section 981 in support of its argument concerning the Section 1014 violation).

[8] The Court notes that in the Verified Complaint for Forfeiture *In Rem*, Count One asserts that the Anicorn Account at Morgan Stanley and the Artemus account at Wells Fargo are subject to

Government proffers also that its evidence at trial "more than sufficiently proved by a preponderance of the evidence that the $104.24 million constitutes 'property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to the forfeiture.'" *Id.* (citation omitted).  As previously noted herein, the Government relies on an interpretation of the term "proceeds," which was accepted by this Court in the context of a motion to dismiss in the civil action, and the Defendant contests the applicability of this interpretation but neither party relies on case law in support of its argument.  Consequently, after the parties filed their initial briefing, this Court requested any "additional briefing . . . regarding [the Government's] claim that the $104.24 million may be considered 'proceeds' of the Section 1014 conspiracy to lie to the banks to obtain access to the funds[.]" Feb. 28, 2025 Minute Order.

### 1. Supplemental Arguments by the Parties

### a. Evidence of Money Obtained by Defendant

The Government begins by citing to record evidence that demonstrates that Low had more than $100 million sent from foreign accounts he controlled by proxy to domestic accounts controlled by Michel, and the Court acknowledges that these record citations support the transfer of money to Michel and his control over that money.  *See* Govt. Supp., ECF No. 393, at 3-4 (containing numerous citations to the record). The Government argues that the purpose of these financial transfers was to "fund illegal, undisclosed lobbying by Michel and his co-conspirators,

---

forfeiture under 18 U.S.C. §981(a)(1)(C).  Counts Two, Three, and Four assert that the Anicorn and Artemus accounts are subject to forfeiture under 18 U.S.C. §981(a)(1)(A). *See* Memorandum Opinion Denying Motion to Dismiss, ECF No. 26, at 6-7 (in Civil Action No. 18-2795).  "To be subject to forfeiture under the statutes cited by the Government, 18 U.S.C. §§981(a)(1)(A) and 981(a)(1)(C), the named funds in this *in rem* action must be property constituting, derived from, or traceable to "proceeds 'of the unlawful activity, [where] [t]he Government identifies bank fraud [18 U.S.C. §1344] as such an activity. *Id.* at 10.

including Elliott Broidy and Nickie Lum Davis, on behalf of Low (to resolve the 1MDB matter) and the Chinese government (to extradite Guo Wengui, a Chinese national)—endeavors that Michel and his co-conspirators attempted to disguise and conceal." *Id.* at 4. (citations omitted). The Court agrees that the evidence at trial was clear on this point, and that the jury accepted it when rendering its verdict of guilty on ten counts related to Mr. Michel's conduct in three schemes involving conduit contributions, witness tampering, and foreign lobbying.

The Government next addresses the "myriad misrepresentations to multiple financial institutions" made by Mr. Michel and Mr. Higginbotham, "about the source and purpose of the funds from Low." *Id.* at 5. More specifically, the Government asserts that:

> Michel's misrepresentations to the financial institutions were necessary to access the U.S. banking system, and specifically to open and maintain bank accounts through which Michel could receive and control Low's money, in excess of $100 million between approximately May and October in 2017. *See* Trial Tr. 4/6 A.M. at 18-19 (Higginbotham testifying that Michel received more than $100 million from Low's entities during this period).

Govt. Supp., ECF No. 393, at 5. The Government expounds also upon its descriptions of Michel and Higginbotham's dealings with City National Bank ("CNB"), Morgan Stanley, and Citibank, all with the goal of opening accounts so that they could have access to and use of a bank account where they could receive Low's money. *See* Govt. Supp., ECF No. 393, at 5-9 (containing numerous record citations). The Government concludes that

> The evidence at trial proved beyond a reasonable doubt, as demonstrated by the jury's unanimous verdict of guilty on all counts, that Michel received and helped launder more than a hundred million dollars from Low–funds sent to Michel via foreign bank accounts controlled by Low's proxies, for purposes of concealment and obfuscation, and in furtherance of their illicit foreign lobbying scheme. And to advance and achieve their objectives, Michel, himself and in partnership with Higginbotham, had to lie to several financial institutions.

Govt. Supp., ECF No. 393, at 8.  As previously noted, the Court finds that this evidence cited by the Government supports that Mr. Michel obtained money from Jho Low, and that Mr. Michel and Mr. Higginbotham lied to banks with the goal of opening accounts, but it does not respond fully to the question of how that money constitutes "proceeds" linked to the Count Twelve offense.  As such, the Court turns now to the interpretation of "proceeds" proffered by the Government and opposed by Defendant.

**b. Interpreting "Proceeds"**

As a preliminary matter, the Court notes that during the hearing, Defendant, through counsel, indicated that Mr. Michel's representations to the banks were not necessary to obtain the funds as there were alternative ways to receive the money, such as digital assets. But that statement ignores the reality of this case where, Mr. Michel and Mr. Higginbotham "made myriad misrepresentations to multiple financial institutions, at the beginning of this scheme and throughout, about the source and purpose of the funds from Low." Govt. Supp., ECF No. 393, at 5.  The evidence in this case supports the Government's contention that these "misrepresentations to the financial institutions were necessary to access the U.S. banking system, and specifically to open and maintain bank accounts through which Michel could receive and control Low's money, in excess of $100 million between approximately May and October in 2017." *Id., see* Trial Tr. 4/6 A.M. at 102-103 ("purpose" of fake agreements and contracts "was to provide. . . 'some sense of legitimacy'. . . for the work that was really being done, which was the 1MDB matter and the extradition of Guo Wengui, and would be used in the event that any party, particularly banks, were to ask any questions about why such large sums of money were coming in at the frequency that they were coming"); *see also* at 7-8 (concealed from the banks that financial transactions involved

Low, 1MDB, or extradition of Chinese national, at Michel's direction). In this case, Defendant made misrepresentations to open accounts with financial institutions, and violation of Section 1014 is an unlawful activity under the forfeiture laws.

Defendant asserts that "the overwhelming majority of proceeds forfeitures involve the defendant's receipt of property that he obtained as a result of his own culpable conduct from someone with whom he was not acting in concert, such as a fraud victim." Def.'s Supp., ECF No. 394, at 8. Defendant focuses on the purpose of Section 1014's enactment, which was "to protect financial institutions against fraud directed at the institution that resulted in a loss to the institution." *Id., see United States v. O'Neill*, 463 F. Supp. 1200, 1203 (E.D. Pa. 1979) ("[T]he evil which [Section 1014] seeks to prevent" is "losses to federally insured banks resulting from fraudulent transactions."); *see also United States v. Mangieri*, 694 F.2d 1270, 1282 (D.C. Cir. 1982) (citing *O'Neill* and noting that "18 U.S.C. §1014 is targeted at fraudulent loan transactions, rather than particular falsehoods used to achieve the illegal transaction").[9]

Defendant concludes therefore that for funds to be "proceeds" resulting from a violation of Section 1014, "they must be proven to be losses that Mr. Michel caused to the bank or to its customers, and that the loss occurred 'as the result of' his actions found by the jury to be violative of Section 1014." Def.'s Supp., ECF No. 394, at 9. Defendant argues that "none of these [Government] citations [to the record] establishes that even one dollar of the Funds w[as] obtained

---

[9] During the hearing, Defendant opined that these two cases and *United States v. Baver*, No. 2:21 Cr. 520 (JNP), 2024 WL 3445061, at *5 (D. Utah July 17, 2024) (concluding "that it would be fair to understand the SBA as a 'victim' for purposes of the civil forfeiture statute," and because "there was financial loss to a victim, Defendant [was] not entitled to a forfeiture deduction"), cited in Def's Supp., ECF No. 394, are "instructive" on the issue of what constitutes "proceeds" in this case. The Court does not find these cases relevant to the analysis of what constitutes "proceeds" for purposes of Section 1014, as applied to this case.

from CNB, Morgan Stanley Bank, or their customers–and thus the Funds were not 'proceeds' obtained from the bank 'as a result of' any misrepresentation to the bank." *Id.* at 9-10. Defendant notes also that the elements of proof to establish Mr. Michel's Section 1014 conviction did not include a requirement that the bank suffered a loss. *Id.* at 9 (referencing the Jury Instructions). Defendant concludes therefore that the Government was not required to and did not produce any evidence at trial that the bank suffered a loss as "loss is not an element under §1014." Def.'s Supp., ECF No. 394, at 11 (citing *United States v. Lane*, 323 F.3d 568, 583 (7th Cir. 2003)). The defendant "need not have intended to harm the bank or to personally profit, and the bank need not have suffered an actual loss in order to sustain [Section 1014] convictions." *United States v. Grissom*, 44 F.3d 1507, 1511 (10th Cir. 1995) (internal citation omitted).

During the hearing, the Government noted that while there is no loss element to Section 1014, that section guards against risk of loss, such as the penalties, fines, financial consequences, and sanctions banks may suffer if they are not diligent. The Government noted also that certain bank officials testified at trial that there were red flags regarding anti-money laundering concerns. *See, e.g.*, Trial Tr. 4/5 A.M. at 32-33 (Morgan Stanley official would not have allowed Michel to open account if official had known about Low's involvement or possible Chinese extradition).

In the instant case, the Government does not argue that the proceeds came from the banks or their customers' funds. Instead, the Government contends that there are two ways in which the Section 1014 conspiracy gives rise to forfeiture "proceeds" of $104.24 million. The first theory is that the post-deposit bank accounts accessible to Michel are different and distinct property from Jho Low's pre-deposit money, and they are "proceeds" of the Section 1014 conspiracy insofar as Michel's lies were the impetus used to fraudulently induce the banks to "trade" such pre-deposit

24

accounts for post-deposit accounts. Govt. Supp., ECF No. 393, at 9; *see* Memorandum Opinion Denying Motion to Dismiss, ECF No. 26, at 10-11 (in the civil action).

The second way in which "post-deposit funds" could constitute "proceeds" is because the lies by Michel "caused the banks to accept the money and thereby transfer ownership from [Low] to [Michel]." Govt. Supp., ECF No. 393, at 9; *see also* ECF No. 26, at 14 ("[T]he increase in the account's value after the wire transfer can qualify as "proceeds" of a false statement regardless of whether the deposit constitutes a *trade* of two distinct pieces of property or a *shift in ownership* of the same property.")[10]

The Government emphasizes that it was "[o]nly through such criminal deceit" that Mr. Michel could "access the U.S. banking system for purposes of opening and maintaining accounts through which he could obtain and control Low's funds." Govt. Supp., ECF No. 393, at 8. And "[i]ndeed, for Michel's schemes and financial arrangements, the significance and indispensability of access to the U.S. banking system were readily apparent by the relentless and repeated efforts that he and Higginbotham undertook to pursue financial accounts in several U.S. banks, exposing themselves to criminal liability throughout the process." *Id., see* Trial Tr. 4/6 A.M. at 81 (where Higginbotham testified about a meeting between himself, Michel, Low, and others: "We discussed the fact that the American banking system was far more vigilant about large sums of money coming in. And there was a determination. . . [to] think about . . . more creative ways to bring money here to pay to the people that were the influencers.")

Considering the record in this case, including the arguments by the parties in their briefs

---

[10] During the hearing, the Government indicated that while it is unaware of any specific cases supporting this theory, it is unaware of any cases contrary to this theory. Nor did Defendant proffer any cases on point.

and at the forfeiture hearing, this Court agrees that the Government has proven by a preponderance of the evidence its contentions set forth during the hearing that: (1) Jho Low controlled and directed (through the United States) more than $100 million, and specifically to Mr. Michel in 2017; (2) Mr. Michel received and maintained that money through accounts, and Defendant disbursed some of this money to co-conspirators in furtherance of an illegal foreign influence campaign; and (3) Mr. Michel and his co-conspirator George Higginbotham lied in order to get access to those accounts so that they could take ownership and control of the money.

Furthermore, the Court finds that the Government's proffer in its Supplement that the "entire purpose and import of the §1014 conspiracy" was to make "misrepresentations to banks so that Michel could access and utilize the U.S. banking system to [get control over] Low's money" is consistent with and supported by the record. *See* Govt. Supp., ECF No. 393, at 9. Finally, the Court agrees with the Government's two arguments as to how the $104.24 million may be considered "proceeds" of the Count Twelve offense. First, the pre-deposit money was, in effect, traded for post-deposit funds that Defendant could access through the financial system which provided him with benefits, protections, and privileges of that system, and that "trade" was induced by fraud. Second, even if the funds are considered the same property, it was only by making material misrepresentations to the banks to open accounts that Mr. Michel was able to take control of the funds, with the bank accounts being the mechanism through which ownership of the funds shifted to Defendant.

In sum, this Court agrees with the Government's conclusion that "[b]ut for Michel's (and Higginbotham's) misrepresentations concerning the source and purpose of the funds received from Low, the financial institutions here would not have permitted Michel to open and maintain

accounts at their banks, and Michel would not have had anywhere to receive, hold, or manage Low's funds, thereby denying Michel ownership and control of the funds or post-deposit accounts." Govt. Supp., ECF No. 393, at 10; *see* Trial Tr. 4/6 A.M. at 16 (Higginbotham testifying that "there was a tremendous amount of money that was flowing from Jho Low to various banks, and there needed to be some justification for that money coming in"), at 114 (discussing the "real purpose" of the letter to City National Bank, as the need to maintain a banking relationship so that the money could continue to come in).

Consequently, the Court finds that $104.24 million that Mr. Michel received from Jho Low and deposited into the accounts constitutes "proceeds" of the Section 1014 conspiracy on which Mr. Michel was convicted at trial. Accordingly, for the reasons set forth in this Memorandum Opinion, the Court grants the Government's Count Twelve forfeiture amount of $104.24 million, less the $39,316,773.63 already forfeited in related proceedings, leaving a personal money judgment against Defendant in the amount of $64,923,226.40. A separate Preliminary Order of Forfeiture Imposing Money Judgment accompanies this Opinion.

COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE